**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

NORTH AMERICAN SOCCER LEAGUE, LLC,

Plaintiff,

v.

UNITED STATES SOCCER FEDERATION, INC.,

Defendant.

Civil Action No. 1:17-cv-5495

**COMPLAINT**

---

Plaintiff North American Soccer League, LLC, by its undersigned attorneys, for its Complaint herein alleges as follows:

## INTRODUCTION

1.  Defendant United States Soccer Federation, Inc. (the "USSF") is the privately organized regional governing body in the United States for Fédération Internationale de Football Association, the private international football federation known as "FIFA." While the USSF, like FIFA, is putatively organized as a non-profit organization, the USSF engages in commercial activities worth many hundreds of millions of dollars and has created a business empire. The USSF is fully subject to the antitrust laws with respect to the commercial activities at issue herein.

2.  This complaint challenges under the antitrust laws contracts, combinations and conspiracies in unreasonable restraint of trade through which the USSF has promulgated various

Divisional regulations which have the purpose and effect of protecting the monopoly position of its commercial business partner, Major League Soccer ("MLS"), in the relevant market for top-tier men's professional soccer leagues located in the U.S. and Canada.  The USSF has declared this top tier market to be "Division I."

3.      Below the top tier of men's professional soccer in the U.S. and Canada, the USSF has also entered into contracts, combinations and conspiracies in restraint of trade which, if not enjoined, will grant a monopoly position in the market for second-tier men's professional soccer leagues located in the U.S. and Canada to the United Soccer League ("USL").  The USL has embraced its "minor league" status below that of MLS and has entered into various commercial arrangements with MLS to serve as its reserve league, with no possibility of USL ever challenging MLS's dominance in the top tier.  The USSF has declared this second-tier market to be "Division II."

4.      By promulgating a changing portfolio of so-called "Professional League Standards" and regulations to protect MLS, and now USL, from competition, the USSF enriches itself and protects MLS as the only top-tier Division I men's professional soccer league located in the U.S. and Canada, immune from competition from new entrants and potential rival leagues even though the USSF is a private organization and has no legal authority to confer immunity from competition to anyone.

5.      Plaintiff North American Soccer League ("NASL") is a men's professional soccer league located in the U.S. and Canada that has sought to compete with MLS as a top-tier professional soccer league, and whose clubs have frequently defeated MLS clubs in periodic matchups.  However, its efforts to compete with MLS in the top tier of professional soccer have been thwarted by the USSF, which has applied its Professional League Standards in an

anticompetitive and discriminatory manner to prevent the NASL from effectively competing with MLS in the top tier.  Indeed, the NASL has been consigned to Division II status by the USSF, which crippled its ability to compete effectively with MLS in the relevant market for top-tier leagues.

6.      Now, in a final effort to eliminate the NASL as a potential competitive rival to MLS once and for all, the USSF has gone even further and used its anticompetitive Professional League Standards—applied in a deliberately output-restricting and discriminatory manner—to deny the NASL even Division II status for the next professional soccer season (commencing in 2018), in favor of bestowing a second-tier professional soccer monopoly upon MLS's favored minor league, the USL.

7.      The NASL brings this action to strike down the USSF's anticompetitive Professional League Standards, which it has adopted as part of a conspiracy with its membership, including MLS, and to permanently enjoin it from adopting or enforcing such rules, which have the purpose and effect of unreasonably restraining competition, restricting output, and maintaining a monopolized market structure.  The rules create anticompetitive barriers to entry that serve no procompetitive objectives and stifle the ability of consumers to decide for themselves which leagues they view as being in the top or second tiers of men's professional soccer in the U.S. and Canada.

8.       The anticompetitive impact of the USSF Professional League Standards are exacerbated by the fact that MLS, unlike other top-tier professional soccer leagues around the world, is restricted in its quality by a "single entity" structure that severely restricts each club's ability to acquire and pay for top-tier players.

9.     The NASL, by contrast, is structured in a manner similar to top-tier men's professional soccer leagues worldwide, with each club owned separately and with control of its own management—a structure that fosters competition among clubs, allows club owners to make the necessary investments to improve their roster, and thereby improves the overall product quality and attractiveness of the league to fans.  The NASL has been outspoken in its desire to compete against MLS in the market for top-tier men's professional soccer leagues located in the U.S. and Canada.

10.     Driven in part by "concern[s] that the new NASL . . . would import players from South America and in essence become the anti-M.L.S. by allowing teams to sign players without worrying about a salary cap or a single-entity setup,"[1] and thereby create a more attractive product for fans, the USSF has conspired with MLS and other USSF members to block the NASL from effectively competing with MLS.  This scheme was originally put into place by saddling the NASL with Division II status, but now the USSF is seeking to deal a death blow to the NASL by denying it even Division II status for next season.

11.     Further, unlike most other soccer federations that belong to FIFA around the world, the USSF has created an artificial hierarchy of closed "Divisions" whose membership is determined not by the free marketplace of consumer demand, or by clubs migrating up or down divisions through a system of promotion and relegation, but rather by a set of anticompetitive rules that serve no purpose other than to act as a barrier to competition and a restriction of output.  No matter how successful a league may be on the soccer pitch, and regardless of the verdict of fans and sponsors, under the Professional League Standards applied by the USSF, a league like the

---

[1] Carlos G. Giron, *Time for Major League Soccer to Allow Its Teams to Sign Players Freely*, Bleacher Report (Jan. 8, 2010), http://bleacherreport.com/articles/322115-time-for-major-league-soccer-to-allow-its-teams-to-sign-players-freely (quotingJack Bell, *U.S.S.F. Announces Deal on New D2 Scheme*, N.Y. Times, Jan. 7, 2010, http://goal.blogs.nytimes.com/2010/01/07/fed-to-announce-deal-on-d2-league).

NASL can only receive the USSF/FIFA-sanctioned designation to compete in Division I against MLS if it can satisfy the anticompetitive Professional League Standards implemented by the USSF.  The application of these Standards each year to protect the MLS monopoly are new overt acts in further of a continuing contract, combination and conspiracy in unreasonable restraint of trade, and have the purpose and effect of maintaining the MLS as a monopoly in the top tier of men's professional soccer leagues located in the U.S. and Canada.

12.     In this case, the NASL seeks two principal forms of relief.  *First*, it seeks a preliminary injunction to preserve the status quo during the pendency of this litigation to prevent the USSF from implementing its decision to revoke the NASL's Division II status, so that it is does not face the immediate prospect of being driven out of existence as a competitor, and can continue to build its league to a level where it can eventually compete with MLS, while it pursues its antitrust rights in this Court.  *Second*, the NASL seeks a declaratory judgment and permanent injunction striking down the USSF's Professional League Standards and other divisional rules as a violation of Sections 1 and 2 of the Sherman Act so that, going forward, competition and consumers, as opposed to the USSF's anticompetitive rules and conspiracy, will determine which professional soccer leagues are able to compete as top-tier men's professional soccer leagues located in the U.S. and Canada and which ones are able to compete in the second tier—the free market situation that exists for all other major professional team sports leagues in the U.S.  Competition, rather than private conspiracies, would then be restored in the relevant markets.

## PARTIES

### Plaintiff

13.     Plaintiff NASL is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York.

14.     The commitment of the NASL teams and owners that will compete in the 2018 season is dependent upon the NASL maintaining at least its Division II status under the existing regime of anticompetitive USSF rules, so that the NASL can maintain its credibility with fans, sponsors, players and broadcasters while it continues to build so that it can eventually compete against MLS in the top tier of men's professional soccer leagues located in the U.S. and Canada.

**Defendant**

15.     Defendant United States Soccer Federation, Inc. is a putative not-for-profit corporation organized under the laws of New York, with its principal place of business in Chicago, Illinois.

16.     The USSF is an organization whose membership includes professional soccer leagues competing horizontally with each other, as well as national associations, state associations, and various individuals involved in soccer in the U.S.  USSF members are separate economic actors from each other with distinct interests.  Many USSF members take part in the USSF's decision-making by voting on proposals before the USSF's National Council.  Certain USSF members also vote on proposals before the USSF's Professional, Adult and Youth Councils.  When these members act together with USFF to enact Professional League Standards, they are entering into contracts, combinations and conspiracies as those terms are defined under the Sherman Act.

17.     The USSF's Professional Council uses an anticompetitive weighted voting system, combining the number of clubs and attendance, with the result that MLS controls 57.1% of the voting power of the USSF Professional Council.  This voting structure has resulted in MLS having the power to control all decisions of the Professional Council.  Among other things, this control has resulted in MLS determining who will be the representatives of the Professional Council on the USSF Board.  It also has resulted in the MLS determining what recommendations the Professional Council has made to the USSF Board regarding the Divisional status of the NASL.

18.     MLS also exercises significant influence over USSF decision-making through the membership of its officers on the USSF's Board of Directors, among other powerful roles at the USSF.  The USSF's Board of Directors includes MLS Commissioner Don Garber and MLS team official Carlos Bocanegra, and until recently included MLS league official Jeff Agoos for a number of years.

19.     The USSF President, who controls the USSF's day-to-day operations and makes many of its important decisions, is former MLS Deputy Commissioner Sunil Gulati.  Gulati for many years was also employed by prominent MLS owner Robert Kraft, and he has worked to have the USFF conspire with MLS in preserving its monopoly position.

20.     Because of its exclusive role as the representative of FIFA for the United States, the USSF has the power to use its Professional League Standards to restrict output and competition for professional soccer leagues in this country.  No professional soccer league located in the U.S. and Canada would have sufficient credibility with fans, sponsors or broadcasters if it were not recognized by the USSF and FIFA, and quality professional soccer players would not play for teams in a league in the United States that was not recognized by the USSF and FIFA.  To compete effectively at all, therefore, the NASL had no choice but to apply for recognition by the USSF.

**Co-Conspirators MLS, SUM and USL**

21.     Co-conspirator MLS is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York.  MLS is a separate economic actor from the USSF, with various economic interests distinct from those of the USSF.  MLS is engaged in the business of operating a men's professional soccer league in the U.S. and Canada that has been granted sole Division I status by the USSF.

22.     Co-conspirator Soccer United Marketing, LLC ("SUM") is a limited liability company organized under the laws of Delaware that is engaged in the business of marketing soccer

properties, with its principal place of business in New York, New York.  Upon information and belief, SUM is controlled by MLS or by the owners of MLS.  SUM has entered into commercial relationships with USSF that are designed to align the economic interests of the USSF to favor MLS and protect its monopoly position.

23.     Co-conspirator United Soccer Leagues, LLC ("USL") is a limited liability company organized under the laws of Florida.  USL is a separate economic actor from the USSF, with various economic interests distinct from those of the USSF.  USL is engaged in the business of operating a men's professional soccer league in the U.S. and Canada.  The USL operates as a feeder league to MLS and currently has been sanctioned by the USSF in Division II.

## JURISDICTION AND VENUE

24.     The NASL brings this action against the USSF under Section 16 of the Clayton Act, 15 U.S.C. § 26, to enjoin continuing Sherman Act violations threatening the business and property of the NASL and its members, and to recover the costs of this action, including reasonable attorneys' fees.  The NASL also brings this action seeking injunctive relief on behalf of its members, pursuant to Rule 65 of the Federal Rules of Civil Procedure and consistent with the governing case law of associational standing.

25.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), Section 2 of the Sherman Act (15 U.S.C. § 2), and Title 28, U.S. Code, Sections 1331 and 1337.

26.     This Court has *in personam* jurisdiction over the USSF in this District because the USSF has: (a) transacted substantial business in the U.S., including in this District; (b) engaged in the antitrust violations alleged in substantial part in this District; (c) organized and held tournament matches in this District, including matches for the Lamar Hunt U.S. Open Cup; (d) arranged and scheduled tournament matches for professional soccer clubs located in this District, including the

8

NASL's New York Cosmos; (e) imposed sanctioning rules governing, and made sanctioning decisions regarding, professional soccer leagues and clubs located in this District, including the NASL and the New York Cosmos; (f) had substantial aggregate contacts with the U.S. as a whole, including in this District; and (g) is engaged in an antitrust conspiracy that is intended to have, and has had, an anticompetitive effect on commerce in this District.

27.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to the NASL's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed above has been carried out in this District, and the USSF does business in, has agents in, is found in or transacts business in this District.     The NASL also has a team, the New York Cosmos, that is located in this District and plays its home games in Coney Island, which is within this District.

## INTERSTATE TRADE, COMMERCE AND CONDUCT

28.     The contracts, combinations and conspiracies of the USSF that are the subject of this Complaint are within the flow of, and substantially affect, interstate and international trade and commerce.

29.     The USSF promulgates, maintains, revises, and grants and denies waivers from its so-called "Professional League Standards"—requirements that professional soccer leagues with clubs in the U.S. and Canada must satisfy for USSF sanctioning in Divisions I, II and III of  men's professional soccer.  The USSF requires such sanctioning for, among other things, the U.S.-based clubs in such leagues to participate in various FIFA-affiliated international competitions, and to indicate to consumers and sponsors which leagues are recognized by the USSF and FIFA as being in the first, second or third tiers of professional soccer.

30.     The USSF's separation of professional soccer leagues into three divisions, and the USSF's promulgation and application of the Professional League Standards for such leagues, affects substantial amounts of interstate trade and commerce, as the sanctioned professional soccer leagues' sale of tickets, sponsorships and broadcast rights collectively generate tens of millions of dollars or more in interstate trade and commerce each year.

31.     The USSF itself regularly organizes, holds, and arranges for professional soccer leagues and clubs to participate in national and international soccer-related competitions and events, which generate tens of millions of dollars or more in interstate commerce each year.

32.     The USSF has entered into commercial agreements with SUM under which its own soccer-related rights and interests are marketed via television and other mass media.  These arrangements also generate substantial revenues in interstate commerce and are impacted by the antitrust violations at issue.

33.     The USSF's aforementioned activities make use of the instrumentalities of interstate commerce, and payments for those activities of the USSF are made by instrumentalities of interstate commerce.

34.     The contracts, combinations and conspiracies at issue entered into by the USSF to restrict output by professional soccer leagues and protect the monopoly positions of MLS and USL substantially affects interstate trade and commerce.

## RELEVANT MARKETS AND MARKET POWER

35.     The relevant product and geographic markets in which the USSF's conduct has unreasonably restrained competition are: (i) the market for men's top-tier professional soccer leagues located in the U.S. and Canada; and (ii) the market for men's second-tier professional soccer leagues located in the U.S. and Canada.

