UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

NORTH AMERICAN SOCCER LEAGUE, LLC,

                        Plaintiff,

          v.

UNITED STATES SOCCER FEDERATION, INC.,

                       Defendant.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
17-CV-05495 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff North American Soccer League, LLC ("NASL" or "Plaintiff") filed the above-captioned action on September 19, 2017, alleging violations of Section 1 and Section 2 of the Sherman Antitrust Act.  (Compl., Docket Entry No. 1.)  On September 20, 2017, Plaintiff moved for a preliminary injunction, seeking a Division II designation for the duration of this litigation.[1]  (Pl. Mot. for Prelim. Inj. ("Pl. Mot."), Docket Entry No. 3; Pl. Mem. in Supp. of Pl. Mot. ("Pl. Mem."), Docket Entry No. 3-1.)  Defendant United States Soccer Federation, Inc. ("USSF" or "Defendant") opposed the motion on October 16, 2017, and Plaintiff replied on October 23, 2017.  (Def. Opp'n to Pl. Mot. ("Def. Opp'n"), Docket Entry No. 27; Pl. Reply to Def. Opp'n to Pl. Mot. ("Pl. Reply"), Docket Entry No. 30.)  The Court heard oral arguments on October 31, 2017.[2]  Although the Court finds that Plaintiff has shown irreparable harm, that the balance of hardships tips in its favor, and that an injunction would not harm the public interest, because as set forth below, the Court finds that

---

[1]  United States Soccer Federation Inc. assigns Division I, II, and III designations to professional soccer leagues.  The designations signify level of play and other qualities about the leagues.

[2]  The parties declined to present testimony at the hearing; both sides asserted that the Court can decide this motion as a matter of law.  *See* October 31, 2017 Hr'g Tr. 72:17–19; 93:14–18.

Plaintiff has not made a clear showing of entitlement to relief, the Court denies Plaintiff's motion

for a preliminary injunction.

## I. Background

Plaintiff NASL is a men's professional soccer league located in the United States and

Canada.[3]  (Compl. ¶ 2.)  NASL formed in 2009 when several teams broke away from the United

Soccer Leagues, another men's professional league, due to differing visions.  (*Id.* ¶ 77; Stefan

Szymanski Decl. in Supp. of Pl. Mot. ("Szymanski Decl.") ¶ 76, Docket Entry No. 3-3.)  At that

time, the United Soccer Leagues consisted of two divisions, USL First and Second Divisions

("USL-1" and "USL-2" respectively).  (Sunil K. Gulati Decl. in Supp. of Def. Opp'n to Pl. Mot.

("Gulati Decl.") ¶ 113, Docket Entry No. 26-1.)  After the formation of the NASL, the remaining

teams in the United Soccer Leagues later created the current existing United Soccer League Pro

("USL").  (*Id.*)  From its inception, NASL has been organized under a club-centric model with each

individual team retaining ownership and decision-making power.  (Compl. ¶¶ 9, 77.)

Defendant USSF is a non-profit, membership organization which serves as the governing

body for soccer in the United States.  (*Id.* ¶ 16; Pl. Mem. at 1.)  USSF asserts that it derives its

authority to govern professional soccer from Fédération Internationale de Football Association

("FIFA"), a private international soccer federation.[4]  (Compl. ¶¶ 16, 59.)  USSF also serves as the

---

[3]  In deciding this motion, the Court has reviewed all submissions of the parties, including expert declarations, the substance of which is discussed in the "II. Discussion."

[4]  Although Plaintiff challenges USSF's authority (*see* October 31, 2017 Hr'g Tr. 15:23–25), Plaintiff has failed to provide sufficient evidence for the Court to conclude that Defendant has no authority to regulate divisional designations of men's professional soccer leagues in the United States, whether formally through FIFA or informally through the respect and recognition accorded by consumers at large.  Indeed, Plaintiff acknowledges as much in its Complaint.  (*See* Compl. ¶ 20 ("No professional soccer league located in the United States and Canada would have sufficient credibility with fans, sponsors or broadcasters if it were not recognized by the USSF and FIFA, and quality professional soccer players would not play for teams in a league in the United States that was not recognized by the USSF and FIFA.").)

national governing body for U.S. Olympic and amateur soccer under the Ted Stevens Olympic and Amateur Sports Act ("Stevens Act").  (*Id.* ¶ 59 n.3.)  In both capacities, USSF's stated mission is to "make soccer, in all its forms, a preeminent sport in the United States and to continue the development of soccer at all recreational and competitive levels."  (Steven R. Peterson Decl. in Supp. of Def. Opp'n to Pl. Mot. ("Peterson Decl.") ¶ 44, Docket Entry No. 26-6.)  The USSF membership is divided primarily into four categories: (1) a Youth Council, representing the interests of youth soccer; (2) an Adult Council, representing the interests of amateur soccer; (3) a Professional Council, representing the interests of professional leagues that are members of USSF; and (4) an Athlete's Council, representing soccer athletes.  (Gulati Decl. ¶ 33.)  These four councils, along with a few other eligible voters, make up the National Council, the legislative body of USSF.  (*Id.* ¶¶ 32–35.)

USSF adopts, amends and applies the Professional League Standards ("PLS"), a set of requirements for professional soccer leagues seeking Division I, II, or III designation in the United States.  Similar to the structure of the National Collegiate Athletic Association ("NCAA"), Division I status is the most desirable.  (*See* Pl. Mem. at 2.)  Division I status signifies the highest level of competition and overall status, conferring several competitive and financial benefits, including better positioning in international competitions and higher-quality sponsorships.  (Compl. ¶¶ 41, 62–63.)  NASL asserts that USSF adopted and applied the PLS in a discriminatory manner as part of a conspiracy to entrench Major League Soccer, LLC ("MLS"), a men's soccer league with long-standing ties to Defendant, and USL as the sole Division I and II soccer leagues in the United States, respectively.[5]  (*Id.* ¶¶ 2, 4, 7, 23, 52, 122.)

---

[5]  Plaintiff asserts that USL has "embraced 'its minor league' status below that of MLS and has entered into various commercial arrangements with MLS to serve as its reserve league."  (Compl. ¶ 3.)  Thus, Defendant and MLS allegedly have an incentive to also benefit USL.

### a. Development of MLS and ties to USSF

Professional "football" or soccer has had a long, troubled history in the United States. While USSF itself was initially formed in 1913 in part in combination with the American Football Association, an organization "compromised principally of professional leagues and teams," professional soccer leagues in the United States have failed to maintain lasting success. (Gulati Decl. ¶¶ 48, 69.) Until the 1990s, there were numerous leagues and teams, with the original North American Soccer League ("Original NASL") being most prominent.[6] (*Id.* ¶ 48; Compl. ¶ 70.) Formed in 1968, the Original NASL folded in 1984, leaving a void in top-tier professional soccer leagues in the United States. (Compl. ¶ 70; Gulati Decl. ¶ 48.)

In 1988, FIFA awarded USSF the right to host the 1994 FIFA World Cup in the United States. (Gulati Decl. ¶ 50.) In exchange, FIFA demanded that USSF "facilitate the development of a sustainable first division outdoor professional men's soccer team." (*Id.* ¶ 50; Compl. ¶¶ 71–72.) With this mandate, USSF eventually formed World Cup USA 94 ("USA 94"), a separate legal entity, which was tasked with establishing first division professional soccer in the United States. (Gulati ¶¶ 52–54.) After review of plans submitted by three groups, the USSF Board of Directors (the "Board") selected Major League Professional Soccer, Inc. ("MLPS"), an entity backed by Alan I. Rothenberg, the then-President of USSF, to develop the league. (*Id.* ¶¶ 54, 90; Compl. ¶¶ 71–74.) After the 1994 World Cup, MLPS was reorganized into MLS. (Gulati Decl. ¶ 58.) With the help of a five-million-dollar loan from the United States Soccer Foundation, an entity created to manage the assets generated from the 1994 World Cup, MLS began league play in 1996. (*Id.* ¶¶ 56–59, 65; Compl. ¶ 74.) Given soccer's lack of popularity in the United States, USSF prioritized "stability and the avoidance of consumer confusion" in helping MLS take hold. (Gulati Decl. ¶ 64.) Thus,

---

[6] The Original NASL has no connection to the current NASL.

USSF made a conscious decision "to not sanction any other league as a first division (Division I) men's professional outdoor league until MLS had finished its second full season in 1997 — to give it a 'runway' of sorts." (*Id.* ¶ 64.) MLS began league play with ten teams in 1996 and has operated continuously as a Division I league. (*Id.* ¶ 65; Compl. ¶ 21.) In contrast to NASL, MLS began play under a single-entity structure, reserving ownership and management power in the league itself. (Compl. ¶ 75.)

MLS and USSF have also maintained a business relationship, most notably through Soccer United Marketing ("SUM"), the marketing affiliate for MLS. (*Id.* ¶¶ 22, 32; Gulati Decl. ¶ 227.) In 2004, after "negotiations that were conducted at arms-length, [and] were lengthy and occasionally testy," USSF granted SUM sponsorship and broadcast rights to the Men's and Women's National Team games over which it controls.[7] (Gulati Decl. ¶ 229.) These rights were then "bundle[d]" with MLS' rights to obtain a much more lucrative sponsorship and broadcast deal than MLS and Defendant could have gained standing alone. (*Id.* ¶ 230.) SUM negotiated an eight-year, $720 million broadcasting agreement with ESPN in 2014 for USSF's and MLS' joint package to run through 2022. (Compl. ¶ 106.) In 2015, USSF extended its marketing relationship with SUM for another eight-years.[8] (Gulati Decl. ¶ 231.)

### b. History of PLS and governance structure of USSF

The PLS were first developed in 1995, a year prior to MLS' inaugural season.[9] (*Id.* ¶¶ 74,

---

[7] The Defendant does not own the rights to the games the national teams play in official FIFA and/or Confederation of North, Central American and Caribbean Association Football ("CONCACAF") tournaments. (*See* Sunil K. Gulati Decl. in Supp. of Def. Opp'n to Pl. Mot. ("Gulati Decl.") at 67 n.8, Docket Entry No. 26-1.)

[8] Plaintiff also asserts that USSF maintains various other personal, commercial, and competitive ties with MLS. (*See* Compl. ¶¶ 109–16.)

[9] USSF also asserts that some form of classification has always existed, even prior to the implementation of the PLS. (Gulati Decl. ¶ 71.)

78.)  "The Division I PLS were adopted in 1995 and the Division II and III PLS were adopted in 1996."  (*Id.* ¶ 78.)  The PLS were revised in 2008, 2010 (for only Division II) and in 2014.  (*Id.* ¶ 78; Szymanski Decl. ¶ 63.)  There were also proposed changes in 2015 that were never implemented due to objections by NASL.  (Gulati Decl. ¶ 78.)

Since 2008, the Professional League Standard Task Force (the "Standard Task Force") has been responsible for reviewing and proposing amendments to the PLS.  (*Id.* ¶ 79.)  The Standard Task Force is comprised of individuals that USSF believes are "familiar with professional soccer," excluding Board members and others "then-associated with any professional leagues."  (*Id.* ¶ 79.)  The Standard Task Force's recommendations are first submitted to the "then-existing" professional leagues for review and comment.  (*Id.* ¶ 80.)  After reviewing the comments provided by the leagues, the Standard Task Force provides the Board with a final set of proposed amendments.  (*Id.* ¶ 80.)  The Board then reviews and votes on the proposals, but excludes from voting all members who have a "then-current relationship" with any professional leagues.  (*Id.* ¶ 81.)

Since at least 2009, USSF has required professional leagues to apply annually for a divisional designation.  (*Id.* ¶ 108.)  As part of this process, the leagues must submit an "annual report," including "the status of compliance" with the PLS, requests and reasons for any waivers if necessary, and a plan to fully comply.  (*Id.*)  These reports and applications are submitted to the Professional League Task Force (the "Application Task Force") for review.  (*Id.* ¶ 109.)  After review, the Application Task Force submits its recommendation for approval or denial to the Board.  (*Id.* ¶ 111.)

