**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

NORTH AMERICAN SOCCER LEAGUE, LLC,

Plaintiff,

v.

UNITED STATES SOCCER FEDERATION, INC., and
MAJOR LEAGUE SOCCER, L.L.C.,

Defendants.

Civil Action No. 1:17-cv-05495-MKB-ST

**AMENDED COMPLAINT**

---

Plaintiff North American Soccer League, LLC ("NASL"), by its undersigned attorneys, for its Amended Complaint (the "Complaint") herein alleges as follows:

## INTRODUCTION

1.      NASL was organized nine years ago as a men's professional soccer league for the purpose of fielding teams to play competitive soccer matches in the U.S. and Canada at the highest level of competition.  That purpose has been stymied as a result of anticompetitive agreements entered into by Defendants United States Soccer Federation, Inc. ("USSF") and Major League Soccer, L.L.C. ("MLS") (collectively, "Defendants"), as well as other co-conspirators. Specifically, Defendants have entered into unlawful contracts, combinations and/or conspiracies that have the purpose and effect of granting and maintaining a monopoly for Defendant MLS in the relevant market for top-tier men's professional soccer leagues located in the U.S. and Canada

1

(which USSF has designated as "Division I"), precluding NASL or any other league from competing in this market against MLS. As a result of Defendants' preclusive agreements and conduct, NASL was consigned to play for the past seven seasons in the second tier of men's professional soccer leagues in the U.S. and Canada (designated by USSF as "Division II"). Defendants, however, have recently acted in concert with others in order to also preclude NASL from even continuing to compete as a Division II league, ultimately forcing NASL to cancel its 2018 season. Defendants knew and intended that the consequence of doing so would be to leave Division II with only a single league, the United Soccer League ("USL"). Defendants do not perceive USL to be a competitive threat to MLS because USL has a contractual business relationship with MLS, making it a beneficiary of MLS's status as the sole top-tier league, and USL has said it does not plan to compete with MLS. Accordingly, Defendants have also entered into unlawful contracts, combinations and/or conspiracies that have the purpose and effect of granting and maintaining a monopoly for USL in the relevant market for second-tier men's professional soccer leagues in the U.S. and Canada.

2.     USSF has arrogated to itself, without any statutory authority, the claimed power to "govern" professional soccer in the United States. It has imposed a system under which any league wishing to play men's professional soccer in this country must qualify for and be assigned to one of three tiered divisions that USSF has established by fiat. USSF is the exclusive U.S. federation recognized by the Fédération Internationale de Football Association ("FIFA")—which runs the World Cup, one of the most popular sporting competitions in the world, as well as other prestigious international soccer events. Under FIFA's rules, players and coaches on U.S. teams that are not sanctioned by USSF cannot compete in FIFA-sponsored events. Accordingly, no professional soccer league in this country would be viewed as credible by fans, sponsors,

broadcasters, players or investors without being sanctioned in a particular Division (I, II or III) by USSF.  This private sanctioning system, under the FIFA umbrella, gives USSF the monopoly power to control entry into the relevant markets for professional soccer at issue in this case.

3.      MLS and USL are members of USSF and have agreed to be governed by USSF's Professional League Standards (the "Standards")—a set of anticompetitive and exclusionary requirements for sanctioning professional soccer leagues in Divisions I to III, which have served as barriers to entry and competition against MLS and USL.  From the beginning, the Standards were intended to protect MLS as the sole men's professional league sanctioned by USSF in Division I, and today, the Standards are also being used to ensure, for the ultimate benefit of MLS, that USL is protected from competition as the sole men's professional league sanctioned by USSF in Division II.  NASL had no viable choice but to become a member of USSF and has sought its sanction to compete at the highest level.   But as a result of the anticompetitive conduct of Defendants, NASL was consigned to Division II for its first seven seasons and now has been denied continued sanctioning as a Division II league.

4.      By this Amended Complaint, Plaintiff alleges that Defendants have engaged in concerted action in violation of the Sherman Act in two distinct ways.  First, the Standards themselves, in totality, have the anticompetitive effect of preventing NASL or new entrants from competing with MLS in Division I or with USL in Division II, and have no offsetting procompetitive effects, if any, sufficient to justify them.  Unlike certain limited sporting matters for which industry standard-setting might have some procompetitive effects—such as the rules of the game, player safety, gambling or drug use—the challenged Standards on their face impose onerous economic requirements and create barriers to inter-league competition that either have no actual procompetitive effects or, at best, procompetitive effects that are far outweighed by their

anticompetitive harms.   Far from improving competition and enhancing the stability of professional soccer for fans, the Standards have been applied to prevent any competition at either the Division I or Division II level, and to force NASL to cancel its 2018 season, *eliminating* the increased competition and output for soccer consumers that NASL had provided for the past seven seasons.  The Standards have thus created the very instability in men's professional soccer in the U.S. and Canada that Defendants falsely claim is the evil that the Standards purportedly were adopted to prevent.  This case challenges the Standards in totality as constituting, in and of themselves, an unreasonable agreement in restraint of trade in violation of Section 1 of the Sherman Act—just like the anticompetitive bylaws of the Associated Press, which were held to be an agreement in unreasonable restraint of trade, in and of themselves, by the Supreme Court.

5.      Second, Plaintiff also challenges as violations of Sections 1 and 2 of the Sherman Act the overarching anticompetitive conspiracy by Defendants and other co-conspirators to ensure that the Standards, and waivers thereunder, are written, imposed and applied in an anticompetitive and discriminatory manner designed to shield MLS's monopoly in top-tier men's professional soccer and, more recently, the second-tier monopoly that Defendants have bestowed upon USL, from any competitive challenge by competitors or potential competitors, including NASL.  USSF has granted a myriad of waivers from the Standards to MLS and USL, as well as protracted grace periods during which these other leagues have had the opportunity to work toward compliance with the Standards, in order to ensure that MLS and USL are able to continue to play at the Division I and Division II levels, respectively, while refusing to extend comparable waivers or grace periods to NASL.  Moreover, the Standards have been repeatedly tailored and modified over time to make it impossible for NASL or another new entrant to gain Division I sanctioning without obtaining waivers, with the intention to deny such waivers discriminatorily

to ensure that MLS remains shielded from all competition. Indeed, each time that NASL appeared to be close to meeting the Division I Standards, the Standards have been made more restrictive and the waiver process made more stringent to deny and deter any competitive entry to the top tier. Defendants have also engaged in other conspiratorial conduct to prevent NASL from effectively competing against MLS, including actions intended to induce various clubs to either leave or not join the NASL. The application of the Standards and waivers thereunder in a discriminatory manner and other acts in furtherance of the conspiracy by Defendants have made it impossible for NASL to compete effectively against MLS in Division I and, more recently, have prevented NASL from even continuing to compete against USL in Division II. This case challenges the foregoing conduct by Defendants as an unreasonable restraint of trade, a conspiracy to monopolize, and both actual and attempted monopolization by MLS in violation of Sections 1 and 2 of the Sherman Act.

6. The Standards were designed at the outset to shield MLS from any competition due to the close, incestuous professional and personal relationships between USSF and MLS, which was founded by both Alan Rothenberg, the USSF President when the Standards were first agreed to, and Sunil Gulati, the USSF President when the Standards repeatedly were applied to deny NASL Division I sanctioning and, eventually, Division II sanctioning. Because of MLS's close relationship with the small group of powerful individuals who have controlled USSF, MLS has always dominated the decision-making of USSF with respect to the Standards, regardless of whether MLS-affiliated USSF Board Members technically recused themselves from voting on the Standards.

7. Further cementing the close relationship between USSF and MLS since the early 2000's has been the role of Soccer United Marketing, LLC ("SUM"), the marketing company

controlled by MLS.  MLS and SUM have persuaded USSF to pool its valuable rights together with those of MLS for marketing on a package basis by SUM, in exchange for tens of millions of dollars in guaranteed payments from SUM each year, pursuant to an agreement between USSF and SUM (the "SUM agreement").  It is therefore in the economic interest of USSF to maintain and protect MLS's valuable top-tier monopoly in order to bolster the economic health of MLS and SUM (and thus enable SUM to make these large guaranteed payments to USSF each year) and to increase the likelihood that the combined rights of MLS and USSF jointly marketed by SUM will yield even larger revenue streams.

8.     The anticompetitive impact of Defendants' antitrust violations on NASL reached its peak in late 2017, when USSF, acting in concert with MLS, dealt a new massive blow by refusing to grant NASL the two waivers it requested and applying the Standards to strip NASL of its Division II sanction for 2018, without any grace period to get into compliance.  This abrupt removal of the Division II sanction that NASL had received for the prior seven years was in stark contrast to USSF granting a large number of waivers to USL for that favored league to receive its Division II sanction for 2018, as well as USSF's history of granting repeated requests for waivers from MLS over the years to comply with the Division I Standards.  This denial of even a Division II sanction to NASL has caused NASL to lose multiple teams and has forced NASL and its remaining teams to cancel their 2018 season.  Nonetheless, NASL and its remaining teams continue to exist and are ready, willing and able to join with a number of new teams that are interested in becoming NASL members once the anticompetitive Standards and the unlawful conspiracies challenged hereunder cease to block competition in the relevant markets.

9.     Each of the challenged categories of concerted action—the anticompetitive agreement embodied in the Standards themselves and the Defendants' broader conspiracy to

modify, apply and manipulate the Standards, and the waivers granted thereunder, to protect the monopolies first granted to MLS in Division I and then created by Defendants for USL in Division II (to benefit MLS) has independently served as an unreasonable barrier to competition in the relevant markets.  The acts complained of constitute contracts, combinations or conspiracies in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (Counts I and II) and a conspiracy to monopolize, monopolization, and attempted monopolization in violation of Section 2 of the Sherman Act (Counts III, IV and V).

10.     Plaintiff seeks two principal forms of relief.  *First*, Plaintiff seeks a declaratory judgment and permanent injunction striking down the Standards, and the conspiracy to apply them to shield the monopolies Defendants have created in the relevant markets, as a violation of Sections 1 and 2 of the Sherman Act so that, going forward, competition and consumers, as opposed to Defendants' anticompetitive agreements, will determine which professional soccer leagues are able to compete as top-tier men's professional soccer leagues, and which ones are able to compete in the second tier—the competitive market outcome that exists for all other major professional team sports leagues in the U.S. except for professional soccer leagues.  The resulting competition would benefit not just NASL and other potential competitors, but also the consumers of men's professional soccer leagues in the U.S. and Canada (e.g., fans, sponsors and broadcasters) in the form of increased output, improved quality of product, and competitive prices.  *Second*, Plaintiff seeks treble damages under Section 4 of the Clayton Act for the injuries it has suffered in its business and property for the last four years, and will incur in the future, as a result of the Defendants' Sherman Act violations, together with its costs and reasonable attorneys' fees.  Plaintiff's damages have totaled many millions of dollars before trebling, in an amount to be determined at trial.

## PARTIES

**Plaintiff**

11.     Plaintiff NASL is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York.  Its business is to operate a men's professional soccer league in the U.S. and Canada, and for the last seven years it successfully operated such a league with a Division II sanction from USSF.  Because of Defendant's anticompetitive actions and recent denial of even a Division II sanction for the league, NASL has lost numerous clubs that previously competed in the league, as well as six additional clubs that had been prepared to join NASL for its 2018 season.  NASL's current member clubs consist of Jacksonville Armada FC, Miami FC, the New York Cosmos, and Puerto Rico FC.

12.     Due to USSF's denial of Division II sanctioning to NASL and the resulting cancellation of NASL's 2018 season, Jacksonville Armada FC, Miami FC, and the New York Cosmos will be fielding separate teams in the National Premier Soccer League in 2018.  This is a stopgap measure to maintain the brand identity and some jobs for these clubs, while NASL continues its fight to strike down the anticompetitive barriers preventing it from competing in Division I or II.

13.     Six additional clubs had previously provided NASL with letters of intent to join the league in 2018, followed by New Team Agreements under which the clubs had committed to join NASL, contingent upon the league maintaining at least its Division II sanction.

14.     Should the USSF's anticompetitive Standards be struck down, NASL and its clubs are ready, willing and able to resume competing in the relevant markets.  It is anticipated that the various teams that had previously expressed interest in joining the league, among others, will provide a pool from which NASL will be able quickly to gain new members.  While NASL has been severely damaged by the Defendants' unlawful actions and will be required to incur

significant additional expenses to re-establish goodwill with the soccer community, recruit top players from around the world, and regain the support of soccer consumers, including sponsors, broadcasters and fans, NASL is committed and prepared to undertake this competition.

**Defendant USSF**

15.     Defendant United States Soccer Federation, Inc. ("USSF") is a putative not-for-profit corporation organized under the laws of New York, with its principal place of business in Chicago, Illinois.

16.     USSF is the sole designated federation of FIFA for the U.S.  FIFA is a private international body that has assumed the role of organizing men's and women's soccer on a global basis.  Its rules and regulations are privately derived and formulated, and do not have any governmental source of authority over professional soccer leagues.  Among its many roles, FIFA administers or sanctions a variety of prestigious international soccer matches, including the men's World Cup tournament every four years, one of the most popular sporting events in the world. FIFA generally recognizes within each country a single "member association" as the organizing body for soccer within that nation.  Under FIFA's rules, players and coaches may participate in the FIFA-sanctioned international events only if they normally play for or coach clubs that are members of leagues sanctioned to play in a particular country by the member association recognized by FIFA as the organizing body for soccer in that country.  Top players generally only play in FIFA-sanctioned leagues, since the players highly value the opportunity to compete on their respective national teams in prestigious international events like the FIFA World Cup. Unless a professional soccer league is sanctioned by a FIFA member association, it is not viewed as credible or worthy of attention by the vast majority of soccer fans, sponsors, players, broadcasters and investors, and is viewed as an outcast by most of the rest of the world's soccer leagues and teams that are FIFA-affiliated.

17.     Separately, USSF also has been designated under federal law as the national governing body for U.S. Olympic and amateur soccer, but not professional soccer leagues.  This designation does not give the USSF any authority to regulate professional soccer leagues, which it has assumed solely as a result of its private association with FIFA.[1]

18.     USSF's members include professional soccer leagues competing horizontally with one another, as well as national associations, state associations, and various individuals involved in non-professional soccer in the U.S.  USSF members are separate economic actors from each other with distinct economic interests.  Many USSF members take part in USSF's decision-making by voting on proposals before USSF's National Council.  Certain USSF members also vote on proposals before USSF's Professional, Adult and Youth Councils.  USSF's Board of Directors consists of current and former USSF officers, individuals representing USSF's Professional, Adult, Youth and Athletes' Councils, an "at-large" member who nominally represents fans, and individuals who are supposedly "independent" even though nominated and supported by USSF's management.  Notwithstanding the participation of these various persons on the USSF Board, USSF has long been dominated in its decision-making by MLS with respect to all matters relating to men's professional soccer leagues located in the U.S. and Canada.

19.     USSF is also a member of the Confederation of North, Central America and Caribbean Association Football ("CONCACAF"), the private association sanctioned by FIFA for these geographic regions.

20.     Because of its exclusive role as the representative of FIFA for the U.S., USSF has the power to use its Standards to restrict output and competition for professional soccer leagues.

---

[1] *See* 36 U.S.C. § 220501, *et seq*.; *ChampionsWorld, LLC v. USSF*, 890 F. Supp. 2d 912, 936 (N.D. Ill. 2012)  ("[T]he Ted Stevens [Olympic and Amateur Sports] Act gives USSF no more of an antitrust exemption, or authority over professional soccer, than necessary for it to oversee Olympic and related events.").

No professional soccer league located in the U.S. and Canada would have sufficient credibility with most fans, sponsors, broadcasters or investors if it were not recognized by USSF and FIFA, and quality professional soccer players would not play for clubs in a league in the U.S. and Canada that was not recognized by USSF and FIFA.  To compete effectively, NASL had no choice but to apply for and seek recognition by USSF.  When that recognition at even the Division II level was abruptly ended for the 2018 season, NASL lost a number of clubs and was forced to cancel its 2018 season.

21.     From 2006 to February 2018, the USSF President—who controls USSF's day-to-day operations and makes many of its important decisions—was former MLS Deputy Commissioner Sunil Gulati, who was also one of the founders of MLS.  Gulati also served as a member of USSF's Nominating and Governance Committee, which oversees the process of nominating candidates for elective office within USSF.  At the same time that Gulati was serving as USSF President, Gulati for many years was also employed by one or more entities controlled by prominent MLS team owner Robert Kraft, and Gulati has worked to have USSF conspire with MLS to preserve the monopoly position of MLS.  The incestuous relationship between USSF and MLS goes back to the very founding of MLS in 1995, when Alan Rothenberg served as both USSF President and MLS Chairman at the same time, when he founded MLS with Sunil Gulati, among others, and obtained substantial financial benefits as a result of creating MLS.

22.     In December 2017, following the failure of the U.S. Men's National Team to qualify for FIFA's 2018 World Cup, Gulati—under great public pressure—announced that he would not seek re-election as USSF President.

23.     On February 10, 2018, Gulati was replaced by Carlos Cordeiro, a former investment banker who joined the USSF Board in 2007.  Before his election as President,

Cordeiro also served as USSF's Treasurer and Vice President, and was the chairman of USSF's Professional League Task Force, which assesses leagues' requests for waivers from the Standards and makes recommendations to the USSF Board on whether to grant them.  Cordeiro has long been viewed as an ally of Gulati and MLS, and the close relationship between USSF and MLS has not been disturbed by his election.  For example, on information and belief, Cordeiro previously voted in favor of the arrangement under which MLS by itself controls a majority of the seats on USSF's Professional Council, which, in turn, selects the two representatives of professional soccer leagues who will serve as USSF Board members in any given year—a structure crafted to help ensure that MLS and its allies will always dominate USSF deliberations and decision-making with respect to professional league issues.  Cordeiro was elected President by the USSF National Council, of which MLS controls over 14% of the voting power—on information and belief, the largest voting power of any single organization by far.  Upon information and belief, Cordeiro won the USSF presidential election after receiving the votes of MLS at the behest of Don Garber—the MLS Commissioner and a USSF Board member, as well as the Chairman of the Nominating and Governance Committee of the USSF Board.

**Defendant MLS**

24.     Defendant MLS is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York.  Although MLS is a professional soccer league member of USSF, it is a separate economic actor from USSF, with economic interests distinct from those of USSF.  Since 1996, MLS has been engaged in the business of operating a men's professional soccer league in the U.S. and Canada that has been granted sole Division I status by USSF.

25.     MLS (as well as other USSF members) has agreed each year to be bound by USSF's Standards.  By doing so, MLS, the other USSF members, and USSF have entered into an

agreement that, by itself, qualifies as a contract, combination or conspiracy as defined under Section 1 of the Sherman Act.

26.     During NASL's last season of competition in 2017, MLS controlled 57.1% of the voting power of the USSF Professional Council, while the National Women's Soccer League, USL, and NASL split the remaining minority of votes, with NASL only having 7.1% of the vote. This vote distribution was recently revised so that MLS controls 56.25% of the voting power, while NASL has only 6.25% of the vote.  This voting structure has resulted in MLS having the power to control all decisions of the USSF Professional Council.  Among other things, this control has resulted in MLS determining who will be the representatives of the Professional Council on the USSF Board.  MLS's appointees to the USSF Board have used their positions to influence USSF's decision-making on matters relating to the professional leagues to protect the monopoly position of MLS, including through Standards and sanctioning decisions.

