UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                          :
NORTH AMERICAN SOCCER LEAGUE                              :
LLC,                                                      :     **<u>MEMORANDUM DECISION</u>**
                                                          :     **<u>AND ORDER</u>**
                                      NASL,               :
                                                          :     17-cv-5495 (BMC)
                    - against -                           :
                                                          :
UNITED STATES SOCCER                                      :
FEDERATION, INC., and MAJOR                               :
LEAGUE SOCCER, LLC,                                       :
                                                          :
                                 Defendants.              :
                                                          :
-------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiff North American Soccer League LLC ("NASL") has filed suit against defendants

United States Soccer Federation, Inc. ("USSF" or "U.S. Soccer") and Major League Soccer, LLC

("MLS") under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, *et seq.*  In short, NASL

alleges that defendants have conspired to exclude NASL and others from competing against

MLS in the market for top-tier men's professional soccer leagues in the U.S. and Canada.

There are a number of motions before the Court.  First, there are six <u>Daubert</u> motions.

Second, NASL has moved for partial summary judgment, and defendants have filed separate

cross-motions for partial summary judgment.  Third, there are three motions to seal certain

exhibits filed by the parties, as well as two motions to seal filed by non-parties United Soccer

Leagues LLC and Aaron Davidson, the former Chairman of NASL.

For the reasons set forth below, the <u>Daubert</u> motions are granted in part and denied in part.  The summary judgment motions are granted to the extent of dismissing Count I of the complaint and otherwise denied.  The motions to seal are also granted in part and denied in part.

## BACKGROUND

**I. Undisputed Facts**

    A. <u>United States Soccer Federation ("USSF" or "U.S. Soccer")</u>

USSF is a non-profit private membership organization affiliated with FIFA, an international soccer body that runs the World Cup and, through its regional affiliates, other major tournaments.  Through its affiliation with FIFA, USSF asserts the authority to regulate and oversee professional soccer in the United States.  U.S. Soccer is also recognized by the United States Olympic Committee as the national governing body for the sport of soccer in the United States.

USSF's members are professional soccer teams and leagues, including plaintiff North American Soccer League ("NASL"), defendant Major League Soccer ("MLS"), and United Soccer League ("USL").  Representatives from separate professional leagues serve on the U.S. Soccer Board of Directors (the "Board") and on other of U.S. Soccer's bodies, such as the Professional Council.

The USSF Board consists of fifteen members, including ten elected from U.S. Soccer's constituent groups (the Athlete's Council, Adult Council, Professional Council, and Youth Council), three independent directors, one director at large, U.S. Soccer's Vice President, and the

current President.  The immediate past President and current Secretary General serve as non-voting members.[1]

U.S. Soccer's Board determines whether to sanction U.S. professional leagues in "Divisions" I through III ("D1," D2," and "D3"), based on Professional League Standards ("Standards" or "PLS") originally adopted by USSF in 1995, with revisions most recently adopted in 2014.  For each Division, the Standards set forth requirements as to minimum stadium seating capacity, number of teams, time zone coverage, and other benchmarks.  Divisional sanctioning by U.S. Soccer confers benefits such as access for the sanctioned league's teams to prominent competitions and access to hiring world-class players.  A D1 or D2 sanction is significant for a professional soccer league's reputation and stature with fans, sponsors, and broadcasters.  Additionally, players on any team with a U.S. Soccer sanction are eligible to play on the U.S. National Teams and in FIFA-sanctioned games and tournaments; players who do not play on a sanctioned team are not eligible to do so.

The Standards, which are set forth in writing, are agreed upon and adopted by USSF and its members by a vote of the Board.  The U.S. Soccer Board annually votes to deny or accept league applications for professional D1, D2, and D3 sanctions based on compliance with the Standards.  Pursuant to the current Standards, all leagues must submit "an annual report, setting forth, in reasonable detail, the status of its compliance with the[] standards."

U.S. Soccer member leagues must meet the applicable PLS or receive waivers to be sanctioned as a D1, D2, or D3 league by U.S. Soccer.  Since their adoption in 1995, the PLS

---

[1] The parties dispute whether the Board members are "disinterested," i.e., unaffiliated with the professional leagues. USSF asserts that the Board's members are disinterested, whereas NASL asserts that the Board represents professional soccer league members of USSF (such as MLS and USL) and other soccer-related organizations.

have included a waiver procedure for leagues that do not meet one or more of the PLS.  NASL has requested waivers each year of its existence.

B. Major League Soccer ("MLS")

MLS is a men's professional soccer league formed in 1995.  It has been the only U.S. Soccer-sanctioned D1 men's league since U.S. Soccer's formation.

In 1993, Alan Rothenberg and Sunil Gulati developed MLS's original business plan and presented MLS's D1 submission to the Board.  Alan Rothenberg was the U.S. Soccer President in 1993, a position he held from 1990-1998.  Sunil Gulati later became U.S. Soccer President, a position he held from 2006-2018.

MLS's aforementioned original business plan included statements that (i) its players would be "subject to a strictly enforced salary cap;" (ii) that "[m]anagement believes that it will be able to maintain this salary structure" because, among other things, it was "not anticipated that there will be any other significant domestic professional league to compete for players' services;" and (iii) "[b]ecause of MLS's status as a Division I league, national teams will likely be staffed primarily with MLS players."

MLS's original business plan further stated that "[i]n exchange for the right to market the United States National Team and Olympic Team, MLS proposes to pay the USSF a significant annual fee plus a percentage of National Team ticket receipts and United States Cup revenues and assume very substantial expenses now being borne by the USSF."

Also in 1993, USSF voted to make MLS the sole D1 league.  The Board voted to "give preliminary approval to one applicant to develop Division I professional soccer."  The same year, USSF denied D1 sanctioning requests from two other leagues.  On the same day as the vote on MLS's D1 application or thereabout, U.S. Soccer formed a subcommittee regarding "creating a

timeline for the MLS to adhere to over the next 18 months; review the use of the World Cup funds[]; review of [Standards] for compliance; long-term relationship between [U.S. Soccer] and MLS; marketing and licensing issues; strategy statement regarding team development and quality of play; relationship to other soccer entities (e.g., women's soccer, youth and amateur players, etc.); and approval of the initial markets."

At the time the Board approved MLS's D1 application in 1993, MLS did not have ten committed teams across at least three time zones playing in stadiums with a minimum seating capacity of 15,000, in violation of the Standards at the time.  However, MLS did meet these requirements by the time it launched its first season in 1996.  MLS secured investors, teams, and stadiums before commencing play that year.

The USSF Board decided that MLS would be the single D1-sanctioned league for the 1996 and 1997 seasons, and that U.S. Soccer would begin accepting D1 applications from any league for the 1998 season on July 1, 1997.  This was done "to give [MLS] a 'runway'" to establish itself.  No leagues applied for a D1 sanction in 1998.

Moving into the early 2000s, MLS struggled financially.  Its operator investors invested billions of dollars into the league, including more than $2.5 billion in soccer-specific stadia, spent nearly $800 million on player and player-related expenditures, steadily increased marketing expenditures, significantly expanded the number of league office employees, and increased league expenditures from over $87 million in its first season to nearly $657 million in 2016.  MLS's attendance and viewership, and therefore its revenues, have grown substantially since its inaugural season.

In 2004, MLS's owners formed Soccer United Marketing ("SUM") as MLS's licensing and marketing entity.  SUM entered into a series of commercial agreements with U.S. Soccer,

under which SUM marketed the bundled rights of MLS and U.S. Soccer.  U.S. Soccer has received at hundreds of millions of dollars in revenue from these agreements with SUM to date.

At various points from 1997 to 2009, one or more MLS teams were not in compliance with certain specific provisions of the PLS.  For example, the D1 Standards adopted in 1995 had a requirement that a team's home stadium must have a minimum seating capacity of 15,000 (a rule that remains in effect today).  USSF granted MLS waivers to keep its D1 status whenever one or more of its stadiums were out of compliance with this requirement.  MLS applied for and received waivers from the D1 stadium capacity requirement for one or more of its teams from 2009 through 2011, while their development of new and construction or renovation of compliant stadia were underway.  From 2012 through 2014, MLS applied for and received a waiver for one of its teams that was still in the process of constructing a compliant stadium.

Gulati testified at his deposition as USSF's corporate representative that "during [the 1997-2009] period, [USSF] didn't have a formal review process … for any of the professional leagues," but did conduct "a general review" of MLS's compliance with the Standards.

C. <u>North American Soccer League ("NASL")</u>

NASL was founded as a men's professional soccer league in 2009, after a number of USL (MLS's minor-league affiliate) teams decided to break away from USL and form a separate league with D1 ambitions.  In 2009, both NASL and USL were seeking D2 league sanctions. The Board ordered NASL and USL's teams to play together in a joint USSF-run D2 league in 2010.[2]

---

[2] Whether NASL was forced to play in a joint league with USL because it had no other choice or whether it wanted to do so is disputed.

Also in 2009, U.S. Soccer announced that it would require each league to demonstrate that it was in compliance with the Standards on an annual basis.  The Standards for D2 were heightened in 2010, when NASL was pursuing its D2 application.  NASL obtained a D2 sanction and began playing as a sanctioned D2 league in 2011.  NASL was sanctioned as a D2 league each year from 2011 to 2017.

In 2015, NASL applied for a D1 sanction.  It was denied in 2016, and U.S. Soccer refused to grant NASL any requested waivers.

In 2017, U.S. Soccer then denied NASL's D2 application for the 2018 season, while granting a D2 sanction to USL.  At this time, NASL only required two waivers from the D2 standards while USL required 21 waivers.  NASL was barred from competing as a D2 league as a result.  Because NASL team owners were unwilling to continue playing in NASL with at least D2 status, NASL suspended operations and cancelled its future seasons of play.

Throughout its history, one of NASL's main sources of funding was Traffic Sports USA ("Traffic"), which loaned the league money, was the primary investor in NASL Team Holdings (NASL's investment vehicle), and was the principal owner of three NASL teams.  In 2013, after Traffic's owner Jose Hawilla and NASL's Chairman of the Board Aaron Davidson pleaded guilty to fraud charges in connection with Traffic's business, Traffic had to divest all assets, including its investment in NASL.  NASL and Traffic settled their claims over Team Holdings in 2016.

## II. <u>Procedural History</u>

Following U.S. Soccer's denial of its D2 sanction, NASL filed suit against U.S. Soccer and sought a preliminary injunction requiring U.S. Soccer to grant NASL a D2 sanction.  Judge Brodie denied NASL's motion for a preliminary injunction on the grounds that NASL failed to demonstrate concerted action, as required for a Sherman Act Section 1 ("Section 1")

7

unreasonable restraint of trade claim.  N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, 296 F. Supp. 3d 442 (E.D.N.Y. 2017) (hereinafter "NASL I").  Notwithstanding the ultimate denial of the preliminary injunction, however, that decision held that NASL had demonstrated irreparable harm.  Id. at 459.  The Second Circuit affirmed and remanded for further adjudication on the merits.  N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, 883 F.3d 32 (2d Cir. 2018) (hereinafter "NASL II").

NASL amended its complaint shortly after its motion for preliminary injunction was denied, which added additional counts and MLS as a defendant.  NASL's Counts I and II, respectively, claim that the Standards themselves and U.S. Soccer's application thereof violate Section 1.  Count III alleges that both defendants conspired to monopolize the market for professional men's soccer in the U.S. and Canada in violation of Section 2 of the Sherman Act ("Section 2"); Counts IV and V allege monopolization and attempted monopolization (of the same market) in violation of Section 2 against only MLS.

NASL, U.S. Soccer, and MLS moved for summary judgment as to Counts I and II; those motions are currently before the Court.  The parties did not brief the remaining counts set forth in the Amended Complaint.

## LEGAL STANDARD

A court will grant summary judgment where "there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law."  Ellicott Square Court Corp. v. Mtn. Valley Indem. Co., 634 F.3d 112, 119 (2d Cir. 2011) (cleaned up).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

After the moving party has shown that there is no genuine issue as to any material fact, the "nonmoving party must come forward with 'specific facts showing that there is a *genuine issue* for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. (cleaned up).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  The nonmoving party cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (internal citation omitted), and "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586.

In considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Hotel Emp. & Rest. Emp. Union, Local 100 of New York, N.Y. & Vicinity v. City of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir. 2002) (cleaned up).

