**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| NORTH AMERICAN SOCCER LEAGUE, LLC,<br><br>                              Plaintiff,<br><br>      v.<br><br>UNITED STATES SOCCER FEDERATION, INC. and<br>MAJOR LEAGUE SOCCER, L.L.C.,<br><br>                              Defendants. | Case No. 1:17-cv-05495-HG<br><br>**ORAL ARGUMENT**<br>**REQUESTED** |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO**
**EXCLUDE THE DIVISION I DAMAGE OPINIONS OF DR. DARRELL L. WILLIAMS**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 4

    A.    NASL's Obligation to Team Holdings Must Be Considered as Part of Any Reliable D1 Damage Estimate ............................................................ 4

    B.    Dr. Williams' First Error: Failing to Account for the Deferral of Team Holdings' Rights to Entry Fees .......................................................... 6

        1.    Dr. Williams' Assumption That the Parties Simply Deferred Payment of an Existing Obligation Is Contradicted by the Evidence He Cites ........................................................................... 7

        2.    The Contemporaneous Evidence Also Shows That Dr. Williams Erred in Assuming a Payment Deferral ......................................... 8

    C.    Dr. Williams' Second Error: The Failure to Calculate Antitrust Damages .......... 10

LEGAL STANDARD ..................................................................................................... 11

ARGUMENT ............................................................................................................... 13

I.    DR. WILLIAMS CONTINUES TO IGNORE THE AMOUNTS NASL OWED TO TEAM HOLDINGS ................................................................................................... 13

    A.    Dr. Williams Failed to Comply With Judge Cogan's Order ................................ 13

    B.    Dr. Williams Disregards The Evidentiary Record ............................................... 15

II.    DR. WILLIAMS FAILED TO CALCULATE ANTITRUST DAMAGES ........................ 17

CONCLUSION ............................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)............................................................................11, 12, 13, 15

*Convergent Wealth Advisors LLC v. Lydian Holding Co.*,
    No. 12 Civ. 1199, 2012 WL 2148221 (S.D.N.Y. June 13, 2012)..........................................17

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)................................................................................................................11

*Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*,
    702 A.2d 1228 (Del. 1997) ....................................................................................................17

*Fishman v. Estate of Wirtz*,
    807 F.2d 520 (7th Cir. 1986) .................................................................................................19

*General Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)................................................................................................................13

*Hopkins v. Nat'l R.R. Passenger Corp.*,
    08-CV-2965 (NGG) (RML), 2015 WL 13741721 (E.D.N.Y. Aug. 20, 2015)..................17 n.7

*Humphrey v. Diamant Boart, Inc.*,
    556 F. Supp. 2d 167 (E.D.N.Y. 2008) ...............................................................................17 n.8

*In re: NFL "Sunday Ticket" Antitrust Litig.*,
    No. ML 15-02668 PSG, 2024 WL 3628118 (C.D. Cal. Aug. 1, 2024) ..................................13

*Jensen v. Cablevision Sys. Corp.*,
    372 F. Supp. 3d 95 (E.D.N.Y. 2019) ....................................................................................13

*Jones & Laughlin Steel Corp. v. Pfeifer*,
    462 U.S. 523 (1983)................................................................................................................20

*Joseph S. v. Hogan*,
    No. 06 Civ. 1042(BMC)(SMG), 2011 WL 2848330 (E.D.N.Y. July 15, 2011)
    (Cogan, J.)..........................................................................................................................17 n.8

*Lane v. Am. Airlines, Inc.*,
    18-CV-6110 (MKB), 2024 WL 1200074 (E.D.N.Y. Mar. 20, 2024)....................................12

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
    No. 03 Civ. 7037(PKC), 2005 WL 4684238 (S.D.N.Y. Apr. 11, 2005) ....................12, 13, 16

*Lippe v. Bairnco Corp.*,
  249 F. Supp. 2d 357 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004)........................14

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ....................................................................................11

*On Track Innovations, Ltd. v. T-Mobile USA, Inc.*,
  12-cv-2224 (AJN), 2015 WL 14072083 (S.D.N.Y. July 24, 2015).................................14, 16

Proposed Amends. to Fed. R. of Evid. 106, 615, & 702,
  344 F.R.D. 850 (Oct. 19, 2022) ..............................................................................................12

*Sardis v. Overhead Door Corp.*,
  10 F.4th 268 (4th Cir. 2021) ...................................................................................................12

*Shiftan v. Morgan Joseph Holdings, Inc.*,
  57 A.3d 928 (Del. Ch. 2012)...................................................................................................17

*Sys. Dev. Integration, LLC v. Computer Scis. Corp.*,
  886 F. Supp. 2d 873 (N.D. Ill. 2012) ......................................................................................20

*Taylor v. B&J Martin, Inc.*,
  611 F. Supp. 3d 278 (E.D. La. 2020) ......................................................................................20

*Trevino v. TFS Servs., LLC*,
  No. 7:22-cv-00158, 2023 WL 5473728 (S.D. Tex. Aug. 24, 2023) ........................................14

*Washington v. Kellwood Co.*,
  714 F. App'x 35 (2d Cir. 2017) .........................................................................................13, 16

## OTHER AUTHORITIES

Fed. R. Evid. 702 ................................................................................................................. passim

## INTRODUCTION

NASL's damage expert, Dr. Williams, submitted a Supplemental Report that fails to follow Judge Cogan's clear instructions as to the changes needed to conform his opinions to the requirements of *Daubert* and Rule 702. Dr. Williams' Supplemental Report, and his testimony as to NASL's Division 1 damages, should be excluded, and NASL should not be given a third chance to comply with *Daubert* and Rule 702, or a second chance to comply with the Court's order.

