**WINSTON & STRAWN LLP**
North America  Europe  Asia

**PEARSON WARSHAW, LLP**
15165 VENTURA BLVD., SUITE 400
SHERMAN OAKS, CA 91403
(818) 788-8300
WWW.PWFIRM.COM

Hon. Hector Gonzalez
United States District Court
Eastern District of New York
225 Cadman Plaza East, Brooklyn, NY 11201

Re:   *NASL v. USSF and MLS*, No. 1:17-cv-05495

Dear Judge Gonzalez:

I write in response to Defendants' letter to the Court dated January 20, 2025 (ECF No. 510) (the "Letter"), requesting for a third time that this Court grant a judgment rejecting NASL's D1 damages claim and excluding the D1 damages opinions of Dr. Williams. Defendants again argue that the text of NASL's LLC Agreement requires it to pay a large portion of its entry fees to Team Holdings for a different set of ten teams than NASL is claiming—and, in fact, a different set of ten teams than Defendants previously argued were required by the terms of the Agreement.

Defendants' request should be rejected. It is a meritless and belated attempt to avoid a D1 damages verdict by constructing new legal arguments seeking the same relief that the Court has previously denied. There is no excuse for Defendants' failure to make this argument in their earlier attempts to exclude Dr. Williams' D1 damages testimony, given that it is purportedly based on "the plain meaning of clear and unambiguous language" in the July 2013 NASL LLC Agreement (Ltr. at 3), produced to Defendants in 2018. Regardless of their timing, Defendants' arguments are wrong as both a matter of fact and a matter of law.

As this Court has recognized, "what [Defendants] seek to cast as settled 'fact'" about the LLC Agreement's terms on entry fee payments to Team Holdings "is a hotly contested issue about the meaning and anticipated performance of contractual terms." ECF No. 451 at 23. This factual dispute, which remains hotly contested, must be resolved by the jury and not the Court. Dr. Williams has assumed for purposes of his D1 damages estimate that the factual interpretation offered by Mr. Sehgal, the only negotiator of the agreement who will have testified on that subject, is correct. If the jury agrees with Mr. Sehgal's testimony about the factual meaning of the agreement with Team Holdings, then they can determine whether also to accept Dr. Williams' D1 damages estimate.

If, on the other hand, the jury determines that Defendants' new factual interpretation of the agreement is correct, Dr. Williams' expert reports contain sufficient information to adjust the D1 damages estimates downward to account for that interpretation. All that is necessary to make this adjustment is to change the set of ten teams for which the larger portion of NASL's entry fees will be deducted from NASL's D1 damages estimate from (i) the first ten teams after the 2009 LLC Agreement to (ii) the first ten teams after the 2013 LLC Agreement. Dr. Williams will be prepared to present this alternative D1 damages estimate to the jury based on the information disclosed in his expert reports. In no event would it be proper to grant Defendants any of the relief they seek, which would have this Court resolve disputed issues of fact in place of the jury.

### I.   Defendants' Letter Is an Untimely and Improper Request

This is the third time that Defendants have asked this Court to exclude NASL's D1 damages based on NASL's obligations to pay entry fees to Team Holdings—specifically, NASL's

obligation to pay Team Holdings the first $450,000 plus 80% of the remainder of the entry fees it received for its first ten new teams (the "80% Portion").[1] There is no proper justification to do so.

First, Defendants moved to exclude Dr. Williams' D1 damages testimony back in 2020 on the ground that, among other things, he had not properly addressed the impact of the NASL's agreement to share expansion fees with Team Holdings. Judge Cogan refused to exclude Dr. Williams' D1 damages testimony, but he did rule that his analysis should be revised to take into account the impact of the agreement with Team Holdings as it existed in March 2016, not as it was subsequently settled at a later date. ECF No. 399 at 27.

