**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NORTH AMERICAN SOCCER LEAGUE, LLC, | Case No. 1:17-cv-05495-HG |
| Plaintiff, | **DEFENDANTS' UNITED STATES SOCCER FEDERATION, INC. AND MAJOR LEAGUE SOCCER, L.L.C.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER FEDERAL RULE OF CIVIL PROCEDURE 50(a)** |
| v. | |
| UNITED STATES SOCCER FEDERATION, INC., and MAJOR LEAGUE SOCCER, L.L.C., | |
| Defendants. | |

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ....................................................................................................................1

LEGAL STANDARD.............................................................................................................5

ARGUMENT ..........................................................................................................................6

I.    NASL Failed To Prove That U.S. Soccer Conspired With MLS To Deny NASL's
      D1 And D2 Sanction Applications And So Judgment Is Warranted On All Its
      Claims ...........................................................................................................................6

      A.    No Reasonable Jury Could Find that U.S. Soccer and MLS Entered into an
            Unlawful Conspiracy to Deny Either of NASL's Sanctioning Applications .........7

      B.    NASL Failed to Prove that Defendants Conspired With Each Other and
            With USL to Deny NASL a D2 Sanction ...............................................................13

II.   NASL Failed To Prove Its Proposed Relevant Markets ......................................14

      A.    NASL Failed To Prove Any D1 Or D2 Sanctions Or Team-Membership
            Markets Limited To The U.S. And Canada .........................................................16

      B.    Dr. Noll's Relevant Market Opinions—Unsupported And Directly
            Contrary To The Market Facts—Cannot Support A Jury Verdict........................17

III.  NASL Failed To Prove Harm To Competition.................................................19

IV.   NASL Failed To Prove Less Restrictive Alternatives .......................................22

V.    NASL Failed To Prove Non-Speculative Damages...........................................24

CONCLUSION.......................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*1-800-Contacts, Inc. v. FTC*,
  1 F.4th 102 (2d Cir. 2021) ................................................................................................ 23

*Abraham & Veneklasen Joint Venture v. American Quarter Horse Ass'n*,
  776 F.3d 321 (5th Cir. 2015) ............................................................................................ 10

*AD/SAT v. Associated Press*,
  181 F.3d 216 (2d Cir. 1999) ...................................................................................... *passim*

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
  53 F. Supp. 2d 909 (N.D. Tex. 1999), *aff'd*, 228 F.3d 574 (5th Cir. 2000) ............................ 5

*Anderson News, LLC v. Am. Media, Inc.*,
  899 F.3d 87 (2d Cir. 2018) ........................................................................................ *passim*

*Aquatherm Indus., Inc. v. Fla. Power & Light Co.*,
  145 F.3d 1258 (11th Cir. 1998) ........................................................................................ 14

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) .......................................................................................................... 19

*Augusta News Co. v. Hudson News Co.*,
  269 F.3d 41 (1st Cir. 2001) ............................................................................................... 23

*Balaklaw v. Lovell*,
  14 F.3d 793 (2d Cir. 1994) ............................................................................................... 21

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
  233 F. Supp. 2d 718 (D. Md. 2002), *aff'd*, 73 F. App'x 576 (4th Cir. 2003) ........................ 18

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ......................................................................................... 4. 15, 18, 25

*Brookins v. Int'l Motor Contest Ass'n*,
  219 F.3d 849 (8th Cir. 2000) ............................................................................................ 17

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) .......................................................................................................... 18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) .......................................................................................................... 19

i

*Cap. Imaging Assocs. v. Mohawk Valley Med. Assocs.*,
  996 F.2d 537 (2d Cir. 1993) ............................................................... 4, 5, 20, 21

*City of N.Y. v. Grp. Health, Inc.*,
  649 F.3d 151 (2d Cir. 2011) ............................................................................. 15

*City of Pontiac Police & Fire Retirement Sys. v. BNP Paribas Secs Corp.*,
  92 F.4th 381 (2d Cir. 2024) .......................................................................... 7, 8

*Concord Assocs. v. Entm't Props.*,
  817 F.3d 46 (2d Cir. 2016) ......................................................................... 4, 14

*Crespo v. Chrysler Corp.*,
  75 F. Supp. 2d 225 (S.D.N.Y. 1999) .............................................................. 16

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ............................................................................................ 5

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ................................................................................... 14. 18

*Epic Games v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ........................................................................... 24

*Gold Medal LLC v. USA Track & Field*,
  899 F.3d 712 (9th Cir. 2018) ........................................................................... 20

*Ho Myung Moolsan, Co., Ltd. v. ManitouMineral Water, Inc.*,
  2010 WL 4892646 (S.D.N.Y. Dec. 2, 2010),
  *aff'd,* 501 F. App'x 85 (2d Cir. 2012) ........................................................... 25

*Impax Labs. v. FTC*,
  994 F.3d 484 (5th Cir. 2021) ........................................................................... 23

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  361 F. Supp. 3d 324 (E.D.N.Y. 2019) ............................................................. 15

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ............................................................. 18

*In re NFL "Sunday Ticket" Antitrust Litig.*,
  2024 WL 3628818 (C.D. Cal. Aug. 1, 2024) .................................................... 25

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 914 (9th Cir. 2015) ........................................................................... 18

*In re Wireless Tel. Servs. Antitrust Litig.*,
  385 F. Supp. 2d 403 (S.D.N.Y. 2005) .............................................................. 18

*Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.*,
    812 F.2d 786 (2d Cir. 1987)............................................................................ 4, 7

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) ................................................................................ 15

*Jessup v. Am. Kennel Club, Inc.*,
    61 F. Supp. 2d 5 (S.D.N.Y. 1999),
    *aff'd on dist. ct. op.*, 210 F.3d 111 (2d Cir. 2000) .......................................... 7, 10, 11

*K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*,
    61 F.3d 123 (2d Cir. 1995)..................................................................................... 19

*Kentucky v. Marathon Petro. Co. LP*,
    464 F. Supp. 3d 880 (W.D. Ky. 2020) .................................................................. 19

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)................................................................................................ 25

*Little Rock Cardiology Clinic, P.A. v. Baptist Health*,
    573 F. Supp. 2d 1125 (E.D. Ark. 2008), *aff'd*, 591 F.3d 591 (8th Cir. 2009) ........................ 14

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
    833 F.3d 172 (2d Cir. 2016).......................................................................... 4, 19, 20

*MLB Props. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)..................................................................................... 4

*NASL v. U.S. Soccer*,
    883 F.3d 32 (2d Cir. 2018)............................................................................... *passim*

*On Track Innovations Ltd. v. T-Mobile USA, Inc.*,
    106 F. Supp. 3d 369 (S.D.N.Y. 2015)..................................................................... 25

*Podiatrist Ass'n v. La Cruz Azul De Puerto Rico, Inc.*,
    332 F.3d 6 (1st Cir. 2003)........................................................................................ 20

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 ............................................................................................................. 23

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill.*,
    412 F. Supp. 3d 941 (N.D. Ill. 2019) ..................................................................... 15

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) .................................................................................. 19

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
    661 F. Supp. 2d 218 (E.D.N.Y. 2009), *aff'd*, 391 F. App'x 59 (2d Cir. 2010) ...................... 14

iii

*Spinelli v. NFL,*
    96 F. Supp. 3d 81 (S.D.N.Y. 2015)...................................................................... 15

*Super Sulky, Inc. v. U.S. Trotting Ass'n,*
    174 F.3d 733 (6th Cir. 1999) ............................................................................... 11

*United States v. Am. Express Co.,*
    838 F.3d 179 (2d Cir. 2016).................................................................... 4, 15, 18

*United States v. Apple, Inc.,*
    791 F.3d 290 (2d Cir. 2015)......................................................................... 7, 12

*United States v. E.I. du Pont de Nemours & Co.,*
    353 U.S. 586 (1957) .......................................................................................... 14

*Washington v. Kellwood Co.,*
    714 F. App'x 35 (2d Cir. 2017) .......................................................................... 25

*Wells Real Est., Inc. v. Greater Lowell Bd. of Realtors,*
    850 F.2d 803 (1st Cir. 1988) .............................................................................. 14

*Williams v. Cnty. of Westchester,*
    171 F.3d 98 (2d Cir. 1999)................................................................................... 6

## STATUTES

36 U.S.C. § 22050, *et seq.*............................................................................................. 20

## RULES

Fed. R. Civ. P. 50(a) .................................................................................................. 1, 6

Fed. R. Evid. 403 ............................................................................................................ 5

Fed. R. Evid. 702 ...................................................................................................... 6, 25

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application,* ¶ 1760d (2024 supp.) ........................................ 24

United States Soccer Federation, Inc. ("U.S. Soccer") and Major League Soccer, L.L.C. ("MLS," together "Defendants") move for judgment as a matter of law.  Fed. R. Civ. P. 50(a).

