**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

NORTH AMERICAN SOCCER LEAGUE, LLC,

                                    Plaintiff,

                    v.                                    Case No. 1:17-cv-05495-HG

UNITED STATES SOCCER FEDERATION, INC., and
MAJOR LEAGUE SOCCER, L.L.C.

                                    Defendants.


**PLAINTIFF NORTH AMERICAN SOCCER LEAGUE'S OPPOSITION TO**
**DEFENDANTS' JOINT RULE 50(a) MOTION**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

STANDARD OF REVIEW ........................................................................................... 3

I.    There Is No Basis to Grant a Rule 50 Motion Based on the Concerted Action Requirement of Plaintiff's Section 1 or Section 2 Claims ................................... 4

    A.    Evidence of Defendants' Concerted Action Presented at Trial ............ 4

II.   There Is No Basis to Grant a Rule 50 Motion on the First Step of the Rule of Reason or to Exclude Dr. Noll's Expert Testimony on This Point ................... 10

    A.    Relevant Markets ................................................................................ 10

    B.    Market Power, Monopoly Power and Anticompetitive Harm ............. 13

III.  There Is No Basis to Grant a Rule 50 Judgment on Step 2 of Rule of Reason. ......................................................................................................................... 15

IV.   There Is No Basis to Grant a Rule 50 Judgment at the Less Restrictive Alternative or Final Balancing Step of the Rule of Reason ............................. 16

V.    There Is No Basis for a Rule 50 Judgment Against Plaintiff's Monopolization and Attempted Monopolization Claims Against MLS (Counts Four and Five) ......................................................................................................................... 19

VI.   There Is No Basis for a Rule 50 Judgment on NASL's Conspiracy to Monopolize Claim (Count Three) ..................................................................... 20

VII.  There Is No Basis for Either a Daubert Exclusion of Dr. Williams' Damages Opinions or a Rule 50 Order Against Plaintiff's Damages Claims ................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
   486 U.S. 492, 509 (1986)...................................................................................16

*American Tobacco Co. v. United States*,
   328 U.S. 781 (1946)..........................................................................................20

*Anderson v. Liberty Lobby*,
   477 U.S. 242 (1986)............................................................................................3

*Apex Oil Co. v. DiMauro*,
   822 F.2d 246 (2d Cir. 1987) ...............................................................................4

*Clorox Co. v. Winthrop*,
   836 F. Supp. 983 (E.D.N.Y. 1993).....................................................................14

*Cruz v. Local Union No. 3*,
   34 F.3d 1148 (2d Cir. 1994) ................................................................................3

*Discon, Inc. v. NYNEX Corp.*,
   93 F.3d 1055 (2d Cir. 1996), *vac'd on unrelated grounds*, 525 U.S. 128
   (1998) .................................................................................................................21

*In re Domestic Drywall Antitrust Litig.*,
   163 F. Supp. 3d 175 (E.D. Pa. 2016) ..................................................................4

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
   103 F. Supp. 2d 268 (S.D.N.Y. 2000).................................................................23

*In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019).................................................................20

*Martinez v. City of N.Y.*,
   2023 WL 4627739 (E.D.N.Y. July 19, 2023)................................................1, 2, 3

*Maurer v. Patterson*,
   197 F.R.D. 244 (S.D.N.Y. 2000)..........................................................................3

*Meloff v. N.Y. Life Ins.*,
   240 F.3d 138 (2d Cir. 2001) ................................................................................3

*Meredith Corp. v. SESAC LLC*,
   1 F. Supp. 3d 180 (S.D.N.Y. 2014).....................................................................13

*Merrick Bank Corp. v. Chartis Specialty Ins.*,
  2018 WL 11657680 (S.D.N.Y. July 16, 2018)...............................................3

*Monsanto Co. v. Spray-Rite Serv.*,
  465 U.S. 752 (1984)...............................................................................4

*Munn v. Hotchkiss Sch.*,
  24 F. Supp. 3d 155 (D. Conn. 2014)...........................................................22

*NASL v. USSF*,
  883 F.3d 32 (2018) ...............................................................4, 15, 17, 20

*P & L Dev., LLC v. Gerber Prods. Co.*,
  715 F. Supp. 3d 435 (E.D.N.Y. 2024).........................................................20

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  No. 05-md-1720, 2022 WL 14863110 (E.D.N.Y. Oct. 26, 2022)...........................28

*PepsiCo v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) ....................................................................10

*Reeves v. Sanderson Plumbing Prods.*,
  530 U.S. 133 (2000)...............................................................................3

*State of N.Y. v. Hendrickson Bros.*,
  840 F.2d 1065, 1077-78 (2d Cir. 1988) ......................................................26

*Tops Markets, Inc. v. Quality Markets, Inc.*,
  142 F.3d 90 (2d Cir. 1998) .....................................................................13

*U.S. v. Am. Express Co.*,
  838 F.3d 179 (2d Cir. 2016) ...............................................................15, 17

*U.S. v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) .............................................................................10

*United States v. Snow*,
  462 F.3d 55 (2d Cir. 2006)......................................................................4

*Vermont Plastics, Inc. v. Brine, Inc.*,
  79 F.3d 272 (2d Cir. 1996).......................................................................3

*Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*,
  857 F.2d 55 (2d Cir. 1988) .....................................................................21

*Zenith Radio Corp. v. Hazeltine Research*,
  395 U.S. 100, 124 (1969)........................................................................26

**Statutes**

15 U.S.C. § 2 ............................................................................................................. 3, 4, 20, 21

**Other Authorities**

Fed. R. Civ. P. 50 ............................................................................................................ *passim*

Fed. R. Civ. P. 50(a) .................................................................................................................. 3

Fed. R. Civ. P. 56 ...................................................................................................................... 3

Fed R. Evid. 702 ..................................................................................................................... 10

## PRELIMINARY STATEMENT

Defendants' Rule 50 Motion should be denied.  The Court rejected these same arguments in deciding Defendants' summary judgment and *Daubert* motions.  *See generally* ECF No. 399 ("SJ Order").  On summary judgment, NASL already made a sufficient showing on the elements of its claims to establish triable issues of fact, and the addition of trial testimony to the record only bolsters that showing.  Because the "arguments that undergird Defendants' 50(a) motion are nearly identical to those that Defendants unsuccessfully raised at summary judgment, the law of the case doctrine counsels . . . against revisiting [the] prior rulings[.]" *See Martinez v. City of N.Y.*, 2023 WL 4627739, at *8 (E.D.N.Y. July 19, 2023).

**Concerted Action**: On summary judgment with respect to NASL's remaining Section 1 claim (Count II), the Court found "an issue of material fact on the element of concerted action" based on a wealth of evidence, including that (i) "MLS and U.S. Soccer agreed to grant MLS waivers from complying with the D1 Standards from 1997 to 2009" (SJ Order at 23); (ii) "prior to the 2018 season, USL (again, the D2 analogue to MLS) was awarded a sanction despite needing 21 waivers from the D2 Standards" while "NASL was rejected that year, despite only needing two waivers" (*id.* at 47 n. 9); (iii) "[Sunil] Gulati and MLS Commissioner Garber repeatedly encouraged the Board to grant every D1 waiver request made by MLS, including multiple waivers of the same stadium capacity requirement that was not waived for NASL and was made the basis for denying it a D1 sanction" (*id.* at 23); (iv) "US Soccer began enforcing the Standards via the annual report requirement in 2009, the same year NASL emerged as a potential competitor to MLS" (*id.* at 24); (v) USSF heightened the Standards in 2010 when NASL was seeking a D2 sanction and then did so again in 2014—"the same year NASL made known to U.S. Soccer that it planned to apply for a D1 sanction" (*id.* at 24); (vi) "U.S. Soccer and MLS pursued a joint financial venture, the SUM agreements" (*id.* at 24); and (7) "while Gulati was working for an MLS team,

he handpicked members of the U.S. Soccer Board who voted on adopting and applying the Standards" (*id.* at 24). This extensive evidence of concerted action, and much more, is now in the trial record, so there is no basis for finding a lack of any triable issue of fact on this issue.

