UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NORTH AMERICAN SOCCER LEAGUE, LLC,

          Plaintiff,

          v.

UNITED STATES SOCCER FEDERATION, INC. and MAJOR LEAGUE SOCCER, LLC,

          Defendants.

**MEMORANDUM & ORDER**
17-CV-5495 (HG)

**HECTOR GONZALEZ**, United States District Judge:

      The Court has now published the final jury instructions in this case. *See* ECF No. 531. However, because one issue was subject to particular debate at the charge conference and due to Plaintiff's shifting positions, the Court writes only briefly to explain its reasoning with respect to Instruction Nos. 16, 31, and 32.[1] These instructions relate to one branch of Plaintiff's Second Count, which alleges that "Defendants [U.S. Soccer Federation ("USSF") and Major League Soccer ("MLS")] and others have entered into a continuing agreement, combination, or conspiracy with the specific intent of granting and maintaining for USL [United Soccer League] a monopoly in the relevant market for [Division 2 ("D2")] professional soccer leagues located in the U.S. and Canada." *See* ECF No. 57 ¶ 282 (Am. Compl.).[2] The Court assumes the parties' familiarity with the basic facts of this case at this late stage, but for context, USL, another soccer league, is not a defendant. The instant issue concerns what Plaintiff must prove to establish Defendants' conspiracy liability in the D2 market under Section 2 of the Sherman Act. For the

---

[1] These refer to the final instructions. At the time of the charge conference, these corresponded to Instruction Nos. 19, 34, and 35, respectively.

[2] At the pleadings stage, this was Plaintiff's Third Count.

reasons explained below, the Court agrees with Defendants that Plaintiff must prove, consistent with its near-uniform position throughout this case, that USL was a member of a trilateral conspiracy with Defendants in order to establish D2 liability on this Count.

*     *     *

To frame the problem, it is helpful to look at the particular instructions at issue. The Court will instruct the jury that "Plaintiff's second count alleges . . . that Defendants conspired <u>with each other and</u> with . . . USL . . . to monopolize the alleged relevant market for team membership in a D[2] sanctioned league in the United States and Canada, in violation of Section 2 of the Sherman Act." *See* ECF No. 531 at 43 (Instruction No. 31) (emphasis added).[3] Consistent with that description of Plaintiff's allegation, the Court will also instruct the jury that "[i]n order to find that MLS sought to achieve a D[2] monopoly for USL, you must find that USL was also a member of the conspiracy." *See id.* at 45 (Instruction No. 32). Importantly, *Plaintiff* proposed to add the underlined language to the instruction. *See* ECF No. 507 at 1, 54. It believed this language to be necessary because "[w]ithout [it], the instruction inaccurately describes [Plaintiff]'s claim. [Plaintiff] alleges not only that Defendants conspired with USL, but that the Defendants conspired with each other. In addition, without that language, the instruction suggests that [Plaintiff] must prove that USL is a member of the conspiracy. As NASL previously objected, this is inaccurate." *See id.* at 26 n.3. But as the Court raised at the charge conference, that argument did not track the proposed additional language, which "necessarily requires a trilateral conspiracy." Trial Tr. at 1768:9–10. Indeed, Plaintiff's counsel conceded that its own proposed language was "a little bit confusing." *Id.* at 1767:15–16.

---

[3] The Court refers to the pages assigned by the Electronic Case Files system ("ECF"). Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.

Accordingly, Plaintiff also objected to the inclusion of the instruction requiring the jury to find that USL was part of the D2 conspiracy. *See* ECF No. 507 at 56 n.24. However, as the Court explained at the charge conference, and as the Court has now decided, that language is necessary to put a "finer point on what [Plaintiff] already agreed to in terms of the instruction for the element of the conspiracy." *See* Trial Tr. at 1788:2–4.

The Court starts with the legal issue. Assuming neither Defendant competes in the D2 market and USL was not a member of the alleged conspiracy, can either Defendant be liable for conspiring to have USL monopolize that market? This Court, like others, thinks not. *See Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1262 n.4 (11th Cir. 1998) ("[N]o authority exists holding a defendant can conspire to monopolize a market in which it does not compete."); *Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1141 (E.D. Ark. 2008) ("No one can conspire to monopolize a market unless at least one of the coconspirators competes in that market."), *aff'd*, 591 F.3d 591 (8th Cir. 2009). Conceptually, that is a sensible outcome. "The specific intent necessary to establish a conspiracy to monopolize is the intent to enable or maintain a monopoly position in the relevant market." *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 383 (S.D.N.Y. 2016). Of course, as with all conspiracies, "proof of success or impending success is irrelevant." *See Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 795 n.8 (2d Cir. 1987). But "the relevant market and the likelihood of its monopolization may have a significant bearing on whether the requisite specific intent to monopolize is present." *See In re Zinc*, 155 F. Supp. 3d at 382. Because "[i]t is axiomatic that a firm cannot monopolize a market in which it does not compete," *RxUSA Wholesale, Inc. v. Alcon Lab'ys, Inc.*, 661 F. Supp. 2d 218, 227 (E.D.N.Y. 2009), *aff'd*, 391 F. App'x 59 (2d Cir. 2010), there is no way that that firm could monopolize such a market.

