UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NORTH AMERICAN SOCCER LEAGUE,
LLC,

                              Plaintiff,

                  v.

UNITED STATES SOCCER FEDERATION,
INC. and MAJOR LEAGUE SOCCER, LLC,

                              Defendants.

**MEMORANDUM & ORDER**
17-CV-5495 (HG)

**HECTOR GONZALEZ**, United States District Judge:

Plaintiff, the North American Soccer League ("NASL"), sued Defendants the United

States Soccer Federation ("U.S. Soccer" or "USSF") and Major League Soccer ("MLS"),

alleging that they violated Sections 1 and 2 of the Sherman Act by conspiring to exclude Plaintiff

from the markets for Division 1 and Division 2 men's professional soccer leagues in the United

States and Canada.  *See* ECF No. 57 ¶ 1 (Am. Compl.).  Years of discovery and pretrial practice

followed.  Following jury selection, trial commenced on January 14, 2025.  Three weeks later,

the jury returned a full verdict for Defendants.  *See* ECF No. 538 (Verdict Form).  On March 3,

2025, Plaintiff filed a motion for a new trial pursuant to Rule 59, arguing that the jury

instructions, verdict form, and evidentiary decisions rendered before and during trial contained

many "serious errors" warranting a redo.  *See* ECF No. 545-1 at 8–9 (Pl.'s Mot.; "Mot.").[1]

Defendants oppose that motion.  For the reasons explained below, the Court rejects Plaintiff's

challenges and DENIES the motion.

---

[1]    Unless otherwise indicated, when quoting cases and the parties' papers, all internal
quotation marks, alteration marks, emphases, footnotes, and citations are omitted.  The Court
refers to the pages assigned by the Electronic Case Files system ("ECF").

## **BACKGROUND**

The Court assumes familiarity with the factual background of this case tried to a jury and only briefly recounts the essential procedural history. Details relevant to the specific issues raised by Plaintiff are discussed in the Court's legal analysis below.

Plaintiff initiated this action on September 19, 2017. *See* ECF No. 1. It also moved for a preliminary injunction to require U.S. Soccer to maintain its status as a Division 2 men's professional soccer league. *See* ECF No. 3. Chief Judge Brodie, who presided over the case at the time, denied the preliminary injunction motion, concluding that Plaintiff failed to make a clear showing of entitlement to relief. *See NASL v. USSF*, 296 F. Supp. 3d 442, 448 (E.D.N.Y. 2017) ("*NASL I*"). On February 23, 2018, the Second Circuit affirmed that ruling, agreeing that Plaintiff failed to demonstrate a clear likelihood of success on the merits. *See NASL v. USSF*, 883 F.3d 32, 34–35 (2d Cir. 2018) ("*NASL II*"). On March 16, 2018, Plaintiff filed the Amended Complaint, *see* ECF No. 57, which Defendants each answered on May 11, 2018, *see* ECF Nos. 68, 69. The case proceeded to discovery. After the parties filed summary judgment and *Daubert* motions in June 2021, the case was reassigned to Judge Cogan on November 10, 2022. On June 12, 2024, Judge Cogan ruled on those motions. *See NASL v. USSF*, No. 17-cv-5495, 2024 WL 2959967 (E.D.N.Y. June 12, 2024) ("*NASL III*"). Most relevant for present purposes, he granted summary judgment to Defendants on Plaintiff's Count 1, which alleged that U.S. Soccer's Professional League Standards (the "Standards") "themselves, in totality" violated Section 1. *Id.* at *1, *20–21. Judge Cogan later granted in part and denied in part reconsideration, which had no effect on the dismissal of Count 1. *See* ECF No. 406. Following summary judgment, the case was reassigned to the undersigned. Additional pretrial practice followed, including two rounds of evidentiary and *Daubert* motion practice. *See NASL v. USSF*,

754 F. Supp. 3d 373 (E.D.N.Y. 2024) ("*NASL IV*"); Dec. 5, 2024, Pretrial Tr.  As mentioned, a jury trial took place earlier this year, resulting in a full verdict for Defendants on February 3, 2025.

Plaintiff filed its motion for a new trial on March 3, 2025.  *See* ECF No. 545.  Defendants filed their opposition on April 3, 2025.  *See* ECF No. 547 ("Opp.").  Plaintiff filed its reply on April 17, 2025.  *See* ECF No. 548 ("Reply").

## LEGAL STANDARD

Following a jury trial, Rule 59(a)(1)(A) permits "[t]he [C]ourt, on motion, [to] grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court."  "Such a motion ordinarily should be denied unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 324 (2d Cir. 2024).  Put differently, "the [C]ourt should only grant such a motion when the jury's verdict is egregious."  *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).

## DISCUSSION

Plaintiff groups its challenges into four large buckets.  First, it argues that "the verdict form, jury instructions, and related orders improperly required the jury to reject [Plaintiff]'s claims unless it found that [Plaintiff] proved one of its four specific relevant markets."  Mot. at 13.  Second, it claims that the Court made "seriously erroneous evidentiary rulings pertaining to the relevant market."  *Id.* at 20.  Third, it alleges that "the admission of a substantial amount of inflammatory and prejudicial evidence was a serious error that had a cumulative prejudicial effect and tainted the verdict."  *Id.* at 21.  Finally, it states that "several [other] erroneous

3

evidentiary rulings . . . had a serious impact on the trial." *Id.* at 25.  The Court addresses each of these arguments in turn and concludes that none has merit.

## I.    Relevant Markets

Plaintiff brought four claims to the jury:  Conspiracy to Restrain Trade in Division 1 and Division 2 (Count 1[2]); Conspiracy to Monopolize Division 1 and Division 2 (Count 2); Monopolization of Division 1 (Count 3); and Attempted Monopolization of Division 1 (Count 4). Counts 1 and 2 were brought against both Defendants; Counts 3 and 4 were brought against only MLS.  For all counts related to Division 1, the jury was asked the threshold question of whether Plaintiff "prove[d] the existence of one or both of the following relevant antitrust markets: (a) The market for Division 1 sanctions for men's professional soccer leagues located in the United States and Canada[.]  (b) The market for team membership in a Division 1 men's professional soccer league located in the United States and Canada[.]"  *See* ECF No. 538 at 2.  It was asked the same threshold question with respect to the Division 2 counts.  *See id.* at 8.  The alleged markets can be conceptualized in a two-by-two matrix:  the markets for sanctions and for team membership, respectively, in D1 and D2, respectively.  *See* Dec. 20, 2024, Pretrial Tr. at 20:17–20.  In both instances—and to each sub-question—the jury responded in the negative and, as instructed on the verdict sheet, went no further.  *See id.* at 2, 8.  In sum, all four of Plaintiff's claims failed on the gating issue of proof of a relevant market.

Plaintiff argues that was "serious error[]" and "contrary to federal antitrust law, which permits 'direct evidence' of anticompetitive effects for a Section 1 horizontal restraint claim or a Section 2 monopolization claim like [Plaintiff]'s, and does not in any circumstance require proof

---

[2]    Following the dismissal of Count 1 of the Amended Complaint at summary judgment, this became the new Count 1 for trial, and the remaining counts were renumbered accordingly.

of a relevant market for a Section 2 conspiracy-to-monopolize claim." *See* Mot. at 13.  Right off

the bat, that argument is surprising.  After all, before trial, Plaintiff's counsel told the Court that

the jurors "have to find at least one relevant market." *See* Dec. 20, 2024, Pretrial Tr. at 22:13–

14.  In any event, for the reasons explained below, the jury instructions and verdict sheet

properly applied the law in this case.

        *A.*    *Waiver*

As an initial matter, Plaintiff's central argument—that there is no threshold relevant

market requirement for any of its counts—is waived.  It is basic that a party may not use a

Rule 59 motion to advance a liability theory inconsistent with the one it pursued at trial.  *See Zsa*

*Zsa Jewels, Inc. v. BMW of N. Am., LLC*, No. 15-cv-6519, 2023 WL 3455057, at \*15 (E.D.N.Y.