36.     MLS is currently the only competitor sanctioned by the USSF to compete in the relevant market for top-tier men's professional soccer leagues located in the U.S. and Canada, which the USSF has designated as Division I.  The NASL has attempted to compete with MLS in this top-tier market, but has been denied Division I certification by the USSF in order to shield the MLS monopoly. As a result, MLS Commissioner Don Garber claims that MLS has "never competed in any market [with] the NASL."[2]  And MLS has been granted monopoly power by USSF in this relevant market.

37.     Under the USSF's anticompetitive Professional League Standards, the NASL was consigned to Division II status for the 2011 through 2017 seasons and left to compete in the market for second-tier men's professional soccer leagues.  The other competitor in the relevant market for second-tier men's professional soccer leagues located in the U.S. and Canada has recently been the USL, which was also granted Division II status in 2017.  While the NASL has remained committed to eventually competing against MLS in the market for top-tier men's professional soccer leagues, the USL has indicated that it is content to be a participant in the second-tier market and support MLS as a feeder minor league.

38.     The customers in the markets for top-tier and second-tier professional soccer leagues located in the U.S. and Canada are fans who purchase tickets or licensed merchandise of the leagues, sponsors who purchase the reputational, promotional and other benefits of association with the leagues and their clubs, and broadcasters who obtain the rights to distribute games.

39.     Men's top-tier and second-tier professional soccer leagues located in the U.S. and Canada have attributes that distinguish them in the eyes of consumers from other professional

---

[2] Jeff Carlisle, *Don Garber Backs Lower Divisions But Says MLS Not to Blame for NASL Peril*, ESPN FC (Dec. 8, 2016), http://www.espnfc.com/major-league-soccer/story/3014831/don-garber-says-he-supports-lower-divisions-mls-not-to-blame-for-nasl-troubles.

sports performed in the U.S. and Canada.  Such other professional sports have different rules of play and competitive attributes that are not reasonably interchangeable with men's top-tier and second-tier professional soccer leagues located in the U.S. and Canada, and do not serve as close substitutes for each other.  Fans, sponsors and broadcasters of top-tier and second-tier men's professional soccer leagues located in the U.S. and Canada do not view other professional sports as close substitutes, and there is no cross-elasticity of demand between prices for men's top-tier and second-tier professional soccer leagues located in the U.S. and Canada, and the prices for other professional sports leagues in those countries, such as the National Hockey League, the National Football League, Major League Baseball and the National Basketball Association.

40.    Top-tier professional soccer leagues located in the U.S. and Canada are also distinct from, and not close substitutes with, second-tier professional soccer leagues located in the U.S. and Canada, because fans, sponsors and broadcasters draw a distinction between top-tier "major league" matches and second-tier "minor league" matches.  The USSF perpetuates and reinforces this distinction with its Division I and Division II designations.  The USSF also uses a Division III designation to distinguish an even lower, developmental-level of men's professional soccer league competition in the U.S. and Canada.

41.    Top-tier professional soccer leagues located in the U.S. and Canada attract considerable sponsorship from nationwide businesses, while sponsorship for second-tier professional soccer leagues tends to be less valuable and more local.  Top-tier professional soccer leagues receiving a Division I designation from USSF are also granted significant advantages by the USSF in qualifying for FIFA-sanctioned competitions, which are important to generating fan interest and support.

42.     Second-tier professional soccer leagues located in the U.S. and Canada are also distinct from even lower-tier professional soccer leagues in Division III, and not a substitute for them, because fans and sponsors regard even lower-tier leagues as intrinsically "developmental" leagues.  Lower-tier matches are perceived as being less compelling as exhibitions of soccer skill, and are regarded by fans as more casual entertainment for residents of the immediate area surrounding a lower-tier club.  Fans and sponsors of second-tier professional soccer leagues located in the U.S. and Canada do not view lower-tier leagues as an interchangeable product or substitute.  The distinction between second-tier and lower-tier professional soccer leagues is demonstrated, for example, by the fact that the current teams comprising the NASL, and those seeking to join the league next season, would not want to continue with the NASL if the league does not at least maintain its Division II status under the current anticompetitive USSF Divisional structure.

43.     Amateur soccer leagues, such as the Premier Development League, are also distinct from, and are not a substitute for, top-tier and second-tier men's professional soccer leagues because the level of competition is much lower, most players are not compensated, and such amateur leagues are not heavily marketed to fans and sponsors.

44.     Women's professional soccer leagues located in the U.S. and Canada are also not in the same relevant market as men's top-tier and second-tier professional soccer leagues located in the U.S. and Canada, because most of the fans of men's top-tier and second-tier men's professional soccer leagues located in the U.S. and Canada do not consider the National Women's Soccer League or any other women's soccer league to be interchangeable with or a substitute for top-tier or second-tier men's professional soccer leagues.  There is no cross-elasticity of demand

between prices for top-tier or second-tier men's professional soccer leagues located in the U.S. and Canada, and prices for women's professional soccer leagues located in the U.S. and Canada.

45.     Periodic international competitions among national soccer teams or clubs, such as the World Cup, the Olympics or the CONCACAF Gold Cup, do not serve as a close substitute for top-tier and second-tier men's professional soccer leagues located in the U.S. and Canada.  Such periodic international competitions are distinct from, and are not a substitute for, top-tier and second-tier men's professional soccer leagues located in the U.S. and Canada because: (i) they do not involve a regular playing season of sustained competition; (ii) they are far less frequent in any given geographic locale in the U.S. and Canada, as such competitions typically occur on a worldwide or regional basis; (iii) they cannot readily be attended by most fans in the U.S. and Canada; (iv) they lack key aspects of professional soccer leagues such as trades of players between clubs, a specific stadium for each club, a playoff system to crown a league champion, and the option of forming new clubs and disbanding or relocating existing clubs; (v) there is no cross-elasticity of demand between such international and regional competitions and top-tier or second-tier men's professional soccer leagues located in the U.S. and Canada; and (vi) fans in the U.S. and Canada of top-tier and second-tier men's professional soccer leagues wish to attend regular matches in the U.S. and Canada and develop loyalties to their local teams, which is not the same as U.S. and Canadian fans of international soccer competitions, who rarely can attend such events live near their homes.

46.     The relevant geographic market for both the top and second tiers of men's professional soccer leagues encompasses the U.S. and Canada because they form a single contiguous landmass that is largely united by a common first language, which supports top-tier and second-tier professional soccer leagues with clubs from both countries.  This geographic

integration across the U.S. and Canada is also demonstrated by the fact that other men's professional sports leagues such as Major League Baseball, the National Basketball Association, and the National Hockey League all have teams and regularly play matches in both the U.S. and Canada.

47.     By contrast, although Mexico is located on the other U.S. border, it has generally developed its own separate professional soccer leagues with their own separate clubs, which have developed their own distinct sets of fans.

48.     The relevant markets do not include professional soccer leagues that are located outside the U.S. and Canada, because such leagues are distant and thus do not permit the regular attendance of U.S. and Canadian fans, or the purchase of local sponsorships for the performance of games in the U.S. and Canada, among other factors.  Moreover, fans of top-tier and second-tier men's professional soccer leagues located in the U.S. and Canada have a geographic affinity for clubs identified by name and physical location with the cities or other geographic areas in the United States or Canada in which they are based (*e.g.*, New England Revolution in MLS, New York Cosmos in the NASL).

49.     As a result of such fan preferences and geographic affinities, MLS, the NASL and USL have clubs only in the U.S., U.S. territories and Canada, and are the only current actual or potential competitors in the top tier or second tier of men's professional soccer leagues located in the U.S. and Canada.

50.     Although the NASL has sought to compete with MLS in the market for top-tier men's professional soccer leagues located in the U.S. and Canada, MLS currently has monopoly power over this market that has been bestowed by the USSF and its anticompetitive Professional League Standards.  This monopoly power is a product of the unlawful and anticompetitive

advantages that the USSF has conferred on MLS by designating it as the only FIFA-sanctioned Division I men's professional soccer league located in the U.S. and Canada.

51.     During 2017, the NASL and the USL have both been Division II leagues competing in the relevant market for second-tier men's professional soccer leagues located in the U.S. and Canada.  The NASL also has continued to seek to compete against MLS in the top-tier professional soccer league market, but has been denied the opportunity to do so by USSF.

52.     On September 3, 2017, the USSF decided to take the final step to end the competitive threat to MLS presented by the NASL and rejected its application for continued Division II status in 2018.  As a result, absent preliminary injunctive relief, the NASL will be deprived of its ability to compete in even the second tier of professional soccer and, most likely, will be destroyed altogether.  If this status quo is shattered and the USL is permitted to become the sole Division II league in 2018, USL will then enjoy monopoly status in the market for second-tier men's professional soccer leagues located in the U.S. and Canada.

53.     As FIFA's exclusive representative for the U.S., the USSF has asserted the sole authority to determine which U.S.-based professional leagues, clubs and players will compete in FIFA-affiliated competitions such as the CONCACAF Champions League and the Lamar Hunt U.S. Open Cup.  Due to the enormous significance accorded by soccer fans to FIFA-affiliated competitions, and FIFA recognition, it is impossible for a U.S.-based top-tier or second-tier men's professional soccer league to compete effectively in the relevant markets without the applicable level of USSF recognition and the ability to participate in such FIFA competitions.

54.     The USSF has granted MLS monopoly power in the relevant market for top-tier men's professional soccer leagues located in the U.S. and Canada by designating MLS as the sole Division I men's professional soccer league, and has sought to insulate MLS from any future

competition, and to restrict output in this relevant market, by denying the NASL even Division II status, knowing that this denial will likely lead to the end of the NASL.

55.     The USSF has also sought to grant monopoly power to the USL in the second-tier relevant market by taking steps to designate it as the only Division II league in 2018.

56.     These contracts, combinations and conspiracies by the USSF and its members, including with MLS, have created a barrier blocking any other men's professional soccer league, such as the NASL, from competing on a fair and even playing field against MLS, with the specific intent of enabling MLS to maintain its monopoly power through these overt acts in furtherance of the continuing conspiracy to unreasonably restrain trade and monopolize the relevant market for top-tier men's professional soccer leagues located in the U.S. and Canada.

## FACTS RELEVANT TO PLAINTIFF'S CLAIMS

### The USSF and Professional Soccer in the U.S.

57.     FIFA is a private international body that has assumed the role of organizing men's and women's soccer on a global basis.  Its rules and regulations are privately derived and formulated, and do not have any governmental source of authority over professional soccer in the U.S.  Among its many roles, FIFA administers the men's World Cup tournament every four years, which is one of the most popular sporting events in the world.

58.     Various national governing bodies, known as "associations" or "federations," are recognized by FIFA.  These private governing bodies are assigned by FIFA the role of determining the FIFA-sanctioned soccer leagues in individual countries.  Top players generally only compete in FIFA-sanctioned leagues, since the players otherwise are ineligible to compete on their respective national teams.  Without a FIFA sanction, a soccer league is not viewed as credible by professional soccer fans, sponsors, players, broadcasters or investors.

59.     The USSF is FIFA's sole licensed federation for the U.S.[3]  The USSF is also a member of the Confederation of North, Central America and Caribbean Association Football ("CONCACAF"), the private governing association for FIFA for these geographic regions.

60.     As set forth above, the USSF is responsible for determining which soccer leagues in the U.S. it sanctions under the FIFA umbrella.  FIFA does not indicate that leagues must or should be assigned to closed "divisions."

61.     In contrast to most of the rest of the world, the USSF requires professional leagues seeking FIFA sanctioning to qualify for and be assigned to separate, tiered divisions—specifically, Division I, Division II or Division III, with leagues in each Division in a closed system regulated by USSF.

62.     Because the USSF has created three separate Divisions, fans, sponsors, players and broadcasters have come to regard the USSF's three Divisions as a competitive hierarchy with three distinct tiers.  Specifically, Division I is regarded as the top tier and Division II as the second tier of men's professional soccer in the U.S. and Canada, with Division III viewed as a developmental league level.

63.     The USSF's separation of professional soccer leagues into three divisions has precluded leagues not granted the Division I designation from competing in the top tier of professional soccer.  As former USSF president and MLS chairman Alan Rothenberg testified, a Division I designation by the USSF is "something that could give [leagues] some benefit" in

---

[3] Separately, the USSF also has been designated under federal law as the national governing body for U.S. Olympic and amateur soccer, but not professional soccer.  *See* 36 U.S.C. § 220501, *et seq.*  This designation does not give the USSF any standing, right or authority to regulate professional soccer leagues, which it has assumed solely as a result of its private association with FIFA.

attracting fans, sponsors, broadcasters, players and investors.[4]  Similarly, when USSF President

Gulati was asked if Division I status was "important," he testified, "[i]t can be in certain areas."[5]

These were understatements.  The selection of MLS as the sole Division I league by USSF did not

just give it "some benefit" in "certain areas"—it enables MLS to acquire and maintain monopoly

power in the relevant market for top-tier men's professional soccer leagues located in the U.S. and

Canada.

64.     The USSF's system for applying its Professional League Standards to separate

professional soccer leagues into different Divisions differs markedly from most other FIFA

federations.  The USSF's closed system is designed to exclude any potential competitors of MLS

from competing in the Division I top tier.

65.      Further, the recent actions by the USSF aimed at granting a monopoly over the

Division II second tier to the USL, a league that has no aspiration to compete with MLS, are an

additional effort to protect MLS from any future competition from the NASL.  There are no

procompetitive objectives or effects of the USSF Professional League Standards, which are

designed and applied to restrain, rather than enhance, competition and output.

66.     By contrast, the classification of professional soccer leagues by FIFA federations

outside of the U.S. are generally premised on club-centric competitive systems of "promotion and

relegation" that are inconsistent with the USSF's anticompetitive model, as well as the "single-

entity" business model of the USSF's co-conspirator MLS.

67.     For example, under the system of promotion and relegation in the English Premier

League, which is typical of  the structures implemented by most other FIFA federations, the bottom

---

[4] *See* Trial Tr. 3653:23-24, Oct. 31, 2000, *Fraser v. Major League Soccer, L.L.C.*, No. 1:97-cv-10342 (D. Mass.).

[5] *See* Trial Tr. 102:20-103:3, Oct. 4, 2000, *Fraser*, No. 1:97-cv-10342 (D. Mass.).

three clubs in the league each year are automatically "relegated" to the second-tier English Football League, and the top two clubs in the English Football League, plus the winner of a playoff series between the clubs ranked third through sixth, rise up to take their places (and their shares) in the top-tier Premier League. This competitive promotion and relegation system operates in accordance with rules promulgated by the Football Association, which is FIFA's regional federation in England. The promotion and relegation systems of other top European leagues such as La Liga in Spain, Serie A in Italy and the Bundesliga in Germany operate similarly to the Premier League. Under these systems, there is a competitive market for professional clubs, which can advance by competitive merit to the top tier of men's professional soccer.