The Board, which ultimately votes on amendments to and applications of the PLS, consists of fifteen directors.  (*Id.* ¶ 43.)  The Board is comprised of a cross-section of soccer interests in the United States, including representatives of athletes, amateurs, and professionals.  (*Id.*)  The National

Council elects three independent directors, in addition to the USSF President and Vice President. (*Id.* ¶¶ 43–44.)  The professional leagues officially have two votes on the Board in the form of the Chairman of the Professional Council and one additional Professional Council delegate.  (*Id.* ¶ 43.) Given the voting structure of the Professional Council, which considers the number of teams and season attendance at games for each league, MLS has had the voting power to control who represents the Professional Council on the Board.  (Compl. ¶ 17; Roger Pielke, Jr. Decl. in Supp. of Pl. Mot. ("Pielke Decl.") ¶¶ 32, 58, Docket Entry No. 30-25.)  Plaintiff asserts that MLS has thus controlled the official recommendations made by the Professional Council to the Board with regard to its divisional designation.  (Compl. ¶ 17.)  Plaintiff also contends that given the personal ties between USSF and MLS, the latter has been able to exert influence on the Board in a more informal manner.  (*Id.* ¶¶ 18–19.)

### c.  Amendments to the PLS

The PLS operated in its original form from 1996 to 2008.  (Gulati Decl. ¶ 78.)  In 2008, however, Sunil Gulati, the then-USSF President, asked Burton Haimes, a Board member elected by the Youth Council, to form the Standard Task Force to "revisit" the standards.  (*Id.* ¶ 82.)  After review, the Standard Task Force proposed amendments to the "time zone requirement" which had previously required Division I leagues to operate in at least three time zones and Division II leagues to do so in at least two time zones.  (*Id.*)  The proposed change required the time zones be "in the continental United States."  (*Id.*; Compl. ¶ 125.)  The proposal was adopted by the Board after review and comment by the then-existing professional leagues.  (Gulati Decl. ¶ 86.)

In 2010, in response to the "issues created by NASL and USL-1," Gulati appointed another Standard Task Force to revisit the Division II PLS.  (*Id.* ¶ 90.)  This time the Standard Task Force recommended that the Division II PLS be revised to require "each team to post a $750,000

performance bond, with a league maximum of $15 million," to cover the cost of a team's operations in case it defaulted mid-season. (*Id.* ¶ 91.) The individual team bond could be reduced to $500,000 and the league maximum to $10 million if all the teams agreed to make the bonds joint and several. (*Id.*) These proposals were adopted by the Board. (*Id.* ¶ 93.)

Sometime in "late 2012," USSF decided to take a more "comprehensive review" of the PLS because "the sport of soccer [had] beg[u]n to experience growth and momentum." (*Id.* ¶ 94; Steven Davidoff Solomon Decl. in Supp. of Def. Opp'n to Pl. Mot. ("Solomon Decl.") ¶ 73, Docket Entry No. 26-7.) However, before changes were implemented, NASL announced expansion plans in mid-2013. (Compl. ¶ 134.) A few months later, on November 18, 2013, USSF officially announced that it would be revising the PLS. (*Id.*) While the Standard Task Force proposed a number of amendments, those most relevant to this dispute are as follows: (1) increasing the minimum number of teams from ten to twelve, with fourteen required by year three in Division I; (2) requiring teams to occupy three time zones in the continental United States, specifically for the first time in the Eastern, Central and Pacific time zones in Division I and Division II (after six years in operation); and (3) requiring each team to have a "principal owner" with an individual net worth of at least $40 million dollars, in addition to the existing $70 million combined net worth and $1 million per-team performance bond requirements.[10] (*Id.* ¶¶ 136–43; Gulati Decl. ¶ 96.) These proposals were provided to all the then-existing professional leagues for review and comment. (Gulati Decl. ¶ 97; Nov. 18, 2013 USSF Memo re: PLS, annexed to Gulati Decl. as Ex. 9.) In response, Bill Peterson, the then-Commissioner of NASL sent USSF a letter focusing primarily on Division II PLS that were

---

[10]  Plaintiff asserts in the Complaint that the Standard Task Force also recommended that the field size requirement be amended. (*See* Compl. ¶ 140) ("[A]ll teams, rather than 75%, had to have FIFA-approved 70 yards by 110 yards fields[.]") Defendant suggests that this amendment was implemented in 2010. (*See* Division I and II PLS Amendments Chart ("Amendments Chart"), annexed to Gulati Decl. as Ex. 62.)

adopted in 2010, asking for a reduction in the performance bond requirements for NASL teams and the league as a whole. (*Id.* ¶ 98; Nov. 27, 2013 NASL Letter re: PLS, annexed to Gulati Decl. as Ex. 10.) Without any further comments from the NASL, the proposed amendments were adopted by the Board on February 28, 2014. (Gulati Decl. ¶ 99; Compl. ¶ 136.)

Despite the amendments in 2014, Gulati and USSF believed more changes were necessary as early as December 2014. (Compl. ¶ 147; Gulati Decl. ¶ 101.) Gulati "expressed [] concern" that the grant of too many waivers "to NWSL[11], NASL, and USL" were having a negative impact on the credibility of the PLS. (Gulati Decl. ¶ 101.) Accordingly, Gulati "ask[ed] the Standard Task Force to once again look at strengthening the standards." (*Id.*) But before any amendments were proposed, NASL submitted a Division I application to USSF for the first time on May 31, 2015. (Compl. ¶ 146.) A few weeks later, on June 24, 2015, the Standard Task Force recommended a number of changes, the most relevant to this dispute are as follows: (1) increasing the minimum team requirement from twelve to sixteen for Division I; (2) strengthening the market size requirement so that seventy-five percent of the league's teams had to play in metropolitan markets of at least 2,000,000 people, doubling the previous 1,000,000 people requirement for Division I; (3) increasing the combined net worth requirement from $70 to $80 million per team for Division I; and (4) requiring each league to present annual plans for expansion and growth. (*Id.* ¶¶ 147–54; Gulati Decl. ¶ 104.) In response to these proposed changes, NASL submitted a letter that largely mirrors the Complaint in this dispute. (Gulati Decl. ¶ 141; July 23, 2015 NASL Letter re: PLS, annexed to Gulati Decl. as Ex. 18.) Following NASL's letter, the amendments were never submitted to the Board and never adopted. [12] (Gulati Decl. ¶ 105.)

---

[11]  The Court believes this to be the National Women's Soccer League.

[12]  As part of the proposed 2015 amendments, the Standard Task Force recommended eliminating the requirement for operating in specific time zones in the continental United States.

### d. Challenges to the application of the PLS

NASL has had designs to compete with MLS in Division I from the very beginning of its existence.[13]  (*See* Compl. ¶¶ 126–27.)  Despite such expectations, NASL first applied for Division II sanctioning for the 2010 season after breaking away from the United Soccer Leagues.  (*Id.* ¶ 129; Gulati Decl. ¶ 114.)  At the same time, the teams remaining in USL-1 also applied for a Division II designation.  (*Id.*)  The Application Task Force found both applications lacking, including the failure of both leagues to meet the minimum eight team requirement.  (Gulati Decl. ¶ 116.)  Both leagues were thus denied an independent Division II sanction for the 2010 season and instead were allowed to compete jointly in 2010 as a USSF-run league under a Division II designation.  (Compl. ¶¶ 129, 133.)

NASL applied for an independent Division II sanction for the 2011 season.  (Gulati Decl. ¶

---

(*See* Gulati Decl. at 25–26.)  The Board did not vote on the change given Plaintiff's complaints about the other proposed amendments.  (*Id.* ¶ 78.)

[13]  Plaintiff asserts that the PLS were designed from inception to preclude competition and continue to be applied in that manner.  (*See* Compl. ¶¶ 157–74.)  In support of its theory, NASL points to the minimum stadium requirement and two player development requirements.  (*Id.* ¶ 157.)  NASL asserts that the 15,000 minimum seating requirement is anticompetitive because new entrants often have difficulty securing stadiums in compliance.  (*Id.* ¶ 159.)  Given its status as a Division II or "minor league," NASL has struggled to convince government officials to help finance compliant facilities.  (*Id.* ¶¶ 161–62.)  NASL further asserts that even the English Premier League, a recognized world-class soccer league, could not have satisfied the stadium requirement.  (*Id.* ¶ 164.)  NASL further asserts that MLS failed to meet this requirement for all its teams from 2009 to 2015.  (*Id.* ¶ 165.)

Plaintiff similarly challenges two 2014 Division I PLS player development requirements.  The first, dating back to 1995, states that "[e]ach U.S.-based team must demonstrate a commitment to a player development program," which "may be satisfied by supporting either an amateur or professional reserve team competing in a USSF-sanctioned league or by the league itself."  (*Id.* ¶ 167.)  The second requirement, dating back to 2008 and building off of the 1995 PLS, states that "[e]ach U.S.-based team must maintain teams and a program to develop players at the youth level," which "may be satisfied by fielding teams in a Federation academy program."  (*Id.*)  Plaintiff asserts that non-Division I leagues have great difficulty convincing players and teams to be in a "minor league for a minor league."  (*Id.* ¶¶ 170–71.)  Plaintiff, however, has not referred to the development requirements of the PLS in its motion papers.

118.)  Despite NASL's failure to comply with all of the PLS Division II requirements, the Board approved the Application Task Force's recommendation to grant NASL "provisional" membership and sanction as a Division II league.  (*Id.*)  This provisional status was revoked, however, after questions arose regarding the financial viability of several NASL teams.  A month after USSF revoked NASL's Division II designation, the NASL re-applied, despite failing to comply with the PLS.  (*Id.*)  The Board again granted NASL a "provisional" Division II status for the 2011 season. (*Id.* ¶¶ 120, 125.)  During this time, USSF granted USL Division III status.  (*Id.* ¶ 119.)

In 2011, Plaintiff applied to change its "provisional" Division II status to full membership. Despite NASL's failure to comply with the PLS, the Board adopted the Application Task Force's recommendation to grant the application with various waivers.  (*Id.* ¶¶ 126–27; Compl. ¶ 134.)  At the same time, the Board re-sanctioned MLS as a Division I league and USL as a Division III league, both without any waivers.  (Gulati Decl. ¶ 127.)

The following year, in 2012, the Board again granted NASL's application for Division II status with the necessary waivers.  (*Id.* ¶¶ 128–29.)  At the same time, the Board re-sanctioned MLS with a single waiver and re-sanctioned USL without any waivers.  (*Id.* ¶ 129.)  In contrast, in 2013, NASL's application was granted without any waivers while MLS and USL were each approved with the need for several team waivers.  (*Id.*)  In 2014, the Board re-sanctioned MLS without any waivers and sanctioned both NASL and USL with several team waivers.  (*Id.*)

On May 31, 2015, NASL submitted its first and only application for Division I status. (Compl. ¶ 146; Gulati Decl. ¶ 137.)  In its application, NASL asserted that it satisfied all Division I standards *except* for those that it deemed illegitimate and anticompetitive.  (Compl. ¶ 146; Gulati Decl. ¶ 138.)  NASL thus requested waivers for the requirements it did not meet.  (Compl. ¶ 146.) On October 30, 2015, NASL sent a letter to USSF again reiterating its request for a Division I

sanction. (Gulati ¶ 149; Oct. 30, 2015 NASL Letter re: PLS and Division I Sanction, annexed to Gulati Decl. as Ex. 24.) USSF responded on November 6, 2015 by stating that it would consider NASL's letter as a request for necessary waivers to obtain a Division I sanction. (Gulati Decl. ¶ 150.) NASL later requested an opportunity to give a presentation to the Application Task Force on the merits of its application, including the illegitimacy of the parts of the PLS it did not meet, eventually making its presentation on December 5, 2015. (*Id.* ¶¶ 155–56; Nov. 23, 2015 NASL Letter re: Application Task Force, annexed to Gulati Decl. as Ex. 30.) On January 13, 2016, the Board granted NASL the opportunity to plead its case for Division I sanctioning to the Board. (*Id.* ¶ 163.) At the same time as the discussion over the PLS, the parties were also regularly communicating about NASL's relationship with Traffic Sports USA, Inc. ("Traffic Sports"), an entity with "substantial ownership interest in the [NASL] as well as a financial interest in several NASL teams." (*Id.* ¶¶ 124, 144.) Traffic Sports had been indicted for "racketeering, conspiracy, money laundering and fraud" a few days before NASL had submitted its Division I application. (*Id.*) After discussion and negotiation on both issues, the Board finally voted to reject NASL's Division I application on March 8, 2016.[14] (*Id.* ¶¶ 169–70.) The Board had previously already approved Division II sanctioning for NASL with the necessary waivers on December 6, 2015. (*Id.* ¶ 158.)

Unlike 2015, NASL only requested a Division II sanction in 2016, seeking three waivers. (*Id.* ¶ 185; Compl. ¶ 179.) NASL had suffered several setbacks in 2016, including the defection of several teams to the USL, and financial difficulty for others.[15] (Gulati Decl. ¶¶ 176, 180–81.)