27.     MLS has exercised its dominant influence over USSF decision-making as to professional-league issues to manipulate the adoption, modification and application of the Standards for anticompetitive purposes, through the membership of its designees on the USSF's Board of Directors and through its close professional and personal relationships with key USSF executives such as Rothenberg and Gulati.  The USSF Board currently includes MLS Commissioner Don Garber and MLS team official Carlos Bocanegra, and until recently included MLS league official Jeff Agoos.  USL, which has stated it will not compete with and will support MLS, similarly has exercised influence over the Standards applied by USSF to benefit MLS and USL, through Board positions held by its officers within USSF.  USSF's Board currently includes USL team owner Stephen Malik, and previously included USL CEO Alec Papadakis.

28.     Notably, MLS-affiliated Board members, including MLS Commissioner Don Garber, while claiming to have recused themselves from formal votes concerning the content or application of the Standards because of their admitted conflicts of interest, have nonetheless participated in USSF Board deliberations about USSF sanctioning decisions with respect to the men's professional leagues.  As a result, MLS-affiliated Board members have had the opportunity to work in tandem with Gulati and other allied USSF officials to dominate and influence Board votes as to sanctioning.  Through these various close relationships and positions—as well as the economic influence of the SUM agreements described below—MLS has dominated USSF decision-making regarding the promulgation, modification, and application of the Standards and the sanctioning of men's professional leagues thereunder.  That is true even when Garber or others aligned with MLS recuse themselves from Board votes concerning the Standards or sanctioning, because they participate in Board meetings, lobby Board members before formal Board meetings occur, and use their connections, power, and economic influence within USSF, bolstered by the SUM agreements, to dictate the outcome of USSF decision-making regarding the Standards.

## JURISDICTION AND VENUE

29.     NASL brings this action against Defendants under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages to NASL and to enjoin continuing Sherman Act violations threatening the business and property of NASL and its member clubs, and to recover the costs of this action, including reasonable attorneys' fees.  NASL also seeks declaratory and injunctive relief on behalf of itself and its member clubs pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and consistent with the governing case law of associational standing.

30.     This Court has jurisdiction over the subject matter of this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), Section 1 of the Sherman Act (15 U.S.C. § 1), Section 2 of the Sherman Act (15 U.S.C. § 2), and 28 U.S.C. §§ 1331 and 1337.

31.     This Court has *in personam* jurisdiction over USSF in this District because USSF has: (a) transacted substantial business in the U.S., including in this District; (b) engaged in the antitrust violations alleged in substantial part in this District; (c) organized and held tournament matches in this District, including matches for the Lamar Hunt U.S. Open Cup; (d) arranged and scheduled tournament matches for professional soccer clubs located in this District, including NASL's New York Cosmos; (e) imposed sanctioning rules governing, and made sanctioning decisions regarding, professional soccer leagues and clubs located in this District, including NASL and the New York Cosmos; (f) engaged in an antitrust conspiracy that is intended to have, and has had, an anticompetitive effect on commerce in this District; and (g) had substantial aggregate contacts with the U.S. as a whole, including in this District.

32.     This Court has *in personam* jurisdiction over MLS in this District because MLS: (a) has its principal place of business in New York, New York; (b) has transacted substantial business throughout the State of New York, including in this District; (c) has engaged in an antitrust conspiracy that is intended to have, and has had, an anticompetitive effect on commerce in this District; and (d) has had substantial aggregate contacts with the U.S. as a whole, including in this District.

33.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. §§ 1391(b), (c), and (d), because a substantial part of the events giving rise to NASL's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed above has been carried out in this District, and Defendants do business

in, have agents in, are found in or transact business in this District.  NASL also has a team, the New York Cosmos, which is located in this District and has played its home games in this District in Coney Island.

## FACTS RELEVANT TO PLAINTIFF'S CLAIMS

**A.**     **The Conspiracy Among MLS, USSF and Others to Create a Division I Monopoly for MLS Through the Anticompetitive Professional League Standards**

34.     In the mid-1980s, USSF received the right to host the 1994 World Cup in the United States.  USSF and MLS used this opportunity to create a monopoly over top-tier men's professional soccer leagues in the U.S. and Canada for MLS—a league founded and led by then-USSF President Alan Rothenberg.  With Rothenberg both leading USSF as its President, and creating MLS with the support and backing of USSF, the ties between USSF and MLS were inextricable.

35.     To create a monopoly position for MLS, its favored league, USSF first agreed with MLS and others to establish a closed divisional system that is different from virtually all of the rest of the world of professional soccer.  Under this system, USSF uses the power of its FIFA affiliation to require professional leagues seeking its sanctioning to qualify for and be assigned to separate, tiered divisions—specifically, Division I, Division II or Division III, with leagues in each Division being part of a closed system controlled by USSF.

36.     As USSF and MLS intended, fans, sponsors, players and broadcasters have come to regard USSF's three Divisions as a competitive hierarchy with three distinct tiers.  Specifically, Division I is regarded as the top tier and Division II as the second tier of men's professional soccer in the U.S. and Canada, with Division III viewed as a developmental league level.  As then-USL President Tim Holt once explained, "for the uninitiated, either fans or potentially corporate

sponsors, it's very simple to just go 'Okay, well, that's Division 1, that's Division 2 and that's Division 3,' the perception being that Division 3 must be inferior in all ways to anything that sits above it."

37.     The systems employed by FIFA federations outside of the U.S. for classifying professional soccer leagues are very different from USSF's closed divisional model.  Most other countries' FIFA sanctioning systems are premised on club-centric competitive systems of "promotion and relegation."  For example, under the system of promotion and relegation in the English Premier League, which is typical of the structures implemented by most other FIFA federations, the bottom three clubs in the league each year are automatically "relegated" to the second-tier English Football League, and the top two clubs in the English Football League, plus the winner of a playoff series between the clubs ranked third through sixth, rise up to take their places (and their shares) in the top-tier Premier League.  This competitive promotion and relegation system operates in accordance with rules promulgated by the Football Association, which is FIFA's regional federation in England.  The promotion and relegation systems of other top European leagues such as La Liga in Spain, Serie A in Italy and the Bundesliga in Germany operate similarly to the Premier League.  Under these systems, there is a competitive market for professional clubs, which can advance by competitive merit to the top tier of men's professional soccer.

38.     Long-time USSF President Gulati has acknowledged that USSF's rejection of promotion and relegation was driven by the shared desire of USSF and MLS to protect the investors in MLS, who built the league under the premise that the USSF would protect MLS from competition.

39.     Under the system used throughout the rest of the soccer world, the national federations affiliated with FIFA also do **not** set any economic standards for qualification in any particular divisional level, as USSF does with its anticompetitive Standards.  Instead, each professional soccer league—not the FIFA affiliated federation—is free to set individual standards that apply to its clubs, as is common in other professional team sports in the U.S. as well, without restrictions on the economic competition between leagues imposed by a private federation.

40.     For example, the top-division league in English soccer, the English Premier League, and the leagues comprising the next three divisions in the hierarchy, collectively known as the English Football League, set their own standards, such as in relation to stadium capacity. Similarly, the Deutsche Fußball Liga in Germany is a league body that regulates its member teams, not a national organizing body such as USSF that sets forth requirements that competing leagues must meet for sanctioning in a broader divisional hierarchy.

41.     In the U.S., the National Football League has standards that an NFL franchise must meet to be a member of the NFL, but there is no national "U.S. American Football Federation" that sets criteria for an American football league to be considered "Division I" or "top tier."  Thus, from time to time the NFL has been subject to competition from competing leagues, with the American Football League ("AFL") presenting a major challenge to the NFL in the 1960's, which eventually led to the AFL seeking a congressional antitrust exemption to enable it to merge into the NFL to create the current league.  And, in the 1980's, the "United States Football League" was formed to challenge the NFL, but that league did not achieve similar success and eventually ceased operations, albeit with a court later determining that the NFL had engaged in antitrust violations to undermine the USFL.  In each case, however, no national American Football federation set standards blocking the AFL and the USFL from competing with the NFL unless

they overcame barriers to entry to be sanctioned as a Division I league.  In each case, the league competed in the marketplace without private sanctioning restraints, seeking to win fans, sponsors, broadcasters, players and investors from the NFL.  In the case of the AFL, the upstart league succeeded, with consumers reaping the various kinds of benefits that competition brings, including new franchises in cities that lacked major league football (an increase in output), rule changes that made the pass-oriented AFL more popular to fans (an increase in quality), increased broadcasts (an increase in output), and more competitive prices.

42.     Similarly, with top-tier professional basketball in the U.S. and Canada, no private federation sets standards for the National Basketball Association ("NBA") to be considered a top-tier league and thus shielded from competition from any rival league.   Like FIFA, Fédération internationale de basket-ball ("FIBA") is the worldwide body setting the criteria for the participation of national basketball teams in FIBA global championship competitions.  And, like USSF, "USA Basketball" is the FIBA-affiliated organizing body in the United States, which is responsible for selecting the U.S. national teams that compete in the FIBA championships.  But FIBA and USA Basketball play no role in regulating competition among men's professional basketball leagues in the U.S. and have not agreed upon any sanctioning standards to shield the NBA from competition.  When the American Basketball Association ("ABA") was created in the 1960's and challenged the NBA, including with quality-improving innovations such as the three-point shot and the slam dunk, which were not permitted in the NBA at that time, there was no private federation regulating the ABA and denying it Division I status.  Competition was left free of private restraints and consumers benefited from the increase in output and improved basketball product.  Here again, it was only Congressional legislation creating an antitrust exemption that permitted the NBA and ABA to merge.

43.    MLS and USSF, however, took a different, anticompetitive path and agreed, from the founding of MLS onward, to adopt and impose restrictive Standards that would grant MLS a monopoly and shield it from competition.  From the beginning, MLS and USSF agreed to eliminate competition against MLS to ensure its economic success.  To that end, MLS and USSF broke from the worldwide practice of promotion and relegation, and instead combined a closed divisional system with sanctioning rules that, in totality, were designed from the outset to prevent any league other than MLS from competing in the top-tier level of men's professional soccer in the U.S. and Canada.

44.    Sunil Gulati—USSF President from 2006 to February 2018, Executive Vice President & Chief International Officer for World Cup USA 1994, and Deputy Commissioner of MLS from 1995 to 1999—has acknowledged his key role in founding (together with Alan Rothenberg) MLS, which he later protected from competition from NASL through his position as USSF President.  As stated in Gulati's publicly available curriculum vitae, he was a "Founding member of [the] group that planned and launched the development of a professional sports league," i.e., MLS.  Gulati was also frequently referred to as Rothenberg's "right-hand man" in the creation and establishment of MLS.

45.    Gulati left his position as MLS deputy commissioner in 1999, but, until at least 2013, including years when he also was serving as USSF President, worked successively as Managing Director, President and Special Advisor for the Kraft Sports Group—an organization that was one of the original MLS owners in 1995 and still owns and manages MLS-related holdings, including at least one MLS club.

46.    During the past twelve years that Gulati was USSF President, he was in constant communication with MLS as together they agreed upon and carried out the conspiracy to protect

MLS, which he had founded with Rothenberg, and shield it from any competition through the anticompetitive application of the Standards.  As current MLS Commissioner, USSF Board Member and SUM CEO Don Garber admitted in 2013:  "**Sunil and I speak multiple times a day.  He's one of my closest friends, and without Sunil's support Major League Soccer isn't what it is today.  Not just for what he did in helping to found it, but what he does every day to be a good partner with us.**"  (Emphasis added).  As part of this "partnership," USSF conspired with MLS and others to apply the Standards in an anticompetitive and discriminatory manner to protect the MLS monopoly.

47.   Once the closed divisional system was created for MLS, the second step necessary to grant MLS a monopoly and protect it from competition was to adopt the anticompetitive Standards, which on their face restricted entry and competition.  Thus, in 1995, USSF and MLS, acting in concert to benefit MLS, worked to ensure USSF's adoption of the first version of the Standards, which by their express terms created barriers for any league to compete against MLS in Division I, and included a waiver process that could be discriminatorily applied in favor of MLS, and against any other league, so that MLS would be the only sanctioned Division I league.

48.   As the First Circuit has noted, "USSF decided as early as 1988 to sanction **only one** Division I professional league."  *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 53 (1st Cir. 2002) (emphasis added).   MLS founder and USSF President Rothenberg's testimony confirmed this fact:

> Q.      . . . [Y]our plan said you didn't anticipate there'd be any other significant domestic league to compete for player services, right?
>
> A.      That's right. . . .
>
> Q.      . . . **[Y]ou asked USSF to only sanction one Division I league, right?**

> **A.**    **No, that was the plan of the USSF all along.  That was in their rules** . . . .

49.    From the outset, the Standards were designed, in totality, to create a monopoly position for MLS in the relevant market.  As Gulati explained:

> When Alan [Rothenberg] was elected [USSF president], we started a committee to look at the development of a professional league. . . .  **What really started formally the process of MLS was two, three, four of us who were [on the] World Cup [organizing committee] started talking about putting a league together and what it would take to do that.** . . . We really wanted to get a document put together, a business plan, and we needed to get somebody on board to do that.  I said to Alan, do you have another young, smart Latham . . . attorney to join us.

That young Latham attorney was Mark Abbott, whom Rothenberg tasked with developing MLS's business plan.  Abbott became MLS's chief operating officer in 1997 and its President in 2006, a role he continues in today.  Abbott also occupies Gulati's former position as the MLS Deputy Commissioner.

50.    To no one's surprise, then-USSF President Rothenberg prevailed in his bid for his own league, MLS, to receive the sole Division I sanction from USSF.  In fact, media reports noted that the bid of Rothenberg's MLS received financial support from USSF, which therefore had, from the very beginning, an economic interest in protecting MLS's status as the sole Division I league:

> **[F]ollowing a vote by the Rothenberg-dominated U.S. Soccer Federation, a nonprofit organization, more than $6 million of the World Cup earnings could soon be set aside for something called Major League Professional Soccer, Inc., a nascent and very much for-profit league controlled (and partially owned) by, yes, Alan Rothenberg**. . . . Rothenberg, reports the Los Angeles Times, used $500,000 of World Cup USA '94 money to promote his own bid to win the right to form a professional league.  Since Rothenberg was also president of the U.S. Soccer Federation—the organization charged with deciding who would be given the league—it was hardly a surprise that Rothenberg's lavishly funded proposal won. . . . **A member of the federation,**

22

> **speaking on condition of anonymity, estimated that World Cup USA '94 has already paid Rothenberg's league as much as $2 million**.  (Emphases added.)

51.     USSF CEO Daniel Flynn has testified that USSF provided a $5 million "loan" to MLS to support its formation as the sole Division I sanctioned league.  USSF then permitted MLS to repay that "loan" by providing marketing support to USSF over the next several years.

52.     According to Gulati, the USSF Board of Directors agreed at the time it sanctioned MLS "to not sanction any other league as a first division (Division I) men's professional outdoor league until MLS had finished its second full season in 1997—to give it a 'runway' of sorts"—in other words, to give MLS time to build up an incumbency advantage against any potential competition in the top-tier relevant market.  In fact, the actual plan that was agreed upon and executed by USSF and MLS, as future events demonstrated, was not to permit any other league *ever* to quality for Division I sanctioning so that MLS could permanently maintain its monopoly.

53.     MLS played its first season in 1996 with ten clubs.  Rather than permit its clubs to make individual investment decisions to improve the quality of play by investing in the best players, MLS implemented a so-called "single-entity" league structure in which MLS owned and closely controlled many of the operations of the clubs themselves, including the selection and allocation of players.

54.     As the First Circuit described this in 2002:

> MLS owns all of the teams that play in the league . . . , as well as all intellectual property rights, tickets, supplied equipment, and broadcast rights.  MLS sets the teams' schedules; negotiates all stadium leases and assumes all related liabilities; pays the salaries of referees and other league personnel; and supplies certain equipment. . . . MLS has the "sole responsibility for negotiating and entering into agreements with, and for compensating, Players."  **In a nutshell, MLS recruits the players, negotiates their salaries, pays them from league funds, and, to a large extent, and determines where each of them will play.**  For example, to balance talent among teams, it decides, with the non-binding input

> of team operators, where certain of the league's "marquee" players
> will play.

*Fraser*, 284 F.3d at 53 (emphasis added).

55.     This structure was unlike the way professional soccer leagues were organized in the rest of the world, where clubs are separately owned and managed on an entrepreneurial basis, with individual club owners having control over club decision-making on player rosters, sponsors and the like.  MLS could employ this structure, which limited the quality of players and games offered by the league, because it knew that, pursuant to its agreement with USSF, MLS's monopoly position as the sole top-tier men's professional soccer league would be protected by USSF, by having potential competition from any other league precluded by USSF's enforcement and application of the anticompetitive Standards.

56.     MLS has been open about its desire to be the sole Division I league joined together with and protected from the risks of competition by USSF.  At the USSF National Council meeting in 2012, MLS Commissioner Garber stated:

> So for those of you who don't know, this is **your Division 1 league**.
> . . . [W]e think it would be weak to go out there and think that
> America can't have a soccer league that could be thought of the way
> the rest of the world thinks of the Premier League or thinks of Serie
> A, or thinks of La Liga. . . . So we don't want to be like [Spain's]
> La Liga, we don't want to be like the [English] Premier League
> where every other day, there's a team that's going bankrupt. **We
> want to do it in a way that we can assure that we're going to be
> around forever.**

(Emphases added).  However, the combination of MLS's single entity structure and immunity from competition has also resulted in the quality of play in MLS being inferior compared to other men's professional soccer leagues in the rest of the world, as described further below.

57.     The main way Defendants have protected MLS's monopoly as "your Division I league"—to ensure that MLS will be "around forever," and that its teams never go bankrupt

because they are protected from competition—has been to agree (i) starting from the inception of MLS, to a scheme of anticompetitive Standards that are designed to shield MLS from competition; and (ii) to discriminatorily modify, manipulate and apply the Standards, and the waiver process thereunder, in order to shield MLS from competition in Division I and, more recently, to shield USL, which has stated that it will not compete against MLS, as the sole Division II league.  The primary effect of the Division I Standards by their express terms, as well as the purpose and effect of how they have been applied, is to exclude leagues seeking to compete with MLS from top-tier Division I status and, instead, to destabilize such leagues and inflict anticompetitive harms upon them by denying and threatening to deny them sanctioning, thus insulating MLS from competition with high barriers to entry and advancement.

58.    USSF and its members, acting in concert with and under the dominant influence of MLS, have periodically adopted and revised the Standards, which continuously have had the effect of protecting MLS from any competition as the sole Division I league and, more recently, have also been applied to ensure that USL, which works in support of MLS, would be the only Division II league.

59.    From the beginning, the Standards have been adopted and revised, and waivers have been granted or denied therefrom, in a discriminatory and anticompetitive manner as a result of the close relationship between USSF and MLS, and the power of MLS to use its influence to control USSF decision-making and agreements with respect to the Standards.

60.    The Standards are themselves an agreement adopted by the determination of members of the USSF Standards Task Force and by the vote of USSF Board members, who are economically distinct from one another.  In addition, each of USSF's members, including professional league members such as MLS, agrees to be bound by the Standards.  The Standards

are thus adopted by concerted action in the form of an agreement among USSF and its members, including MLS.  MLS has effectively dominated USSF's deliberations, agreements and decisions as to men's professional leagues, including the promulgation, modification and application of the Standards.

61.     For example, USSF's Professional Council uses an anticompetitive weighted voting system, combining the number of clubs and attendance, so that MLS controls 56.25% of the voting power of the Council.  As a result, even if all other sanctioned professional leagues— *i.e.*, the National Women's Soccer League, USL and NASL—were united in opposition to an MLS-supported measure, MLS would win out and the USSF Professional Council would act in MLS's favor.

62.     One consequence of this MLS-controlled voting structure is that MLS effectively decides who the two representatives of professional leagues on the USSF Board of Directors will be each year.  It is thus unsurprising that, for decades, MLS Commissioner and SUM CEO Don Garber has continuously occupied one of those seats and has participated in Board deliberations to make certain that the Standards were applied to protect the MLS monopoly.