## DISCUSSION

### I.  Daubert Motions

First, this Order addresses the parties' pending motions to exclude expert testimony pursuant to Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993).  Defendants have jointly moved to exclude expert opinions offered by NASL's experts Stefan Szymanski [276]

9

and Roger G. Noll [290], and have separately moved to exclude opinions offered by Darrell L. Williams [282, 298].  NASL has moved to exclude opinions offered by defendants' experts Steven Solomon, Jonathan Walker, and Kevin Murphy [302].

A.  <u>Applicable Law</u>

Under Rule 702, an expert witness must be "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702(a).  A qualified expert may testify in the form of an opinion if:

> the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

<u>Id.</u>  Although Rule 702 "embodies a liberal standard of admissibility for expert opinions," <u>Nimely v. City of New York</u>, 414 F.3d 381, 395 (2d Cir. 2005), the court must ensure that the proffered expert's testimony is both relevant and reliable.  <u>See</u> <u>Daubert</u>, 509 U.S. at 589.  Expert evidence is relevant if "the proposed expert testimony 'will help the trier of fact to understand the evidence or to determine a fact in issue.'"  <u>A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC</u>, 364 F. Supp. 3d 291, 325 (S.D.N.Y. 2019) (quoting Fed. R. Evid. 702).

For evidence to be reliable, the expert must offer "some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion."  <u>Riegel v. Medtronic, Inc.</u>, 451 F.3d 104, 127 (2d Cir. 2006).  The Supreme Court in <u>Daubert</u> named several factors that a court may consider when determining whether a proffered expert meets the requirements of Rule 702.  Those factors are: "whether a theory or technique had been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or

operation." Nimely, 414 F.3d at 396 (citing Daubert, 509 U.S. at 593-94). "In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002). But because conclusions and methodologies "are not entirely distinct from one another," Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997), "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony," Amorgianos, 303 F.3d at 266.

   B. <u>Defendants' Motion to Exclude Opinions by Stefan Szymanski [276]</u>

      NASL's expert witness Professor Stefan Szymanski is a Professor of Sport Management at the University of Michigan. After conducting an "economic analysis" regarding the "adoption and enforcement of the Professional League Standards," he concludes that "[t]he Standards were . . . created and implemented in a discriminatory manner by an economically partisan organization with a motive to insulate MLS from competition." He bases this opinion to a significant extent on the theory of "regulatory capture," which occurs when an entity has the ability to "control the standard-setting process in its own interests" "by means of overlapping personnel" at the standard-setting organization. Szymanski recognizes that this "concept is most frequently invoked in the context of government-empowered agencies," but nonetheless finds it applicable here where "MLS aligned itself economically with USSF in such a way that USSF had a continuing economic incentive to favor MLS by adopting the Professional League Standards, to grant MLS a monopoly at the top tier of men's professional soccer leagues in the US and Canada, and to protect that monopoly from competitors such as NASL."

11

Szymanski also opines as to the anticompetitive nature of the Standards, specifically that the history of USSF's "adoption and implementation" of the Standards – especially its "economically biased and discriminatory 'waiver' process" – "indicates an anti-competitive design" that had the effect of "driv[ing] NASL out of the relevant markets."  In his opinion, "USSF's design of the Professional League Standards system created a barrier to entry that is inherently anticompetitive" and the Standards "are economically anomalous and have no parallel in any other major professional league sport either in the U.S. and Canada."

Lastly, Szymanski concludes that "the pro-competitive justifications USSF asserts are unsupportable as a matter of economic theory and fact" and that "the anti-competitive effects of the PLS far outweigh their pro-competitive effects."  He also opines that any procompetitive justification for the Standards could be achieved through less restrictive alternatives, "including: (a) use of the prior iterations of the Standards before NASL competition arose; (b) self-regulation by the individual leagues themselves, as MLS was permitted to do during a twelve-year period when the PLS were not enforced against it; or (c) the creation of a new standard-setting process."

Defendants seek to exclude Szymanski's testimony on a few grounds.  As an initial matter, defendants argue that much of Szymanski's proffered testimony should be excluded because it is nothing more than a "one-sided narration" of "cherry-picked evidence" "that is heavily characterized to support NASL's theory of the case."  In defendants' view, Szymanski's testimony "invades the province of the fact-finder, ignores contrary evidence, argumentatively characterizes facts, opines on legal conclusions, and exceeds the scope of [] expertise by speculating as to others' intentions and motives."  This argument is unpersuasive.  It is well-established that an expert is permitted to rely on facts in the record to form his opinions.  See Hopkins v. Nat'l R.R. Passenger Corp., No. 08-cv-2965, 2015 WL 13741721, at *10 (E.D.N.Y.

12

Aug. 20, 2015).  Szymanski is allowed to examine the factual record to inform his conclusions.
And although defendants point to some evidence in the record that undercuts Szymanski's
conclusions, the omitted evidence is not so extreme as to render Szymanski's conclusions
unreliable.  Defendants will be given a full opportunity to cross-examine Szymanski at trial on
any evidence they believe he failed to consider.  See Phelps v. CBS Corp., No. 17-cv-8361, 2020
WL 7028954, at *10 (S.D.N.Y. Nov. 30, 2020).  The jury will also be instructed that the
recitation of a "fact" by an expert does not mean that it is true – the burden remains on party
asserting that fact to prove it.

Next, defendants argue that Szymanski offers improper opinions on the "ultimate legal
conclusion[s] about whether a conspiracy existed or anticompetitive conduct actually occurred."
See U.S. Info. Sys. v. Int'l Bhd. of Elec. Workers Local Union No. 3, 313 F. Supp. 2d 213, 241
(S.D.N.Y. 2004) (citations omitted); Union Carbide Corp. v. Montell, 28 F. Supp. 2d 833, 843
(S.D.N.Y. 1998) ("[Experts] are not to testify that this conduct was either 'anti-competitive' or
'unlawful.'").  The Court agrees that Szymanski goes too far in opining that defendants were
"biased" or "conflicted" or that their conduct was "discriminatory."  These are issues outside the
bounds of his expertise as an economist.  Those are arguments to be raised by NASL's counsel to
the jury in summation and for the jury to decide.  Cf. Fed. R. Evid. 704(a).

Szymanski may, however, opine as to whether, as a matter of economic theory,
defendants' conduct decreased or otherwise restrained competition – and he may refer to the
theory of regulatory capture to explain how he reached this opinion.  For example, he may "point
to factors that would tend to show anticompetitive conduct in a market," "indicate whether he
believed those factors existed here[] and what the economic significance of those factors would

be," or "explain how certain conduct could affect a market through the use of hypothetical statements."  See U.S. Info. Sys., Inc., 313 F. Supp. 2d at 241.

Defendants also argue that Szymanski should not be permitted to testify as to the state of mind or intentions of certain actors.  In its opposition, NASL assures the Court that Szymanski will "not offer the jury any conclusions about the subjective intent of Sunil Gulati, Don Garber, or anyone else."  But it also notes that "Szymanski cannot and appropriately did not ignore the parts of the record in which Defendants' witnesses explicitly admitted their economic intentions in taking particular actions" because "[t]hese admissions provide context for the economic analysis that Professor Szymanski performed regarding the competitive effects of Defendants' actions."  Defendants' challenge on this score is persuasive to a certain extent.  His role as an expert is to assist the trier of fact by conducting an economic analysis of defendants' conduct.  Accordingly, Szymanski may testify to the statements of defendants witnesses themselves (insofar as they support his position), but he will not be permitted to testify as to witnesses' states of mind or intentions even for this limited purpose.

Defendants also challenge Szymanski's opinions regarding regulatory capture.  First, defendants contend that his opinions regarding regulatory capture "should be excluded because [the concept] has never been used to supplant the requirement of concerted action under the Sherman Act."  In response, NASL stated that Szymanski will "not offer[] any legal opinion that regulatory capture constitutes a conspiracy in violation of the antitrust laws."  This assurance moots the issue.  While Szymanski would not be permitted, regardless, to testify that regulatory capture supersedes or stands in the place of the requirements for liability under antitrust law, he will be allowed to offer his opinion that regulatory capture "provides an economic explanation of

14

when the standard-setting process can have the anticompetitive effect of protecting an entrenched company from competition."

Defendants also challenge Szymanski's opinions regarding regulatory capture as exceeding the scope of his expertise as a sports economist.  According to defendants, regulatory capture is a "niche concept" that Professor Szymanski recognizes to be "most frequently invoked in the context [of] government empowered agencies," and this falls outside his purported area of expertise in "sports economics."  To shore up his qualifications on this topic, NASL points to a 2008 publication from Szymanski discussing "special interest capture" in the sports industry. The fact that NASL was only able to find one publication from 2008 in which Szymanski discusses regulatory capture does not make me particularly confident that Szymanski has devoted a significant amount of time to studying this concept in his career.  Nonetheless, given Szymanski's unchallenged expertise as an economist generally, I find that he is qualified to testify as to regulatory capture insofar as that doctrine is supported by the economics literature – which he is clearly qualified to assess and interpret.

Defendants also argue that Szymanski should be precluded from testifying as to the corporate governance practices of defendants.  NASL states that Szymanski will not offer any opinions regarding "proper corporate form or constituency-based governance."  That's for the best, as NASL has not established that Szymanski is qualified to testify on such issues.

Lastly, defendants argue that Szymanski should be precluded from testifying that, in his opinion, the divisional designation of a league (e.g., D1 or D2) is "all-important" to a league's success.  They argue that this opinion is inconsistent with his previous statements made before this litigation was commenced and at the preliminary injunction phase of this case that league success depends on quality of play and investment – not on sanctioning or other certification.

Although there is some tension between Szymanski's present opinion that a league's designation – standing alone – is necessary for a league's success, and his previous statements that league success depends on other factors such as the quality of play, I cannot say that these positions are so contradictory as to warrant exclusion.  As Szymanski explains, "[i]t is not possible to attract a quality pool of professional players or to gain competitive credibility with fans, sponsors, investors, or broadcasters" without a divisional sanction.  Therefore, in his view, league designation (which Szymanski now argues is necessary for a league's success) is a prerequisite for high quality of play (which Szymanski has previously argued is important to a league's success).

Defendants' motion to exclude, in part, Szymanski's opinion is thus granted in part and denied in part.  He will be permitted to testify, but only insofar as his testimony complies with the above rulings.

C.  <u>Defendants' Motions to Exclude Opinions by Darrell L. Williams</u> [282, 298]

NASL's expert Darrell L. Williams is an economic consultant and former professor at the University of California at Los Angeles.  He uses a multiple regression analysis to estimate NASL's damages in two but-for worlds (<u>i.e.</u>, a world in which defendants' allegedly anticompetitive conduct never occurred).  First, Williams calculates damages resulting from defendants' decision to deny D1 status to NASL in 2016 ("D1 damages").[3]  Second, he calculates damages resulting from defendants' decision to revoke NASL's D2 status in September 2017 ("D2 damages").  Williams' calculation of D1 and D2 damages "are in the alternative and not cumulative."  In other words, "if the jury finds that the plaintiff was

---

[3] Williams uses a date range for his damages calculation ranging from May 31, 2015 (the year NASL applied for D1 status) and March 10, 2016 (the date NASL's application was rejected).

wrongfully deprived of a D1 sanction in 2016, the but-for world would have NASL remaining in Division I going forward" – so NASL could not collect D2 damages in that but-for world.  If, however, the jury finds that "the denial of a D1 sanction was not unlawful, but the denial of the D2 sanction was unlawful, then the appropriate but-for world is one in which D2 damages would have been incurred, but not D1 damages."

For both models, Williams focuses only on damages resulting from the loss of expansion fees, which are the fees paid by a new team when it joins a league.  His primary "Baseline Model" is a linear regression model that "controls for a broad range of economic factors that are likely to influence expansion fees, including location-specific factors (such as household income, percent male population, percent Hispanic/Latino population, number of professional sport teams), soccer demand variables (such as population, percent population of soccer viewers), and league-specific characteristics (such as average team salaries, season points, the age distribution of teams)."  Using his Baseline Model, he concludes that D1 damages amount to $355,629,000 and D2 damages amount to $41,933,000.

Williams also provides two alternative damages models: the Valuation Model, which "takes into account the fact that the number of viable cities suitable for locating expansion teams will decrease over time throughout the damages period," and the Benchmark Model, which is a "linear time trend model" using historical data from actual team transactions.  He uses various models because each "has advantages that address the challenges in forecasting an unseen and unobservable counterfactual scenario."  D1 damages under the Valuation Model are $380,435,000, and D2 damages are $61,816,000.  For the Benchmark Model, D1 damages are $324,731, and D2 damages are $62,000,000.  He also conducted various "robustness checks"

17

using "alternative proxies for local market characteristics, soccer demand, and league-specific characteristics."