Defendants moved to exclude Dr. Williams' original reports given their flawed methodologies and his unreliable conclusions: he opined that NASL—an unstable league that existed for only several years and never made a profit—would have immediately started earning ███████████████████ in entry fees if only U.S. Soccer had just granted it a Division 1 ("D1") sanction in 2016. ECF Nos. 284, 299. Judge Cogan granted Defendants' motion to exclude Dr. Williams' D1 opinions, on the ground that Dr. Williams' analysis had two fundamental errors: (1) the failure to account for the amounts NASL owed its primary funder, NASL Team Holdings ("Team Holdings"), and (2) the failure to deduct NASL's ongoing value as a D2 league from his estimated value of NASL as a D1 league. Memorandum Decision and Order (the "Order"), ECF No. 399 at 23-27. Judge Cogan ordered Dr. Williams to correct these errors. *Id.*

Dr. Williams' new Supplemental Report pays only lip service to Judge Cogan's instructions. *See* Ex. 1 (the "Supp. Rep.").[1] The new report reintroduces the same flawed analysis that Judge Cogan previously found unreliable and warranted exclusion.

The first problem is the "deferral error." To reach the largest damages figure possible, Dr. Williams' model projects that the entry fees incoming teams would pay NASL as a D1 league would rise astronomically over time. That put him in a bind, however, because NASL had agreed

---

[1] References to "Ex." are to the exhibits to the Ruskin Declaration submitted with this Motion.

to relinquish more than 80% of those entry fees to Team Holdings.  NASL and Team Holdings had originally agreed to take those entry fees from the first ten incoming teams.  But they deferred that obligation to apply to future expansions so that NASL could instead use its initial entry fees to fund struggling teams.  This meant that as of March 2016 (the date of NASL's alleged injury from the denial of the D1 sanction), Team Holdings had not received any entry fees, because its right to a share of future entry fees had not yet been triggered.  Judge Cogan ordered Dr. Williams to correct this "major oversight," directing him to "discount his estimates to reflect the real-world conditions that existed *at the time of the challenged conduct*" and the "terms of the Team Holdings contract *as it existed in March 2016*."  Order at 25, 27 (emphasis added).

Dr. Williams did not do that.  Instead, he applied the terms of NASL's 2009 LLC Agreement and simply declared that he was "not aware of any reason that the NASL would have deviated from" those terms.  Supp. Rep. ¶¶ 19, 31.  Dr. Williams assumed that the parties simply deferred *payment* of Team Holdings' share of the entry fees that NASL had already received (which were based on the significantly lower entry fees NASL charged as a new D2 league rather than the oversize fees he projected NASL would receive as a D1 league).  But that assumption is flatly contradicted by extensive record evidence that the parties did not simply defer *payment* of an existing obligation.  They deferred the entire obligation, so that it would be calculated based on future incoming teams.  For example, under Dr. Williams' assumption that the parties simply deferred payment, both NASL's and Team Holdings' financial statements should have reflected that accrued obligation.  Neither one did.  And when the parties themselves described or modeled Team Holdings' rights, they repeatedly did so based on the entry fees from future teams, *not* based on a simple "payment deferral" of Team Holdings' share of entry fees from past teams.

Dr. Williams' assumption is also contradicted by the one—and only—document he relied

on.  Supp. Rep. ¶ 16 n.3.  That document unambiguously confirms that the parties deferred the entire obligation, so that it would be both *calculated* and *paid* based on *future* entry fees.  Dr. Williams once again engineered his D1 damage estimates to produce the highest number possible. This time, he did so in direct contravention of the Court's instructions.

The second problem is the "overstated damage" error.  The injury that NASL claims from the alleged antitrust violation—the denial of a D1 sanction—was the loss of its incremental value as a D1 league beyond its value as a D2 league as of March 2016.  Dr. Williams therefore should have subtracted NASL's ongoing value as a D2 league from the value he ascribed to NASL if it were a D1 league.  Judge Cogan also instructed Dr. Williams to correct this error: "he must assess and subtract the actual value of NASL's expansion fees in the real world after it was denied a D1 sanction."  Order at 24-25.

Dr. Williams again failed to follow the Court's instructions.  His Supplemental Report instead looks two years into the future—to when U.S. Soccer denied NASL's D2 sanction for the 2018 season—and concludes "it would make no sense" to deduct "D2 expansion fees in 2018 and beyond."  Supp. Rep. ¶ 37.  He accordingly subtracts only $1 million in entry fees that NASL received in 2017, and he continues to ignore entirely NASL's ongoing value as a D2 league.  *Id.* ¶¶ 33-34.  This is particularly egregious because, in his D2 damages model, Dr. Williams values NASL as a D2 league (as of 16 months later) at ███████ .  *Id.* at Ex. 1.

NASL's September 6, 2024 pre-motion letter claims that Dr. Williams followed Judge Cogan's instructions exactly: "assess and subtract *the actual value* of NASL's expansion fees in the real world."  ECF No. 421 at 3.  NASL and Dr. Williams misread those instructions.  The Court was focused on the "actual value of NASL's expansion fees" only because that was how Dr. Williams calculated NASL's value.  Order at 24-25.  The entire discussion was about calculating

3

"the difference between the value of NASL in the actual world"—as a D2 league—"and the but-for world"—as a D1 league—"to calculate antitrust damages." *Id*. at 24.  Instead, Dr. Williams inflated his damage estimate by another ███████.

Dr. Williams should not be given yet another opportunity to get it right.  He disregarded Judge Cogan's instructions and has twice produced unreliable D1 damage estimates.  Amended Rule 702 requires a district court to act as a gatekeeper and not punt unreliable contentions by an expert to a jury.  Dr. Williams' D1 damages opinions should be excluded in their entirety.