Second, after Dr. Williams revised his D1 damages estimate to follow the directions of the Court, Defendants again moved to exclude Dr. Williams' D1 damages opinions on September 20, 2024, arguing that he failed to properly reduce his damages estimate to take into account the fact that NASL purportedly amended its LLC Agreement so that NASL would be obligated to pay Team Holdings the 80% Portion of its entry fees for the first ten teams that joined NASL after it paid off a separate debt to Traffic. ECF No 442-1. Defendants contended that NASL owed this 80% Portion of entry fees to Team Holdings for the first ten teams that joined NASL from March 2016 onward, as opposed to the first ten teams that joined NASL after the original LLC Agreement was entered into in 2009. *Id.* But the Court denied Defendants' motion, holding that Dr. Williams was permitted to assume that NASL's interpretation of the LLC Agreement was correct, since the correct interpretation was a disputed fact issue that would have to be resolved by the jury at trial. ECF No. 451 at 23.

Now, Defendants have come up with a new argument as to why Dr. Williams' D1 damages opinions are contrary to the LLC Agreement—that, by amending the LLC Agreement in 2013 to include a definition of "Expansion Teams", NASL agreed with Team Holdings to reset the team count to zero for NASL's first ten new teams. Under this new interpretation, Defendants are no longer arguing that the count of the first ten new teams should have started in March of 2016— their previous position before the Court. They are instead advancing a new interpretation of NASL's agreement with Team Holdings in which the first ten new teams subject to the 80% Portion would be the first ten teams to join NASL after the July 25, 2013 date of the LLC Agreement. This new interpretation by Defendants, at best, raises yet another factual dispute for the jury to resolve and confirms the agreement's ambiguity.

***Nowhere*** in Defendants' 2020 Daubert briefing or their September 2024 Daubert brief did Defendants ever advance this interpretation of NASL's agreement with Team Holdings.[2] Yet, they now argue that this was always the plain and unambiguous meaning of the agreement—even though it was never identified in two prior rounds of briefing by Defendants. Defendants have had NASL's 2013 LLC Agreement since 2018. They cannot in good faith argue that there is no fact issue for the jury to resolve because of Defendants' sudden discovery of the purportedly "plain meaning" of the 2013 LLC Agreement.

The deadline for serving summary judgment and Daubert motions was November 16, 2020 (ECF No. 246), and the deadline for Defendants' more recent Daubert motion directed at Dr. Williams' supplemental D1 damages estimates was September 20, 2024 (September 6, 2024

---

[1] For a more detailed discussion of the contract terms at issue, see ECF No. 450.
[2] Nor did Traffic make this argument when it argued for a different interpretation of the agreement. *See* DX-297.

Minute Entry via ECF). Such deadlines for dispositive motion practice must be enforced. *See Picard v. Sage Realty*, 2021 WL 5830752 at *1 (S.D.N.Y. Dec. 8, 2021) (denying a dispositive motion filed two years after the close of discovery). Any other rule would allow a party to "save" case-dispositive arguments to deploy disruptively during a trial, as Defendants seek to do here. *See Paone v. Microsoft Corp.*, 2012 WL 13106065 at *2 (E.D.N.Y. Dec. 14, 2012) (denying request to file summary judgment motion on the eve of trial).[3]

## II. Defendants' New Argument Is Not a Basis for Excluding Dr. Williams' D1 Damages Estimates

The reason Defendants never previously raised the argument that the 2013 LLC Agreement reset the counting of the first ten new NASL teams until now—over seven years into this case—is that it is factually meritless. NASL's obligation to pay entry fees to Team Holdings is set forth in Section 7.02 of NASL's LLC Agreement. That section states that NASL must pay Team Holdings "the first $450,000 of any Entry Fees paid by each of the first ten New Class A Members [*i.e.*, team owners] in connection with the admission of Expansion Teams plus 80% of any Entry Fees in excess of $450,000 paid by such first ten New Class A Members." JX-25.0044; DX-0233.0042.

Defendants now argue that the parties to the 2013 LLC Agreement decided to bury a drastic change in the counting of the first ten new teams to join NASL in a definition of the term "Expansion Team," contained in a definition section of the 2013 LLC Agreement that is 33 pages away from the provision that uses the exact same language to define the first ten new teams in the 2013 LLC Agreement as was used in the 2009 LLC Agreement. As Mr. Sehgal testified under oath, this was not the intent of the parties to the 2013 LLC Agreement, and not consistent with how the NASL in fact interpreted the agreement (Trial Tr. (Sehgal) at 669:23–670:1; 670:23–671:1; 680:11–12; 748:22–749:1). At best, therefore, this is just another disputed issue of fact for the jury to resolve.