## INTRODUCTION

Both as a soccer league and in court, NASL has been given every chance.  As a league, U.S. Soccer worked with NASL for years, mediating its disputes, giving it waivers so it could play as a D2 league when it never met the standards, and even offering up pathways to become a D1 league.  But despite all the chances, NASL could not succeed.  Mired by poor management, constant owner departures, and its deep ties to a criminal organization, the league failed.

In this case, NASL has also been given every chance for the last eight years.  The NASL had years of discovery to uncover evidence of the supposed cabal it claims led to its downfall.  It found none.  And it was given a chance to present its case to a jury.  For over two weeks, the jury has heard NASL make its best case.  NASL called its senior leadership as well as current and former executives from U.S. Soccer and MLS, and questioned them extensively.  NASL also was given the chance to present expert testimony to support its antitrust liability and damages claims. But at trial, NASL chose to withdraw one of its liability experts, leaving its presentation completely silent on key legal elements.  The liability expert it did put forth did not tie his opinions to record evidence during his testimony.  And as for damages, NASL's "expert" was permitted to revise his calculations multiple times to fix a barrage of errors—and even got to present a new damages calculation in the middle of trial.  Yet at the end of the day yesterday, it was clear that Dr. Williams could not claim his D1 or D2 damages calculations were reasonable, reliable or accurate.

Plaintiff NASL's response to Defendants' oral Rule 50(a) motion at the close of its case-in-chief only confirmed why judgment should be entered for Defendants.  The Second Circuit has made clear that "to avoid confusion when considering the validity of an antitrust conspiracy claim, [the court] must ask precisely 'Who was in agreement with whom and about what?'" *Anderson*

1

*News, LLC v. Am. Media, Inc.*, 899 F.3d 87, 98–99 (2d Cir. 2018). The Court asked NASL's counsel that very question, and the response was telling. Rather than offer a cogent explanation of what actual conspiracy it proved at trial, NASL offered an ever-shifting tale involving supposed conspirator after conspirator—some of whom were barely mentioned at trial. NASL also reverted back to the "walking conspiracy" it presented eight years ago in its failed bid for a preliminary injunction: that because U.S. Soccer's Chairman presented issues for decision at Board meetings, that proves a conspiracy. That is not only a ridiculous theory, it is wrong as a matter of law.

NASL conceded that it has no direct evidence of any conspiracy. Tr. 2500:14–15; 2508:21–22. It did not present to the jury a single text message, email, or any other piece of evidence to support what appeared to be its final "conspiracy" theory: that Mr. Gulati and Mr. Garber entered into some unlawful agreement to deny NASL its demanded divisional sanctions. Both denied entering into any unlawful agreement or engaging in undue influence, the independent directors of the U.S. Soccer Board who voted all denied that their votes resulted from any unlawful agreement, and the record is unequivocal that there was no unlawful agreement. This is critical because the antitrust laws limit the permissible inferences from ambiguous evidence. *Anderson News*, 899 F.3d at 98. NASL needed to present "circumstantial evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Id*. It failed to, and the unrebutted evidence in NASL's own case reflects that its sanctioning applications were denied because the Board directors who did vote concluded that it did not meet the Professional League Standards.

Mr. Commisso and others plainly feel aggrieved by those decisions. However, NASL brought an antitrust case. And so NASL needed to prove concerted action. It failed to do so. It also needed to offer evidence sufficient for the jury to find that such a conspiracy actually harmed *competition*—not just itself—in a relevant antitrust market, and that such competitive harm caused

2

some discernible, non-speculative damages.  NASL failed to present this evidence too.  And NASL defaulted on its ultimate burden of proving substantially less restrictive alternatives at the rule of reason's third step.  Were that not enough, the testimony of NASL's damages expert, Dr. Williams, confirmed that his opinions are entirely unreliable, speculative, and unduly prejudicial.

Judgment as a matter of law is appropriate because, having rested its case, NASL has offered no evidence that could allow the jury to find liability on any of its claims.

*First*, NASL failed to prove that either of U.S. Soccer's D1 or D2 sanctioning decisions with respect to NASL resulted from an unlawful agreement between U.S. Soccer and MLS.  For the jury to find such an agreement, NASL needed to elicit evidence that U.S. Soccer and MLS engaged in "concerted action . . . in the form of a conscious commitment to a common scheme designed to achieve an unlawful objective." *Anderson News*, 899 F.3d at 97.  The evidence elicited by NASL in its case confirmed there was no such agreement:  no one affiliated with MLS or USL voted on the two sanctioning decisions, JX-110 (Moeller 262:07–15); Tr. 1238:2–6 (Gulati); Tr. 1674:24–1675:9 (Garber); JX-111 (Shalala 218:07–19); all Board members voted independently; and no one from U.S. Soccer or MLS ever agreed to anything with respect to NASL's sanctioning applications.  *E.g.*, Tr. 1246:6–8 (Gulati); 1607:23–1608:5 (Garber); 1870:8–14 (L'Hote); JX-110 (Moeller 260:2–262:21); JX-111 (Shalala 216:12–218:1); JX-113 (Cordeiro 317:7–318:5).

At bottom, NASL presented nothing more than evidence of deliberations and two votes by the U.S. Soccer Board.  NASL's belief that those Board decisions were unfair is not evidence that "tend[s] to show that association members, in their individual capacities, consciously committed themselves to a common scheme *designed to achieve an unlawful objective*." *NASL v. U.S. Soccer*, 883 F.3d 32, 40 (2d Cir. 2018) (citing *AD/SAT v. Assoc. Press*, 181 F.3d 216, 234 (2d Cir. 1999)).  There is nothing for the jury to infer that the denials of NASL's sanctioning applications resulted

3

from concerted action.  And because the NASL's Section 1 and 2 claims rest entirely on this claimed conspiracy, this failure of proof requires judgment on all claims.  *AD/SAT*, 181 F.3d at 233–34; *Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 796 (2d Cir. 1987).

*Second*, NASL failed to prove any substantial harm to competition in a properly defined relevant market.  All NASL offered at trial was the opinions of Dr. Roger Noll that the relevant antitrust markets in this case are D1 and D2 sanctions and team-membership.  But Dr. Noll's opinions were pure *ipse dixit*, entirely untethered to any facts presented to the jury and admittedly ungrounded in any empirical analysis.  Tr. 2181:19–2182:14.  The only *evidence* unequivocally undermined these markets.  *E.g.*, DX-233.0022–.0023; Tr. 1390:17–1391:8 (Anthony); 1618:7–1619:5 (Garber); 1909:12–24 (Hunt).  A proper relevant market definition must be based on market facts and built upon a reliable economic analysis.  *See U.S. v. Am. Express Co.*, 838 F.3d 179, 198–200 (2d Cir. 2016); *MLB Props. v. Salvino, Inc.*, 542 F.3d 290, 328–330 (2d Cir. 2008).  Where—as here—"an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."  *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).  This lack of evidence is dispositive, as a proper market definition is "'essential for assessing the potential harm to competition from the defendants' alleged misconduct.'"  *Concord Assocs. v. Entm't Props.*, 817 F.3d 46, 53 (2d Cir. 2016).