**Rule of Reason:** Defendants' Rule 50 attacks on Dr. Noll's economic testimony with respect to the relevant market, market power, and competitive effects are substantially the same criticisms made in their rejected *Daubert* and summary judgment motions. SJ Order at 13-16. As the Court held, anticompetitive harm may be found from the evidence that "Defendants' application of the Standards has resulted in a reduction in the output of D1 and D2 leagues because MLS is the only member of the former, and USL, the latter. This in effect reduces consumer (*i.e.* soccer team) choices of which league to join." *Id.* at 27. The court also found that there was sufficient evidence to support Dr. Noll's relevant market definitions *Id.* at 53. This same evidence was presented at trial, and it raises an issue of fact for the jury.

Further, Defendants have not and cannot satisfy their burden to show procompetitive justifications. As narrowed by the Court, NASL's claims challenge the modification and application of the Standards, not the requirements themselves. But Defendants and their experts have only disclosed opinions that the standards requirements, in the abstract, are purportedly procompetitive—not that their application through the alleged conspiracy to protect MLS from competition was procompetitive. *See* SJ Order at 21; *infra* at 16.

As for less restrictive alternatives, the Court held, on summary judgment, that NASL could raise a genuine issue of fact for the jury by arguing that "either the earlier version of the Standards or some other set of rules would be a less restrictive means of achieving the stability and organization that the Standards seemingly promote." *Id* at 28. The trial record further supports another less restrictive alternative—that NASL should have been granted a multi-year

"incubation" or "runway" period similar to those received by MLS and USL.  *See infra* at 16-19.

**Monopolization and Attempted Monopolization:** As the Court stated in denying summary judgment, the Section 2 claims rise and fall with the Section 1 claims, forming "two sides of the same coin." *Id*. at 28.  A Rule 50 judgment should be denied for those counts for the same reasons set forth herein.  *See infra* at 19-20.

**Williams Daubert Motion and Damages:** Finally, there is no basis for the Court to either grant a *Daubert* motion against Dr. Williams' damages testimony or to grant a Rule 50 motion against NASL's damages claims.  Virtually all of Defendants' damages arguments either were rejected at the summary judgment and *Daubert* stage or merely present disputed issues for jury resolution.  As for the issue of the entry fees that NASL owed to Team Holdings, it has nothing to do with Dr. Williams' D2 damages estimates, and the new evidence that Defendants presented yesterday regarding NASL's Puerto Rico team merely raises another factual question for the jury, not a methodological issue with Dr. Williams' D1 damages methodology.

## STANDARD OF REVIEW

"In light of [its] extremely high standard, judgment as a matter of law under Rule 50 is [only] granted on 'rare occasions.'" *Martinez*, 2023 WL 4627739, at *7.  The evidence must be so one-sided that "there can be but one conclusion as to the verdict."  *Merrick Bank Corp. v. Chartis Specialty Ins.*, 2018 WL 11657680, at *2 (S.D.N.Y. July 16, 2018) (quoting *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1154–55 (2d Cir. 1994)).  The Court must view the evidence in the light most favorable to the plaintiff, drawing all reasonable inferences in its favor.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 135 (2000); *Vermont Plastics, Inc. v. Brine, Inc.*, 79 F.3d 272, 277 (2d Cir. 1996).  Because Rule 50 judgment "deprives the party of a determination of the facts by a jury, they should be cautiously and sparingly granted[.]" *Maurer v. Patterson*, 197 F.R.D. 244, 246 (S.D.N.Y. 2000); *Meloff v. N.Y. Life Ins.*, 240 F.3d 138, 145 (2d Cir. 2001) (same).  The standard

3

under Rule 50(a) mirrors that for summary judgment under Rule 56. *Reeves*, 530 U.S. at 135; *Anderson v. Liberty Lobby*, 477 U.S. 242, 2500-51 (1986).

## I.    There Is No Basis to Grant a Rule 50 Motion Based on the Concerted Action Requirement of Plaintiff's Section 1 or Section 2 Claims

To prevail on a Section 1 conspiracy claim or a Section 2 conspiracy to monopolize claim, a plaintiff must show "some form of concerted action." SJ Order at 22. Concerted action can be shown with "direct or circumstantial evidence" of "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv.*, 465 U.S. 752, 768 (1984). "Rarely do co-conspirators plainly state their purpose." *NASL v. USSF*, 883 F.3d 32, 39 (2018); *United States v. Snow,* 462 F.3d 55, 68 (2d Cir. 2006) ("conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with ... precision"). "[T]hat is the whole point of circumstantial evidence, as unlawful conspirators rarely commit their plan to writing." SJ Order at 23.

### A.    Evidence of Defendants' Concerted Action Presented at Trial

The record here contains ample circumstantial evidence from which the jury can conclude that MLS and USSF engaged in concerted action. First, the trial evidence demonstrates that Gulati was not only USSF's president until 2018, but also simultaneously worked for an MLS team and represented it at MLS and SUM meetings until the end of 2014. Gulati, Trial Tr. 1098:13-18. During that overlap, he directed increases in the D1 Standards that protected MLS from competition and made it harder for NASL to get a D1 sanction. JX-107 (Fike) Tr. 8:16-9:6, 13:19-14:18, 29:6-31:6, 38:8-39:4. When Gulati's proposed increases to the Standards were submitted to the Standards Task Force, its members recognized that they served to exclude new competition to MLS. PX-91; JX-39. Even if certain proposed increases were not adopted, the proposed increases themselves reflect conspiratorial intent that was later manifested in USSF's sanctions

4

denials. The jury also heard evidence that Gulati lied to the Court when he represented that his relationship with MLS had ended in 2013, before those Standards increases in 2014. Gulati, Trial Tr. at 1053:12–1054:22.

Second, the trial record evidences USSF's and MLS's shared economic motive to protect MLS from competition through Soccer United Marketing (SUM)—an entity owned by the MLS investor-operators (Abbott, Trial Tr. 906:24-25), which licensed USSF's and MLS's bundled rights. JX-12. The evidence shows that the SUM agreements provided a "substantial financial guarantee to USSF." Abbott, Trial Tr. 810:20-811:1; JX-17.077. Garber stated that these guarantees were essential for the success of USSF and "unprecedented in the sport." Garber, Trial Tr. 1444:23-1445:01, 1470:14-25; PX-224. These financial guarantees were part of MLS's original proposal for obtaining a sole Division 1 sanction (Abbott, Trial Tr. 807:3-20, 810:20-8), and they provided USSF a financial motive to protect MLS from competition because higher-value MLS rights would result in higher payments to USSF under the next SUM agreement. JX-109 (Collins) Tr. 14:17-15:6; SJ Order at 50.