Specific intent is therefore lacking, as the alleged relevant market is as foreign to non-competing co-conspirators as a non-existent market. *See Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 363 (S.D.N.Y. 2009) (finding a lack of evidence that defendants "enjoy[ed], or ha[d] any realistic hope of gaining, monopoly power in" a broadly defined market "fatal" to plaintiff's conspiracy claim, and comparing this to a conspiracy to monopolize a non-existent relevant market, which "one cannot monopolize").

Plaintiff resists this conclusion by pointing to *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055 (2d Cir. 1996), *vacated on irrelevant grounds*, 525 U.S. 125 (1998). In that case, plaintiff alleged that several defendants, successors to AT&T, conspired with non-party AT&T to eliminate it from the market for the removal of obsolete telephone equipment. *Id.* at 1057–58. In reversing the district court's dismissal of the conspiracy to monopolize claim, the Second Circuit explained that "to be liable for conspiracy to monopolize, it is not necessary that the [successor] Defendants compete directly in the market for removal services. A defendant may be liable for conspiracy to monopolize where it agrees with another firm to assist that firm in its attempt to monopolize the relevant market." *Id.* at 1062. Plaintiff also points the Court to *Volvo North America Corp. v. Men's International Professional Tennis Council*, 857 F.2d 55 (2d Cir. 1988). In that case, plaintiffs claimed that fellow members of an alleged tennis cartel, namely MIPTC, which sanctioned professional tennis events, conspired to monopolize the market for men's professional tennis in a variety of ways. *Id.* at 58–60, 67–68. In other words, plaintiffs sought to challenge as anticompetitive rules of the sanctioning organization to which they belonged. *Id.* at 68. In a very brief discussion, the Second Circuit concluded that plaintiffs stated a claim for conspiracy to monopolize. *Id.* at 74.

4

The problem for Plaintiff is that these cases, neither of which is directly on point, do not support its maximalist view that *none* of the alleged co-conspirators (*i.e.*, Defendants here) needs to compete in the alleged relevant market. *See* ECF No. 507 at 26 n.3; Trial Tr. at 1775:2–5, 1789:2–8. Even if a firm need not compete "directly" in the alleged relevant market to be subject to Section 2 conspiracy liability, the precedent cited by Plaintiff assumes that that firm illegally "agrees" with some other entity, irrespective of its status as a defendant, that does compete in the relevant market. *See Discon*, 93 F.3d at 1062.[4]

At the charge conference, Plaintiff largely pivoted away from its most aggressive position and argued that Defendant MLS actually did compete in the D2 market because MLS teams competed in the USL. *See* Trial Tr. at 1777:16–1778:4; *see also* ECF No. 513-1 at 10 n.13 (Pl.'s Proposed Verdict Sheet) ("Further, MLS participated in the D2 market through its partnership with USL and its reserve teams competing in USL."). That theory is nowhere to be found in the Amended Complaint. *See, e.g.*, ECF No. 57 ¶ 283 ("Defendants and others have engaged in concerted action, including numerous overt acts described above, with the specific intent of obtaining and maintaining such monopoly power for MLS and USL in their *respective relevant markets* . . . . (emphasis added)). To be sure, in opposition to summary judgment, Plaintiff argued that it alleged "a conspiracy between MLS and USSF to monopolize the D2 market through the partisan application of the [sanctioning] Standards process to protect MLS's minor league, USL, from any competition, with the ultimate MLS goal of having a monopoly 'MLS-

---

[4] The Court separately notes that Plaintiff's reference to *Volvo* is vague, focusing on one challenged rule and stating that "MIPTC itself did not compete in the alleged relevant markets." *See* ECF No. 507 at 26 n.3. Defendants disagree with that as a factual matter. *See* Trial Tr. at 1777:4–6. Although *Volvo* does not precisely state the contours of the alleged Section 2 conspiracy, at a minimum, it does not support the bold proposition that no co-conspirator needs to compete in the alleged relevant market. *See Volvo*, 857 F.2d at 74.