May 15, 2023).  Indeed, in this case, the Court previously rejected Plaintiff's attempt, just before

the case was submitted to the jury, to obtain jury instructions (on a different issue) "plainly

inconsistent with charge language [Plaintiff] . . . submitted three times to the Court and its

consistent position throughout this case." *NASL v. USSF*, No. 17-cv-5495, 2025 WL 368805, at

\*3 (E.D.N.Y. Jan. 31, 2025) ("*NASL V*").

Here, Defendants convincingly show that Plaintiff's instant argument is out of step with

the position it previously and repeatedly put before the Court.  *See* Opp. at 21–23.  At the final

pretrial conference, Plaintiff's counsel initially suggested that Plaintiff could prevail on any of its

four claims without a jury unanimously finding that it also proved the existence of one of its four

theorized relevant markets with respect to a given claim.  *See* Dec. 20, 2024, Pretrial Tr. at

23:18–24:1.  Plaintiff's counsel later retreated from that position, stating that "the jury must

unanimously find that there is a relevant market in which either the unreasonable restraint of

trade or the monopolization took place," and, "I don't really have a problem with saying you all

5

must find the same relevant market and the violation in that market." *Id.* at 32:3–6, 33:1–3. Setting aside the issue of the mixing-and-matching the counts and alleged relevant markets, Plaintiff's counsel did not argue, as Plaintiff does now, that there was no need for the jury to find *any* relevant market for *any* count. To the contrary, he quite clearly stated, as one would expect, that for each count, "[t]hey [the jurors] have to find at least one relevant market." *Id.* at 22:12–25. Plaintiff argues that the context of this discussion was not related to the need to prove a relevant market as a general matter since "the entire premise of this discussion was that the Court already had ruled that it would require a specific relevant market to be found, over [Plaintiff]'s prior objections." Reply at 14. That is inaccurate. Contrary to Plaintiff's view, the Court's statement—"Forget about whether you agree that you *need a question* about relevant market. . . . I think you need a question about relevant market," *see* Dec. 20, 2024, Pretrial Tr. at 34:9–14 (emphasis added)—was a reference to the structure of the verdict sheet, and came after Plaintiff's counsel repeatedly conceded the requirement to prove at least one relevant market, *see, e.g.*, *id.* at 23:20–24. Further, Plaintiff misleadingly suggests that the Court had already rejected its theory of *per se* liability contained in its initial proposed jury instructions, *see* ECF No. 474, at the pretrial conference, even though the Court did not make initial rulings on the jury instructions until two weeks later, *see* ECF No. 499.

Beyond the pretrial conference, Plaintiff's instant contention "that [it] could prevail without proving its relevant markets" is, frankly, surprising, especially with respect to the Section 2 claims. *See* Mot. at 11. Plaintiff never articulated that maximalist position with nearly as much clarity as it now suggests it did. In its Motion, it points to three places in which it supposedly raised this point. *See id.*; Reply at 13. First, it highlights language about "a direct showing of anticompetitive effects." Mot. at 11. It did include such language, *see* ECF No. 507

at 36–37 & n.7, 66 n.28, with respect to its Section 1 and Section 2 claims, but only in the second round of proposed jury instructions (timing not mentioned by Plaintiff).  Minimally, it failed to make such an argument in the first round of proposed jury instructions in relation to a Section 2 claims, and therefore waived the argument as to those claims.  *See United States v. Spruill*, 808 F.3d 585, 598 (2d Cir. 2015) (finding waiver where defendant "affirmatively agreed to and, at times, even recommended the actions he now challenges").[3]  Notably, the other two instances it raises relate exclusively to Section 1.  *See* Mot. at 11.  And of those two instances, one is so vague—explaining that the rule of reason is not a "checklist"—that it cannot reasonably be read as describing a *per se* theory of liability, *see* ECF No. 474 at 60 (and it misunderstands the distinction between the *per se* and rule of reason frameworks, as described further below).

Additionally, beyond its general concession about the jury's need to find a relevant market at the threshold, Plaintiff waived its instant argument more specifically elsewhere, as cogently summarized by Defendants and discussed further below, even if it did later attempt to walk back instructions it previously agreed to at some point.  *See* Opp. at 22–23.  In sum, given that Plaintiff, Defendants, and the Court all agreed on the threshold relevant market requirement with respect to each count, the Court instructed the jury that it needed to find as much.  Plaintiff may regret having "endorsed the substance of the given charge," but that does not retroactively render that charge erroneous.  *See United States v. Kosinski*, 976 F.3d 135, 153 (2d Cir. 2020) (in

---

[3]     Plaintiff's contention that the Court's directive not to make "repetitive objections" in the second round compelled it not to repeat "proposed jury instructions that would have permitted it to prove its claims without proving a specific relevant market" is overly generalized and misleading.  Reply at 13.  In the first round, it did not make such an argument as to the Section 2 claims.  So the Court's instruction not to repeat objections limited Plaintiff in no way.  It couldn't "repetitive[ly]" argue a point not made in the first place.

the appellate posture, explaining that "[s]uch endorsement might well be deemed a true waiver, negating even plain error review").

B.    *Substantive Counts*

Even had Plaintiff not waived its challenges regarding the relevant market instruction, it is also wrong on the law as applied to this case.  As mentioned, Plaintiff's argument is an aggressive one, as it argues that there was no need to prove a relevant market for any Section 1 or Section 2 claim.  However, that view improperly casts aside the fundamental role of market analysis in assessing liability.  *See NCAA v. Alston*, 594 U.S. 69, 93 (2021) ("Whether an antitrust violation exists necessarily depends on a careful analysis of market realities.").

i.    <u>Scope of Market Proof</u>

The Court begins with a threshold issue.  In Reply, Plaintiff argues that "Defendants do not even attempt to defend a serious verdict form error applicable to all of NASL's claims—the fact that the Court rejected NASL's proposed verdict form that asked whether Defendants 'participated in a conspiracy to unreasonably restrain trade in ***a market*** for top-tier or second-tier men's professional soccer leagues'" and instead required proof of one of Plaintiff's proposed specific markets.  Reply at 12 (emphasis in original).  That is much ado about nothing.  Initially, the argument turns the spotlight back onto Plaintiff's waiver:  its own proposed verdict sheet embedded a requirement for Plaintiff to prove "a market" for every count, contrary to its central market-free argument in this motion.  *See* ECF No. 474-1 at 2–3.  In addition, the argument seeks to transform Plaintiff's vague initial proposal into a "serious verdict form error" only with the hindsight of an unsuccessful trial.  Plaintiff, who never articulated this specific argument until now, claims that the jury could have found "anticompetitive harm in a relevant market that is different or broader than the one alleged," and so the jury should have been given a question

permitting it to find harm in some unknown and undefined market.  *See* Reply at 12.  Not so.

First, adopting Plaintiff's amorphous proposal would have created a confusing dissonance with

its own proposed jury instructions, which read:

> The parties disagree over what constitutes the relevant product market.  More
> specifically, NASL contends that the relevant markets in this case are certain
> markets involving top-tier and second-tier men's professional soccer leagues
> located in the United States and Canada.  Specifically, the relevant markets alleged
> by NASL are the markets to obtain league sanctions to play Division 1 or Division
> 2 men's professional soccer, and the markets in which leagues compete within
> Division 1 or Division 2 to obtain teams.
>
> […]
>
> In this case, NASL contends that in the alleged markets to obtain sanctions, the
> seller in the market is the US Soccer Federation that grants the sanctions, and the
> buyers are the leagues that compete for such sanctions.  NASL further contends that
> in the alleged market for Division I and Division 2 teams, the buyers are people or
> entities who want to buy an expansion team from a league, and the sellers are the
> leagues which sell expansion teams to the buyers.  NASL contends that separate
> relevant markets exist for Division 1 and Division 2 sanctions and leagues because
> the quality and level of competition in Division 1 and Division 2 are not
> interchangeable to leagues and teams.

ECF No. 474 at 64–65.  Plaintiff never proposed to tell the jury that its alleged markets were

some starting point that the jury could alter at will.  Thus, the verdict form given to the jury

hewed closely to Plaintiff's own proposed instructions, which reflected all four of its own

alleged markets.  That was sufficient.  *See Lore v. City of Syracuse*, 670 F.3d 127, 160 (2d Cir.