68. No such club-based competitive system exists for top-tier professional soccer leagues located in the U.S. and Canada because the USSF has instead mandated its anticompetitive closed system of Professional League Standards. In order to protect the monopoly status of MLS, the USSF has refused to provide for promotion and relegation under its rules. Indeed, the USSF's rules prevent any such competitive promotion of clubs into "higher" divisions, because any club that failed to satisfy the anticompetitive Professional League Standards applicable to its new division would disqualify the entire league from that division.

69. The fact that the USSF effectively precludes promotion and relegation is at odds with FIFA's regulations, which specifically support such a competitive system—even providing that a club's entitlement to take part in a domestic league championship should depend principally on sporting merit.[6] Instead, in order to protect MLS from effective competition, the USSF has conspired to adopt and continuously implement a system under which it divides men's professional

---

[6] *See* FIFA Regulations Governing the Application of the Statutes, art. 9(1).

leagues into wholly separate and closed Divisions, based on anticompetitive Professional League

Standards that are discriminatorily applied and serve no procompetitive purpose.

**The USSF  Has Applied Its Anticompetiive Professional League Standards to Protect MLS**
**as the Sole Division I Professional Soccer League Located in the U.S.**

70.     The first top-tier men's professional soccer league in the U.S. was launched in 1968

under the "NASL" name.  Despite being a new league in a country relatively unfamiliar with

soccer, the NASL grew quickly, as the barriers to entry and advancement currently posed by the

USSF's anticompetitive hierarchy of Divisions I to III and the USSF's anticompetitive

Professional League Standards did not exist at that time.  By 1980, there were 24 clubs in the

NASL, playing 32 matches a season, with an average per-game attendance of 14,440.  However,

the combination of a weak U.S. economy and overly rapid league expansion in the early 1980s led

to the demise of the former NASL in 1985.

71.     Subsequently, the USSF requested FIFA to grant it the right to host the 1994 World

Cup in the U.S.  In 1988, FIFA agreed to do so, but only on the condition that top-tier men's

professional soccer return to the U.S. at that time.  The USSF decided that it would use this

opportunity to grant a monopoly over men's Division I soccer to MLS—a league created and

chaired by USSF President Alan Rothenberg.

72.     As the First Circuit has stated, the "USSF decided as early as 1988 to sanction only

one Division I professional league." *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 53 (1st

Cir. 2002).  Rothenberg's testimony confirmed this fact:

> Q. . . . [Y]our plan said you didn't anticipate there'd be any other
> significant domestic league to compete for player services, right?
>
> A.  That's right. . . .
>
> Q. . . . **[Y]ou asked USSF to only sanction one Division I league,**
> **right?**

> **A. No, that was the plan of the USSF all along. That was in their rules** . . . .[7]

73.     The USSF's admitted "plan" to sanction only one Division I soccer league in the U.S. purportedly grew out of its "concern [] that sanctioning rival leagues would dilute revenues, drive up costs, and thereby dim the long-term prospects for Division I soccer in the U.S." *Id*. In reality, the plan was designed to confer monopoly benefits on MLS, shielded from competition, in which the USSF would also share. Beneath MLS would be a clearly defined hierarchy of lower-tier "minor leagues" that would not pose any competitive threat to MLS's monopoly status in Division I, but instead would develop professional soccer players who were not ready for the "major league" MLS and thus help create a broader talent pool for MLS to draw on.

74.     For the designation as the sole Division I professional soccer league in the U.S., in 1993, the USSF hand-picked "Major League Professional Soccer ('MLPS'), the precursor to MLS, headed by the USSF's own president, Alan Rothenberg." *Id*. MLS played its first season in 1996, and opened up Division I play with 10 clubs: the Colorado Rapids, the Columbus Crew, D.C. United, the Dallas Burn, the Kansas City Wiz, the Los Angeles Galaxy, the New England Revolution, the New York/New Jersey MetroStars, the San Jose Clash and the Tampa Bay Mutiny.

75.     Rather than permit its clubs to make individual investment decisions to improve the quality of play by investing in the best players, MLS implemented a "single-entity" league structure in which MLS owned and closely controlled many of the operations of the clubs themselves, including the selection and allocation of players. As the First Circuit stated in 2002:

> MLS owns all of the teams that play in the league . . . , as well as all intellectual property rights, tickets, supplied equipment, and broadcast rights. MLS sets the teams' schedules; negotiates all stadium leases and assumes all related liabilities; pays the salaries of referees and other league personnel; and supplies certain

---

[7] Trial Tr. 3652:10-20, Oct. 31, 2000, *Fraser*, No. 1:97-cv-10342 (D. Mass.) (emphasis added).

> equipment. . . . MLS has the "sole responsibility for negotiating and entering into agreements with, and for compensating, Players." **In a nutshell, MLS recruits the players, negotiates their salaries, pays them from league funds, and, to a large extent, determines where each of them will play.** For example, to balance talent among teams, it decides, with the non-binding input of team operators, where certain of the league's "marquee" players will play.

*Id.* (emphasis added). This structure was unlike the way professional soccer leagues were organized in the rest of the world, where clubs are separately owned and managed on an entrepreneurial basis, with individual club owners having control over club decision-making on player rosters, sponsors and the like.

76.    Each year since 1995, the USSF has applied its anticompetitive Professional League Standards to shield MLS from competition in Division I. The result has been dramatic growth in the value of MLS franchises, which are now worth more than $100 million each. Today, MLS is composed of 22 clubs, each of whom, after the original members, had to pay a substantial fee to MLS to gain entry to the league: Atlanta United FC, the Chicago Fire, the Colorado Rapids, the Columbus Crew, D.C. United, FC Dallas, the Houston Dynamo, the L.A. Galaxy, Minnesota United FC, the Montreal Impact, the New England Revolution, New York City FC, the New York Red Bulls, Orlando City SC, the Philadelphia Union, the Portland Timbers, Real Salt Lake, the San Jose Earthquakes, Seattle Sounders FC, Sporting Kansas City, Toronto FC, and Vancouver Whitecaps FC.

## The Modern NASL and USSF's Anticompetitive Application of Its Professional League Standards and Sanctioning Determinations

77.    The new NASL was founded in 2009 when several USL clubs acquired the NASL name and broke apart from the USL due to frustrations with USL's entrenched minor-league status and mindset and its lack of competitive improvement, as well as a desire to control the destiny of a new league and in time have that league compete at the top tier of men's professional soccer in

the U.S. and Canada against MLS, the only league sanctioned by the USSF as being in Division I. Unlike MLS, the NASL was structured as a club-centric league with individually owned clubs, most commercial rights held at the club level, and player acquisition and investment decisions generally left to club owners.

78.     Following the 2010 season in which clubs from the NASL and the USL competed together in a temporary USSF Division II Professional Soccer League, the USSF provisionally recognized the NASL as a Division II men's professional soccer league.

79.     After overcoming various initial sanctioning hurdles imposed by the USSF, the NASL successfully conducted its first season in 2011 as a USSF-sanctioned Division II league with eight clubs:  the Atlanta Silverbacks, the Carolina RailHawks, FC Edmonton, the Fort Lauderdale Strikers, the NSC Minnesota Stars, the Montreal Impact, the Puerto Rico Islanders and the Tampa Bay Rowdies.  The USSF formally designated the NASL as a Division II professional league member in 2012.

80.     The fact that the NASL was consigned to Division II under the USSF's artificial divisional structure, rather than Division I, came with a number of handicaps that made it impossible for the NASL to compete effectively with MLS.  The NASL's exclusion from Division I status, due to the anticompetitive application of the Professional League Standards, has caused and continues to cause severe harm to the perceptions of the league and its clubs among fans, potential owners and investors, players, sponsors and broadcast networks.

81.     Further competitive injuries to the NASL and its clubs have been, and continue to be, inflicted as a result of other negative consequences the USSF has attached to non-Division I status: (i) non-eligibility for three of the four slots in the CONCACAF Champions League, a FIFA-affiliated tournament among the top soccer clubs in North America; (ii) fewer rounds of "byes" in

the Lamar Hunt U.S. Open Cup tournament, a USSF-run tournament in which MLS, NASL, USL and other clubs compete, the winner of which receives the U.S.'s fourth slot in the CONCACAF Champions League; (iii) being assigned lower-quality referees by the Professional Referee Organization ("PRO"), jointly run by the USSF and MLS; and (iv) being subject to a lower limit on the foreign players that each club may include on its roster, compared to Division I leagues (i.e., MLS).

82.     Despite these handicaps, the NASL began to steadily improve in economic strength and competitiveness as a Division II League.  This was a testament to the effectiveness and fan appeal of its club-centric league model and the greater degree of competition among clubs that it unleashes.  The NASL's club membership grew regularly after its formation.  Ten clubs competed in the NASL in 2014, eleven in 2015, and twelve in 2016.

83.     The NASL's attendance had, at that point, also grown rapidly since its inception— from 3,810 to 5,909 per regular-season game in 2015.  NASL clubs had also had competitive success on the pitch in competitions against MLS clubs, winning 42% of their matches against MLS clubs during Lamar Hunt U.S. Open Cup competitions.  And many NASL players had competed for national squads in the FIFA World Cup and its qualifiers.  On the strength of this rapid growth and success, the NASL submitted a formal application for Division I status on May 31, 2015.  In its application, the NASL pointed out that it met any and all Professional League Standards for Division I status, other than a few that were clearly anticompetitive and in violation of the antitrust laws—such as the time zone and stadium capacity requirements—which had no conceivable procompetitive rationale and only served as a barrier to competition against MLS. The NASL thus asked for a waiver of these anticompetitive restrictions.

84.     At this point, the anticompetitive conspiracy to maintain the MLS monopoly came fully into play, as the USSF made sure to apply its Professional League Standards in a manner that would protect MLS from any competition and damage the NASL's ability to compete. Specifically, the USSF brought the NASL's successful growth to a jarring halt when, instead of granting the NASL's application for Division I status with the few needed waivers, the USSF sat on the NASL's application without a decision for over nine months, during which time the USSF proposed new and even more anticompetitive and restrictive Professional League Standards—even though the USSF had just revised and stiffened the Standards the prior year. The purpose of these proposed changes was to make sure that the NASL could not obtain Division I status and to ensure that the monopoly of MLS would be maintained. While ultimately those changes were not implemented under the threat of an antitrust challenge, the USSF nonetheless carried out its plan to apply its Professional League Standards in an anticompetitive manner to protect MLS by denying the NASL's application to enter Division I on March 10, 2016.

85.     The USSF based its denial of Division I status to NASL on the arbitrary and anticompetitive requirements of its Professional League Standards that all Division I teams' stadia have at least 15,000 seats—even though the English Premier League would not satisfy this standard—and that any Division I league have U.S. teams (i.e., not Canadian teams) in three different time zones, another anticompetitive requirement that top-tier European leagues that are based in individual countries would not satisfy. The USSF refused to grant the NASL waivers from these two requirements, even though it had granted comparable waivers from various portions of the Professional League Standards to MLS repeatedly over the years.

86.     The USSF's long delay in considering the NASL's Division I application, its proposal of even more anticompetitive and restrictive Professional League Standards to stifle any

new entry into Division I , and its eventual denial of the NASL's application for Division I status blunted the NASL's upward momentum and made clear that Division I status was not going to be granted.  An exodus of NASL clubs took place over the following year.  The USSF's actions against the NASL application, and its proposal of even more onerous Division I Standards, made it clear that the USSF had no intention of ever allowing the NASL to compete effectively against MLS in the top tier of men's professional soccer leagues located in the U.S. and Canada, and that the USSF would use its anticompetitive Professional League Standards as a barrier to competition against MLS that would restrict output and prevent the NASL from challenging the MLS monopoly.

87.     The clubs that left the NASL after its application for Division I status was rejected by the USSF were the Fort Lauderdale Strikers, Minnesota United FC, Ottawa Fury FC, Rayo OKC, the San Antonio Scorpions, and the Tampa Bay Rowdies.  This set of departures had nothing to do with the quality of the product offered by the NASL.  The high quality of the clubs in the NASL was illustrated by the fact that Minnesota United FC (and, previously, the Montreal Impact) were able to join MLS when they left the NASL, proving that they were Division I-quality clubs.

88.     By the time the NASL was able to apply for re-sanctioning as a Division II league for the 2017 season, the NASL had already suffered considerable damage as a result of the USSF's anticompetitive actions.  The USSF then seized on this opportunity to embark upon a final scheme to use its anticompetitive Professional League Standards to end the competitive threat posed by the NASL to MLS once and for all.

89.     Specifically, the USSF began to apply its Professional League Standards in a discriminatory manner with the intent to replace the NASL in Division II with USL—an MLS

reserve league, which had embraced its "minor league" status and had no intention of challenging MLS's monopoly status in Division I.

90.     Unlike the NASL, USL had publicly stated that it was content to have a long-term status as a Division II league in a role secondary and subordinate to MLS. For example, the USL's President made the following comments in an article from 2014:

> Whatever stigma may come from USL Pro literally becoming a feeder league doesn't seem to be a problem in [USL President Tim] Holt's eyes.
>
> **"There's no aspect of our business plan that had us competing with Major League Soccer or trying to become their rival," said Holt, a statement that is quite different than what his NASL counterpart has said. "There's one major league of professional soccer in North American and it's MLS**.
>
> "Our goal hasn't changed. We wanted to be the strongest, best operated league **in support of Major League Soccer** in the United States. That's what drives us.[8]

91.     In order to effectuate this part of its anticompetitive scheme, the USSF employed a strategy of selectively granting and denying waivers to its Professional League Standards. Specifically, on or about January 6, 2017, the USSF refused to grant the NASL the three waivers necessary for it to have full Division II sanctioning for the 2017 season and instead granted it only provisional Division II sanctioning, asserting that the NASL did not meet "all the standards set forth by U.S. Soccer"—even though the USSF previously had granted the NASL and even MLS full sanctioning notwithstanding their need for similar waivers.

92.     At the same time, the USSF took the opposite approach with USL, which had been in Division III, and suddenly granted USL provisional Division II sanctioning for the 2017

---

[8] Jeremiah Oshan, *MLS's Partnership Gives USL Pro a Path to Bright Future*, SB Nation (Mar. 11, 2014), https://www.sbnation.com/soccer/2014/3/11/5476982/major-league-soccer-usl-partnership-galaxy-ii (emphases added).

season—even though, as of 2017, the USL had at least eight clubs whose stadia had too few seats to satisfy the Professional League Standards' minimum seating requirement, and thus was granted waivers.