---

[14] As a direct consequence, Plaintiff asserts that several teams decided to leave the NASL, with several teams joining MLS. October 31, 2017 Hr'g Tr. 97:19–25.

[15] Plaintiff argues that this, at least in part, was caused by the denial of its 2015 Division I application. October 31, 2017 Hr'g Tr. 97:19–25.

There was concern that NASL would struggle to field an eight team league for 2017. (*Id.* ¶¶ 180, 189.) Given these issues, representatives for the NASL requested that the Board delay its consideration of the divisional status of the NASL. (*Id.* ¶ 187.) Due to these and other concerns, the Application Task Force recommended that NASL's application for Division II status be rejected. (*Id.* ¶ 195; Compl. ¶ 179.) During this time, the Application Task Force also recommended that USL's Division II application be rejected. (Gulati Decl. ¶ 195.) Despite these recommendations, the Board voted to grant both leagues a provisional sanction for Division II subject to several conditions, including a showing of improvement. (*Id.* ¶ 203; Compl. ¶¶ 180–81.)

In August of 2017, both Plaintiff and USL submitted their applications to the Application Task Force for 2018 sanctioning. (Gulati Decl. ¶ 207; Letter re: 2018 Division II Application ("2018 Application Letter"), annexed to Gulati Decl. as Ex. 55; Compl. ¶ 183.) NASL's application sought two waivers for (1) the minimum team requirement and (2) the time zone requirement to have teams in the Eastern, Central and Pacific time zones. (Compl. ¶¶ 183–85.) NASL alleged that it was in "advanced discussions" with various potential ownership groups. (Gulati Decl. ¶ 208.) However, NASL did not provide much detail as to these discussions and conceded that two of its eight existing teams had not committed to return, (*id.*; 2018 Application Letter annexed to Gulati Decl. as Ex. 55.), and Defendant later discovered that the North Carolina team had been wavering in its commitment. (*Id.*) USL also requested waivers but its requests were "team-specific."[16] (*Id.* ¶ 210.) Following a presentation by NASL on September 1, 2017, the Board voted to deny NASL Division II status for 2018. (*Id.* ¶ 221; Compl. ¶ 186.) In contrast, the Board gave USL thirty days

---

[16] Defendant states that "team waivers" are categorically different from "league waivers." While league waivers make up the "basic foundation of any league," team waivers govern less critical issues such as "coaching license[s]," need for a "few hundred extra seats," and field measurements. *See* October 31, 2017 Hr'g Tr. 60:16–25.

to strengthen its application, potentially with the help of as many as twenty waivers.[17]  (Gulati Dec.

¶ 221; Compl. ¶ 187.)  Both decisions were communicated to the respective leagues on September

3, 2017.  (Compl. ¶ 186; Gulati Decl. ¶ 222.)

## II. Discussion

### a. Standard of Review

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v.*

*Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008).  The purpose of a preliminary injunction is

to "preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of*

*Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  "A party seeking a preliminary injunction must

ordinarily establish (1) irreparable harm'; (2) 'either (a) a likelihood of success on the merits, or (b)

sufficiently serious questions going to the merits of its claims to make them fair ground for

litigation, plus a balance of the hardships tipping decidedly in favor of the moving party'; [(3) that

the balance of hardships tips in its favor]; and ([4]) 'that a preliminary injunction is in the public

interest.'"  *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015), *cert.*

*dismissed sub nom. Allergan PLC v. New York ex. rel. Schneiderman*, 136 S. Ct. 581 (2015)

(citation omitted); *Benihana, Inc. v. Benihana of Tokyo, LLC,* 784 F.3d 887, 895 (2d Cir. 2015).

However, a heightened standard is appropriate where: "(i) an injunction is 'mandatory,' or (ii) the

injunction 'will provide the movant with substantially all the relief sought and that relief cannot be

undone even if the defendant prevails at a trial on the merits.'"  *New York ex rel. Schneiderman*, 787

F.3d at 650 (citation omitted)*.*  A mandatory injunction may be granted "only upon a clear showing

that the moving party is entitled to the relief requested, or where extreme or very serious damage

---

[17]  Defendant asserts that USL has not yet been sanctioned for Division II and therefore no waivers have been granted.  October 31, 2017 Hr'g Tr. 59:24–60:2.

will result from a denial of preliminary relief." [18]  *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (citation omitted).

Here, the heightened standard applies because Plaintiff requests a mandatory injunction seeking to "alter rather than maintain the status quo." [19]  *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012).  Defendant's divisional designation is granted on an annual basis.  (Gulati Decl. ¶ 108.)  Although designated as a Division II league for 2017, Plaintiff has already been denied Division II status for 2018.  (Compl. ¶ 186; Gulati Decl. ¶ 222.)  Plaintiff's requested relief would disrupt the status quo by effectively requiring Defendant to reverse its previous denial.  With or without court intervention, Plaintiff required Defendant to act affirmatively in its favor to receive *any* designation in 2018.  *See also Jessup v. Am. Kennel Club, Inc.*, 862 F. Supp. 1122, 1128 (S.D.N.Y. 1994) (applying heightened standard for mandatory

---

[18]  Plaintiff requests the Court find that the denial of an injunction would cause "extreme" or "very serious damage," thereby relieving Plaintiff of the burden to make a clear showing of entitlement to relief.  October 31, 2017 Hr'g Tr. 7:13–8:18.  The Second Circuit has provided little guidance on what constitutes sufficiently "extreme" or "very serious damage."  However, the Court finds instructive the cases involving a "total loss of business," where courts have only found that such total loss was "irreparable harm."  *See, e.g.*, *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York*, 749 F.2d 124, 126 (2d Cir. 1984); *Galvin v. New York Racing Ass'n*, 70 F. Supp. 2d 163, 170 (E.D.N.Y.), *aff'd sub nom. Galvin v. New York Racing Ass'n, Inc. (NYRA)*, 166 F.3d 1200 (2d Cir. 1998).  In addition, in a footnote in *Jacobson & Co. v. Armstrong Cork Co.*, the Second Circuit seems to suggest that irreparable harm and extreme or very serious damage are one and the same. 548 F.2d 438, 441 n.3 (2d Cir. 1977) ("Since it seems to us that 'irreparable harm' is indistinguishable from 'extreme or very serious damage,' we read *Clune* [*v. Publishers' Association of New York City*, 214 F. Supp. 520 (S.D.N.Y. 1963), *aff'd on the opinion below*, 314 F.2d 343 (2d Cir. 1963)] as merely a reaffirmation of the traditional reluctance to issue mandatory injunctions 'in doubtful cases or where the injury complained of is capable of compensation in damages.'").  However, the Court notes that the movants in these cases do not appear to have requested a finding of "extreme" harm.  Nevertheless, the Court declines Plaintiff's request and applies the clear entitlement to relief standard.

[19]  In advance of the hearing, the Court notified the parties that it had determined that Plaintiff was seeking a mandatory injunction and requested that the parties be prepared to address the higher standard.  (Order dated October 29, 2017.)

injuctions where plaintiff sought to restore former standards).  Under these circumstances,

Plaintiff's request is more analogous to a request for reinstatement of previously terminated

benefits.  *See, e.g., Lawrence v. Town of Brookhaven Dep't of Hous., Cmty. Dev. &*

*Intergovernmental Affairs*, No. 07-CV-2243, 2007 WL 4591845, at *6 (E.D.N.Y. Dec. 26,

2007) (holding request to "continue" previously terminated Section 8 benefits to be a mandatory

injunction) *aff'd*, 393 F. App'x 791 (2d Cir. 2010); *Union Cosmetic Castle, Inc. v. Amorepacific*

*Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 68 (E.D.N.Y. 2006) (finding reinstatement of previously

terminated business relationships with plaintiffs would constitute mandatory injunction); *Brown v.*

*New York City Health & Hosps. Corp.*, No. 96-CV-0156, 1996 WL 68558, at *2 (E.D.N.Y. Feb. 5,

1996) (finding request to reinstate plaintiffs to prior positions to be a request for mandatory

injunction).

### b.  Irreparable harm

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary

injunction," requiring the movant to show such injury is "likely" before the other elements may be

considered. [20] *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)

(citation omitted); *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999).  To

establish irreparable harm, "[p]laintiffs must demonstrate that absent a preliminary injunction they

will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that

cannot be remedied if a court waits until the end of trial to resolve the harm."  *Id.* (citation omitted).

Absent "extraordinary circumstances," injunctions are also unavailable where there is an "adequate

---

[20]  The Court notes the sometimes inconsistent recitations of the standard.  *New York ex rel. Schneiderman v. Actavis PLC* states that the movant must make a "strong showing" of irreparable harm and also show that the preliminary injunction is in the public interest.  787 F.3d 638, 650 (2d Cir. 2015), *cert. dismissed sub nom. Allergan PLC v. New York ex. rel. Schneiderman*, 136 S. Ct. 581 (2015).  The Court finds that Plaintiff has made a strong showing of irreparable harm.

remedy at law, such as money damages. *Id.* (citation omitted). Courts have "found irreparable harm where a party is threatened with the loss of a business," particularly when the "very viability" of the business is at risk. *Tom Doherty*, 60 F.3d at 37–38.

Plaintiff asserts several theories as to the irreparable harm it will suffer. First, Plaintiff alleges that it will likely cease to exist absent injunctive relief. (Pl. Mem. at 16.) In support, several current team owners have submitted declarations attesting to Plaintiff's dire circumstances. (*See* Riccardo Silva Reply Decl. in Supp. of Pl. Mot. ("Silva Decl.") ¶¶ 4–5, 8, 11, Docket Entry No. 30-21; Capriotti II Reply Decl. in Supp. of Pl. Mot. ("Capriotti II Decl.") ¶¶ 4–5, 8, 11, Docket Entry No. 30-22; Robert J. Watkins Reply Decl. in Supp. of Pl. Mot. ("Watkins Decl.") ¶¶ 4–5, 8, 11, Docket Entry No. 30-23.) The owners allege that Division III status is fundamentally at odds with the Plaintiff's business model. (*See* Silva Decl. ¶ 8; Capriotti II Decl. ¶ 8; Watkins Decl. ¶ 8.) Division III status allegedly does not provide sufficient revenues to continue operations "in a manner consistent with [Plaintiff's] plans," likely leading to the departure or closure of several teams. (*See* Silva Decl. ¶ 8; Capriotti II Decl. ¶ 8; Watkins Decl. ¶ 8; Rocco B. Commisso Decl. in Supp. of Pl. Mot. ("Commisso Decl.") ¶ 26, Entry Docket No. 3-2; Pl. Reply in Supp. of Pl. Mot. ("Pl. Reply") 3, Docket Entry No. 30.)

Defendant disagrees and claims that the "USL has shown that a league can not only survive, but thrive, as a Division III league." (Def. Opp'n at 24.) Plaintiff asserts that USL's success as a Division III league may be attributable to factors that are inapplicable to NASL, including a "reserve-league relationship with MLS."[21] (Pl. Reply at 4.) Further, Defendant asserts throughout the record that Plaintiff has been on shaky financial ground. (*See* Gulati Decl. ¶¶ 172, 180-81.) In

---

[21]  The Court recognizes that Defendant has submitted comparisons of NASL teams and USL teams that are not affiliated with MLS. However, as noted in the record, there are many other differences that may lead to differing outcomes, including the different trajectory of the leagues. *See* October 31, 2017 Hr'g Tr. 53:6–13.

addition, Defendant itself acknowledges the importance of its divisional designations. (*See* Compl.