63.     A person supportive of MLS, such as USL CEO Alec Papadakis, has typically occupied the other professional league seat on the USSF Board.  It briefly appeared that there might be an exception to this pattern in 2017 when Steven Malik, then the owner of NASL's North Carolina FC, was elected to the USSF Board.  But in fact, Malik had declared his interest in joining MLS the prior December 2016—providing a clear incentive for Malik's decision-making on the Board to favor MLS—and it was revealed shortly after his appointment that Malik would be transferring his North Carolina FC club to USL.

64.     As a result of these MLS-determined Board positions—together with the influence of first USSF President and MLS founder Alan Rothenberg, and then MLS's close ally and co-founder, President Gulati, as well as other USSF officers who have been close allies of MLS—USSF has always agreed to adopt and apply the Standards so as to protect MLS from any competitor in the market for top-tier competition and, more recently, to protect MLS's allied league, USL, from any competition in Division II.

65.     Indeed, while USSF has purported to use a specially appointed Standards Task Force to propose modifications to the Standards, it has made sure that the Task Force has been populated with members allied with MLS—including, for many years, none other than MLS founder Alan Rothenberg.  Other members of the Task Force were also beholden to MLS, Gulati or other MLS supporters, so that the entire Standards modification process was nothing but a smokescreen to obscure USSF's ongoing commitment to modify and apply the Standards to protect the MLS monopoly.

66.     MLS also has been able to exercise dominant influence over the USSF Board with respect to the Standards through the power and influence of President Rothenberg, President Gulati, and other USSF officers.

67.     For example, Gulati had significant control over the selection of the Board's three purported "independent" directors, as, upon information and belief, he initially nominated each candidate to fill the independent-director seats.  Many other Board members also looked to curry favor with Gulati and those in the USSF and MLS power structure.

68.     It is thus not surprising that most Board members bowed to the wishes and desires of Gulati, Garber and other MLS-affiliated USSF officers and voted to support the MLS positions with respect to the Standards.  This desire to please MLS was only bolstered by the SUM

agreements, which, as discussed below, provide a strong economic incentive for USSF to favor MLS.

**B.    The Original Anticompetitive Professional League Standards and Their Continued Application to Block Competition from NASL or Other Soccer Leagues**

69.    From 1996 through 2008, the Standards first adopted in 1995 (the "1995 Standards") served as an effective barrier to any competition emerging to challenge MLS in Division I even though MLS, with its quality-suppressing single-entity system, struggled to satisfy those very Standards and in many years could not do so without waivers. A number of those original restrictions still apply today and serve to shield the MLS monopoly from competition.

70.    The 1995 Standards not only were an anticompetitive agreement in and of themselves, but also were adopted in furtherance of an overarching conspiracy between USSF and MLS to confer top-tier monopoly status on MLS.

71.    As reviewed below, MLS itself often did not comply with one or more of the Standards, but its monopoly position as the sole Division I league was secure because each time it did not comply, USSF simply granted MLS waivers to continue as the sole Division I league. In this manner, pursuant to the conspiracy between MLS and USSF, the Standards served as a barrier to entry to other leagues, while MLS was repeatedly excused from complying with them.

72.    Because of this discriminatory waiver system, which MLS knew USSF would apply to protect it, the Standards could be set at such stiff levels that other leagues would be deterred from even trying to compete at the top-tier level, with MLS alone being the only league able to obtain the essential Division I sanction from USSF, which, as the association for FIFA in the U.S., had the power to control market entry.

28

73.     Among other things, the 1995 Standards required that any Division I league have: (i) "at least 10 teams" (§ I(A)) (the "Number of Teams" requirement); (ii) "U.S.-based teams located in at least 3 different time Zones" (§ II(A)) (the "Time Zones" requirement); (iii) "regular home field stadia must have a minimum seating capacity of 15,000" (§ II(E)) (the "Stadium Capacity" requirement); (iv) "75 percent of the league's teams" playing on "surfaces of at least 70 yards by 110 yards" (§ II(D)) (the "Pitch Size" requirement); and (v) "75 percent of the league's teams . . . in metropolitan markets of at least 1,000,000 persons" (§ II(C)) (the "Market Size" requirement).  These barriers were adopted with the design that only MLS would be able to meet those standards, or would be granted waivers while other leagues would not, once MLS was chosen as the sole Division I League.

74.     **Number of Teams**.  There was no legitimate justification for USSF's requirement that a league must have at least ten clubs to be granted Division I status.  The National Hockey League prospered for many years as the sole major hockey league in the U.S. and Canada when it had only the storied "original six" clubs up until 1967 before NHL expansion:  the Boston Bruins, New York Rangers, Chicago Blackhawks, Detroit Red Wings, Toronto Maple Leafs and Montreal Canadians.

75.     Then, in the 1970's, the World Hockey Association was formed and during many of its seasons had less than ten teams.  In 1979, the WHA operated with only six teams, but four of which merged with the NHL with great success, including the Edmonton Oilers, which went on to win many NHL championships with a team headed by Wayne Gretzky, perhaps the best hockey player ever.  Two other WHA franchises (the Quebec Nordiques and Hartford Whalers) similarly won NHL championships after moving to the NHL and moving to new markets (Denver and North Carolina, respectively).  There was no "federation" preventing the WHA from

29

competing as a top-tier league because it did not have ten teams. Instead, the success or failure of the WHA and its teams was up to the marketplace—not an inter-league standards-setting body with a vested interest in protecting the incumbent league from competition.

76.     The National Basketball Association similarly only had nine teams during much of the 1960's, when there was no question the NBA was the preeminent professional basketball major league in the U.S. (the NBA did not have a tenth team until the Chicago Bulls were founded in 1966-67). Again, no federation existed that prevented the NBA from claiming top-tier status because it only had nine teams.

77.     To understand the arbitrary and anticompetitive nature of the Number of Teams requirement, all one has to do is consider a situation in which one league with 7 or 8 teams and a higher quality of play is successfully outcompeting another league with 12 or more teams but a lower quality of play—thus winning in the marketplace and benefiting consumers through its own competitive strategy, including its decisions about how many teams to have. The Standards' Number of Teams requirement would prevent this procompetitive, free-market outcome by denying the first league a sanction, artificially ensuring the marketplace success of the second league by excluding its higher-quality competition from the relevant market. Federal antitrust laws do not permit a private standard-setting organization, such as USSF and its members, to restrain competition in order to dictate its preferred competitive outcome in this manner.

78.     As discussed below, this original anticompetitive Number of Teams requirement has subsequently been made even more restrictive to block competitive entry by NASL.

79.     **Time Zones**. As to the three time zone requirement, which was imposed with the design of protecting MLS from competition, it too has no procompetitive justification. The highest-quality and best-regarded professional soccer leagues in the world—such as the Premier

League in England, La Liga in Spain, the Bundesliga in Germany, Serie A in Italy and Ligue 1 in France—typically only occupy one or two time zones.  Nevertheless, those leagues manage to attract numerous fans and vast media interest from other nearby time zones, demonstrating that a league can achieve a broad financial footprint without being physically present in all the time zones where it has followers.

80.    Similarly, numerous college football and basketball conferences operate in the U.S. within less than three time zones while generating many millions of dollars and achieving national recognition.  To give just one example, the Southeastern Conference is located in only two time zones (Eastern and Central) but no one seriously contends that the SEC is not in the top tier of these sports, and indeed is considered by many as the preeminent college football conference in the U.S.

81.    The Atlantic Coast Conference (ACC) is similarly one of the most successful college conferences in both football and basketball, yet all of its members are located in the Eastern Time Zone.  Indeed, the ACC includes as a member Notre Dame, one of the most popular college sports programs in the Midwest, but Notre Dame is located in South Bend, Indiana, which is in the Eastern time zone with its fellow ACC members.  The ACC also illustrates that a single time zone is no indication of geographic reach, since its members span much of the nation from as far south as Miami, Florida to Boston, Massachusetts, and from Boston in the east to South Bend, Indiana in the west.

82.    The anticompetitive nature of the Time Zone requirement is apparent when one considers a scenario in which a league with teams located only in the Eastern and Pacific Time Zones prevails in the marketplace by producing a higher-quality product that attracts fans and players from across the country, while a second league with teams in the Eastern, Central and

Pacific Time Zones produces an inferior product with less marketplace success.  By preventing the first league from being sanctioned and thus excluding it from the relevant market, the Standards' Time Zone requirement would artificially protect the second league from competition, and thus deprive consumers of the higher-quality product that otherwise would have been available through the natural and procompetitive operation of the free market.

83.    As discussed below, this anticompetitive Time Zone requirement has since been made even more restrictive to block competitive entry by NASL.

84.    **Stadium Capacity**.  The 1995 Standards require that a Division I "league's regular home field stadia must have a minimum seating capacity of 15,000" (§ II(E))—a requirement that continues to this day under the operative 2014 Standards, which require that "[a]ll league stadiums must have a minimum seating capacity of 15,000" (§ II(b)(iii)(2)) (the "Stadium Capacity" requirement).  The effect of this rigid and arbitrary Stadium Capacity requirement is that, irrespective of average seating capacity, attendance, and quality of play league-wide, a single stadium with under 15,000 seats can disqualify a whole league from Division I status.

85.    New entrants seeking to compete at the top tier of professional soccer, such as NASL, initially have severely limited stadium options to satisfy the Division I Stadium Capacity requirement, given the entrenched position of MLS, the limited availability of suitable stadiums of the required size, and the need for time to grow as competitors in Division I to increase their fan base and justify the investment in building new stadiums.  In a competitive, free market, such expansion and investment in stadiums would take place incrementally over time without creating an unnecessary and anticompetitive barrier to Division I competition.  This is in part because securing a stadium seating at least 15,000 people, as mandated by USSF's Stadium Capacity requirement, typically requires a club to obtain assistance from municipalities or counties or

investments from other third parties.  In even the most favorable of circumstances, this is a difficult task; for a club whose league is stigmatized by its lack of a USSF Division I sanction, it is often impossible.  As discussed below, this continuing anticompetitive Stadium Capacity requirement has been employed as a barrier to NASL competing against MLS in Division I.

86.     In fact, government officials have opposed funding for NASL stadiums on a number of occasions, on the ground that its lack of a Division I sanction made it a "minor league." For instance:

> Sen. Wilton Simpson brought up an amendment to the amendment—one that would add the North American Soccer League (the league that includes the Rowdies soccer club that plays in St. Petersburg) to the pool of potential beneficiaries eligible for state funding.  **Sen. Latvala . . . stated that he was unsure as to what the North American Soccer League was and whether it is classified as a "major league sports league."  Sen. Latvala voiced his opposition and encouraged the committee to vote against the amendment.**  Following a vote, the amendment failed. . . .  Before and after the committee meeting, Sen. Latvala let it be known that he was upset that supporters of the amendment didn't ask him about the amendment and **compared NASL to "international baseball or the rodeo."**  (Emphases added.)

87.     Government officials in Texas similarly denied funding for an NASL stadium due to NASL's "minor league" non-Division I status:

> City and county officials, in a meeting Thursday with the Express-News Editorial Board, said that based on the early results of a joint feasibility study, **they would not endorse using public money for minor-league soccer**.  **San Antonio developer Gordon Hartman has asked the city and county for $4 million each to build a 5,400-seat stadium at STAR Soccer Complex for a planned North American Soccer League franchise**.  The soccer portion of an exploration of pro sports possibilities in San Antonio, worked up by California-based Premier Partnerships, [2] offers bleak prospects for the profit potential of such operations, stressing that teams "will sustain continued losses throughout the development of the leagues."   Further, the draft summary of the study, commissioned by the city and county last month, notes that

---

[2] Notably, the chairman of Premier Partnerships is former USSF President and MLS Chairman Alan Rothenberg.

> **typically cities "have not provided significant funding for new
> stadium development for tertiary soccer teams and stadiums."**
> (Emphases added.)

88.     Further, even NASL's New York Cosmos faced continual setbacks in their

unsuccessful efforts to secure approval for a planned stadium in Belmont Park, despite the club's

on-field success, due to NASL's status as a non-Division I league:

> Having refused to pursue an affiliation or feeder agreement with
> MLS, the NASL is now at a crossroads—tied to a "minor league"
> label it refuses to embrace yet is forced, for now, to accept.  The
> Cosmos may be a big club in certain ways.  **Yet according to the
> U.S. Soccer Federation, New York and its NASL brethren are
> stuck in the second tier. . . . [T]he semantic weight of the "minor
> league" label can make its product a tougher sell.  That, in turn,
> makes it difficult to build to a Division I standard.**  It also limits
> access to international competition, since three of the U.S.'s four
> berths in the CONCACAF Champions League are guaranteed to
> MLS teams (the fourth goes to the winner of the U.S. Open Cup,
> where the NASL has a 10-15-1 record against MLS opposition
> since first entering in 2012). . . .  **Major league teams require
> major league venues.**  The [Cosmos] club's interest [in] building
> what [Cosmos COO] Stover called "the best soccer stadium in the
> United States" at Belmont Park in Elmont, New York, remains
> high.  **It submitted its proposal, which includes a privately-
> financed, 25,000-seat stadium, to state authorities two years
> ago.  The Cosmos are still awaiting a response**.  (Emphases
> added.)

89.     Defendants' conspiracy to use the anticompetitive Standards to accord Division I

status only to MLS has made it more difficult—and often impossible—for clubs in other men's

professional soccer leagues, such as NASL, to secure stadium funding.  This, in turn, has further

prevented NASL from satisfying the rigid Stadium Capacity requirement, thus creating yet

another high barrier protecting the MLS monopoly from competition.

90.     Indeed, even if some seating capacity requirement could be justified for Division I

status, the 15,000-seat minimum for all clubs is indefensible.  This is demonstrated by the fact

that A.F.C. Bournemouth has competed in the English Premier League for the past several seasons

34

with a significantly lower-capacity stadium (11,464) than USSF's requirement of 15,000, as have

other English Premier League teams.  There is no question that the Premier League is one of the

preeminent soccer leagues in the world, yet, under USSF's Stadium Capacity requirements, the

Premier League would be, at most, a Division II league.  The same is true for the Argentine

Primera Division, La Liga in Spain, Serie A in Italy, Ligue 1 in France, and Eredivisie in the

Netherlands, all of which are among the top leagues in the world, but would not satisfy the USSF's

Stadium Capacity requirement for Division I.

91.    Far from improving league quality, an artificial requirement for all league

stadiums to have 15,000 seats reduces the quality of the league's product by imposing on owners

the additional expense of securing and maintaining large stadiums, which wastes money that

otherwise would have gone toward improving the product's quality (such as by hiring better

players and coaches).  And in situations where larger stadiums *would* make economic and

competitive sense, the operation of the free and unrestrained market naturally will result in such

stadiums being built or secured, without the need for market intervention via Standards that

restrain competition.

92.    Significantly, MLS itself did not satisfy the Stadium Capacity requirement at any

point for a period of six full seasons, from 2009 until 2015, when MLS's San Jose Earthquakes

relocated from the 10,500-seat Buck Shaw Stadium to a new venue.  Similarly, from 2008 to

2010, MLS's Kansas City Wizards occupied CommunityAmerica Ballpark, which had slightly

over 10,000 seats.  Upon information and belief, both the Earthquakes and the Wizards had the

option of securing larger, more expensive stadiums, but nevertheless chose to compete in lower-

cost, lower-capacity stadiums.  The fact that USSF granted the necessary waivers for MLS to

remain in Division I, notwithstanding its non-compliance with the Stadium Capacity requirement

for many years, is an example of how the Standards have been applied in a discriminatory and anticompetitive manner to protect MLS as USSF's favored league, while deterring and preventing competition from other leagues.

93.     The anticompetitive nature of the Stadium Capacity requirement is clear when one considers a scenario in which one league has succeeded in the marketplace by spending its funds on top-quality players and coaches, while utilizing stadiums that in some cases have fewer than 15,000 seats; and another league has failed in the marketplace by squandering its money on unnecessarily large stadiums that uniformly have more than 15,000 seats.  USSF's Stadium Capacity requirement would automatically exclude the first league from competition with the second league in the relevant market, by denying it sanctioning—thus depriving consumers in the relevant market of the higher-quality product, and thwarting the procompetitive, free-market outcome that otherwise would have occurred.

94.     **Pitch Size**.  The requirement in the 1995 Standards that 75% of soccer pitches in a league be at least 70 yards by 110 yards—which has since been increased to 100%, as discussed below—is another artificial constraint that has been selectively applied against other leagues to protect MLS.  Unlike the Standards, the FIFA Laws of the Game do not mandate that soccer fields for league play be at least 70 yards by 110 yards.  MLS itself has had soccer pitches as narrow as 62 yards in both Columbus and San Jose, far less than the required 70 yards, until new stadiums were built.  It has also been publicly commented that the current pitch for New York City FC in Yankee Stadium "continues to be an embarrassment, even more narrow than club officials are willing to admit. MLS mandates a field area minimum of 110-by-70 yards. While there is some pretense that the Yankee Stadium pitch meets that standard, very few people buy into the notion." While a minimum pitch size that is applied consistently, solely on the basis of sporting

36

requirements, might be defensible in some circumstances, USSF's discriminatory creation and application of the rule as a barrier to protect the MLS monopoly, when MLS itself has often not had all of its teams comply with this requirement, cannot be justified as procompetitive.

95.     **Player Development**.  The 1995 Standards also imposed an additional barrier to entry with an onerous player development resource requirement that continues to serve as a barrier to entry to this day.  *First*, "[e]ach U.S.-based team must demonstrate a commitment to a player development program," which "may be satisfied by supporting either an amateur or professional reserve team competing in a USSF-sanctioned league or by the league itself."  2014 Standards § II(e)(ii).  *Second*, under the 1995 Standards, each team was required to "to demonstrate its commitment to the promotion of soccer at all levels in the home market."  This requirement was modified in 2008 and 2014 so it now provides that "[e]ach U.S.-based team must maintain teams and a program to develop players at the youth level," which "may be satisfied by fielding teams in a Federation academy program."  2014 Standards § II(e)(iii).

96.     Although support for lower-level player development is a laudable goal, the Player Development requirements in the Standards are a barrier to entry and have the further anticompetitive effect of impeding competition among professional soccer leagues by driving them into reserve-league partnerships in support of MLS.  As the sole men's Division I league located in the U.S. and Canada, MLS has been able to foster relationships with lower-level teams and players with relative ease.

97.     As a non-Division I league, NASL has faced much greater hurdles than MLS in securing adequate reserve squads and satisfying the player development requirements.  Essentially, NASL must persuade players and teams to compete in a "minor league for a minor league," which at times has proven difficult or impossible.  More broadly, due to their non-

Division I status, NASL clubs have had greater difficulty reaching the level of attendance and sponsorship that is necessary to support reserve and youth squads.

98.    The Standards' rigid Player Development rules are also anticompetitive in that they require a considerable expenditure of resources from a league before it is permitted to even begin competing at the Division I level, resulting in another unjustifiable barrier to competition. Under the Player Development requirements, each Division I team must support at least two additional clubs, or equivalent player development programs. This is thus another cost that MLS's competitors, such as NASL, must incur before being allowed to challenge MLS in the market for men's top-tier professional soccer leagues located in the U.S. and Canada.

99.    NASL has supported the promotion of lower-level player development. A number of NASL clubs have been affiliated with reserve and youth teams, and NASL's clubs have worked to expand their player development programs over the years. But a rigid requirement that every Division I team support multiple lower-level teams, or some equivalent, goes beyond any reasonable requirement and is not procompetitive.