In his rebuttal and supplemental reports, Williams offered revised damages models that account for criticism levied by defendants' experts and assume that certain factual issues would be resolved in favor of defendants.  For example, D1 damages are $233,273,000 and D2 damages are $39,710,000 in his Revised Baseline Model.

Defendants move to exclude Williams's testimony in its entirety.  Defendants first contend that the wide range of Williams' various models renders his opinions "inherently and irreconcilably contradictory."  They argue that he plans to offer "at least nine different [D1] damages figures to choose from for that alleged harm, ranging from $380,435,000.00 down to $182,714,000.00," and "six different quantifications of that single harm, with the top figure being 50% higher than the lowest."

But defendants mischaracterize Williams' proffered opinions.  In his initial report, he offered a primary model, the Baseline Model, and two alternative models, the Valuation and Benchmark Models.  These three models do not vary widely, and Williams rightly points out that, at least arguably, the "the similar results they generate . . . corroborate the reliability of [his] damages estimates."  Williams then revised these models downward in his rebuttal and supplemental reports to estimate damages *assuming* that defendants' criticism was well-placed and that certain factual questions would be resolved in favor of defendants.  He argues that these assumptions make his model "more conservative."  Estimating damages is an inherently probabilistic endeavor, and there is nothing wrong with an expert accounting for criticism in a rebuttal or supplemental report that may or may not be accepted by the jury.  Because William's damages models are consistent on the whole, his opinion will not be excluded on this ground.

Defendants' next criticism is that, in his opening report, Williams purports to offer an analysis of NASL's "lost profits," but in his rebuttal report, he says that he performed a "valuation" of NASL at the time of the alleged harm. Defendants argue that Williams' linguistic slight-of-hand was necessary to save his damages models from becoming obsolete, as the shutdown from the COVID-19 pandemic – which occurred after Williams submitted his initial report – rendered Williams' lost profits analysis unreliable. In response, NASL maintains that Williams "has always presented a lost value analysis for NASL, as determined from the loss of future profits that NASL suffered as a result of its inability to sell new D1, or alternatively D2, expansion teams due to the denials of its D1 and D2 applications." Defendants' argument is largely semantic, and Williams has offered consistent opinions as to defendants' damages using the same methodology in his opening report and rebuttal report. From the very beginning, Williams characterized his task as assessing "the value and/or profits of the plaintiff on an ongoing basis, and to quantify the resulting damages, if any, to the business and property of the plaintiff." The Court, therefore, will not exclude his opinions for this reason.

Additionally, defendants challenge Williams's regression analysis as unreliable for a few reasons. First, they argue that Williams improperly relied on data and events that occurred after the date of the challenged conduct. For example, he relies on viewership data from 2018. Defendants also argue that Williams selectively "ignored *ex post* evidence that the COVID-19 pandemic would decrease NASL's projected profits." NASL argues that Williams used *ex post* data as a proxy when "he did not have and count not practicably obtain" pre-sanction data. And as for the impact of COVID-19, NASL's position – supported by testimony from Williams and Noll – is that COVID-19 should not be accounted for estimating damages because the models already account for the probability of disruption and defendants have failed to show that

COVID-19 had any lasting impact on league valuation.  The Court agrees with NASL that none of these criticisms undercut the fundamental reliability of William's methodology.  Defendants are free to cross-examine Williams as to the propriety of these inputs and assumptions, but I will not exclude Williams's testimony for this reason.

Second, defendants argue that Dr. Williams has wrongly assumed that NASL's league dues (which are paid on an annual basis and are distinct from expansion fees charged at the time a team joins the league) and operating costs would have continued canceling each other out in the but-for world.  In other words, defendants contend that Williams erred in assuming that NASL would operate at-cost in the but-for world, so that any estimate of lost expansion fees should be offset by an estimate of costs.  NASL admits that NASL had never turned a profit, but points out that NASL's team owners were contractually obligated to pay for NASL's league costs through league dues, and it was reasonable to assume that they would abide by these obligations.  In NASL's view, NASL had not turned a profit because it had sustained one-time costs – including a $3 million settlement payment that NASL made to Traffic Sports – that were not likely to occur again in the future.  Again, the Court is not persuaded that this assumption is so speculative as to render Williams's opinions unreliable.

Third, defendants argue that Williams's regression analysis is unduly speculative because his model for projecting NASL's future performance is based on MLS's past performance – an erroneous assumption in light of the differences between NASL and MLS.  For example, defendants point out that MLS operates as a league-centric model with investments coming from the league itself, while NASL operated as a team-centric model with investments coming from individual teams.  Despite these differences, I cannot say that Williams was unreasonable in using MLS's performance as an input into his model.  MLS's performance is simply the closest

20

thing that Williams could have used to evaluate the performance of a D1-sanctioned league, as there isn't another D1-sanctioned league in NASL's proposed relevant market.  Williams also worked to minimize these differences by substituting NASL data into the regression model to control for differences between the leagues.  In fact, Williams opines that certain differences between the leagues actually gave NASL an advantage.  For example, NASL's team-centric model actually had competitive advantages for the league in reducing costs for NASL and encouraging inter-team competition and investment that would improve the quality of play and other aspects of NASL's product.

Fourth, defendants argue that once NASL entered as a D1 league without having to satisfy the Standards, other leagues would rationally do the same.  This would create competition for entry fees, with leagues lowering the price to woo potential expansion teams, ultimately lowering the amount of fees that NASL could collect from new teams and therefore its damages.  This is a reasonable supposition, but NASL's position is that there was no reason to speculate that another team would seek to compete because, at the time of the challenged conduct, there were only three real-world leagues seeking sanctions: MLS, NASL and USL.  MLS, of course, already had a D1 sanction, and the record evidence indicates that USL never intended to become a D1 league.

Critically, Williams did account for the price effect of NASL's entry into the market.  Using the "Stackelberg model of competition," Williams concluded that NASL's entry would drive down "expansion fees by 50% relative to the single-league/monopoly power outcome" – and Williams accounted for this effect in his damages estimate.  Defendants argue that Williams also erred in this analysis, because he only accounted for competition in terms of price, not in terms of output.  Defendants maintain that there would have been a corresponding decrease in

the rate of expansion if NASL had entered the D1 market, therefore resulting in fewer expansion teams – less expansion fees – than Williams' model predicts. NASL unsurprisingly contends that Williams properly applied the Stackelberg model and that it was not necessary for him to further adjust the rate of team entry.[4] Ultimately, these critiques relating to competition in the but-for world do not render Williams's analysis unreliable, and are yet additional points for cross examination.

Fifth, defendants argue that Williams was unreasonable to assume that NASL would maintain its D1 or D2 sanction for ten years. Defendants argue that this assumption is "contrary to the law of this case," as the Second Circuit noted when ruling on NASL's motion for a preliminary injunction that "NASL annually applies to USSF for a divisional designation." While the uncontested facts do show that NASL, or any other league, would need to apply annually for a sanctioning designation, I cannot say that Dr. Williams was unreasonable in assuming that NASL would continue as a D1 team for ten years had it received that designation in 2016. Nor do I think the Circuit intended to cabin recoverable damages by merely noting the fact that NASL would need to reapply for sanctioning yearly. None of that changes NASL's burden to convince the jury that NASL was likely to succeed as a D1 league for at least ten years had it received that initial sanction.

Sixth, defendants point out that Williams's model does not accurately predict past expansion team value in the real world. This criticism is misplaced. Williams does not offer his regression analysis as an accurate method to predict past performance – he offers it as a probabilistic model to predict future performance. "Numerous courts have held that regression

---

[4] Williams already accounted for the fact that certain cities would be removed as potential expansion locations over time.

analysis is a reliable method for determining damages and a mainstream tool in economic study"
– and there is no requirement that these models predict past as well as future performance.
Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp., 103 F. Supp. 2d 268, 283 (S.D.N.Y.
2000) (cleaned up).

Seventh, defendants argue that Williams's D2 damages model is unreliable because his
assumptions about the number of teams are not grounded in any record evidence and, in fact, are
contrary to NASL's own internal planning documents.   Williams uses a "time series regression
model of cumulative team entry for each league – NASL, MLS, and USL – regressed on a time
trend" to estimate the number of teams that would join each league in the future.  Based on this
model, he concludes that two teams would join NASL each year in the D2 but-for world.  He
then "conservative[ly]" rounds down so that NASL adds two teams one year and only one team
the next.  This means that he assumes that 15 teams would join the league over 10 years (i.e., 3
teams every two years), bringing the total number of teams to approximately 23 (as NASL had 8
teams when it applied for a D2 sanction in 2017).  Defendants argue that Williams's assumption
that NASL would expand to over 20 D2 teams contradicts the record evidence, as he
acknowledges that internal planning documents show that "[a]s of 2012, the plaintiff had plans to
expand through 2020 and to reach a league size of 20 teams by then."  But these documents do
not show that NASL did not plan to expand past 20 teams after 2020.  Whether NASL planned to
do so is a question of fact that will need to be decided by the jury – I cannot say that Williams's
damages model is unreliable simply because he concludes that NASL would have more than 20
D2 teams after 2020.

Defendants also argue that Williams has failed to calculate antitrust damages at all.  The
parties recognize that the proper measure of antitrust damages is the "difference between the

price [NASL] actually paid or received and the price that would have prevailed in a competitive market."  Herbert J. Hovenkamp, A Primer on Antitrust Damages 27 (2011); see also In re Namenda Direct Purchaser Antitrust Litig., 331 F. Supp. 3d 152, 213 (S.D.N.Y. 2018). Defendants argue that Williams skipped the second part of this damages calculation in failing to calculate the value of NASL as a going concern even with the challenged conduct.  Without this figure, defendants contend, Williams couldn't possibly calculate the difference between the value of NASL in the actual world and the but-for world to calculate antitrust damages.

NASL argues that Williams did make this calculation – it's just that the value of NASL in the "actual-world value was zero . . . because NASL had no ability to sell either D1 or D2 entry fees without a D1 or D2 sanction."  Accordingly, NASL argues, the "difference" between the value of NASL in the but-for world and the actual world is the full amount of Williams's estimated expansion fees to be collected in either the D1 or D2 but-for worlds.

This makes some sense with respect to Williams's D2 damages model, as NASL ceased to operate a league after having its D2 sanction revoked – and it is reasonable to assume that NASL had *de minimus* value as a D3 league if it chose to continue.  But Williams's assumption that NASL's value in the actual world is zero makes little sense with respect to his calculation of D1 damages.  NASL continued to operate as a D2 league through September 2017 after being denied a D1 sanction – so how could Williams conclude that it had no value at that time? NASL's entire theory as to D2 damages is that NASL could have collected D2 expansion fees if it had been allowed to continue as a D2 team – so there is no reason to think that it couldn't have collected D2 expansion fees even if it was denied a D1 sanction.  Williams must correct this error if he intends to testify as to NASL's D1 damages.  That is, he must assess and subtract the actual value of NASL's expansion fees in the real world after it was denied a D1 sanction in

24

2016 (even if these expansion fees could only come from D2 expansion fees) from his estimate of the value of NASL's D1 expansion fees in the but-for world.

Eighth, defendants raise another valid criticism of Williams's opinion regarding D1 damages. Williams's D1 but-for world begins in March 2016. At that time, a separate entity from NASL, NASL Team Holdings LLC ("Team Holdings"), and its member Traffic, held the right to collect the first $450,000 and 80% of the remainder of all expansion fees collected from the first ten teams and 20% of all expansion fees collected from subsequent expansion teams. NASL had deferred paying those fees to Team Holdings. After Traffic Sports and members of its leadership were indicted and pleaded guilty to fraud, NASL settled with Team Holdings, and the latter relinquished its claim to future expansion fees as part of the settlement.

Williams's failure to account for NASL's agreement with Team Holdings in his initial report is a major oversight. NASL cannot seek as damages any fees owed to Team Holdings, so anything owed to Team Holdings is not recoverable. See Oracle Corp. v. SAP AG, 734 F. Supp. 2d 956, 968 (N.D. Cal. 2010) (a plaintiff "may recover only their own lost profits, and . . . they cannot assert the rights of third parties – even affiliated entities").