## BACKGROUND

Dr. Williams' D1 damages model is intended to project the entry fees that NASL would have earned as a D1 league for ten years into the future.  Order at 17.  Dr. Williams purports to (i) estimate the rate at which new teams would join NASL, (ii) estimate the expansion fees that new teams would pay, and (iii) discount the future cash flows to August 2019 (the date of his original expert report).[2]  Although Dr. Williams produced a wide variety of D1 damage estimates throughout this case, his "primary" D1 damage estimate was ███████, a number he has since reduced to ███████, in part due to his efforts to correct the errors that Judge Cogan identified. *See* Supp. Rep. ¶¶ 5, 12.  That figure is comprised exclusively of entry fees that teams supposedly would pay to join NASL.  Order at 17.

### A.    NASL's Obligation to Team Holdings Must Be Considered as Part of Any Reliable D1 Damage Estimate

NASL's 2009 Amended and Restated LLC Agreement (the "LLC Agreement") distinguished between two types of members: Class A and Class B members. Ex. 2 at -728-730.  Class A members owned and operated teams, paid league dues, and were entitled to designate a

---

[2] As discussed below, discounting to such a random date—the date on which Dr. Williams served his expert report—is inappropriate.  NASL's damages must be discounted to March 2016, the date of the alleged injury. *See infra* p. 20.

representative to NASL's Board of Governors.  *Id.* at -669, -674-75, -682, -686, -691.  Team

Holdings was NASL's sole Class B member.  *Id.* at -663, -730.  It was formed in 2009 to serve as

NASL's "investment vehicle" and, upon NASL's formation, it was expected to contribute $4.5

million to help fund NASL's start-up expenses.  Ex. 3 -299; Ex. 4 at -593; Ex. 5 at -569.  In return,

the LLC Agreement entitled Team Holdings to most of the entry fees that new teams would pay

to join the league.  Specifically, under Section 7.02 of the LLC Agreement, Team Holdings was

entitled to the first $450,000, plus 80% of any amounts over that, of the entry fees paid by the first

ten teams to join the league, and 20% of every expansion fee paid thereafter.  Ex. 2 at -696.

But things did not go as planned.  *First*, though NASL's Class A Members were supposed

to contribute capital to Team Holdings, most did not and so they resigned from Team Holdings.

Ex. 3 at -299, -303; Ex. 4 at -593.  Instead, by 2012, Traffic Sports USA ("Traffic")—the company

that founded NASL—owned a 92% stake in Team Holdings.  *Id*.  *Second*, early on, three of

NASL's teams experienced financial distress, which forced NASL to step in and fund the

operations of the Minnesota Stars, and required Traffic to take over and fund the Atlanta

Silverbacks and the Carolina Railhawks.  Ex. 3 at -305; Ex. 4 at -592-93; Ex. 5 at -569.

Critically, to keep the NASL-owned Minnesota team and Traffic-owned Atlanta and

Carolina teams afloat, NASL needed capital.  Thus, NASL and Team Holdings agreed to *defer*

Team Holdings' rights to entry fees under Section 7.02 of the LLC Agreement.  Ex. 3 at -305-306;

Ex. 4 at -592; Ex. 5 at -569.  That way, NASL could use current entry fees to operate the Minnesota

Stars and reimburse Traffic for the amounts it invested in the other two clubs.  *Id*.

The minutes from NASL's Board of Governors Meeting held on October 29, 2011 show

that the Board voted unanimously to defer giving Team Holdings its share of entry fees, and instead

use that money as follows: "first, to cover expenses of [the] Minnesota Stars; second, to reduce

expenses incurred by Traffic in connection with the operation of the Atlanta Silverbacks and

Carolina Railhawks; and third, any remainder to be distributed to North American Soccer League,

LLC." Ex. 6 at -692. This deferral was later memorialized in a July 25, 2013 letter agreement

between NASL and Traffic (signing on behalf of the three teams it owned), which NASL's Board

approved at a meeting that same day. Ex. 7 at -214, -224-227 (the "Deferral Agreement"). That

Deferral Agreement provided, in relevant part, that:

> Notwithstanding Section 7.02 of the LLC Agreement, the Company
> . . . has agreed that until such time as Traffic Group has been
> reimbursed for the actual cash amounts invested by [Traffic] in
> Carolina and Atlanta during each of the 2011, 2012 and 2013
> Seasons (the "Traffic Investment"), the Company shall not make
> any Distributions pursuant to Section 7.02 and shall instead use any
> Entry Fees received by the Company to reimburse Traffic Group for
> the Traffic Investment.

Ex. 8 at -157-158.[3]

Over the years, NASL and Traffic continued to operate these three teams and NASL's

obligation to reimburse Traffic continued to grow. Ex. 3 at -306-311; Ex. 4 at -592; Ex. 5 at -569.

Because NASL never reimbursed Traffic, Team Holdings never received its share of entry fees.

*Id.* By March 2016 – when U.S. Soccer denied NASL a D1 sanction and, therefore, the valuation

date for Dr. Williams' D1 model – Team Holdings still had not received any entry fees and

remained entitled to receive more than 80% of the entry fees that NASL would earn from ten future

teams.

### B.   Dr. Williams' First Error: Failing to Account for the Deferral of Team Holdings' Rights to Entry Fees

In November 2020, Defendants moved to exclude Dr. Williams' opinions because, in

---

[3] On the same date that NASL and Traffic signed the Deferral Agreement, all the LLC members
executed a Second Amended and Restated LLC Agreement. *See* Ex. 9. The provisions of
Section 7.02 were not changed meaningfully in the new agreement, but they were altered in the
Deferral Agreement that all LLC members approved. Exs. 7, 8.

relevant part, his D1 damages model failed to account for the fact that NASL did not own the rights to most of the entry fees comprising its damages.  Team Holdings owned those rights.  ECF No. 284 at 16-19.  Under settled law, NASL cannot recover amounts that belonged to third parties.  *See id.*  Judge Cogan agreed, finding that Dr. Williams committed a "major oversight" and needed to correct it.  Order at 25-27.  Judge Cogan instructed Dr. Williams to "discount his estimates to reflect the real-world conditions that existed *at the time of the challenged conduct*" and the "terms of the Team Holdings contract *as it existed in March 2016*."  Order at 27 (emphasis added).  Dr. Williams did not do that.