As Mr. Sehgal testified, a "New Class A Member" is defined as a team admitted by "[t]he [NASL] Board of Governors … in accordance with" specified sections of the agreement (JX-25.0023; DX-0233.0019), which included teams added between 2009 and 2013 (Trial Tr. (Sehgal) 434:18–21, 753:16–20), contrary to Defendants' contention. The definition of "Expansion Team" as an "additional Team added to the League after the date of this Agreement" did not reset that team count to zero. Rather, all that meant was that new teams after the 2013 LLC Agreement would be added to the existing count toward ten teams. *Id*.

Defendants' argument that the new definition of Expansion Team was intended to drastically change the amount of money NASL would owe Team Holdings—all without any mention of such an intention elsewhere in the contract—violates the interpretive rule that drafters do not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 373 (6th Cir. 2017) (quoting *Gallo v. Moen, Inc.*, 813 F.3d 265, 269 (6th Cir. 2016) (quoting *Whitman*)) ("construing contract language 'to find 'elephants in mouseholes'' is improper); *Cockerill v. Corteva, Inc.*, 2024 WL 5159892, at *56 (E.D. Pa. Dec. 18, 2024) ("A contract cannot 'hide elephants in mouseholes.'");

---

[3] Indeed, this Court has stated that it "should not have to address [this issue] further" since it "has now been briefed exhaustively and repeatedly," and that the Court would "not be amenable to any dramatic dives in an effort to draw [a] red card" (ECF No. 451 at 26)—but that is precisely what Defendants are now seeking to do with their new letter brief.

*Breeders' Cup Ltd. v. Nuvei Techs., Inc.*, 2023 WL 4111373, at *7 (E.D. Ky. June 21, 2023) ("The contract says nothing about ticket sales for the World Championship. The Court will not read an elephant into this mousehole."). This was not the intent of the parties, as Mr. Sehgal testified, and the Court cannot find that this was the plain meaning of the Agreement. Indeed, if it were, why did Defendants fail to mention this interpretation in their two prior briefings of this issue?

At best, the contractual effect of the new definition of Expansion Team is ambiguous, presenting factual issues which the jury must resolve, based on extrinsic evidence. *See Sunline Com. Carriers v. CITGO Petrol.*, 206 A.3d 836, 851 & n.95 (Del. 2019); *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783–4 (Del. 2012). And the extrinsic evidence shows that NASL's performance under the 2013 LLC Agreement was consistent with Mr. Sehgal's testimony about what the agreement means. As explained during Mr. Sehgal's testimony, NASL continued to calculate its obligation to Team Holdings based on the first ten teams after the 2009 LLC Agreement, and rejected a later proposal by Traffic to alter that arrangement:

- A. "[T]he idea was that when the league started, we started operating, the first ten teams that paid entry fees, we would share the first 450,000 with Team Holdings. So, that always stayed the same. ***It was the first ten teams***." [Trial Tr. 434:18–21 (emphasis added).]

- A. "This chart on the left shows the various teams that had joined NASL since ***2009***. Then the columns show the entry fees that NASL received by year and the amounts, and then the section to the far right shows the calculation of ***the payments that were due to Team Holdings per the LLC agreement***." [Trial Tr. 753:16–20 (emphasis added).]

- Q. "[D]id Traffic have a different position in terms of how the payments would be made?"

    A. "Not at this time when we executed this agreement. … What we were deferring was the payment obligation. … After we had satisfied the Traffic debt, then they seemed to take a different position. … The timing of the counting would have started with a later set of ten teams."

    Q. "And what was NASL's response to Traffic's position?

    A. "***It was a nonstarter.*** It was absolutely clear and agreed that the deferral was on the timing of the payment." [Trial Tr. 438:13–439:8 (emphasis added).]