*Third*, NASL failed to prove any harm to competition.  The "purpose of the antitrust law" is "to ensure competition in general, not narrowly focused to protect individual competitors."  *Cap. Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d Cir. 1993).  There is "only one way to prove an adverse effect on competition under the rule of reason:  by showing actual harm to consumers in the relevant market."  *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833

F.3d 172, 182 (2d Cir. 2016).  NASL presented no such evidence.  The uncontroverted evidence was that output of professional men's soccer has only *increased*, and there is *zero* evidence of any decrease in quality or increase in price above competitive levels. Tr. 1869:23–1870:5 (L'Hote); 2217:1–3 (Noll).  That precludes any jury finding as to harm to competition.

*Fourth*, having opted not to present testimony from Dr. Stefan Szymanski, NASL failed to offer any evidence of less restrictive alternatives to the application of the Professional League Standards with respect to NASL's two sanctioning applications.  This precludes a jury verdict.

*Last*, Dr. Williams' speculative and unreliable damages testimony should be excluded under Rule 403, 702, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and therefore cannot support a damages verdict.  His trial testimony only confirmed that neither his D1 nor D2 damages estimates are premised on any reliable, non-speculative methodology and are in fact "inherently and irreconcilably contradictory."  *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 53 F. Supp. 2d 909, 935 (N.D. Tex. 1999), *aff'd*, 228 F.3d 574 (5th Cir. 2000).

"Antitrust law is not intended to be available as an over-the-counter cold remedy," "brought into play too readily."  *Cap. Imaging*, 996 F.2d at 539.  Over the course of two weeks, NASL simply failed to present any evidence for a reasonable jury to return a verdict in its favor. Under these circumstances, the jury should not be required to sacrifice any more of its time, and Defendants should not be forced to continue to expend massive resources, just so NASL's counsel can stand up in closing and (1) try to mislead the jury with a factually baseless tale untethered to the actual evidence and (2) seek hundreds of millions of dollars in damages based solely on the opinions of an expert whose testimony must be excluded.  Enough is enough. The Court should grant a Rule 50 judgment.

## LEGAL STANDARD

A court may "grant a motion for judgment as a matter of law against the party on a claim

. . . that, under the controlling law, can be maintained . . . only with a favorable finding on that issue" if "a party has been fully heard" on that issue and "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). An earlier denial of summary judgment of course does not preclude granting a Rule 50 motion. *Williams v. Cnty. of Westchester*, 171 F.3d 98, 102 (2d Cir. 1999).

## ARGUMENT

## I.   NASL FAILED TO PROVE THAT U.S. SOCCER CONSPIRED WITH MLS TO DENY NASL'S D1 AND D2 SANCTION APPLICATIONS AND SO JUDGMENT IS WARRANTED ON ALL ITS CLAIMS

To find a conspiracy, a court must "consider the question of 'who was in agreement with whom and about what' and at what point in time." *Anderson News*, 899 F.3d at 104. The cornerstone of NASL's case was a supposed unlawful conspiracy between U.S. Soccer and MLS to deny NASL's D1 application for the 2016 season and NASL's D2 application for the 2018 season.[1] This alleged conspiracy underlies not only the Section 1 claim and Section 2 conspiracy to monopolize claims, but it is also the only "conduct" underlying NASL's monopolization claims. NASL has consistently recognized this link between its claims.[2] What NASL presented at trial, however, was not a conspiracy case, but one about U.S. Soccer's purported unfair treatment of

---

[1] NASL has been all over the map about who, exactly, it thinks conspired. In the initial jury instructions submission, NASL argued that it was "wrong" to say that U.S. Soccer "must have conspired with a third party." ECF No. 474 at 42. In its mid-trial letter, NASL claimed that it was "no longer challenging an internal agreement of the voting members of USSF's Board of directors" and that its claim was only "between USSF and MLS." ECF No. 511 at 2, 3. After resting their case, NASL spun out several new conspiracies, mentioning Mr. Gulati, Mr. Garber, Mr. Flynn, and U.S. Soccer "staff"—while alternatively arguing that their "theory of the case" revolved around Mr. Gulati and Mr. Garber and involved deceiving Board members. Tr. 2505:20–25; 2507:12–25; 2511:23–2512:7. NASL's continuing inability to say who was in agreement with whom and at what time—even after presenting its case at trial—is all one needs to know to conclude that the NASL completely failed to meet its burden.

[2] ECF No. 399 at 57 (NASL's "Section 2 claims rise and fall with its Section 1 claims"); 6/21/2024 Hr'g Tr. 46:21–22 ("[I]t's all the same evidence, it's all the same allegations.").

NASL.  None of the evidence supports a jury finding of any "'agreement to agree to vote a particular way.'"  *NASL*, 883 F.3d at 39.  This failure of proof is fatal.  *AD/SAT*, 181 F.3d at 233 ("threshold showing that a reasonable jury could find that the defendants' actions were concerted rather than independent" applied to Section 1 conspiracy and Section 2 conspiracy to monopolize claims); *Int'l Distrib. Ctrs.*, 812 F.2d at 796 (finding same "corpus of evidence" insufficient to show conspiracy under Sections 1 and 2); *Jessup v. Am. Kennel Club, Inc.*, 61 F. Supp. 2d 5, 10 (S.D.N.Y. 1999), *aff'd on dist. ct. op.*, 210 F.3d 111 (2d Cir. 2000) (noting that Section 1 and Section 2 conspiracy to monopolize claim "share a common element of conspiracy").

### A.    No Reasonable Jury Could Find that U.S. Soccer and MLS Entered into an Unlawful Conspiracy to Deny Either of NASL's Sanctioning Applications

NASL "must present evidence of . . . some form of concerted action between at least two legally distinct economic entities' in the form of a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'"  *Anderson News*, 899 F.3d at 97.  There must be "direct or circumstantial evidence that 'tends to exclude the possibility that the alleged conspirators acted independently.'"  *Id.* at 98.  Direct evidence is something like "a recorded phone call in which two competitors agreed to fix prices," while circumstantial evidence might include "parallel action" plus "additional circumstances" that "allow the jury "to infer a conspiracy."  *U.S. v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015).  "[A]mbiguous evidence," does not "permit an inference of conspiracy" because that "would 'deter or penalize perfectly legitimate' and procompetitive conduct."  *Anderson News*, 899 F.3d at 98.  None of NASL's evidence—whether related to the Board votes or connections between U.S. Soccer and MLS—supports concerted action.

***There is no direct evidence of any agreement between U.S. Soccer and MLS regarding U.S. Soccer's sanctioning decisions.***  There is no "explicit" evidence (say, a phone call or an admission) of any conspiracy.  *City of Pontiac Police & Fire Retirement Sys. v. BNP Paribas Secs*

*Corp.*, 92 F.4th 381, 391 (2d Cir. 2024).  NASL conceded that "this is a case of circumstantial evidence" and that they "don't have direct evidence" of a conspiracy.  Tr. 2500:14–15; 2508:21–22.  And the evidence NASL presented at trial established that no one affiliated with MLS, USL, or NASL voted on either of the two NASL sanctioning decisions.  JX-111 (Shalala 218:07–19); JX-110 (Moeller 262:07–15); Tr. 1238:2–6 (Gulati); Tr. 1674:24–1675:9 (Garber); JX-112 (Papadakis 149:17-21).  Everyone who did testify—voting Board members or otherwise—confirmed that there was *no* agreement to deny NASL's sanctions to protect MLS (or USL).  Tr. 1246:6–8 (Gulati); 1607:23–1608:5 (Garber); JX-110 (Moeller 260:02–262:21); JX-111 (Shalala 216:12–218:01); JX-113 (Cordeiro 315:13–17; 317:07–318:5); Tr. 1870:8–14 (L'Hote); JX-112 (Papadakis 202:16-203:02); Tr. 1282:3–1283:5 (Gulati); 1303:21–1304:17 (Gulati).