Third, the trial record is replete with admissions by Gulati and Garber that support a finding of conspiracy: for example, that MLS and USSF are "joined at the hip on just about every issue … for years" (Garber, JX-34.0001; Garber, Trial Tr. 1478:16-24); that MLS and USSF are "completely aligned" (Gulati, Trial Tr. 1321:18-21); that their close relationship was unprecedented around the world (Gulati, PX-445.001); that Gulati and Garber could "always count" on each other (Garber, JX-34.0002); that USSF and MLS had "a strategic and financial connection that is unprecedented in our sport" (PX-445-002; *see also* PX-598); and that MLS had had a "mutually beneficial relationship with the Federation" since its founding in which both "the leaders of MLS, our owners, the leaders of the Federation believe that the league and the future of

the sport is inextricably linked." PX-621, Garber, Trial Tr. 1593:25-1594:6. Garber also stated that the relationship between MLS and USSF was "symbiotic." Garber, Trial Tr. 1578:4-9.

Fourth, there was a twenty-year history of unequal treatment favoring MLS and later USL over NASL (Gulati, Trial Tr. 1164:19-1165:2; Garber, Trial Tr. 1580:9-17, 1683:8-1685:13), which the Court cited on summary judgment as strong circumstantial evidence in concluding that NASL had raised a triable issue of fact on concerted action. SJ Order at 47-48. All of this evidence must be considered as a whole in assessing the circumstantial evidence of the alleged D1 and D2 conspiracies. SJ Order at 45.

### 1.    Division 1 Concerted Action Evidence

Ample record evidence was presented at trial on the alleged conspiracy with respect to Division 1. First, USSF accepted MLS's proposal to grant MLS an exclusive D1 sanction in 1993 and bar other leagues from even applying to compete as a D1 league until 1998. PX-487 at 2. At the same time, USSF adopted the Standards with the express motivation to protect MLS from "competition" to ensure it was "successful." JX-108 (Contiguglia) Tr. 73:17-24. MLS was selected for D1 without being required to comply with the Standards—it did not even have any teams, stadiums or investors. Abbott, Trial Tr. 797:2-21. MLS was not required to comply with the Standards from 1997 to 2009 under any formal review process. Abbott, Trial Tr. 834:20-835:06. It was only when NASL emerged as a potential long-term competitor to MLS in 2009 that Gulati declared that USSF would begin enforcing the Standards. Gulati, Trial Tr. 1079-6:21; Abbott, Trial Tr. 841:9-842:4. And then, MLS freely was given waivers whenever it requested them (Abbott, Trial Tr. 858:14-19, 861:22-862:11) and was able to retain its D1 sanction even when it needed waivers and failed to ask for them (Abbott, Trial Tr. 835:24-836:02).

In stark contrast, USSF denied NASL a D1 sanction based primarily on the stadium capacity requirement, characterized by USSF and MLS witnesses at trial as a "team waiver"

(Abbott, Trial Tr. 960:17-23), without any consideration of an incubation period like that given to MLS, or even a few years to come into compliance with the D1 sanction (Gulati, Trial Tr. 1115:07-21, 1324:04-09). Gulati—who had testified that team waivers were much less significant than league waivers—could not explain why it was warranted to deny NASL eight stadium-related team waivers, when MLS had received eight team waivers as recently as 2014 and many prior stadium-related waivers in other years as well. Gulati, Trial Tr. 1312:2-13, 1314:2-16. Further, the only league waiver NASL needed for its D1 application was for the lack of a time in the Pacific Time Zone (even though it had teams in four time zones in 2016). Even USSF compliance officer Jeff L'Hote conceded this was not a significant waiver. L'Hote, Trial Tr. 1876:2-6.

Nor can Defendants argue that Rule 50 relief is warranted because of an absence of evidence that the individual voting members of the Board knew about the conspiracy between MLS and USSF that was participated in by Gulati, Garber, and others working at their behest. First, there is no requirement to prove an agreement between the voting members of the USSF Board in their individual capacities in a case alleging a conspiracy between USSF and MLS as entities. *See* ECF No. 515. Second, the trial evidence shows that Gulati successfully employed his role as USSF President to cause the voting Board members to follow his sanction recommendations that favored MLS to protect it from competition with NASL. The brief deliberations on NASL's D1 application show that Gulati directed the Board to deny NASL's application, and other Board members just went along with virtually no discussion. JX-58.0026-0027. Moreover, there was no vote on the possibility of granting NASL waivers, even though NASL was later falsely told such a vote had taken place. *Id.*; JX-59. And no recommendation on NASL's sanctioning application to the Board was presented by the Professional League Task Force, even though that was the responsibility of that group. JX-58.0026-0027; Gulati, Trial Tr.

1113:18-1114:9.[1]

## 2.    Division 2 Concerted Action Evidence

The trial evidence also raises fact questions that require the denial of Defendants' Rule 50 motion with respect to the alleged D2 conspiracy.  As early as 2009, MLS and USSF were discussing their preference for a single D2 league, and according to Garber, MLS was "interested in a closer relationship with a US second division."  PX-574.  L'Hote, then a consultant to MLS, advised the league that "to ensure benefits, MLS must lead D-2."  JX-27.0001, .0005.  USL—whose business plan, according to CEO Alec Papadakis, had always called for it to not compete with MLS—was an obvious partner.  JX-112 (Papadakis) Tr., 18:24-19:3. MLS followed through with its plan and formalized its participation in the Division 2 market in January 2013 by signing an affiliation agreement with USL.  JX-32.0003.  Under that initial agreement, USL paid MLS 50% of USL Pro franchise acquisition fees received by USL.  *Id.* at -.0005.  The evidence shows that by 2014 MLS and USL had a plan for USL to apply for a D2 sanction in 2017.  JX-46.0001.

The trial evidence also shows the unequal treatment by USSF to favor the MLS/USL partnership, as compared to NASL, in 2017.  Such unequal treatment is powerful circumstantial evidence of the alleged D-2 market conspiracy.  SJ Order at 47-48 & n.9.  The jury heard evidence that both NASL and USL received provisional sanctioning for the 2017 season, despite USL needing 31 waivers and NASL needing two.  Sehgal, Trial Tr. 477:9-14; JX-78.  USL's provisional sanction letter included a requirement that USL "provide a plan to the Federation regarding those teams which do not currently meet the D2 standards, detailing how such teams will come into

---

[1] Defendants also have contended that NASL's alleged lack of Division 1 readiness in terms of player quality—or its connection with Aaron Davidson and Traffic Sports—explained the decision to deny it a D1 sanction. But these are clearly disputed issues of fact for the jury.  Neither Traffic, nor lack of player quality were never mentioned at the deliberations to deny NASL a D-1 sanction (JX-58) or in the letter denying the sanction (JX-59).

compliance and providing milestones and completion dates," while NASL's letter had other requirements. JX-78 at 9-11; PX-197. Significantly, USL did not satisfy requirements in its letter (L'Hote, Trial Tr. 1828:6-25), while NASL met all the requirements in its letter (Sehgal, Trial Tr. 479:10-482:10). Nonetheless, NASL was denied a D2 sanction despite only needing the same two waivers it had received for the 2017 season (JX-78 at 5) purportedly based on its lack of a plan to come into compliance with the Standards, a requirement only in USL's sanction letter (JX-79). USL, in contrast, kept its D2 sanction despite initially needing *21* waivers and ultimately needing 11 waivers, and was given two more years to show substantial progress toward Standards compliance. L'Hote, Trial Tr. 1881:6-1883:8.