5

run D2.'" *See* ECF No. 289 at 53–55. With respect to MLS, that is most naturally read as an alter ego theory of liability: MLS *is* USL, so MLS also competed in the D2 market. But the Amended Complaint makes no such allegation. *Cf. In re Zinc*, 155 F. Supp. 3d at 381 (for Section 2 claim, declining to pierce the corporate veil "[i]n the absence of allegations that [the parent company] failed to comply with corporate formalities"). And if Plaintiff is actually trying to allege a theory of "shared monopoly" in D2 between two distinct entities, it has never articulated that position, nor pointed to authority sustaining it in the Section 2 conspiracy context. *See id.* at 382–83.

Most importantly, the current instructions are most consistent with Plaintiff's near-uniform position throughout this case. In addition to its proposed additional language making clear that there was an alleged trilateral conspiracy, *see supra* at 2–3, Plaintiff initially proposed the following language for a preliminary jury instruction: "NASL alleges that U.S. Soccer Federation and Major League Soccer conspired with each other, and with *another soccer entity*, to exclude NASL and other soccer leagues from competing in certain markets involving top-tier and second-tier men's professional soccer leagues located in the United States and Canada." *See* ECF No. 471 at 9.[5] Critically, although that instruction was mostly jointly composed, *Plaintiff* proposed to unilaterally add the italicized language. *See id.* at 2, 9. Then, in the first proposed final instruction, Plaintiff proposed that same formulation: "NASL's second count alleges that U.S. Soccer Federation and Major League Soccer conspired with each other, *and another soccer entity*, to monopolize relevant markets for top-tier and second-tier men's professional soccer

---

[5] Further, it is worth observing that this language captures both Plaintiff's Section 1 and Section 2 theories of liability. The jury instructions reflect this position for both Sections 1 and 2, *see* ECF No. 531 at 22 (Instruction No. 16); *id.* at 26 (Instruction No. 19), notwithstanding Plaintiff's argument, raised for the first time *yesterday*, that it intended something different for Section 1, too, *see* Trial Tr. at 2593:24–2594:9.

6

leagues in the United States and Canada, in violation of Section 2 of the Sherman Act." *See* ECF No. 474 at 5, 89 (emphasis added). As the foregoing makes clear, USL is the only other relevant soccer entity in this case. *See* Trial Tr. at 1772:12–16.

There is more. In pre-trial motion practice, Plaintiff argued that a letter from USL should be admitted under Rule 801(d)(2)(E) because it was a statement of a "party's co-conspirator (USL)." *See* ECF No. 500-12 at 1. At trial, in its opening statement, Plaintiff's counsel explained to the jury that "now we hit the second part of the conspiracy, which is that MLS and USL become joined now." *See* Trial Tr. at 257:6–7. And even at the charge conference, Plaintiff's counsel described USL as a co-conspirator: "I think we are entitled to prevail under the law even if we prove that only two of the *three alleged conspirators* participated." *See* Trial Tr. at 1775:2–5 (emphasis added).

In sum, the Court will not allow Plaintiff to confuse the issues by springing a new theory of its case onto the jury and Defendants this late in the game. *See id.* at 1774:23–1775:1. And it will certainly not permit Plaintiff to seek instructions plainly inconsistent with charge language it has submitted three times to the Court and its consistent position throughout this case. After all, Plaintiff "respectfully request[ed] that the Court defer to [it] with respect to its own allegations" in crafting instructions, contending that "Defendants can challenge the sufficiency of NASL's evidence at trial." ECF No. 471 at 9 n.12. The jury will decide if Defendants have adequately done that, but allowing Plaintiff to shape-shift out of its own position after the close of evidence would pull the rug out from under Defendants, and the Court will not condone it. *See K.R. v. Sch. Dist. of Phila.*, No. 06-cv-2388, 2008 WL 5397533, at *4 (E.D. Pa. Dec. 26, 2008) (denying plaintiffs' Rule 59 motion and concluding that the Court did not err by declining to give a jury instruction on a "theory of liability . . . made for the first time only five days prior to trial"),

7

*aff'd*, 373 F. App'x 204 (3d Cir. 2010); *Kinsel v. BMW of N. Am.*, No. 20-cv-08296, 2024 WL 113305, at *7 (D. Ariz. Jan. 10, 2024) ("hold[ing] [p]laintiff to her representations and preclud[ing] any jury instructions on" a certain theory of liability not reflected in plaintiff's briefing on jury instructions).

   SO ORDERED.

                  */s/ Hector Gonzalez*
                  HECTOR GONZALEZ
                  United States District Judge

Dated: Brooklyn, New York
     January 31, 2025