2012) ("[T]here is no abuse of discretion if the verdict form, when read in conjunction with the

instructions to the jury, clearly presents the material factual issues raised by the pleadings and

evidence.").

Second, Plaintiff's claim of error relies on a faulty view of the law.  According to

Plaintiff, relevant market has no meaning; the jury can look to any market and fill in a blank.

Plaintiff overreads *U.S. Football League v. NFL*, 842 F.2d 1335, 1363–67 (2d Cir. 1988), for the

proposition that "a plaintiff can prevail where the jury finds anticompetitive harm in a relevant market that is different or broader than the one alleged by the plaintiff," claiming that the Second Circuit upheld a supplemental jury instruction after the jury redefined the relevant market on the verdict sheet. Reply at 12 & n.11. But the portion of the decision it relies on is dictum; the Second Circuit found waiver of the objection to the jury charge and purportedly ambiguous verdict. *See U.S. Football*, 842 F.2d at 1367. More basically, *U.S. Football*, in which the Second Circuit addressed the kind of instruction a plaintiff might be entitled to upon the jury asking about redefining the market, clearly does not stand for the broad understanding of verdict form flexibility claimed by Plaintiff. *See id.* at 1365. At bottom, Plaintiff's unique view, raised belatedly, of a case with idiosyncratic facts, does not justify the extraordinary relief it now seeks.

    ii. <u>Section 1</u>

   Plaintiff contends that "[n]o . . . legal requirement exists" to prove the existence of a relevant market for a Section 1 claim because (1) no rule of reason analysis is required when a plaintiff asserts a *per se* antitrust violation and (2) "a plaintiff claiming a Section 1 violation based on horizontal restraints can prove anticompetitive harm directly under the Rule of Reason without having to prove that its market definition is correct." Mot. at 13–17. The first argument ignores the nature of this case. To be sure, some commercial practices may be so obviously anticompetitive such that no further inquiry into issues like market structure is needed. The classic example is naked price fixing among competitors. *See Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 343–48 (1982). But this case, like "[m]ost [antitrust] cases," falls outside this "limited class" of "narrow, carefully demarcated categories held to be illegal *per se*." *See Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542–43 (2d Cir. 1993) (*per se* violations also include geographic division of markets and certain tying

arrangements and group boycotts). Accordingly, in this very case, the Second Circuit was clear in explaining that "[r]egulation of league sports is a textbook example of when the rule of reason applies." *NASL II*, 883 F.3d at 41. Nor, consistent with the Second Circuit's earlier decision, *see id.* at 41–42, was Plaintiff entitled to a jury instruction permitting it to find for Plaintiff under an "abbreviated" "quick look" rule of reason analysis, which applies where there is a "great likelihood of anticompetitive effects [that] can be easily ascertained," *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). In Reply, Plaintiff attempts to argue that this was all wrong, relying on *Relevent Sports, LLC v. USSF*, 61 F.4th 299 (2d Cir. 2023), to claim that member leagues' agreement to follow organizational standards constitutes a horizontal restraint. *See* Reply at 8. That is an incredulous reference. *Relevent Sports* specifically distinguished *this case*:

> We recognized that if NASL were challenging the Professional League Standards themselves—in totality—as violative of the antitrust laws, then the USSF Board's promulgation of them would constitute direct evidence of § 1 concerted action in that undertaking. But the NASL, we explained, had opted to allege an overarching conspiracy to restrain competition in markets for top- and second-tier men's professional soccer leagues in North America, so that the promulgation of the Standards constituted only circumstantial evidence of that conspiracy, not direct evidence.

61 F.4th at 307–08. Plaintiff's claim challenging the Standards "in totality" did not survive summary judgment. And jury instructions were not the vehicle to revisit that decision.

Consistent with the foregoing, the Court also agrees with Defendants that Plaintiff's argument runs afoul of the law of the case doctrine. That discretionary doctrine provides that "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991). As one would expect, it also applies in the post-trial posture. *See, e.g.*, *Menghi v. Hart*, 745 F. Supp. 2d 89, 99 (E.D.N.Y. 2010), *aff'd*, 478 F. App'x 716 (2d Cir. 2012). And here, there is a particularly compelling case for its application, as every judge to consider this issue, both in this

11

Court and at the Court of Appeals, rejected a *per se* or quick look framework and instead employed rule of reason analysis with respect to Plaintiff's Section 1 claim. *See NASL I*, 296 F. Supp. 3d at 469–70; *NASL II*, 883 F.3d at 41–42; *NASL III*, 2024 WL 2959967, at *26 (at summary judgment, finding "no reason to disturb th[e] holding" that rule of reason was the appropriate mode of analysis). So, when Plaintiff argued that "per se analysis" was warranted for the Section 1 instructions in this case, *see* ECF No. 474 at 54, this Court also rejected that position, *see* ECF No. 540-1 at 30 (final jury instruction requiring use of rule of reason).

Plaintiff's second argument in this area is that even under the rule of reason, it did not need to prove a relevant market because its case was based on proof of horizontal restraints. To start off, that argument is inconsistent with Plaintiff's actual proposed instruction. As Defendants summarize, *see* Opp. at 22, Plaintiff repeatedly conceded the need to prove a relevant market with respect to its Section 1 claim, including in its initial proposed jury instructions, where it, jointly with Defendants, proposed the following instruction with respect to the rule of reason: "NASL must show that the harm to competition occurred in an identified market, known as a relevant market." *See* ECF No. 474 at 63. As this Court previously made clear during trial, Plaintiff cannot have it both ways, for it would allow Plaintiff to unfairly "shape-shift out of its own position[s]" previously conceded. *See NASL V*, 2025 WL 368805, at *3; *see also* Trial Tr. at 1795:18–20, 22–23 (explaining the difficulties presented by Plaintiff's shifting positions).

In any event, proof of a relevant market was required under the rule of reason. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) ("The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition."); *NASL I*, 296 F. Supp. 3d at 470 ("The determination of the relevant market is a 'necessary predicate' to analyzing antitrust claims under the rule of reason." (quoting

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957)).  Of course, as previously discussed, some "horizontal restraints," or those "imposed by agreement between competitors," are "unreasonable *per se*," but as the Supreme Court has made clear, "[r]estraints that are not unreasonable *per se* are judged under the rule of reason."  *Am. Express*, 585 U.S. at 540–41.  Plaintiff's reliance on *American Express* is therefore unavailing.  *See* Mot. at 13–14. The only way Plaintiff's argument makes sense is if we depart from the rule of reason framework.  But, for the reasons previously explained, the Court will not do so.

iii.      <u>Section 2 Conspiracy to Monopolize</u>

Plaintiff also argues that the Court erred in requiring the jury to find a relevant market for its conspiracy to monopolize claim under Section 2, stating that because Section 2 prohibits a conspiracy to monopolize "any part" of interstate commerce, Plaintiff could have sustained this claim just with proof of specific intent to monopolize.  *See* Mot. at 17–18 & n.10.  For this point, Plaintiff relies on *United States v. Yellow Cab Co.*, in which the Supreme Court stated that Section 2 "makes it unlawful to conspire to monopolize 'any part' of interstate commerce, without specifying how large a part must be affected."  332 U.S. 218, 225–26 (1947).  Plaintiff never points to where it made this argument with respect to the jury instruction; indeed, its own initial proposed instruction stated that "[t]he first element of the conspiracy to monopolize claim is that [USSF] and [MLS] entered into an agreement or mutual understanding for MLS to obtain or maintain monopoly power in one or more relevant markets" and that "Defendants had the specific intent that [MLS] would obtain or maintain monopoly power in the relevant markets." ECF No. 474 at 5, 89–90.  In the second round of proposed jury instructions, Plaintiff's description of this count also contained relevant market requirements.  *See* ECF No. 507 at 54–55.  Only after trial, apparently, did Plaintiff have a full *Yellow Cab*-inspired change of heart,

13

now arguing that, for an attempt to monopolize claim, "the essential element is not the power, but the specific intent, to monopolize." Mot. at 18 (quoting *United States v. Consol. Laundries Corp.*, 291 F.2d 563, 573 (2d Cir. 1961)).