93.     Then, on September 3, 2017, the anticompetitive scheme to destroy the NASL and shield the MLS from future competition in Division I came into full effect.  When the NASL re-applied for Division II status for 2018, the USSF denied its application outright and refused to grant the NASL the two waivers it requested to meet all of the Division II Standards—an action that, if not enjoined, threatens to be a fatal blow to the NASL and its aspirations to compete on the same level with MLS.

94.     In stark contrast, the USSF responded to USL's re-application for Division II status for 2018 with exactly the opposite approach—by giving USL a month to provide a "plan for bringing its teams into compliance" with the Division II Standards and, upon information and belief, by provisionally granting USL approximately twenty waivers so that it can become the only Division II league.  This set of events only served to illustrate that the USSF's Professional League Standards are designed for one purpose—to protect the MLS monopoly and restrict competition and output, for the economic benefit of both the USSF and MLS.

**The Economic Ties Between the USSF and MLS**

95.     The USSF and MLS's shared plan for a hierarchy of anticompetitive professional soccer league standards, designed to provide MLS with a monopoly as the sole Division I league, dates back to the original plan of the USSF and its then-President Alan Rothenberg in the early 1990s to "only sanction one Division I league."

96.     The idea of forming MLS and submitting it to become the sole Division I league arose in a series of meetings between Rothenberg; Mark Abbott, his colleague at the firm of

Latham & Watkins; and Sunil Gulati, an economist and businessman who is now and has long served as the head of the USSF.

97.     As Gulati explained:

> When Alan [Rothenberg] was elected [USSF president], we started a committee to look at the development of a professional league. . . . **What really started formally the process of MLS was two, three, four of us who were [on the] World Cup [organizing committee] started talking about putting a league together and what it would take to do that.** . . . We really wanted to get a document put together, a business plan, and we needed somebody on board to do that.  I said to Alan, do you have another young, smart Latham . . . attorney to join us.[9]

Rothenberg tasked Abbott with developing MLS's business plan.

98.     To no one's surprise, USSF President Rothenberg prevailed in his bid for his own league, MLS, to receive the USSF's sole Division I sanction.  In fact, media reports noted that MLS's bid received direct support from the USSF:

> **[F]ollowing a vote by the Rothenberg-dominated U.S. Soccer Federation, a nonprofit organization, more than $6 million of the World Cup earnings could soon be set aside for something called Major League Professional Soccer, Inc., a nascent and very much for-profit league controlled (and partially owned) by, yes, Alan Rothenberg**. . . . Rothenberg, reports the Los Angeles Times, used $500,000 of World Cup USA '94 money to promote his own bid to win the right to form a professional league.  Since Rothenberg was also president of the U.S. Soccer Federation—the organization charged with deciding who would be given the league—it was hardly a surprise that Rothenberg's lavishly funded proposal won. . . . **A member of the federation, speaking on condition of anonymity, estimated that World Cup USA '94 has already paid Rothenberg's league as much as $2 million**.[10]

---

[9] Beau Dure, *Long Range Goals: The Success Story of Major League Soccer* 3 (2010) (emphasis added).

[10] Michael Agovino & Alex Williams, *Why This Month's World Cup Is More American Than You Think*, N.Y. Mag., June 20, 1994, at 69 (emphases added).

99.     Subsequently, USSF CEO Daniel Flynn testified that the USSF provided a $5 million "loan" to MLS to support its initial formation as the sole Division I sanctioned league. The USSF then permitted MLS to repay that "loan" by providing marketing support to the USSF over the next several years.[11]

100.    Following the formation of MLS, Sunil Gulati was appointed deputy commissioner of MLS from 1995 to 1999.  Gulati was Rothenberg's "right-hand man, [who] decide[d] where [MLS's] stars will play" as part of the league's asserted single-entity structure.[12]

101.    Gulati left his position as MLS deputy commissioner in 1999, but, until at least 2012, worked successively as Managing Director, President and Special Advisor for the Kraft Sports Group—an organization that owns and manages MLS-related holdings, including the New England MLS team.  Gulati was elected president of the USSF in 2006 and has served in that role since then.

102.    As for Rothenberg's former associate Mark Abbott, he became MLS's chief operating officer in 1997 and its president in 2006, a role he continues in today.  Abbott also occupies Gulati's former position as the MLS Deputy Commissioner.

103.    The economic motivation for the USSF to use its Professional League Standards to maintain the MLS Division I monopoly, in concert with MLS, is evident from the series of commercial arrangements that the USSF entered into with MLS under which the USSF profits (notwithstanding its putative non-profit status) from the monopoly status it maintains for MLS. Most prominently, the USSF's commercial rights have been pooled together and sold jointly with

---

[11] Flynn Tr. 24:7-30:4, Oct. 28, 2010, *Championsworld LLC v. USSF, Inc.*, No. 12-3219, ECF No. 26-18 (7th Cir. Oct. 24, 2012).

[12] David Kiefer, *Does Rothenberg Add Clout or Confusion to Clash?*, Santa Cruz Sentinel, Aug. 11, 1998, § B1.

the commercial rights of MLS in "Soccer United Marketing" ("SUM"), a marketing company that, upon information and belief, is owned and controlled by MLS or its owners.

104.   Acting in concert with the USSF, MLS has sought through SUM to control as many of the commercial rights relating to top-tier men's soccer leagues located in the U.S. and Canada as possible, and thereby ensure that the fruits of any efforts to promote top-tier men's soccer in the U.S. and Canada jointly flow to MLS and SUM's stakeholders.  Their objective to concentrate the revenues from top-tier men's soccer in the United States in a single company is aptly summarized by SUM's slogan: "One Sport.  One Company."

105.   The USSF has received, and will continue to receive, a significant economic benefit from its agreement to pool its commercial rights in MLS's SUM, as demonstrated by the USSF's Audited Financial Statements:

> The Federation recognizes revenue earned under this agreement net based on amounts received from SUM.   Most sponsorship, television, licensing and royalty revenues (excluding Nike) are paid to SUM.  **Revenue under the agreement totaled $18,305,172 and $15,433,754 for the years ended March 31, 2015 and 2014, respectively.    This includes $5,462,068 and $6,683,750 of revenue sharing for the respective fiscal years**.[13]

This direct economic link between the USSF and MLS creates a powerful economic incentive for the USSF to protect MLS's monopoly position as the sole men's top-tier Division I league located in the U.S. and Canada.

106.   On May 12, 2014, MLS publicly announced that it and the USSF had reached an eight-year, $720 million broadcasting agreement with ESPN, Fox Sports, and Univision in exchange for the networks' right to telecast both MLS matches and U.S. Men's and Women's

---

[13] USSF, Inc. Financial Statements, Years Ended March 31, 2015 and 2014, *available at* http://www.ussoccer.com/about/federation-services/resource-center/financial-information.

National Team competitions through the end of 2022.  Under this broadcast deal, the USSF and MLS together would receive $90 million each year.  The networks also would be obligated to provide substantial marketing and promotional support to the USSF and MLS under the new deal.[14]

107.   MLS Commissioner, SUM CEO, and USSF board member Don Garber emphasized the cooperative business relationship between the USSF and MLS in obtaining its latest broadcast deal:  "This is the most comprehensive media rights partnership in the history of soccer in our country . . . It's a statement about where the soccer market is and where Major League Soccer and U.S. Soccer fit into the paradigm."[15]

108.   Gary Stevenson, President and Managing Director of MLS Business Ventures, echoed Commissioner Garber's sentiments about the close economic partnership between MLS and the USSF:  "We went out with a very simple deck to tell everyone, 'Here's what we're building.'  I don't think there's a closer relationship between a league and its national team than we have with U.S. Soccer."[16]

109.   Following Gulati's election as USSF president in 2006, Garber worked to advance MLS's interests with Gulati and FIFA official Charles Blazer, who were close friends dating back several decades to when both were involved in amateur soccer.  As Gulati remarked in one article describing how Garber and Blazer together secured a joint television rights agreement for the

---

[14] *See* John Ourand & Christopher Botta, *MLS's Big Play*, Sports Bus. J., May 12, 2014, http://www.sportsbusinessdaily.com/Journal/Issues/2014/05/12/Media/MLS-TV.aspx; *MLS, U.S. Soccer Sign Landmark TV and Media Rights Partnerships with ESPN, FOX & Univision Deportes*, MLSSoccer.com (May 12, 2014), https://www.mlssoccer.com/post/2014/05/13/mls-us-soccer-sign-landmark-tv-and-media-rights-partnerships-espn-fox-univision.

[15] *Id.*

[16] *Id.* (emphases added).

World Cup and MLS games, "If we have to go to the mat on something, Chuck's where we go."[17]
Indeed, Blazer personally conducted the USSF presidential election at which Garber nominated
Gulati and gave an effusive speech in his favor; Gulati won unopposed.[18]

110.    At the USSF National Council meeting in 2012, Commissioner Garber announced
that MLS's goal was to be regarded as highly as the most competitive European leagues, but
without the financial risks that come with economic competition:

> So for those of you who don't know, this is your Division 1 league.
> . . . [W]e think it would be weak to go out there and think that
> America can't have a soccer league that could be thought of the way
> the rest of the world thinks of the Premier League or thinks of Serie
> A, or thinks of La Liga. . . . **So we don't want to be like [Spain's]
> La Liga, we don't want to be like the [English] Premier League
> where every other day, there's a team that's going bankrupt.
> We want to do it in a way that we can assure that we're going to
> be around forever.**[19]

111.    MLS has sought and received from the USSF its protection from competition as the
sole Division I league through the anticompetitive application of the USSF Professional League
Standards.  It has then shared its monopoly benefits with the USSF, by entering into commercial
arrangements that give the USSF a financial incentive to protect and promote MLS as the sole
Division I league with monopoly power.  As Commissioner Garber stated:

> **How do we do things together so the league is not competing
> with its federation?  It's our big challenge.  We've cut up an
> already small market.  That makes no sense to me.**[20]

---

[17] *See* Tripp Mickle, *Trail Blazer*, June 7, 2010, Sports Bus. J., http://www.sportsbusinessdaily.com/Journal/Issues/2010/06/20100607/SBJ-In-Depth/Trail-Blazer.aspx (emphasis added).

[18] *See* Tr. 62:2-64:13, USSF 90th Ann. Gen. Mtg., Nat'l Council Mtg., Mar. 11, 2006, *available at* http://www.ussoccer.com/about/governance/previous-agm-locations/transcripts-summaries; Matt Lichtenstadter, *What Did U.S. Soccer Know About Chuck Blazer's Bribes?*, World Soccer Talk (June 3, 2015) http://worldsoccertalk.com/2015/06/03/what-did-us-soccer-know-about-chuck-blazers-bribes.

[19] Tr. 52:13-58:14, USSF 96th Ann. Gen. Mtg., Nat'l Council Mtg., Mar. 3, 2012 (emphasis added), *available at* http://www.ussoccer.com/about/governance/previous-agm-locations/transcripts-summaries.

[20] Dure, *supra* note 9, at 76 (emphasis added).

112.    Similarly, Gulati has publicly declared that the USSF's and MLS's economic objectives go "hand in hand" to an "extraordinary" extent, unlike other federations and leagues worldwide:

> **The growth of the game goes hand in hand with what the league [MLS] has done over the last 16 years**, and the growth of so much of what's going on in U.S. Soccer . . . **The working relationship between the two is extraordinary and my guess is there aren't many in the world that are like that**. **We don't have the sorts of conflicts you see between leagues and federations—that's a plus**.[21]

113.    The partnership between the USSF and MLS extends beyond SUM and their lucrative commercial agreements with third parties.

114.    For example, the USSF and MLS jointly "govern and fund" PRO, which was formed in 2012 to manage and develop referees in professional soccer leagues located in the U.S. and Canada.  PRO trains referees to officiate matches in Division I by first assigning them to officiate matches in Divisions II and III.  Thus, in practice, the same referees who serve as "fourth officials" (*i.e.*, reserve officials) in MLS games often serve as "head officials in many Division 2 NASL games."[22]

115.    In 2016, the NASL asked PRO to list the "[c]osts that would be associated with NASL being assigned" higher-quality referees and whether there were "[a]ny non-monetary impediments" to this.  PRO General Manager Peter Walton replied by declining to specify any cost amount and explaining: "This proposal is not determined by cost. . . .  PRO has been

---

[21] Charles Boehm, *Sunil Gulati's Steady Rise, with the Biggest Challenge Still to Come*, MLSSoccer.com (June 7, 2013),      http://www.mlssoccer.com/post/2013/06/07/sunil-gulatis-steady-rise-biggest-challenge-still-come-word (emphases added).

[22] Brian Quarstad, *U.S. Soccer and MLS to Announce Newly Organized Professional Referee Organization (PRO)*, IMSOCCER NEWS (Mar. 2, 2012), http://www.insidemnsoccer.com/2012/03/02/u-s-soccer-and-mls-to-announce-newly-organized-professional-referee-organization-pro.

established to serve the professional soccer leagues in a pyramid manner, with MLS being the major league."

116.    The close financial ties between MLS and the USSF include the fact that MLS-owned or operated stadiums almost always are used for games that USSF organizes (World Cup Qualifiers, international friendlies, etc.).  Upon information and belief, pre-sales and other incentives for USSF matches also are provided to MLS ticket holders.

117.    Whenever a voice within the USSF has questioned the protected monopoly status granted to MLS, that voice has been either ignored or suppressed.  For example, in 2014, when the U.S. Men's National Team coach and technical director questioned the level of competition within MLS, after speaking favorably of NASL and the possibility of the USSF moving to the promotion and relegation system embraced around the world, Commissioner Garber responded by sending the USSF what he described as a "very strong letter" in protest, declaring that he was "confident" the USSF would "ensure that our technical director is in line with the vision [USSF President Gulati] has publicly stated."[23]  And Commissioner Garber has made clear that the "shared vision" that MLS has with the USSF is to promote and protect MLS—not any competitive league—as the "key driver" of Division I professional soccer in this country:

> We have invested since our founding billions and billions of dollars in creating a foundation for this league and sport, growing a fan base, commercializing this sport, creating a dynamic where it's part of the sports culture in this country and creating a soccer nation. . . . To think that we are not aligned with our national team coach is disappointing and frankly it is personally infuriating.  **It is not in line with the shared vision that we have heard many times from the federation that a strong and vibrant first division in the United States is going to be one of the key drivers of this sport in this country. . . . [W]e collectively need to ensure that**

---

[23] Steven Goff, *MLS Commissioner Says Klinsmann "Needs to Think Very, Very Hard About How He Manages Himself Publicly,"* Wash. Post (Oct. 15, 2014), http://www.washingtonpost.com/blogs/soccer-insider/wp/2014/10/15/mls-commissioner-says-klinsmann-needs-to-think-very-very-hard-about-how-he-manages-himself-publicly (emphasis added).