¶ 63; Def. Opp'n at 25 (discussing importance of *maintaining* credibility of the PLS)); October 31,

2017 Hr'g Tr. 53:13 ("Certainly a sanction is beneficial."). Defendant thus understands that a drop

in divisional status may indeed "deal a death blow to the NASL."[22] (*See* Compl. ¶ 10.) Given the

likely total loss of its business, Plaintiff has established irreparable harm. *See also Galvin v. New*

*York Racing Ass'n*, 70 F. Supp. 2d 163, 170 (E.D.N.Y. 1988) ("But the loss of business need not be

total, so long as it is so great as to seriously compromise the company's ability to continue in its

current form."), *aff'd sub nom. Galvin v. New York Racing Ass'n, Inc. (NYRA)*, 166 F.3d 1200 (2d

Cir. 1998).[23]

---

[22] Defendant cites to various district courts opinions suggesting that the movant must provide "concrete data" or "detailed" financial information when the alleged irreparable harm is the potential destruction of a business. *See Auto Sunroof of Larchmont, Inc. v. Am. Sunroof Corp.*, 639 F. Supp. 1492, 1494 (S.D.N.Y. 1986); *Christ Gatzonis Elec. Contractor, Inc. v. New York City Sch. Const. Auth.*, No. 93-CV-2418, 1993 WL 262715, at *5 (E.D.N.Y. July 2, 1993). Although financial data and projections may be most probative of the imminent loss of a business, and may be required in some cases, the Court declines to find that such information is always required. Both *Auto Sunroof* and *Christ Gatzonis* involved cases where the movant only had self-serving statements to support its assertions. By contrast, in the instant action, Defendant itself acknowledges that Plaintiff is in financial trouble, and that a league's divisional status may have an impact on its finances. (*See* Compl. ¶ 63; Def. Opp'n to Pl. Mot. ("Def. Opp'n") at 25, Docket Entry No. 27); October 31, 2017 Hr'g Tr. 53:13.

Defendant also argues that the alleged harm is "a consequence of [Plaintiff's] own making." *See Commodex Sys. Corp. v. GTE Telenet Commc'ns Corp.*, 543 F. Supp. 164, 165 (S.D.N.Y. 1982). But to the extent that the PLS were applied in a discriminatory manner, any harm arising from the denial would not be considered "self-inflicted." In addition, as Plaintiff asserts, given its specific situation, Division III status does not appear to be a viable alternative.

[23] Because of the importance of Divisional status to its very business, Plaintiff has also demonstrated irreparable harm based on loss in reputation and good will. *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (explaining loss in goodwill constituting irreparable harm typically involve cases threatening the "very viability of the plaintiff's business") (citation omitted); (*see also* Riccardo Silva Reply Decl. in Supp. of Pl. Mot. ("Silva Decl.") ¶¶ 4–5, 8, Docket Entry No. 30-21; Capriotti II Reply Decl. in Supp. of Pl. Mot. ("Capriotti II Decl.") ¶¶ 4–5, 8, Docket Entry No. 30-22; Robert J. Watkins Reply Decl. in Supp. of Pl. Mot. ("Watkins Decl.") ¶¶ 4–5, 8, Docket Entry No. 30-23.) The Court, however, does not find Plaintiff's claim based on the potential loss of "high-quality player talent and other valuable employees" to be an independent basis for irreparable harm. (Pl. Mem. in Supp. of Pl. Mot. ("Pl. Mem.") 17, Docket Entry No. 3-1.)

Relatedly, Plaintiff also asserts that it will lose the interest of potential investors. (Pl. Mem. at 16.) In support of this argument, Plaintiff submitted letters of intent from six potential new teams interested in joining the NASL in 2018. (Letters of Intent, annexed to Rocco B. Commisso Reply Decl. in Supp. of Pl. Mot. ("Commisso Reply Decl."), Docket Entry No. 32, as Exs. B–G.) All six letters of intent expressly condition their commitment on Plaintiff retaining Division II status. Based on these contingent commitments, Plaintiff has demonstrated irreparable harm on the basis of potential loss of investors. *See Levinson v. Cello Music & Film Sys., Inc.*, 199 F.3d 1322 (2d Cir. 1999) (discussing possibility of irreparable harm if "potential investors" had been deterred by the uncertainty caused by the issue in dispute); *N. Am. Soccer League v. Nat'l Football League*, 465 F. Supp. 665, 672 (S.D.N.Y. 1979) (finding irreparable harm in part due to "chilling effect . . . upon potential new investors"). The loss of potential investors also supports Plaintiff's showing of irreparable harm based on total loss of business. Part of the reason Plaintiff pursued these teams is to stabilize its league structure.

### c. Clear showing of entitlement to relief

#### i. Sherman antitrust section 1 standard

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy" that *unreasonably* restraints trade.[24] 15 U.S.C.A. § 1; *United States v. Apple, Inc.*, 791 F.3d 290,

---

While loss of high-quality talent, especially in a sports setting, may constitute irreparable harm, Plaintiff's proffered evidence is too speculative. In discussing the potential loss of players, the NASL owners discussed the *possibility*, rather than *likelihood* of harm. (*See* Silva Decl. ¶ 10 ("many of our top players *may* leave") (emphasis added); Capriotti II Decl. ¶ 10 (same); Watkins Decl. ¶ 10 (same); *see also Jessup v. Am. Kennel Club, Inc.*, 862 F. Supp. 1122, 1127 (S.D.N.Y. 1994) ("[A] party seeking preliminary injunctive relief must show a *likelihood* of irreparable injury, not a *possibility* of irreparable injury[.]"). But the potential loss of players, and other complications arising with other employees support the concern of loss of business. (*See* Silva Decl. ¶ 11.)

[24] Although the Plaintiff seeks permanent relief under both Section 1 and 2 of the Sherman Act, Plaintiff moves only under Section 1 for preliminary injunctive relief. Thus the Court will only address the likelihood of success of the Section 1 claim.

320–21 (2d Cir. 2015) ("Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,' [the Supreme] Court has long recognized that Congress intended to outlaw only unreasonable restraints.") (citing *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997), *cert. denied*, 136 S. Ct. 1376 (2016)). Thus, to succeed on a Section 1 claim, "a plaintiff must prove that the common scheme designed by the conspirators 'constituted an unreasonable restraint of trade either per se or under the rule of reason.'" *Apple*, 791 F.3d at 321 (citation omitted). Courts "presumptively" apply the rule of reason which requires consideration of "all of the circumstances of a case" in deciding whether the challenged practice violates Section 1. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49-50 (1977). "Per se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive." *Cont'l T.V.*, 433 U.S. at 50. Given their potential for "significant procompetitive benefits," standard-setting by private associations are typically evaluated under the rule of reason. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988). Here, Plaintiff concedes that a variation of the rule of reason should apply. (*See* Pl. Mem. at 19–23.) The Court, however, first addresses the threshold inquiry of the existence of a concerted action. *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010) ("[A]n arrangement must embody concerted action in order to be a 'contract, combination . . . or conspiracy'" under [Section] 1").

### ii. Concerted action

A conspiracy in violation of Section 1 requires proof of "a conscious commitment to a common scheme designed to achieve an unlawful objective" demonstrated by "direct or circumstantial evidence that tends to exclude the possibility of independent action by the [parties].'"[25] *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). While evidence of

---

[25] The Court rejects Defendant's argument that the alleged conspiracy is "implausible" because the PLS predate the Plaintiff, the "object of the supposed conspiracy," by "nearly 15 years."

"parallel conduct can be probative . . . [of] an antitrust conspiracy," such evidence "alone will not suffice."[26] *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987). "Accordingly, [] a plaintiff must show the existence of additional circumstances, often referred to as plus factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apple*, 791 F.3d at 315 (citation and internal quotation marks omitted). "These 'plus factors' may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Mayor of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (citation omitted). "[T]hese plus factors are neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Id.* at 136 n.6.

Plaintiff first claims that the adoption and changes to the PLS are express agreements in and of themselves sufficient to satisfy the concerted action prong of Section 1.[27] (*See* Pl. Reply at 4–5

_____

(Def. Opp'n at 14.) This reading of the Complaint fails to consider Plaintiff's allegation that the PLS were designed to prevent *any* competitor from challenging MLS at *any* time. (*See* Compl. ¶¶ 157–74.) A conspiracy that seeks to eliminate all *future* competition cannot be said to be lawful for lack of a specific target. *See Associated Press v. United* States, 326 U.S. 1, 12 (1945) ("Combinations are no less unlawful because they have not as yet resulted in restraint."). "Trade restraints of this character, aimed at the destruction of competition, tend to block the initiative which brings newcomers into a field of business and to frustrate the free enterprise system which it was the purpose of the Sherman Act to protect." *Id.* at 13–14. Moreover, Plaintiff also asserts that the PLS have been revised and applied in a discriminatory fashion favoring MLS. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988) ("Concerted efforts to *enforce* (rather than just agree upon) private product standards face more rigorous antitrust scrutiny.") (emphasis in original).

[26] "Parallel conduct" refers to the same or substantially similar actions taken by actors on the same level. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) ("A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'"), *cert. denied*, 136 S. Ct. 2485 (2016).

[27] Plaintiff clarified in its reply its theory on "concerted action." (Pl. Reply to Def. Opp'n to Pl. Mot. ("Pl. Reply") 4–5, Docket Entry No. 30.) In its moving papers, failing to provide any

("[T]he USSF Standards Task Force agree upon new Standards, and the USSF's Board members then vote (and thus agree) on whether to promulgate them."); *see also* Compl. ¶ 16 ("When these members act together with USSF to enact Professional League Standards, they are entering into contracts, combinations and conspiracies as those terms are defined under the Sherman Act.").)

Although *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988), provides some support that any standard promulgated by a private standard-setting organization is inherently "an implicit agreement not to trade," the Second Circuit has cautioned that "every action by a trade association is not concerted action by [its] members." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999). "Consistent votes," absent additional evidence, is best viewed as "parallel conduct . . . equally consistent with legal behavior." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 437 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015), *cert. denied*, 136 S. Ct. 2485 (2016); *see also Jessup*, 862 F. Supp. at 1129 (observing the weakness of antitrust claims where the plaintiff failed to "identify or refer to specific acts or activities suggesting any illegal agreement or concerted action by Defendants" to revise the challenged standard); *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 273 (5th Cir. 2008) (citing *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293–94 (5th Cir. 1988), for proposition "that though a trade association naturally involves collective action by competitors, it is

_____

direct evidence of a "meeting of the minds," Plaintiff merely alleged that the Defendant "consists of many separate economic actors *capable* of concerted conduct." (Pl. Mem. at 19) (emphasis added). Plaintiff in a conclusory manner asserted that "agreements among these parties satisfy the concerted action requirement." (*Id.*) Given this broad assertion of "concerted action," Plaintiff appears to argue that any agreement involving some combination of SUM, USL, MLS, and USSF and the Board members, in addition to the standards, demonstrate concerted action. *See* October 31, 2017 Hr'g Tr. 31:7–12 ("I have to show it's a concerted agreement, which I think I have, because the agreements are in the standards themselves. And I also allege an agreement with MLS, that's another agreement I allege in USL[.]"). Assuming this is Plaintiff's argument, the Court's reasoning regarding both direct and circumstantial evidence would apply with equal force to any agreement that Plaintiff may articulate.

not by its nature a 'walking conspiracy'").

At the very least, Plaintiff must provide evidence that there was an *agreement to agree* to

vote a particular way, compromising each individual Board member's independence.[28] *See Indian*

---

[28] The Court recognizes that there may be cases where a by-law, rule, regulation or standard is so clearly anticompetitive on its face to warrant a finding of an "agreement" for purposes of Section 1. In such cases, the anticompetitive principles are written into the agreement itself, often involving active participation by horizontal competitors. *See Associated Press*, 326 U.S. at 11; *NCAA v. Bd. of Regents*, 468 U.S. 85, 94 (1984). In *Associated Press*, for example, the by-laws at issue specifically "contained provisions designed to stifle competition." 326 U.S. at 11. There, the district court "declared that the conditions which old members could impose upon new applicants for membership were 'plainly designed in the interests of preventing competition', and that the requirement of payments from new members to competing old members, 'were also designed to compensate competitors for the loss in value of their membership, arising out of the applicant's improved position as a competitor.'" *Id.* at 13 n.7. Likewise, in *NCAA v. Board of Regents*, the NCAA and its members entered into an agreement expressly "limit[ing] the total amount of televised intercollegiate football and the number of games that any one team may televise." 468 U.S. at 94. In addition to expressly limiting output, "[n]o member [wa]s permitted to make any sale of television rights except in accordance with the basic plan." *Id.* at 104. These cases indicate that courts may impute the existence of an agreement between participants when the agreement on its face is designed to preclude all competition or competitors. That is not the case here.

The Court also finds *North Carolina State Board of Dental Examiners v. F.T.C.*, cited by Plaintiff, to undermine rather than support Plaintiff's case. 717 F.3d 359, 365 (4th Cir. 2013), *aff'd*, 135 S. Ct. 1101 (2015). In *North Carolina State Board of Dental Examiners*, the Board at issue regulated the practice of dentistry in North Carolina. *Id.* at 364. The Board "consisted of six licensed dentists, one licensed hygienist, and one 'consumer member.'" *Id.* at 365. At issue was the Board's collusive actions to exclude all non-dentists from providing "teeth whitening services." *Id.* Because of the status of most of the Board members as practicing dentists, they had a "personal financial interest in excluding non-dentist[s]" from the market. *Id.* at 371.