100.    The Player Development rules are unnecessary to achieve any procompetitive objective because, even without those rules, top-tier soccer clubs will form player development teams naturally to support their own economic and competitive interests. This is demonstrated by the fact that, in other professional league sports throughout the U.S. and Canada, major-league teams form feeder and developmental relationships with minor-league clubs, without needing any federation rule that requires them to do so. There was no need for USSF to impose such a rigid player development requirement except to create another barrier for a league to obtain Division I status, and the continued existence of this barrier to entry cannot be justified.

101. The original requirements of the 1995 Standards still applied as a continuing agreement and restriction upon competition today thus serve as continuing anticompetitive barriers to entry and advancement by leagues such as NASL seeking to compete with MLS. The Standards, in totality, are far more restrictive than necessary to achieve any theoretical procompetitive benefits that have been asserted by USSF.

102. The Standards also cannot be justified on the basis that economic conditions for soccer in the U.S. are different from the rest of the world, so soccer requires protection from the forces of competition to enable the sport to take hold in the United States. Whatever may have been the case in 1995, over twenty years ago, soccer is a very popular sport in the U.S. and Canada today, with television ratings, media rights contracts and other metrics that demonstrate the popularity of the sport and its ability to attract fans, sponsors and broadcast partners. There is no factual basis to justify any continued special rules restricting competition for men's professional soccer leagues in the U.S based on any purported concerns about the viability of professional soccer in the U.S. Indeed, even former USSF President Sunil Gulati has stated that any special protection for MLS as the sole Division I league was not needed after its first two years of existence.

103. Further, USSF is a private organization, not a governmental authority, and has no legal basis to regulate soccer in the U.S. like a government agency based on its desires to protect MLS from competition. USSF has no immunity from application of the antitrust laws in imposing Standards that have significant anticompetitive effects, have no offsetting procompetitive benefits, and are far more restrictive than is reasonably necessary to achieve any claimed procompetitive benefits (assuming such benefits would actually exist, which has not been the case).

104.    The inescapable conclusion is that the Standards themselves, as initially adopted in 1995, and as amended since then as described further below, in totality, are a continuing agreement among USSF members, including MLS, that unreasonably restrains competition in the relevant markets.  The anticompetitive agreement embodied in the Standards themselves has served only to protect MLS's monopoly status as the sole men's Division I professional soccer league located in the U.S. and Canada and, more recently, as discussed below, to also create a monopoly in the market for Division II leagues.

**C.    The Role of "Soccer United Marketing" in the Broader Conspiracy To Protect the MLS Monopoly**

105.    Beginning in the early 2000s, USSF, MLS and SUM entered into a series of economic arrangements under which USSF gave SUM the right to jointly and exclusively market certain media and other intellectual property rights owned by USSF in packages with the rights of MLS and certain other soccer properties.  These joint marketing arrangements were promoted by MLS to USSF both because they benefited MLS, which was floundering at the time, and because they had the contractual effect of linking the two organizations together economically so that it would be in the interest of USSF to continue to apply the Standards to protect the MLS monopoly.

106.    In the early 2000s, MLS was in poor economic shape and two of its teams had recently folded.  Meanwhile, in 2002 the U.S. Men's National Team recently had far exceeded its prior performance in the World Cup, reaching the quarterfinals, where the team lost 1-0 to Germany.  It was in this context that MLS proposed, and USSF agreed, to pool the USSF's increasingly valuable rights with MLS's own rights and market them jointly via SUM.

107.    The benefits of this SUM arrangement to MLS were twofold:  *First*, combining MLS rights with USSF rights that were, at that time, more desirable in the marketplace would be

an economic benefit to MLS—which, upon information and belief, MLS was able to obtain without even any competitive bidding, due to the favored relationship and incestuous connection that the USSF had with MLS. *Second*, the SUM arrangement contractually tied together the economic fortunes of these organizations so that USSF would have a concrete economic interest in protecting the MLS monopoly on an ongoing basis. Specifically, under the SUM arrangement, USSF receives tens of millions of dollars in large annual guaranteed payments, so USSF has a strong economic incentive to ensure the financial success of MLS and SUM to enable SUM to make these guaranteed payments. This incentive to support SUM's ability to make the guaranteed payments to USSF is even more important in years in which the performance of the Men's National Team takes a downturn—such as a failure to qualify for the World Cup, as happened this past year—which decreases the value of USSF's rights. As a result of the SUM agreement, USSF has an economic interest in maintaining MLS's top-tier monopoly to maximize the value of the MLS rights, which are packaged and jointly marketed with the USSF rights.

108.    Through the initial SUM agreement and subsequent extensions of that agreement, MLS and USSF have further cemented their financial alliance. Thus, not only did USSF and MLS—driven by both economic interest and close personal ties—create a plan to anoint MLS as the exclusive competitor in top-tier men's professional soccer, they also entered into the SUM agreement, which provides a specific economic incentive for USSF to favor MLS. The SUM agreement is extremely unusual in the soccer world, where, upon information and belief, no other national soccer federation sells its intellectual property rights in a joint venture together with the rights of a soccer league that the federation purports to regulate on a neutral basis.

109.    Since the early 2000s, the SUM agreement has been periodically renewed and renegotiated in furtherance of the anticompetitive conspiracy to protect MLS from competition.

41

As the SUM agreement has been renewed, USSF has received, and will continue to receive, substantial economic benefits linked to the large guaranteed payments supported by the increased value of the marketing rights enjoyed by MLS, because its monopoly status is protected by USSF's application of the anticompetitive Standards.  These substantial revenue flows from MLS/SUM to USSF are described in USSF's Audited Financial Statements:

> The Federation recognizes revenue earned under this agreement net based on amounts received from SUM.  Most sponsorship, television, licensing and royalty revenues (excluding Nike) are paid to SUM.  **Revenue under the agreement approximated $25,250,000 and $18,305,000 for the years ended March 31, 2016 and 2015, respectively**.  This includes $- [sic] and $5,462,000 of revenue sharing for the respective fiscal years.  The Federation was due receivables of $6,725,795 and $7,741,685 from SUM at March 31, 2016 and 2015, respectively.

As recently elected USSF President Carlos Cordeiro explained, "[t]he funds generated from these sales represent a material part of U.S. Soccer's annual budget."

110.   As further explained by USSF expert Steven Peterson in his publicly filed declaration, for each year, the SUM agreement "provides for a [guaranteed] minimum payment from SUM to USSF and further provides for USSF and SUM to split revenues above certain thresholds based on a 70/30 split with 70% going to USSF."

111.   The guaranteed payments to USSF under the SUM agreement are substantial. According to MLS Commissioner and SUM CEO Don Garber, between the early 2000s and 2022, SUM would be providing USSF over $300 million in guaranteed payments.  Such large guaranteed payments for an organization like USSF provide a powerful economic incentive for USSF to continue to protect the MLS monopoly through the anticompetitive Standards so that MLS generates sufficient revenues from its rights to support the increasingly large guarantees to USSF promised by SUM.

112.    The SUM agreement gives USSF a direct financial interest to favor MLS and protect its valuable monopoly position to ensure that SUM is always financially strong enough to make its large guaranteed payments, including each time that the SUM agreement is renewed and renegotiated with new payment terms and increased amounts for the guarantees.  The joint marketing of MLS and USSF rights also gives USSF a financial incentive to protect the MLS monopoly so that MLS's contribution to the joint rights' value will be as large as possible, where the purchaser of those rights just makes a single payment for the bundle of rights.

113.    The size of the SUM payments to USSF has grown increasingly large over the years, further linking together the economic fortunes of USSF and MLS.  For example, on May 12, 2014, MLS announced that it and USSF had reached an eight-year, $720 million broadcasting agreement with ESPN, Fox Sports, and Univision in exchange for the networks' right to telecast both MLS matches and U.S. Men's and Women's National Team competitions through the end of 2022.  Under this joint broadcast deal arranged by SUM, USSF and MLS together would receive $90 million each year.  The networks also would be obligated to provide substantial marketing and promotional support to USSF and MLS under the new deal.

114.    The economic value of this broadcast deal for both USSF and MLS was substantially enhanced by the conspiracy to apply the Standards and the waiver process thereunder to protect the MLS monopoly, because MLS's monopoly position served to increase the value of the MLS portion of the packaged rights being jointly marketed.

115.    Then-USSF President Gulati's declaration in this case describes how USSF leveraged this joint rights agreement with MLS in 2014 into a "significant increase" in SUM's payments to USSF for the next eight years, confirming USSF's economic interest in protecting

MLS's monopoly position to make the MLS rights jointly packaged with USSF's own rights as valuable as possible:

> In an effort to create value for potential sponsors and broadcast partners, SUM was able to "bundle" the MLS rights with the USSF sponsorship and national team broadcast rights to create a package of rights . . . **SUM was able to negotiate sponsorship and broadcast deals which generated more money for <u>both</u> MLS <u>and</u> the USSF than either had previously been able to negotiate.** . . . The USSF extended its agreement with SUM in 2015 for another eight-year term, again after extended arm's length negotiating process. **The USSF negotiated a significant increase in the annual minimum guarantee and potential upside if SUM is able to exceed certain annual targets**.

116.    The SUM agreement thus helps to facilitate and further motivate the continuing anticompetitive conspiracy by Defendants to maintain MLS as the exclusive Division I league. As a result of the SUM agreement, USSF has an additional and significant economic interest in protecting the monopoly position of MLS, and not acting as a purportedly "neutral" administrator of industry standards for the benefit of the soccer community.  USSF's economic interest to favor MLS as a result of the SUM agreement compounds with the close and incestuous personal relationships among MLS and USSF officials, to create a powerful motivation for the USSF, including its Board, to agree to favor MLS and use the Standards to protect the MLS monopoly from any competition.  Even current USSF President Carlos Cordeiro has expressed concerns about the USSF's close ties with MLS and its marketing arm SUM, stating, "I would sleep a lot better if I was president knowing that our executives in Chicago, and the folks at SUM, were acting responsibly and in our best interest."

117.    In commenting on the joint media rights deal concluded by SUM with several networks in 2014, Don Garber—who serves simultaneously as MLS Commissioner, SUM CEO, a USSF Board member, *and* Chairman of the Nominating and Governance Committee of the USSF Board—emphasized the unprecedented degree to which the economic interests of USSF

and MLS have become inextricably intertwined:  "This is the most comprehensive media rights partnership in the history of soccer in our country . . . It's a statement about where the soccer market is and where Major League Soccer and U.S. Soccer fit into the paradigm."

118.    Based on these economic and close personal ties, Garber has acknowledged that USSF's intention is not to be a neutral promoter of all professional soccer leagues, but rather, to take "commercial" and "competitive" actions "to have MLS be the leader of the sport":

> [U.S. Soccer's] Sunil [Gulati] and Dan [Flynn] had this view that **as the governing body of the sport they would make commitments on the commercial side and on the competitive side to have MLS be the leader of the sport**.  That's not something that exists in other parts of the world.  I believe that Sunil could have made a different decision when he came in as president [in 2006], and **had he made that decision MLS isn't what it is today.  Because we are joined at the hip**.

(Emphases added).   This stark admission that USSF has made "commitments . . . on the competitive side" to make MLS "the leader of the sport" is powerful evidence of the conspiracy by Defendants to protect MLS from competition.

119.    Gary Stevenson, President and Managing Director of MLS Business Ventures, echoed Commissioner Garber's sentiments about the close economic partnership between MLS and the USSF, through SUM, in connection with the 2014 broadcast deal:  "We went out with a very simple deck to tell everyone, 'Here's what we're building.'  I don't think there's a closer relationship between a league and its national team than we have with U.S. Soccer."

120.    The fact that the SUM economic arrangements were, upon information and belief, entered into without a competitive bidding process, and that they were extended orally for several years, underscores the fact that the relationship between MLS, USSF and SUM has not been a normal arms-length business arrangement, but rather a closely aligned partnership in which the USSF has agreed to wield its anticompetitive Standards to protect its partner's monopoly position.

121.    The economic partnership between the USSF and MLS is a powerful additional motivation for USSF to continue in its anticompetitive conspiracy to protect the MLS monopoly, and for USSF Board members to vote in favor of actions to protect that monopoly from NASL or other professional league competition.  Even current USSF President Carlos Cordeiro recently acknowledged, over a decade too late, that "[t]he unique ownership of SUM creates conflicts that need to be addressed."

D.    **2009-2011: The Birth of NASL and Its Struggle to Compete Against MLS and Overcome the Barriers of the Anticompetitive Standards and USSF-MLS Conspiracy**

122.    In 2008, a breakaway group of USL club owners known as the "Team Owners Association" or "TOA"—frustrated with USL's management and structure—set out to explore the possibility of forming a new league, with the goal of competing at the top tier of professional soccer.  The TOA's efforts ultimately would result in the formation of the NASL.

123.    Based on these developments in and around 2008, MLS began to worry that new entrants might soon be competing against it for fans, players, sponsors, broadcasters, teams and owners—just as the revenues generated by soccer in the U.S. were increasing.  In response, USSF, acting in concert with MLS and others, agreed to a revised set of Standards (the "2008 Standards").  The 2008 Standards were similar to the 1995 Standards, but increased the barriers to entry with a modification of the Time Zones requirement, to require U.S.-based teams not just in three time zones, but in three time zones in the continental United States.  This would exclude Puerto Rico, which was in the Atlantic Time Zone (and would soon have an NASL franchise). This anticompetitive modification of the Time Zones requirement had the effect of making new entry even more difficult and had no procompetitive justification.

124.    MLS and USSF were correct to be concerned about possible new entry during this time period.  NASL was founded shortly thereafter in 2009, adopting a name that had valuable

46

goodwill from an earlier professional soccer league that was the top-tier men's professional league in the U.S. and Canada in the 1970's and 80's.  Shortly after its formation, NASL publicly declared its intention to compete eventually at the top level of men's professional soccer in the U.S. and Canada, using a different business model from the "single-entity" structure of MLS. NASL's structure, in which clubs are independently owned and player salaries are uncapped, was modeled on the successful structure of professional soccer leagues around the world.  Other U.S. professional sports leagues, such as the NBA and the NFL, similarly have adopted independent club ownership structures.  NASL thus sought to compete head-on against MLS, USSF's business partner, by bringing to top-tier professional soccer in the U.S. and Canada the free and open ownership model that is typically used by top-tier sports leagues in this and other countries.  The competition from such a model would not only increase output in the top tier of professional soccer, but also improve the quality of the professional soccer product for fans and lower the prices of top-tier professional soccer for consumers.

125.    NASL's aspirations to compete at the top tier of men's professional soccer by investing in its players immediately worried USSF and MLS officials.  In particular, it was reported that "[USSF] and M.L.S. officials were concerned that . . . the N.A.S.L. would import players from South America and in essence become the anti-M.L.S. by allowing teams to sign players without worrying about a salary cap or a single-entity setup."

126.    Threatened by NASL's stated intention to compete at the top tier of men's professional soccer, Defendants engaged in a sustained and concerted effort to use the anticompetitive Standards to prevent NASL from emerging as a successful competitor to MLS. This included not only increasingly stringent modifications to the Standards whenever NASL threatened to meet them, but a continuing conspiracy to apply the Standards and their waiver

process in a discriminatory manner to make it difficult for NASL even to maintain a Division II designation, let alone achieve its objective of becoming a direct competitor of MLS in the top tier.

127.    To begin with, USSF refused to sanction NASL to compete as an independent league in any division for the 2010 season.  Instead, USSF only permitted an arrangement under which NASL clubs and USL clubs would compete together in a USSF-run Division II league. This anticompetitive and arbitrary application of the Standards, undertaken in concert with MLS, ensured consumers would not perceive NASL as a potential top-tier competitor to MLS when it first entered the market.

128.    At this time, MLS Commissioner Garber, who was also a powerful USSF Board member, not-so-subtly urged NASL to seek out a relationship with MLS as "partners" rather than competitors, pointedly commenting that USSF's support for MLS was "not because we've asked for it"; it was because "we've earned it with respecting the process and understanding what kinds of things we need to do to be better partners to help grow the sport."  MLS wanted a "partner" subordinate to it, not a competitor.

129.    In early 2010, Gulati publicly admitted that USSF's goal in developing its divisional structure was to limit movement "between divisions," and that USSF would be promoting "developmental relationships" and "partnering" between MLS and other leagues—*i.e.*, shielding MLS from competition to protect its monopoly status as the sole top-tier Division I league—a structure that is inconsistent with how professional soccer is organized throughout the rest of the world:

> **We'll put a little more substance into it about what a second division should look like.** . . . [W]e want to work with a number of people and all the teams to find a long-term solution **so we don't have**

> **teams changing back and forth between divisions . . .**
> (Emphasis added.)

130.     Several months after USSF refused to sanction NASL as an independent league, and instead consigned it to a USSF-run Division II league shared with USL, MLS announced that NASL's Montreal Impact had decided to leave NASL and join MLS as an expansion club where it could be part of a Division I League.  Upon information and belief, Montreal's departure from NASL occurred in large part as a result of concerted action between USSF and MLS to hinder the development of NASL.

131.     After overcoming various initial sanctioning hurdles imposed by USSF, NASL successfully conducted its first season in 2011 as a USSF-sanctioned Division II league with eight clubs with a broad geographic reach:  the Atlanta Silverbacks, the Carolina RailHawks, FC Edmonton, the Fort Lauderdale Strikers, the NSC Minnesota Stars, the Montreal Impact, the Puerto Rico Islanders and the Tampa Bay Rowdies.  NASL however was consigned to Division II because it could not meet the arbitrary and anticompetitive barriers to entry imposed by the Standards to block competition with MLS in Division I.

**E.     2012-2015:  NASL Seeks To Become a Direct Competitor to MLS, Causing MLS and USSF To Ratchet Up Their Conspiracy And Discriminatorily Apply the Professional League Standards to Block Any Possibility of Competition to MLS From NASL**

132.     USSF formally designated NASL as a Division II league in 2012.  Despite the handicaps imposed by being consigned to Division II, NASL began to steadily improve in economic strength and competitiveness.  This was a testament to the effectiveness and fan appeal of its club-centric league model and the greater degree of competition among clubs that it unleashes.  NASL's club membership grew regularly after its formation.  Ten clubs competed in NASL in 2014, eleven in 2015, and at least twelve were scheduled to be in the league in 2016.

133.    NASL's attendance had, at that point, also grown rapidly since its inception—from 3,810 to 5,909 per regular-season game in 2015.  NASL clubs had also had competitive success on the pitch in competitions against MLS clubs, winning 42% of their matches against MLS clubs during Lamar Hunt U.S. Open Cup competitions.  And many NASL players competed for national squads in the FIFA World Cup and its qualifiers.

134.    As NASL began to present itself as a possible direct competitor to MLS, USSF took various actions to favor MLS and hinder the development of NASL.  For example, MLS and USSF jointly govern and fund the Professional Referee Organization ("PRO"), which is the organization through which USSF manages and develops referees for all USSF-sanctioned professional leagues.  This governance and funding structure naturally biases PRO in favor of MLS.  Thus, unsurprisingly, PRO has assigned its top referees to MLS, while using NASL games as an opportunity to develop its less experienced referees.  PRO even refused to allow NASL to *pay* for better referees for its teams because, as PRO's General Manager put it, "PRO has been established to serve the professional soccer leagues in a pyramid manner, with MLS being the major league."  This is a clear example of concerted action under which the USSF allows MLS to exercise a controlling influence over the USSF's inter-league governance activities, to the detriment of NASL as a professional soccer league seeking to compete with MLS.

135.    By mid-2013, NASL had announced plans to form several new expansion clubs including the New York Cosmos.  NASL made clear that it wanted to obtain Division I status in the near future so that it could compete on an even playing field with MLS.