Williams attempts to account for the agreement with Team Holdings by proving alternative damages estimate in his rebuttal report. He does so by determining "but-for settlement terms" – that is, the amount of money NASL would have likely paid to Team Holdings to settle outstanding money owed to it from expansion fees and convince it to relinquish its right to future expansion fees. To determine but-for settlement terms, Williams calculates the value owed to Team Holdings "if they received a percentage[] of future expansion fees in accordance with the terms of their original contractual claim" – which Williams takes to be $5.1 million as of 2016. He also concludes that NASL owed Team Holdings approximately

$10 million in additional claims – meaning that the total value owed to Team Holdings under the contract was approximately $15.1 million.   Williams then "estimate[s] what percentage of the present value of the contractual claims did NASL Team Holdings receive in light of their bargaining power at the time."  Because NASL settled Team Holdings claims for $5.1 million, this represents a settlement of approximately "31% of the total value of [Team Holdings'] contractually-determined claim on future NASL expansion fees."  He then applies this percentage to NASL Team Holdings's "contractually-determined share of the but-for NASL Division I expansion fees" to determine a but-for settlement amount of $22 million for the Baseline Model, before discounting.

Williams's attempt to create a but-for world based on negotiation of the licensing agreement is too speculative and must be excluded.   He recognizes that "[t]he terms of that agreement reflected myriad factors that influenced (a) the decisions precipitating the desire to settle on both sides and (b) the relative bargaining power of each party."  But he cites no economic literature to support his conclusion that "the only change that flows from the absence of the exclusionary conduct (i.e., the decision to deny a Division I sanction) is the amount of the cash flows, with all other factors being held constant, including the fact of the settlement itself and the relative bargaining power of the parties."  The truth is that we just don't know what would have happened with Team Holding's rights had NASL been granted a D1 license.  Team Holdings may very well have demanded better terms or refused to enter into a settlement agreement at all.  Nor does Williams point to any evidence in the record that indicates that NASL would even have had the cash on hand to pay $22 million to settle Team Holdings' claims.  And if the deal could have been done through financing, Williams does not account for the cost of financing the settlement.

26

Having dispensed with most of defendants' challenges to Williams's damages model, his failure to adequately account for the agreement with Team Holdings does not mean that his damages estimate should be reduced to zero.  But the Court must exercise its role as a gatekeeper to ensure that the jury is not misled by speculative expert testimony.  Therefore, Dr. Williams will be permitted to rely on his damages estimates as a general matter, but he must discount his estimates to reflect the real-world conditions that existed at the time of the challenged conduct. This means that Dr. Williams will need to discount his damages forecast to reflect the terms of the Team Holdings contract as it existed in March 2016 – with Team Holdings taking the first $450,000 and a further 80% of expansion fees collected from the first 10 teams and 20% of expansion fees collected from further expansion.

Defendants' motion to exclude Williams' testimony is therefore granted in part and denied in part; he may testify consistent with the above rulings.

D. Defendants' Motion to Exclude Opinions By Roger G. Noll [290]

NASL anticipates calling Professor Roger Noll, Professor of Economics at Stanford University, to testify as to the operative relevant markets and the anti-competitive effects caused by the challenged conduct.  He concludes that there are four relevant markets in which U.S. soccer leagues compete.  First, there are two "Sanctions Markets," consisting of a market "to obtain league sanctions to play D1 men's outdoor professional soccer and a market to obtain league sanctions to play D2 men's outdoor professional soccer.  Second, there are two "Membership Markets" – one for D1 and one for D2 – "in which leagues compete to obtain teams and team owners in . . . leagues in the United States and Canada, so long as the Canadian federation permits teams in Canada to play in U.S. professional leagues."  Noll's conclusion that D1 and D2 leagues operate in separate markets is based on his opinion "that the quality

27

differences between the two categories of leagues are sufficiently great that one is not a close competitive substitute for the other for prospective owners of either a professional soccer league or a professional soccer team."

Noll also opines that USSF has monopoly power in the Sanctioning Market, "and, more generally, in granting league sanctions to play professional soccer at any level in the U.S." He concludes that "USSF enjoys monopoly power because it is the exclusive sanctioning body for soccer in the U.S. that is recognized by [FIFA], the international governing body for soccer."

Noll concluded that MLS has monopoly power in the D1 Membership Market and USL has monopoly power in the D2 membership market because each has the only U.S. sanction for a league in its division.[5] Additionally, "[t]he monopoly power of MLS extends to Canada because Canada Soccer, the FIFA governing body for soccer in Canada, has agreed to allow Canadian teams to become members of MLS while simultaneously being members of Canada Soccer, thereby qualifying these teams and their players for participation in events that are open only to Canadian teams or players."

Further, Noll concludes that "[t]he monopoly power of both MLS and USL was obtained through anticompetitive conduct by USSF and MLS." He opines that the "structure and historical development of USSF since 1990 has caused the two organizations to be interconnected in both executive management and business activities and, in particular, has aligned the financial incentives of USSF with the interests of MLS."

Noll will also testify that defendants' anticompetitive conduct has harmed competition. He argues that "owners and prospective owners of D1 and D2 professional soccer teams do not

---

[5] Although not named as a defendant, NASL claims that USL was a member of the conspiracy to monopolize the D1 and D2 membership markets.

have a choice between competing leagues, but instead must join either MLS in D1 or USL in D2."  In addition, "by preventing NASL from becoming a D1 league and then eliminating NASL from D2, the sanction decisions have caused several teams either to cease playing professional soccer or to play in a lower league that is not a close competitive substitute for either D1 or D2."  Finally, "the reduction in the number of D1 and then D2 teams has caused anticompetitive harm to the fans of those teams, who were denied access to a local team at first at the D1 level and then the D2 level."

Defendants seek to exclude Noll's testimony on a number of grounds.  Defendants first argue that Noll's opinions do not "fit" NASL's claims because his relevant markets differ from the markets alleged in the Amended Complaint, which alleges that "[t]he consumers in the markets for top-tier and second-tier professional soccer leagues located in the U.S. and Canada are fans who purchase tickets or licensed merchandise of the leagues, sponsors who purchase the reputational, promotional and other benefits of association with the leagues and their clubs, and broadcasters who obtain the rights to distribute games."  Contrastingly, fans, sponsors, and broadcasters are not a part of the markets that Noll defines.  Instead, the consumers in Noll's markets are leagues seeking sanctions in the Sanctions Markets and teams and team owners seeking entry into a league in the Membership Markets.

This argument fails.  The amended complaint (and the original complaint) gave sufficient notice that NASL was challenging defendants' monopolization of soccer leagues in the U.S. and Canada.  Specifically, the Amended Complaint alleges that "[t]he relevant product and geographic markets in which the USSF's conduct has unreasonably restrained competition are: (i) the market for men's top-tier professional soccer leagues located in the U.S. and Canada; and (ii) the market for men's second-tier professional soccer leagues located in the U.S. and

Canada."  Although not exactly a model of clarity, this allegation is sufficient to cover the Sanctions and Membership Markets now defined by Professor Noll.

At the preliminary injunction phase, Noll suggested that the Sanctions and Membership Markets would be at the center of NASL's case in his declaration in support of NASL's motion for a preliminary injunction.  He explained that USSF had "excluded NASL from competing in the top tier of US/Canadian league soccer, and now threatens to exclude NASL from competing in the second tier of US/Canadian league soccer."  And he discussed defendants' market power in the "market for team ownership."  To the extent Professor Noll has further narrowed or more clearly defined the relevant markets post-discovery, this is to be expected in an antitrust case of this complexity.  See Todd v. Exxon Corp., 275 F.3d 191, 199 (2d Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery.").  Professor Noll also submitted his opening report over a year before the end of discovery, so defendants are not prejudiced by change in NASL's proposed markets.

Defendants also argue that Noll failed to conduct an adequate substitution analysis to define the relevant markets.  A relevant product market must include all products "reasonably interchangeable by consumers for the same purposes."  United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956).  Products are reasonably interchangeable if consumers treat them as acceptable substitutes.  See PepsiCo v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002).  Although consumers may have "some degree of preference" for one product or another, products are in the same relevant market if "one product is roughly equivalent to another for the use to which it is put."  Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll., 106 F. Supp. 2d 406, 411 (N.D.N.Y. 2000) (cleaned up).  Economically speaking, two products are reasonably interchangeable, and part of the same relevant market, where there is sufficient cross-elasticity of

30

demand, which exists if consumers would respond to a small increase in the price of one product by switching to another product.  AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 227 (2d Cir. 1999).

Defendants argue that Noll failed to assess whether D1 and D2 labels are substitutes for each other; whether a D3 label is a substitute for either a D1 or D2 label; whether unsanctioned leagues that pay players are substitutes for leagues with D1, D2, or D3 labels; whether an increase in the price of U.S. Soccer sanctions would cause a professional league to move to another sport or country; or the actual price that leagues pay for a sanction, which is necessary to perform a substitution analysis.

Defendants also point out that Noll failed to perform a "hypothetical monopolist test" ("HMT") – a widely accepted substitution analysis commonly used to define the relevant market in antitrust cases.  See Fed. Trade Comm'n v. Shkreli, 581 F. Supp. 3d 579, 626-27 (S.D.N.Y. 2022).  To apply the HMT, "imagin[e] that a hypothetical monopolist has imposed a small but significant non-transitory increase in price ("SSNIP") within the proposed market," and if the hypothetical monopolist can impose the SSNIP "without losing so many sales to other products as to render the SSNIP unprofitable, then the proposed market is the relevant market."  However, "if consumers are able and inclined to switch away from the products in the proposed market in sufficiently high numbers to render the SSNIP unprofitable, then the proposed market definition is likely too narrow and should be expanded."  United States v. Am. Express Co., 838 F.3d 179, 198-199 (2d Cir. 2016), aff'd sub nom, Ohio v. Am. Express Co., 585 U.S. 529 (2018).

In response, NASL argues that Noll performed an adequate substitution analysis that supports his conclusions and that he considered, and rejected, the issues raised by defendants.  The Court agrees that Noll concluded a substitution analysis using adequate methods.  Although

there may be weaknesses or oversights in Noll's approach, those weaknesses are better left to cross examination rather than exclusion.

As for the Sanctioning Markets, Noll concluded that an HMT would not be possible because USSF is a monopolist for all levels of the Sanctioning Market.  Because there are no "transactions out there that would reflect a competitive environment," "one cannot use the prices of sanctions and the choice of divisions by leagues to apply a SSNIP test to determine whether sanctions for leagues at one level of the hierarchy (e.g., Division 2) are close competitive substitutes for league sanctions at adjacent levels of the hierarchy (e.g., Divisions 1 and 3)." Noll therefore performed an direct analysis of various substitutes and found that "evidence indicates that teams do not regard leagues in different divisions as close competitive substitutes"; "[b]ecause leagues in different divisions differ so much in quality, sanctions in these divisions are not close competitive substitutes"; "[b]ecause the privileges of being in a D1 or D2 league have value, classifications affect the incentive for teams to spend on team quality, inducing teams that are in a higher league to spend more" so that unclassified teams are not close substitutes; and that "an increase of ten percent in USSF league sanction fees" would not "cause a league such as MLS to become a professional major league in another sport or move to Europe."

As for the Membership Markets, Noll concluded that "a ten percent increase in MLS expansion fees" would not "cause a prospective owner of an MLS expansion team instead to buy a major league team in another sport or a soccer team in Europe."  He also concludes that expansion fees would decrease if various leagues in the same division competed for potential team owners.  He also examines the history of teams switching between divisions, and concluded that this history supports his conclusion that each division is a market unto itself because it

shows that leagues must move up and down divisions in order to "seek a different level of quality, not because the Division II and Division III USL leagues were in competition with one another."

Defendants also argue that Noll errs in defining the relevant market based on the area in which USSF is authorized as FIFA's sanctioning body.  They are correct that the mere fact that USSF is authorized as FIFA's sanctioning body is not, on its own, determinative of the scope of the geographic market definition – what matters is whether there are substitutes to USSF or MLS as a USSF-sanctioned league that leagues or team owners would seek out if looking to participate in the Sanctioning or Membership Markets.  Noll does not rely solely on the geographic scope of USSF's authority, but rather conducts a substitutivity analysis to conclude that there are no substitutes.