1.     **Dr. Williams' Assumption That the Parties Simply Deferred Payment of an Existing Obligation Is Contradicted by the Evidence He Cites**

In his Supplemental Report, Dr. Williams declared that he is "not aware of any reason that NASL would have deviated from the terms of the Team Holdings agreement" and simply applied NASL's 2009 LLC Agreement.  Supp. Rep. ¶¶ 19-20.  Because thirteen teams joined NASL in the years after it executed the 2009 agreement and prior to the D1 denial in March 2016, Dr. Williams assumed that NASL incurred "certain debts" to Team Holdings based on the entry fees paid by those thirteen teams.  *Id.* ¶ 16 ("In the ensuing years, more than ten new teams joined the NASL. As a result, the NASL incurred certain debts to Team Holdings for its portion of the expansion fees paid by those teams.").  Based on that assumption, Dr. Williams calculated amounts owed to Team Holdings based on much lower entry fees that NASL commanded in its early years, some of which were as small as $0.  Supp. Rep. ¶¶ 19-20; Ex. 21.  Dr. Williams calculated Team Holdings' share of those entry fees at $9.98 million.  Ex. 21.

Dr. Williams' assumption is contradicted by the very evidence upon which he relies.  Specifically, in support of his suggestion that "NASL would defer paying that debt until a later date," Dr. Williams cited a presentation that Team Holdings discussed with NASL's Board of

Governors at a September 2014 board meeting. Supp. Rep. ¶ 16 n.3, *citing* Ex. 10 at slide 32. As Dr. Williams recognized, slide 32 explained that "Team Holdings distribution rights were . . . delayed . . . ." Ex. 10 at slide 32. But Dr. Williams ignored slide 31, which confirmed that Team Holdings and NASL agreed to defer Team Holdings' "distribution rights" (i.e., *not* payment) and "not count . . . entry fees as part of the first 10 for which it has distribution rights." *Id.* at slide 31.

Rather than cite the *actual* presentation that Team Holdings presented at the September 2014 meeting, Dr. Williams also cited an incomplete version of this presentation that an NASL employee recirculated two years later (in November 2016). *Compare* Ex. 10 (Williams' version) and Ex. 3 (final version). Tellingly, the version actually presented at the Board meeting contains other facts that Dr. Williams ignored, including (and most importantly) an analysis of entry fees confirming that—under the "current model"—"THold" (Team Holdings) was still entitled to receive the first $450,000 and 80% of the excess of NASL's *next ten* entry fees starting with its 14th team and continuing through its 23rd team, giving Team Holdings a projected total of $59.9 million, plus 20% of the entry fee paid by the 24th team, rather than the $9.98 million deferred obligation that Dr. Williams calculates. Ex. 3 at -327.

### 2. The Contemporaneous Evidence Also Shows That Dr. Williams Erred in Assuming a Payment Deferral

The record confirms that Dr. Williams' assumption of a payment deferral is incorrect. Rather, the parties deferred the *entire* obligation, so that it would be both *calculated* and *paid* based on *future* entry fees from the *next ten* teams to enter the league after NASL reimbursed Traffic in full. For example:

- In July 2013, Rishi Sehgal, NASL's Director of Business Development (later NASL's Commissioner), emailed NASL's COO and another employee a financial model estimating NASL's future entry fees. Ex. 11 at -050. Mr. Sehgal's model confirmed that the trigger of Team Holdings' rights under Section 7.02 would not begin until NASL's fifteenth team joined the league, and that NASL would need to distribute ██████ in future entry fees

to Team Holdings, rather than the $9.98 million that Dr. Williams calculates as the deferred obligation.  Ex. 11 at DX-0231.0006.

- A year earlier, David Downs, NASL's Commissioner, emailed Mr. Sehgal and Aaron Davidson, Chairman of NASL's Board, updating them on conversations between Mr. Downs and potential buyers about the "distribution of future expansion team entry fees to Team Holdings." Ex. 12.  Mr. Downs explained that "it was true" that "Holdings will get somewhere between $20 and $50 million total from *the next ten teams*," not the $9.98 million deferred obligation that Dr. Williams calculates.  Ex. 12 (emphasis added).

- In 2011 and 2012, as part of NASL's negotiations with the New York Cosmos to join the league, SUF ¶ 195,[4] Traffic offered the Cosmos a stake in Team Holdings and created a financial projection of the value of that interest.  Ex. 13. Those projections confirmed that NASL's early entry fees would be kept "100% for NASL" and that Team Holdings would earn its $450,000 and 80% from NASL's *next ten* teams, at least through 2019.  *Id.*

- NASL created internal presentations that described NASL's structure for various purposes, including discussions with prospective league commissioners.  Ex. 14.  In describing Team Holdings' "preferred return on expansion fees," NASL again made clear that Team Holdings still was entitled to the first $450K plus 80% for NASL's "*[n]ext 10 teams*." Ex. 14 (emphasis added.); *see also* Ex. 15 at -088; Ex. 16.