- A. "This chart represents the alternative proposed definition that we got from Traffic … "

    Q. "And could you read what it says on the top left of that page?"

    A. "Yes. ***No-go, start over.***"

    Q. "Why did it say that?

    A. "Because this was a much worse deal for the league and it did not make sense for the league."

    Q. "Did NASL accept the proposal that is represented by the chart?"

    A. "No." [Trial Tr. 754:3–14.]

Consistent with these facts, when NASL settled with Traffic to buy back its interest in Team Holdings, it paid only $3 million to Traffic, Team Holdings' 92% owner (DX-0549.001)—

an amount that would have been preposterously small, if Team Holdings were owed $450,000 plus 80% of the entry fees for many future teams.

Until now, Defendants have never contended that the 2013 LLC Agreement reset the count to zero for the first ten new teams under Section 7.02. To the contrary, Defendants' expert report on damages showed the first ten new teams as those added from 2010 to 2015[4]:

| Team | Year | Entry Fees Paid | 100% of First $450,000 | 80% of Remainder | Total Amount Due to NASL Team Holdings |
|---|---|---|---|---|---|
| **Actual Entry Fee Paid** | | | | | |
| Edmonton | 2010 | $250,000 | $250,000 | $0 | $250,000 |
| San Antonio | 2010 – 2011 | $500,000 | $450,000 | $40,000 | $490,000 |
| Ottawa | 2011 | $1,000,000 | $450,000 | $440,000 | $890,000 |
| Indianapolis | 2012 – 2014 | $1,000,000 | $450,000 | $440,000 | $890,000 |
| Virginia | 2012 | $500,000 | $450,000 | $40,000 | $490,000 |
| Jacksonville | 2013 – 2014 | $1,500,000 | $450,000 | $840,000 | $1,290,000 |
| Cosmos | N/A | N/A | $0 | $0 | $0 |
| Oklahoma | 2013 – 2014 | $1,500,000 | $450,000 | $840,000 | $1,290,000 |
| **Actual Entry Fees Collected 2010 - 2014** | | **$6,250,000** | **$2,950,000** | **$2,640,000** | **$5,590,000** |
| **Expected Entry Fees to be Paid** | | | | | |
| Oklahoma City | 2015 | $1,000,000 | $450,000 | $440,000 | $890,000 |
| Miami | 2015 | $3,000,000 | $450,000 | $2,040,000 | $2,490,000 |
| **Grand Total** | | **$10,250,000** | **$3,850,000** | **$5,120,000** | **$8,970,000** |

To be sure, Defendants previously argued that NASL owed entry fees to Team Holdings for a later set of ten teams, starting in "March 2016." ECF No. 442-1 at 14. But in doing so, Defendants made a completely different argument that had nothing to do with the definition of "Expansion Team." Defendants' previous position was that "Team Holdings and NASL agreed to defer the calculation of Team Holdings' right to future entry fees, not simply the payment of what NASL initially would have owed it on the first ten teams." *Id.* at 15.

The fact that Defendants have not advanced this interpretation of the 2013 LLC agreement until now demonstrates that it is not the plain meaning of the agreement. The testimony of Mr. Sehgal and documentary extrinsic evidence presented by NASL in support of its interpretation of the agreement must thus be considered by the jury, who will determine the facts.[5] In any case, Dr. Williams' D1 damages testimony may not be excluded, as it was proper for him to rely upon the assumption that NASL's interpretation of the agreement with Team Holdings was correct. And, if the jury finds that Defendants' factual interpretation is correct, Dr. Williams' D1 damages methodology will still enable the jurors to determine damages as he will provide them with the alternative damages calculations from the data already disclosed in his expert reports.

For all the foregoing reasons, Defendants' belated and meritless request to exclude NASL's D1 damages claim or expert D1 damages testimony must be denied.

---

[4] Meyer Dec. 6, 2019 Report at 34, ECF No. 285-13 at 34.
[5] Contrary to Defendants' arguments, such extrinsic evidence will assist—not confuse—the jury in deciding a basic factual issue: which ten teams count for purposes of construing Team Holdings' right to entry fees under NASL's LLC Agreement.

                                                 Respectfully submitted,

By:    s/Jeffrey L. Kessler
          Jeffrey L. Kessler

cc:    All counsel of record (via ECF)