***There is no indirect evidence of any agreement.***  None of NASL's circumstantial evidence—whether related to the Board votes or concerning connections between U.S. Soccer and MLS—is legally sufficient.  It is at most "ambiguous evidence" that does not "permit an inference of conspiracy" because it is at least "equally consistent with independent conduct."  *Anderson News*, 899 F.3d at 98.  Choosing between "two equally likely explanations for defendants' conduct, one legal and one illegal, would 'amount to mere speculation.'"  *Id.* at 104–05.  And "[c]onspiracy claims cannot be based on speculation."  *AD/SAT*, 181 F.3d at 240.  But that is all NASL has.

Undisputed evidence confirmed that the Board had obvious, non-conspiratorial reasons to deny NASL's applications.  NASL applied for a D1 sanction in 2015 though it admittedly did not meet D1 Standards.  JX-100.0048; Tr. 1259:2–1260:5 (Gulati) (time-zone and stadium-capacity requirements in place since 1995).  Rather than provide any plan to come into compliance, NASL insisted the requirements it failed to satisfy were improper.  JX-100.0048.  And, mere days before NASL submitted its application, news broke that Traffic Sports (which owned three NASL teams)

had pleaded guilty to racketeering and wire fraud and Aaron Davidson (Chairman of NASL's Board of Governors) had been indicted.  Tr. 458:10–21; 566:21–567:16; 568:8–569:6; 691:13–693:23 (Sehgal).  The Board debated NASL's application for an extended period, raised Traffic Sports on multiple occasions (DX-399, DX-425), and ultimately denied NASL's application for a D1 sanction.  Tr. 1261:10–1275:13 (Gulati) (discussing meetings and correspondence between NASL's May 2015 application and March 2016 decision).  Still, U.S. Soccer was willing to give NASL a pathway to a D1 designation if NASL made improvements towards meeting the Standards.  Tr. 618:7–619:4 (Sehgal); 1268:4–1269:3 (Gulati); DX-410.

But NASL did not improve.  In 2017, NASL had at most eight teams confirmed for 2018, even though the D2 Standards required twelve—and none of those teams were in the Central time zone.  JX-79.0002; Tr. 1295:18–23 (Gulati); JX-94.0007–.0008.  Beyond those waivers, NASL asked the Board for three more years to comply with the D2 Standards.  Tr. 516:22–517:4 (Sehgal).  When the Board asked *how* NASL would comply, NASL said that it would "develop a plan for a plan."  Tr. 1305:13–16; 1291:11–12 (Gulati); JX-110 (Moeller 91:05).  But "[t]here was no plan."  JX-113 (Cordeiro 275:07–15; 278:01–13).  And the evidence confirmed that the NASL had no strategic plan and was teetering on the brink of failure.  Tr. 724:11–726:1 (Sehgal) (discussing DX-741).  Disinterested members of the Board therefore voted 8-1 to deny NASL a D2 sanction.  JX-79.0002; Tr. 1305:17–18 (Gulati).  NASL "didn't meet the standards"—or even "get close."  Tr. 1309:5–15 (Gulati); JX-111 (Shalala 162:07–22) (NASL "given plenty of opportunity to meet the standards" and "had not made any significant progress").  On top of all of that, U.S. Soccer supported and wanted NASL to succeed—and even offered it a path to a D1 sanction.  JX-77.0085; Tr. 728:22–729:14 (Sehgal); 1298:14–15 (Gulati).  This undercuts any suggestion of conspiracy.

Imagine a world in which Mr. Garber expressly stated that the Board should deny NASL's

application to protect MLS, and then he voted to deny NASL's application himself. That, of course, is contrary to the evidence NASL elicited at trial. Tr. 1581:3–24; 1607:23–1608:5 (Garber); 1246:6–8 (Gulati). Even then, NASL would *still* lack evidence of an unlawful conspiracy, as such evidence would be "at most, parallel conduct following an invitation to conspire" which "does not give rise to an inference of conspiracy." *AD/SAT*, 181 F.3d at 236.

In *Jessup*, the challenged actions were two related votes (one by a membership organization, another by a separate membership organization's board) altering a Labrador Retriever breed standard. 61 F. Supp. 2d at 6–7. Plaintiffs' alleged conspiracy focused on two competitors who were "key figures"—the committee chair who "drafted the proposed standard" and a director who "cast the decisive vote." *Id.* at 11. Even viewing the two individuals' actions "as self-serving and anticompetitive," there was no "inference of an agreement to achieve an unlawful objective on the part of a majority" of the others who voted. *Id.* at 12. There was thus "nothing, apart from mere speculation, to suggest that the votes . . . w[ere] the result of an anti-competitive agreement rather than a legitimate exercise of the permissible function that defendants are authorized to perform in setting uniform breed standards." *Id.*

*Abraham & Veneklasen Joint Venture v. American Quarter Horse Association*, which concerned votes by a board committee to block the registration of particular horses, is similar. 776 F.3d 321, 326–27 (5th Cir. 2015). There, the Fifth Circuit reversed the denial of a Rule 50 motion and found no evidence of a conspiracy where financially interested board members were "outnumbered in voting strength by the others who were not shown to have such financial interests" and there was no evidence that other board members were "influenced" or "g[a]ve any weight" to comments advocating for that action by the financially interested board members. *Id.* at 332. The plaintiffs had failed to "produce evidence tending to exclude the possibility of a

10

decision arrived at by independent, not illegally concerted action." *Id.* at 334.

This case is weaker than *Jessup* and *American Quarter Horse*, as no one affiliated with any professional league voted on NASL's sanctioning applications. NASL tries to make much of Mr. Gulati and Mr. Garber's friendship, or Mr. Gulati's dual roles in 2014 and before for U.S. Soccer and Kraft Soccer. But none of that is linked to the two Board decisions denying NASL's sanctions applications. Mr. Gulati stopped working at Kraft Soccer before those decisions. Tr. 1240:22–1241:9. And friendship (or a "strong relationship") is not conspiracy. Tr. 2098:11–2100:12 (Commisso); *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 739 (6th Cir. 1999) ("Personal friendships are natural" and "do not amount to proof of conspiracy."). Just because Mr. Gulati and Mr. Garber were aligned on bringing the World Cup to the U.S. (or even "joined at the hip") does not mean they entered into an unlawful agreement. Neither Mr. Gulati nor Mr. Garber were "involved in" the Board's vote to deny NASL a sanction. *AD/SAT*, 181 F.3d at 241. And "it would be counter to the goals of" U.S. Soccer "to eliminate a competitor in the market," *id.* at 242; its mission is to "grow the game" in "every possible way," Tr. 1191:19–23 (Gulati). There is also zero evidence of NASL's late-breaking theory that Mr. Gulati or Mr. Garber (who was not even present for either vote) *deceived* Board members. Tr. 2507:16–25; *see, e.g.*, JX-111 (Shalala 57:25–58:07). NASL failed to show "actual knowledge of" or "*participation in*[] the illegal scheme." *AD/SAT*, 181 F.3d at 234. Under NASL's theory, Mr. Gulati could not serve on the Board. But U.S. Soccer "is not by its nature a 'walking conspiracy.'" *NASL*, 883 F.3d at 40.