This unequal treatment is strong circumstantial evidence of the alleged conspiracy to favor MLS' business partner USL with a D2 monopoly, and that evidence is bolstered by additional circumstantial evidence. First, L'Hote advocated for accelerating the sanctioning deadline for D2 applications because "2018 league application deadlines and Board sanctioning decision date becomes critical, particularly re: whether NASL will have enough teams to apply for D-2." PX-180. Second, Mr. Gulati met with the Pro League Task Force the night before the September 1, 2017 Board meeting and developed the position he advocated the next day: that NASL be denied a D-2 sanction outright and that USL be given thirty days to demonstrate further compliance with the Standards. Gulati, Trial Tr. 1171:6-19. Gulati openly stated that the plan was to deny NASL a D2 sanction to try to persuade its members to leave NASL and join USL in a merger. JX-77 at 135:14-137:10. He made this the "Chair's recommendation," which the voting Board members followed. JX-77 at 185-86. Third, at the same board meeting, before the voting took place, Garber made a speech urging the Board to have the federation act "with teeth." JX-77-0061. At trial, Garber was given every opportunity to offer a benign explanation for his "teeth" comments, but

9

he could not offer a single one to dispute the fact that he was telling the Board to deny the NASL D-2 sanction outright. *Id.*

## II. There Is No Basis to Grant a Rule 50 Motion on the First Step of the Rule of Reason or to Exclude Dr. Noll's Expert Testimony on This Point

Defendants have no basis to seek a Rule 50 judgment against Plaintiff's showing of anticompetitive effects in a relevant market under the first step of the Rule of Reason analysis. *See* SJ Order at 54. Nor do they have any basis to seek to exclude Dr. Noll's testimony on these issues under Rule 702 or *Daubert*. All of these arguments were advanced by Defendants previously on summary judgment and in their failed *Daubert* motion against Dr. Noll. *See* MLS MSJ at 45–53; USSF MSJ at 27–32; Defs.' Noll *Daubert* Memo at 1–2.

### A. Relevant Markets

Defendants sought to exclude Dr. Noll's relevant market testimony at the *Daubert* stage on the same grounds they argue now in their Rule 50 motion. Specifically, Defendants argued that Dr. Noll failed to conduct an adequate substitution analysis to define the relevant markets. As the Court held then, a relevant product market only includes all products "reasonably interchangeable by consumers for the same purposes." *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). Products are reasonably interchangeable if consumers treat them as acceptable substitutes. *See PepsiCo v. Coca-Cola Co.,* 315 F.3d 101, 105 (2d Cir. 2002).

Defendants further argued in their prior *Daubert* motion that Dr. Noll failed to assess whether D1 and D2 labels are substitutes for each other; whether a D3 label is a substitute for either a D1 or D2 label; whether unsanctioned leagues that pay players are substitutes for leagues with D1, D2, or D3 labels; whether an increase in the price of U.S. Soccer sanctions would cause a professional league to move to another sport or country; or the actual price that leagues pay for a sanction, which is necessary to perform a substitution analysis. Defendants also argued that Dr.

10

Noll failed to perform a "hypothetical monopolist test" ("HMT") and run a so-called "SSNIP [small but significant non-transitory increase in price] test." SJ Order at 31.

The Court rejected all of these arguments. Specifically, it held that the substitution analysis that Dr. Noll used in his expert reports, and which he covered in his trial testimony, was sufficient, holding that "[t]he Court agrees that Noll concluded a substitution analysis using adequate methods. Although there may be weaknesses or oversights in Noll's approach, those weaknesses are better left to cross examination rather than exclusion." SJ Order at 32.

The court expressly found that, for the Sanctioning Markets, Dr. Noll concluded that an HMT would not be possible because USSF is a monopolist for all levels of that market. He therefore performed a direct analysis of various substitutes, finding that "evidence indicates that teams do not regard leagues in different divisions as close competitive substitutes"; "[b]ecause leagues in different divisions differ so much in quality, sanctions in these divisions are not close competitive substitutes"; "[b]ecause the privileges of being in a D1 or D2 league have value, classifications affect the incentive for teams to spend on team quality, inducing teams that are in a higher league to spend more" so that unclassified teams are not close substitutes; and that "an increase of ten percent in USSF league sanction fees" would not "cause a league such as MLS to become a professional major league in another sport or move to Europe." *Id.*

At trial, Dr. Noll presented the very same analysis, based on his review of substantial data, as to the Sanctions Markets. *See* Noll, Trial Tr. 2127:9–17 (explaining the process for determining competitive product substitutes); *id.* at 2127:22–2128:23 ("[W]hat I concluded after looking at those data was that D1 versus D2 are completely different lines of business, they have very different exposure to the public, they have different pricing structures, different costs, they have different performance in international competitions and national competitions."); *id.* at 2129:17–

11

2130:5 (sanction is necessary for leagues attempting to attract professional players); *id.* at 2130:9–2131:3 (in general, international competition selection is based on Division; Divisions thus are not fully interchangeable); *id.* at 2132:18–21 (small price changes in one Division would not be enough to make it interchangeable with another); *id.* at 2119:24-2120:6 (reviewing data Dr. Noll analyzed), 2119:2-10 (same).

As for the Team Membership Markets, the court found, in rejecting Defendant's *Daubert* motion, that Dr. Noll concluded that "a ten percent increase in MLS expansion fees" would not "cause a prospective owner of an MLS expansion team instead to buy a major league team in another sport or a soccer team in Europe." SJ Order at 32. Dr. Noll also concluded that expansion fees would decrease if various leagues in the same division competed for potential team owners. He further examined the history of teams switching between divisions, and concluded that the history supports his conclusion that each division is its own market because it shows that leagues must divisions to "seek a different level of quality, not because the Division 2 and Division 3 USL leagues were in competition with one another." *Id.* at 33.

Dr. Noll's trial testimony on the Team Membership Market is the same. SJ Order at 34; *e.g.,* Noll, Trial Tr. 2134:19–2135:5 ("How much does an expansion franchise cost in a Division I league versus a Division II league, versus a Division III league. Again, if they were all perfect substitutes, if you were different as to which league you will be in, you couldn't charge a premium for D-II, and then a really big premium for D-III. But, in fact, those premiums exist."), 2136:6-17, 2137:18-22, 2138:23-2139:14; 2175:11-19; *id.* at 2179:4-8; 2265:6-18. Defendants have failed to present any new argument as to why this testimony does not present fact issues for the jury in defining the relevant markets. Expert disputes involving market definition are "highly factual ... and ... best allocated to the trier of fact." *See Meredith Corp. v. SESAC LLC,* 1 F. Supp. 3d 180,

219 (S.D.N.Y. 2014). This Court noted that the Second Circuit found the relevant markets offered in support of the preliminary injunction to be proper based on, among other things, the industry treatment of these markets as distinct—a point testified to by Professor Noll at trial. (*E.g.*, Noll, Trial Tr. 2123:5-2124:8, 2127:18-2128:23).

## B.    Market Power, Monopoly Power and Anticompetitive Harm

There is also no basis for a Rule 50 judgment on the issues of market power, monopoly power and anticompetitive harm. The Court previously addressed Dr. Noll's evidence on these issues at summary judgment and found that they raised issues of fact for trial. SJ Order at 34 (regarding Noll's opinions on anticompetitive effects in the relevant markets, "[u]ltimately, the question of causality is a fact-dependent issue that the jury must determine."). That same evidence was presented at trial, presenting the same factual issues for the jury to decide.