On this issue, the Court agrees with Defendants that Plaintiff could not have sustained its conspiracy to monopolize claim based only on proof of intent to monopolize some undefined part of interstate commerce, and so was not entitled to an instruction stating as much. In the context of a Section 2 attempted monopolization claim, the Supreme Court has rejected "the notion that proof of unfair or predatory conduct alone is sufficient." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 457 (1993). Notably, the Court repudiated the argument Plaintiff now suggests—that *Yellow Cab* did away with any requirement for market identification—explaining that the "any part" language stood only for the principle "that it is immaterial how large an amount of interstate trade is affected." *Id.* at 457 n.9. Although *Spectrum Sports* did not deal with a conspiracy to monopolize claim, it forecloses the same argument presented by Plaintiff here with respect to Section 2 claims generally. *See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997) ("Intent alone is not sufficient[;] . . . the defendant's power in the relevant market must be established . . . .").

To be sure, some courts have made statements like "while rigorous proof of a relevant market and of a dangerous probability of achieving monopoly power are not, in this Circuit, essential elements of conspiracy to monopolize, the relevant market and the likelihood of its monopolization may have a significant bearing on whether the requisite specific intent to monopolize is present." *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 382 (S.D.N.Y. 2016). But to suggest, as Plaintiff does, that such precedent dispels altogether with the need for market identification is to overread it; rather, that precedent stands for the more modest

14

proposition that market definition, although not central to the inquiry, is a necessary reference point for discerning specific intent. *See Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 363 (S.D.N.Y. 2009) ("There quite plainly is no admissible evidence supporting the existence of the alleged Service Submarket, so the very notion of a conspiracy to monopolize it is an oxymoron—one cannot monopolize something that does not exist."). Accordingly, in contrast to the pre-*Spectrum Sports* authority cited by Plaintiff, courts today consistently require relevant market definitions for all Section 2 claims. *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 453 (S.D.N.Y. 2015) ("To state any claim under § 2, a plaintiff must allege plausible facts that a defendant possesses market power . . . in a relevant market . . . ."); *Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y. Inc.*, No. 22-cv-04040, 2025 WL 1031093, at *8 (E.D.N.Y. Apr. 7, 2025).

On a verdict sheet, market identification takes place through relevant market analysis. The Second Circuit has stated that "the relevant market analysis . . . is essential for assessing the potential harm to competition from the defendants' alleged misconduct" and that this is "equally applicable to claims made under Section Two . . . because without a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016); *Regeneron Pharma., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 338 (2d Cir. 2024) ("To state a claim under either Section 1 or Section 2[,] . . . a plaintiff must plausibly allege that the defendants' anticompetitive conduct restricted competition within a relevant market."); *accord Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 495, 506–07 (2d Cir. 2004); *see also Prime Int'l Trading, Ltd. v. BP P.L.C.*, 784 F. App'x 4, 6–8 (2d Cir. 2019) (in reviewing Section 2 conspiracy to monopolize claim, explaining that "the Court must first determine the 'relevant market' for purposes of

15

assessing antitrust injury"). This is consistent with the views of other courts, which have more explicitly put *Spectrum Sports* in dialogue with a Section 2 conspiracy to monopolize claim so as to require a relevant market. *See Auraria Student Hous. at the Regency LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1230 (10th Cir. 2016) ("*Spectrum Sports* . . . provides new guidance for reading *Yellow Cab* and its progeny. With the benefit of this direction, we . . . hold that plaintiffs must define the relevant market in every § 2 claim."); *accord Physician Specialty Pharmacy, LLC v. Prime Therapeutics, LLC*, No. 18-cv-1044, 2019 WL 1239705, at *9 (D. Minn. Jan. 24, 2019), *report and recommendation adopted*, 2019 WL 1399571 (D. Minn. Mar. 28, 2019).

In Reply, Plaintiff contends that *Spectrum Sports* did not actually displace binding Second Circuit authority on a conspiracy to monopolize claim. *See* Reply at 10–11. It focuses on the fact that the *Auraria* court distinguished the Second Circuit's *Consolidated Laundries* decision, which applied *Yellow Cab*, arguing that this Circuit goes in a different direction. *See Auraria*, 843 F.3d at 1236 n.2. As previously stated, the *Consolidated Laundries* court reiterated *Yellow Cab*'s holding that "where the charge is conspiracy to monopolize, the essential element is not the power, but the specific intent, to monopolize." 291 F.2d at 573. To the extent that that is still good law, it appears to the Court that *Spectrum Sports* and subsequent Second Circuit authority "ha[ve] so clearly undermined [it] that it will almost inevitably be overruled." *Packer ex rel. 1-800-Flowers.Com v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 54 n.36 (2d Cir. 2024). But the Court need not even go so far, because Second Circuit authority listing the elements of a conspiracy to monopolize as "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize," *see Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988), can be read in harmony with a relevant market

requirement, *see Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996) ("Unlike the previous two Section Two claims, to be liable for conspiracy to monopolize, it is not necessary that the . . . Defendants compete directly in the market for removal services.  A defendant may be liable for conspiracy to monopolize where it agrees with another firm to assist that firm in its attempt to monopolize the relevant market."), *vacated on irrelevant grounds*, 525 U.S. 125 (1998).  Plaintiff's claim of error fails.

> iv.    Section 2 Monopolization and Attempted Monopolization

Plaintiff makes the same argument regarding the lack of a need to prove a relevant market with respect to its monopolization and attempted monopolization claims.  *See* Mot. at 19. It relies on *PepsiCo, Inc. v. Coca-Cola Co.*, which it quotes (partially):  "[T]here is authority to support [the] claim that a relevant market definition is not a necessary component of a monopolization claim."  315 F.3d 101, 107 (2d Cir. 2002).  As before, that argument was absent in Plaintiff's initial proposed instructions; indeed, with respect to monopolization, Plaintiff and Defendants jointly proposed to instruct the jury:  "You were previously instructed on how to determine whether the markets alleged by NASL are relevant antitrust markets.  Those same instructions apply to this monopolization Count."  ECF No. 474 at 102.  Similarly, with respect to attempted monopolization, Plaintiff asked the Court to instruct the jury that "[t]he second element of an attempt to monopolize claims requires NASL to prove, through a preponderance of the evidence, that [MLS] had a specific intent to monopolize one of the relevant markets."  *Id.* at 116.  Then, even though Plaintiff referred to *PepsiCo* in the second round of proposed jury instructions, the parties still jointly proposed virtually the same relevant market language as to both counts.  *See* ECF No. 507 at 64, 74.

In any event, as just explained, much more recent Second Circuit authority makes clear that proof of a market is needed for any Section 2 claim. *See supra* at 15–16. Just recently, the Second Circuit said as much specifically with regard to the kinds of claims at issue here: "Monopolization claims under Section 2 require 'the possession of monopoly power in the relevant market' or, for attempted monopoly, an intent to acquire such power." *Go N.Y. Tours Inc. v. Gray Line N.Y. Tours, Inc.*, No. 24-2392-cv, 2025 WL 947083, at *3 (2d Cir. Mar. 27, 2025) (quoting *Volvo*, 857 F.2d at 73–74). To the extent Plaintiff tries to seize on the *PepsiCo* language stating that "direct measurements of a defendant's ability to control prices or exclude competition" may serve as an alternative to relying on a relevant market, *see PepsiCo*, 315 F.3d at 108, Defendants are right to point out that the Second Circuit narrowed that path in *Heerwagen v. Clear Channel Communications*, when it stated precedentially that "[a] showing of market power is a substantive element of plaintiff's monopolization claim, and plaintiff cannot escape proving her claims with reference to a particular market even if she intends to proffer direct evidence of controlling prices or excluding competition," as Plaintiff says it did here. 435 F.3d 219, 229 (2d Cir. 2006), *overruled in irrelevant part by Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196 (2d Cir. 2008). Plaintiff replies that there is daylight between *Heerwagen*'s "reference to a particular market" and the need to actually prove a relevant market. Reply at 11–12. That's fair enough for pleading purposes. *See Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 481–82 (S.D.N.Y. 2016). But Plaintiff never explains how that was supposed to be incorporated into its verdict form, which needed to include

a "reference to a particular market." Even under its own proposed form, failure to prove "a market" would have required a defense verdict. *See* ECF No. 474-1 at 3.[4]

> C.    Conclusion

At bottom, the genesis of most of Plaintiff's claims of "serious error" with the jury instructions is its own proposals to the Court. The Court rejects its challenges, not only because Plaintiff waived them, but also because Plaintiff's second look at its own proposals produces legally unsound results, often directly contradicted by Second Circuit authority. In this case, Plaintiff attempted to cover the waterfront by proposing four different relevant markets, but the jury concluded that Plaintiff failed to prove any of them. The Court will not now send this case back to a jury based on freeform ideas about anticompetitive behavior not just disconnected from Plaintiff's own market definitions, but from any market definition at all.