> everybody is aligned with the *mutual goal* that we have of growing the game and *the league's* role in growing the game. **In order to do that,** *we* **can't try to denigrate or damage or disparage** *the very entity that will be the key driver of the sport in this country*.[24]

118.    MLS Commissioner and USSF Board Member Garber subsequently elaborated:

> What I intended to do was support our league and our players and our clubs . . . and **to** *ensure that everybody associated with this sport was aligned* **with the vision that comes from our [U.S. Soccer] Federation President that** *a* **strong league is a necessary component** for national team success.[25]

119.    In response, USSF President Gulati stated that the comments made by the U.S. Men's National Team coach should have been "handled in a private way" and reiterated the USSF's strong commitment to the "job at hand," which was to "grow MLS":

> [T]he fundamental views of all of us involved are: "We're on the same page."  We got diverted from that . . . **We will get back to the job at hand, which is continuing to grow MLS**, continuing to improve the national team, and the broader goal, which does both of those things . . . **[T]he actual opinions of . . . me and the leadership at MLS and U.S. Soccer [are] actually closely aligned with where we see the game going**.[26]

120.    As wryly noted in an article on the U.S. National Soccer Team Players Association website, "it's easy to see why [the U.S. Men's National Team coach], or anyone else for that matter, probably wouldn't make much headway in convincing US Soccer president Sunil Gulati

---

[24] *Id.* (emphasis added).

[25] MLSSoccer Staff, *MLS Commissioner Don Garber: A Strong League and Foundation Is the Formula for Success*, MLSSoccer.com (Oct. 23, 2014), http://www.mlssoccer.com/post/2014/10/22/mls-commissioner-don-garber-strong-league-and-federation-formula-success (emphasis added).

[26] Steven Goff, *Sunil Gulati Says USSF and MLS Are "On the Same Page,"* Wash. Post, Oct. 22, 2014, http://www.washingtonpost.com/blogs/soccer-insider/wp/2014/10/22/sunil-gulati-says-ussf-and-mls-are-on-the-same-page (emphases added).

to make significant changes to a league-federation marriage that has greatly enriched both partners."[27]

121.    These economic ties between the USSF and MLS have led to a conspiracy in which the USSF continues to engage in new overt acts to protect MLS's monopoly status as the sole top-tier Division I league, and has now sought to insulate MLS further from competition by conferring a second-tier monopoly on the MLS-friendly USL, in an effort to destroy the competitive threat posed by the NASL once and for all.

**The Anticompetitive Professional League Standards**

122.    The USSF promulgates the Professional League Standards, a set of anticompetitive requirements, designed to shield MLS from competition, that a professional soccer league must meet to be sanctioned by the USSF as a member of each Division I through III.  The primary purpose and effect of these Standards is to effectuate the USSF's anticompetitive conspiracy with MLS to exclude leagues seeking to compete with MLS from top-tier Division I status and, instead, to disrupt the growth of such leagues and inflict anticompetitive harms upon them by denying or threatening to deny them sanctioning, thus insulating MLS from competition.

123.    The USSF's anticompetitive and conspiratorial conduct relating to the Professional League Standards falls into three categories, which are discussed in sequence below.  *First*, the USSF repeatedly increased the severity of the Professional League Standards in response to the NASL's creation and subsequent growth and progress toward top-tier Division I status, in an effort to block the NASL, or any other entrant, from competing with MLS in the top tier of professional soccer.  *Second*, a number of the Professional League Standards adopted under USSF President

---

[27] Charles Boehm, *A USSF-MLS Split: Still Out of the Question?*, U.S. Nat'l Soccer Players Official Website (Oct. 23, 2014), http://ussoccerplayers.com/2014/10/ussf-mls-split-still-out-of-the-question.html (emphasis added).

and MLS Chairman Alan Rothenberg were designed from the start to protect MLS's monopoly in the top-tier relevant market and served no other purpose. *Third*, the USSF has most recently employed a strategy of selectively granting and denying waivers from its Professional League Standards in order to elevate USL to a Division II monopoly designed to finally destroy the NASL as a potential competitor to either MLS or USL. Through each of these anticompetitive strategies, the USSF has engaged with MLS in a continuing conspiracy to impose and manipulate these anticompetitive Professional League Standards and enable MLS to maintain its monopoly in the market for men's top-tier professional soccer leagues located in the U.S. and Canada.

**1.      The USSF Has Repeatedly Escalated the Anticompetitive Restrictions in the Professional League Standards to Exclude the NASL and Any Other Competitors of MLS from Obtaining Division I Status**

124.     Shortly before MLS began its first season, the USSF adopted a set of "Professional Outdoor League Standards" for men's Division I soccer leagues, dated May 21, 1995 (the "1995 Standards"). Among other things, the 1995 Standards required that any Division I league have: (i) "at least 10 teams" (§ I(A)) (the "Number of Teams" requirement); (ii) "U.S.-based teams located in at least 3 different time Zones" (§ II(A)) (the "Time Zones" requirement); (iii) "75 percent of the league's teams" playing on "surfaces of at least 70 yards by 110 yards," § II(D) (the "Playing Surfaces" requirement); and (iv) "75 percent of the league's teams . . . in metropolitan markets of at least 1,000,000 persons" (§ II(C)) (the "Market Size" requirement). At the time, no other league besides MLS could satisfy all of these requirements, thereby ensuring that MLS would be the only Division I men's professional soccer league in the United States.

125.     In 2008, the USSF promulgated a revised set of Professional League Standards (the "2008 Standards"). The 2008 Standards were similar to the 1995 Standards, but one notable difference was in the Time Zones requirement, which now provided that each men's Division I

league must have "U.S.-based teams located in at least 3 different time zones *in the continental United States*" (§ II(A)(i)) (emphasis added).  This narrowing of the Time Zones requirement to discount certain U.S.-based teams had no legitimate justification, and was instead just an arbitrary barrier to advancement by any potential competitors of MLS.

126.    The new NASL was founded in 2009.  Before long, it had publicly declared its intention to eventually compete at the top level of men's professional soccer in the U.S. using a different business model from the "single-entity" structure of MLS.  The NASL structure, in which clubs are independently owned and player salaries are uncapped, was modeled on the successful structure of professional soccer leagues around the world.  The NASL thus sought to compete head-on against MLS, the USSF's long-time business partner, by bringing to the U.S. and Canada the free and open ownership model that is used by top-tier leagues in other countries.

127.    The NASL's aspirations to compete at the top tier of men's professional soccer by investing in its players severely worried USSF and MLS officials.  In particular, "[USSF] and M.L.S. officials were concerned that . . . the N.A.S.L. would import players from South America and in essence become the anti-M.L.S. by allowing teams to sign players without worrying about a salary cap or a single-entity setup."[28]

128.    Threatened by the NASL's stated intention to compete at the top tier of men's professional soccer, the USSF and its co-conspirators embarked upon a sustained and concerted effort to prevent the NASL from successfully competing against MLS by, among other things, manipulating and escalating the Professional League Standards so that the NASL could never achieve Division I status.  By doing so, the USSF and MLS sought to ensure that the NASL would permanently be viewed as a minor league that could not be competitive with MLS.

---

[28] Bell, *supra* note 1; Giron, *supra* note 1.

129.   To begin with, the USSF refused to sanction the NASL to compete as an independent league in any division for the 2010 season.  Instead, the USSF only permitted an arrangement under which NASL clubs and USL clubs would compete together in a USSF-run Division II league.  This, in turn, ensured consumers would not perceive the NASL as a Division I competitor to MLS.

130.   As USSF President Gulati explained at USSF's 2010 National Council meeting, the USSF's goal was "to make sure we restabilize things" in two ways: first, by "essentially running Division 2 soccer for the year" with USSF CEO "Dan [Flynn] de facto the commissioner of the league"; and second, by implementing demanding new Standards.[29]

131.   At this same meeting, MLS Commissioner Garber not-so-subtly urged the NASL to seek out a relationship with MLS as "partners" rather than competitors, pointedly commenting that the USSF's support for MLS was "not because we've asked for it"; it was because "we've earned it with respecting the process and understanding what kinds of things we need to do to be better partners to help grow the sport."[30]

132.   In early 2010, Gulati explained that the USSF's goal in developing its divisional structure was to promote "stability" by limiting movement "between divisions," and by promoting "developmental relationships" and "partnering" between MLS and other leagues—*i.e.*, to shield MLS from competition and protect its monopoly status as the sole top-tier Division I league:

> **We'll put a little more substance into it about what a second division should look like.** . . . [W]e want to work with a number of people and all the teams to find a long-term solution **so we don't have teams changing back and forth between divisions. . . . We've had discussions with MLS**, some of the teams and some of the leadership of the groups we've been talking about had their own

---

[29] Tr. 38:8-18:14, Feb. 6, 2010, USSF 94th Ann. Gen. Mtg., Nat'l Council Mtg., *available at* https://www.ussoccer.com/~/media/migrated/documents/agm/transcript-summary/2010-minutes-of-agm.pdf?la=en.

[30] *Id.* 107:13-17.

independent discussions prior to all these processes starting with MLS. They talked about working together and potentially partnering, having MLS handle some of the functions and developmental relationships. . . . **As we continue to develop this model and look for further stability, you're going to see natural synergies come into place that make sense financially to try and get everyone on sound footing both on and off the field**. . . . **[T]here will be a developmental element to this Division 2 structure.** . . . So in a Division 2 or Division 3 we may have a rule that says you **need** to have four Under-23 players on the roster or something to that effect.[31]

133. Several months after the USSF refused to sanction the NASL as an independent league, and instead consigned it to a USSF-run Division II league shared with USL, MLS announced that the NASL's Montreal Impact had decided to leave the NASL and join MLS as an expansion club.[32]

134. The USSF formally designated the NASL as a Division II league in 2012. To the consternation of MLS and the USSF, however, the NASL continued its efforts to compete with MLS at the top tier of men's professional soccer. By mid-2013, the NASL had announced plans to form several new expansion clubs including the New York Cosmos, Ottawa Fury FC, Virginia Cavalry FC and the Indy Eleven. The NASL repeatedly made clear that it wanted to obtain Division I status from the USSF so that it could compete on an even playing field with MLS.

135. In response, in a letter dated November 18, 2013, the USSF announced that it would be revising its Professional League Standards to make them even more stringent. The USSF said the purpose of these revisions was to "protect against and prevent the harm brought to all members

---

[31] U.S. Soccer Conference Call Regarding 2010 Division 2 Soccer League, USSF Official Website (Jan. 7, 2010), http://www.ussoccer.com/stories/2014/03/17/13/55/nasl-usl-conference-call-transcript (emphases added).

[32] Jonah Freedman, "Passionate" Montreal Named as 19th MLS City, MLSSoccer.com (May 7, 2010), https://www.mlssoccer.com/post/2010/05/07/passionate-montreal-named-19th-mls-city.

of the U.S. Soccer community by failed leagues and teams"—*i.e.*, to prevent any "harm" caused by competition against MLS.

136.    The USSF soon enacted the 2014 Standards, dated February 28, 2014, which remain the operative Professional League Standards today.  The new Standards now required—in addition to the arbitrary existing stadium capacity criteria—that each men's Division I league have (i) "a minimum of 12 teams to apply" and, "[b]y year three, . . . a minimum of 14 teams" (§ II(a)(i)); (ii) "U.S.-based teams . . . in at least the Eastern, Central and Pacific time zones in the continental United States" (§ II(b)(i)); and (iii) "[p]laying surfaces for all teams" that are "at least 70 yards by 110 yards and [] FIFA-approved" (§ I(b)(ii)(2)).[33]  The USSF had no plausible procompetitive justification for the revised Standards.  Rather, they served only to protect MLS's monopoly over the top tier of men's professional soccer leagues located in the U.S. and Canada, since the USSF knew that the NASL could not satisfy these increased requirements at that time.

137.    *First*, there was no procompetitive purpose for increasing the Number of Teams requirement to 12 teams when applying and 14 teams by year three, when 10 teams was deemed sufficient by the USSF for Division I from 1995 until 2014, including when MLS first started as a Division I league with only ten teams.  Indeed, this moving target was designed to outpace the NASL's rate of expansion so as to keep Division I status out of its reach.  As the USSF knew, it is very difficult for a new entrant to Division I to have so many teams satisfying the Standards at the outset, which is why the Standards only required 10 teams from 1995 through 2014 when MLS was getting established.  MLS itself began play in Division I with only 10 teams in 1996 and, despite sputtering efforts at growth, still only had 10 teams as late as the 2004 season.  Now, MLS's

---

[33] The new Playing Surfaces requirement applied to all Divisions.

already-dominant presence in many of the available metropolitan markets only made it harder for any new entrant, like the NASL, to satisfy a much higher Number of Teams requirement.

138.    During the period when the NASL's Division I application was under the USSF's consideration, the NASL managed to satisfy the Number of Teams requirement in the 2014 Standards for Division I by adding expansion clubs in Miami, Oklahoma and Puerto Rico in 2016. However, the fact that the NASL would soon have 12 teams prompted the USSF to propose increasing the Number of Teams requirement again in 2015, as discussed below.

139.    *Second*, further narrowing the Time Zones requirement to the Eastern, Central and Pacific time zones in the continental U.S. was similarly devoid of any procompetitive justification. There is no procompetitive basis for the USSF to promulgate Standards that deliberately disregard a league's presence in major markets in other time zones.  The most highly regarded professional soccer leagues in the world—such as the Premier League in England, La Liga in Spain, the Bundesliga in Germany, Serie A in Italy and Ligue 1 in France—typically only occupy one or two time zones.  Put simply, this new requirement was imposed because the USSF knew that the NASL had no team in the Pacific Time Zone in 2014 and thus could not meet this particular requirement.

140.    *Third*, the new USSF requirement—applicable to all divisions—that all teams, rather than 75% of teams, have playing surfaces of at least 70 yards by 110 yards was also transparently aimed at protecting the MLS from competition.  The effect of this revision was to hinder new entrants from expanding incrementally into new markets with smaller playing fields— even though MLS was able to follow this approach from 1995 through 2014.  Indeed, as recently as December 2013, MLS itself had to be granted a waiver from the Playing Surfaces rule when it was set to take effect for the 2014 season.

141.   The 2014 Standards also imposed new "Financial Viability" requirements for Division I.  Putting aside whether such requirements are ever proper, these particular rules raised anticompetitive barriers to Division I status that serve no procompetitive purpose.  Specifically, each team must now designate a "principal owner" with an "individual net worth of at least forty million US dollars (US $40,000,000) exclusive of the value of his/her ownership in the league or team and his/her primary personal residence" (§ II(c)(ii)) (the "Individual Net Worth" requirement).