Plaintiff argues that the Fourth Circuit's decision supports a conclusion that "an agreement among organization members (even when it takes the form of a vote) qualifies as concerted action" and that "[n]othing more than that agreement is needed to satisfy the concerted action requirement." (*See* Pl. Letter in response to Def. Sur-reply ("Pl. Letter") 2, Docket Entry No. 48.) Plaintiff, however, cites to the Fourth Circuit's reference to the underlying FTC decision which specified that there was direct evidence of a concerted action because "[o]n several occasions, the Board discussed teeth whitening services provided by non-dentists and *then* voted to take action to restrict these services." *Id.* at 373 (emphasis added). The FTC's interpretation of the significance of the "vote … to restrict [] services" was informed by the fact that there was a discussion about "teeth whitening services" *prior* to the vote. *Id.* Thus, the vote or outcome in and of itself was not sufficient direct evidence as Plaintiff argues. Unlike the USSF Board members, the Board in *North Carolina State Board of Dental Examiners* met prior to voting, agreed on what action to take, and *then* formalized that action through a vote.

The FTC's original opinion fully supports this interpretation. For example, the FTC explained that there was "direct evidence of *advance* discussion and formal approval by Board

*Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938, 941 (2d Cir. 1987) (finding that the defendants "*admitted[ly] . . . agreed*" to oppose the plaintiff's proposal by "subverting the consensu[s] standard rules and procedures" of the rule-making association) (emphasis added) *aff'd*, 486 U.S. 492 (1988); *see also Klickads, Inc. v. Real Estate Bd. of New York, Inc.*, No. 04-CV-8042, 2007 WL 2254721, at *4 (S.D.N.Y. Aug. 6, 2007) (whether defendants "consciously committed themselves" "to exclude plaintiff" through trade association rules and decisions a question of fact for jury) *adhered to on denial of reconsideration sub nom. Klickads, Inc. v. Real Estate Bd. of New York*, No. 04-CV-8042, 2007 WL 2981422 (S.D.N.Y. Oct. 9, 2007). Plaintiff fails to provide any such direct evidence.

However, Plaintiff offers circumstantial evidence in support of a concerted action. *See Ross v. Citigroup, Inc.*, 630 F. App'x 79, 82 (2d Cir. 2015), *as corrected* (Nov. 24, 2015) (holding that conspiracies "m[ay] be proven though 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'") (citation omitted). Viewing the votes on the adoption and amendments of the standard as "parallel conduct," Plaintiff's circumstantial evidence is assessed as potential "plus factors."[29] To make its case, Plaintiff relies on an alleged conflict of interest arising from

---

members." *In the Matter of the N. Carolina Bd. of Dental Examiners*, 152 F.T.C. 75, 2011 WL 11798452, at *69 (July 14, 2011) (emphasis added). The FTC further found "significant" that the "content . . . as well as [the] *purpose*[] [of the official action taken by the Board] was discussed and unanimously approved by Board members in advance." *Id.* at *70 (emphasis added). For example, one of the Board members specifically sought help from the Cosmetology Board to "assist [] in [] efforts regarding non-dentist teeth whitening services." *Id.* at *51. The Board member then instructed counsel to prepare an article for the Cosmetology Board after discussing the issue with Board members. *Id.* Soon after, the Board had a closed session meeting where they "formally approved" the course of action. *Id.* The FTC's opinion suggests that Board members had made an *agreement to agree* prior to the formal vote. Plaintiff has provided no similar direct evidence. To the extent the case can be read to suggest a vote in of itself is sufficient direct evidence of an agreement, the Court finds contrary authority more persuasive. *See SD3*, 801 F.3d at 437.

[29] The Court recognizes that parallel action and plus factors are usually used for horizontal agreements (involving restraints between competitors) and not vertical agreements (involving restraints between entities at different levels of competition) as alleged in this case. However, the

Defendant's relationship with SUM, the alleged arbitrary adoption, amendment, and application of the PLS, including most notably the initial decision to make MLS the only Division I league. (*See* Pl. Reply at 5-7.)

### 1. PLS revision process

While there is ample evidence of a conflict of interest between Defendant and MLS, Plaintiff fails to present sufficient evidence of undue influence in the actual standard-setting process, i.e., the process pursuant to which the PLS is revised. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 123 F. Supp. 3d 478, 500 (S.D.N.Y. 2015) ("Motive to conspire may be inferred where the parallel 'action taken [by defendants] had the effect of creating a likelihood of increased profits.'") (citation omitted). To discredit the adequacy of the current procedures, Plaintiff points to, among other things, MLS' dominance of the Professional Council, an alleged loophole for "affiliated" member entities like MLS in the Defendant's Conflict of Interest Policy, and the continuing formal and informal influence of individuals with ties to MLS.[30] (Pielke Decl. ¶¶ 32, 45–47, 51, 54, 55-58) Plaintiff also asserts that Defendant's ties to MLS through SUM are an overarching influence on "any Board members, whether or not affiliated with MLS," in their decision-making related to the PLS. (*Id.* ¶ 50.) Defendant asserts that Board's governance structure employs "best practices," namely by preventing interested Board members from voting, and excluding all interested members from the Standard Task Force, the body that actually proposes amendments to the PLS.

---

Court's analysis of whether the circumstantial evidence demonstrates concerted action would have been the same even if the Court did not view the Board votes as parallel conduct.

[30] The Court assigns very little weight to Plaintiff's arguments that Defendant does not employ "best practices" based on Defendant's failure to publicly disclose its Conflict of Interest handbook and the fact that the current Conflict of Interest policy was subject to an editing process or review. (Roger Pielke, Jr. Decl. in Supp. of Pl. Mot. ("Pielke Decl.") ¶¶ 37–38, 42–43, Docket Entry No. 30-25 ("However, it is clear that any such proposed changes would be unnecessary if the Policy were considered to be consistent with 'best practices.'").)

The Professional Council is one of the four administrative bodies that make up the USSF National Council, Defendant's legislative body. (Gulati Decl. ¶ 33.) Plaintiff, as a professional league, sits on the Professional Council and votes on the two delegates to the Board. Under the current voting structure, however, MLS holds a majority share and is able to effectively control the Professional Council's representatives on the Board. (Pielke Decl. ¶¶ 32, 58.) Plaintiff contends that this arrangement results in the unfair consideration of MLS' interests over its own. (*Id.*)

While these representatives may be naturally more inclined to address the concerns of MLS, and perhaps allowed to do so via the alleged loophole, the Court finds significant that Plaintiff has had opportunities to voice its concerns directly to the Board. (*See* Gulati Decl. ¶¶ 179, 187, 199, 202, 215); *see also* Federal Trade Commissioner, Christine A. Varney, Remarks Before the District of Columbia Bar Annual Seminar on Antitrust and Trade Associations (Feb. 22, 1995), ANTITRUST IMPLICATIONS IN STANDARD SETTING, 1995 WL 232950, at *2 (listing various factors in assessing fairness of standard-setting including interested parties' opportunities to be heard). Procedurally, prior to a vote by the Board, the Standard Task Force's recommendations are submitted to the "then-existing" professional leagues, including Plaintiff, for review and comment. (Gulati Decl. ¶¶ 80, 97, 98.) Through this review and comment process, Plaintiff has been able to prevent the passage of the 2015 PLS recommendations.[31] (*Id.* ¶ 78.) In addition, any representatives who have a then-existing relationship with professional leagues are excluded from voting on the Board or being a member of the Standard Task Force. (*Id.* ¶¶ 78, 81.) While those with present and past-relationships with MLS may partake in deliberations and have an informal influence on decision-making, the Court is mindful that membership associations inherently include some degree of conflicts of interest. *See SD3*, 801 F.3d at 436 ("Similarly, it is not problematic,

---

[31] The Court acknowledges that Plaintiff also applied informal pressure that is not necessarily part of the official review and comment process.

standing alone, for market participants to try to influence the standard-setting process through the organization's ordinary procedures."). Besides, as Defendant points out, Steve Malik, a NASL owner, served as a Board member in 2017.[32] Nevertheless, the Plaintiff may have valid concerns about the involvement of Alan Rothenberg on the Standard Task Force. (Pielke Decl. ¶ 47.) But the Court notes that the Standard Task Force traditionally has three to four other members who *should* have been screened out for any then-existing conflicts of interests. (Gulati Decl. ¶ 109.)

Although Plaintiff alleges that all Board members are inherently conflicted because of Defendant's ties to MLS through SUM, this concern appears to be guarded against by Defendant's fiduciary duties to its members. (Pielke Decl. ¶ 50.) As Defendant's expert explains, directors "must 'act in the corporation's best interest.'" (Solomon Decl. ¶ 44.) Because of the substantial financial benefits conferred by the licensing deal with MLS and SUM, the Board may be compelled to maximize the benefits from the arrangement in order to act in the "best interests" of Defendant, which in turn may require acting in favor of MLS. But as a constituent-based organization, the Board also owes "fiduciary duties to [its] members." (*Id.* ¶ 43.)

Given these safeguards, even if so motivated, members of the Board and the Standard Task Force may not blindly benefit MLS to the detriment of NASL or other professional leagues. Because Plaintiff's claims rely so heavily on Defendant's alleged financial motives, the Court's conclusion on this factor also undercuts somewhat the other proffered evidence. *See Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793–94 (2d Cir. 1987) ("Evidence of a conspiracy should not be 'fragmented;' it must be viewed as a whole to determine the reasonableness of inferences drawn by the jury."); *see also AD/SAT*, 181 F.3d at 233 ("[I]f the

---

[32] *See* October 31, 2017 Hr'g Tr. 79:21–24 ("And then, finally, you have Mr. Steve Malik, who is an NASL owner. And NASL brushes over that. There's no mention of the fact they have an owner on the U.S. Soccer board at the time of the September 2017 decision.").

defendants have 'no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy[.]'") (citation omitted).

## 2. Amendments to the PLS

Plaintiff also alleges that the PLS have been amended to further entrench MLS. *See Balaklaw v. Lovell*, 822 F. Supp. 892, 903 (N.D.N.Y. 1993) (analyzing claim that defendant lacked legitimate business reasons for parallel action) *aff'd*, 14 F.3d 793 (2d Cir. 1994). Since its creation, the PLS have been amended in 2008, 2010 (for Division II), and 2014. (Gulati Decl. ¶ 78; Szymanski Decl. ¶ 63.) There were also proposed amendments in 2015 that were never adopted. In particular, the timing of the 2014 Amendments and the proposed 2015 Amendments appear to best support Plaintiff's argument of "an escalation" of the PLS for the purpose of keeping MLS as the sole Division I league. (*See* Compl. ¶¶ 124–56.)

## A. 2014 amendments

In 2014, Defendant made the PLS more stringent for Division I sanctioning, including an increase in the minimum number of teams, less choice in time zones, and higher financial requirements for owners. (Compl. ¶ 136–43; Gulati ¶¶ 94, 96.) Plaintiff asserts that this "escalation" was in response to its "continued efforts to compete with MLS," and specifically its mid-2013 announcement of planned expansion. (Compl. ¶ 134.) Defendant disputes Plaintiff's timeline and asserts that it had decided in "late 2012" that it was "time for a comprehensive review" of the PLS. (Gulati Decl. ¶ 94.)

While a periodic review of the PLS appears appropriate, Defendant fails to provide a specific reason for the necessity of such a review at that time other than a conclusory assertion that "the sport of soccer [had] beg[u]n to experience growth and momentum." (Solomon Decl. ¶ 73.)

Nevertheless, as Defendant indicates, Plaintiff did not appear concerned nor surprised about the timing of the 2014 amendments, given its lack of opposition through the review and comment process.  (Gulati Decl. ¶¶ 98–99.)

**B.  2015 proposed amendments**

In contrast, Plaintiff objected to the proposed 2015 amendments for Division I.  (Compl. ¶ 146.)  The proposed changes included an increase in the minimum number of teams, much more limited options for markets, and heightened financial obligations.  (*Id.* ¶¶ 147–54; Gulati Decl. ¶ 104.)  Plaintiff contends that these proposals were a direct response to its Division I application filed on May 31, 2015.  (Compl. ¶ 146.)