136.    The response to the increased competitive threat to MLS posed by NASL was swift and exclusionary.  USSF and MLS perceived NASL as a serious potential competitor to MLS,

and determined that NASL would not be permitted to challenge MLS's monopoly status in Division I.

137.    In a letter dated November 18, 2013, USSF announced that it would be revising its Division I Standards.  Its objective was to make them even more stringent and a higher barrier to competing with MLS.  USSF, in concert with MLS, then adopted the modified 2014 Standards, dated February 28, 2014, which remain the operative Standards employed by the USSF today to shield the MLS monopoly.  The 2014 Standards now required—in addition to the already existing arbitrary and anticompetitive Stadium Capacity criteria—that each men's Division I league have (i) "a minimum of 12 teams to apply" and, "[b]y year three, . . . a minimum of 14 teams" (§ II(a)(i)); (ii) "U.S.-based teams . . . in at least the Eastern, Central and Pacific time zones in the continental United States" (§ II(b)(i)); and (iii) "[p]laying surfaces for all teams" that are "at least 70 yards by 110 yards and . . . FIFA-approved" (a requirement for all Divisions) (§ I(b)(ii)(2)). MLS agreed to follow the 2014 Standards, which it knew that only it could meet at that time, or it could obtain waivers from USSF if needed.  Upon information and belief, MLS was a driving force behind these Standards, and the USSF adopted them in concert with MLS and other conspirators.

138.    USSF had no plausible procompetitive justification for making more stringent Division I 2014 Standards to increase the barriers to competition.  Rather, the changes served only to implement Defendants' conspiracy to employ the Standards to protect MLS and enable it to maintain a complete monopoly over the top tier of men's professional soccer leagues located in the U.S. and Canada.

139.    **The New Anticompetitive Number of Teams Requirement**.  There was no procompetitive purpose for increasing the Number of Teams requirement in 2014 to 12 teams

when applying for Division I status, and 14 teams by year three, when 10 teams was deemed sufficient by USSF for Division I from 1995 until 2014—including when MLS first started as a Division I league with only 10 teams.  Indeed, this moving target was designed to outpace NASL's rate of expansion so as to keep Division I status out of its reach.  As USSF and MLS knew, it is very difficult for a new entrant to Division I to have so many teams satisfying the Number of Teams requirement in the early years of a top-tier league, which is why the Division I Standards only required 10 teams from 1996 through 2014 when MLS was growing over an eighteen-year period.  MLS itself began play in Division I with only 10 teams in 1996 and, despite sputtering efforts at growth, had fallen back down to 10 teams from the 2002 through 2004 seasons.  Thus, MLS itself would not have satisfied the current Number of Teams requirement when it was of a comparable age to NASL.  Now, MLS's already-dominant presence in many of the available metropolitan markets has only made it harder for any new entrant, like NASL, to satisfy a much higher Number of Teams requirement.

140.    Requiring leagues seeking Division I status to start out with 12 teams and soon expand to 14 teams merely serves to destabilize such leagues, by forcing them to expand more quickly than MLS itself had been able to expand in order to obtain and keep Division I sanctioning.  Far from stimulating fan interest, the lack of stability resulting from the Number of Teams requirement serves to dissuade fans from forming attachments to unnecessary teams that were hastily formed just to satisfy the rules and may soon cease to exist.  While USSF claims that the purpose of the Standards is to promote stability in professional soccer, in reality, these anticompetitive requirements make it more likely that any competitor to MLS will become destabilized, as illustrated by the adverse effects suffered by NASL.

141.    Even if the 12-team requirement had some slight procompetitive benefits in that leagues would not be too small (in fact, such a requirement is unnecessary because consumers can decide for themselves what size league is preferable), the prior 10-team requirement is a less restrictive alternative that would achieve any such hypothetical benefits.  While the Division I Standards' 10-team requirement was in effect from 1995 to 2014, the sole Division I league (MLS) repeatedly had fewer than 12 teams, but grew to 19 teams by 2014 on its own accord—demonstrating that Division I leagues would grow large at their own pace under the old 10-team rule, without any need for the USSF to further restrain competition with a 12-team requirement to get that competitive result, let alone a further destabilizing requirement that a Division I league have 14 teams by year three.

142.    Another less restrictive alternative would be for each league to establish its own internal policies as to the number of teams it should have, based on its own economic circumstances and competitive strategy.  This is precisely what other U.S. professional sports leagues have done, and they have thrived—without needing any inter-league rules setting a minimum number of teams and thus constraining their competitive options.

143.    Despite being confronted with the difficulty of adding so many teams so soon in its existence, by 2015, NASL had 11 teams and indicated that it would have at least 12 teams by 2016 so that it could meet even the increased Number of Teams requirement for the first year of a Division I league.  In response, USSF, in concert with MLS, determined that it should try to increase the barrier to entry even further, and set in motion a proposal for a new set of modifications to the Standards which, among other things, would have increased the Number of Teams requirement in the first season for Division I to 16 teams.  This pattern of constantly trying to ratchet up the Standards to head off entry to Division I by NASL or any other competitor, while

at the same time ensuring that the new Standards would not adversely impact the already-established MLS, illustrates the anticompetitive purpose that underlies the repeated changes to the Standards.

144.   **The New Anticompetitive Time Zone Requirement.**  The change in the 2014 Standards to further narrow the three Time Zones requirement to the Eastern, Central and Pacific Time Zones in the continental U.S. was similarly devoid of any procompetitive justification and solely intended to place an increased barrier to any competitor obtaining a Division I sanction to compete against MLS.  Put simply, this new requirement was imposed because USSF, MLS and their other co-conspirators knew that NASL had no team in the Pacific Time Zone in 2014 and thus could not meet this new requirement.  It was and is a purely anticompetitive restraint with no redeeming procompetitive benefit.  The rule also was arbitrary in excluding the Mountain Time Zone, which included major soccer-friendly markets such as Denver.

145.   Even assuming, however, that a requirement for leagues to have a wide geographic spread had some slight procompetitive benefit, any such hypothetical benefit could be achieved through far less restrictive means than the new 2014 Time Zone requirement.  For example, if the goal was to achieve a widespread fan and media interest for professional soccer leagues, there is no valid procompetitive justification for the fact that the rule completely *ignores* teams in the Mountain Time Zone, U.S. territories, and Canada in assessing whether a league is spread widely enough.  All such teams are within the relevant geographic market, so any legitimate analysis of competitive benefits from a league's geographic dispersion would take account of those teams.

146.   Similarly, if the goal was to have a wide geographic spread of clubs extending into different regions of the U.S, the 2014 Time Zone requirement would not be a rational basis to address any such concern since, for example, Detroit and Indianapolis, two major Midwestern

markets, are both in the Eastern Time Zone (just as South Bend, Indiana, as reviewed above in regard to Notre Dame in the ACC, is in the Eastern Time Zone). It would be far less restrictive, and equally capable of achieving any legitimate procompetitive objective, to have a three-time-zone requirement that did not limit which three time zones in the U.S. and Canada would satisfy the test (or have another standard based on geography other than time zones). NASL could have satisfied such a time zone requirement in 2015, which is the only reason the more restrictive standard was adopted.

147.    Another less restrictive alternative to the 2014 Time Zone requirement would be allowing leagues to develop their own internal policies as to what level of geographic dispersion is desirable or necessary, just as leagues do in other U.S. professional sports. The leagues themselves are better-placed than USSF to determine, based on their individual circumstances, what time zones or geographic areas they should inhabit to compete most effectively against other leagues and create as high-quality and low-price a product as possible for their consumers.

148.    **The New Anticompetitive Pitch Size Requirement**. The new requirement of the 2014 Standards—applicable to all divisions—that all teams, rather than 75% of teams, have playing surfaces of at least 70 yards by 110 yards was also transparently aimed at protecting MLS from competition. The effect of this revision was to hinder new entrants from expanding incrementally into new markets with smaller pitches—even though MLS was able to follow this approach from 1995 through 2014. Indeed, in December 2013, MLS itself had to be granted a waiver from the Pitch Size rule when it was set to take effect for the 2014 season. This requirement is even more anticompetitive because MLS occupies such a large number of markets in which it often controls the only available soccer stadium that meets this unnecessary and anticompetitive barrier to entry.

149.    Assuming, arguendo, that requiring leagues to secure soccer pitches with minimum dimensions beyond the minimum needed for sporting purposes might further some procompetitive purpose, a less restrictive alternative to the rule that would accomplish that same objective would be the prior Pitch Size requirement that 75% of teams in a league must have soccer pitches of the requisite size—a rule that existed for two decades.  While even the 75% rule is an anticompetitive barrier to entry that cannot be justified, at least it permitted leagues to expand by first using some smaller stadiums.  On information and belief, even today, the stadium used by MLS's New York City FC (Yankee Stadium) does not comply with this anticompetitive Pitch Size requirement, yet MLS has not lost its Division I sanction for this non-compliance with the Standards.

150.    **The New Anticompetitive Financial Viability Requirement**.   The 2014 Standards also imposed new "Financial Viability" requirements for Division I.   Putting aside whether such requirements are ever procompetitive, these particular rules raised anticompetitive barriers to Division I status that serve no procompetitive purpose.   Specifically, each team now had to designate a "principal owner" with an "individual net worth of at least forty million US dollars (US $40,000,000) exclusive of the value of his/her ownership in the league or team and his/her primary personal residence" (§ II(c)(ii)) (the "Individual Net Worth" requirement).

151.    The Individual Net Worth requirement is an unnecessary and anticompetitive barrier to competition, especially when viewed in the light of two other less restrictive requirements that also were put in place purportedly to ensure the financial viability of teams in a Division I league:  *First*, it is separately required in the Standards that "[t]he principal owner, together with all other owners, must have a combined individual net worth of at least seventy million US dollars (US $70,000,000) exclusive of the value of ownership interests in the league

or team and primary personal residences" (§ II(c)(ii)) (the "Combined Net Worth" requirement). *Second*, Division I leagues "must demonstrate adequate financial viability to ensure continued operation on a season-by-season basis either in the form of a performance bond or similar instrument for each team in the amount of one million US dollars (US $1,000,000), or readily-available league funds representing such amount," which are "used to cover the costs of the teams' operations" (§ II(c)(i)) (the "Performance Bond" requirement).

152.    Assuming, arguendo, that certain types of financial requirements might be reasonable to impose in some circumstances (even though such requirements have not been so justified by USSF here), the Combined Net Worth and Performance Bond requirements are less restrictive alternatives that render the Individual Net Worth rule anticompetitive and unnecessary as it is very difficult for new entrants to attract enough individual owners with such high net worth.  The Division I Individual Net Worth requirement, which appeared for the first time in 2014, was blatantly designed as an added barrier to competition from the NASL against MLS.

153.    Indeed, during the period when NASL's application for Division I status was under consideration, NASL's teams satisfied the Combined Net Worth requirement and were able to satisfy the Performance Bond requirement, but one team could not satisfy the Individual Net Worth requirement—and, under the Standards, that fact by itself would bar NASL from joining Division I and thus competing with MLS at the top tier.  There is no legitimate justification for Professional League Standards that impose such an anticompetitive outcome.

154.    The lack of any procompetitive purpose for the Individual Net Worth requirement is also shown by the fact that the National Football League ("NFL") would not satisfy this requirement because the Green Bay Packers are a publicly owned franchise.  Numerous top-tier

European football clubs also could not satisfy the requirement because they are owned on a community basis or by a group of owners, and not by an individual high net worth person.

155.    For example, the Bundesliga in Germany is the top-tier league in that country and one of the best leagues in the world.  In direct contradiction to the USSF requirement of a principal owner with a high net worth, the Bundesliga "has a '50 + 1' rule, whereby the association or club has to have a controlling stake, commercial interests can't gain control.  In Bayern Munich, for example, Audi and Adidas each own 9% but the rest is controlled by the members via the club.  There are two exceptions: Wolfsburg is owned by Volkswagen and Bayer Leverkusen is owned by the chemical company, Bayer—both clubs originated as works sporting clubs.  But generally a club in Germany is a true club for the members.  So if you ask fans outside a Bayern game who owns the club, they are incredulous: 'The members, of course', they say."  There is no question that the Bundesliga has been far more successful than MLS, and that the quality of play in the Bundesliga is far more appealing to its consumers than the level of play in MLS.  Indeed, unlike the vast majority of his teammates who play in MLS, the most promising player on the U.S. Men's National Team, Christian Pulisic, plays on Borussia Dortmund in the Bundesliga, and did so to have a higher level of competition than that offered by MLS.

156.    If NASL tried to expand with such a community-owned team, no matter its collective financial resources, it could not qualify for Division I under the anticompetitive Individual Net Worth requirement.

157.    USSF's adoption of a new version of the Standards in 2014, which were so stringent as to try to ensure MLS would not face Division I competition from NASL, occurred when MLS was facing increasing competitive pressures from NASL as a viable competitor to MLS.  Indeed, the 2014 Standards were adopted at a time when MLS was feeling competitively

vulnerable as it was subject to strong public criticism for its quality of play and the quality of its players whom USSF had selected as the main "feeder" for the U.S. Men's National Soccer Team, which competes internationally against other national teams (i.e., not in a league).

158.    In 2014, the U.S. Men's National Team head coach and technical director Jurgen Klinsmann questioned the level of competition within MLS, after speaking favorably of NASL and the possibility of USSF moving to the promotion and relegation system embraced around the world.  MLS Commissioner Garber responded vehemently against Klinsmann, sending USSF what he described as a "very strong letter" in protest, declaring that he was "confident" USSF would "ensure that our technical director is in line with the vision [USSF President Gulati] has publicly stated."

159.    Commissioner Garber made it 100% clear that the "shared vision" MLS has with USSF is to promote and protect **MLS**—not any competitor league—as the "key driver" of Division I professional soccer in this country:

> We have invested since our founding billions and billions of dollars in creating a foundation for this league and sport, growing a fan base, commercializing this sport, creating a dynamic where it's part of the sports culture in this country and creating a soccer nation. . . . To think that we are not aligned with our national team coach is disappointing and frankly it is personally infuriating.  **It is not in line with the shared vision that we have heard many times from the federation that a strong and vibrant first division in the United States is going to be one of the key drivers of this sport in this country. . . . [W]e collectively need to ensure that everybody is aligned with the *mutual goal* that we have of growing the game and *the league's* role in growing the game.  In order to do that, *we* can't try to denigrate or damage or disparage *the very entity that will be the key driver of the sport in this country*.**

MLS Commissioner and USSF Board Member Garber subsequently elaborated:

> What I intended to do was support our league and our players and our clubs . . . and **to *ensure that everybody associated with this sport was aligned* with the vision that comes from our [U.S. Soccer] Federation President that *a* strong league is a necessary component** for national team success.

160.    In response to Garber's attack on Klinsmann, USSF President Gulati stated that the comments made by the U.S. Men's National Team coach should have been "handled in a private way"—i.e., there should be no public criticism of USSF's closed model of supporting MLS and feeding MLS players to the Men's National Team.  And to remove any doubt, Gulati proclaimed the USSF's strong commitment was to the "job at hand," which was to "**grow MLS**":

> [T]he fundamental views of all of us involved are: "We're on the same page."  We got diverted from that . . . **We will get back to the job at hand, which is continuing to grow MLS**, continuing to improve the national team, and the broader goal, which does both of those things . . . **[T]he actual opinions of . . . me and the leadership at MLS and U.S. Soccer [are] actually closely aligned with where we see the game going**.

161.    As wryly noted in an article on the U.S. National Soccer Team Players Association website, "it's easy to see why [the U.S. Men's National Team coach], or anyone else for that matter, probably wouldn't make much headway in convincing US Soccer president Sunil Gulati to make significant changes to a **league-federation marriage that has greatly enriched both partners**." (Emphasis added).

162.    USSF has also favored MLS in other ways to entrench its monopoly, even at the expense of the Men's National Team and its fans.  USSF almost always uses MLS-owned or operated stadiums for games that USSF organizes (World Cup Qualifiers, international friendlies, etc.).  Upon information and belief, pre-sales and other incentives for USSF matches also are provided to MLS ticket holders.  These stadium selections have been made to bolster MLS financially even when such selections may not be in the best interests of USSF and the Men's National Team.

**F.      2015-16:  Despite the Anticompetitive Barriers, NASL Pushes Forward to Seek a Division I Sanction, Only to Be Denied by Defendants' Anticompetitive Conspiracy to Apply The Standards and Waiver Process to Shield the MLS Monopoly**

163.    Confronted with the new 2014 Standards, NASL pressed on in its efforts to compete with MLS and obtain Division I status.  By mid-2015, NASL had publicly declared its intention to expand into the Pacific Time Zone and was in active discussions with various West Coast ownership groups.  Moreover, NASL was in the late stages of forming an expansion club in Puerto Rico, which, as widely reported in the popular press, was purchased by NBA star Carmelo Anthony.  These additional teams would enable NASL to soon apply for Division I status under even the anticompetitive 2014 Standards, as long as it could obtain a few waivers, just as MLS had done many times, including as recently as 2013.

164.    More broadly, NASL had succeeded in putting out a highly competitive product of top-tier quality.  NASL clubs had at that point won 42% of their competitions with MLS clubs in inter-league competitions as part of the Lamar Hunt U.S. Open Cup since NASL's first season.  Many NASL players had competed for their respective national teams in the FIFA World Cup or in World Cup qualifiers.  The competitive threat to MLS was thus growing.  However, the absence of Division I status continued to block NASL from becoming an effective challenger to the MLS monopoly.

165.    On May 31, 2015, NASL submitted its formal Division I application to the USSF.  In the application, NASL advised the USSF that it satisfied all the Division I Standards apart from those that were clearly inconsistent with the antitrust laws.  NASL requested waivers from these anticompetitive requirements of the Division I Standards, similar to prior waivers that the USSF had granted to MLS.  As there was no lawful basis to deny NASL Division I status, NASL further requested that such status be granted in time for the 2016 NASL season, which was set to begin on April 2, 2016.

166.    USSF, however, refused to end its continuing conspiracy with MLS and others to protect MLS from competition, responding to NASL's Division I application with more threatened escalation of the Standards, nine months of delay, and ultimately a denial of the few modest waivers that NASL needed to meet the stiff requirements and barriers to entry imposed by the 2014 Standards.

167.    Within just a few weeks after NASL filed its application for Division I status, USSF, acting in concert with MLS and others, took action to derail NASL's efforts.  On June 24, 2015, USSF circulated a new set of proposed revisions to the Standards (the "2015 Proposal"), which, if implemented, would be impossible for NASL to satisfy, and USSF then informed NASL that it would delay considering its Division I application while the 2015 Proposal was being considered.

168.    Among its many new anticompetitive additions, the 2015 Proposal would have increased the Number of Teams requirement yet again, this time to "a minimum of sixteen teams" (§ II(a)(i)), and would heighten the Market Size requirement so that "75 percent of the league's teams must play in metropolitan markets of at least 2,000,000 persons" (§ II(b)(ii)).  These proposed revisions were directed at killing NASL's chances of obtaining Division I sanctioning and served no plausible procompetitive purpose.

169.    Indeed, the 2015 Proposal's increase of the Number of Teams requirement to 16 was clearly aimed at keeping Division I status out of NASL's reach.  The Number of Teams requirement had remained at 10 from 1995 until 2014.  During the majority of that period, the Division I MLS had only 10 to 12 teams.  In 2014, USSF raised the Number of Teams requirement from 10 to 12, with a "minimum of 14 teams" by "year three."  Yet, in 2015—before any "year three" ever arrived—USSF was already proposing to increase the minimum to 16.  Nothing

changed between 2014 and 2015 that would legitimately explain this.  Rather, the only plausible explanation for the proposed change is that NASL had achieved the 12-team requirement, so the standard needed to be increased above the reach of NASL so it could not attain Division I.