Defendants also take issue with Noll's opinions regarding anticompetitive effects in the relevant markets.  They argue that his conclusions "rest on [the] untested assumption . . . that U.S. Soccer's divisional labels (D1, D2, D3) drive league quality and success, rather than investments in players, coaches, first-class stadiums, training facilities, and the like."  This raises what the parties have referred to as the "question of causality."  Is a divisional sanction necessary for a league and/or team to compete and improve the quality of their product – as NASL argues?  Or can leagues and/or teams compete and improve the quality of their product without a divisional sanction – as defendants argue?  Defendants point to prior statements from Noll which they say undermine his conclusions that divisional labels determine league success.  For example, Noll has previously stated in testimony and prior writing that league and team success depends on the quality of play, which itself depends on the quality of players.

Here, Noll opines that – unlike the market for other sports entertainment – a divisional F sanction is necessary to compete and succeed in men's professional outdoor soccer due to the unique role of USSF as providing a "quality-identifying sanction." Because of USSF's unique role, team owners and/or league investors will only be "incentivized to pay the higher salaries to obtain higher quality players if those owners have received the required sanction that would incentivize them to do so." Given the unique characteristics of the proposed relevant markets in this case, the Court does not see anything inherently contradictory in Noll's previous writings and testimony. Ultimately, the question of causality is a fact-dependent issue that the jury must determine.

Next, defendants argue that Noll should not be permitted to opine that NASL fans, sponsors, or broadcasters were harmed when NASL did not play D1 soccer in 2016 and D2 soccer in 2018. Defendants argue Noll cannot speak to any harm to these downstream consumers because he did not "define a market for products sold to fans, sponsors, and broadcasters."

NASL argues that a court may properly consider downstream effects in determining whether a defendants' conduct had anticompetitive effects in an upstream market. But the single case cited by NASL for this point is distinguishable. In In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig., 958 F.3d 1239 (9th Cir. 2020), aff'd, 594 U.S. 69 (2021), the Ninth Circuit considered expert opinions regarding consumers of college football and basketball in order to assess the procompetitive justifications of the NCAA's rules capping compensation for college football and basketball players. This of course entailed an inquiry into the effect of the restraints in improving consumer choice. But here, defendants do not argue that

consumer choice is a procompetitive justification for the restraints, so the In re NCAA case is distinguishable.

Accordingly, NASL has failed to convince the Court that harm to consumers in the downstream markets – fans, sponsors, and broadcasters – is relevant to NASL's claim that defendants' conduct has caused anticompetitive effects in NASL's proposed relevant markets.[6] See Am. Express, 838 F.3d at 194 (under the rule of reason, a plaintiff must show that defendant's actions "had an *actual* adverse effect on competition as a whole in the relevant market"); FTC v. Qualcomm Inc., 969 F.3d 974, 993 (9th Cir. 2020) ("[H]arms to customers and consumers outside the relevant markets are beyond the scope of antitrust law."). Noll will therefore be precluded from testifying as to whether consumers in the downstream markets were harmed.

Next, defendants seek to exclude certain opinions offered by Noll which they take to be legal, rather than economic, opinions. Specifically, first, defendants seek to prevent Noll from testifying that a plaintiff does not need to define a relevant market if there is direct evidence of anticompetitive effects. I agree that this is a legal conclusion regarding NASL's burden under the rule of reason and, accordingly, Noll will not be permitted testify to this conclusion. The parties will argue at the charge conference whether the jury should be so instructed.

Lastly, defendants seek to exclude Noll's opinion that Williams was correct not to consider the effects of COVID-19 in his damages model. This argument fails. Noll's conclusions on this score are well within the realm of an expert economist, and defendants mischaracterize his testimony insofar as they argue that Noll will tell the jury that, as a matter of

---

[6] This issue is related to NASL's motion to prevent defendants' expert Dr. Jonathan Walker from opining on the "contours" of "downstream" output markets for tickets and/or attendance for live games, the television programming market, and the sponsorship market – which is discussed below.

law, an economist is not required to revise his damages model due to subsequent events.  Rather, Noll's testimony is that Williams was correct, in this case and as a matter of economics, in not revising his damages model in light of the economic impact of COVID-19 because the risks of an economic downturn were already accounted for in the standard regression valuation model.  Defendants remain free to argue that NASL was too weak to survive the pandemic, or that the pandemic altered the price of sports teams to such a degree as to require a downward adjustment in NASL's damages.  But the Court will not exclude Noll's opinions on this issue.

Defendants' motion to exclude opinions of Noll is therefore granted in part and denied in part; Noll may testify consistent with the above rulings.

E.  NASL's Motion to Exclude Opinions by Steven Solomon [302]

Defendants' expert Steven Solomon is a corporate law professor at the University of California at Berkeley.  He is prepared to testify that USSF "acted in accord with [its] constituency-based mission [as a non-profit organization] in the application and adoption of the [Standards]."  He also "detail[s] how the U.S. Soccer board acted reasonably and in accord with good governance practices and without bias in adopting and administering the PLS."  He does all of this in an effort to rebut Szymanski's claims that USSF "is 'captured' by MLS and that the U.S. Soccer board acted in a biased manner in adopting and implementing the PLS."

NASL moves to exclude Solomon's opinions in their entirety.  It argues that he is "not qualified to offer opinions on any of the economic or soccer industry issues at the heart of this case" and that "most of his 182-page report focuses on irrelevant corporate law issues like the purported application of the Business Judgment Rule or the elements of a claim for breach of the duty of loyalty under Delaware law."

Whether USSF complied with good corporate governance practices is irrelevant to NASL's antitrust claims. Defendants seem to concede as much, but nonetheless maintain that Professor Solomon should be allowed to respond to the "corporate governance issues that NASL (and its expert) have placed at the heart of NASL's affirmative case." The Court disagrees. The solution is not to allow Solomon to rebut an opinion that is irrelevant to the claims at issue – it is to exclude all testimony on the irrelevant topic of corporate governance. Solomon may not testify as to defendants' compliance with corporate governance obligations under legal standards that exist separate and apart from the antitrust law. But on the other hand, NASL will not be permitted to suggest to the jury that defendants have violated any corporate governance rules.

Defendants argue that Solomon's testimony is needed to counter NASL's arguments regarding regulatory capture. As discussed above, Szymanski will be permitted to offer only limited testimony to explain to the jury how the theory of regulatory capture could explain the economic impetus behind defendants' actions. But Szymanski will not be able to testify that USSF was "dominated" by MLS, that the Standards process was "tainted by MLS-favoring bias," or that the defendants did not have appropriate "safeguards" in place to account for "conflicts of interest." This ruling renders defendants' point moot.

NASL's motion is therefore granted, and Solomon's testimony is excluded in its entirety.

F.   <u>NASL's Motion to Exclude Opinions by Jonathan Walker [302]</u>

Defendants' expert Dr. Johnathan Walker is an economics consultant. He offers opinions related to market definition, market power, anticompetitive harm, and the existence of less restrictive alternatives. As relevant here, Walker offers opinions related to separate downstream markets for tickets and/or attendance for live games, television programming, and sponsorship. He concludes that there is no evidence of any anticompetitive effects in these markets.

37

NASL moves to exclude Walker from offering opinions on the "contours" of these downstream markets (i.e., his opinions regarding market definition in downstream markets) and whether defendants have market power in those markets.  It does not seek to prevent Walker from testifying as to the lack of anticompetitive effects in these downstream markets (presumably because NASL wants its experts to be able to testify that there were anticompetitive effects in downstream markets).

But, as discussed above in ruling on defendants' objections to Noll's testimony, whether anticompetitive effects were felt in downstream markets is not pertinent to proving NASL's claims related to its alleged relevant upstream markets for league sanctions and league memberships.  Therefore, as with Noll, Walker may not testify as to anticompetitive effects in markets other than those alleged to have been monopolized.[7]  See Qualcomm, 969 F.3d at 993 (9th Cir. 2020) ("[A]ctual or alleged harms to customers and consumers outside the relevant markets are beyond the scope of antitrust law."); Maris Distrib. Co. v. Anheuser-Busch, Inc., 302 F.3d 1207, 1215 (11th Cir. 2002) (affirming exclusion of expert testimony, and stating: "[A] defendant's market share in a market other than the alleged relevant market is irrelevant."); H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1018 (2d Cir. 1989) (rejecting evidence regarding a market that was not the alleged relevant market: "[T]he cited passages deal only with concentration at the supplier level, which obviously is not the market that is alleged to be the target of . . . attempted monopolization at the dealer level.").

---

[7] This does not mean that a defendant is stuck with the market alleged in the complaint or defined by a plaintiff's expert.  If, for example, a defendant challenged NASL's alleged relevant markets as being too broad or too narrow, it could offer alternative markets that include the good or service that is subject of the plaintiff's complaint.  It could then attempt to show that there are no anticompetitive effects in that market – which defendant contends to be the relevant market.  Here, none of the parties argue that the relevant market, however defined, includes tickets and/or attendance for live games, television programming, and sponsorship.

NASL's motion to preclude Walker from offering opinions on downstream markets is thus granted consistent with the Court's decision to preclude Noll from testifying about the same topic.

G.   NASL's Motion to Exclude Opinions by Kevin Murphy [302]

Defendants' expert Dr. Kevin Murphy is a Professor of Economics at the University of Chicago.  He opines that defendants' conduct was not anticompetitive and that NASL has not suffered any anticompetitive injury or damages.

NASL moves to exclude Murphy from offering opinions as to procompetitive benefits of the Standards.  In his report, Murphy expressly states that "economist[s]" – including himself – "lack[] expertise to opine upon whether specific thresholds embodied in particular standards, such as the size of the metropolitan area, the minimum net worth of owners, or the number of seats in a stadium, are optimal either from the perspective of the standard-setting organization (or a social planner)."  In his view, "[s]econd-guessing decisions of a body such as U.S. Soccer, as Professors Noll and Szymanski have done in their reports, is dangerous because many factors difficult to discern and weigh by outsiders can influence decisions made by an organization such as U.S. Soccer."  Although admitting that he is "not best-suited to opine whether a specific threshold . . . is socially optimal, as a matter of economics, U.S. Soccer's standards provide teams and leagues incentives to increase investments in U.S. professional soccer and enhance competition without unduly restricting leagues' and teams' flexibility to operate to enhance their competitiveness and financial returns."

NASL argues that Murphy has conceded that he is not qualified to opine on the procompetitive benefits of the Standards at all, even at a high level of generality.  I disagree. Although Murphy has declined to provide an opinion as to whether the specific thresholds

embodied in the Standards are optimal, he has provided a reliable assessment of the procompetitive benefits of the types of standards implemented by defendants, and NASL does not otherwise challenge his qualifications to offer this testimony.

NASL also seeks to prevent Dr. Murphy from offering what it sees as an impermissible "legal opinion" that economists are not well-suited to determine whether particular standards imposed by a standard-setting organization have procompetitive benefits.  NASL argues that this opinion would contradict Supreme Court precedent set forth in <u>Allied Tube & Conduit Corp.</u>, 486 U.S. 492, 501 (1988), which holds that for "private standards [to] have significant procompetitive advantages," they must be "based on the merits of objective expert judgments." Again, NASL's argument fails.  The principle of law articulated in <u>Allied Tube</u> relates to adoption of associational standards in the real world – which must be based on objective judgement – not the kind of post-hoc economic analysis of associational standards performed by NASL's experts.  Defendants' position is that USSF's standard-setting process was objective and informed, meeting the requirements of <u>Allied Tube</u>, and it is Murphy's opinion that, as a matter of economics, it is not possible to justify the exact thresholds that resulted from what defendants contend to be an objective and informed process.

NASL also seeks to prevent Murphy from opining on a variety of other topics. Defendants have stated that Murphy will not opine on the majority of these subjects, and NASL's request is denied as moot as to those issues.  One topic remains.

NASL seeks to exclude Murphy from testifying that fans were aware of ties between NASL and Traffic Sports at the time of the challenged conduct and that attendance at NASL matches decreased following the announcement of the indictment against Traffic Sports.  NASL points to Murphy's deposition testimony, in which he admitted that he doesn't' have "direct

evidence . . . that fans knew [about the indictment]."  They also claim that Dr. Murphy admitted

that he did not study whether NASL's 2015-16 season attendance decreased or was otherwise

affected after the mid-season announcement of the Traffic indictment, which occurred in early

2016.

In his deposition, Murphy testified that he looked at economic outcomes in the 2015-16

season generally including a downturn in attendance, loss of teams, and "cases where people

specifically identified the Traffic Sports issues as being important to them and those decisions."

This is sufficient circumstantial evidence to infer that fans knew of the connection between

NASL and Traffic, and Murphy will be permitted to testify as to those conclusions.  However, it

is not sufficient to infer that the Traffic indictment *caused* the economic effects he studied, so

Murphy may not testify to that conclusion.