- Team Holdings understood this as well.  In September 2014, Eduardo Pletsch, Traffic's Secretary and Treasurer, emailed Mr. Sehgal financial projections estimating NASL's entry fees through 2020.  Ex. 17.  Mr. Pletsch projected that Team Holdings would not begin earning its share of entry fees until NASL's twelfth team joined the league in 2017, and that NASL would need to distribute to Team Holdings over $53 million in entry fees from NASL's *next ten* teams.  *Id.*

- In July 2014, Acuitas, an independent third-party that Traffic had engaged, issued a valuation analysis and detailed appraisal report to assist Traffic's management in valuing its investment in Team Holdings.  Ex. 18.  This analysis showed that no entry fee had been distributed to Team Holdings and that Team Holdings did not expect to begin receiving distributions of entry fees from new teams until 2015, when Team Holdings would be entitled to $64.5 million for *ten new* teams based on the distribution of $450,000 plus 80% of the remainder, not the $9.98 million deferred obligation that Dr. Williams calculates. *Id.* at -083.  This analysis underlies Team Holdings' audited financial statements.  *Id.*

- If the parties had agreed merely to defer payment of an "accrued debt" of $9.98 million

---

[4] References to "SUF" are to the Defendants' Joint Statement of Undisputed Facts, submitted in connection with their motions for summary judgment (ECF No. 263).  A hyperlinked copy of that document, including links to the evidence cited therein, along with hyperlinked copies of all parties' summary judgment filings, has been provided to the Court.

based on the first ten teams to ever join NASL, NASL's financial statements would have reflected a liability for that deferred obligation, and Team Holdings' financial statements would have reflected a receivable due from NASL. *But there are no such entries in either of those financial statements. See* Ex. 19 at pp. 27-32.

In late 2014, around the time Traffic secretly signed a plea agreement requiring it to divest all its assets and pay a $151 million fine to the U.S. government, SUF ¶ 231, Traffic and NASL began discussing a buyout of Team Holdings' Class B interest. Those negotiations became even more urgent after May 2015, when the Department of Justice unsealed Traffic's indictments and guilty pleas and NASL began to try to sever its ties with Traffic (and thus Team Holdings). Ex. 20. During those negotiations, NASL evidently concluded that it would be cheaper to buy out Traffic's interest if it adopted the view that the parties had simply agreed to a payment deferral. But the contemporaneous evidence surrounding and predating the Deferral Agreement confirms that the parties deferred Team Holdings' distribution rights (not merely payment of an accrued debt), and, by March 2016—when NASL's D1 application was denied and Dr. Williams' D1 but-for world begins—Team Holdings' rights under Section 7.02 of the LLC Agreement (as amended in the Deferral Agreement) remained intact.

### C. Dr. Williams' Second Error: The Failure to Calculate Antitrust Damages

Defendants also moved to exclude Dr. Williams' D1 damage opinions on the separate ground that he failed to deduct from his D1 model NASL's value as a D2 league and, thus, failed to calculate antitrust damages. ECF No. 284 at 10-13. In Dr. Williams' original reports, he opined that if NASL had received a D1 sanction in March 2016, its valuation would be between ███ and

████. But those amounts substantially overstated NASL's potential D1 damages because the injury that NASL claims to have suffered from the alleged antitrust violation—the denial of a D1 sanction—was not the total value of NASL, which still had ongoing value as a D2 league as of March 2016. *Id.* Rather, NASL's injury was the loss of its *incremental* value as a D1 league over

its value as a D2 league.  *Id.*  Thus, Defendants argued, Dr. Williams erred by failing to deduct NASL's ongoing value as a D2 league from its alleged value as a D1 league.  *Id.*

Judge Cogan again agreed, explaining that "NASL continued to operate as a D2 league" after it was denied a D1 sanction "so how could Williams conclude it had no value at that time?" Order at 24.  Judge Cogan instructed Dr. Williams to "correct this error if he intends to testify as to NASL's D1 damages." *Id.*  He ordered Dr. Williams to "assess and subtract the actual value of NASL's expansion fees in the real world after it was denied a D1 sanction." *Id.*

But Dr. Williams again chose to disregard Judge Cogan's instructions.  Rather than calculate the value of NASL as a D2 league as of March 10, 2016—the date on which it was denied a D1 sanction—Dr. Williams looked two years into the future, considered that U.S. Soccer later denied NASL's D2 sanction for the 2018 season, and concluded that "it would make no sense" to deduct "D2 expansion fees in 2018 and beyond" because that later denial forced NASL to "suspend operations and exit the business."  Supp. Rep. ¶¶ 35, 37.  Thus, Dr. Williams identified two $500,000 entry fees that NASL received in 2017, subtracted $1 million from his D1 estimate, and completely ignored NASL's ongoing value as a D2 league as of March 2016.  *Id.* ¶¶ 33-37.  In stark contrast, for purposes of his alternative D2 damages estimate, Dr. Williams estimates NASL's value at ███████ *16 months later*.  *Id.* at Ex. 1.  Both cannot be correct.

### LEGAL STANDARD

Courts are the "gatekeeper" of expert evidence.  *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 561-62 (S.D.N.Y. 2007).  In assessing evidence under Rule 702, the court must determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  Since "[e]xpert evidence can be both powerful and quite misleading," (*id.* at 595 (citation omitted)), it is "critical that an expert's analysis be reliable at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d

256, 267 (2d Cir. 2002).

In 2023, Rule 702 was amended to reinforce these requirements. As the Advisory Committee on Evidence Rules explained, the amendments were to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates *to the court* that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." *Lane v. Am. Airlines, Inc.*, 18-CV-6110 (MKB), 2024 WL 1200074, at *4 n.3 (E.D.N.Y. Mar. 20, 2024) (emphasis added). And "[a]lthough the language remains largely similar," (*id.*), the amendment arose because the Advisory Committee detected a "pervasive problem" of courts delegating to the jury the judicial responsibility of critically screening expert testimony and repeatedly holding that "the critical questions of the sufficiency of an expert's basis, . . . and the application of the expert's methodology, are generally questions of weight and not admissibility." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 283-84 (4th Cir. 2021). The amendment rejects that "incorrect application" of Rule 702 (*id.*), and "emphasize[s] that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis." Proposed Amends. to Fed. R. of Evid. 106, 615, & 702, 344 F.R.D. 850, 857-58 (Oct. 19, 2022).