None of NASL's other evidence shows that "association members, in their individual capacities, consciously committed themselves to a common scheme *designed to achieve an unlawful objective*" either. *NASL*, 883 F.3d at 41 (quoting *AD/SAT*, 181 F.3d at 234). Neither the MLS nor USL waivers "tend to exclude the possibility" that the Board "acted independently."

11

*AD/SAT*, 181 F.3d at 236.  Disparate treatment and conspiracy belong in two different boxes. Imagine a parent who gives two children different curfews (disparate treatment).  That fact is not evidence that the parent agreed with the child who gets to stay out later that their sibling does not get the same curfew (conspiracy).  There may well be alternative explanations:  perhaps the earlier curfew is a result of repeatedly failing to comply with household rules, failing to do homework, or associating with the wrong crowd.  That is the situation here, where NASL needed waivers every year, Tr. 2217:10–18 (Noll), attacked the Standards it did not meet as illegitimate, JX-100.0048, and was closely associated with criminals, Tr. 458:10–21; 566:21–567:16; 568:8–569:6; 691:13–693:23 (Sehgal).  What is more, there were categorical differences between the waivers sought by MLS and NASL.  Tr. 771:13-14 (Stover); JX-113 (Cordeiro 99:05-100:04).  And the USL could have eliminated teams and still had more than 20 teams in full compliance with the D2 standards in 2017.  Tr. 1187:7–16 (Gulati); *see* DX-0766.0001.  NASL, on the other hand, nearly died at the end of 2016, had no plan to meet the Standards.  Tr. 1305:9-25 (Gulati); JX-113 (Cordeiro 275:07–15; 278:01–13).  These differences matter, and they do not indicate a conspiracy.  Nor does a comparison of NASL in 2016 with MLS in 2001.

Finally, the SUM agreement does not exclude the possibility of independent action.  NASL presented no evidence that SUM was considered by Board members.  Nothing in the SUM agreement "relate[s] at all to decisions about divisional sanctioning."  Tr. 967:5–15 (Abbott).  And even if MLS rights were more profitable, that "didn't do anything for" U.S. Soccer.  Tr. 1209:24–1210:13 (Gulati).  Nothing in the SUM agreement was tied "in any way to MLS's status as a Division 1 league" or "to NASL's divisional sanctioning."  Tr. 1308:5–16 (Gulati).  This is not evidence of a conspiracy; it is at best "ambiguous" evidence "equally consistent with independent conduct."  *Apple*, 791 F.3d at 315; *see also NASL*, 883 F.3d at 44.

### B. NASL Failed to Prove that Defendants Conspired With Each Other and With USL to Deny NASL a D2 Sanction

NASL's D2 conspiracy claims also fail because there is no evidence from which a reasonable jury could conclude that USL was part of any alleged conspiracy. Although NASL claims that there was a trilateral conspiracy involving MLS, U.S. Soccer, and USL, Tr. 1771:17–1772:16, NASL offered nothing to establish how this alleged conspiracy with USL was formed, who at USL was involved, or how it operated. There is also no evidence that USL was involved in the decision to deny NASL's D2 sanction for the 2018 season, that USL discussed that decision with MLS or U.S. Soccer, or that USL was ever aware of that decision being made.

The trial evidence established at most that MLS had a player-development relationship with USL that began in 2013 and ended in 2022. There is no evidence of how USL worked with MLS and U.S. Soccer to NASL's detriment. Indeed, the evidence reflects tension between MLS and USL in the months before the Board's September 2017 vote, which forced MLS and USL to reconsider their player-development relationship.[3] *E.g.*, DX-1021.0017. Because MLS's relationship with USL focused on player development, MLS did not care that USL was sanctioned as D3, or about the revenues (or lack thereof) that its development clubs generated in USL. *See* Tr. 968:4–970:16 (Abbott); DX-1021.0017.

The provision in the 2013 MLS-USL LOI that provided MLS with the right to share in USL's expansion fees did not give MLS a financial incentive to favor the growth of USL and, by implication, the demise of NASL, as the non-binding LOI was limited to 2013 and 2014. JX-32.

---

[3] Because MLS's relationship with USL focused on player development, MLS did not care that USL was sanctioned as D3, or about any revenues its development clubs generated in USL. *See* Tr. (Abbott) 968:4–970:16; DX-1021.0004. NASL tries to point to a 2014 presentation showing that MLS knew of USL's potential plan to apply for a D2 sanction in 2017. *See* JX 46. But when the USL applied, from MLS's perspective the "friction" caused by "this misalignment [had] become more acute." DX 1021.0017. That is the opposite of evidence of a conspiracy.

The LOI was never extended, and MLS never again earned any portion of USL's expansion fees after the 2014 season.  Tr. 1669:18–1670:14 (Garber).  MLS had no financial interest in USL's expansion in 2017 and had not had one for years at that point.  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468–69 (1992) ("If the plaintiff's theory [of conspiracy] is economically senseless, no reasonable jury could find in its favor").

NASL offered no evidence that MLS and USL conspired with U.S. Soccer to reject NASL's D2 application for the 2018 season.  Judgment is warranted on NASL's D2 claims.[4]  *See supra* 6–7; *Wells Real Est., Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 816 (1st Cir. 1988) (affirming directed verdicts where "jury could not reasonably have found a conspiracy to monopolize on the basis of the scanty evidence in the record regarding these defendants").

## II.    NASL FAILED TO PROVE ITS PROPOSED RELEVANT MARKETS

A Rule 50 judgment is independently warranted because NASL failed to prove any of the relevant markets required to sustain each of its claims.[5]  A proper market definition is "essential for assessing the potential harm to competition from the defendants' alleged misconduct." *Concord Assocs.*, 817 F.3d at 53.    It must be defined around "all products 'reasonably

---

[4] Absent concerted action with USL, a jury cannot find that U.S. Soccer and MLS conspired to monopolize the D2 team-membership market, as neither U.S. Soccer nor MLS competes in that market.  *See RxUSA Wholesale, Inc. v. Alcon Labs., Inc.,*, 661 F. Supp. 2d 218, 227 (E.D.N.Y. 2009), *aff'd,* 391 F. App'x 59 (2d Cir. 2010) (a defendant "cannot monopolize a market in which it does not compete"); *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1262 n. 4 (11th Cir. 1998) (similar); *Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1141 (E.D. Ark. 2008) (similar).

[5] NASL previously argued that "we don't agree that the jury has to be unanimous on which relevant market."  Dec. 20, 2024 H'ring Tr. 23:13–25.  NASL then offered no authority on that point, *see* ECF 507 No. at 36-41, and shifted gears to claim that "a direct showing of anticompetitive harm can obviate the need for an inquiry into relevant markets," *id.* at 34.  But a relevant market is a "necessary predicate" to analyzing antitrust claims under the rule of reason. *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957).  This Court rightly rejected NASL's attempts to read out a critical element of its claims.

interchangeable by consumers for the same purposes,' because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level." *City of N.Y. v. Grp. Health, Inc.*, 649 F.3d 151, 155 (2d Cir. 2011).  Where a plaintiff "'fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient.'"  *Id.*  A relevant market must be supported by reliable economic and empirical analyses, *see Am. Express*, 838 F.3d at 198–200, and must be grounded in actual, market-based facts, *see Brooke Grp.*, 509 U.S. at 242.