For example, Dr. Noll testified at trial on the indisputable point that if his relevant markets are accepted, MLS has monopoly power with 100% of the D1 team membership market. Noll, Trial Tr. at 2142:19-25. The same would be true of USL in the D2 market following NASL's D2 sanction denial. *Id.* at 2143:10-16. Noll further testified how USSF had monopoly power in the Sanctions Markets to exclude and control entry. *See, e.g., id.* at 2142:03-15. The case law holds that "a market share of over 70 percent is usually strong evidence of monopoly power," let alone 100%. *Tops Markets, Inc. v. Quality Markets, Inc.,* 142 F.3d 90, 99 (2d Cir. 1998).

Having shown that there are relevant markets in which the Defendants have monopoly power, or conspired to obtain such power, Dr. Noll then provided ample trial testimony to support a jury determination that the conspiracy to deny NASL a D1 and D2 sanction would have anticompetitive effects in the relevant markets. Defendants have argued that harm to a single competitor is not harm to competition. But that is not the case where the plaintiff is excluded from a market so concentrated, as is the case here, that its exclusion causes a reduction in output and a

13

reduction in competitive choice. *Clorox Co. v. Winthrop*, 836 F. Supp. 983, 990 (E.D.N.Y. 1993) ("[C]ommon sense indicates that the pool of potential competitors and famous names is limited, and that an agreement that restricts even one competitor from using a famous mark could possibly implicate competitive conditions in the market."). The court previously considered this issue in denying Defendants summary judgment on this point. SJ Order at 55. The same analysis should apply here, where Dr. Noll has presented the same testimony about competitive harm at trial.

Before trial, Defendants argued that Dr. Noll's conclusions as to anticompetitive effects "rest on [the] untested assumption . . . that U.S. Soccer's divisional labels (D1, D2, D3) drive league quality and success, rather than investments in players, coaches, first-class stadiums, training facilities, and the like." Defs.' Noll *Daubert* Memo at 1. The court, in response, stated in its summary judgment decision that Dr. Noll "opines that – unlike the market for other sports entertainment – a divisional sanction is necessary to compete and succeed in men's professional outdoor soccer due to the unique role of USSF as providing a 'quality-identifying sanction.' Because of USSF's unique role, team owners and/or league investors will only be 'incentivized to pay the higher salaries to obtain higher quality players if those owners have received the required sanction that would incentivize them to do so.'" SJ Order at 34. The Court then rejected Defendants' arguments on this issue.

At trial, Dr. Noll testified to these same competitive harms. Noll, Trial Tr. 2148:13–2149:10. The decision to deny NASL a D1 sanction caused competitive harm by creating a monopoly in the D1 market. The decision to deny NASL a D2 sanction caused competitive harm by creating a monopoly in the D2 market, and forcing many NASL teams to either join a lower sanctioned league or cease operation; *id*. at 2150:22–2151:13 (speed of growth and expansion of teams is lower in markets that have been monopolized); *id*. at 2214:23–2215:8 (USSF held NASL

14

to a higher expectation than MLS and USL in the sanctioning process.)

## III.    There Is No Basis to Grant a Rule 50 Judgment on Step 2 of Rule of Reason.

Defendants' argument for a Rule 50 judgment on Step 2 of the rule of reason analysis—procompetitive benefits—is frivolous for two reasons.  First, it is well established that a plaintiff does not bear the burden on Step 2 of the rule of reason.  *See* SJ Order at 54.  Once anticompetitive effects are shown, as here, "the burden shifts to the defendant[s], who must demonstrate the procompetitive effects of the challenged restraint."  *NASL v. USSF*, 883 F.3d at 42 (citing *U.S. v. Am. Express Co.* ("*AmEx*"), 838 F.3d 179, 195 (2d Cir. 2016)).

Second, because NASL's claims as limited by prior Court rulings are directed at the application of the Standards and the anticompetitive harms resulting therefrom,[2] Defendants must provide procompetitive justifications for the challenged conspiracy to apply the Standards to protect MLS from competition.  But Defendants have not offered evidence of any justification for that anticompetitive application of the Standards.  Nor could they—applying standards discriminatorily to exclude competition and protect MLS is inherently anticompetitive.  *See Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 509 (in a private standards case, "the hope of procompetitive benefits depends upon the existence of safeguards sufficient to prevent the standard-setting process from being biased by members with economic interests in restraining competition").  Instead, Defendants merely have offered evidence that standards requirements in the abstract might be beneficial,[3] which cannot justify the alleged conspiracy to apply the

---

[2] *See* MSJ Order at 43, ECF No. 399 ("[T]he denial of sanctions is attributable to U.S. Soccer's application of the Standards, not the Standards in and of themselves."); MIL Order at 3, ECF No. 451 ("In dismissing Count One, Judge Cogan made clear that the remainder of Plaintiff's case turns on the application of the Standards, not on the decision to use sanctioning standards to restrict entry.").

[3] JX-108 (Contiguglia) Tr. 123:22-124:21, 127:15-22.

Standards in an unequal manner to shield MLS and USL from competition.[4]

Defendants also cannot satisfy their burden to show a procompetitive justification using their experts, because their expert reports do not disclose any opinions that the alleged conspiracy to apply the Standards unequally to shield MLS and USL from competition in the D1 and D2 markets, respectively, would have any procompetitive effects.  Indeed, Dr. Murphy offers no opinions at all on procompetitive effects regarding the Standards and their application, as he states that it is not within his expertise as an economist to do so.[5]  Moreover, to the extent Dr. Murphy offers the opinion that the Standards themselves may be procompetitive, that testimony has been precluded by this Court's ruling on the parties' motions *in limine*.  Dec. 5, 2024 Hearing Tr. At 8:10-9:12. None of Defendants' experts have disclosed any opinions that the application of the Standards through a conspiracy to protect MLS and USL from competition would be procompetitive in any way.[6]  And that is the only relevant issue on the rule of reason now that Count I of the Amended Complaint has been dismissed.

## IV.    There Is No Basis to Grant a Rule 50 Judgment at the Less Restrictive Alternative or Final Balancing Step of the Rule of Reason

Assuming there was any relevant evidence of procompetitive benefits, NASL has more than met its burden to raise a jury issue that any such "'legitimate competitive benefits ... could

---

[4] The fact that NASL has chosen not to call Dr. Szymanski to opine on this issue is irrelevant.  It is Defendants, not Plaintiff, who have the burden to show procompetitive effects, and no evidence has been presented at trial by Defendants to meet this burden.

[5] Murphy Tr. at 148:22-149:9 ("Q: Have you done any analysis of . . . whether or not USSF enforced the professional league standards in Division 1 for the period between 1997 and 2008? [. . . ] A: I wouldn't put myself forth as an expert on that. I know that there were standards.  My understanding is there wasn't the same annual review process that there was later.  To the extent to which they, quote, enforce those standards, you'd have to talk to them. I can't give you further insight into that."); *id.* at 188:19-23 ("Like I said, I don't know the specifics of why the Central time zone was considered more important than the Mountain time zone. You should ask the people who formulated the standards why they thought that was a more appropriate criteria."); *id.* at 196:15-197:20 (admitting he did not know how many waivers USL needed from the Standards in 2017 but that it could be relevant to assessing whether or not the standards applied in a procompetitive or anticompetitive way).