## II.    Evidentiary Rulings Related to Relevant Market

In the same area, Plaintiff next argues that the Court "exclude[d] evidence regarding downstream markets," but "permit[ted] Defendants to attack [Plaintiff]'s relevant markets and confuse the jury by presenting evidence and arguments about downstream markets." Mot. at 20. In resolving *Daubert* motions, Judge Cogan ruled that Plaintiff "failed to convince the Court that

---

[4]    Although the issue is not necessary to resolve here, the Court also thinks Plaintiff would not have been entitled to a direct evidence instruction based on its proof at trial. In its Motion, Plaintiff points only to "a direct showing of Defendants' monopoly power to exclude competition through the anticompetitive application of the Standards." Mot. at 19. But that does not refer to MLS's conduct, the only Defendant against whom Plaintiff brought monopolization and attempted monopolization counts. *See* Opp. at 19. In Reply, Plaintiff's argument shifts to "MLS'[s] control of prices, including the fact that MLS has inflated its team prices in the absence of any competitor D1 leagues." Reply at 12 (citing Mot. at 15). But the trial evidence it cites doesn't have to do with "MLS'[s] control of prices"; it just generally relates to teams needing to join MLS to become D1 teams. *See* Mot. at 15 n.7. And its claim to entitlement based on "MLS'[s] exclusion of competition through its successful conspiracy with [U.S. Soccer] to exclude any D1 competitor" assumes proof of a conspiracy in the first instance. *See* Reply at 12.

harm to consumers in the downstream markets—fans, sponsors, and broadcasters—is relevant to [its] claim that [D]efendants' conduct . . . caused anticompetitive effects in NASL's proposed relevant markets," and excluded expert evidence to this effect. *NASL III*, 2024 WL 2959967, at *16. Judge Cogan similarly excluded Defendants' proffered expert evidence concerning "downstream markets for tickets and/or attendance for live games, television programming, and sponsorship." *Id.* at *18. Against that backdrop, Plaintiff claims that the Court at trial erred by "only enforc[ing] this ruling against [it]," while allowing Defendants to bring in evidence and argument about downstream markets. *See* Mot. at 20–21.

On an evidentiary challenge like this one (and the rest of Plaintiff's issues discussed below), Plaintiff faces an additional hurdle on the already steep climb to relief under Rule 59. As the Second Circuit has explained, "an erroneous evidentiary ruling warrants a new trial only when a substantial right of a party is affected, as when a jury's judgment would be swayed in a material fashion by the error." *Restivo v. Hessemann*, 846 F.3d 547, 573 (2d Cir. 2017). But here, there was no error, much less that kind of serious error that would require a new trial. On this point, the Court agrees with Defendants that Plaintiff's arguments are both principally and factually flawed. *See* Opp. at 24–25. In the portion of Judge Cogan's *Daubert* decision not quoted by Plaintiff in its motion, he made clear that his ruling "d[id] not mean that a defendant is stuck with the market alleged in the complaint or defined by a plaintiff's expert." *NASL III*, 2024 WL 2959967, at *18 n.7. Thus, he explained:

> If, for example, a defendant challenged [Plaintiff]'s alleged relevant markets as being too broad or too narrow, it could offer alternative markets that include the good or service that is [the] subject of the plaintiff's complaint. It could then attempt to show that there are no anticompetitive effects in that market – which defendant contends to be the relevant market. Here, none of the parties argue that the relevant market, however defined, includes tickets and/or attendance for live games, television programming, and sponsorship.

20

*Id.* The Court does not see how that limitation on expert testimony supposedly barred Defendants from bringing in facts relevant to the jury's evaluation of Plaintiff's alleged relevant markets. Indeed, in his reconsideration order, Judge Cogan was careful to explain:

> At trial, NASL will be permitted to present evidence of its proposed market definition, and [D]efendants will be permitted to present evidence casting doubt on NASL's market definition or to introduce evidence during their case on their contrary definition of the market. Thus, to the extent the [summary judgment] Order suggested *any limitation* on [D]efendants' ability to prove the appropriate market definition, it is corrected by the instant order.

ECF No. 406 at 1–2 (emphasis added). And although not discussed by Plaintiff in its motion, this Court's *in limine* ruling was also limited, precluding Defendants from offering "evidence of procompetitive effects in the downstream markets." Dec. 5, 2024, Pretrial Tr. at 12:22–23. Thus, Plaintiff's counsel's sweeping argument at trial "that both sides were precluded from *talking about* downstream markets, competition [for] fans, [for] consumers and broadcasters" was wrong in scope both then and now. *See* Trial Tr. at 2672:21–23 (emphasis added).

This conclusion is bolstered by the fact that Plaintiff's current misconstruction of Judge Cogan's order is at least partially new; at the motion *in limine* stage, Plaintiff made clear that it did not seek to preclude Defendants from bringing in evidence concerning downstream markets "in assessing the bounds of the at-issue relevant market of team owners." *See* ECF No. 455-1 at 21 n.6. Similarly, Plaintiff's initial proposed jury instruction permitted the jury to "consider how people in the industry and the public at large view the products; whether the products have the same or similar characteristics or uses; whether the products have similar prices; whether the products are sold to similar customers; and whether they are distributed and sold by the same kinds of sellers." ECF No. 474 at 65–66. The Court has difficulty seeing how Defendants traversed even Plaintiff's own understanding of the limit it now seeks to enforce.

Additionally, Plaintiff's assertion about what evidence came in is itself misleading.  For example, Plaintiff complains that the Court allowed Defendants' fact witnesses to testify about downstream markets but did not allow Plaintiff's expert to testify about the same.  *See* Mot. at 20.  But Plaintiff did not object in either of the two cited instances of Defendants' fact witnesses providing such testimony.  *See id.* (citing Trial Tr. at 1646:01–1647:18, 1909:09–1910:11).  And the Court allowed Plaintiff's expert to testify about the defense testimony concerning market definition; indeed, he volunteered that he "d[id] not even disagree" with the defense witness's testimony that "[MLS] competes with other U.S. professional leagues and also foreign soccer leagues for fan attention."  Trial Tr. at 2236:24–2237:5.  In its motion, Plaintiff cites just one example of where it was "prevented" from eliciting testimony about market definition.  *See* Mot. at 20 (citing Trial Tr. at 2265:06–2266:02).  But in that case, the Court sustained Defendants' objection because the redirect was beyond the scope of the cross-examination, not because of anything Judge Cogan supposedly ruled on.  *See* Trial Tr. at 2265:23–2266:2.