142.   The Individual Net Worth requirement is an unnecessary and anticompetitive barrier to competition, especially when viewed in the light of two other requirements that would more than satisfy any legitimate need to ensure the financial viability of a Division I league:  *First*, it is separately required that "[t]he principal owner, together with all other owners, must have a combined individual net worth of at least seventy million US dollars (US $70,000,000) exclusive of the value of ownership interests in the league or team and primary personal residences" (§ II(c)(ii)) (the "Combined Net Worth" requirement).  *Second*, Division I leagues "must demonstrate adequate financial viability to ensure continued operation on a season-by-season basis either in the form of a performance bond or similar instrument for each team in the amount of one million US dollars (US $1,000,000), or readily-available league funds representing such amount," which are "used to cover the costs of the teams' operations" (§ II(c)(i)) (the "Performance Bond" requirement).  These other two requirements ensure that any given team will remain stable throughout a season, thus making it unnecessary to also impose the Individual Net Worth requirement, which appeared for the first time in 2014 as an added barrier to competition.

143.   In light of the $70 million Combined Net Worth requirement and the $1 million-per-team Performance Bond requirement, there is no plausible procompetitive basis for a

$40 million Individual Net Worth requirement for *every* team in a Division I league.  On the contrary, the Individual Net Worth requirement is just another anticompetitive barrier designed to protect the monopoly status of MLS.  Indeed, during the period when the NASL's application for Division I status was under consideration, the NASL's teams satisfied the Combined Net Worth requirement and were able to satisfy the Performance Bond requirement, but one team could not satisfy the Individual Net Worth requirement—and, under the Standards, that fact by itself would bar the NASL from joining Division I and thus competing with MLS at the top tier.  There is no legitimate justification for Professional League Standards that call for such an anticompetitive outcome.

144.  Despite these anticompetitive barriers, the NASL pressed on in its efforts to compete with MLS and obtain Division I status.  By mid-2015, the NASL had publicly declared its intention to expand into the Pacific Time Zone and was in active discussions with various West Coast ownership groups.  Moreover, the NASL was in the late stages of forming an expansion club in Puerto Rico, which, as widely reported in the popular press, was purchased by NBA star Carmelo Anthony.

145.  More broadly, the NASL had succeeded in putting out a highly competitive product of top-tier quality.  NASL clubs had at that point won 42% of their competitions with MLS clubs in inter-league competitions as part of the Lamar Hunt U.S. Open Cup since the NASL's first season.  Many NASL players had competed for their respective national teams in the FIFA World Cup or in World Cup qualifiers.  The competitive threat to MLS was thus growing.  However, the absence of Division I status continued to block the NASL from becoming a challenger to the MLS monopoly.

146.    On May 31, 2015, the NASL submitted its formal Division I application to the USSF.  In the application, the NASL advised the USSF that it satisfied all the Division I Standards, apart from those that were clearly inconsistent with the antitrust laws.  The NASL requested waivers from these anticompetitive requirements of the Division I Standards, similar to prior waivers that the USSF had granted to MLS.  As there was no lawful basis to deny the NASL Division I status, NASL further requested that such status be granted in time for the 2016 NASL season, which was set to begin on April 2, 2016.  The USSF, however, refused to end its continuing conspiracy to protect MLS from competition, responding to the NASL's Division I application with more threatened escalation of the Professional League Standards, nine months of delay, and ultimately denial.

147.    Within just a few weeks after the NASL filed its application for Division I status, the USSF, true to form, took action to derail the NASL's efforts.  On June 24, 2015, the USSF circulated a new set of proposed revisions to the Professional League Standards (the "2015 Proposal"), which, if implemented, would be impossible for the NASL to satisfy.  The USSF then informed the NASL that it would delay considering its Division I application while the 2015 Proposal was being considered.

148.    Among its many anticompetitive additions, the 2015 Proposal would increase the Number of Teams requirement to "a minimum of sixteen teams," § II(a)(i), and would heighten the Market Size requirement so that "75 percent of the league's teams must play in metropolitan markets of at least 2,000,000 persons" (§ II(b)(ii)).  These proposed revisions once again served no plausible procompetitive purpose, and were transparently designed to make it impossible for the NASL to obtain Division I status and effectively compete with the MLS monopoly.

149.     Indeed, the 2015 Proposal's increase of the Number of Teams requirement to 16 was clearly aimed at keeping Division I status out of the NASL's reach.  The USSF left the Number of Teams requirement at 10 from 1995 until 2014.  During the majority of that period, the Division I MLS had only 10 to 12 teams.  In 2014, the USSF raised the Number of Teams requirement from 10 to 12, with a "minimum of 14 teams" by "year three."  Yet, in 2015—before any "year three" ever arrived—the USSF was already proposing to increase the minimum to 16.  Nothing changed between 2014 and 2015 that would legitimately explain this.  Rather, the only plausible explanation for the proposed change is that the NASL had achieved the 12-team requirement.

150.     There was also no plausible procompetitive purpose for the new requirement in the 2015 Proposal that 75% of a Division I league's teams play in metropolitan markets with two million people—double the one million people required under the Professional League Standards from 1995 until now.  The USSF knew that the NASL and its team owners had invested significant resources locating teams and building up fan support in markets with more than one million, but sometimes fewer than two million people.  The proposal to abruptly double that requirement would make some of the NASL's most successful clubs count against satisfying the Professional League Standards, so it would be virtually impossible for the NASL to satisfy the Division I requirements going forward.  Even if the NASL had formed multiple new teams in metropolitan markets with greater than two million people, it likely would have had to abandon some of its existing locations to satisfy the 75% requirement.  Doubling the Market Size requirement was an anticompetitive bait and switch, with the sole purpose of entrenching MLS's monopoly position.

151.     If the reference to "metropolitan markets" in the 2015 Proposal was to Metropolitan Statistical Areas ("MSAs") as determined by the U.S. Census Bureau, only 31 MSAs over two million people existed in the U.S. as of 2014 (the most recent census estimate at the time of the

2015 Proposal), in contrast to 53 MSAs of more than one million people.34  Canada had only three metropolitan areas in excess of two million people, but six in excess of one million people.35 Thus, the 2015 Proposal would have nearly cut in half the number of metropolitan areas in the U.S. and Canada that would qualify under the new rule (34 instead of 59), and the majority of this shortened list of qualifying metropolitan areas already had entrenched MLS teams located in them or were slotted for specific MLS expansion teams.

152.    In fact, the USSF's proposed Market Size requirement was so unreasonably high that even the National Hockey League could not have satisfied it, and would have been considered a "minor league" by the USSF, even though it is the preeminent professional hockey league in the U.S. and Canada.

153.    The 2015 Proposal also would have increased the Combined Net Worth requirement for each team's owners from $70 million to $80 million (§ II(c)(ii)).  There was no plausible justification for such an increase.  The USSF went from 1995 until 2014 with no Combined Net Worth requirement, and settled on $70 million in 2014.  Nothing changed between 2014 and 2015 that would legitimately explain this increase.  The only explanation is that the NASL had managed to satisfy the $70 million requirement.

154.    In addition, the 2015 Proposal included a new requirement that each league in any Division "annually present its plans for expansion (if any) and growth" (§ I(a)(iii))—in other words, to participate in formal exchanges of sensitive competitive information with MLS's and other professional leagues' representatives on the USSF Board.  MLS had already lured away

---

34 *See, e.g.*, *Annual Estimates of the Resident Population: April 1, 2010 to July 1, 2014 – United States – Metropolitan and Micropolitan Statistical Area; and for Puerto Rico*, U.S. Census Bureau, http://factfinder2.census.gov/bkmk/table/1.0/en/PEP/2014/GCTPEPANNR.US23PR.

35 *See, e.g.*, *Population and Dwelling Counts, for Census Metropolitan Areas and Census Agglomerations, 2011 and 2006 Censuses*, Gov't of Canada Official Website, http://www12.statcan.gc.ca/census-recensement/2011/dp-pd/hlt-fst/pd-pl/Table-Tableau.cfm?LANG=Eng&T=201&S=3&O=D&RPP=150.

successful franchises from the NASL, and repeatedly had disrupted the NASL's expansion efforts by announcing plans to expand into the same cities (so-called "vapor" expansion teams).  This requirement would make it even easier for MLS to engage in such disruptive tactics and thus shield its monopoly from competitors.36

155.    The 2015 Proposal prompted significant media criticism of the USSF's efforts to protect MLS from its competitors.  For example:

> The NASL hasn't been secretive about its desire to challenge MLS head-on for supremacy. . . . Hence why U.S. Soccer would attempt to clip the NASL's wings before they grow. . . . **MLS never misses [an] opportunity to conflate itself with the very idea of soccer in America, and U.S. Soccer is always far too eager to support this posture**. . . . **The problem with this kind of favoritism is that it hurts the very thing U.S. Soccer should be trying to promote: as much competitive soccer in America as possible**. Why should any criteria other than quality of play determine who is best? And shouldn't leagues be defined by the talent of their constituent players and teams rather than how many people live in a team's home city?37

156.    The USSF's history of escalating the Professional League Standards to protect MLS from competition with other professional leagues is summarized in the chart below:

**Summary of the USSF's Escalation of the Professional League Standards
to Insulate MLS from Competition**

| 1995 Standards for Division I | 2008 Standards for Division I | 2014 Standards for Division I | 2015 Proposal for Division I |
| --- | --- | --- | --- |
|  |  |  |  |

---

36 Notably, under the 2015 Proposal, the Time Zones requirement would revert to that of the 2008 Standards, requiring "U.S.-based teams located in at least 3 different time zones in the continental United States." § II(b)(i).  The USSF thus does not even attempt to defend the 2014 Standards' arbitrary and irrational discounting of teams outside the Eastern, Central and Pacific time zones.

37 Billy Haisley, *U.S. Soccer Continues To Sabotage Soccer In The U.S.*, Deadspin, Sept 2, 2015, http://screamer.deadspin.com/u-s-soccer-continues-to-sabotage-soccer-in-the-u-s-1728268664 (emphasis added); *see also* Kara Scannell, *League Cries Foul at U.S. Soccer Federation's New Rules*, Financial Times, Aug. 31, 2015, http://www ft.com/intl/cms/s/0/6ef8ed4e-5002-11e5-8642-453585f2cfcd html#axzz3yt0QObXn.

| § I(A): "[A]t least 10 teams." | § I(A)(i): "[M]inimum 10 teams" | § II(a)(i): "[M]inimum of 12 teams to apply. By year three, . . . a minimum of 14 teams." | § II(a)(i): "[M]inimum of sixteen (16) teams." |
|---|---|---|---|
| § II(A): "U.S.-based teams located in at least 3 different time zones" | § II(A)(i): "U.S.-based teams located in at least 3 different time zones in the continental United States" | § II(b)(i): "U.S.-based teams must be located in at least the Eastern, Central and Pacific time zones in the continental United States." | § II(b)(i): "U.S.-based teams must be located in at least three different time zones in the continental United States." |
| § II(D): "75 percent of the league's teams . . . with playing surfaces of at least 70 yards by 110 yards." | § II(D)(iii): "75 percent of playing surfaces must be at least 70 yards by 110 yards" | § I(b)(ii)(2): "Playing surfaces for all teams must be at least 70 yards by 110 yards and be FIFA-approved." | § I(b)(ii)(2): "Playing surfaces for all teams must be at least 70 yards by 110 yards and be FIFA-approved." |
| § II(C): "75 percent of the league's teams . . . in metropolitan markets of at least 1,000,000 persons." | § II(C)(i): "75 percent of the league's teams . . . in metropolitan markets of at least 1,000,000 persons." | § II(b)(ii): "75 percent of the league's teams . . . in metropolitan markets of at least 1,000,000 persons." | § II(b)(ii): "75 percent of the league's teams . . . in metropolitan markets of at least 2,000,000 persons." |
| N/A | N/A | § II(c)(ii): "[P]rincipal owner" with an "individual net worth of at least forty million US dollars" | § II(c)(ii): "[P]rincipal owner" with an "individual net worth of at least forty million US dollars" |
| N/A | N/A | § II(c)(ii): "[C]ombined [owner] net worth of at least seventy million US dollars" | § II(c)(ii): "[C]ombined [owner] net worth of at least eighty million US dollars" |

2.     **The USSF Designed the Professional League Standards from the Outset to Protect MLS as the Sole Division I League**

157.   The USSF adopted the 1995 Standards under the leadership of Alan Rothenberg, who at the time headed both the USSF and MLS.  From the outset, the Professional League Standards have embodied and furthered the USSF and Rothenberg's admitted "plan" to "only sanction one Division I league"—Rothenberg's own league, MLS.  At least two of those initial requirements that continue to be imposed as part of the USSF's conspiracy are clearly designed to shield MLS's monopoly over top-tier men's professional soccer in the U.S. and Canada: *first*, the minimum stadium capacity requirement, and *second*, the player development requirements.

158.   The 2014 Standards provide that "[a]ll league stadiums must have a minimum seating capacity of 15,000" (§ II(b)(iii)(2)) (the "Stadium Capacity" requirement).  The effect of this rigid and arbitrary Stadium Capacity requirement is that, irrespective of average seating capacity, attendance, and quality of play league-wide, a single stadium with under 15,000 seats can disqualify a whole league from Division I status.

159.   New entrants seeking to compete at the top tier of professional soccer, such as the NASL, initially have severely limited stadium options to satisfy the Division I Stadium Capacity requirement, given the entrenched position of MLS, the limited availability of suitable stadiums of the required size, and the need for time to grow as competitors in Division I to increase their fan base and justify the investment in building new stadiums.  In a competitive, free market, such expansion and investment in stadiums would take place incrementally over time without creating an unnecessary and anticompetitive barrier to Division I competition.  This is in part because securing a stadium seating over 15,000 people, as mandated by the USSF's Stadium Capacity requirement, typically requires a club to obtain assistance from municipalities or investments from

other third-parties.  In even the most favorable of circumstances, this is a difficult task; for a club

whose league is stigmatized as a "minor league," it is often impossible.