While Defendant asserts that there had been plans to revisit the PLS since December 2014, both the timing and the proffered reason are suspect.  (Gulati Decl. ¶¶ 101–02).  According to Defendant, Gulati, the then-president of USSF, "expressed [] concern" that the grant of too many waivers "to NWSL, NASL, and USL" were having a negative impact on the credibility of the PLS. (*Id.* ¶ 101.)  Thus, Gulati "ask[ed] the Standard Task Force to once again look at strengthening the standards."  (*Id.*)  The circulated proposals, however, do not appear to address this concern.  *See L. Moore Drug Exch. v. Eli Lilly & Co.*, 662 F.2d 935, 939 (2d Cir. 1981) (analyzing evidence suggesting policy at issue was a "mere pretext or 'sham'").  Although there were many proposed amendments, there were only cosmetic changes to the standards directly concerning waiver.[33]  (*See* June 24, 2015 Memo re: PLS, annexed to Gulati Decl. as Ex. 12.)

Nevertheless, the Standard Task Force is expected to act objectively in proposing amendments.  As Plaintiff's own governance expert explained, it would be improper for Gulati and the Board to dictate to the Standard Task Force *how* to revise the PLS.  (*See* Pielke ¶ 56.)  Once

---

[33]  Defendant has not provided a rationale for why strengthening Division I and II requirements would help decrease the number of waivers that are granted.

called, the Standard Task Force should have the autonomy to recommend changes it deems appropriate, on any standard, without consideration of external pressures.  Given this structure, absent more evidence, the Court cannot conclude that the 2015 proposals were more likely than not borne out of a desire to impede NASL from achieving its goal to be sanctioned as a Division I league.

### 3.  Application of the PLS

Plaintiff also asserts that the PLS have been applied in a discriminatory manner favoring MLS and USL.  In particular, Plaintiff argues that its 2015 Division I and 2017 Division II applications were unfairly denied.  According to Plaintiff, the 2015 application was denied because it directly challenged MLS's monopoly in Division I.  (Compl. ¶ 146.)  Similarly, the 2017 application was allegedly denied to create a monopoly for USL in Division II.  (*Id.* ¶ 17.)  In addition, Gulati, the current USSF President, has admitted that Defendant has been willing to apply the PLS to favor MLS in the past.

### A.  Prior discriminatory application

Gulati admits that Defendant had in the past decided "to not sanction any other league as a first division (Division I) men's professional outdoor league until MLS had finished its second full season in 1997 — to give it a 'runway' of sorts."  (Gulati Decl. ¶ 64.)  The Court finds Gulati's admission that the PLS would not have been applied faithfully in MLS's infancy troubling.  *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 449 (S.D.N.Y. 2014) ("Evidence of '[p]rior antitrust violations and the history of competition in a market' may be used to show the 'intent, motive and method of a conspiracy under Section 1' so long as there is a 'direct, logical relationship' between the collateral conspiracy and the instant conspiracy.") (citing *U.S. Football League v. Nat'l Football League,* 842 F.2d 1335, 1371 (2d Cir. 1988)) *aff'd sub nom. Ross v. Citigroup, Inc.*, 630 F. App'x 79 (2d Cir.

2015), *as corrected* (Nov. 24, 2015); *In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 988 F.

Supp. 2d 696, 711 (E.D. La. 2013) (listing "involvement in other conspiracies" as potential plus

factor); *but see In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 798 (M.D. Pa.

2014), *amended*, No. 2:08-CV-00414, 2014 WL 4104474 (M.D. Pa. Aug. 19, 2014)

("Anticompetitive conduct 'elsewhere in time or place does not generally allow the inference of an

immediate conspiracy.'") (citation omitted) and *aff'd,* 801 F.3d 383 (3d Cir. 2015).

Gulati's admission, however, does not necessarily mean that the PLS itself was *designed* to

entrench MLS.  The original PLS may very well have been adopted based on objective criteria for a

procompetitive purpose.  (*See* Solomon Decl. ¶ 27 ("[T]he USSF implemented the Professional

Standards to mitigate the risk of league and team failure to promote the growth of soccer at all

levels.").)  Moreover, Gulati did state that USSF only meant to limit Division I sanctioning to one

team until 1998 because of the history of failed leagues in the United States up to that time.  Thus,

later amendments and applications of the PLS may not be an extension of this earlier misconduct.[34]

### B.  NASL's 2015 application

Plaintiff's 2015 application was denied for failure of two PLS requirements — the lack of

United States based teams in three different time zones and failure to have all its teams play in

stadia with at least 15,000 seating capacity.  (Compl. ¶ 85.)  To demonstrate the unfairness of the

denial, Plaintiff asserts that MLS's Division I status was maintained from 2009 until 2015 despite

MLS' failure to meet the same standard.  (Pl. Mem. at 13.)  Plaintiff also argues that Defendant

discriminated against it by failing to decide its application "for over nine months" and ultimately

declining to grant the NASL the necessary waivers.

The denial letter to NASL explains that a waiver for the stadia requirement was considered,

---

[34]  The Court construes Alan Rothenberg's statements cited by Plaintiff in a similar manner.
(*See* Compl. ¶ 72.)

but not approved, because "the *overwhelming* majority of the [Plaintiff's] teams play in stadia that seat *far less* than 15,000." (USSF Letter re: NASL Division I Application, annexed to Gulati Decl. as Ex. 40) (emphasis added). As the letter indicates, Plaintiff's requested waivers may have been qualitatively different from those granted to MLS. In addition, as to the delay in deciding its 2015 application, because Plaintiff asserted in the application that the parts of the PLS it failed to meet were "not a legitimate basis to exclude a league from Division I," "it seemed reasonably clear" to Defendant that Plaintiff "was posturing towards litigation." (Gulati Decl. ¶ 137, 139; NASL 2015 Division I Application, annexed to Gulati Decl. as Ex. 17.) As a result, the parties engaged in discussion and negotiation over the appropriateness of the PLS, culminating in a presentation by Plaintiff to the Application Task Force on December 5, 2015. (*Id.* ¶¶ 155–56.) Further, a few days before the submission of the application, Traffic Sports, an entity with "substantial ownership interest in the [NASL] as well as a financial interest in several NASL teams," was indicted for "racketeering, conspiracy, money laundering and fraud." (*Id.* ¶¶ 124, 144.) While the application was pending, the parties discussed at length Traffic Sports' continuing relationship with NASL into January 2016. Based on this record, the Court has no basis to infer discriminatory intent to the delayed decision.

### C. NASL's 2017 application

Plaintiff's 2017 application was rejected for failure to meet the minimum number of teams and the time zone requirements. (Compl. ¶¶ 183–85.) According to Plaintiff, the denial is unjustified because the USL received a month reprieve to bring its teams into compliance while Plaintiff was not given the same opportunity. (*Id.* ¶¶ 186–87.) Plaintiff further claims that the USL needed as many as twenty waivers to be granted provisional Division II status for 2018. (*Id.* ¶ 187.)

Defendant disagrees and asserts that NASL's application was denied because Plaintiff failed

to show improvement towards meeting the Division II standards, a condition under Plaintiff's 2017 Provisional Division II status. (Gulati Decl. ¶ 211.) Even in its application, Plaintiff conceded that two of its eight existing teams had not committed to return, (Gulati Decl. ¶ 208; 2018 Application Letter, annexed to Gulati Decl. as Ex. 55.), and Defendant later discovered that the North Carolina team had also been wavering in its commitment. (Gulati Decl. ¶ 208.) Plaintiff also failed to provide information to determine whether the proposed replacement teams met the PLS. (*Id.*) Moreover, Plaintiff failed to provide any concrete information about its search for new teams, a continuing problem since its application for Division II status for 2017. (*Id.*; 2018 Application Letter, annexed to Gulati Decl. as Ex. 55) ("[T]he NASL is in discussions with a number of other groups, including those in Atlanta and Detroit, to finalize their admission into the league for 2018."). Rather than providing a concrete plan for eventual compliance, Plaintiff in a conclusory fashion asserted that "[t]he NASL's intention is to grow past [twelve] clubs heading into the 2019 Season and to feature at least one club in each of the Eastern, Central and Pacific times zones during the 2019 Season." (*Id.*) Finally, Defendant asserts that any waivers that may be granted to USL would be "team specific" rather than a league-wide requirement. According to Defendant, the two types of waivers are qualitatively different, the latter being concerned with "the fundamental requirements for a national league." (*Id.* ¶ 210.)

Defendant also notes, and the Court also finds significant, that the Application Task Force, the body charged with initially reviewing divisional status applications, is designed to function as a neutral body separate from the Board, as evidenced by the Board's willingness, on occasion, to decline to adopt its recommendations.[35] Through these procedures, Defendant has granted Plaintiff Division II status from 2011 through 2017 *with waivers* in every year except 2013. (*Id.* ¶¶ 118,

---

[35] Plaintiff has also been given the opportunity to directly voice its concerns to the PLS Task Force. (*See* Gulati Decl. ¶¶ 155–56.)

128–31.)  Moreover, when the Board has chosen to disregard the recommendation of the Application Task Force, it has done so in ways benefiting Plaintiff.  For example, despite the Application Task Force's initial recommendation to deny Plaintiff Division II sanctioning for 2017, the Board voted to grant NASL a provisional Division II sanction.  (*Id.* ¶ 203.)

Because the evidence "does not tend to exclude the possibility of [] independent [action]" the Court concludes that Plaintiff has failed to establish a likelihood of success on the merits, let alone a "clear showing" of entitlement to relief.  *See AD/SAT*, 181 F.3d at 241.

### iii.    Rule of Reason

Even assuming, however, that Plaintiff has sufficiently demonstrated that there is concerted action as required by Section 1, Plaintiff nevertheless fails to demonstrate unreasonable restraint of trade under the rule of reason analysis.

Under the standard rule of reason analysis, courts apply a three-step burden-shifting framework.  *United States v. Am. Express Co.*, 838 F.3d 179, 194 (2d Cir. 2016).  First, the plaintiff must demonstrate that the defendant's actions "had an *actual* adverse effect on competition as a whole in the relevant market."  *Id.* (citing *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) (emphasis in original)).  To satisfy the initial burden, a plaintiff may rely either on (1) direct evidence of actual adverse effects or (2) circumstantial evidence "showing that the defendant has 'sufficient market power to cause an adverse effect on competition.'"  *Id.* (citations omitted).  However, "[b]ecause [m]arket power is but a surrogate for detrimental effects, [a] plaintiff seeking to use market power as a proxy for adverse effect must show market power, plus some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market."  *Id.* (internal citations and quotation marks omitted).  If the

plaintiff is able to establish anticompetitive effects, "the burden shifts to the defendant to offer

evidence of any procompetitive effects of the restraint at issue." *Id.* Upon rebuttal by the

defendant, "the burden shifts back to the plaintiff[ ] to prove that any legitimate competitive benefits

offered by defendant[ ] could have been achieved through less restrictive means." *Id.* (citation

omitted).

"But not every case that requires rule of reason analysis 'is a candidate for plenary market

examination.'" *Apple*, 791 F.3d at 329 (citation omitted). In lieu of the standard framework, an

abbreviated or "quick look" analysis is appropriate where the "anticompetitive effects [of the

arrangement in question] can *easily* be ascertained." *California Dental Ass'n v. F.T.C.*, 526 U.S.

756, 770 (1999) (emphasis added). "Under a quick look analysis, the 'plaintiff is relieved of its

initial burden of showing that the challenged restraints have an adverse effect on competition

because the anticompetitive effects are obvious.'" *Major League Baseball Properties, Inc. v.

Salvino, Inc.*, 420 F. Supp. 2d 212, 220 (S.D.N.Y. 2005), *aff'd,* 542 F.3d 290 (2d Cir. 2008) (citation

omitted).

As an initial matter, as the Court informed the parties at the hearing, the Court declines to

apply the quick look test. The restraint at issue is not an absolute limitation on output. *See, e.g.*,

*California Dental Ass'n*, 526 U.S. at 770 (explaining that the Supreme Court's prior application of

the quick look test was limited to restraints that "expressly limited output," was "an absolute ban,"

and a "horizontal agreement" to withhold a desired service). While arguably *applied* as an absolute

ban, the PLS does not necessarily preclude competitors from entering the market. Moreover, even

on its face, a rating system such as the PLS may "plausibly be thought to have a net procompetitive

effect" by providing consumers a quick and easy way to assess the quality and expected

characteristics of a given product. *See id.* at 771; (*see also* Szymanski Decl. ¶ 64) ("[Regulators]

may have a legitimate interest in promoting rules that benefit consumers, improve quality, increase output, and ensure competition.")  A casual observer, especially in light of the evidence proffered by Defendant, could not summarily conclude that the PLS have a net anticompetitive effect on consumers.  *See Major League Baseball Properties*, 420 F. Supp. 2d at 220 ("[Quick look analysis] is not appropriate [] where the anticompetitive effects of an agreement are not obvious or may 'have a net procompetitive effect, or possibly no effect at all on competition.'") (citation omitted). Accordingly, Plaintiff bears the initial burden of demonstrating that the PLS have an "*actual* adverse effect on competition as a whole in the relevant market."  *See Am. Express Co.*, 838 F.3d at 194.  Thus, the Court must first determine the relevant market.