170.    There also was no plausible procompetitive purpose for the new requirement in the 2015 Proposal that 75% of a Division I league's teams play in metropolitan markets with two million people—double the one million people required under the Professional League Standards from 1995 to 2015.  USSF and MLS knew that NASL and its team owners had invested significant resources locating teams and building up fan support in markets with more than one million, but sometimes fewer than two million people.  The proposal to double that requirement abruptly would make some of NASL's most successful clubs count *against* satisfying the Standards, so it would be virtually impossible for NASL to satisfy the Division I requirements going forward. Even if NASL had formed multiple new teams in metropolitan markets with greater than two million people, it likely would have had to abandon some of its existing locations to satisfy the 75% requirement.  Doubling the Market Size requirement was an anticompetitive bait and switch, with the sole purpose of entrenching MLS's monopoly position.

171.    If the reference to "metropolitan markets" in the 2015 Proposal was to Metropolitan Statistical Areas ("MSAs") as determined by the U.S. Census Bureau, only 31 MSAs over two million people existed in the U.S. as of 2014 (the most recent census estimate at the time of the 2015 Proposal), in contrast to 53 MSAs of more than one million people.  Canada had only three metropolitan areas in excess of two million people, but six in excess of one million people.  Thus, the 2015 Proposal would have nearly cut in half the number of metropolitan areas in the U.S. and Canada that would qualify under the new rule (34 instead of 59), and the majority

of this shortened list of qualifying metropolitan areas already had entrenched MLS teams located in them or were slotted for specific MLS expansion teams.

172.    In fact, the new proposed Market Size requirement was so unreasonably high that even the National Hockey League could not have satisfied it, and would have been considered a "minor league" by USSF, even though the NHL is the preeminent hockey league in the U.S. and Canada.

173.    The 2015 Proposal also would have increased the Combined Net Worth requirement for each team's owners from $70 million to $80 million (§ II(c)(ii)).  There was no plausible justification for such an increase.  USSF went from 1995 until 2014 with no Combined Net Worth requirement, and settled on $70 million in 2014.  Nothing changed between 2014 and 2015 that would legitimately explain this increase.  The only explanation is that NASL had managed to satisfy the $70 million requirement.

174.    Notably, under the 2015 Proposal, the Time Zones requirement would revert to that of the 2008 Standards, requiring "U.S.-based teams . . . located in at least three different time zones in the continental United States."  § II(b)(i).  USSF thus did not even attempt to defend the 2014 Standards' arbitrary and irrational discounting of teams outside the Eastern, Central and Pacific time zones.  Yet that anticompetitive requirement continues to exist and be applied today.

175.    In addition, the 2015 Proposal included a new requirement that each league in any Division "annually present its plans for expansion (if any) and growth" (§ I(a)(iii))—in other words, to participate in formal exchanges of sensitive competitive information with MLS's and USL's representatives on the USSF Board.  MLS had already lured away successful franchises from NASL, and repeatedly had disrupted NASL's expansion efforts by announcing plans to expand into the same cities (so-called "vapor" expansion teams).  This requirement would make

it even easier for MLS to engage in such disruptive tactics and thus shield its monopoly from competitors.

176.    Upon information and belief, the 2015 Proposal was made in concert with MLS and other conspirators, in order to protect MLS from competition from NASL and deter NASL and other potential competitors from trying to compete with MLS, knowing that MLS and the USSF would continually work in concert to increase the barriers to competition and protect MLS's monopoly.

177.    The 2015 Proposal prompted significant media criticism of USSF's efforts to protect MLS from its competitors.  For example, the following appeared in one media report:

> The NASL hasn't been secretive about its desire to challenge MLS head-on for supremacy. . . . Hence why U.S. Soccer would attempt to clip the NASL's wings before they grow. . . . **MLS never misses [an] opportunity to conflate itself with the very idea of soccer in America, and U.S. Soccer is always far too eager to support this posture.** . . . **The problem with this kind of favoritism is that it hurts the very thing U.S. Soccer should be trying to promote: as much competitive soccer in America as possible**.  Why should any criteria other than quality of play determine who is best?  And shouldn't leagues be defined by the talent of their constituent players and teams rather than how many people live in a team's home city?

178.    While the 2015 Proposal ultimately was not implemented under threat of an antitrust challenge by NASL, the 2015 Proposal nevertheless had an adverse impact on NASL. The 2015 Proposal was a crystal-clear demonstration that USSF and MLS were determined to prevent NASL from reaching Division I, one way or another—even if it required revising and increasing the Standards just one year after their last revisions.

179.    Many of NASL's team owners had joined or remained with the league on the premise that NASL would be able to compete with MLS in the top tier.  Once the 2015 Proposal showed that USSF and MLS would use their monopoly power to block NASL from ever doing

so, a number of NASL clubs left the league over the next year and a half, leaving the league in a smaller and weaker state and damaging its competitive position.  NASL and its clubs thus suffered significant harms as a result of the 2015 Proposal, which was part of the continuing conspiracy to maintain the MLS monopoly.

180.   USSF's history of modifying the Standards in concert with MLS to increase the barriers to entry and protect MLS from competition with other professional leagues is summarized in the chart below:

## ESCALATION OF THE STANDARDS TO PROTECT MLS

|  | 1995 Standards for Division I | 2008 Standards for Division I | 2014 Standards for Division I | 2015 Proposal for Division I |
|---|---|---|---|---|
| **Number of Teams** | § I(A): "[A]t least 10 teams." | § I(A)(i): "[M]inimum 10 teams" | § II(a)(i): "[M]inimum of 12 teams to apply.  By year three, . . . a minimum of 14 teams." | § II(a)(i): "[M]inimum of sixteen (16) teams." |
| **Time Zone** | § II(A): "U.S.-based teams located in at least 3 different time zones" | § II(A)(i): "U.S.-based teams located in at least 3 different time zones in the continental United States" | § II(b)(i): "U.S.-based teams must be located in at least the Eastern, Central and Pacific time zones in the continental United States." | § II(b)(i): "U.S.-based teams must be located in at least three different time zones in the continental United States." |
| **Pitch Size** | § II(D): "75 percent of the league's teams . . . with playing surfaces of at least 70 yards by 110 yards." | § II(D)(iii): "75 percent of playing surfaces must be at least 70 yards by 110 yards" | § I(b)(ii)(2): "Playing surfaces for all teams must be at least 70 yards by 110 yards and be FIFA-approved." | § I(b)(ii)(2): "Playing surfaces for all teams must be at least 70 yards by 110 yards and be FIFA-approved." |

| | | | | |
|---|---|---|---|---|
| **Market Size** | § II(C): "75 percent of the league's teams . . . in metropolitan markets of at least 1,000,000 persons." | § II(C)(i): "75 percent of the league's teams . . . in metropolitan markets of at least 1,000,000 persons." | § II(b)(ii): "75 percent of the league's teams . . . in metropolitan markets of at least 1,000,000 persons." | § II(b)(ii): "75 percent of the league's teams . . . in metropolitan markets of at least 2,000,000 persons." |
| **Individual Net Worth** | N/A | N/A | § II(c)(ii): "[P]rincipal owner" with an "individual net worth of at least forty million US dollars" | § II(c)(ii): "[P]rincipal owner" with an "individual net worth of at least forty million US dollars" |
| **Combined Net Worth** | N/A | N/A | § II(c)(ii): "[C]ombined [owner] net worth of at least seventy million US dollars" | § II(c)(ii): "[C]ombined [owner] net worth of at least eighty million US dollars" |

181.     The anticompetitive requirements of the Standards set forth above cannot be justified on the ground that they are necessary to coordinate competition that otherwise would not occur.  Rules that legitimately serve to coordinate competition among leagues might include, for example, rules of play and scheduling for *inter-league* matches and tournaments or common rules regarding doping prevention or match fixing.  By contrast, the Standards' economic requirements as to Number of Teams, Time Zones, Pitch Size, Market Size, Financial Viability, Stadium Capacity, and Player Development have nothing to do with coordinating competition among leagues that otherwise would not occur.  The Standards could be made less restrictive by eliminating all of these economic requirements comprising barriers to entry, without detracting from any supposed procompetitive effect a different, much more limited set of Standards might have in coordinating inter-league matches or addressing matters such as doping and match fixing.

182.     When it was founded, and for many years after, MLS would have violated not only

the requirement of the current 2014 Standards that such leagues have at least 12 or 14 teams, but

even the *Division II* requirement (originating in the 2010 Standards) that such leagues have 12

teams by year six (§ II.a.i)—the very requirement, as discussed below, that USSF has now relied

upon to deny Division II status to NASL for 2018.  In years past, MLS also would have been in

violation of the 2014 Standards' requirement that "no owner may exercise control over more than

one team in a division" (§ I.g.iv)—in 2002, ten MLS teams were owned by just three owners, and

six of the ten teams were owned by just one company—a requirement that was only changed after

MLS was able to satisfy it, which has made it much more difficult for new leagues like NASL to

grow and succeed.

183.     On March 10, 2016, after a nine-month delay, and after concluding that it would

not go through with the 2015 proposal to modify the Standards again in the face of an antirust

challenge, USSF finally considered NASL's Division I application and rejected it.  Specifically,

NASL satisfied most of the Division I Standards, but had requested waivers from the Standards'

requirement for 15,000 seats at **all** stadiums (a waiver that MLS repeatedly had been given in

prior years), as well as the requirement that the league have U.S.-based teams located in the

Eastern, Central and Pacific Time Zones (NASL's teams had a broad geographic dispersion and

were present in three time zones, but the Pacific Time Zone was not one of them).  USSF refused

to grant these waivers, even though it had a history of granting similar waivers to MLS.

**G.     2015-16:  After Denying NASL's Division I Application, Defendants Engage in Conspiratorial Acts To Drive NASL Out of Division II and Replace It with USL**

184.     The impact upon NASL of being denied Division I status was severe.  Several

teams that had planned on being part of a Division I NASL league in 2016 became so discouraged

by the USSF's denial that they left the league, just when NASL now had to apply for renewed

Division II status in order to compete.  At this point, Defendants broadened their conspiracy to deal with the competitive threat of NASL once and for all by applying the anticompetitive Standards and waiver process to drive NASL out of even Division II and replace it with USL, a league that had stated it would support, and not compete with, MLS.

185.    The goal of replacing NASL with USL in Division II and eventually granting USL a protected monopoly in the second-tier market was adopted by Defendants because USL was not a competitive threat to MLS.  USL did not try to compete with MLS.  Instead, USL has opted for a different business strategy under which it enters into contractual arrangements with MLS to support it and compete in the second tier.

186.    For example, USL's then-President made the following comments in 2014:

> Whatever stigma may come from USL Pro literally becoming a feeder league doesn't seem to be a problem in [USL President Tim] Holt's eyes.
>
> **"There's no aspect of our business plan that had us competing with Major League Soccer or trying to become their rival," said Holt, a statement that is quite different than what his NASL counterpart has said.   "There's one major league of professional soccer in North American and it's MLS.**
>
> "Our goal hasn't changed.  We wanted to be the strongest, best operated league **in support of Major League Soccer** in the United States.  That's what drives us."  (Emphases added.)

187.    USL has also publicly stated that it will not place its own clubs in MLS markets.

188.    USL has included in its franchise agreements provisions that favor MLS.  For example, USL's publicly available franchise agreements include a two-year non-compete provision for team owners who seek to leave the USL for another league, but there is an express exception for teams that are transferring to MLS (and only MLS) rather than another league like NASL.  For two years after a team's termination of its USL's franchise agreement, the non-compete bars the team and its owners from operating a rival soccer team within ten miles of the

"Protected Territory" of any of USL's teams nationwide.  Teams transferring to MLS, however, are expressly exempted from this non-compete.

189.    The plan to use the anticompetitive Standards to drive NASL out of business and replace it with a Division II monopoly for USL began to be implemented in earnest in late 2016. Despite USSF's history of granting similar waivers to NASL in the past for Division II status, and despite the generous discretion USSF had exercised in granting Division I Standards waivers to MLS to avoid disrupting its monopoly position, USSF abruptly changed course in late 2016 and refused to grant NASL the few waivers from Standards that it needed for full sanctioning in Division II for the 2017 season.  Instead, USSF placed NASL's Division II application in a state of suspense—on December 6, 2016, the USSF Board of Directors decided to "h[o]ld in abeyance any action with respect to the re-sanctioning of NASL as a Division 2 league for the 2017 season." When USSF finally granted NASL Division II sanctioning a month later, it did so only on a provisional basis.

190.    At this same time, SUM made an offer to purchase NASL's New York Cosmos for $5,000,000 in a December 15, 2016 email from Jon Patricof, President of New York City FC (an MLS team), to the former owner of the Cosmos, copying MLS President and Deputy Commissioner Mark Abbott.  The terms proposed by the SUM offer required, among other things, that the Cosmos cease operations and transfer its intellectual property and other assets to SUM, and that its owners not operate any soccer team in the New York metropolitan area for ten years.

191.    This was an effort by MLS, which controls SUM, to destabilize and destroy NASL by permanently eliminating one of its flagship squads, in furtherance of its anticompetitive conspiracy with USSF.  The proposed terms would have harmed NASL by destroying one of its critical members—the Cosmos, which are the most famous squad in the history of U.S.

professional soccer.  Eliminating the competition from the Cosmos team in this manner would have also been a clear and immediate benefit for the two MLS teams that competed in New York City.

192.     In January 2017, after SUM's efforts to buy the Cosmos had fallen through, the Cosmos were purchased by their current owner, and it became clear that the Cosmos would remain as a member of NASL.  Although USSF then granted NASL "provisional" Division II sanctioning for the 2017 season, its conspiracy with MLS to drive NASL out of business through the use of the anticompetitive Standards and waiver process continued.

193.     At the same time that it granted Division II status to the NASL for the 2017 season, USSF also granted the same status to USL—a sudden boost for that league, which supported MLS and was previously competing at the lower Division III level.  USSF has not made public what waivers from the Division II Standards it granted to USL for the 2017 season, but it appears that those waivers were numerous.  For example, USL had at least eight clubs that would all require waivers because their stadiums did not satisfy the Division II requirement that "[a]ll league stadiums must have a minimum seating capacity of 5,000" (§ IV.b.iii).  By contrast, all of NASL's clubs had stadiums satisfying the Standards' minimum seating capacity requirements for Division II during the 2017 season.

194.     In or about January 2017, a USSF official whom USSF appointed as compliance officer for Division II, and who also did work for MLS, ominously advised a potential investor in NASL that it would be wiser to look towards USL, stating that "[a]t this time next year the NASL will be out of business."  This statement reflected Defendants' ongoing conspiracy to destroy NASL once and for all.

**H.**   **2017-18: Defendants Effectuate Their Conspiracy to Use The Anticompetitive Standards to Deprive NASL Even of Division II Status**

195.   When NASL applied for re-sanctioning as a Division II league for 2018, it sought only two waivers from the Standards, which was fewer than it had sought and obtained for 2017.

196.   *First*, NASL sought a waiver from exactly the same twelve-team requirement for Division II sanctioning for which it had received a waiver for the 2017 season.  NASL still had only eight clubs at the time of its application as it had in the 2017 season, but also had multiple other clubs in active discussions to join soon, demonstrating its efforts and progress toward satisfying the twelve-team Division II requirement.  Specifically, NASL represented in its 2018 sanction submission letter to the USSF that an ownership group in New Orleans had entered into a letter of intent to bring a new club to NASL, and that the league was also in discussions with ownership groups in Detroit and Atlanta, with the goal of finalizing the admissions for all of these clubs into NASL for the 2018 season.  NASL further advised USSF that it was in discussions with ownership groups in additional cities.

197.   *Second*, NASL requested a waiver from the Division II Standards' requirement for clubs in "at least the Eastern, Central and Pacific time zones" (§ IV.b.i), because it did not have a club in the Central Time Zone.  NASL had been granted Division II sanctioning in years past when NASL did not have a club in the Pacific Time Zone, and there was no legitimate procompetitive basis for USSF to deny a waiver now with respect to the Central Time Zone.  After all, NASL had clubs in the Pacific, Eastern and Atlantic Time Zones, and one of its clubs (Indy Eleven) was in the state of Indiana, which partly occupies the Central Time Zone.  Accordingly, even if it were a legitimate goal to require Division II leagues to have a geographically broad customer base—in fact, there is no justification for such a multi-time zone requirement, as the top leagues overseas generally cover only one or two time zones, while attracting both fans and

players from *other* nearby time zones—NASL's widespread clubs clearly achieved that purpose without being in the three specific time zones that the Standards required.

198.    On or about September 1, 2017, and as memorialized in a USSF e-mail dated September 3, 2017, USSF denied NASL's Division II application outright, refusing to grant any waivers, refusing to grant even provisional Division II sanctioning, and stating there would be no appeal or grace period to get into compliance, with the decision being final.  Before September 1, 2017, the NASL had not received any warning that USSF would be denying the NASL's Division II sanctioning for 2018.  This denial by USSF directly resulted in the cancellation of NASL's 2018 season and the departure of multiple NASL teams, and thus blocked NASL's ability to compete in 2018.

199.    USSF purportedly based its decision on its assertion that the "NASL was not able to provide the Board with assurances it would have greater than eight teams for the 2018 season, a team in the central time zone, or any plan as to how it would come into full compliance with the Federation's professional league standards"—even though NASL had demonstrated that it would be expanding its number of clubs, and USSF itself had proposed to do away with the arbitrary Central Time Zone requirement in its 2015 Proposal.

200.    Tellingly, USSF treated the USL's Division II application completely differently from NASL's application.  USL sought numerous waivers relating to stadium capacity and other issues.  For example, at that time, USL still had eight teams whose stadiums' capacities were below the Division II minimum of 5,000 seats.  Upon information and belief, USL sought approximately twenty waivers, *i.e.*, ten times as many waivers as NASL requested.  In spite of that, USSF did not deny USL's application.  Instead, USSF gave USL a month to provide a "plan

for bringing its teams into compliance" with the Division II requirements—unlike NASL, whose Division II application was flatly denied by USSF without any grace period.

201.    The month that USSF granted USL to bolster its Division II application stretched into multiple months.  During this time, USL strengthened its Division II application by acquiring multiple NASL clubs, Indy Eleven and North Carolina FC, who would not play in NASL without at least Division II status.  Since then, another NASL club, San Diego 1904 FC, has also announced plans to move to USL due to the loss of NASL's Division II status.

202.    Significantly, USSF's sanctioning decision as to NASL came several months earlier than USSF's past sanctioning decisions, which typically occurred just a couple months before the relevant season—i.e., around January, not the preceding September.  On information and belief, USSF's early announcement of NASL's non-sanctioning was aimed at destabilizing NASL so that its clubs would defect over the next several months.  The resulting incentive to transfer to USL to maintain Division II status was tacitly acknowledged in North Carolina FC's November 2017 announcement of its move from NASL to USL, which stated that "[t]he move, which is effective immediately, ensures that NCFC will **continue to play at the highest level possible**" (emphasis added).

203.    Another NASL club, FC Edmonton, announced in November 2017 that it would discontinue its operations, due to the environment of continual instability generated by the USSF's destabilizing and discriminatorily applied Standards.  "Although we believed in and have supported the NASL business model," one of FC Edmonton's owners said, the team was forced to cease operations "by the continuous uncertainty being forced upon the NASL by the United States Soccer Federation."

204.    The defections and departures of these NASL clubs were a direct result—and, upon information and belief, the intended outcome—of USSF denying NASL's Division II application early and simultaneously granting a grace period to USL to obtain Division II status, all in an effort by Defendants and others to drive NASL out of business and protect the monopoly position of MLS in the top tier, and to eliminate any threat to MLS's monopoly that might otherwise be presented by ensuring that the only league in Division II was USL, which was not viewed by Defendants as a competitive threat to MLS.