Therefore, NASL's motion is granted in part and denied in part; Murphy may testify

consistent with the above rulings.

## II.  NASL's Count I: The Standards "In Totality"

Under Section 1, it is illegal to form a "contract [or] combination . . . in restraint of trade

or commerce."  15 U.S.C. § 1.  In Count I of its Amended Complaint, NASL alleges that the

Standards "[t]hemselves, in [t]otality" constitute an agreement in unlawful restraint of

competition in violation of Section 1.  Specifically, NASL claims that the agreement embodied

in the Standards themselves effectively restrains horizontal competition among top-tier men's

professional soccer leagues located in the U.S. and Canada.

To assert a claim under Section 1, NASL must demonstrate that it has antitrust standing.

A Section 1 plaintiff must meet two elements to demonstrate antitrust standing: it has suffered

antitrust injury, and it is an efficient enforcer of antitrust law.  See Associated Gen. Contractors

of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535 n.31 (1983).

The inquiry here focuses on the first element, antitrust injury.  To establish antitrust injury on Count I, NASL must show that the Standards themselves caused it "injury of the type the antitrust laws were intended to prevent" and that the injury "flows from that which makes [the] defendants' acts unlawful."  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  Put differently, NASL must show that the claimed harm – here, the Standards themselves – is "attributable to an anti-competitive aspect of the practice under scrutiny."  Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) (cleaned up).  This requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place."  Id. at 342.

Defendants argue that, during discovery, NASL "abandoned" Count I and focused on developing evidence to support Count II, which alleges that defendants' application and enforcement of the Standards constituted an unreasonable agreement in restraint of trade in violation of Section 1.  In other words, defendants argue that each of NASL's claimed harms arose from the application of the Standards, not the Standards themselves.  Therefore, NASL has failed to demonstrate antitrust injury – and, consequently, antitrust standing – on Count I.  Tellingly, NASL's summary judgment papers do not attempt to counter this argument or explain what antitrust injury the Standards in and of themselves have caused.

Applying the authorities, I agree with defendants that NASL lacks antitrust injury and thus, antitrust standing with respect to Count I.  Simply put, each of the harms claimed by NASL are "attributable" to defendants' application of the Standards, not the Standards themselves.  Whether it is U.S. Soccer's denial of NASL's sanctions or granting MLS waivers, there is some real-world application of the Standards standing between each of NASL's claimed harms and the Standards themselves.  The enforcement of the Standards, not their existence, is what NASL's

42

claimed injuries "flow[] from" and allegedly "makes defendants' acts unlawful." Brunswick, 429 U.S. at 489. U.S. Soccer's application of the Standards, most notably its denial of NASL's sanctions and grant of waivers to MLS, is what NASL claims has triggered "reduced output, decreased quality, and supra-competitive pricing," Am. Express Co., 838 F.3d at 194, which are exactly the "injur[ies] of the type the antitrust laws were intended to prevent." Brunswick, 429 U.S. at 489. I address each of NASL's alleged injuries one-by-one to explain why they are products of the application of the Standards, not the Standards themselves.

NASL's first claimed injury is that U.S. Soccer's denial of D1 and D2 sanctions prevented NASL from charging expansion teams higher entry fees. Implicated in that claimed injury, of course, is U.S. Soccer's denial of sanctions due to NASL's apparent failure to meet the Standards. This is an obvious application of the Standards rather than their mere existence, thus divorcing the alleged injury from Count I.

Second, NASL cites its decision to stop league play as an injury. But as NASL itself admits, it made this decision as a result of U.S. Soccer's denial of its D2 sanction – again, a product of U.S. Soccer applying the Standards, as opposed to their sheer existence.

Finally, NASL complains of its loss of status and reputation, again, as a result of U.S. Soccer denying it sanctions. As explained above, the denial of sanctions is attributable to U.S. Soccer's application of the Standards, not the Standards in and of themselves. Indeed, each of the injuries NASL alleges is attributable to U.S. Soccer enforcing the Standards in some way.

Because NASL has clearly failed to establish that it has sustained antitrust injury as a result of the Standards themselves (as opposed to the Standards' application, which is the subject of Count II), Count I fails as a matter of law, and defendants' motions for summary judgment are granted insofar as they apply to Count I. The Court, therefore, need not address the other

43

element of antitrust standing here, nor whether the Standards themselves constitute concerted action or unreasonably restrained trade in violation of Section 1.[8]

### III. NASL's Count II: The Standards, As Applied

A. <u>Section 1 Claims</u>

As previewed above, NASL's Count II alleges that defendants' enforcement of the Standards constituted an unlawful restraint of trade in violation of Section 1 of the Sherman Act. Again, under Section 1, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  "Since all contracts necessarily restrain trade to some extent, this provision cannot be read literally: [O]nly 'unreasonable' restraints of trade are unlawful."  <u>In re Aluminum Warehousing Antitrust Litig.</u>, 95 F. Supp. 3d 419, 438 (S.D.N.Y. 2015) (quoting <u>Bus. Elecs. Corp. v. Sharp Elecs. Corp.</u>, 485 U.S. 717, 723 (1988)).

To prevail on a Section 1 claim, a plaintiff must show: "(1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade."  <u>Am. Express Co.</u>, 838 F.3d at 193-94 (cleaned up).  The Court will address each of these elements in turn.

---

[8] Moreover, to sustain its claim that the Standards "in totality" caused anticompetitive effects, NASL and its experts would have had to analyze a hypothetical world without the Standards in place to show injury in the relevant market and attendant damages.  <u>See</u> <u>Borger v. Yamaha Intern. Corp.</u>, 625 F.2d 390, 398 (2d Cir. 1980).  But NASL's experts did not do so, bolstering defendants' theory that NASL abandoned Count I during discovery.  Indeed, NASL's experts admitted that their but-for worlds are based on the Standards remaining in place, exactly as written. <u>See</u> Noll Dep. 40:3-20 (NASL's economic expert focused only on "the way the standards are used" and not "the standards per se"); <u>see also</u> Szymanski Dep. 40:23-41:22.

B.  Concerted Action

      1.  *Applicable Law*

"For an arrangement to be a conspiracy under § 1, it 'must embody concerted action.'

Concerted action exists where there is an agreement between 'separate economic actors pursuing

separate economic interests.'"  NASL II, 883 F.3d at 39 (quoting Am. Needle, Inc. v. Nat'l

Football League, 560 U.S. 183, 191 (2010)).  To show concerted action, a plaintiff must put forth

"direct or circumstantial evidence that [shows] a conscious commitment to a common scheme

designed to achieve an unlawful objective."  Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S.

752, 768 (1984).

      When a plaintiff seeks to show concerted action through circumstantial evidence, courts

look to whether certain "plus factors" "can serve to allow a fact-finder to infer a conspiracy"

"when viewed in conjunction with the parallel acts."  NASL II, 883 F.3d at 39 (cleaned up).

"These 'plus factors' may include: a common motive to conspire, evidence that shows that the

parallel acts were against the apparent individual economic self-interest of the alleged

conspirators, and evidence of a high level of interfirm communications."  Mayor of Baltimore,

Md. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013) (cleaned up).  This list is "neither

exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when

combined with parallel behavior, might permit a jury to infer the existence of an agreement."  Id.

at 136 n.6.

      With respect to the last factor – a high level of interfirm communications – courts in this

Circuit have found the presence of this factor when members of more than one firm participate in

frequent meetings in which the firms' shared interests are discussed.  See Minpeco, S.A. v.

Conticommodity Servs., Inc., 673 F.Supp. 684, 696-97 (S.D.N.Y. Nov. 17, 1987).  When an

antitrust plaintiff presents evidence that members of the firms actually met and discussed their common strategy on a frequent basis, it has sufficiently established a high level of interfirm communication.  See In re Propanolol Antitrust Litig., 249 F. Supp. 3d 712, 722-23 (S.D.N.Y. April 6, 2017).

Although a plaintiff need only adduce "enough factual matter . . . to suggest that an agreement was made . . . to achieve an unlawful objective," Relevant Sports, LLC v. United States Soccer Fed'n, Inc., 61 F.4th 299, 306 (2d Cir. 2023) (citations omitted), "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986) (citation omitted).  In other words, a court should look for evidence that "tends to exclude the possibility that the [defendant was] acting independently."  Monsanto, 465 U.S. at 764.  When evaluating this evidence, "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."  United States v. Apple, Inc., 791 F.3d 290, 319 (2d Cir. 2015).

Although "[b]usiness, professional, trade, and sports organizations and associations . . . are all subject to federal antitrust laws if their members demonstrate a conscious commitment to a common scheme designed to achieve an unlawful objective," Relevant Sports, 61 F.4th at 307 (internal quotations omitted), "organizational decisions do not inherently constitute § 1 concerted action."  NASL II, 883 F.3d at 40.  "Evidence should tend to show that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective."  Id. (cleaned up); cf. Relevent Sports, 61 F.4th at 302 (reversing denial of motion to dismiss Section 1 claim on the grounds that the adoption of a binding association rule designed to prevent competition is direct evidence of concerted action).

46

2. *Application to Count II*

NASL does not offer any direct evidence of an agreement or conspiracy among defendants to promulgate, revise, or apply the Standards in a discriminatory manner; however, NASL does offer some circumstantial evidence of parallel conduct by defendants.  Defendants, though, have also introduced evidence that creates an issue of material fact on the element of concerted action.

In assessing NASL's motion for a preliminary injunction, the district court found that although NASL presented "ample evidence of a conflict of interest between [U.S. Soccer] and MLS, NASL fail[ed] to present sufficient evidence of undue influence in the actual standard-setting process, i.e., the process pursuant to which the PLS is revised."  NASL I, 296 F. Supp. 3d at 463.  Although, with the benefit of discovery, NASL has adduced some additional evidence of defendants' parallel conduct, it is not enough to eliminate any issue of material fact.  Indeed, neither side has put forward enough evidence for the Court to hold that defendants entered or did not enter an agreement to restrain competition as a matter of law.  In other words, with the evidence presented in support of both sides' motions for summary judgment, a reasonable jury could find that defendants acted in concert or unilaterally.   I will explain why there are issues of fact on each of the arguments the parties present.

First, MLS and U.S. Soccer agreed to grant MLS waivers from complying with the D1 Standards from 1997 to 2009.  In other words, MLS enjoyed status as a D1 league without being required to demonstrate its compliance with the D1 Standards.[9]  To achieve this outcome, Mr. Gulati and MLS Commissioner Garber repeatedly encouraged the Board to grant every D1

---

[9] Furthermore, prior to the 2018 season, USL (again, the D2 analogue to MLS) was awarded a sanction despite needing 21 waivers from the D2 Standards.  NASL was rejected that year, despite only needing two waivers.

waiver request made by MLS, including multiple waivers of the same stadium capacity requirement that was not waived for NASL and was made the basis for denying it a D1 sanction.

In response, defendants argue that "[t]here is no document reflecting any such agreement, and no witness has testified that U.S. Soccer agreed to exempt MLS from U.S. Soccer's Standards." Of course, that is the whole point of circumstantial evidence, as unlawful conspirators rarely commit their plan to writing. See In re Foreign Exchange Benchmark Rates Antitrust Litig., 74 F. Supp. 3d 581, 591 (S.D.N.Y. 2015) ("in many antitrust cases, a smoking gun can be hard to come by") (cleaned up). On the other hand, it calls into question whether defendants had an agreement to restrain trade. Further, defendants argue that U.S. Soccer's acceptance of one league's requested waiver from some aspect of the Standards says nothing about U.S. Soccer's acceptance of waiver requests from other leagues. Despite that this argument misleadingly presents this fact in a vacuum, the Court recognizes that defendants' decisions as to whether to grant and deny waivers to various leagues are not necessarily related to one another. Therefore, there is an issue of fact as to the reasoning behind defendants' sanctioning decisions.

Second, NASL argues that the timing of defendants' initial enforcement of the Standards and heightening of the Standards strongly supports an inference of concerted action. Specifically, NASL contends that the fact that U.S. Soccer began enforcing the Standards via the annual report requirement in 2009, the same year NASL emerged as a potential competitor to MLS, is circumstantial evidence of an agreement to restrain competition. NASL points to testimony from former USSF president Robert Contiguglia stating that prior to instituting the annual report requirement in 2009, U.S. Soccer conducted less "formal oversight" and more of a "general review," and it discussed waivers on an "as-needed basis." In other words, defendants

48

concede that U.S. Soccer had no formal annual reporting process before 2009.  Then, at the same 2009 meeting at which NASL applied for a D2 sanction for the first time, U.S. Soccer made the decision to begin enforcing the Standards against potential leagues by making them demonstrate their compliance with the Standards.