Under *Daubert*, the Court must undertake a two-step analysis in assessing an expert's proposed testimony. *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03 Civ. 7037(PKC), 2005 WL 4684238, at *9 (S.D.N.Y. Apr. 11, 2005). The Court must first determine "whether the reasoning or methodology underlying the testimony is scientifically valid" and "whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* (citation omitted.) As a second step, "the court must consider whether the methodology [] is appropriate for the particular issue or task for which it is being used, and must also assess whether the witness is applying it in a manner that ensures a reliable linkage between the facts that he is examining and the conclusions

that he is announcing." *Id.* at *10.

This second step is critical. As the Supreme Court has explained:

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also In re: NFL "Sunday Ticket" Antitrust Litig.,* No. ML 15-02668 PSG (SKx), 2024 WL 3628118, at *6 (C.D. Cal. Aug. 1, 2024) (concluding after a jury trial in an antitrust case that the plaintiffs' expert's damage model was based on a flawed assumption and vacating a jury verdict for plaintiff).

Accordingly, "court[s] should undertake a *rigorous examination of the facts* on which the expert relies" and reject expert testimony where an expert's conclusions are contradicted by facts or data in the record. *Amorgianos*, 303 F.3d at 267 (emphasis added); *Washington v. Kellwood Co.*, 714 F. App'x 35, 39 (2d Cir. 2017) (rejecting damages estimate because expert assumed facts that were belied by other facts in the record); *Lava*, 2005 WL 4684238 at *20-21 (same); *Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 111 (E.D.N.Y. 2019) ("[T]he Court is not obligated to accept conclusions that do not flow from the facts[.]").

It is NASL's burden to demonstrate that Dr. Williams' approach satisfies these criteria. *Lava*, 2005 WL 4684238 at *10. For the reasons detailed below, NASL is unable to do so.

## ARGUMENT

## I.   DR. WILLIAMS CONTINUES TO IGNORE THE AMOUNTS NASL OWED TO TEAM HOLDINGS

### A.   Dr. Williams Failed to Comply With Judge Cogan's Order

Judge Cogan held that "Williams's failure to account for NASL's agreement with Team Holdings in his initial report is a major oversight." Order at 25. That was because when Dr.

Williams' D1 but-for world began in March 2016, "NASL had deferred paying those [entry] fees to Team Holdings." *Id.* The Court ordered Dr. Williams to "discount his estimates to reflect real-world conditions that existed *at the time of the challenged conduct*" and the "terms of the Team Holdings contract *as it existed in March 2016.*" *Id.* at 27 (emphasis added).

Dr. Williams did not comply with this command. Rather than discount his estimates to reflect "the real-world conditions" and the "terms of the Team Holdings contract" as it existed in March 2016, Dr. Williams simply declared that he was "not aware of any reason that the NASL would have deviated from the terms of the Team Holdings agreement" and then *applied the terms of the December 2009 agreement*. Supp. Rep. at ¶¶ 15, 19, 21, 23-24, 30 ("Exhibit 12 lists . . . the amounts owed to Team Holdings using the terms of the December 2009 Team Holdings agreement."); ("[T]he December 2009 agreement called for the NASL to pay Team Holdings $450,000 plus 80% only for the first ten teams that joined after that agreement took effect.").

This completely ignores what Judge Cogan directed Dr. Williams to do and is itself grounds for exclusion. *See On Track Innovations, Ltd. v. T-Mobile USA, Inc.*, 12-cv-2224 (AJN), 2015 WL 14072083, at *6 (S.D.N.Y. July 24, 2015) ("[H]aving transgressed the boundaries of Daubert and Rule 702(b), they are not now entitled to a second bite at the apple."); *Trevino v. TFS Servs., LLC*, No. 7:22-cv-00158, 2023 WL 5473728, at *5 (S.D. Tex. Aug. 24, 2023) ("Given that Plaintiffs have already been given a chance to have their expert amend the report, and the amended report is still not sufficient, the Court finds that exclusion of Mr. Garcia's expert report in its entirety is the necessary remedy."); *see also Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 386 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) ("[I]t would be fundamentally unfair to require defendants to go through the process again, to delay the final resolution of this very difficult and burdensome case, solely because plaintiffs made some ill-advised tactical choices and refused

to adjust when it was apparent that they should.").[5]

**B.      Dr. Williams Disregards The Evidentiary Record**

Dr. Williams disregarded not only Judge Cogan's instructions, but also extensive record evidence, which is inconsistent with his assumption that the parties did not deviate from the terms of the 2009 agreement and merely deferred payment of "certain debts."  As noted above, *Daubert* and Rule 702 require, among other things, that a court "undertake a *rigorous examination of the facts* on which the expert relies" and reject expert testimony where the expert renders conclusions or makes assumptions based on facts or data without record support.  *Amorgianos*, 303 F.3d at 267 (emphasis added).

Here, Dr. Williams' assumption that the parties did not deviate from the 2009 LLC Agreement and merely deferred payment of "certain debts" is contrary to the facts.  For one thing, as discussed above, neither NASL nor Team Holdings recorded those alleged "debts" in their financial statements (or anywhere else).  Ex. 19 at pp. 27-32.  And the one document on which Dr. Williams relies undermines his opinion: it shows that Team Holdings and NASL agreed to defer the calculation of Team Holdings' right to *future* entry fees, not simply the payment of what NASL initially would have owed it on the first ten teams had the 2009 agreement terms held.  *See* pp. 7-8, *supra*.

That should be the death knell for Dr. Williams' D1 model.  There are no other documents

---

[5] To be clear, an expert may make certain assumptions and calculate damages based on those assumptions, as NASL suggests in its pre-motion letter.  ECF No. 421 at 2.  An expert may not, however, ignore the record evidence, make a flawed assumption as critical as this one, disregard the Court's instructions, and then argue that this is more properly a "question of fact for the jury." *Id.* at 3 (citation omitted).  It is not.  It is a question of admissibility, and it is one for the Court. *See* Fed. R. Evid. 702.

upon which he relied for his opinions.[6]   NASL should not be permitted to try to supplement the record now.  *See Lava*, 2005 WL 4684238, at *8 ("[O]n the current *Daubert* motion, plaintiff has proffered extensive new affidavits by [its experts] in which they offer new explanations [and] new analyses . . . This new effort only underscores the failure of the original and revised reports . . ."); *On Track Innovations*, 2015 WL 14072083, at *6 ("[A]t the time an expert issues his report, that report reflects his full knowledge and complete opinions on the issues for which his opinion has been sought.").