At trial, NASL tried to prove four relevant markets defined exclusively around U.S. Soccer's D1 and D2 designations:  two separate D1 and D2 sanctioning markets and two separate D1 and D2 team-membership markets.  These were always inherently flawed, given that relevant markets defined around a single brand or the plaintiff's preferences generally fail as a matter of law.  *See In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 343–45 (E.D.N.Y. 2019) (noting prevailing rule against single-brand markets); *Spinelli v. NFL*, 96 F. Supp. 3d 81, 111 (S.D.N.Y. 2015) ("[T]o define the market as that group of products over which a defendant exercises control would as an analytic matter read the market definition step out of the Sherman Act."); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) (court "was not required to accept uncritically two market definitions" that "fit plaintiff's precise circumstances"); *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill.*, 412 F. Supp. 3d 941, 952-53 (N.D. Ill. 2019) (dismissing complaint, as "'Tier I' is a name . . . akin to a trademark or brand that cannot define a market for antitrust scrutiny.").  This evidence at trial undermined the notion that any markets could be constrained to U.S. Soccer's D1 and D2 designations.  *See infra*

16–17.  NASL's only other proof was the testimony of Dr. Noll.  But he did not conduct any empirical analyses, Tr. 2181:19–2182:14, and the market-based *evidence* confirmed that Dr. Noll's relevant market opinions are not grounded in record evidence.  His untethered opinions cannot support a jury finding as to relevant markets.  While NASL pointed to Noll's expert reports, Tr. 2514:15–18, only his *conclusions* were presented to the jury.  "[V]ague and conclusory statements from plaintiff's expert" are *not* "material evidence . . . presented to the jury."  *Crespo v. Chrysler Corp.*, 75 F. Supp. 2d 225, 230 (S.D.N.Y. 1999).  The jury "was left to speculate about a necessary element of the case without having an adequate basis to do so."  *Id.* at 232.

### A.    NASL Failed To Prove Any D1 Or D2 Sanctions Or Team-Membership Markets Limited To The U.S. And Canada

The evidence that NASL elicited indisputably confirmed that professional soccer leagues and teams compete on a global scale against other sports and entertainment options for fans, broadcasters and sponsors.  Evidence from the NASL's team owners and documents uniformly reflect that the league and team owners viewed the markets in which they competed as one for fans, sponsors and broadcasters, rather than the made-for-litigation markets gerrymandered around U.S. Soccer's D1 and D2 designations.  *E.g.*, DX-741.0001 (Sehgal stating that NASL is "in the sports and entertainments business"); DX.340.0004 (team owner stating that to "operate at a first division level" means "having a bigger, better stadium," "more sponsorships," "a better broadcast deal," and "a more competitive team").  NASL's own operating agreement contained a noncompete providing for buy-out fees for NASL team owners wanting to own or operate a MLS team, a team in another D2-sanctioned league, or a team in any other outdoor professional soccer league.  DX-233.0022–0023. And Mr. Commisso's testimony about an imagined conspiracy involving major American sports leagues keeping soccer down concedes that those leagues were "compet[ing] against soccer."  Tr. 2087:7–2088:11.

The only other evidence presented in NASL's case corroborated that fact, as several witnesses testified that professional soccer leagues in the United States compete with "other North American sports" like the "NFL, NBA, MLB, [and] NHL" and with "soccer teams around the globe" for "fans, for sponsors, for investors."  Tr. 1909:12–24 (Hunt); *see also* Tr. 948:9–20 (Abbott); 1646:16–1647:17 (Garber).  Were this not enough, the evidence confirmed that neither U.S. Soccer's D1 or D2 sanctions operated as a barrier to entry for soccer teams or leagues looking to compete.  *Nothing* in the Standards limits investments into leagues and Dr. Noll conceded that neither D1 nor D2 labels were necessary to compete for players.  Tr. 1925:20–1926:4 (Hunt); 1998:11–2001:7 (Commisso); 1390:17–1391:8 (Anthony); 2257:17–2258:3 (Noll).  NASL failed to present any market-based facts from which the jury could find relevant product markets limited to D1 or D2 sanctioning or team memberships, or a geographic market limited to the U.S. and Canada.  The only evidence the jury heard unequivocally confirmed that professional soccer leagues and teams compete against other sports in global markets for fans, broadcasters, sponsors, and investors.  This is inimical to NASL's proposed markets.  *See Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000) (to prove market defined by sports governing body sanction, plaintiff must show "no cross-elasticity of demand between this game and other games").

## B.    Dr. Noll's Relevant Market Opinions—Unsupported And Directly Contrary To The Market Facts—Cannot Support A Jury Verdict

Absent market facts to support any of NASL's four claimed relevant markets, the trial testimony of Dr. Noll regarding relevant markets cannot support a jury finding.

First, as Dr. Noll admitted at trial, he did not undertake any of the required economic analysis required to support a viable market definition.  He did not analyze cross-elasticity of demand—such as the interchangeability of D1, D2 or D3 (or other leagues) from the perspectives of teams, or the differences in quality or player salaries between leagues and teams across

divisions.  Tr. 2226:12–16 (Noll).  He did not do a SSNIP or a Hypothetical Monopolist Test.  Tr. 2181:19–2182:14 (Noll).  And while Dr. Noll testified that D1 and D2 sanctions impose significant financial obligations on teams and leagues, he did no economic analysis of whether an increase in the price of a sanction would cause teams or leagues to seek a different divisional sanction.  Tr. 2204:12–22.  These abject failures preclude Dr. Noll's opinions from supporting NASL's claimed markets.  *See Am. Express*, 838 F.3d at 198–200 (reversing judgment given plaintiffs' failure to apply the Hypothetical Monopolist Test); *Salvino*, 542 F.3d at 329; *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 987 (C.D. Cal. 2012) (excluding market definition where expert "did not reliably apply the SSNIP methodology to the facts of this case").

Second, an expert's opinion cannot supplant actual market-based evidence.  "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them."  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 924 (9th Cir. 2015) (quoting *Brooke Grp.*, 509 U.S. at 242).  A "[r]elevant market cannot be proved through generalizations about any given industry, but instead must be based on the economic and commercial realities of the particular market studied."  *Berlyn, Inc. v. Gazette Newspapers*, 233 F. Supp. 2d 718, 726-27 (D. Md. 2002), *aff'd*, 73 F. App'x 576 (4th Cir. 2003) (citing *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 467 (1992) and *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 335 (1962)).  "[T]o prove relevant market, expert testimony . . . , or any other evidence, *must be based on specific facts pertaining to the proposed market*."  *Id.* at 727 (emphasis added); *see also In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 424 (S.D.N.Y. 2005).

Here, there were simply no market facts presented to the jury to support any of Dr. Noll's claimed markets.  On direct, Dr. Noll did not discuss a *single* document or portion of trial testimony supporting his market definitions.  And *all* of the market facts relating to the structure of the

markets in which professional soccer operates undermine Dr. Noll's opinions. *Supra* 16–17. Both NASL and USL's operating agreements contained non-competes that belie Dr. Noll's market definition. Tr. 2186:25–2187:4 (NASL noncompete "doesn't say anything about the level of divisional sanctioning"); 2185:19–2188:5; 2191:12–2196:15. Dr. Noll even *conceded* that U.S. soccer leagues compete with other U.S. and foreign professional soccer leagues. Tr. 2236:24–2237:5; 2237:11–2238:8. In "antitrust law, if there are undisputed facts about the structure of the market that render the inference economically unreasonable, the expert opinion is insufficient to support a jury verdict." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435–36 (9th Cir. 1995); *see also Kentucky v. Marathon Petro. Co. LP*, 464 F. Supp. 3d 880, 891 (W.D. Ky. 2020) (even if plaintiff's expert "defined his market using a reliable method, his opinion would still be excluded because his proposed market does not reflect the economic realities of the [ ] market"). Absent a grounding in market-based evidence, Dr. Noll's opinions cannot support a verdict.