[6] Defendants have only disclosed Dr. Murphy as testifying on procompetitive benefits.  ECF No. 464 at 22-23.

have been achieved through less restrictive means.'" *NASL*, 883 F.3d at 42 (quoting *AmEx*, 838 F.3d at 195). Specifically, the trial record shows that MLS and USL both were given multi-year "incubation" and "runway" periods during which the Standards were not enforced against them, and they were given time to develop in D1 and D2 without the destabilizing threat of having their sanctions being taken away each year, including the following specific evidence: (1) MLS was selected to receive a D1 sanction in 1993 before it even had any teams, stadiums, or investors (Abbott, Trial Tr. 797:2-21; Gulati, Trial Tr. 1323:3-11); (2) MLS was granted a "runway" such that it explicitly did not have to comply with the Standards until 1998 (Gulati, Trial Tr. 1051:9-16; Abbott, Trial Tr. 824:11-826:14); (3) MLS did not comply with the Standards from 1998 through 2009, and USSF did not require MLS to either show compliance with the Standards (Gulati, Trial Tr. 1084:7-14; Abbott, Trial Tr. 835:1-6); and (4) MLS was granted waivers freely after that point whenever it requested them for twenty years and was allowed to remain in D1 even when it violated the Standards and failed to request any waivers (Gulati, Trial Tr. 1164:5-1165:2; Abbott, Trial Tr. 853:19-855:20; Garber, Trial Tr. 1554:4-24, 1569:18-1570:24).

As for USL, after being granted 31 waivers for 2017 and being allowed to retain its D2 sanction for 2018 despite needing 21 waivers, USL was granted two more years to make "substantial progress" toward coming into compliance with the Standards, without requiring full compliance. Gulati, Trial Tr. 1141:16-1142:4, 1177:7-22, 1313:1-1314:1, 1345:11-1346:15.

The jury should be able to determine, based on this record, whether a less restrictive alternative to denying NASL's D1 and D2 applications outright would have been granting NASL a similar incubation or runway period. Specifically, NASL requested in its D1 application for 2016 that the D1 requirements concerning time-zone coverage and stadium capacity not be enforced to deny it a D1 sanction, because NASL would satisfy the time-zone requirement with

17

its new team in California in 2017, and NASL was making progress toward satisfying the stadium capacity requirement but was being held back from doing so by its lack of a D1 sanction. JX-100.0048-.0052. But USSF refused to grant NASL a D1 sanction for even a single year—despite giving MLS a decades-long incubation period without enforcing the Standards.

Similarly, after NASL lost a number of teams as a result of that D1 denial, NASL requested a three-year period during which the D2 Standards would not be applied against it, such that it could recover from the D1 denial and attract team owners to invest in the league—without the threat of having its sanction taken away each season deterring team owner investment. JX-77.0089-.0090, .0097, .0105-.0106. But USSF President Sunil Gulati denied that request for three years on the spot without even putting it to a USSF Board vote (JX-77.0114-.0116), in stark contrast with the multi-year non-enforcement period granted to USL.

Significantly, USSF's own Standards compliance officer Jeff L'Hote asserted that a less restrictive alternative to enforcing the Standards each year—or a "more flexible recourse"—would be to give leagues such multi-year periods to come into compliance with the Standards:

> Neither the existing [Standards] nor their application have stopped the continued volatility around lower divisions. ... Other than not sanctioning a league, the [Standards] do not provide US Soccer with more flexible recourse options ... From a practical perspective, many recent waivers were clearly not curable in a single year. Should 2018 waivers be granted for an extended period to attempt to cure all existing waivers? (PX-193).

Another less restrictive alternative which the jury should be able to consider is the fact that, for D2, NASL could have just been subject to the eight-team requirement that applied in D2 for decades and that still applied for a league with a D2 sanction for its first two years. JX-94.0007. Hunt testified that he believed eight teams was a reasonable number of teams even for a D1 league. Hunt, Trial Tr. 1914:11-15. Another less restrictive alternative for D1 was to give NASL team waivers for its stadiums, as USSF previously had freely given team waivers to MLS. Hunt testified

18

that he did not see any legitimate need for USSF to tell leagues that they needed a minimum stadium capacity.  Hunt, Trial Tr. 1943:14-21.

Finally, the jury should be permitted to balance any anticompetitive harm and asserted procompetitive effects.  Because USSF has no expert testimony to offer that the conspiracy to favor MLS in the application of the Standards through unequal treatment would be procompetitive, there is nothing to balance against the expert testimony of Roger Noll about anticompetitive harm. As the Second Circuit held earlier in this case, "[u]ltimately, '[t]he true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.'" *NASL*, 883 F.3d at 42.  Based on the evidence of anticompetitive harm, which raises fact issues for the jury, as well as Defendants' inability to show any procompetitive justification for the Standards' discriminatory application, there is clearly no basis for the Court to grant a Rule 50 order on this issue and deprive the jury of its right to decide the disputed facts in this case.

**V.    There Is No Basis for a Rule 50 Judgment Against Plaintiff's Monopolization and Attempted Monopolization Claims Against MLS (Counts Four and Five)**

As this Court has held in denying Defendants' summary judgment motion, the same evidence serves to prove the alleged concerted anticompetitive conduct for purposes of Plaintiff's Section 2 claims as for Section 1, requiring the same conclusion.  SJ Order at 57 ("[NASL's] Section 2 claims rise and fall with its Section 1 claims."). Because the evidence presented requires that the jury determine Plaintiffs' claims of conspiracy under Section 1 (*see* Section I, *supra*), the same conclusion must be reached for Plaintiff's Section 2 claims.

In the context of both monopolization and attempted monopolization claims, evidence of a conspiracy to obtain or maintain a monopoly constitutes evidence of exclusionary or anticompetitive conduct to support a Section 2 verdict. *See American Tobacco Co. v. United States*,

328 U.S. 781, 809-10 (1946) (agreements to monopolize are actionable under Section 2); Likewise, in attempted monopolization claims, agreements aimed at excluding competitors or foreclosing market access satisfy the anticompetitive conduct element.   *In re Keurig Green Mt. Singleserve Coffee Antitrust Litig*., 383 F. Supp. 3d 187, 230, 234 (S.D.N.Y. 2019). Moreover, the specific intent to monopolize element of an attempted monopolization claim is satisfied by the showing of a conscious commitment to a common scheme designed to achieve an unlawful purpose. *P & L Dev., LLC v. Gerber Prods. Co.*, 715 F. Supp. 3d 435, 461, 465 (E.D.N.Y. 2024). The same is true for the requirements of proving relevant markets, monopoly power or attempted monopolization. Because there are triable issues of fact on each of these points for Section 1, the same conclusion must be reached for the Section 2 claims. SJ Order at 57.

## VI.    There Is No Basis for a Rule 50 Judgment on NASL's Conspiracy to Monopolize Claim (Count Three)

Plaintiff's conspiracy to monopolize claim "requires proof of (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988). As discussed above, the circumstantial evidence of the alleged conspiracy is sufficient to require the jury to determine whether there was a conspiracy to monopolize the Division 1 and Division 2 markets.