Plaintiff also complains about U.S. Soccer's closing argument, where defense counsel argued at length about relevant markets, and made statements like "[t]he product is the game on the field."  *See id.* at 2657:17.  As an initial matter, Plaintiff uses the wrong framework for this challenge, which sounds in misconduct, not evidence.  *See Boateng v. BMW AG*, 753 F. Supp. 3d 215, 245–46 (E.D.N.Y. 2024).  Under that rubric, a new trial may be appropriate where "counsel's conduct create[s] undue prejudice or passion which played upon the sympathy of the jury."  *Id.* at 246.  But there was no misconduct here, and definitely not serious misconduct requiring a new trial.  Again, Defendants were permitted to try to undermine Plaintiff's proposed markets, including by proposing alternatives.  Contrary to Plaintiff's assertion now, defense counsel did not "falsely assert[]" the nature of Plaintiff's markets, Mot. at 20; rather, he was

arguing that those markets were incorrectly defined. Plaintiff's counsel sought to refute that in his summation. *See, e.g.*, Trial Tr. at 2796:11–12 ("Most of what they showed you is completely irrelevant diversion, completely irrelevant diversion."). The jury agreed with Defendants. Plaintiff points to normal attorney argument, not misconduct or error. That is why the Court previously denied Plaintiff's motion to give a curative instruction as to this issue in the summation. There was nothing to cure. *See id.* at 2672:18–2674:8.

At bottom, Plaintiff's claim of "unequal treatment" is imaginary. Reply at 14–15 & n.14. Plaintiff appears to misunderstand that, while parties are of course entitled to evenhanded evidentiary rulings, *it* carried the burden of proof on market definition. Thus, as Judge Cogan repeatedly stated, Defendants were not required to sit idly by and accept that definition.

### III.    "[I]nflammatory and [P]rejudicial" Evidence

Departing from relevant market issues, Plaintiff's next claim of error is that the Court improperly admitted two categories of evidence concerning (i) Rocco Commisso's tweets and litigation funding and (ii) Traffic Sports. The Court explores these issues in detail below, but notes at the outset that, even if these arguments had merit, they would not be the basis for a new trial. That is because Plaintiff never links them to the jury's verdict, which related exclusively to Plaintiff's failure to prove relevant markets. It is not enough for Plaintiff to claim or even to prove that it was unfairly prejudiced by the admission of certain evidence; rather, it must show that "it is likely that in some material respect the factfinder's judgment was swayed by the error." *Tesser v. Bd. of Educ.*, 370 F.3d 314, 319–20 (2d Cir. 2004). Plaintiff has not even tried to do that in its Motion nor in its Reply. And there were no errors in any case.

### A.    *Commisso Tweets and Litigation Funding*

Rocco Commisso was an NASL team owner and chairman of NASL's board.  *See* Trial Tr. at 1989:8–17.  After NASL was denied its D2 sanction, he anonymously tweeted about U.S. Soccer and MLS.  Before trial, Plaintiff moved to exclude those tweets, but the Court denied the motion, explaining that although the "tweets might be inflammatory," they were "significantly probative in terms of Mr. Commisso's bias and credibility" under Rule 403.  *See* Dec. 5, 2024, Pretrial Tr. at 14:25–15:24.  Plaintiff now effectively seeks post-trial reconsideration of that motion; indeed, its instant legal argument is not different from that in its motion *in limine*. *Compare* Mot. at 22 (citing *Rosario v. City of New York*, No. 18-cv-4023, 2022 WL 3098305 (S.D.N.Y. Aug. 4, 2022)), *with* ECF No. 455-1 at 25–26 (motion *in limine* citing the same).  But as far as the legal analysis goes, nothing has changed; thus, the Court again rejects Plaintiff's repetitive argument.  *See Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998) ("It is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'").

The same is true with respect to Plaintiff's argument concerning Commisso's funding of this litigation.  There, its attempt to rehash a settled issue is even more brazen, citing Second Circuit authority available to it before trial, *Carroll v. Trump*, 124 F.4th 140 (2d Cir. 2024), affirming a district court decision, *see Carroll v. Trump*, No. 20-cv-7311, 2024 WL 97359 (S.D.N.Y. Jan. 9, 2024) (cited by Plaintiff *in limine*, ECF No. 455-1 at 9), that the Court previously distinguished in detail, analysis which goes unaddressed by Plaintiff.  *See* Dec. 5, 2024, Tr. at 5:22–6:15.  That is not surprising, since the Second Circuit's reasoning for affirming the exclusion of evidence of "outside" litigation funding, *see Carroll*, 124 F.4th at 171–73,

remains "different" from a case in which the witness himself is the funder, *see* Dec. 5, 2024, Tr. at 6:4–8.[5]  The Court's prior reasoning is undisturbed.

Beyond the Court's prior evidentiary analysis, Plaintiff complains about the way in which defense counsel brought this admissible evidence in at trial.  For example, in one tweet, Commisso called a U.S. Soccer official "the Harvey Weinstein of U.S. Soccer raping USSF for fifteen years for MLS owners," and in another, he accused Defendants of "engineer[ing] a Madoff-type scam on all of American soccer."  *See* Trial Tr. at 2058:11–15, 2069:4–6.  Now, Plaintiff takes issue with defense counsel's multiple references to "rape" and discussion of the Madoff scandal during the cross-examination of Commisso.  *See* Mot. at 22.  As before, this type of claim sounds in attorney misconduct rather than admissibility.  *See Boateng*, 753 F. Supp. 3d at 245–46.  Here, especially "in the context of the trial as a whole," there was nothing to improperly inflame the jury.  *See id.* at 245.  I observed the cross-examination, which was vigorous but not "incendiary."  *See* Mot. at 22.  The same goes for defense counsel's references to Commisso's personal financial interest in the outcome of the case and references to him as a "billionaire," *see id.* at 22–23, especially where Plaintiff itself elicited testimony about

---

[5]     Plaintiff misreads the Second Circuit's *Carroll* decision in another way, too.  In reference to that case, Plaintiff writes that "the Second Circuit has refused to admit prejudicial evidence to show bias or credibility, where the witness's alignment with one party is already clear."  Mot. at 23.  In *Carroll*, the Second Circuit affirmed the exclusion of "extrinsic evidence of . . . litigation funding" to show bias and motive in part because there was much other evidence in the record that the plaintiff and her key witnesses acknowledged their political opposition to the defendant. 124 F.4th at 173.  That stands for the principle that the availability of other evidence to show bias and motive may weigh on the applicable Rule 403 analysis, not for Plaintiff's bold proposition that so long as a witness's adversarial relationship to a party is known, there may no further inquiry into it.  Indeed, although again unacknowledged by Plaintiff, the Court previously explained in its motion *in limine* ruling why Commisso's personal financial stake in this case had "substantial probative value," *see* Dec. 5, 2024, Pretrial Tr. at 6:9–15, and the *Carroll* court, too, reaffirmed the basic principle that a party must be "given full opportunity to explore [a] witness's apparent bias," 124 F.4th at 173.

Commisso's wealth, *see* Trial Tr. at 1986:3–5.  Plaintiff's complaint appears to be that one of its central witnesses may have been impeached in the eyes of the jury, but contrary to its suggestion, defense counsel was not limited to "eliciting relevant facts," *see* Mot. at 22, and was permitted to probe "matters affecting the witness's credibility" on cross-examination, *see* Fed. R. Evid. 611(b).  For these reasons, there was no error with respect to the admission of the tweets and litigation funding evidence, nor with the presentation of that evidence at trial.

### B.    *Traffic Sports*

Plaintiff also argues that the Court should not have admitted evidence related to Traffic Sports and Aaron Davidson.  As the Court previously explained, Traffic was an international soccer organization "closely affiliated" with NASL and Davidson was a Traffic executive who served as chairman of Plaintiff's Board of Governors, both of whom were later indicted and pled guilty to fraud.  *NASL IV*, 754 F. Supp. 3d at 379–80; Trial Tr. at 583:3–9, 586:20–24.  As relevant here, the Court held that it would not "wholesale exclude evidence or testimony relating to the indictments and convictions of Traffic and Davidson," but cautioned that Defendants should not "belabor" these issues.  *NASL IV*, 754 F. Supp. 3d at 381–82.  Plaintiff now says that the Court erroneously allowed Defendants to cross that line at trial in a variety of ways.  However, Plaintiff does not now actually contest the Court's Rule 403 weighing in its motion *in limine* Order; rather, it again objects to the use of this evidence at trial.  *See Boateng*, 753 F. Supp. 3d at 245–46.  The Court addresses Plaintiff's arguments in turn.