160.    There are a number of examples of government officials opposing funding for

NASL stadiums on the ground that its Division II status makes it a "minor league."  For instance:

> Sen.  Wilton  Simpson  brought  up  an  amendment  to  the
> amendment—one  that  would  add  the  North  American  Soccer
> League (the league that includes the Rowdies soccer club that plays
> in St. Petersburg) to the pool of potential beneficiaries eligible for
> state funding.  **Sen. Latvala . . . stated that he was unsure as to
> what the North American Soccer League was and whether it is
> classified as a "major league sports league."  Sen. Latvala voiced
> his opposition and encouraged the committee to vote against the
> amendment.**  Following a vote, the amendment failed. . . . Before
> and after the committee meeting, Sen. Latvala let it be known that
> he was upset that supporters of the amendment didn't ask him about
> the amendment and **compared the NASL to "international
> baseball or the rodeo."**[38]

161.    Government officials in Texas similarly denied funding for an NASL club due to

its "minor league" non-Division I status:

> City and county officials, in a meeting Thursday with the Express-
> News Editorial Board, said that based on the early results of a joint
> feasibility study, **they would not endorse using public money for
> minor-league soccer**.  **San Antonio developer Gordon Hartman
> has asked the city and county for $4 million each to build a
> 5,400-seat stadium at STAR Soccer Complex for a planned
> North American Soccer League franchise**.  The soccer portion of
> an exploration of pro sports possibilities in San Antonio, worked up
> by California-based Premier Partnerships[39], offers bleak prospects
> for the profit potential of such operations, stressing that teams "will
> sustain  continued  losses  throughout  the  development  of  the
> leagues."   Further, the draft summary of the study, commissioned
> by the city and county last month, notes that **typically cities "have**

---

[38] Peter Schorsch, *Jack Latvala Gives St. Pete Boosters a Kick in the Grass Over Soccer Issue*, SPB (Mar. 25, 2014),
http://saintpetersblog.com/jack-latvala-gives-st-pete-boosters-a-kick-in-the-grass-over-soccer-issue/ (emphases
added).

[39] Notably, the chairman of Premier Partnerships is former USSF President and MLS Chairman Alan Rothenberg.

**not provided significant funding for new stadium development for tertiary soccer teams and stadiums."**[40]

162.    Further, due to the NASL's designated status as a Division II league, the NASL's

New York Cosmos faced continual setbacks in their unsuccessful efforts to secure approval for a

planned stadium in Belmont Park, despite the club's on-field success:

> Having refused to pursue an affiliation or feeder agreement with MLS, the NASL is now at a crossroads—tied to a "minor league" label it refuses to embrace yet is forced, for now, to accept.  The Cosmos may be a big club in certain ways.  **Yet according to the U.S. Soccer Federation, New York and its NASL brethren are stuck in the second tier. . . . [T]he semantic weight of the "minor league" label can make its product a tougher sell.  That, in turn, makes it difficult to build to a Division I standard.**  It also limits access to international competition, since three of the U.S.'s four berths in the CONCACAF Champions League are guaranteed to MLS teams (the fourth goes to the winner of the U.S. Open Cup, where the NASL has a 10-15-1 record against MLS opposition since first entering in 2012). . . .  **Major league teams require major league venues.**  The [Cosmos] club's interest [in] building what [Cosmos COO] Stover called "the best soccer stadium in the United States" at Belmont Park in Elmont, New York, remains high.  **It submitted its proposal, which includes a privately-financed, 25,000-seat stadium, to state authorities two years ago.  The Cosmos are still awaiting a response**.[41]

163.    The USSF's decision to apply its anticompetitive Professional League Standards to

accord Division I status only to its longtime business partner, MLS, has made it more difficult—

and often impossible—for NASL teams to secure stadium funding.  This, in turn, has further

prevented the NASL from satisfying the USSF's rigid Stadium Capacity requirement, thus creating

yet another high barrier protecting the MLS from competition.

---

[40] Richard Oliver, *Public Funds Unlikely for Soccer Plans: Minor-League Proposals Not Seen as a Good Bet by Officials*, Express News, Feb. 4, 2011, http://www.mysanantonio.com/sports/article/Public-funds-unlikely-for-soccer-plans-996052.php (emphases added).

[41] Brian Straus, *NASL Seeks to Outgrow "Minor League" Label as Fifth Year Kicks Off*, Sports Illustrated, Apr. 4, 2015, http://www.si.com/planet-futbol/2015/04/03/nasl-season-new-york-cosmos-minnesota-united-bill-peterson (emphases added).

164.    Indeed, even if some seating capacity requirement could be justified for Division I status, the existing 15,000-seat minimum for all clubs is indefensible.  This is demonstrated by the fact that A.F.C. Bournemouth has competed in the English Premier League for the past three seasons—with a significantly lower-capacity stadium (11,464) than the USSF's requirement of 15,000—as have other English Premier League teams.  There is no question that the Premier League is one of the preeminent soccer leagues in the world, yet under the USSF's 2014 Standards, the Premier League would not satisfy the Stadium Capacity requirement and would be, at most, a Division II league.  The same is true for the Argentine Primera Division, La Liga in Spain, Serie A in Italy, Ligue 1 in France, and Eredivisie in the Netherlands, all of which are among the top leagues in the world, but would not satisfy the USSF's Stadium Capacity requirement.

165.    Significantly, MLS itself did not even satisfy the Stadium Capacity requirement at any point from the founding of the NASL in 2009 until 2015, when MLS's San Jose Earthquakes relocated from the 10,500 seat Buck Shaw Stadium to a new venue.  Yet the USSF permitted MLS to remain in Division I, declining to enforce the Professional League Standards against MLS—its sole, and transparently favored, Division I league.

166.    During the period when the NASL's Division I application was under consideration, the average capacity of its stadiums, including its new expansion clubs, was approximately 12,500.  The reluctance of municipalities and third parties to invest in large stadiums for a Division II "minor league" slowed the NASL's progress in securing larger stadiums—yet the USSF's Professional League Standards do not permit a Division I top-tier designation unless a league already has only stadiums with at least 15,000 seats.  There is no justification for this anticompetitive barrier to effective competition created by the USSF's rigid Stadium Capacity requirement.

167.     The 2014 Standards also include two anticompetitive requirements pertaining to player development that the USSF has continued for many years to protect the MLS monopoly (collectively, the "Player Development" requirements): *First*, "[e]ach U.S.-based team must demonstrate a commitment to a player development program," which "may be satisfied by supporting either an amateur or professional reserve team competing in a USSF-sanctioned league or by the league itself." § II(e)(ii). This requirement was adopted by the USSF under Rothenberg as part of the 1995 Standards. *Second*, "[e]ach U.S.-based team must maintain teams and a program to develop players at the youth level," which "may be satisfied by fielding teams in a Federation academy program." § II(e)(iii). This requirement dates back to 2008, and builds on a similar provision of the 1995 Standards that "[e]ach team must demonstrate its commitment to the promotion of soccer at all levels in its home market."

168.     Although fostering lower-level player development is a laudable goal, these rigid Player Development requirements operate as just another barrier to competition. Under the Player Development requirements, each Division I team must support at least two additional teams, or equivalent player development programs. This is thus another cost that MLS's competitors must incur before being allowed to challenge MLS in the market for men's top-tier professional soccer leagues located in the U.S. and Canada.

169.     As the sole men's Division I league located in the U.S. and Canada, fostering relationships with lower-level teams has been relatively easy for MLS. Lower-tier players and teams have jumped at the chance to compete as the "minor league" for the only USSF-sanctioned "major league," seeing this as a potential path to competing in the majors. For example, in recent years, MLS has developed affiliations with third-tier USL teams under which MLS loans players

to compete at a lower level.  MLS also has integrated its existing reserve teams into the USL's schedule, with the result that the USL now effectively serves "as a reserve league for MLS."[42]

170.    As a non-Division I league, the NASL has faced much greater hurdles in securing adequate reserve squads.  Essentially, the NASL must persuade players and teams to compete in a "minor league for a minor league."  More broadly, due to their non-Division I status, NASL clubs have had greater difficulty reaching the level of attendance and sponsorship that is necessary to support reserve and youth squads.

171.    The NASL supports the promotion of lower-level player development.  A number of NASL clubs are affiliated with reserve and youth teams, and the NASL's clubs have been working to expand their player development programs over the years.  But a rigid requirement that every Division I team support multiple lower-level teams, or some equivalent, goes far beyond what can be justified on any procompetitive basis.

172.    After sitting on the NASL's Division I application for over nine months with no action, and proposing to drastically increase the Division I standards under the 2015 Proposal, the USSF advised the NASL on March 10, 2016 that it had decided to deny the NASL's Division I application.  The USSF based its denial on the fact that the NASL did not satisfy the arbitrary and anticompetitive Stadium Capacity and Time Zone requirements of the Professional League Standards.

173.    Specifically, the USSF noted that not all of the NASL's teams had stadia with at least 15,000 seats—a requirement that MLS itself had failed to satisfy throughout most of the NASL's existence, and the considerably superior English Premier League also could not satisfy.

---

[42] Brian Straus, *The MLS-USL Partnership Remains a Work in Progress*, Sports Illustrated, Oct. 22, 2016, https://www.si.com/planet-futbol/2016/10/22/mls-usl-partnership-jake-edwards.  In fact, MLS initially proposed such an affiliate relationship to NASL, and the NASL rejected the offer, which would further consign the NASL to Division II status.

Further, the USSF noted that the NASL did not have U.S.-based teams in three time zones—an absurd and unjustifiable basis for denying the NASL Division I sanctioning, as the NASL had a *Canadian* team (FC Edmonton) in a third time zone, and top-tier professional soccer leagues worldwide generally occupy only one or two time zones.

174.    In sum, the USSF application of its anticompetitive Professional League Standards has been the product of a continuing conspiracy with its economically distinct members and MLS to shield MLS from competition, imposing both new and longstanding requirements designed to maintain MLS's monopoly as the sole men's Division I professional soccer league located in the U.S. and Canada.  The USSF's Professional League Standards and the divisional structure they perpetuate are not designed to serve any procompetitive purpose, and, even if they had any plausible justification, are far more restrictive than necessary.  Many of the Professional League Standards have no plausible explanation, except as a means to prevent the NASL and any other league from obtaining Division I status and thus competing with MLS.

**3.     The USSF Has Selectively Granted and Denied Waivers From the Professional League Standards in a New Effort to Confer a Second-Tier Division II Monopoly on USL, and to Destroy the NASL as a Potential Competiotr to MLS**

175.    During the years leading up to the NASL's submission of its Division I application on May 31, 2015, the USSF and MLS had repeatedly and publicly urged the NASL not to follow through on its stated goal of challenging MLS at the top tier of professional soccer.  For example, as the NASL was initially forming and embarking upon its effort to compete with MLS in 2010, USSF President Gulati pointedly announced at USSF's 2010 National Council meeting that the USSF would be implementing demanding new Professional League Standards "**to make sure we restabilize things**."

176.    Shortly afterward, Gulati explained that the USSF's goal was to work toward a divisional structure that involved "**partnering**" between the Division I MLS and a Division II league, and that "there will be a developmental element to this Division 2 structure."  Gulati indicated that the USSF would "continue to develop this model and look for further stability" to avoid any "changing back and forth between divisions."  In other words, the USSF would insulate MLS from competition by creating a stable Division II monopoly for a second-tier league "partnering" with MLS—which is exactly the result the USSF has now sought to implement by conferring a Division II monopoly on USL as MLS's reserve league.

177.    At the same 2010 USSF National Council meeting, MLS Commissioner Don Garber candidly pushed for such a partnership arrangement with MLS as the sole top-tier league, pointedly commenting that the USSF's support for MLS was "not because we've asked for it," but because "we've earned it with respecting the process and understanding what kinds of things we need to do to be better partners to help grow the sport."

178.    After the NASL formally applied for Division I status on May 31, 2015, demonstrating the seriousness of its intention to challenge MLS at the top tier of professional soccer in the U.S. and Canada, the USSF gave up on encouraging the NASL to be a "stable" second-tier league "partnering" with the top-tier MLS, and set out to replace the NASL in Division II with the MLS-friendly USL, and to destroy the NASL as a competitor to MLS and USL.

179.    To carry out its plan, the USSF employed a strategy of selectively granting and denying waivers.  Specifically, when the NASL re-applied for Division II status for 2017, it sought a waiver from the Professional League Standards' requirement that it "have a minimum of 12 teams" (§ IV.a.i).  This was necessary due to the exodus of NASL clubs following the USSF's delay and denial in response to the NASL's Division I application, which had left the NASL with

eight clubs.  Similarly, the NASL sought a waiver from a requirement that "[a]t least 75 percent of the league's teams must play in metropolitan markets of at least 750,000 persons" (§ IV.b.ii), as the departure of several NASL clubs had left the NASL temporarily unable to satisfy this threshold.  The NASL also requested a waiver from a requirement that each club's "principal owner must have an individual net worth of at least twenty million US dollars" (§ IV.c.ii), because one of its clubs was in the process of switching ownership groups.  The three waivers sought by the NASL for 2017 were similar to numerous waivers that the USSF had freely granted to MLS and USL over the years.

180.    Despite the USSF's history of granting similar waivers, the USSF abruptly changed course and refused to grant the NASL the necessary waivers from the Professional League Standards for full sanctioning in Division II.  Instead, the USSF only granted the NASL "provisional" Division II sanctioning, with the implicit threat that the NASL soon might not be sanctioned even in Division II.

181.    The USSF showed its cards as to its anticompetitive motive for denying the NASL full sanctioning by simultaneously granting USL provisional Division II sanctioning for 2017—a sudden boost for an MLS reserve league that had occupied Division III.  The USSF has not made public what waivers it granted to USL in doing so, but it appears that those waivers were numerous. For example, USL had at least eight clubs that would all require waivers because their stadia did not satisfy the Division II requirement that "[a]ll league stadiums must have a minimum seating capacity of 5,000" (§ IV.b.iii).  By contrast, all of the NASL's clubs have stadiums satisfying the Professional League Standards' minimum seating capacity requirements for Division II.

182.     Recent events have confirmed that the USSF's sanctioning and waiver decisions last year were, in fact, aimed at replacing the NASL with USL in Division II and destroying the NASL.

183.     When the NASL applied for re-sanctioning as a Division II league for 2018, it sought only two waivers, which was fewer than it had sought for 2017.  *First*, the NASL sought a waiver from exactly the same twelve-team requirement as in 2017.  The NASL still had only eight clubs at the time of its application, but also had multiple other clubs in active discussions to join soon, demonstrating its efforts and progress toward satisfying the twelve-team Division II requirement.

184.     Specifically, the NASL represented in its 2018 sanction submission letter to the USSF that an ownership group in New Orleans had entered into a letter of intent to bring a new club to the NASL, and that the league was also in discussions with ownership groups in Detroit and Atlanta, with the goal of finalizing admissions for all of these clubs in 2018.  The NASL further advised the USSF that it was in discussions with ownership groups in additional cities.