### 1.  Relevant market and market power

The determination of the relevant market is a "necessary predicate" to analyzing antitrust claims under the rule of reason.[36]  *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957); *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("To state a claim under § 7 of the Clayton Act, §§ 1 or 2 of the Sherman Act, or New York's Donnelly Act, a plaintiff must allege a plausible relevant market in which competition will be impaired.").  For Section 1 claims, the market definition "provides the context against which to measure the competitive effects of an agreement."  *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).  In defining the market, courts examine both the relevant product and the relevant geographic markets.  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). "A relevant product market consists of 'products that have reasonable interchangeability for the

---

[36]  Defendant did not address the relevant market in its opposition to the motion and, despite the Court notifying the parties at the hearing that it determined the relevant market to be the (1) top-tier and (2) second-tier men's professional soccer leagues in the United States and Canada, Defendant did not address it at the hearing.  Instead, Defendant in its sur-reply provided another declaration from its expert witness restating his earlier testimony.  The new affidavit appears to provide no additional information on this issue and the Court declines to consider it.

purposes for which they are produced — price, use and qualities considered.'" *Id.* at 105.  A

relevant geographic market is the "area of effective competition . . . in which the seller operates, and

to which the purchaser can practicably turn for supplies."  *United States v. Eastman Kodak Co.*, 63

F.3d 95, 104 (2d Cir. 1995) (citation omitted).

      In analyzing the product market, courts typically consider the "cross-elasticity of demand,"

an empirical methodology used to determine whether two or more products are reasonably

interchangeable substitutes.[37]  The Second Circuit also "often applies a hypothetical monopolist test

("HMT") asking whether a hypothetical monopolist acting within the proposed market would be

substantially constrain[ed] from increasing prices by the ability of customers to switch to other

producers."[38]  *Am. Express Co.*, 838 F.3d at 198–99 (citation and internal quotation marks omitted).

Given this highly fact-intensive inquiry, courts also consider "practical indicia [such as] industry or

public recognition of the submarket as a separate economic entity, the product's peculiar

characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity

to price change, and specialized vendors."  *Geneva Pharm.*, 386 F.3d at 496 (citing *Brown Shoe Co.

v. United States,* 370 U.S. 294, 325 (1962)).  "The emphasis always is on the actual dynamics of the

market rather than rote application of any formula."  *Id.*

      Plaintiff defines the relevant product and geographic markets as the market for (1) top-tier

---

[37]  Cross-elasticity of demand exists if (1) the increase in the price of one product causes (2) a corresponding increase in demand for a substitute product.  (*See* Stefan Szymanski Decl. in Supp. of Pl. Mot. ("Szymanski Decl.") ¶ 27, Docket Entry No. 3-3.)  A high cross-elasticity of demand suggests that consumers consider the products to be interchangeable substitutes, indicating that the products should be grouped into the same relevant market.  (*See id.*)

[38]  "Under the HMT, [a] market is any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level."  *United States v. Am. Express Co.*, 838 F.3d 179, 198–99 (2d Cir. 2016) (citation and internal quotation marks omitted).  "If the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market."  *Id.* (citation and internal quotation marks omitted).

and (2) second-tier men's professional soccer leagues located in the United States and Canada. (Compl. ¶ 35; Szymanski Decl. ¶ 23 & n.21.) While acknowledging that "[s]ports involve multiple overlapping markets," including ticket sales, sponsorships, and broadcast rights, Plaintiff asserts that access to all these markets first requires a league. (Szymanski Decl. ¶ 23.) Thus, in its expert declaration, Plaintiff analyzes the "ownership market" for top-tier and second-tier men's professional soccer leagues in the United States. (*See id.* ¶ 23 & n.21.) Under Plaintiff's view, MLS and USL are the only current suppliers of top-tier and second-tier professional men's soccer leagues in the United States and Canada.[39] (*Id.* ¶ 37.)

Defendant disagrees and asserts that Plaintiff has defined the wrong market "for assessing whether [Defendant] could benefit by discriminating against [Plaintiff]." (Peterson Decl. ¶ 24.) According to Defendant, the relevant product markets are the markets for access rights to view or broadcast "a season-long series of competitive soccer matches in the context of league competition that culminates in a championship series." (*Id.* ¶¶ 24, 99.) The geographic market for in-person attendance is alleged to be "roughly the metropolitan area where the match is played." (*Id.* ¶ 106.) Defendant concedes, however, that the geographic market for broadcasts is "at least as large as the United States." (*Id.* ¶ 121.)

The Court is persuaded that the Plaintiff's proposed market definition is appropriate for purposes of assessing the claims at this stage.[40] Typically, the relevant market is defined in

---

[39] Demand for the market allegedly comes from "teams/owners/promoters wishing to play in these forms of season-long, league-based competition." (Szymanski Decl. ¶ 37.)

[40] The Court also accepts for the purposes of deciding this motion Plaintiff's assertion that there are no reasonable substitutes to the proposed relevant market (including Division III). (*See* Compl. ¶¶ 39–45; Szymanski Decl. at 18–22.); *see also Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998) ("Ordinarily, findings of fact and conclusions of law made in a preliminary injunction proceeding do not preclude reexamination of the merits at a subsequent trial.").

reference to the defendant's alleged antitrust conduct.  *See PepsiCo*, 315 F.3d at 105 ("[T]he relevant market consists of all of the products that the Defendants' customers view as substitutes to those supplied by the Defendants.") (citation omitted).  Here, Defendant's challenged conduct is its assignment of divisional designations to men's professional soccer leagues in the United States and Canada.  Through the application of the PLS, Defendant determines which leagues in the United States are considered Division I or II for any given year.  Based on Defendant's role as a *standard-setting* organization, the Court finds it logical to define the relevant market as Plaintiff proposes. *See, e.g.*, *Allied Tube*, 486 U.S. at 496 (market definition was the market for "electrical conduits," the product regulated by the standard-setting organization); *Hydrolevel Corp. v. Am. Soc. of Mech. Engineers, Inc.*, 635 F.2d 118, 124 (2d Cir. 1980) (market definition was the market for "low-water cut-off" devices, the product regulated by the standard-setting organization) *aff'd,* 456 U.S. 556 (1982); *Jessup*, 862 F. Supp. at 1123 (market definition was the market for "Championship Stock Labrador Retrievers" or "Championship Stock Show Dogs,"  the products regulated by the standard-setting organization).  Stated differently, in the absence of the PLS, there would be competition among soccer leagues to determine which leagues should be considered top-tier or second-tier.  *See ChriMar Sys., Inc v. Cisco Sys., Inc*, 72 F. Supp. 3d 1012, 1018 (N.D. Cal. 2014) ("[I]n the context of a standard setting organization . . . locking in a standard which eliminates substitute or alternative technologies, courts have allowed a relevant market to be defined by the technologies that were competing before the standard was adopted to perform the function that is covered by the standard and the essential patent.").  Under these circumstances, the "industry recognition" factor may be especially relevant. *See Todd v. Exxon Corp.*, 275 F.3d 191, 205 (2d Cir. 2001) ("Industry recognition is a "well established" factor in defining a market under the "assum[ption] that [] economic actors usually have accurate perceptions of economic realities.") (citation omitted).  As

both parties readily acknowledge, Defendant is a constituent membership organization that *sets* the industry standards for Division I or II leagues. By adopting and amending the PLS, Defendant establishes what the industry and the public at large expect from Division I and II leagues.

While Plaintiff has not adequately demonstrated direct evidence of actual adverse effect on competition as a whole,[41] the Court concludes that Plaintiff has presented circumstantial evidence that Defendant has sufficient market power to cause an adverse effect on competition in the relevant market as defined. As the standard-setting organization for men's professional soccer leagues in the United States, Defendant has the power to "exclude competition" from the relevant market. *E. I. du Pont de Nemours & Co.*, 351 U.S. at 426 ("[Market] power is the power to control prices or exclude competition."). Defendant itself asserts that the PLS and its application is one of its "core activit[ies]." (Def. Opp'n at 18.) In addition, the Second Circuit has suggested that actions "that reduce[] consumer choice," "heighten[] existing barriers or create[] new ones" are sufficient "other

---

[41] Plaintiff asserts that the PLS have harmed competition in the relevant market by (1) causing consumer confusion (Szymanski Decl. ¶¶ 66–67), (2) reducing output by discouraging potential entrants (Szymanski Decl. ¶ 69), and (3) decreasing consumer choice (Pl. Reply at 10 n.21; *see also* Pl. Mem. at 22.) However, Plaintiff's expert undercuts Plaintiff's argument about consumer confusion. As the expert explained, "it is very easy for fans to gain experience and realize product quality quickly." (Szymanski Decl. ¶ 67.) Even if Defendant's designations are misleading, Plaintiff's argument would suggest that fans would be able to quickly determine if they were arbitrary or not. Here, Plaintiff has also failed to provide empirical evidence of actual confusion. *See also MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 186–87 (2d Cir. 2016) ("There is no evidence that even a single customer was actually misled . . . [a]nd even if [Defendant's actions] did mislead some customers . . . [such] actions that 'merely interfere with the consumer's freedom of choice in deciding' whether to buy a product are insufficient to support an antitrust claim, absent any further showing of 'demonstrable, anti-competitive impact.'") (citation omitted). Plaintiff also fails to provide actual evidence of a reduction in output other than NASL's own exclusion. (*See* Szymanski Decl. ¶ 69 ("The use of arbitrary criteria to designate league quality is *likely* to reduce output.") (emphasis added).) "In order to fulfill this requirement, the plaintiff must show more than just that he was harmed by defendants' conduct." *K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995). Lastly, the Second Circuit discussed a reduction in consumer choice in the context of *indirect* evidence of actual harm as a potential "other ground" necessary in addition to market power. *See MacDermid*, 833 F.3d at 183 & n.42.

ground[s]" necessary in addition to market power.  *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 183, 186 & n.56 (2d Cir. 2016); *see also US Airways, Inc. v. Sabre Holdings Corp.*, No. 11-CV-2725, 2017 WL 1064709, at *14 (S.D.N.Y. Mar. 21, 2017).  By enacting and strengthening the PLS, Defendant has, at the very least, created and heightened existing barriers to entry in the market for top-tier and second-tier men's professional soccer leagues.  Plaintiff has therefore satisfied its initial burden by showing that Defendant has sufficient market power to cause an adverse effect on competition.

### 2.  Procompetitive effects of the PLS

Because Plaintiff has satisfied the first step of the rule of reason analysis, the burden shifts to Defendant "to offer evidence of any procompetitive effects of the restraint at issue."  *Am. Express Co.*, 838 F.3d at 195.  "The primary goal of antitrust law is to maximize consumer welfare by promoting competition among firms."  *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308–09 (3d Cir. 2007).  Private standard-setting may promote this objective by, among other things, "enlarging the overall consumer market."  *Id.*  Standards may, for example, convey "product information reduc[ing] uncertainty, [] [thereby] increas[ing] consumer demand for the product and encourag[ing] producers to improve their products."  *Consol. Metal Prod.*, 846 F.2d at 296 n.46.

Here, Defendant argues that the PLS are procompetitive because they promote quality, enriching the experience of fans, thereby "increas[ing] output and interest in [] [soccer] over time." (Peterson Decl. ¶ 16.); *see also DM Research, Inc. v. Coll. of Am. Pathologists,* 170 F.3d 53, 57 (1st Cir.1999) ("[I]t is commonplace, and often very useful, for organizations to recommend quality standards [] or adopt them as part of a certification process [].")  Defendant also argues that the PLS are designed to encourage investment by teams and leagues, in part by reducing the incentive to "free-ride" off the investments made by Defendant and other organizations.  (Peterson Decl. ¶ 16.)