205.    Even with the NASL clubs it acquired, USL still could not satisfy the USSF's Division II Standards for 2018. But USSF was willing to overlook that fact for USL, unlike NASL. On or around January 16, 2018, USSF granted USL waivers from the relevant requirements of the Standards and designated USL as a Division II league for the 2018 season, allowing USL to pursue a "two-year pathway to full compliance with the Professional League Standards." This clear discriminatory application of the Standards further demonstrated that they serve only to restrict competition and output and serve no procompetitive purpose.

206.    On February 27, 2018, NASL announced that, as a result of the USSF's decision to revoke NASL's Division II status, it had no choice but to cancel the 2018 season.

207.    USSF's selective denials of waivers or a grace period to NASL—following USSF's history of routinely granting MLS and, more recently, USL similar waivers, and allowing USL a grace period—is further evidence of Defendants' unlawful conspiracy to apply the Standards in an anticompetitive and discriminatory manner to exclude competition from Divisions I and II, thereby perpetuating monopolies in both Divisions.

## ANTITRUST INJURIES SUFFERED BY THE NASL, ITS CLUBS AND CONSUMERS

### A.    Harm to NASL and Its Clubs

208.    The unlawful restraints embodied in the Standards themselves—an agreement among the USSF and its members, including MLS—has caused severe antitrust injury and competitive harm to NASL and its clubs.

209.    In addition, Defendants and their co-conspirators' broader contract, combination, and/or conspiracy to modify and discriminatorily apply the Standards, and to engage in additional anticompetitive acts, to exclude other leagues from competing with MLS in Division I or, for MLS's benefit, with USL in Division II and thus to monopolize competition in the top-tier and second-tier relevant markets, or alternatively in a broader relevant market for men's professional soccer leagues, has also caused antitrust injury to the business and property of NASL and its clubs.

210.    Severe harms have been inflicted upon Plaintiff as a result of Defendants' Sherman Act violations.  These harms include loss of good will, lost teams, lost contractual fees for team entry and departure, lost business opportunities, lost contracts and talent, the cancellation of NASL's 2018 season (and possibly further cancellations thereafter, if the requested injunctive and other relief has not been granted), and other significant economic damages totaling millions of dollars to the NASL before trebling in an amount to be determined at trial.  These damages date back at least to USSF's delay and then denial of NASL's application for Division I sanctioning, submitted on May 31, 2015 and finally denied on March 10, 2016, and have continued as a result of NASL being blocked from competing against MLS in Division I and, more recently, even being blocked from competing in Division II.

211.    Defendants' and their co-conspirators' anticompetitive conduct that has harmed NASL has correspondingly harmed NASL clubs, whose interests are intertwined with the league's

interests.  USSF's denial of Division I and II sanctioning to NASL is a denial of the ability to compete as part of NASL to NASL's clubs as well.  In short, the fortunes of NASL clubs rise and fall with the league itself.

212.    It is in the interests of those respective clubs that NASL continue its efforts to compete against MLS at the top tier of professional soccer, including by seeking declaratory and injunctive relief on their behalf and its own behalf through this lawsuit.  Seeking such relief is germane to NASL's purposes, and neither the claims asserted nor the injunctive or declaratory relief sought requires the participation of any NASL clubs as named plaintiffs.  Accordingly, NASL also brings this action seeking declaratory and injunctive relief on behalf of NASL member clubs, pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and consistent with the governing case law of associational standing.

213.    Defendants' contracts, combinations and/or conspiracies in unreasonable restraint of trade, as well as Defendants' conspiracy to monopolize and MLS's actual and attempted monopolization, have damaged NASL's and its clubs efforts to develop their fan bases and created an incentive for various clubs to depart the league or not join the league.

214.    NASL's forced status as a perceived "minor league"—imposed with no legitimate justification by USSF—has prevented NASL from effectively competing with MLS, and thus NASL and its clubs have lost, and will continue to lose, the opportunity for increased revenues and fan support.  NASL and its clubs also have suffered financially from depressed franchise values and other antitrust injuries.

215.    Further competitive injuries to NASL and its clubs have been inflicted as a result of other damaging consequences USSF attached to non-Division I status: (i) non-eligibility for three of the four slots in the CONCACAF Champions League, a FIFA-affiliated tournament

among the top soccer clubs in North America; (ii) fewer rounds of "byes" in the Lamar Hunt U.S. Open Cup tournament, a USSF-run tournament in which MLS, NASL, USL and other clubs compete, the winner of which receives the U.S.'s fourth slot in the CONCACAF Champions League; (iii) being assigned lower-quality referees by the Professional Referee Organization, jointly run by USSF and MLS; and (iv) being subject to a lower limit on the foreign players that each club may include on its roster, compared to Division I leagues (*i.e.*, MLS).

216.    USSF's recent denial of even Division II status to NASL has severely worsened all of these harms to NASL and its clubs, which are ongoing and will result in an additional amount of damages to NASL. These additional injuries include the loss of franchise fees and other payments to NASL, as well as the damages caused as a result of NASL having to cancel its 2018 season—a tremendous blow to its goodwill and reputation among consumers, as well as its franchise values.

**B.    <u>Harm to Consumers</u>**

217.    The USSF's Standards in and of themselves and the anticompetitive application of the Standards have harmed and continue to harm consumers by causing a reduction of professional soccer league output and quality of play and a deprivation of competitive choice and competitive prices that injures fans, stadium operators, broadcasters, sponsors, and players.

218.    Defendants' concerted, discriminatory and exclusionary efforts to confer monopolies over top-tier and second-tier men's professional soccer to MLS and (to the benefit of MLS) USL also have injured consumers by depriving them of the opportunity to reap the benefits of competition in the relevant markets for top-tier and second-tier men's professional soccer leagues located in the U.S. and Canada, including increased output of games and clubs, improved

product quality, and greater competitive choice and prices.  The consumers suffering antitrust injury as a result of these actions include fans, who buy tickets and consume broadcasts and merchandise, as well as sponsors and broadcasters.

219.    Another respect in which consumers have been harmed by Defendants' anticompetitive conduct results from the fact that MLS's immunity from competition has deprived consumers of what would otherwise be a higher quality of play in top-tier soccer.  It is widely recognized that as a result of MLS's single-entity structure—which has restricted the ability of MLS teams to acquire and pay for top-quality players—MLS's quality of play is inferior to other top-tier men's professional soccer leagues worldwide.  This has led to vigorous public debate in which observers repeatedly have pointed out that soccer in the U.S. will not reach its quality potential unless and until MLS clubs are subject to the forces of competition that are present everywhere else in the world.  In other countries, if a club underperforms, it is relegated out of the top-tier league and that inferior performance is punished.  In MLS, by contrast, an inferior club has a secure position, protected from the forces of competition both by an absence of relegation and the anticompetitive Standards.

220.    The lower quality of play associated with MLS is demonstrated by the performance of the U.S. Men's National Team, which largely has consisted of MLS players. Unlike the U.S. Women's National Team, which has *won* the World Cup and the Olympics, the Men's National Team has not advanced in recent history beyond the quarterfinals of the World Cup (which it reached only once in the last half-century, in 2002).  The Men's National Team has frequently been criticized as consisting largely of lower-quality MLS players who are not subject to the rigors of high-stakes competition present in non-U.S. leagues, where a club can lose revenue

and be relegated if its players do not perform, even while the league in which it competed and other clubs in the league continue to produce higher-quality competition for consumers.

221.    Thus, while Defendants' anticompetitive behavior has provided MLS with a protected monopoly that has been able to obtain monopoly profits and charge new franchise fees of more than one hundred million dollars per team, it has yielded inferior play, reduced output, and other anticompetitive effects imposed on the consumers of men's professional soccer in the U.S. and Canada.

222.    USSF has admitted that the U.S. and Canadian market can support at least two top-tier men's professional soccer leagues—confirming that USSF's exclusion of leagues besides MLS from Division I deprives consumers of competitive choice and greater output in that top-tier market.

223.    Despite this fact, Defendants have engaged in a continuing conspiracy to shield MLS from any Division I competition from NASL or any future league that seeks to compete in the top tier.  Defendants also have now engaged in anticompetitive acts to further shield MLS from competition by ensuring that the only league playing in the second tier is USL, which Defendants do not deem to pose any competitive threat to MLS.

224.    The injuries to the public from such unlawful acts have been recognized by a number of state and federal legislators and officials who have come out against the USSF's recent decision not to renew NASL's sanction even in Division II, which deprives fans of their chosen teams and also injures the public at large.  As U.S. Senator Chuck Schumer put it:

> [NASL's New York Cosmos] has been a welcome addition to the Brooklyn's Coney Island neighborhood, attracting tens of thousands of visitors and extending the tourist season well beyond the traditional summer months.  Moreover, the team has created numerous jobs in New York State for players, coaches, front office personnel, and stadium workers, among others.  Local restaurants, bars, and hotels

have benefited from the increased foot traffic brought in from Cosmos fans.

225.   "From the profitable sponsorship deals to the steady job creation that the New York Cosmos have brought to Coney Island and Brooklyn at large, it's clear that a division two status is a win-win for the region," Senator Schumer said.  "I'm urging the U.S. Soccer Federation to reconsider its decision and support a division two status for the North American Soccer League so that teams like the New York Cosmos can continue to thrive."

226.   The injuries that the Standards themselves and Defendants' broader anticompetitive conspiracy have inflicted on NASL, its clubs and consumers, as described above, are injuries of precisely the type that the antitrust laws were meant to prevent.

227.   Until the 2018 season, NASL had been competing in the second-tier relevant market, while also trying to compete in the top-tier relevant market against MLS.  NASL is ready, willing and able to resume its competition in the relevant markets once Defendants' anticompetitive barriers are eliminated.  Should the Court grant NASL its requested relief and strike down the Standards and other anticompetitive restraints at issue, NASL and its clubs have the intention, the financial resources, the experience, and the preparedness needed for NASL to compete in the relevant markets.  NASL has taken the necessary affirmative steps toward competing in the relevant markets, as demonstrated by NASL's many successful seasons in Division II and its application for Division I status that was under consideration as recently as 2016.

228.   Moreover, NASL is prepared to secure many new teams to add to the league, should it obtain the requested relief and thus be able to compete directly against MLS in the top tier without USSF restriction.  Four teams remain as members of NASL, and NASL's ability to add to this list once the barriers to it competing are removed is evidenced by the fact that at least

six clubs had recently provided NASL with letters of intent to join the league in 2018, followed by New Team Agreements under which the clubs had committed to join NASL, contingent upon the league maintaining at least its Division II status.

## RELEVANT MARKETS AND MARKET POWER

229.     The relevant product and geographic markets in which Defendants' conduct has unreasonably restrained competition are: (i) the market for men's top-tier professional soccer leagues located in the U.S. and Canada; and (ii) the market for men's second-tier professional soccer leagues located in the U.S. and Canada.  Alternatively, as described below, the relevant market is a broader market for both top-tier and second-tier men's professional soccer leagues in the U.S. and Canada.

230.     MLS is currently the only competitor sanctioned by USSF to compete in the relevant market for top-tier men's professional soccer leagues located in the U.S. and Canada, which USSF has designated as Division I.  NASL is ready, willing and able to compete with MLS in this top-tier market, but has been denied Division I sanctioning due to Defendants' unlawful conspiracy to exclude competition through the anticompetitive Standards and the discriminatory application, modification and waiver process for such Standards.

231.     USL is currently the only competitor sanctioned by USSF to compete in Division II and thus has been granted, for the ultimate benefit of MLS, a monopoly in the second-tier market by virtue of the USSF's exercise of its power to control and exclude entry in this relevant market.  For seven years prior to 2018, NASL was sanctioned by USSF to compete in Division II.  However, once it became clear that NASL was determined to compete against MLS in the top tier of professional soccer, Defendants—in furtherance of their conspiracy to protect MLS from competition—launched a plan to drive NASL out of the relevant markets entirely and make USL the exclusive Division II league, because Defendants do not perceive USL to be a

competitive threat to MLS.  That plan came to fruition with the denial of even Division II sanctioning for NASL for the 2018 season, thereby granting USL a monopoly position in the second-tier market.  NASL remains ready, willing and able to re-enter this market, but is currently barred from doing so by the Defendants' unlawful conduct.

232.    The consumers in the markets for top-tier and second-tier professional soccer leagues located in the U.S. and Canada are fans who purchase tickets or licensed merchandise of the leagues, sponsors who purchase the reputational, promotional and other benefits of association with the leagues and their clubs, and broadcasters who obtain the rights to distribute games.

233.    Men's top-tier and second-tier professional soccer leagues located in the U.S. and Canada have attributes that distinguish them in the eyes of consumers from other professional sports performed in the U.S. and Canada.  Such other professional sports have different rules of play and competitive attributes that are not reasonably interchangeable with men's top-tier and second-tier professional soccer leagues located in the U.S. and Canada, and do not serve as close substitutes for each other.  Fans, sponsors and broadcasters of top-tier and second-tier men's professional soccer leagues located in the U.S. and Canada do not view other professional sports as close substitutes, and there is no cross-elasticity of demand between prices for men's top-tier and second-tier professional soccer leagues located in the U.S. and Canada, and the prices for other professional sports leagues in those countries, such as the National Hockey League, the National Football League, Major League Baseball and the National Basketball Association.

234.    Top-tier professional soccer leagues located in the U.S. and Canada are also distinct from, and not close substitutes with, second-tier professional soccer leagues located in the U.S. and Canada, because fans, sponsors and broadcasters draw a distinction between top-tier "major league" matches and second-tier "minor league" matches.  USSF perpetuates and

83

reinforces this distinction with its Division I and Division II designations.  USSF also uses a Division III designation to distinguish an even lower, developmental level of men's professional soccer league competition in the U.S. and Canada.

235.   Top-tier professional soccer leagues located in the U.S. and Canada attract considerable sponsorship from nationwide businesses, while sponsorship for second-tier professional soccer leagues tends to be less valuable and more local.  Top-tier professional soccer leagues receiving a Division I designation from USSF also are granted significant advantages by USSF in qualifying for FIFA-sanctioned competitions, which are important to generating fan interest and support.

236.   Second-tier professional soccer leagues located in the U.S. and Canada are also distinct from even lower-tier professional soccer leagues in Division III, and not a substitute for them, because fans and sponsors regard even lower-tier leagues as intrinsically "developmental" leagues.  Lower-tier league matches are perceived as being less compelling as exhibitions of soccer skill, and are regarded by fans as more casual entertainment for residents of the immediate area surrounding a lower-tier club.  Fans and sponsors of second-tier professional soccer leagues located in the U.S. and Canada do not view lower-tier leagues as an interchangeable product or substitute.  The distinction between second-tier and lower-tier professional soccer leagues is demonstrated, for example, by the fact that multiple teams left NASL following its loss of Division II status, and commitments from many other new teams to join NASL had been contingent upon NASL remaining in at least Division II.

237.   Amateur soccer leagues, such as the Premier Development League, are also distinct from, and are not a substitute for, top-tier and second-tier men's professional soccer leagues because the level of competition is much lower, most players are not compensated, and

such amateur leagues are not heavily marketed to fans and sponsors.  Fans, sponsors, broadcasters and others thus view the amateur game as fundamentally inferior to the professional game.

238.    Women's professional soccer leagues located in the U.S. and Canada are also not in the same relevant market as men's top-tier and second-tier professional soccer leagues located in the U.S. and Canada, because most of the fans of men's top-tier and second-tier men's professional soccer leagues located in the U.S. and Canada do not consider the National Women's Soccer League or any other women's soccer league to be interchangeable with or a substitute for top-tier or second-tier men's professional soccer leagues.  There is no cross-elasticity of demand between prices for top-tier or second-tier men's professional soccer leagues located in the U.S. and Canada, and prices for women's professional soccer leagues located in the U.S. and Canada.

239.    Periodic international competitions among national soccer teams or clubs, such as the World Cup, the Olympics or the CONCACAF Gold Cup, do not serve as a close substitute for top-tier and second-tier men's professional soccer leagues located in the U.S. and Canada.  Such periodic international competitions are distinct from, and are not a substitute for, top-tier and second-tier men's professional soccer leagues located in the U.S. and Canada because: (i) they do not involve a regular playing season of sustained competition; (ii) they are far less frequent in any given geographic locale in the U.S. and Canada, as such competitions typically occur on a worldwide or regional basis; (iii) they cannot readily be attended by most fans in the U.S. and Canada; (iv) they lack key aspects of professional soccer leagues such as trades of players between clubs, a specific stadium for each club, a playoff system to crown a league champion, and the option of forming new clubs and disbanding or relocating existing clubs; (v) there is no cross-elasticity of demand between such international and regional competitions and top-tier or second-tier men's professional soccer leagues located in the U.S. and Canada; and

(vi) fans in the U.S. and Canada of top-tier and second-tier men's professional soccer leagues wish to attend regular matches in the U.S. and Canada and develop loyalties to their local teams, which is not the same as U.S. and Canadian fans of international soccer competitions, who rarely can attend such events live near their homes.

240.    Alternatively, NASL alleges that should the Court determine that a broader relevant market exists in which both top-tier and second-tier men's professional soccer leagues compete with each other, NASL would still be a competitor in that broader market, and MLS would still have a monopoly share in that market as a result of the competitive advantages granted to MLS by its sole Division I sanction and the power of the USSF to control and exclude entry in this alternative relevant market.  Publicly available estimates indicate that the combined revenues of MLS's teams in 2016 were approximately $644 million.  Upon information and belief, that is at least several times higher than the combined revenues of NASL's and USL's teams both as of 2016 and presently.  It is thus clear that MLS would have a monopoly market share and monopoly power in any such alternative relevant market.  Plaintiff pleads that such a relevant market for both top-tier and second-tier men's professional soccer leagues exists in the alternative.

241.    The relevant geographic market for both the top and second tiers of men's professional soccer leagues (or a broader men's professional soccer league market) encompasses the U.S. and Canada because they form a single contiguous landmass that is largely united by a common first language, which supports top-tier and second-tier professional soccer leagues with clubs from both countries.  This geographic integration across the U.S. and Canada is also demonstrated by the fact that other men's professional sports leagues such as Major League Baseball, the National Basketball Association, and the National Hockey League all have teams and regularly play matches in both the U.S. and Canada.

242.     By contrast, although Mexico is located on the other U.S. border, it has generally developed its own separate professional soccer leagues with their own separate clubs, which have developed their own distinct sets of fans.

243.     The relevant markets do not include professional soccer leagues that are located outside the U.S. and Canada, because such leagues are distant and thus do not permit the regular attendance of U.S. and Canadian fans, or the purchase of local sponsorships for the performance of games in the U.S. and Canada, among other factors.  Moreover, fans of top-tier and second-tier men's professional soccer leagues located in the U.S. and Canada, as well as fans in any broader alternative market of all men's professional soccer leagues, have a geographic affinity for clubs identified by name and physical location with the cities or other geographic areas in the United States or Canada in which they are based (*e.g.*, New England Revolution in MLS, New York Cosmos in NASL).

244.     As a result of such fan preferences and geographic affinities, MLS, NASL and USL have clubs only in the U.S. (including U.S. territories) and Canada, and are the only current actual or potential competitors in the top tier or second tier of men's professional soccer leagues located in the U.S. and Canada, as well as in the alternative broader relevant market for all men's professional soccer leagues.

245.     As FIFA's exclusive representative for the U.S., USSF has asserted the sole authority to determine which U.S.-based professional leagues, clubs and players will compete in FIFA-affiliated competitions such as the CONCACAF Champions League and the Lamar Hunt U.S. Open Cup.  Due to the enormous significance accorded by soccer fans to FIFA-affiliated competitions, and FIFA recognition, it is impossible for a U.S.-based top-tier or second-tier men's professional soccer league to compete effectively in the relevant markets without the applicable

level of USSF recognition and the ability to participate in such FIFA competitions.  This is also true of the alternative broader men's professional soccer market.  The result is that the USSF has the power to control and exclude entry in each of the relevant markets.