As for the timing of defendants' heightening of the Standards, the first instance of this took place in 2010, when NASL was applying for a D2 sanction again.  Specifically, U.S. Soccer adopted new ownership requirements for D2 men's leagues in 2010.  The second instance of heightening the Standards took place in 2014, the same year NASL made known to U.S. Soccer that it planned to apply for a D1 sanction.  The 2014 revisions to the D1 Standards increased the requirements for number of teams in a league (from 10 to 12), time zone coverage (Eastern, Central, and Pacific), and other operations.  Although NASL satisfied the pre-2014 10-team requirement and had teams in three time zones, it had neither 12 teams nor one in the Pacific time zone.

In response, defendants argue that the Standards (including the annual reporting requirement) were developed before NASL existed, so their purpose could not have been to disadvantage NASL.  Defendants argue that their reason for this decision was, in 2009 when NASL was formed, "U.S. Soccer faced, for the first time, a situation in which two leagues— NASL and USL—each sought a sanction to become a D2 league," which prompted USSF "to start that process, to [ensure] leagues get certified, and [make sure leagues remain] in good standing" (quoting Mr. Gulati's deposition testimony).

Although this timeline decreases the possibility of coincidence, temporal proximity does not always indicate causation.  Whether defendants' motivation to enforce and heighten the Standards was to preclude NASL from becoming a league is an issue of material fact.  NASL's

evidence does not eliminate the possibility that U.S. Soccer's enforcement and heightening of the standards was not independent action.

Third, NASL argues that U.S. Soccer and MLS pursued a joint financial venture: the SUM agreements, which collectively marketed the rights of the two organizations. Joint financial ventures between two firms, such as the SUM agreements, can constitute circumstantial evidence of concerted action. See Tower Air, Inc. v. Fed. Exp. Corp., 956 F. Supp. 270, 282-83 (E.D.N.Y. 1996). The effect of the SUM agreements, NASL argues, was to tie a significant source of U.S. Soccer's revenue to the economic value of MLS's rights as the sole D1 league. Indeed, U.S. Soccer's Rule 30(b)(6) corporate representative, Jay Berhalter, admitted that U.S. Soccer was financially reliant on the SUM agreements because "[t]here were not any interested parties" besides MLS to enter a similar licensing agreement with U.S. Soccer.

However, defendants argue that the SUM Agreements have nothing to do with the Standards. Although the agreements may have aligned the two firms' economic interests, as defendants point out, NASL has not proven that the agreements incentivized U.S. Soccer to insulate MLS as the sole D1 league. I agree – this is another issue of material fact.

Fourth, NASL argues that MLS had a significant degree of control over the U.S. Soccer Board's policymaking process, including decisions related to sanctions and the Standards. NASL points to testimony stating that, while Gulati was working for an MLS team, he handpicked members of the U.S. Soccer Board who voted on adopting and applying the Standards. NASL's expert Szymanski mentions this fact in support of his conclusion that the Board was controlled by MLS-aligned members. Relatedly, a report prepared by McKinsey Consulting in connection with its work to improve U.S. Soccer's board governance contained multiple statements from board members indicating MLS's dominance, including: "MLS has a

stranglehold of U.S. Soccer"; "It's not clear Sunil [Gulati] needs the Board. Some decisions are made outside the Board entirely"; and "We go to meetings to rubber stamp things."[10]  Indeed, NASL's expert Noll cited these statements as evidence of the "entanglements" between U.S. Soccer and MLS executives that created overlapping interests between the two companies. MLS's significant influence on and contribution to U.S. Soccer's Standards-related decisions constitutes a "high degree of interfirm communication," which is another plus factor in determining the concerted action element.  See Propanolol, 249 F. Supp. at 722-23.

Defendants counter with the fact that MLS-affiliated board members (namely, Don Garber and Gulati), did not vote on sanctioning applications.  Although the evidence plaintiff presents is strong, I agree with defendants that these leaders' abstinence from the vote calls into question the material fact of whether the U.S. Soccer Board was actually dominated by MLS.

At bottom, the antitrust laws limit "the range of inferences" that the court may draw from "ambiguous evidence."  Clorox Co. v Sterling Winthrop, Inc., 117 F.3d 50, 55 (2d Cir. 1997) (cleaned up).   Given the complexity of the factual record and the evidence both sides present, it is not permissible for the Court to infer that, as a matter of law, defendants acted or did not act in a concerted effort to preserve MLS's monopoly as a D1 team.  The first element of plaintiff's Count II will therefore proceed to trial.

---

[10] I agree with NASL that these statements are admissible.  The McKinsey report is a business record and falls into the hearsay exception.  See Fed. R. Evid. 803(6).  Further, the U.S. Soccer employees' statements therein qualify as party-opponent admissions under Fed. R. Evid. 801(d)(2).  These statements were made by U.S. Soccer's employees regarding the scope of their employment, and adopted by the report as support for its findings.  See Schering Corp. v. Pfizer 189 F.3d 218, 219 (2d Cir. 1999); Royal & Sun Alliance Ins. PLC v. UPS Supply Chain Sols., No. 09-cv-5935, 2011 WL 3874878, at *12-13 (S.D.N.Y. Aug. 31, 2011); see also Arista Records LLC v. Lime Group LLC, 784 F. Supp. 2d 398, 420 (S.D.N.Y. 2011).

C.  Unreasonable Restraint of Trade

Pursuant to the two-step Section 1 framework, the Court will now consider whether the application of the Standards constitutes an unlawful restraint on trade.  As an initial matter, this requires the Court to define the market and determine what "mode of analysis" should apply to NASL claims – rule of reason, quick look, or *per se*.  As explained infra at Section III.C.2, the Court will analyze NASL's Count II pursuant to the rule of reason.

1.  *Market Definition*

To state a claim under Section 1, a plaintiff must allege a plausible relevant market in which competition must be harmed.  Indeed, as the district court recognized in denying the preliminary injunction, the determination of the relevant market is necessary to analyze antitrust claims under the rule of reason.  NASL I, 296 F. Supp. at 470 (cleaned up).

NASL asks the Court to define the relevant market as the market for top-tier and second-tier men's professional soccer leagues located in the United States and Canada.  Specifically, as Dr. Noll opines, these include the markets to obtain league sanctions to play D1 or D2 men's professional soccer, and the markets in which leagues compete to obtain teams.  Above, I held that Dr. Noll will be permitted to testify as to his market definition-related opinions. Additionally, at the preliminary injunction phase, the court accepted NASL's market definition. NASL I, 296 F. Supp. at 471.  Although NASL has altered its market definition since that stage (as it is permitted to do with the benefit of fact and expert discovery), that court's reasoning for accepting NASL's market definition remains sound:

> The Court is persuaded that the plaintiff's proposed market definition is appropriate for purposes of assessing the claims at this stage. Typically, the relevant market is defined in reference to the defendant's alleged antitrust conduct.  Here, Defendant's challenged conduct is its assignment of divisional designations to men's professional soccer leagues in the United States and Canada. Through the application of the PLS, Defendant determines which leagues in the United States

52

are considered Division I or II for any given year. Based on Defendant's role as a *standard-setting* organization, the Court finds it logical to define the relevant market as NASL proposes. Stated differently, in the absence of the PLS, there would be competition among soccer leagues to determine which leagues should be considered top-tier or second-tier. Under these circumstances, the "industry recognition" factor may be especially relevant. As both parties readily acknowledge, Defendant is a constituent membership organization that *sets* the industry standards for Division I or II leagues. By adopting and amending the PLS, Defendant establishes what the industry and the public at large expect from Division I and II leagues.

Id. at 471-72 (internal citations omitted).

On this score, defendants raise substantially the same arguments they raised in support of their motion to exclude Dr. Noll's testimony regarding market definition. For the same reasons I rejected those arguments supra at Section II.D, I reject them here. I find that NASL has adduced enough evidence to support its market definition. NASL's definition of the relevant markets will govern during the trial. Accordingly, as to the element of market definition, NASL's motion for summary judgment is granted and defendants' is denied.

## 2.   *Choosing the Mode of Analysis*

When assessing whether challenged restraints constitute an unlawful restraint of trade in violation of Section 1 claims, courts either apply the *per se* rule or the rule of reason. "Under the *per se* rule, certain practices, *e.g.*, horizontal price-fixing or market division with no purpose other than to limit competition, are entitled to a conclusive presumption of unreasonableness and thus considered *per se* illegal. All other practices are analyzed under the rule of reason." Am. Express Co., 838 F.3d at 193-94 (citations omitted). Courts may only use per se analysis when "courts can predict with confidence that [the challenged restraint] would be invalidated in all or almost all instances under the rule of reason." Leegin Creative Leather Prods., Inc., v. PSKS, Inc., 551 U.S. 877, 886-87 (2007).

At the preliminary injunction stage, the district court applied the rule of reason, <u>NASL I</u>, 296 F. Supp. at 459-60, 468-69, and the Second Circuit approved that decision, <u>NASL II</u>, 883 F.3d at 41-42.  Both courts reasoned that defendants' conduct was not so obviously anticompetitive as to necessitate a *per se* mode of analysis.  I see no reason to disturb this holding and will apply the rule of reason here.

        3.   *Applying the Rule of Reason*

The rule of reason requires a factfinder to apply a "three-step, burden-shifting framework." <u>Ohio</u>, 585 U.S. at 541.  Under this framework:

> [T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market.  If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint.  If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

<u>Id.</u> at 541-42.  Therefore, NASL bears the initial burden of demonstrating that the PLS have an "actual adverse effect on competition as a whole in the relevant market."  <u>NASL I</u>, 296 F. Supp. at 469-70.

To survive a defendant's summary judgment motion, an antitrust plaintiff must present a genuinely disputed issue of material fact as to the elements of the rule of reason analysis, and "only then will the case go to a jury."  <u>In re Namenda Direct Purchaser Antitrust Litig</u>, 331 F. Supp. 3d 152, 198 (S.D.N.Y. 2018); <u>see also</u> <u>Aventis Env. Science USA LP v. Scotts Co.</u>, 383 F. Supp. 2d 488, 502 (S.D.N.Y. 2005) (denying defendant's summary judgment motion because material issues of facts, including whether defendant's actions had procompetitive benefits, remained).

Here, issues of material fact – at every stage of the rule of reason analysis – preclude me from granting summary judgment on NASL's Count II to either side.[11]

First, regarding anticompetitive effects, NASL has presented evidence that defendants' application of the Standards has resulted in a reduction in the output of D1 and D2 leagues because MLS is the only member of the former, and USL the latter.  This, in effect, reduces consumer (i.e., soccer team) choices of which league to join.  Further, NASL has presented evidence that MLS and USL have been able to charge higher expansion team prices because their league memberships are the only products available for purchasers of D1 and D2 league memberships (again, soccer teams).  NASL also argues that, as a result of defendants' application of the Standards, it failed to obtain higher entry fees, suffered a diminished reputation and goodwill, ultimately had to stop league play.

On the other hand, defendants cast doubt on whether these allegedly anticompetitive effects were the direct result of the application of the Standards.  Defendants contend that there is no record evidence of a decrease in the quality of soccer leagues or play, nor of harm to fans. They also argue that NASL's struggles, primarily its connection to the Traffic criminal indictments and its ultimate exit from the market, were the result of its own mismanagement.

Both sides' proffered evidence has created an issue of material fact on the element of anticompetitive effects.[12]  Evaluating whether this element is met would require me to weigh the

---

[11] This decision does not contain an exhaustive list of evidence presented by any party in support of its arguments. Accordingly, the parties are free to present evidence not mentioned in this Order at trial.

[12] As discussed earlier, antitrust standing (which is necessary to sustain a Section 1 claim) requires antitrust injury, defined as "injury of the type the antitrust laws were intended to prevent."  Brunswick, 429 U.S. at 489.  The antitrust injury standard is quite similar to the standard for the anticompetitive effects prong of a rule of reason analysis; indeed, the Supreme Court has used the former term to define the latter term.  See id. ("[The antitrust] injury should reflect the anticompetitive effect either of the [Sherman Act] violation or of anticompetitive acts made possible by the violation.").  For the same reasons I find there to be an issue of fact on the anticompetitive effects element, I find that NASL's Count II has satisfied the antitrust injury (and thus, the antitrust standing) requirement; a separate analysis is unnecessary.

evidence – which I am not permitted to do at the summary judgment stage – so this element will proceed to trial.