If the Court is willing to look beyond the four corners of Dr. Williams' report, the other contemporaneous evidence on this issue (discussed at pp. 7-11 above and in the accompanying rebuttal report of Paul Meyer (Ex. 19)) is extensive and confirms that Dr. Williams' opinion has no basis in fact and should be excluded.  *Lava*, 2005 WL 4684238 at *20-21 (rejecting expert report that is "premised on a number of crucial factual assumptions that are dramatically belied by the record before us"); *Washington*, 714 F. App'x at 39 (rejecting damages estimate because expert's model assumed facts that were belied by other facts in the record).[7]

---

[6] Dr. Williams' Appendix D, which contains the "List of Materials Relied Upon," lists nine other documents in total.  *See* Supp. Rep. App'x D.  Six of those are previous expert reports in this case (including those of Defendants' experts), the seventh is the Court's Order, the eighth is NASL's 2009 LLC Agreement, and the ninth is an NASL presentation that Dr. Williams cites for an unrelated point: that NASL had made one $500,000 payment to Team Holdings for a May 2014 "buyout fee."  *Id.*

[7] NASL argues in its pre-motion letter that it is "improper" for Mr. Meyer to "assess[] fact-record documents" and "opine on fact issues about which he has no personal knowledge . . . ."  ECF No. 421 at 1-2.  But, as Judge Cogan already explained, it is unquestionable that "an expert is permitted to rely on facts in the record to form his opinions."  Order at 12 (citing *Hopkins v. Nat'l R.R. Passenger Corp.*, 2015 WL 13741721, at *10 (E.D.N.Y. Aug. 20, 2015)).  In other places, NASL argues that "Mr. Meyer's legal opinion on the meaning of the LLC Agreement and its terms is inadmissible."  ECF No. 421 at 2.  But nowhere does Mr. Meyer offer a "legal opinion on the meaning of the LLC Agreement."  Instead, and ironically, *Mr. Meyer does exactly what Judge Cogan instructed Dr. Williams to do*: examine "the real world conditions that existed at the time of the challenged conduct" and "the terms of the Team Holdings contract as it existed in March 2016."  Order at 27.  Mr. Meyer does this by, among other things, analyzing financial statements,

NASL may try to muddy the waters with internal analyses created for negotiation purposes years after the July 2013 Deferral Agreement (and not relied on by Dr. Williams). Such evidence may not be considered for that purpose under Delaware law, which governs NASL's LLC Agreement (*see* Ex. 9). In construing a contract under Delaware law, "[o]nly '[a]greements and negotiations prior to or contemporaneous with the adoption of a writing' are admissible." *Shiftan v. Morgan Joseph Holdings, Inc.*, 57 A.3d 928, 935 n.15 (Del. Ch. 2012) (citing Restatement (Second) of Contracts § 214 (1981)); *see also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 n.11 (Del. 1997) ("[R]elevant extrinsic evidence is that which reveals the parties' intent *at the time they entered into the contract*. In this respect, backward-looking evidence gathered after the time of contracting is not usually helpful."); *Convergent Wealth Advisors LLC v. Lydian Holding Co.*, No. 12 Civ. 1199, 2012 WL 2148221, at *4 (S.D.N.Y. June 13, 2012) ("When faced with an ambiguous contract provision, the interpreting court must look beyond the language of the contract to ascertain the parties' intentions *at the time of drafting*.") (applying Delaware law).[8]

## II.   DR. WILLIAMS FAILED TO CALCULATE ANTITRUST DAMAGES

Dr. Williams also failed to assess properly and subtract the value of NASL's D2 expansion

---

financial projections, and contemporaneous documents (some of which are technical and complex) to understand those "real world conditions" in March 2016. That is undoubtedly the proper role of an expert. *Hopkins,* 2015 WL 13741721, at *10.

[8] If NASL is allowed to present additional evidence beyond what Dr. Williams relied on, and if the Court determines that such evidence is relevant under Delaware contract law, the proper course is a *Daubert* evidentiary hearing, not denial of this motion. *See Joseph S. v. Hogan*, No. 06 Civ. 1042(BMC)(SMG), 2011 WL 2848330, at *3 (E.D.N.Y. July 15, 2011) (Cogan, J.) ("Where the parties raise factual issues, like they do here with respect to the data on which Dr. Fries based his opinion, an evidentiary hearing is useful and may indeed be necessary . . ."); *cf. Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d 167, 173 n.3 (E.D.N.Y. 2008) ("Although a Rule 104(a) pretrial evidentiary hearing is often necessary to address Daubert issues, such hearings are unnecessary if the objections to the testimony being raised do not turn on factual issues . . . .").

fees.  As noted, Judge Cogan directed Dr. Williams to "assess and subtract the actual value of NASL's expansion fees in the real world *after it was denied a D1 sanction*."  Order at 24 (emphasis added).  Dr. Williams did not do that.  Instead, he declared that "it would make no sense" to deduct "D2 expansion fees in 2018 and beyond" because the denial of a D2 sanction in 2017 forced NASL to "suspend operations and exit the business."  Supp. Rep. ¶¶ 33-37.  Thus, Dr. Williams identified two $500,000 entry fees that NASL received in 2017, subtracted $1 million from his estimate, and otherwise ignored NASL's value as a D2 league as of March 2016.  *Id*. ¶ 33.  That is not what Judge Cogan ordered Dr. Williams to do.