## III.    NASL FAILED TO PROVE HARM TO COMPETITION

Even if NASL had offered sufficient evidence for its proposed markets, NASL failed to prove any harm beyond that to itself or the requisite "antitrust injury."[6] *See* ECF No. 508 at 40; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). NASL has not offered any evidence that any injury "stems from a competition-*reducing* aspect or effect of" Defendants' sanctioning decisions. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). That failure is another one that infects *all* of NASL's claims. *See* ECF No. 508 at 40–41, 50, 58, 63.

"[T]he antitrust laws protect competition, not competitors," so "a plaintiff must show that more than its own business suffered." *MacDermid*, 833 F.3d at 187; *see also K.M.B. Warehouse*

---

[6] This Court rightly rejected NASL's repeated attempts to bypass this requirement of harm to competition in the parties' jury instruction submissions. *See* ECF No. 474 at 62–63 (NASL's first attempt); ECF No. 507 at 33–35 (NASL's second attempt).

*Distribs. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995) ("[T]he plaintiff must show more than just that he was harmed by defendants' conduct). In the Second Circuit's words:

> Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors. Were the law construed otherwise, routine disputes between business competitors would be elevated to the status of an antitrust action, thereby trivializing the Act because of its too ready availability.

*Cap. Imaging*, 996 F.2d at 543 (citations omitted). NASL has presented no evidence on this front.

All of NASL's evidence of harm concerns harm to its own business. For example, Mr. Sehgal testified that the denial of the Division 1 sanction "was incredibly hurtful *to the league*" and that "it caused teams to leave the league and caused a lot of damage *to us*." Tr. 468:2–6; Tr. 540:6–12 (Sehgal) (emphases added). But that is legally insufficient.

Start with the sanctioning markets, where, according to Dr. Noll, U.S. Soccer is the seller and leagues are the buyers.[7] Even there, NASL has not "show[n] that more than its own business suffered." *MacDermid*, 833 F.3d at 187. There was a mountain of evidence confirming the lack of harm to others. *First*, other leagues (including new ones) continued to be sanctioned after NASL's sanctions were denied. JX-112 (Papadakis 34:6–35:5); Tr. 972:1–11 (Abbott); 1718:15 (L'Hote). *Second*, the Standards remain in place, and each application is dealt with each year, on

---

[7] Notably, NASL's claimed conspiracy rests on two votes by U.S. Soccer's Board. Those decisions are not "concerted action between at least two legally distinct economic entities." *Cap. Imaging*, 996 F.2d at 542. No one affiliated with MLS voted on NASL's applications. Tr. 1606:8–10; 1674:24–1675:9 (Garber). And U.S. Soccer is the *only* entity that can grant (or deny) such sanctions. Tr. 389:3–14 (Sehgal); 1020:22–1021:5 (Gulati). The Board's decisions regarding NASL's applications are thus acts by a single entity. "[T]o extent that [membership organizations] are buying and selling [products or services] in their own right, they can fairly be regarded as single entities" whose policies are not antitrust conspiracies. *AD/SAT*, 181 F.3d at 234; *see also, e.g., Podiatrist Ass'n v. La Cruz Azul De Puerto Rico, Inc.*, 332 F.3d 6, 13–14 (1st Cir. 2003). Plus, as the NGB under the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 22050, *et seq.*, U.S. Soccer enjoys implied antitrust immunity with respect to certain decisions. *See, e.g., Gold Medal LLC v. USA Track & Field*, 899 F.3d 712, 718 (9th Cir. 2018).

its own merits. *E.g.*, Tr. 1050:11–14 (Gulati) (applications go "back to the Board on an annual basis"); 1218:7–14 (Gulati) (similar); 1845:1–4 (L'Hote) (similar). *Third*, U.S. Soccer sanctions leagues that comply with the Standards, or gives waivers to leagues that make progress toward such compliance. Tr. 1546:1–6 (Garber) ("[I]f you qualify you can have more than one league designated Division 1 and Division 2."); 1215:16–1216:2 (Gulati) (similar); 1305:19–25 (Gulati) (noting "USL had made a lot of progress"); 1833:6–10 (L'Hote) (similar). And *fourth*, NASL's denial of a sanction lasted only one year, *see Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) (no antitrust injury where the opportunity for competition remained after three-year term of exclusive contract). NASL could have applied for a sanction the following year while it continued play as a D3 or even an unsanctioned league. Tr. 1307:1–11 (Gulati) (JX-79 inviting NASL to apply for D3); JX-106 (Palmer 122:6–20) (NPSL is "not sanctioned" but "[a]bsolutely" had "successful" teams). Instead, NASL sued.

In NASL's supposed team-membership markets where leagues are the sellers and owners are the buyers, there is no "proof of harm to the whole market" either. *Cap. Imaging*, 996 F.2d at 543. NASL offered no evidence that there were reduced choices for teams or a reduction in either quality or output. Again, the evidence in NASL's own case is to the contrary—opportunities to compete in professional soccer and to invest in teams and leagues continue to grow. Since 2017, the number of teams playing in professional leagues sanctioned by U.S. Soccer has increased dramatically—from about "70" teams in 2017 to "125 teams" in 2024. Tr. 1869:23–1870:5 (L'Hote). There are also "some new leagues … since 2017," Tr. 1870:2–5 (L'Hote), including USL League 1 (first sanctioned in 2018) and MLS Next Pro (first sanctioned in 2022), JX-112 (Papadakis 34:6–35:5); Tr. 972:1–11 (Abbott). MLS has more teams than it did in 2018 as well. Tr. 939:12–15 (Abbott) (roughly 20 teams in 2018); 1601:19–21 (Garber) (30 teams in 2025). And

though NASL shuttered its doors, its teams that wanted to play in other leagues did so. Some of its former teams joined the NPSL, an unsanctioned league. JX-106 (Palmer 43:16–21) (Jacksonville Armada); JX-106 (Palmer 223:15–19) (Miami FC); Tr. 762:11–17 (Stover) (New York Cosmos reserve team). Others joined the USL. Tr. 526:21–25 (Sehgal) (Indianapolis Eleven, North Carolina FC, and maybe "one or two others"). In short, "[s]occer is still a growing sport in the United States. It's become more popular." Tr. 1645:21–22 (Garber). NASL's sanctions denials did not cause market-wide harm. That craters NASL's claims.

Dr. Noll's testimony cannot plug these holes. He was unable to testify to the "reduced number of leagues" or "elimination of choice for team owners," as neither of these opinions were disclosed—and both are circular, at any rate. *See* Tr. 2145:24–2151:22 (Noll). His ungrounded testimony about reduced number of D2 teams is belied by the evidence of USL's growth, including with former NASL teams. Tr. 526:21–25 (Sehgal). And his testimony about reduced expansion teams was not grounded in any market facts presented at trial. *See id.* Theorizing—without any market-based facts, any trial testimony, or any other evidence—is not enough.