Moreover, with respect to NASL's claim of conspiracy to monopolize the D2 market in particular, NASL does not need to prove that USL is a member of the conspiracy with MLS and USSF. Nor does MLS need to be a participant in the Division 2 market to be found liable; a conspiratorial agreement between two parties that is intended to acquire or sustain monopoly power for any entity is sufficient for liability under Section 2 of the Sherman Act, even if the monopolist itself is not found to be proven to be one of the conspirators. *Id.* at 60, 74 (2d Cir. 1988) (upholding conspiracy to monopolize allegations where a tennis membership organization

had required "the top one hundred men's professional tennis players [to] sign[] Commitment Agreements," even though MIPTC itself did not compete in the alleged relevant markets); *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996), *vac'd on unrelated grounds*, 525 U.S. 128 (1998) (emphasis added) (upholding a conspiracy to monopolize claim because "to be liable for conspiracy to monopolize, it is not necessary that the [] Defendants compete directly in the [relevant] market.").  Further, even if there were a requirement for MLS to participate in the D2 market, NASL has presented sufficient evidence on this issue to go to the jury, including the facts that (i) MLS directly participated in the D2 market monopoly through its teams in the USL (Abbott, Trial Tr. 874:4-875:2, 890:12-18; Garber, Trial Tr. 1562:6-9); (ii) MLS and USSF entered into a partnership in which it was planned, back in 2014, that USL would obtain a D-2 sanction in the 2017 season (JX-46.0009); and (iii) MLS investor operators, which own MLS, competed directly in the D2 market through USL, in 2017 and 2018 either by virtue of having teams in USL or affiliations with teams in USL.  Garber, Trial Tr. 1567:4-1568:12; 1697:19-1698:18.

## VII.    There Is No Basis for Either a Daubert Exclusion of Dr. Williams' Damages Opinions or a Rule 50 Order Against Plaintiff's Damages Claims.

All but one of Defendants' criticisms of Dr. Williams' damages opinions are either arguments that were rejected at the *Daubert* stage or are clearly disputed fact issues for resolution by the jury:[7]

- Defendants argue that NASL's league dues failed to fully offset NASL's operational expenses, such that NASL's profits from entry fees would have been reduced.  But this is a fact issue for the jury, not an issue of reliability, as the Court explained previously in its earlier Daubert ruling.[8]

---

[7] *Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155, 172 (D. Conn. 2014) (finding that where there is a disagreement on a factual issue, the issue is to be resolved by the jury, not via *Daubert* motion).

[8] MSJ Order at 20, ECF No. 399 ("NASL admits that NASL had never turned a profit, but points out that NASL's team owners were contractually obligated to pay for NASL's league costs through league dues, and it was reasonable to assume that they would abide by these obligations.  In NASL's view, NASL had not turned a profit because it had

21

- Defendants argue that Dr. Williams failed to account for the possibility that Traffic's indictment reduced the willingness of future teams to join NASL. But this is a fact issue for the jury since, as Dr. Williams explained, the rate of team entry that he calculated takes account of the time period after Traffic's indictment was made public in May 2015. Williams, Trial Tr. 2413:7-24. Indeed, NASL had three more teams agree to join the league in 2015 after May, contrary to Defendants' theory that Traffic would have dissuaded any team owners from joining the league. Williams, Trial Tr. 2290:2-8.

- As Dr. Williams testified, he used data from MLS to help calculate the value of a D1 sanction using a regression methodology, since MLS was the only men's D1 league in the U.S. that was available for this purpose. Williams, Trial Tr. 2293:4-2294:13. He then used a regression to apply that D1 value to a league with NASL's characteristics, rather than MLS' characteristics. *Id*. This is a proper and standard usage of regression methodology in the damages context. *See Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp*., 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000).

- Defendants argue that MLS is not a proper "yardstick" for NASL due to its differences from NASL. But this is just another fact issue for the jury that the Court rejected.[9]

- Defendants argue that Dr. Williams' projected expansion fees are too high. But, this too is a fact issue for the jury, as Dr. Williams' projections are rooted in sound economic methodology and expansion fee data from MLS, USL and NASL itself, and the expansion fees he projects are merely a small fraction of those that MLS has been able to obtain, which reached over $300 million *per team*. Abbott, Trial Tr. 903:20-21. Further, as Dr. Williams pointed out, the value of NASL's Minnesota club rose from a few million dollars in D2 to over $50 million in D1, reflecting the great impact of a D1 sanction on how much a team is worth. Williams, Trial Tr. 2475:3-2476:9.

- Under Miami FC's league admission agreement, the "entry fee payable ... [wa]s three million dollars ($3,000,000)," which would be discounted to $2,750,000 if Miami FC fielded a team by 2016. PX-128.002 (cited in Dr. Williams' Materials Considered, PX-296.018). Dr. Williams used $3 million as Miami FC's price for purposes of his projection of NASL future entry fees because it was his economic opinion that that was the appropriate price for Miami FC to use for purposes of projecting future NASL entry fees—not the discounted $2,750,000. Williams, Trial Tr. 2429:11-2431:24. While Defendants argue that $2,750,000 was the appropriate figure, that is a dispute for resolution by the jury, not a *Daubert* issue. SJ Order at 8-13.

---

sustained one-time costs—including a $3 million settlement payment that NASL made to Traffic Sports—that were not likely to occur again in the future. Again, the Court is not persuaded that this assumption is so speculative as to render Williams's opinions unreliable.").

[9] MSJ Order at 20-21, ECF No. 399 ("I cannot say that Williams was unreasonable in using MLS's performance as an input into his model. MLS's performance is simply the closest thing that Williams could have used to evaluate the performance of a D1-sanctioned league, as there isn't another D1-sanctioned league in NASL's proposed relevant market. Williams also worked to minimize these differences by substituting NASL data into the regression model to control for differences between the leagues. In fact, Williams opines certain differences between the leagues gave NASL an advantage. For example, NASL's team-centric model actually had competitive advantages for the league in reducing costs for NASL and encouraging inter-team competition and investment that would improve the quality of play and other aspects of NASL's product.").

- Defendants argue that Dr. Williams' testimony is unreliable because he projected that eight new D1 teams or fifteen new D2 teams would join NASL over the course of ten years, but NASL's team count only changed from eight to twelve between 2011 and 2016. Williams, Trial Tr. 2360:10-17. In reality, NASL added some teams between 2011 and 2016, but also lost some. Williams, Trial Tr. 2360:15-2361:01. The fact that NASL lost some teams does not mean the expansion fees they paid should be ignored in projecting NASL's future expansion fees, as Dr. Williams explained. Williams, Trial Tr. 2478:8-13.

- Defendants argue that it was unreasonable for Dr. Williams to assume that NASL would have successfully maintained its sanction in the but-for world throughout the damages period. But the Court specifically rejected that argument as a fact issue for jury resolution at the *Daubert* stage.[10]

- Defendants argue that Dr. Williams' testimony is unreliable because a column in one of his exhibit spreadsheets lists what Defendants claim is the wrong number of NASL's teams. Specifically, to determine the number of teams NASL would have had in 2017 in the but-for world, Dr. Williams took the number of teams that NASL already had—eight—and added two additional teams from California that committed to join NASL for the following season. Williams, Trial Tr. 2388:02-15. Dr. Williams then added two teams for each subsequent season. Williams, Trial Tr. 2309:21-2310:1. Defendants argue that Dr. Williams should have subtracted two teams from the number-of-teams column because, after the 2017 season, two of its teams left the league. Williams, Trial Tr. 2392:10-2393:19. But this is a fact issue for the jury, as Dr. Williams explained that under economic damages theory, Defendants' approach would improperly be taking account of events that occurred in the actual world after the D2 denial, which is when the but-for world began. Williams, Trial Tr. 2391:17-2392:3.