First, Plaintiff takes issue with defense counsel "push[ing] a witness to agree that NASL was 'proud of [its] association with Traffic' after its indictment."  Mot. at 24 (second brackets retained).  On this point, the Court agrees with Defendants, *see* Opp. at 28–29, that Plaintiff misunderstands the Court's *in limine* Order, which obviously permitted Defendants to probe the

NASL-Traffic relationship.  The referenced lines of questioning, which were just a small part of this significant trial record, were not particularly notable, and certainly did not sway the jury into rendering a defense verdict (much less one based on relevant markets).

Second, Plaintiff complains that Defendants "were permitted to play a deposition video in which Davidson invoked the Fifth Amendment 75 times, largely about trivial, irrelevant[,] or undisputed issues."  Mot. at 24.  Setting aside that mischaracterization of the importance of the testimony, this exact issue was litigated exhaustively both at the motion *in limine* stage, *see NASL IV*, 754 F. Supp. 3d at 384–36 & n.10, and during trial, *see* Trial Tr. at 2242:2–2246:17.  Plaintiff's perfunctory objection to it now does not change any of that prior analysis.  Relatedly, Plaintiff takes issue with the way in which defense counsel made arguments about the implications of Davidson's Fifth Amendment invocations in closing.  *See* Mot. at 24.  But there was nothing improper about counsel trying to persuade the jury about how it should interpret that hole in the record.  *See Schwartz v. Nw. Airlines Inc.*, 275 F.2d 846, 846 (2d Cir. 1960) ("In arguing to a jury, counsel must properly have some latitude so long as prejudice does not appear.").  Plus, the Court was keenly aware of these issues, and carefully instructed the jury both before the deposition was played and during the final instructions to assist it in fairly considering this evidence.  *See, e.g.*, Trial Tr. at 2544:18–22 ("[B]ecause this is a civil case, you may, as a jury, but are not required to, infer from such a refusal that the answer would have been adverse to the witness's interest and the interest of any parties in the case who are closely associated with the witness."); *id.* at 2864:7–9 ("You should consider any inference you may or may not choose to draw from a refusal to testify on Fifth Amendment grounds together with all the other evidence in this case.").

Third, Plaintiff focuses heavily on Defendants' argument "that Traffic had criminally 'bribed' a consultant to persuade the New York Cosmos to join NASL instead of MLS," calling it "made up," "fiction," and "misinformation."  Mot. at 24–25.  Here, too, the issue was litigated *in limine*, and Plaintiff lost its effort to exclude this evidence.  *See* Dec. 5, 2024, Pretrial Tr. at 13:5–14:24.  Attempts to characterize the at-issue payment to a consultant were appropriately directed to the factfinder; indeed, Plaintiff's counsel actually made these arguments to the jury. *See, e.g.*, Trial Tr. at 2742:15–17 ("It's not about this false allegation of a bribe paid to the Cosmos for which there is zero evidence.").  Based on this, Plaintiff asks the Court to order a new trial, going as far as to drill down into the distinction between a "bribe" to a government official and "a payment to a consultant."  *See* Mot. at 24 n.14.  If this all seems beyond the scope of a Rule 59 motion, that's because it is.  Simply, no "miscarriage of justice," *ABKCO*, 50 F.4th at 324, resulted from Defendants' merely having been permitted to try to frame evidence in a certain way, especially in light of the Court's repeated instruction, *see, e.g.*, Trial Tr. at 2856:5–6, that attorney arguments are not evidence, *see Boateng*, 753 F. Supp. 3d at 248 (noting that this reminder supports the view "that the jury was able to disregard any inappropriate argument").

Fourth, Plaintiff says it was "further prejudic[ed]" by the Court's instruction to the jury, requested by Defendants, regarding Plaintiff's counsel's summation.  *See* Mot. at 25.  For context, in his closing, Plaintiff's counsel argued:

> Now, I want to talk about the invocation of the Fifth.  They made a big deal that he [Davidson] invoked the Fifth when he got asked a question about Mr. Sehgal knowing about the bribe and they said you should read something into that.  He invoked the Fifth more than 70 times.  If you look at it you'll see that his counsel gave him a time period said if it's in that time period you can tell them.  But when he does it, anything within that time period he's invoking the Fifth.
>
> Look at this one.  Page 305 question:  NASL was formed in late 2009 with 11 teams, only four made it to the 2011 season under the same ownership and those four were

> Fort Lauderdale, Edmonton, Tampa and Montreal.  Was that an accurate statement.  Invoke the Fifth.
>
> What could be criminal about that?  He's not invoking the Fifth because there's some criminality involved.  He was invoking the Fifth because his lawyer told him to invoke the Fifth all over the place in the time period.

Trial Tr. at 2818:11–2819:2.  In response, Defendants demanded a curative instruction, which the Court granted, explaining that the above claim "was well beyond 'vigorous and robust' argument, *see United States v. Smith*, 778 F.2d 925, 929 (2d Cir. 1985) . . . .  [b]ecause Plaintiff's counsel's assertion had zero foundation in the record" and "was entirely speculative." *See* Feb. 2, 2025, Text Order.  "Accordingly, because Defendants now ha[d] no opportunity to challenge that unfairly prejudicial claim, their proposed curative instruction [was] appropriate and necessary to cure the prejudice." *Id.*  Plaintiff now complains that the curative instruction unfairly limited its efforts to "respond to [Defendants'] misinformation about the alleged bribe and Fifth invocations." Mot. at 25.  But that creates a false equivalency.  No one disputes that the at-issue payment took place; everyone disputes why it took place.  That is a classic issue for the jury to resolve by evaluating competing evidence. *See Zsa Zsa Jewels*, 2023 WL 3455057, at *13.  On the other hand, Plaintiff's counsel's argument about why Davidson invoked the Fifth Amendment was made up out of whole cloth and not "based on the evidence in the record." *See Smith*, 778 F.2d at 929.  The curative instruction was both appropriate and necessary.

In conclusion, Plaintiff presents no compelling argument displacing the Court's prior Rule 403 balancing with respect to evidence concerning NASL and Traffic.  Furthermore, it fails to identify an error, much less a serious error, with the way this evidence was presented.  That is not surprising, since the Court enforced careful guardrails around the presentation of this evidence.  There will be no new trial on this basis.

# IV.    Other Evidence

Plaintiff concludes by listing a variety of "other evidentiary errors that had serious impacts" and "should be corrected upon retrial."  *See* Mot. at 25–26.  It is not clear to the Court what the purpose of this section is within a Rule 59(a) motion, as Plaintiff contends only that one "serious error" with respect to one branch of one expert's testimony "warrants retrial."  *See id.* at 32.  In any case, even if these arguments were meritorious, they would not lead to that relief. That is because, like the alleged errors discussed in the previous Section, they have no relationship to the jury's verdict, which concerned only relevant markets.  Nevertheless, for the avoidance of doubt but without rehashing the entire respective histories of these issues already extensively litigated, the Court briefly explains why Plaintiff's assertions are wrong.

### A.    *2015 Standards*

Plaintiff complains that the Court excluded evidence related to amendments of the Standards proposed in 2015.  *See* Mot. at 26.  It says that U.S. Soccer sought to amend the Standards to make D1 membership unattainable after NASL applied to join D1.  *See id.*  As the Court already explained in detail, because the 2015 amendments (1) were not adopted and (2) U.S. Soccer was meeting to discuss them before NASL submitted its D1 application, those amendments were not probative of Defendants' alleged conspiratorial intent and properly excluded under Rule 401.  *See* Dec. 5, 2024, Pretrial Tr. at 23:21–25:11.  Plaintiff now faults the Court for relying on *Warrior Sports, Inc. v. NCAA*, in which the Sixth Circuit explained that an unadopted rule "necessarily did not cause . . . any injury to [plaintiff]" and that only the adopted rule "matter[ed] for purposes of the antitrust analysis."  623 F.3d 281, 285 (6th Cir. 2010).  It says that such reasoning is relevant only to antitrust injury and not to evidence of conspiracy. Mot. at 27.  That is an accurate case-specific distinction, but the Court never said *Warrior Sports*

was dispositive as to its Rule 401 analysis; rather, the Court noted that the case supported its

conclusion regarding the relevance of this specific evidence Plaintiff wanted to admit.