185.     *Second*, the NASL requested a waiver from the Division II standards' requirement for clubs in "at least the Eastern, Central and Pacific time zones" (§ IV.b.i), because it did not have a club in the Central Time Zone.  The USSF had granted the NASL Division II sanctioning in years past when the NASL did not have a club in the Pacific Time Zone, and there was no legitimate procompetitive basis for the USSF to deny a waiver now with respect to the Central Time Zone.  After all, the NASL had clubs in the Pacific, Eastern and Atlantic Time Zones, and one of its clubs (Indy Eleven) was in the state of Indiana which partly occupies the Central Time Zone.  Accordingly, even if it were a legitimate goal for the USSF to require Division II leagues to have a geographically broad customer base (in fact, there is no justification for such a multi-

time zone requirement, as the top leagues overseas generally cover only one or two time zones), the NASL's widespread clubs clearly achieved that purpose.

186.    On September 3, 2017, the USSF responded by denying the NASL's Division II application outright, refusing to grant any waivers, and refusing to grant even provisional Division II sanctioning—a decision that threatens to destroy the NASL in the imminent future, absent injunctive relief.  The USSF based its decision on its assertion that the "NASL was not able to provide the Board with assurances it would have greater than eight teams for the 2018 season, a team in the central time zone, or any plan as to how it would come into full compliance with the Federation's professional league standards"—even though the NASL had demonstrated that it would be expanding its number of clubs, and USSF itself had proposed to do away with the arbitrary Central Time Zone requirement in its 2015 Proposal.

187.    Tellingly, the USSF treated the USL's Division II application completely differently from the NASL's application.  The USSF provisionally waived many requirements for USL and simply required it to provide a "plan for bringing its teams into compliance" with the Division II requirements within approximately a month's time—unlike the NASL, whose Division II application the USSF flatly denied.  Upon information and belief, the number of waivers the USSF provisionally granted to USL was approximately twenty—*i.e.*, ten times as many waivers as the NASL requested.

188.    The stark contrast between the USSF's selective denials of waivers to NASL following its unsuccessful bid for Division I, and the USSF's history of routinely granting MLS and USL similar waivers—including, on information and belief, as many as twenty for USL this year—demonstrates the USSF's plan to grant MLS-friendly USL a Division II monopoly, and destroy the NASL, thereby insulating both MLS and USL from competition.

189.    The continued application of the USSF's anticompetitive divisional structure and Professional League Standards has caused and continues to cause severe harm to the business and property of the NASL and its clubs.  In the absence of injunctive relief, there is now a serious risk that the NASL will be forced to dissolve and cease to compete as a professional soccer league, thereby securing the MLS monopoly and sending a powerful deterrent message to any league that might in the future think about competing with MLS or even USL.  Meanwhile, both MLS and the USSF reap the financial benefits of this monopoly structure, which is a product of Professional League Standards that have no plausible procompetitive justification.

## ANTITRUST INJURIES SUFFERED BY THE NASL AND BY CONSUMERS

190.    The USSF and its co-conspirators contract, combination, and conspiracy to exclude other leagues from competing with MLS in Division I, and thus to monopolize competition in the market for men's top-tier professional soccer leagues located in the U.S. and Canada, has caused severe harm to the NASL and its members.  Most prominently, the application of the USSF's anticompetitive Professional League Standards has prevented the NASL from competing with MLS and now threatens to destroy the league entirely.  This loss of competition also causes a reduction of output and quality of play that injures fans, stadium operators, broadcasters, sponsors, and players.

191.    The USSF and its co-conspirators' concerted effort to confer a monopoly over Division II upon the USL as MLS's reserve league, has further restricted competition and injured the NASL and its clubs.  Most glaringly, as a result of losing its Division II status, the NASL will suffer critical damage and, absent injunctive relief, is not likely to survive.

192.    The USSF's anticompetitive conduct harming the NASL also has correspondingly harmed NASL clubs, whose interests are intertwined with the league's interests.  The USSF's denial of Division I and II sanctioning to the NASL is a denial of the competitive advantages of

sanctioning to the NASL's clubs, and results in fans perceiving the clubs as lower-tier "minor league" clubs as part of the "minor league" NASL.  In short, the fortunes of the NASL's clubs rise and fall with the league itself.  Accordingly, it is in the interests of their respective clubs that the NASL continue its efforts to compete against MLS at the top tier of professional soccer, including by seeking relief on their behalf and its own behalf through this lawsuit.  Seeking such relief is germane to the NASL's purposes, and that neither the claims asserted nor the relief sought requires the participation of the NASL clubs as named plaintiffs.  Accordingly, the NASL also brings this action seeking injunctive relief on behalf of its members, pursuant to Rule 65 of the Federal Rules of Civil Procedure and consistent with the governing case law of associational standing.

193.    The USSF's anticompetitive Professional League Standards have damaged the NASL's efforts to develop its fan base and created an incentive for NASL clubs to depart the league.  Business media outlets have noted the low profit potential of  "minor league soccer" and the fact that fans consider it to be in the same category as "roller derby":

> Hopefully more Minnesota companies will profit within the team's ecosystem . . . . Of course, the [North] American Soccer League is no Major League Baseball.  **Indeed, it's a Division ii league under Major League Soccer.  [Minnesota United FC owner] Mcguire has acknowledged that minor league soccer is not the best place to make money.  Even if Minnesota United is successful, its market will be a niche one similar to those of other minor league teams in the state, including the St. Paul Saints in baseball, the Minnesota Swarm in lacrosse, and even the Minnesota Rollergirls of women's roller derby**.[43]

194.    As a result of this perceived minor league status of the NASL—imposed with no legitimate justification by the USSF—the NASL has been prevented from effectively competing with MLS, and the NASL has lost, and will continue to lose, the opportunity for increased revenues

---

[43] Tom Johnson, *Net Gain*, Minn. Bus. Mag., June 2013, http://minnesotabusiness.com/net-gain (emphasis added).

and fan support.  The NASL also has suffered financially from depressed franchise values and other antitrust injuries.

195.    The USSF's concerted and exclusionary efforts to confer monopolies over top-tier and second-tier professional soccer to MLS and USL, respectively, have injured consumers by depriving them of the opportunity to reap the benefits of competition in the relevant markets for top-tier and second-tier men's professional soccer leagues located in the U.S. and Canada, including increased output of games and clubs, improved product quality and greater competitive choice.

196.    The USSF has admitted that the U.S. and Canadian market can support two top-tier men's professional soccer leagues.  As USSF President Gulati stated at the USSF's 2007 National Council Meeting:

> [W]e are going to try to bring the World Cup back to the United States, the Men's World Cup in 2018.  But we'd be available if FIFA needs us to do it any earlier, 2014. . . . **I think by then we will have two professional leagues of Division 1.**[44]

Despite this fact, the USSF has engaged in a continuing conspiracy to shield MLS from any Division I competition from the NASL or any future league that seeks to compete in the top tier.

197.    The injuries that the USSF's anticompetitive conspiracy has inflicted on the NASL and consumers, as described above, are injuries of precisely the type that the antitrust laws were meant to prevent.

---

[44] Tr. 51:7-25, USSF 91st Ann. Gen. Mtg., Nat'l Council Mtg., Feb. 24, 2007 (emphasis added), *available at* http://www.ussoccer.com/about/governance/previous-agm-locations/transcripts-summaries.

## CLAIMS FOR RELIEF

## COUNT ONE

**(Violation of Section 1 of the Sherman Act: Conspiracy to Restrain Competition in Markets for Top-Tier and Second-Tier Men's Professional Soccer Leagues Located in the U.S. and Canada)**

198.    The NASL incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

199.    The USSF's voting membership consists of many separate economic actors, including professional leagues competing horizontally and seeking to compete horizontally in the same market.  The actions of the USSF's members undertaking the conduct described above by the USSF constitutes action by separate economic actors.  The USSF is also a separate economic actor from its co-conspirators MLS, USL and SUM.

200.    The USSF and co-conspirators MLS, USL and SUM have entered into a continuing agreement, combination, or conspiracy in restraint of trade with the purpose, intent and effect of restraining horizontal competition among top-tier men's professional soccer leagues located in the U.S. and Canada, and among second-tier men's professional soccer leagues located in the U.S. and Canada, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

201.    This contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among the USSF and its co-conspirators that enables MLS to be the only men's top-tier professional soccer league located in the U.S. and Canada, by promulgating, revising, manipulating, and selectively granting and denying waivers from anticompetitive Professional League Standards so that MLS, and only MLS, will satisfy the USSF's requirements and be granted any waivers necessary to qualify for men's top-tier Division I sanctioning.

202.    This contract, combination or conspiracy further has resulted in an agreement, understanding or concerted action between and among the USSF and its co-conspirators that accords competitive and economic advantages to MLS over all other men's professional leagues located in the U.S. and Canada, such as the NASL, by virtue of MLS's exclusive top-tier Division I status.

203.    This contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among the USSF and its co-conspirators that will maintain and protect MLS's top-tier monopoly and further insulate MLS from competition by applying the Professional League Standards to destroy the NASL as a potential competitor and confer a Division II monopoly on the MLS reserve league, the USL.

204.    This is an inherently suspect contract, combination, or conspiracy—under which the USSF, whose voting membership includes professional leagues, has combined in a concerted effort with MLS and USL to deny the NASL and any other men's professional soccer league located in the U.S. and Canada sanctioning as a Division I league, thereby precluding any such league from effectively competing with MLS in the market for top-tier men's professional soccer leagues located in the U.S. and Canada—and its anticompetitive character is apparent without elaborate industry analysis.  Accordingly, it should be found to be a violation of Section 1 of the Sherman Act under the abbreviated Rule of Reason, *i.e.*, the "quick look" test.

205.     This contract, combination, or conspiracy has led to significant anticompetitive effects in the relevant markets, as alleged above, and has caused antitrust injury to consumers and competitors in the relevant markets.  It also has maintained the monopoly power of MLS in the top-tier relevant market, has sought to grant USL monopoly power in the second-tier relevant

market, and has created nearly insurmountable barriers to effective competition against MLS and USL in their respective markets.

206.    This contract, combination, agreement, understanding or concerted action has not served any procompetitive purpose, and has instead served to create and preserve the monopoly power of MLS and to economically benefit MLS's economic partner, USSF.  Further, even if any of the Professional League Standards at issue had some plausible procompetitive purpose, reasonably less restrictive means existed to achieve any such purpose, rendering the Professional League Standards unlawful.  In particular, other federation members of FIFA around the world have not found it necessary to impose and implement similarly restrictive Professional League Standards.  Nor have other professional team sports leagues in the U.S. found it necessary to have any such Professional League Standards, leaving it to competition and consumer choice to determine which professional team sports leagues were top tier and most desired by consumers. There is simply no justification for having a private group, like the USSF, impose such "standards" to unreasonably restrict competition.

207.    Accordingly, in the alternative, the restraints at issue should be found to be a violation of Section 1 of the Sherman Act under the full Rule of Reason analysis.

208.    The USSF's anticompetitive conspiracy at issue occurred in and unreasonably restrained interstate commerce.

209.    The USSF's anticompetitive conspiracy has directly and proximately caused antitrust injury to the business and property of the NASL, its members and consumers.  The NASL and consumers will continue to suffer antitrust injury, unless the USSF is enjoined from continuing to engage in the foregoing violations of law.

## <u>COUNT TWO</u>

**(Violation of Section 2 of the Sherman Act: Conspiracy to Monopolize Markets Top-Tier and Second-Tier Professional Soccer Leagues Located in the U.S. and Canada)**

210.    The NASL incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

211.    The USSF and its co-conspirators have entered into a continuing agreement, combination, or conspiracy with the specific intent of granting and maintaining for MLS a monopoly in the relevant market for top-tier professional soccer leagues located in the U.S. and Canada, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

212.    The USSF and its co-conspirators have entered into a continuing agreement, combination, or conspiracy with the specific intent of granting and maintaining for USL a monopoly in the relevant market for second-tier professional soccer leagues located in the U.S. and Canada, and with the additional specific intent of maintaining for MLS a monopoly in the relevant market for top-tier professional soccer leagues located in the U.S. and Canada, by destroying NASL as a potential competitor to either MLS or USL, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

213.    The USSF and its co-conspirators have engaged in concerted action, including numerous overt acts described above, with the specific intent of obtaining and maintaining such monopoly power for MLS and USL in their respective relevant markets for the purposes of unreasonably excluding or limiting competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  The concerted actions of the USSF and its co-conspirators are exclusionary in nature, do not constitute legitimate business activities, and are an abuse of their market position.

214.    The USSF's conspiracy to monopolize occurred in and unreasonably restrained interstate commerce.

215.    The USSF's conspiracy to monopolize has directly and proximately caused antitrust injury to the business and property of the NASL, its members and consumers. The NASL, its members and consumers will continue to suffer antitrust injury and damages unless the USSF is enjoined from continuing to engage in the foregoing violations of law.

## **PRAYER FOR RELIEF**

WHEREFORE, the NASL prays as follows:

A.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by the USSF and its co-conspirators, as alleged in this Complaint, be adjudged to have been a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.    That the conspiracy of USSF and its co-conspirators to acquire and maintain monopoly power for MLS and USL in the relevant markets, and the acts done in furtherance thereof, as alleged in this Complaint, be adjudged to have been in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

C.    That the Court issue a preliminary injunction maintaining the status quo of the NASL's Division II status pending the resolution of this action;

D.    That the Court issue a permanent injunction enjoining the USSF from continuing to promulgate or implement Professional League Standards to sanction men's professional soccer leagues in separate closed divisions or any equivalent classifications, leaving the competitive market and consumer preference to determine which men's professional soccer leagues, including the NASL, MLS and USL, are top-tier, second-tier or some other competitive level;

E.    That the USSF be enjoined from further violations of the antitrust laws;

F.    That judgment be entered for the NASL against the USSF pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, including the award of reasonable costs and attorneys' fees; and

G.      That the NASL be accorded such other, further or different relief as the case may

require and the Court may deem just and proper under the circumstances.


Dated:      September 19, 2017

                                            By:      s/Jeffrey L. Kessler
                                                     Jeffrey L. Kessler
                                                     David G. Feher
                                                     Mark E. Rizik Jr.
                                                     Isabelle Mercier-Dalphond
                                                     **WINSTON & STRAWN LLP**
                                                     200 Park Avenue
                                                     New York, New York 10166
                                                     Tel: (212) 294-6700
                                                     Fax: (212) 294-4700
                                                     jkessler@winston.com
                                                     dfeher@winston.com
                                                     mrizik@winston.com
                                                     imercier@winston.com

                                                     *Counsel for Plaintiff North American Soccer*
                                                     *League, LLC*