While the procompetitive purposes of standards are "disputable," as discussed below, the Court finds that Defendant has provided plausible bases to conclude that the PLS have procompetitive effects. *See DM Research*, 170 F.3d at 57 ("Merely to say that the standards are disputable or have some market effects has not generally been enough to condemn them as 'unreasonable' under the Sherman Act."). The dispute over the PLS centers around the following five standards: (1) minimum number of teams; (2) time zone or geographic dispersion; (3) market size; (4) stadium capacity; and (5) financial validity.

Defendant first asserts that requiring a minimum number of teams is procompetitive because an increase in the number of teams helps "sustain fan interest" by limiting "repetitive matchups." (Peterson Decl. ¶ 58.) As argued by Defendant, *some* minimum number of teams is necessary and Plaintiff's dispute is really about "where the number is set." [42] (*Id.* ¶ 61.) In addition to increasing output by encouraging investment in expansion teams, this requirement may also provide stability as "larger leagues are more likely to survive . . . setbacks." (*Id.* ¶ 63.)

The time zone and market size requirements allegedly work together to generate "broad fan interest" and also the interest of national broadcasters. (*Id.* ¶¶ 65, 68.) By mandating geographic dispersion, the time zone requirement is designed to help soccer "compete with the four major U.S. sports, all of which have national footprints." (*Id.* ¶ 3.) According to Defendant, American consumers and national broadcasters expect major professional sports to have a country-wide presence. (Def. Opp'n at 20–21; Peterson Decl. ¶ 65.) Likewise, having teams in larger markets naturally promotes soccer to a broader audience which also attracts the interest of national broadcasters. (Peterson Decl. ¶¶ 70–71.) Armed with larger fan bases and media platforms, larger markets may also provide more resources to improve the quality of teams leagues can field. (*Id.* ¶

_____

[42] The Court recognizes that Plaintiff asserts that the market itself best dictates the minimum.

68.)

Similarly, Defendant asserts that the stadium capacity requirement promotes quality by ensuring that "fans' experiences at top-tier soccer matches meet their expectations of what a top-tier sporting event should be like." (*Id.* ¶ 74.) As Defendant argues, the quality of team facilities likely impacts fans' experiences and perceptions of the team and the league as a whole. (*Id.*) Sub-par facilities such as high school fields may reduce fan interest and investment in the league and soccer more generally. (*Id.*)

Finally, Defendant asserts that the various financial viability requirements need to be considered in light of the history of failures of soccer leagues in the United States. (*Id.* ¶ 78.) In doing so, Defendant points to Plaintiff's former CEO who stated in 2011: "106 teams have played in division two or three since 1996 and of those 84 folded. Fans don't want to follow a team who's in a league with those sort of stats and that much turnover." (*Id.*) Failure of teams, especially mid-season, may diminish fan interest. (*Id.* ¶¶ 78, 80.) The net worth requirement specifically helps protect the financial viability of leagues as a whole because it prevents any owner from "underfund[ing] teams and free rid[ing] on the investment of others." (*Id.* ¶ 80.)

In short, Defendant has satisfied its burden by offering evidence that the PLS have procompetitive effects.

### 3. Less restrictive means

Because Defendant has alleged plausible procompetitive benefits of the PLS, the burden shifts back to Plaintiff to provide less restrictive alternatives to the restraints at issue. *Capital Imaging*, 996 F.2d at 543 ("Assuming defendant comes forward with such proof, the burden shifts back to plaintiff for it to demonstrate that any legitimate collaborative objectives proffered by defendant could have been achieved by less restrictive alternatives, that is, those that would be less

prejudicial to competition as a whole.").  Ultimately, Plaintiff must provide some alternative to the

current PLS that offers the same procompetitive benefits — enhanced product quality, and greater

output through increased fan interest and investment — "without significantly increased cost."  *See*

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1074 (9th Cir. 2015) *cert. denied*, 137

S. Ct. 277 (2016) (citation omitted).  The Court conceives of two ways to make such a showing: (1)

a completely different model to regulate professional soccer in the United States or (2) amendments

to the PLS.

Plaintiff has not expressly proposed any less restrictive alternatives other than the

*elimination* of the parts of the PLS in dispute.  Essentially, Plaintiff argues that the standards are

inherently anticompetitive, offering little to no procompetitive benefits, and that the *free market*

itself is a better alternative.[43]  (*See* Szymanski Decl. at 35–49 (discussing the anticompetitive effects

and lack of procompetitive effects of the PLS).)  But as discussed above, Defendant has proffered

plausible bases and evidentiary support to conclude that the PLS have procompetitive effects.  The

history of professional soccer in the United States both before and after the PLS also appears to

substantiate Defendant's assertions.  *See Capital Imaging*, 996 F.2d at 543 ("The history of the

restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end

sought to be attained, are all relevant facts.") (citation omitted).  As Defendant argues, the PLS may

have been necessary and directly responsible for the growth of soccer in the United States.  While

Plaintiff may ultimately be correct in its assessment that the PLS create more harms than benefits,

the Court cannot conclude, based on the evidence thus far, that Plaintiff has demonstrated a clear

---

[43]  *See* October 31, 2017 Hr'g Tr. 41:4–11 ("Finally, on our rebuttal burden, on less
restrictive alternative, the biggest less restrictive alternative on issues like size of teams, number of
teams, size of stadium which is not an issue on this motion but it is an issue generally, time zones, is
let the marketplace decide.").

showing of entitlement to relief on these grounds.

Although Plaintiff fails to expressly provide any other alternatives, Plaintiff's various challenges to the amendment of the PLS may be construed as arguing that the *prior* versions of the PLS, before their alleged "escalation," are the less restrictive alternatives.[44]  For the minimum team requirement, Plaintiff asserts that, even if necessary, the standard has been raised only after "MLS was significantly above it."  (Szymanski Decl. ¶ 94.)  Whatever benefits this standard may confer, Plaintiff questions the necessity of requiring twelve teams (after six years in existence) for Division II when eight was sufficient for Division I[45] and II for a number of years.  Plaintiff similarly questions the specific need to have teams in the Eastern, Central, and Pacific time zones when geographic dispersion is the end goal.  As Plaintiff explains, NASL currently has teams in the Eastern, Pacific, and *Atlantic* time zones.  (Pl. Reply at 10 (emphasis added).)  Further, in 2015, the Standard Task Force itself recommended the elimination of the requirement to have teams in the Eastern, Central, and Pacific time zones for Divisions I and II, suggesting that it is an unnecessary requirement.  (*See* ¶ Gulati 104.)  Finally, Plaintiff asserts that the financial viability amendment in 2014, requiring the principal owner to have an individual net worth of $40 million, was unnecessary in light of preexisting protections.  (Compl. ¶ 141–44.)  Plaintiff argues that the already existing $70 million combined net worth and the $1 million performance bond requirements are sufficient to "ensure that any given team w[ould] remain stable throughout a season."  (*Id.* ¶ 142.)

However, because Plaintiff has not provided sufficient evidence to adequately assess whether the prior iterations of the PLS provide the same procompetitive benefits as the current

---

[44]  The Court recognizes that there are other parts of the PLS for which Plaintiff does not provide a less restrictive alternative.  However, Plaintiff's 2018 application for Division II was denied on the basis of Plaintiff's failure to meet the minimum team and time zone requirements.

[45]  While the Division I requirement has always required at least ten teams, USSF gave MLS waivers when MLS only had eight teams.  October 31, 2017 Hr'g Tr. 43:5–8.

version, the Court instead reviews the existence or lack thereof of "meaningful safeguards" in the private standard-setting process, i.e., in the process of revising the PLS. *See Allied Tube*, 486 U.S. at 501; *Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 572 (1982).

A lack of safeguards or the subversion of existing procedures may serve as a proxy for finding the amendments unreasonable. *See Allied Tube*, 486 U.S. at 506–07. Because of the inherent difficulty of assessing whether one rule is superior to another, courts often instead assess the adequacy of the rulemaking process. *See Golden Bridge*, 547 F.3d at 273 ("We have found it 'axiomatic' that a standard setting organization must exclude some products, and such exclusions are not themselves antitrust violations."); *SD3*, 801 F.3d at 437 ("If antitrust suits were permitted to go forward based solely on an allegation that the standard-setting body erred, courts would be cast into the role of standard-setting appellate bodies."). In doing so, courts examine whether there are "meaningful safeguards" to protect against potential bias and abuse. *See Allied Tube*, 486 U.S. at 501; *Am. Soc. of Mech. Engineers*, 456 U.S. at 572. Even so, courts are mindful that constituent-member organizations inherently involve some conflicts of interest. *See SD3*, 801 F.3d at 436 ("Similarly, it is not problematic, standing alone, for market participants to try to influence the standard-setting process through the organization's ordinary procedures."). Nevertheless, whatever the process for the adoption, amendment and application of the standards at issue, the process must be "conducted in a nonpartisan manner." *Allied Tube*, 486 U.S. at 506-07. "In other words, a plaintiff must ordinarily show that the standard-setting activity . . . was committed 'through the use of unfair, or improper practices or procedures.'" *SD3,* 801 F.3d at 436 (citation omitted).

As discussed above in the concerted action discussion, the Court concludes that Defendant has sufficient "meaningful safeguards." While as Plaintiff argues Defendant may not literally employ "best practices," the alleged defects in the current standard-setting process do not rise to

levels courts have found problematic.  *See, e.g., Indian Head*, 817 F.2d at 947 ("[Defendant] packed the annual meeting with newly registered members, whom it subsidized, for the sole purpose of achieving an anticompetitive result."); *Am. Soc. of Mech. Engineers*, 456 U.S. at 572 (conspirators "planned a course of action" "where one of the very authors of the inquiry" of the plaintiff's product was able to "prepare[] the response" of the association); *see also SD3*, 801 F.3d at 436 ("In the usual case, neither the standard-setting organization nor its participants will run afoul of antitrust law when they use ordinary processes to adopt unexceptional standards."); *Jessup*, 862 F. Supp. at 1125 (declining to grant preliminary injunction where plaintiffs alleged "certain improprieties in the conduct of the votes" on the standard at issue).  Plaintiff also has failed to provide sufficient evidence of "*unique, external pressure*" impacting the actual application of the standards.  *SD3*, 801 F.3d at 436 (emphasis added); *see also DM Research,* 170 F.3d at 57–58 ("[T]he principal concern has been the use of standards setting as a predatory device . . . ; normally there is a showing that the standard was deliberately distorted by competitors of the injured party, sometimes through lies, bribes, or other improper forms of influence, in addition to a further showing of market foreclosure.").

As a result, the Court finds that, based on the limited evidence before it, Plaintiff has failed to establish a "clear showing" of entitlement to relief based on the reasonableness of the restraint, in addition to its failure to demonstrate concerted action.  The Court is satisfied that the pleadings and the accompanying declarations have demonstrated a plausible claim for relief, but that is not the standard the Court is required to apply in deciding Plaintiff's preliminary injunction motion.

### d.  Balance of Hardships

Under the third prong, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter v.*

*Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008) (citation omitted). "Plaintiffs must establish that the 'balance of hardships tips in their favor regardless of the likelihood of success.'" *Main St. Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*, 103 F. Supp. 3d 244, 262 (N.D.N.Y. 2015).

Here, Defendant alleges that as the governing body for United States soccer, its credibility and relationship with FIFA will be severely undermined if the Court grants a mandatory injunction. While Plaintiff dismisses Defendant's claim as "abstract," "intangible," and "theoretical," district courts within the Second Circuit have found such injury to be credible and severe, specifically in the context of a preliminary injunction. (*See* Pl. Reply at 4); *Jessup*, 862 F. Supp. at 1129 ("Moreover, the Court finds that the relief requested by Plaintiffs, prior to an adverse determination on the merits, would pose hardship to Defendants and that their credibility as sanctioning organizations would be undermined."); *Heldman v. U.S. Lawn Tennis Ass'n,* 354 F. Supp. 1241, 1252 (S.D.N.Y.1973) (observing "[i]t would unduly damage the prestige and the operation of the [standard-setting organization] to enjoin its rules before an adverse determination on the merits"). However, because Plaintiff has sufficiently demonstrated a potential total loss of its business, the Court finds that the balance of hardships tips slightly in Plaintiff's favor.

### e. Public Interest

In analyzing the public interest prong, a court must ensure that the proposed injunction will not harm the public interest. *SEC v. Citigroup Global Mkts. Inc.,* 673 F.3d 158, 163 n.1 (2d Cir.2012). The Court finds that the grant of an injunction would not have harmed the public interest.

### III. Conclusion

For the foregoing reasons the Court DENIES Plaintiff's application for a preliminary injunction.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: November 4, 2017
       Brooklyn, New York