## INTERSTATE TRADE, COMMERCE AND CONDUCT.

246.    Defendants' contracts, combinations and conspiracies that are the subject of this Complaint are within the flow of, and substantially affect, interstate and international trade and commerce.

247.    Acting in concert with MLS and others, USSF adopts, maintains, revises, and grants and denies waivers from its so-called "Professional League Standards"—requirements that professional soccer leagues with clubs in the U.S. and Canada must satisfy for USSF sanctioning in Divisions I, II and III of men's professional soccer leagues.  USSF requires such sanctioning for, among other things, the U.S.-based clubs in such leagues to participate in various FIFA-affiliated international competitions, and to indicate to consumers and sponsors which leagues are recognized by USSF and FIFA as being in the first, second or third tiers of professional soccer.

248.    USSF's separation of professional soccer leagues into three divisions, and USSF's promulgation and application of the Professional League Standards for such leagues, affects substantial amounts of interstate trade and commerce, as the sanctioned professional soccer leagues' sale of tickets, sponsorships and broadcast rights collectively generate tens of millions of dollars or more in interstate trade and commerce each year.  Indeed, on information and belief, SUM has itself provided hundreds of millions of dollars in revenues to the USSF.

249.    USSF itself regularly organizes, holds, and arranges for professional soccer leagues and clubs to participate in national and international soccer-related competitions and events, which generate tens of millions of dollars or more in interstate commerce each year.  MLS and its clubs routinely participate in USSF's national and international competitions.

250.    Defendants have entered into commercial agreements and arrangements under which USSF's and MLS's soccer-related media and sponsorship rights and interests are jointly marketed via television, the Internet, and other mass media, pooled together with other soccer-related rights associated with business entities throughout the U.S. and in other nations.  These arrangements also generate tens of millions of dollars or more in interstate commerce each year.

251.    MLS operates professional soccer clubs across the nation and internationally; regularly organizes, holds, and arranges for professional soccer matches and soccer-related events throughout the nation and internationally; and engages in related business transactions across the nation and internationally, which generate tens of millions of dollars or more in interstate commerce each year.

252.    Defendants' aforementioned activities make use of the instrumentalities of interstate commerce, and payments for those activities of Defendants are made by instrumentalities of interstate commerce.

253.    The contracts, combinations and conspiracies at issue entered into by Defendants to restrict output by professional soccer leagues and to create and protect the monopoly positions of MLS and USL substantially affect interstate trade and commerce.

## CLAIMS FOR RELIEF

### COUNT ONE

**Violation of Section 1 of the Sherman Act: Agreement Among USSF and Its Members, including MLS, Embodied in the Professional League Standards Themselves, in Totality, in Unreasonable Restraint of Competition**

254.    NASL incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

255.    USSF is a separate economic actor from Defendant MLS.  USSF's other members also are separate economic actors from USSF and from one another.  In addition, USSF's Board of Directors, its Standards Task Force, its Professional League Task Force, its Professional Council, and its membership each consist of many separate economic actors, including professional leagues competing horizontally and seeking to compete horizontally in the same market, as well as their respective officers and representatives.  The actions of USSF, its members (including MLS), and its directors, officers, employees, and representatives undertaking the conduct alleged herein constitutes action by separate economic actors engaged in concerted action and agreements.

256.    USSF and its members, including MLS, have entered into a continuing agreement in unreasonable restraint of trade, embodied in the Standards themselves, in totality.

257.    The agreement embodied in the Standards themselves, in totality, has the purpose, intent and effect of restraining horizontal competition among top-tier men's professional soccer leagues located in the U.S. and Canada, and among second-tier men's professional soccer leagues located in the U.S. and Canada, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

258.    The agreement embodied in the Standards themselves, in totality, is inherently anticompetitive because it imposes severely restrictive requirements that block entry into the relevant markets, while simultaneously permitting the USSF and its members to waive such requirements at their discretion—a structure that is inherently anticompetitive because it enables and creates an incentive for USSF and its members to advance their own economic interests through discriminatory waiver decisions, to the detriment of competition in the relevant markets.

259.    This agreement embodied in the Standards themselves, in totality, has conferred and maintained MLS's top-tier monopoly and, for MLS's benefit, USL's second-tier monopoly

by excluding or driving out any potential competitors of MLS and USL from the relevant markets, and continues to do so.

260.    The agreement embodied in the Standards themselves, in totality, is an inherently suspect agreement, and its anticompetitive character is apparent without elaborate industry analysis, because it directly excludes competition from the relevant markets for top-tier and second-tier professional soccer leagues located in the U.S. and Canada, or the alternative relevant market alleged, based on criteria that cannot be justified on procompetitive grounds.  Accordingly, it should be found to be a violation of Section 1 of the Sherman Act under the abbreviated Rule of Reason, *i.e.*, the "quick look" test.

261.    The agreement embodied in the Standards themselves, in totality, has led to significant anticompetitive effects in the relevant markets, as alleged above, and has caused antitrust injury to consumers and competitors in the relevant markets.  It also has conferred and maintained monopoly power for MLS and USL in the top-tier and second-tier relevant markets, respectively, or alternatively has conferred and maintained monopoly power upon MLS in a broader men's professional soccer leagues market, and has created barriers to effective competition against MLS and USL in their respective relevant markets.

262.    The agreement embodied in the Standards themselves, in totality, has not served any procompetitive purpose, and has instead served to create and preserve the monopoly power of MLS and USL in their respective relevant markets.

263.    Further, even if any requirements of the Standards had some plausible procompetitive purpose, reasonably less restrictive means existed to achieve any such purpose, rendering the Standards unlawful.  Other federation members of FIFA around the world have not found it necessary to impose and implement similarly restrictive standards for professional

leagues to accomplish any procompetitive purpose.  Nor have other professional team sports leagues in the U.S. and Canada found it necessary to have any such standards for professional leagues promulgated by a federation, leaving it to competition and consumer choice to determine which professional team sports leagues were top tier and most desired by consumers.  Other professional sports leagues in the U.S. and Canada and soccer leagues worldwide have adopted league rules, rather than rules restraining competition among multiple leagues, and have thrived in doing so.  Moreover, the fact that USSF has previously imposed less stringent versions of the Standards while achieving any purported procompetitive objectives confirms that there are numerous reasonably less restrictive alternatives to the current Standards, which have been deliberately made more and more restrictive to preserve the monopoly position of MLS, and more recently, the monopoly position of USL.  There is simply no justification for having the USSF, MLS, and others impose such Standards to unreasonably restrict competition.

264.    Accordingly, in the alternative, the agreement embodied in the Standards themselves, in totality, should be found to be a violation of Section 1 of the Sherman Act under a full Rule of Reason analysis.

265.    The agreement embodied in the Standards themselves, in totality, has been imposed and applied in interstate commerce, and has unreasonably restrained interstate commerce.

266.    The agreement embodied in the Standards themselves, in totality, has directly and proximately caused antitrust injury and damages to the business and property of NASL, its clubs and consumers.  NASL, its clubs and consumers will continue to suffer antitrust injury and damages unless USSF is enjoined from continuing to engage in the foregoing violation of law.

## COUNT TWO

### Violation of Section 1 of the Sherman Act: Contract, Combination, or Conspiracy By Defendants in Unreasonable Restraint of Competition

267.    NASL incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

268.    Defendants are separate economic actors, as further alleged above.

269.    Defendants and others have entered into a continuing contract, combination, or conspiracy in unreasonable restraint of trade with the purpose, intent and effect of restraining horizontal competition among top-tier men's professional soccer leagues located in the U.S. and Canada, and among second-tier men's professional soccer leagues located in the U.S. and Canada, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, in the relevant markets identified in this Complaint.

270.    This contract, combination or conspiracy has resulted in an agreement, understanding, or concerted action between and among Defendants and others under which the USSF has promulgated and from time to time revised the Standards, and has also manipulated and selectively granted and denied waivers from the Standards, in a discriminatory and anticompetitive manner, so that only MLS and USL will satisfy or be granted the necessary waivers from USSF's requirements for sanctioning in Divisions I and II, respectively.  The purpose and effect of these agreements is to exclude competition and maintain the monopoly positions of MLS and USL in Divisions I and II, respectively.  Defendants and their co-conspirators have also engaged in additional anticompetitive conduct in furtherance of their conspiracy as set forth in this Complaint.

271.    This contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among Defendants and others that accords

competitive and economic advantages to MLS and USL over all other men's professional leagues located in the U.S. and Canada, such as NASL, by virtue of MLS's exclusive top-tier Division I status and USL's exclusive second-tier Division II status.

272. This contract, combination or conspiracy has resulted in agreements, understandings or concerted action by Defendants as alleged throughout this Complaint. The SUM agreements provide an additional economic motivation and incentive for the USSF to engage in the conspiracy, to enhance and protect its substantial revenues from the SUM agreements and the joint marketing of MLS's and USSF's rights, including in highly lucrative broadcast agreements.

273. This is an inherently suspect contract, combination, or conspiracy—under which Defendants have conspired to deny any other men's professional soccer league located in the U.S. and Canada, including NASL, sanctioning as a Division I or II league, thereby precluding any such league from effectively competing with MLS or USL in the top-tier or second-tier relevant markets, or the alternative broader market for men's professional soccer leagues—and its anticompetitive character is apparent without elaborate industry analysis. Accordingly, it should be found to be a violation of Section 1 of the Sherman Act under the abbreviated Rule of Reason, *i.e.*, the "quick look" test.

274. This contract, combination, or conspiracy has led to significant anticompetitive effects in the relevant markets, as alleged above, and has caused antitrust injury to consumers and competitors in the relevant markets. It also has conferred and maintained monopoly status upon MLS and USL in the top-tier and second-tier relevant markets, respectively, or alternatively for MLS in the broader men's professional soccer league market, and has created barriers to effective competition against MLS and USL in their respective markets.

275.    This contract, combination, or conspiracy has not served any procompetitive purpose, as alleged above, and has instead served to create and preserve the monopoly status of MLS and USL and to economically benefit Defendants, including through the SUM agreements. Further, even if this contract, combination, or conspiracy had some plausible procompetitive purpose, reasonably less restrictive means existed to achieve any such purpose, as alleged above, rendering it unlawful.

276.    Accordingly, in the alternative, this contract, combination, or conspiracy should be found to be a violation of Section 1 of the Sherman Act under a full Rule of Reason analysis.

277.    Defendants' contract, combination, or conspiracy occurred in and unreasonably restrained interstate commerce.

278.    Defendants' contract, combination, or conspiracy has directly and proximately caused antitrust injury and damages to the business and property of NASL, its clubs and consumers.  NASL, its clubs and consumers will continue to suffer antitrust injury and damages unless Defendants are enjoined from continuing to engage in the foregoing violation of law.

## COUNT THREE

### Violation Of Section 2 Of The Sherman Act: Conspiracy By Defendants To Monopolize

279.    NASL incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

280.    Defendants are separate economic actors, as further alleged above.

281.    Defendants and others have entered into a continuing agreement, combination, or conspiracy with the specific intent of granting and maintaining for MLS a monopoly in the relevant market for top-tier professional soccer leagues located in the U.S. and Canada, or

alternatively in a broader market for men's professional soccer leagues in these countries, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

282.   Defendants and others have entered into a continuing agreement, combination, or conspiracy with the specific intent of granting and maintaining for USL a monopoly in the relevant market for second-tier professional soccer leagues located in the U.S. and Canada, and with the additional specific intent of maintaining for MLS a monopoly in the relevant market for top-tier professional soccer leagues located in the U.S. and Canada, or alternatively for MLS in the broader market for men's professional soccer leagues alleged in the alternative in this Complaint, by destroying NASL as a potential competitor to either MLS or USL, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

283.   Defendants and others have engaged in concerted action, including numerous overt acts described above, with the specific intent of obtaining and maintaining such monopoly power for MLS and USL in their respective relevant markets for the purposes of unreasonably excluding or limiting competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The concerted actions of Defendants and others, as alleged further throughout this Complaint, are exclusionary in nature, do not constitute legitimate business activities, and are an abuse of their market position.

284.   Defendants' conspiracy to monopolize the relevant markets occurred in and unreasonably restrained interstate commerce.

285.   Defendants' conspiracy to monopolize the relevant markets has directly and proximately caused antitrust injury and damages to the business and property of NASL, its clubs and consumers.  NASL, its clubs and consumers will continue to suffer antitrust injury and

damages unless Defendants are enjoined from continuing to engage in the foregoing violation of law.

## COUNT FOUR

### Violation of Section 2 of the Sherman Act: Monopolization (By MLS Only)

286.    NASL incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

287.    MLS has monopolized the market for top-tier men's professional soccer leagues in the U.S. and Canada, or in the alternative a broader relevant market for men's professional soccer leagues in the U.S. and Canada, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

288.    MLS possesses monopoly power in the top-tier relevant market as the sole Division I men's professional soccer league.  MLS's monopoly power derives from USSF's power, as the exclusive U.S. association for FIFA, to determine which leagues are included in and excluded from the top-tier relevant market by deciding which leagues to sanction in Division I. Without a USSF sanction under the FIFA umbrella, no professional soccer league has the credibility with fans, sponsors, broadcasters, players and owners to effectively compete in the relevant markets.

289.    In the alternative, MLS possesses monopoly power in the broader alternative relevant market for men's professional soccer leagues in the U.S. and Canada, with a market share and total team revenues that, on information and belief, are several times higher than all other such leagues combined.  MLS's monopoly position derives from USSF's application of its ability to confer monopoly power upon MLS by designating it as the sole Division I FIFA-sanctioned league, while withholding such an essential sanction from MLS's competitors and potential competitors such as NASL.

290.    MLS has engaged in the willful acquisition and maintenance of its monopoly power over the relevant market by conspiring with and exerting influence over the USSF in order to have USSF adopt, revise, and discriminatorily apply anticompetitive Professional League Standards to create and maintain MLS's monopoly over the relevant market.  USSF has agreed to and willfully engaged in the act of conferring such monopoly power upon MLS and maintaining that monopoly through its application of its anticompetitive Standards.

291.    The purpose and effect of MLS's acts of monopolization have been to ensure that USSF would use its sanctioning power to maintain MLS's monopoly status in the relevant market, by adopting anticompetitive Professional League Standards and applying them in a discriminatory manner to prevent MLS's competitors and potential competitors such as NASL from competing with MLS.

292.    MLS's conduct in furtherance of acquiring and maintaining its monopoly in the relevant market is exclusionary in nature, does not consist of legitimate business activities, and is an abuse of its market position.  MLS's monopoly power in the relevant market does not result from growth or development as a consequence of a superior product, business acumen, or historic accident.  USSF's conduct in furtherance of granting and maintaining the MLS monopoly position is also exclusionary in nature, does not constitute legitimate business activities, and is an abuse of USSF's power to control entry into the relevant market.

293.    MLS's monopolization of the relevant market occurred in and unreasonably restrained interstate commerce.

294.    MLS's monopolization of the relevant market has directly and proximately caused antitrust injury and damages to the business and property of NASL, its clubs and consumers.

NASL, its clubs and consumers will continue to suffer antitrust injury and damages unless MLS is enjoined from continuing to engage in the foregoing violations of law.

## COUNT FIVE

### Violation of Section 2 of the Sherman Act: Attempted Monopolization (By MLS Only)

295.    NASL incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

296.    MLS has attempted to monopolize the market for top-tier men's professional soccer leagues in the U.S. and Canada, or in the alternative a broader relevant market for men's professional soccer leagues in the U.S. and Canada, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

297.    MLS has engaged in anticompetitive and exclusionary conduct in furtherance of its attempted monopolization of the relevant market, as alleged further throughout this Complaint.

298.    MLS's conduct in furtherance of their attempted monopolization of the relevant market is exclusionary in nature, does not consist of legitimate business activities, and is an abuse of its market position.

299.    MLS has acted with the specific intent of acquiring and maintaining a monopoly in the relevant top-tier market, or in the alternative the broader alternative relevant market, as alleged further throughout this Complaint.

300.    There is a dangerous probability that MLS's attempt to monopolize the relevant market will succeed, as demonstrated by the fact that it has already succeeded in becoming the sole competitor in the top-tier Division I relevant market for over two decades—or, in the alternative, acquiring a dominant market share in the broader relevant market for men's professional soccer leagues that, upon information and belief, is several times higher than all other such leagues put together—and has succeeded in eliminating the competitive threat posed by

leagues seeking to compete with MLS, including NASL, by conspiring with USSF and others to deny such leagues sanctioning in Division I or, in the case of NASL, any division at all, as further alleged above.

301.   MLS's attempted monopolization of the relevant market occurred in and unreasonably restrained interstate commerce.

302.   MLS's attempted monopolization of the relevant market has directly and proximately caused antitrust injury and damages to the business and property of NASL, its clubs and consumers.   NASL, its clubs and consumers will continue to suffer antitrust injury and damages unless MLS is enjoined from continuing to engage in the foregoing violations of law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A.   That the agreement among the USSF and its members including MLS that is embodied in the Professional League Standards themselves, in totality, be adjudged to be an unreasonable restraint of trade in the relevant markets alleged in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.   That the conspiracy by Defendants regarding the imposition, implementation, and application of the Professional League Standards, including the discriminatory and selective grants and denials of waivers from such Standards, as well as other conspiratorial conduct described in this Complaint, with the purpose and effect of excluding competition from the relevant markets to protect the monopoly position of MLS in the top-tier market and USL in the second-tier market, or MLS in the broader alternative relevant market, be adjudged to be in violation of Section 1 of the Sherman Act;

C.   That the conspiracy of Defendants to monopolize the relevant top-tier and second-tier markets, with the specific intent that MLS and USL alone compete in such markets—or, in

the alternative, for MLS to monopolize the broader alleged relevant market, with the specific intent that MLS alone compete in that market—be adjudged to be in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

D.    That MLS's monopolization of the relevant top-tier market, or in the alternative the broader relevant market for men's professional soccer leagues, as alleged in this Complaint, be adjudged to be in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

E.    That MLS's attempted monopolization of the relevant top-tier market, or in the alternative the broader relevant market for men's professional soccer leagues, as alleged in this Complaint, be adjudged to be in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

F.    That the Court issue a permanent injunction enjoining USSF from continuing to promulgate or implement the Professional League Standards to sanction men's professional soccer leagues, leaving the competitive market and consumer preference to determine which men's professional soccer leagues in the U.S. and Canada, including NASL, MLS and USL, are top-tier, second-tier or some other competitive level;

G.    That Defendants be enjoined from further violations of the antitrust laws;

H.    That judgment be entered for Plaintiff against Defendants for three times the amount of damages sustained by Plaintiff as allowed by law, in an amount to be determined at trial, together with the costs of this action and reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and

I.    That Plaintiff be accorded such other, further or different relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: March 16, 2018

By:    s/Jeffrey L. Kessler
         Jeffrey L. Kessler
         David G. Feher
         Mark E. Rizik Jr.
         **WINSTON & STRAWN LLP**
         200 Park Avenue
         New York, New York 10166
         Tel: (212) 294-6700
         Fax: (212) 294-4700
         jkessler@winston.com
         dfeher@winston.com
         mrizik@winston.com

         Heather L. Kafele
         **WINSTON & STRAWN LLP**
         1700 K Street N.W.
         Washington, DC  20006
         Tel: (202) 282-5000
         hkafele@winston.com

         *Counsel for Plaintiff North American Soccer*
         *League, LLC*