      Second, regarding procompetitive benefits, U.S. Soccer and MLS have presented evidence that refutes some of the evidence NASL presented on the prior element.  For example, they argue that attendance at men's soccer games in the relevant geographic market has grown since the Standards have been enforced, which is evidence of increased output.  More generally, defendants also point to the well-recognized principle that standard-setting provides procompetitive benefits to many industries (especially professional sports).  See Allied Tube, 486 U.S. at 501.  Specifically, as the district court and the Second Circuit found, defendants have adduced evidence that "the minimum-team requirement increases output through sustained fan interest and provides stability because larger leagues are less likely to collapse," "the time zone and market-size requirements generate fan and media interest, and, along with the stadium-capacity requirement, promote league quality," and "the financial-viability requirements keep fans interested, stabilize the leagues financially, and prevent free riding."  NASL II, 883 F.3d at 43.  On the other hand, NASL argues that defendants do not actually have evidence that the Standards' application promotes vague concepts like "stability" and "fan interest."  And like U.S. Soccer does for the anticompetitive effects element, NASL challenges the causal relationship between the application of the Standards and their apparent procompetitive benefits.  Again, as with the previous element, both sides' evidence has created an issue of fact that the jury must determine at trial.

      Third, with respect to the last element of the rule of reason analysis – less restrictive alternatives – NASL argues that either the earlier version of the Standards or some other set of rules would be a less restrictive means of achieving the stability and organization that the

Standards seemingly promote.  Defendants counter that NASL has presented no evidence that the alternatives would benefit competition and, even if they did, the alternatives would serve the same procompetitive purposes that the current Standards do.  Analyzing whether an alternative is less restrictive almost certainly requires weighing the parties' respective evidence and, accordingly, this element presents an issue of material fact that the jury must resolve.

Because the parties' competing evidence has created issues of material fact at every phase of the rule of reason analysis, the issue of whether the Standards' enforcement unlawfully restrains trade (i.e., the second half of NASL's Count II) will proceed to trial.

## IV. NASL's Remaining Counts

NASL's Amended Complaint includes three additional counts brought under Section 2, which prohibits firms from monopolizing or attempting to monopolize commerce.  See 15 U.S.C. § 2.  The parties have not sought relief with respect to these counts in the instant cross-motions for summary judgment.  As NASL recognizes, its Section 2 claims rise and fall with its Section 1 claims.  Indeed, the Section 1 and Section 2 claims form two sides of the same coin, i.e., allegations of forming an agreement in restraint of trade and monopolization of trade involve much of the same evidence.  See generally Andrew Gavil, Copperweld 2000: The Vanishing Gap Between Sections 1 and 2 of the Sherman Act, 68 Antitrust L. J. 87 (Am. Bar Ass'n 2000).  Because Count II survives summary judgment, so do the remaining counts; therefore, these counts will also proceed to trial.

For the same reasons Count II presents issues of fact appropriate for jury resolution, there are issues of fact as to whether NASL is entitled to damages and injunctive relief.

## V. Sealing Motions

Finally, the Court resolves sealing motions by parties NASL, U.S. Soccer, and MLS, as well as nonparties USL and Aaron Davidson.

A. Legal Standard

Pursuant to the First Amendment, the public has a right to access certain judicial documents.  See Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 120 (2d Cir. 2006).  This principle of public access applies "even in private business disputes."  Alcon Vision, LLC v. Lens.com, No. 18-cv-0407, 2020 WL 3791865, at *4 (E.D.N.Y. July 7, 2020).  Courts have discretion as to whether to seal certain materials in light of the facts of the particular case.  See Nixon v. Warner Comms., 435 U.S. 589, 599 (1978).

The Second Circuit employs a three-step analysis to determine whether documents should be placed under seal.  First, the Court must determine whether the documents are "judicial documents" to which the presumption of public access applies.  Second, if the presumption applies, the Court determines what weight to give the presumption based on whether the information in the document "directly affect[s] an adjudication."  Lugosch, 435 F.3d at 119.  Third, the Court assesses any countervailing factors weighing against access, such as the privacy interests of those opposing disclosure.  See id.

Applying the first step of the sealing analysis, each of the documents at issue in the parties' five sealing motions – including portions of summary judgment briefs, Daubert briefs, and associated exhibits – qualify as "judicial documents" to which the right of public access attaches.  See Brown v. Maxwell, 929 F.3d 41, 47 (2d Cir. 2019); American Railcar Indus., Inc. v. Gyansys, Inc., No. 14-cv-8533, 2017 WL 11501880, at *1 (S.D.N.Y. May 8, 2017).

Applying the second and third steps of the sealing analysis, the Court rules as follows.

B. NASL's Motion to Seal [357]

NASL has moved to seal portions of the parties' summary judgment and Daubert briefing and associated exhibits, namely (1) settlement agreements and discussions, (2) information

58

regarding future litigation and litigation plans, (3) private information about individuals currently or formerly associated with NASL, and (4) business information.

First, because a subset of the information in category (1) is public information about NASL's settlement with Traffic Sports, and because this information is implicated in the Court's summary judgment decision (see supra at 55), I decline to leave this information under seal.  In light of these two factors, the Court accords the presumption of public access significant weight and, given its already-public status, finds that NASL has no valid privacy interest to counteract that weight.  See King Pharmaceuticals, Inc. v. Eon Labs, Inc., No. 04-cv-5540, 2010 WL 3924689, at *10 (E.D.N.Y. Sept. 28, 2010) (denying sealing request as to information that was "already public and [therefore] cannot constitute confidential business information").

Next, with respect to all other information NASL seeks to seal, the Court finds that its content is, at most, tangential to the issues central to adjudicating summary judgment, so the presumption of public access has little weight.  Further, the Court finds that NASL's interest in maintaining confidentiality over its litigation plans, employees' private information, and financial information outweighs the presumption of public access.

Accordingly, the Court grants NASL's motion to seal except with respect to public information regarding its settlement with Traffic.

C.  U.S. Soccer's Motion to Seal [349]

U.S. Soccer has similarly moved to seal portions of the parties' summary judgment and Daubert briefing and associated exhibits, specifically (1) its commercial agreements, (2) board communications and analyses, (3) third-party information, and (4) U.S. Soccer employees' personal information.

59

First, category (1) includes the SUM agreements between U.S. Soccer and MLS that bundled the marketing rights of the two entities.  Because these agreements aligned the financial incentives of the two entities alleged to be in a conspiracy, they are highly pertinent to the issue of concerted action and the Court considered these agreements in its summary judgment decision (see supra at 50).  Therefore, the weight of the public access presumption with respect to these agreements is significant.  Although the Court recognizes that these agreements contain sensitive financial information, that does not entitle defendants to maintain the entirety of the agreements under seal.  Therefore, the Court will afford defendants an opportunity to file copies of the SUM agreements with proposed redactions, and the Court will reconsider whether to seal those portions.

Second, category (2) includes a report created by McKinsey regarding the U.S. Soccer Board.  I decline to leave the quoted statements from the report[13] under seal because the information therein is highly relevant to the central issue of concerted action and factored into the Court's summary judgment decision (see supra at 50-51), which heightens the weight of the public access presumption.  As for countervailing factors, I do not find that the statements in question involve U.S. Soccer's sensitive commercial or financial information.  Additionally, as NASL points out, the statements are anonymized and thus do not implicate any board member's privacy or future candor.  See Byrnes v. Empire Blue Cross Blue Shield, No. 98-cv-8520, 2000 WL 60221, at *5 (S.D.N.Y. Jan. 25, 2000) (declining to seal board materials because there "[wa]s nothing . . . that is of such evident sensitivity that public disclosure of those documents is likely to deter members of defendant's Board from full and robust assessment of policy questions

---

[13] For avoidance of doubt, the "quoted statements" are those included in NASL's Rule 56.1 statement at ¶ 125.

facing the company in the future"). The McKinsey report itself (as an exhibit) may remain under seal.

Next, with respect to the remainder of the information U.S. Soccer wishes to seal, the Court finds it peripheral to its summary judgment decision and that U.S. Soccer's confidentiality interest over its commercial agreements and employees' privacy outweighs the presumption of public disclosure.

The Court, therefore, grants U.S. Soccer's motion to seal except with respect to the quoted statements from the McKinsey report, and reserves decision on whether to seal portions of the SUM agreements.

D. MLS's Motion to Seal [354]

MLS moves to seal portions of the parties' summary judgment and Daubert briefing and exhibits as well, specifically (1) commercial contracts, (2) financial information, (3) marketing analyses, and (4) arbitration information.

First, MLS's request to seal information regarding past expansion fees – which is part of MLS's category (1) – is denied. As just explained, it is improper to seal information that is already public. The amounts of MLS's previous expansion fees are publicly available, and are thus not entitled to sealing.[14] However, as to the rest of the information MLS seeks to seal, the Court finds that it is, at most, tangentially relevant to the summary judgment analysis and that MLS's privacy interests outweigh the presumption of public access.

E. USL's Motion to Intervene and Seal [353]

Nonparty USL moves to intervene for the purpose of moving to seal information in the

---

[14] See https://en.wikipedia.org/wiki/Expansion_of_Major_League_Soccer.

parties' summary judgment and <u>Daubert</u> materials.  Its motion to intervene for this limited objective – which is unopposed – is granted.  <u>See</u> Fed. R. Evid. 24(b)(1)(B); <u>see also</u> <u>In re Telegraph Media Grp. Ltd.</u>, No. 23-mc-215, 2023 WL 5770115, at *4 (Sept. 6, 2023).

Like the parties, USL moves to seal, *inter alia*, portions of the parties' summary judgment and <u>Daubert</u> motions and exhibits, specifically (1) financial information, (2) marketing information, (3) USL franchisee owners' personal information, and (4) franchisee agreements.

First, I defer ruling on USL's request to seal the entire deposition transcript of U.S. Soccer board member and USL CEO Alec Papadakis.  As NASL points out, sealing requests must be "narrowly tailored," <u>Lugosch</u>, 435 F.3d at 124.  But NASL seeks to seal dozens of pages of testimony on the grounds that it contains USL's sensitive commercial information.  The Second Circuit's standard demands more targeted explanations as to why specific information – not entire voluminous documents that contain at least some public information – should be sealed.  <u>See</u> <u>Khelafa v. Gen. Elec. Co.</u>, No. 19-cv-10727, 2021 WL 11660920, at *7 (S.D.N.Y. March 22, 2021) ("Because [sealing] must be narrowly tailored, wholesale or blanket sealing of entire judicial documents is generally inappropriate.").  Accordingly, USL is ordered to file narrowly tailored proposed redactions to Mr. Papadakis's deposition transcript and provide a reason for sealing as to each, and the Court will reconsider those requests.

As for the rest of the information USL seeks to seal, the Court recognizes that USL is not a party to this litigation and "the privacy interests of [] third parties … should weigh heavily in a court's balancing equation" when evaluating sealing requests.  <u>Doe v. Apfel</u>, No. 98-cv-182, 1999 WL 182669, at *3 (E.D.N.Y. March 22, 1999) (cleaned up).  Applying this principle alongside the required sealing analysis, the Court finds that the other information USL seeks to

seal is peripheral to summary judgment and its interest in maintaining confidentiality over its commercial and financial material outweighs the presumption of public access.

F. <u>Aaron Davidson's Motion to Seal [360]</u>

Finally, nonparty and former NASL Chairman Aaron Davidson moves to seal a Consulting Services Agreement between Traffic and Golden Miracle Management, a former consultant to the New York Cosmos, a NASL member team, on the grounds that it is implicated in an ongoing criminal investigation in this District, namely <u>United States v. Webb et al.</u>, 15-cr-252. But, as defendants point out, Mr. Davidson's letter motion does not explain how this proceeding implicates the agreement in question. The motion is therefore denied.

## CONCLUSION

For the foregoing reasons, NASL's motion for summary judgment is denied, defendants U.S. Soccer and MLS's motions for summary judgment are granted as to NASL's Count I and denied as to NASL's Count II. Additionally, the parties' <u>Daubert</u> and sealing motions are granted and denied as set forth above.


**SO ORDERED.**

*Brian M. Cogan*
_____
                          U.S.D.J.


Dated: Brooklyn, New York
       June 11, 2024