Under fundamental valuation principles, "[t]he valuation date is the specific date at which the valuation analyst estimates the value of the subject interest" and "the valuation analyst should consider only circumstances existing at the valuation date and events occurring up to the valuation date."  Ex. 19 at p. 35 (citing AICPA).  Dr. Williams knows this fundamental principle because (i) in calculating NASL's value 16 months later for purposes of his D2 estimate, Dr. Williams valued NASL at ▮▮▮▮▮▮▮ based on NASL's estimated future expansion fees as of September 2017 (the date on which it was denied a D2 sanction); and (ii) Dr. Williams repeatedly represented in his previous reports that his methodology calculates the *ex-ante* value of NASL's damages "as of the date of the challenged conduct in 2016."  ECF No. 285-3 ¶¶ 11, 14-15, 18 ("The damages methodology calculates the *ex ante* value of the damages to NASL . . . *as of the date of the challenged conduct in 2016* . . . .") (emphasis added).  Nevertheless, Dr. Williams decided to abandon that fundamental principle and value NASL based on events that would not have been known as of that date.

In its September 6 pre-motion letter, NASL contends that Dr. Williams' approach was "legally correct" because the Seventh Circuit once explained that a value "derived from actual

gain" is more relevant than "a value based on expectation gain."  ECF No. 421 at 3, *citing Fishman v. Estate of Wirtz*, 807 F.2d 520, 550-53 (7th Cir. 1986).  But *Fishman*, in fact, *confirms* the flaws in Dr. Williams' approach.  There, the plaintiff's expert was tasked with valuing the plaintiff's losses—over a ten-year period—in connection with its failed purchase of the Chicago Bulls basketball team.  *Fishman*, 807 F.2d at 550-53.  Critically, "[t]he Bulls did not go out of business" after the failed purchase "but instead continued in business in [defendants'] hands" for more than ten years.  *Id.* at 552.  Thus, as NASL (correctly) points out, the Court found that the Bulls continuing for more than ten years provided "an exceptionally helpful guide to [plaintiff's] damages" and allowed the plaintiff to perform a valuation based on the "actual gain experienced by the Bulls over [those] ten years."  *Id*.  Here, NASL did not continue operating for ten years. Rather it operated for two years.  The *Fishman* decision thus provides no support for a mix-and-match valuation in which NASL purports to value its expected D1 expansion fees over a ten-year period but, for purposes of the D2 deduction, stops counting them after the first two years.

NASL also disingenuously justifies Dr. Williams' approach by claiming that he followed Judge Cogan's instructions exactly: "assess and subtract *the actual value of NASL's expansion fees in the real world* after it was denied a D1 sanction in 2016 (even if these expansion fees could only come from D2 expansion fees) from his estimate of the value of NASL's D1 expansion fees in the but-for world."  ECF No. 421 at 3.  This approach misreads and misapplies the Court's instruction. The Court was focused on the "actual" value of NASL's expansion fees only because that was how Dr. Williams calculated NASL's value.  Order at 24.  The instruction was not to add up and deduct the expansion fees "actually" received before NASL went out of business.  Indeed, the entire discussion was about calculating "the difference between the value of NASL in the actual world and the but-for world to calculate antitrust damages."  *Id*.  NASL's value in the actual world

as of March 2016 was as a D2 league. NASL's value in the "but for" world as of March 2016 was its value as a D1 league. As the Court recognized, it is the *difference* between those values that would constitute NASL's antitrust damages. *Id*.

Compounding his errors, Dr. Williams continues to discount his estimates back to a completely arbitrary date—that of his initial expert report (April 2019), rather than the date of the alleged harm (March 2016). Fundamental valuation principles, as well as the governing law, are not complicated: "[e]x ante damages calculations (including ex ante lost profits calculations) discount damages from *all* periods back to the date of the damaging event . . . ." Ex. 19 at p. 38 (emphasis added); *see also, e.g., Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 538 n.22 (1983) ("It is both easier and more precise to discount the entire lost stream of earnings back to the date of injury . . . ."); *Taylor v. B&J Martin, Inc.*, 611 F. Supp. 3d 278, 284 (E.D. La. 2020) ("[E]ach future payment in the income stream must be discounted to present value *as of the day of the accident*.") (citation omitted); *Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 886 F. Supp. 2d 873, 886 (N.D. Ill. 2012) ("[U]sing the trial date to determine present value calculations results in SDI recovering more damages for the years that have passed between the date of the breach and the present than it could have recovered as of the date of the breach.").

**CONCLUSION**

Dr. Williams did *not* produce a reliable estimate of damages but instead grossly inflated NASL's purported D1 damages and failed to follow the Court's instructions. His opinions on NASL's alleged D1 damages should be excluded under Federal Rule of Evidence 702.

Dated: September 20, 2024

Respectfully submitted,

By: */s/ Bradley I. Ruskin*

PROSKAUER ROSE LLP

Bradley I. Ruskin
Kevin J. Perra
Keisha-Ann Gray
Scott A. Eggers
Eleven Times Square
New York, New York 10036
(212) 969-3000
bruskin@proskauer.com
kperra@proskauer.com
kgray@proskauer.com
seggers@proskauer.com

Colin R. Kass
1001 Pennsylvania Ave., NW, Suite 600S
Washington, DC 20004
(202) 416-6800
ckass@proskauer.com

*Counsel for Defendant Major League Soccer, L.L.C.*

By: */s/ Christopher S. Yates*

LATHAM & WATKINS LLP

Christopher S. Yates (*pro hac vice*)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600
chris.yates@lw.com

Lawrence E. Buterman
885 Third Avenue
New York, NY 10022
(212) 906-1200
lawrence.buterman@lw.com

Anna M. Rathbun (*pro hac vice*)
David L. Johnson (*pro hac vice*)
555 Eleventh Street, NW

Suite 1000
Washington, D.C. 20004
(202) 637-2200
anna.rathbun@lw.com
david.johnson@lw.com

*Counsel for Defendant United States Soccer*
*Federation, Inc.*