## IV.    NASL FAILED TO PROVE LESS RESTRICTIVE ALTERNATIVES

Because NASL failed to prove a conspiracy, relevant markets, or harm to competition, this Court need not move beyond the first step of the rule of reason. Regardless, there were legitimate procompetitive justifications for enforcing the Standards. They were "meant to deal with the very unstable soccer landscape," avoiding a situation with "leagues or teams coming into business and [then] folding." Tr. 1218:17–1219:12 (Gulati); JX-106 (Palmer 165:14-16) ("[T]here's been ongoing instability in minor league soccer since its inception into this country."). Particular Standards were also procompetitive. The time-zone standard tracks "where the major cities are in the United States," Tr. 1259:12 (Gulati), which mattered both for "attendance" and "from a media perspective," Tr. 1328:15–17; 1258:15–23 (Gulati). The stadium-capacity standard attracts

community, fan, and media interest.  Tr. 1258:7–14 (Gulati).  And "the number of teams and the number of owners associated with those teams" is "the most critical component of a league," because "hav[ing] three or four teams" is "not a league in anyone's eyes," Tr. 1225:5–8; 1295:4–17 (Gulati).  "[F]ree-rider and stability justifications . . . evince procompetitive" effects. *NASL*, 883 F.3d at 43–44.  And these Standards "further benefit the market by coordinating necessary competition," "generat[ing] fan and media interest," and "promot[ing] league quality." *Id.*

Since Defendants carried their burden in NASL's case, NASL needed to show a "substantially less restrictive" alternative exists "that achieves the same legitimate competitive benefits." *1-800-Contacts, Inc. v. FTC*, 1 F.4th 102, 120–21 (2d Cir. 2021).  But NASL declined to call Dr. Szymanski, the only witness NASL disclosed to testify about "less restrictive alternatives." ECF No. 464 at 15–16.  A finding of a viable less restrictive alternative generally depends on "economic analysis" by an "expert witness." *Impax Labs. v. FTC*, 994 F.3d 484, 499–500 (5th Cir. 2021); *see also Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 49 (1st Cir. 2001) (similar).  But NASL offered no such analysis.  That is especially significant in the soccer context, where "developing standards" reflect a "[g]rowing industr[y]" and leagues market "competition itself—contests between competing institutions." *NASL*, 883 F.3d at 45; *see also Race Tires Am. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010) ("[S]ports-related organizations should have the right to determine for themselves the set of rules that they believe best advance their respective sport.").

The suggestion that U.S. Soccer should have granted NASL waivers or given it a three-year runway—when NASL lacked plans to come into compliance and argued that certain Standards were illegitimate—attacks the Standards themselves, which NASL cannot do.  ECF No. 399 at 41–44.  It is also a *non sequitur*:  Granting limited waivers to others does not prove that

23

granting perpetual league-wide waivers to NASL would create the same procompetitive effects. Indeed, doing so would undermine those goals—suggesting that a league need not have a stable foundation to receive a sanction.  Plus, there is literally no evidentiary basis for the jury to find that any purported alternatives are "virtually as effective in serving Defendants' procompetitive purposes without significantly increased cost."  ECF No. 508 at 38; *see* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1760d (2024 supp.); *Epic Games v. Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023).

## V.    NASL FAILED TO PROVE NON-SPECULATIVE DAMAGES

Despite the repeated and numerous opportunities to present a reliable, reasonable and accurate damages estimate, Dr. Williams' testimony only revealed more critical errors underlying his fanciful D1 and D2 damages numbers amongst a prolonged history of them.  On cross, Dr. Williams admitted that he was "unable to answer th[e] question" of whether his latest revised D1 damages estimate was correct.  Tr. 2461:1–4.  That was because his estimate wrongly assumed that Puerto Rico FC paid a $3 million entry fee that was counted as one of the 10 teams for entry-fee purposes.  That is doubly wrong:  Puerto Rico FC did *not* pay any entry fee, and that fee was *not* counted as one of the 10 under the 2013 Agreement.  Tr. 1398:16–19 (Anthony "didn't have to come up out-of-pocket with any money"); DX-350.0003 (Puerto Rico "would not be treated as an expansion team within the context of NASL Team Holdings" and "should not count as a new Class A member entry fee for the purposes of the Team Holdings calculation"); *see* DX-233.0042 (2013 Agreement).  His assumption about Miami paying a $3 million entry fee and Los Angeles paying a $2.25 million expansion fee was proven false as well, DX-516.0002, Tr. 2433:13–2423:19—which he conceded would "impact" his D1 and D2 calculations, Tr. 2429:11–15.

These errors more than warrant precluding the jury from considering Dr. Williams' pure speculation.  But there were more.  He assumed that NASL would have kept a sanction for ten

24

years, Tr. 2370:16–21, even though sanctions last for only a year and NASL never complied with the Standards.  Tr. 1050:11–14 (Gulati); 2217:10–18 (Noll); *see Ho Myung Moolsan, Co., Ltd. v. ManitouMineral Water, Inc.*, 2010 WL 4892646, at *7 (S.D.N.Y. Dec. 2, 2010), *aff'd,* 501 F. App'x 85 (2d Cir. 2012) (excluding expert's opinion that projected several years' worth of damages past the expiration of the disputed contract).  He assumed that no NASL teams would fail over ten years and that NASL would have 23 D2 teams by 2026—without any evidence that NASL could support that league, and despite numerous NASL team failures.  Tr. 2353:8–2354:17; 2361:4–7; 2366:24–2367:17 (Williams); 563:12–22 (Sehgal).  And he testified that the Traffic indictment's "net effect [on NASL] was positive," Tr. 2414:17–23, despite NASL's own evidence that Traffic was a major issue for the league, *e.g.*, DX-0372.0002; DX-520.0002; JX-77.0087.

Under these remarkable circumstances, this Court must exercise its continuing obligation "as a gatekeeper" to exclude Dr. Williams' "invalid and unreliable expert testimony."  *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 378 (S.D.N.Y. 2015); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158–59 (1999) (Scalia, J., concurring) (court does not have "discretion to abandon [its] gatekeeping function" under Rule 702 and *Daubert*).  Dr. Williams offered no testimony that "help[s]" the jury "to understand the evidence or to determine a fact in issue," nor is it "based on sufficient facts or data" or "the product of reliable principles and methods."  Fed. R. Evid. 702(a)–(c); *Brooke Grp.*, 509 U.S. at 242; *Washington v. Kellwood Co.*, 714 F. App'x 35, 39 (2d Cir. 2017).  Dr. Williams' speculative and unreliable testimony is not a "reasonable basis [grounded] in the evidence" for the jury to find damages.  ECF No. 508 at 65; *In re NFL "Sunday Ticket" Antitrust Litig.*, 2024 WL 3628118, at *8 (C.D. Cal. Aug. 1, 2024) (without expert testimony, "it is impossible for a jury to determine" damages).

## CONCLUSION

For these reasons, the Court should enter judgment as a matter of law for Defendants.

Date: January 29, 2025

Respectfully submitted,

By: */s/ Christopher S. Yates*

**LATHAM & WATKINS LLP**
Christopher S. Yates (*pro hac vice*)
Aaron T. Chiu (*pro hac vice*)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Tel: (415) 391-0600
chris.yates@lw.com
aaron.chiu@lw.com

Lawrence E. Buterman
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
lawrence.buterman@lw.com

Anna M. Rathbun (*pro hac vice*)
David L. Johnson (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
anna.rathbun@lw.com
david.johnson@lw.com

*Counsel for Defendant United States Soccer Federation, Inc.*

**PROSKAUER ROSE LLP**
*/s/ Bradley I. Ruskin*
Bradley I. Ruskin
Kevin J. Perra
Keisha-Ann Gray
Scott A. Eggers

Eleven Times Square
New York, New York 10036
(212) 969-3000
bruskin@proskauer.com
kperra@proskauer.com
kgray@proskauer.com
seggers@proskauer.com

Colin R. Kass
1001 Pennsylvania Ave., NW, Suite 600S

Washington, DC 20004
(202) 416-6800
ckass@proskauer.com

Genesis Sanchez Tavarez
One International Place
Boston, MA 02110
(617) 526-9675
GSanchezTavarez@proskauer.com

*Attorneys for Major League Soccer, L.L.C*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Christopher S. Yates, an attorney admitted *pro hac vice* to practice before this Court, hereby certify pursuant to Local Civil Rule 7.1(c) and Rule IV.B.2 of Judge Hector Gonzalez's Individual Practices, that the foregoing Memorandum of Law was prepared in Microsoft Word is 25 double-spaced pages.

Dated: January 29, 2025
      Brooklyn, New York

                         /s/ *Christopher S. Yates*
                         Christopher S. Yates