- Defendants argue that Dr. Williams should have been able to identify the future teams that would have joined NASL over the course of ten years by name, location, ownership group, and the like. Williams, Trial Tr. 2485:17-22. But as Dr. Williams correctly explained, this is not how projections of damages work using standard economic methodology, and it is neither possible nor necessary to project that type of detailed information about what would have occurred in the but-for world. Williams, Trial Tr. 2486:16-2487:7. Any such requirement to prove exactly what would have occurred in the but-for world, despite the impossibility of doing so, would violate the well-established rule that where uncertainty as to the plaintiff's damages results from the defendants' own unlawful conduct, "the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. … Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim."[11]

---

[10] SJ Order at 22 ("I cannot say that Dr. Williams was unreasonable in assuming that NASL would continue as a D1 team for ten years had it received that designation in 2016. Nor do I think the Circuit intended to cabin recoverable damages by merely noting the fact that NASL would need to reapply for sanctioning yearly. None of that changes NASL's burden to convince the jury that NASL was likely to succeed as a D1 league for at least ten years had it received that initial sanction.").

[11] *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 124 (1969) (quoting *Bigelow*, 327 U.S. at 264-65); *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1077-78 (2d. Cir. 1998) (same; rejecting defendants' arguments that the jury's damages verdict should be vacated as "arbitrary and speculative," because otherwise this "would permit defendants to profit by their wrongdoing at the expense of the person injured").

- Defendants argue that Dr. Williams should not have included past expansion fees supposedly obtained by "fraud" in projecting NASL's future expansion fees. Williams, Trial Tr. 2421:16-2422:2. But what Defendants are referring to is the fact that two NASL team owners sought to escape paying withdrawal fees by making baseless accusations of "fraud" against NASL (Sehgal, Trial Tr. 491:6-492:12), and NASL is entitled to present its factual position on this issue for jury resolution. It is not an expert issue for resolution via *Daubert*. Further, as Dr. Williams explained, he already took account of any impact of this issue on NASL's damages through the rate of team entry that he used included the time period after these events. Williams, Trial Tr. 2423:8-22.

The one new damages argument by Defendants that potentially raises more than disputed fact issues is the argument raised for the first time at trial yesterday about whether NASL's Puerto Rico team counted for purposes of calculating NASL's entry fee obligation to Team Holdings, which only relates to NASL's D1 damages claim. Williams, Trial Tr. 2496:17-25. This issue has nothing to do with Dr. Williams' D2 damages methodology and cannot be used to seek a Rule 50 order or *Daubert* exclusion with respect to D2 damages.

Further, this new argument is not a proper basis for rejecting NASL's D1 damages because it is based on a document with no supporting witness to explain it and no evidence about how it fit into the dispute with Traffic over the meaning of the NASL LLC Agreement. Defendants chastise Dr. Williams for not being aware of this document, but it did not even become relevant to the Williams D1 damages analysis until at trial last week when Defendants first revealed their argument about the definitions section of the 2013 LLC Agreement. Under both parties' prior interpretations of the LLC Agreement, the question of whether Puerto Rico counted for purposes of determining the amount of entry fees that NASL would have to pay Team Holdings was insignificant. Under NASL's interpretation, the ten-team count began at the date of NASL's December 2009 LLC Agreement, and it was undisputed that NASL had well over ten teams join between December 2009 and the start of the D1 damages period in March 2016. ECF No. 512. And under Defendants' interpretation, the ten-team count did not begin until March 2016, after

24

Puerto Rico had joined NASL.  ECF No. 510 at 1-2.

Then, at trial, last week, Defendants argued that NASL's July 2013 LLC Agreement reset the ten-team count to zero.  ECF No. 510.  Following a discussion of this issue in Court on January 22nd, Dr. Williams was directed to submit a report approximately 45 hours later adjusting his damages figures to address this issue.  Williams, Trial Tr. 1525:3-7.  During that 45-hour period, neither Dr. Williams nor NASL became aware of any issue involving the Puerto Rico team not counting for purposes of the ten-team count, and thus Dr. Williams included that team in his ten-team count.  Williams, Trial Tr. 2451:25-2452:4; 2522:4-2525:12.  Given the lack of any witness to explain the new document about the Puerto Rico team, NASL respectfully submits that this new evidence should be left to the jury to evaluate.[12]

In any event, there is no basis to exclude NASL's evidence of *D2* damages.  Defendants have baselessly attempted to tie this issue involving Puerto Rico to Dr. Williams' D2 damages estimates, to which it is irrelevant.  As testified at trial, all of NASL's entry fee obligations to Team Holdings were settled and extinguished in November 2016, long before the D2 but-for damages period began.  Williams, Trial Tr. 2310:18-2311:1; Sehgal, Trial Tr. 471:12-16.  As a result, it is irrelevant whether Puerto Rico would have counted toward the first ten teams under that former arrangement.[13]

---

[12] October 28, 2024 Order, ECF No. 451 ("Dr. Williams has attempted to 'discount his estimates to reflect the real-world conditions that existed at the time of the challenged conduct,' including by making an assumption about what the agreement continued to require at that time. Defendants are free to attack that assumption. But ultimately, as Chief Judge Brodie has explained, '[d]isputes of fact do not as a matter of law render an expert's opinion unreliable. Were it otherwise, no expert would ever be able to testify in any case not decided as a matter of law.'") (citing *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 14863110, at *16 (E.D.N.Y. Oct. 26, 2022)).

[13] Defendants also argue that Dr. Williams should not have included Puerto Rico's $3 million entry fee in his calculation of NASL's damages, because NASL ultimately agreed to permit Puerto Rico to instead pay off that debt with in-kind services.  (Williams, Trial Tr. 2471:19-2472:7.) But that argument is nothing more than another fact issue for the jury, not a basis for excluding Dr. Williams' opinions under *Daubert*. Dr. Williams explained why it was relevant to include the $ 3 million price for the team in his analysis even though the price was paid through the promotional services of Carmelo Anthony, an NBA legend with enormous marketing value for the league.  (Williams, Trial Tr. 2471:1-2472:7.)

Dated: January 29, 2025                    By: s/ *Jeffrey L. Kessler*

Jeffrey L. Kessler
David G. Feher
Eva W. Cole
Johanna Rae Hudgens
Mark E. Rizik Jr.
Sarah L. Viebrock
**WINSTON & STRAWN, LLP**
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
jkessler@winston.com
dfeher@winston.com
ewcole@winston.com
jhudgens@winston.com
mrizik@winston.com
sviebrock@winston.com

Clifford H. Pearson (Admitted *Pro Hac Vice*)
Daniel L. Warshaw (Admitted *Pro Hac Vice*)
Matthew A. Pearson (Admitted *Pro Hac Vice*)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Tel.: (818) 788-8300
Fax.: (818) 788-8104
cpearson@pwfirm.com
dwarshaw@pwfirm.com
mapearson@pwfirm.com

Neil J. Swartzberg (Admitted *Pro Hac Vice*)
**PEARSON WARSHAW, LLP**
555 Montgomery Street, Suite 1205
San Francisco, California 94104
Tel.: (415) 433-9000
Fax.: (415) 433-9008
nswartzberg@pwfirm.com

*Counsel for Plaintiff North American Soccer League, LLC*

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 29, 2025, Plaintiff North American Soccer League, LLC's Opposition to Defendants' Joint Rule 50(a) Motion was served upon all counsel of record by operation of the Court's ECF system.

Executed on January 29, 2025

<u>s/ *Jeffrey L. Kessler*</u>
Jeffrey L. Kessler

28