> ### B.    U.S. Soccer's Board

Plaintiff also disagrees with this Court's rulings regarding certain evidence concerning

U.S. Soccer's board.  *See* Mot. at 27–30.  Specifically, it objects to the Court's exclusion of a

report by McKinsey Consulting containing "statements from board members indicating MLS's

dominance," which Judge Cogan found admissible on summary judgment.  *See NASL III*, 2024

WL 2959967, at *24 & n.10.  Defendants later moved to exclude certain evidence related to

corporate governance issues, which this Court granted in part and denied in part.  As relevant

here, the Court excluded the McKinsey Report, which it reviewed in its entirety and analyzed in

detail.  *See* Dec. 5, 2024, Pretrial Tr. at 25:15–30:11.  The Court explained, for example, that the

report was not relevant under Rule 401 because the quotes within it related to general corporate

governance issues, which Judge Cogan's earlier ruling found was beyond this case's scope.  *See*

*id.* at 28:3–14.  The Court also noted that certain quotes in the report appeared to relate to soccer

in the United States generally rather than Defendant U.S. Soccer.  *See id.* at 28:15–29:21.  It also

explained that the report warranted exclusion under Rule 403 because the Court was

unconvinced that the quotes in the report could be attributed to U.S. Soccer board members,

creating a high risk that it would be confusing and misleading to the jury.  *See id.* at 29:22–

30:11.  Plaintiff, unsurprisingly, still disagrees with the analysis, but its arguments basically

mirror those already advanced *in limine*, which addressed the relevance of this argument in

relation to Defendants' defense about board independence.  *See* ECF No. 462 at 18–22.  Thus,

there is nothing really new here to change the Court's prior analysis, and this is again little more

than a procedurally improper reconsideration motion with respect to a decided issue.

C.    *Dr. Williams*

Plaintiff argues that the Court made two errors with respect to limitations on the testimony of Dr. Williams, its damages expert.  As a framing issue, the Court notes that, with the benefit of having witnessed Dr. Williams's testimony, both of these issues appear immaterial.  Even after several rulings reined in his testimony, in response to Defendants' Rule 50 motion for judgment as a matter of law, the Court expressed serious reservation about allowing the jury to award damages on the basis of this testimony, expressing concern about the witness's "lack of preparedness" and "lack of understanding or at least willfulness in not understanding basic premises about assumptions and the lack of assumptions" undergirding his theory.  *See* Trial Tr. at 2521:19–2522:3.  In light of the jury's ultimate verdict, this issue became moot, but as a first principles matter, it seems hard to imagine that granting the witness more leeway would have allowed him to generate a model capable of withstanding such scrutiny.  Nevertheless, the Court briefly discusses why each of the specific challenges raised here continues to fail.

i.    Team Holdings Agreement

Plaintiff first faults Judge Cogan's decision on summary judgment to exclude two of Dr. Williams's damages models.  *See* Mot. at 30–31.  As this Court has previously explained:

> Judge Cogan's Order direct[ed] [Dr. Williams] to discount his D1 damages estimates to reflect the real-world conditions that existed at the time of the challenged conduct.  Specifically, Judge Cogan directed Dr. Williams to discount his damages forecast to reflect the terms of the Team Holdings contract as it existed in March 2016—with Team Holdings taking the first $450,000 and a further 80% of expansion fees collected from the first 10 teams and 20% of expansion fees collected from further expansion. . . .  Judge Cogan required the above because he found Dr. Williams's first D1 model, which attempted to capture a hypothetical settlement between NASL and Team, to be too speculative.  So, he instead required Dr. Williams to account for the NASL-Team agreement, as described above.

*NASL IV*, 754 F. Supp. 3d at 389.  Plaintiff now argues that Judge Cogan erred because (1) the question of how much [it] would have paid Team Holdings in the D1 but-for world was a

disputed fact question for the jury" and (2) "under established antitrust damages law, when uncertainty as to the plaintiff's damages results from the defendants' own unlawful conduct, the jury may make a just and reasonable estimate of the damage."  Mot. at 31.

Issues surrounding this testimony, which needed to be revised over and over, have been litigated extensively.  *See NASL III*, 2024 WL 2959967, at *12–13; *NASL IV*, 754 F. Supp. 3d at 389–91; Trial Tr. at 1497:1–1533:4, 1933:11–1959:14, 2102:9–2106:1.  Plaintiff's first argument here is neither new nor persuasive.  It still fails to explain why it would have been appropriate for the Court to permit Dr. Williams to testify to a damages calculation that failed to account for contractual obligations that would have eaten into any damages award.  That was a "major oversight" correctly kept away from the jury under *Daubert*.  *NASL III*, 2024 WL 2959967, at *12.  And the second argument is misleading.  Of course, an antitrust plaintiff need not prove damages with absolute certainty.  But Dr. Williams's testimony was not precluded because it was inexact.  It was partially precluded because it was too speculative under *Daubert* as well as confusing and unfairly prejudicial under Rule 403.  *See id.* at 1945:8–1947:2.  In Plaintiff's world, so long as an antitrust plaintiff accuses a defendant of wrongdoing (as will always be the case), the witness should be allowed to guess at damages and present that testimony to the jurors with the weighty "expert" imprimatur.  But that is exactly what *Daubert* and its progeny prohibit.  *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("The flexible *Daubert* inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact.  To warrant admissibility, however, it is critical that an expert's analysis be reliable at every step.").

ii.       D2 Entry Fees

Plaintiff also argues that this Court compounded Judge Cogan's alleged error with regard to this testimony.  *See* Mot. at 32.  Specifically, with respect to the D1 model, Judge Cogan ordered Dr. Williams to "assess and subtract the actual value of NASL's expansion fees in the real world after it was denied a D1 sanction in 2016 (even if these expansion fees could only come from D2 expansion fees) from his estimate of the value of NASL's D1 expansion fees in the but-for world."  *NASL III*, 2024 WL 2959967, at *12.  Dr. Williams then subtracted "the $1 million in D2 expansion fees that NASL actually received in the real world after the D1 denial."  Mot. at 32.  That was inadequate, as this Court subsequently explained:

> Dr. Williams'[s] revised D1 damages model is not consistent with the directives in Judge Cogan's Order as it still does not compare like for like.  Dr. Williams's revised model assumes that in the but-for world where NASL is granted a D1 sanction in 2016, it will continue to operate as a D1 league bringing in expansion fees for ten years, through 2025.  At the same time, Dr. Williams's revised model assumes that if NASL is denied a D1 sanction, it will only have value as a D2 league for a single season because NASL was actually denied a D2 sanction in 2017.  This comparison is fundamentally unequal and results in an inflated D1 damages calculation.  As of March 2016, when NASL was denied a D1 sanction, it continued to have value as a D2 going concern that could have attracted expansion fees through 2025, as made clear by Dr. Williams's own D2 damages model.

*NASL IV*, 754 F. Supp. 3d at 391.  Plaintiff says that analysis was flawed because "NASL's D1 damages would be reduced by the over $30 million in D2 entry fees that NASL was projected to receive by 2025, when in reality, Defendants drove NASL out of business in 2017."  Mot. at 32.  With that argument, Plaintiff doubles down on its prior fundamental error, seeking to calculate a damages figure in a but-for D1 world while simultaneously departing to the real world to avoid an obvious offset (the value of NASL as a D2 going concern) that would need to be accounted for in assessing damages.  That is not reliable expert modeling.  It is gamesmanship.

### V.    Rule 50(a) Motion

Defendants argue that, even if the Court agreed that a new trial was warranted here, it should deny such relief because the Court could have properly granted Defendants' Rule 50(a) motion based on failure to prove conspiracy or harm to competition.  *See* Opp. at 33.  Because the Court finds no basis to order a new trial, it declines to reach this argument.

## <u>CONCLUSION</u>

For the reasons provided above, Plaintiff's motion for a new trial is denied.

SO ORDERED.

*/s/ Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
       May 6, 2025