1250

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

                       : 17CV5495(HG)

NORTH AMERICAN SOCCER     :
LEAGUE, LLC,                :
                       :
        Plaintiff,     : United States Courthouse
v.                    : Brooklyn, New York
                       :
UNITED STATES SOCCER      :
FEDERATION, INC.        : January 22, 2025
and MAJOR LEAGUE SOCCER,  : 9:30 a.m.
L.L.C.,               :
                       :
       Defendants.     :

- - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR A JURY TRIAL
BEFORE THE HONORABLE HECTOR GONZALEZ
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Plaintiff:   WINSTON & STRAWN, LLP
                  200 Park Avenue
                  New York, NY 10166
              BY:JEFFREY L. KESSLER, ESQ.
                  DAVID G. FEHER , ESQ.
                  EVA W. COLE, ESQ.
                  JOHANNA RAE HUDGENS , ESQ.
                  MARK E. RIZIK JR., ESQ.

              PEARSON WARSHAW, LLP
                  15165 Ventura Boulevard, Suite 400
                  Sherman Oaks, California 91403
              By:CLIFFORD H. PEARSON, ESQ.

              PEARSON WARSHAW, LLP
                  555 Montgomery Street, Suite 1205
                  San Francisco, California 94104
             BY:ADRIAN JOHN BUONANOCE, ESQ.
               MATTHEW A. PEARSON, ESQ.
               NEIL J. SWARTZBERG, ESQ.

SN      OCR      RPR

1251

For the
Defendant United States Soccer Federation, Inc.:

LATHAM & WATKINS LLP
    1271 Avenue of the Americas
    New York, NY 10020
BY:LAWRENCE E. BUTERMAN, ESQ.

LATHAM & WATKINS LLP
    505 Montgomery Street, Suite 2000
    San Francisco, CA 94111
by:CHRISTOPHER S. YATES, ESQ.

Counsel for Defendant
Counsel for Defendant Major League Soccer, L.L.C.

PROSKAUER ROSE LLP
    Eleven Times Square
    New York, New York 10036
BY:BRADLEY I. RUSKIN, ESQ.
    KEVIN J. PERRA, ESQ.
    SCOTT A. EGGERS, ESQ.

PROSKAUER ROSE LLP
    1001 Pennsylvania Ave.NW Suite 600S
    Washington, DC 20004
BY:COLIN R. KASS, ESQ.

Court Reporter:    SOPHIE NOLAN
                   225 Cadman Plaza East/Brooklyn, NY 11201
                   NolanEDNY@aol.com
Proceedings recorded by mechanical stenography, transcript produced by Computer-Aided Transcription

SN      OCR      RPR

*Proceedings*                                               1252

(In open court; jury not present.)

MR. KESSLER:  Good morning, your Honor.  I have an issue to raise first.

We were just handed a book of supplemental exhibits for Mr. Gulati this morning.  This is a series of letters in which our law firm, it starts out with, was threatening legal action over the revised standards, a subject your Honor has totally excluded by virtue of the MIL at their request.

Then, it follows up.  The first one is a letter from Winston & Strawn making legal claims against the revised standards.

Then the next document is a series of communications back and forth between the parties about our threatening legal action over the revised standards, whether these are settlement talks or not, whether this is an application, how this relates to the application.

My understanding was this whole subject is excluded. I don't think it's appropriate.  And your Honor could look at -- they should hand up to you and look at very first document there, DX-374.  I don't understand what this is for, your Honor, but it's inappropriate and should be precluded, the whole subject matter.

MR. BUTERMAN:  Mr. Kessler does know what it's for. We're not planning on introducing that document.  It's just in the binder in case I need to refresh the witness' recollection

*Linda A. Marino, Official Court Reporter*

*Proceedings*                                                      1253

as to a date.  It is not going to be introduced in any way, shape, or form.

But more generally with respect to these issues, I am going to not get into the substance of any legal disputes, but Mr. Kessler spent yesterday with this witness eliciting testimony in front of the jury that the only discussion that took place was in March 8, 2016.

THE COURT:  Only discussion about --

MR. BUTERMAN:  The D-I application.

THE COURT:  D-I.

MR. BUTERMAN:  And with respect to Mr. Kessler, the communications that he had were not just about the proposed revisions to the professional league standards, they were about NASL's Division I sanctioning application.  It's all over the documents where both Mr. Kessler and Mr. Sehgal and others say:  If you do not give us our D-I sanction immediately, we will potentially explore our legal options.

Again, I do not plan to go into the specifics of that, but I do plan to elicit from the witness just the answer to the question or testimony -- depending on how he answers -- that there were conversations with Mr. Kessler going on regarding a potential for litigation and that that is one of the reasons why it took so long to get through this application.  But I'm not going to get into the specifics of the disputes beyond that.

*Linda A. Marino, Official Court Reporter*

*Proceedings*                                                        1254

MR. KESSLER:  Your Honor, what I elicited from the witness is that there were no other substantive discussions among the board members about whether or not to grant the application.  I did not elicit from the witness, and, in fact, it came out from counsel and otherwise, that there were other meetings with counsel, there was a threatened lawsuit --

THE COURT:  But Mr. Kessler, you clearly -- I sat through that testimony.  You clearly tried to make it seem as if, from your questioning, that this was effectively a rubber-stamping of Gulati's view and that he sort of crammed that through the board without much discussion.

So, I don't see how it's not proper to try to rehabilitate the witness with questions about what was going on during that period vis-à-vis the D-I sanction application.

MR. KESSLER:  So your Honor, I understand your point, it would be totally appropriate if they could elicit testimony:  Were there earlier meetings of the board to consider the application?  Were there other times when the board looked into the merits of the application?

What this is going into is that Mr. Kessler threatened a lawsuit, which, as your Honor can see from the first document --

THE COURT:  They already said they're not going to go into that first document.

MR. KESSLER:  But that's what I was going to say.

*Linda A. Marino, Official Court Reporter*

*Proceedings*                                                         1255

The document number two, three, four, five keep mentioning the threatened lawsuit.

THE COURT:   But you did spend a tremendous amount of time also on the timing.  So, if the back-and-forth about litigation potential is a reason for the delay or a reason why the sanctioning process took longer, given your whole line of questions about the timing aspect, how are they not allowed to try to rehabilitate the witness.

MR. KESSLER:   Because, your Honor, I don't believe the witness can testify that the reason for the nine-month delay was the threatened litigation.

The reason for the delay, which we can't go into, is they sent us a notice that they were going to adopt these new standards which had to go into effect and that's what would apply to our application.

We then threatened litigation over that and then nothing happened while I guess they decided whether or not they put into the new standard --

If we could go into all that, if your Honor wants to open the MIL from this --

THE COURT:   That's not opening the MIL.  You did leave an impression with the jury about the time aspect and how long it took.  And you also left an impression with the jury that this is effectively a rubber stamp that he crammed through the board.

*Linda A. Marino, Official Court Reporter*

*Proceedings*                                                    1256

MR. KESSLER:  The second point I agree with, but I don't understand what the threatened litigation has to do with the rubber stamp.

THE COURT:  Let's see how they develop it, but I don't see anything improper with it.

MR. KESSLER:  All right.

If we can get the witness on the stand.

(Witness resumes the stand; jury enters.)

THE COURT:  We can be seated.

Good morning, ladies and gentlemen.  We will continue with the examination of Mr. Gulati.

Mr. Buterman.

MR. BUTERMAN:  Thank you, your Honor.

SUNIL GULATI,

    called as a witness, having been previously duly

    sworn, was examined and testified further as follows:

CROSS-EXAMINATION

BY MR. BUTERMAN (Continuing):

Q    Good morning, Mr. Gulati.

A    Good morning.

Q    I'd like to begin this morning by discussing NASL's Division I application that it submitted in 2015 for the 2016 season, okay?

A    Okay.

        MR. BUTERMAN:  Let's look at their application, which is already in evidence at JX-100.  And if we could please turn to JX-100.0048.

Q    And you'll see this is a page entitled:  Compliance with standards.

        Do you see that?

A    Yes.

Q    The last paragraph reads as follows:  NASL meets all of the standards to operate a Division I men's outdoor professional soccer league except for two improper criteria relating to, one, geographic location and, two, stadium capacity that are arbitrary in nature and have no meaningful value in determining whether a league merits the Division I classification.

*Gulati - Cross - Mr. Buterman* 1258

Q    Do you agree with NASL that the geographic location standards and stadium capacity standards were arbitrary and had no meaningful value in determining whether a league merits the Division I classification?

A    No, I do not.

Q    Why not?

A    For a Division I sanction or Division I league to have very small stadiums, for example, to play at stadiums of three or four thousand, to be a top league in the United States wouldn't make a lot of sense.

So, in order to be viewed by the community, by fans, by anyone, by the media, you have to play in stadiums with some minimum capacity and that minimum capacity can't be a few thousand.  So, therefore, a minimum should be set.

Geographic location, for a U.S. league, in order to have a top league, a Division I league, in order to be able to attract media attention, a television deal, now a streaming deal, whatever it might be, to not play in many cities across the country.  So, I can't imagine us having a national Division I league, for example, that was all on the east coast or all on the west coat or all in Texas.  So, to have a geographic distribution means being able to play in the major markets across the country.

Q    For how long has U.S. Soccer required Division I leagues to have U.S. teams in at least three time zones in the

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                        1259

continental United States?

A     Three time zones I believe goes back to 1995.  I think we added the continental part of it in 2008.

Q     And was there a time when more structure was put around which time zones were required?

A     A couple of years later, we added that you needed Eastern, Central, and Western time zones.

Q     Is the Western sometimes referred to as the Pacific tame zone?

A     Absolutely.

Q     And why those time zones?

A     It's where the major cities are in the United States.

      Again, to have a league that doesn't have teams in, for example, New York, Boston, Philadelphia, Miami, Orlando, Atlanta; or in the central time zone, Chicago, Houston, Dallas; or on the west coast, Los Angeles, San Francisco, Seattle, San Diego; to be missing one of those in its entirety doesn't in a country like the United States make sense for something that's going to be a national league.

Q     Do you recall how many time zones within the continental United States the NASL had U.S.-based teams in when it applied for its Division I sanction in 2015?

A     I think in the continental United States it would have been two.

Q     Now, you also mentioned the Division I stadium capacity

*Linda A. Marino, Official Court Reporter*

requirement.

For how long has the requirement existed within U.S. Soccer's standards that a Division I league have stadiums with capacities of at least 15,000?

A     Since 1995.

Q     Mr. Kessler asked you questions yesterday about whether the professional league task force made any recommendations in connection with NASL's Division I application; do you recall that?

A     Yes.

Q     And what is the function of the professional task force -- excuse me, what is the function of the professional league task force?

A     To review the applications of members, of potential members, and to make a recommendation to the full board if they have a recommendation to make.

Q     As of the time of NASL's Division I submission in May of 2015, did you believe -- did you have a belief as to whether the board needed the task force to help it in determining whether NASL met the Division I standards?

A     Needed -- we had a group that reviewed them.  In this particular case, we had a lot of meetings as a full board, and, so, the task force didn't have the same role it might have in another situation.

Q     And had NASL in its application to U.S. Soccer for

*Gulati - Cross - Mr. Buterman*                    1261

divisional sanctioning made clear whether it was in compliance with all the Division I standards?

A    Their application, I believe, said:  We're in compliance with the following standards.  And these two standards, namely the two that are listed here, we don't believe are appropriate.

Q    Now, yesterday Mr. Kessler discussed with you the fact that it took U.S. Soccer almost nine months to vote on NASL's application.

Can you tell the jury, why did it take so long for U.S. Soccer to vote on NASL's Division I application?

A    I think there were probably three reasons.  In one case, we wanted more information on certain things.  The second -- and that would have been a general, that could have happened in any number of applications.

The second was the ongoing involvement of Traffic with the league.  As we talked about yesterday, the application came four days after Traffic and Aaron Davidson were indicted and pled guilty.  So, for a number of months there was a lot of correspondence, us asking for updates on the involvement of Traffic.  We were given certain assurances. Those took longer.

And then the third is that the NASL and Mr. Kessler asked for several opportunities to meet with the board or the task force, which were granted.  We had multiple meetings with

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                1262

them.  I think they had one with the task force and then with the full board to outline -- both present their case and outline their concerns with the process.

All of that gave us pause, frankly, and it took much longer than it might have if points number two and three didn't exist.

Q    Yesterday during questioning from Mr. Kessler, you stated, quote:  I can't think of a time when the circumstances that were taking place then mirror anything else we've seen in the last 25 years.

What were you referring to?

A    We've never had an application from a group that had multiple teams owned by an indicted company in the middle of a FIFA scandal that involved that company and the chairman of the NASL at the time.

Q    Now, between NASL's submission of its D-I application in May 2015 and the board's denial in March of 2016, did the board ever meet with NASL?

A    Multiple times, yes.

Q    And did the task force meet with NASL?

A    At least once.

Q    And do you recall Mr. Kessler during opening showing the transcript of a board meeting from March 2016 and commenting that there was little deliberation on NASL's application?

A    Yes.

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                    1263

Q    What's your response to that?

A    Both in the length of time and the discussions that took place and the meetings that were held, I don't know -- I can't speak to the discussions about MLS 20 years earlier because I wasn't in those on the board -- I can't remember another issue, certainly another application, that we spent as much time on looking at it, studying, having legal advice, and every other way of analyzing the situation including, as I mentioned, multiple meetings with NASL or their representatives.

          MR. BUTERMAN:  Can we pull up JX-50, please?

          (Exhibit published to the jury.)

Q    Mr. Gulati, could you tell us what JX-50 is?

A    It's the minutes of a meeting, executive session of a meeting of the U.S. Soccer board in May 2015.

Q    And the date there, is it May 31, 2015?

A    Yes, it is.

Q    Do you recall when NASL submitted its Division I application?

A    It would be in this very time frame.  I don't know if it was a day or two before, on this day, or a day or two later.

Q    Do you see in the --

          MR. BUTERMAN:  If we could blow up the part that says:  Professional league standards.

Q    Do you see it says:  President Gulati updated the board

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                    1264

on NASL's current status.  Bill Peterson, NASL commissioner,

informed the board about NASL's current status.

Do you see that?

A    Yes.

Q    Do you recall Mr. Peterson attending this executive

session of United States Soccer Federation's board of

directors meeting on or about the time that NASL submitted its

application for Division I sanctioning?

A    I don't remember the specific meeting, but it's clear he

did attend this meeting.

Q    And if you look down, can you please read the last

sentence of that paragraph?

A    The board discussed the professional league standards and

NASL's application for Division I status.

Q    So, just so we're clear, how quickly after NASL submitted

its Division I application did U.S. Soccer begin discussing

it?

A    Either the same day or a day later.

MR. BUTERMAN:  Can we look at DX-399?

Q    And Mr. Gulati, do you see that DX-399 is an e-mail from

Linda Cardenas to Mr. Peterson at the NASL dated November 6,

2015?

A    Yes.

Q    And you were copied on this e-mail?

A    Yes.

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                    1265

MR. BUTERMAN:  Your Honor, I move to admit DX-399.

MR. KESSLER:  No objection.

THE COURT:   So admitted.

(DX-399 so marked and published to the jury.)

Q    Now, Mr. Gulati, without going into all the specifics, does this letter reflect a series of communications between the NASL and U.S. Soccer related to its Division I application over a series of months?

A    It is certainly one of those letters.

Q    By the way, do you recall Mr. Kessler asking you questions yesterday regarding whether the issue of Traffic was discussed by U.S. Soccer in connection with NASL's Division I application?

A    Yes.

Q    Could you please read the last full paragraph out loud, the one that begins with "finally," and just read it slowly, please?

A    Finally, we are likewise in receipt of your letter, also dated October 30, 2015, concerning the involvement of Traffic in the NASL.  While we appreciate your update, given the indictments and guilty pleas, it is imperative that the NASL's relationship with Traffic be completely resolved posthaste. Towards that end, please provide a timeline with respect to your stated objective of, quote, restructuring the investment to include a complete parting of ways with Traffic, end quote.

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                1266

Q    Was the issue of Traffic and its connection to NASL a topic that was discussed with the NASL during its application process for Division I sanctioning?

A    For sure whether it was specifically in meetings or in correspondence, it certainly was discussed because it was a major concern to U.S. Soccer.

        MR. BUTERMAN:  Can we look at DX-406, please?

Q    And do you see that DX-406 is an e-mail from Mr. Sehgal to Mr. Flynn, copying yourself and others, dated November 16, 2015?

A    Yes.

        MR. BUTERMAN:  Your Honor, I move to admit DX-406.

        MR. KESSLER:  Your Honor, this is the objection I raised before.

        THE COURT:  You have your objection.  Overruled.

        MR. KESSLER:  Okay.  Thank you.

        (DX-406 so marked and published to the jury.)

Q    And a few moments ago, you mentioned that there had been requests from the NASL for its counsel to be able to make presentations at various board meetings and task force meetings; do you recall that?

A    The NASL and/or their counsel, yes.

Q    And I believe that was one of the issues that you had referenced as relating to why this process had taken as long as it did?

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                     1267

A      Yes.

Q      Can you please read in the second paragraph the line that begins -- it's the second full sentence:  The NASL does ask.

A      The NASL does ask that its counsel be permitted to make a presentation to the task force and the board of directors at its December meeting to explain why the NASL application for Division I status should be immediately granted and why the USSF cannot lawfully use its standards to continue to deprive the NASL of the ability to compete as a Division I league.

Q      Did U.S. Soccer grant NASL's request to allow its counsel to make the requested presentations in December of 2015?

A      I know that NASL's counsel presented or met with the task force and the board.  I don't know that it was in this time frame, but they certainly had meetings.

         MR. BUTERMAN:  Can we look at DX-410, please?

Q      And do you see that DX-410 is another e-mail, sent on behalf of Dan Flynn to Mr. Peterson with a copy to yourself?

A      Yes.

         MR. BUTERMAN:  Your Honor, I move for the admission of DX-410.

         MR. KESSLER:  Just a continuing objection to this line, your Honor.

         THE COURT:  Overruled and it's admitted.

         (DX-410 so marked and published to the jury.)

Q      Looking at the third paragraph of the letter, the one

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                    1268

that begins with:  On the other hand.

Do you see that?

A    Yes.

Q    And on behalf of -- Mr. Flynn in this letter writes:  On the other hand, if the NASL were willing to consider a more reasonable approach, there may be a path to Division I status. For example, if over the next several years the NASL is able to make strides towards substantial compliance with the existing Division I standards, an application for provisional Division I status could be considered at that time with full Division I status to follow if the NASL achieves full compliance with the standards in an agreed-upon period of time thereafter.

Do you see that?

A    Yes.

Q    Now, you heard Mr. Kessler claim during opening statements that U.S. Soccer conspired to deny NASL its Division I application in order to protect MLS, correct?

A    Yes.

Q    So, can you explain to the jury why it was that U.S. Soccer was proposing to NASL in November of 2015 that there may be a path to NASL achieving Division I status?

A    It's inconsistent with those comments in the opening statement.

Our goal, as I said yesterday, was to promote all of

*Linda A. Marino, Official Court Reporter*

our leagues, to see them succeed.  And while these words don't need translation, basically it says:  We'll work with you to get there.

Q    And Mr. Kessler asked you a number of questions yesterday about incubation periods; do you recall that?

A    Yes.

Q    Can you tell us whether what's being referenced here is a suggestion of an incubation period?

A    Well, it's beyond an incubation period.  The NASL had existed since 2010 in one format or another.  Now, this could be considered incubation period for Division, I but it wasn't a new league in that sense.

So, it was:  We'll work with you.  We'll give you some time along the way.  You can be provisional and then become a full nonprovisional league member -- federation member as a Division I league.  But make some progress.

Q    Picking up on what you said, you said this is an incubation period for Division I.

But in your view, was NASL given an incubation period for Division II?

A    As I mentioned yesterday, there is no year that NASL played in Division II without waivers.  So, in that sense, there was an incubation period right through.

MR. BUTERMAN:  Can we look at JX-56, please?

(Exhibit published to the jury.)

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                    1270

Q    Do you understand JX-56 to be a meeting of the pro league task force dated December 5, 2015?

A    Yes.

Q    And if we look at Page 002, do you see who attended this meeting?

A    Members of the task force; Jay Berhalter, who at the time was chief operating officer or deputy general secretary.  I'm not sure of the title at the time.

Q    Who attended this meeting on behalf of NASL?

A    Bill Peterson, the commissioner; and Mr. Kessler and Mr. Feher, attorneys for the NASL.

Q    We saw earlier in documents a reference to a request to make a presentation to the task force in December.

      Can you tell if this is the meeting requested by NASL to present on its Division I application?

A    Yes, a few days or a week or ten days after, yes.

Q    Going back to the issue of whether U.S. Soccer ever raised the Traffic issue in connection with discussions regarding NASL's Division I application --

      MR. BUTERMAN:  Can we please pull up DX-425?

Q    And do you see that DX-425 is a memo to the NASL from the pro league task force of U.S. Soccer dated December 8, 2015, entitled:  Follow-up from December 5, 2015 meeting.

A    Yes.

      MR. BUTERMAN:  And your Honor, I move for the

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                    1271

admission of DX-425.

MR. KESSLER:  No objection.

THE COURT:   So admitted.

(DX-425 so marked and published to the jury.)

Q    Just looking at the first paragraph, do you see it says: Thank you for meeting with the United States Soccer Federation's professional league task force -- the task force -- on Saturday, December 5, 2015, with respect to the NASL's request to be sanctioned as a Division I professional league and, also, the NASL's current sanction as a Division II professional league.  As the task force discussed and as was communicated by U.S. Soccer to the NASL in several communications leading up to the task force meeting, U.S. Soccer has serious concerns, which are shared by the task force, about what it understands to be a continuing relationship between the NASL and one or more members or affiliates of the Traffic group, including, but not limited to, Traffic USA, collectively "Traffic."

Do you see that?

A    Yes.

Q    Mr. Gulati, did U.S. Soccer's professional league task force raise with NASL concerns that it had about NASL's then continuing relationship with Traffic during its meetings with the NASL regarding NASL's Division I application?

A    It is pretty clear they did.

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                    1272

MR. BUTERMAN:  Last document on this topic, can we please pull up DX-437 --

Sorry, your Honor, I move to admit DX-425.

THE COURT:   That was in already.

MR. BUTERMAN:  Sorry, apologize.

(Exhibit published to the jury.)

Q    Could you tell us what DX-437 is?

A    It's the minutes of a meeting of U.S. Soccer's board January 13, 2016.

Q    And what is an "executive session"?

A    It's part of our board meetings where either legal issues or personnel issues that are of a confidential nature for any number of reasons are held.  So, the general public -- our meetings are open.  A member of the general public can sit in or any of our members can sit in.  So, this would be a part of the meeting where that wasn't possible.

MR. BUTERMAN:  Can we scroll down to the part that says:  Professional league standards and the NASL's Division I application.

Q    Do you see that?

A    Yes.

Q    And it begins:  President Gulati updated the board about the NASL application for Division I status.

Do you see that?

A    Yes.

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                    1273

Q    And do you recall updating the board about NASL's division -- application for Division I status in January of 2016?

A    I don't remember specifically doing that, but clearly I did by the minutes of the meeting.

Q    Then if we go down a few lines, it says:  Bill Peterson, Rishi Sehgal, David Feher, and Jeffrey Kessler joined the meeting representing NASL.

Do you recall Mr. Kessler, Mr. Feher, the commissioner Mr. Peterson, and Mr. Sehgal attending this meeting in January of 2016?

A    As I mentioned earlier, they participated and attended several meetings in this period.  I don't remember the specific date, but it's clear they did from these minutes.

Q    Then the next sentence says:  Bill Peterson and --

THE COURT:   Hold on.

Is this in evidence yet?

MR. BUTERMAN:  My apologies, your Honor.  I move for the admission of DX-437.

MR. KESSLER:  I have an objection on the same ground, your Honor.

THE COURT:   Overruled, admitted.

(DX-437 so marked and published to the jury.)

Q    So Mr. Gulati, you see the two sentences that we've already gone through regarding the statement that you updated

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                1274

the board on NASL's application and then that Mr. Peterson, Mr. Sehgal, Mr. Feher, and Mr. Kessler joined the meeting, representing NASL?

A     Yes.

Q     And then the next sentence says:  Bill Peterson and Jeffrey Kessler presented NASL's application for Division I status and urged the board to approve the application.

          Do you see that?

A     Yes.

Q     And do you have any reason to doubt that that happened in that meeting on January 13, 2016?

A     No.

Q     And it then notes that the NASL representatives left the meeting and then do you see the next sentence what it says?

          Can you please read that to the jury?

A     The board discussed the NASL application.

Q     And do you recall the board discussing NASL's application for Division I sanctioning on January 13, 2016?

A     Again, not on the specific date.  This says we did.  And as I said earlier, we discussed it in a number of meetings in this period.

Q     And do you see that the last sentence says that:  The board determined that it would review the additional materials that Mr. Kessler suggested and make a determination on the NASL application after that review?

*Gulati - Cross - Mr. Buterman*                          1275

A     Yes.

Q     Now, Mr. Gulati, when you were being questioned by Mr. Kessler yesterday, did Mr. Kessler show you any of the documents, transcripts, and meeting minutes that we just went over?

A     No.

MR. KESSLER:  Objection, your Honor.

THE COURT:   I'll allow it.

Q     Did the pages of the March 8, 2016, board of directors transcript that Mr. Kessler showed you yesterday reflect the entire consideration by the board and the pro league task force of NASL's Division I application?

A     No, it did not.

Q     Now, we've discussed this already, but just did the U.S. Soccer board of directors vote on NASL's Division I application in March of 2016?

A     I'm sure it did, yes.

Q     Mr. Gulati, did you prepare a demonstrative concerning the board members who voted on that application?

A     Yes.

MR. BUTERMAN:  Can we please put up this demonstrative which I believe we are going to mark for identification purposes as DG-5?

Q     Is this the demonstrative that you assisted in the preparation of?

*Gulati - Cross - Mr. Buterman*                    1276

A     Yes.

Q     Mr. Gulati, could you please tell the jury what is depicted in this demonstrative?

A     This would have been the eight members who voted on the issue, those that weren't recused and were present at the meeting.

Q     Now Mr. Gulati, just to be clear, there was -- was there another board member at this time, a gentleman named Chris Ahrens?

A     Yes, Chris would have been on the board at this time.

Q     Do you recall whether Mr. Ahrens attended this meeting by telephone or not?

A     I don't recall specifically, but Chris didn't miss meetings.  So, he may well have been on the phone.

Q     But do you know whether Mr. Ahrens was on the phone at the time that the actual vote took place on NASL's Division I application?

A     I'm not sure, no.

Q     So, he's not depicted in this picture; is that correct?

A     That's correct.

Q     So, let's just go through these people, and I'm hoping that you might be able to give the jury a little bit of background into the actual individuals who voted on NASL's Division I application in in March of 2016.

          Do you see the first picture on the top left-hand

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                                1277

corner is of Donna Shalala?

A     Yes.

Q     Could you please tell the jury, who is Donna Shalala?

A     Donna Shalala was an independent board member for U.S. Soccer; former president of the University of Miami; I think she's the current president, interim president of The New School; chancellor of the University of Wisconsin; eight years as Secretary of Health and Human Services in the Clinton Administration; most recently, two years as a Congresswoman representing Florida; and a longtime public servant.

Q     Mr. Gulati, at any time did you instruct Donna Shalala how to vote on NASL's Division I application?

A     Of course not.

Q     Did you reach any agreement with Donna Shalala at any time regarding how she should vote on NASL's Division I application?

A     No.

Q     Who is Carlos Cordeiro?

A     Mr. Cordeiro was an executive with Goldman Sachs, Harvard undergrad, Harvard MBA, independent member on our board after he had served in the New York bid to bring the Olympics here and then became vice president of U.S. Soccer, subsequently president of U.S. Soccer, and is now a senior advisor to the president of FIFA.

Q     Mr. Gulati, at any time did you instruct Mr. Cordeiro how

*Linda A. Marino, Official Court Reporter*

to vote on NASL's Division I application?

A     No.

Q     Did you reach an agreement with Mr. Cordeiro at any time regarding how he should vote on NASL's Division I application?

A     No.

Q     Could you tell the jury, who is John Motta?

A     John Motta is a longtime member of the soccer community, for most years as a member of our belt organization, he was president of that organization, has been on the board for many years.  Also, a very successful entrepreneur.  He's a franchisee in the Dunkin Donuts world and has a series of stores on the east coast, mid-Atlantic, and so on.

Q     Mr. Gulati, at any time did you instruct Mr. Motta how to vote on NASL's Division I application?

A     No.

Q     Did you reach an agreement with Mr. Motta at any time regarding how he should vote on NASL's Division I application?

A     No.

Q     Can you tell the jury who Cindy Cone is?

A     Cindy Parlow Cone.  Cindy Parlow was her maiden name. Multiple time world and Olympic champion, I think four-time all-American at University of North Carolina, college player of the year, former board member as an athlete representative, which is what I think she was in this particular moment, vice president of U.S. Soccer, and the current president of

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                    1279

U.S. Soccer.

Q    Mr. Gulati, at any time did you instruct Ms. Cone how to vote on NASL's Division I application?

A    Absolutely not.

Q    Did you reach an agreement with Ms. Cone at any time regarding how she should vote on NASL's Division I application?

A    No.

Q    Could you tell the jury who Tim Turney is?

A    Tim at the time was the vice chair of our youth soccer association.  I think he's from Kentucky.  Longtime member of the soccer community.  I believe he raises, buys, sells, horses as his profession.

Q    At any time did you instruct Mr. Turney how to vote on NASL's Division I application?

A    No.

Q    Did you reach an agreement with Mr. Turney at any time regarding how he should vote on NASL's Division I application?

A    No.

Q    Can you tell the jury who Fabian Nunez is?

A    Fabian was an independent member of our board.  He was the leader of the California State Assembly, a democrat, and actually became quite famous for working across the aisle with then-Governor Schwarzenegger of California, and now is in the private sector.

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                    1280

Q     At any time did you instruct Mr. Nunez how to vote on NASL's Division I application?

A     Absolutely not.

Q     Did you reach an agreement with Mr. Nunez at any time regarding how he should vote on NASL's Division 1 application?

A     No.

Q     Could you tell the jury who Arthur Mattson is?

A     Arthur is the former president of the Florida association.  At this time, he's the vice president of youth and adult, one of the two representative of the adult division.  I believe he's involved in the real estate industry.

Q     Mr. Gulati, at any time did you instruct Mr. Mattson how to vote on NASL's Division I application?

A     No.

Q     Did you reach an agreement with Mr. Mattson at any time regarding how he should vote on NASL's Division I application?

A     Absolutely not.

Q     Let's just round this out, could you tell the jury who John Sutter is?

A     John was president of the U.S.  youth organization, roughly four, five million members; from Texas, from Dallas; longtime involvement in youth soccer; and involved in the -- as a profession, in the insurance business.

Q     At any time did you instruct Mr. Sutter how to vote on

*Linda A. Marino, Official Court Reporter*

NASL's Division I application?

A     No.

Q     Did you reach an agreement with Mr. Sutter at any time regarding how he should vote on NASL's Division 1 application?

A     Absolutely not.

MR. BUTERMAN:  If we could look back at JX-58.  And it's Page 0026, that's transcript Page 99.  And there's some redactions.  I'd like to blow up the part underneath the redactions on transcript Page 99, if we can.

(Exhibit published to the jury.)

Q     Do you see here -- and so we're clear this is the transcript from the March 8, 2016, board of directors meeting, where the vote took place on NASL's Division I application.

Do you see here Mr. Nunez, who you just talked about, says:  We've given them a lot of chances.

And then Ms. Shalala says:  We gave them a big chance.

A     Yes.

Q     Do you have an understanding of what Mr. Nunez and Ms. Shalala were referring to when they were talking about giving them chances?

A     Effectively, the processes in prior years of us sanctioning the NASL with multiple waivers starting in 2010, when we provided that umbrella situation for the two leagues.

MR. BUTERMAN:  Now, can we put back that

*Gulati - Cross - Mr. Buterman*                    1282

demonstrative for a second?

(Exhibit published to the jury.)

Q    Mr. Gulati, there's been a suggestion from NASL's counsel in this case that U.S. Soccer board members just voted how you wanted them to vote.

Looking at these individuals who you just laid out, what's your response to that?

A    You've got some really serious people in this picture. To think that, to take an example, Donna Shalala would be under my thumb in a decision, when she had battled multiple years with the President of the United States, with Congress, is, I think, far-fetched; to think a guy like Fabian Nunez, who did the same at the California level as a democratic leader battling and many times agreeing with the Governor of California; to think Cindy Parlow, a world champion many times over, in the Olympics, would be listening to me; a successful entrepreneur like John Motta, it's just far-fetched to think any of these people would have been directed by anything I would say in terms of voting.  There were discussions, but it's nonsensical.

Q    Are these the kind of people who were shy about giving their opinions on issues during board meetings?

A    Absolutely not.

Q    In your experience, did these individuals take their responsibilities as U.S. Soccer board members seriously?

*Linda A. Marino, Official Court Reporter*

MR. KESSLER:  Objection, your Honor.

THE COURT:   I'll allow it.

A    Serious people, volunteers in the organization, did the reading, listened to advice from counsel, who gave the discussions and made their own decisions.

MR. BUTERMAN:  Now, can we look at JX-59?

(Exhibit published to the jury.)

Q    JX-59 is the letter where U.S. Soccer informs NASL that its Division I sanctioning application has been denied, in March of 2016; do you recognize that?

A    Yes.

Q    And can you please read the paragraph that begins with as U.S. Soccer previously indicated?

A    As U.S. Soccer previously indicated, U.S. Soccer remained willing to discuss and assist the NASL in developing a path forward towards attaining its recently stated goal of receiving a Division I sanction, possibly even providing a provisional Division I sanction once most NASL teams meet the Division I standards, with a defined and achievable timetable for compliance with the standards in a reasonable time thereafter.

Q    Did U.S. Soccer mean what it said when it offered to work with NASL on developing a path towards attaining a Division I sanction?

A    Absolutely.

*Linda A. Marino, Official Court Reporter*

*Gulati - Cross - Mr. Buterman*                    1284

Q    Did the Traffic indictments have an impact on U.S. Soccer's decision not to sanction NASL as a Division I league?

A    I can't believe that the board members didn't have that in their minds and weren't concerned about it.  I think it would be irresponsible for us to not consider any of that. The group that was the primary, the largest owner of the league, having been indicted, if we ignored that -- we certainly weren't ignorant of it -- if we were ambivalent about it, I think that would have been very irresponsible.

Q    Did U.S. Soccer intend to harm the North American Soccer League by denying it a Division I sanction?

A    Absolutely not.

Q    As you discussed with Mr. Kessler, after NASL's Division I sanction was denied, did NASL play the 2016 season as a Division II league?

A    It did.

Q    And do you recall how the league was performing in 2016?

A    I don't remember the specifics.  During the course of the year -- there were problems at the end of the year.  They lost some teams at the end of the year, which obviously led to some instability.

Q    And how did you personally respond to NASL's struggles in 2016?

A    It was clear that they were losing some teams and may not

*Gulati - Cross - Mr. Buterman*                    1285

have enough teams to continue.  We had a number of meetings with the NASL, with the NASL and the USL, with individual team members of both leagues, mostly individual team members of the NASL with representatives of the USL, and groups of owners from the NASL.  It wasn't big groups because they had lost some teams, but I think we probably met with every owner in the NASL certainly at a league meeting and most, if not all, at individual meetings.

(Continued on the following page.)

S. Gulati - Redirect/Mr. Buterman                1286

EXAMINATION BY

MR. BUTERMAN:

(Continuing.)

Q    Can you take a look at DX-564.

And do you understand DX-564 to be a set of e-mails involving yourself and Mr. Malik from December of 2016?

A    Yes.

Q    And do you have any reason to doubt that you had these communications with Mr. Malik in December of 2016?

A    I don't remember the specific timing but we had lots of conversations and this indicates that this was in that timeframe.

MR. BUTERMAN:  Your Honor, I move for the admission of DX-564.

MR. KESSLER:  So my objection, your Honor, is to the internal hearsay from Mr. Malik.

THE COURT:  That's sustained.  You can ask him questions about what he said to Mr. Malik.

MR. BUTERMAN:  Okay.

Q    Do you recall a meeting between yourself and others and individuals at NASL and USL of that took place in Atlanta?

A    Yes.

Q    And what was that meeting about?

A    Trying to see if there was a way for the two leagues to cooperate more, or for some of the teams to cooperate, a way

forward for at that time, a way forward for both leagues. USL had played as Division III that year; NASL had played as Division II, but clearly, it was going to lose or had lost by later in the year some teams.

Q    What was the reaction of Mr. Malik and the other NASL attendees at that meeting to the efforts that U.S. Soccer had undertaken to set up that meeting?

            MR. KESSLER:  Same objection, your Honor.  Those are not parties to the case.

            MR. BUTERMAN:  I'm not asking for a statement.

            MR. KESSLER:  Reaction and statement can be the same.

            THE COURT:  I'll allow it.

A    Throughout this period of time, and as we discussed yesterday, individual owners of the teams in the NASL were appreciative of our efforts to try to find a path forward for them.  Whether it was Mr. Malik or Mark Frisch, when he owned the team in Jacksonville, or Ersal from Indiana, or the folks in Miami; Ronald Felch or Brian Helmick from San Francisco.  They're all appreciative of us trying to find a solution for them given their loss of teams and the other issues they faced.

Q    And yesterday, you showed the jury an award that you received from Mr. Helmick from around this time; is that correct?

*S. Gulati - Redirect/Mr. Buterman*                1288

A    That's correct.

Q    Did you understand an award to be given to you in part because of these efforts that you were talking about?

A    I'm sure it was.  Brian Helmick was coming in into the league for 2017 and he wanted to make sure there was going to be a league and that happened.

Q    Now, do you recall at the end of 2016 there was a time when Mr. Commisso joined the NASL?

A    Yes.

Q    And what was your reaction to Mr. Commisso joining the NASL?

A    I had known Mr. Commisso for some years, primarily through our mutual affiliation with Columbia University.  I don't know when I learned that he bought the Cosmos or taken over the Cosmos, but it was certainly going to be a strong new owner in the New York market so that was a plus.

Q    Did you make any promises to Mr. Commisso about the sanctioning that the North American Soccer League would be getting going forward?

A    Absolutely not.

Q    Did NASL seek sanctioning for the 2017 season?

A    Yes.

Q    And what divisional classification did the NASL seek for the 2017 season?

A    Division II.

S. Gulati - Redirect/Mr. Buterman          1289

Q    And do you recall whether the task force made a recommendation regarding NASL's Division II application in 2017?

A    The recommendation from the task force was to not sanction the NASL as a Division II League.

Q    And do you have an understanding as to what the basis was for that recommendation?

A    The primary issue for the task force was the number of teams.  They had eight teams at the time, a couple of them were going to be new teams, a couple had left, and in effect, no progress being shown.  And our requirement at that time would have been 12 teams, they had eight.

Q    Now, did USL make an application for divisional sanctioning for 2017?

A    They did.

Q    And what division were they seeking a sanction for?

A    Division II.

Q    The same as NASL?

A    Yes.

Q    Now, do you understand that NASL claims that U.S. Soccer conspired to deny NASL a Division II sanction so that USL could be the only two-division league in the United States?

A    I understand that's part of the claim, yes.

Q    Do you recall what the task force recommended with

S. Gulati - Redirect/Mr. Buterman          1290

respect to USL's Division II application for 2017?

A      It not sanction them.

          MR. BUTERMAN:  Can we look at DX-599?

Q      Mr. Gulati, can you tell us what DX-599 is?

A      A note to me from the board of directors.

Q      The date is January 2, 2017?

A      That's correct.

          MR. BUTERMAN:  Your Honor, I move for the admission of DX-599?

          MR. KESSLER:  No objection.

          THE COURT:   So admitted.

          (Defendant's Exhibit DX-599 .)

Q      And could you please read the first two paragraphs.

A      Over the last few days, the Pro League Task Force has had multiple teleconference calls to discuss two pending Division II applications.  The group has also held phone sessions with the NASL and USL.  Based on their work, the unanimous recommendation of the task force is that neither league be sanctioned as Division II for 2017 as they fail to meet multiple federation standards.  It is of course up to the board to make a final decision.  We will advise the two leagues of the recommendation and the board call set for Friday.

Q      As of this time, what did you think U.S. Soccer's board would do about NASL's sanctioning in 2017?

S. Gulati - Redirect/Mr. Buterman          1291

A     I wasn't sure.

Q     And what did U.S. Soccer's board of directors ultimately decide to do with respect to both NASL and USL's Division II sanctioning applications?

A     Approved both.

Q     So was it the case that U.S. Soccer's board just did whatever U.S. Soccer or its task force recommended?

A     No.  In this case, it overruled the task force or didn't accept the recommendation of the task force.

Q     What was NASL's response to the grant of a provisional sanction for the 2017 season?

A     They were obviously very pleased that they were going to be continuing to play.

Q     Can we pull up DX-615, please.

      And what is DX-615?

A     It's a letter from Mr. Sehgal to me and to general secretary Dan Flynn in response to that decision.

Q     And what's the date?

A     January 10, 2017.

         MR. BUTERMAN:  Your Honor, I move for the admission of DX-615.

         MR. KESSLER:  No objection.

         THE COURT:   So admitted.

         (Defendant's Exhibit DX-615 .)

Q     At the very beginning of this e-mail, do you see that

*S. Gulati - Redirect/Mr. Buterman*      1292

Mr. Sehgal says, Hi, Sunil, and Dan.  I want to thank you and all at USSF for the effort that everyone put into the sanctioning process especially over the holidays.

Do you see that?

A    Yes.

Q    And you and others at U.S. Soccer put efforts into the sanctioning process over the holidays?

A    All of this work was taking place sort of just before Christmas and the first few days of the year.

Q    And what, specifically, do you recall that you and others from U.S. Soccer were doing in connection with the sanctioning process?

A    I don't know if that we were talking with individual owners of two leagues together.  We were certainly talking to the leadership of the leagues.  They both made -- we offered them an opportunity to make a presentation to the full board which both groups did on a teleconference call and then we had a pretty lengthy discussion about the applications.

Q    Do you see that Mr. Sehgal goes on to say, It forced the league and owners to ask a lot of ourselves and I think we have emerged stronger and more focused.

A    Yes, I see that.

Q    And then he goes on to say, You have my commitment that I will work tirelessly to fulfill the promises that we made

S. Gulati - Redirect/Mr. Buterman                    1293

to you.

Do you see that?

A    Yes.

Q    What promises did the NASL make to U.S. Soccer in connection with its sanctioning application for 2017?

A    I don't know the specifics, but effectively, we would get better.

Q    He goes on to say, We will be more collaborative and I have some ideas that I may come back to you on with respect to how we may be able to engage USL yet.

Do you see that?

A    Yes.

Q    And what did you understand Mr. Sehgal to be referring to when he said, I have some ideas that I may come back to you on with respect to how we may be able to engage USL yet?

A    Throughout much of 2016, and in this period, there have been discussions about how they might work together.  How some of their teams might play.  Whether there could be an interleague championship.  All of those sorts of things and this is a continuation that Mr. Sehgal had, as he says, ideas about how we might be able to continue those discussions.

Q    Now, let's move forward to NASL's application for 2018.

MR. BUTERMAN:  If we pull up DX-725.

Q    Mr. Gulati, do you understand DX-725 to be NASL's

Division II application for the 2018 season?

A     Yes.

          MR. BUTERMAN:  Your Honor, I move for the admission of DX-725.

          MR. KESSLER:  No objection.

          THE COURT:   So admitted.

          (Defendant's Exhibit DX-725,received.)

Q     And do you see, Mr. Gulati, if we look at the first page under the heading, "League Composition for 2018"?

A     Yes.

Q     You see that NASL said that the NASL currently has eight committed clubs for the 2018 season.  Two clubs that participated in 2017 had not committed to return for the 2018 season.

      Do you see that?

A     Yes.

Q     And was that your recollection at the time?

A     Yes.

Q     And then if you look under the next page, under the heading of "Waivers."  Do you see that NASL wrote:  The NASL as a league will require two waivers for the 2018 season with respect to the number of clubs and with respect to the location of clubs.

      Do you see that?

A     Yes.

S. Gulati - Redirect/Mr. Buterman          1295

Q    Were those the same standards that NASL had requested waivers from for the 2017 season?

A    Yes.

Q    And we had a discussion yesterday about whether all waivers were created equal and whether all standards are equal.  Where did you view the need for a waiver for the number of teams and the number of clubs to be in the scheme of important waivers?

A    The single most important requirement for a league is to have credible owners, and if you have credible owners you have credible teams.  So if you don't have enough owners, then you're not going to have enough teams except for situations where obviously a single owner owns more than one team.  So if you're short on the number of teams, that is the number one criteria to have seriously.  To take a silly example, if you have three or four teams that doesn't -- that's not a league in anyone's eyes.

Q    Can you remind the jury how many teams was NASL required to have under the Division II standards for this application?

A    12.

Q    And how many were they approaching U.S. Soccer with?

A    In this application, they said they had eight.

Q    Now, after the submission, you recall that there was a presentation that was made to U.S. Soccer's board in

*S. Gulati - Redirect/Mr. Buterman*                1296

September of 2017?

A     Yes.

Q     Do you recall who attended that meeting on behalf of NASL?

A     Mr. Sehgal was there, Mr. Commisso was there, Robert Palmer from the Jacksonville team was there.

          MR. BUTERMAN:  Can we pull up JX-77?

A     Mr. Malik was there.

          MR. BUTERMAN:  Thank you.

Q     And do you understand JX-77 to be the transcript of that board of directors meeting?

A     Yes.

Q     Can we look at Transcript Page 85.

      And do you see that at the top this is Mr. Sehgal speaking to the U.S. Soccer board?

A     Yes.

Q     Mr. Sehgal begins by saying, Thank you for your team and for all the work and the support that you have given us over the years.

      Do you see that?

A     Yes.

Q     And what did you understand Mr. Sehgal to be referring to?

A     Exactly what it says.  The efforts that whether it was the leadership of the organization for the board more

generally, or the task force, had the time and effort they had put in over a number of years to make sure they were successful.

Q    And if we go to the bottom of Page 87.

Do you see that Mr. Sehgal says, We still had some of the lingering effects of 2016, the Traffic challenges. Thankfully, Sunil and Lydia successfully helped us mediate and negotiate the settlement with two of our former teams out of disputes with our former teams that was largely related to Traffic.

Do you see that?

A    Yes.

Q    Can you explain what that refers to?

A    Two of the teams that were part of the league were leaving the league or had left the league, and there was litigation with the NASL and they pointing they were leaving the league because of the relationship with Traffic.  And so, I don't know if this got to litigation, or if there was an arbitration, but U.S. Soccer's general counsel at the time Lydia Wahlke and I got involved and were able to resolve that with their two teams and the league.

Q    Now, yesterday, you testified that you mediated the dispute between NASL and USL back in 2010; do you recall that?

A    Yes.

S. Gulati - Redirect/Mr. Buterman          1298

Q    But this is a separate set of mediations that you did on behalf of the NASL, is it not?

A    Yes.

Q    In terms of timing, was this assistance that you gave to NASL before or after U.S. Soccer denied NASL's application to be designated a Division I League in 2016?

A    Well, this mediation would have taken place in late 2016 and they were already playing in '16, so I don't know the exact timing.  It would have certainly been before their 2017 approval and after their 2016 approval.

Q    And why did you and U.S. Soccer's general counsel at the time Ms. Wahlke agree to help NASL resolve those disputes?

A    We wanted to see the NASL and all of our leagues, our members, succeed.  In this case, we thought we could help resolve legal issues, one of which was with the Canadian team as I recall and use our ability to insert ourselves into that process and help.

Q    Now, I want to just quickly go over something on the bottom of Page 89.

Do you see that Mr. Sehgal states, Our ask is that we continue in our Division II status.  What we would like is three years to comply with the standards.

Do you see that?

A    Yes.

S. Gulati - Redirect/Mr. Buterman          1299

Q    And what did you understand Mr. Sehgal's ask to mean?

A    Effectively, that they wanted a three-year waiver from the standards.

Q    And what was your reaction to that request?

A    I don't remember my specific reaction.  The board's reaction, in viewing this application and this sort of request, was that they had a number of years and progress hadn't been shown and that's really the main issue.  It came with eight teams, two of which were new teams, and one of which was uncertain; namely, North Carolina.

So we didn't view that as progress, and there wasn't a plan that they outlined on how they plan to make progress.  I think those sorts of things would have gone a long way with the members of the board.

Q    Now, you recall yesterday you were asked questions about whether you and U.S. Soccer wanted only one Division II League?

A    Yes.

Q    Can we look at Page 66 of the transcript.

And do you see where you stated starting at Line 8.  We have a situation where if multiple teams --

THE COURT:  Multiple leagues.

MR. BUTERMAN:  Excuse me, your Honor.

Q    We have a situation where if multiple leagues meet the standards -- you have all heard me say this before -- that

we will sanction those leagues because we have no choice under American law.

What did you mean by that, sir?

A    Just exactly what it says.  That, and I said it before, that it wasn't the ideal situation to have multiple leagues because of how it looked internationally and somewhere else. It may have us look silly but that we would absolutely do that, and frankly, others who spoke at the meeting from Division II both agreed with that sentiment, that it would be best to have one in each of the different categories. And here, I'm saying is that may be true but we will sanction all leagues that meet the standards.

Q    Do you recall whether anyone from NASL expressed a view on whether there should only be one Division II League in the United States?

A    Two of the representatives of the NASL, two of the owners in the NASL, in this same meeting, said, yes, ideally we have one in each category in Division I, II, and III. Mr. Commisso and Mr. Malik.

Q    Can we turn to Page 118 of the transcript.  And do you see at Line 14, Mr. Commisso says, I think, you know, at the end of the day, the best thing that could happen to U.S. Soccer is a Division I and a Division II League.  Okay? Just one, not two, not three; one, okay?

Do you recall Mr. Commisso making that statement?

A    Yes.

Q    And then, Mr. Commisso goes on and says, If we could find the parameters under which everybody gets in the same room, which I asked you, right, and decides this there was give and take from all parties, that would be, that safety net, that would be the best thing that you, as an organization, could do for U.S. Soccer, in my humble opinion.

Do you see that?

A    Yes.

Q    What did you understand Mr. Commisso to be saying here about getting everyone in the same room?

A    Exactly what it says.  Everyone in this case meant the USL the leadership of U.S. Soccer or the U.S. Soccer board, and the NASL.  And the request for this sort of meeting, it wasn't the first time that request was made.  And we, in fact, facilitated those meetings as I talked about earlier today.

Q    Now, let's talk for a moment about the vote on NASL's application for sanctioning for 2018.

MR. BUTERMAN:  Can we pull up the next demonstrative.

Q    And Mr. Sehgal --

MR. BUTERMAN:  Your Honor, this is Demonstrative 6.  Defendant's Demonstrative 6.

*S. Gulati - Redirect/Mr. Buterman*                              1302

Q    And Mr. Gulati, can you please tell us what Demonstrative 6 reflects?

A    This would have been the nine members of U.S. Soccer's board that voted on the NASL and USL applications at the end of 2017 for the 2018 season.

Q    Now, we've gone over some of the names here, Mr. Gulati, so I'm not going to go over those again.  But I do want to go over some of the names that do not -- that appear here for the first time.

And could you tell us why there are different individuals that voted on NASL's Division II application for the 2018 season, then voted on NASL's Division I application for the 2016 season?

A    Primarily, because you've got four new board members. Either some board members may have been term limited or there were elections.  And you got four new board members and Mr. Ahrens is new on this, and I think that we established that he was on the board previously but may or may not have been on the call at the time of the vote.

Q    So can you just -- let's go through those names.

Can you tell us who to who Mr. Ahrens is?

A    Chris is a teacher in California.  He was a paralympian athlete.  He has represented us in international competition.  I don't know if he played in the Paralympic Games sitting here today, and is the chair of the Athletes

Council.

Q    Who is Mr. Moeller?

A    Representative from the youth soccer world and represented the adult soccer world at various times.  At this time, he was the vice president of the youth organization from Florida.

Q    And who is Lisa Carnoy?

A    At the time, she was a Bank of America executive.  She was, at the time, a member of the board of directors of Columbia University and I believe at this time co-chair of the trustees at Columbia.

Q    Who is Ms. Hucles?

A    Angela was a former national team player.  Quite sure she's won an one Olympic, world championship, or both.  Was involved with one of the NWSL teams most recently.

Q    And who is Val Ackerman?

A    Currently the commissioner of the Big East.  One of the founders of the WNBA.  Long time leader in sports.  At the NBA for many years.  Trained as a lawyer from the University of Virginia.

Q    Mr. Gulati, did you instruct any of these individuals how to vote on NASL's Division II application for 2018?

A    Absolutely not.

Q    Mr. Gulati, did you reach an agreement with any of these individuals at any time regarding how they would vote

*S. Gulati - Redirect/Mr. Buterman*          1304

on NASL's Division II application for 2018?

A     No.

Q     You gave testimony earlier regarding your views on the assertions made by counsel with respect to whether board members would just rubber stamp what you wanted them to do.

Are your answers with respect to the voting members for the 2018 NASL Division II application the same as the answers that you gave with respect to NASL's Division I application in 2016?

A     Yes.  There are no rubber stampers in this group.

Q     By the way, how did the board vote on NASL's Division II application for 2018?

A     I believe all of the voting members voted not to sanction with the exception of John Motta.

Q     So was the vote with respect to NASL's Division II application for 2018 even unanimous?

A     No, it was not.

Q     Now, Mr. Kessler showed you some statements yesterday where Mr. Motta and other members were discussing whether NASL should be given waivers for the 2018 season.

Do you recall that?

A     Yes.

Q     Now, in your view, what did those discussions and comments reflect?

MR. KESSLER:  Objection, your Honor.

S. Gulati - Redirect/Mr. Buterman          1305

THE COURT:   I'll allow it.  L.

A     Just that, a healthy discussion and a difference of opinion among board members.

Q     Do you recall that Mr. Kessler, during opening statements said that you were trying to force the NASL out as a standalone league and put them under the thumb of USL?

A     I recall that he mentioned that, yes.

Q     And what's your response to that?

A     It's simply not the case.  What we were trying to do was to find a way for as many teams to participate in Division II as possible.  So when it was clear that Division II was not going to have two groups because the NASL was nowhere near the standards required, and had not made any progress, and did not present a plan for how they were going to achieve those standards.  The best they offered us is we will develop a plan for a plan.  It just wasn't going to happen for them.  And in a vote it was, I guess, 8 to 1.

The USL had made a lot of progress, had a lot of teams, had cured a number of waivers, still had many waivers.  So the thought was if they are close and can get closer with the number of teams they have maybe we'll see some of the teams or all of the teams be part of one league.  And, in fact, a number those teams did move to the USL and a number other teams moved to a different league.

*S. Gulati - Redirect/Mr. Buterman*      1306

Q    Now, yesterday, Mr. Kessler showed you JX-79 which is the letter that U.S. Soccer sent to NASL informing them of their sanctioning decision.

And do you see on the second page of that letter, U.S. Soccer wrote:

As you know, the board provisionally approved the NASL's application in 2017 with the understanding that NASL would satisfy the professional league standards for 2018, or at a minimum, show material progress toward compliance and provide a definitive plan for achieving compliance.

Do you see that?

A    Yes.

Q    And is that your recollection?

A    It's most precisely what I said a few minutes ago.  It is my recollection.

Q    The letter continues.

As of September 1, 2017, NASL was not able to provide the board with assurances it would have greater than eight teams for the 2018 season, a team in the Central Time Zone, or any plan as to how it would come into full compliance with the Federation's professional league standards.

Do you see that?

A    Yes.

Q    And was that accurate?

A    Absolutely.

S. Gulati - Redirect/Mr. Buterman          1307

Q    And the next paragraph the letter reads.

The board has asked me to communicate that its decision does not prevent NASL from reapplying as a division three league, and we hereby invite you to do so on or before October 2, 2017.

Do you see that?

A    Yes.

Q    Did the NASL apply for a Division III sanction?

A    No.

Q    What did the NASL do instead?

A    They filed litigation.

Q    Now, I'd like to conclude just by asking you a few questions, Mr. Gulati.  I'd asked you some of these yesterday, let me just finish.

Mr. Gulati, was your compensation while you were at U.S. Soccer at all tied to MLS's divisional sanctioning?

A    No.

Q    Was your compensation while you were at U.S. Soccer at all tied to NASL's divisional sanctioning?

A    No.

Q    Was your compensation while you were at U.S. Soccer at all tied to USL's divisional sanctioning?

A    No.

Q    If NASL had been sanctioned as a Division I League for 2016, would that have impacted in any way your compensation?

A     No.

Q     If NASL had been sanctioned as a Division II League for 2018, would that have impacted in any way your compensation?

A     No.

Q     Now, moving beyond you personally, was the amount of money that U.S. Soccer was entitled to receive from SUM tied in any way to MLS's status as a Division I League?

A     No.

Q     Was the amount of money that U.S. Soccer was entitled to receive from SUM tied in any way to MLS being the only men's Division I League?

A     No.

Q     Was the amount of money that U.S. Soccer was entitled to receive from tied in any way to NASL's divisional sanctioning?

A     No.

Q     Did U.S. Soccer receive any additional compensation from any source as a result of NASL being denied a Division I sanction in 2016?

A     To the contrary, it received less because no dues were paid by the NASL.

Q     Did United States Soccer receive any additional compensation from any source as a result of NASL being denied a Division II sanction for 2018?

A     Same.  Less dues from a league that wasn't playing.

*S. Gulati - Re-cross/Mr. Kessler*                1309

Q     Mr. Gulati, was NASL denied either its Division I sanction for 2016 or its Division II sanction for 2018 because of any conspiracy involving U.S. Soccer and MLS?

A     Absolutely not.

Q     To the best of your knowledge, why did the board of directors of U.S. Soccer vote to deny NASL those two sanctions?

A     They didn't meet the standards.  And certainly, in both cases, hadn't met not only the standards, hadn't made the progress that we were looking for leagues to be able to succeed.

In that period of time from 2009 to 2017's decision, we did everything we could and offered them multiple opportunities to try to do so assisting them and did assist them.  They just didn't get close.

MR. BUTERMAN:  No further questions, your Honor.

THE COURT:   Any re-cross?

MR. KESSLER:  Yes, your Honor.  But should we take our break now?

THE COURT:   No.  We've been going for an hour and 20 minutes.

MR. KESSLER:  Okay.

RE-CROSS EXAMINATION

BY MR. KESSLER:

Q     Good morning, Mr. Gulati?

S. Gulati - Re-cross/Mr. Kessler          1310

A     Good morning.

Q     Mr. Gulati, you testified with counsel several times that there is some distinction between a waiver for league requirements in the standards and team requirements in the standards.

      Do you recall that testimony?

A     Yes.

Q     Now, first, if I look at the Professional League Standards themselves, do the standards say in words that league standards are more important than team standards?

A     They're separated in the standards, but do the words -- are there words that say these are more important, no.

Q     In fact, Mr. Gulati there's no hierarchy in the standards, there's no language in the standards that say one standard is more important than another, correct?

A     There are no words that say that, correct.

Q     And nonetheless, it's your belief, your opinion as chairman, when you were in USSF president, that the team requirements are not as important to be enforced as the league requirements, right?

A     It's the board's view that the league standards are, in fact, especially when it's the number of teams, it's the league standards that are critical and common sense would indicate that and the board felt that way.

Q     And when the board gave 31 team waivers to USL, 31,

that was because the board and you did not feel team waivers were as important as league waivers because NASL only needed two leave waivers, right?

A     The board didn't give 31 waivers, it was 21.  They had reduced from 31 in 2017.

Q     Okay.  Let's go back to 2017.  They gave 31 waivers, correct?

A     In Division III, yes.

Q     And your testimony is the reason they did that is because 31 team waivers could be granted, it wasn't as important, right?

A     Not strictly.  It's not a counting game, that's correct.  It's not strictly the number of waivers, it's the type of waivers both between league and team, and then, in that second subset, even what waivers.

              (Continued on the next page.)

S. Gulati - Re-cross/Mr. Kessler                1312

BY MR. KESSLER:  (Continuing.)

Q    Right.  And the most important waiver.  The most important standard you testified was the number of teams; correct?

A    The number of teams and the owners associated with those teams, yes.

Q    Okay.  Let's go to the NASL's D-1 application.

When the NASL applied for D-1, it had met the number of teams application; correct?  It was going to have 12?

A    Yes.

Q    Okay.  So that was the most important standard and the NASL met it; right?

A    Yes.

Q    What the NASL was told was that it was a big problem that it couldn't satisfy the stadium capacity requirement; correct?

A    And the geographic.

Q    Let's go first with stadium capacity, that was one of the big ones; right?

A    Correct.

Q    Is that a team waiver or a league waiver?

A    Well, you kind of --

Q    Yes, is it a team or league, you can answer?

A    It's a league -- I don't know how it's specifically defined having ten stadiums that we didn't meet.  A league that didn't have those or was it ten waivers.

SN        OCR        RPR

S. Gulati - Re-cross/Mr. Kessler                    1313

Q    Mr. Gulati, when we spoke with about the 31 waivers for USL, some of those were stadium capacity waivers; correct?

A    Correct.

Q    And they were characterized by Mr. L'Hote as team waivers.  Are you now saying when you want to deny NASL a D-1 sanction suddenly there magically become league waivers when otherwise they're team waivers?

            MR. BUTERMAN:  Objection.

            THE COURT:  I'll allow it.

A    What I'm saying is, Mr. Kessler, is that yesterday you defined it as one waiver, a league waiver that ten teams -- and that was your definition yesterday.

Q    Mr. Gulati, would you admit to the jury that the waivers you denied to NASL for stadium capacity were team waivers?

A    It's inconsistent with what you said yesterday, but I'll go along with that.

Q    And they only needed eight team waivers; correct?  They had eight stadiums that didn't comply, four complied; right?

A    I don't know if that's the number, most did not.

Q    Okay.  The 31 waivers you gave USL was for 2017; correct?

A    No, they needed 21.

Q    They needed 31 for the 2017 season?

A    Yes.  Yes, for '17.

Q    Okay.  Now, the only league waiver that NASL needed for D-1 was the three time zones; correct?

SN        OCR        RPR

S. Gulati - Re-cross/Mr. Kessler                1314

A    Yes.

Q    And by the way, in 2014, MLS was given eight team waivers; correct?

A    I don't know the exact number.

Q    Did you remember in 2014 MLS needed stadium waivers, it needed coaches' license waivers, it had some field size waivers and it totaled to eight.  Do you recall that?

A    I don't know if the number was eight but I accept they needed some waivers, yes.

Q    Okay.  And if MLS was entitled to eight team waivers in 2014, why was NASL not able to get eight team waivers in 2016?

A    It's quite simple, Mr. Kessler.  As I said yesterday, it's not simply a matter of counting waivers.  Needing eight stadium waivers out of a league of 12 is different than needing two stadium waivers out of a league of whatever MLS had at that time.  Probably 16, 18, 20 teams.

Q    Okay.  When MLS had only ten teams, how many waivers would it be appropriate to give it for individual team waivers?

A    It's not a matter of counting which waivers, stadium waivers or coaching waivers in the first year of existence or in their seventh year of existence, those things matter.

Q    They do matter, Mr. Gulati.

     Let me ask you the following:  NASL in its sixth year in 2016 had 12 teams; correct?

SN        OCR        RPR

S. Gulati - Re-cross/Mr. Kessler                  1315

A    Yes.

Q    MLS in its sixth year of existence had 12 teams; correct?

A    It's probably right, yes.

Q    Okay.  Is it also correct -- is it also correct that in its sixth year of existence, MLS had only five different investor-operator owners?

A    In 2000 and --

Q    It's sixth year would be '96, '97, '98, '99, 2002?

A    It's possible.

Q    Right.  And NASL had 12 different owners; correct?

A    In which year?

Q    2016.

A    I don't know if they had separated themselves when they applied which was in 2015, they hadn't separated themselves from Traffic at that point so they did not have 12.

Q    When they -- immediately after they applied, very shortly after Traffic divested itself of that team, correct, so they had a separate owner?

A    They had multiple teams, not a team.

Q    Traffic divested itself of its teams almost immediately after the indictments came out; correct?

A    It took some time.

Q    A month or two?

A    I don't know.

Q    Okay.  For 2016, they would have had 12 separate owners

SN        OCR        RPR

S. Gulati - Re-cross/Mr. Kessler          1316

in their sixth year while MLS only had five separate owners in its sixth year; correct?

A     If those are the numbers.

Q     And I'm talking about 2001 was the sixth year, just so we're all on the same page.

      Is it also correct that in 2001, MLS was actually in four different time zones?

A     They always had teams in the east, the central, Rocky Mountains, and the west coast.

Q     There were four time zones?

A     They always had a team in New York.

Q     And in 2016, NASL was going to be in four different time zones also; correct?

A     Not -- not in the continental United States.

Q     My question is:  Would they be in four different time zones?

A     I don't remember all of their 12 cities.  Most of them were new.

Q     They were in the eastern time zone; correct?

A     I don't know the 12 teams.

Q     Okay.  Do you know if they had a team in Puerto Rico?

A     I know they played.  Yeah.

Q     That's in a fourth time zone, it's not in the continental United States; correct?

A     Or a member of the United States Soccer Federation.

SN       OCR       RPR

Q    Is Puerto Rico part of the United States?

A    Not part of the United States Soccer Federation.

Q    Is it part of United States of America?

A    Currently, it is.

Q    And so they had four time zones -- they had four -- they had three time zones in the United States of America and they had one team, Edmonton from Canada, who was in a fourth time zone; correct?

A    Yes, they had a team in Edmonton, yes.

Q    Mr. Gulati, one of the things you said is financial instability is a big factor in evaluating leagues; is that correct?

A    Sure, the league needs a certain type of finance.

Q    Right.  Now, there's nothing in the professional league standards that says that teams have to make a -- that teams have requirements where the USSF does an examination of their financial stability; correct?  There were just specific standards, there were things like that.  But there's no inquiry power given to USSF to do a financial analysis of the league; right?

A    We can certainly ask for that.

Q    Okay.  Did you ever ask -- did USSF ever ask for that of MLS when it almost went bankrupt?

A    No, I don't know that it did.

Q    Do you recall that in 2001 MLS met with its bankruptcy

SN        OCR        RPR

lawyers?

A    I do.

Q    Do you recall that it got bailed out because the Hunt family decided to take over multiple teams?

A    That's partially correct.

Q    Right.  And did -- did USSF come in and say you are financially unstable so we're taking away your Division 1 sanction?

A    It didn't -- it did not do that.

Q    Okay.  Let me move on to another subject.

You were asked your compensation several times. You're a volunteer, that's what you testified?

A    No, I was a volunteer for U.S. Soccer.

Q    Okay.  How about the years you worked for Kraft Soccer while you were also president of the USSF, were you compensated by Kraft Soccer?

A    Yes.

Q    Okay.  And that lasted through 2014; right?

A    That's correct.

Q    And after that when you no longer were working for Kraft Soccer, did you have positions in which you were compensated for by either FIFA or CONCACAF?

A    Yes.

Q    Okay.  And you got those positions because of your role as president of the USSF; correct?

S. Gulati - Re-cross/Mr. Kessler                1319

A     In part, yes.

Q     Okay.  So you told the jury you were a volunteer who was never compensated because of your position as president of USSF, but you didn't tell the jury that because you were president of the USSF, you got positions in CONCACAF and FIFA where you got lots of compensation; right?

A     You just misstated the fact of my comments.  What I said yesterday was that I was never compensated nor was any board member for being on the board of U.S. Soccer.  That is correct.

      The positions at FIFA and CONCACAF were not directly related to being president of U.S. Soccer.

Q     You only got those positions because you were president of U.S. Soccer; correct?

A     No, that's not correct.

Q     That's not correct, okay.

      The position is CONCACAF is not based on your being president of U.S. --

A     It's related to it.  It's not directly --

Q     It's related to.  Let's use related to.  So related to the fact that you're the president of U.S. Soccer you go to somewhere else, CONCACAF and FIFA and you get all of this compensation; correct?

A     After winning elections against other representatives from CONCACAF, yes.

SN        OCR        RPR

S. Gulati - Re-cross/Mr. Kessler          1320

Q    Okay.  Now, you also got questions about how USSF isn't hurt financially if MLS is stronger or weaker.  Do recall that?

A    Yes.

Q    Okay.  Under the SUM agreements, the rights to televise, for example, MLS were bundled with the rights to televise USSF national team games; correct?

A    Yes.

Q    Under the SUM agreements, the rights in some cases for sponsoring MLS were bundled in some cases with the rights to sponsor USSF; correct?

A    In some cases, yes.

Q    And you had an arrangement in which not only did you get a financial guarantee, but you had a sharing of money in excess of the guarantee if benchmarks were hit; right?

A    Correct.

Q    All right.  So if the package of MLS and USSF rights made more money, your potential revenue sharing was higher; correct?

A    Incorrect.

Q    You didn't get more -- a bigger share -- you got the same share, right, but a same share of a bigger number is higher; correct?

A    Well, that statement is correct.  Your first statement is incorrect.  We did not get more.  If a bundled package sold

SN          OCR          RPR

S. Gulati - Re-cross/Mr. Kessler          1321

for more, certain amounts in those bundled packages were attributed to sponsor U.S. Soccer and were agreed upon in advance.

Q    Okay.  If MLS lost its Division-I sanction, would the bundled rights be worth a lot less?

A    The bundled rights might be, but U.S. Soccer's revenue would not necessarily change.  In fact, it might go up.

Q    Okay.  You think that's the mechanics of how those agreements were?

A    I think it's quite possible that if a sponsor was interested in a soccer property and couldn't support MLS because it wasn't around or was different, that U.S. Soccer's rights would be worth more.  I think it's quite likely.

Q    You might get a different deal out of SUM.  In other words, you're saying you might renegotiate it?

A    No.  We might get from Anheuser-Busch more money just for the national team.

Q    Okay.  Do you recall the statements you made about how the interest of MLS and USSF were completely aligned?

A    In many areas they are aligned as they are with a number of our members, yes.

Q    Do you recall the statements Mr. Garber made about you being joined at the hip?

A    Yes.

Q    Okay.  And you testified you agreed with those

SN          OCR          RPR

S. Gulati - Re-cross/Mr. Kessler            1322

sentiments; correct?

A     I believe what I said yesterday was those wouldn't be my words but we were, in fact, aligned in many ways.

Q     Yes.  And you recall the statements where Mr. Garber said that MLS and USSF agreed on most issues; correct?

A     Yes.

Q     Okay.  And do you recall this testimony where it was said that the -- having a strong MLS which Mr. Garber said was extremely important to having a strong U.S. Soccer?

A     Yes, I remember him saying that, sure.

Q     And, in fact, you wrote that to the president of either ABC or ESPN or Disney, you wrote those words that "having a strong MLS was a critical for the development of U.S. Soccer"; correct?

A     For the development of a game in the United States, yes.

Q     And that includes U.S. Soccer; correct?

A     It includes all of our members.

Q     And you agree with me if MLS was not D-1, it wouldn't be as strong; correct?

A     I can't hypothesize on what that specific sanctioning would have meant.  Did we want a strong MLS, yes.  Did we want a strong NASL, yes.  Did we want a strong USL, yes.

Q     Now, you also spoke about the fact that leagues need to earn their sanction.  They need to demonstrate commitment, things like that; correct?

SN        OCR        RPR

S. Gulati - Re-cross/Mr. Kessler                1323

A     I don't think I ever used the word "earn" but the rest of what you said I agree with.

Q     What MLS got it's D-1 sanction in 1993 it had no teams; correct?

A     Correct.

Q     It had no investor-operators?

A     That's correct.

Q     It had no stadiums?

A     Correct.

Q     Did it do anything to earn that sanction at that point?

A     It had a plan.

Q     It had a plan.

      So a plan was sufficient; correct?

A     It's certainly an important part.

Q     And, in fact, what you and Mr. Rothenberg told USSF at that time was that you needed to get the D-1 sanction first in order to get the investors to sign up and put in the money and be willing to start the league; correct?

A     Mr. Rothenberg may have told them that.  I wouldn't have said that but he may have told them that, sure.

Q     You were asked questions by your counsel about incubation periods.  Do you recall that?

A     Yes.

Q     When MLS got incubation periods, that was referring to the fact that it was given a D-1 sanction and for two years it

SN        OCR        RPR

S. Gulati - Re-cross/Mr. Kessler                1324

didn't have to comply with the standards and no one else could apply for D-1 during those years; correct?

A    Correct.

Q    When NASL applied for a D-1, it was not offered any incubation period in which it could get a provisional D-1 sanction in 2016 for a couple of years and then see if it could meet the rest of the standards, right?  That was not offered?

A    Your statement is correct.

Q    Okay.  And it's also correct, is it not, you spoke about -- I think you got asked questions as to whether or not when MLS got a waiver for a stadium in one year, whether that would apply in the next year or multiple years.

        Do you recall that question?

A    That question wasn't asked here about multiple years.

Q    You don't recall, I believe Mr. Buterman asked you.  He said since they already had a waiver for the San Jose stadium, they wouldn't need it the next year.

        Do you recall a question like that?

A    The question, yes, MLS requested it for the second or third year.  Mr. Flynn, in his comment, at the board meeting said MLS needed no waivers.

Q    Okay.  But they did need waivers but there are no multi-year waivers; correct?

A    They were building new stadiums; correct.

SN        OCR        RPR

S. Gulati - Re-cross/Mr. Kessler                    1325

Q    They needed waivers when he said they did not?

A    And had requested them, yes.

Q    All right.  Now, in 2000- -- first of all, when the D-1 sanction was denied to NASL, that letter did not mention Traffic at all; correct?

A    That letter did not.

Q    Right.  And in the transcript of the March 16th, 2016 meeting that we reviewed, there's no mention of Traffic at that time; correct?

A    At that meeting, that's correct.

Q    Right.  And you testified about the fact that Traffic had been discussed previously with the Pro Leagues Task Force; correct?

A    And at the board level.

Q    Yes, thank you.

     And it also was the position if Traffic was still associated with NASL, it would have been an issue not just for D-1, it would have been an issue for D-2; correct?

A    They're being associated with a criminal enterprise would be an issue for any of our leagues, yes.

Q    Right.  In other words, if Traffic were an issue for the board, it would not have granted NASL it's D-2 sanction for the 2016 season; correct?

A    No, I don't want to quite say that.  The questions that were asked that you asked yesterday and were asked today, were

SN        OCR        RPR

S. Gulati - Re-cross/Mr. Kessler          1326

about the length of time that it took for us to make a decision and my comment to that was one of the fundamental issues was the ongoing Traffic connection.

Q    Okay.  I'm not asking about length of time so we're clear.

I'm saying you granted NASL a D-2 sanction in January of 2007 -- 2016; correct?

A    Yes.

Q    So, in January of 2016, you granted a D-2 sanction to the NASL and you didn't say we're not going to grant you a sanction because of Traffic; correct?

A    We didn't say that in either of the two decisions, that's correct.

Q    Right.  And the January D-2 sanction to NASL was granted two months before the March meeting in which you denied the D-1 sanction; correct?

A    That's correct.

Q    And that's because the Traffic issue had been resolved or otherwise you wouldn't have granted the D-2 application; correct?

A    I don't know that it was completely resolved but obviously it did not -- it was resolved to the point where we were willing to grant the sanction.

Q    Thank you.

Now, let me ask you about the one league waiver that

S. Gulati - Re-cross/Mr. Kessler                    1327

NASL needed for the D-1 sanction which was the three time zone waiver; correct?

I want to ask about that.

Mr. Gulati, under the D-1 standards that were changed in 2014 to specify three time zones, Pacific time zone, Central, East, you recall they were changed in 2014; correct?

A    They had been changed in a couple of cases but they were changed for '14.

Q    The three specific time zones were added in '14; correct?

A    That's correct.

Q    Okay.  Under that change if a league had a team in Denver, that's the Mountain West time zone; correct?

A    It's the Mountain, yes.

Q    If a league had a league team in Denver, Colorado, it would not satisfy one of the three time zone requirements because the Mountain West was decided not to count; correct?

A    West, Central, East.

Q    Right, so Denver doesn't count; right?

A    I would never say Denver doesn't count but it is not in the Pacific, Central or Eastern time zone.

Q    But if you had a soccer team in a small city in Oregon, let's say, Eugene, Oregon, that would count because that's in the Pacific time zone; correct?

A    It would not meet one of our other requirements about

SN          OCR          RPR

S. Gulati - Re-cross/Mr. Kessler          1328

metropolitan areas, but it would count.

Q    How about Sacramento, would that meet your geographic standards?

A    I don't know the population of Sacramento, but it might.

Q    Okay.  So could you explain to the jury why there is a difference that makes sense to say we're going to approve a league under the time zone requirements if it has a team in Sacramento, but if it doesn't have a team in the Pacific area in Sacramento, we won't approve it if it's third time zone is in Denver?

A    It's the hypothetical because all of the leagues, all of the major leagues, as you well know, have teams in Los Angeles for some time, yes, the MSL didn't.

Most of the leagues have team in San Diego and San Francisco.  So, the idea, as I said earlier, was to be in major markets both from an attendance point of view and from a media perspective.

Q    Is there any requirement that those other leagues that you just mentioned must have teams in particular time zones?

A    Only the requirement of common sense.

THE COURT:  Why don't we take our break.

MR. KESSLER:  Thank you, Your Honor.

THE COURT:  Ladies and gentlemen, we're going to take our morning break.  We'll be ready to go in 15 minutes. Thank you.

SN          OCR          RPR

Gulati - redirect - Kessler                1329

(Jury exits.)

THE COURT:   All right.  Be back in 15.

(Recess taken.)

(Jury enters.)

THE COURT:  You can be seated.

Mr. Kessler, you may continue.

MR. KESSLER:  Thank you, Your Honor.

BY MR. KESSLER:  (Continuing.)

Q    Mr. Gulati, do you remember your counsel put up some documents that said they were the minutes of the meetings of the board of directors and indicated that there were discussions of the NASL D-I application that took place during those meetings, do you remember that testimony?

A    Yes.

Q    And there was something different about what the counsel showed you.  They weren't the actual transcript of the meeting; it was, like, another document called the minutes of the meeting.  Do you recall?

A    Yes.

Q    So let me just remind the jury.  If we can just put up the document that they showed you, which I believe was DX-362.  DX-362 is called the minutes and I guess the minutes are different from the transcript; correct?

A    Yes.

Q    Okay.  And the transcript is what shows in detail what

SN        OCR        RPR

Gulati - redirect - Kessler                    1330

actually happened at the meeting.  Would you agree with me that?

A    What was actually said, yes.

Q    The minutes are sort of like a summary.  There was a discussion.  It's very short; right?

A    It can be, yes.

MR. KESSLER:  And what your counsel showed you was under professional league standards the board -- if you can put that up under professional league standards.  Can we put it up on the screen it's already in evidence?

(Exhibit published.)

BY MR. KESSLER:

Q    Under professional league standards what you pointed out is that the board discussed the professional league standards and NASL application for Division-I status, correct, you discussed it there; correct?

A    That's what it says, yes.

Q    At this actual meeting was anything discussed -- this is May 31, 2015.  This is right after the Traffic indictments were announced; correct?

A    Yes.

Q    And Mr. Peterson came to this meeting; correct?

A    That's what it says here, yes.

Q    And was anything discussed at this meeting about the application other than Mr. Peterson explaining how the NASL

SN        OCR        RPR

Gulati - redirect - Kessler                1331

was going to completely get rid of Traffic?

A      I don't know.

Q      Okay.  Well let's look at the actual transcript.

THE COURT:    Your Honor this is PX-36 -- PX-620.
Your Honor, this was added.

BY MR. KESSLER:

Q      Mr. Gulati, do you recognize this as the actual
transcript of that meeting?

A      That's what it's marked as, yes.

Q      Okay.

MR. KESSLER:  And, Your Honor, I would offer PX-620.

MR. BUTERMAN:  No objection, Your Honor.

THE COURT:    Okay.  It's admitted.

(Exhibit PX-620 received in evidence.)

(Exhibit published.)

BY MR. KESSLER:

Q      If we can look at page three where it says the meeting
commenced at 9:58 a.m. and put that up on the screen, please.

(Exhibit published.)

Q      I'm not going to delay this.  Mr. Gulati, will you take a
look at this exhibit.  You'll see at 9:58 a.m., basically what
happens is that you tell the board that the -- about the
Traffic situation and then you say you're introducing
Mr. Peterson who is going to talk about what happened with
Traffic in terms of the NASL taking steps to remove them;

SN        OCR        RPR

Gulati - redirect - Kessler                1332

correct?

A      I'm just looking at this now.  The introduction part is certainly right.

Q      And then Mr. Peterson is there if you look all the way through page seven; correct?

A      Page eight.  Let me read it.

Q      I'm not asking the content Mr. Peterson is presenting the whole time.

A      All the way up to page six and then others and Mr. Peterson again.

Q      And the only thing you speak about is this Traffic situation with Mr. Peterson; correct?

A      Well, no, on page -- if we're going through page eight.  On page seven there's other comments.  I'm looking at league, pro league standards.  Pro leagues have a chance to comment.  That's on page seven.

Q      Right.  There's no discussion of the NASL's application; correct?  That's discussing proposed changes to the pro league standards.  So it's available now, Mr. Gulati.  I don't want to belabor this point.

        As you're sitting here now to the jury, does this refresh your recollection that there was no substantive discussion of the NASL application at this meeting other than the efforts of the NASL to get rid of Traffic?

A      In this first seven pages, that's correct.  Again, I

Gulati - redirect - Kessler                    1333

can't confirm that without looking at the rest of the --

Q    It will be in evidence.

As you are sitting here right now you don't recall any; correct?

A    That's correct.

Q    And then you also referred with counsel to a later meeting that I attended; correct?

A    Several meetings that you attended.

Q    I said the two meetings; correct?  And you said at both of those meetings, the application was discussed; correct? That's what you told the jury?

A    I said it may have been discussed, yes.

Q    Well, was it discussed or may have been discussed?

A    We would need to see the transcript.

Q    No.  Sitting here now under your memory was it discussed or not?

A    I can't sit here right now and say which of those four meetings it covered that topic or not.

Q    Isn't it correct that the meetings that I attended NASL presented why it thought it should be certified; correct?

A    I'm sure it was the main topic of conversation, sure.

Q    You referenced the fact that I was there giving some views about the legality of issues; correct?

A    Sure.

Q    Okay.  And there was no discussion by the board about the

SN        OCR        RPR

stadium capacity issue; correct?

A    Again, I can't say what was discussed, as I just said a couple of minutes ago.

Q    As you're sitting here right now was there any discussion about the stadium capacity issue by anyone?

A    I can't say there was or wasn't.

Q    Other than my saying it's illegal?

A    I can't say.

THE COURT:    Can we come to the side, please?

(Sidebar on the following page.)

```
                          Sidebar                        1335
```

(Sidebar)

THE COURT:  I know the defense is not raising an objection to it, but I'm having a problem with an unsworn witness problem the way you're asking these questions.

MR. KESSLER:  Your Honor, I appreciate that but this is one of the reasons why I objected to going into this area, right?  I thought the whole subject matter wasn't appropriate and Your Honor overruled my objections.

THE COURT:  We never raised that your objection was because you are a fact witness to this.  I am concerned with the manner in which these questions are being asked making it seem as if you are putting your credibility -- because you are a percipient witness to the events into the questions.

MR. KESSLER:  I will rephrase the questions to avoid that.

THE COURT:  Let's avoid the reference to you being present at the meeting.  That is inappropriate -- that is no an appropriate way to examine the witness.

MR. KESSLER:  I appreciate that, Your Honor, but they brought it out several times that I was at the meeting and made statements.  I felt the need to address it.  I preferred and I tried to do it without saying that, but once they did that.  It's hard for me to go on with the questions but I won't ask questions in the way Your Honor doesn't want me to.

Sidebar                                                                1336

(Sidebar ends.)

(Continued on next page.)

SN        OCR        RPR

Gulati - redirect - Kessler                    1337

BY MR. KESSLER: (Continuing.)

Q    Mr. Gulati, as you're sitting here today, you do not recall any discussion by the board members outside of the presence of representatives of the NASL and either the May 31, 2015 meeting or the two subsequent meetings that took place prior to the March 2016 meeting.  So you have -- picture -- I'm talking about the other three meetings.

You don't recall any substantive discussions by the board about the stadium capacity noncompliance; correct?

A    I can't sit here nine and a half years later and without a document to reference saying we discussed or didn't discuss a particular issue.

Q    Okay.  And similarly you can't recall any discussions about the three time zone noncompliance issue; correct?

A    That would be covered by any specific issue.

Q    And the way that the jury could find out whether it was discussed in those meetings is by looking at the transcripts that will be in evidence; correct?

MR. BUTERMAN:  Objection.

THE COURT:   Sustained.

(Continued on the following page.)

SN       OCR       RPR

*Gulati - Redirect - Mr. Kessler*                          1338

BY MR. KESSLER  (Continuing):

Q    Now, let me ask you questions now about the time that you said that the professional league task force made a recommendation not to certify either USL or NASL.

Do you recall that?

A    Yes.

Q    Do you recall what happened next is that there was a board meeting in December of 2016, and at that board meeting you, as the chair, made the recommendation:  Let's take 30 more days to consider this issue.

Do you remember that?

A    I don't recall that specifically, but that's possible.

Q    And the reason you made that recommendation is because if the professional league task force recommendation was followed, neither league, neither NASL nor MLS' partner USL, would have been certified, correct?

MR. RUSKIN:  Objection.

THE COURT:  Sustained.

Q    Is it correct that if the board followed the recommendation at that time, both the MLS partner league and NASL would not be certified?

MR. RUSKIN:  Same objection.

THE COURT:  Same ruling, sustained.

Q    Was the recommendation of the board to not certify either league?

*Linda A. Marino, Official Court Reporter*

A    The board didn't make a recommendation.

Q    I'm sorry, did the professional --

MR. KESSLER:  And now I understand the objection.  I got ahead of myself in my language.  I apologize.

Q    Did the pro league task force make a recommendation not to certify either league?

A    Yes.

Q    Okay.  And, so, if the board had acted at that December meeting to follow that recommendation, then the USL, the MLS partner league, would also not have been certified, correct?

MR. RUSKIN:  Objection.

THE COURT:  Sustained as to form.

Q    Would the USL have been certified at that meeting if the board followed the pro league recommendation?

A    Neither league would have been certified if the board followed the recommendation at any point.

Q    Okay.  And, so, then, after that, you make the recommendation:  Let's adjourn for 30 days and we'll have another discussion.

Correct?

A    I don't have recollection of that specific, but I'm sure that's the case.

Q    And then there's a meeting in January.

And at that meeting, did you then make a recommendation that both leagues be provisionally certified?

*Gulati - Redirect - Mr. Kessler*　　　1340

A    I don't recall that I made it.  We took them up separately and I'm not sure if I made the recommendation or if someone else did.

Q    You met with the leagues in that interim period of time or your staff did?

A    I'm sure we did, several times.

Q    And there was developed a consensus to have both leagues provisionally certified and that that would be recommended to the board by the pro league task force?

A    Well, that doesn't make sense because the pro league task force, in fact, recommended that not be the case.  So, there was certainly no consensus.

Q    Who developed the recommendation to the board in January that both leagues should be recommended certified?

A    I don't recall.  The options were one, the other, both, or none.  I recall that.

Q    Mr. Gulati, is it true that you, as the chair, never recommended that USL not be certified, ever?

A    Well, in 2009 --

Q    So sorry.  I withdraw the question.

In 2017 and 2018, when they were applying for Division II, you did not make any recommendation that USL not be certified, correct?

A    I don't recall if I made any recommendation in 2017.

Q    You don't recall that you recommended they both be

*Linda A. Marino, Official Court Reporter*

*Gulati - Redirect - Mr. Kessler*                    1341

certified?

A    In 2017, I think I laid out that we had a choice; both, one, or neither.  There were four options, basically.

If you have the transcript and it says I recommended them, I wouldn't argue with that.

Q    Okay.  We don't have a transcript of the January meeting because it was by a phone call.  We only have the transcript of the meeting in which you recommended:  Let's put it off for 30 days.

A    Okay.

Q    Let me ask you this next:  During the period -- I think we're agreed upon this -- of 2017, USL needed 31 waivers; correct, team waivers?

A    To play in '17.

Q    And they were granted that, correct?

A    Yes.

Q    And USL was given a letter -- we reviewed this on your direct -- which said they were required as part of their provisional sanction to come up with a plan to come into compliance with the standards, correct?

A    Yes.

Q    And Mr. L'Hote, who was your consultant, told the board on January -- on September 1, 2017, that USL did not fulfill that requirement, correct?

A    As of that date, correct.

*Linda A. Marino, Official Court Reporter*

*Gulati - Redirect - Mr. Kessler*                    1342

Q    Right.  And the board at that time knew they needed 21 waivers, correct?

A    Yes.

Q    And despite all of that, the board did not deny their certification for USL on that date, correct?

A    That's correct.

Q    And at the same time, the NASL fulfilled all the written requirements of its provisional certification; correct?

     We went through that with your direct.

A    All the specific written requirements.

Q    Yes.  And NASL only needed two waivers, correct?

A    The league -- yeah, two league waivers, correct.

Q    And those were the same two waivers they had been granted the prior year, correct?

A    Yes.

Q    And then at the meeting, you made a chairman's recommendation; do you recall that?

A    Yes.

Q    And the chairman's recommendation was deny NASL outright and give USSL more time to come into compliance, correct?

         MR. BUTERMAN:  Objection.  I think that was a misstatement there.

         MR. KESSLER:  I'm sorry.

         THE COURT:  Please repeat the question.

         MR. KESSLER:  I withdraw it.

*Linda A. Marino, Official Court Reporter*

Q    The chairman's recommendation was to deny the NASL sanction outright and give USL more time to come into compliance, in 30 days, correct?

A    I think what the transcript said yesterday, that was my recommendation and the recommendation of the task force chair.

Q    It was yours too, correct?

A    That's what I just said, yes.

Q    Mr. Gulati, is it correct that there has never been a time that you have made a recommendation to the board about whether to grant a sanction or not where the board has ever not followed your recommendation?

A    I don't know that I made many recommendations in that period.  If you're citing there's two cases, it sounds like that's right, but I wouldn't have made a recommendation every year in this period.

Q    I'm just asking in your opinion -- can you remember, can you identify for the jury, a single time in the history of your time as president of USSF where you ever made a recommendation as to whether to sanction a league or not sanction a league or to give waivers or not give waivers where the board did not follow your recommendation?

A    It wasn't a frequent situation where I made recommendation.  Of the two we can identify, that would be the case.

Q    So, it was infrequent for you to make recommendations,

*Gulati - Redirect - Mr. Kessler*                    1344

but two of the infrequent ones you made was to deny NASL an application in 2016 for Division I and to deny NASL an application for Division II in 2017 for the '18 season; correct, those are two recommendations you made?

A    A minute ago, what you were talking about was recommendations I made about the USL, and now you're talking about the NASL in 2016.

     I don't think we've seen a document that said I made a recommendation in '16 regarding D-I.

Q    Mr. Gulati, you made a recommendation.

     Did you make a recommendation -- as you're sitting here now, do you remember you made a recommendation in 2016 you didn't think NASL should be certified?

     Correct?

A    I don't know that I made that recommendation.  If we have a transcript, I'd be happy to have my memory --

Q    You don't remember one way or the other.

A    That's correct.

     Now that you've brought up both leagues, I obviously did make a recommendation in 2017 that both the NASL and USL be provisionally sanctioned.

Q    And they followed that recommendation.

A    They did not unanimously, but they did.

Q    You got asked questions about some of the board members.

A    Yes.

*Linda A. Marino, Official Court Reporter*

*Gulati - Redirect - Mr. Kessler*                1345

Q    You mentioned Dr. Shalala, yes?

A    Yes.

Q    You mentioned Ms. Ackerman, correct?

A    Yes.

Q    You mentioned Mr. Cordeiro, correct?

A    Yes.

Q    Went through that, okay.

Is it correct that each of the independent directors on the board, including Mr. Cordeiro, Dr. Shalala, Ms. Ackerman, all the independent directors while you were the president were always found, selected by you?

A    Found?  No.  I wouldn't use that terminology.

Dr. Shalala was recommended to us by national team player Julie Foudy and we approached her.

Val Ackerman.  Val Ackerman recommended herself after I asked her for a list of potential board members and also people that run the NWSL.  In the second note, she said: Could I be a candidate?

Q    Do you remember being deposed about this issue, Mr. Gulati?

A    Yes.

Q    Is it true that you were the one who brought Donna Shalala to the board?

A    On the recommendation of Julie Foudy.

Q    But you were the one who suggested to the board, correct?

*Linda A. Marino, Official Court Reporter*

*Gulati - Redirect - Mr. Kessler*                    1346

A     Yes.

Q     And you were the one who suggested Val Ackerman?

A     Eventually.  She went through a process.  We had an outside firm.  I suggested to her and then she came back and several of the board members talked to her.

Q     In fact, there was some issue because first she was appointed director without going through what people thought was the full process; is that correct?

A     She wasn't appointed.  She was suggested at that point without going through committee structure formally.

Q     And who made that suggestion?

A     That?

Q     That she be considered?

A     I did to the committee -- well, she made suggestion to me.

Q     She approached you to do it and you suggested it and you did not properly submit it to the committee at first, correct?

        MR. RUSKIN:  Objection, your Honor.

        THE COURT:   Sustained.

Q     Did you submit it to the committee as required?

        MR. RUSKIN:  Objection, your Honor.

        THE COURT:   I'll allow that.

A     Eventually, she did get reviewed by the committee.

Q     But you were also the one who suggested her, correct?

A     Again, she suggested it herself.

*Linda A. Marino, Official Court Reporter*

*Gulati - Redirect - Mr. Kessler*                    1347

Q    You were the one who brought Mr. Cordeiro as a name to the board, correct?

A    Yes.

Q    And you were the one who brought every independent director to the board while you were president.  There wasn't one who got there through some other means.

Correct?

A    No.  Mr. -- I'm trying to think who recommended Fabian Nunez to us.  I didn't know Mr. Nunez at the time he was recommended to us.  I may have talked to him first.

Q    And then suggested it to the board?

A    Sure.

Q    Sure, because that's the way it always works, right?

A    Always works?

Q    You're always the one who suggests the independent directors to the board.

A    All board members have the ability to come up with names and suggest them.

Q    Okay.  Now, is it also correct that -- let me gather my thoughts for a second on what we've already covered.

Is it also correct that the gift you mentioned that you received from the NASL was in 2013, correct?

A    That's what it says on the plaque.

Q    So, that was before the NASL's D-I application was denied or its D-II application was denied, correct?

*Linda A. Marino, Official Court Reporter*

*Gulati - Redirect - Mr. Kessler*                    1348

A     Yes.

Q     Then there was a second gift you identified from the Deltas that was given to you I believe in March of 2016; is that correct?

A     Yes -- 2017.

Q     2017.  Thank you.

Now, that was before the D-II application was denied, correct?

A     After the D-I denial, before the D-II denial.

Q     The Deltas were not involved at all with the league at the time of the D-I denial, correct?

A     They came about in 2016, they did not play in 2016.

Q     Right.  So, they were not going to play if the D-I application had been granted in 2016.  They were a later team.

A     I don't know if they were going to play if it was D-I, but they played only one season, 2017.

Q     In any event, let me ask you this:  After you denied the D-I application, did NASL ever give you a gift?

MR. BUTERMAN:  Objection, your Honor, to the term "you."

THE COURT:   Are you considering a plaque a gift.

If that's the question, did you receive a plaque?

Q     I'm sorry, a plaque.

Did they give you a plaque?  Award?

Did they give you any recognition as the NASL after

*Linda A. Marino, Official Court Reporter*

*Gulati - Redirect - Mr. Kessler*                1349

you denied their D-I application?

A    Only the written thanks many times in the correspondence we've already seen.

Q    They never gave you a plaque, an award, et cetera, correct?

A    These are the two.

Q    And is it correct that after you denied the D-II application, no one from the NASL, no team after that, gave you any recognition or award, correct?

A    Unfortunately, no.

Q    Mr. Gulati, do you think you should have received a plaque from NASL for denying its D-I application, then it's D-II application, and driving it out of business?

MR. BUTERMAN:  Objection, your Honor.

THE COURT:    Sustained.

Q    Let me show you DX-766.  Your counsel showed this to you.

MR. KESSLER:  Would you display it, please?

(Exhibit published to the jury.)

Q    This was the letter that was sent by Mr. Papadakis, I believe.  Let me just check to make sure it was him.

Yes, Mr. Papadakis at United Soccer League, and this is what they sent to show how they were going to comply after they were given another 30 days by the board to consider their D-II application in 2017 for the 2018 season, correct?

A    Yes.

*Linda A. Marino, Official Court Reporter*

Q     Okay.  And in fact, the first thing on the first page in Paragraph 3, what Mr. Papadakis writes:  However, we feel it necessary to point out an apparent misunderstanding.  In the letter dated September 3, 2017, from Ms. Lydia Wahlke to me -- attached as Exhibit 1 -- Ms. Wahlke stated the board provisionally approved the application of the United States Soccer League with the understanding that USL would meet the professional league standards by the end of 2017.

          Do you see that?

A     Yes.

Q     And that's what Ms. Wahlke wrote in her letter that they attached, correct?

          Want to look at it?

A     I'm just looking at it.  I'm reading this statement.

          Yes, if we could see the letter itself.

          MR. KESSLER:  Let's put up the letter itself, please, which is Exhibit 1 in this.

          Keep going.  Little further in, please.  I don't have the page number, I apologize.

          Here it is.  Let's blow that up.

Q     So, what was written is the following:  As you know -- this is the second sentence -- the board provisionally approved the application of United States Soccer League in 2017 with the understanding USL would meet the professional league standards by the end of 2017.

*Gulati - Redirect - Mr. Kessler*          1351

Do you see that?

A    Yes.

Q    And this was the official letter that was sent by the general counsel of the United States Soccer Federation, correct?

A    Yes.

Q    And in fact, you will agree with me that USL did not meet the professional league standards by the end of 2017, correct?

A    Yes.

Q    And yet, USL was certified as a Division II league for the 2018 season, correct?

A    Subsequently, after receiving this additional document that you just had on the screen.

Q    Right.  And this additional document indicated that it would take at least two more years for USL to get into compliance, correct?

A    I have to look at that again.

Q    If you take a look, you could take a look at Page 136 in the bottom.  It's the one that says:  Teams requesting waivers, 2018.

And you'll see that this lists the eleven waivers that are being requested for these various teams, correct?

A    Yes.

Q    And these all indicate, do you recall, that it was going to be at least another two years before they'd be into

*Linda A. Marino, Official Court Reporter*

compliance?

A    They're indicating that some of the teams will need time to come into compliance and explaining how that will happen, yes.

Q    And do you remember yesterday we went through a document -- I can pull it up again, maybe you remember it -- that in January 2018, when the board gave them, the USL, the D-II sanction for 2018, what your requirement was that they show substantial progress towards compliance in two years, it wasn't even that they had to fully comply in two more years, correct?

A    You stated a document that we sent them on January '18 --

Q    Let me go to that document.

        MR. KESSLER:  If you could find that please, which one that is, the January 2018 presentation to the board.

Q    While we're looking for that, Mr. Gulati, do you recall there was a meeting in January 2018 to consider whether to grant USL sanctioning in Division II for 2018?

A    I'm not sure if that's the date, but we did have a meeting subsequently to grant them.

Q    And do you recall, there were slides put up as to what the recommendation was?

A    That would have been normally the case, yes.

Q    And we're about to get the slides in a minute so that will refresh your recollection.

MR. KESSLER:  If we could get that, we'll put it up right now.

(Exhibit published to the jury.)

Q    You'll see this is the January 14, 2018, meeting of USSF board of directors?

A    Yes.

MR. KESSLER:  If we can go in a few pages, please. Most of this has no content.  Just go to where it shows the USL issue, if we can.  Just keep scrolling, keep going, keep going, next one.

Q    USL.  And you'll see what it says here is that:  Requests D-II sanctioning for 2018 season.

Do you see that?

A    Yes.

Q    And that there are eleven teams -- eleven team-related waivers are currently outstanding for the 2018 season, correct?

A    Yes.

Q    And that was fewer than the eight team-related waivers that NASL needed for its D-I application, correct?

A    Eleven team waivers for 33 teams, right.

MR. KESSLER:  Okay.  Next page.

Q    It then says -- let's go to the next one.  This lists what all the waivers are.  Let's go back to that for a second.

When you see all the waivers that there are, you go

*Linda A. Marino, Official Court Reporter*

to the bottom, you'll see that it lists for each team which waivers have been cured and which ones have been granted, correct?

A    Yes.

Q    And we'll go to the next page.  It says this is the pro league task force recommendation:  Full sanctioning with caveats.

        And what the caveat was, the second one, is:  The league to make substantial progress in curing its remaining team waivers over 2018 and 2019, correct?

A    Yes.

Q    So, it was given two years to just make substantial progress.  It did not even have to cure them all in those two years, correct?

A    It says substantial progress.

Q    And you supported that recommendation at this meeting, correct?

A    I certainly didn't vote, but I don't recall what I said on the topic.

        MR. BUTERMAN:  Your Honor, counsel hasn't identified what document this is.  I'm hoping he can for us.

        MR. KESSLER:  JX-83.

        MR. BUTERMAN:  Thank you.

Q    Finally, Mr. Gulati, at the time that this decision was made to first deny NASL a sanction at all for D-II and then to

*Gulati - Redirect - Mr. Kessler*                    1355

give this sanction to USL, every member of the board and you knew that MLS was in a partnership agreement with USL, correct?

MR. RUSKIN:  Objection.

THE COURT:  Sustained.

Q    Did you know that?

MR. RUSKIN:  Same objection.

THE COURT:  Sustained, form.

Q    Mr. Gulati, was MLS in a partnership agreement with USL at the time of its getting its 2018 season sanction?

A    MLS, I don't know if I'd call it a partnership agreement, MLS had teams playing in the USL.

Q    They also had a financial arrangement between them which I knew about from when you were on the board of U.S. Soccer?

MR. RUSKIN:  Objection.

MR. KESSLER:  I'm sorry, withdrawn.

Q    When you were on the board of MLS, okay, and also on the board of SUM, you became familiar with the partnership terms between MLS and USL, correct?

MR. RUSKIN:  Objection, also misstates.

MR. BUTERMAN:  Objection, your Honor.

THE COURT:  Sustained.

Q    Mr. Gulati, when you were on the MLS board, did you review the arrangement?

MR. RUSKIN:  Objection, same objection, your Honor.

*Linda A. Marino, Official Court Reporter*

*Gulati - Redirect - Mr. Kessler*                    1356

THE COURT:   Were you ever on the MLS board.

THE WITNESS:   As an alternate and represented family but I was an alternate on the board.

Q    I'll rephrase the question.

You attended MLS board meetings, correct.

A    Yes.

Q    On behalf of the Kraft Sports Group, correct?

A    Yes.

Q    By the way, a question about that too.

You asked questions sort of distinguishing between MLS and Kraft Sports; do you remember that?

A    They are two distinct organizations.

Q    Right.  Is the Kraft Sports Group an owner of MLS?

Does it invest directly in MLS?

A    It's an investor operator.  Kraft Soccer is an investor operator in MLS, yes.

Q    It has an ownership interest in MLS, correct?

A    Yes, yes.

Q    Okay.  So, when you were attending board meetings as a representative of Kraft Soccer that had an ownership interest in MLS, did you learn the terms of the USL MLS agreement?

A    I don't know.  This is now four years or five years after I had left.  I have no idea what I knew about the financial terms.

Q    You don't remember, for example, that USL would pay half

*Linda A. Marino, Official Court Reporter*

of their expansion fees to MLS; you don't recall that?

A     I don't recall that, no.

Q     Mr. Gulati, do you think you should get another plaque because of what was done by the USSF board to deny NASL sanctions?

MR. BUTERMAN:  Objection.

THE COURT:   Sustained.

MR. KESSLER:  I don't have any further questions.

THE COURT:   Redirect.

MR. BUTERMAN:  Just a few questions.

May I proceed, your Honor?

THE COURT:   Yes, please.

*Gulati - Recross - Mr. Buterman*                           1358

MR. BUTERMAN:  Can we pull up DX-766?

(Exhibit published to the jury.)

RECROSS-EXAMINATION

BY MR. BUTERMAN:

Q    That's the USL letter from October 2, 2017, that Mr. Kessler just went through with you.  And you saw a moment ago that Mr. Kessler directed you to the third paragraph in that letter where USL states:  Our belief and interpretation, which has been communicated to USSF on previous occasions, is that USL already meets and exceeds the professional league standards.

Do you see that, Mr. Gulati?

A    Yes.

Q    And then Mr. Papadakis in the next paragraph goes on and explains what he meant by that.  He says:  The professional league standards require, in essence, a league of twelve teams which play in the Eastern, Central, and Pacific time zones; have stadiums which seat at least 5,000 people; meet certain pitch surface and dimension requirements; and have principal owners with a net worth in excess of $20 million.  As stated earlier, the USL already not only meets this requirement but far exceeds it.  For 2018, the USL will have 31 teams, standing in each of the time zones that meet all Division II requirements.

Do you see that, sir?

*Linda A. Marino, Official Court Reporter*

*Gulati - Recross - Mr. Buterman*                    1359

A     Yes.

Q     And Mr. Gulati, at any point in time could the statement that Mr. Papadakis made about the USL have been made about the NASL?

A     No.

Q     When NASL applied for its Division II sanction for the 2018 season, did it have twelve teams playing in the continental United States in three time zones?

A     No.

Q     Mr. Kessler asked you a number of questions about incubation periods again; do you recall that?

A     Yes.

Q     From 2011 through 2016, what was the only league that U.S. Soccer sanctioned as a Division II men's league?

A     The North American Soccer League.

            MR. BUTERMAN:  No further questions.

            THE COURT:   Anything further.

            MR. KESSLER:  Nothing from me.

            THE COURT:   Thank you.

            Next witness, please.

            Sir, you can step down.

            (Witness excused.)

            MR. KESSLER:  Your Honor, we're going to next play the video testimony of Mr. Contiguglia to basically fill the time to lunch, following your Honor's guidance about that, and

*Linda A. Marino, Official Court Reporter*

*Proceedings*                                                      1360

then we'll call a live witness after lunch.

            MS. COLE:  Before we do that, your Honor, can we read in the documents into evidence?

            THE COURT:  No, let's do that after.  Let's not waste the jury's time.

            So, just call your witness so we have a record and then let's play the deposition.

            MS. COLE:  We call -- NASL calls Dr. Bob Contiguglia by video.

            THE COURT:  Ladies and gentlemen, I just remind you of the same instruction I gave you in the past about video testimony.  You're to consider it in the same way as if the person were testifying in person.

            (Video deposition of Robert Contiguglia played.)

            MR. KESSLER:  Your Honor, that concludes the testimony for this morning.

            THE COURT:  All right, ladies and gentlemen.  We're going to take our lunch break and we'll be back ready to start right around 2 o'clock.

            With that, thank you.

            (Jury exits. )

            THE COURT:  All right.  Let's be back at two.


            (Luncheon recess taken.)

*Linda A. Marino, Official Court Reporter*

*Proceedings*                                              1361

AFTERNOON SESSION

(In open court.)

(Parties present.)

THE COURT:   Do you want to offer those exhibits.

MS. COLE:  Yes.  Okay.  So plaintiffs would like to enter into evidence JX-1, PX-9, PX-10, and PX-576 in connection with the video of Mr. Contiguglia.  Also, PX-11 and JX-2 were testified about but they've already been entered into evidence and we're going to mark the transcript and the video as JX-108.

THE COURT:   Any objection.

MS. RATHBUN:  No objection, your Honor.  It.

THE COURT:   That's all admitted.  Let's have the witness on the stand.

(Exhibits JX-1, PX-9, PX-10, PX-576, PX-11, JX-2, and JX-108 were marked in evidence.)

THE COURT:   Come up to the stand, sir.

(Witness takes the witness stand.)

(Jury enters courtroom at 2:06 p.m.)

THE COURT:   All right.  We can be seated.

Ms. Hudgens, you would call the next witness?

MS. HUDGENS:  Yes, Your Honor, NASL calls Carmelo Anthony.

THE COURT:   Mr. Anthony, please stand and face

Mr. Neptune.

COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear or affirm that the answers and the testimony that you are about to give to the Court will be the truth, the whole truth, and nothing but the truth.

CARMELO ANTHONY, called by the Plaintiff, having been first duly sworn, was examined and testified as follows:

THE WITNESS:  I do.

THE COURT:  All right.  Thank you.  You can be seated.

DIRECT EXAMINATION

BY MS. HUDGENS:

Q    Good afternoon, Mr. Anthony.

A    Good afternoon.

Q    Could you please introduce yourself to the jury.

A    Carmelo Anthony.

Q    Where do you live?

A    Westchester, New York.

Q    And what do you to for a living Mr. Anthony?

A    I run a media company now but retired from professional basketball after 19 seasons.

Q    And those 19 seasons, what time period was that?

A    2003 to 2022.

Q    And what did you do before -- I'm sorry, did you say

C. Anthony - Direct/Ms. Hudgens                1363

the league that you played in during those years?

A    The National Basketball Association.

Q    Also called the NBA?

A    Yes.

Q    And before you played in the NBA, what did you do?

A    Tried to get to the NBA.  Nothing.

Q    And where did you do that?  Where were you trying to get to the NBA?

A    Brooklyn, New York and Baltimore, Maryland.

Q    And just can you describe what you did in Brooklyn and Baltimore?

A    Well, I was a young kid in Brooklyn in Red Hook.  Moved to Baltimore when I was nine.  Grew up in the Baltimore and the rest is history.

Q    Did you go to college?

A    I attended Syracuse University.

Q    And did you play basketball at Syracuse?

A    Yes, for one season.

Q    What was that -- what year were you in college?

A    2002.

Q    Were you a freshman?

A    I was a freshman.

Q    And what did you -- can you describe what you did during your freshman year of college?

A    Well, I tried to get acclimated to the university,

C. Anthony - Direct/Ms. Hudgens          1364

tried to get acclimated to the cold in Syracuse, and eventually we won a national championship, March Madness, Final Four, and then I put my name in the NBA draft.

Q     And did you get drafted in the NBA?

A     I did, third.

Q     When you say "third" what do you mean by that?

A     Third pick of the 2003 NBA draft.

Q     Where were you drafted at that time?

A     Denver Nuggets.

Q     Did you say with the Nuggets for your whole NBA career?

A     No, I stayed in Denver from '03 to, I want to say, 2010, '11.

I got traded, came to New York.  Played in New York from 2011 to about '15, '16.  After that, I went to the Oklahoma Thunder for a season.  After that, went to Houston Rockets for a season.  Portland for two seasons, a season and a half.  And then ended my career of 19 seasons with the Los Angeles Lakers.

Q     And while you were playing in the NBA, what position did you play?

A     I started off small forward, but it went to positions in basketball so it didn't matter.

Q     When you were playing in the NBA, did you win any awards?

A     Wow, yes.  I won multiple awards, it would be a lot to

C. Anthony - Direct/Ms. Hudgens          1365

discuss right now.  I won multiple awards in the NBA.

Q    And you said you retired from the NBA in what year?

A    2022.

Q    And you said you now have a media company?

A    Yes.

Q    And is that what you would consider your occupation now?

A    For the most part, yes.

Q    And what does that media company do?

A    We produce podcasts, we produce content, produce movies, films, TV shows, all of the above.

Q    You said podcasts, do you have after you podcast?

A    Yes.

Q    What is that podcast?

A    It's called "7 PM in Brooklyn."

Q    Why is it called "7 PM in Brooklyn"?

A    Well it's a play on me playing.  I used to play at 7:00 o'clock in basketball.  And then me being from Brooklyn and having my office in Brooklyn and the studio is in Brooklyn, so just creatively we just put it together.

Q    Aside from the media company, do you do anything else or have any other business endeavors?

A    Yes.  I have a wine company.  I have a long-time production company.  I have a hemp company.  And I have a media company.

*C. Anthony - Direct/Ms. Hudgens*          1366

Q    Do you have any charitable endeavors?

A    Yes.  The Carmelo Anthony Foundation.

Q    And can you describe a little bit about what the Carmelo Anthony Foundation does?

A    Yes.  The Carmelo Anthony Foundation serves underprivileged kids, underprivileged neighborhoods, underprivileged communities.  Whether through sport, education, mental health.  And eventually, it all comes down to everything, we deal with everything in the community.

Q    And where does this foundation operate?

A    The foundation operates in Puerto Rico, Baltimore, New York, pretty much whatever city that I went to go play in.

Q    You said Puerto Rico, did you play basketball in Puerto Rico?

A    No, no.  I'm Afro-Latino, half Puerto Rican half Black.

Q    Did you spend time in Puerto Rico?

A    Yes, as a kid my dad is from the island, my family is still on the island, and I used to visit quite often with my family.

Q    I'm going to skip ahead here.

     Are you familiar with an entity called the North American Soccer League?

A    Yes.

Q    Have you also heard it referred to as the NASL?

C. Anthony - Direct/Ms. Hudgens            1367

A     Yes.

Q     And how did you become familiar with the North American Soccer League?

A     Again, I went back to Puerto Rico.  So I was always a fan of just the previous Puerto Rico team, The Islanders. Being of Puerto Rican, descent really understanding that as a Puerto Rican that was the only league we kind of knew because our team was in the actual NASL.

Q     You said that the Puerto Rico Islanders.  Do you recall what year they were playing?

A     I don't recall what year.

Q     Are you familiar with an entity called the Puerto Rico FC?

A     Yes.

Q     What is that?

A     I founded the Puerto Rico FC, the football club.

Q     When did you found the Puerto Rico FC?

A     Around 2014.

Q     At the time that you were founding it, was there already a professional soccer team in Puerto Rico?

A     No.

Q     You mentioned The Islanders, what had happened to The Islanders?

A     I have no idea.  I just knew that they wasn't active. They wasn't playing.  It's been shut down for probably more

C. Anthony - Direct/Ms. Hudgens          1368

than 20 years at that point in time.  And I had an opportunity to kind of revitalize the island, bring the sport back to the island.  I was already working on that through my foundation and I just figured this is the way that I wanted to do this, the route that I wanted to take to bring something back to my island.

Q     And when you founded the team, what steps did you take in order to bring that about?

A     I guess the due diligence of information and research and, you know, looking and reading and talking to people, and just trying to get some more insight on what was actually going on at that point.

Q     And what type of information were you gathering at that time?

A     Well, population, you know, the mountain people in Puerto Rico, information on the island, information on the league, information on other teams, information on new teams, information on owners, information on players.  The inner workings of the league.

Q     When you say "the league" are you refer to NASL?

A     Correct.

Q     When you say "information about the league from owners," did you speak to any of the owners in the NASL before you founded the team?

A     Yes, I spoke to them briefly just about kind of what to

expect or how can they help.  Can I get some information from them to help me build this thing up from the beginning.

Q    Did anything they tell you impact your interest in bringing a team to Puerto Rico?

A    It got me a little bit more excited to actually do it.

Q    What did you learn that made you more excited to do it?

A    The opportunities that was arising.  The structure, the league structure.  As a business owner, it was enticing to me to be a part of a business structure like that at that time.

Q    When you say business structure, what are you referring to?

A    The business structure of the NASL.  The fact that ownership has a hundred percent of, you know, of concessions, of jersey sales, of merch, of stadium. Whatever, it's yours.  As an owner, and as a new owner, that was something that I actually was looking forward to from a business standpoint.

Q    And to your knowledge, did any other league offer you those -- that type of business structure?

A    No.

Q    Have you heard the terms Division I, Division II, Division III?

A    Yes.

Q    What's your understanding of those terms?

C. Anthony - Direct/Ms. Hudgens          1370

A    The level of -- the level of the sport at that point. You could be Division I, Division II.  For me it's the level of the sport.

Q    Did you have an awareness of what division NASL was playing in at the time that you were looking in, I think, you said fall or some time in 2014?

A    It was my understanding it was a Division II, I would say.

Q    Did the fact that it was Division II make a difference to you in terms of whether you wanted to bring a team to Puerto Rico through NASL?

A    Not at the beginning, no.

Q    When you say, Not at the beginning, did it become --

A    I'm sorry.  Go ahead.

Q    Did it become important later?

A    It became important later.  At the beginning, it was more about me building the program, building the club, getting back to the community, talking to the people.  Like, doing what I got to do to give them something.  And then from there, I could figure everything else out.

Q    In terms of what you learned about NASL through your research, how did that align with what your vision was for your team?

A    Can you repeat that?  I didn't hear you.  Sorry.

Q    I'll try.

When you're talking about the research you did for NASL, how did what you learned about NASL align with what your vision was for your team?

A    It was aligned.  The vision of NASL and where they was going and where they wanted to go and the information that I was receiving at that point in time definitely aligned with my goals and what I was trying to do in trying to create on the island.  I just felt like this was the perfect situation for me to do that.

Q    And when you mentioned getting that information, speaking to owners, doing research, were you doing all of that personally?

A    At the beginning, yes.  I was kind of talking and trying to get just doing my own due diligence before I gave everything over to my team.

Q    And when you say "your team," who would that have been?

A    At the time, it was my business partner Asani Swann and my legal representation which was Allan Hoque.

Q    And what type of work did Allon Hoque and Asani Swann do?

A    Just did more due diligence of information that they knew I would need to make a decision.  League information, teams information, information on Puerto Rico at that point in time.  So it was just all the information and due diligence that I needed in order to make that decision.

Q    And at some point, did you express your interest in joining the NASL to the league?

A    When?  I'm not sure of the timeframe.

Q    Just at any time did you tell NASL that you were interested in joining the league?

A    Yes.

Q    And when you expressed that interest, did you sign any documents with NASL?

A    The first document you signed was a letter of intent.

Q    Okay.

A    Just saying that I'm interested to be in the league, and in order for me to get that information I had to sign an LOI.

Q    What information are you referring to?

A    Information on the NASL for me coming in as a, you know, new owner.  It was information that I really needed from the league itself, stuff that I couldn't go out there and find out on my own.

Q    And what time period did you sign that first agreement?

A    I want to say March, March probably '15.

Q    March of 2015?

A    Yes.

Q    And after you signed that agreement that provided you the opportunity to look into NASL further, did you, in fact, look into NASL further?

C. Anthony - Direct/Ms. Hudgens                 1373

A     Yes.  Because I was able to receive a lot more information to further my decision at that point in time.

Q     And after you did get further information, did you sign any other agreement with NASL?

A     Yes.  Well, I had to sign on as a team owner, an official team owner.

Q     And when did that happen?

A     June, I would say.  That June of '15.

Q     Do you know roughly when in June it was?

A     I can't recall exactly.

Q     Okay.  And that's the document that kind of made you an official team owner in the NASL?

A     Correct.

Q     Okay.  Do you know of anyone named Aaron Davidson?

A     Yes.

Q     What about Traffic Sports?

A     Yes.

Q     How did you hear about them?

A     Just as I'm doing my due diligence on the league, understanding that they were part of the league in some capacity and that was the information that I received.

Q     And around the time that you were signing those agreements with NASL, did you learn about criminal indictments against those two entities?

A     When I signed the agreement in, there was, I would say,

C. Anthony - Direct/Ms. Hudgens                    1374

yes, at that point in time, yes.

Q    When did you learn about the criminal charges against Aaron Davidson and Traffic Sports?

A    I would say after it was signed.

Q    Do you know which agreement you're referring to?

A    The letter of intent was signed probably -- it was signed in March of 2015.  That agreement of ownership was probably June and we're talking about around the time that I actually signed the agreement for -- as an owner.

Q    Okay.  And what was your reaction to hearing about the indictments?

A    When I first received the information, it was more of a top level for me.  It was more trying to get a better understanding of what was going on.  But, at that time, I was focused on my club and trying to build my club up.  And whatever my legal team was telling me to have that information and figure out if this is what're going to give you, this what we're going to let you know how this actually happens.  Once they came back to me, it was good for me to make that decision.

Q    When you say they came back to you?

A    I'm sorry, I'm referring to my legal team, Allan.

Q    And after you heard back from your legal team, what, if any, steps did you --

        MS. HUDGENS:  Let me start over.

C. Anthony - Direct/Ms. Hudgens        1375

Q    After you heard back from your legal team, did you decide to continue on with the NASL?

A    Yes.

Q    Okay.  At the time that you signed the official agreement to become a team owner with the NASL in June of 2015, did you have the team up and running at that point?

A    No.

Q    Okay.  What steps, if any, did you take to get the team up and running?

A    I had to do my work on the ground.  I had to be on the island.  I had to hire people.  I had to create planning.  I had to talk to the community.  I had to get approval from the community.  You know, the steps that you have to take to build a business.  I think I did that.

     Just as far as being on the ground really understanding what the fans wanted and what the community wanted, what the island wanted and was able to kind of orchestrate that and put that into some type of creative strategy.

Q    And what you learned about what the fans wanted, what the island wanted, did that impact your vision for the team?

A    In a positive way because I was able to hear them.  I was able to sit down and talk to them.  I was able to kind of grow this and strategize this business plan with them.  So I was very transparent with my fan base in the community.

Q    And you mentioned the team earlier.  Was the team

C. Anthony - Direct/Ms. Hudgens          1376

helping you at that time?

A     My personal team or PRFC?

Q     Good question.

The team you mentioned, Allan Hoque and Asani Swann, did they help get the team up and running?

A     Yes.

Q     How involved were you at the time you were getting the team up and running.  How involved were you with its operations?

A     I was very involved in the early process of getting this club off the ground and running.

Q     In addition to working with sponsors and that sort of thing, did you have to hire players?

A     Yes, because it was a new club.  So you have to hire players, you have to have front office staff, you have to have a stadium, you have to figure that out.  You have to have coaches, you have to have -- it's a whole process that you have to go through.

Q     And did you participate in that process, that part of the process?

A     Yes.

Q     Who paid for all of the expenses to get the team up and running?

A     Me.

Q     When did PRFC actually begin playing in the NASL?

C. Anthony - Direct/Ms. Hudgens          1377

A     The second half of, the second season or half season of 2016.

Q     When you say second half season, what are you referring to?

A     The schedule was broken up into two parts of the season.  There was the first part and the second half.  And we came in on the second half of that leg of that schedule.

Q     That was the 2016 season?

A     '16 yes.

Q     What division was NASL at the time?

A     Two, Division II.

Q     And so, they came in the second half of the season. That was -- they didn't play a full season in 2016?

A     No.

Q     Did you attend the games in 2016?

A     Yes, some of them, yes.

Q     And what did you see at the games in terms of the community's reaction?

A     I saw happiness; I saw joy.  I saw, like, the community starting to get behind just the idea of having a sports club down there that they can get behind.  I saw Puerto Rican pride coming back.  I saw the island have this vibrancy once I announced this.  And that was when I knew I have something that's going to be good.

Q     And you mentioned talking to different entities.  At

*C. Anthony - Direct/Ms. Hudgens*        1378

the time that Puerto Rico FC, sorry, you sometimes refer to it as PRFC?

A    Yes.

Q    If I refer to it as PRFC, you'll know I mean Puerto Rico FC?

A    Absolutely.

Q    At the time that PRFC, or Puerto Rico FC, started playing, did they have sponsors?

A    At the beginning?

Q    At the time they began playing in the second half?

A    We had a couple sponsors, couple personal -- kind of personal sponsors partners that I had from my own personal stuff that I was kind of allowing them to come on and be a part of PRFC, Puerto Rico Football Club.

    We had a kid sponsor.  Nike was the uniform and kid response.  We had a drink sponsor.  We was working on an actual TV broadcasting sponsor down on the island.  We had a couple sponsorships already lined up for the beginning of that season.

Q    And in terms of negotiating with those sponsors, did you take any part in that process?

A    Yes, early, yes.

Q    Did you have experience prior to this in terms of bringing on sponsors?

A    Yes.

C. Anthony - Direct/Ms. Hudgens          1379

Q    And what is that, where does that experience come from?

A    Other businesses that I have.  Sponsorship deals that I have for my own personal brand.

Q    Okay.  Let's go to 2017.  Did Puerto Rico FC play in 2017?

A    Yes.

Q    And did you see -- did you attend the games in 2017?

A    I want to say yes.  But, at this point in time, it was more I had my day job so I had to go and work and play.  But the times that I could get there, I would get there.

Q    When you say your day job, what's your day job?

A    I was an NBA player for the New York Knicks at the time.

Q    Okay.  And you said you would sometimes get down there.
     What would you do when you would go to Puerto Rico during that time?

A    I would go promote my club.  I would go meet with sponsors.  I would go meet in fans, meet with the community. We would have community events prior to the game.  Meet with the players; meet with the coaches.  Meet with my foundation.

Q    And between the time that you spent in 2016 when the PRFC started playing, and later, when you were visiting in 2017, did you see any changes in how people were reacting to Puerto Rico FC?

*C. Anthony - Direct/Ms. Hudgens*                1380

A    Yes.  Again, everybody was actually very, very excited getting through that second part of the first season. Everybody was excited for what was it come after that.

Q    And the 2017 season, did PRFC have sponsors?

A    Yes.  So we had actually carryover sponsors from the previous season.  That was carried over who made multiyear deals, two-year deals, three-year deals.

Q    How would you describe discussions with your sponsors at that time in 2017?

A    My discussions with my sponsors with the team giving them the vision of PRFC, giving them the vision of the island, giving my personal vision of what I plan on doing down there on the island.

Q    And during the 2017 season, did NASL have -- what division was NASL playing in?

A    Division II.

Q    Division II?

A    Yes.

Q    At some point in 2017, did you learn that NASL would not have a Division II sanction for the following season for 2018?

A    Yes.

Q    Okay.  Do you recall when you heard that information?

A    I can't recall exactly when.

Q    Okay.  There was another event that happened in 2017,

C. Anthony - Direct/Ms. Hudgens          1381

do you remember that?

A     Yes.

Q     What was that event?

A     That event was Hurricane Maria came to Puerto Rico.

Q     Do you recall in terms of timeframe whether you learned about the DII sanction issue before or after Hurricane Maria?

A     It was, for me, it was for -- I want to say right before Maria.  That's when I started to hear about the sanction of Division II.

Q     Okay.  When you say, "Sanction of Division II," are you referring to losing the DII status?

A     Yes.

Q     What was your reaction to learning that information?

A     I got to get to -- now, I have to have a different type of conversation with the island and the people and the sponsors and everybody who was just excited about what's to come.

Q     When you say, "different type conversation," what do you mean?

A     I got to save my club now.  I have to save my players. I have to save my employees.  I have to save coaches.  It's a lot that I had come to fruition.

Q     Why does the loss of the DII sanction impact what's happening with your coaches or players or the team?

MS. GRAY:  Objection.

THE COURT:  Sustained.

Q    From your our perspective as a business owner, did you have any concerns about what the loss of the DII sanction would have on the operations of your team?

MS. GRAY:  Objection.

THE COURT:  Sustained.

Q    At the time that you learned of the loss of the DII sanction, were you in conversations with sponsors?

A    Yes.

Q    Were you in conversations with your actual team members and players?

A    Not directly with my actual team members, no.

Q    Okay.  What about the coaching staff?

A    Not much.  I was handling business more kind of top level trying to figure out what was going to be the next step and how I was going to get this information out there to people and to a group of people that was used to somebody bringing something to the island and taking it away from them.

Q    As the team owner, did you see any impact from the loss of the DII sanction for the 2018 on your team?

A    Yes.

Q    And what was that impact?

A    It started dwindling.  Again, sponsorship,

*C. Anthony - Direct/Ms. Hudgens*                1383

partnerships.  The question always started to become, well, what's next?  What league?  What division?  Those are conversations that I really had to have.  My partners were asking the same question because, again, they was involved in this because of just the vision and the idea and the pride that I took in building this.

So now we get to this moment where I have to talk to them about, please, don't leave, please be apart of this moving forward.  This is what we're going to do.  We're going to get this right.  Those were hard conversations to have.

Q    Going back to 2015 when you were -- after you signed the agreement, were you bringing on sponsors at that time as well in 2015?

A    Yes.

Q    And, at that time, with the sponsors, did you discuss the DII status of the league?

A    No.  At that time, the conversation was more about actually building something down here on the island and getting people involved into Puerto Rico FC.

Q    So if you weren't talking with them at the beginning in 2015 about the DII status, why did you see an impact in those discussions with sponsors when it was lost for the 2018 season?

MS. GRAY:  Objection.

THE COURT:   Sustained.

Q   Did the issue of the sanction come up later in 2017?

A   Yes.

Q   Okay.  What did you learn, if anything, from the sponsors about their interest in the DII status at that time?

MS. GRAY:  Objection.

THE COURT:   Sustained.

Q   Did you learn anything from the sponsors that impacted your plans for the future for PRFC?

MS. GRAY:  Objection.

THE COURT:   I'll allow that.

A   I'm sorry.

Q   Did you learn anything from the conversations with your sponsors that impacted your plans for the future for PRFC?

A   Yes.  When I've spoken to several sponsors who are now looking.

THE COURT:   Let me interrupt.

The question calls for what you learned as opposed to what they told you.  So if you can limit your answer.

THE WITNESS:  Understood.

A   What I've learned from the sponsors talking to them was actually they were getting more and more excited about having a club in Puerto Rico.  About having a team.  About having something that they can call their own and sponsors

to get behind something locally.

So those were the conversations that, at that point in time, when those sanction conversations started to happen, it was more about they were excited about staying on and making this work and helping and coming on as a bigger partner as opposed to anything else.

So they was concerned about that. Are we going to play? What league are we? What division are we going to play in? Are we going to have a team? Are we going to have players? What is going on here?

So those are questions I actually had to really, really answer and look people in the face and say, I'm going to figure this out for us and that's what was going on at that point with the sponsors.

Q   So, at that time, when the NASL lost its division sanction, did you want PRFC to continue playing as part of a men's soccer league?

A   Absolutely.

Q   And, in your view as the owner of the team, did you think that that was feasible without the DII sanction?

A   Well, I didn't know what was going to happen, but I still had to be an owner, I still had to deal with tragedy that was going on down there on the island. Losing players. Players losing houses. Employees losing houses. Employees not having nowhere to stay. Employees not having no

C. Anthony - Direct/Ms. Hudgens                1386

electricity.  Coaches got to figure out -- players got to leave, right?  Me still having to pay players months and months and staff later after we not playing.

So all of that came out my pocket.  I wasn't complaining about it but it was like I knew this was something I had to do.  It wasn't a question because of what was going on.

Q    Was your intention at that time -- and you were talking about the tragedy on the island, what are you referring to there?

A    The hurricane.

Q    What impacts did you see of what the hurricane did to the island?

A    Well, for one, we had no place for my staff and players had no place to stay, no place to live.  We had to relocate them.  We had no arena to play in at this point in time. The arena was ruined.  And by the time we found another place, it would have been months or maybe a year down the line.  Those were the most important things.  Families losing homes.  Players losing homes.  Players on contracts. Players as free agents that's going to be, you know, looking for a contract that I was looking forward to coming back to play with PRFC so that was a lot.

Q    Was it feasible at that time after Hurricane Maria hit the island, was it feasible for PRFC to play in Puerto Rico

C. Anthony - Direct/Ms. Hudgens                    1387

for the rest of the 2017 season?

A    No.

Q    And did PRFC continue to play during the 2017 season?

A    Yes, we tried to.  We started playing in other places.
We had to relocate to Florida.  We had to play out of
Florida.  Luckily, the schedule's is in our favor because
most of our games was on the road at that point in time, so
it worked.  But it was just -- we couldn't go back to the
island.

Q    And, as the team owner, how did the hurricane
financially impact your investment in the team?

A    Well, I was still investing into something that was no
longer there because players was leaving, staff was leaving.
I ended up with one employee on my list.

Q    And, at that time, did you want the PRFC team to play
in the 2018 season?

A    Yes.

Q    And could they play in the 2018 season?

A    Not in Puerto Rico.

Q    Okay.  You mentioned other locations.  Was it possible
for them to play in other locations in 2018?

A    I'm sure it was possible.  But from a financial
standpoint, I -- as a business, it probably didn't make
sense for me personally as an owner.  I was a single owner
of my team, so it was very difficult for me to make those

C. Anthony - Direct/Ms. Hudgens          1388

decisions.

Q    At that time in 2018, did you have any plans for the team in terms of updates that would happen to the stand?

A    Say that again.

Q    I'll ask a better question?

A    Thank you.

Q    At that time, after the hurricane, did you have plans to improve the conditions for the Puerto Rico team for 2018?

A    Yes, I was in conversations with the island about continuing the Puerto Rico FC and seeing what we can do at that point.

Q    And what did the hurricane stop those conversations?

A    The hurricane stopped those conversations completely.

Q    Did those conversations ever resume later?

A    There was conversations just about if I would continue, if I wanted to continue to do this.  If I still wanted the team.  What I wanted to do.  At that time, I had lost all my staff.  I had nobody left on my staff.  So I would have to start all the way over again on the island.  And that it just wasn't financially feasible for me to do that.

Q    Could you have moved your team to a different league at that time?

A    Not that I knew of.  I mean, I wasn't aware of, like -- I didn't want to move PRFC, let me get that right. I didn't want to move them.  That's what the island knows,

*C. Anthony - Cross/Ms. Gray*                    1389

Puerto Rico FC from the history, the tradition, like, it was PRFC, The Islanders, and the NASL that was the connection. And that's all that they kind of understood down there on the island.

Q    At some point, did you ask the NASL to waive a penalty for PRFC for not playing in the 2018 season?

A    Yes, I think so.

Q    At that time, did you have plans for PRFC to return?

A    Yes.

Q    And what prevented you from bringing back the team in later seasons?

A    It was just destroyed.  It was, you know, the fact that we didn't get the sanction that hurt us, too.  Internally responses and talking to people about the growth of what we trying to do.  But it hurt everything.  So, again, I didn't want to have to start all the way over from the ground up to build something that I just started to build a year or two ago.

          MS. HUDGENS:  I have no further questions at this time.

          THE COURT:  Thank you.  Any cross?

CROSS-EXAMINATION

BY MS. GRAY:

Q    Good afternoon, Mr. Anthony.

A    Good afternoon.

*C. Anthony - Cross/Ms. Gray*                1390

Q    Mr. Anthony, you are an investor, in other words, an owner in an a club in the NASL, correct?

A    Yes, ma'am.

Q    And, as we heard on your direct, that club it is the Puerto Rico FC?

A    Correct.

Q    And there was a specific reason that you shared with us on direct, and I want to go over it with you, as to why you chose to acquire the Puerto Rico FC.

     And that reason, the reason you chose to acquire the Puerto Rico FC was because you wanted to do something positive for Puerto Rico?

A    Correct.

Q    Your choice to acquire the club had nothing whatsoever to do with making money, did it?

A    Not at that moment, no.

Q    And importantly, your choice to acquire this NASL club also had nothing whatsoever to do with what division it played in either, correct?

A    From my recollection, it was already Division II.  So that was already the standard for me.

Q    But it had nothing to do, your choice to acquire the club had nothing to do with what division it played in?

A    Correct.

Q    So, to be clear, your decision to acquire the club had

*C. Anthony - Cross/Ms. Gray*                    1391

absolutely nothing to do with the level of sanctioning the NASL did or did not have, correct?

A    Can you repeat that, I'm sorry.  I didn't hear the last part.

Q    Your decision to acquire the club had absolutely nothing to do with the decision or, sorry, with the level of sanctions that the NASL did or did not have?

A    No, at the time beginning, no.

Q    In fact, what division your club played in was so inconsequential to your choice that you would have made the same exact choice to acquire the club even if it had to play in Division III?

A    I don't recall that.

Q    You recall giving your deposition under oath?

A    Yes, ma'am.

Q    And you swore to tell the truth, the whole truth, and nothing but the truth at your deposition?

A    Yes, ma'am.

Q    And I'm sure you did tell the truth?

A    Yes, ma'am.

Q    Okay.  Reading from your deposition, Page 34, to 13.

     "QUESTION:  Right.  But I guess the question that I have is did it matter to you whether it was Division I, Division II, Division III.  Did that matter to you at all when you were deciding whether to purchase the ownership

C. Anthony - Cross/Ms. Gray          1392

stake in Puerto Rico FC?"

A    No.

Q    There was an objection then your answer was:

"ANSWER:  Not when I purchased it, the club, no."

Those were the questions asked of you,

Mr. Anthony, and that was your answer.

A    Yes.

Q    And we do know that Division III is the lowest possible level a club can be sanctioned for, just to be clear?

A    Yes.

Q    Now, as to where your club played, as you said obviously it played in Puerto Rico.  I want to pull up JX-0094, which is in evidence, which I'll represent to you, Mr. Anthony, is the 2016 Professional League Standards.

And I'd like to turn to Page 0004 under Division I, Men's Outdoor League.  It lists the requirements for a DI sanction.

Do you see that, Mr. Anthony?

A    Yes.

Q    It says, "U.S.-based teams must be located in at least the Eastern, Central, and Pacific time zones in the Continental United States."

Correct?

A    Correct.

Q    And while Puerto Rico is part of the United States, it

C. Anthony - Cross/Ms. Gray                    1393

is not in the Continental United States?

MS. HUDGENS:  Objection, your Honor, to scope.

THE COURT:  I'll allow it.

Q    It's in the Caribbean?

A    Yes, yes.  I was waiting for the back and forth.

Q    Okay.  And even still, it's not in the Eastern, Central, or Pacific Time zones?

A    Yes.  According to facts, yes.  Yes.  Yes.

Q    You're right.

But irrespective of the time stones or the location, your club was not going to be able to play in 2018?

A    Correct.

Q    And so, let's turn to the reason, the cause for why your club stopped playing.

The reason why your club did not play in the 2018 season was because of Hurricane Maria?

A    That was a part of it, yes.

Q    Well, that was the reason, wasn't it?

A    That wasn't the full reason.  But, yes, that was a part of it.

Q    Let's go back to your deposition.  I know you told the truth at your deposition.  You swore to tell the truth and you did?

A    Yes.

Q    Reading from your deposition testimony Page 74, 8 to

14:

"QUESTION:  Am I correct that Puerto Rico FC wasn't going to be able to play in 2018 regardless of anything that was happening in U.S. Soccer; is that correct, because of the hurricane?"

There was an objection and you answered

"ANSWER:  Correct."

Those were the questions that was asked of you and that was your answer?

A    Yes, ma'am.

Q    So, to be specific, it's because of the damage Hurricane Maria did to Puerto Rico, and by extension, the Puerto Rico FC stadium that caused your club to not be able to play?

A    Can I rephrase that?

Q    No, you can answer that question.

A    Do I have to?  I don't know how this works.  Do I have to agree?

Q    I'll ask it again.

A    Yeah, because it's --

Q    To be specific, I'm going to be specific.  It's because of the damage that Hurricane Maria did to Puerto Rico which caused -- which, by extension, caused damage to the stadium that caused your club to not be able to play?

A    No.

*C. Anthony - Cross/Ms. Gray*        1395

Q    Let's go back to your deposition testimony.

You swore to tell the truth and I'm sure you did.

A    Yes, ma'am, yes.

Q    Reading from Page 73/24 to 74/14:

"QUESTION:  Do you know what the current condition is of the stadium where the Puerto Rico FC team was playing?"

"ANSWER:  Now?"

"QUESTION:  Yes?"

"ANSWER:  I know the field is messed up and seats, so it takes a lot of kind of built that back."

"QUESTION:  Am I correct that Puerto Rico FC wasn't going to be able to play in 2018 regardless of anything that was happening with U.S. Soccer; is that correct, because of the hurricane?"

Objection

"ANSWER:  Correct."

Were those the questions asked of you?

A    Yes, ma'am.

Q    And so, just logically, U.S. Soccer's decision on the NASL sanctioning application had nothing to do with that?

MS. HUDGENS:  Objection.

THE COURT:   You may answer.

A    It was a double whammy for me.  If you want me to be all the way technical.  It was a double whammy, the

sanctions to the hurricane is actually what I had.

Q    The sanctions had nothing to do -- the decision on the sanctions had absolutely, positively, nothing to do with the inability of your team to play?

A    I disagree with that.

Q    Remember your deposition testimony?

A    I understand that.  I'm sorry.

Q    Don't be sorry.  You told the truth, as you said?

A    I did.  It's just -- that was a couple years ago and I can't elaborate on why I was answering.

Q    But a couple of years ago is closer in time to the events that we're talking about in this case?

A    Absolutely.

Q    So that's a better recollection a couple years ago?

A    Absolutely but I didn't get a chance to explain, elaborate, why that happened.  Why it was a double whammy that folded Puerto Rico FC as opposed to just singularity.

Q    I'll go to your sworn deposition testimony where you told the truth and give you that answer.

So, question, this is from Page 74, 8 to 14:

"QUESTION:  Am I correct that Puerto Rico FC wasn't going to be able to play in 2018 regardless of anything that was happening with U.S. Soccer; is that correct, because of the hurricane?"

There was an objection.

"ANSWER:  Correct."

A    Correct.

Q    Now, as for sponsors, Mr. Anthony, you do not recall any league-wide sponsors that the NASL had, do you?

A    Do I -- I can't recall that, no.

Q    So, as an owner for an NASL club, part of your responsibilities was to try to get sponsors for the league?

A    I offered that, yes.

Q    And Nike was one of the sponsors you were trying to bring in to the league?

A    Correct.

Q    But your conversations with Nike stopped, they halted because of Hurricane Maria; correct?

A    Was that in my deposition?  It's hard to -- yes, to answer your question, yes.  I answered your question yes.

Q    So, to be clear, the hurricane was the reason that Nike ended up not becoming a sponsor for the NASL, correct?

A    That's not correct but -- that's not correct.

Q    Okay.  So let's go back to your deposition.  You told the truth there?

A    Absolutely.

Q    Closer in time to the events that took place?

A    Yes, ma'am.

Q    So that's --

A    I understand.

*C. Anthony - Cross/Ms. Gray*                    1398

Q    Right.  So reading from Page 70, 18 to 24:

"QUESTION:  So the reason that Nike ended up not becoming a sponsor for the NASL as a league was because of the hurricane; is that correct?"

"ANSWER:  Correct.  It was because of my conversation that stopped with all sponsors at that point in time."

Those were the questions asked you and that was your answer, correct?

A    Correct.

Q    In fact, in fact, Mr. Anthony, unfortunately, the hurricane stopped all conversations you were having with all sponsors or potential sponsors for the NASL, isn't that correct?

A    Yes.

Q    Now, when you acquired the Puerto Rico FC, you didn't have to come up out-of-pocket with any money to join the NASL, right?

A    Correct.

Q    I want to show you five documents related to your ownership of your club.  Let's start with the DX-0367 for identification.  If you can look at your screen.

This is the league admission agreement entered into between the NASL and the Puerto Rico FC which was -- which is your team; is that right?

*C. Anthony - Cross/Ms. Gray*                    1399

A     Yes.

         (Continued on the next page.)

Anthony - cross - Gray                    1400

bY MS. GRAY:  (Continuing.)

Q    Let's turn to DX 367, 008.

          MS. GRAY:  Just pull that up if we could.

          (Exhibit published to the witness, counsel and the Court.)

Q    And, Mr. Anthony, that's your signature?

A    Yes, ma'am.

          MS. GRAY:  So, we offer DX-0367 into evidence.

          MS. HUDGENS:  No objection.

          THE COURT:  Admitted.

          (Exhibit DX-0367 received in evidence.)

          MS. GRAY:  Could we pull up DX-0530 for identification?

          (Exhibit published to the witness, counsel and the Court.)

BY MS. GRAY:

Q    This is an October 28, 2016 e-mail from an individual named Brian Helmick to NASL Commissioner Bill Peterson, Rishi Sehgal and two other NASL club owners, including you.

          You are amongst those receiving this e-mail; correct?

A    Correct.

          MS. GRAY:  We would move DX-0530 into evidence.

          MS. HUDGENS:  No objection.

          THE COURT:  So admitted.

SN        OCR        RPR

Anthony - cross - Gray                    1401

(Exhibit DX-0530 received in evidence.)

MS. GRAY:  Let's pull up another document.  Pull up DX-0464 for identification.

(Exhibit published to the witness, counsel and the Court.)

BY MS. GRAY:

Q    Mr. Anthony, this is another e-mail from Bill Edwards an NASL owner, team owner, to other NASL club owners including you regarding NASL Team Holdings LLC's Class B membership interest in the NASL.

This is a document you received based on the subject matter and your e-mail; is that correct?

A    Yes.  That's my e-mail, yes.

MS. GRAY:  We would move DX-0464 into evidence, Your Honor.

MS. HUDGENS:  No objection, Your Honor.

THE COURT:   So admitted.

(Exhibit DX-0464 received in evidence.)

MS. GRAY:  Another one.  Let's look at DX-0477 for identification.

(Exhibit published to the witness, counsel and the Court.)

BY MS. GRAY:

Q    This is yet another e-mail from Bill Edwards owner of an NASL club to other NASL club owners including you.  You're on

SN       OCR       RPR

Anthony - cross - Gray                    1402

this e-mail and this is regarding TBR Holdings letter of status of Traffic resolution.

You received this, correct, Mr. Anthony?

A    That is my e-mail, correct, yes.

MS. GRAY:  We would move DX-0477 into evidence Your Honor.

MS. HUDGENS:  No objection.

THE COURT:  So admitted.

(Exhibit DX-0477 received in evidence.)

MS. GRAY:  Finally -- last one, I promise.  In this grouping let's look at DX-0991 for identification.

(Exhibit published to the witness, counsel and the Court.)

BY MS. GRAY:

Q    Mr. Anthony, this is a December 5, 2016 e-mail from the president of your club, Tim Payne (ph) sent directly to you regarding NASL/USL.  That was your e-mail and you received this, Mr. Anthony?

A    That is my e-mail; correct.

Q    And you received it; correct?

A    That is my e-mail.

MS. GRAY:  We move DX-0991 into evidence, Your Honor.

MS. HUDGENS:  No objection.

THE COURT:  All right.  So admitted.

SN        OCR        RPR

Anthony - cross - Gray                          1403

(Exhibit DX-0991 received in evidence.)

BY MS. GRAY:

Q    Mr. Anthony, as you said on direct you are familiar with Traffic Sports?

A    I know of them, yes.

Q    On May 27, 2015 Aaron Davidson, the president of Traffic Sports USA who is also the chairman of the board of the NASL was indicted for criminal racketeering conspiracy and corruption.  Are you aware of that?

A    Yes.

Q    And did you know that two months after Mr. Davidson was indicted, the NASL, the plaintiff in this case, deleted every single one of the e-mail communications that Mr. Davidson stored on the NASL server?

         MS. HUDGENS:  Objection.

Q    Did you know that?

         MS. HUDGENS:  Objection, Your Honor.

         THE COURT:   What is the basis?

         MS. HUDGENS:  The scope.

         THE COURT:   Sustained.

BY MS. GRAY:

Q    Did you know that?

A    No.

         THE COURT:   It was sustained.

         MS. GRAY:  I'm sorry.  I'm sorry.

SN        OCR        RPR

Anthony - cross - Gray                          1404

A      I will answer for you, no.

Q      Okay.  Were you aware that on the same day that Mr. Davidson was indicted Traffic Sports pled guilty in this very court to wire fraud conspiracy?

MS. HUDGENS:  Objection.

THE COURT:  I'll allow it.

A      No.

Q      Let's look at a few documents related to the NASL's relationship with Traffic Sports.

MS. GRAY:  I'm going to ask you to pull up DX-04 -- sorry, 064 which is in evidence.

(Exhibit published.)

BY MS. GRAY:

Q      This is an e-mail, a May 18th e-mail from Bill Edwards, an NASL club owner to other NASL club owners, including you.

Do you see that?

A      Yes.  I'm part of it, yes.

Q      So let's turn to the page ending 002, Mr. Edwards, who is your fellow NASL club owner, writes, and I quote:  "The Rowdies became concerned that Team Holdings and the Class B membership in NASL was a money laundering scheme which contemplated Traffic Sports' investments in NASL from the proceeds of decades of criminal acts being repaid from the growth of NASL with clean money and healthy returns."

MS. HUDGENS:  Object to scope, Your Honor.

SN        OCR        RPR

Anthony - cross - Gray                          1405

THE COURT:   This exhibit is in, right?

MS. HUDGENS:   I objected to scope of his testimony.

THE COURT:   No, I'll allow it.

BY MS. GRAY:

Q    Were you aware that this is what a fellow team owner had sent to you and others, Mr. Anthony?

A    I'm on the e-mail.  So, yes, I obviously --

Q    But did you know about this?

A    Know about?

Q    What he was saying.

A    What he's saying in the e-mail?

Q    That he's saying the Rowdies became concerned that Team Holdings and Class B membership in NASL was a money laundering scheme?

A    No.

Q    Later on in the e-mail Mr. Edwards continues, quote, "Never in my life did I expect to be unwittingly mixed up in a scheme like this.  If you are like me and had no idea that something this sinister was going on, you would join me in my urgent efforts to extricate myself and the league from it.  If we cannot do so, I do not believe we can save our league."

        Do you see that?

A    Yes, ma'am.

MS. HUDGENS:   Objection, Your Honor, to the scope and the MIL.

SN        OCR        RPR

Anthony - cross - Gray                          1406

THE COURT:  Overruled.

BY MS. GRAY:

Q    Let's set that one down, Mr. Anthony, and take a look at DX-0521 which is also in evidence.  This is an October 12, 2016 e-mail from then NASL commissioner, Bill Peterson, attaching a letter drafted by Rishi Sehgal, who was the NASL's former interim commissioner.

So I would like to turn to page 3003.  Do you see that attachment which is a memorandum, Mr. Anthony?

A    Yes, ma'am.

Q    And let's pull up the paragraph under subsection two, Traffic Team Holdings.  In this both Mr. Sehgal and Mr. Malik write the following:  Quote, "The involvement of Traffic in NASL continues to damage NASL.  Each of the Tampa Bay Rowdies and Ottowa Fury identified Traffic's continuing relationship with NASL as a major factor in their decision to withdraw."

Did I read that correctly?

MS. HUDGENS:  Objection, Your Honor, foundation.

THE COURT:  She's just asking whether --

This document is in evidence, is it not?  It is.

MS. HUDGENS:  I don't know the exhibit number.

THE COURT:  You know that.

All right, move on.  Overruled.

BY MS. GRAY:

Q    Mr. Anthony, did you know that Mr. Sehgal and Mr. Malik

SN        OCR        RPR

both identified the NASL's continuing relationship with Traffic as, in their own words, a major factor why two NASL teams chose to withdraw from the league?

A    No.

Q    And they -- a little further down in the next sentence Mr. Sehgal continues, quote, "Further, Minnesota United has threatened nonpayment of amounts owed to NASL because certain portions of those amounts will ultimately be paid to Traffic."

Did I read that correctly?

A    Correct.

Q    And, you know, logically speaking, Mr. Anthony, you agree with me that when clubs withhold funds from the NASL, that creates instability for the NASL?

MS. HUDGENS:  Objection.

A    No, I'm agreeing with -- you asked me if you read it correctly and I would agree with that.

THE COURT:  Overruled.

BY MS. GRAY:

Q    And I'm asking you a separate question now.  Would you agree with me that when clubs withhold funds from the NASL, when their own clubs withhold funds from them, it creates instability for the NASL?

MS. HUDGENS:  Objection.

THE COURT:  Overruled.

Q    You can answer.

Anthony - cross - Gray                                    1408

A    Could you ask that again, please?

Q    You're a businessman?

A    Yes, ma'am.

Q    And you're a successful businessman?

A    Yes.

Q    Okay.  So logically speaking when a club that's supposed to be paying its league money withholds funds from paying the league that money, it could create instability for that league; right?

A    Logically speaking, yes.

Q    Right.  Finally, let's bring up DX-0520 which is also in evidence and I represent to you that this is a letter dated October 13, 2016 from the NASL's own lawyer, Douglas Kelly, to NASL Team Holdings, okay?

A    Yes.

Q    If we turn to the next page in the middle of the first paragraph, this is NASL's own lawyer talking.  They write, quote, "Recently the league received notice that two of its member teams, Tampa Bay Rowdies and Ottowa Fury FC, will withdraw from the league because of the league's continuing relationship with Team Holdings and Traffic USA."

        That's what the NASL's own lawyer writes; isn't that correct, Mr. Anthony?

        MS. HUDGENS:  Objection, foundation.

        THE COURT:  I'll allow it.

SN        OCR        RPR

Anthony - cross - Gray                1409

A    That's what I'm reading here, yes.

Q    Were you aware that these two NASL teams, the Ottowa Fury and the Tampa Bay Rowdies had threatened to withdraw, and did in fact withdraw, from the NASL because of the NASL's continuing relationship with Traffic Sports?  Were you aware of that?

A    Not to the T; only what my team was presenting to me at the time.

Q    So you weren't aware of this what I just read to you?

A    I had no idea, no.

Q    You're aware now though; right?

A    Yes, ma'am.

Q    And fair to say, you're a businessman, losing two of its teams because of its continuing relationship with Traffic caused further instability to the league, to the NASL?

A    Are you asking or --

Q    I'm asking you.

A    Say that again.

Q    Losing two of its clubs, two of its teams, you need to have the teams.  Losing two teams because of its league's continuing relationship with Traffic caused further instability to the league; isn't that right?

         MS. HUDGENS:  Objection, foundation.

         THE COURT:  I'll allow it.

A    I don't know how to answer that question, to be honest.

SN        OCR        RPR

Anthony - cross - Gray                                    1410

I didn't know anything about that.  At that time, my

lawyers --

Q      The NASL didn't tell you about this?

A      Who?

Q      The NASL didn't tell you about this?

A      My team was a part of it.  My lawyer was bringing me

information as I was doing what I had to do in my other job.

Q      But the NASL didn't reach out to you?

A      Personally?

Q      Yes.

A      I'm sure they had conversation with my --

Q      I'm talking about you.  You're the person.  You're the

one.  You're the opener.  Nobody from the NASL reached out to

you?

A      I'm sure my team took those conversations because I had

to go play and do what I had to do.

Q      Because you were doing other things.  So they didn't

directly to you?

A      NASL?

Q      Yeah.

A      Not that I recall.

Q      I understand.  Let's turn to the third paragraph where

the NASL -- again this is the NASL's own lawyer talking, makes

this important representation about what actually caused the

NASL's damages.  This is what their lawyer says and I quote,

SN        OCR        RPR

Anthony - cross - Gray                    1411

"The departures of the Tampa Bay Rowdies and Ottowa Fury FC do more than cause reputational damage to the league.  They have threatened the league's existence.  Despite the league's efforts to keep this business confidential, these events have become public and have caused significant damage to the league's ability to conduct its business."

Q     Did I read that accurately as to what the NASL's own lawyer said about what caused NASL's damages, Mr. Anthony?

A     Yes, ma'am.

Q     Did you know that the NASL's own lawyer also represented that it was the NASL's continuing relationship with Traffic and the departure of these two teams that also threatened the league's very existence?  Did you know that?

A     No, ma'am.

Q     And something else the NASL lawyer wrote and I'll quote again, "The departures and the league's continuing relationship with Team Holdings and Traffic USA have also threatened the league's ability to maintain it's Division-II status."

        Do you see that."

A     Yes, ma'am.

Q     Did you know that that's what the NASL's own lawyer thought?

A     No.

Q     Mr. Anthony, when -- strike that.

SN        OCR        RPR

Anthony - cross - Gray                    1412

Now, by this time, the letter from the NASL's own lawyer that I read was, I believe October 2016.  By this time, which is October 2016, you were a whole one year and four months locked in as an NASL club owner, were you not?

A    Yes.

Q    But you didn't know any of this Traffic mess at that time, did you?

A    I knew of Traffic.  I didn't know --

Q    Talking about this mess --

A    No, ma'am, no, ma'am.

Q    When doing your due diligence did the league tell you how much money it was losing?

A    I was aware a little bit of what was happening but I didn't get the exact numbers.  That conversations was held and had with my team.

Q    You said you're aware of what was happening.  How much was the league losing?

A    I'm not aware of the numbers.

Q    They didn't tell you the numbers?

A    I wasn't aware of the numbers.

Q    Because they didn't tell you; correct?

A    Because at that point in time I didn't have the wherewithal to handle that.

Q    I'm not blaming you.  Mr. Anthony, trust me, I'm not blaming you.  I'm trying to understand.

SN        OCR        RPR

Anthony - cross - Gray                          1413

Did the NASL tell you how much money it was losing?

A    No, not me personally, no.

Q    And when doing your due diligence because you're a businessman, when you're doing your due diligence, did the league tell you how much money other clubs in the league were losing?

A    Not me personally, no.

Q    When doing your due diligence, did the league tell you how many teams it had lost from the league?

A    Not me personally, no.

Q    When you joined do you know how many teams it had already lost?

A    When I joined -- lost?

Q    Yes.

A    No I didn't know.

Q    They didn't tell you that?

A    I mean, I got information about the league.  They didn't tell me we lost X amount of teams.  So, no, they didn't tell me.

Q    And you did not know, did you, Mr. Anthony, before you signed on to purchase Puerto Rico FC that Traffic Sports had been indicted in connection with a bribery scandal; you didn't know that before you signed on, did you?

A    Before?

Q    Correct.

SN        OCR        RPR

Anthony - cross - Gray                                   1414

A    When I signed on there was information already going on out there, when I signed on.

Q    I'm saying you did not know before you signed on to purchase the Puerto Rico FC that Traffic Sports had been indicted in connection with the bribery scandal?

A    No, not when I signed my first letter.

Q    You didn't know?

A    No.

Q    And speaking of signing on, in evidence we talked is DX-0364, which is your --

        MS. GRAY:  Pull it up just in evidence.

        (Exhibit published.)

Q    Which is the league admission agreement.  And it says here that Puerto Rico joined the -- joined the NASL on?

        THE COURT:   Can I stop you?  It's 00367.

        MS. GRAY:  My mistake, Your Honor.

Q    0367.  It shows that the Puerto Rico FC joined the NASL on June 11, 2015; right?

A    Correct.

Q    And June 11, 2015 was only 15 days after Traffic USA pled guilty on May 27, 2015; right?

A    Yes.

Q    Now, Mr. Anthony I would like you to take a look at a demonstrative exhibit that was shown to this jury during opening statements?

                    SN        OCR        RPR

Anthony - cross - Gray                              1415

MS. GRAY:  For purposes of the record, I would like to mark this as defendant's demonstrative.  I think it's DD-7.

Q   Would you look at that, Mr. Anthony?

(Exhibit published.)

A   Yes, ma'am.

Q   Now, under the NASL column, the first column, there are six people identified and described as key players for the NASL, correct?  The key players across the top and down you see six people?

A   Yes, ma'am.

THE COURT:   Six?  Am I missing something?

A   It's five.

Q   Five?

THE COURT:   Yes.

Q   You're right.  That's what happens when you don't eat breakfast in the morning.

And the five people identified as key players for the NASL are Rishi Sehgal, who is the NASL's interim commissioner; right?

A   Yes.

Q   Rocco Commisso who is putting up money for this litigation on behalf of the NASL; correct?

A   I see Rocco, yes.

Q   Eric Stover, who is the chief operating officer for the New York Cosmos which is a club owned by Mr. Commisso who is

SN        OCR        RPR

Anthony - cross - Gray                                    1416

the funder for this litigation; correct?

A     Right, yes.

Q     And Robert Palmer who is the owner of the NASL club, the Jacksonville Armada.  Do you see that?

A     Yes.

Q     And then, Mr. Anthony, there is you, your face is there as well; correct?

A     Yes.

Q     Do you agree that you are a key player for the NASL?

A     Do I agree?

Q     Yeah.

A     I would say yes.

Q     You would?

A     Yes.

Q     So you consider yourself to be a key player for the NASL?

A     For what I bring to the league, yes.

Q     Are you a key player for the plaintiff, which is the NASL?

A     I don't understand when you say "key player."  I don't understand what that means.

Q     Key player.  There's a demonstrative here that has key players and you're identified as a key player for the NASL?

A     Yes.

Q     This was shown to the jury.  So, are you -- do you agree that you are a key player for the NASL?

SN        OCR        RPR

Anthony - cross - Gray                    1417

A    Yes, ma'am, according to the document, yes.

Q    But do you believe you are, irrespective of the document? Is this an accurate document?

A    I believe what I bring to the table, yes.

Q    Would you identify yourself irrespective of this document as a key player for the NASL?

MS. HUDGENS:  Objection.

THE COURT:   I'll allow it.

MS. GRAY:  I couldn't hear, Your Honor.

THE COURT:   I ruled, but let's move on.  It's been done to death.

BY MS. GRAY:

Q    We'll accept that what you're saying about being a key player so I want to ask you this:  When connecting with the NASL in the first instance it wasn't you who reached out -- who reached out to it about acquiring --

A    What is "it"?

Q    You didn't reach out to the NASL originally when -- about acquiring the Puerto Rico FC?

A    No.

Q    And it was your team, as you said not you, who handled the acquisition of the club and anything related to it; correct?

A    Later.  Later at the beginning it was -- I was hands-on with building my team, building the program, getting the boots

SN        OCR        RPR

Anthony - cross - Gray                                1418

on the ground; doing what I had to do to build that.

Later on, my team started to build e-mails, take the phone calls, do their due diligence as I was away doing what I had to do.

Q    Okay.  You only had one conversation with the NASL commissioner, Bill Peterson, about acquiring the club; is that right?

A    I recall, yes.

Q    And you were not involved in any other conversations with the NASL regarding acquiring the team; correct?

A    What team are you referring to?

Q    Your team.

A    No.

Q    As to your due diligence for the acquisition, you do not remember nor do you even recall ever making a request to review the NASL's financials, do you?

A    I don't remember financials specifically, but information about NASL, yes.

Q    I'm talking about the financials.  You don't remember nor do you recall --

A    I don't recall that, no.

Q    And even though you were a part of the NASL's board of governors, you really don't know how often that board actually met?

A    The board met three times -- maybe three or four times a

SN        OCR        RPR

year, if that.

Q    But you don't know actually how often?

A    No.

Q    Okay.  And the reason why you don't know how often the board actually met was because you weren't attending those meetings, were you?

A    I had another job to do.

Q    So you weren't attending the meeting?

A    No.  Personally, no.

Q    When it comes to your own club, Mr. Anthony, your own NASL club, you don't recall what the financial condition of your own club was as of June 2017, do you?

A    I can't recall that at the moment, no.

Q    And you also don't know whether or not your own club had a business plan; correct?

A    Can you rephrase that?  Could you ask that again?

Q    No problem.

A    What do you mean when you say --

        THE COURT:   Let her ask another question.

BY MS. GRAY:

Q    The business plan that organizations have --

A    Yes.

Q    -- you do not know whether or not your own club had a business plan?

A    We had a business plan.  We had to have a business plan.

Anthony - cross - Gray                    1420

We had to have a business plan.

Q    I mean, you should have had one but you don't know if you had one; isn't that correct?

A    I'm not saying that.

Q    Do you remember your deposition testimony?

A    I mean, if you pull it up for me you can refresh my memory but if that's the case then yes.

Q    I'm going to read -- you swore to tell the truth then and you told the truth?

A    Yes.

Q    And that's closer in time?

A    I got you, ma'am, yes.

Q    Let's pull up your deposition testimony page.  Page 90, line 13 to 17.

        "Do you know whether Puerto Rico FC had a business plan?"

        That was a question.  There was an objection.

        "Answer:  No."

        Those were the questions asked and that was the answer you gave?

A    Yes, ma'am.

Q    Mr. Anthony, on direct the NASL's lawyers asked you about your background as a professional basketball player.  So I now want to pick up that line of questioning and ask you two things that are important to this case and those two things

SN        OCR        RPR

Anthony - cross - Gray                    1421

are choices and cause and effect, okay?

You are a ten-time NBA all star, which means you got the NBA all star title not once not twice, but ten times over; isn't that correct?

A    Correct.

Q    But getting the all star title, all of those titles, it didn't just up and happen to you, it didn't just drop upon you, it didn't just happen; correct?

A    No.

Q    All right.  I know it didn't.  You weren't given the titles because you simply asked that they be given to you, were you?

A    No.

Q    The reason you got the NBA All Star title ten times over was because of the excellence you demonstrated and the way you played the game.  Would you agree with me?

A    Yes.

Q    Consistently playing at the highest level, that is what caused you to receive the titles you received, agree?

A    Yes.

Q    And, you know, I read your book, apart from your natural talent and ability, the excellence in the way you played the game was caused by, as you say in your memoir, your hard work; correct?

A    Yes.

Anthony - cross - Gray                    1422

Q     Your sacrifice; right?

A     Yes.

Q     And your commitment to building your skillset to the highest level year after year after year, agree?

A     Agree.

Q     And as the title says of your book, you chose -- you chose to do what was necessary to perfect your game every single year you played; is that a correct statement?

A     Yes, ma'am.

Q     And that is the reason fans came to see you play; right?

A     I would hope so, yes.

Q     And, you know, because again you say tomorrows aren't promised, but you worked hard.  That's why the fans came to see you play and that's the reason why you got the sponsors you got, because of your hard work?

A     Okay, yes.

Q     And the reason why broadcasters were interested in you; correct?

A     Broadcasters?

Q     Yeah, people wanting to watch you; right?

A     They weren't interested in me.  They were interested in the league and ratings.

Q     And the level of the play you brought to the league; right?

A     Absolutely.

SN        OCR        RPR

Anthony - redirect - Hudgens                    1423

Q    So simply put, you -- Mr. Anthony, the reason why you are a ten-time NBA All Star is because you earned it?

A    Absolutely.

Q    So anybody who says they should get an NBA All Star title ten times over just because you have it and they don't, you would agree with me they would be just plain silly; right?

A    That's logic, yes.

Q    Just like anybody who claims unfairness or discrimination just because they don't have the titles you have that you earned, that would be just as silly too, right?

        MS. HUDGENS:  Objection.

        THE COURT:   I'll allow it.

A    Yes.

Q    Right?  Thank you.

        MS. GRAY:  No further questions.

        THE COURT:   Any redirect?

        MS. HUDGENS:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. HUDGENS:

Q    Do you recall being asked questions about the Traffic indictments on your cross-examination?

A    Yes, ma'am.

Q    And I believe you said the first agreement.  Do you recall using that phrase first agreement?

A    Yes.

SN       OCR       RPR

Anthony - redirect - Hudgens                    1424

Q    You said it was after the first agreement, was that your testimony?

A    Yes.  My first agreement that I signed was the LOI in order for me to get the information that I really needed.

Q    Did you know about the Traffic indictments before you signed the later league agreement in June of 2015?

A    Yes.

Q    Mr. Anthony, are you a lawyer?

A    Me?  No, no, no.

Q    Are you an accountant?

A    I'm not an accountant.

Q    Did you personally do the financial due diligence when you were looking into buying the team?

A    No.

Q    So did you use the phrase "due diligence" as something as a step that you took?

A    No.

Q    Did you do anything -- did you use your team to do the due diligence when you were looking into the joining the league?

A    Did I use my team?  Yes, I did in part, yes.

Q    And did they handle the financial aspect of that for you?

A    Yes.

Q    And did they handle the legal aspect of that for you?

A    Yes.

Anthony - redirect - Hudgens                1425

Q    Do you recall being asked questions about what NASL told you personally before you joined the league in 2015?

A    I can't recall that.

Q    On cross-examination?

A    Yes, yes, I'm sorry, yes.

Q    When you signed on before you signed on, did NASL tell you that they had just gained teams in the league between 2015 and 2016?

A    Before I signed on?

Q    Yes.

A    Yes.

Q    And did you learn later that they were gaining TEAMS between 2015 and 2016?

A    Yes.

Q    And how do you know that?

A    How?

Q    Yes.

A    It was because of the letter -- the letter of intent that I signed, the information that I received was part of what I received from the league information.

Q    As part of that history did you learn about the league?

A    Yes.

Q    You were asked questions about the impact of Hurricane Maria on the team.  Do you recall that?

A    Correct.

SN        OCR        RPR

Anthony - redirect - Hudgens                    1426

Q    And after the hurricane in 2017, did NASL still have a D-II status at that time?

A    After the hurricane?

Q    For the 2017 season.

A    Yes.

Q    Did they have a D-II status at that time?

A    I can't recall that.  I want to say -- I can't recall.

Q    Do you recall ever playing in a season where they did not have a D-II status?

A    No.

Q    And after the hurricane in 2017 did your team continue to play?

A    Yes.

Q    And did they play in Puerto Rico?

A    No, we had to play somewhere else.

Q    Okay.  And did you play somewhere else?

A    Yes.

Q    Okay.  Once NASL lost the D-II sanction, did you become aware that NASL had ended its operations?

A    No.

Q    Okay.  Do you recall learning that the NASL had cancelled the 2018 season?

A    I can recall that, yes.

Q    Okay.  And, so, could PRFC play in the NASL after they said they were ending their operations?

SN        OCR        RPR

Proceedings                                1427

A    Could we play if they ended?

Q    Logically speaking --

A    Logically speaking we couldn't play if they ended it.

Q    You were asked questions about some things you wrote in your memoir.  Do you remember that, on cross?

A    Yes.

Q    Did you bring hard work to the PRFC?

A    Absolutely.

Q    Did you bring sacrifice to the PRFC?

A    Absolutely.

Q    And did you bring your commitment to building their skillset to the highest level year after year to the PRFC?

A    Yes, I did.

Q    Nothing further.

        THE COURT:   Any recross?

        MS. GRAY:  No, Your Honor.

        THE COURT:   You may step down.

        (Witness excused.)

        THE COURT:   Ladies and gentlemen, we're going to take our afternoon break.  So we'll be back in 15 minutes. Thank you.

        (Jury exits.)

        THE COURT:   Ms. Hudgens, I want to understand the basis for the foundation?

        MS. HUDGENS:  There were documents that he was being

                    SN      OCR      RPR

Proceedings                                                   1428

asked about that he never saw.  He testified he wasn't on them.  He wasn't on any of them.  While the document is in there, there was no foundation to ask him certain of the questions that they asked.

THE COURT:  Foundation generally goes to admissibility of the document, not to whether a witness can then be questioned about it.  There's no question that the reason that this witness was put on, as I see it, is I guess to show harm and injury to plaintiff, but really to solicit, I don't know, some level of sympathy, I guess, for an individual owner.

I mean, so I think it was totally proper to ask questions about the basis of what was elicited during direct about harm to him and to the city and to the hurricane.  I mean, quite honestly, after listening to that testimony, I'm considering amending one of the damages instructions; in particular instruction number 51.

So, right now I think this is the current draft. I've only got my trial notebook with me.  At instruction 51, the second paragraph of that instruction reads, "The law provides that plaintiff should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the conduct that you have found to be a Sherman Act violation.

And I'm considering adding the following language

SN        OCR        RPR

Proceedings                                              1429

and we can talk about this tomorrow during the charge

conference.  Right after "violation," I would add, "in this

trial you have heard testimony from certain NASL team owners.

I instruct you that to the extent you determine that any

damages are appropriate, those damages must be to compensate

for antitrust injury allegedly sustained by plaintiff, the

NASL, as opposed to any individual NASL team or owner."

          So, that's language that I'm considering adding in

light of this testimony and, honestly, also in light of

Palmer's testimony but this testimony obviously highlighted

this point and brought it into focus for me.

          So we can talk about that at tomorrow's conference.

          Who is your next witness?

          MR. KESSLER:  We'll be calling Commissioner Garber.

          THE COURT:   Let's have him on the stand at a

quarter to.


          (Recess taken.)

                    SN        OCR        RPR

*Garber - Direct - Mr. Kessler*                    1430

(Continuing)

(Jury enters.)

THE COURT:   Let's get seated.

Counsel, your next witness.

MR. KESSLER:  We next call for the NASL as an adverse witness Don Garber.

THE COURT:   All right, Mr. Garber.  If you could stand, please, and face Mr. Neptune.

(Witness sworn.)

THE COURT:   If you could sit and pull yourself up close to the mic.

Whenever you're ready, Mr. Kessler.

DONALD GARBER,

called by the Plaintiff as a witness, having

been first duly sworn, was examined and testified

as follows:

DIRECT EXAMINATION

BY MR. KESSLER:

Q    Good afternoon, Mr. Garber.

A    Good afternoon.

Q    Mr. Garber, when did you become the commissioner of Major League Soccer?

A    In August of 1999.

Q    And have you been commissioner since then?

A    Yes, I have.

*Garber - Direct - Mr. Kessler*                    1431

Q    Long time.

A    Long time.

Q    Mr. Garber, could you tell the jury what your responsibilities are as the commissioner of Major League Soccer?

A    I oversee the day-to-day operations of the league, I manage the MLS board of governors, I work to establish the short-, mid-, and long-term strategy of the league, I work to ensure that our league is managed with integrity, with a long-term focus on building the game.

Q    Are you responsible for all the business decisions at MLS?

A    I am.

Q    And are you also in charge of Soccer United Marketing?

A    I am.

Q    What is your position at Soccer United Marketing?

A    I'm the chief executive officer.

Q    So, you're both the most senior officer of MLS and the most senior officer of Soccer United Marketing, correct?

A    I am.

Q    And do you chair their board meetings at MLS or how does that work?

A    Yes.  Soccer United Marketing is owned by the MLS team owners.  It operates as a commercial entity no different than NFL Properties or NBA Entertainment.  So, yes, our board

*Linda A. Marino, Official Court Reporter*

*Garber - Direct - Mr. Kessler*                    1432

meetings are combined, correct.

Q    Now, would you agree with me the structure of Major League Soccer is different from the structure of some of the other sports leagues, like the NFL, NBA, Major League Baseball?

A    Maybe you could describe what you mean by "structure."

Q    The ownership structure?

A    Every team is owned by an individual owner, they also own a share in the company which is called Major League Soccer LLC.  It operates no different than any of the other leagues.

It's structured somewhat differently, so I only partly agree with that.

Q    Wasn't MLS structured as a so-called "single-entity league"?

A    Yes, it was.

Q    And the NFL not a single-entity league correct?

A    No it's not.

Q    The NBA is not a single-entity league, right?

A    No, it's not.

Q    So, the difference in a single-entity league is that MLS itself actually owns the teams and the investor operators get a share of MLS and they get a right to operate the teams and share in the revenues from the teams, correct?

A    By our corporate structure, that's correct, yes.

Q    Okay.  While in other leagues, let's say the NFL that I

*Linda A. Marino, Official Court Reporter*

*Garber - Direct - Mr. Kessler*                 1433

know you're familiar with, each team just owns an NFL team, correct?

A     That's correct, each owner.

Q     Each owner just owns an NFL team itself, correct?

A     Yes.

Q     And is it correct that one of the reasons for that structure of MLS was so that it would have better control over player salaries?

          MR. RUSKIN:   Objection.

          THE COURT:   I'll allow it.

A     Yeah, I don't know that that was one of the reasons.

          I think it was structured at that time -- formation was before I joined Major League Soccer -- sort of as a league, as a league that had the opportunity for owners to be partners with each other in business decisions and competitors with each other on the field.  And as it relates to the structure regarding players, it was before I joined the league so I'm not sure I can --

Q     You're not familiar with that.

A     I'm familiar with it now, but I wasn't familiar with it then.

Q     Well, since you've become familiar with it now, did you learn that when the very first -- have you ever read the business plan of MLS when it was first being proposed?

A     No, I haven't.

*Linda A. Marino, Official Court Reporter*

*Garber - Direct - Mr. Kessler*                    1434

Q    Did you ever learn that in the business plan it was stated to United States Soccer Federation that one of the reasons for its structure was to be able to control player salaries?

Did you ever hear that?

A    No, I never have.

Q    Now, Mr. Garber, have you also been involved in selling expansion teams in MLS over the years?

A    Yes, I have.

Q    That's been one of your responsibilities, I think, together with Mr. Abbott; is that correct?

A    Correct.

Q    And do you agree with me that the expansion team value of MLS teams has grown by leaps and bounds since you've been commissioner?

A    Yes, it has.

Q    That's something you're proud of, right?

A    Yes, I am.

Q    Now, Mr. Garber, when you became commissioner, MLS already had its Division I sanction from United States Soccer Federation, correct?

A    It did.

Q    All right.  So, it was before your time when it was awarded that sanction, correct?

A    That's correct.

*Linda A. Marino, Official Court Reporter*

*Garber - Direct - Mr. Kessler*                                    1435

Q    Okay.  Now, after you became commissioner, it's correct that you don't recall any process from when you --

What year did you become commissioner?

A    1999.

Q    From 1999 until 2009, you don't recall any formal process where MLS had to each year get recertified as a Division I sanctioned league, right?

A    That's correct.

Q    And you do recall that in 2009 you learned I think at a USSF board meeting that that process was now going to commence, correct?

A    It was going to become more formalized, correct.

Q    Do you remember that you had just like three weeks at the end of November of 2009 to quickly put together your first report in the compliance process and a report on the league as an annual basis?

A    I believe at that meeting in I think it was Seattle in 2009, I didn't view it as a compliance report.  We were asked to make a presentation to the board almost like a state of the league, if you will.

Q    But that was the first time you were asked for that, correct?

A    That's correct.

Q    And you remember you had only three weeks before that meeting to put that together in a hurry.

*Linda A. Marino, Official Court Reporter*

A     I do remember that.

Q     Now Mr. Garber, when you came into the league in 1999, the next few years, would you agree with me, were times of financial challenge?

A     Yes.

Q     You got to a point where you lost -- you had to contract down a couple of teams, correct?

A     What year are we talking about, I'm sorry?

Q     The period between 1999 and 2002.

A     Yes.

Q     You cut down from twelve teams to ten teams, correct?

A     That's correct.

Q     And do you recall you had meetings -- you had at least one meeting with bankruptcy lawyers; do you recall that?

A     We had a meeting.  A group of our owners came together to talk about a restructuring of the league.  Each of those owners were represented by attorneys; some of them were bankruptcy attorneys, some of them were just their corporate or family attorneys.

Q     The restructuring you were considering at that moment is whether you would use the bankruptcy laws to restructure. That was on the table as a possibility.

          Correct?

A     I suppose it was a possibility, but I don't really agree with that entirely.

*Garber - Direct - Mr. Kessler*                1437

Q    Do you recall that you lost a number of investor operators so that Mr. Anschutz ended up being the investor operator for six out of your ten teams?

A    I don't agree in the way that's represented, so I'm happy to explain.

Q    No, counsel will give you a chance to explain.  Right now, I get to ask yes-or-no questions, if you can answer yes or no.

My question is, do you recall that you got to a point where out of your ten teams, six were controlled by one investor operator?

A    That's correct.

Q    And do you also recall -- and that was the Anschutz Group, right?

A    Yes.

Q    In addition, at this time of financial stress, the Hunt family had to step in and help out the league; is that correct?

A    That's correct.

Q    Now during that period of time, did MLS -- did USSF ever question your Division I sanction because they were concerned that MLS might not be sustainable?

A    Not that I'm aware of.

Q    Did anyone tell you that you had to make any showing to MLS -- to USSF that you were going to not lose teams the next

*Linda A. Marino, Official Court Reporter*

*Garber - Direct - Mr. Kessler*                    1438

year or that your financial condition was solid?

Did you ever get a request like that?

A    What year are we talking about?

Q    2000, 2001, that period of time.

A    Not that I can recall.

Q    Now let me show you next PX-614.

MR. KESSLER:  We're going to show it for identification, please.

Q    This is an e-mail at the top from Don Garber to Don Garber.

Can you explain to the jury why you would e-mail from yourself to yourself?

What does that mean?

A    I'm sorry, this is a little fuzzy.

MR. KESSLER:  Can we blow it up so it's a little better?

Q    Do you recognize this e-mail, Mr. Garber?

A    I don't recognize the e-mail, no.

Q    But do you have a practice of sending yourself e-mails sometimes, to yourself?

A    Can you show me the rest of it?

THE COURT:  Why don't you look in your binder, towards the back of the binder.

A    Can you give me the number again?

THE COURT:  614.

*Linda A. Marino, Official Court Reporter*

*Garber - Direct - Mr. Kessler*                    1439

Q    Yes, 614.

A    Okay.

Q    And do you see below this is an e-mail from Mr. Dan Courtemanche?

          I'm probably mispronouncing.

          THE COURT:    One at a time, please.

A    Courtemanche.

Q    Who is this --

          (Pause in proceedings.)

          THE COURT:    Hold on.  Let's just set some ground rules here.  One at a time, please, for the benefit of our reporter.

          MR. KESSLER:    Certainly.

Q    And who is Mr. Courtemanche?

A    He is and was the head of communications for Major League Soccer.

Q    Right.  And we discussed this document at your deposition, as you just stated, correct?

A    Correct.

Q    And this document that Mr. Courtemanche sent to you were notes that you were going to use in preparation to give a media year-end interview in November 28, 2015, correct.

A    I assume so, yes.

          MR. KESSLER:    Your Honor, I move in 614.

          MR. RUSKIN:    No objection.

*Linda A. Marino, Official Court Reporter*

*Garber - Direct - Mr. Kessler*                    1440

THE COURT:   So admitted.

MR. KESSLER:   Now let's display it for the jury, please.

(PX-614 so marked and published to the jury.)

Q    And attached to this e-mail are the notes that were prepared for you by your media team, correct?

A    Correct.

MR. KESSLER:   Let's look, if we can, at Page 5 of this document.

Q    And you'll see on Page 5 you're talking about 20 seasons of MLS, correct?

A    Correct.

Q    And what I want to look at is the third bullet called: Down but not out.

Do you see that?

A    I do.

Q    And what your media team prepared for you was that:  MLS was down to three owners for ten teams in late 2001 and bankruptcy attorneys attended our owners meeting in December.

And that was true, correct?

A    That's correct.

Q    And you had lost two teams; the team in Miami and the team in Tampa, correct?

A    That's correct.

Q    And in early 2002, in part in response, Soccer United

*Linda A. Marino, Official Court Reporter*

Marketing was formed, correct?

A    Correct.

Q    Now, Mr. Garber, is it correct that at this time, in 2001, MLS had been a D-I sanctioned league since 1996?

That was the first season, correct?

A    That's correct.

Q    So, 2001 was the sixth season of MLS as a D-I league?

A    That's correct.

Q    And despite being a D-I league for six seasons, you would agree with me MLS, at least at this moment in time, was down and financially challenged, correct?

A    In 2001, correct.

Q    Okay.  Let me move on.

MR. KESSLER:  We can take this document now -- sorry, let's go to Page 9.  I'm sorry.

Q    On Page 9, you state the following.  Look at the bottom of the paragraph, the "but."

You say these are the facts -- well, you didn't write this, your media people wrote this.

It says:  These are the facts.  We have quickly become a league of choice for top players and coaches and North American soccer fans are embracing the league in record numbers.  But it wasn't always that way.  In 1996, the pundits questioned whether or not MLS would make it past its first season.

*Garber - Direct - Mr. Kessler*                    1442

And that was true, correct?

A    This was written by my media guy.  I don't know whether I gave this --

Q    Do you have knowledge as to whether that was true in 1996?

A    I wasn't there in 1996.

Q    It then goes on to say:  No one ever said it was easy during that first decade.  In fact, it was very hard.

That you would agree with; correct?

Because you were there in 1999.  That first decade as D-I sanctioned league was very hard, correct?

A    That's correct, I'd agree with that.

Q    And then go to the next paragraph below it:  We can't ignore what we had to overcome.  MLS was down to three owners for ten teams in late 2001 and bankruptcy attorneys attended our owners meeting in December.  We contracted by two, shutting down our teams in Miami and Tampa Bay.  Attendance was stagnant and we had only one stadium, in Columbus, that was built for professional soccer.

And I'll take you to the -- it's correct, isn't it, that attendance was stagnant at that time?

A    I would agree with that.

Q    And it is correct that you had only one stadium, in Columbus, that was built for professional soccer, correct?

A    That's correct.

*Linda A. Marino, Official Court Reporter*

*Garber - Direct - Mr. Kessler*                    1443

Q    And this was your sixth year as a D-I league, correct?

A    Correct.

Q    And if you look at the next -- let's go next to Page 15.

On Page 15, you're giving a -- this is preparation for different facts and figures, correct?

A    I've got to take a look at this.  I can't read it on the screen, so give me a quick second.

Q    Sure.  I'm not going to ask you about these details.

These were facts and figures prepared in case you needed to refer to them during your media appearance?

A    I would assume so.

Q    Let's look at Page 16.

On Page 16, under expansion fees --

And this document was written, to remind you, in November 28 of 2015, correct?

A    That's correct.

Q    And, so, this is -- this is after the troubles of 2001. We're now more than ten years later, correct?

A    Correct.

Q    And what you had as preparation was that:  MLS expansion fees have increased 13 times since 2005.

Do you see that?

A    Yes, I do.

Q    And it went from 7.5 million to more than 1 million in 2015?

*Linda A. Marino, Official Court Reporter*

A       More than 1 million?

Q       More than 100 million.

A       Yes.

Q       Right.  Now, it's also correct that those expansion fees have continued to increase since 2015, correct?

A       That is correct.

Q       And by 2019, it reached $300 million, correct?

A       That's correct.

Q       Now, let me move on now to another document.

        MR. KESSLER:  If we could look at JX-103.  You can put this up because, your Honor, I don't know if it's been admitted, but it's presumptively admissible.  If it's not, I move in JX-103.

        THE COURT:   All the JXs are in.

        MR. KESSLER:  Thank you, your Honor.

        (Exhibit published to the jury.)

Q       These are the minutes of a board of governors meeting of Major League Soccer on April 22, 2009, correct?

A       That's correct.

Q       And you would have attended this meeting; is that correct?

A       Yes.

Q       And if you look at the first page, if you look under Kraft Soccer, it says:  Mr. Sunil Gulati was attending as an authorized representative.

Do you see that?

A    I do.

Q    And in your experience, while Mr. Gulati was at Kraft Soccer, he routinely attended board of governor meetings as one of the representatives of Kraft Soccer, correct?

A    "Routinely," what do you mean by that?

Q    Let me ask you this:  Did he frequently attend those meetings?

A    He attended meetings.  I don't know exactly how many meetings he attended.

Q    It wasn't a rare thing for him to be there, correct?

A    I don't know that it was a rare thing, correct.

Q    And he also attended board meetings of Soccer United Marketing, correct?

A    I believe so.

Q    And if you look at Page 3, the commissioner's report --

And this we're now looking at is in April of 2009, correct?

A    Yeah.

Q    Okay.  So in April of 2009, you gave a report to the MLS board in which you reported the following.

Would you look at the word "while"?

While the league --

MR. KESSLER:  Just blow it up, the paragraph "while."

*Garber - Direct - Mr. Kessler*                1446

Q    While the league has made significant strides in the past few years, it is currently facing a number of issues, including the economic downturn, declining attendance and television ratings, and increased market sophistication competition.

Is it correct that you gave a report on these subjects at this meeting to the board?

A    It's correct.

Q    And if you look under audit and finance, you will see in the second paragraph that the commissioner stated concern that the league will not achieve the ticket revenue projections, correct?

A    I think in the year after the economic downturn, I think that was why we did not achieve our ticket revenue projection, but that's true.

Q    Right.  Now in 2009, MLS had already had its D-I sanction from 1996.  So, we're looking at about 13 years as a D-I league.

Correct?

A    Correct.

Q    And despite having the D-I sanction for 13 years, in 2009 you were experiencing declining attendance and television ratings, correct?

A    Again, I don't know that we were experiencing that.  I know we experienced that in 2009.  So, I don't want to

*Garber - Direct - Mr. Kessler*                          1447

wordsmith here, but in this particular report that's what we were talking about.

Q     And that was your report?

A     Right.

Q     This is summarizing what you told the board, correct?

A     Uh-huh.

Q     Let's look at Page 10.

      At Page 10, it says that -- you explain that the development of MLS can be divided into three phases.

      Do you remember giving a report to the board where you said that you had identified three phases of MLS up to that point in time?

A     This was a minutes, so I'm sure I made that presentation. I don't remember the specific meeting, but, clearly, these are minutes from the meeting.

Q     Okay.  And it says:  In phase one, from 1996 to 2001, was the launch of MLS.  This period of development was characterized by increasingly higher capital calls, a small ownership base, instability, and a legal challenge to the MLS single-entity structure.

      And that was all true, correct?

A     Correct.

Q     And you would agree with me that MLS was experiencing instability during that period of time.

A     That's what I said.

*Linda A. Marino, Official Court Reporter*

*Garber - Direct - Mr. Kessler*                    1448

Q    And did you know that during that period of time when MLS was experiencing instability with its Division I sanction, USSF was very supportive of MLS during that time?

Would you agree?

A    I didn't say or hear anything about the Division I sanctioning.

Q    Do you agree that during that period of time you were the Division I sanction league?

A    I do.

Q    Do you agree USSF was supportive of MLS during that period of time?

A    I don't know what you mean by "supportive."

Q    Did they take away your sanction?

A    No, they didn't.

Q    Did they require you to submit to annual reviews as to how you were doing, formal reviews?

A    No, they did not.

Q    Do you recall that they went to FIFA and convinced them to let you have multiple teams controlled by the same owners?

A    I don't recall that, no.

Q    Do you know anything about that issue?

A    No.  I know about the issue, but I don't know anything about U.S. Soccer asking FIFA for permission.

Q    Did you ask FIFA for permission?

A    Not that I am aware of, no.

*Linda A. Marino, Official Court Reporter*

*Garber - Direct - Mr. Kessler*                     1449

Q    Look at part two.  It says:  Part two, from 2002 to 2006, was a period in which MLS made a number of changes to its business model which set the stage for growth.

And you believe that was true, right?

A    Correct.

Q    That was the period in which, for example, you developed soccer-specific stadiums, correct?

A    Correct.

Q    And that second period didn't happen until seven years after you got your Division I sanction, correct?

A    That's correct.

Q    Then you talk about phase three.  And phase three, you say, started in 2007 and continues through the present time.  That was 2009.

Correct?

A    Correct.

Q    Okay.  And then you state two paragraphs down, where it says "the commissioner stated," the following:  The commissioner stated that while the enterprise has grown on a variety of levels, particular in increased expansion fees and club value, the performance of the league in key measurements, attendance and television ratings, has essentially remained flat since the inception of the league.

Do you see that?

A    I do.

*Linda A. Marino, Official Court Reporter*

*Garber - Direct - Mr. Kessler*                    1450

Q     And that was true, correct?

A     I think in large part, yes.

Q     So, attendance was flat, essentially flat, television ratings were flat, but club values and expansion fees were growing, correct?

A     Correct.

Q     And during that whole period of time, MLS, as an entity, not counting SUM now, MLS as an entity never made any profits, correct?

A     That's correct.

Q     So, let me move on to I think another subject.

No, I'm sorry.  I have one more page to discuss with you, Page 11, and this talks about player strategy.

Do you see that?

A     I do.

Q     And it says:  The commissioner stated that drawing on this research as well as discussions with broadcast partners, sponsors, and potential investors clearly improving the quality of play and adding star players is a major issue for the league.

And that was true at that time, correct?

A     I would agree with that.

Q     And then if you look at the bottom paragraph, it says: Since 1996, MLS spending on players has remained flat.

Do you see that?

*Linda A. Marino, Official Court Reporter*

*Garber - Direct - Mr. Kessler*                    1451

A    I do.

Q    That was true, correct?

A    I would assume so, yes.

Q    So from 1996 all the way to 2009, MLS didn't increase its spending on players; right, it remained flat?

A    No, that's not factually correct.  I know it's stating that here, but if you look at the numbers that's not true.

Q    This is what you told the board, right, as reported in the minutes?

A    That's correct.

Q    You wouldn't tell the board a falsehood, right?

A    No.  This was reflecting the salary budget.

Q    Your budget was flat, correct?

A    Correct.

Q    There was inflation between 1996 and 2009, right?

A    There was.

Q    Now this says:  This is in the face of significant increases to worldwide salaries.

         And when you were referring to worldwide salaries, you're now referring salaries outside the United States, correct?

A    Correct.

Q    You're saying outside the United States, because of those increases you were losing top players, correct?

A    In some cases, yes.

*Linda A. Marino, Official Court Reporter*

Q     And it was causing you to have an inability to improve or increase the quality of play in the league, right?

A     I agree with that partially.

Q     And did USSF ever come to you during this period of time and say:  MLS, you're our Division I league.  Why aren't you doing better?

Did you ever have that discussion with them in 2009?

A     No.

Q     Now we can move to something else, different subject.

Mr. Garber, you would agree that MLS was a very important relationship for the United States Soccer Federation, correct?

A     I would agree with that.

Q     And in fact, you would also agree that there was a good and strong relationship between MLS and the United States Soccer Federation, correct?

A     Correct.

Q     In fact, you have often said it was one of the best relationships between a first division league in a country and their soccer federation; right, you had one of the best relationships in the world, in your view?

A     I agree with that.

Q     And you also agree that that relationship was essential not just to the success of MLS but also for the success of the United States Soccer Federation, correct?

*Garber - Direct - Mr. Kessler*                    1453

A    Yes, I agree with that.

Q    It was a mutually beneficial relationship, it wasn't one way correct?

A    Correct.

Q    Let's look at PX-466.

        MR. KESSLER:  PX-466, if we can blow it up so we can read it better.

Q    This was an e-mail from you and it was in response to Donna Shalala on January 13, 2018; is that correct?

A    This is an e-mail from me to Secretary Shalala, yes.

Q    And you also copied those other board members on the USSF and also Mr. Flynn, who was the staff, as well Mr. Gulati?

A    Correct.

Q    And in this document, you were asking Mr. Flynn to add an item for the USSF board meeting; is that correct?

        MR. RUSKIN:  Objection, your Honor.  This is corporate governance.  It's protected.  It comes under the terms of the MIL.

        THE COURT:  Give me one second.

        MR. RUSKIN:  Thank you.

        (Pause in proceedings.)

        THE COURT:  Which paragraph do you want to talk about.

        MR. KESSLER:  The paragraph that starts with the word "SUM."

*Linda A. Marino, Official Court Reporter*

*Garber - Direct - Mr. Kessler*                    1454

THE COURT:  On the first page.

MR. KESSLER:  Yes, your Honor.

THE COURT:  The exhibit is admitted for that limited purpose and just as to that paragraph.

MR. KESSLER:  Okay.

(Portion of PX-466 so marked.)

Q    In the course of this correspondence, Mr. Garber, you wrote the following:  SUM has been a critical long-term strategic partner for U.S. Soccer since 2003 and has provided hundreds of millions of dollars of funding that has allowed the federation to manage its budget with absolutely no financial risk to the organization due to market conditions, labor conflict, or any other factors, including not qualifying for key tournaments.

You wrote that, correct?

A    I did, but I don't -if you look at this document, the paragraphs are all out of -- this doesn't look like a document from me.

Q    This was how it was produced.

Let me just ask you this:  You agree with every word in that paragraph, correct?

A    I do.

Q    Yes.  And that was something that you told to all the board members on USSF, correct?

This is an e-mail that was part of something sent to

*Linda A. Marino, Official Court Reporter*

*Garber - Direct - Mr. Kessler*                          1455

all the board members, correct?

A    I don't know that -- again, I'm not agreeing that this letter is something I said, but I believe we were a key strategic partner for U.S. Soccer and supported them at times where they had very little risk to market conditions, et cetera.

Q    In fact, when you're referring to that they had no financial risk, including not qualifying for key tournaments, what you meant is that even if the men's national team didn't qualify for something like the World Cup and the soccer federation wouldn't make that money, they were protected by financial risks because of the relationship with SUM, correct?

A    That's what the relationship was.  We took that risk, that was a benefit to them.  If the national team didn't qualify, and there were times they didn't, that had a negative impact on us.

Q    Mr. Garber, let me ask you, I know it looks odd -- as I said, that's how it's been produced -- you'll see this is an e-mail from you to the board.

Do you have any reason to believe it wasn't sent to the board?

A    I don't know how to comment on that.  This is not a note that I would send.  It looks to me like a draft of a note, but I would have responded differently.

MR. KESSLER:  Let me direct you next -- we can turn

*Garber - Direct - Mr. Kessler*                    1456

that off.  Let's go next to PX-617.

Q    And you'll see this is also a board of governors meeting -- well, this is of Soccer United Marketing for November 11, 2006; do you see that.

A    I do.

Q    And if you look at the first page, you'll see that Mr. Gulati attended this meeting on behalf of Kraft Soccer; is that correct?

A    I believe so.

                (Continued on the following page)

*Linda A. Marino, Official Court Reporter*

EXAMINATION BY

MR. KESSLER:

(Continuing.)

Q    And you'll see on the second page, you were there as the CEO; correct, of Soccer United Marketing?

A    Correct.

Q    And if you look at the CEO's remarks, you'll see that you stated, The key objectives for the meeting are, and you listed several things, and one of them was to approve SUM's extension of MLS rights through 2011.

     Do you see that?

          THE COURT:   Are you going to offer a document.

          MR. KESSLER:  I'm sorry, your Honor.  I will do that I offer PX-617.

          MR. BUTERMAN:  No objection.

          (Plaintiff's Exhibit PX-617.)

Q    One of the objectives of this meeting was to approve SUM's extension of the MLS rights through 2011, correct?

A    That was one of the objectives stated here, correct.

Q    So the original SUM agreement was entered into in 2004; is that correct?

A    That's correct.

Q    And so, just three years later, you were entering into an extension; correct?

A    Correct.

D. Garber - Direct/Mr. Kessler                1458

Q    Okay.  And if you take a look at Page 6 of this document, they set forth the terms at the bottom that you've agreed on the following terms for 2011 to 2014 renewal.

Do you see that?

A    Was this is the one where Sunil left the meeting, I'm sorry.

Q    Yes, above the extension, yes.

A    Okay.

Q    Okay.  And then it says, SUM and U.S. Soccer have agreed on the following terms for the 2011, 2014 renewal.

Do you see that at the very bottom, it's below what was highlighted.

Do you see that?

A    I do see that.

Q    And, as explained in the next page, that the deal was that U.S. Soccer receives a minimum guarantee of 8.25 million in 2011 and '12, and 8.75 million in 2013 and 2014, correct?

A    Correct.

Q    And then it says, SUM receives the next 3.125 million in 2011 and 2012, and 3.375 million in 2013 and '14, assuming there are sufficient funds; correct?

A    I see that, yes.

Q    So you had no guarantee, the only one who has a guarantee of this money is USSF, correct?

D. Garber - Direct/Mr. Kessler          1459

A    I'm sorry.

Q    In other words, you would get this money if there was sufficient funds earned.  If they weren't sufficient, you would get less at SUM, correct?

A    Give me a second here.  This was beyond the guarantee. It says, "sufficient funds," it really would mean if there was a sufficient excess.

Q    And it says, Additional revenue was shared 70 percent to U.S. Soccer and 30 percent to SUM, correct?

A    Correct.

Q    And that was a general percentage of whatever was raised, correct?

A    No, that's not correct.  I could -- could I explain?

Q    It says 70 percent was the correct and additional revenue was shared 70/30?

A    Additional revenue beyond a certain point.  We make a guarantee.  If there is sufficient money after that guarantee, U.S. Soccer would get 70 percent and we would get 30 percent.  That was a traditional sports marketing representation concept.

It is very clear in the guarantee, any excess funds, not sufficient funds, additionally shared.  Majority of it to them and then to us.  And then after that, there were probably other, you know, measures or areas of additional sharing.

*D. Garber - Direct/Mr. Kessler*                     1460

Q     Now, Mr. Garber, what you told your board on SUM, is that the agreement that was not ideal but the property is still very important to SUM's portfolio, especially for political reasons; correct?

A     Could you show me that, please.

Q     Yes.

A     It's only my bad eyesight.  I have a difficult time reading this.  I apologize for that.

Q     You stated that although the agreement is not ideal, the property is still very important to SUM's portfolio, especially for political reasons; correct?

A     That's what we stated here, yes.

Q     So let's break this down.

      What you meant that the agreement is not ideal, you meant from a financial standpoint.  The agreement with USSF was not, for example, as lucrative for SUM directly as your agreement with some other groups; correct?

A     Some were better; some were worse.

Q     But you said this agreement was not ideal.  You meant it was not ideal financially for SUM?

A     I agree with that.

Q     Yes.  But even though it was not a great financial deal for SUM, there were political benefits of it; correct?

A     Correct, that's what it states here.

Q     Right.  And an example you gave is that U.S. Soccer

*D. Garber - Direct/Mr. Kessler*                    1461

supported SUM during television negotiations with ESPN which was a key factor in allowing SUM to secure the new television agreement; correct?

A    Correct.

Q    And those television agreements covered both the United States Soccer Federation games, the national team games, and the MLS game, correct?

A    Correct.

Q    Because they were joined together in an a joint deal, correct?

A    Correct.

Q    You can put that one aside and go to the next document.

Let's look now at JX-31.  And you'll see here this is a document from -- do you know who Brett Lashbrook is?

A    Yes, he was a young man that worked at Major League Soccer at that time in 2012.

Q    And this was going to be a presentation you were going to make on the USSF-SUM relationship, correct?

A    I do not know what this presentation was.

Q    This was a presentation, if you look at the e-mail below, you'll see he sent it to Mr. Remedi with a CC to you, correct?

A    Correct.

Q    And it says, Attached is the presentation for tomorrow.

Do you see that?

D. Garber - Direct/Mr. Kessler                1462

A    I do.

Q    And it also said on the top e-mail, Please note, the commissioner made the following changes this evening; correct.

A    This was an e-mail from one of our executives to other executives in MLS --

Q    Right?

A    -- who worked on this presentation.

Q    But it's correct that what happened here is you were sent a presentation, you made some changes, your staff incorporated it and now they're circulating the final version, correct?

A    That's true, yes.

Q    Okay.  And let's look at what this is.

The next page says, this is a presentation, we go to the next, Page 2.  It says this was a presentation for the United States Soccer Federation board on February 16, 2012, correct.

MR. RUSKIN:  Can we ask, counsel is reading from -- it's not on the screen or Page 2?

THE COURT:   If you're going to use the screen, then point it out to the witness.

And, Mr. Garber, if you need to look at the document.

THE WITNESS:  I don't have the document.

Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

MR. KESSLER:  I'm sorry we did not display the page.

THE WITNESS:  I see the cover page here.

MR. KESSLER:  This page.

Q    Can you see it?  It's the cover page of the presentation.  It should be on your screen.

A    I see the cover page but I don't know what the presentation is.

Q    I'm going to show you the presentation.  I'm just saying the cover page, do you remember attending a meeting with the U.S. board offsite on February 16, 2012, in which you made presentation about Soccer United Marketing?

A    I don't recall being in the meeting.

Q    Do you recall attending meetings like that if you don't recall the specific dates?

A    I attended dozens and dozens of U.S. Soccer meetings.

Q    Do you recall that some of those meetings were ones where you made a presentation to the U.S. Soccer board about Soccer United Marketing.

Do you recall making presentations like that?

A    I'm sorry, I don't recall that.

Q    You don't recall that, okay.  Let's take a look, if we can, on Page 12.

Okay.  And it says the following.  It says, SUM is the leading soccer commercial company in North America.

*D. Garber - Direct/Mr. Kessler*                    1464

Would you agree with that in 2012?

A    Is this from the presentation?

Q    Yes, these are the sheets in the presentation.  Do you agree with that?

A    I do.

Q    Okay.  And then it says the following, okay?

Each year, at the bottom, SUM subsidizes the combined losses of MLS and the clubs through a distribution of its earnings; is that true?

A    That's true.

Q    However, this distribution is substantially less than the losses incurred at the league and clubs combined, thereby increasing the owners' investment in soccer each year; is that true?

A    That's true.

Q    So, in other words, even after SUM distributed its profits the total losses of MLS and the clubs as of 2012 exceeded that, correct?

A    That's correct.

Q    Let's look at the next line, page, please, 13.

The next line says, The growth of the sport and the changing perception of game is due in large part to the partnership between MLS and U.S. Soccer.

And you agree with that, right?

A    I do.  I agree with everything on this slide.

Q    Okay.  Let me go to the third paragraph which you also agree with.

The partnership between MLS and U.S. Soccer is unique in football, one that many countries aspire to have -- most countries cite the contentious relationship between league and federation as the most significant impediment to growth -- either due to the fractured nature of the market or due to the enormous amount of time and energy spent resolving conflicts.

And you agree with that, correct?

A    I do.

Q    And, in the United States, because of your partnership with U.S. Soccer, you did not have to spend a lot of time and energy resolving conflicts between you; correct?

A    You know, this is a very broad statement here, so I'm happy to explain what this slide was about.

Q    Counsel will give you plenty of time to do that.  I'm asking now, is it true that because of your close partnership with United States Soccer Federation, MLS did not have to spend a lot of time resolving conflicts between you and the soccer federation?

A    I agree with that.

Q    Okay.  And then, take a look at Page 20 on the bottom.

This is a summary of the SUM-USSF agreement and I direct your attention to 2011-2014.

*D. Garber - Direct/Mr. Kessler*                   1466

It says, the sharing arrangement between the partners substantially changes.  This is in the 2011-2014 period, resulting in a higher share for U.S. Soccer.

And that was true, correct?

A    This reflects the new proposal.  If you let me take a second here.

Q    This is in 2012, you already had a deal through 2014; correct?

A    Correct.

Q    Right.  So this was just stating what was going to happen?

A    If you wouldn't mind giving me a quick second here.

Q    Sure.

A    Okay.

Q    Under this deal, 74.51 percent of the revenue would go to U.S. Soccer between 2011 and 2012, while 25.49 percent would go to MLS; correct?

A    Correct.  It's the 70/30; 75/25 traditionally between the way the business operated.

Q    Let's move to another document.

Now, I'm going to show you next a document, PX-609 if we can put it up.

This is a letter from you to Mr. Flynn and Mr. Gulati dated November 4, 2013; is that correct?

A    Correct.

*D. Garber - Direct/Mr. Kessler*          1467

Q    It has your signature on the last page?

A    Correct.

            MR. KESSLER:  I move into evidence PX-609.

            MR. RUSKIN:  No objection.

            THE COURT:   It's admitted.

            (Plaintiff's Exhibit PX-609 .)

Q    In this document, in the first paragraph, you write to Dan and Sunil, For over ten years, U.S. Soccer and SUM have worked together to grow the commercial value of soccer in America.

     And that was true, correct.

A    Correct.

Q    But more importantly, we have joined forces it is turn our country into a true soccer nation.

     That was true, correct?

A    Yes.

Q    Okay.  Now, look at the third paragraph.

     The third paragraph, you wrote, As part of a renewed eight-year relationship, we are prepared to guarantee a fee to U.S. Soccer of $220 million.

     And that was the proposal you were making, correct?

A    For that eight-year period, correct.

Q    Yes.  And you also said, In addition to the guaranteed payment, SUM proposes to cover the cost of sales for all partners leading to greater levels of activation.

*D. Garber - Direct/Mr. Kessler*          1468

Do you see that?

A     I do.

Q     And that meant you would cover the cost for USSF as well, correct?

A     We were their sales agent.  We would cover all the costs related to the sales.

Q     They wouldn't have to pay any costs, you would do all that?

A     Part of the relationship was us covering the costs.

Q     And you estimated this cost to SUM to be over $20 million over the term; correct?

A     Correct.

Q     And USSF did agree to extend their agreement with SUM around this period of time, correct?

A     Correct.

Q     And when you did this extension, there was no competitive bidding process with USSF, correct?

A     We had renewal rights in our agreements.  So if we were able to reach agreement, there would be no competitive bid.

Q     And each time you extended, you reached a new agreement without any competitive bid, correct?

A     That was part of the contract that we had.  If we were able to reach terms, it did not go out to market traditionally the way the business operates.

Q     And you wrote on Page 3, We believe that SUM's

expertise as well as its relationship with MLS makes it the best choice to continue to grow the U.S. Soccer brand and achieve exponential growth over the next eight years.

You agree with that statement, correct?

A    I did.  I do.

Q    And what you meant by the relationship with MLS, it was your consistent position that the fact that SUM was owned by the MLS investor/operators, and that SUM also marketed the rights of MLS; that this was a positive reason why USSF should enter into an agreement with SUM as opposed to with a third-party marketing company who had no relationship with the soccer league, correct?

A    That was one of the reasons, correct.

Q    Right.  And you believe that reason, correct?

A    I do.

Q    Let's go to the next document.  PX-610.

PX-610 has a cover letter.  This is one of those Don Garber to Don Garber and it's attaching it to if you look at the next page.  Actually it's just a Peter Garber.

Let me just establish that you are, in fact, also at D. Peter Garber is also you?

A    Yes, that's my Gmail account.

Q    So this is something you sent to yourself?

A    I would assume so, yes.

MR. KESSLER:  I move into evidence PX-610.

*D. Garber - Direct/Mr. Kessler*      1470

MR. RUSKIN:  Objection, your Honor.  This relates to the election, the soccer election.

MR. KESSLER:  Your Honor, we're only going to be asking --

THE COURT:  Let me just take a look, please.

Which part are you asking about.

MR. KESSLER:  This is on Page Number 4 and it's also just about the SUM agreement.

THE COURT:  You don't have to describe it.  It's not in evidence yet.

MR. KESSLER:  Yes.

THE COURT:  So you're just going to ask about Page 4.

MR. KESSLER:  Page 4 through the top sentence on 5 because it completes the sentence.

THE COURT:  All right.  With that condition, the exhibit PX-610 is admitted but just as to Page 4 and the top three lines of Page 5.

MR. KESSLER:  And, your Honor, I just ask the cover e-mail, just the cover, so that it's clear that it was sent by him to himself.

THE COURT:  That's fine as well.

MR. KESSLER:  Thank you, your Honor.

(Plaintiff's Exhibit PX-601 .)

MR. KESSLER:  You can display Page 4, please.  And

*D. Garber - Direct/Mr. Kessler*                    1471

start with U.S. Soccer-SUM agreement.  You can blow up from that going down.

Q    Mr. Garber, what you wrote to yourself as notes for the following.

The U.S. Soccer-SUM agreement runs through 2022.  And that was correct after the next extension; correct?  That's how it read?  It was extended all the way through 2022?

A    This document has cut and paste.  There's --

Q    So, Mr. Garber, I'm just going to ask you questions --

THE COURT:    One at a time.

If he's answering a question, don't interrupt. And then if you want to strike, you can move to strike.

MR. KESSLER:    Thank you, your Honor.

A    So this document, if you look at Page 4 and Page 5, there's cuts and pastes and I don't know whether this was notes that were sent to me and that I sent to my Gmail address so I can take a look at it.  I don't know what happened to this note.  I don't even know whether these are my notes.

MR. KESSLER:    I move to strike as nonresponsive.

THE COURT:    I'll allow it.  You can ask him a specific question.

Q    Is it correct as it says in the first sentence, that the U.S. Soccer-SUM agreement ran through 2022 at this time?

A    Correct.

*D. Garber - Direct/Mr. Kessler*          1472

Q     Is it correct that since the first year of the agreement and through the expiration in 2022, U.S. Soccer will receive $318 million in financial guarantees as part of these agreements.

A     That's correct.

Q     Is it correct that you believe it is important, looking at the next line, that it is important that SUM is, in fact, owned by MLS owners and delivers value to MLS owners who are investing in the game.

      Is that true?

A     I believe that, yes.

Q     Okay.  Is it true that through the 2017 season, MLS will have paid $18 million in registration fees, membership dues, vastly more than any other U.S. Soccer member to USSF?

A     These notes were written there.  I would assume that was from the beginning of the league's inception.  But I don't know about that.  I'm not even acknowledging that this was my note.

Q     Just answer, do you know if that's true or not?

A     I don't.

Q     Okay.  Do you know if it's true that MLS and MLS clubs have paid 34 million for the rights to promote international games in the United States?

A     I don't know that to be true.

Q     Okay.  Look at the next sentence.  It says, the most

important part of this is that SUM is an affiliate owned by the owners of MLS, the sanctioned first division of U.S. Soccer; do you see that?

That was the most important point, in your view, at this time in 2018; correct?

A    I'm going to have to continue to say that I don't know that these are my comments.

Q    Apart from whether you know what this was in this e-mail that you sent to -- let me ask you this, this was sent to dpetergarber@gmail.com.

Does anybody else besides you, send e-mails like this to D. Peter Garber, to your knowledge?

A    If you look at the end of this document, it's from Dan Courtemanche, the head of communications.  It is from him. It is his comments and I'm sure I sent these comments to my Gmail so I can take a look at it.  I do that at times because I have better editing in my Gmail account.

Q    Thank you, Mr. Garber, it's very helpful.

So your belief looking at the last page, these are comments Mr. Courtemanche prepared for you to consider at this time?

A    He prepared them.  I don't know whether he prepared them for me to do anything with them.  But these are comments now that I look at the rest of the document.

Q    So it was Mr. Courtemanche who prepared for you to

*D. Garber - Direct/Mr. Kessler*          1474

comment that the most important part of this was that SUM is an affiliate owned by the owners and MLS?

A    This was what Dan was saying, correct.

Q    By the way, it is correct whether you know the amount or not that MLS paid a significant amount in registration fees, membership dues, to U.S. Soccer that are higher than any other member pays to U.S. Soccer; is that true, whatever the number is?

A    No, I actually think the annual payments from other councils are more than Major League Soccer pays on an annual basis.

Q    On any single member, are you the highest payer?

A    I don't know that I can answer that.

Q    Okay.  Did you pay U.S. Soccer for the right to promote international games in the United States?

A    We paid a percentage of any ticket sales that we had as did all promoters when we promoted games.

Q    Is it correct as written here that, at this time, you were paid $34 million to U.S. Soccer?

A    This is what that Dan -- I don't know where he got that from.

Q    Wouldn't he get that from your records, he wouldn't make it up?

A    I don't know the answer to that.

Q    You think -- you know Mr. Courtemanche.  When he sends

*D. Garber - Direct/Mr. Kessler*                    1475

Q    you material, would he go to records and give you real numbers or would he make them up?

A    He could have gotten them from our financial guys.  I really don't have an answer to that.

Q    By the way this 34 million or whatever the number it is that's paid for these rights is on top of what's paid by SUM.  In other words, these are not the SUM numbers, the 34 million, these are payments that MLS paid to have international games; correct?

A    MLS would promote matches, but mostly our clubs would promote matches and U.S. Soccer as a sanctioning fee where a percentage of the revenue so I'm trying to answer question as best I can.

I don't know whether 33 of the 34 came from our teams when the Chicago team is promoting Real Madrid against Barcelona they have to pay a fee U.S. Soccer.  So I don't know whether it was MLS or MLS clubs and I don't know percentage of that.  I don't have an answer to that.

Q    But it was either MLS or MLS clubs who paid 34 million or something in that range in addition to the SUM agreement. I just want to make it clear to the jury this is not part of the SUM agreement?

A    No, it's not.

Q    It's something extra?

A    Correct.

*D. Garber - Direct/Mr. Kessler*                    1476

Q    Okay.  Let's look next at PX-616.  And you can look at this first.

This is a transcript that I reviewed with you.  You may remember an audio file of a press conference you gave on October 15, 2014.

Do you recall giving a press conference on 2014 regarding a situation with Mr. Klinsmann?

A    I do.

MR. KESSLER:  And, your Honor, we have the actual audio file which is an exhibit, but I reviewed this transcript with the witness at his deposition and I think he can answer what he remembers about what was stated just with the paper if that's acceptable to the Court.

MR. RUSKIN:  Your Honor, we have an objection.

This is incomplete, selected pieces.  We don't if it's right or not right.

THE COURT:  Is there a transcript of the entire file.

MR. KESSLER:  No.  We have the audio file and this is what we have as an exhibit.  I could -- I don't know if there is a bigger transcript.

THE COURT:  Since I have a feeling Mr. Garber will be back tomorrow, why don't he move on from this exhibit and try to figure this out.

MR. KESSLER:  Very good your Honor and I'll see if

we can get more transcript and mark it as an exhibit instead.

Let me skip on to PX-445.

Q    PX-445 is an e-mail dated June 4, 2014, from you to Mr. Abbott and Mr. Stevenson.

Do you see that?

A    I do.

Q    And below that is an e-mail from you to Mr. Gulati and Mr. Flynn, correct?

A    Correct.

Q    Okay.

MR. KESSLER:  Your Honor, I move into evidence PX-445.

MR. RUSKIN:  No objection.

THE COURT:  Okay.  So admitted.

(Plaintiff's Exhibit PX-445 .)

Q    Take a look first at the e-mail from you and Mr. Gulati to Mr. Flynn.

And to set the stage here, at this time, Mr. Klinsmann was the head coach of the Men's National Team; is that correct?

A    He was the head coach and the technical director for all levels.

Q    And he had made some comments in an interview in the New York Times that you thought was unfair or disparaging to

MLS.

Is that a fair statement of what your feelings were?

A    He titled how he plans to make U.S. Soccer better and less American, correct.

Q    Right.  And you thought those comments were uncalled for; is that fair?

A    It is fair.

Q    Okay.  And you write to Mr. Gulati and Mr. Flynn.  And you make certain statements to them about why you thought that was unfair for the head of the Men's National Team to make such comments, correct?

A    Correct.

Q    Let's look at Page 2.

And on Page 2 in the fourth paragraph, fifth paragraph, you write, the relationship between the league and the federation leadership is as good as it has ever been in my 15 years in this sport.  Together, the three of us (now with Gary the four of us, have a strategic and financial connection that is unprecedented in our sport.

You wrote those words, correct?

A    I do.

Q    You believe those words at the time?

A    I do.

Q    Right.  And you still believe them today, correct?

A    I do.

Q    Okay.  And the four of you mentioned here were you, Mr. Gulati, Mr. Abbott, and Mr. Stevenson who was an executive of SUM; correct?

I just identified who the four of you were?

A    It was Sunil, Dan, me and Gary.

Q    I'm sorry, not Mr. Abbott, you're right.  Thank you four catching that.

A    Okay.

(Continued on the next page.)

Garber - direct - Kessler                    1480

BY MR. KESSLER:  (Continuing.)

Q    The four of you, who had this good relationship that --
who have -- let me do it again.

The four of you who have a strategic and financial
connection that is unprecedented in our sport was you,
Mr. Gulati, Mr. Flynn and Mr. Stevenson; correct?

A    Correct.

Q    Okay.  Let's move to another document, PX-062.

(Exhibit published to the witness, counsel and the
Court.)

BY MR. KESSLER:

Q    It's an e-mail from you to Mark Abbott, Dan Flynn and
Kathryn Carter; is that correct?

A    Say that again?

Q    The top e-mail is dated September 15, 2010 from you to
Mr. Mark Abbott, Dan Flynn and Kathryn Carter; correct?

A    Correct.

MR. KESSLER:  Your Honor, I move into evidence
PX-062.

MR. BUTERMAN:  No objection.

THE COURT:  So admitted.

(Exhibit PX-062 received in evidence.)

BY MR. KESSLER:

Q    Kathryn Carter, what was her role in 2010?

A    She was the head of Soccer United Marketing.  I don't

SN        OCR        RPR

Garber - direct - Kessler                    1481

know her title, president and managing director of sales.

Q    Okay.  And Mr. Flynn was the CEO of USSF; right?

A    Correct.

Q    And Mr. Abbott we know was at this time I think one of your most senior executives in Major League Soccer; correct?

A    Correct.

Q    And this was a revised draft note from Sunil to JS.  Now, Sunil refers to Mr. Gulati; correct?

A    Correct.

Q    And JS was to who?

A    JS is John Skipper who at that time was the president of ESPN.

Q    And what was happening is you had suggested to Mr. Gulati that you would like him to write a note to ESPN at that time to make certain points about the relationship between the U.S. Soccer Federation and Major League Soccer; correct?

A    I don't agree with that.

Q    Okay.  Do you agree that you were giving suggestions to Mr. Gulati to a note you wanted him to send to ESPN at that time?

A    Dan Flynn, who is the CEO, asked us to draft a note for Sunil who was going to be working on the World Cup bid and was going to send this note to John Skipper regarding the MLS and SUM, but Sunil didn't ask for this note.

Q    Mr. Flynn, the CEO of U.S. Soccer, asked for this note?

SN        OCR        RPR

Garber - direct - Kessler                    1482

A       Asked us to draft it on Sunil's behalf.

Q       He was going to draft it to Sunil to be able to send out to ESPN, right?

A       Right.

Q       Right.  And what you sent to Mr. Abbott was what was being sent to Mr. Flynn that had been revised.  Had it been revised by you?

A       I don't know that I revised it.  I would imagine there were a number of revisions to this note.

Q       In any event, this was the revised note that you were sending to Mr. Flynn and Mr. Carter -- Mr. Flynn, Kathryn Carter and Mark Abbott as the revision; correct?

A       Correct.

Q       And this is what the note said:  It said, "John:  As I mentioned to Scott, Dan Flynn and I have spent the last two days meeting with Don and his team about finalizing a joint vision and plan for soccer in America including U.S. Soccer, MLS and the 2022 World Cup."

        Starting there, was that a true statement that at that time you had just spent two days meeting with Mr. Galeotti and others to finalize this joint vision and plan for soccer in America?

A       I would assume so, yes.

Q       And then it says, "The key component of this plan is the continued alignment of U.S. Soccer and MLS in all areas that

SN        OCR        RPR

Garber - direct - Kessler                1483

impact the sport."

That was true; correct?  That was the key component of the plan?

A    Including all of those things that were continuing in that paragraph.

Q    Right.  But the point was you were going to have continued alignment in all areas that included the sport and then you said including and you gave some examples, right?

A    I did, yeah.

Q    And you mentioned player development, marketing and promotion, media and infrastructure.  Those are the examples you gave; right?

A    Yes.

Q    Okay.  Then you said the following, that "From U.S. Soccer's perspective and in my position of the U.S. World Cup bid" --

And you were writing this for Mr. Gulati to send; right?

A    I don't know if I was writing it.  Somebody was drafting it, but I was sending it over to U.S. Soccer.

Q    But this was drafted for Mr. Gulati to send so when it says from U.S. Soccer's perspective it was for him to write that; right?

A    Correct.

Q    Is this a note for Mr. Gulati --

Garber - direct - Kessler                        1484

THE COURT:   One at time.  One at a time, please.

MR. KESSLER:   Sorry.

A    I said correct.  This was a note drafted for Mr. Gulati to send to ESPN.

Q    And then it says, "It is my strong view that the professional gain of the U.S. is the key driver of the future growth of the sport at all levels."

That's one of the things that was suggested to be sent; correct?

A    Correct.

Q    Look at the next paragraph.  It also says, "While both U.S. Soccer and MLS need to continue to make significant financial investments in a wide variety of areas, I do not believe we can achieve our goals as a federation or with respect to the World Cup without a strong and successful MLS."

That's what was suggested that Mr. Gulati send; correct?

A    Correct.

Q    And you believed that to be true when that was sent; correct?

A    I do.

Q    And then it said, "During our meetings we agreed that U.S. Soccer and MLS would continue our joint approach to managing all strategic relationships, particularly our

Garber - direct - Kessler                    1485

discussions with ESPN."

And that was true; correct.

A    For sure.

Q    And then it says, "I understand from Don that you have a meeting scheduled with MLS on September 27th to discuss ways to improve the performance of MLS on television.  After our meeting this week, both Don and I believe it makes sense to expand the agenda of that meeting to include the ideas that you had previously spoken to me about on working together to grow U.S. Soccer and the sport overall as well as the new ideas that we have."

And you wrote that as well; correct?

A    Correct.  And I think it's clear that this has gone back and forth.  I don't know what discussions John Skipper and Sunil had, but this note reflects what it is that we were asked to draft.

Q    And is it your understanding, Mr. Garber, eventually either this version or a very close version of this was sent to Mr. Skipper?

A    Yes.

Q    Let's go next to JX-34.

(Exhibit published.)

Q    JX-34 is an e-mail on the top from you to Mr. Stevenson, but I'm going to ask you about the e-mail below from you to Mr. Gulati dated September 24, 2013.  Do you see that?

SN        OCR        RPR

Garber - direct - Kessler                      1486

A      Yes.

Q      And you sent this e-mail; is that correct?

A      Yes.

Q      Okay.  Let's go to the second paragraph.  You wrote to Mr. Gulati -- let me start with the preamble that, "I believe our relationship has been one of the key drivers of the recent success of soccer in America.  We trust and like each other immensely and I say that deeply on a personal level."

That's what you wrote to Mr. Gulati?

A      Yes, yes.

Q      And you meant it when you said it; right?

A      Yes.

Q      You felt that you trusted him immensely and you felt it deeply on a personal level; right?

A      Yes.

Q      Okay.  Then you wrote, "We have been joined at the hip on just about every issue; good ones, bad ones, easy ones and difficult ones for years."

You wrote that sentence; correct?

A      Yes, I did.

Q      And you meant it when you sent it; right?

A      I did.

Q      Do you still mean it today?

A      I do.

Q      Okay.  Now let's look at the last paragraph.  It says,

SN      OCR      RPR

Garber - direct - Kessler                    1487

"As I mentioned to you last Wednesday, we were about to make an all-in offer on behalf of SUM to purchase all commercial rights of the Federation.  That offer could have been as high as 300 million" --

That 300 meant 300 million; right?

A    Correct.

Q    "300 million for eight years.  As you heard during our offsite, we feel strongly that the best way to build the Federation at all levels is to have full integration between commercial partners, sponsors, broadcasters, the integration would have led to greater revenue opportunity and as importantly more marketing, promotion and fan development."

And you wrote that to Mr. Gulati; correct?

A    Correct.

Q    And this was the time that Mr. Gulati and the USSF board were considering whether or not to extend the SUM relationship; correct?

A    I don't know the timing.  This document was related to the Nike deal that they were doing and we were making a proposal that would have included us purchasing the merchandising rights which we did not have in any existing SUM agreement and they opted not to do that.

Q    This was in September 24, 2013; correct?

A    Correct.

MR. KESSLER:  Let's go down to the next page,

SN        OCR        RPR

Garber - direct - Kessler                    1488

please.

A    And I'm going to take you one, two, three, four, five paragraphs down.  It says, "On a far more important level, I believe we really need to sit down with my key folks, including select members of the MLS board, you and Dan and finally get to drafting an integrated strategy to grow the game."

That's something you proposed; correct?

A    I proposed that we get together and do that, yes.

Q    And that's something that happened after this; correct?

A    I don't recall if we got together and had that meeting.

Q    Do you recall that you were able to craft an integrated strategy between MLS, SUM and USSF?

A    I don't recall at that this time if we had an integrated strategy, but I had hoped to put to together an integrated strategy to develop the game of soccer.

Q    At some point that strategy was developed; correct?

A    I would assume so and I hope so.

Q    Let's look at the next paragraph.  "Sunil, I also believe we need to have a discussion on how you want to involve and engage members of the USSF board.  The business has changed and is far more complex and interconnected with the league and with other member constituents.  You can always count on my support as I know I can count on your support on the MLS board"

SN        OCR        RPR

Garber - direct - Kessler                1489

Q    You wrote that to Mr. Gulati; correct?

A    I did.

Q    And you believed it; correct?

A    I believed it broadly, yes.

Q    You believed broadly that you could count on Mr. Gulati's support with the MLS board; correct?

A    He never had a vote so I think that was a broad comment. He knew many of our owners.  He was the president of U.S. Soccer, but Sunil never had a vote on the MLS board.

Q    Right.  He never had a vote, but --

How long were you on the MLS board?

A    Twenty-five years.

Q    Twenty-five years.  You've seen a lot.

You would agree with me that while Mr. Gulati doesn't have a vote on many issues, he doesn't vote, he discusses his views on many issues to the MLS board.  You would agree with that; right?

A    Sunil rarely, rarely spoke at MLS board meetings.  I think you can see that in our minutes.

Q    Okay.  So if Mr. Gulati gave his chairman's recommendation on what to do about a sanctioning decision, that would be a rare opportunity for him to speak?

MR. RUSKIN:  Your Honor, counsel once again --

THE COURT:   I understand.

Sustained, sustained.

SN      OCR      RPR

Garber - direct - Kessler                    1490

MR. KESSLER:  Okay.

BY MR. KESSLER:

Q    Mr. Garber, it's your testimony based on twenty years that Mr. Gulati rarely spoke at board meetings; that's what you're telling the jury?

MR. RUSKIN:  Your Honor --

THE COURT:  We're talking past each other.  The question that this witness heard is about MLS.  The question you're asking is about U.S. Soccer.

MR. KESSLER:  I apologize.

THE COURT:  So let's be clear since we have two entities.

Q    I'm asking about the USSF.  I asked the wrong question. It's my fault.  I agree with the judge.  It's my fault.

With respect to the USSF board, do you agree while Mr. Gulati did not have a vote, he frequently expressed his views on different issues?

A    Yes.

Q    Okay.  And he frequently would make recommendations, the board would vote, but he would say here is my view; correct?

A    Yes.

Q    And when you write here that, "I can count on your support on the MLS board," that would mean if Mr. Gulati spoke on an issue, you were stating you thought you could count on his support; correct?

SN        OCR        RPR

Garber - direct - Kessler                    1491

THE COURT:   Again, we're mixing -- this statement is about MLS board.  You just asked a question --

MR. KESSLER:  No.

THE COURT:   -- and framed this question in the context of USSF's board.

MR. KESSLER:  Yes.

THE COURT:   So let's be clear.

MR. KESSLER:  Okay.

BY MR. KESSLER:

Q   With respect to the USSF board, it's correct that you believed -- let me ask this.

MR. KESSLER:  I understand, Your Honor.

BY MR. KESSLER:

Q   The first statement here says, "Sunil:  I also believe we need to have a discussion on how you want to involve and engage members of the USSF board."

Do you see that?

A   I do.

Q   When you stated in the next sentence down, "You can always count on my support as I know I can count on your support on the MLS board."

Mr. Gulati was not a member of the MLS board; correct?  You testified to that.

A   Correct.

Q   Okay.  He was just attending on behalf of Kraft Soccer?

SN       OCR       RPR

Garber - direct - Kessler                    1492

A     Yes.

Q     So did you mean to write "MLS board" here or were you referring earlier to the USSF board?

A     No, I believe that I meant that I can count on him for his support when he was chatting with MLS owners.

Q     Okay.  In the next sentence it says, "But these meetings have to be more productive or they are just a time consuming formality."

Are you referring to the USSF board meetings or the MLS board meetings in that sentence?

A     The USSF board meetings.

Q     Okay.  So, now, in the next sentence you're back to talking about the USSF board meetings; correct?

A     Correct.

Q     You're sure that the prior sentence didn't mean to be USSF board and, like me, you sometimes mixed the two of them together?

A     Absolutely sure.

Q     Okay.  Let me show you PX-097.

(Exhibit published to the witness, counsel and the Court.)

Q     This is an e-mail from Mr. Gulati to you in response to an e-mail from you to Mr. Gulati dated 11/23/2013.

Do you see that?

A     Yup.

SN        OCR        RPR

Garber - direct - Kessler                1493

Q    Okay.

MR. KESSLER:  Your Honor, I move into evidence PX-97.

MR. BUTERMAN:  No objection.

THE COURT:  So admitted.

(Exhibit PX-97 received in evidence.)

BY MR. KESSLER:

Q    I would like to direct your attention to your e-mail to Mr. Gulati at 12:29 p.m.  Do you see that?  And you wrote to Mr. Gulati as follows:  "You're the man.  And BTW, I tell you this a lot, but can't ever enough.  Forget what the sport would be without you.  MLS could never exist.  I mean that."

That's what you wrote to Mr. Gulati; correct?

A    Yes.

Q    At 12:29 p.m.; correct?

A    Correct.

Q    And this came -- do you recall what you were thanking Mr. Gulati for at this time?

A    I don't recall.

Q    Okay.  But you meant these statements that you believe that MLS could not exist without the help of Mr. Gulati; correct?

A    I think it was a broad hyperbolic comment.

Q    But you made it?

A    I did.

SN        OCR        RPR

Garber - direct - Kessler                    1494

Q      Okay.  Let's look next as JX-84?

           (Exhibit published.)

Q      JX-84 is -- sometimes reporters ask questions and written answers are provided.  Are you familiar with that process?

A      Yes.

Q      And is this an article where Mr. Grant Wahl of SI Soccer submitted to you certain questions?

A      Yes.

Q      Okay.  Let me look, if we can, at the following:  It says, "What did SUM go on to do right after 2002?"

           If you see that section.  It's on page three of eight.  And if you look at the paragraph that says in 2014 -- "In 2014 you told me," this was the introduction, "U.S. Soccer's Sunil Gulati and Dan Flynn had this view that as the governing body of sport they would make commitments on the commercial side and on the competitive side to have MLS be the leader of the sport.  That's not something that exists in other parts of the world.  I believe that Sunil could have made a different decision when he came in as president," and then it says in brackets "in 2006" and had he made that decision MLS isn't what it is today, because we are joined at the hip."

           Those are comments you made; correct?

A      This, I think, is an interview from 2018.  This must have been a re-stating of a discussion I had with Mr. Wahl

SN        OCR        RPR

Garber - direct - Kessler                    1495

years earlier, but I would assume that I made that.  He was a respected reporter.

Q    But you made those comments?

A    I would assume so.

Q    And, in fact, you recognize the "joined at the hip" phrase.  You used it more than once; correct?

A    Correct.

Q    And looking at page six and eight.  There's a statement that Mr. Wahl asked that, "Had any of the current board members of U.S. Soccer received any payments from Soccer United Marketing?  Do any current members of the U.S. Soccer hold any equity in some" and it says the answer to both is no.

        Do you see that?

A    I do.

Q    Did you help prepare that answer to Mr. Wahl at all?

A    Excuse me?

Q    Did you help prepare that answer to Mr. Wahl?

A    Help prepare?

Q    You submitted this answer?

A    We submitted this answer.

Q    Okay.  In fact, you were a board member of MLS at this time; correct?

A    I was.

Q    And you received substantial compensation from SUM?

A    I get paid by Major League Soccer and Soccer United

Garber - direct - Kessler                    1496

Marketing is a sister company.  My paycheck comes from Major League Soccer.

Q    You don't believe you received any payments based on Major League Soccer at all -- from SUM at all?

A    I don't know.  My paycheck comes from Major League Soccer.

Q    Is it agreed that part of your compensation from Major League Soccer is for the work you do in SUM?

A    Yes.

Q    Thank you.

MR. KESSLER:  Your Honor, this is probably a good time to take a break or I can try to squeeze in a document or so.

THE COURT:   No.  That's all right.

Ladies and gentlemen, we're done for the day.  We will pick up again tomorrow and we'll try to start at 9:30. Let me remind you not to discuss the case with anyone including your fellow jurors and to not do any independent research or read anything about the case.

So, with that, have a good night.  Thank you.

(Jury exits.)

(Continued on the following page.)

SN        OCR        RPR

*Proceedings*                                                            1497

THE COURT:  So, we're here on the motion related to the Dr. Williams opinion.  I'll start off by saying neither side is making this an easy call.

Turning first to Defendants, I guess other than the fact that Mr. Sehgal's testimony, which I can see is an important qualification, most of what you raise in your motion about the construction of the 2013 agreement, at least in my opinion, could have been raised before trial.

Nevertheless, I do agree that I have a continuing obligation under Daubert to be a gatekeeper and to ensure that any expert testimony is based on assumptions that are bona fide and not speculative.

So Mr. Kessler, I guess with that table setting, I will tell you that I do have serious reservations following Sehgal's testimony about how it is that Dr. Williams can persist in his assumption about the interplay between the 2009 and 2013 agreements and specifically the effect of 7.02 and the effect of the expansion team definition.  And not to be flippant, but just by saying the issue is hotly contested doesn't make it hotly contested.

So, let me sort of tell you kind of the state of play and then we'll have the discussion.

So I've gone back to review Williams' supplemental report, which is at Docket No. 441-2.  And it's clear to me from that report -- and I'm looking at it right now -- that he

*Linda A. Marino, Official Court Reporter*

*Proceedings*                                          1498

continues to rely on the 2009 version of the LLC agreement with one caveat that he raises in a single sentence in footnote six to that report.

Let me ask you this Mr. Kessler: Is there any debate from you that the operative agreement is the 2013 agreement and that that supersedes the 2009 agreement?

MR. KESSLER: Our view, your Honor, is that the 2013 agreement is operative but did not change the meaning of the 2009 agreement with respect to this particular issue. That was the testimony Mr. Sehgal, that's the assumption that Dr. Williams is relying upon.

And I believe, your Honor, in order for their argument to prevail --

Is it all right if I sit, by the way?

THE COURT: Yes.

MR. KESSLER: In order for their argument to prevail, you would have to find as a matter of law the plain meaning of the contract is as they have argued.

Given the fact that Traffic never made this argument about the definition of expansion fees in all the disputes it had as a governing party, that able counsel on the other side never made or found this argument through two times of briefings, it doesn't seem to me that at best it creates ambiguity, and I agree it creates ambiguity, but that then it's a fact issue for the jury.

*Linda A. Marino, Official Court Reporter*

*Proceedings* 1499

THE COURT:  I am telling you that I am not making a Rule 50 finding.  So, there's no Rule 50 finding.  I don't think I need to go to Rule 50.  I think I'm sticking with Daubert and I'm sticking with 7.02 and I'm sticking with 403.

Hold on.  So, you're telling me that just as I read, right, I'm not exercising any magical skills here, I'm reading 7.02 in the 2013 agreement -- so, I guess I didn't get a straight answer.

Is the 2013 agreement in effect?

MR. KESSLER:  Yes.

THE COURT:  So, that agreement, then, reads that the first 450,000 and the entry fees paid by the first ten new Class A members -- and that's a defined term -- in connection with the admission of and it says "expansion teams."

So, I can replace "expansion teams" with the new definition of expansion team, which then would be with the admission of additional teams added to the league after the date of this agreement, which would be July 25, 2013, right?

How much more straightforward can that be?

MR. KESSLER:  Again, your Honor, what I would say is the following:  I want to start first because now we are in Daubert, not Rule 50, and I want to address it that way.

As your Honor knows, it's very common when you have a damages expert to say:  Assume liability and estimate the amount of damages.

*Linda A. Marino, Official Court Reporter*

*Proceedings*                                                    1500

That assumption is well known as a way of proceeding.  In fact --

THE COURT:   Let me interrupt, which I'm going to do.

Experts rely on assumptions.  Experts' opinions are tested by virtue of trying to undermined their assumption.

However, under Daubert, the assumption can't be fanciful.  And we are bordering here on a fanciful assumption given the plain language of the agreement and also what Mr. Sehgal testified to.  And I'll get to that in a moment.

MR. KESSLER:  So, my belief would be because there is an ambiguity as a result of this situation, you could look to then parole evidence --

THE COURT:   But where is the ambiguity.

MR. KESSLER:  The ambiguity was that, as Mr. Sehgal testified, that no thought was put into -- he's the only negotiator testifying.  And in his understanding, his definition, he even said it might have been an error, didn't reflect the intent of the parties which is then illustrated by the post agreement conduct, and, most importantly, that if Traffic intended that, the first argument they would have made in every one of their papers is that this expansion definition resolves it.

They never make the argument.

So, in that context only, it is reasonable to have

*Linda A. Marino, Official Court Reporter*

*Proceedings*                                                    1501

him, because he can't be the fact finder.  As your Honor ruled, we were granted a Daubert against an expert opining on what the facts are.  It has to be an assumption.  He can rely on that assumption.

And if their evidence is very persuasive and the jury will agree, then they will reject that assumption just like you test expert testimony.

THE COURT:  Right.  But a jury also should not be expected, and under 403 I have an obligation to ensure, that they are not misled and confused, right.

So, your witness calls the addition of this definition a drafting error.  That's fanciful.

I have a gatekeeping function.  I'm allowed to assess for purposes of evidence, I'm allowed to assess all the issues that go into that, right?

And let me walk through what I think is the key aspect of his examination, all right?

So, and to be clear, that term "expansion team," the new term as defined, I think by my count, and maybe you put this in your letter as well, appears only three times in the 2013 agreement, twice in the 7.02 section, which is the critical section here, right?

So, in his testimony, Mr. Buterman asked -- and I'm looking at Page 679 of his testimony:  Question, all of the ten teams that you say the expansion fee obligation applied to

Proceedings                                        1502

their entry into the NASL, they're defined as Class A members in this document; correct, sir?

Answer, That's right.

The examination continues:  Question, But if we look back at 7.02 -- and this is in reference to the 2013 agreement -- if we look back at 7.02, the obligation applies to new Class A members, sir; do you see that?

And Sehgal confirmed that he did.

And then continuing on Page 680:  Question, None of those ten that you testified under oath yesterday, which would be the ten from effectively the 2009 agreement, none of those ten that you testified under oath yesterday the obligation belonged to are new Class A members; correct, sir?

He replied:  That's correct.

7.02 requires that the payment be for new Class A members.  Your witness conceded that the ten that he was referring to, and that was on Pages 678 to 679, the ten teams beginning with FC Edmonton down to the Oklahoma City team, that none of those ten teams could be new class members.

So during the Daubert, you told me in your response -- not you, but your firm told me that the issue wasn't ripe yet, to wait to see what happened at trial.  And here we are.

Is there going to be another witness that's going to try to buttress Mr. Sehgal's testimony?

Linda A. Marino, Official Court Reporter

Because based on that testimony, how is it not clear from his own testimony that the ten teams that you're arguing should be the basis for the calculation, that those ten teams do not qualify as new Class A members?

MR. KESSLER: So, your Honor, two things.

One is that Mr. Sehgal also testified -- I think it was on redirect but I don't have the citation for you -- that his understanding was that the new teams was prospectively going forward, and that this did not, as he put it, require a resetting of when you counted the ten for.

And if your Honor, if Traffic had made this argument, because they were the two drafters; right?

They didn't call anybody from Traffic on the other side. In fact, they had him testify, Mr. Davidson, but they didn't ask these questions.

The point is that no, it didn't occur, so the logic, the reasonableness, could be proven wrong, to the jury, but for him to reasonably state, to testify, that his understanding was putting in that definition was not intended to make a recount just going forward is not an unreasonable interpretation.

And I agree, it's a contested interpretation. It's even one that may not be there --

THE COURT: It's not even a question of reasonableness. He concedes the point. He concedes that new

*Proceedings* 1504

Class A members -- that new Class A members cannot be the teams that are the basis for the calculation.  He concedes that.

How is that not a concession?

MR. KESSLER:  I believe he also testified it didn't -- I can find the testimony and submit it to your Honor, that he testified that in his understanding, that was prospectively and it didn't change the original recount because they never would have entered into the agreement to change it.  That way, your Honor, they never would have settled this for $5 million --

THE COURT:  How do I know that.

It's a company that is indicted or related to the indicted entity.  All I have, right, all I have is the documents before me and the testimony of Sehgal.  I don't have anything else.

MR. KESSLER:  I understand, your Honor.

THE COURT:  And that's the only basis that I have to make an evidentiary decision.

MR. KESSLER:  I understand that, but I don't believe that your responsibility is to decide this disputed fact as a basis for excluding this expert testimony.

I agree if this rose to Rule 50, you obviously could do something in Rule 50.

THE COURT:  You're saying it's disputed because

*Linda A. Marino, Official Court Reporter*

*Proceedings*                                                          1505

you're saying it's disputed.  Like I said, assumptions normally go to weight.

MR. KESSLER:  Yes.

THE COURT:   I understand that.

MR. KESSLER:  Yes.

THE COURT:   But here, the assumption based on what we have right now, based on the trial testimony, that assumption is at the outer limits of that principal, right.

And when you get to that outer limit, right, then what we do is we're then bordering on whether the assumption is admissible under Daubert.  It's no longer a weight question.  It's no different than Williams coming up with some other assumption that's fanciful.

If what's before me is fanciful, how do I not analyze this under Daubert?

MR. KESSLER:  So I would say, your Honor, that it is not unreasonable, it is within Daubert for him, for the negotiator, to testify that he believed that that use there, if it had that effect, would be an error in the parties.

I'll point out that they had an expert who examined this issue and these contracts who put in a declaration and that expert didn't even look at it and say:  Gee, what about this?  B it was so obscure.

THE COURT:   It doesn't matter.  If everyone up until two days ago was asleep at the switch, it doesn't

*Linda A. Marino, Official Court Reporter*

*Proceedings*                                                      1506

matter.  We are where we are.  So, the history of who analyzed this first, whether someone saw it or if someone didn't see it, that's irrelevant.

MR. KESSLER:  But your Honor, what does matter is what's the intent of the parties to the agreement, right?

That's what we do in a contract.  And if it's decided as a matter of law, that's all you decide, that's fine.  But if you're not deciding as a matter of law the intent of the parties, you have unequivocal testimony from a negotiator that that was not the intent of the parties.  We have subsequent evidence that that was consistent with it not being the intent of the parties.

And I think that more than satisfies the Daubert test subject to challenge before the jury.

THE COURT:  How can you say it's unequivocal with the line of questions that I just went through.

MR. KESSLER:  Because that -- no.

What I'm saying is that the testimony makes it equivocal so that you look at all this other evidence and what you're weighing is not just the language of the contract, you're weighing his testimony and the subsequent documents and all the extrinsic evidence.

THE COURT:  Why aren't we back in the territory of one of the cases that was referenced in the Daubert and that I cited in the opinion, the Washington v. Kelwood case.

*Proceedings*                                                    1507

In my last decision I distinguished it, but now that there's further factual foundation or at least as I'm articulating lack of foundation, why doesn't this case look a lot more like that Washington v. Kelwood case?

MR. KESSLER:  Because I believe that here there is reasonable grounds for the jury -- that's why it's not Rule 50.  That means a jury could conclude otherwise as a matter of fact.  And if a jury could conclude otherwise as a matter of fact, it is not so unreasonable an assumption that it should be a basis for Daubert.

THE COURT:  But Washington was not a Rule 50 case.

MR. KESSLER:  I understand that.

THE COURT:  It was an expert case, right?  And there, the Circuit affirmed the trial Court's decision to exclude testimony --

MR. KESSLER:  Yes.

THE COURT:  -- about -- let me get my facts straight.

About profits expected from a contract -- very similar to the flip side of this -- where the expert's view about a contracts review, the quote from the Circuit was, quote, "speculative and belied by the contract itself," close quote, which gave the other party the unilateral right to renew.

Why isn't the contract itself enough here?

*Linda A. Marino, Official Court Reporter*

MR. KESSLER:  Because in that case, I believe there was no principal negotiator testifying in support of the interpretation of the expert.  A direct participant giving the intent of the parties on a contract that is not -- as a matter of law, you don't consider the testimony.  If in that case there had been such a negotiator testifying, I don't think it would have come out the same way.

I agree with you if the expert had simply looked at a contract and said, Oh, I'm relying just on this contract, and the contract doesn't at all support that, that's the type of case that you have there.

THE COURT:  I mean, how do I sort of fulfill my obligation, right, to not -- I mean, the Defendants shouldn't be -- just because the jury can assess it or can be asked to assess it, the Defendants shouldn't be put through the task of having to defeat an expert argument that's based on, at least in my view, reading Sehgal's testimony and sitting through saying's testimony, on what is speculation.

He's just now saying that wasn't our intent when the plain language of the intent is that that was their intent.

MR. KESSLER:  I don't believe it's the plain language because it's ambiguous whether --

THE COURT:  Forget about what Sehgal said.

Where is it ambiguous in this contract?

MR. KESSLER:  Whether changing the word "expansion"

*Proceedings*                                                      1509

was meant to apply going forward but not eliminating counting the earlier teams from 2009, which already counted.

Remember, this was an amendment of the 2009 agreement.

THE COURT:   So, you're asking me to accept that a definition term is specifically added to a provision that is effectively the payment provision but that that definitional term has no significance.

MR. KESSLER:   No, I'm not asking that.

THE COURT:   Okay.

MR. KESSLER:   I'm saying it doesn't rise to a level where you would Daubert the testimony of it because it is exactly the case of -- it's case law we cited about the elephant in the mouse hole, which is that if the parties intended to resolve such a significant issue of financial consequence, they wouldn't have --

Remember, the language is exactly the same in the two agreements; not the definition, the language is the same. They would have changed the language there -- and I'm not saying to find that -- it's logical that they would have and not have intended to do it through just this change of the definition.

(Continued on the following page.)

*Linda A. Marino, Official Court Reporter*

*Proceedings*                                                    1510

(In open court; 6:11 p.m.)

THE COURT:    You're saying just the change of definition.  In most contracts, the definitional provisions are the most important.

MR. KESSLER:  And some of the teams had already been counted for purposes of this.  In other words, they were ready -- because remember, we're going back to 2009 there had been some new teams already between 2009 and '13.

THE COURT:    You're asking me to allow in expert testimony that at least by last count is damages in the amount of 170 million-odd for the DI sanction on what is highly speculative when his only assumption is based on the contract.

MR. KESSLER:  One thing I want to address, your Honor, just in terms of the significance.

I do believe, if you rule this way, which I don't believe you should.  But if you do, then at the very least, he should be able to do the math which is in his report to express the deduction starting from 2013 because there's no prejudice to defendants.  It's simple math, as your Honor knows, you just start to count.  It doesn't change his methodology or anything else.  It would be enormously prejudiced because had he known.  And I would say this, your Honor, had he known this was defendant's position at the time of their motion, we would have had him do a calculation

Proceedings                                                 1511

based on 2013 and put it in with his supplemental as an alternative north jury to consider.  But because it's just coming up now mid-trial, he couldn't do that.  And, by the way, I called and asked him because it's simple math, he could do this calculation in about an hour.

THE COURT:  Let me ask defendants.

On the point that Mr. Kessler makes that.  Assume it's correct that -- let's assume that the contract language is unambiguous.  Why doesn't that permit, given Sehgal's testimony, Williams to rely on that testimony to say that while, yes, the contract is to be straightforward, there's more than just a contract.  And based on my understanding of what the parties intended, the amount is X.

MR. BUTERMAN:  Your Honor, this is a Delaware contract and Mr. Kessler's argument, respectfully, is completely circular.  It's taking parol evidence to try to undermine a clear and unambiguous provision within the contract and then say that that somehow makes it acceptable for his expert to get onto the stand and testify to something that, with respect, we all know is factually incorrect at this point.

I would also note, your Honor, that there are two provisions that I think are particularly important here and they go to Mr. Kessler's argument.

One is Section 13.10 entitled, Entire Agreement.

And that reads, This agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supercedes all prior agreements and understandings pertaining to.

That's one.

THE COURT:    That's in the 2013.

MR. BUTERMAN:  Yes.

THE COURT:    The Integration Clause in the 2013.

MR. BUTERMAN:  Correct, your Honor.

And the other is 13.17, which is construction, where it states that each party hereto acknowledges and agrees it has had the opportunity to draft, review, and edit the language of this agreement and that no presumption for or guns any party arising out of drafting all or any part of this agreement will be applied and any dispute relating to in connection with or involving this agreement.

Accordingly, the parties hereby waive the benefit of any rule of law or any legalization which would require that, in cases of uncertainty, the handling of the contract should be interpreted most strongly gets the party who drafted such language.

I think that when you take those two provisions along with the plain and unambiguous language of §702, the addition of the expansion team definition, as well as the testimony regarding the definition of class A members and

*Proceedings*                                                    1513

new class A members and Mr. Sehgal's admissions on this and, in fact, the follow-up question, your Honor, that I asked him after the part that you had read at 680 when I say it him, "So I'm going back, I'm going to go back to the question I asked you just a moment ago."

THE COURT:  You're where now.

MR. BUTERMAN:  I am at 680, Line 5, your Honor.

THE COURT:  Okay.

MR. BUTERMAN:  Question:

"QUESTION:  So I'm going back to the question I asked you just a moment ago.  The July 25, 2013, LLC agreement expressly provides that expansion teams for which NASL has to pay Team Holdings the 450,000 plus 80 percent means additional teams added to the league after the date of this agreement, July 25, 2013; correct, sir?

His response:

"ANSWER:  It may have been a drafting error.  My understanding is that it's always supposed to be the first ten teams."

"QUESTION:  This is an agreement that was signed by the NASL?"

"ANSWER:  Yeah."

"QUESTION:  It's a binding agreement?"

"ANSWER:  It is."

We believe that all of this establishes that this

*Proceedings*                                                    1514

is an unambiguous contract.  The language is unambiguous under Delaware law and, therefore, there could be no parol evidence and it can be just as a sheer matter of propriety it would be wrong for Dr. Williams to take the stand and argue that somehow the 2009 agreement is the operative agreement.

Mr. Sehgal's testimony, one hundred percent makes clear that you cannot count the expansion teams the way that Dr. Williams did.  That, I think, goes beyond the language of the agreement, that's his testimony.  There is no other witness who going to be coming to this court to talk about this issue.  The next person who may or may not testify on this is Dr. Williams.  And we did not believe there is any basis to say that that's an assumption that can be presented to the jury.

THE COURT:  It is telling, Mr. Buterman, it is telling just from an, I don't know what's telling, tells me something that he spends the entirety of -- this is Dr. Williams -- of his supplemental declaration on damages that he was required to do in light of Judge Cogan's Daubert decision.  He spends the entirety of that section dealing with the 2009 agreement.  And then, in passing, just sort of kind of whiffs the back of his hand to the 2013 agreement. I mean, clearly that's being done for a reason.

MR. KESSLER:  Your Honor, I think if you look at

his next, not the first one, but the one that was put in the declaration in response to the motion they filed before you.

THE COURT:   Isn't that the one I'm looking at.

MR. KESSLER:   I'm not sure there was one after Judge Cogan's opinion.   I think there is a subsequent one, isn't there.

THE COURT:   There's the July 21st.

MR. KESSLER:   That's the correct one.   That's the correct one.

I think he makes it clear that he is not finding facts, he is not.

THE COURT:   But that's not -- my point is that after Judge Cogan says, hey, you can't ignore the fact that there is this potential payment from expansion fees and expansion fees are the basis for the damages as calculated by Williams, that there is this potential that a huge chunk of these expansion fees don't go to NASL but rather go to Traffic or team.   So go fix that if you want to testify. And then in going to fix that, he focuses 99 percent of his attention on the 2009 agreement and not the 2013 agreement.

MR. KESSLER:   So, your Honor, just to go back to Judge Cogan's decision because I think it's context.

When Dr. Williams documents originally was that he thought that the proper way to do this was to use the settlement agreement payment, that's what he deducted.

*Proceedings*                                                    1516

Judge Cogan said, In the but-for world in 2016, the date you started is March 2016 when the DI sanction was denied which was before the settlement agreement was reached.  He therefore instructed Dr. Williams saying, Therefore, you have to assume the but-for world going forward is whatever the contractual state was before March of 2016.

THE COURT:  That's the critical point, right? Like you said to me earlier that none of the parties thought about this, right?  And Judge Cogan already said, like, the parties thinking about this is the settlement agreement. And he said, do not look at the settlement agreement, look at the contract as it existed.

MR. KESSLER:  No, no that was a different issue, your Honor.

What he said is, in creating a but-for world, you're doing it at a point in time.  And at a point in time, what matters is what is the state of the world at that time. In March of 2016, there was no settlement agreement yet.  So he said, therefore, you have to project based on that moment.  And so, he wasn't making any comment about --

THE COURT:  There's no settlement agreement, meaning, that the only thing that's in effect is a contract.

MR. KESSLER:  Correct.  But I didn't make a ruling that it wasn't relevant what the intent of the parties was.

*Proceedings*                                             1517

What I'm saying is here is that because -- when he had to look, so he said, okay, I have to understand what's the agreement.  He was told by counsel, you can't fact-find, we'll give you an assumption to make.

We spoke to Mr. Sehgal who went through what we thought the history, frankly, your Honor, I'll be very honest, Mr. Sehgal said nothing to us about that expansion fee definition because he never thought of it in time as there.  We didn't find it, they didn't find it.  We looked at what their expert said.  And we said, based on Mr. Sehgal, who was a negotiator, you can make this -- you could rely on this.  And unless you find, I believe, unless you find that there's no question of fact at all, you know, it's -- because remember the question is not the meaning of the agreement, the question is what would they have paid to Team Holdings.

And what Mr. Sehgal testified is that they did not intend to pay Team Holdings more than that.  That's what he's relying upon and there's a factual dispute about that which went back and forth and was ultimately settled.  It was put aside, it was settled, but they never intended to pay Team Holdings other than that.

So I believe under, again, established law of Daubert including the Second Circuit, this would be one that they could, and I'm not going to put Dr. Williams on the

*Proceedings*                                                    1518

stand to say this is what the agreement means.  He's simply going to say, I've been asked to assume that they only would start the count of ten from the beginning.  And so, I think that's fair expert testimony.  I think it's within the bounds of admissibility and that's how your Honor should rule.

THE COURT:  What you just said, doesn't that then lead me right by the leash to Rule 403?  Why doesn't what you just said take me right to §403.

MR. KESSLER:  Because I don't think, your Honor, that that §403 prejudice is designed to cover a situation like this where the jury has a difficult -- all this means is the jury would have a difficulty issue to decide as, by the way, this is an antitrust case.  There are many -- they're going to have to define relevant market. There are a lot of issues they're not equipped with.

THE COURT:  You have to find relevant market.

MR. KESSLER:  They're going to have to find whether we've proven a relevant market.  They're going to listen to economic testimony.  Lots of things that are very difficult for the jury.

THE COURT:  Why isn't the fact that we have this foundation issue as I've articulated it.  Why wouldn't that lead to confusion?  Why wouldn't that lead to misleading the jury when you have, like, why should this jury be put to the

*Proceedings*                                                    1519

task of having to interpret this contract and make decisions about it when your own witness has clearly articulated what the contract means.

MR. KESSLER:  Because, your Honor, again, unless you apply Rule 50 which I don't think would be appropriate, that means there is, in fact, an issue to be determined by the jury.  And if it is an issue to be determined by the jury, it's not a §403 violation that it's a hard issue or a complicated issue.

THE COURT:  It's not an issue to be determined. The Rule 50 and the §702 Daubert issues, that's apples and oranges, right?  We're just talking about Daubert.

In Daubert the expert has to make -- have an opinion based on sound assumptions.  In a case involving a contractual issue, those sound assumptions have to be based on basic principles of contract interpretation, do they not.

MR. KESSLER:  Yes.

THE COURT:  Okay.  So assuming that's the case, what in this case allows for parol evidence as allowing this witness to make basic assumptions about the contract.

MR. KESSLER:  Because I don't believe it's correct that this language is under Delaware law would preclude testimony from the negotiators as the intent.

THE COURT:  If we were sitting in chancery court right now.

*Proceedings*                                                    1520

MR. KESSLER:  Yes.

THE COURT:  Do you think that a judge in chancery court would say that this contract with an integration clause would allow Sehgal's testimony about what the contract means.

MR. KESSLER:  In these circumstances I do, your Honor.  I don't think the integration clause is relevant because we're not arguing there was a separate agreement made.  We're arguing for the interpretation of this contract.

THE COURT:  Are you not arguing that the assumption that Williams is claiming that he's relying on, is premised on parol evidence, is it not?

MR. KESSLER:  Yes, it's premised on what he understood -- he did not read the contract because he's not a lawyer.  He did not read the contract and do his legal interpretation of the contract.  He is basing this on the testimony of the principal negotiator as to what the parties understood it meant.  And it's reasonable for him to rely upon it.  It could be wrong, it could be found differently, but I don't think it's a basis to preclude the testimony.

THE COURT:  You're basically arguing for sort of like an expert witness immunity provision that as long as someone gives him an assumption, that we should just rely on that assumption without testing the bona fides of the

*Proceedings*                                                      1521

assumption which is what Daubert is intended to do.  You

can't just get up here and say, you know, I made this

assumption because X, Y, Z told me that when there's real

challenges to the basis for the assumption.

MR. KESSLER:  So, your Honor, maybe this will

help.

His damage analysis is based on a but-for world,

right?  There's like what would have happened going forward

if they had the DI sanction?  It is not an unreasonable,

unreliable assumption given the testimony of the negotiators

that NASL would not have agreed to start the count from that

first -- from that first one.  They had intense

disagreement.  So that's what he's really assuming that NASL

wouldn't have agreed to it.

Now, they argue, well, there would have been a

future lawsuit and maybe NASL would lose or something, but

that is -- that is not something the experts could resolve.

The jury have to do that and decide what would happen in the

but-for world.  It's not like he's testifying as an expert

on the contract saying here's what the contract means in the

real world.

He's saying --

THE COURT:  He's not saying that because he's not

allowed to say that.  But he is saying, here is the math

based on this interpretation of the contract.  And his

*Proceedings*                                                    1522

interpretation of the contract is based on parol evidence that is clearly contradicted by the contract.

MR. KESSLER:  I say it a little differently.

He's saying here is the math based on an assumption that NASL would refuse and not have to pay for counting starting from a later date, the counting would be earlier.  And that, in fact, was NASL's position the whole time as we heard from the negotiator.  That's what they -- if this had gone forward, if the sanction had been granted, and they started getting expansion fees after.  There's no question, in a but-for world, there's no question based on Mr. Sehgal's testimony that NASL would have taken the position we start the count earlier because that was always their position.

THE COURT:  That's fine and dandy that's the position he takes.  But what is controlling is the contract. I mean, everything you're saying is not the contract.

(Continued on the next page.)

Proceedings                1523

(Continuing.)

THE COURT:    So you don't even agree that the contract, as drafted in 2013, would require new Class A members to be ten teams going forward from the date of the contract.

MR. KESSLER:    I do not, Your Honor because I think it would have been contested and resolved.  And in fact what you need at a minimum to do this, I believe, is at least one of the negotiators stating Holdings or NASL stating that they understood this change meant that the count would start later.

Where is that evidence?  They have not come forward with that.

THE COURT:    That is not their burden.  You are the one putting forward an expert.  You have the burden as the proponent of that expert to ensure that that expert's assumptions are bona fide.  It's not just, like, okay Sehgal says it's a different view than what the plain language of what the contract says.

MR. KESSLER:    And, Your Honor, based on -- if you put in the declaration first for Mr. Sehgal and then we had testimony from Mr. Sehgal.  We believe we satisfied that burden.

THE COURT:    The Sehgal declaration is worth what it's written on for purposes of the motion and that's what I relied on for the motion.  We're beyond that.

SN        OCR        RPR

Proceedings                               1524

MR. KESSLER:  Okay --

THE COURT:   I have his testimony now.

MR. KESSLER:  But the assumption was based on the declaration at the time.  In other, words that's what we knew at the time.

THE COURT:   Okay.

MR. KESSLER:  And so when Dr. Williams did his analysis that's what we had, but you ruled upon the same thing.  Now we have something else, does that change it, and my belief is it should not change it because what the issue is would the NASL going forward, you know, have said yes, this is what it means and pay it.  If they would say no and contest it in the but-for world, which they clearly would, then it's not clear.  It is uncertain whether it would have been the count there or now.  And if it's uncertain, then the jury has to decide what's reasonable.

THE COURT:   Everything about the but-for world is uncertain, but it still has to be based on solid assumptions.

MR. KESSLER:  And I believe having the one negotiator testify about this, the fact that -- we have all of these documents from Traffic which says that, you know, here is how we should do it and they cite -- what do they cite?

They cite the deferral agreements as being the reason why and that was all briefed before Your Honor.  That was the dispute.  Their expert does a whole different count.

SN        OCR        RPR

Proceedings                                    1525

He looks at it and says, well, I'm looking at the deferral agreement so here is the ten that I would use.

And he doesn't use from 2013 forward.  He uses a different count so you have experts, lawyers, the negotiators, the parties all looking at this language and none of them are saying that it is unambiguous.

THE COURT:   We're going around in circles because we've talked about this already.

MR. BUTERMAN:   I would like to make one point. Mr. Kessler has said repeatedly now that Dr. Williams' opinion was based on the assumption and he referenced Mr. Sehgal's deposition.  Mr. Sehgal's declaration went in months after Dr. Williams issued his report.  If you look at the materials Dr. Williams relied upon, it doesn't mention Mr. Sehgal's declaration because it didn't exist at that time.  It doesn't even mention the 2013 agreement.

THE COURT:   What doesn't mention the 2013 --

MR. BUTERMAN:   The appendix of materials that Dr. Williams relied upon.

The only thing that Dr. Williams bases his assumption on is the plain language of the 2009 agreement and Mr. Kessler I believe agreed that that's not the operative agreement.

There is a dispute between the parties and I think that that dispute remains as to whether the obligation -- and

SN        OCR        RPR

Proceedings                                      1526

this is what Ms. Cole testified -- what Ms. Cole went through with the witness, about whether the deferral was a deferral of the counting or the deferral of the payment.

We're not saying that the -- that the obligation -- that the 2013 agreement, that the timing for accounting starts from the 2013 agreement. Our position has been consistent throughout that the counting has to begin from the date that the divisional sanction is denied.

The reason that we brought this all up is because Dr. Williams' assumption, which is based just on the contract, is demonstrably false and again we believe because of that it would be improper under Daubert and 403 to allow Dr. Williams to present a $170 million damages figure based on clearly unambiguous --

THE COURT:  That is a good point that I hadn't really focused on which is that footnote six in his July -- in his July 2nd supplemental declaration. It doesn't even say that he was asked to assume. He's just making that statement. It's his own view.

MR. KESSLER:  It would be presented here as he's asked to presume. That's how we --

THE COURT:  All right.

MR. KESSLER:  In any event, Your Honor, I would just close by saying again I'm not going to make arguments over and over again if Your Honor has heard. At a minimum if you're

SN        OCR        RPR

Proceedings                                    1527

going to rule this way, we do believe that had this been presented and argued and decided in their prior briefings Dr. Williams then would have just done the math and presented the alternative calculation.

THE COURT:  But that's not the point that the defense is making.  The defense is saying -- they can do the math too.  The math is the least-complicated part of this, I would think.

MR. KESSLER:  That's the only other difference. Every other part of his analysis and work is reliable. There's no challenge and that was ruled in the original Daubert by Judge Cogan.  They challenged all aspects of his methodology, all of that was rejected by Cogan.  So the only thing we have left is whether this one last part of his calculation, that's the only part that's based on this assumption.

THE COURT:  The -- you're describing it as sort of a one kernel of corn, but this kernel is the whole thing.

MR. KESSLER:  It's not, Your Honor.  The whole thing is in estimating what the expansion -- that's the whole analysis, estimating what the expansion fees would have been.

THE COURT:  Right, but if 80 percent of those go not to NASL, then --

MR. KESSLER:  Well, it has economic significance but in terms of his analysis, it's actually the simplest part of

SN        OCR        RPR

Proceedings                                        1528

his analysis.  It was just the math based on his assumption.
So he should be able to redo the math if you're going to rule
this way.

THE COURT:  All right.  I just want to be clear
that I understand -- I'm not prepared to rule tonight, but I
want to make sure what is the remedy that you're asking for
Mr. Buterman.

MR. BUTERMAN:  We believe that Dr. Williams should
be precluded from presenting a Division-I damages calculation
to the jury in this case, Your Honor.

THE COURT:  And that's even if he puts forward as
his primary an alternate calculation based on a go-forward
date of July 2013 or whatever the effective date of the 2013
agreement.

MR. BUTERMAN:  We don't believe that that would be
correct, Your Honor, and to -- I don't want to reargue this,
but there has been a history of Whack-a-Mole here with
Dr. Williams and we don't believe it would be fair at this
point for Dr. Williams to now present another set of numbers.

We already have, I believe, somewhere in the
neighborhood of north of fifteen and I think I'm being very
conservative, to use Dr. Williams' favorite expression, when I
say that we have fifteen different numbers that he's presented
for the exact same thing, for Division I damages, and we don't
believe it would be appropriate at this juncture for

SN        OCR        RPR

Proceedings                                                1529

Dr. Williams to be permitted to present another number and us to have to move on the fly to respond to this.

MR. KESSLER:  Your Honor, our position at least so you have it, would be if you decide to rule this way and obviously we advocate against it, and I appreciate that we believe the appropriate relief would be to direct that Dr. Williams only present based on the 2013 count starting going forward so we would not offer it as an alternative to the jury and he would present that result based on now making an assumption consistent with Your Honor's direction that that's the plain meaning of the agreement and it is no burden on them because, as Your Honor knows, it's simple math which they can easily cross-examine him on.

MR. BUTERMAN:  Your Honor, this is not simple math, with respect.  No one in this room, with the possible exception of Mr. Meyer in the back, could do this calculation. This is not a simple one.

THE COURT:  I know you guys still have a long night ahead of you.  So let me just --

While I think about what an appropriate remedy is, what I'm going to do is require Dr. Williams to produce a supplemental report by Friday at noon.

MR. KESSLER:  Very good.

THE COURT:  In that report he's going to disclose his alternative estimates and how he reached it.  When I say

SN        OCR        RPR

Proceedings                                    1530

alternative estimate, or at least reading what you wrote, my assumption of that is that that estimate will be a calculation based on the expansion fees for teams coming into the league after July of 2013, July 25, 2013, which was the date of the 2013 agreement.

And then to the extent that he -- since I haven't ruled, right, to the extent that he's persisting in relying on his current report and not choosing to pursue the alternative estimate as plaintiff's D-I damages model, he's also going to explain in that supplemental report how, if at all, in view of Sehgal's trial testimony he stands by footnote six in his report. And then I'll consider, for the reasons discussed today, whether his D-I opinion -- his D-I damages model opinion should be excluded.

MR. BUTERMAN: Your Honor, could I just make one point? I want to make it clearer if it's not. The defendants' position is not that it would be appropriate for any damages calculation to begin as of the date of July 25, 2013.

The defendants' position has been and continues to be that the calculation has to begin as of the date that the Division I sanction was denied, which was March 10, 2016.

THE COURT: Okay. And then -- I understand. So, the focus is only -- since there wasn't a D-I, but-for world in July 2013, the only time that that hypothetical but-for

SN        OCR        RPR

Proceedings                    1531

world existed was the date of the denial because that's when the but-for world begins.

MR. BUTERMAN:  And as at that time there had been no payments made to Team Holdings for any expansion teams.  And, so, therefore, we believe that the calculation should begin as of the date of the Division I denial.

THE COURT:   Which is March 10, 2016.

MR. BUTERMAN:  Yes, Your Honor.

MR. KESSLER:  Your Honor, on that point, this argument they have made before through their expert.  It has nothing to do with the interpretation of the contract.  In other words, they would take this position, whether Mr. Sehgal's interpretation of the contract is correct or whether the other interpretation of the contract is correct, but it's not dependent on when the count starts.

It's dependent simply on the date of the but-for world.  So this one, they have no basis for asking for that relief now.  In fact, I believe they asked for this relief in their prior motions and it was determined that, no, you can go forward.

The only issue now should be based on the contract change, not on their legal argument which is independent of the contract that it should start on 2016, which I don't believe was what Judge Cogan envisioned in his opinion. That's a debate about what Judge Cogan's opinion means.

SN        OCR        RPR

Proceedings                                    1532

THE COURT:  Mr. Buterman.

MR. BUTERMAN:  I fundamentally disagree with that, Your Honor.

THE COURT:  You do agree with Mr. Kessler's point that if -- if we weren't here today debating the point of the operative agreement and the effect of footnote six and the definition of expansion team, we would be in a situation where Dr. Williams would not be using that March 2016 date and that is something that you would be crossing him on.

MR. BUTERMAN:  Absolutely, Your Honor.

THE COURT:  I am going to leave it as the July 25, 2013 date.  That doesn't change sort of your theory of undermining Williams, if that's what you achieve, but I guess I leave the option to plaintiffs in terms of whether you want to just go with the alternative model and not --

If you just go with the alternative model, I mean, he's still going to have to explain what the basis of his assumption is.

MR. KESSLER:  Of course.

THE COURT:  And if you're persisting in relying on the current report, like I said, he will have to explain how he gets to that, in light of the Sehgal testimony.

MR. KESSLER:  Okay.  So, just ask a question about that so we can decide what we want to do with it.  If he -- if we decide to go with the alternative model, would that just

SN        OCR        RPR

Proceedings                                    1533

end the issue or is there still an issue as to whether or not you might exclude it entirely?

THE COURT:   I want to see how he gets to the alternative.

MR. KESSLER:  Understood.  Thank you, Your Honor.

THE COURT:   I can't rule on it without seeing it. Once I see it at that noon on Friday, you know --

MR. KESSLER:  That's very clear.  Thank you, Your Honor.

THE COURT:   Anything else?

MR. BUTERMAN:  Thank you, Your Honor.

MR. KESSLER:  Thank you.

THE COURT:   Have a good night.


(Matter adjourned until January 23, 2025 at 9:30 a.m.)


- ooOoo -


SN       OCR       RPR

1534

I N D E X

WITNESS                                                      PAGE


  SUNIL GULATI

        CROSS-EXAMINATION BY MR. BUTERMAN          1257

        RE-DIRECT EXAMINATION BY MR. KESSLER       1309

        RECROSS-EXAMINATION BY MR. BUTERMAN        1358

  CARMELO ANTHONY

        DIRECT EXAMINATION BY MS. HUDGENS          1362

        CROSS-EXAMINATION BY MS. GRAY              1389

        REDIRECT EXAMINATION

        BY MS. HUDGENS                             1423

  DONALD GARBER

        DIRECT EXAMINATION BY MR. KESSLER          1430


E X H I B I T S

  DX-399                                           1265

  DX-406                                           1266

  DX-410                                           1267

  DX-425                                           1271

  DX-437                                           1273

  Defendant's Exhibit DX-599                       1290

  Defendant's Exhibit DX-615                       1291

  Defendant's Exhibit DX-725                       1294

VB        OCR        CRR

1535

Exhibits JX-1, PX-9, PX-10, PX-576, PX-11, JX-2, and JX-108 were marked in evidence          1361

Exhibit DX-0367          1400

Exhibit DX-0530          1401

Exhibit DX-0464          1401

Exhibit DX-0477          1402

Exhibit DX-0991          1403

PX-614          1440

Portion of PX-466          1454

Plaintiff's Exhibit PX-617          1457

Plaintiff's Exhibit PX-609          1467

Plaintiff's Exhibit PX-601          1470

Plaintiff's Exhibit PX-445          1477

Exhibit PX-062          1480

Exhibit PX-97          1493

VB          OCR          CRR

## ALL WORD INDEX

1

### $

**$170** [1] - 1526:13
**$18** [1] - 1472:13
**$20** [2] - 1358:20, 1468:11
**$220** [1] - 1467:20
**$300** [1] - 1444:7
**$318** [1] - 1472:3
**$34** [1] - 1474:19

### '

**'03** [1] - 1364:11
**'11** [1] - 1364:12
**'12** [1] - 1458:17
**'13** [1] - 1510:8
**'14** [3] - 1327:9, 1327:10, 1458:21
**'15** [3] - 1364:14, 1372:20, 1373:8
**'16** [4] - 1298:8, 1344:9, 1364:14, 1377:9
**'17** [2] - 1313:23, 1341:14
**'18** [2] - 1344:3, 1352:12
**'96** [1] - 1315:8
**'97** [1] - 1315:8
**'98** [1] - 1315:8
**'99** [1] - 1315:8

### 0

**0004** [1] - 1392:15
**002** [2] - 1270:4, 1404:18
**0026** [1] - 1281:7
**00367** [1] - 1414:15
**008** [1] - 1400:2
**0367** [1] - 1414:17
**064** [1] - 1404:11

### 1

**1** [10] - 1280:5, 1281:4, 1305:18, 1306:17, 1318:7, 1341:23, 1350:5, 1350:17, 1443:24, 1444:1
**10** [5] - 1291:19, 1447:7, 1447:8, 1530:22, 1531:7
**100** [1] - 1444:2
**1001** [1] - 1251:10
**10020** [1] - 1251:2
**10036** [1] - 1251:7
**10166** [1] - 1250:15
**11** [4] - 1414:18, 1414:20, 1450:13, 1456:4
**11/23/2013** [1] - 1492:23
**11201** [1] - 1251:17
**118** [1] - 1300:20
**12** [13] - 1289:12, 1295:21, 1312:9, 1314:14, 1314:25, 1315:2, 1315:10,

1315:15, 1315:25, 1316:17, 1316:20, 1406:4, 1463:23
**1205** [1] - 1250:22
**1257** [1] - 1534:6
**1265** [1] - 1534:18
**1266** [1] - 1534:19
**1267** [1] - 1534:20
**1271** [2] - 1251:2, 1534:21
**1273** [1] - 1534:22
**1290** [1] - 1534:23
**1291** [1] - 1534:24
**1294** [1] - 1534:25
**12:29** [2] - 1493:9, 1493:15
**13** [11] - 1272:9, 1274:11, 1274:18, 1391:21, 1408:13, 1420:14, 1443:21, 1446:17, 1446:21, 1453:9, 1464:20
**13.10** [1] - 1511:25
**13.17** [1] - 1512:10
**1309** [1] - 1534:7
**1358** [1] - 1534:8
**136** [1] - 1351:18
**1361** [1] - 1535:2
**1362** [1] - 1534:10
**1389** [1] - 1534:11
**14** [4] - 1300:21, 1353:4, 1394:1, 1396:20
**1400** [1] - 1535:3
**1401** [2] - 1535:4, 1535:5
**1402** [1] - 1535:6
**1403** [1] - 1535:7
**1423** [1] - 1534:13
**1430** [1] - 1534:15
**1440** [1] - 1535:8
**1454** [1] - 1535:9
**1457** [1] - 1535:10
**1467** [1] - 1535:11
**1470** [1] - 1535:12
**1477** [1] - 1535:13
**1480** [1] - 1535:14
**1493** [1] - 1535:15
**15** [9] - 1328:24, 1329:2, 1414:20, 1427:20, 1443:3, 1443:4, 1476:5, 1478:17, 1480:15
**15,000** [1] - 1260:4
**15165** [1] - 1250:19
**16** [6] - 1266:9, 1314:16, 1443:12, 1443:13, 1462:17, 1463:11
**16th** [1] - 1325:7
**17** [1] - 1420:14
**170** [1] - 1510:11
**17CV5495(HG** [1] - 1250:3
**18** [2] - 1314:16, 1398:1
**18th** [1] - 1404:14
**19** [3] - 1362:22, 1362:23, 1364:17
**1993** [1] - 1323:3
**1995** [2] - 1259:2, 1260:5
**1996** [9] - 1441:4, 1441:23, 1442:5, 1442:6, 1446:17, 1447:16, 1450:24, 1451:4, 1451:15

**1999** [6] - 1430:23, 1435:4, 1435:5, 1436:2, 1436:9, 1442:10

### 2

**2** [8] - 1290:6, 1307:5, 1358:5, 1360:19, 1462:16, 1462:20, 1478:13, 1478:14
**20** [6] - 1263:4, 1309:21, 1314:16, 1368:1, 1440:10, 1465:23
**200** [1] - 1250:15
**2000** [4] - 1251:4, 1315:7, 1325:3, 1438:4
**20004** [1] - 1251:11
**2001** [11] - 1316:4, 1316:6, 1317:25, 1438:4, 1440:18, 1441:4, 1441:7, 1441:12, 1442:15, 1443:17, 1447:16
**2002** [6] - 1315:8, 1363:20, 1436:9, 1440:25, 1449:1, 1494:10
**2003** [3] - 1362:24, 1364:7, 1454:9
**2004** [1] - 1457:20
**2005** [1] - 1443:21
**2006** [3] - 1449:1, 1456:4, 1494:20
**2007** [2] - 1326:7, 1449:13
**2008** [1] - 1259:3
**2009** [29] - 1309:12, 1340:19, 1435:5, 1435:9, 1435:14, 1435:18, 1444:18, 1445:17, 1445:20, 1446:16, 1446:21, 1446:25, 1449:14, 1451:4, 1451:15, 1452:7, 1497:16, 1498:1, 1498:6, 1498:9, 1502:11, 1509:2, 1509:3, 1510:7, 1510:8, 1514:5, 1514:22, 1515:20, 1525:21
**2010** [6] - 1269:10, 1281:23, 1297:23, 1364:12, 1480:15, 1480:24
**2011** [9] - 1359:13, 1364:14, 1457:10, 1457:18, 1458:3, 1458:10, 1458:17, 1458:21, 1466:16
**2011-2014** [2] - 1465:25, 1466:2
**2012** [8] - 1458:21, 1461:16, 1462:17, 1463:11, 1464:1, 1464:17, 1466:7, 1466:16
**2013** [38] - 1347:22, 1458:17, 1458:21, 1466:24, 1485:25, 1487:23, 1497:7, 1497:17, 1498:5, 1498:7, 1499:7, 1499:9, 1499:18, 1501:21, 1502:5, 1510:19, 1511:1, 1512:6, 1512:8, 1513:11, 1513:15, 1514:23, 1515:20, 1523:3, 1525:3, 1525:16, 1525:17, 1526:5, 1526:6, 1528:13, 1529:7, 1530:4, 1530:5, 1530:19, 1530:25, 1532:12
**2014** [17] - 1314:2, 1314:5, 1314:11, 1318:18, 1327:5, 1327:6, 1367:18, 1370:6, 1458:3, 1458:10, 1458:18, 1466:7, 1476:5, 1476:6, 1477:4, 1494:12, 1494:13
**2015** [36] - 1257:9, 1259:22, 1260:18, 1262:17, 1263:15, 1263:16, 1264:22,

ALL WORD INDEX
2

1265:19, 1266:10, 1267:11, 1268:21, 1270:2, 1270:22, 1270:23, 1271:8, 1315:14, 1330:19, 1337:5, 1372:21, 1374:7, 1375:6, 1383:12, 1383:14, 1383:22, 1403:6, 1414:18, 1414:20, 1414:21, 1424:6, 1425:2, 1425:7, 1425:13, 1439:22, 1443:15, 1443:25, 1444:5

**2016** [72] - 1253:7, 1257:9, 1262:17, 1262:23, 1272:9, 1273:3, 1273:11, 1274:11, 1274:18, 1275:9, 1275:16, 1276:24, 1281:12, 1283:10, 1284:15, 1284:18, 1284:24, 1286:6, 1286:9, 1288:7, 1293:16, 1297:6, 1298:6, 1298:8, 1298:10, 1302:13, 1304:9, 1307:25, 1308:19, 1309:2, 1314:11, 1314:25, 1315:12, 1315:25, 1316:12, 1324:6, 1325:7, 1325:23, 1326:7, 1326:9, 1337:6, 1338:8, 1344:2, 1344:7, 1344:12, 1348:3, 1348:12, 1348:14, 1359:13, 1377:2, 1377:8, 1377:13, 1377:15, 1379:22, 1392:14, 1400:17, 1402:15, 1406:5, 1408:13, 1412:2, 1412:3, 1425:8, 1425:13, 1516:1, 1516:2, 1516:7, 1516:19, 1530:22, 1531:7, 1531:23, 1532:8

**2017** [58] - 1288:5, 1288:21, 1288:24, 1289:3, 1289:14, 1290:1, 1290:6, 1290:19, 1290:25, 1291:11, 1291:19, 1293:5, 1294:13, 1295:2, 1296:1, 1298:10, 1302:5, 1306:7, 1306:17, 1307:5, 1311:5, 1311:6, 1313:20, 1313:22, 1340:21, 1340:24, 1341:2, 1341:12, 1341:23, 1344:3, 1344:20, 1348:5, 1348:6, 1348:16, 1349:24, 1350:4, 1350:8, 1350:24, 1350:25, 1351:8, 1358:5, 1379:4, 1379:5, 1379:7, 1379:24, 1380:4, 1380:9, 1380:14, 1380:19, 1380:25, 1384:2, 1387:1, 1387:3, 1419:12, 1426:1, 1426:4, 1426:11, 1472:12

**2017's** [1] - 1309:12

**2018** [54] - 1293:23, 1294:1, 1294:9, 1294:12, 1294:14, 1294:21, 1301:20, 1302:5, 1302:12, 1303:22, 1304:1, 1304:7, 1304:12, 1304:16, 1304:20, 1306:8, 1306:19, 1308:3, 1308:24, 1309:2, 1340:21, 1349:24, 1351:11, 1351:20, 1352:7, 1352:8, 1352:15, 1352:17, 1352:18, 1353:4, 1353:12, 1353:16, 1354:10, 1355:10, 1358:22, 1359:7, 1380:21, 1382:22, 1383:24, 1387:16, 1387:18, 1387:21, 1388:2, 1388:8, 1389:6, 1393:11, 1393:15, 1394:3, 1395:13, 1396:22, 1426:22, 1453:9, 1473:5, 1494:24

**2019** [2] - 1354:10, 1444:7
**2022** [7] - 1362:24, 1365:3, 1471:5, 1471:7, 1471:24, 1472:2, 1482:18
**2025** [2] - 1250:7, 1533:15

**21** [3] - 1311:4, 1313:21, 1342:1
**21st** [1] - 1515:7
**22** [2] - 1250:7, 1444:18
**225** [1] - 1251:17
**23** [1] - 1533:15
**24** [3] - 1398:1, 1485:25, 1487:23
**25** [7] - 1262:10, 1499:18, 1513:11, 1513:15, 1530:4, 1530:18, 1532:11
**25.49** [1] - 1466:16
**27** [2] - 1403:6, 1414:21
**27th** [1] - 1485:5
**28** [3] - 1400:17, 1439:22, 1443:15
**2:06** [1] - 1361:20
**2nd** [1] - 1526:17

**3**

**3** [4] - 1350:2, 1350:4, 1445:16, 1468:25
**3.125** [1] - 1458:20
**3.375** [1] - 1458:21
**30** [8] - 1265:19, 1338:9, 1339:18, 1341:9, 1343:3, 1349:23, 1459:9, 1459:19
**300** [4] - 1487:4, 1487:5, 1487:7
**3003** [1] - 1406:8
**31** [14] - 1263:16, 1310:25, 1311:4, 1311:5, 1311:6, 1311:10, 1313:1, 1313:20, 1313:22, 1330:19, 1337:4, 1341:12, 1358:22
**33** [2] - 1353:21, 1475:14
**34** [6] - 1391:21, 1472:22, 1475:5, 1475:7, 1475:14, 1475:19
**367** [1] - 1400:2

**4**

**4** [8] - 1466:24, 1470:7, 1470:13, 1470:14, 1470:17, 1470:25, 1471:14, 1477:4
**400** [1] - 1250:19
**403** [4] - 1499:4, 1501:9, 1518:8, 1526:12
**441-2** [1] - 1497:24
**450,000** [2] - 1499:12, 1513:13

**5**

**5** [11] - 1270:2, 1270:23, 1271:8, 1402:15, 1440:8, 1440:10, 1470:14, 1470:18, 1471:14, 1504:11, 1513:7
**5,000** [1] - 1358:18
**50** [10] - 1499:2, 1499:3, 1499:22, 1504:23, 1504:24, 1507:7, 1507:11, 1519:5, 1519:11
**505** [1] - 1251:4
**51** [2] - 1428:17, 1428:19

**555** [1] - 1250:22

**6**

**6** [5] - 1264:21, 1301:25, 1302:2, 1458:1
**600S** [1] - 1251:10
**614** [3] - 1438:25, 1439:1, 1439:24
**66** [1] - 1299:19
**678** [1] - 1502:17
**679** [2] - 1501:24, 1502:17
**680** [3] - 1502:9, 1513:3, 1513:7
**6:11** [1] - 1510:1

**7**

**7** [2] - 1365:15, 1365:16
**7.02** [7] - 1497:17, 1499:4, 1499:7, 1501:21, 1502:5, 1502:6, 1502:15
**7.5** [1] - 1443:24
**70** [4] - 1398:1, 1459:8, 1459:14, 1459:18
**70/30** [2] - 1459:15, 1466:18
**73/24** [1] - 1395:4
**74** [2] - 1393:25, 1396:20
**74.51** [1] - 1466:15
**74/14** [1] - 1395:4
**75/25** [1] - 1466:18
**7:00** [1] - 1365:18

**8**

**8** [8] - 1253:7, 1270:22, 1275:9, 1281:12, 1299:20, 1305:18, 1393:25, 1396:20
**8.25** [1] - 1458:17
**8.75** [1] - 1458:17
**80** [2] - 1513:13, 1527:22
**85** [1] - 1296:13
**87** [1] - 1297:4
**89** [1] - 1298:20

**9**

**9** [2] - 1441:15, 1441:16
**90** [1] - 1420:13
**91403** [1] - 1250:20
**94104** [1] - 1250:22
**94111** [1] - 1251:5
**99** [3] - 1281:7, 1281:9, 1515:19
**9:30** [3] - 1250:8, 1496:16, 1533:15
**9:58** [2] - 1331:18, 1331:21

VB        OCR        CRR

ALL WORD INDEX 3

# A

**a.m** [4] - 1250:8, 1331:18, 1331:21, 1533:15
**Aaron** [4] - 1261:18, 1373:14, 1374:3, 1403:6
**Abbott** [9] - 1434:11, 1477:5, 1479:2, 1479:6, 1480:12, 1480:16, 1481:4, 1482:5, 1482:12
**ABC** [1] - 1322:12
**ability** [6] - 1267:9, 1298:17, 1347:17, 1411:6, 1411:18, 1421:22
**able** [31] - 1258:16, 1258:22, 1266:19, 1268:7, 1276:22, 1293:10, 1293:15, 1293:21, 1297:20, 1306:17, 1309:10, 1314:11, 1373:1, 1375:17, 1375:21, 1375:22, 1393:11, 1394:3, 1394:13, 1394:24, 1395:13, 1396:22, 1434:3, 1468:19, 1468:23, 1482:2, 1488:12, 1498:21, 1510:18, 1528:2
**absolutely** [20] - 1288:20, 1300:7, 1303:23, 1306:25, 1309:4, 1378:6, 1385:18, 1391:1, 1391:5, 1396:3, 1396:13, 1396:15, 1397:21, 1422:25, 1423:3, 1427:8, 1427:10, 1454:11, 1492:18, 1532:10
**Absolutely** [8] - 1259:10, 1279:4, 1280:3, 1280:18, 1281:5, 1282:23, 1283:25, 1284:13
**accept** [4] - 1291:9, 1314:8, 1417:13, 1509:5
**acceptable** [2] - 1476:13, 1511:18
**acclimated** [2] - 1363:25, 1364:1
**according** [2] - 1393:8, 1417:1
**accordingly** [1] - 1512:17
**account** [2] - 1469:22, 1473:17
**accountant** [2] - 1424:10, 1424:11
**accounting** [1] - 1526:5
**accurate** [2] - 1306:24, 1417:3
**accurately** [1] - 1411:7
**achievable** [1] - 1283:19
**achieve** [6] - 1305:15, 1446:11, 1446:14, 1469:3, 1484:14, 1532:13
**achieves** [1] - 1268:11
**achieving** [2] - 1268:22, 1306:10
**Ackerman** [6] - 1303:16, 1345:3, 1345:10, 1345:15, 1346:2
**acknowledges** [1] - 1512:11
**acknowledging** [1] - 1472:17
**acquire** [8] - 1390:9, 1390:10, 1390:14, 1390:17, 1390:22, 1390:25, 1391:5, 1391:11
**acquired** [1] - 1398:16
**acquiring** [4] - 1417:16, 1417:19, 1418:6, 1418:10
**acquisition** [2] - 1417:22, 1418:14
**Act** [1] - 1428:24
**acted** [1] - 1339:8
**action** [2] - 1252:7, 1252:14

**activation** [1] - 1467:25
**active** [1] - 1367:24
**acts** [1] - 1404:23
**actual** [11] - 1276:16, 1276:23, 1329:16, 1330:18, 1331:3, 1331:7, 1367:8, 1378:17, 1382:11, 1382:13, 1476:9
**add** [2] - 1429:2, 1453:14
**added** [7] - 1259:3, 1259:6, 1327:10, 1331:5, 1499:17, 1509:6, 1513:14
**adding** [3] - 1428:25, 1429:8, 1450:19
**addition** [6] - 1376:12, 1437:16, 1467:23, 1475:20, 1501:11, 1512:24
**Additional** [1] - 1459:8
**additional** [10] - 1274:23, 1308:17, 1308:22, 1351:12, 1351:14, 1459:14, 1459:16, 1459:24, 1499:17, 1513:14
**additionally** [1] - 1459:22
**address** [4] - 1335:21, 1471:17, 1499:22, 1510:14
**adjourn** [1] - 1339:18
**adjourned** [1] - 1533:15
**Administration** [1] - 1277:9
**admissibility** [2] - 1428:6, 1518:5
**admissible** [2] - 1444:12, 1505:11
**admission** [11] - 1267:19, 1271:1, 1273:19, 1286:14, 1290:9, 1291:21, 1294:4, 1398:23, 1414:13, 1499:14, 1499:17
**admissions** [1] - 1513:1
**admit** [4] - 1265:1, 1266:12, 1272:3, 1313:13
**admitted** [22] - 1265:3, 1267:23, 1271:3, 1273:22, 1290:11, 1291:23, 1294:6, 1331:13, 1361:14, 1400:10, 1400:25, 1401:17, 1402:8, 1402:25, 1440:1, 1444:12, 1454:3, 1467:5, 1470:17, 1477:15, 1480:21, 1493:5
**adopt** [1] - 1255:13
**adult** [3] - 1280:10, 1303:4
**advance** [1] - 1321:3
**adverse** [1] - 1430:6
**advice** [2] - 1263:7, 1283:4
**advise** [1] - 1290:21
**advisor** [1] - 1277:23
**advocate** [1] - 1529:5
**affiliate** [2] - 1473:1, 1474:2
**affiliates** [1] - 1271:17
**affiliation** [1] - 1288:13
**affirm** [1] - 1362:3
**affirmed** [1] - 1507:14
**Afro** [1] - 1366:16
**Afro-Latino** [1] - 1366:16
**afternoon** [8] - 1361:1, 1362:14, 1362:15, 1389:24, 1389:25, 1427:20, 1430:19, 1430:20
**agenda** [1] - 1485:8
**agent** [1] - 1468:5
**agents** [1] - 1386:21

**ago** [12] - 1266:18, 1306:14, 1334:3, 1344:5, 1358:7, 1389:18, 1396:9, 1396:11, 1396:14, 1505:25, 1513:5, 1513:11
**agree** [66] - 1256:1, 1258:1, 1298:12, 1322:18, 1323:2, 1330:1, 1351:7, 1394:18, 1407:11, 1407:16, 1407:20, 1416:9, 1416:10, 1416:24, 1421:16, 1421:19, 1422:4, 1422:5, 1423:6, 1432:2, 1432:12, 1434:13, 1436:3, 1436:24, 1437:4, 1441:10, 1442:9, 1442:12, 1442:22, 1447:23, 1448:4, 1448:7, 1448:10, 1450:22, 1452:3, 1452:10, 1452:13, 1452:14, 1452:22, 1452:23, 1453:1, 1454:20, 1460:21, 1464:1, 1464:4, 1464:24, 1464:25, 1465:2, 1465:10, 1465:22, 1468:13, 1469:4, 1481:17, 1481:18, 1489:14, 1489:17, 1490:14, 1490:15, 1497:9, 1498:24, 1501:6, 1503:22, 1504:23, 1508:8, 1523:2, 1532:4
**agreed** [13] - 1268:12, 1300:9, 1321:2, 1321:25, 1322:5, 1341:12, 1458:3, 1458:10, 1484:23, 1496:7, 1521:11, 1521:14, 1525:22
**agreed-upon** [1] - 1268:12
**agreeing** [3] - 1282:14, 1407:15, 1455:2
**Agreement** [1] - 1511:25
**agreement** [105] - 1277:14, 1278:3, 1278:16, 1279:5, 1279:17, 1280:4, 1280:16, 1281:3, 1303:24, 1355:2, 1355:9, 1355:11, 1356:21, 1372:19, 1372:23, 1373:4, 1373:25, 1374:5, 1374:7, 1374:9, 1375:5, 1383:13, 1398:23, 1414:13, 1423:23, 1423:24, 1424:1, 1424:3, 1424:6, 1457:20, 1460:2, 1460:9, 1460:14, 1460:15, 1460:17, 1460:19, 1461:3, 1465:24, 1468:13, 1468:19, 1468:20, 1469:10, 1470:8, 1471:1, 1471:5, 1471:24, 1472:2, 1475:20, 1475:22, 1487:22, 1497:7, 1498:1, 1498:5, 1498:6, 1498:8, 1498:9, 1499:7, 1499:9, 1499:11, 1499:18, 1500:9, 1500:20, 1501:21, 1502:6, 1502:11, 1504:9, 1506:5, 1509:4, 1512:1, 1512:2, 1512:13, 1512:15, 1512:16, 1513:12, 1513:15, 1513:20, 1513:23, 1514:5, 1514:6, 1514:10, 1514:22, 1514:23, 1515:20, 1515:25, 1516:3, 1516:11, 1516:12, 1516:19, 1516:22, 1517:3, 1517:15, 1518:1, 1520:8, 1525:2, 1525:16, 1525:21, 1525:23, 1526:5, 1526:6, 1528:14, 1529:11, 1530:5, 1532:6
**agreements** [11] - 1320:5, 1320:9, 1321:9, 1373:23, 1461:5, 1468:18, 1472:4, 1497:17, 1509:18, 1512:3, 1524:23

VB        OCR        CRR

ALL WORD INDEX                                                          4

**agrees** [1] - 1512:12
**ahead** [4] - 1339:4, 1366:21, 1370:14, 1529:19
**Ahrens** [5] - 1276:9, 1276:11, 1276:15, 1302:17, 1302:21
**Aided** [1] - 1251:18
**aisle** [1] - 1279:23
**align** [2] - 1370:22, 1371:2
**aligned** [5] - 1321:19, 1321:20, 1322:3, 1371:4, 1371:6
**alignment** [2] - 1482:25, 1483:7
**all-American** [1] - 1278:22
**all-in** [1] - 1487:2
**Allan** [3] - 1371:18, 1374:22, 1376:4
**allegedly** [1] - 1429:6
**Allon** [1] - 1371:19
**allow** [20] - 1267:10, 1275:8, 1283:2, 1287:13, 1305:1, 1313:9, 1346:22, 1384:12, 1393:3, 1404:6, 1405:3, 1408:25, 1409:24, 1417:8, 1423:12, 1433:10, 1471:21, 1510:9, 1520:4, 1526:12
**allowed** [5] - 1255:7, 1454:10, 1501:13, 1501:14, 1521:24
**allowing** [3] - 1378:13, 1461:2, 1519:19
**allows** [1] - 1519:19
**almost** [4] - 1261:8, 1315:20, 1317:23, 1435:19
**alternate** [3] - 1356:2, 1356:3, 1528:12
**alternative** [10] - 1511:2, 1527:4, 1529:8, 1529:25, 1530:1, 1530:8, 1532:15, 1532:16, 1532:25, 1533:4
**ambiguity** [5] - 1498:24, 1500:12, 1500:14, 1500:15
**ambiguous** [2] - 1508:22, 1508:24
**ambivalent** [1] - 1284:9
**amending** [1] - 1428:16
**amendment** [1] - 1509:3
**America** [8] - 1303:8, 1317:3, 1317:6, 1463:25, 1467:10, 1482:17, 1482:22, 1486:7
**AMERICAN** [1] - 1250:4
**American** [9] - 1278:22, 1284:11, 1288:18, 1300:2, 1359:15, 1366:23, 1367:2, 1441:22, 1478:4
**Americas** [1] - 1251:2
**amount** [11] - 1255:3, 1308:5, 1308:9, 1308:13, 1413:18, 1465:8, 1474:4, 1474:5, 1499:25, 1510:11, 1511:13
**amounts** [3] - 1321:1, 1407:7, 1407:8
**analysis** [7] - 1317:19, 1521:7, 1524:8, 1527:10, 1527:21, 1527:25, 1528:1
**analyze** [1] - 1505:15
**analyzed** [1] - 1506:1
**analyzing** [1] - 1263:8
**Angela** [1] - 1303:13
**Angeles** [3] - 1259:16, 1328:12, 1364:18
**Anheuser** [1] - 1321:16

**Anheuser-Busch** [1] - 1321:16
**announced** [2] - 1330:20, 1377:23
**annual** [4] - 1435:16, 1448:15, 1474:9, 1474:10
**Anschutz** [2] - 1437:2, 1437:13
**answer** [31] - 1253:19, 1312:22, 1384:20, 1385:12, 1392:3, 1392:6, 1394:9, 1394:16, 1395:23, 1396:19, 1397:15, 1398:9, 1404:1, 1407:25, 1409:25, 1420:18, 1420:20, 1437:7, 1472:19, 1474:13, 1474:24, 1475:4, 1475:12, 1475:18, 1476:12, 1495:12, 1495:15, 1495:17, 1495:19, 1495:20, 1499:8
**Answer** [1] - 1502:3
**ANSWER** [10] - 1392:4, 1394:7, 1395:8, 1395:10, 1395:17, 1397:1, 1398:5, 1513:17, 1513:22, 1513:24
**answered** [2] - 1394:6, 1397:15
**answering** [2] - 1396:10, 1471:11
**answers** [5] - 1253:20, 1304:6, 1304:8, 1362:3, 1494:4
**Anthony** [38] - 1361:24, 1361:25, 1362:14, 1362:17, 1362:20, 1366:2, 1366:4, 1366:5, 1389:24, 1390:1, 1392:6, 1392:14, 1392:18, 1397:3, 1398:11, 1400:6, 1401:7, 1402:3, 1402:15, 1402:18, 1403:3, 1405:6, 1406:3, 1406:9, 1406:25, 1407:11, 1408:23, 1411:8, 1411:25, 1412:24, 1413:20, 1414:23, 1415:3, 1416:6, 1419:10, 1420:22, 1423:1, 1424:8
**ANTHONY** [2] - 1362:7, 1534:9
**antitrust** [2] - 1429:6, 1518:14
**apart** [3] - 1383:8, 1421:21, 1473:8
**apologies** [1] - 1273:18
**apologize** [5] - 1272:5, 1339:4, 1350:19, 1460:8, 1490:10
**apparent** [1] - 1350:3
**appear** [1] - 1302:9
**appearance** [1] - 1443:10
**appendix** [1] - 1525:18
**apples** [1] - 1519:11
**application** [112] - 1252:15, 1252:16, 1253:9, 1253:14, 1253:24, 1254:4, 1254:14, 1254:18, 1254:19, 1255:15, 1257:9, 1257:12, 1260:8, 1260:25, 1261:3, 1261:9, 1261:11, 1261:18, 1262:12, 1262:16, 1262:24, 1263:6, 1263:19, 1264:8, 1264:14, 1264:16, 1265:7, 1265:13, 1266:2, 1267:6, 1268:9, 1268:18, 1270:15, 1270:19, 1271:24, 1272:19, 1272:23, 1273:2, 1274:1, 1274:6, 1274:7, 1274:16, 1274:17, 1274:25, 1275:12, 1275:16, 1275:19, 1276:17, 1276:24, 1277:12, 1277:16, 1278:1, 1278:4, 1278:14, 1278:17, 1279:3, 1279:7, 1279:15, 1279:18, 1280:2, 1280:5, 1280:14, 1280:17, 1281:1, 1281:4, 1281:13,

1283:9, 1289:2, 1289:13, 1290:1, 1293:5, 1293:23, 1294:1, 1295:20, 1295:23, 1298:6, 1299:6, 1301:20, 1302:11, 1302:12, 1303:22, 1304:1, 1304:7, 1304:9, 1304:12, 1304:16, 1306:7, 1312:7, 1312:9, 1326:19, 1329:12, 1330:15, 1330:25, 1332:17, 1332:23, 1333:10, 1344:2, 1344:3, 1347:24, 1347:25, 1348:7, 1348:14, 1348:18, 1349:1, 1349:8, 1349:12, 1349:13, 1349:24, 1350:6, 1350:23, 1353:20, 1395:21
**applications** [6] - 1260:14, 1261:15, 1290:16, 1291:4, 1292:19, 1302:4
**applied** [8] - 1259:21, 1312:8, 1315:14, 1315:16, 1324:4, 1359:6, 1501:25, 1512:15
**applies** [1] - 1502:6
**apply** [6] - 1255:15, 1307:8, 1324:2, 1324:13, 1509:1, 1519:5
**applying** [1] - 1340:21
**appointed** [2] - 1346:7, 1346:9
**appreciate** [4] - 1265:20, 1335:5, 1335:19, 1529:5
**appreciative** [2] - 1287:16, 1287:20
**approach** [2] - 1268:6, 1484:24
**approached** [2] - 1345:14, 1346:16
**approaching** [1] - 1295:22
**appropriate** [12] - 1252:18, 1254:16, 1261:6, 1314:18, 1335:7, 1335:18, 1429:5, 1519:5, 1528:25, 1529:6, 1529:20, 1530:17
**approval** [3] - 1298:10, 1375:12
**approve** [5] - 1274:7, 1328:6, 1328:9, 1457:9, 1457:17
**approved** [4] - 1291:5, 1306:6, 1350:6, 1350:23
**April** [3] - 1444:18, 1445:17, 1445:20
**arbitrary** [2] - 1257:23, 1258:2
**arbitration** [1] - 1297:19
**area** [2] - 1328:8, 1335:6
**areas** [6] - 1321:20, 1328:1, 1459:24, 1482:25, 1483:7, 1484:13
**arena** [2] - 1386:16, 1386:17
**argue** [3] - 1341:5, 1514:5, 1521:15
**argued** [2] - 1498:18, 1527:2
**arguing** [5] - 1503:2, 1520:8, 1520:9, 1520:11, 1520:22
**argument** [12] - 1498:13, 1498:16, 1498:19, 1498:22, 1500:21, 1500:24, 1503:12, 1508:16, 1511:15, 1511:24, 1531:10, 1531:22
**arguments** [1] - 1526:24
**arising** [2] - 1369:7, 1512:14
**Armada** [1] - 1416:4
**arrangement** [4] - 1320:13, 1355:13, 1355:24, 1466:1
**Arthur** [2] - 1280:7, 1280:8
**article** [1] - 1494:6
**articulated** [2] - 1518:23, 1519:2

VB        OCR        CRR

ALL WORD INDEX                                    5

**articulating** [1] - 1507:3
**Asani** [3] - 1371:17, 1371:19, 1376:4
**aside** [3] - 1365:21, 1461:12, 1517:21
**asleep** [1] - 1505:25
**aspect** [5] - 1255:7, 1255:22, 1424:22, 1424:24, 1501:17
**aspects** [1] - 1527:12
**aspire** [1] - 1465:4
**Assembly** [1] - 1279:22
**assertions** [1] - 1304:4
**assess** [4] - 1501:14, 1508:14, 1508:15
**assist** [2] - 1283:15, 1309:14
**assistance** [1] - 1298:4
**assisted** [1] - 1275:24
**assisting** [1] - 1309:14
**associated** [3] - 1312:5, 1325:17, 1325:19
**Association** [1] - 1363:2
**association** [2] - 1279:11, 1280:9
**assume** [14] - 1439:23, 1443:11, 1451:3, 1469:24, 1472:15, 1482:23, 1488:18, 1495:1, 1495:4, 1511:7, 1511:8, 1516:5, 1518:2, 1526:18
**Assume** [1] - 1499:24
**assuming** [3] - 1458:22, 1519:18, 1521:13
**assumption** [34] - 1497:16, 1498:10, 1500:1, 1500:6, 1500:7, 1500:8, 1501:3, 1501:4, 1501:6, 1505:6, 1505:8, 1505:10, 1505:13, 1507:9, 1510:12, 1514:14, 1517:4, 1520:12, 1520:24, 1520:25, 1521:1, 1521:3, 1521:4, 1521:10, 1522:5, 1524:3, 1525:11, 1525:21, 1526:10, 1527:16, 1528:1, 1529:10, 1530:2, 1532:18
**assumptions** [8] - 1497:11, 1500:5, 1505:1, 1519:14, 1519:15, 1519:20, 1523:16, 1524:18
**assurances** [2] - 1261:21, 1306:18
**athlete** [2] - 1278:23, 1302:23
**Athletes** [1] - 1302:25
**Atlanta** [2] - 1259:15, 1286:21
**Atlantic** [1] - 1278:12
**attached** [3] - 1350:5, 1350:12, 1440:5
**Attached** [1] - 1461:24
**attaching** [2] - 1406:6, 1469:18
**attachment** [1] - 1406:9
**attaining** [2] - 1283:16, 1283:23
**attend** [4] - 1264:10, 1377:15, 1379:7, 1445:7
**attendance** [6] - 1328:16, 1442:21, 1446:3, 1446:22, 1449:22, 1450:3
**Attendance** [1] - 1442:17
**attended** [19] - 1270:4, 1270:9, 1273:12, 1276:11, 1296:3, 1333:7, 1333:8, 1333:19, 1356:5, 1363:16, 1440:19, 1442:15, 1444:20, 1445:4, 1445:9, 1445:10, 1445:13, 1456:7, 1463:16

**attendees** [1] - 1287:6
**attending** [9] - 1264:5, 1273:10, 1356:19, 1419:5, 1419:8, 1444:24, 1463:10, 1463:14, 1491:25
**attention** [4] - 1258:17, 1465:25, 1493:8, 1515:20
**attorneys** [6] - 1270:11, 1436:17, 1436:18, 1436:19, 1440:19, 1442:15
**attract** [1] - 1258:17
**attributed** [1] - 1321:2
**audio** [3] - 1476:4, 1476:10, 1476:19
**audit** [1] - 1446:9
**August** [1] - 1430:23
**authorized** [1] - 1444:25
**available** [1] - 1332:19
**Ave.NW** [1] - 1251:10
**Avenue** [2] - 1250:15, 1251:2
**avoid** [2] - 1335:14, 1335:16
**award** [4] - 1287:23, 1288:2, 1349:4, 1349:9
**Award** [1] - 1348:24
**awarded** [1] - 1434:24
**awards** [3] - 1364:24, 1364:25, 1365:1
**aware** [15] - 1388:23, 1403:9, 1404:2, 1405:5, 1409:2, 1409:5, 1409:9, 1409:11, 1412:13, 1412:16, 1412:18, 1412:20, 1426:19, 1437:23, 1448:25
**awareness** [1] - 1370:4

# B

**back-and-forth** [1] - 1255:4
**background** [2] - 1276:23, 1420:23
**bad** [2] - 1460:7, 1486:17
**bailed** [1] - 1318:3
**Baltimore** [5] - 1363:9, 1363:11, 1363:13, 1366:11
**Bank** [1] - 1303:8
**bankrupt** [1] - 1317:23
**bankruptcy** [6] - 1317:25, 1436:14, 1436:18, 1436:21, 1440:19, 1442:15
**Barcelona** [1] - 1475:16
**base** [2] - 1375:24, 1447:19
**Baseball** [1] - 1432:5
**based** [35] - 1290:17, 1319:17, 1401:11, 1490:3, 1496:3, 1497:11, 1503:1, 1505:6, 1505:7, 1508:16, 1510:12, 1511:1, 1511:12, 1516:20, 1517:10, 1519:14, 1519:15, 1521:7, 1521:25, 1522:1, 1522:4, 1522:11, 1523:19, 1524:3, 1524:18, 1525:11, 1526:10, 1526:13, 1527:15, 1528:1, 1528:12, 1529:7, 1529:9, 1530:3, 1531:21
**bases** [1] - 1525:20
**basic** [2] - 1519:16, 1519:20
**basing** [1] - 1520:17
**basis** [17] - 1289:6, 1403:18, 1427:24, 1428:13, 1435:16, 1474:11, 1503:3,

1504:2, 1504:18, 1504:22, 1507:10, 1514:14, 1515:15, 1520:21, 1521:4, 1531:17, 1532:17
**basketball** [6] - 1362:22, 1363:17, 1364:22, 1365:18, 1366:14, 1420:23
**Basketball** [1] - 1363:2
**battled** [1] - 1282:10
**battling** [1] - 1282:14
**Bay** [5] - 1406:14, 1408:19, 1409:3, 1411:1, 1442:17
**became** [8] - 1277:22, 1279:23, 1355:18, 1370:16, 1404:20, 1405:12, 1434:19, 1435:1
**become** [14] - 1269:15, 1313:6, 1367:2, 1370:13, 1370:15, 1375:5, 1383:1, 1411:5, 1426:18, 1430:21, 1433:22, 1435:3, 1435:12, 1441:21
**becoming** [2] - 1397:17, 1398:3
**BEFORE** [1] - 1250:12
**began** [1] - 1378:10
**begin** [7] - 1257:8, 1264:16, 1376:25, 1526:7, 1530:18, 1530:21, 1531:5
**beginning** [14] - 1291:25, 1369:2, 1370:12, 1370:13, 1370:16, 1371:13, 1378:9, 1378:18, 1383:21, 1391:8, 1417:24, 1472:16, 1502:18, 1518:3
**begins** [7] - 1265:16, 1267:3, 1268:1, 1272:22, 1283:12, 1296:17, 1531:2
**behalf** [11] - 1267:17, 1268:4, 1270:9, 1296:3, 1298:2, 1356:7, 1415:22, 1456:7, 1482:1, 1487:2, 1491:25
**behind** [3] - 1377:20, 1377:21, 1385:1
**belabor** [1] - 1332:20
**belied** [1] - 1507:22
**belief** [6] - 1260:18, 1310:17, 1358:8, 1473:19, 1500:11, 1524:10
**belonged** [1] - 1502:13
**below** [6] - 1439:3, 1442:13, 1458:11, 1461:21, 1477:8, 1485:24
**belt** [1] - 1278:8
**benchmarks** [1] - 1320:15
**beneficial** [1] - 1453:2
**benefit** [3] - 1439:11, 1455:14, 1512:17
**benefits** [1] - 1460:23
**Berhalter** [1] - 1270:6
**best** [11] - 1300:10, 1300:22, 1301:6, 1305:15, 1309:5, 1452:18, 1452:20, 1469:2, 1475:13, 1487:8, 1498:23
**better** [11] - 1293:7, 1374:13, 1388:5, 1396:14, 1433:7, 1438:16, 1452:6, 1453:7, 1460:18, 1473:17, 1478:3
**between** [34] - 1252:13, 1262:16, 1265:6, 1271:16, 1286:20, 1297:23, 1310:3, 1311:14, 1355:13, 1355:19, 1356:10, 1379:22, 1398:24, 1425:7, 1425:13, 1436:9, 1451:15, 1452:15, 1452:19, 1464:23, 1465:3, 1465:5, 1465:14, 1465:20, 1466:1, 1466:16, 1466:18, 1478:15, 1481:15, 1487:9,

VB        OCR        CRR

ALL WORD INDEX                                              6

1488:13, 1497:16, 1510:8, 1525:24
**beyond** [7] - 1253:25, 1269:9, 1308:5, 1459:5, 1459:16, 1514:9, 1523:25
**bid** [5] - 1277:21, 1468:19, 1468:21, 1481:22, 1483:16
**bidding** [1] - 1468:17
**big** [5] - 1281:16, 1285:5, 1312:14, 1312:18, 1317:11
**Big** [1] - 1303:17
**bigger** [4] - 1320:21, 1320:22, 1385:5, 1476:21
**Bill** [11] - 1264:1, 1270:10, 1273:6, 1273:15, 1274:5, 1400:18, 1401:7, 1401:24, 1404:14, 1406:5, 1418:6
**binder** [3] - 1252:25, 1438:22, 1438:23
**binding** [1] - 1513:23
**bit** [4] - 1276:22, 1366:3, 1369:5, 1412:13
**Black** [1] - 1366:16
**blaming** [2] - 1412:24, 1412:25
**blow** [7] - 1263:23, 1281:8, 1350:20, 1438:15, 1445:24, 1453:6, 1471:1
**board** [189] - 1254:3, 1254:11, 1254:17, 1254:19, 1255:25, 1260:15, 1260:19, 1260:22, 1261:24, 1262:2, 1262:18, 1262:23, 1263:5, 1263:15, 1263:25, 1264:2, 1264:6, 1264:13, 1266:20, 1267:5, 1267:13, 1272:8, 1272:11, 1272:22, 1273:1, 1274:1, 1274:7, 1274:16, 1274:17, 1274:23, 1275:9, 1275:11, 1275:15, 1275:19, 1276:8, 1276:10, 1277:4, 1277:20, 1278:9, 1278:23, 1279:21, 1281:12, 1282:4, 1282:22, 1282:25, 1284:4, 1290:5, 1290:21, 1290:22, 1290:24, 1291:2, 1291:6, 1292:17, 1295:25, 1296:11, 1296:15, 1296:25, 1299:14, 1301:14, 1302:4, 1302:14, 1302:15, 1302:16, 1302:18, 1303:9, 1304:4, 1304:11, 1305:3, 1306:6, 1306:18, 1307:2, 1309:5, 1310:24, 1310:25, 1311:1, 1311:4, 1319:8, 1319:9, 1324:21, 1325:14, 1325:22, 1329:11, 1330:8, 1330:14, 1331:22, 1333:25, 1337:3, 1337:9, 1338:8, 1338:19, 1338:24, 1339:1, 1339:8, 1339:14, 1339:15, 1340:9, 1340:13, 1341:22, 1342:1, 1342:4, 1343:9, 1343:10, 1343:21, 1344:24, 1345:9, 1345:16, 1345:23, 1345:25, 1346:5, 1347:2, 1347:5, 1347:11, 1347:16, 1347:17, 1349:23, 1350:5, 1350:22, 1352:7, 1352:15, 1353:5, 1355:1, 1355:14, 1355:17, 1355:18, 1355:23, 1356:1, 1356:3, 1356:5, 1356:19, 1357:4, 1403:7, 1418:22, 1418:23, 1418:25, 1419:5, 1431:7, 1431:21, 1431:25, 1435:10, 1435:19, 1444:17, 1445:4, 1445:13, 1445:21, 1446:7, 1447:5, 1447:10, 1451:8, 1451:11, 1453:11,

1453:15, 1454:24, 1455:1, 1455:19, 1455:21, 1456:2, 1460:1, 1462:17, 1463:11, 1463:18, 1487:15, 1488:5, 1488:21, 1488:25, 1489:6, 1489:9, 1489:11, 1489:16, 1489:18, 1490:4, 1490:15, 1490:20, 1490:23, 1491:2, 1491:5, 1491:10, 1491:16, 1491:21, 1491:22, 1492:2, 1492:3, 1492:9, 1492:10, 1492:11, 1492:13, 1492:16, 1495:9, 1495:21
**board's** [3] - 1262:17, 1299:5, 1310:21
**Bob** [1] - 1360:8
**body** [1] - 1494:15
**bona** [3] - 1497:11, 1520:25, 1523:16
**book** [3] - 1252:4, 1421:21, 1422:6
**boots** [1] - 1417:25
**bordering** [2] - 1500:8, 1505:10
**Boston** [1] - 1259:14
**bottom** [10] - 1297:4, 1298:20, 1351:19, 1354:1, 1441:16, 1450:23, 1458:2, 1458:11, 1464:7, 1465:23
**bought** [1] - 1288:14
**Boulevard** [1] - 1250:19
**bounds** [2] - 1434:14, 1518:5
**brackets** [1] - 1494:20
**brand** [2] - 1379:3, 1469:2
**break** [7] - 1309:19, 1328:21, 1328:24, 1360:18, 1427:20, 1460:13, 1496:12
**breakfast** [1] - 1415:16
**Brett** [1] - 1461:14
**Brian** [3] - 1287:19, 1288:4, 1400:18
**bribery** [2] - 1413:22, 1414:5
**briefed** [1] - 1524:24
**briefings** [2] - 1498:23, 1527:2
**briefly** [1] - 1368:25
**bring** [12] - 1277:21, 1368:2, 1368:6, 1368:8, 1370:10, 1397:10, 1408:11, 1416:16, 1417:4, 1427:7, 1427:9, 1427:11
**bringing** [6] - 1369:4, 1378:24, 1382:19, 1383:13, 1389:10, 1410:6
**broad** [3] - 1465:15, 1489:7, 1493:23
**broadcast** [1] - 1450:17
**broadcasters** [3] - 1422:17, 1422:19, 1487:10
**broadcasting** [1] - 1378:17
**broadly** [2] - 1489:4, 1489:5
**broken** [1] - 1377:5
**Brooklyn** [9] - 1250:6, 1363:9, 1363:10, 1363:12, 1365:15, 1365:16, 1365:18, 1365:19, 1365:20
**brought** [8] - 1335:20, 1344:19, 1345:22, 1347:1, 1347:4, 1422:23, 1429:11, 1526:9
**BTW** [1] - 1493:10
**budget** [3] - 1451:12, 1451:13, 1454:11
**build** [8] - 1369:2, 1374:15, 1375:14, 1389:17, 1418:1, 1418:2, 1487:8
**building** [10] - 1324:25, 1370:17,

1383:6, 1383:19, 1417:25, 1422:3, 1427:11, 1431:10
**built** [3] - 1395:11, 1442:19, 1442:24
**bullet** [1] - 1440:13
**bundled** [6] - 1320:6, 1320:10, 1320:25, 1321:1, 1321:5, 1321:6
**BUONANOCE** [1] - 1250:23
**burden** [4] - 1523:13, 1523:14, 1523:22, 1529:11
**Busch** [1] - 1321:16
**business** [33] - 1280:24, 1349:13, 1365:22, 1369:8, 1369:9, 1369:11, 1369:13, 1369:18, 1369:20, 1371:17, 1375:14, 1375:23, 1382:3, 1382:15, 1387:23, 1411:4, 1411:6, 1419:15, 1419:21, 1419:24, 1419:25, 1420:1, 1420:15, 1428:22, 1431:11, 1433:15, 1433:24, 1434:1, 1449:3, 1466:19, 1468:24, 1488:21
**businesses** [1] - 1379:2
**businessman** [4] - 1408:2, 1408:4, 1409:13, 1413:4
**but-for** [12] - 1516:1, 1516:5, 1516:16, 1521:7, 1521:19, 1522:11, 1524:13, 1524:17, 1530:24, 1530:25, 1531:2, 1531:16
**BUTERMAN** [76] - 1251:3, 1252:23, 1253:9, 1253:11, 1256:13, 1257:5, 1257:12, 1263:11, 1263:23, 1264:19, 1265:1, 1266:7, 1266:12, 1267:15, 1267:19, 1269:24, 1270:20, 1270:25, 1272:1, 1272:5, 1272:17, 1273:18, 1275:21, 1281:6, 1281:25, 1283:6, 1286:2, 1286:13, 1286:19, 1287:10, 1290:3, 1290:8, 1291:20, 1293:24, 1294:3, 1296:7, 1296:9, 1299:23, 1301:21, 1301:24, 1309:16, 1313:8, 1331:12, 1337:19, 1342:21, 1348:19, 1349:14, 1354:20, 1354:23, 1355:21, 1357:6, 1357:10, 1358:1, 1358:4, 1359:16, 1457:15, 1480:20, 1493:4, 1511:14, 1512:7, 1512:9, 1513:7, 1513:9, 1525:9, 1525:18, 1528:8, 1528:15, 1529:14, 1530:15, 1531:3, 1531:8, 1532:2, 1532:10, 1533:11, 1534:6, 1534:8
**Buterman** [6] - 1256:12, 1324:16, 1501:23, 1514:16, 1528:7, 1532:1
**buttress** [1] - 1502:25
**buying** [1] - 1424:13
**buys** [1] - 1279:12
**BY** [43] - 1257:5, 1286:1, 1309:24, 1312:1, 1329:8, 1330:12, 1331:6, 1331:16, 1337:1, 1338:1, 1358:4, 1362:13, 1389:23, 1400:16, 1401:6, 1401:23, 1402:14, 1403:2, 1403:21, 1404:13, 1405:4, 1406:2, 1406:24, 1407:18, 1417:12, 1419:20, 1423:19, 1430:18, 1457:1, 1480:1, 1480:11, 1480:23, 1490:2, 1491:9, 1491:13,

ALL WORD INDEX
7

1493:7, 1534:6, 1534:7, 1534:8, 1534:10, 1534:11, 1534:13, 1534:15
**BY:ADRIAN** [1] - 1250:23
**BY:BRADLEY** [1] - 1251:8
**by:CHRISTOPHER** [1] - 1251:5
**by:CLIFFORD** [1] - 1250:20
**BY:COLIN** [1] - 1251:11
**BY:JEFFREY** [1] - 1250:16
**BY:LAWRENCE** [1] - 1251:3

# C

**CA** [1] - 1251:5
**Cadman** [1] - 1251:17
**calculated** [1] - 1515:15
**calculation** [13] - 1503:3, 1504:2, 1510:25, 1511:5, 1527:4, 1527:15, 1528:9, 1528:12, 1529:16, 1530:2, 1530:18, 1530:21, 1531:5
**California** [7] - 1250:20, 1250:22, 1279:22, 1279:24, 1282:13, 1282:15, 1302:22
**Canada** [1] - 1317:7
**Canadian** [1] - 1298:16
**cancelled** [1] - 1426:21
**candidate** [1] - 1345:18
**cannot** [4] - 1267:8, 1405:21, 1504:1, 1514:8
**capacities** [1] - 1260:4
**capacity** [13] - 1257:23, 1258:2, 1258:13, 1259:25, 1312:15, 1312:17, 1313:2, 1313:14, 1334:1, 1334:5, 1337:9, 1373:21
**capital** [1] - 1447:18
**Cardenas** [1] - 1264:21
**career** [2] - 1364:10, 1364:17
**Caribbean** [1] - 1393:4
**Carlos** [1] - 1277:18
**Carmelo** [5] - 1361:23, 1362:17, 1366:2, 1366:4, 1366:5
**CARMELO** [2] - 1362:7, 1534:9
**Carnoy** [1] - 1303:7
**Carolina** [2] - 1278:22, 1299:10
**carried** [1] - 1380:6
**carryover** [1] - 1380:5
**Carter** [5] - 1480:13, 1480:16, 1480:24, 1482:11, 1482:12
**case** [37] - 1252:25, 1260:22, 1261:12, 1262:2, 1282:4, 1287:9, 1291:6, 1291:8, 1298:15, 1301:13, 1305:9, 1339:22, 1340:11, 1343:24, 1352:23, 1396:12, 1403:12, 1420:7, 1420:25, 1443:9, 1496:17, 1496:19, 1506:25, 1507:3, 1507:4, 1507:11, 1507:13, 1508:1, 1508:5, 1508:11, 1509:13, 1518:14, 1519:14, 1519:18, 1519:19, 1528:10
**cases** [9] - 1309:9, 1320:9, 1320:10, 1320:12, 1327:8, 1343:13, 1451:25,

1506:24, 1512:19
**catching** [1] - 1479:7
**categories** [1] - 1300:10
**category** [1] - 1300:18
**CAUSE** [1] - 1250:11
**caused** [11] - 1394:13, 1394:23, 1394:24, 1409:15, 1409:21, 1410:24, 1411:5, 1411:8, 1421:19, 1421:23
**causing** [1] - 1452:1
**caveat** [2] - 1354:8, 1498:2
**caveats** [1] - 1354:7
**CC** [1] - 1461:21
**Central** [8] - 1259:7, 1306:19, 1327:6, 1327:18, 1327:21, 1358:17, 1392:21, 1393:7
**central** [2] - 1259:15, 1316:8
**CEO** [4] - 1457:5, 1481:2, 1481:21, 1481:25
**CEO's** [1] - 1457:7
**certain** [12] - 1261:13, 1261:21, 1317:13, 1321:1, 1358:18, 1407:7, 1428:3, 1429:3, 1459:16, 1478:9, 1481:15, 1494:7
**Certainly** [1] - 1439:13
**certainly** [15] - 1263:6, 1265:9, 1266:5, 1267:14, 1284:9, 1285:7, 1288:15, 1292:14, 1298:9, 1309:8, 1317:21, 1323:14, 1332:3, 1340:12, 1354:18
**certification** [2] - 1342:5, 1342:8
**certified** [14] - 1333:20, 1338:16, 1338:21, 1339:10, 1339:13, 1339:15, 1339:25, 1340:8, 1340:14, 1340:18, 1340:23, 1341:1, 1344:13, 1351:10
**certify** [3] - 1338:4, 1338:24, 1339:6
**cetera** [2] - 1349:4, 1455:6
**chair** [7] - 1279:10, 1302:25, 1303:10, 1338:9, 1340:17, 1343:5, 1431:21
**chairman** [3] - 1262:14, 1310:18, 1403:7
**chairman's** [4] - 1342:16, 1342:19, 1343:1, 1489:20
**challenge** [4] - 1436:4, 1447:19, 1506:14, 1527:11
**challenged** [2] - 1441:11, 1527:12
**challenges** [2] - 1297:6, 1521:4
**champion** [2] - 1278:21, 1282:15
**championship** [3] - 1293:19, 1303:14, 1364:2
**chance** [4] - 1281:17, 1332:15, 1396:15, 1437:6
**chancellor** [1] - 1277:7
**chancery** [2] - 1519:24, 1520:2
**chances** [2] - 1281:15, 1281:21
**change** [13] - 1321:7, 1327:12, 1498:8, 1504:8, 1504:10, 1509:21, 1510:2, 1510:21, 1523:10, 1524:9, 1524:10, 1531:22, 1532:12
**changed** [6] - 1327:5, 1327:6, 1327:8, 1327:9, 1488:21, 1509:19
**changes** [6] - 1332:18, 1379:24,

1449:2, 1462:3, 1462:10, 1466:2
**changing** [2] - 1464:22, 1508:25
**characterized** [2] - 1313:4, 1447:18
**charge** [2] - 1429:1, 1431:14
**charges** [1] - 1374:2
**charitable** [1] - 1366:1
**chatting** [1] - 1492:5
**check** [1] - 1349:20
**Chicago** [2] - 1259:15, 1475:15
**chief** [3] - 1270:7, 1415:24, 1431:17
**choice** [9] - 1300:1, 1341:2, 1390:14, 1390:17, 1390:22, 1391:10, 1391:11, 1441:21, 1469:2
**choices** [1] - 1421:1
**choosing** [1] - 1530:8
**chose** [5] - 1390:9, 1390:10, 1407:3, 1422:6, 1422:7
**Chris** [4] - 1276:8, 1276:10, 1276:13, 1302:22
**Christmas** [1] - 1292:9
**chunk** [1] - 1515:16
**Cindy** [4] - 1278:19, 1278:20, 1282:15
**circles** [1] - 1525:7
**Circuit** [3] - 1507:14, 1507:21, 1517:24
**circular** [1] - 1511:16
**circulating** [1] - 1462:11
**circumstances** [2] - 1262:8, 1520:6
**citation** [1] - 1503:7
**cite** [4] - 1465:5, 1524:22, 1524:23
**cited** [2] - 1506:25, 1509:13
**cities** [3] - 1258:18, 1259:12, 1316:17
**citing** [1] - 1343:13
**city** [3] - 1327:22, 1366:12, 1428:14
**City** [1] - 1502:18
**CIVIL** [1] - 1250:11
**claim** [2] - 1268:16, 1289:24
**claiming** [1] - 1520:12
**claims** [3] - 1252:10, 1289:20, 1423:8
**Class** [12] - 1401:9, 1404:20, 1405:13, 1499:13, 1502:1, 1502:7, 1502:13, 1502:15, 1503:4, 1504:1, 1523:3
**class** [3] - 1502:19, 1512:25, 1513:1
**classification** [3] - 1257:25, 1258:4, 1288:23
**clause** [2] - 1520:4, 1520:7
**Clause** [1] - 1512:8
**clean** [1] - 1404:24
**clear** [28] - 1261:1, 1264:9, 1264:15, 1271:25, 1273:14, 1276:7, 1281:11, 1284:25, 1305:11, 1326:5, 1390:25, 1392:9, 1397:16, 1459:21, 1470:20, 1475:21, 1485:13, 1490:11, 1491:7, 1497:24, 1501:18, 1503:1, 1511:17, 1514:8, 1515:10, 1524:14, 1528:4, 1533:8
**clearer** [1] - 1530:16
**clearly** [11] - 1254:7, 1254:8, 1273:4, 1287:3, 1447:14, 1450:18, 1514:24, 1519:2, 1522:2, 1524:13, 1526:13

VB        OCR        CRR

ALL WORD INDEX                                                                                    8

**Clinton** [1] - 1277:8
**close** [7] - 1305:21, 1309:15, 1430:11, 1465:18, 1485:18, 1507:22, 1526:24
**closer** [4] - 1305:21, 1396:11, 1397:22, 1420:11
**club** [50] - 1367:16, 1370:17, 1374:15, 1376:11, 1376:14, 1377:20, 1379:17, 1381:21, 1384:24, 1390:2, 1390:4, 1390:14, 1390:17, 1390:23, 1390:25, 1391:5, 1391:9, 1391:11, 1392:4, 1392:9, 1392:11, 1393:11, 1393:14, 1393:15, 1394:13, 1394:24, 1397:6, 1398:21, 1400:19, 1401:8, 1401:25, 1402:16, 1404:15, 1404:19, 1408:6, 1412:4, 1415:25, 1416:3, 1417:22, 1418:6, 1419:10, 1419:11, 1419:12, 1419:14, 1419:23, 1449:21, 1450:4
**Club** [1] - 1378:14
**clubs** [17] - 1294:12, 1294:22, 1294:23, 1295:7, 1407:12, 1407:20, 1407:21, 1409:19, 1413:5, 1464:8, 1464:12, 1464:17, 1472:21, 1475:10, 1475:17, 1475:19
**co** [1] - 1303:10
**co-chair** [1] - 1303:10
**coach** [2] - 1477:20, 1477:22
**coaches** [6] - 1376:17, 1379:20, 1381:22, 1381:25, 1386:1, 1441:21
**coaches'** [1] - 1314:6
**coaching** [2] - 1314:21, 1382:14
**coast** [4] - 1258:20, 1259:16, 1278:12, 1316:9
**coat** [1] - 1258:21
**Cogan** [6] - 1515:13, 1516:1, 1516:10, 1527:12, 1527:13, 1531:24
**Cogan's** [4] - 1514:20, 1515:5, 1515:22, 1531:25
**cold** [1] - 1364:1
**COLE** [4] - 1250:17, 1360:2, 1360:8, 1361:6
**cole** [2] - 1526:1
**collaborative** [1] - 1293:8
**collectively** [1] - 1271:18
**college** [4] - 1278:22, 1363:15, 1363:19, 1363:24
**Colorado** [1] - 1327:15
**Columbia** [3] - 1288:13, 1303:10, 1303:11
**Columbus** [2] - 1442:18, 1442:24
**column** [2] - 1415:6
**combined** [3] - 1432:1, 1464:7, 1464:12
**coming** [9] - 1288:4, 1372:15, 1377:22, 1385:5, 1386:22, 1505:12, 1511:3, 1514:11, 1530:3
**commence** [1] - 1435:11
**commenced** [1] - 1331:18
**comment** [8] - 1324:21, 1326:2, 1332:15, 1455:22, 1474:1, 1489:7, 1493:23, 1516:21

**commenting** [1] - 1262:23
**comments** [14] - 1268:23, 1304:24, 1319:7, 1332:14, 1473:7, 1473:15, 1473:20, 1473:24, 1477:24, 1478:5, 1478:11, 1494:23, 1495:3
**commercial** [6] - 1431:24, 1463:25, 1467:9, 1487:2, 1487:10, 1494:16
**Commissioner** [2] - 1400:18, 1429:14
**commissioner** [20] - 1264:1, 1270:10, 1273:10, 1303:17, 1406:5, 1406:7, 1415:19, 1418:6, 1430:21, 1430:24, 1431:4, 1434:15, 1434:19, 1435:1, 1435:3, 1446:10, 1449:18, 1449:19, 1450:16, 1462:3
**commissioner's** [1] - 1445:16
**Commisso** [12] - 1288:8, 1288:10, 1288:12, 1288:17, 1296:5, 1300:19, 1300:21, 1300:25, 1301:2, 1301:11, 1415:21, 1415:25
**commitment** [4] - 1292:24, 1322:24, 1422:3, 1427:11
**commitments** [1] - 1494:15
**committed** [2] - 1294:12, 1294:13
**committee** [5] - 1346:10, 1346:14, 1346:17, 1346:20, 1346:23
**common** [3] - 1310:23, 1328:20, 1499:23
**communicate** [1] - 1307:2
**communicated** [2] - 1271:12, 1358:9
**communications** [8] - 1252:12, 1253:12, 1265:6, 1271:13, 1286:9, 1403:13, 1439:15, 1473:14
**communities** [1] - 1366:7
**community** [12] - 1258:11, 1278:7, 1279:12, 1366:9, 1370:18, 1375:12, 1375:13, 1375:16, 1375:24, 1377:19, 1379:18, 1379:19
**community's** [1] - 1377:18
**company** [15] - 1262:13, 1262:14, 1362:21, 1365:4, 1365:9, 1365:21, 1365:23, 1365:24, 1365:25, 1432:9, 1463:25, 1469:11, 1496:1, 1504:13
**compensate** [1] - 1429:5
**compensated** [5] - 1318:16, 1318:21, 1319:3, 1319:8, 1428:21
**compensation** [12] - 1307:15, 1307:18, 1307:21, 1307:25, 1308:3, 1308:17, 1308:23, 1318:11, 1319:6, 1319:23, 1495:24, 1496:7
**compete** [1] - 1267:9
**competition** [2] - 1302:24, 1446:5
**competitive** [4] - 1468:17, 1468:19, 1468:21, 1494:16
**competitors** [1] - 1433:15
**complaining** [1] - 1386:5
**complete** [1] - 1265:25
**completely** [6] - 1265:22, 1321:19, 1326:21, 1331:1, 1388:13, 1511:16
**completes** [1] - 1470:15
**complex** [1] - 1488:22

**compliance** [17] - 1261:1, 1261:3, 1268:8, 1268:12, 1283:20, 1306:9, 1306:10, 1306:20, 1341:20, 1342:20, 1343:3, 1351:16, 1352:1, 1352:3, 1352:9, 1435:15, 1435:18
**Compliance** [1] - 1257:15
**complicated** [2] - 1519:9, 1527:7
**complied** [1] - 1313:18
**comply** [5] - 1298:23, 1313:18, 1324:1, 1349:22, 1352:10
**component** [2] - 1482:24, 1483:2
**Composition** [1] - 1294:9
**Computer** [1] - 1251:18
**Computer-Aided** [1] - 1251:18
**CONCACAF** [6] - 1318:22, 1319:5, 1319:11, 1319:17, 1319:22, 1319:25
**conceded** [1] - 1502:16
**concedes** [3] - 1503:25, 1504:2
**concept** [1] - 1459:20
**concern** [2] - 1266:6, 1446:10
**concerned** [6] - 1284:5, 1335:10, 1385:7, 1404:20, 1405:12, 1437:21
**concerning** [2] - 1265:19, 1275:18
**concerns** [4] - 1262:3, 1271:14, 1271:22, 1382:4
**concession** [1] - 1504:4
**concessions** [1] - 1369:15
**conclude** [3] - 1307:12, 1507:7, 1507:8
**concludes** [1] - 1360:15
**condition** [4] - 1395:5, 1419:11, 1438:1, 1470:16
**conditions** [3] - 1388:8, 1454:12, 1455:5
**conduct** [3] - 1411:6, 1428:23, 1500:20
**Cone** [4] - 1278:19, 1278:20, 1279:2, 1279:5
**conference** [4] - 1429:2, 1429:12, 1476:4, 1476:6
**confidential** [2] - 1272:12, 1411:4
**confirm** [1] - 1333:1
**confirmed** [1] - 1502:8
**conflict** [1] - 1454:13
**conflicts** [3] - 1465:9, 1465:14, 1465:20
**confused** [1] - 1501:10
**confusion** [1] - 1518:24
**Congress** [1] - 1282:11
**Congresswoman** [1] - 1277:9
**connecting** [1] - 1417:14
**connection** [15] - 1260:8, 1265:12, 1266:1, 1270:18, 1292:11, 1293:5, 1326:3, 1361:8, 1389:2, 1413:22, 1414:5, 1478:19, 1480:5, 1499:13, 1512:16
**consensus** [2] - 1340:7, 1340:12
**consequence** [2] - 1428:23, 1509:16
**conservative** [1] - 1528:22

**consider** [13] - 1254:18, 1268:5, 1284:6, 1338:10, 1349:23, 1352:17, 1360:12, 1365:6, 1416:15, 1473:20, 1508:5, 1511:2, 1530:12
**consideration** [1] - 1275:11
**considered** [3] - 1268:10, 1269:11, 1346:13
**considering** [6] - 1348:21, 1428:16, 1428:25, 1429:8, 1436:20, 1487:16
**consistent** [4] - 1469:7, 1506:11, 1526:6, 1529:10
**consistently** [1] - 1421:18
**conspiracy** [3] - 1309:3, 1403:8, 1404:4
**conspired** [2] - 1268:17, 1289:21
**constituents** [1] - 1488:23
**constitutes** [1] - 1512:1
**construction** [2] - 1497:7, 1512:10
**consultant** [1] - 1341:22
**consuming** [1] - 1492:7
**contemplated** [1] - 1404:22
**content** [3] - 1332:7, 1353:8, 1365:10
**contentious** [1] - 1465:5
**contest** [1] - 1524:12
**contested** [4] - 1497:19, 1497:20, 1503:22, 1523:7
**context** [3] - 1491:5, 1500:25, 1515:22
**Contiguglia** [4] - 1359:24, 1360:8, 1360:14, 1361:8
**Continental** [2] - 1392:22, 1393:1
**continental** [7] - 1259:1, 1259:3, 1259:20, 1259:23, 1316:14, 1316:23, 1359:8
**continuation** [1] - 1293:20
**continue** [16] - 1256:11, 1267:8, 1285:1, 1293:21, 1298:22, 1329:6, 1375:2, 1385:16, 1387:3, 1388:15, 1388:16, 1426:11, 1469:2, 1473:6, 1484:12, 1484:24
**continued** [3] - 1444:5, 1482:25, 1483:7
**Continued** [10] - 1285:10, 1311:16, 1336:2, 1337:22, 1399:2, 1456:11, 1479:9, 1496:23, 1509:24, 1522:18
**continues** [8] - 1306:16, 1405:16, 1406:14, 1407:6, 1449:13, 1498:1, 1502:4, 1530:20
**Continuing** [8] - 1257:5, 1286:3, 1312:1, 1338:1, 1430:1, 1457:3, 1480:1, 1523:1
**continuing** [19] - 1267:21, 1271:15, 1271:23, 1291:13, 1329:8, 1337:1, 1388:10, 1400:1, 1406:15, 1407:1, 1408:20, 1409:5, 1409:14, 1409:21, 1411:11, 1411:16, 1483:4, 1497:9, 1502:9
**contract** [50] - 1386:22, 1436:6, 1468:22, 1498:18, 1506:6, 1506:20, 1507:19, 1507:22, 1507:25, 1508:4, 1508:9, 1508:10, 1508:24, 1510:13,

1511:8, 1511:11, 1511:12, 1511:15, 1511:18, 1512:19, 1514:1, 1516:13, 1516:23, 1519:1, 1519:3, 1519:16, 1519:20, 1520:3, 1520:5, 1520:10, 1520:15, 1520:16, 1520:17, 1521:20, 1521:25, 1522:1, 1522:2, 1522:16, 1522:17, 1523:3, 1523:5, 1523:18, 1526:10, 1531:11, 1531:13, 1531:14, 1531:21, 1531:23
**contracted** [1] - 1442:16
**contracts** [4] - 1386:20, 1505:21, 1507:21, 1510:3
**contractual** [2] - 1516:6, 1519:15
**contradicted** [1] - 1522:2
**contrary** [1] - 1308:20
**control** [2] - 1433:7, 1434:3
**controlled** [2] - 1437:10, 1448:19
**controlling** [1] - 1522:16
**conversation** [7] - 1333:21, 1381:16, 1381:19, 1383:18, 1398:6, 1410:11, 1418:5
**conversations** [19] - 1253:21, 1286:11, 1382:9, 1382:11, 1383:3, 1383:10, 1384:14, 1385:2, 1385:3, 1388:9, 1388:12, 1388:13, 1388:14, 1388:15, 1397:12, 1398:12, 1410:15, 1412:14, 1418:9
**convinced** [1] - 1448:18
**cooperate** [2] - 1286:25
**copied** [2] - 1264:24, 1453:11
**copy** [1] - 1267:17
**copying** [1] - 1266:9
**Cordeiro** [7] - 1277:18, 1277:19, 1277:25, 1278:3, 1345:5, 1345:9, 1347:1
**corn** [1] - 1527:18
**corner** [1] - 1277:1
**corporate** [3] - 1432:24, 1436:18, 1453:17
**correct** [476] - 1268:18, 1276:19, 1276:20, 1287:25, 1288:1, 1290:7, 1310:15, 1310:16, 1311:7, 1311:13, 1312:4, 1312:9, 1312:15, 1312:19, 1313:2, 1313:3, 1313:17, 1313:20, 1313:25, 1314:3, 1314:25, 1315:2, 1315:4, 1315:10, 1315:17, 1315:21, 1316:2, 1316:6, 1316:13, 1316:19, 1316:24, 1317:8, 1317:12, 1317:17, 1318:5, 1318:19, 1318:25, 1319:10, 1319:14, 1319:15, 1319:16, 1319:23, 1320:7, 1320:11, 1320:16, 1320:19, 1320:23, 1320:24, 1322:1, 1322:5, 1322:14, 1322:16, 1322:19, 1322:25, 1323:4, 1323:5, 1323:7, 1323:9, 1323:13, 1323:18, 1324:2, 1324:3, 1324:9, 1324:10, 1324:24, 1324:25, 1325:5, 1325:9, 1325:10, 1325:13, 1325:18, 1325:23, 1326:7, 1326:11, 1326:13, 1326:16, 1326:17, 1326:20, 1327:2, 1327:7, 1327:10, 1327:11,

1327:13, 1327:17, 1327:24, 1329:23, 1330:15, 1330:16, 1330:20, 1330:22, 1332:1, 1332:5, 1332:12, 1332:18, 1332:25, 1333:4, 1333:5, 1333:7, 1333:9, 1333:10, 1333:19, 1333:20, 1333:23, 1334:1, 1337:9, 1337:14, 1337:18, 1338:16, 1338:19, 1339:10, 1340:23, 1341:13, 1341:15, 1341:20, 1341:24, 1341:25, 1342:2, 1342:5, 1342:6, 1342:8, 1342:11, 1342:12, 1342:14, 1342:20, 1343:3, 1343:6, 1343:8, 1344:4, 1344:18, 1345:3, 1345:5, 1345:8, 1345:25, 1346:8, 1346:17, 1346:24, 1347:2, 1347:19, 1347:21, 1347:22, 1347:25, 1348:4, 1348:8, 1348:11, 1349:5, 1349:7, 1349:9, 1349:24, 1350:12, 1351:5, 1351:8, 1351:11, 1351:16, 1351:22, 1352:11, 1353:17, 1353:20, 1354:3, 1354:10, 1354:14, 1354:17, 1355:3, 1355:19, 1356:5, 1356:7, 1356:17, 1368:21, 1373:13, 1390:2, 1390:6, 1390:13, 1390:19, 1390:24, 1391:2, 1392:23, 1392:24, 1393:12, 1394:2, 1394:4, 1394:7, 1395:12, 1395:15, 1395:17, 1396:21, 1396:24, 1397:1, 1397:2, 1397:11, 1397:13, 1397:17, 1397:18, 1398:4, 1398:5, 1398:9, 1398:10, 1398:14, 1398:19, 1400:21, 1400:22, 1401:12, 1402:3, 1402:4, 1402:19, 1402:20, 1407:10, 1408:23, 1412:21, 1413:25, 1414:19, 1415:8, 1415:22, 1416:1, 1416:7, 1417:23, 1418:10, 1419:15, 1420:3, 1421:4, 1421:5, 1421:8, 1421:24, 1422:8, 1422:18, 1425:25, 1431:19, 1432:1, 1432:16, 1432:23, 1432:24, 1433:2, 1433:3, 1433:4, 1433:6, 1434:11, 1434:21, 1434:24, 1434:25, 1435:1, 1435:8, 1435:11, 1435:12, 1435:22, 1435:23, 1436:7, 1436:11, 1436:12, 1437:12, 1437:18, 1437:19, 1439:18, 1439:22, 1440:6, 1440:11, 1440:20, 1440:21, 1440:23, 1440:24, 1441:1, 1441:3, 1441:5, 1441:6, 1441:8, 1441:11, 1441:12, 1442:1, 1442:9, 1442:11, 1442:12, 1442:20, 1442:23, 1442:24, 1442:25, 1443:1, 1443:5, 1443:15, 1443:16, 1443:18, 1444:4, 1444:5, 1444:6, 1444:7, 1444:8, 1444:18, 1444:19, 1444:21, 1445:5, 1445:11, 1445:12, 1445:14, 1445:18, 1446:6, 1446:8, 1446:12, 1446:23, 1447:5, 1447:21, 1449:7, 1449:10, 1449:11, 1450:1, 1450:5, 1450:9, 1450:10, 1450:21, 1451:2, 1451:6, 1451:10, 1451:13, 1451:21, 1451:24, 1452:12, 1452:16, 1452:25, 1453:3, 1453:9, 1453:15, 1454:15, 1454:21, 1454:24, 1455:1, 1455:12, 1456:8, 1457:5, 1457:6, 1457:18, 1457:19,

ALL WORD INDEX                                                  10

1457:21, 1457:22, 1457:24, 1457:25, 1458:18, 1458:19, 1458:22, 1458:25, 1459:4, 1459:9, 1459:10, 1459:12, 1459:13, 1459:14, 1460:4, 1460:11, 1460:17, 1460:23, 1460:24, 1461:3, 1461:4, 1461:7, 1461:8, 1461:10, 1461:11, 1461:18, 1461:22, 1461:23, 1462:4, 1462:9, 1462:12, 1462:18, 1464:18, 1464:19, 1465:10, 1465:14, 1466:4, 1466:8, 1466:9, 1466:17, 1466:18, 1466:24, 1466:25, 1467:2, 1467:11, 1467:12, 1467:15, 1467:21, 1467:22, 1468:4, 1468:11, 1468:12, 1468:14, 1468:15, 1468:17, 1468:21, 1469:4, 1469:12, 1469:13, 1469:14, 1471:6, 1471:23, 1471:25, 1472:1, 1472:5, 1472:6, 1473:5, 1474:3, 1474:4, 1474:18, 1475:9, 1475:25, 1477:9, 1477:10, 1477:21, 1478:4, 1478:11, 1478:12, 1478:20, 1478:24, 1479:3, 1480:6, 1480:7, 1480:13, 1480:16, 1480:17, 1481:3, 1481:5, 1481:6, 1481:8, 1481:9, 1481:16, 1482:12, 1482:13, 1483:2, 1483:24, 1484:3, 1484:9, 1484:10, 1484:18, 1484:19, 1484:21, 1485:2, 1485:12, 1485:13, 1486:2, 1486:19, 1487:6, 1487:13, 1487:14, 1487:17, 1487:23, 1487:24, 1488:8, 1488:10, 1488:17, 1489:1, 1489:3, 1489:6, 1490:20, 1490:25, 1491:10, 1491:23, 1491:24, 1492:13, 1492:14, 1493:13, 1493:15, 1493:16, 1493:22, 1494:23, 1495:6, 1495:7, 1495:22, 1502:2, 1502:13, 1502:14, 1511:8, 1512:9, 1513:15, 1515:8, 1515:9, 1516:24, 1519:21, 1528:16, 1531:13, 1531:14

**Correct** [24] - 1339:20, 1344:14, 1347:7, 1434:12, 1436:23, 1439:19, 1440:7, 1440:12, 1441:2, 1443:2, 1443:19, 1446:19, 1446:20, 1447:22, 1449:5, 1449:8, 1449:15, 1449:16, 1450:6, 1451:14, 1451:22, 1452:17, 1453:4, 1453:13

**correctly** [3] - 1406:17, 1407:9, 1407:16

**correspondence** [4] - 1261:20, 1266:5, 1349:2, 1454:7

**corruption** [1] - 1403:9

**Cosmos** [3] - 1288:14, 1288:15, 1415:25

**cost** [3] - 1467:24, 1468:3, 1468:10

**costs** [3] - 1468:6, 1468:7, 1468:9

**Council** [1] - 1303:1

**councils** [1] - 1474:10

**Counsel** [3] - 1251:7, 1251:8, 1430:4

**counsel** [34] - 1254:5, 1254:6, 1266:19, 1266:22, 1267:4, 1267:10, 1267:12, 1282:3, 1283:4, 1297:19, 1298:11, 1304:4, 1310:2, 1323:21,

1329:9, 1329:15, 1330:7, 1333:6, 1349:16, 1351:4, 1354:20, 1400:4, 1400:14, 1401:4, 1401:21, 1402:12, 1437:6, 1462:19, 1465:17, 1480:9, 1489:23, 1492:20, 1498:21, 1517:3

**count** [26] - 1327:17, 1327:19, 1327:20, 1327:23, 1328:1, 1488:23, 1488:24, 1489:5, 1490:22, 1490:24, 1491:20, 1492:4, 1501:19, 1510:10, 1510:21, 1514:8, 1518:3, 1521:11, 1522:13, 1523:10, 1524:14, 1524:25, 1525:4, 1529:7, 1531:15

**counted** [3] - 1503:10, 1509:2, 1510:6

**counting** [9] - 1311:12, 1314:13, 1314:20, 1450:8, 1509:1, 1522:6, 1526:3, 1526:7

**countries** [2] - 1465:4, 1465:5

**country** [5] - 1258:19, 1258:23, 1259:18, 1452:19, 1467:14

**couple** [13] - 1259:6, 1289:9, 1289:10, 1324:6, 1327:8, 1334:3, 1378:11, 1378:18, 1396:9, 1396:11, 1396:14, 1436:7

**course** [5] - 1277:13, 1284:19, 1290:20, 1454:7, 1532:19

**Court** [10] - 1251:16, 1362:4, 1400:5, 1400:15, 1401:5, 1401:22, 1402:13, 1476:13, 1480:10, 1492:21

**COURT** [219] - 1250:1, 1253:8, 1253:10, 1254:7, 1254:23, 1255:3, 1255:21, 1256:4, 1256:9, 1265:3, 1266:15, 1267:23, 1271:3, 1272:4, 1273:16, 1273:22, 1275:8, 1283:2, 1286:17, 1287:13, 1290:11, 1291:23, 1294:6, 1299:22, 1305:1, 1309:17, 1309:20, 1313:9, 1328:21, 1328:23, 1329:2, 1329:5, 1331:4, 1331:13, 1334:9, 1335:2, 1335:9, 1335:16, 1337:20, 1338:18, 1338:23, 1339:12, 1342:24, 1346:19, 1346:22, 1348:21, 1349:15, 1355:5, 1355:8, 1355:22, 1356:1, 1357:7, 1357:9, 1357:12, 1359:17, 1359:19, 1360:4, 1360:10, 1360:17, 1360:22, 1361:5, 1361:12, 1361:14, 1361:18, 1361:21, 1361:25, 1362:10, 1382:2, 1382:7, 1384:1, 1384:8, 1384:12, 1384:18, 1389:21, 1393:3, 1395:23, 1400:10, 1400:25, 1401:17, 1402:8, 1402:25, 1403:18, 1403:20, 1403:24, 1404:6, 1405:1, 1405:3, 1406:1, 1406:19, 1406:22, 1407:17, 1407:24, 1408:25, 1409:24, 1414:15, 1415:11, 1415:14, 1417:8, 1417:10, 1419:19, 1423:12, 1423:16, 1427:15, 1427:17, 1427:19, 1427:23, 1428:5, 1429:15, 1430:3, 1430:7, 1430:10, 1433:10, 1438:22, 1438:25, 1439:6, 1439:10, 1440:1, 1444:14, 1453:19, 1453:22, 1454:1, 1454:3, 1457:12, 1462:21, 1467:5, 1470:5,

1470:9, 1470:12, 1470:16, 1470:22, 1471:10, 1471:21, 1476:17, 1476:22, 1477:15, 1480:21, 1484:1, 1489:24, 1490:7, 1490:11, 1491:1, 1491:4, 1491:7, 1493:5, 1496:14, 1497:1, 1498:15, 1499:1, 1499:11, 1500:3, 1500:14, 1501:8, 1503:24, 1504:12, 1504:18, 1504:25, 1505:4, 1505:6, 1505:24, 1506:15, 1506:23, 1507:11, 1507:13, 1507:17, 1508:12, 1508:23, 1509:5, 1509:10, 1510:2, 1510:9, 1511:6, 1512:6, 1512:8, 1513:6, 1513:8, 1514:16, 1515:3, 1515:7, 1515:12, 1516:8, 1516:22, 1518:7, 1518:17, 1518:22, 1519:10, 1519:18, 1519:24, 1520:2, 1520:11, 1520:22, 1521:23, 1522:15, 1523:2, 1523:13, 1523:23, 1524:2, 1524:6, 1524:17, 1525:7, 1525:17, 1526:15, 1526:22, 1527:5, 1527:17, 1527:22, 1528:4, 1528:11, 1529:18, 1529:24, 1530:23, 1531:7, 1532:1, 1532:4, 1532:11, 1532:20, 1533:3, 1533:6, 1533:10, 1533:13

**court** [7] - 1252:1, 1361:3, 1404:4, 1510:1, 1514:11, 1519:24, 1520:3

**Court's** [1] - 1507:14

**Courtemanche** [8] - 1439:4, 1439:7, 1439:14, 1439:20, 1473:14, 1473:20, 1473:25, 1474:25

**Courthouse** [1] - 1250:5

**courtroom** [1] - 1361:20

**COURTROOM** [1] - 1362:2

**cover** [11] - 1463:3, 1463:5, 1463:7, 1463:10, 1467:24, 1468:3, 1468:5, 1469:17, 1470:20, 1518:11

**covered** [4] - 1333:18, 1337:15, 1347:20, 1461:5

**covering** [1] - 1468:9

**craft** [1] - 1488:12

**crammed** [2] - 1254:10, 1255:24

**create** [3] - 1371:7, 1375:11, 1408:8

**created** [1] - 1295:5

**creates** [4] - 1407:13, 1407:21, 1498:23, 1498:24

**creating** [1] - 1516:16

**creative** [1] - 1375:18

**creatively** [1] - 1365:20

**credibility** [1] - 1335:12

**credible** [3] - 1295:10, 1295:11

**criminal** [5] - 1325:19, 1373:23, 1374:2, 1403:8, 1404:23

**criteria** [2] - 1257:21, 1295:15

**critical** [5] - 1310:23, 1322:13, 1454:8, 1501:22, 1516:8

**CROSS** [5] - 1257:4, 1309:23, 1389:22, 1534:6, 1534:11

**cross** [6] - 1309:17, 1389:21, 1423:21, 1425:4, 1427:5, 1529:13

**cross-examination** [2] - 1423:21,

VB          OCR          CRR

1425:4
**CROSS-EXAMINATION** [4] - 1257:4, 1389:22, 1534:6, 1534:11
**cross-examine** [1] - 1529:13
**crossing** [1] - 1532:9
**Cup** [5] - 1455:10, 1481:22, 1482:18, 1483:15, 1484:15
**cure** [1] - 1354:13
**cured** [2] - 1305:20, 1354:2
**curing** [1] - 1354:9
**current** [11] - 1264:1, 1264:2, 1271:10, 1277:6, 1278:25, 1395:5, 1428:18, 1495:9, 1495:11, 1530:8, 1532:21
**cut** [2] - 1436:11, 1471:8
**cuts** [1] - 1471:15

# D

**D-1** [16] - 1312:7, 1312:8, 1313:5, 1313:25, 1322:18, 1323:3, 1323:16, 1323:25, 1324:2, 1324:4, 1324:5, 1325:3, 1325:18, 1326:16, 1327:1, 1327:4
**D-2** [6] - 1325:18, 1325:22, 1326:6, 1326:9, 1326:14, 1326:19
**D-I** [2] - 1253:10, 1344:9
**D-II** [13] - 1347:25, 1348:7, 1348:9, 1349:7, 1349:13, 1349:24, 1352:8, 1353:12, 1354:25, 1426:2, 1426:6, 1426:9, 1426:18
**dad** [1] - 1366:18
**Dallas** [2] - 1259:16, 1280:22
**damage** [7] - 1394:11, 1394:22, 1394:23, 1406:14, 1411:2, 1411:5, 1521:7
**damages** [17] - 1410:25, 1411:8, 1428:16, 1428:22, 1429:5, 1499:24, 1499:25, 1510:10, 1514:19, 1515:15, 1526:13, 1528:9, 1528:24, 1530:9, 1530:13, 1530:18
**Dan** [15] - 1267:17, 1291:17, 1292:1, 1439:3, 1467:8, 1473:13, 1474:3, 1474:20, 1479:5, 1480:12, 1480:16, 1481:21, 1482:15, 1488:5, 1494:14
**dandy** [1] - 1522:15
**date** [25] - 1253:1, 1263:16, 1273:14, 1274:19, 1290:6, 1291:18, 1341:25, 1342:5, 1352:19, 1499:18, 1513:14, 1516:2, 1522:6, 1523:4, 1526:7, 1528:13, 1530:4, 1530:18, 1530:21, 1531:1, 1531:6, 1531:16, 1532:8, 1532:12
**dated** [12] - 1264:21, 1265:19, 1266:9, 1270:2, 1270:22, 1350:4, 1408:12, 1466:24, 1477:4, 1480:15, 1485:25, 1492:23
**dates** [1] - 1463:15
**Daubert** [21] - 1497:10, 1499:4, 1499:22, 1500:7, 1501:2, 1502:20,

1505:11, 1505:15, 1505:17, 1506:13, 1506:24, 1507:10, 1509:12, 1514:20, 1517:24, 1519:11, 1519:12, 1519:13, 1521:1, 1526:12, 1527:12
**David** [1] - 1273:7
**DAVID** [1] - 1250:16
**Davidson** [8] - 1261:18, 1373:14, 1374:3, 1403:6, 1403:11, 1403:13, 1404:3, 1503:14
**day-to-day** [1] - 1431:6
**days** [14] - 1261:18, 1270:16, 1290:14, 1292:9, 1338:10, 1339:18, 1341:9, 1343:3, 1349:23, 1414:20, 1482:16, 1482:20, 1505:25
**DC** [1] - 1251:11
**DD-7** [1] - 1415:2
**deal** [11] - 1258:17, 1258:18, 1321:14, 1366:9, 1385:22, 1458:15, 1460:22, 1461:9, 1466:7, 1466:15, 1487:19
**dealing** [1] - 1514:21
**deals** [4] - 1379:2, 1380:7
**death** [1] - 1417:11
**debate** [2] - 1498:5, 1531:25
**debating** [1] - 1532:5
**decade** [2] - 1442:8, 1442:10
**decades** [1] - 1404:23
**December** [14] - 1267:6, 1267:11, 1270:2, 1270:13, 1270:22, 1270:23, 1271:8, 1286:6, 1286:9, 1338:8, 1339:8, 1402:15, 1440:19, 1442:16
**decide** [10] - 1291:3, 1375:2, 1504:21, 1506:7, 1518:13, 1521:18, 1524:16, 1529:4, 1532:24, 1532:25
**decided** [5] - 1255:17, 1318:4, 1327:17, 1506:7, 1527:2
**decides** [1] - 1301:4
**deciding** [2] - 1391:25, 1506:8
**decision** [27] - 1282:10, 1284:2, 1290:21, 1291:17, 1306:3, 1307:2, 1309:12, 1326:2, 1354:24, 1371:22, 1371:25, 1373:2, 1374:20, 1390:25, 1391:5, 1391:6, 1395:20, 1396:2, 1406:16, 1489:21, 1494:19, 1494:21, 1504:19, 1507:1, 1507:14, 1514:21, 1515:22
**decisions** [6] - 1283:5, 1326:12, 1388:1, 1431:11, 1433:15, 1519:1
**declaration** [9] - 1505:21, 1514:19, 1515:2, 1523:20, 1523:23, 1524:4, 1525:12, 1525:15, 1526:17
**declining** [2] - 1446:3, 1446:22
**deducted** [1] - 1515:25
**deduction** [1] - 1510:19
**deeply** [2] - 1486:8, 1486:14
**defeat** [1] - 1508:16
**Defendant** [3] - 1251:2, 1251:7, 1251:8
**Defendant's** [6] - 1290:12, 1291:24, 1294:7, 1534:23, 1534:24, 1534:25
**defendant's** [3] - 1301:25, 1415:2,

1510:24
**defendants** [3] - 1250:9, 1510:20, 1511:6
**Defendants** [3] - 1497:4, 1508:13, 1508:15
**defendants'** [2] - 1530:17, 1530:20
**defense** [3] - 1335:2, 1527:6
**deferral** [5] - 1524:23, 1525:1, 1526:2, 1526:3
**define** [1] - 1518:15
**defined** [6] - 1283:19, 1312:24, 1313:11, 1499:13, 1501:19, 1502:1
**definitely** [1] - 1371:6
**definition** [16] - 1313:12, 1497:18, 1498:20, 1499:16, 1500:18, 1500:22, 1501:12, 1503:19, 1509:6, 1509:18, 1509:22, 1510:3, 1512:24, 1512:25, 1517:8, 1532:7
**definitional** [2] - 1509:7, 1510:3
**definitive** [1] - 1306:10
**Delaware** [3] - 1511:14, 1514:2, 1519:22
**delay** [4] - 1255:5, 1255:11, 1255:12, 1331:20
**deleted** [1] - 1403:12
**deliberation** [1] - 1262:24
**delivers** [1] - 1472:8
**Deltas** [2] - 1348:3, 1348:10
**democrat** [1] - 1279:22
**democratic** [1] - 1282:13
**demonstrably** [1] - 1526:11
**demonstrate** [1] - 1322:24
**demonstrated** [1] - 1421:15
**Demonstrative** [3] - 1301:24, 1301:25, 1302:2
**demonstrative** [9] - 1275:18, 1275:22, 1275:24, 1276:3, 1282:1, 1301:22, 1414:24, 1415:2, 1416:21
**denial** [6] - 1262:17, 1348:9, 1348:11, 1531:1, 1531:6
**denied** [18] - 1283:9, 1284:15, 1298:5, 1308:18, 1308:24, 1309:1, 1313:14, 1325:4, 1326:15, 1347:24, 1347:25, 1348:8, 1348:17, 1349:1, 1349:7, 1516:3, 1526:8, 1530:22
**Denver** [7] - 1327:13, 1327:15, 1327:19, 1327:20, 1328:10, 1364:9, 1364:11
**deny** [11] - 1268:17, 1289:21, 1309:6, 1313:5, 1342:4, 1342:19, 1343:1, 1344:1, 1344:2, 1354:25, 1357:4
**denying** [2] - 1284:12, 1349:12
**departure** [1] - 1411:12
**departures** [2] - 1411:1, 1411:16
**dependent** [2] - 1531:15, 1531:16
**depicted** [2] - 1276:3, 1276:19
**deposed** [1] - 1345:19
**deposition** [18] - 1360:7, 1360:14, 1391:14, 1391:17, 1391:21, 1393:21, 1393:22, 1393:25, 1395:1, 1396:6,

1396:18, 1397:14, 1397:19, 1420:5, 1420:13, 1439:18, 1476:11, 1525:12

**deprive** [1] - 1267:8

**deputy** [1] - 1270:7

**DEPUTY** [1] - 1362:2

**descent** [1] - 1367:6

**describe** [6] - 1363:10, 1363:23, 1366:3, 1380:8, 1432:6, 1470:9

**described** [1] - 1415:7

**describing** [1] - 1527:17

**designated** [1] - 1298:6

**designed** [1] - 1518:11

**despite** [4] - 1342:4, 1411:3, 1441:9, 1446:21

**destroyed** [1] - 1389:12

**detail** [1] - 1329:25

**details** [1] - 1443:8

**determination** [1] - 1274:24

**determine** [1] - 1429:4

**determined** [5] - 1274:23, 1519:6, 1519:7, 1519:10, 1531:19

**determining** [3] - 1257:24, 1258:3, 1260:19

**develop** [3] - 1256:4, 1305:16, 1488:16

**developed** [4] - 1340:7, 1340:13, 1449:6, 1488:17

**developing** [2] - 1283:15, 1283:23

**development** [6] - 1322:13, 1322:15, 1447:9, 1447:17, 1483:10, 1487:12

**DG-5** [1] - 1275:23

**DI** [30] - 1253:9, 1253:16, 1254:14, 1262:16, 1329:12, 1347:24, 1348:9, 1348:11, 1348:13, 1348:15, 1348:18, 1349:1, 1349:12, 1353:20, 1392:16, 1441:4, 1441:7, 1441:9, 1442:11, 1443:1, 1446:16, 1446:17, 1446:21, 1510:11, 1516:2, 1521:9, 1530:9, 1530:13, 1530:24

**Diego** [2] - 1259:17, 1328:14

**difference** [5] - 1305:2, 1328:6, 1370:9, 1432:20, 1527:9

**different** [30] - 1300:10, 1302:10, 1305:25, 1314:14, 1315:5, 1315:10, 1316:7, 1316:12, 1316:15, 1321:12, 1321:14, 1329:15, 1329:23, 1377:25, 1381:15, 1381:19, 1388:21, 1431:24, 1432:3, 1432:10, 1443:5, 1452:9, 1490:17, 1494:19, 1505:12, 1516:14, 1523:17, 1524:25, 1525:4, 1528:23

**differently** [4] - 1432:11, 1455:24, 1520:20, 1522:3

**difficult** [5] - 1387:25, 1460:7, 1486:18, 1518:12, 1518:21

**difficulty** [1] - 1518:13

**DII** [10] - 1381:6, 1381:12, 1381:24, 1382:4, 1382:8, 1382:22, 1383:17, 1383:22, 1384:5, 1385:20

**diligence** [14] - 1368:9, 1371:14, 1371:21, 1371:25, 1373:19, 1412:11, 1413:3, 1413:4, 1413:8, 1418:3, 1418:14, 1424:12, 1424:15, 1424:19

**dimension** [1] - 1358:19

**DIRECT** [5] - 1362:12, 1430:17, 1534:7, 1534:10, 1534:15

**direct** [13] - 1341:18, 1342:9, 1390:4, 1390:8, 1403:3, 1420:22, 1428:13, 1428:22, 1455:25, 1465:25, 1493:8, 1508:3, 1529:6

**directed** [2] - 1282:18, 1358:7

**direction** [1] - 1529:10

**directly** [7] - 1319:11, 1319:19, 1356:14, 1382:13, 1402:16, 1410:18, 1460:16

**director** [4] - 1346:7, 1347:5, 1477:22, 1481:1

**directors** [15] - 1264:7, 1267:5, 1275:9, 1275:15, 1281:12, 1290:5, 1291:2, 1296:11, 1303:9, 1309:6, 1329:11, 1345:8, 1345:10, 1347:16, 1353:5

**disagree** [2] - 1396:5, 1532:2

**disagreement** [1] - 1521:13

**disclose** [1] - 1529:24

**discrimination** [1] - 1423:8

**discuss** [8] - 1283:15, 1290:15, 1337:11, 1365:1, 1383:16, 1450:12, 1485:5, 1496:17

**discussed** [26] - 1261:7, 1264:13, 1265:12, 1266:2, 1266:5, 1271:11, 1274:16, 1274:20, 1275:14, 1284:14, 1287:14, 1325:12, 1330:14, 1330:16, 1330:18, 1330:24, 1333:10, 1333:12, 1333:13, 1333:15, 1334:2, 1337:11, 1337:17, 1439:17, 1530:12

**discusses** [1] - 1489:16

**discussing** [5] - 1257:8, 1264:16, 1274:17, 1304:19, 1332:18

**discussion** [18] - 1253:6, 1253:8, 1254:11, 1292:18, 1295:4, 1305:2, 1330:5, 1332:17, 1332:23, 1333:25, 1334:4, 1337:3, 1339:19, 1452:7, 1488:20, 1491:15, 1494:25, 1497:22

**discussions** [18] - 1254:2, 1263:2, 1263:4, 1270:18, 1282:19, 1283:5, 1293:17, 1293:22, 1304:23, 1329:12, 1337:8, 1337:13, 1380:8, 1380:10, 1383:23, 1450:17, 1485:1, 1485:14

**Disney** [1] - 1322:12

**disparaging** [1] - 1477:25

**display** [4] - 1349:17, 1440:2, 1463:1, 1470:25

**dispute** [6] - 1297:23, 1512:15, 1517:19, 1524:25, 1525:24, 1525:25

**disputed** [3] - 1504:21, 1504:25, 1505:1

**disputes** [5] - 1253:4, 1253:25, 1297:9, 1298:13, 1498:20

**distinct** [1] - 1356:12

**distinction** [1] - 1310:3

**distinguished** [1] - 1507:1

**distinguishing** [1] - 1356:10

**distributed** [1] - 1464:16

**distribution** [3] - 1258:22, 1464:8, 1464:11

**DISTRICT** [3] - 1250:1, 1250:1, 1250:12

**divested** [2] - 1315:17, 1315:20

**divided** [1] - 1447:9

**Division** [163] - 1253:14, 1257:9, 1257:20, 1257:24, 1258:4, 1258:7, 1258:16, 1258:20, 1258:24, 1259:22, 1259:25, 1260:3, 1260:8, 1260:17, 1260:20, 1261:2, 1261:11, 1263:18, 1264:8, 1264:14, 1264:16, 1265:7, 1265:12, 1266:3, 1267:7, 1267:9, 1268:6, 1268:9, 1268:10, 1268:11, 1268:18, 1268:22, 1269:11, 1269:16, 1269:18, 1269:20, 1269:22, 1270:15, 1270:19, 1271:9, 1271:10, 1271:24, 1272:18, 1272:23, 1273:2, 1274:6, 1274:18, 1275:12, 1275:15, 1276:16, 1276:24, 1277:12, 1277:15, 1278:1, 1278:4, 1278:14, 1278:17, 1279:3, 1279:6, 1279:15, 1279:18, 1280:2, 1280:5, 1280:14, 1280:17, 1281:1, 1281:4, 1281:13, 1283:9, 1283:17, 1283:18, 1283:19, 1283:23, 1284:2, 1284:12, 1284:15, 1284:16, 1287:2, 1287:3, 1288:25, 1289:2, 1289:5, 1289:17, 1289:21, 1290:1, 1290:16, 1290:19, 1291:4, 1294:1, 1295:19, 1298:6, 1298:22, 1299:17, 1300:9, 1300:14, 1300:18, 1300:23, 1302:11, 1302:12, 1303:22, 1304:1, 1304:7, 1304:8, 1304:12, 1304:15, 1305:11, 1305:12, 1307:8, 1307:24, 1308:2, 1308:7, 1308:11, 1308:19, 1308:24, 1309:1, 1309:2, 1311:8, 1318:7, 1321:4, 1330:15, 1340:22, 1344:2, 1344:3, 1351:10, 1352:18, 1358:23, 1359:6, 1359:14, 1369:22, 1369:23, 1370:2, 1370:7, 1370:9, 1377:11, 1380:16, 1380:17, 1380:20, 1381:10, 1381:11, 1390:20, 1391:12, 1391:23, 1391:24, 1392:8, 1392:15, 1411:18, 1434:20, 1435:6, 1437:21, 1448:2, 1448:5, 1448:8, 1449:10, 1452:5, 1528:9, 1528:24, 1530:22, 1531:6

**division** [16] - 1273:2, 1280:11, 1289:16, 1289:22, 1307:3, 1370:4, 1377:10, 1380:15, 1383:2, 1385:8, 1385:15, 1390:18, 1390:23, 1391:9, 1452:19, 1473:2

**Division-I** [3] - 1321:4, 1330:15, 1528:9

**Division-II** [1] - 1411:18

**divisional** [8] - 1261:1, 1288:23, 1289:13, 1307:16, 1307:19, 1307:22, 1308:14, 1526:8

VB          OCR          CRR

**Docket** [1] - 1497:24
**document** [55] - 1252:12, 1252:20, 1252:24, 1254:22, 1254:24, 1255:1, 1272:1, 1329:17, 1329:21, 1337:11, 1344:8, 1351:12, 1351:14, 1352:6, 1352:12, 1352:13, 1354:21, 1372:9, 1373:11, 1401:2, 1401:11, 1406:20, 1417:1, 1417:2, 1417:3, 1417:5, 1428:2, 1428:6, 1439:17, 1439:20, 1440:9, 1441:14, 1443:14, 1444:9, 1453:14, 1454:16, 1454:17, 1457:12, 1458:2, 1461:12, 1461:14, 1462:24, 1462:25, 1466:20, 1466:21, 1467:7, 1469:16, 1471:8, 1471:14, 1473:13, 1473:24, 1480:8, 1487:18, 1496:12, 1502:2
**documents** [13] - 1253:15, 1270:12, 1275:4, 1329:10, 1360:3, 1372:8, 1398:20, 1404:8, 1427:25, 1504:15, 1506:21, 1515:23, 1524:21
**dollars** [1] - 1454:10
**Don** [8] - 1430:6, 1438:9, 1469:17, 1469:18, 1482:16, 1485:4, 1485:7
**DONALD** [2] - 1430:13, 1534:14
**done** [5] - 1357:4, 1417:11, 1496:15, 1514:24, 1527:3
**Donna** [8] - 1277:1, 1277:3, 1277:4, 1277:11, 1277:14, 1282:9, 1345:22, 1453:9
**Donuts** [1] - 1278:11
**double** [3] - 1395:24, 1395:25, 1396:16
**doubt** [2] - 1274:10, 1286:8
**Douglas** [1] - 1408:13
**Down** [1] - 1440:14
**down** [33] - 1264:11, 1272:17, 1273:6, 1359:21, 1366:8, 1367:25, 1375:22, 1377:21, 1378:17, 1379:14, 1380:13, 1383:19, 1385:23, 1386:18, 1389:3, 1406:3, 1407:5, 1415:8, 1427:17, 1436:7, 1436:11, 1440:18, 1441:10, 1442:14, 1442:17, 1449:17, 1460:13, 1471:2, 1487:25, 1488:3, 1488:4, 1491:19, 1502:18
**downturn** [2] - 1446:3, 1446:13
**dozens** [2] - 1463:16
**dpetergarber@gmail.com** [1] - 1473:10
**Dr** [31] - 1345:1, 1345:9, 1345:13, 1360:8, 1497:2, 1497:15, 1498:11, 1514:4, 1514:9, 1514:13, 1514:19, 1515:23, 1516:4, 1517:25, 1524:7, 1525:10, 1525:13, 1525:14, 1525:19, 1525:20, 1526:10, 1526:12, 1527:3, 1528:8, 1528:18, 1528:19, 1528:22, 1529:1, 1529:7, 1529:21, 1532:8
**draft** [10] - 1364:3, 1364:7, 1428:18, 1455:23, 1481:7, 1481:21, 1482:1, 1482:2, 1485:16, 1512:12
**drafted** [7] - 1364:4, 1364:8, 1406:6,

1483:21, 1484:3, 1512:21, 1523:3
**drafters** [1] - 1503:12
**drafting** [5] - 1483:19, 1488:6, 1501:12, 1512:14, 1513:17
**drawing** [1] - 1450:16
**drink** [1] - 1378:16
**driver** [1] - 1484:6
**drivers** [1] - 1486:6
**driving** [1] - 1349:13
**drop** [1] - 1421:7
**due** [18] - 1368:9, 1371:14, 1371:21, 1371:24, 1373:19, 1412:11, 1413:3, 1413:4, 1413:8, 1418:3, 1418:14, 1424:12, 1424:15, 1424:19, 1454:12, 1464:22, 1465:7, 1465:8
**dues** [4] - 1308:20, 1308:25, 1472:14, 1474:6
**duly** [3] - 1257:2, 1362:8, 1430:15
**Dunkin** [1] - 1278:11
**During** [3] - 1284:19, 1341:11, 1484:23
**during** [31] - 1254:14, 1262:7, 1262:22, 1266:2, 1268:16, 1271:23, 1282:22, 1305:4, 1324:2, 1329:12, 1363:1, 1363:24, 1379:16, 1380:14, 1387:3, 1414:24, 1428:13, 1429:1, 1437:20, 1442:8, 1443:10, 1447:24, 1448:1, 1448:3, 1448:7, 1448:10, 1450:7, 1452:4, 1461:1, 1487:7, 1502:20
**dwindling** [1] - 1382:25
**DX** [1] - 1400:2
**DX-0364** [1] - 1414:10
**DX-0367** [4] - 1398:21, 1400:8, 1400:11, 1535:3
**DX-04** [1] - 1404:10
**DX-0464** [4] - 1401:3, 1401:14, 1401:18, 1535:5
**DX-0477** [4] - 1401:19, 1402:5, 1402:9, 1535:6
**DX-0520** [1] - 1408:11
**DX-0521** [1] - 1406:4
**DX-0530** [4] - 1400:12, 1400:23, 1401:1, 1535:4
**DX-0991** [4] - 1402:11, 1402:22, 1403:1, 1535:7
**DX-362** [2] - 1329:21, 1329:22
**DX-374** [1] - 1252:20
**DX-399** [5] - 1264:19, 1264:20, 1265:1, 1265:4, 1534:18
**DX-406** [5] - 1266:7, 1266:8, 1266:12, 1266:17, 1534:19
**DX-410** [5] - 1267:15, 1267:16, 1267:20, 1267:24, 1534:20
**DX-425** [6] - 1270:20, 1270:21, 1271:1, 1271:4, 1272:3, 1534:21
**DX-437** [5] - 1272:2, 1272:7, 1273:19, 1273:23, 1534:22
**DX-564** [3] - 1286:4, 1286:5, 1286:14
**DX-599** [5] - 1290:3, 1290:4, 1290:9,

1290:12, 1534:23
**DX-615** [5] - 1291:14, 1291:15, 1291:21, 1291:24, 1534:24
**DX-725** [4] - 1293:24, 1293:25, 1294:4, 1534:25
**DX-725,received** [1] - 1294:7
**DX-766** [2] - 1349:16, 1358:1

# E

**e-mail** [50] - 1264:20, 1264:24, 1266:8, 1267:16, 1291:25, 1400:17, 1400:20, 1401:7, 1401:12, 1401:13, 1401:24, 1402:1, 1402:4, 1402:15, 1402:17, 1402:19, 1402:21, 1403:13, 1404:14, 1405:7, 1405:11, 1405:16, 1406:5, 1438:9, 1438:11, 1438:17, 1438:18, 1439:3, 1440:5, 1453:8, 1453:10, 1454:25, 1455:19, 1461:20, 1462:2, 1462:5, 1470:20, 1473:9, 1477:4, 1477:8, 1477:17, 1480:12, 1480:15, 1485:23, 1485:24, 1486:2, 1492:22, 1492:23, 1493:8
**e-mails** [4] - 1286:5, 1418:2, 1438:19, 1473:11
**early** [3] - 1376:10, 1378:22, 1440:25
**earn** [3] - 1322:24, 1323:1, 1323:10
**earned** [3] - 1423:2, 1423:10, 1459:3
**earnings** [1] - 1464:9
**easily** [1] - 1529:13
**East** [3] - 1303:17, 1327:6, 1327:18
**east** [3] - 1258:20, 1278:12, 1316:8
**East/Brooklyn** [1] - 1251:17
**eastern** [1] - 1316:19
**EASTERN** [1] - 1250:1
**Eastern** [5] - 1259:7, 1327:21, 1358:17, 1392:21, 1393:6
**easy** [3] - 1442:7, 1486:17, 1497:3
**eat** [1] - 1415:15
**economic** [4] - 1446:3, 1446:13, 1518:20, 1527:24
**edit** [1] - 1512:12
**editing** [1] - 1473:17
**Edmonton** [3] - 1317:7, 1317:9, 1502:18
**education** [1] - 1366:8
**Edwards** [5] - 1401:7, 1401:24, 1404:14, 1404:18, 1405:16
**effect** [9] - 1255:14, 1289:11, 1421:1, 1497:17, 1497:18, 1499:9, 1505:19, 1516:23, 1532:6
**effective** [1] - 1528:13
**Effectively** [1] - 1281:22
**effectively** [6] - 1254:9, 1255:24, 1293:6, 1299:2, 1502:11, 1509:7
**effects** [1] - 1297:6
**effort** [2] - 1292:2, 1297:1
**efforts** [8] - 1287:6, 1287:16, 1288:3, 1292:6, 1296:24, 1332:24, 1405:20,

ALL WORD INDEX _____ 14

1411:4

**EGGERS** [1] - 1251:9

**eight** [25] - 1276:4, 1277:7, 1289:9, 1289:12, 1294:12, 1295:23, 1299:9, 1306:18, 1313:17, 1313:18, 1314:2, 1314:7, 1314:8, 1314:10, 1314:11, 1314:13, 1332:6, 1332:13, 1353:19, 1467:19, 1467:22, 1469:3, 1487:7, 1494:12, 1495:8

**eight-year** [2] - 1467:19, 1467:22

**either** [14] - 1272:11, 1302:15, 1309:1, 1318:22, 1322:11, 1326:12, 1337:4, 1338:4, 1338:24, 1339:6, 1390:19, 1465:7, 1475:19, 1485:18

**Either** [1] - 1264:18

**elaborate** [2] - 1396:10, 1396:16

**election** [2] - 1470:2

**elections** [2] - 1302:16, 1319:24

**electricity** [1] - 1386:1

**elephant** [1] - 1509:14

**Eleven** [2] - 1251:7, 1353:21

**eleven** [3] - 1351:21, 1353:15

**elicit** [3] - 1253:19, 1254:4, 1254:16

**elicited** [2] - 1254:1, 1428:13

**eliciting** [1] - 1253:5

**eliminating** [1] - 1509:1

**embracing** [1] - 1441:22

**emerged** [1] - 1292:22

**employee** [1] - 1387:14

**employees** [4] - 1381:22, 1385:24, 1385:25

**end** [14] - 1265:23, 1265:25, 1284:20, 1284:21, 1288:7, 1300:22, 1302:4, 1350:8, 1350:25, 1351:8, 1435:14, 1439:22, 1473:13, 1533:1

**endeavors** [2] - 1365:22, 1366:1

**ended** [8] - 1364:17, 1387:14, 1397:17, 1398:2, 1426:19, 1427:1, 1427:3, 1437:2

**ending** [2] - 1404:18, 1426:25

**ends** [1] - 1336:1

**energy** [2] - 1465:8, 1465:14

**enforced** [1] - 1310:19

**engage** [4] - 1293:10, 1293:15, 1488:21, 1491:16

**enormous** [1] - 1465:8

**enormously** [1] - 1510:22

**ensure** [4] - 1431:9, 1497:10, 1501:9, 1523:15

**enter** [2] - 1361:7, 1469:10

**entered** [4] - 1361:10, 1398:23, 1457:20, 1504:9

**entering** [1] - 1457:23

**enterprise** [2] - 1325:19, 1449:19

**enters** [4] - 1256:8, 1329:4, 1361:20, 1430:2

**Entertainment** [1] - 1431:25

**enticing** [1] - 1369:8

**entire** [3] - 1275:11, 1476:17, 1512:1

**Entire** [1] - 1511:25

**entirely** [2] - 1436:25, 1533:2

**entirety** [3] - 1259:17, 1514:18, 1514:21

**entities** [3] - 1373:24, 1377:25, 1490:12

**entitled** [7] - 1257:15, 1270:23, 1308:6, 1308:9, 1308:13, 1314:10, 1511:25

**entity** [11] - 1366:22, 1367:12, 1431:24, 1432:13, 1432:16, 1432:18, 1432:20, 1447:20, 1450:7, 1450:8, 1504:14

**entrepreneur** [2] - 1278:10, 1282:17

**entry** [2] - 1499:12, 1502:1

**envisioned** [1] - 1531:24

**equal** [2] - 1295:5, 1295:6

**equipped** [1] - 1518:16

**equity** [1] - 1495:12

**equivocal** [1] - 1506:19

**Eric** [1] - 1415:24

**error** [4] - 1500:18, 1501:12, 1505:19, 1513:17

**Ersal** [1] - 1287:18

**especially** [4] - 1292:3, 1310:22, 1460:3, 1460:11

**ESPN** [8] - 1322:12, 1461:1, 1481:12, 1481:14, 1481:19, 1482:3, 1484:4, 1485:1

**ESQ** [15] - 1250:16, 1250:16, 1250:17, 1250:17, 1250:18, 1250:20, 1250:23, 1250:23, 1250:24, 1251:3, 1251:5, 1251:8, 1251:8, 1251:9, 1251:11

**essence** [1] - 1358:16

**essential** [1] - 1452:23

**essentially** [2] - 1449:22, 1450:3

**establish** [2] - 1431:7, 1469:20

**established** [2] - 1302:18, 1517:23

**establishes** [1] - 1513:25

**estate** [1] - 1280:11

**estimate** [4] - 1499:24, 1530:1, 1530:2, 1530:9

**estimated** [1] - 1468:10

**estimates** [1] - 1529:25

**estimating** [2] - 1527:20, 1527:21

**et** [2] - 1349:4, 1455:5

**Eugene** [1] - 1327:23

**EVA** [1] - 1250:17

**evaluating** [1] - 1317:11

**evening** [1] - 1462:3

**event** [6] - 1348:17, 1380:25, 1381:3, 1381:4, 1482:10, 1526:23

**events** [5] - 1335:13, 1379:19, 1396:12, 1397:22, 1411:4

**Eventually** [2] - 1346:3, 1346:23

**eventually** [3] - 1364:2, 1366:8, 1485:17

**evidence** [48] - 1257:13, 1273:17, 1330:10, 1331:14, 1333:2, 1337:18, 1360:3, 1361:7, 1361:10, 1361:17, 1392:13, 1400:8, 1400:11, 1400:23,

1401:1, 1401:14, 1401:18, 1402:5, 1402:9, 1402:22, 1403:1, 1404:11, 1406:4, 1406:20, 1408:12, 1414:9, 1414:11, 1467:3, 1469:25, 1470:10, 1477:12, 1480:18, 1480:22, 1493:2, 1493:6, 1500:13, 1501:5, 1501:14, 1506:11, 1506:19, 1506:22, 1511:16, 1514:3, 1519:19, 1520:13, 1522:1, 1523:11, 1535:2

**evidentiary** [1] - 1504:19

**exact** [5] - 1298:9, 1314:4, 1391:11, 1412:14, 1528:24

**exactly** [8] - 1296:24, 1300:4, 1301:13, 1373:10, 1380:24, 1445:9, 1509:13, 1509:17

**examination** [6] - 1256:11, 1317:16, 1423:21, 1425:4, 1501:17, 1502:4

**EXAMINATION** [16] - 1257:4, 1286:1, 1309:23, 1358:3, 1362:12, 1389:22, 1423:18, 1430:17, 1457:1, 1534:6, 1534:7, 1534:8, 1534:10, 1534:11, 1534:12, 1534:15

**examine** [2] - 1335:18, 1529:13

**examined** [4] - 1257:3, 1362:8, 1430:15, 1505:20

**example** [11] - 1258:8, 1258:20, 1259:14, 1268:7, 1282:9, 1295:16, 1320:6, 1356:25, 1449:6, 1460:16, 1460:25

**examples** [2] - 1483:8, 1483:11

**exceeded** [1] - 1464:18

**exceeds** [2] - 1358:10, 1358:22

**excellence** [2] - 1421:15, 1421:22

**except** [2] - 1257:21, 1295:12

**exception** [2] - 1304:14, 1529:16

**excess** [4] - 1320:15, 1358:20, 1459:7, 1459:21

**excited** [7] - 1369:5, 1369:6, 1380:1, 1380:3, 1381:17, 1384:23, 1385:4

**exclude** [2] - 1507:15, 1533:2

**excluded** [3] - 1252:8, 1252:17, 1530:14

**excluding** [1] - 1504:22

**excuse** [3] - 1260:12, 1299:23, 1495:16

**excused** [2] - 1359:22, 1427:18

**executive** [7] - 1263:14, 1264:5, 1272:10, 1277:19, 1303:8, 1431:17, 1479:3

**executives** [3] - 1462:5, 1462:6, 1481:5

**exercising** [1] - 1499:6

**Exhibit** [56] - 1263:12, 1269:25, 1272:6, 1281:10, 1282:2, 1283:7, 1290:12, 1291:24, 1294:7, 1330:11, 1331:14, 1331:15, 1331:19, 1349:18, 1350:5, 1350:17, 1353:3, 1358:2, 1400:4, 1400:11, 1400:14, 1401:1, 1401:4, 1401:18, 1401:21, 1402:9, 1402:12, 1403:1, 1404:12, 1414:12,

1415:4, 1444:16, 1457:16, 1467:6, 1470:24, 1477:16, 1480:9, 1480:22, 1485:22, 1492:20, 1493:6, 1494:2, 1534:23, 1534:24, 1534:25, 1535:3, 1535:4, 1535:5, 1535:6, 1535:7, 1535:10, 1535:11, 1535:12, 1535:13, 1535:14, 1535:15

**exhibit** [10] - 1331:21, 1405:1, 1406:21, 1414:24, 1454:3, 1470:17, 1476:10, 1476:20, 1476:24, 1477:1

**exhibits** [2] - 1252:4, 1361:5

**Exhibits** [2] - 1361:16, 1535:1

**exist** [4] - 1262:6, 1493:12, 1493:21, 1525:15

**existed** [4] - 1260:2, 1269:10, 1516:13, 1531:1

**existence** [6] - 1314:21, 1314:22, 1315:2, 1315:5, 1411:3, 1411:13

**existing** [2] - 1268:9, 1487:21

**exists** [1] - 1494:17

**exits** [4] - 1329:1, 1360:21, 1427:22, 1496:21

**expand** [1] - 1485:8

**expansion** [30] - 1357:1, 1434:8, 1434:13, 1443:13, 1443:20, 1444:4, 1449:20, 1450:4, 1497:18, 1498:20, 1499:14, 1499:15, 1499:16, 1500:22, 1501:18, 1501:25, 1508:25, 1512:24, 1513:12, 1514:8, 1515:14, 1515:15, 1515:17, 1517:7, 1522:10, 1527:20, 1527:21, 1530:3, 1531:4, 1532:7

**expect** [2] - 1369:1, 1405:17

**expected** [2] - 1501:9, 1507:19

**expenses** [1] - 1376:22

**experience** [4] - 1282:24, 1378:23, 1379:1, 1445:3

**experienced** [1] - 1446:25

**experiencing** [4] - 1446:22, 1446:24, 1447:23, 1448:2

**expert** [22] - 1497:11, 1499:24, 1501:2, 1501:7, 1504:22, 1505:20, 1505:22, 1507:13, 1508:3, 1508:8, 1508:16, 1510:9, 1511:19, 1517:10, 1518:4, 1519:13, 1520:23, 1521:19, 1523:14, 1523:15, 1524:25, 1531:10

**expert's** [2] - 1507:20, 1523:15

**expertise** [1] - 1469:1

**Experts** [1] - 1500:5

**experts** [2] - 1521:17, 1525:4

**Experts'** [1] - 1500:5

**expiration** [1] - 1472:2

**explain** [14] - 1267:6, 1268:20, 1297:13, 1328:5, 1396:15, 1437:5, 1437:6, 1438:11, 1447:8, 1459:13, 1465:16, 1530:10, 1532:17, 1532:21

**explained** [1] - 1458:15

**explaining** [2] - 1330:25, 1352:3

**explains** [1] - 1358:15

**explore** [1] - 1253:17

**exponential** [1] - 1469:3

**express** [2] - 1372:1, 1510:19

**expressed** [3] - 1300:13, 1372:7, 1490:16

**expression** [1] - 1528:22

**expressly** [1] - 1513:12

**extend** [2] - 1468:13, 1487:16

**extended** [2] - 1468:20, 1471:7

**extension** [8] - 1394:12, 1394:23, 1457:10, 1457:18, 1457:24, 1458:7, 1468:16, 1471:6

**extent** [3] - 1429:4, 1530:6, 1530:7

**extra** [1] - 1475:24

**extremely** [1] - 1322:9

**extricate** [1] - 1405:20

**extrinsic** [1] - 1506:22

**eyes** [1] - 1295:17

**eyesight** [1] - 1460:7

# F

**Fabian** [4] - 1279:20, 1279:21, 1282:12, 1347:8

**face** [5] - 1361:25, 1385:12, 1416:6, 1430:8, 1451:17

**faced** [1] - 1287:22

**facilitated** [1] - 1301:17

**facing** [1] - 1446:2

**fact** [57] - 1254:4, 1261:7, 1301:17, 1305:24, 1310:13, 1310:22, 1319:7, 1319:21, 1321:7, 1322:3, 1322:11, 1322:23, 1323:15, 1323:25, 1325:11, 1333:22, 1335:10, 1340:11, 1346:6, 1350:1, 1351:7, 1369:13, 1370:9, 1372:24, 1389:12, 1391:9, 1398:11, 1409:4, 1442:8, 1452:14, 1452:18, 1455:7, 1469:7, 1469:20, 1472:7, 1495:5, 1495:21, 1497:5, 1498:19, 1498:25, 1500:2, 1501:1, 1503:14, 1504:21, 1507:8, 1507:9, 1513:2, 1515:13, 1517:3, 1517:13, 1518:22, 1519:6, 1522:7, 1523:7, 1524:20, 1531:18

**fact-find** [1] - 1517:3

**factor** [4] - 1317:11, 1406:16, 1407:2, 1461:2

**factors** [1] - 1454:13

**facts** [8] - 1393:8, 1441:18, 1441:20, 1443:5, 1443:9, 1501:3, 1507:17, 1515:11

**factual** [2] - 1507:2, 1517:19

**factually** [2] - 1451:6, 1511:20

**fail** [1] - 1290:19

**fair** [6] - 1409:13, 1478:2, 1478:6, 1478:7, 1518:4, 1528:18

**fairly** [1] - 1428:21

**fall** [1] - 1370:6

**false** [1] - 1526:11

**falsehood** [1] - 1451:11

**familiar** [11] - 1355:18, 1366:22,

1367:2, 1367:12, 1403:3, 1433:1, 1433:19, 1433:20, 1433:22, 1494:4

**families** [1] - 1386:19

**family** [6] - 1318:4, 1356:2, 1366:18, 1366:20, 1436:19, 1437:17

**famous** [1] - 1279:23

**fan** [3] - 1367:5, 1375:24, 1487:12

**fanciful** [5] - 1500:8, 1501:12, 1505:13, 1505:14

**fans** [7] - 1258:11, 1375:16, 1375:19, 1379:18, 1422:10, 1422:13, 1441:22

**far** [6] - 1282:12, 1282:17, 1358:22, 1375:15, 1488:3, 1488:22

**far-fetched** [2] - 1282:12, 1282:17

**fault** [2] - 1490:14

**favor** [1] - 1387:6

**favorite** [1] - 1528:22

**FC** [31] - 1367:13, 1367:16, 1367:17, 1378:1, 1378:5, 1378:7, 1379:4, 1379:25, 1383:20, 1388:10, 1389:1, 1390:5, 1390:9, 1390:11, 1392:1, 1394:2, 1394:13, 1395:6, 1395:12, 1396:17, 1396:21, 1398:16, 1398:24, 1408:19, 1411:1, 1413:21, 1414:4, 1414:17, 1417:19, 1420:15, 1502:18

**feasible** [4] - 1385:20, 1386:24, 1386:25, 1388:20

**February** [2] - 1462:17, 1463:11

**FEDERATION** [1] - 1250:7

**federation** [9] - 1269:15, 1290:20, 1452:20, 1454:11, 1455:11, 1465:6, 1465:21, 1478:16, 1484:14

**Federation** [15] - 1251:3, 1316:25, 1317:2, 1351:4, 1434:2, 1434:21, 1452:12, 1452:16, 1452:25, 1461:6, 1462:17, 1465:19, 1481:16, 1487:3, 1487:9

**Federation's** [3] - 1264:6, 1271:7, 1306:21

**fee** [5] - 1467:19, 1475:11, 1475:16, 1501:25, 1517:8

**feelings** [1] - 1478:2

**fees** [16] - 1357:1, 1443:13, 1443:21, 1444:4, 1449:20, 1450:4, 1472:13, 1474:6, 1498:20, 1499:12, 1515:14, 1515:15, 1515:17, 1522:10, 1527:21, 1530:3

**Feher** [4] - 1270:11, 1273:7, 1273:9, 1274:2

**FEHER** [1] - 1250:16

**Felch** [1] - 1287:19

**fellow** [3] - 1404:19, 1405:5, 1496:18

**felt** [5] - 1310:24, 1335:21, 1371:8, 1486:13

**fetched** [2] - 1282:12, 1282:17

**few** [13] - 1258:13, 1266:18, 1270:16, 1273:6, 1290:14, 1292:9, 1306:14, 1307:12, 1353:7, 1357:10, 1404:8, 1436:3, 1446:2

**fewer** [1] - 1353:19

ALL WORD INDEX _____16

**fide** [2] - 1497:12, 1523:16
**fides** [1] - 1520:25
**field** [3] - 1314:6, 1395:10, 1433:16
**FIFA** [9] - 1262:14, 1277:24, 1318:22, 1319:5, 1319:11, 1319:22, 1448:18, 1448:23, 1448:24
**fifteen** [2] - 1528:21, 1528:23
**fifth** [1] - 1478:14
**figure** [8] - 1370:20, 1374:17, 1376:16, 1382:16, 1385:13, 1386:1, 1476:24, 1526:13
**figured** [1] - 1368:4
**figures** [2] - 1443:5, 1443:9
**file** [4] - 1476:4, 1476:10, 1476:18, 1476:19
**filed** [2] - 1307:11, 1515:2
**fill** [1] - 1359:24
**films** [1] - 1365:11
**final** [2] - 1290:21, 1462:11
**Final** [1] - 1364:3
**finalize** [1] - 1482:21
**finalizing** [1] - 1482:16
**finally** [4] - 1265:16, 1402:10, 1408:11, 1488:6
**Finally** [2] - 1265:18, 1354:24
**finance** [2] - 1317:13, 1446:9
**financial** [24] - 1317:10, 1317:17, 1317:19, 1320:14, 1355:13, 1356:23, 1387:22, 1419:11, 1424:12, 1424:22, 1436:4, 1437:16, 1438:1, 1454:12, 1455:8, 1455:12, 1460:15, 1460:22, 1472:3, 1475:3, 1478:18, 1480:4, 1484:13, 1509:15
**financially** [6] - 1318:7, 1320:2, 1387:11, 1388:20, 1441:11, 1460:20
**financials** [3] - 1418:16, 1418:17, 1418:19
**finder** [1] - 1501:1
**fine** [3] - 1470:22, 1506:8, 1522:15
**finish** [1] - 1307:14
**firm** [3] - 1252:6, 1346:4, 1502:21
**first** [70] - 1252:3, 1252:9, 1252:19, 1254:22, 1254:24, 1271:5, 1276:25, 1290:13, 1292:9, 1294:8, 1301:16, 1302:9, 1310:8, 1312:17, 1314:21, 1320:24, 1323:16, 1325:3, 1332:25, 1346:6, 1346:17, 1347:10, 1350:1, 1354:25, 1362:7, 1372:9, 1372:19, 1374:12, 1377:6, 1380:2, 1408:16, 1414:6, 1415:6, 1417:15, 1423:23, 1423:24, 1424:1, 1424:3, 1430:15, 1433:23, 1433:24, 1435:14, 1435:21, 1441:5, 1441:24, 1442:8, 1442:10, 1444:23, 1452:19, 1454:1, 1456:6, 1467:7, 1471:23, 1472:1, 1473:2, 1476:2, 1477:17, 1491:14, 1497:4, 1499:12, 1499:21, 1500:21, 1506:2, 1513:18, 1515:1, 1521:12, 1523:20
**five** [12] - 1255:1, 1280:22, 1315:5, 1316:1, 1356:22, 1398:20, 1415:12,

1415:13, 1415:17, 1488:2, 1489:12, 1489:13
**fix** [2] - 1515:18, 1515:19
**flat** [7] - 1449:23, 1450:3, 1450:4, 1450:24, 1451:5, 1451:13
**flip** [1] - 1507:20
**flippant** [1] - 1497:19
**Florida** [5] - 1277:10, 1280:8, 1303:6, 1387:5, 1387:6
**fly** [1] - 1529:2
**Flynn** [22] - 1266:9, 1267:17, 1268:4, 1291:17, 1324:21, 1453:12, 1453:14, 1466:23, 1477:9, 1477:18, 1478:8, 1480:6, 1480:12, 1480:16, 1481:2, 1481:21, 1481:25, 1482:6, 1482:11, 1482:15, 1494:14
**focus** [3] - 1429:11, 1431:10, 1530:24
**focused** [3] - 1292:22, 1374:15, 1526:16
**focuses** [1] - 1515:19
**folded** [1] - 1396:17
**folks** [2] - 1287:19, 1488:4
**Follow** [1] - 1270:23
**follow** [4] - 1268:11, 1339:9, 1343:21, 1513:2
**follow-up** [1] - 1513:2
**Follow-up** [1] - 1270:23
**followed** [6] - 1338:15, 1338:19, 1339:14, 1339:16, 1343:11, 1344:22
**following** [27] - 1261:4, 1285:10, 1314:24, 1334:10, 1337:22, 1350:21, 1359:25, 1380:20, 1406:13, 1428:25, 1441:16, 1445:21, 1449:18, 1454:8, 1456:11, 1458:3, 1458:10, 1462:3, 1463:24, 1464:6, 1471:4, 1483:14, 1494:9, 1496:23, 1497:14, 1499:21, 1509:24
**follows** [6] - 1252:9, 1257:3, 1257:19, 1362:8, 1430:16, 1493:10
**football** [2] - 1367:16, 1465:4
**Football** [1] - 1378:14
**footnote** [4] - 1498:3, 1526:16, 1530:11, 1532:6
**FOR** [1] - 1250:11
**Force** [2] - 1290:14, 1325:12
**force** [39] - 1260:7, 1260:12, 1260:13, 1260:19, 1260:23, 1261:25, 1262:1, 1262:20, 1266:20, 1267:5, 1267:13, 1270:2, 1270:6, 1270:13, 1270:22, 1271:7, 1271:8, 1271:11, 1271:13, 1271:15, 1271:22, 1275:12, 1289:1, 1289:4, 1289:8, 1289:25, 1290:18, 1291:7, 1291:8, 1291:9, 1297:1, 1305:5, 1338:3, 1338:14, 1339:5, 1340:9, 1340:11, 1343:5, 1354:6
**forced** [1] - 1292:20
**forces** [1] - 1467:13
**forget** [1] - 1493:11
**Forget** [1] - 1508:23
**form** [3] - 1253:2, 1339:12, 1355:8

**formal** [2] - 1435:5, 1448:16
**formality** [1] - 1492:8
**formalized** [1] - 1435:12
**formally** [1] - 1346:10
**format** [1] - 1269:10
**formation** [1] - 1433:12
**formed** [1] - 1441:1
**former** [7] - 1277:5, 1278:23, 1280:8, 1297:8, 1297:9, 1303:13, 1406:7
**forth** [6] - 1252:13, 1255:4, 1393:5, 1458:2, 1485:14, 1517:20
**forward** [25] - 1283:16, 1287:1, 1287:16, 1288:19, 1293:23, 1364:21, 1369:17, 1383:9, 1386:22, 1503:9, 1503:20, 1509:1, 1516:6, 1521:8, 1522:9, 1523:4, 1523:11, 1523:14, 1524:11, 1525:3, 1528:11, 1528:12, 1529:8, 1531:20
**Foudy** [2] - 1345:14, 1345:24
**Foundation** [3] - 1366:2, 1366:4, 1366:5
**foundation** [13] - 1366:10, 1366:11, 1368:4, 1379:21, 1406:18, 1408:24, 1409:23, 1427:24, 1428:3, 1428:5, 1507:2, 1507:3, 1518:23
**founded** [3] - 1367:16, 1368:7, 1368:24
**founders** [1] - 1303:18
**founding** [1] - 1367:19
**four** [27] - 1255:1, 1258:9, 1261:18, 1278:21, 1280:22, 1295:16, 1302:14, 1302:16, 1313:18, 1316:7, 1316:10, 1316:12, 1316:15, 1317:5, 1333:17, 1341:3, 1356:22, 1412:3, 1418:25, 1478:18, 1479:1, 1479:4, 1479:7, 1480:2, 1480:4, 1488:2
**Four** [1] - 1364:3
**four-time** [1] - 1278:21
**fourth** [3] - 1316:23, 1317:7, 1478:14
**fractured** [1] - 1465:7
**frame** [2] - 1263:20, 1267:14
**framed** [1] - 1491:4
**franchisee** [1] - 1278:11
**Francisco** [5] - 1250:22, 1251:5, 1259:16, 1287:20, 1328:15
**frankly** [3] - 1262:4, 1300:8, 1517:6
**fraud** [1] - 1404:4
**free** [1] - 1386:21
**frequent** [1] - 1343:22
**frequently** [3] - 1445:7, 1490:16, 1490:19
**freshman** [3] - 1363:21, 1363:22, 1363:24
**Friday** [3] - 1290:23, 1529:22, 1533:7
**Frisch** [1] - 1287:17
**front** [2] - 1253:6, 1376:15
**fruition** [1] - 1381:23
**fulfill** [3] - 1292:25, 1341:23, 1508:12
**fulfilled** [1] - 1342:7
**full** [14] - 1260:15, 1260:22, 1262:2,

VB        OCR        CRR

1265:15, 1267:3, 1268:10, 1268:11, 1269:15, 1292:17, 1306:20, 1346:8, 1377:13, 1393:19, 1487:9
**Full** [1] - 1354:6
**fully** [1] - 1352:10
**function** [3] - 1260:11, 1260:12, 1501:13
**fundamental** [1] - 1326:2
**fundamentally** [1] - 1532:2
**funder** [1] - 1416:1
**funding** [1] - 1454:10
**funds** [9] - 1407:12, 1407:20, 1407:21, 1408:7, 1458:22, 1459:3, 1459:6, 1459:21, 1459:22
**Fury** [4] - 1406:15, 1408:19, 1409:2, 1411:1
**future** [4] - 1384:10, 1384:15, 1484:6, 1521:16
**fuzzy** [1] - 1438:14

# G

**gain** [1] - 1484:6
**gained** [1] - 1425:7
**gaining** [1] - 1425:12
**Galeotti** [1] - 1482:21
**game** [12] - 1311:12, 1322:15, 1379:19, 1421:16, 1421:23, 1422:7, 1431:10, 1461:7, 1464:22, 1472:9, 1488:7, 1488:16
**games** [11] - 1320:7, 1377:15, 1377:17, 1379:7, 1387:7, 1461:6, 1472:23, 1474:15, 1474:17, 1475:9
**Games** [1] - 1302:25
**GARBER** [2] - 1430:13, 1534:14
**Garber** [32] - 1321:22, 1322:4, 1322:8, 1429:14, 1430:6, 1430:7, 1430:19, 1430:21, 1431:3, 1434:7, 1434:19, 1436:2, 1438:9, 1438:10, 1438:17, 1441:3, 1452:10, 1454:7, 1455:17, 1460:1, 1462:23, 1469:18, 1469:19, 1469:21, 1471:3, 1471:9, 1473:12, 1473:18, 1476:22, 1485:17, 1490:3
**Gary** [2] - 1478:18, 1479:5
**gatekeeper** [1] - 1497:10
**gatekeeping** [1] - 1501:13
**gather** [1] - 1347:19
**gathering** [1] - 1368:13
**Gee** [1] - 1505:22
**general** [9] - 1261:14, 1270:7, 1272:13, 1272:14, 1291:16, 1297:19, 1298:11, 1351:4, 1459:11
**generally** [3] - 1253:3, 1297:1, 1428:5
**gentleman** [1] - 1276:8
**gentlemen** [6] - 1256:10, 1328:23, 1360:10, 1360:17, 1427:19, 1496:15
**geographic** [5] - 1257:22, 1258:1, 1258:22, 1312:16, 1328:2
**Geographic** [1] - 1258:15

**gift** [4] - 1347:21, 1348:2, 1348:18, 1348:21
**Given** [1] - 1498:19
**given** [21] - 1255:6, 1261:21, 1265:20, 1269:19, 1281:15, 1287:21, 1288:2, 1296:18, 1304:20, 1314:2, 1317:19, 1323:25, 1341:17, 1348:3, 1349:23, 1354:12, 1421:10, 1421:11, 1500:9, 1511:9, 1521:10
**Gmail** [4] - 1469:22, 1471:16, 1473:16, 1473:17
**go-forward** [1] - 1528:12
**goal** [2] - 1268:25, 1283:16
**goals** [2] - 1371:7, 1484:14
**Goldman** [1] - 1277:19
**GONZALEZ** [1] - 1250:12
**governance** [1] - 1453:17
**governing** [2] - 1494:15, 1498:21
**Governor** [2] - 1279:24, 1282:14
**governor** [1] - 1445:4
**governors** [4] - 1418:23, 1431:7, 1444:17, 1456:2
**Grant** [1] - 1494:6
**grant** [8] - 1254:3, 1267:10, 1291:10, 1326:10, 1326:23, 1343:10, 1352:18, 1352:20
**granted** [14] - 1261:25, 1267:7, 1311:10, 1325:22, 1326:6, 1326:9, 1326:14, 1326:19, 1341:15, 1342:13, 1348:14, 1354:2, 1501:2, 1522:9
**GRAY** [39] - 1382:1, 1382:6, 1383:25, 1384:7, 1384:11, 1389:23, 1400:1, 1400:3, 1400:8, 1400:12, 1400:16, 1400:23, 1401:2, 1401:6, 1401:14, 1401:19, 1401:23, 1402:5, 1402:10, 1402:14, 1402:22, 1403:2, 1403:21, 1403:25, 1404:10, 1404:13, 1405:4, 1406:2, 1406:24, 1407:18, 1414:11, 1414:16, 1415:1, 1417:9, 1417:12, 1419:20, 1423:15, 1427:16, 1534:11
**great** [1] - 1460:22
**greater** [3] - 1306:18, 1467:25, 1487:11
**grew** [1] - 1363:13
**ground** [7] - 1273:21, 1375:10, 1375:15, 1376:11, 1389:16, 1418:1, 1439:10
**grounds** [1] - 1507:6
**group** [8] - 1260:21, 1262:12, 1271:17, 1284:7, 1290:16, 1304:10, 1382:18, 1436:15
**Group** [3] - 1356:7, 1356:13, 1437:14
**grouping** [1] - 1402:11
**groups** [5] - 1285:4, 1285:5, 1292:17, 1305:12, 1460:17
**grow** [5] - 1375:23, 1467:9, 1469:2, 1485:10, 1488:6
**growing** [1] - 1450:5
**grown** [2] - 1434:14, 1449:19
**growth** [7] - 1389:14, 1404:24, 1449:3,

1464:21, 1465:7, 1469:3, 1484:7
**guarantee** [10] - 1320:14, 1320:15, 1458:16, 1458:24, 1458:25, 1459:5, 1459:17, 1459:18, 1459:21, 1467:19
**guaranteed** [1] - 1467:23
**guarantees** [1] - 1472:3
**guess** [11] - 1255:17, 1305:18, 1329:22, 1368:9, 1391:22, 1428:8, 1428:10, 1497:4, 1497:13, 1499:7, 1532:13
**guidance** [1] - 1359:25
**guilty** [4] - 1261:19, 1265:21, 1404:3, 1414:21
**GULATI** [2] - 1257:1, 1534:5
**gulati** [18] - 1293:25, 1294:8, 1302:1, 1302:7, 1303:21, 1303:24, 1307:13, 1307:15, 1309:1, 1309:25, 1310:2, 1310:13, 1466:23, 1477:8, 1477:17, 1478:8, 1479:2, 1483:25
**Gulati** [75] - 1252:5, 1256:11, 1257:6, 1263:13, 1263:25, 1264:20, 1265:5, 1271:21, 1272:22, 1273:24, 1275:2, 1275:18, 1276:2, 1276:7, 1277:11, 1277:25, 1278:13, 1279:2, 1280:13, 1282:3, 1290:4, 1313:1, 1313:13, 1314:23, 1317:10, 1327:4, 1329:9, 1331:7, 1331:20, 1332:19, 1337:2, 1340:17, 1343:8, 1344:10, 1345:20, 1349:11, 1352:16, 1354:24, 1355:9, 1355:23, 1357:3, 1358:12, 1359:2, 1444:24, 1445:3, 1453:12, 1456:7, 1480:6, 1481:8, 1481:13, 1481:19, 1483:17, 1483:21, 1484:3, 1484:17, 1485:25, 1486:5, 1486:9, 1487:13, 1487:15, 1489:1, 1489:14, 1489:20, 1490:4, 1490:16, 1490:23, 1491:22, 1492:22, 1492:23, 1493:9, 1493:10, 1493:13, 1493:18, 1493:21, 1494:14
**Gulati's** [1] - 1254:10
**gulati's** [1] - 1489:5
**guns** [1] - 1512:14
**guy** [2] - 1282:12, 1442:2
**guys** [2] - 1475:3, 1529:18

# H

**half** [12] - 1337:10, 1356:25, 1364:17, 1366:16, 1377:1, 1377:3, 1377:6, 1377:7, 1377:12, 1378:10
**halted** [1] - 1397:12
**hand** [6] - 1252:19, 1268:1, 1268:5, 1276:25, 1362:2, 1514:23
**handed** [1] - 1252:4
**handle** [3] - 1412:23, 1424:22, 1424:24
**handled** [1] - 1417:21
**handling** [2] - 1382:15, 1512:19
**hands** [1] - 1417:24
**hands-on** [1] - 1417:24

ALL WORD INDEX                                                                18

**happiness** [1] - 1377:19
**happy** [3] - 1344:16, 1437:4, 1465:16
**hard** [10] - 1335:23, 1383:10, 1397:14, 1421:23, 1422:13, 1422:15, 1427:7, 1442:8, 1442:11, 1519:8
**harm** [3] - 1284:11, 1428:9, 1428:14
**Harvard** [2] - 1277:19, 1277:20
**head** [6] - 1439:15, 1473:14, 1477:20, 1477:22, 1478:10, 1480:25
**heading** [2] - 1294:9, 1294:20
**Health** [1] - 1277:8
**health** [1] - 1366:8
**healthy** [2] - 1305:2, 1404:24
**hear** [8] - 1370:24, 1373:18, 1375:21, 1381:9, 1391:3, 1417:9, 1434:5, 1448:5
**heard** [13] - 1268:16, 1299:25, 1366:25, 1369:22, 1374:23, 1375:1, 1380:23, 1390:4, 1429:3, 1487:7, 1490:8, 1522:8, 1526:25
**hearing** [1] - 1374:10
**hearsay** [1] - 1286:16
**HECTOR** [1] - 1250:12
**held** [4] - 1263:3, 1272:13, 1290:16, 1412:14
**Helmick** [4] - 1287:19, 1287:24, 1288:4, 1400:18
**help** [13] - 1260:19, 1298:12, 1298:15, 1298:18, 1369:1, 1369:2, 1376:5, 1437:17, 1493:21, 1495:15, 1495:17, 1495:18, 1521:6
**helped** [1] - 1297:7
**helpful** [1] - 1473:18
**helping** [2] - 1376:1, 1385:5
**hemp** [1] - 1365:24
**hereby** [2] - 1307:4, 1512:17
**hereof** [1] - 1512:3
**hereto** [2] - 1512:2, 1512:11
**herself** [2] - 1345:15, 1346:25
**Hi** [1] - 1292:1
**hierarchy** [1] - 1310:13
**high** [1] - 1487:3
**higher** [5] - 1320:18, 1320:22, 1447:18, 1466:3, 1474:6
**highest** [4] - 1421:18, 1422:4, 1427:12, 1474:12
**highlighted** [2] - 1429:10, 1458:12
**highly** [1] - 1510:12
**himself** [1] - 1470:21
**hip** [4] - 1321:23, 1486:16, 1494:22, 1495:5
**hire** [3] - 1375:11, 1376:13, 1376:14
**history** [7] - 1343:17, 1363:14, 1389:1, 1425:21, 1506:1, 1517:6, 1528:17
**hit** [2] - 1320:15, 1386:24
**Hold** [3] - 1273:16, 1439:10, 1499:5
**hold** [1] - 1495:12
**Holdings** [14] - 1401:9, 1402:1, 1404:20, 1405:13, 1406:12, 1408:14,

1408:21, 1411:17, 1513:13, 1517:16, 1517:18, 1517:22, 1523:9, 1531:4
**hole** [1] - 1509:14
**holidays** [2] - 1292:3, 1292:7
**homes** [2] - 1386:20
**honest** [2] - 1409:25, 1517:7
**honestly** [2] - 1428:15, 1429:9
**Honor** [137] - 1252:2, 1252:7, 1252:18, 1252:21, 1254:1, 1254:15, 1254:21, 1255:9, 1255:19, 1256:13, 1265:1, 1266:12, 1266:13, 1267:19, 1267:22, 1270:25, 1272:3, 1273:18, 1273:21, 1275:7, 1283:1, 1286:13, 1286:15, 1287:8, 1290:8, 1291:20, 1294:3, 1299:23, 1301:24, 1304:25, 1309:16, 1309:18, 1328:22, 1329:7, 1331:4, 1331:5, 1331:11, 1331:12, 1335:5, 1335:8, 1335:19, 1335:24, 1346:18, 1346:21, 1348:19, 1349:14, 1354:20, 1355:21, 1355:25, 1357:11, 1359:23, 1360:2, 1360:15, 1361:13, 1361:23, 1393:2, 1401:15, 1401:16, 1402:6, 1402:23, 1403:17, 1404:25, 1405:24, 1406:18, 1414:16, 1417:9, 1423:17, 1427:16, 1439:24, 1444:11, 1444:15, 1453:16, 1454:2, 1457:13, 1470:1, 1470:3, 1470:19, 1470:23, 1471:13, 1476:9, 1476:14, 1476:25, 1477:12, 1480:18, 1489:23, 1490:6, 1491:12, 1493:2, 1496:11, 1498:7, 1498:12, 1499:20, 1499:23, 1501:1, 1503:5, 1503:11, 1504:7, 1504:10, 1504:17, 1505:16, 1506:4, 1510:15, 1510:20, 1510:24, 1511:14, 1511:22, 1512:9, 1513:2, 1513:7, 1514:25, 1515:21, 1516:15, 1517:6, 1518:5, 1518:10, 1519:4, 1520:7, 1521:5, 1523:6, 1523:19, 1524:24, 1526:23, 1526:25, 1527:19, 1528:10, 1528:16, 1529:3, 1529:12, 1529:14, 1530:15, 1531:8, 1531:9, 1532:3, 1532:10, 1533:5, 1533:9, 1533:11
**Honor's** [2] - 1359:25, 1529:10
**HONORABLE** [1] - 1250:12
**Hook** [1] - 1363:12
**hope** [2] - 1422:11, 1488:18
**hoped** [1] - 1488:15
**hoping** [2] - 1276:21, 1354:21
**Hoque** [3] - 1371:18, 1371:19, 1376:4
**horses** [1] - 1279:13
**hotly** [2] - 1497:19, 1497:20
**hour** [2] - 1309:20, 1511:5
**houses** [2] - 1385:24
**Houston** [2] - 1259:15, 1364:16
**Hucles** [1] - 1303:12
**Hudgens** [2] - 1361:22, 1427:23
**HUDGENS** [32] - 1250:17, 1361:23, 1362:13, 1374:25, 1389:19, 1393:2, 1395:22, 1400:9, 1400:24, 1401:16, 1402:7, 1402:24, 1403:15, 1403:17,

1403:19, 1404:5, 1404:25, 1405:2, 1405:24, 1406:18, 1406:21, 1407:14, 1407:23, 1408:24, 1409:23, 1417:7, 1423:11, 1423:17, 1423:19, 1427:25, 1534:10, 1534:13
**huge** [1] - 1515:16
**Human** [1] - 1277:8
**humble** [1] - 1301:7
**hundred** [2] - 1369:14, 1514:7
**hundreds** [1] - 1454:10
**Hunt** [2] - 1318:3, 1437:16
**hurricane** [17] - 1386:11, 1386:12, 1387:10, 1388:7, 1388:12, 1388:13, 1394:5, 1395:15, 1396:1, 1396:24, 1397:16, 1398:4, 1398:12, 1426:1, 1426:3, 1426:11, 1428:14
**Hurricane** [8] - 1381:4, 1381:7, 1386:24, 1393:16, 1394:12, 1394:22, 1397:13, 1425:23
**hurry** [1] - 1435:25
**hurt** [3] - 1320:2, 1389:13, 1389:15
**hyperbolic** [1] - 1493:23
**hypothesize** [1] - 1322:20
**hypothetical** [2] - 1328:11, 1530:25

## I

**idea** [7] - 1328:15, 1356:23, 1367:24, 1377:20, 1383:5, 1405:18, 1409:10
**ideal** [6] - 1300:5, 1460:2, 1460:9, 1460:14, 1460:19, 1460:20
**ideally** [1] - 1300:17
**ideas** [5] - 1293:9, 1293:14, 1293:21, 1485:8, 1485:11
**identification** [7] - 1275:23, 1398:22, 1400:13, 1401:3, 1401:20, 1402:11, 1438:8
**identified** [9] - 1348:2, 1354:20, 1406:15, 1407:1, 1415:7, 1415:17, 1416:22, 1447:11, 1479:4
**identify** [3] - 1343:17, 1343:23, 1417:5
**ignorant** [1] - 1284:9
**ignore** [2] - 1442:14, 1515:13
**ignored** [1] - 1284:8
**ll** [66] - 1269:20, 1269:22, 1271:10, 1284:16, 1287:3, 1288:25, 1289:2, 1289:5, 1289:17, 1289:21, 1290:1, 1290:16, 1290:19, 1291:4, 1294:1, 1295:19, 1298:22, 1299:17, 1300:9, 1300:14, 1300:18, 1300:23, 1302:11, 1303:22, 1304:1, 1304:7, 1304:12, 1304:15, 1305:11, 1305:12, 1308:2, 1308:24, 1309:2, 1340:22, 1344:3, 1347:25, 1348:7, 1348:9, 1349:7, 1349:13, 1349:24, 1351:10, 1352:8, 1352:18, 1353:12, 1354:25, 1358:23, 1359:6, 1359:14, 1369:22, 1370:2, 1370:7, 1370:9, 1377:11, 1380:16, 1380:17, 1380:20, 1381:10, 1381:11,

VB          OCR          CRR

ALL WORD INDEX 19

1390:20, 1391:24, 1411:18, 1426:2, 1426:6, 1426:9, 1426:18

**III** [8] - 1287:2, 1300:18, 1307:8, 1311:8, 1369:23, 1391:12, 1391:24, 1392:8

**illegal** [1] - 1334:7

**illustrated** [1] - 1500:19

**imagine** [2] - 1258:19, 1482:8

**immediately** [4] - 1253:17, 1267:7, 1315:16, 1315:20

**immensely** [2] - 1486:8, 1486:13

**immunity** [1] - 1520:23

**impact** [11] - 1284:1, 1369:3, 1375:20, 1381:24, 1382:21, 1382:24, 1383:22, 1387:11, 1425:23, 1455:16, 1483:1

**impacted** [4] - 1307:25, 1308:3, 1384:9, 1384:15

**impacts** [1] - 1386:12

**impediment** [1] - 1465:6

**imperative** [1] - 1265:21

**important** [30] - 1295:8, 1295:9, 1310:10, 1310:12, 1310:15, 1310:19, 1311:2, 1311:11, 1312:2, 1312:3, 1312:11, 1322:9, 1323:14, 1370:15, 1370:16, 1386:19, 1410:24, 1420:25, 1452:11, 1460:3, 1460:10, 1472:6, 1472:7, 1473:1, 1473:4, 1474:1, 1488:3, 1497:6, 1510:4, 1511:23

**importantly** [4] - 1390:17, 1467:13, 1487:12, 1500:20

**impression** [2] - 1255:22, 1255:23

**improper** [3] - 1256:5, 1257:21, 1526:12

**improve** [3] - 1388:8, 1452:1, 1485:6

**improving** [1] - 1450:18

**inability** [2] - 1396:4, 1452:1

**inappropriate** [2] - 1252:21, 1335:17

**Inc** [1] - 1251:3

**INC** [1] - 1250:7

**inception** [2] - 1449:23, 1472:16

**include** [2] - 1265:25, 1485:8

**included** [2] - 1483:7, 1487:20

**includes** [2] - 1322:16, 1322:17

**including** [16] - 1263:8, 1271:17, 1345:9, 1400:19, 1401:8, 1401:25, 1404:15, 1446:3, 1454:13, 1455:8, 1482:17, 1483:4, 1483:8, 1488:5, 1496:18, 1517:24

**incomplete** [1] - 1476:15

**inconsequential** [1] - 1391:10

**inconsistent** [2] - 1268:23, 1313:15

**incorporated** [1] - 1462:11

**incorrect** [3] - 1320:20, 1320:25, 1511:21

**increase** [3] - 1444:5, 1451:4, 1452:2

**increased** [3] - 1443:21, 1446:4, 1449:20

**increases** [2] - 1451:18, 1451:24

**increasing** [1] - 1464:13

**increasingly** [1] - 1447:18

**incubation** [11] - 1269:5, 1269:8, 1269:9, 1269:11, 1269:18, 1269:19, 1269:23, 1323:21, 1323:24, 1324:5, 1359:11

**incurred** [1] - 1464:12

**independent** [9] - 1277:4, 1277:20, 1279:21, 1345:8, 1345:10, 1347:4, 1347:15, 1496:18, 1531:22

**Indiana** [1] - 1287:18

**indicate** [2] - 1310:24, 1351:24

**indicated** [4] - 1283:13, 1283:14, 1329:11, 1351:14

**indicates** [1] - 1286:11

**indicating** [1] - 1352:2

**indicted** [10] - 1261:19, 1262:13, 1284:8, 1403:8, 1403:12, 1404:3, 1413:22, 1414:5, 1504:13, 1504:14

**indictments** [8] - 1265:21, 1284:1, 1315:21, 1330:19, 1373:24, 1374:11, 1423:21, 1424:5

**individual** [10] - 1285:2, 1285:3, 1285:8, 1287:15, 1292:13, 1314:18, 1400:17, 1428:10, 1429:7, 1432:8

**individuals** [7] - 1276:23, 1282:6, 1282:24, 1286:21, 1302:11, 1303:21, 1303:25

**industry** [1] - 1280:12

**inflation** [1] - 1451:15

**information** [37] - 1261:13, 1368:9, 1368:13, 1368:16, 1368:17, 1368:18, 1368:22, 1369:1, 1371:5, 1371:10, 1371:21, 1371:22, 1371:23, 1371:24, 1372:12, 1372:14, 1372:15, 1372:16, 1373:2, 1373:3, 1373:21, 1374:12, 1374:17, 1380:23, 1381:14, 1382:17, 1410:7, 1413:17, 1414:1, 1418:17, 1424:4, 1425:19, 1425:20

**informed** [1] - 1264:2

**informing** [1] - 1306:2

**informs** [1] - 1283:8

**infrastructure** [1] - 1483:11

**infrequent** [2] - 1343:25, 1344:1

**injury** [2] - 1428:9, 1429:6

**inner** [1] - 1368:19

**inquiry** [1] - 1317:19

**insert** [1] - 1298:17

**insight** [1] - 1368:11

**instability** [10] - 1284:22, 1317:11, 1407:13, 1407:22, 1408:8, 1409:15, 1409:22, 1447:19, 1447:24, 1448:2

**instance** [1] - 1417:15

**instead** [2] - 1307:10, 1477:2

**instruct** [10] - 1277:11, 1277:25, 1278:13, 1279:2, 1279:14, 1280:1, 1280:13, 1280:25, 1303:21, 1429:4

**instructed** [1] - 1516:4

**instruction** [4] - 1360:11, 1428:17, 1428:19, 1428:20

**instructions** [1] - 1428:16

**insurance** [1] - 1280:24

**integrated** [4] - 1488:6, 1488:12, 1488:14, 1488:15

**Integration** [1] - 1512:8

**integration** [4] - 1487:9, 1487:10, 1520:3, 1520:7

**integrity** [1] - 1431:9

**intend** [2] - 1284:11, 1517:18

**intended** [7] - 1500:21, 1503:19, 1509:15, 1509:21, 1511:13, 1517:21, 1521:1

**intense** [1] - 1521:12

**intent** [14] - 1372:9, 1374:6, 1425:18, 1500:19, 1506:5, 1506:9, 1506:10, 1506:12, 1508:4, 1508:19, 1508:20, 1516:25, 1519:23

**intention** [1] - 1386:8

**interconnected** [1] - 1488:22

**interest** [8] - 1321:19, 1356:17, 1356:20, 1369:3, 1372:1, 1372:7, 1384:5, 1401:10

**interested** [6] - 1321:11, 1372:5, 1372:11, 1422:17, 1422:21

**interim** [4] - 1277:6, 1340:4, 1406:7, 1415:18

**interleague** [1] - 1293:19

**internal** [1] - 1286:16

**internally** [1] - 1389:13

**international** [4] - 1302:23, 1472:22, 1474:15, 1475:9

**internationally** [1] - 1300:6

**interplay** [1] - 1497:16

**interpret** [1] - 1519:1

**interpretation** [12] - 1358:8, 1503:21, 1503:22, 1508:3, 1519:16, 1520:9, 1520:17, 1521:25, 1522:1, 1531:11, 1531:13, 1531:14

**interpreted** [1] - 1512:20

**interrupt** [3] - 1384:18, 1471:11, 1500:3

**interview** [3] - 1439:22, 1477:24, 1494:24

**introduce** [1] - 1362:16

**introduced** [1] - 1253:1

**introducing** [2] - 1252:24, 1331:23

**introduction** [2] - 1332:2, 1494:13

**invest** [1] - 1356:14

**investing** [2] - 1387:12, 1472:9

**investment** [3] - 1265:24, 1387:11, 1464:13

**investments** [2] - 1404:22, 1484:13

**investor** [9] - 1315:6, 1323:6, 1356:15, 1390:1, 1432:21, 1437:1, 1437:2, 1437:11

**investor-operator** [1] - 1315:6

**investor-operators** [1] - 1323:6

**investor/operators** [1] - 1469:8

**investors** [2] - 1323:17, 1450:18

**invite** [1] - 1307:4

**involve** [2] - 1488:20, 1491:15

**involved** [13] - 1262:14, 1280:11,

1280:23, 1297:20, 1303:15, 1348:10, 1376:7, 1376:8, 1376:10, 1383:4, 1383:20, 1418:9, 1434:7

**involvement** [5] - 1261:16, 1261:21, 1265:19, 1280:23, 1406:13

**involving** [4] - 1286:6, 1309:3, 1512:16, 1519:14

**irrelevant** [1] - 1506:3

**irrespective** [3] - 1393:10, 1417:2, 1417:5

**irresponsible** [2] - 1284:6, 1284:10

**island** [26] - 1366:18, 1366:19, 1368:2, 1368:3, 1368:6, 1368:16, 1371:8, 1375:11, 1375:17, 1375:20, 1377:22, 1378:17, 1380:12, 1380:13, 1381:16, 1382:19, 1383:19, 1385:23, 1386:9, 1386:13, 1386:25, 1387:9, 1388:9, 1388:19, 1388:25, 1389:4

**Islanders** [5] - 1367:5, 1367:9, 1367:22, 1367:23, 1389:2

**issue** [50] - 1252:3, 1263:6, 1265:11, 1266:1, 1270:17, 1270:18, 1276:5, 1289:8, 1299:8, 1325:17, 1325:18, 1325:20, 1325:21, 1326:18, 1334:1, 1334:5, 1337:12, 1337:14, 1337:15, 1338:10, 1345:19, 1346:6, 1353:9, 1381:6, 1384:2, 1448:21, 1448:22, 1450:19, 1486:17, 1490:24, 1497:19, 1498:9, 1498:25, 1502:21, 1505:21, 1509:15, 1514:12, 1516:14, 1518:13, 1518:23, 1519:6, 1519:7, 1519:8, 1519:9, 1519:10, 1519:15, 1524:10, 1531:21, 1533:1

**issued** [1] - 1525:13

**issues** [17] - 1253:3, 1266:23, 1272:11, 1272:12, 1282:22, 1287:22, 1298:16, 1322:5, 1326:3, 1333:23, 1446:2, 1489:15, 1489:16, 1490:17, 1501:15, 1518:16, 1519:11

**item** [1] - 1453:15

**itself** [9] - 1315:17, 1315:20, 1350:15, 1350:16, 1372:17, 1432:21, 1433:4, 1507:22, 1507:25

# J

**Jacksonville** [3] - 1287:18, 1296:6, 1416:4

**January** [21] - 1272:9, 1273:2, 1273:11, 1274:11, 1274:18, 1290:6, 1291:19, 1326:7, 1326:9, 1326:14, 1339:23, 1340:13, 1341:6, 1341:23, 1352:7, 1352:12, 1352:15, 1352:17, 1353:4, 1453:9, 1533:15

**january** [1] - 1250:7

**Jay** [1] - 1270:6

**Jeffrey** [2] - 1273:7, 1274:6

**jersey** [1] - 1369:15

**job** [5] - 1379:9, 1379:11, 1410:7,

1419:7

**JOHANNA** [1] - 1250:17

**JOHN** [1] - 1250:23

**John** [10] - 1278:6, 1278:7, 1280:20, 1280:21, 1282:17, 1304:14, 1481:11, 1481:23, 1482:14, 1485:14

**join** [2] - 1398:17, 1405:19

**joined** [17] - 1273:7, 1274:2, 1288:8, 1321:23, 1413:11, 1413:13, 1414:14, 1414:17, 1425:2, 1433:13, 1433:17, 1461:9, 1467:13, 1486:16, 1494:21, 1495:5

**joining** [4] - 1288:10, 1372:2, 1372:5, 1424:19

**joint** [4] - 1461:9, 1482:16, 1482:21, 1484:24

**Jose** [1] - 1324:17

**joy** [1] - 1377:19

**JR** [1] - 1250:18

**JS** [3] - 1481:7, 1481:10, 1481:11

**judge** [2] - 1490:14, 1520:2

**Judge** [9] - 1514:20, 1515:5, 1515:13, 1515:22, 1516:1, 1516:10, 1527:12, 1531:24, 1531:25

**JUDGE** [1] - 1250:12

**Julie** [2] - 1345:14, 1345:24

**July** [12] - 1499:18, 1513:11, 1513:15, 1515:7, 1526:16, 1526:17, 1528:13, 1530:4, 1530:18, 1530:25, 1532:11

**juncture** [1] - 1528:25

**June** [10] - 1373:8, 1373:9, 1374:8, 1375:5, 1414:18, 1414:20, 1419:12, 1424:6, 1477:4

**jurors** [1] - 1496:18

**Jury** [6] - 1329:1, 1329:4, 1360:21, 1361:20, 1430:2, 1496:21

**jury** [75] - 1252:1, 1253:6, 1255:22, 1255:24, 1256:8, 1261:10, 1263:12, 1265:4, 1266:17, 1267:24, 1268:20, 1269:25, 1271:4, 1272:6, 1273:23, 1274:15, 1276:2, 1276:22, 1277:3, 1278:6, 1278:19, 1279:9, 1279:20, 1280:7, 1280:19, 1281:10, 1282:2, 1283:7, 1287:23, 1295:18, 1313:13, 1319:2, 1319:4, 1328:5, 1329:20, 1332:21, 1333:11, 1337:16, 1343:17, 1349:18, 1353:3, 1358:2, 1362:16, 1414:24, 1416:24, 1427:22, 1431:3, 1438:11, 1440:2, 1440:4, 1444:16, 1475:21, 1490:5, 1498:25, 1501:6, 1501:8, 1503:17, 1506:14, 1507:6, 1507:7, 1507:8, 1508:14, 1511:2, 1514:15, 1518:12, 1518:13, 1518:21, 1518:25, 1519:7, 1519:8, 1521:18, 1524:15, 1528:10, 1529:9

**JURY** [1] - 1250:11

**jury's** [1] - 1360:5

**JX-0094** [1] - 1392:13

**JX-1** [3] - 1361:7, 1361:16, 1535:1

**JX-100** [1] - 1257:13

**JX-100.0048** [1] - 1257:14

**JX-103** [2] - 1444:10, 1444:13

**JX-108** [3] - 1361:11, 1361:17, 1535:2

**JX-2** [3] - 1361:9, 1361:16, 1535:2

**JX-31** [1] - 1461:13

**JX-34** [2] - 1485:21, 1485:23

**JX-50** [2] - 1263:11, 1263:13

**JX-56** [2] - 1269:24, 1270:1

**JX-58** [1] - 1281:6

**JX-59** [2] - 1283:6, 1283:8

**JX-77** [2] - 1296:7, 1296:10

**JX-79** [1] - 1306:1

**JX-83** [1] - 1354:22

**JX-84** [2] - 1494:1, 1494:3

**JXs** [1] - 1444:14

# K

**KASS** [1] - 1251:11

**Kathryn** [4] - 1480:13, 1480:16, 1480:24, 1482:11

**keep** [5] - 1255:1, 1353:9, 1411:4

**Keep** [1] - 1350:18

**Kelly** [1] - 1408:13

**Kelwood** [2] - 1506:25, 1507:4

**Kentucky** [1] - 1279:11

**kernel** [2] - 1527:18

**KESSLER** [172] - 1250:16, 1252:2, 1254:1, 1254:15, 1254:25, 1255:9, 1256:1, 1256:6, 1265:2, 1266:13, 1266:16, 1267:21, 1271:2, 1273:20, 1275:7, 1283:1, 1286:15, 1287:8, 1287:11, 1290:10, 1291:22, 1294:5, 1304:25, 1309:18, 1309:22, 1309:24, 1312:1, 1328:22, 1329:7, 1329:8, 1330:7, 1330:12, 1331:6, 1331:11, 1331:16, 1335:5, 1335:14, 1335:19, 1337:1, 1338:1, 1339:3, 1342:23, 1342:25, 1349:17, 1350:16, 1352:14, 1353:1, 1353:7, 1353:22, 1354:22, 1355:16, 1357:8, 1359:18, 1359:23, 1360:15, 1429:14, 1430:5, 1430:18, 1438:7, 1438:15, 1439:13, 1439:24, 1440:2, 1440:8, 1441:14, 1444:10, 1444:15, 1445:24, 1453:6, 1453:24, 1454:2, 1454:5, 1455:25, 1457:2, 1457:13, 1463:1, 1463:4, 1467:3, 1469:25, 1470:3, 1470:7, 1470:11, 1470:14, 1470:19, 1470:23, 1470:25, 1471:13, 1471:20, 1476:9, 1476:19, 1476:25, 1477:12, 1480:1, 1480:11, 1480:18, 1480:23, 1484:2, 1487:25, 1490:1, 1490:2, 1490:10, 1491:3, 1491:6, 1491:8, 1491:9, 1491:12, 1491:13, 1493:2, 1493:7, 1496:11, 1498:7, 1498:16, 1499:10, 1499:20, 1500:11, 1500:15, 1503:5, 1504:5, 1504:17, 1504:20, 1505:3, 1505:5, 1505:16, 1506:4, 1506:17, 1507:5,

1507:12, 1507:16, 1508:1, 1508:21, 1508:25, 1509:9, 1509:11, 1510:5, 1510:14, 1514:25, 1515:4, 1515:8, 1515:21, 1516:14, 1516:24, 1518:10, 1518:18, 1519:4, 1519:17, 1519:21, 1520:1, 1520:6, 1520:14, 1521:5, 1522:3, 1523:6, 1523:19, 1524:1, 1524:3, 1524:7, 1524:19, 1526:20, 1526:23, 1527:9, 1527:19, 1527:24, 1529:3, 1529:23, 1531:9, 1532:19, 1532:23, 1533:5, 1533:8, 1533:12, 1534:7, 1534:15

**Kessler** [40] - 1252:23, 1253:5, 1253:11, 1253:15, 1253:21, 1254:7, 1254:20, 1260:6, 1261:7, 1261:23, 1262:7, 1262:22, 1265:10, 1268:16, 1269:4, 1270:10, 1273:7, 1273:9, 1274:2, 1274:6, 1274:24, 1275:3, 1275:10, 1284:14, 1304:18, 1305:4, 1306:1, 1313:10, 1314:12, 1329:6, 1358:6, 1358:7, 1359:10, 1430:12, 1497:13, 1498:4, 1511:7, 1525:10, 1525:22

**Kessler's** [3] - 1511:15, 1511:24, 1532:4

**KEVIN** [1] - 1251:8

**key** [25] - 1415:7, 1415:8, 1415:17, 1416:9, 1416:15, 1416:17, 1416:19, 1416:21, 1416:22, 1416:25, 1417:6, 1417:13, 1449:21, 1454:14, 1455:3, 1455:8, 1457:8, 1461:2, 1482:24, 1483:2, 1484:6, 1486:6, 1488:4, 1501:16

**kid** [4] - 1363:12, 1366:18, 1378:15

**kids** [1] - 1366:6

**kind** [16] - 1282:21, 1312:21, 1367:7, 1368:2, 1368:25, 1371:13, 1373:11, 1375:17, 1375:22, 1378:11, 1378:13, 1382:15, 1389:3, 1395:11, 1497:21, 1514:23

**Klinsmann** [2] - 1476:7, 1477:19

**Knicks** [1] - 1379:12

**knowledge** [4] - 1309:5, 1369:19, 1442:4, 1473:12

**known** [4] - 1288:12, 1500:1, 1510:23, 1510:24

**knows** [4] - 1388:25, 1499:23, 1510:21, 1529:12

**Kraft** [13] - 1318:14, 1318:16, 1318:20, 1356:7, 1356:11, 1356:13, 1356:15, 1356:20, 1444:24, 1445:3, 1445:5, 1456:7, 1491:25

# L

**L'Hote** [2] - 1313:4, 1341:22

**L.L.C** [2] - 1250:8, 1251:9

**labor** [1] - 1454:13

**lack** [1] - 1507:3

**ladies** [5] - 1256:10, 1328:23, 1360:17, 1427:19, 1496:15

**Ladies** [1] - 1360:10

**laid** [2] - 1282:6, 1341:2

**Lakers** [1] - 1364:18

**language** [21] - 1310:14, 1339:4, 1428:25, 1429:8, 1500:9, 1506:20, 1508:20, 1508:22, 1509:17, 1509:18, 1509:19, 1511:8, 1512:13, 1512:21, 1512:23, 1514:1, 1514:9, 1519:22, 1523:17, 1525:5, 1525:21

**large** [2] - 1450:2, 1464:22

**largely** [1] - 1297:9

**largest** [1] - 1284:7

**Lashbrook** [1] - 1461:14

**Last** [1] - 1272:1

**last** [16] - 1257:19, 1262:10, 1264:11, 1265:15, 1274:22, 1290:14, 1391:3, 1402:10, 1467:1, 1473:19, 1482:15, 1486:25, 1487:1, 1507:1, 1510:10, 1527:14

**lasted** [1] - 1318:18

**late** [3] - 1298:7, 1440:18, 1442:15

**LATHAM** [2] - 1251:1, 1251:4

**Latino** [1] - 1366:16

**launch** [1] - 1447:17

**laundering** [2] - 1404:21, 1405:13

**law** [12] - 1252:6, 1300:2, 1428:20, 1498:17, 1506:7, 1506:8, 1508:5, 1509:13, 1512:18, 1514:2, 1517:23, 1519:22

**lawfully** [1] - 1267:8

**laws** [1] - 1436:21

**lawsuit** [4] - 1254:6, 1254:21, 1255:2, 1521:16

**lawyer** [14] - 1303:19, 1408:13, 1408:17, 1408:22, 1410:6, 1410:23, 1410:25, 1411:8, 1411:10, 1411:15, 1411:22, 1412:2, 1424:8, 1520:16

**lawyers** [5] - 1318:1, 1410:2, 1420:22, 1436:14, 1525:4

**lead** [3] - 1518:8, 1518:24

**leader** [4] - 1279:22, 1282:14, 1303:18, 1494:17

**leadership** [4] - 1292:15, 1296:25, 1301:14, 1478:16

**leading** [3] - 1271:13, 1463:25, 1467:25

**LEAGUE** [2] - 1250:4, 1250:8

**league** [210] - 1253:13, 1257:21, 1257:24, 1258:3, 1258:7, 1258:9, 1258:15, 1258:16, 1258:20, 1259:13, 1259:19, 1260:3, 1260:7, 1260:13, 1261:17, 1263:24, 1264:13, 1267:9, 1269:12, 1269:15, 1269:16, 1270:1, 1270:22, 1271:7, 1271:10, 1271:11, 1271:21, 1272:18, 1275:11, 1284:3, 1284:8, 1284:16, 1284:18, 1285:7, 1288:5, 1288:6, 1289:22, 1290:19, 1292:21, 1294:21, 1295:9, 1295:17,

1297:14, 1297:15, 1297:17, 1297:21, 1305:6, 1305:23, 1305:25, 1306:8, 1306:21, 1307:4, 1308:25, 1310:3, 1310:10, 1310:20, 1310:21, 1310:23, 1311:2, 1311:14, 1312:20, 1312:22, 1312:23, 1312:24, 1313:6, 1313:11, 1313:24, 1314:14, 1314:15, 1317:13, 1317:14, 1317:20, 1323:18, 1326:25, 1327:12, 1327:15, 1328:7, 1330:8, 1330:9, 1330:13, 1330:14, 1332:14, 1332:15, 1332:18, 1338:3, 1338:14, 1338:15, 1338:20, 1338:25, 1339:5, 1339:6, 1339:10, 1339:14, 1339:15, 1340:9, 1340:10, 1342:12, 1343:19, 1343:20, 1348:10, 1350:8, 1350:25, 1351:8, 1351:10, 1354:6, 1354:9, 1358:10, 1358:16, 1359:13, 1359:14, 1363:1, 1367:7, 1368:17, 1368:19, 1368:20, 1368:22, 1369:8, 1369:19, 1371:22, 1372:2, 1372:5, 1372:11, 1372:17, 1373:19, 1373:20, 1383:2, 1383:17, 1385:8, 1385:17, 1388:21, 1397:4, 1397:7, 1397:10, 1398:3, 1398:23, 1405:20, 1405:21, 1407:3, 1408:7, 1408:8, 1408:9, 1408:18, 1408:20, 1409:15, 1409:22, 1411:2, 1412:11, 1412:17, 1413:5, 1413:8, 1413:9, 1413:17, 1414:13, 1416:16, 1422:22, 1422:23, 1424:6, 1424:20, 1425:2, 1425:7, 1425:20, 1425:21, 1431:6, 1431:8, 1431:9, 1432:14, 1432:16, 1432:18, 1432:20, 1433:14, 1433:17, 1435:7, 1435:15, 1435:20, 1436:2, 1436:16, 1437:17, 1441:4, 1441:7, 1441:9, 1441:21, 1441:22, 1442:11, 1443:1, 1445:23, 1446:1, 1446:11, 1446:18, 1448:8, 1449:21, 1449:23, 1450:20, 1452:2, 1452:5, 1452:19, 1464:12, 1465:5, 1469:12, 1478:15, 1488:22, 1499:17, 1513:14, 1530:3

**League** [40] - 1251:9, 1284:12, 1288:18, 1289:5, 1290:14, 1294:9, 1298:6, 1299:17, 1300:14, 1300:23, 1307:24, 1308:2, 1308:7, 1308:11, 1310:8, 1349:21, 1350:7, 1350:23, 1359:15, 1366:23, 1367:3, 1392:14, 1392:16, 1430:22, 1431:4, 1432:3, 1432:4, 1432:9, 1433:13, 1439:15, 1444:18, 1461:15, 1474:10, 1481:5, 1481:16, 1495:25, 1496:2, 1496:4, 1496:5, 1496:8

**league's** [9] - 1408:20, 1409:20, 1411:3, 1411:6, 1411:13, 1411:16, 1411:18, 1472:16

**league-wide** [1] - 1397:4

**Leagues** [1] - 1325:12

**leagues** [32] - 1258:24, 1269:1, 1281:24, 1285:3, 1286:24, 1287:1, 1290:22, 1292:14, 1292:15, 1298:14,

1299:22, 1299:24, 1300:1, 1300:5, 1300:12, 1309:10, 1317:11, 1322:23, 1325:20, 1328:11, 1328:12, 1328:14, 1328:18, 1332:15, 1339:25, 1340:4, 1340:7, 1340:14, 1344:19, 1432:4, 1432:10, 1432:25

**leaps** [1] - 1434:14

**learn** [12] - 1356:21, 1369:6, 1373:23, 1374:2, 1380:19, 1384:4, 1384:9, 1384:14, 1425:12, 1425:21, 1433:23, 1434:1

**learned** [9] - 1288:14, 1370:21, 1371:2, 1375:19, 1381:5, 1382:8, 1384:19, 1384:22, 1435:9

**learning** [2] - 1381:14, 1426:21

**leash** [1] - 1518:8

**least** [18] - 1258:25, 1260:4, 1262:21, 1351:15, 1351:25, 1358:18, 1392:20, 1436:13, 1441:10, 1497:7, 1507:2, 1508:16, 1510:10, 1510:17, 1523:8, 1527:7, 1529:3, 1530:1

**least-complicated** [1] - 1527:7

**leave** [6] - 1255:22, 1311:3, 1383:8, 1386:2, 1532:11, 1532:14

**leaving** [4] - 1297:15, 1297:16, 1387:13

**led** [2] - 1284:21, 1487:11

**left** [9] - 1255:23, 1274:13, 1276:25, 1289:10, 1297:15, 1356:23, 1388:18, 1458:5, 1527:14

**left-hand** [1] - 1276:25

**leg** [1] - 1377:7

**legal** [17] - 1252:6, 1252:10, 1252:13, 1253:4, 1253:17, 1263:7, 1272:11, 1298:16, 1371:18, 1374:16, 1374:22, 1374:23, 1375:1, 1424:24, 1447:19, 1520:16, 1531:22

**legality** [1] - 1333:23

**legalization** [1] - 1512:18

**length** [3] - 1263:2, 1326:1, 1326:4

**lengthy** [1] - 1292:18

**less** [6] - 1308:20, 1308:25, 1321:5, 1459:4, 1464:11, 1478:4

**letter** [35] - 1252:9, 1265:6, 1265:18, 1267:25, 1268:4, 1283:8, 1291:16, 1306:2, 1306:4, 1306:16, 1307:1, 1325:4, 1325:6, 1341:17, 1349:19, 1350:4, 1350:11, 1350:15, 1350:16, 1351:3, 1358:5, 1358:8, 1372:9, 1374:6, 1402:1, 1406:6, 1408:12, 1412:1, 1414:6, 1425:18, 1455:3, 1466:23, 1469:17, 1501:20

**letters** [2] - 1252:5, 1265:9

**level** [19] - 1282:13, 1325:14, 1370:1, 1370:2, 1374:13, 1382:16, 1391:1, 1391:6, 1392:9, 1421:18, 1422:4, 1422:23, 1427:12, 1428:10, 1486:8, 1486:14, 1488:3, 1509:11

**levels** [5] - 1449:20, 1467:25, 1477:23, 1484:7, 1487:9

**liability** [1] - 1499:24

**license** [1] - 1314:6

**life** [1] - 1405:17

**light** [4] - 1429:9, 1514:20, 1532:22

**likely** [2] - 1321:13, 1428:23

**likewise** [1] - 1265:18

**limit** [2] - 1384:20, 1505:9

**limited** [3] - 1271:17, 1302:15, 1454:4

**limits** [1] - 1505:8

**Linda** [1] - 1264:21

**line** [10] - 1255:6, 1267:2, 1267:22, 1386:19, 1420:14, 1420:24, 1464:20, 1464:21, 1472:7, 1506:16

**Line** [3] - 1299:20, 1300:21, 1513:7

**lined** [1] - 1378:18

**lines** [2] - 1273:6, 1470:18

**lingering** [1] - 1297:6

**Lisa** [1] - 1303:7

**list** [2] - 1345:16, 1387:14

**listed** [2] - 1261:5, 1457:9

**listen** [1] - 1518:20

**listened** [1] - 1283:4

**listening** [2] - 1282:16, 1428:15

**lists** [4] - 1351:21, 1353:23, 1354:1, 1392:16

**litigation** [10] - 1253:22, 1255:5, 1255:11, 1255:16, 1256:2, 1297:16, 1297:18, 1307:11, 1415:22, 1416:1

**live** [3] - 1360:1, 1362:18, 1386:15

**living** [1] - 1362:20

**LLC** [4] - 1250:4, 1432:10, 1498:1, 1513:11

**LLC's** [1] - 1401:9

**LLP** [7] - 1250:14, 1250:19, 1250:21, 1251:1, 1251:4, 1251:6, 1251:10

**locally** [1] - 1385:1

**located** [1] - 1392:20

**location** [5] - 1257:22, 1258:1, 1258:15, 1294:23, 1393:10

**locations** [2] - 1387:20, 1387:21

**locked** [1] - 1412:4

**logic** [2] - 1423:7, 1503:16

**logical** [1] - 1509:20

**logically** [6] - 1395:20, 1407:11, 1408:6, 1408:10, 1427:2, 1427:3

**LOI** [2] - 1372:13, 1424:3

**long-term** [3] - 1431:8, 1431:10, 1454:8

**long-time** [1] - 1365:23

**longtime** [3] - 1277:10, 1278:7, 1280:23

**Longtime** [1] - 1279:11

**look** [95] - 1252:18, 1252:19, 1257:12, 1264:11, 1264:19, 1266:7, 1267:15, 1269:24, 1270:4, 1281:6, 1283:6, 1286:4, 1290:3, 1294:8, 1294:19, 1296:13, 1299:19, 1300:7, 1310:8, 1331:3, 1331:17, 1331:21, 1332:4, 1350:13, 1351:17, 1351:18, 1372:24,

1372:25, 1385:12, 1398:22, 1401:19, 1402:11, 1404:8, 1406:3, 1414:23, 1415:3, 1438:22, 1440:8, 1440:13, 1443:3, 1443:6, 1443:12, 1444:10, 1444:23, 1445:16, 1445:22, 1446:9, 1447:7, 1450:23, 1451:7, 1453:5, 1454:16, 1454:17, 1456:6, 1457:7, 1458:1, 1461:13, 1461:20, 1462:14, 1462:23, 1463:22, 1464:20, 1465:23, 1467:17, 1469:18, 1470:5, 1471:14, 1471:17, 1472:25, 1473:13, 1473:16, 1473:24, 1476:1, 1477:17, 1478:13, 1484:11, 1486:25, 1488:19, 1494:1, 1494:9, 1494:12, 1500:12, 1502:4, 1502:6, 1505:22, 1506:19, 1507:3, 1514:25, 1516:12, 1517:2, 1525:13

**Look** [2] - 1441:16, 1449:1

**looked** [4] - 1254:19, 1300:6, 1508:8, 1517:9

**looking** [27] - 1263:7, 1271:5, 1309:10, 1332:2, 1332:14, 1333:1, 1337:17, 1350:14, 1352:16, 1368:10, 1369:17, 1370:5, 1384:17, 1386:21, 1386:22, 1424:13, 1424:19, 1445:17, 1446:17, 1472:6, 1473:19, 1495:8, 1497:25, 1501:24, 1515:3, 1525:1, 1525:5

**Looking** [2] - 1267:25, 1282:6

**looks** [3] - 1455:17, 1455:23, 1525:1

**Los** [3] - 1259:16, 1328:12, 1364:18

**lose** [3] - 1287:3, 1437:25, 1521:16

**losing** [15] - 1284:25, 1381:12, 1385:23, 1385:24, 1386:20, 1409:13, 1409:19, 1409:20, 1412:12, 1412:17, 1413:1, 1413:6, 1451:24

**loss** [5] - 1287:21, 1381:24, 1382:4, 1382:8, 1382:21

**losses** [3] - 1464:8, 1464:12, 1464:17

**lost** [15] - 1284:20, 1285:5, 1287:3, 1321:4, 1383:23, 1385:15, 1388:17, 1413:9, 1413:12, 1413:13, 1413:18, 1426:18, 1436:6, 1437:1, 1440:22

**loud** [1] - 1265:15

**lowest** [1] - 1392:8

**luckily** [1] - 1387:6

**lucrative** [1] - 1460:16

**lunch** [3] - 1359:25, 1360:1, 1360:18

**Luncheon** [1] - 1360:24

**Lydia** [3] - 1297:7, 1297:20, 1350:4

# M

**ma'am** [25] - 1390:3, 1391:15, 1391:18, 1391:20, 1394:10, 1395:3, 1395:19, 1397:23, 1400:7, 1405:23, 1406:10, 1408:3, 1409:12, 1411:9, 1411:14, 1411:21, 1412:10, 1415:5, 1415:10, 1417:1, 1420:12, 1420:21, 1422:9, 1423:22

**Madness** [1] - 1364:2

ALL WORD INDEX ————————— 23

**Madrid** [1] - 1475:15
**magical** [1] - 1499:6
**magically** [1] - 1313:6
**maiden** [1] - 1278:20
**mail** [50] - 1264:20, 1264:24, 1266:8, 1267:16, 1291:25, 1400:17, 1400:20, 1401:7, 1401:12, 1401:13, 1401:24, 1402:1, 1402:4, 1402:15, 1402:17, 1402:19, 1402:21, 1403:13, 1404:14, 1405:7, 1405:11, 1405:16, 1406:5, 1438:9, 1438:11, 1438:17, 1438:18, 1439:3, 1440:5, 1453:8, 1453:10, 1454:25, 1455:19, 1461:20, 1462:2, 1462:5, 1470:20, 1473:9, 1477:4, 1477:8, 1477:17, 1480:12, 1480:15, 1485:23, 1485:24, 1486:2, 1492:22, 1492:23, 1493:8
**mails** [4] - 1286:5, 1418:2, 1438:19, 1473:11
**main** [2] - 1299:8, 1333:21
**maintain** [1] - 1411:18
**major** [8] - 1258:22, 1259:12, 1266:6, 1328:12, 1328:16, 1406:16, 1407:2, 1450:19
**Major** [18] - 1251:8, 1430:21, 1431:4, 1432:2, 1432:4, 1432:9, 1433:13, 1439:15, 1444:18, 1461:15, 1474:10, 1481:5, 1481:16, 1495:25, 1496:1, 1496:4, 1496:5, 1496:7
**MAJOR** [1] - 1250:8
**majority** [1] - 1459:22
**Malik** [10] - 1286:6, 1286:9, 1286:16, 1286:18, 1287:5, 1287:17, 1296:8, 1300:19, 1406:12, 1406:25
**man** [2] - 1461:15, 1493:10
**manage** [2] - 1431:7, 1454:11
**managed** [1] - 1431:9
**managing** [2] - 1481:1, 1484:25
**manner** [1] - 1335:11
**March** [23] - 1253:7, 1262:17, 1262:23, 1275:9, 1275:16, 1276:24, 1281:12, 1283:10, 1325:7, 1326:15, 1337:6, 1348:3, 1364:2, 1372:20, 1372:21, 1374:7, 1516:2, 1516:6, 1516:19, 1530:22, 1531:7, 1532:8
**Maria** [9] - 1381:4, 1381:7, 1381:9, 1386:24, 1393:16, 1394:12, 1394:22, 1397:13, 1425:24
**mark** [5] - 1275:22, 1361:10, 1415:2, 1477:1, 1480:16
**MARK** [1] - 1250:18
**Mark** [3] - 1287:17, 1480:12, 1482:12
**marked** [10] - 1265:4, 1266:17, 1267:24, 1271:4, 1273:23, 1331:9, 1361:17, 1440:4, 1454:6, 1535:2
**market** [9] - 1288:16, 1446:4, 1454:12, 1455:5, 1465:7, 1468:23, 1518:15, 1518:17, 1518:19
**marketed** [1] - 1469:8
**Marketing** [13] - 1431:14, 1431:16,

1431:19, 1431:23, 1441:1, 1445:14, 1456:3, 1457:5, 1463:12, 1463:19, 1480:25, 1495:11, 1496:1
**marketing** [4] - 1459:19, 1469:11, 1483:10, 1487:12
**markets** [2] - 1258:23, 1328:16
**Maryland** [1] - 1363:9
**matches** [2] - 1475:10, 1475:11
**material** [2] - 1306:9, 1475:1
**materials** [3] - 1274:23, 1525:13, 1525:18
**math** [12] - 1510:18, 1510:20, 1511:4, 1521:24, 1522:4, 1527:3, 1527:7, 1528:1, 1528:2, 1529:12, 1529:14
**matter** [21] - 1252:22, 1314:13, 1314:20, 1314:22, 1314:23, 1335:7, 1364:22, 1391:23, 1391:24, 1401:12, 1498:17, 1505:24, 1506:1, 1506:4, 1506:7, 1506:8, 1507:8, 1507:9, 1508:4, 1512:3, 1514:3
**Matter** [1] - 1533:15
**matters** [1] - 1516:18
**MATTHEW** [1] - 1250:23
**Mattson** [3] - 1280:7, 1280:13, 1280:16
**MBA** [1] - 1277:20
**mean** [28] - 1283:22, 1299:1, 1300:3, 1364:6, 1378:4, 1381:20, 1388:23, 1413:17, 1419:18, 1420:2, 1420:6, 1428:12, 1428:15, 1432:6, 1438:13, 1445:6, 1448:12, 1459:6, 1486:23, 1490:23, 1492:2, 1492:15, 1493:12, 1508:12, 1508:13, 1514:24, 1522:17, 1532:16
**meaning** [5] - 1498:8, 1498:18, 1516:23, 1517:14, 1529:11
**meaningful** [2] - 1257:23, 1258:3
**means** [14] - 1258:22, 1347:6, 1416:20, 1421:2, 1507:7, 1513:14, 1518:1, 1518:12, 1519:3, 1519:6, 1520:5, 1521:20, 1524:12, 1531:25
**meant** [17] - 1301:13, 1322:21, 1358:15, 1455:9, 1460:14, 1460:15, 1460:19, 1468:3, 1469:6, 1486:11, 1486:21, 1487:5, 1492:4, 1493:20, 1509:1, 1520:19, 1523:10
**measurements** [1] - 1449:21
**measures** [1] - 1459:24
**mechanical** [1] - 1251:18
**mechanics** [1] - 1321:8
**media** [15] - 1258:12, 1258:17, 1328:17, 1362:21, 1365:4, 1365:9, 1365:21, 1365:25, 1439:22, 1440:6, 1440:17, 1441:19, 1442:2, 1443:10, 1483:11
**mediate** [1] - 1297:7
**mediated** [1] - 1297:22
**mediation** [1] - 1298:7
**mediations** [1] - 1298:1
**meet** [23] - 1261:24, 1262:18, 1262:20,

1283:18, 1290:20, 1299:24, 1300:12, 1309:8, 1312:24, 1324:7, 1327:25, 1328:2, 1350:7, 1350:24, 1351:7, 1358:18, 1358:23, 1379:17, 1379:18, 1379:19, 1379:20
**meeting** [94] - 1262:23, 1263:14, 1263:15, 1264:7, 1264:9, 1264:10, 1267:6, 1270:1, 1270:5, 1270:9, 1270:14, 1270:23, 1271:6, 1271:13, 1272:8, 1272:16, 1273:5, 1273:8, 1273:11, 1274:2, 1274:11, 1274:14, 1275:4, 1276:6, 1276:11, 1281:12, 1285:7, 1286:20, 1286:23, 1287:6, 1287:7, 1296:3, 1296:11, 1300:8, 1300:17, 1301:15, 1324:21, 1325:8, 1325:10, 1326:15, 1329:17, 1329:18, 1330:1, 1330:18, 1330:22, 1330:24, 1331:8, 1331:17, 1332:23, 1333:7, 1335:17, 1335:20, 1337:5, 1337:6, 1338:8, 1339:9, 1339:13, 1339:23, 1339:24, 1341:6, 1341:8, 1342:16, 1352:17, 1352:20, 1353:4, 1354:16, 1419:8, 1435:10, 1435:17, 1435:25, 1436:14, 1436:15, 1440:19, 1442:16, 1444:17, 1444:20, 1446:7, 1447:14, 1447:15, 1453:15, 1456:3, 1456:7, 1457:8, 1457:17, 1458:5, 1463:10, 1463:13, 1482:16, 1482:20, 1485:5, 1485:7, 1485:8, 1488:11
**meetings** [52] - 1254:6, 1254:17, 1260:22, 1261:25, 1263:3, 1263:9, 1266:4, 1266:20, 1266:21, 1267:14, 1271:23, 1272:11, 1272:14, 1273:13, 1274:20, 1276:14, 1282:22, 1285:1, 1285:8, 1301:17, 1329:10, 1329:13, 1333:8, 1333:9, 1333:10, 1333:18, 1333:19, 1337:5, 1337:7, 1337:17, 1356:5, 1356:19, 1419:6, 1431:21, 1432:1, 1436:13, 1445:4, 1445:8, 1445:9, 1445:10, 1445:13, 1463:14, 1463:16, 1463:17, 1484:23, 1489:18, 1490:4, 1492:6, 1492:9, 1492:10, 1492:11, 1492:13
**meets** [3] - 1257:19, 1358:10, 1358:21
**member** [22] - 1269:15, 1269:16, 1272:14, 1276:8, 1277:4, 1277:20, 1278:7, 1278:8, 1278:23, 1279:11, 1279:21, 1303:9, 1316:25, 1319:9, 1355:1, 1408:19, 1472:14, 1474:7, 1474:12, 1488:23, 1491:22, 1495:21
**members** [53] - 1254:3, 1260:14, 1260:15, 1271:16, 1272:15, 1275:19, 1276:4, 1280:22, 1282:4, 1282:25, 1284:4, 1285:3, 1298:15, 1299:14, 1302:3, 1302:14, 1302:15, 1302:16, 1304:5, 1304:6, 1304:13, 1304:19, 1305:3, 1321:21, 1322:17, 1337:3, 1344:24, 1345:16, 1346:5, 1347:17, 1382:11, 1382:13, 1453:11, 1454:24, 1455:1, 1488:5, 1488:21, 1491:16,

VB        OCR        CRR

1495:10, 1495:11, 1499:13, 1502:1, 1502:7, 1502:13, 1502:16, 1502:19, 1503:4, 1504:1, 1512:25, 1513:1, 1523:4
**Members** [1] - 1270:6
**membership** [5] - 1401:9, 1404:21, 1405:13, 1472:13, 1474:6
**memo** [1] - 1270:21
**memoir** [2] - 1421:23, 1427:5
**memorandum** [1] - 1406:9
**memory** [3] - 1333:15, 1344:16, 1420:7
**Men's** [3] - 1392:16, 1477:20, 1478:10
**men's** [5] - 1257:20, 1308:11, 1359:14, 1385:17, 1455:9
**mental** [1] - 1366:8
**mention** [5] - 1325:4, 1325:8, 1525:14, 1525:16, 1525:17
**mentioned** [21] - 1259:25, 1263:9, 1266:18, 1269:21, 1273:12, 1305:7, 1328:19, 1345:1, 1345:3, 1345:5, 1347:21, 1367:22, 1371:10, 1375:25, 1376:4, 1377:25, 1387:20, 1479:1, 1482:15, 1483:10, 1487:1
**mentioning** [1] - 1255:1
**merch** [1] - 1369:15
**merchandising** [1] - 1487:21
**merits** [3] - 1254:19, 1257:24, 1258:3
**mess** [2] - 1412:6, 1412:9
**messed** [1] - 1395:10
**met** [11] - 1260:20, 1267:12, 1285:6, 1309:9, 1312:8, 1312:12, 1317:25, 1340:4, 1418:24, 1418:25, 1419:5
**methodology** [2] - 1510:22, 1527:13
**metropolitan** [1] - 1328:1
**Meyer** [1] - 1529:16
**Miami** [5] - 1259:14, 1277:5, 1287:19, 1440:22, 1442:17
**mic** [1] - 1430:11
**mid** [3] - 1278:12, 1431:8, 1511:3
**mid-Atlantic** [1] - 1278:12
**mid-trial** [1] - 1511:3
**middle** [2] - 1262:13, 1408:16
**might** [16] - 1258:18, 1260:23, 1262:5, 1276:22, 1293:17, 1293:18, 1293:21, 1321:6, 1321:7, 1321:14, 1321:15, 1321:16, 1328:4, 1437:22, 1500:18, 1533:2
**MIL** [5] - 1252:8, 1255:20, 1255:21, 1405:25, 1453:18
**million** [26] - 1280:22, 1358:20, 1443:24, 1444:1, 1444:2, 1444:7, 1458:17, 1458:20, 1458:21, 1467:20, 1468:11, 1472:3, 1472:13, 1472:22, 1474:19, 1475:5, 1475:8, 1475:19, 1487:4, 1487:5, 1487:7, 1504:11, 1510:11, 1526:13
**million-odd** [1] - 1510:11
**millions** [1] - 1454:10
**mind** [1] - 1466:12

**minds** [1] - 1284:5
**minimum** [7] - 1258:13, 1258:14, 1306:9, 1458:16, 1523:8, 1526:25
**Minnesota** [1] - 1407:6
**minute** [2] - 1344:5, 1352:24
**minutes** [20] - 1263:14, 1272:8, 1273:5, 1273:14, 1275:4, 1306:14, 1309:21, 1328:24, 1329:10, 1329:17, 1329:22, 1330:4, 1334:3, 1427:20, 1444:17, 1447:13, 1447:15, 1451:9, 1489:19
**mirror** [1] - 1262:9
**misleading** [1] - 1518:24
**misled** [1] - 1501:10
**mispronouncing** [1] - 1439:5
**miss** [1] - 1276:13
**missing** [2] - 1259:17, 1415:11
**misstated** [1] - 1319:7
**misstatement** [1] - 1342:22
**misstates** [1] - 1355:20
**mistake** [1] - 1414:16
**misunderstanding** [1] - 1350:3
**mixed** [2] - 1405:17, 1492:16
**mixing** [1] - 1491:1
**MLS** [153] - 1263:4, 1268:18, 1308:10, 1309:3, 1314:2, 1314:5, 1314:10, 1314:15, 1314:17, 1315:2, 1315:5, 1316:1, 1316:6, 1317:23, 1317:25, 1320:2, 1320:6, 1320:10, 1320:17, 1321:4, 1321:11, 1321:19, 1322:5, 1322:8, 1322:13, 1322:18, 1322:21, 1323:3, 1323:24, 1324:12, 1324:20, 1324:22, 1338:20, 1339:9, 1355:2, 1355:9, 1355:11, 1355:12, 1355:17, 1355:19, 1355:23, 1356:1, 1356:5, 1356:11, 1356:13, 1356:14, 1356:16, 1356:17, 1356:21, 1357:1, 1431:7, 1431:12, 1431:18, 1431:21, 1431:23, 1432:13, 1432:20, 1432:22, 1433:7, 1433:24, 1434:8, 1434:14, 1434:19, 1435:6, 1437:20, 1437:22, 1437:25, 1440:11, 1440:17, 1441:4, 1441:7, 1441:10, 1441:24, 1442:14, 1443:20, 1445:20, 1446:16, 1447:9, 1447:11, 1447:17, 1447:19, 1447:23, 1448:1, 1448:3, 1448:10, 1449:2, 1450:7, 1450:8, 1450:24, 1451:4, 1452:5, 1452:10, 1452:15, 1452:24, 1457:10, 1457:18, 1461:7, 1462:6, 1464:8, 1464:17, 1464:23, 1465:3, 1465:19, 1466:17, 1469:1, 1469:6, 1469:8, 1469:9, 1472:8, 1472:12, 1472:21, 1473:2, 1474:2, 1474:5, 1475:8, 1475:10, 1475:17, 1475:19, 1478:1, 1481:23, 1482:18, 1482:25, 1484:12, 1484:16, 1484:24, 1485:5, 1485:6, 1488:5, 1488:13, 1488:24, 1489:6, 1489:9, 1489:11, 1489:16, 1489:18, 1490:8, 1490:23, 1491:2, 1491:21, 1491:22, 1492:2, 1492:5, 1492:10,

1493:12, 1493:21, 1494:16, 1494:21, 1495:21
**MLS'** [1] - 1338:15
**MLS's** [2] - 1307:16, 1308:7
**model** [6] - 1449:3, 1530:9, 1530:13, 1532:15, 1532:16, 1532:25
**Moeller** [1] - 1303:2
**Mole** [1] - 1528:17
**moment** [12] - 1278:24, 1301:19, 1358:6, 1383:7, 1390:16, 1419:13, 1436:20, 1441:10, 1500:10, 1513:5, 1513:11, 1516:21
**moments** [1] - 1266:18
**money** [22] - 1308:6, 1308:9, 1308:13, 1320:14, 1320:18, 1321:16, 1323:17, 1390:15, 1398:17, 1404:21, 1404:24, 1405:13, 1408:7, 1408:8, 1412:12, 1413:1, 1413:5, 1415:21, 1455:11, 1458:25, 1459:2, 1459:17
**Montgomery** [2] - 1250:22, 1251:4
**month** [2] - 1255:10, 1315:23
**months** [10] - 1261:8, 1261:19, 1265:8, 1326:15, 1386:2, 1386:3, 1386:18, 1403:11, 1412:4, 1525:12
**morning** [11] - 1252:2, 1252:5, 1256:10, 1257:6, 1257:7, 1257:8, 1309:25, 1310:1, 1328:24, 1360:16, 1415:16
**most** [30] - 1277:9, 1278:8, 1283:18, 1285:7, 1295:9, 1303:15, 1306:14, 1312:2, 1312:11, 1313:19, 1316:17, 1322:5, 1328:14, 1365:8, 1386:19, 1387:7, 1431:18, 1431:19, 1465:4, 1465:6, 1472:25, 1473:4, 1474:1, 1481:5, 1497:6, 1500:20, 1510:3, 1510:4, 1512:20
**Most** [1] - 1353:8
**mostly** [2] - 1285:3, 1475:10
**motion** [6] - 1497:1, 1497:6, 1510:25, 1515:2, 1523:24, 1523:25
**motions** [1] - 1531:19
**Motta** [7] - 1278:6, 1278:7, 1278:13, 1278:16, 1282:17, 1304:14, 1304:19
**mountain** [1] - 1368:15
**Mountain** [3] - 1327:13, 1327:14, 1327:17
**Mountains** [1] - 1316:9
**mouse** [1] - 1509:14
**move** [38] - 1265:1, 1266:12, 1267:19, 1270:25, 1272:3, 1273:18, 1286:13, 1290:8, 1291:20, 1293:23, 1294:3, 1305:24, 1318:10, 1388:24, 1388:25, 1400:23, 1401:14, 1402:5, 1402:22, 1406:23, 1417:10, 1439:24, 1441:13, 1444:9, 1444:13, 1450:11, 1452:9, 1466:20, 1467:3, 1469:25, 1471:12, 1471:20, 1476:23, 1477:12, 1480:8, 1480:18, 1493:2, 1529:2
**moved** [3] - 1305:25, 1363:12, 1388:21
**movies** [1] - 1365:11

**moving** [2] - 1308:5, 1383:9
**MR** [267] - 1252:2, 1252:23, 1253:9, 1253:11, 1254:1, 1254:15, 1254:25, 1255:9, 1256:1, 1256:6, 1256:13, 1257:5, 1257:12, 1263:11, 1263:23, 1264:19, 1265:1, 1265:2, 1266:7, 1266:12, 1266:13, 1266:16, 1267:15, 1267:19, 1267:21, 1269:24, 1270:20, 1270:25, 1271:2, 1272:1, 1272:5, 1272:17, 1273:18, 1273:20, 1275:7, 1275:21, 1281:6, 1281:25, 1283:1, 1283:6, 1286:2, 1286:13, 1286:15, 1286:19, 1287:8, 1287:10, 1287:11, 1290:3, 1290:8, 1290:10, 1291:20, 1291:22, 1293:24, 1294:3, 1294:5, 1296:7, 1296:9, 1299:23, 1301:21, 1301:24, 1304:25, 1309:16, 1309:18, 1309:22, 1309:24, 1312:1, 1313:8, 1328:22, 1329:7, 1329:8, 1330:7, 1330:12, 1331:6, 1331:11, 1331:12, 1331:16, 1335:5, 1335:14, 1335:19, 1337:1, 1337:19, 1338:1, 1338:17, 1338:22, 1339:3, 1339:11, 1342:21, 1342:23, 1342:25, 1346:18, 1346:21, 1348:19, 1349:14, 1349:17, 1350:16, 1352:14, 1353:1, 1353:7, 1353:22, 1354:20, 1354:22, 1354:23, 1355:4, 1355:7, 1355:15, 1355:16, 1355:20, 1355:21, 1355:25, 1357:6, 1357:8, 1357:10, 1358:1, 1358:4, 1359:16, 1359:18, 1359:23, 1360:15, 1429:14, 1430:5, 1430:18, 1433:9, 1438:7, 1438:15, 1439:13, 1439:24, 1439:25, 1440:2, 1440:8, 1441:14, 1444:10, 1444:15, 1445:24, 1453:6, 1453:16, 1453:20, 1453:24, 1454:2, 1454:5, 1455:25, 1457:2, 1457:13, 1457:15, 1462:19, 1463:1, 1463:4, 1467:3, 1467:4, 1469:25, 1470:1, 1470:3, 1470:7, 1470:11, 1470:14, 1470:19, 1470:23, 1470:25, 1471:13, 1471:20, 1476:9, 1476:14, 1476:19, 1476:25, 1477:12, 1477:14, 1480:1, 1480:11, 1480:18, 1480:20, 1480:23, 1484:2, 1487:25, 1489:23, 1490:1, 1490:2, 1490:6, 1490:10, 1491:3, 1491:6, 1491:8, 1491:9, 1491:12, 1491:13, 1493:2, 1493:4, 1493:7, 1496:11, 1498:7, 1498:16, 1499:10, 1499:20, 1500:11, 1500:15, 1503:5, 1504:5, 1504:17, 1504:20, 1505:3, 1505:5, 1505:16, 1506:4, 1506:17, 1507:5, 1507:12, 1507:16, 1508:1, 1508:21, 1508:25, 1509:9, 1509:11, 1510:5, 1510:14, 1511:14, 1512:7, 1512:9, 1513:7, 1513:9, 1514:25, 1515:4, 1515:8, 1515:21, 1516:14, 1516:24, 1518:10, 1518:18, 1519:4, 1519:17, 1519:21, 1520:1, 1520:6, 1520:14, 1521:5, 1522:3, 1523:6, 1523:19, 1524:1, 1524:3, 1524:7, 1524:19,

1525:9, 1525:18, 1526:20, 1526:23, 1527:9, 1527:19, 1527:24, 1528:8, 1528:15, 1529:3, 1529:14, 1529:23, 1530:15, 1531:3, 1531:8, 1531:9, 1532:2, 1532:10, 1532:19, 1532:23, 1533:5, 1533:8, 1533:11, 1533:12, 1534:6, 1534:7, 1534:8, 1534:15
**MS** [74] - 1360:2, 1360:8, 1361:6, 1361:13, 1361:23, 1362:13, 1374:25, 1382:1, 1382:6, 1383:25, 1384:7, 1384:11, 1389:19, 1389:23, 1393:2, 1395:22, 1400:1, 1400:3, 1400:8, 1400:9, 1400:12, 1400:16, 1400:23, 1400:24, 1401:2, 1401:6, 1401:14, 1401:16, 1401:19, 1401:23, 1402:5, 1402:7, 1402:10, 1402:14, 1402:22, 1402:24, 1403:2, 1403:15, 1403:17, 1403:19, 1403:21, 1403:25, 1404:5, 1404:10, 1404:13, 1404:25, 1405:2, 1405:4, 1405:24, 1406:2, 1406:18, 1406:21, 1406:24, 1407:14, 1407:18, 1407:23, 1408:24, 1409:23, 1414:11, 1414:16, 1415:1, 1417:7, 1417:9, 1417:12, 1419:20, 1423:11, 1423:15, 1423:17, 1423:19, 1427:16, 1427:25, 1534:10, 1534:11, 1534:13
**MSL** [1] - 1328:13
**multi** [1] - 1324:24
**multi-year** [1] - 1324:24
**multiple** [19] - 1261:25, 1262:13, 1263:9, 1281:23, 1282:10, 1290:15, 1290:20, 1299:21, 1299:22, 1299:24, 1300:5, 1309:13, 1315:19, 1318:4, 1324:13, 1324:15, 1364:25, 1365:1, 1448:19
**Multiple** [2] - 1262:19, 1278:21
**multiyear** [1] - 1380:6
**must** [4] - 1328:19, 1392:20, 1429:5, 1494:24
**mutual** [1] - 1288:13
**mutually** [1] - 1453:2

# N

**name** [3] - 1278:20, 1347:1, 1364:3
**named** [3] - 1276:8, 1373:14, 1400:18
**namely** [2] - 1261:4, 1299:10
**names** [4] - 1302:6, 1302:8, 1302:20, 1347:17
**NASL** [287] - 1257:19, 1258:1, 1259:21, 1260:20, 1260:25, 1261:23, 1262:15, 1262:18, 1262:20, 1263:9, 1263:18, 1264:1, 1264:7, 1264:15, 1264:21, 1265:7, 1265:20, 1266:1, 1266:2, 1266:19, 1266:22, 1267:3, 1267:4, 1267:6, 1267:9, 1268:5, 1268:7, 1268:11, 1268:17, 1268:21, 1268:22, 1269:9, 1269:19, 1269:21, 1270:9, 1270:11, 1270:15, 1270:21,

1271:12, 1271:16, 1271:22, 1271:24, 1272:23, 1273:8, 1274:3, 1274:13, 1274:16, 1274:25, 1281:23, 1283:8, 1283:15, 1283:18, 1283:23, 1284:2, 1284:15, 1285:2, 1285:4, 1285:5, 1285:7, 1286:21, 1287:2, 1287:5, 1287:15, 1288:8, 1288:11, 1288:21, 1288:23, 1289:5, 1289:18, 1289:20, 1289:21, 1290:17, 1291:3, 1293:4, 1294:11, 1294:20, 1295:1, 1295:18, 1296:4, 1297:16, 1297:23, 1298:2, 1298:5, 1298:12, 1298:14, 1300:13, 1300:16, 1300:17, 1301:15, 1302:4, 1304:7, 1304:20, 1305:5, 1305:13, 1306:2, 1306:7, 1306:17, 1307:3, 1307:8, 1307:10, 1307:24, 1308:2, 1308:18, 1308:21, 1308:23, 1309:1, 1309:6, 1311:2, 1312:8, 1312:12, 1312:14, 1313:5, 1313:14, 1313:24, 1314:11, 1314:24, 1315:10, 1316:12, 1322:22, 1324:4, 1325:4, 1325:17, 1325:22, 1326:6, 1326:10, 1326:14, 1327:1, 1329:12, 1330:15, 1330:25, 1331:25, 1332:23, 1332:24, 1333:19, 1337:4, 1338:4, 1338:15, 1338:21, 1342:7, 1342:11, 1342:19, 1343:1, 1344:1, 1344:2, 1344:7, 1344:13, 1344:20, 1347:22, 1348:18, 1348:25, 1349:8, 1349:12, 1353:20, 1354:25, 1357:4, 1359:4, 1359:6, 1360:8, 1361:23, 1366:25, 1367:8, 1368:20, 1368:23, 1369:13, 1370:4, 1370:11, 1370:21, 1371:2, 1371:4, 1372:2, 1372:4, 1372:8, 1372:15, 1372:24, 1372:25, 1373:4, 1373:12, 1373:23, 1375:2, 1375:5, 1376:25, 1377:10, 1380:14, 1380:15, 1380:19, 1385:15, 1389:2, 1389:5, 1390:2, 1390:17, 1391:2, 1391:7, 1395:21, 1397:4, 1397:6, 1397:17, 1398:3, 1398:13, 1398:18, 1398:24, 1400:18, 1400:19, 1401:8, 1401:9, 1401:10, 1401:25, 1403:7, 1403:12, 1403:14, 1404:15, 1404:19, 1404:21, 1404:22, 1404:24, 1405:13, 1406:5, 1406:14, 1406:16, 1407:2, 1407:7, 1407:12, 1407:13, 1407:20, 1407:22, 1408:14, 1409:2, 1409:4, 1409:15, 1410:3, 1410:5, 1410:8, 1410:13, 1410:19, 1410:23, 1411:15, 1412:4, 1413:1, 1414:14, 1414:17, 1415:6, 1415:8, 1415:18, 1415:22, 1416:3, 1416:9, 1416:15, 1416:18, 1416:22, 1416:25, 1417:6, 1417:15, 1417:18, 1418:5, 1418:10, 1418:18, 1419:11, 1425:1, 1425:6, 1426:1, 1426:18, 1426:19, 1426:21, 1426:24, 1429:3, 1429:7, 1430:5, 1502:1, 1513:13, 1513:21, 1515:17, 1521:11, 1521:13, 1521:16, 1522:5, 1522:12, 1523:9, 1524:11, 1527:23
**NASL's** [89] - 1253:14, 1257:8, 1260:8,

1260:17, 1261:8, 1261:11, 1262:16, 1262:24, 1264:1, 1264:2, 1264:14, 1265:12, 1265:21, 1267:10, 1267:12, 1270:19, 1271:9, 1271:10, 1271:22, 1271:24, 1272:18, 1273:1, 1274:1, 1274:6, 1274:17, 1275:12, 1275:15, 1276:16, 1276:23, 1277:12, 1277:15, 1278:1, 1278:4, 1278:14, 1278:17, 1279:3, 1279:6, 1279:15, 1279:18, 1280:2, 1280:5, 1280:14, 1280:17, 1281:1, 1281:4, 1281:13, 1282:3, 1284:14, 1284:23, 1289:2, 1290:25, 1291:10, 1293:23, 1293:25, 1298:5, 1301:19, 1302:11, 1302:12, 1303:22, 1304:1, 1304:8, 1304:11, 1304:15, 1306:7, 1307:19, 1308:14, 1312:7, 1332:17, 1347:24, 1404:8, 1406:6, 1407:1, 1408:13, 1408:17, 1408:22, 1409:4, 1410:23, 1410:25, 1411:7, 1411:8, 1411:10, 1411:11, 1411:22, 1412:1, 1415:18, 1418:16, 1418:22, 1420:22, 1522:7

**NASL/USL** [1] - 1402:17
**nation** [1] - 1467:14
**national** [10] - 1258:19, 1259:19, 1303:13, 1320:7, 1321:17, 1345:13, 1364:2, 1455:9, 1455:14, 1461:6
**National** [3] - 1363:2, 1477:20, 1478:10
**natural** [1] - 1421:21
**nature** [3] - 1257:23, 1272:12, 1465:7
**NBA** [22] - 1303:19, 1363:3, 1363:5, 1363:6, 1363:8, 1364:3, 1364:4, 1364:7, 1364:10, 1364:19, 1364:23, 1365:1, 1365:2, 1379:12, 1421:2, 1421:3, 1421:14, 1423:2, 1423:4, 1431:25, 1432:4, 1432:18
**near** [1] - 1305:13
**necessarily** [1] - 1321:7
**necessary** [2] - 1350:3, 1422:7
**need** [19] - 1252:25, 1269:2, 1295:6, 1322:23, 1322:24, 1324:18, 1324:23, 1333:14, 1335:21, 1352:2, 1371:22, 1409:19, 1462:23, 1484:12, 1488:4, 1488:20, 1491:15, 1499:3, 1523:8
**needed** [22] - 1259:6, 1260:19, 1311:2, 1313:17, 1313:21, 1313:22, 1313:24, 1314:5, 1314:6, 1314:9, 1323:16, 1324:22, 1325:1, 1327:1, 1341:12, 1342:1, 1342:11, 1353:20, 1371:25, 1372:16, 1424:4, 1443:10
**Needed** [1] - 1260:21
**needing** [2] - 1314:13, 1314:15
**needs** [1] - 1317:13
**negative** [1] - 1455:15
**negotiate** [1] - 1297:8
**negotiating** [1] - 1378:20
**negotiations** [1] - 1461:1
**negotiator** [9] - 1500:17, 1505:18, 1506:10, 1508:2, 1508:6, 1517:11,

1520:18, 1522:8, 1524:20
**negotiators** [4] - 1519:23, 1521:10, 1523:9, 1525:4
**neighborhood** [1] - 1528:21
**neighborhoods** [1] - 1366:6
**NEIL** [1] - 1250:24
**Neptune** [2] - 1362:1, 1430:8
**net** [2] - 1301:6, 1358:20
**never** [22] - 1262:12, 1319:3, 1319:8, 1327:20, 1335:9, 1340:17, 1343:8, 1349:4, 1428:1, 1434:6, 1450:8, 1489:7, 1489:9, 1489:10, 1493:12, 1498:19, 1498:22, 1500:24, 1504:9, 1504:10, 1517:8, 1517:21
**Never** [1] - 1405:17
**Nevertheless** [1] - 1497:9
**NEW** [1] - 1250:1
**new** [33] - 1255:13, 1255:18, 1269:12, 1288:16, 1289:10, 1299:9, 1302:14, 1302:16, 1302:17, 1316:18, 1324:25, 1368:17, 1369:16, 1372:16, 1376:14, 1461:2, 1466:5, 1468:20, 1485:10, 1499:12, 1499:15, 1501:19, 1502:7, 1502:13, 1502:15, 1502:19, 1503:4, 1503:8, 1503:25, 1504:1, 1510:8, 1513:1, 1523:3
**New** [18] - 1250:6, 1250:15, 1251:2, 1251:7, 1259:14, 1277:7, 1277:21, 1288:16, 1316:11, 1362:19, 1363:9, 1364:13, 1366:12, 1379:12, 1415:25, 1477:25
**Next** [2] - 1353:22, 1359:20
**next** [63] - 1252:12, 1268:7, 1273:15, 1274:5, 1274:14, 1294:19, 1301:21, 1307:1, 1311:16, 1324:13, 1324:18, 1336:2, 1338:7, 1341:11, 1353:10, 1353:23, 1354:5, 1358:14, 1359:23, 1361:22, 1382:16, 1383:2, 1399:2, 1407:5, 1408:16, 1429:13, 1430:4, 1430:5, 1436:3, 1437:25, 1438:6, 1442:13, 1443:3, 1455:25, 1456:1, 1458:15, 1458:20, 1461:12, 1462:15, 1462:16, 1464:20, 1464:21, 1466:21, 1469:3, 1469:16, 1469:19, 1471:6, 1472:7, 1472:25, 1476:1, 1479:9, 1484:11, 1485:21, 1487:25, 1488:19, 1491:19, 1492:6, 1492:12, 1494:1, 1514:12, 1515:1, 1522:18
**NFL** [6] - 1431:25, 1432:4, 1432:16, 1432:25, 1433:1, 1433:4
**night** [3] - 1496:20, 1529:18, 1533:13
**Nike** [6] - 1378:15, 1397:9, 1397:12, 1397:16, 1398:2, 1487:19
**nine** [5] - 1255:10, 1261:8, 1302:3, 1337:10, 1363:13
**nine-month** [1] - 1255:10
**nobody** [2] - 1388:18, 1410:13
**NOLAN** [1] - 1251:16
**NolanEDNY@aol.com** [1] - 1251:17
**noncompliance** [2] - 1337:9, 1337:14

**None** [1] - 1502:9
**none** [5] - 1340:16, 1502:11, 1502:19, 1516:9, 1525:5
**nonetheless** [1] - 1310:17
**nonpayment** [1] - 1407:7
**nonprovisional** [1] - 1269:15
**nonresponsive** [1] - 1471:20
**nonsensical** [1] - 1282:20
**noon** [2] - 1529:22, 1533:7
**normally** [2] - 1352:23, 1505:2
**north** [2] - 1511:2, 1528:21
**NORTH** [1] - 1250:4
**North** [9] - 1278:22, 1284:11, 1288:18, 1299:10, 1359:15, 1366:22, 1367:2, 1441:22, 1463:25
**note** [21] - 1290:5, 1345:17, 1455:22, 1455:23, 1462:2, 1471:18, 1472:18, 1481:7, 1481:14, 1481:19, 1481:21, 1481:23, 1481:24, 1481:25, 1482:9, 1482:10, 1482:14, 1483:25, 1484:3, 1485:15, 1511:22
**notebook** [1] - 1428:19
**notes** [7] - 1274:13, 1439:21, 1440:5, 1471:3, 1471:16, 1471:19, 1472:15
**nothing** [17] - 1255:17, 1317:14, 1362:5, 1363:6, 1390:14, 1390:18, 1390:22, 1390:23, 1391:1, 1391:6, 1391:17, 1395:21, 1396:2, 1396:3, 1427:14, 1517:7, 1531:11
**Nothing** [1] - 1359:18
**notice** [2] - 1255:13, 1408:18
**November** [8] - 1264:21, 1266:9, 1268:21, 1435:14, 1439:22, 1443:15, 1456:4, 1466:24
**nowhere** [2] - 1305:13, 1385:25
**Nuggets** [2] - 1364:9, 1364:10
**number** [42] - 1255:1, 1261:15, 1261:19, 1262:5, 1269:4, 1272:13, 1274:20, 1285:1, 1289:8, 1294:22, 1295:7, 1295:14, 1295:15, 1297:2, 1299:7, 1305:20, 1305:22, 1305:24, 1310:22, 1311:13, 1312:3, 1312:5, 1312:8, 1313:19, 1314:4, 1314:8, 1320:22, 1321:20, 1350:19, 1359:10, 1406:21, 1428:17, 1437:1, 1438:24, 1446:2, 1449:2, 1474:8, 1475:5, 1482:9, 1529:1
**Number** [1] - 1470:7
**numbers** [11] - 1316:3, 1412:14, 1412:18, 1412:19, 1412:20, 1441:23, 1451:7, 1475:2, 1475:7, 1528:19, 1528:23
**Nunez** [8] - 1279:20, 1280:1, 1280:4, 1281:14, 1281:19, 1282:12, 1347:9
**NWSL** [2] - 1303:15, 1345:17
**NY** [3] - 1250:15, 1251:2, 1251:17

# O

**o'clock** [2] - 1360:19, 1365:18
**Oaks** [1] - 1250:20
**oath** [3] - 1391:14, 1502:10, 1502:12
**object** [1] - 1404:25
**objected** [2] - 1335:6, 1405:2
**objection** [57] - 1265:2, 1266:13, 1266:15, 1267:21, 1271:2, 1273:20, 1286:15, 1287:8, 1290:10, 1291:22, 1294:5, 1304:25, 1331:12, 1335:3, 1335:9, 1338:22, 1339:3, 1355:7, 1355:25, 1361:12, 1361:13, 1382:1, 1382:6, 1383:25, 1384:7, 1384:11, 1392:3, 1393:2, 1394:6, 1395:16, 1395:22, 1396:25, 1400:9, 1400:24, 1401:16, 1402:7, 1402:24, 1403:15, 1403:17, 1404:5, 1405:24, 1406:18, 1407:14, 1407:23, 1408:24, 1409:23, 1417:7, 1420:17, 1423:11, 1439:25, 1457:15, 1467:4, 1470:1, 1476:14, 1477:14, 1480:20, 1493:4
**Objection** [19] - 1275:7, 1283:1, 1313:8, 1337:19, 1338:17, 1339:11, 1342:21, 1346:18, 1346:21, 1348:19, 1349:14, 1355:4, 1355:15, 1355:20, 1355:21, 1355:25, 1357:6, 1433:9, 1453:16
**objections** [1] - 1335:8
**objective** [1] - 1265:24
**objectives** [3] - 1457:8, 1457:17, 1457:19
**obligation** [8] - 1497:10, 1501:9, 1501:25, 1502:6, 1502:12, 1508:13, 1525:25, 1526:4
**obscure** [1] - 1505:23
**obviously** [10] - 1284:21, 1291:12, 1295:13, 1326:22, 1344:19, 1392:12, 1405:7, 1429:10, 1504:23, 1529:5
**occasions** [1] - 1358:9
**occupation** [1] - 1365:6
**occur** [1] - 1503:16
**October** [9] - 1265:19, 1307:5, 1358:5, 1400:17, 1406:4, 1408:13, 1412:2, 1412:3, 1476:5
**odd** [2] - 1455:17, 1510:11
**OF** [2] - 1250:1, 1250:11
**offer** [9] - 1331:11, 1361:5, 1369:19, 1400:8, 1457:12, 1457:14, 1487:2, 1487:3, 1529:8
**offered** [7] - 1283:22, 1292:16, 1305:16, 1309:13, 1324:4, 1324:8, 1397:8
**office** [2] - 1365:19, 1376:15
**officer** [5] - 1270:7, 1415:24, 1431:17, 1431:18, 1431:19
**official** [4] - 1351:3, 1373:6, 1373:12, 1375:4
**offsite** [2] - 1463:11, 1487:8

**often** [5] - 1366:19, 1418:23, 1419:2, 1419:4, 1452:18
**Oklahoma** [2] - 1364:15, 1502:18
**Olympic** [2] - 1278:21, 1303:14
**Olympics** [2] - 1277:21, 1282:16
**once** [10] - 1262:21, 1283:18, 1335:22, 1374:19, 1377:22, 1421:3, 1426:18, 1489:23, 1495:6, 1533:7
**One** [3] - 1439:6, 1439:11, 1503:6
**one** [131] - 1252:9, 1253:22, 1257:22, 1259:17, 1261:12, 1262:1, 1265:9, 1265:16, 1266:23, 1267:25, 1269:10, 1271:16, 1280:10, 1295:13, 1295:15, 1298:16, 1299:9, 1299:16, 1300:10, 1300:14, 1300:18, 1300:24, 1303:14, 1303:15, 1303:17, 1305:23, 1310:14, 1312:17, 1313:11, 1317:7, 1317:10, 1324:1, 1324:12, 1326:2, 1326:25, 1327:16, 1327:25, 1335:6, 1340:15, 1341:3, 1344:17, 1345:22, 1345:25, 1346:2, 1346:24, 1347:1, 1347:4, 1347:6, 1347:15, 1348:16, 1349:8, 1351:19, 1352:15, 1353:10, 1353:23, 1354:8, 1363:18, 1386:14, 1387:14, 1397:9, 1401:19, 1402:10, 1403:13, 1406:3, 1410:13, 1412:3, 1418:5, 1420:2, 1420:3, 1428:16, 1433:6, 1433:11, 1434:2, 1434:10, 1436:14, 1437:10, 1442:7, 1442:18, 1442:23, 1445:5, 1447:16, 1450:12, 1452:18, 1452:20, 1453:2, 1453:19, 1457:9, 1457:17, 1457:19, 1458:5, 1458:24, 1461:12, 1462:5, 1465:4, 1469:13, 1469:17, 1471:10, 1481:4, 1484:1, 1484:8, 1486:6, 1488:2, 1498:2, 1500:22, 1503:23, 1506:24, 1510:14, 1511:25, 1512:5, 1514:7, 1515:1, 1515:3, 1515:4, 1515:5, 1515:8, 1515:9, 1517:24, 1521:12, 1523:8, 1523:14, 1524:19, 1525:9, 1527:14, 1527:18, 1529:15, 1529:17, 1530:15, 1531:17
**ones** [8] - 1312:18, 1344:1, 1354:2, 1463:17, 1486:17, 1486:18
**ongoing** [2] - 1261:16, 1326:3
**ooOoo** [1] - 1533:17
**open** [5] - 1252:1, 1255:20, 1272:14, 1361:3, 1510:1
**opener** [1] - 1410:13
**opening** [6] - 1255:21, 1262:22, 1268:16, 1268:23, 1305:4, 1414:25
**operate** [3] - 1257:20, 1366:10, 1432:22
**operated** [1] - 1466:19
**operates** [4] - 1366:11, 1431:24, 1432:10, 1468:24
**operating** [2] - 1270:7, 1415:24
**operations** [5] - 1376:9, 1382:5, 1426:19, 1426:25, 1431:6
**operative** [5] - 1498:5, 1498:8, 1514:5,

1525:22, 1532:6
**operator** [5] - 1315:6, 1356:15, 1356:16, 1437:3, 1437:11
**operators** [3] - 1323:6, 1432:21, 1437:2
**opining** [1] - 1501:2
**opinion** [14] - 1301:8, 1305:3, 1310:17, 1343:16, 1497:2, 1497:8, 1506:25, 1515:5, 1519:14, 1525:10, 1530:13, 1530:14, 1531:24, 1531:25
**opinions** [2] - 1282:22, 1500:5
**opportunities** [3] - 1261:24, 1309:14, 1369:7
**opportunity** [7] - 1292:16, 1368:2, 1372:24, 1433:14, 1487:11, 1489:22, 1512:12
**opposed** [5] - 1384:19, 1385:6, 1396:17, 1429:7, 1469:10
**opted** [1] - 1487:22
**option** [1] - 1532:14
**options** [3] - 1253:17, 1340:15, 1341:3
**oranges** [1] - 1519:12
**orchestrate** [1] - 1375:17
**order** [11] - 1258:11, 1258:15, 1258:16, 1268:18, 1323:17, 1368:8, 1371:25, 1372:12, 1424:4, 1498:12, 1498:16
**Oregon** [2] - 1327:22, 1327:23
**organization** [8] - 1278:8, 1278:9, 1280:21, 1283:3, 1296:25, 1301:7, 1303:6, 1454:12
**organizations** [2] - 1356:12, 1419:21
**original** [3] - 1457:20, 1504:8, 1527:11
**originally** [2] - 1417:18, 1515:23
**Orlando** [1] - 1259:14
**otherwise** [5] - 1254:5, 1313:7, 1326:19, 1507:7, 1507:8
**Ottowa** [4] - 1406:15, 1408:19, 1409:2, 1411:1
**ourselves** [2] - 1292:21, 1298:17
**out-of-pocket** [1] - 1398:17
**outdoor** [1] - 1257:20
**Outdoor** [1] - 1392:16
**outer** [2] - 1505:8, 1505:9
**outline** [2] - 1262:2, 1262:3
**outlined** [1] - 1299:12
**outright** [2] - 1342:19, 1343:2
**outside** [4] - 1337:3, 1346:4, 1451:20, 1451:23
**outstanding** [1] - 1353:16
**overall** [1] - 1485:10
**overcome** [1] - 1442:14
**overruled** [6] - 1291:8, 1335:8, 1406:1, 1406:23, 1407:17, 1407:24
**Overruled** [3] - 1266:15, 1267:23, 1273:22
**oversee** [1] - 1431:6
**owed** [1] - 1407:7
**own** [25] - 1283:5, 1371:14, 1372:18, 1378:12, 1379:3, 1384:25, 1407:2,

1407:21, 1408:13, 1408:17, 1408:22, 1410:23, 1411:7, 1411:10, 1411:22, 1412:1, 1419:10, 1419:12, 1419:14, 1419:23, 1432:8, 1503:2, 1519:2, 1526:19

**owned** [9] - 1262:13, 1287:18, 1415:25, 1431:23, 1432:8, 1469:7, 1472:8, 1473:1, 1474:2

**owner** [37] - 1284:7, 1285:6, 1288:16, 1295:13, 1315:18, 1356:13, 1369:8, 1369:16, 1372:16, 1373:5, 1373:6, 1373:12, 1374:9, 1375:5, 1382:3, 1382:21, 1385:19, 1385:22, 1387:10, 1387:24, 1390:2, 1397:6, 1401:8, 1401:24, 1404:15, 1404:19, 1405:5, 1412:4, 1416:3, 1428:11, 1429:7, 1432:8, 1433:3, 1433:4

**owners** [38] - 1285:4, 1287:15, 1292:14, 1292:21, 1295:10, 1295:11, 1300:17, 1312:5, 1315:6, 1315:10, 1315:25, 1316:1, 1358:20, 1368:18, 1368:23, 1371:11, 1400:19, 1401:8, 1401:25, 1404:15, 1429:3, 1431:24, 1433:14, 1436:15, 1436:17, 1440:18, 1440:19, 1442:14, 1442:16, 1448:19, 1472:8, 1473:2, 1474:2, 1489:8, 1492:5

**owners'** [1] - 1464:13

**ownership** [8] - 1356:17, 1356:20, 1369:14, 1374:7, 1391:25, 1398:21, 1432:7, 1447:19

**owns** [4] - 1295:13, 1432:21, 1433:1, 1433:4

# P

**p.m** [4] - 1361:20, 1493:9, 1493:15, 1510:1

**Pacific** [8] - 1259:8, 1327:5, 1327:21, 1327:24, 1328:8, 1358:17, 1392:21, 1393:7

**package** [2] - 1320:17, 1320:25

**packages** [1] - 1321:1

**PAGE** [1] - 1534:3

**Page** [46] - 1270:4, 1281:7, 1281:9, 1296:13, 1297:4, 1298:20, 1299:19, 1300:20, 1351:18, 1391:21, 1392:15, 1393:25, 1395:4, 1396:20, 1398:1, 1440:8, 1440:10, 1441:15, 1441:16, 1443:3, 1443:4, 1443:12, 1443:13, 1445:16, 1447:7, 1447:8, 1450:13, 1458:1, 1462:16, 1462:20, 1463:23, 1465:23, 1468:25, 1470:7, 1470:13, 1470:14, 1470:17, 1470:18, 1470:25, 1471:14, 1478:13, 1478:14, 1501:24, 1502:9

**page** [53] - 1257:15, 1285:10, 1294:9, 1294:19, 1306:4, 1311:16, 1316:5, 1331:17, 1332:5, 1332:6, 1332:9,

1332:13, 1332:14, 1332:16, 1334:10, 1336:2, 1337:22, 1350:1, 1350:19, 1353:22, 1354:5, 1399:2, 1404:18, 1406:8, 1408:16, 1420:13, 1444:23, 1450:12, 1454:1, 1456:6, 1456:11, 1457:4, 1458:15, 1462:15, 1463:2, 1463:3, 1463:4, 1463:5, 1463:7, 1463:10, 1464:20, 1467:1, 1469:19, 1473:19, 1479:9, 1487:25, 1494:11, 1495:8, 1496:23, 1509:24, 1522:18

**Pages** [1] - 1502:17

**pages** [3] - 1275:9, 1332:25, 1353:7

**paid** [15] - 1308:21, 1376:22, 1407:8, 1472:13, 1472:22, 1474:5, 1474:16, 1474:19, 1475:6, 1475:8, 1475:19, 1495:25, 1499:12, 1517:15

**Palmer** [2] - 1296:6, 1416:3

**Palmer's** [1] - 1429:10

**Papadakis** [5] - 1349:19, 1349:21, 1350:2, 1358:14, 1359:3

**paper** [1] - 1476:13

**papers** [1] - 1500:22

**paragraph** [35] - 1257:19, 1264:12, 1265:15, 1267:2, 1267:25, 1271:5, 1283:12, 1307:1, 1358:7, 1358:14, 1406:11, 1408:17, 1410:22, 1428:20, 1441:17, 1442:13, 1445:24, 1446:10, 1450:23, 1453:22, 1453:24, 1454:4, 1454:21, 1465:1, 1467:7, 1467:17, 1467:18, 1478:14, 1483:5, 1484:11, 1486:4, 1486:25, 1488:19, 1494:12

**Paragraph** [1] - 1350:2

**paragraphs** [4] - 1290:13, 1449:17, 1454:17, 1488:3

**paralympian** [1] - 1302:22

**Paralympic** [1] - 1302:24

**parameters** [1] - 1301:3

**Park** [1] - 1250:15

**Parlow** [3] - 1278:20, 1282:15

**parol** [5] - 1511:16, 1514:2, 1519:19, 1520:13, 1522:1

**parole** [1] - 1500:13

**Part** [1] - 1449:1

**part** [58] - 1259:3, 1263:23, 1272:11, 1272:15, 1272:17, 1281:8, 1288:2, 1289:24, 1297:14, 1305:23, 1317:1, 1317:2, 1317:3, 1319:1, 1323:14, 1332:2, 1341:18, 1365:8, 1369:9, 1373:20, 1376:19, 1377:6, 1378:14, 1378:21, 1380:2, 1385:16, 1391:4, 1392:25, 1393:17, 1393:19, 1397:6, 1404:17, 1410:6, 1418:22, 1424:21, 1425:19, 1425:21, 1440:25, 1449:1, 1450:2, 1454:25, 1464:22, 1467:18, 1468:9, 1468:22, 1470:6, 1472:3, 1473:1, 1474:1, 1475:21, 1496:7, 1512:14, 1513:3, 1527:7, 1527:10, 1527:14, 1527:15, 1527:25

**partially** [2] - 1318:5, 1452:3

**participant** [1] - 1508:3

**participate** [2] - 1305:10, 1376:19

**participated** [2] - 1273:12, 1294:13

**particular** [8] - 1260:22, 1278:24, 1328:19, 1337:12, 1428:17, 1447:1, 1449:20, 1498:9

**particularly** [2] - 1484:25, 1511:23

**parties** [21] - 1252:13, 1287:9, 1301:5, 1361:4, 1500:19, 1505:19, 1506:5, 1506:9, 1506:10, 1506:12, 1508:4, 1509:14, 1511:13, 1512:2, 1512:17, 1516:9, 1516:11, 1516:25, 1520:18, 1525:5, 1525:24

**parting** [1] - 1265:25

**partly** [1] - 1432:12

**partner** [7] - 1338:15, 1338:20, 1339:10, 1371:17, 1385:6, 1454:9, 1455:4

**partners** [7] - 1378:12, 1383:3, 1433:15, 1450:17, 1466:1, 1467:25, 1487:10

**partnership** [8] - 1355:2, 1355:9, 1355:11, 1355:18, 1464:23, 1465:3, 1465:12, 1465:19

**partnerships** [1] - 1383:1

**parts** [2] - 1377:5, 1494:18

**party** [6] - 1469:11, 1498:21, 1507:23, 1512:11, 1512:14, 1512:20

**passing** [1] - 1514:22

**past** [4] - 1360:11, 1441:24, 1446:1, 1490:7

**paste** [1] - 1471:8

**pastes** [1] - 1471:15

**path** [5] - 1268:6, 1268:22, 1283:15, 1283:23, 1287:16

**Pause** [2] - 1439:9, 1453:21

**pause** [1] - 1262:4

**pay** [10] - 1356:25, 1386:2, 1468:7, 1474:14, 1475:16, 1513:13, 1517:18, 1517:22, 1522:5, 1524:12

**paycheck** [2] - 1496:1, 1496:5

**payer** [1] - 1474:12

**paying** [2] - 1408:7

**payment** [6] - 1467:24, 1502:15, 1509:7, 1515:14, 1515:25, 1526:3

**payments** [5] - 1474:9, 1475:8, 1495:10, 1496:3, 1531:4

**Payne** [1] - 1402:16

**pays** [2] - 1474:7, 1474:10

**PEARSON** [4] - 1250:19, 1250:20, 1250:21, 1250:23

**penalty** [1] - 1389:5

**pending** [1] - 1290:15

**Pennsylvania** [1] - 1251:10

**people** [24] - 1276:21, 1282:8, 1282:18, 1282:21, 1283:3, 1345:17, 1346:7, 1358:18, 1368:10, 1368:15, 1370:18, 1375:11, 1379:24, 1381:16, 1382:18, 1383:20, 1385:12, 1389:14, 1415:7, 1415:9, 1415:17, 1422:20, 1441:19

VB        OCR        CRR

ALL WORD INDEX_____29

**percent** [12] - 1369:14, 1459:8, 1459:9, 1459:14, 1459:18, 1459:19, 1466:15, 1466:16, 1513:13, 1514:7, 1515:19, 1527:22
**percentage** [4] - 1459:11, 1474:16, 1475:12, 1475:18
**perception** [1] - 1464:22
**percipient** [1] - 1335:13
**perfect** [2] - 1371:8, 1422:7
**performance** [2] - 1449:21, 1485:6
**performing** [1] - 1284:18
**period** [36] - 1254:14, 1268:12, 1269:8, 1269:9, 1269:11, 1269:18, 1269:20, 1269:23, 1273:13, 1274:21, 1287:14, 1293:16, 1309:12, 1324:5, 1340:4, 1341:11, 1343:13, 1343:15, 1362:23, 1372:19, 1436:9, 1437:20, 1438:4, 1447:17, 1447:24, 1448:1, 1448:7, 1448:11, 1449:2, 1449:6, 1449:9, 1450:7, 1452:4, 1466:2, 1467:22, 1468:14
**periods** [4] - 1269:5, 1323:22, 1323:24, 1359:11
**permission** [2] - 1448:23, 1448:24
**permit** [1] - 1511:9
**permitted** [2] - 1267:4, 1529:1
**PERRA** [1] - 1251:8
**persist** [1] - 1497:16
**persisting** [2] - 1530:7, 1532:20
**person** [4] - 1360:13, 1410:12, 1514:12
**personal** [8] - 1376:2, 1378:11, 1378:12, 1379:3, 1380:12, 1486:8, 1486:14
**personally** [11] - 1284:23, 1308:5, 1371:12, 1387:24, 1410:9, 1413:2, 1413:7, 1413:10, 1419:9, 1424:12, 1425:2
**personnel** [1] - 1272:12
**perspective** [4] - 1328:17, 1382:3, 1483:15, 1483:22
**persuasive** [1] - 1501:5
**pertaining** [2] - 1512:2, 1512:4
**Peter** [3] - 1469:19, 1469:21, 1473:12
**Peterson** [20] - 1264:1, 1264:5, 1264:21, 1267:17, 1270:10, 1273:6, 1273:10, 1273:15, 1274:1, 1274:5, 1330:22, 1330:25, 1331:24, 1332:4, 1332:7, 1332:10, 1332:12, 1400:18, 1406:5, 1418:6
**ph** [1] - 1402:16
**phase** [3] - 1447:16, 1449:12
**phases** [2] - 1447:9, 1447:11
**Philadelphia** [1] - 1259:14
**phone** [5] - 1276:14, 1276:15, 1290:16, 1341:7, 1418:3
**phrase** [3] - 1423:24, 1424:15, 1495:6
**pick** [3] - 1364:7, 1420:24, 1496:16
**Picking** [1] - 1269:17
**picture** [4] - 1276:19, 1276:25, 1282:8,

1337:6
**pieces** [1] - 1476:15
**pitch** [1] - 1358:19
**place** [15] - 1253:7, 1262:9, 1263:3, 1276:16, 1281:13, 1286:21, 1292:8, 1298:7, 1329:12, 1337:5, 1386:14, 1386:15, 1386:18, 1397:22
**places** [1] - 1387:4
**plain** [9] - 1423:6, 1498:17, 1500:9, 1508:20, 1508:21, 1512:23, 1523:17, 1525:21, 1529:11
**Plaintiff** [4] - 1250:5, 1250:14, 1362:7, 1430:14
**plaintiff** [5] - 1403:12, 1416:17, 1428:9, 1428:21, 1429:6
**plaintiff's** [1] - 1530:9
**Plaintiff's** [8] - 1457:16, 1467:6, 1470:24, 1477:16, 1535:10, 1535:11, 1535:12, 1535:13
**plaintiffs** [2] - 1361:6, 1532:14
**plan** [28] - 1253:18, 1253:19, 1299:12, 1305:14, 1305:16, 1306:10, 1306:20, 1323:11, 1323:12, 1323:13, 1341:19, 1375:23, 1380:12, 1419:15, 1419:21, 1419:24, 1419:25, 1420:1, 1420:16, 1433:24, 1434:1, 1482:17, 1482:21, 1482:24, 1483:3
**planning** [2] - 1252:24, 1375:11
**plans** [6] - 1384:10, 1384:15, 1388:2, 1388:7, 1389:8, 1478:3
**plaque** [8] - 1347:23, 1348:21, 1348:22, 1348:23, 1348:24, 1349:4, 1349:12, 1357:3
**play** [56] - 1258:8, 1258:12, 1258:18, 1258:22, 1284:15, 1291:13, 1293:18, 1341:14, 1348:12, 1348:13, 1348:15, 1358:17, 1359:23, 1360:7, 1363:17, 1364:20, 1365:17, 1366:12, 1366:14, 1377:13, 1379:4, 1379:9, 1385:8, 1385:9, 1386:16, 1386:23, 1386:25, 1387:3, 1387:5, 1387:15, 1387:18, 1387:21, 1391:11, 1393:11, 1393:15, 1394:3, 1394:14, 1394:24, 1395:13, 1396:4, 1396:22, 1410:16, 1422:10, 1422:14, 1422:23, 1426:12, 1426:14, 1426:15, 1426:16, 1426:24, 1427:1, 1427:3, 1450:19, 1452:2, 1497:22
**played** [18] - 1269:22, 1287:2, 1302:24, 1316:22, 1348:16, 1360:14, 1363:1, 1363:5, 1364:13, 1390:19, 1390:23, 1391:9, 1392:11, 1392:12, 1421:16, 1421:22, 1422:8
**player** [18] - 1278:22, 1303:13, 1345:14, 1379:12, 1416:9, 1416:15, 1416:17, 1416:19, 1416:21, 1416:22, 1416:25, 1417:6, 1417:14, 1420:23, 1433:8, 1434:3, 1450:13, 1483:10
**players** [27] - 1368:18, 1376:13, 1376:15, 1379:20, 1381:21, 1381:25, 1382:12, 1385:10, 1385:23, 1385:24,

1386:1, 1386:2, 1386:14, 1386:20, 1386:21, 1387:13, 1415:7, 1415:8, 1415:17, 1416:22, 1433:17, 1441:21, 1450:19, 1450:24, 1451:5, 1451:24
**playing** [23] - 1298:8, 1308:25, 1355:12, 1359:7, 1364:19, 1364:23, 1365:17, 1367:10, 1367:25, 1370:5, 1376:25, 1378:8, 1378:10, 1379:23, 1380:15, 1385:16, 1386:3, 1387:4, 1389:6, 1393:14, 1395:7, 1421:18, 1426:8
**Plaza** [1] - 1251:17
**pleas** [1] - 1265:21
**pleased** [1] - 1291:12
**pled** [3] - 1261:19, 1404:3, 1414:20
**plenty** [1] - 1465:17
**plus** [2] - 1288:16, 1513:13
**PM** [2] - 1365:15, 1365:16
**pocket** [2] - 1386:4, 1398:17
**podcast** [2] - 1365:12, 1365:14
**podcasts** [2] - 1365:10, 1365:12
**point** [56] - 1254:16, 1256:1, 1315:15, 1323:10, 1326:22, 1328:16, 1332:20, 1339:16, 1346:9, 1350:3, 1359:2, 1368:1, 1368:12, 1370:1, 1371:6, 1371:23, 1372:1, 1373:2, 1374:1, 1375:6, 1379:8, 1380:19, 1385:2, 1385:14, 1386:16, 1387:7, 1388:11, 1389:5, 1398:6, 1412:22, 1429:11, 1436:6, 1437:10, 1447:12, 1459:16, 1462:22, 1473:4, 1483:6, 1488:17, 1503:16, 1503:25, 1505:20, 1511:7, 1511:21, 1515:12, 1516:8, 1516:17, 1525:9, 1526:15, 1527:5, 1528:19, 1530:16, 1531:9, 1532:4, 1532:5
**pointed** [1] - 1330:13
**pointing** [1] - 1297:16
**points** [2] - 1262:5, 1481:15
**political** [3] - 1460:4, 1460:11, 1460:23
**population** [2] - 1328:4, 1368:15
**portfolio** [2] - 1460:3, 1460:10
**Portion** [2] - 1454:6, 1535:9
**portions** [1] - 1407:8
**Portland** [1] - 1364:16
**position** [17] - 1319:3, 1319:17, 1325:16, 1364:19, 1431:16, 1469:7, 1483:15, 1510:24, 1522:7, 1522:13, 1522:14, 1522:16, 1526:6, 1529:3, 1530:17, 1530:20, 1531:12
**positions** [6] - 1318:21, 1318:24, 1319:5, 1319:11, 1319:13, 1364:21
**positive** [3] - 1375:21, 1390:12, 1469:9
**positively** [1] - 1396:3
**possibility** [2] - 1436:22, 1436:24
**possible** [9] - 1272:16, 1305:11, 1315:9, 1321:10, 1338:12, 1387:20, 1387:22, 1392:8, 1529:15
**possibly** [1] - 1283:17

ALL WORD INDEX
30

**post** [1] - 1500:20
**posthaste** [1] - 1265:22
**potential** [9] - 1253:22, 1255:5, 1260:14, 1320:18, 1345:16, 1398:13, 1450:18, 1515:14, 1515:16
**potentially** [1] - 1253:17
**power** [1] - 1317:19
**practice** [1] - 1438:19
**preamble** [1] - 1486:5
**precisely** [1] - 1306:14
**preclude** [2] - 1519:22, 1520:21
**precluded** [2] - 1252:21, 1528:9
**preferred** [1] - 1335:22
**prejudice** [2] - 1510:20, 1518:11
**prejudiced** [1] - 1510:23
**premised** [2] - 1520:13, 1520:14
**preparation** [4] - 1275:25, 1439:21, 1443:4, 1443:20
**prepare** [4] - 1275:18, 1495:15, 1495:17, 1495:18
**prepared** [9] - 1440:6, 1440:17, 1443:9, 1467:19, 1473:20, 1473:22, 1473:25, 1528:5
**presence** [1] - 1337:4
**present** [13] - 1252:1, 1262:2, 1270:15, 1276:5, 1305:14, 1335:17, 1361:4, 1449:13, 1526:13, 1528:19, 1529:1, 1529:7, 1529:9
**presentation** [22] - 1267:5, 1270:13, 1292:16, 1295:25, 1352:15, 1435:19, 1447:13, 1461:17, 1461:19, 1461:20, 1461:24, 1462:8, 1462:10, 1462:15, 1462:16, 1463:6, 1463:8, 1463:9, 1463:12, 1463:18, 1464:2, 1464:3
**presentations** [3] - 1266:20, 1267:11, 1463:20
**presented** [8] - 1267:12, 1274:6, 1333:20, 1514:14, 1526:20, 1527:2, 1527:3, 1528:23
**presenting** [3] - 1332:7, 1409:7, 1528:9
**president** [32] - 1277:5, 1277:6, 1277:22, 1277:23, 1277:24, 1278:9, 1278:25, 1280:8, 1280:9, 1280:21, 1303:5, 1310:18, 1318:15, 1318:25, 1319:3, 1319:5, 1319:12, 1319:13, 1319:18, 1319:21, 1322:11, 1343:18, 1345:11, 1347:5, 1402:16, 1403:6, 1481:1, 1481:11, 1489:8, 1494:19
**President** [3] - 1263:25, 1272:22, 1282:11
**press** [2] - 1476:4, 1476:6
**presume** [1] - 1526:21
**presumption** [1] - 1512:13
**presumptively** [1] - 1444:12
**pretty** [3] - 1271:25, 1292:18, 1366:12
**prevail** [2] - 1498:13, 1498:17
**prevent** [1] - 1307:3
**prevented** [1] - 1389:10
**previous** [3] - 1358:9, 1367:5, 1380:6

**previously** [6] - 1257:2, 1283:13, 1283:14, 1302:18, 1325:12, 1485:9
**PRFC** [24] - 1376:2, 1376:25, 1378:2, 1378:4, 1378:7, 1378:14, 1379:23, 1380:4, 1380:11, 1384:10, 1384:15, 1385:16, 1386:23, 1386:25, 1387:3, 1387:15, 1388:24, 1389:2, 1389:6, 1389:8, 1426:24, 1427:7, 1427:9, 1427:12
**pride** [2] - 1377:22, 1383:6
**primarily** [2] - 1288:12, 1302:14
**primary** [3] - 1284:7, 1289:8, 1528:12
**principal** [4] - 1358:19, 1505:8, 1508:2, 1520:18
**principles** [1] - 1519:16
**private** [1] - 1279:25
**Pro** [2] - 1290:14, 1325:12
**pro** [11] - 1270:1, 1270:22, 1275:11, 1332:15, 1332:18, 1339:5, 1339:14, 1340:9, 1340:10, 1354:5
**problem** [4] - 1312:14, 1335:3, 1335:4, 1419:17
**problems** [1] - 1284:20
**proceed** [1] - 1357:11
**proceeding** [1] - 1500:2
**Proceedings** [1] - 1251:18
**proceedings** [2] - 1439:9, 1453:21
**proceeds** [1] - 1404:23
**process** [21] - 1255:6, 1262:3, 1266:3, 1266:24, 1292:3, 1292:7, 1292:12, 1298:18, 1346:3, 1346:8, 1376:10, 1376:17, 1376:19, 1376:20, 1378:21, 1435:2, 1435:5, 1435:10, 1435:15, 1468:17, 1494:4
**processes** [1] - 1281:22
**produce** [4] - 1365:10, 1529:21
**produced** [3] - 1251:18, 1454:19, 1455:18
**production** [1] - 1365:24
**productive** [1] - 1492:7
**profession** [2] - 1279:13, 1280:24
**Professional** [4] - 1263:24, 1272:18, 1310:8, 1392:14
**professional** [31] - 1253:13, 1257:21, 1260:7, 1260:11, 1260:12, 1264:13, 1271:7, 1271:9, 1271:11, 1271:21, 1306:8, 1306:21, 1317:14, 1330:8, 1330:9, 1330:13, 1330:14, 1338:3, 1338:14, 1339:2, 1350:8, 1350:24, 1351:8, 1358:10, 1358:15, 1362:21, 1367:20, 1420:23, 1442:19, 1442:24, 1484:6
**profits** [3] - 1450:8, 1464:17, 1507:19
**program** [2] - 1370:17, 1417:25
**progress** [13] - 1269:16, 1289:11, 1299:7, 1299:11, 1299:12, 1305:14, 1305:19, 1306:9, 1309:10, 1352:9, 1354:9, 1354:13, 1354:15
**project** [1] - 1516:20
**projection** [1] - 1446:14

**projections** [1] - 1446:11
**promise** [1] - 1402:10
**promised** [1] - 1422:13
**promises** [3] - 1288:17, 1292:25, 1293:4
**promote** [6] - 1268:25, 1379:17, 1472:22, 1474:14, 1475:10, 1475:11
**promoted** [1] - 1474:17
**promoters** [1] - 1474:17
**promoting** [1] - 1475:15
**promotion** [2] - 1483:11, 1487:12
**proper** [3] - 1254:12, 1428:12, 1515:24
**properly** [1] - 1346:17
**Properties** [1] - 1431:25
**property** [4] - 1321:11, 1428:22, 1460:2, 1460:10
**proponent** [1] - 1523:15
**proposal** [3] - 1466:5, 1467:21, 1487:20
**proposed** [5] - 1253:12, 1332:18, 1433:24, 1488:8, 1488:9
**proposes** [1] - 1467:24
**proposing** [1] - 1268:21
**propriety** [1] - 1514:3
**PROSKAUER** [2] - 1251:6, 1251:10
**prospectively** [2] - 1503:8, 1504:8
**protect** [1] - 1268:18
**protected** [2] - 1453:17, 1455:11
**proud** [1] - 1434:17
**proven** [2] - 1503:17, 1518:19
**provide** [3] - 1265:23, 1306:10, 1306:17
**provided** [4] - 1281:24, 1372:23, 1454:9, 1494:4
**provides** [2] - 1428:21, 1513:12
**providing** [1] - 1283:17
**provision** [4] - 1509:6, 1509:7, 1511:17, 1520:23
**provisional** [7] - 1268:9, 1269:14, 1283:18, 1291:10, 1324:5, 1341:19, 1342:8
**provisionally** [6] - 1306:6, 1339:25, 1340:8, 1344:21, 1350:6, 1350:22
**provisions** [3] - 1510:3, 1511:23, 1512:22
**public** [4] - 1272:13, 1272:14, 1277:10, 1411:5
**published** [31] - 1263:12, 1265:4, 1266:17, 1267:24, 1269:25, 1271:4, 1272:6, 1273:23, 1281:10, 1282:2, 1283:7, 1330:11, 1331:15, 1331:19, 1349:18, 1353:3, 1358:2, 1400:4, 1400:14, 1401:4, 1401:21, 1402:12, 1404:12, 1414:12, 1415:4, 1440:4, 1444:16, 1480:9, 1485:22, 1492:20, 1494:2
**Puerto** [60] - 1316:21, 1317:1, 1366:11, 1366:14, 1366:15, 1366:16, 1366:17, 1367:4, 1367:5, 1367:6, 1367:7, 1367:9, 1367:13, 1367:16,

VB        OCR        CRR

1367:17, 1367:20, 1368:16, 1369:4, 1370:11, 1371:23, 1377:21, 1378:1, 1378:5, 1378:7, 1378:14, 1379:4, 1379:15, 1379:25, 1381:4, 1383:20, 1384:24, 1386:25, 1387:19, 1388:8, 1388:10, 1389:1, 1390:5, 1390:9, 1390:11, 1390:12, 1392:1, 1392:12, 1392:25, 1394:2, 1394:12, 1394:13, 1394:22, 1395:6, 1395:12, 1396:17, 1396:21, 1398:16, 1398:24, 1413:21, 1414:4, 1414:14, 1414:17, 1417:19, 1420:15, 1426:14

**pull** [20] - 1263:11, 1270:20, 1272:2, 1291:14, 1293:24, 1296:7, 1301:21, 1352:6, 1358:1, 1392:12, 1400:3, 1400:12, 1401:2, 1404:10, 1406:11, 1414:11, 1420:6, 1420:13, 1430:10

**pundits** [1] - 1441:23

**purchase** [4] - 1391:25, 1413:21, 1414:4, 1487:2

**purchased** [1] - 1392:4

**purchasing** [1] - 1487:20

**purpose** [1] - 1454:4

**purposes** [5] - 1275:23, 1415:1, 1501:14, 1510:6, 1523:24

**pursue** [1] - 1530:8

**put** [40] - 1255:18, 1259:4, 1275:21, 1281:25, 1292:2, 1292:6, 1297:2, 1305:6, 1323:17, 1329:9, 1329:20, 1330:9, 1331:18, 1341:8, 1350:16, 1352:21, 1353:1, 1364:3, 1365:20, 1375:18, 1423:1, 1428:8, 1435:14, 1435:25, 1444:11, 1461:12, 1466:22, 1488:15, 1500:16, 1501:19, 1503:9, 1505:21, 1508:15, 1511:1, 1515:1, 1517:21, 1517:25, 1518:25, 1523:20

**puts** [1] - 1528:11

**putting** [4] - 1335:12, 1415:21, 1503:19, 1523:14

**PX-062** [4] - 1480:8, 1480:19, 1480:22, 1535:14

**PX-097** [1] - 1492:19

**PX-10** [3] - 1361:7, 1361:16, 1535:1

**PX-11** [3] - 1361:8, 1361:16, 1535:1

**PX-36** [1] - 1331:4

**PX-445** [5] - 1477:3, 1477:4, 1477:13, 1477:16, 1535:13

**PX-466** [4] - 1453:5, 1453:6, 1454:6, 1535:9

**PX-576** [3] - 1361:7, 1361:16, 1535:1

**PX-601** [2] - 1470:24, 1535:12

**PX-609** [4] - 1466:21, 1467:3, 1467:6, 1535:11

**PX-610** [4] - 1469:16, 1469:17, 1469:25, 1470:17

**PX-614** [3] - 1438:6, 1440:4, 1535:8

**PX-616** [1] - 1476:1

**PX-617** [4] - 1456:1, 1457:14, 1457:16, 1535:10

**PX-620** [3] - 1331:4, 1331:11, 1331:14

**PX-9** [3] - 1361:7, 1361:16, 1535:1

**PX-97** [3] - 1493:3, 1493:6, 1535:15

## Q

**qualification** [1] - 1497:6

**qualify** [3] - 1455:10, 1455:15, 1503:4

**qualifying** [2] - 1454:13, 1455:8

**quality** [2] - 1450:19, 1452:2

**quarter** [1] - 1429:16

**QUESTION** [10] - 1391:22, 1394:2, 1395:5, 1395:9, 1395:12, 1396:21, 1398:2, 1513:10, 1513:20, 1513:23

**questioned** [3] - 1275:2, 1428:7, 1441:24

**questioning** [3] - 1254:9, 1262:7, 1420:24

**questions** [46] - 1254:13, 1255:7, 1260:6, 1265:11, 1269:4, 1286:18, 1299:15, 1307:13, 1309:16, 1320:1, 1323:21, 1324:11, 1325:24, 1335:4, 1335:11, 1335:13, 1335:14, 1335:23, 1335:24, 1338:2, 1344:24, 1356:10, 1357:8, 1357:10, 1359:10, 1359:16, 1385:11, 1389:19, 1392:5, 1394:8, 1395:18, 1398:8, 1420:19, 1423:15, 1423:20, 1425:1, 1425:23, 1427:4, 1428:4, 1428:13, 1437:7, 1471:9, 1494:3, 1494:7, 1503:15, 1506:16

**quick** [2] - 1443:7, 1466:12

**quickly** [4] - 1264:15, 1298:19, 1435:14, 1441:20

**quite** [8] - 1279:23, 1303:13, 1314:12, 1321:10, 1321:13, 1325:24, 1366:19, 1428:15

**quote** [13] - 1262:8, 1265:24, 1265:25, 1404:19, 1405:16, 1406:13, 1407:6, 1408:18, 1410:25, 1411:15, 1507:21, 1507:22, 1507:23

## R

**racketeering** [1] - 1403:8

**RAE** [1] - 1250:17

**raise** [4] - 1252:3, 1271:22, 1362:2, 1497:6

**raised** [5] - 1266:14, 1270:18, 1335:9, 1459:12, 1497:8

**raises** [2] - 1279:12, 1498:2

**raising** [1] - 1335:2

**ran** [1] - 1471:24

**range** [1] - 1475:20

**rare** [3] - 1445:11, 1445:12, 1489:22

**rarely** [3] - 1489:18, 1490:4

**RATHBUN** [1] - 1361:13

**rather** [1] - 1515:17

**ratings** [5] - 1422:22, 1446:4, 1446:23, 1449:22, 1450:4

**re** [2] - 1309:17, 1494:25

**RE** [2] - 1309:23, 1534:7

**re-cross** [1] - 1309:17

**RE-CROSS** [1] - 1309:23

**RE-DIRECT** [1] - 1534:7

**re-stating** [1] - 1494:25

**reach** [13] - 1277:14, 1278:3, 1278:16, 1279:5, 1279:17, 1280:4, 1280:16, 1281:3, 1303:24, 1410:8, 1417:18, 1468:19, 1468:23

**reached** [7] - 1410:13, 1417:15, 1417:16, 1444:7, 1468:20, 1516:4, 1529:25

**reacting** [1] - 1379:24

**reaction** [9] - 1287:5, 1287:11, 1288:10, 1299:4, 1299:5, 1299:6, 1374:10, 1377:18, 1381:14

**read** [26] - 1264:11, 1265:15, 1265:16, 1267:2, 1274:15, 1283:12, 1290:13, 1332:6, 1360:3, 1406:17, 1407:9, 1407:15, 1409:9, 1411:7, 1412:2, 1420:8, 1421:21, 1433:23, 1443:6, 1453:7, 1471:7, 1496:19, 1499:5, 1513:3, 1520:15, 1520:16

**reading** [13] - 1283:4, 1350:14, 1368:10, 1391:21, 1393:25, 1395:4, 1398:1, 1409:1, 1460:8, 1462:19, 1499:6, 1508:17, 1530:1

**reads** [5] - 1257:19, 1307:1, 1428:20, 1499:11, 1512:1

**ready** [4] - 1328:24, 1360:18, 1430:12, 1510:7

**real** [4] - 1280:11, 1475:1, 1521:3, 1521:21

**Real** [1] - 1475:15

**really** [17] - 1282:8, 1299:8, 1367:6, 1372:16, 1375:15, 1383:3, 1385:11, 1418:23, 1424:4, 1428:9, 1436:24, 1459:6, 1475:4, 1488:4, 1521:13, 1526:16

**reapplying** [1] - 1307:3

**reargue** [1] - 1528:16

**reason** [30] - 1255:5, 1255:10, 1255:12, 1274:10, 1286:8, 1311:9, 1338:13, 1390:7, 1390:10, 1393:13, 1393:15, 1393:18, 1393:19, 1397:16, 1398:2, 1419:4, 1421:14, 1422:10, 1422:14, 1422:17, 1423:1, 1428:8, 1455:20, 1469:9, 1469:14, 1514:24, 1524:24, 1526:9

**reasonable** [6] - 1268:6, 1283:20, 1500:25, 1507:6, 1520:19, 1524:16

**reasonableness** [2] - 1503:17, 1503:25

**reasonably** [1] - 1503:18

**reasons** [11] - 1253:23, 1261:12, 1272:13, 1335:6, 1433:6, 1433:11, 1434:3, 1460:4, 1460:11, 1469:13, 1530:12

**receipt** [1] - 1265:18

ALL WORD INDEX 32

**receive** [9] - 1308:6, 1308:10, 1308:14, 1308:17, 1308:22, 1348:22, 1373:1, 1421:19, 1472:3
**received** [25] - 1287:24, 1308:20, 1331:14, 1347:22, 1349:11, 1373:21, 1374:12, 1400:11, 1401:1, 1401:11, 1401:18, 1402:3, 1402:9, 1402:17, 1402:20, 1403:1, 1408:18, 1421:19, 1425:19, 1425:20, 1480:22, 1493:6, 1495:10, 1495:24, 1496:3
**receives** [2] - 1458:16, 1458:20
**receiving** [4] - 1283:17, 1351:12, 1371:6, 1400:20
**recent** [1] - 1486:6
**recently** [3] - 1277:9, 1283:16, 1303:15
**Recently** [1] - 1408:18
**recertified** [1] - 1435:6
**Recess** [2] - 1329:3, 1429:18
**recess** [1] - 1360:24
**recognition** [2] - 1348:25, 1349:9
**recognize** [5] - 1283:10, 1331:7, 1438:17, 1438:18, 1495:5
**recollection** [9] - 1252:25, 1294:17, 1306:13, 1306:15, 1332:22, 1339:21, 1352:25, 1390:20, 1396:14
**recommendation** [48] - 1260:15, 1260:16, 1289:2, 1289:4, 1289:7, 1290:18, 1290:22, 1291:9, 1338:4, 1338:9, 1338:13, 1338:14, 1338:20, 1338:24, 1339:1, 1339:5, 1339:9, 1339:14, 1339:16, 1339:18, 1339:25, 1340:2, 1340:13, 1340:22, 1340:24, 1342:17, 1342:19, 1343:1, 1343:5, 1343:9, 1343:11, 1343:14, 1343:19, 1343:21, 1343:23, 1344:9, 1344:10, 1344:11, 1344:12, 1344:15, 1344:20, 1344:22, 1345:24, 1352:22, 1354:6, 1354:16, 1489:21
**recommendations** [6] - 1260:7, 1343:12, 1343:25, 1344:4, 1344:6, 1490:19
**recommended** [13] - 1289:25, 1291:7, 1340:8, 1340:11, 1340:14, 1340:18, 1340:25, 1341:4, 1341:8, 1345:13, 1345:15, 1347:8, 1347:10
**record** [3] - 1360:6, 1415:1, 1441:22
**recorded** [1] - 1251:18
**records** [2] - 1474:22, 1475:1
**recount** [2] - 1503:20, 1504:8
**recross** [1] - 1427:15
**RECROSS** [2] - 1358:3, 1534:8
**RECROSS-EXAMINATION** [2] - 1358:3, 1534:8
**recused** [1] - 1276:5
**Red** [1] - 1363:12
**redactions** [2] - 1281:8, 1281:9
**Redirect** [1] - 1357:9
**redirect** [2] - 1423:16, 1503:7
**REDIRECT** [2] - 1423:18, 1534:12

**redo** [1] - 1528:2
**reduced** [1] - 1311:5
**refer** [4] - 1368:20, 1378:1, 1378:4, 1443:10
**reference** [4] - 1270:12, 1335:16, 1337:11, 1502:5
**referenced** [5] - 1266:24, 1269:7, 1333:22, 1506:24, 1525:11
**referred** [3] - 1259:8, 1333:6, 1366:25
**referring** [19] - 1262:11, 1281:20, 1293:13, 1296:22, 1323:24, 1369:11, 1372:14, 1374:5, 1374:22, 1377:3, 1381:12, 1386:9, 1418:11, 1451:19, 1451:20, 1455:7, 1492:3, 1492:9, 1502:17
**refers** [2] - 1297:13, 1481:8
**reflect** [4] - 1265:6, 1275:10, 1304:24, 1500:19
**reflecting** [1] - 1451:12
**reflects** [3] - 1302:2, 1466:5, 1485:15
**refresh** [4] - 1252:25, 1332:22, 1352:25, 1420:6
**refuse** [1] - 1522:5
**regarding** [25] - 1253:22, 1265:11, 1270:19, 1271:24, 1273:25, 1277:15, 1278:4, 1278:17, 1279:6, 1279:18, 1280:5, 1280:17, 1281:4, 1289:2, 1303:25, 1304:3, 1344:9, 1401:9, 1402:1, 1402:17, 1418:10, 1433:17, 1476:7, 1481:23, 1512:25
**regardless** [3] - 1394:3, 1395:13, 1396:22
**registration** [2] - 1472:13, 1474:5
**rehabilitate** [2] - 1254:13, 1255:8
**reject** [1] - 1501:6
**rejected** [1] - 1527:13
**related** [16] - 1265:7, 1297:10, 1319:12, 1319:19, 1319:20, 1353:15, 1353:19, 1398:20, 1404:8, 1417:22, 1468:6, 1487:18, 1497:1, 1504:13
**relates** [3] - 1252:16, 1433:16, 1470:1
**relating** [3] - 1257:22, 1266:24, 1512:15
**relationship** [31] - 1265:22, 1271:16, 1271:23, 1297:17, 1404:9, 1406:15, 1407:1, 1408:21, 1409:5, 1409:14, 1409:21, 1411:11, 1411:17, 1452:11, 1452:15, 1452:23, 1453:2, 1455:12, 1455:13, 1461:18, 1465:5, 1467:19, 1468:9, 1469:1, 1469:6, 1469:11, 1478:15, 1480:2, 1481:15, 1486:6, 1487:17
**relationships** [3] - 1452:19, 1452:21, 1484:25
**relevant** [5] - 1516:25, 1518:15, 1518:17, 1518:19, 1520:7
**reliable** [1] - 1527:10
**relied** [3] - 1523:25, 1525:14, 1525:19
**relief** [3] - 1529:6, 1531:18
**relocate** [2] - 1386:15, 1387:5

**rely** [7] - 1498:1, 1500:5, 1501:3, 1511:10, 1517:12, 1520:19, 1520:24
**relying** [6] - 1498:11, 1508:9, 1517:19, 1520:12, 1530:7, 1532:20
**remained** [4] - 1283:14, 1449:22, 1450:24, 1451:5
**remaining** [1] - 1354:9
**remains** [1] - 1525:25
**remarks** [1] - 1457:7
**Remedi** [1] - 1461:21
**remedy** [2] - 1528:6, 1529:20
**Remember** [2] - 1509:3, 1509:17
**remember** [37] - 1263:5, 1264:9, 1273:4, 1273:13, 1284:19, 1286:10, 1299:5, 1314:5, 1316:17, 1322:10, 1329:9, 1329:13, 1338:11, 1343:16, 1344:12, 1344:17, 1345:19, 1352:5, 1352:6, 1356:11, 1356:25, 1381:1, 1396:6, 1418:15, 1418:17, 1418:19, 1420:5, 1427:5, 1435:13, 1435:24, 1436:1, 1447:10, 1447:14, 1463:10, 1476:4, 1510:7, 1517:14
**remembers** [1] - 1476:12
**remind** [5] - 1295:18, 1329:20, 1360:10, 1443:14, 1496:17
**remove** [1] - 1331:25
**renegotiate** [1] - 1321:15
**renew** [1] - 1507:24
**renewal** [3] - 1458:3, 1458:10, 1468:18
**renewed** [1] - 1467:18
**repaid** [1] - 1404:23
**repeat** [3] - 1342:24, 1370:24, 1391:3
**repeatedly** [1] - 1525:10
**rephrase** [4] - 1335:14, 1356:4, 1394:15, 1419:16
**replace** [1] - 1499:15
**replied** [1] - 1502:14
**report** [20] - 1435:15, 1435:18, 1445:16, 1445:20, 1446:6, 1447:1, 1447:3, 1447:10, 1497:24, 1497:25, 1498:3, 1510:18, 1525:13, 1529:22, 1529:24, 1530:8, 1530:10, 1530:12, 1532:21
**reported** [2] - 1445:21, 1451:8
**Reporter** [1] - 1251:16
**reporter** [2] - 1439:12, 1495:2
**reporters** [1] - 1494:3
**represent** [2] - 1392:13, 1408:12
**representation** [3] - 1371:18, 1410:24, 1459:20
**representative** [5] - 1278:23, 1280:10, 1303:3, 1356:20, 1444:25
**representatives** [7] - 1263:10, 1274:13, 1285:4, 1300:16, 1319:24, 1337:4, 1445:5
**represented** [6] - 1302:23, 1303:4, 1356:2, 1411:10, 1436:17, 1437:4
**representing** [3] - 1273:8, 1274:3, 1277:10
**reputational** [1] - 1411:2

VB         OCR         CRR

ALL WORD INDEX                                                    33

**request** [10] - 1252:8, 1267:10, 1270:12, 1271:9, 1299:4, 1299:7, 1301:15, 1301:16, 1418:15, 1438:2
**requested** [6] - 1267:11, 1270:14, 1295:1, 1324:20, 1325:2, 1351:22
**requesting** [1] - 1351:19
**requests** [1] - 1266:19
**Requests** [1] - 1353:11
**require** [7] - 1294:21, 1358:16, 1448:15, 1503:9, 1512:18, 1523:3, 1529:21
**required** [7] - 1258:24, 1259:5, 1295:19, 1305:13, 1341:18, 1346:20, 1514:20
**requirement** [10] - 1260:1, 1260:2, 1289:11, 1295:9, 1312:15, 1328:18, 1328:20, 1341:24, 1352:8, 1358:21
**requirements** [13] - 1310:4, 1310:19, 1310:20, 1317:16, 1327:16, 1327:25, 1328:7, 1342:8, 1342:10, 1358:19, 1358:24, 1392:16
**requires** [1] - 1502:15
**research** [6] - 1368:9, 1370:22, 1371:1, 1371:11, 1450:17, 1496:19
**reservations** [1] - 1497:14
**resetting** [1] - 1503:10
**resolution** [1] - 1402:2
**resolve** [5] - 1297:21, 1298:12, 1298:16, 1509:15, 1521:17
**resolved** [5] - 1265:22, 1326:18, 1326:21, 1326:22, 1523:7
**resolves** [1] - 1500:23
**resolving** [3] - 1465:9, 1465:14, 1465:20
**respect** [20] - 1253:3, 1253:11, 1265:23, 1271:8, 1290:1, 1291:3, 1293:9, 1293:15, 1294:22, 1304:4, 1304:6, 1304:8, 1304:15, 1484:15, 1490:15, 1491:10, 1498:9, 1511:20, 1529:15
**respected** [1] - 1495:2
**respectfully** [1] - 1511:15
**respond** [2] - 1284:23, 1529:2
**responded** [1] - 1455:24
**response** [12] - 1263:1, 1282:7, 1291:10, 1291:17, 1305:8, 1378:16, 1440:25, 1453:8, 1492:22, 1502:21, 1513:16, 1515:2
**responses** [1] - 1389:14
**responsibilities** [4] - 1282:25, 1397:7, 1431:4, 1434:10
**responsibility** [1] - 1504:21
**responsible** [1] - 1431:11
**rest** [7] - 1323:1, 1324:7, 1333:1, 1363:14, 1387:1, 1438:21, 1473:24
**restructure** [1] - 1436:21
**restructuring** [3] - 1265:24, 1436:16, 1436:20
**result** [5] - 1308:18, 1308:23, 1428:22, 1500:12, 1529:9

**resulting** [1] - 1466:3
**resume** [1] - 1388:14
**resumes** [1] - 1256:8
**retired** [2] - 1362:21, 1365:2
**return** [2] - 1294:13, 1389:8
**returns** [1] - 1404:24
**revenue** [10] - 1320:18, 1321:6, 1446:11, 1446:14, 1459:8, 1459:15, 1459:16, 1466:15, 1475:12, 1487:11
**revenues** [1] - 1432:23
**review** [8] - 1260:14, 1274:23, 1274:25, 1355:24, 1418:16, 1497:23, 1507:21, 1512:12
**reviewed** [6] - 1260:21, 1325:8, 1341:17, 1346:23, 1476:3, 1476:10
**reviews** [2] - 1448:15, 1448:16
**revised** [8] - 1252:7, 1252:10, 1252:14, 1481:7, 1482:6, 1482:7, 1482:8, 1482:10
**revision** [1] - 1482:12
**revisions** [2] - 1253:13, 1482:9
**revitalize** [1] - 1368:2
**Rican** [4] - 1366:16, 1367:6, 1367:7, 1377:21
**Rico** [56] - 1316:21, 1317:1, 1366:11, 1366:14, 1366:15, 1366:17, 1367:4, 1367:5, 1367:9, 1367:13, 1367:16, 1367:17, 1367:20, 1368:16, 1369:4, 1370:11, 1371:23, 1378:1, 1378:5, 1378:7, 1378:14, 1379:4, 1379:15, 1379:25, 1381:4, 1383:20, 1384:24, 1386:25, 1387:19, 1388:8, 1388:10, 1389:1, 1390:5, 1390:9, 1390:11, 1390:12, 1392:1, 1392:12, 1392:25, 1394:2, 1394:12, 1394:13, 1394:22, 1395:6, 1395:12, 1396:17, 1396:21, 1398:16, 1398:24, 1413:21, 1414:4, 1414:14, 1414:17, 1417:19, 1420:15, 1426:14
**rid** [2] - 1331:1, 1332:24
**rights** [16] - 1320:5, 1320:6, 1320:9, 1320:10, 1320:17, 1321:5, 1321:6, 1321:13, 1457:10, 1457:18, 1468:18, 1469:9, 1472:22, 1475:6, 1487:3, 1487:21
**ripe** [1] - 1502:22
**rise** [1] - 1509:11
**Rishi** [4] - 1273:7, 1400:18, 1406:6, 1415:18
**risk** [4] - 1454:12, 1455:5, 1455:8, 1455:13
**risks** [1] - 1455:12
**RIZIK** [1] - 1250:18
**road** [1] - 1387:7
**Robert** [3] - 1296:5, 1360:14, 1416:3
**Rocco** [2] - 1415:21, 1415:23
**Rockets** [1] - 1364:16
**Rocky** [1] - 1316:8
**role** [3] - 1260:23, 1318:24, 1480:24
**Ronald** [1] - 1287:19

**room** [3] - 1301:4, 1301:12, 1529:15
**ROSE** [2] - 1251:6, 1251:10
**rose** [1] - 1504:23
**rothenberg** [1] - 1323:15
**Rothenberg** [1] - 1323:19
**roughly** [2] - 1280:22, 1373:9
**round** [1] - 1280:19
**route** [1] - 1368:5
**routinely** [1] - 1445:4
**Routinely** [1] - 1445:6
**Rowdies** [6] - 1404:20, 1405:12, 1406:14, 1408:19, 1409:3, 1411:1
**rubber** [5] - 1254:10, 1255:24, 1256:3, 1304:5, 1304:10
**rubber-stamping** [1] - 1254:10
**ruined** [1] - 1386:17
**rule** [8] - 1510:16, 1512:18, 1518:6, 1527:1, 1528:2, 1528:5, 1529:4, 1533:6
**Rule** [11] - 1499:2, 1499:3, 1499:22, 1504:23, 1504:24, 1507:7, 1507:11, 1518:8, 1519:5, 1519:11
**ruled** [5] - 1417:10, 1501:2, 1524:8, 1527:11, 1530:7
**rules** [1] - 1439:11
**ruling** [2] - 1338:23, 1516:24
**run** [2] - 1345:17, 1362:21
**running** [6] - 1375:6, 1375:9, 1376:5, 1376:8, 1376:11, 1376:23
**runs** [1] - 1471:5
**RUSKIN** [22] - 1251:8, 1338:17, 1338:22, 1339:11, 1346:18, 1346:21, 1355:4, 1355:7, 1355:15, 1355:20, 1355:25, 1433:9, 1439:25, 1453:16, 1453:20, 1462:19, 1467:4, 1470:1, 1476:14, 1477:14, 1489:23, 1490:6

# S

**Sachs** [1] - 1277:19
**Sacramento** [4] - 1328:2, 1328:4, 1328:8, 1328:9
**sacrifice** [2] - 1422:1, 1427:9
**safety** [1] - 1301:5
**salaries** [5] - 1433:8, 1434:4, 1451:18, 1451:19, 1451:20
**salary** [1] - 1451:12
**sales** [6] - 1369:15, 1467:24, 1468:5, 1468:6, 1474:16, 1481:1
**San** [8] - 1250:22, 1251:5, 1259:16, 1259:17, 1287:20, 1324:17, 1328:14
**sanction** [81] - 1253:16, 1254:14, 1258:7, 1259:22, 1271:10, 1283:17, 1283:18, 1283:24, 1284:2, 1284:12, 1284:15, 1289:5, 1289:16, 1289:21, 1290:2, 1291:11, 1300:1, 1300:12, 1304:14, 1307:8, 1308:19, 1308:24, 1309:2, 1313:6, 1318:8, 1321:4, 1322:24, 1323:3, 1323:10, 1323:16,

VB          OCR          CRR

ALL WORD INDEX _____34

1323:25, 1324:6, 1325:4, 1325:22, 1326:6, 1326:9, 1326:11, 1326:14, 1326:16, 1326:23, 1327:1, 1341:19, 1343:2, 1343:10, 1343:19, 1343:20, 1352:8, 1354:25, 1355:1, 1355:10, 1359:6, 1380:20, 1381:6, 1381:10, 1381:24, 1382:4, 1382:9, 1382:22, 1384:2, 1385:3, 1385:16, 1385:20, 1389:13, 1392:17, 1426:18, 1434:20, 1434:24, 1437:21, 1446:16, 1446:21, 1448:2, 1448:8, 1448:13, 1449:10, 1510:11, 1516:2, 1521:9, 1522:9, 1526:8, 1530:22

**Sanction** [1] - 1381:11
**sanctioned** [11] - 1271:9, 1290:19, 1307:24, 1308:2, 1344:21, 1359:14, 1392:9, 1435:7, 1441:4, 1442:11, 1473:2
**sanctioning** [32] - 1253:14, 1255:6, 1261:1, 1264:8, 1266:3, 1274:18, 1281:23, 1283:9, 1288:18, 1288:21, 1289:14, 1290:25, 1291:4, 1292:3, 1292:7, 1292:12, 1293:5, 1301:20, 1306:3, 1307:16, 1307:19, 1307:22, 1308:15, 1322:20, 1352:18, 1353:12, 1354:6, 1391:1, 1395:21, 1448:6, 1475:11, 1489:21
**sanctions** [6] - 1309:7, 1357:5, 1391:7, 1396:1, 1396:2, 1396:3
**sat** [1] - 1254:7
**satisfied** [1] - 1523:21
**satisfies** [1] - 1506:13
**satisfy** [3] - 1306:8, 1312:15, 1327:16
**Saturday** [1] - 1271:8
**save** [5] - 1381:21, 1381:22, 1405:21
**saw** [9] - 1270:12, 1358:6, 1377:19, 1377:21, 1377:22, 1428:1, 1506:2
**saying's** [1] - 1508:18
**scandal** [3] - 1262:14, 1413:22, 1414:5
**schedule** [2] - 1377:5, 1377:7
**schedule's** [1] - 1387:6
**scheduled** [1] - 1485:5
**scheme** [4] - 1295:7, 1404:21, 1405:14, 1405:18
**School** [1] - 1277:7
**Schwarzenegger** [1] - 1279:24
**scope** [5] - 1393:2, 1403:19, 1404:25, 1405:2, 1405:24
**Scott** [1] - 1482:15
**SCOTT** [1] - 1251:9
**screen** [8] - 1330:10, 1331:18, 1351:13, 1398:22, 1443:7, 1462:20, 1462:21, 1463:6
**scroll** [1] - 1272:17
**scrolling** [1] - 1353:9
**season** [56] - 1257:10, 1284:15, 1288:21, 1288:24, 1291:11, 1294:1, 1294:12, 1294:14, 1294:21, 1295:2, 1302:5, 1302:12, 1302:13, 1304:20, 1306:19, 1313:22, 1325:23, 1344:3,

1348:16, 1349:24, 1351:11, 1353:12, 1353:16, 1355:10, 1359:7, 1363:18, 1364:15, 1364:16, 1364:17, 1377:1, 1377:3, 1377:6, 1377:8, 1377:12, 1377:13, 1378:19, 1380:2, 1380:4, 1380:6, 1380:14, 1380:20, 1383:24, 1387:1, 1387:3, 1387:16, 1387:18, 1389:6, 1393:16, 1426:4, 1426:8, 1426:22, 1441:5, 1441:7, 1441:25, 1472:12
**seasons** [7] - 1362:22, 1362:23, 1364:16, 1364:17, 1389:11, 1440:10, 1441:9
**seat** [1] - 1358:18
**seated** [5] - 1256:9, 1329:5, 1361:21, 1362:11, 1430:3
**seats** [1] - 1395:10
**Seattle** [2] - 1259:17, 1435:17
**second** [33] - 1256:1, 1261:13, 1261:16, 1267:2, 1267:3, 1282:1, 1306:4, 1311:15, 1324:20, 1345:17, 1347:20, 1348:2, 1350:22, 1353:24, 1354:8, 1377:1, 1377:3, 1377:6, 1377:7, 1377:12, 1378:10, 1380:2, 1428:20, 1443:7, 1446:10, 1449:9, 1453:19, 1457:4, 1459:5, 1466:6, 1466:12, 1486:4
**Second** [1] - 1517:24
**Secretary** [2] - 1277:8, 1453:10
**secretary** [2] - 1270:7, 1291:17
**Section** [1] - 1511:25
**section** [4] - 1494:11, 1501:21, 1501:22, 1514:21
**sector** [1] - 1279:25
**secure** [1] - 1461:2
**see** [130] - 1254:12, 1254:21, 1256:4, 1256:5, 1257:15, 1257:17, 1263:22, 1263:25, 1264:3, 1264:20, 1266:8, 1267:16, 1268:2, 1268:14, 1269:1, 1270:4, 1270:21, 1271:5, 1271:19, 1272:20, 1272:24, 1273:24, 1274:8, 1274:14, 1274:22, 1276:25, 1281:11, 1281:14, 1286:24, 1291:25, 1292:4, 1292:20, 1292:23, 1293:2, 1293:11, 1294:8, 1294:11, 1294:15, 1294:20, 1294:24, 1296:14, 1296:20, 1297:5, 1297:11, 1298:14, 1298:21, 1298:24, 1299:20, 1300:21, 1301:9, 1305:22, 1306:4, 1306:11, 1306:22, 1307:6, 1324:6, 1331:21, 1333:14, 1350:9, 1350:15, 1351:1, 1351:21, 1353:4, 1353:11, 1353:13, 1353:25, 1354:1, 1358:12, 1358:25, 1377:17, 1379:7, 1379:24, 1382:21, 1383:22, 1386:12, 1392:18, 1404:16, 1405:22, 1406:8, 1411:20, 1415:9, 1415:23, 1416:4, 1422:10, 1422:14, 1428:8, 1439:3, 1440:10, 1440:15, 1443:22, 1445:1, 1446:9, 1449:24, 1450:14, 1450:25, 1455:18, 1456:2, 1456:4, 1456:6,

1457:4, 1457:7, 1457:11, 1458:4, 1458:11, 1458:13, 1458:14, 1458:23, 1461:13, 1461:21, 1461:25, 1463:3, 1463:5, 1463:7, 1468:1, 1473:3, 1476:25, 1477:6, 1485:25, 1489:19, 1491:17, 1492:24, 1493:9, 1494:11, 1495:13, 1497:5, 1502:7, 1502:22, 1506:2, 1533:3, 1533:7
**seeing** [2] - 1388:10, 1533:6
**seek** [2] - 1288:21, 1288:23
**seeking** [1] - 1289:16
**seem** [3] - 1254:8, 1335:12, 1498:23
**Sehgal** [39] - 1253:15, 1266:8, 1273:7, 1273:10, 1274:2, 1291:16, 1292:1, 1292:20, 1293:13, 1293:20, 1296:5, 1296:14, 1296:17, 1296:22, 1297:5, 1298:21, 1301:23, 1400:19, 1406:6, 1406:12, 1406:25, 1407:6, 1415:18, 1498:10, 1500:10, 1500:15, 1502:8, 1503:6, 1504:15, 1508:23, 1517:5, 1517:7, 1517:11, 1517:17, 1523:16, 1523:20, 1523:21, 1523:23, 1532:22
**Sehgal's** [15] - 1299:1, 1497:5, 1497:15, 1502:25, 1508:17, 1511:9, 1513:1, 1514:7, 1520:4, 1522:12, 1525:11, 1525:12, 1525:14, 1530:11, 1531:13
**select** [1] - 1488:5
**selected** [2] - 1345:11, 1476:15
**selling** [1] - 1434:7
**sells** [1] - 1279:12
**send** [9] - 1455:23, 1473:11, 1481:19, 1481:23, 1482:2, 1483:17, 1483:21, 1484:4, 1484:17
**sending** [3] - 1438:19, 1482:11, 1483:20
**sends** [1] - 1474:25
**senior** [4] - 1277:23, 1431:18, 1431:19, 1481:5
**sense** [10] - 1258:10, 1259:18, 1269:12, 1269:22, 1310:23, 1328:6, 1328:20, 1340:10, 1387:24, 1485:7
**sent** [28] - 1255:13, 1267:16, 1306:2, 1349:19, 1349:22, 1351:3, 1352:12, 1402:16, 1405:6, 1439:20, 1454:25, 1455:20, 1461:21, 1462:10, 1469:23, 1470:21, 1471:16, 1473:9, 1473:10, 1473:15, 1482:5, 1482:6, 1484:9, 1484:20, 1485:18, 1486:2, 1486:21
**sentence** [19] - 1264:12, 1267:3, 1273:15, 1274:5, 1274:14, 1274:22, 1350:22, 1407:5, 1470:14, 1470:15, 1471:23, 1472:25, 1486:19, 1491:19, 1492:6, 1492:10, 1492:12, 1492:15, 1498:2
**sentences** [1] - 1273:24
**sentiment** [1] - 1300:9
**sentiments** [1] - 1322:1
**separate** [6] - 1298:1, 1315:18, 1315:25, 1316:1, 1407:19, 1520:8

VB        OCR        CRR

**separated** [3] - 1310:11, 1315:13, 1315:14
**separately** [1] - 1340:2
**September** [8] - 1296:1, 1306:17, 1341:23, 1350:4, 1480:15, 1485:5, 1485:25, 1487:23
**series** [5] - 1252:5, 1252:12, 1265:6, 1265:8, 1278:11
**Serious** [1] - 1283:3
**serious** [3] - 1271:14, 1282:8, 1497:14
**seriously** [2] - 1282:25, 1295:15
**servant** [1] - 1277:10
**served** [1] - 1277:21
**server** [1] - 1403:14
**serves** [1] - 1366:5
**Services** [1] - 1277:8
**session** [3] - 1263:14, 1264:6, 1272:10
**SESSION** [1] - 1361:1
**sessions** [1] - 1290:17
**set** [11] - 1258:14, 1286:5, 1287:7, 1290:22, 1298:1, 1406:3, 1439:10, 1449:3, 1458:2, 1477:19, 1528:19
**setting** [1] - 1497:13
**settled** [3] - 1504:11, 1517:20, 1517:21
**settlement** [8] - 1252:15, 1297:8, 1515:25, 1516:3, 1516:11, 1516:12, 1516:19, 1516:22
**seven** [5] - 1332:5, 1332:14, 1332:16, 1332:25, 1449:9
**seventh** [1] - 1314:22
**several** [12] - 1261:24, 1268:7, 1271:12, 1273:13, 1310:2, 1318:11, 1333:8, 1335:20, 1340:6, 1346:5, 1384:16, 1457:9
**Shalala** [14] - 1277:1, 1277:3, 1277:4, 1277:11, 1277:14, 1281:16, 1281:20, 1282:9, 1345:1, 1345:9, 1345:13, 1345:23, 1453:9, 1453:10
**shape** [1] - 1253:2
**share** [7] - 1320:21, 1320:22, 1432:9, 1432:22, 1432:23, 1466:3
**shared** [5] - 1271:14, 1390:7, 1459:8, 1459:15, 1459:22
**sharing** [4] - 1320:14, 1320:18, 1459:25, 1466:1
**sheer** [1] - 1514:3
**sheets** [1] - 1464:3
**Sherman** [2] - 1250:20, 1428:24
**short** [3] - 1295:14, 1330:5, 1431:8
**shortly** [1] - 1315:16
**show** [14] - 1275:3, 1306:9, 1349:16, 1349:22, 1352:9, 1398:20, 1428:9, 1438:6, 1438:7, 1438:21, 1460:5, 1463:9, 1466:21, 1492:19
**showed** [8] - 1275:10, 1287:23, 1304:18, 1306:1, 1329:16, 1329:21, 1330:7, 1349:16
**showing** [2] - 1262:22, 1437:24
**shown** [4] - 1289:11, 1299:8, 1414:24,

1416:24
**shows** [4] - 1329:25, 1353:8, 1365:11, 1414:17
**shut** [1] - 1367:25
**shutting** [1] - 1442:17
**shy** [1] - 1282:21
**SI** [1] - 1494:6
**side** [7] - 1334:9, 1494:16, 1497:3, 1498:21, 1503:14, 1507:20
**Sidebar** [3] - 1334:10, 1335:1, 1336:1
**sign** [6] - 1323:17, 1372:7, 1372:12, 1372:19, 1373:3, 1373:5
**signature** [2] - 1400:6, 1467:1
**signed** [22] - 1372:9, 1372:23, 1373:25, 1374:4, 1374:6, 1374:7, 1374:9, 1375:4, 1383:12, 1413:21, 1413:23, 1414:1, 1414:2, 1414:3, 1414:6, 1424:3, 1424:6, 1425:6, 1425:9, 1425:19, 1513:20
**significance** [3] - 1509:8, 1510:15, 1527:24
**significant** [7] - 1411:5, 1446:1, 1451:17, 1465:6, 1474:5, 1484:12, 1509:15
**signing** [2] - 1373:22, 1414:9
**silly** [4] - 1295:15, 1300:7, 1423:6, 1423:10
**similar** [1] - 1507:20
**similarly** [1] - 1337:13
**simple** [6] - 1314:12, 1510:20, 1511:4, 1529:12, 1529:14, 1529:17
**simplest** [1] - 1527:25
**simply** [7] - 1305:9, 1314:13, 1421:11, 1423:1, 1508:8, 1518:1, 1531:16
**single** [13] - 1295:9, 1295:13, 1343:17, 1387:24, 1403:13, 1422:8, 1432:13, 1432:16, 1432:18, 1432:20, 1447:20, 1474:12, 1498:2
**single-entity** [5] - 1432:13, 1432:16, 1432:18, 1432:20, 1447:20
**singularity** [1] - 1396:17
**sinister** [1] - 1405:19
**sister** [1] - 1496:1
**sit** [8] - 1272:14, 1272:15, 1333:17, 1337:10, 1375:22, 1430:10, 1488:4, 1498:14
**sitting** [9] - 1302:25, 1332:21, 1333:3, 1333:15, 1334:4, 1337:2, 1344:11, 1508:17, 1519:24
**situation** [14] - 1260:24, 1263:8, 1281:24, 1299:21, 1299:24, 1300:5, 1331:23, 1332:12, 1343:22, 1371:8, 1476:7, 1500:12, 1518:11, 1532:7
**situations** [1] - 1295:13
**six** [12] - 1332:9, 1415:7, 1415:9, 1415:11, 1437:3, 1437:10, 1441:9, 1495:8, 1498:3, 1526:16, 1530:11, 1532:6
**sixth** [9] - 1314:24, 1315:2, 1315:5, 1315:8, 1316:1, 1316:2, 1316:4,

1441:7, 1443:1
**size** [1] - 1314:6
**skills** [1] - 1499:6
**skillset** [2] - 1422:3, 1427:12
**skip** [2] - 1366:21, 1477:3
**Skipper** [4] - 1481:11, 1481:23, 1485:14, 1485:19
**slide** [2] - 1464:25, 1465:16
**slides** [2] - 1352:21, 1352:24
**slowly** [1] - 1265:16
**small** [4] - 1258:8, 1327:22, 1364:21, 1447:18
**so-called** [1] - 1432:13
**Soccer** [176] - 1251:3, 1251:9, 1258:24, 1260:25, 1261:8, 1261:11, 1263:15, 1264:6, 1264:16, 1265:7, 1265:12, 1266:6, 1267:10, 1268:17, 1268:21, 1270:17, 1270:22, 1271:6, 1271:12, 1271:14, 1275:15, 1277:5, 1277:22, 1277:23, 1278:25, 1279:1, 1282:4, 1282:25, 1283:8, 1283:13, 1283:14, 1283:22, 1284:11, 1287:6, 1288:18, 1289:21, 1291:7, 1292:6, 1292:11, 1293:4, 1295:22, 1296:15, 1298:5, 1299:16, 1300:23, 1301:7, 1301:14, 1306:2, 1306:5, 1307:16, 1307:18, 1307:21, 1308:6, 1308:9, 1308:13, 1308:17, 1308:22, 1309:3, 1309:6, 1316:25, 1317:2, 1318:13, 1318:14, 1318:16, 1318:21, 1319:9, 1319:12, 1319:14, 1319:21, 1321:2, 1322:9, 1322:13, 1322:16, 1349:21, 1350:7, 1350:23, 1351:4, 1355:14, 1356:15, 1356:20, 1359:14, 1359:15, 1366:23, 1367:3, 1394:4, 1395:14, 1396:23, 1430:22, 1431:5, 1431:14, 1431:16, 1431:19, 1431:23, 1432:3, 1432:9, 1433:13, 1434:2, 1434:20, 1439:16, 1440:25, 1444:18, 1444:24, 1445:4, 1445:5, 1445:13, 1448:23, 1452:11, 1452:16, 1452:25, 1454:9, 1455:4, 1456:3, 1456:7, 1457:5, 1458:9, 1458:16, 1459:9, 1459:18, 1460:25, 1461:6, 1461:16, 1462:17, 1463:12, 1463:16, 1463:18, 1463:19, 1464:23, 1465:3, 1465:13, 1465:19, 1466:3, 1466:16, 1467:8, 1467:20, 1469:2, 1471:1, 1471:5, 1471:24, 1472:2, 1472:14, 1473:3, 1474:6, 1474:7, 1474:10, 1474:14, 1474:19, 1475:11, 1475:16, 1478:3, 1480:25, 1481:5, 1481:16, 1481:25, 1482:17, 1482:25, 1483:20, 1484:12, 1484:24, 1485:10, 1489:9, 1490:9, 1491:25, 1494:6, 1495:10, 1495:11, 1495:25, 1496:2, 1496:4, 1496:6, 1496:8
**soccer** [28] - 1257:21, 1278:7, 1279:10, 1279:12, 1280:23, 1303:3, 1303:4, 1321:11, 1327:22, 1367:20, 1385:17, 1441:22, 1442:19, 1442:24,

1449:7, 1452:20, 1455:10, 1463:25, 1464:13, 1465:21, 1467:9, 1467:14, 1469:12, 1470:2, 1482:17, 1482:22, 1486:7, 1488:16

**SOCCER** [3] - 1250:4, 1250:7, 1250:8

**Soccer's** [17] - 1260:3, 1271:21, 1272:8, 1284:2, 1290:24, 1291:2, 1291:6, 1295:25, 1297:19, 1298:11, 1302:3, 1321:6, 1321:12, 1395:20, 1483:15, 1483:22, 1494:14

**soccer-specific** [1] - 1449:7

**Soccer-SUM** [3] - 1471:1, 1471:5, 1471:24

**sold** [1] - 1320:25

**solemnly** [1] - 1362:3

**solicit** [1] - 1428:9

**solid** [2] - 1438:1, 1524:18

**solution** [1] - 1287:21

**someone** [4] - 1340:3, 1506:2, 1520:24

**sometimes** [6] - 1259:8, 1378:1, 1379:14, 1438:20, 1492:16, 1494:3

**somewhat** [1] - 1432:11

**somewhere** [5] - 1300:6, 1319:22, 1426:15, 1426:16, 1528:20

**SOPHIE** [1] - 1251:16

**sophistication** [1] - 1446:4

**Sorry** [2] - 1272:3, 1272:5

**sorry** [31] - 1339:2, 1340:20, 1342:23, 1348:23, 1355:16, 1362:25, 1370:14, 1370:24, 1374:22, 1378:1, 1384:13, 1391:3, 1391:6, 1396:7, 1396:8, 1403:25, 1404:11, 1425:5, 1436:8, 1438:14, 1441:15, 1450:12, 1457:13, 1458:6, 1459:1, 1463:1, 1463:21, 1479:6, 1484:2

**sort** [14] - 1254:10, 1292:8, 1299:6, 1301:15, 1330:4, 1356:10, 1376:12, 1433:13, 1497:21, 1508:12, 1514:22, 1520:22, 1527:17, 1532:12

**sorts** [2] - 1293:19, 1299:13

**sound** [2] - 1519:14, 1519:15

**sounds** [1] - 1343:13

**source** [2] - 1308:18, 1308:23

**speaking** [8] - 1296:15, 1371:11, 1407:11, 1408:6, 1408:10, 1414:9, 1427:2, 1427:3

**specific** [19] - 1264:9, 1273:14, 1274:19, 1286:10, 1299:5, 1317:17, 1322:20, 1327:10, 1337:15, 1339:21, 1342:10, 1390:7, 1394:11, 1394:21, 1447:14, 1449:7, 1463:15, 1471:22

**specifically** [9] - 1266:4, 1273:4, 1276:13, 1292:10, 1312:23, 1338:12, 1418:17, 1497:17, 1509:6

**specifics** [5] - 1253:18, 1253:24, 1265:5, 1284:19, 1293:6

**specify** [1] - 1327:5

**speculation** [1] - 1508:18

**speculative** [3] - 1497:12, 1507:22,

1510:12

**spend** [4] - 1255:3, 1366:17, 1465:13, 1465:20

**spending** [2] - 1450:24, 1451:5

**spends** [2] - 1514:18, 1514:21

**spent** [6] - 1253:5, 1263:6, 1379:22, 1465:8, 1482:15, 1482:20

**spoken** [2] - 1384:16, 1485:9

**sponsor** [8] - 1320:11, 1321:2, 1321:10, 1378:15, 1378:16, 1378:17, 1397:17, 1398:3

**sponsoring** [1] - 1320:10

**sponsors** [33] - 1376:12, 1378:8, 1378:11, 1378:12, 1378:20, 1378:24, 1379:18, 1380:4, 1380:5, 1380:8, 1380:10, 1381:17, 1382:9, 1383:13, 1383:16, 1383:23, 1384:5, 1384:9, 1384:15, 1384:16, 1384:22, 1384:25, 1385:14, 1397:3, 1397:4, 1397:7, 1397:9, 1398:6, 1398:13, 1422:14, 1450:18, 1487:10

**sponsorship** [2] - 1379:2, 1382:25

**sponsorships** [1] - 1378:18

**sport** [15] - 1366:7, 1368:3, 1370:1, 1370:3, 1464:21, 1478:17, 1478:19, 1480:5, 1483:1, 1483:7, 1484:7, 1485:10, 1493:11, 1494:15, 1494:17

**Sports** [12] - 1356:7, 1356:11, 1356:13, 1373:16, 1374:3, 1403:4, 1403:7, 1404:3, 1404:9, 1409:5, 1413:21, 1414:4

**sports** [4] - 1303:18, 1377:20, 1432:4, 1459:19

**Sports'** [1] - 1404:22

**Square** [1] - 1251:7

**squeeze** [1] - 1496:12

**stability** [1] - 1317:17

**stadium** [23] - 1257:22, 1258:2, 1259:25, 1312:15, 1312:17, 1313:2, 1313:14, 1314:5, 1314:14, 1314:15, 1314:20, 1324:12, 1324:17, 1334:1, 1334:5, 1337:9, 1369:15, 1376:16, 1394:13, 1394:23, 1395:6, 1442:18, 1442:23

**stadiums** [10] - 1258:8, 1258:12, 1260:3, 1312:24, 1313:18, 1323:8, 1324:25, 1358:18, 1449:7

**staff** [10] - 1340:5, 1376:15, 1382:14, 1386:3, 1386:14, 1387:13, 1388:18, 1453:12, 1462:10

**stage** [2] - 1449:3, 1477:19

**stagnant** [2] - 1442:18, 1442:21

**stake** [1] - 1392:1

**stamp** [3] - 1255:24, 1256:3, 1304:5

**stampers** [1] - 1304:10

**stamping** [1] - 1254:10

**stand** [12] - 1256:7, 1256:8, 1361:15, 1361:18, 1361:19, 1361:25, 1388:3, 1429:15, 1430:8, 1511:19, 1514:4, 1518:1

**standalone** [1] - 1305:6

**standard** [5] - 1255:18, 1310:15, 1312:3, 1312:11, 1390:21

**Standards** [2] - 1310:9, 1392:14

**standards** [64] - 1252:7, 1252:11, 1252:14, 1253:13, 1255:14, 1257:16, 1257:20, 1258:2, 1260:3, 1260:20, 1261:2, 1261:4, 1263:24, 1264:13, 1267:8, 1268:9, 1268:12, 1272:18, 1283:19, 1283:20, 1290:20, 1295:1, 1295:5, 1295:19, 1298:23, 1299:3, 1299:25, 1300:12, 1305:13, 1305:15, 1306:8, 1306:21, 1309:8, 1309:9, 1310:4, 1310:5, 1310:9, 1310:10, 1310:11, 1310:14, 1310:21, 1310:23, 1317:15, 1317:18, 1324:1, 1324:7, 1327:4, 1328:3, 1330:8, 1330:9, 1330:13, 1330:14, 1332:15, 1332:19, 1341:20, 1350:8, 1350:25, 1351:8, 1358:11, 1358:16

**standing** [1] - 1358:23

**standpoint** [3] - 1369:18, 1387:23, 1460:15

**stands** [1] - 1530:11

**star** [4] - 1421:2, 1421:3, 1421:6, 1450:19

**Star** [3] - 1421:14, 1423:2, 1423:4

**start** [17] - 1323:18, 1360:18, 1374:25, 1388:19, 1389:16, 1398:21, 1471:1, 1486:5, 1496:16, 1497:2, 1499:21, 1510:21, 1518:3, 1521:11, 1522:13, 1523:10, 1531:23

**started** [13] - 1364:21, 1378:7, 1379:23, 1381:9, 1382:25, 1383:1, 1385:3, 1387:4, 1389:17, 1418:2, 1449:13, 1516:2, 1522:10

**starting** [7] - 1281:23, 1299:20, 1377:20, 1482:19, 1510:19, 1522:6, 1529:7

**starts** [4] - 1252:6, 1453:24, 1526:5, 1531:15

**state** [7] - 1435:19, 1441:16, 1449:17, 1497:21, 1503:18, 1516:6, 1516:18

**State** [1] - 1279:22

**statement** [19] - 1268:24, 1273:25, 1287:10, 1287:11, 1300:25, 1320:24, 1324:9, 1350:14, 1359:2, 1422:8, 1465:15, 1469:4, 1478:2, 1482:19, 1491:1, 1491:14, 1495:8, 1526:18

**statements** [10] - 1268:17, 1304:18, 1305:5, 1321:18, 1321:22, 1322:4, 1335:21, 1414:25, 1478:9, 1493:20

**states** [4] - 1298:21, 1358:8, 1460:24, 1512:11

**STATES** [3] - 1250:1, 1250:7, 1250:12

**States** [42] - 1250:5, 1251:2, 1258:9, 1259:1, 1259:12, 1259:18, 1259:21, 1259:23, 1264:6, 1271:6, 1282:11, 1289:23, 1300:15, 1308:22, 1316:14, 1316:24, 1316:25, 1317:1, 1317:2,

1317:3, 1317:6, 1322:15, 1350:6, 1350:23, 1351:4, 1359:8, 1392:22, 1392:25, 1393:1, 1434:2, 1434:20, 1451:20, 1451:23, 1452:11, 1452:15, 1452:25, 1461:6, 1462:17, 1465:12, 1465:19, 1472:23, 1474:15

**stating** [6] - 1451:6, 1466:10, 1490:24, 1494:25, 1523:9

**status** [23] - 1264:1, 1264:2, 1264:14, 1267:7, 1268:6, 1268:10, 1268:11, 1268:22, 1272:23, 1273:2, 1274:7, 1298:22, 1308:7, 1330:15, 1381:12, 1383:17, 1383:22, 1384:5, 1402:2, 1411:19, 1426:2, 1426:6, 1426:9

**stay** [2] - 1385:25, 1386:15

**stayed** [1] - 1364:11

**staying** [1] - 1385:4

**stenography** [1] - 1251:18

**step** [5] - 1359:21, 1382:17, 1424:16, 1427:17, 1437:17

**steps** [5] - 1331:25, 1368:7, 1374:24, 1375:8, 1375:13

**Stevenson** [4] - 1477:5, 1479:2, 1480:6, 1485:23

**sticking** [3] - 1499:3, 1499:4

**still** [19] - 1297:5, 1305:20, 1325:16, 1366:19, 1385:22, 1386:2, 1387:12, 1388:16, 1393:6, 1426:1, 1460:3, 1460:10, 1478:24, 1486:23, 1524:18, 1529:18, 1532:17, 1533:1

**stones** [1] - 1393:10

**stop** [2] - 1388:12, 1414:15

**stopped** [5] - 1388:13, 1393:14, 1397:12, 1398:6, 1398:12

**stored** [1] - 1403:14

**stores** [1] - 1278:12

**Stover** [1] - 1415:24

**straight** [2] - 1499:8, 1507:18

**straightforward** [2] - 1499:19, 1511:11

**strategic** [5] - 1454:9, 1455:4, 1478:18, 1480:4, 1484:25

**strategize** [1] - 1375:23

**strategy** [8] - 1375:18, 1431:8, 1450:13, 1488:6, 1488:13, 1488:15, 1488:16, 1488:17

**STRAWN** [1] - 1250:14

**Strawn** [1] - 1252:10

**streaming** [1] - 1258:17

**Street** [2] - 1250:22, 1251:4

**stress** [1] - 1437:16

**strictly** [2] - 1311:12, 1311:13

**strides** [2] - 1268:8, 1446:1

**strike** [4] - 1411:25, 1471:12, 1471:20

**strong** [11] - 1288:15, 1322:8, 1322:9, 1322:13, 1322:19, 1322:21, 1322:22, 1452:15, 1484:5, 1484:15

**stronger** [2] - 1292:22, 1320:2

**strongly** [2] - 1487:8, 1512:20

**structure** [17] - 1259:4, 1346:10, 1369:7, 1369:8, 1369:9, 1369:11,

1369:13, 1369:20, 1432:2, 1432:3, 1432:6, 1432:7, 1432:24, 1433:7, 1433:17, 1434:3, 1447:20

**structured** [3] - 1432:11, 1432:13, 1433:12

**struggles** [1] - 1284:23

**studio** [1] - 1365:19

**studying** [1] - 1263:7

**stuff** [2] - 1372:17, 1378:13

**subject** [10] - 1252:7, 1252:17, 1252:22, 1318:10, 1335:7, 1401:11, 1450:11, 1452:9, 1506:14, 1512:2

**subjects** [1] - 1446:7

**submission** [3] - 1260:17, 1262:16, 1295:24

**submit** [4] - 1346:17, 1346:20, 1448:15, 1504:6

**submitted** [7] - 1257:9, 1263:18, 1264:7, 1264:15, 1494:7, 1495:19, 1495:20

**subsection** [1] - 1406:11

**subsequent** [4] - 1337:5, 1506:11, 1506:21, 1515:5

**subsequently** [2] - 1277:22, 1352:20

**Subsequently** [1] - 1351:12

**subset** [1] - 1311:15

**subsidizes** [1] - 1464:7

**substance** [1] - 1253:4

**substantial** [6] - 1268:8, 1352:9, 1354:9, 1354:12, 1354:15, 1495:24

**substantially** [2] - 1464:11, 1466:2

**substantive** [3] - 1254:2, 1332:22, 1337:8

**succeed** [3] - 1269:1, 1298:15, 1309:11

**success** [3] - 1452:24, 1486:7

**successful** [5] - 1278:10, 1282:16, 1297:3, 1408:4, 1484:15

**successfully** [1] - 1297:7

**suddenly** [1] - 1313:6

**sufficient** [8] - 1323:13, 1458:22, 1459:3, 1459:6, 1459:7, 1459:17, 1459:22

**suggest** [1] - 1347:18

**suggested** [12] - 1274:24, 1345:25, 1346:2, 1346:4, 1346:9, 1346:16, 1346:24, 1346:25, 1347:11, 1481:13, 1484:8, 1484:17

**suggestion** [4] - 1269:8, 1282:3, 1346:11, 1346:14

**suggestions** [1] - 1481:18

**suggests** [1] - 1347:15

**Suite** [4] - 1250:19, 1250:22, 1251:4, 1251:10

**SUM** [54] - 1308:6, 1308:10, 1320:5, 1320:9, 1321:14, 1355:18, 1450:8, 1453:25, 1454:8, 1455:12, 1457:20, 1458:9, 1458:20, 1459:4, 1459:9, 1460:1, 1460:16, 1460:20, 1460:23, 1461:1, 1461:2, 1461:18, 1463:24,

1464:7, 1464:16, 1465:24, 1467:8, 1467:24, 1468:10, 1468:13, 1469:7, 1469:8, 1469:10, 1470:8, 1471:1, 1471:5, 1471:24, 1472:7, 1473:1, 1474:1, 1475:7, 1475:20, 1475:22, 1479:3, 1481:24, 1487:2, 1487:16, 1487:21, 1488:13, 1494:10, 1495:24, 1496:4, 1496:8

**SUM's** [5] - 1457:9, 1457:18, 1460:3, 1460:10, 1468:25

**SUM-USSF** [1] - 1465:24

**summarizing** [1] - 1447:5

**summary** [2] - 1330:4, 1465:24

**SUNIL** [2] - 1257:1, 1534:5

**Sunil** [18] - 1292:1, 1297:7, 1444:24, 1458:5, 1467:8, 1479:5, 1481:7, 1481:8, 1481:22, 1481:24, 1482:2, 1485:15, 1488:19, 1489:9, 1489:18, 1491:14, 1494:14, 1494:18

**Sunil's** [1] - 1482:1

**supercedes** [1] - 1512:3

**supersedes** [1] - 1498:6

**supplemental** [7] - 1252:4, 1497:23, 1511:1, 1514:19, 1526:17, 1529:22, 1530:10

**support** [12] - 1296:18, 1321:11, 1488:24, 1489:6, 1490:23, 1490:25, 1491:20, 1491:21, 1492:5, 1508:2, 1508:10

**supported** [3] - 1354:16, 1455:4, 1461:1

**supportive** [3] - 1448:3, 1448:10, 1448:12

**suppose** [1] - 1436:24

**supposed** [2] - 1408:6, 1513:18

**surface** [1] - 1358:19

**sustainable** [1] - 1437:22

**sustained** [10] - 1286:17, 1337:20, 1338:23, 1382:2, 1382:7, 1403:20, 1403:24, 1429:6, 1489:25

**Sustained** [10] - 1338:18, 1339:12, 1346:19, 1349:15, 1355:5, 1355:8, 1355:22, 1357:7, 1384:1, 1384:8

**Sutter** [3] - 1280:20, 1280:25, 1281:3

**Swann** [3] - 1371:17, 1371:19, 1376:4

**SWARTZBERG** [1] - 1250:24

**swear** [1] - 1362:3

**switch** [1] - 1505:25

**swore** [4] - 1391:16, 1393:22, 1395:2, 1420:8

**sworn** [5] - 1257:3, 1362:8, 1396:18, 1430:9, 1430:15

**sympathy** [1] - 1428:10

**Syracuse** [3] - 1363:16, 1363:17, 1364:1

# T

**table** [3] - 1417:4, 1436:22, 1497:13

VB        OCR        CRR

ALL WORD INDEX                                                                                                    38

**talent** [1] - 1421:22
**talks** [2] - 1252:15, 1450:13
**tame** [1] - 1259:8
**Tampa** [6] - 1406:14, 1408:19, 1409:3, 1411:1, 1440:23, 1442:17
**Task** [2] - 1290:14, 1325:12
**task** [40] - 1260:7, 1260:11, 1260:13, 1260:19, 1260:23, 1261:25, 1262:1, 1262:20, 1266:20, 1267:5, 1267:12, 1270:2, 1270:6, 1270:13, 1270:22, 1271:7, 1271:11, 1271:13, 1271:14, 1271:21, 1275:11, 1289:1, 1289:4, 1289:8, 1289:25, 1290:18, 1291:7, 1291:8, 1291:9, 1297:1, 1338:3, 1338:14, 1339:5, 1340:9, 1340:10, 1343:5, 1354:6, 1508:15, 1519:1
**TBR** [1] - 1402:1
**teacher** [1] - 1302:22
**team** [141] - 1285:2, 1285:3, 1287:18, 1295:14, 1296:6, 1296:17, 1298:17, 1303:13, 1306:19, 1310:4, 1310:10, 1310:18, 1310:25, 1311:1, 1311:10, 1311:14, 1312:20, 1312:22, 1313:4, 1313:7, 1313:14, 1313:17, 1314:2, 1314:10, 1314:11, 1314:18, 1315:17, 1315:19, 1316:11, 1316:21, 1317:7, 1317:9, 1320:7, 1321:17, 1327:12, 1327:15, 1327:22, 1328:7, 1328:8, 1328:14, 1341:13, 1345:13, 1348:14, 1349:8, 1353:15, 1353:19, 1353:21, 1354:1, 1354:10, 1367:5, 1367:8, 1367:20, 1368:7, 1368:24, 1369:4, 1370:10, 1370:23, 1371:3, 1371:15, 1371:16, 1373:5, 1373:6, 1373:12, 1374:16, 1374:22, 1374:23, 1375:1, 1375:5, 1375:6, 1375:8, 1375:20, 1375:25, 1376:2, 1376:4, 1376:5, 1376:8, 1376:22, 1380:10, 1381:25, 1382:5, 1382:11, 1382:13, 1382:21, 1382:22, 1384:24, 1385:9, 1385:19, 1387:10, 1387:11, 1387:15, 1387:25, 1388:3, 1388:8, 1388:17, 1388:21, 1389:10, 1395:6, 1396:4, 1398:25, 1401:8, 1405:5, 1409:7, 1410:6, 1410:15, 1412:15, 1417:21, 1417:25, 1418:2, 1418:10, 1418:11, 1418:12, 1424:13, 1424:18, 1424:21, 1425:24, 1426:11, 1429:3, 1429:7, 1431:23, 1432:8, 1433:1, 1433:4, 1434:13, 1440:6, 1440:17, 1440:22, 1440:23, 1455:9, 1455:14, 1461:6, 1475:15, 1482:16, 1497:18, 1499:16, 1501:18, 1502:18, 1512:24, 1515:18, 1532:7
**Team** [14] - 1401:9, 1404:20, 1405:12, 1406:12, 1408:14, 1408:21, 1411:17, 1477:20, 1478:10, 1513:13, 1517:16, 1517:18, 1517:22, 1531:4
**team-related** [2] - 1353:15, 1353:19
**teams** [121] - 1258:25, 1259:13, 1259:21, 1262:13, 1283:18, 1284:21,

1284:25, 1285:1, 1285:6, 1286:25, 1287:4, 1287:15, 1287:21, 1289:9, 1289:10, 1289:12, 1293:18, 1295:7, 1295:11, 1295:12, 1295:14, 1295:16, 1295:18, 1297:8, 1297:9, 1297:14, 1297:21, 1299:9, 1299:21, 1303:15, 1305:10, 1305:19, 1305:22, 1305:23, 1305:24, 1305:25, 1306:19, 1310:22, 1312:3, 1312:5, 1312:6, 1312:9, 1313:11, 1314:16, 1314:17, 1314:25, 1315:2, 1315:19, 1315:20, 1316:8, 1316:20, 1317:15, 1318:4, 1323:3, 1328:12, 1328:19, 1351:22, 1352:2, 1353:15, 1353:21, 1355:12, 1358:16, 1358:22, 1359:7, 1368:17, 1368:18, 1371:23, 1392:20, 1407:3, 1408:19, 1409:2, 1409:14, 1409:19, 1409:20, 1411:12, 1413:9, 1413:11, 1413:18, 1425:7, 1432:21, 1432:22, 1432:23, 1434:8, 1434:14, 1436:7, 1436:11, 1437:3, 1437:10, 1437:25, 1440:18, 1440:22, 1442:15, 1442:17, 1448:19, 1475:14, 1499:14, 1499:15, 1499:17, 1501:25, 1502:17, 1502:19, 1503:2, 1503:3, 1503:8, 1504:2, 1509:2, 1510:5, 1510:8, 1513:12, 1513:14, 1513:19, 1514:8, 1523:4, 1530:3, 1531:4
**TEAMS** [1] - 1425:12
**Teams** [1] - 1351:19
**technical** [2] - 1395:25, 1477:22
**teleconference** [2] - 1290:15, 1292:17
**telephone** [1] - 1276:12
**televise** [2] - 1320:5, 1320:6
**television** [9] - 1258:17, 1446:4, 1446:22, 1449:22, 1450:3, 1461:1, 1461:3, 1461:5, 1485:6
**ten** [32] - 1270:16, 1312:24, 1312:25, 1313:11, 1314:17, 1421:2, 1421:3, 1421:14, 1423:2, 1423:5, 1436:11, 1437:3, 1437:10, 1440:18, 1442:15, 1443:18, 1467:8, 1499:12, 1501:25, 1502:10, 1502:11, 1502:12, 1502:16, 1502:17, 1502:19, 1503:2, 1503:3, 1503:10, 1513:19, 1518:3, 1523:4, 1525:2
**ten-time** [2] - 1421:2, 1423:2
**term** [11] - 1302:15, 1348:19, 1431:8, 1431:10, 1454:8, 1468:11, 1499:13, 1501:18, 1501:19, 1509:6, 1509:8
**terminology** [1] - 1345:12
**terms** [23] - 1282:19, 1298:4, 1331:25, 1355:18, 1356:21, 1356:24, 1369:22, 1369:25, 1370:10, 1370:21, 1377:17, 1378:20, 1378:23, 1381:5, 1388:3, 1453:18, 1458:2, 1458:3, 1458:10, 1468:23, 1510:15, 1527:25, 1532:14
**territory** [1] - 1506:23
**test** [2] - 1501:7, 1506:14
**tested** [1] - 1500:6

**testified** [21] - 1257:3, 1297:22, 1310:2, 1312:3, 1318:12, 1321:25, 1325:11, 1361:9, 1362:8, 1428:1, 1430:15, 1491:23, 1500:10, 1500:16, 1502:10, 1502:12, 1503:6, 1504:5, 1504:7, 1517:17, 1526:1
**testify** [8] - 1255:10, 1503:14, 1503:18, 1505:18, 1511:19, 1514:12, 1515:18, 1524:20
**testifying** [5] - 1360:13, 1500:17, 1508:2, 1508:6, 1521:19
**testimony** [67] - 1253:6, 1253:20, 1254:8, 1254:17, 1304:3, 1310:6, 1311:9, 1322:7, 1329:13, 1359:24, 1360:12, 1360:16, 1362:4, 1393:25, 1395:1, 1396:6, 1396:18, 1405:2, 1420:5, 1420:13, 1424:2, 1428:15, 1429:3, 1429:9, 1429:10, 1490:3, 1497:5, 1497:11, 1497:15, 1498:10, 1501:7, 1501:23, 1501:24, 1502:25, 1503:1, 1503:2, 1504:6, 1504:15, 1504:22, 1505:7, 1506:9, 1506:18, 1506:21, 1507:15, 1508:5, 1508:17, 1508:18, 1509:12, 1510:10, 1511:10, 1512:25, 1514:7, 1514:10, 1518:4, 1518:20, 1519:23, 1520:4, 1520:18, 1520:21, 1521:10, 1522:12, 1523:21, 1524:2, 1530:11, 1532:22
**testing** [1] - 1520:25
**Texas** [2] - 1258:21, 1280:22
**thankfully** [1] - 1297:7
**thanking** [1] - 1493:17
**THE** [224] - 1250:12, 1253:8, 1253:10, 1254:7, 1254:23, 1255:3, 1255:21, 1256:4, 1256:9, 1265:3, 1266:15, 1267:23, 1271:3, 1272:4, 1273:16, 1273:22, 1275:8, 1283:2, 1286:17, 1287:13, 1290:11, 1291:23, 1294:6, 1299:22, 1305:1, 1309:17, 1309:20, 1313:9, 1328:21, 1328:23, 1329:2, 1329:5, 1331:4, 1331:13, 1334:9, 1335:2, 1335:9, 1335:16, 1337:20, 1338:18, 1338:23, 1339:12, 1342:24, 1346:19, 1346:22, 1348:21, 1349:15, 1355:5, 1355:8, 1355:22, 1356:1, 1356:2, 1357:7, 1357:9, 1357:12, 1359:17, 1359:19, 1360:4, 1360:10, 1360:17, 1360:22, 1361:5, 1361:12, 1361:14, 1361:18, 1361:21, 1361:25, 1362:9, 1362:10, 1382:2, 1382:7, 1384:1, 1384:8, 1384:12, 1384:18, 1384:21, 1389:21, 1393:3, 1395:23, 1400:10, 1400:25, 1401:17, 1402:8, 1402:25, 1403:18, 1403:20, 1403:24, 1404:6, 1405:1, 1405:3, 1406:1, 1406:19, 1406:22, 1407:17, 1407:24, 1408:25, 1409:24, 1414:15, 1415:11, 1415:14, 1417:8, 1417:10, 1419:19, 1423:12, 1423:16, 1427:15, 1427:17, 1427:19, 1427:23, 1428:5, 1429:15,

VB          OCR          CRR

ALL WORD INDEX _____39

1430:3, 1430:7, 1430:10, 1433:10, 1438:22, 1438:25, 1439:6, 1439:10, 1440:1, 1444:14, 1453:19, 1453:22, 1454:1, 1454:3, 1457:12, 1462:21, 1462:25, 1463:3, 1467:5, 1470:5, 1470:9, 1470:12, 1470:16, 1470:22, 1471:10, 1471:21, 1476:17, 1476:22, 1477:15, 1480:21, 1484:1, 1489:24, 1490:7, 1490:11, 1491:1, 1491:4, 1491:7, 1493:5, 1496:14, 1497:1, 1498:15, 1499:1, 1499:11, 1500:3, 1500:14, 1501:8, 1503:24, 1504:12, 1504:18, 1504:25, 1505:4, 1505:6, 1505:24, 1506:15, 1506:23, 1507:11, 1507:13, 1507:17, 1508:12, 1508:23, 1509:5, 1509:10, 1510:2, 1510:9, 1511:6, 1512:6, 1512:8, 1513:6, 1513:8, 1514:16, 1515:3, 1515:7, 1515:12, 1516:8, 1516:22, 1518:7, 1518:17, 1518:22, 1519:10, 1519:18, 1519:24, 1520:2, 1520:11, 1520:22, 1521:23, 1522:15, 1523:2, 1523:13, 1523:23, 1524:2, 1524:6, 1524:17, 1525:7, 1525:17, 1526:15, 1526:22, 1527:5, 1527:17, 1527:22, 1528:4, 1528:11, 1529:18, 1529:24, 1530:23, 1531:7, 1532:1, 1532:4, 1532:11, 1532:20, 1533:3, 1533:6, 1533:10, 1533:13

**themselves** [3] - 1310:9, 1315:13, 1315:14

**then-Governor** [1] - 1279:24

**theory** [1] - 1532:12

**thereafter** [2] - 1268:13, 1283:21

**thereby** [1] - 1464:13

**therefore** [5] - 1258:14, 1514:2, 1516:4, 1516:20, 1531:5

**Therefore** [1] - 1516:5

**they've** [1] - 1361:9

**thinking** [1] - 1516:11

**third** [14] - 1261:23, 1267:25, 1324:21, 1328:9, 1358:7, 1364:5, 1364:6, 1364:7, 1410:22, 1440:13, 1465:1, 1467:17, 1467:18, 1469:11

**third-party** [1] - 1469:11

**thoughts** [1] - 1347:20

**thousand** [2] - 1258:9, 1258:14

**threatened** [11] - 1254:6, 1254:21, 1255:2, 1255:11, 1255:16, 1256:2, 1407:7, 1409:3, 1411:3, 1411:12, 1411:18

**threatening** [2] - 1252:6, 1252:13

**Three** [1] - 1259:2

**three** [37] - 1255:1, 1258:8, 1258:25, 1261:12, 1262:5, 1295:16, 1298:23, 1299:2, 1300:24, 1307:3, 1313:25, 1317:6, 1327:1, 1327:5, 1327:10, 1327:16, 1331:17, 1337:7, 1337:14, 1359:8, 1380:7, 1418:25, 1435:13, 1435:24, 1440:18, 1442:14, 1447:9,

1447:11, 1449:12, 1457:23, 1470:18, 1478:17, 1488:2, 1494:11, 1501:20

**three-year** [2] - 1299:2, 1380:7

**throughout** [3] - 1287:14, 1293:16, 1526:7

**thumb** [2] - 1282:10, 1305:6

**Thunder** [1] - 1364:15

**ticket** [3] - 1446:11, 1446:14, 1474:16

**tied** [6] - 1307:16, 1307:19, 1307:22, 1308:6, 1308:10, 1308:14

**Tim** [3] - 1279:9, 1279:10, 1402:16

**timeframe** [3] - 1286:12, 1372:3, 1381:5

**timeline** [1] - 1265:23

**timetable** [1] - 1283:19

**timing** [7] - 1255:4, 1255:7, 1286:10, 1298:4, 1298:9, 1487:18, 1526:5

**tirelessly** [1] - 1292:25

**title** [7] - 1270:8, 1421:3, 1421:6, 1421:14, 1422:6, 1423:4, 1481:1

**titled** [1] - 1478:3

**titles** [4] - 1421:6, 1421:11, 1421:19, 1423:9

**today** [9] - 1301:18, 1302:25, 1325:25, 1337:2, 1478:24, 1486:23, 1494:21, 1530:13, 1532:5

**together** [15] - 1292:14, 1293:17, 1365:20, 1434:11, 1435:14, 1435:25, 1436:15, 1461:9, 1467:9, 1478:17, 1485:9, 1488:9, 1488:11, 1488:15, 1492:17

**tomorrow** [4] - 1429:1, 1461:24, 1476:23, 1496:16

**tomorrow's** [1] - 1429:12

**tomorrows** [1] - 1422:12

**tonight** [1] - 1528:5

**took** [21] - 1253:7, 1253:23, 1255:6, 1255:23, 1261:8, 1261:22, 1262:4, 1263:2, 1276:16, 1281:7, 1286:21, 1315:22, 1326:1, 1329:12, 1337:5, 1340:1, 1383:6, 1397:22, 1410:15, 1424:16, 1455:13

**top** [16] - 1258:9, 1258:16, 1276:25, 1296:14, 1374:13, 1382:15, 1415:8, 1438:9, 1441:21, 1451:24, 1462:2, 1470:14, 1470:17, 1475:6, 1480:15, 1485:23

**topic** [5] - 1266:2, 1272:1, 1333:18, 1333:21, 1354:19

**total** [1] - 1464:17

**totaled** [1] - 1314:7

**totally** [3] - 1252:8, 1254:16, 1428:12

**tournaments** [2] - 1454:14, 1455:8

**toward** [1] - 1306:9

**Towards** [1] - 1265:23

**towards** [5] - 1268:8, 1283:16, 1283:23, 1352:9, 1438:23

**traded** [1] - 1364:13

**tradition** [1] - 1389:1

**traditional** [1] - 1459:19

**traditionally** [2] - 1466:18, 1468:24

**Traffic** [65] - 1261:16, 1261:18, 1261:21, 1265:11, 1265:19, 1265:22, 1265:25, 1266:1, 1270:18, 1271:17, 1271:18, 1271:23, 1284:1, 1297:6, 1297:10, 1297:17, 1315:15, 1315:17, 1315:20, 1325:5, 1325:8, 1325:11, 1325:16, 1325:21, 1326:3, 1326:11, 1326:18, 1330:19, 1331:1, 1331:23, 1331:25, 1332:11, 1332:24, 1373:16, 1374:3, 1402:2, 1403:4, 1403:6, 1404:3, 1404:9, 1404:22, 1406:12, 1406:13, 1407:2, 1407:8, 1408:21, 1409:5, 1409:14, 1409:21, 1411:11, 1411:17, 1412:6, 1412:8, 1413:21, 1414:4, 1414:20, 1423:20, 1424:5, 1498:19, 1500:21, 1503:11, 1503:13, 1515:18, 1524:21

**Traffic's** [1] - 1406:15

**tragedy** [2] - 1385:22, 1386:9

**trained** [1] - 1303:19

**Transcript** [1] - 1296:13

**TRANSCRIPT** [1] - 1250:11

**transcript** [27] - 1251:18, 1262:23, 1275:10, 1281:7, 1281:9, 1281:12, 1296:10, 1299:19, 1300:20, 1325:7, 1329:16, 1329:23, 1329:25, 1331:3, 1331:8, 1333:14, 1341:4, 1341:6, 1341:7, 1343:4, 1344:16, 1361:10, 1476:3, 1476:11, 1476:17, 1476:21, 1477:1

**Transcription** [1] - 1251:18

**transcripts** [2] - 1275:4, 1337:17

**translation** [1] - 1269:2

**transparent** [1] - 1375:24

**tremendous** [1] - 1255:3

**trial** [8] - 1428:19, 1429:3, 1497:8, 1502:22, 1505:7, 1507:14, 1511:3, 1530:11

**TRIAL** [1] - 1250:11

**tried** [6] - 1254:8, 1335:22, 1363:6, 1363:25, 1364:1, 1387:4

**troubles** [1] - 1443:17

**true** [33] - 1300:11, 1340:17, 1345:22, 1440:20, 1442:1, 1442:4, 1446:15, 1447:21, 1449:4, 1450:1, 1450:21, 1451:2, 1451:7, 1462:13, 1464:9, 1464:10, 1464:14, 1464:15, 1465:18, 1466:4, 1467:11, 1467:14, 1467:15, 1472:10, 1472:12, 1472:19, 1472:21, 1472:24, 1474:7, 1482:19, 1483:2, 1484:20, 1485:2

**trust** [2] - 1412:24, 1486:7

**trusted** [1] - 1486:13

**trustees** [1] - 1303:11

**truth** [15] - 1362:5, 1362:6, 1391:16, 1391:17, 1391:19, 1393:22, 1395:2, 1396:8, 1396:19, 1397:20, 1420:8, 1420:9

**try** [11] - 1254:12, 1255:8, 1287:16,

VB        OCR        CRR

1309:14, 1370:25, 1397:7, 1476:24, 1496:12, 1496:16, 1502:25, 1511:16
**trying** [18] - 1286:24, 1287:20, 1305:5, 1305:9, 1347:8, 1363:7, 1368:11, 1371:7, 1371:14, 1374:13, 1374:15, 1382:16, 1389:15, 1397:9, 1412:25, 1475:12, 1500:6
**turn** [11] - 1257:14, 1300:20, 1392:15, 1393:13, 1400:2, 1404:18, 1406:8, 1408:16, 1410:22, 1455:25, 1467:13
**Turney** [3] - 1279:9, 1279:14, 1279:17
**Turning** [1] - 1497:4
**TV** [2] - 1365:11, 1378:17
**twelve** [3] - 1358:16, 1359:7, 1436:11
**twenty** [3] - 1489:12, 1489:13, 1490:3
**twenty-five** [2] - 1489:12, 1489:13
**twice** [2] - 1421:3, 1501:21
**two** [90] - 1255:1, 1257:21, 1257:22, 1259:24, 1261:4, 1261:5, 1262:5, 1263:21, 1273:24, 1277:9, 1280:10, 1281:24, 1286:24, 1289:22, 1290:13, 1290:15, 1290:21, 1292:14, 1294:12, 1294:21, 1297:8, 1297:14, 1297:21, 1299:9, 1300:16, 1300:24, 1305:12, 1309:6, 1311:3, 1314:15, 1315:23, 1323:25, 1326:12, 1326:15, 1333:9, 1337:5, 1342:11, 1342:12, 1342:13, 1343:13, 1343:23, 1344:1, 1344:4, 1349:6, 1351:15, 1351:25, 1352:9, 1352:10, 1354:12, 1354:13, 1356:12, 1360:22, 1364:16, 1373:24, 1377:5, 1377:11, 1380:7, 1389:17, 1400:19, 1403:11, 1406:11, 1407:2, 1408:18, 1409:2, 1409:13, 1409:19, 1409:20, 1411:12, 1420:24, 1420:25, 1440:22, 1442:16, 1449:1, 1449:17, 1482:15, 1482:20, 1488:2, 1490:11, 1492:16, 1498:22, 1503:5, 1503:12, 1505:25, 1509:18, 1511:22, 1512:22
**two-division** [1] - 1289:22
**two-year** [1] - 1380:7
**type** [9] - 1311:14, 1317:13, 1368:13, 1369:20, 1371:19, 1375:18, 1381:15, 1381:19, 1508:10

# U

**U.S** [136] - 1258:15, 1258:24, 1258:25, 1260:3, 1260:25, 1261:8, 1261:11, 1263:15, 1264:16, 1265:7, 1265:12, 1266:6, 1267:10, 1268:17, 1268:21, 1270:17, 1270:22, 1271:12, 1271:14, 1271:21, 1272:8, 1275:15, 1277:5, 1277:22, 1277:23, 1278:25, 1279:1, 1280:21, 1282:4, 1282:25, 1283:8, 1283:13, 1283:14, 1283:22, 1284:2, 1284:11, 1287:6, 1289:21, 1290:24, 1291:2, 1291:6, 1291:7, 1292:6, 1292:11, 1293:4, 1295:22, 1295:25,

1296:15, 1297:19, 1298:5, 1298:11, 1299:16, 1300:23, 1301:7, 1301:14, 1302:3, 1306:2, 1306:5, 1307:16, 1307:18, 1307:21, 1308:6, 1308:9, 1308:13, 1308:17, 1309:3, 1309:6, 1318:13, 1319:9, 1319:12, 1319:14, 1319:18, 1319:21, 1321:2, 1321:6, 1321:12, 1322:9, 1322:13, 1322:16, 1355:14, 1359:14, 1394:4, 1395:14, 1395:20, 1396:23, 1448:23, 1454:9, 1455:4, 1458:9, 1458:16, 1459:9, 1459:18, 1460:25, 1463:11, 1463:16, 1463:18, 1464:23, 1465:3, 1465:13, 1466:3, 1466:16, 1467:8, 1467:20, 1469:2, 1471:1, 1471:5, 1471:24, 1472:2, 1472:14, 1473:3, 1474:6, 1474:7, 1474:14, 1474:19, 1475:11, 1475:16, 1478:3, 1481:15, 1481:25, 1482:17, 1482:25, 1483:14, 1483:15, 1483:20, 1483:22, 1484:6, 1484:12, 1484:24, 1485:10, 1489:8, 1490:9, 1494:13, 1495:10, 1495:11
**U.S.-based** [2] - 1259:21, 1392:20
**ultimately** [3] - 1291:3, 1407:8, 1517:20
**umbrella** [1] - 1281:24
**unambiguous** [7] - 1511:9, 1511:17, 1512:23, 1514:1, 1525:6, 1526:14
**unanimous** [2] - 1290:18, 1304:16
**unanimously** [1] - 1344:23
**uncalled** [1] - 1478:5
**uncertain** [4] - 1299:10, 1524:14, 1524:15, 1524:18
**uncertainty** [1] - 1512:19
**under** [37] - 1282:10, 1294:9, 1294:19, 1295:19, 1300:2, 1301:3, 1305:6, 1320:5, 1320:9, 1327:4, 1327:12, 1328:7, 1330:8, 1330:9, 1330:13, 1333:15, 1391:14, 1392:15, 1406:11, 1415:6, 1443:13, 1444:23, 1446:9, 1453:17, 1466:15, 1497:10, 1500:7, 1501:9, 1502:10, 1502:12, 1505:11, 1505:15, 1514:2, 1517:23, 1519:22, 1526:12
**undergrad** [1] - 1277:20
**undermine** [1] - 1511:17
**undermined** [1] - 1500:6
**undermining** [1] - 1532:13
**underneath** [1] - 1281:8
**underprivileged** [3] - 1366:6, 1366:7
**understandings** [1] - 1512:4
**understood** [6] - 1384:21, 1389:3, 1520:15, 1520:19, 1523:10, 1533:5
**undertaken** [1] - 1287:7
**unequivocal** [2] - 1506:9, 1506:15
**unfair** [2] - 1477:25, 1478:10
**unfairness** [1] - 1423:8
**Unfortunately** [1] - 1349:10
**unfortunately** [1] - 1398:11
**uniform** [1] - 1378:15

**unilateral** [1] - 1507:23
**unique** [1] - 1465:3
**UNITED** [3] - 1250:1, 1250:7, 1250:12
**United** [57] - 1250:5, 1251:2, 1258:9, 1259:1, 1259:12, 1259:18, 1259:21, 1259:23, 1264:6, 1271:6, 1282:11, 1289:22, 1300:15, 1308:22, 1316:14, 1316:24, 1316:25, 1317:1, 1317:2, 1317:3, 1317:6, 1322:15, 1349:21, 1350:6, 1350:23, 1351:4, 1359:8, 1392:22, 1392:25, 1393:1, 1407:6, 1431:14, 1431:16, 1431:19, 1431:23, 1434:2, 1434:20, 1440:25, 1445:13, 1451:20, 1451:23, 1452:11, 1452:15, 1452:25, 1456:3, 1457:5, 1461:5, 1462:17, 1463:12, 1463:19, 1465:12, 1465:19, 1472:23, 1474:15, 1480:25, 1495:11, 1495:25
**University** [7] - 1277:5, 1277:7, 1278:22, 1288:13, 1303:10, 1303:19, 1363:16
**university** [1] - 1363:25
**unless** [3] - 1517:12, 1519:4
**unprecedented** [2] - 1478:19, 1480:5
**unreasonable** [4] - 1503:20, 1505:17, 1507:9, 1521:9
**unreliable** [1] - 1521:10
**unstable** [1] - 1318:7
**unsworn** [1] - 1335:3
**unwittingly** [1] - 1405:17
**up** [86] - 1252:9, 1252:19, 1263:11, 1263:23, 1269:17, 1270:20, 1270:23, 1271:13, 1272:2, 1275:21, 1281:8, 1287:7, 1290:20, 1291:14, 1293:24, 1296:7, 1301:21, 1321:7, 1323:17, 1329:9, 1329:20, 1330:9, 1330:10, 1331:18, 1332:9, 1340:1, 1341:19, 1344:19, 1347:17, 1350:16, 1350:20, 1352:6, 1352:21, 1353:1, 1358:1, 1361:18, 1363:13, 1369:2, 1374:15, 1375:6, 1375:9, 1376:5, 1376:8, 1376:22, 1377:5, 1378:18, 1384:2, 1387:14, 1389:16, 1392:12, 1395:10, 1397:17, 1398:2, 1398:17, 1400:3, 1400:12, 1401:2, 1404:10, 1405:17, 1406:11, 1408:11, 1414:11, 1415:21, 1420:6, 1420:13, 1420:24, 1421:7, 1430:10, 1437:2, 1438:15, 1444:11, 1445:24, 1447:11, 1453:6, 1466:22, 1471:1, 1474:23, 1475:2, 1496:16, 1505:12, 1505:24, 1511:3, 1513:2, 1521:2, 1526:9
**update** [1] - 1265:20
**updated** [3] - 1263:25, 1272:22, 1273:25
**updates** [2] - 1261:20, 1388:3
**updating** [1] - 1273:1
**urged** [1] - 1274:7
**urgent** [1] - 1405:20
**USA** [5] - 1271:18, 1403:7, 1408:21,

1411:17, 1414:20
**uses** [1] - 1525:3
**USL** [54] - 1285:2, 1285:4, 1286:21, 1287:2, 1289:13, 1289:22, 1290:17, 1293:10, 1293:15, 1297:23, 1301:14, 1302:4, 1305:6, 1305:19, 1305:24, 1310:25, 1313:2, 1313:20, 1322:22, 1338:4, 1338:15, 1339:9, 1339:13, 1340:18, 1340:22, 1341:12, 1341:17, 1341:23, 1342:5, 1343:2, 1344:6, 1344:20, 1350:7, 1350:24, 1351:7, 1351:10, 1351:15, 1352:7, 1352:18, 1353:9, 1353:11, 1355:1, 1355:2, 1355:9, 1355:12, 1355:19, 1356:21, 1356:25, 1358:5, 1358:8, 1358:10, 1358:21, 1358:22, 1359:3
**USL's** [3] - 1290:1, 1291:3, 1307:22
**USSF** [53] - 1267:8, 1292:2, 1310:18, 1317:16, 1317:19, 1317:22, 1318:6, 1318:15, 1318:25, 1319:4, 1319:5, 1320:1, 1320:6, 1320:11, 1320:17, 1321:19, 1322:5, 1323:15, 1343:18, 1353:4, 1357:4, 1358:9, 1435:10, 1437:20, 1437:25, 1448:3, 1448:10, 1452:4, 1453:11, 1453:15, 1454:24, 1458:25, 1460:15, 1461:18, 1465:24, 1468:3, 1468:13, 1468:17, 1469:9, 1472:14, 1481:2, 1487:15, 1488:13, 1488:21, 1490:13, 1490:15, 1491:10, 1491:16, 1492:3, 1492:9, 1492:11, 1492:13, 1492:16
**USSF's** [1] - 1491:5
**USSF-SUM** [1] - 1461:18
**USSL** [1] - 1342:20

**V**

**Val** [4] - 1303:16, 1345:15, 1346:2
**value** [6] - 1257:24, 1258:3, 1434:13, 1449:21, 1467:9, 1472:8
**values** [1] - 1450:4
**variety** [2] - 1449:20, 1484:13
**various** [3] - 1266:20, 1303:4, 1351:22
**vastly** [1] - 1472:14
**Ventura** [1] - 1250:19
**version** [4] - 1462:12, 1485:18, 1498:1
**vibrancy** [1] - 1377:22
**vice** [5] - 1277:22, 1278:24, 1279:10, 1280:9, 1303:5
**Video** [1] - 1360:14
**video** [5] - 1359:24, 1360:9, 1360:11, 1361:8, 1361:11
**view** [21] - 1254:10, 1269:19, 1295:6, 1299:11, 1300:13, 1304:23, 1310:21, 1328:16, 1385:19, 1435:18, 1452:21, 1473:4, 1484:5, 1490:20, 1494:14, 1498:7, 1507:20, 1508:17, 1523:17, 1526:19, 1530:10
**viewed** [1] - 1258:11

**viewing** [1] - 1299:6
**views** [4] - 1304:3, 1333:23, 1489:16, 1490:17
**violation** [3] - 1428:24, 1429:2, 1519:8
**Virginia** [1] - 1303:20
**virtue** [2] - 1252:8, 1500:6
**vis-à-vis** [1] - 1254:14
**vision** [10] - 1370:22, 1371:3, 1371:4, 1375:20, 1380:11, 1380:12, 1383:5, 1482:17, 1482:21
**visit** [1] - 1366:19
**visiting** [1] - 1379:23
**volunteer** [3] - 1318:12, 1318:13, 1319:2
**volunteers** [1] - 1283:3
**vote** [38] - 1261:8, 1261:11, 1275:15, 1276:16, 1277:12, 1277:15, 1278:1, 1278:4, 1278:14, 1278:17, 1279:3, 1279:6, 1279:14, 1279:18, 1280:1, 1280:5, 1280:14, 1280:17, 1280:25, 1281:4, 1281:13, 1282:5, 1301:19, 1302:19, 1303:22, 1303:25, 1304:11, 1304:15, 1305:17, 1309:6, 1354:18, 1489:7, 1489:9, 1489:10, 1489:15, 1490:16, 1490:20
**voted** [8] - 1275:19, 1276:4, 1276:23, 1282:4, 1302:4, 1302:11, 1302:12, 1304:13
**voting** [3] - 1282:19, 1304:6, 1304:13

**W**


**wahl** [1] - 1495:17
**Wahl** [4] - 1494:6, 1494:25, 1495:9, 1495:15
**Wahlke** [5] - 1297:20, 1298:12, 1350:4, 1350:5, 1350:11
**wait** [1] - 1502:22
**waiting** [1] - 1393:5
**waive** [2] - 1389:5, 1512:17
**waiver** [13] - 1295:6, 1299:2, 1310:3, 1312:2, 1312:20, 1313:11, 1313:24, 1324:12, 1324:17, 1326:25, 1327:2
**waivers** [65] - 1269:22, 1281:23, 1294:21, 1295:2, 1295:5, 1295:8, 1304:20, 1305:20, 1310:25, 1311:1, 1311:2, 1311:3, 1311:4, 1311:6, 1311:10, 1311:13, 1311:14, 1311:15, 1312:25, 1313:1, 1313:2, 1313:5, 1313:6, 1313:7, 1313:13, 1313:14, 1313:17, 1313:20, 1314:3, 1314:5, 1314:6, 1314:7, 1314:9, 1314:10, 1314:11, 1314:13, 1314:14, 1314:15, 1314:17, 1314:19, 1314:20, 1314:21, 1324:22, 1324:23, 1324:24, 1325:1, 1341:12, 1341:13, 1342:2, 1342:11, 1342:12, 1342:13, 1343:20, 1351:20, 1351:21, 1353:16, 1353:19, 1353:21, 1353:24, 1353:25, 1354:2, 1354:10

**Waivers** [1] - 1294:20
**walk** [1] - 1501:16
**wants** [1] - 1255:19
**WARSHAW** [2] - 1250:19, 1250:21
**Washington** [4] - 1251:11, 1506:25, 1507:4, 1507:11
**waste** [1] - 1360:5
**watch** [1] - 1422:20
**WATKINS** [2] - 1251:1, 1251:4
**ways** [3] - 1265:25, 1322:3, 1485:5
**weaker** [1] - 1320:2
**Wednesday** [1] - 1487:1
**week** [2] - 1270:16, 1485:7
**weeks** [2] - 1435:13, 1435:24
**weighing** [2] - 1506:20, 1506:21
**weight** [2] - 1505:2, 1505:11
**West** [2] - 1327:13, 1327:17
**west** [4] - 1258:21, 1259:16, 1316:9, 1327:18
**Westchester** [1] - 1362:19
**Western** [2] - 1259:7, 1259:8
**Whack** [1] - 1528:17
**Whack-a-Mole** [1] - 1528:17
**whammy** [3] - 1395:24, 1395:25, 1396:16
**what're** [1] - 1374:17
**whatsoever** [2] - 1390:14, 1390:18
**wherewithal** [1] - 1412:23
**whiffs** [1] - 1514:23
**whole** [16] - 1252:17, 1252:22, 1255:6, 1332:8, 1335:7, 1362:5, 1364:10, 1376:17, 1391:16, 1412:3, 1450:7, 1522:7, 1524:25, 1527:18, 1527:19, 1527:20
**wide** [2] - 1397:4, 1484:13
**Williams** [29] - 1497:2, 1497:15, 1498:11, 1505:12, 1511:10, 1514:4, 1514:9, 1514:13, 1514:19, 1515:16, 1515:23, 1516:4, 1517:25, 1520:12, 1524:7, 1525:13, 1525:14, 1525:19, 1525:20, 1526:12, 1527:3, 1528:8, 1528:18, 1528:19, 1529:1, 1529:7, 1529:21, 1532:8, 1532:13
**Williams'** [4] - 1497:23, 1525:10, 1526:10, 1528:22
**willing** [4] - 1268:5, 1283:15, 1323:18, 1326:23
**win** [1] - 1364:23
**wine** [1] - 1365:23
**winning** [1] - 1319:24
**WINSTON** [1] - 1250:14
**Winston** [1] - 1252:10
**wire** [1] - 1404:4
**Wisconsin** [1] - 1277:7
**withdraw** [7] - 1340:20, 1342:25, 1406:16, 1407:3, 1408:20, 1409:3, 1409:4
**withdrawn** [1] - 1355:16
**withhold** [3] - 1407:12, 1407:20,

VB      OCR      CRR

ALL WORD INDEX  42

1407:21

**withholds** [1] - 1408:7
**WITNESS** [6] - 1356:2, 1362:9, 1384:21, 1462:25, 1463:3, 1534:3
**witness** [44] - 1253:5, 1253:19, 1254:2, 1254:4, 1254:13, 1255:8, 1255:10, 1256:7, 1257:2, 1335:4, 1335:10, 1335:13, 1335:18, 1359:20, 1360:1, 1360:6, 1361:15, 1361:19, 1361:22, 1400:4, 1400:14, 1401:4, 1401:21, 1402:12, 1427:18, 1428:6, 1428:8, 1429:13, 1430:4, 1430:6, 1430:14, 1462:22, 1476:11, 1480:9, 1490:8, 1492:20, 1501:11, 1502:16, 1502:24, 1514:11, 1519:2, 1519:20, 1520:23, 1526:2
**Witness** [4] - 1256:8, 1359:22, 1361:19, 1430:9
**witness'** [1] - 1252:25
**WNBA** [1] - 1303:18
**won** [4] - 1303:14, 1364:2, 1364:25, 1365:1
**word** [5] - 1323:1, 1445:22, 1453:25, 1454:20, 1508:25
**words** [19] - 1269:1, 1310:9, 1310:11, 1310:12, 1310:16, 1321:15, 1322:3, 1322:12, 1325:21, 1390:1, 1407:2, 1459:2, 1464:16, 1475:7, 1478:20, 1478:22, 1510:6, 1524:4, 1531:12
**wordsmith** [1] - 1447:1
**workings** [1] - 1368:19
**works** [3] - 1347:13, 1347:14, 1394:17
**world** [22] - 1278:11, 1278:21, 1282:15, 1303:3, 1303:4, 1303:14, 1452:21, 1494:18, 1516:1, 1516:5, 1516:16, 1516:18, 1521:7, 1521:19, 1521:21, 1522:11, 1524:13, 1524:17, 1530:24, 1531:1, 1531:2, 1531:17
**World** [5] - 1455:10, 1481:22, 1482:18, 1483:15, 1484:15
**worldwide** [2] - 1451:18, 1451:19
**worse** [1] - 1460:18
**worth** [4] - 1321:5, 1321:13, 1358:20, 1523:23
**wow** [1] - 1364:25
**write** [10] - 1406:13, 1408:17, 1441:19, 1467:7, 1478:8, 1478:15, 1481:14, 1483:22, 1490:22, 1492:2
**writes** [4] - 1268:4, 1350:2, 1404:19, 1408:22
**writing** [2] - 1483:17, 1483:19
**written** [10] - 1342:7, 1342:10, 1349:2, 1350:21, 1442:2, 1443:14, 1472:15, 1474:18, 1494:3, 1523:24
**wrote** [24] - 1294:20, 1306:5, 1322:11, 1322:12, 1350:11, 1411:15, 1427:4, 1441:19, 1454:8, 1454:15, 1467:18, 1468:25, 1471:3, 1478:20, 1485:12, 1486:4, 1486:9, 1486:16, 1486:19, 1487:13, 1489:1, 1493:9, 1493:13,

1530:1

# Y

**YATES** [1] - 1251:5
**year** [56] - 1269:21, 1278:23, 1284:20, 1284:21, 1287:2, 1287:4, 1292:9, 1299:2, 1314:21, 1314:22, 1314:25, 1315:2, 1315:5, 1315:8, 1315:11, 1316:1, 1316:2, 1316:4, 1324:12, 1324:13, 1324:18, 1324:21, 1324:24, 1342:14, 1343:15, 1363:19, 1363:24, 1365:2, 1367:10, 1367:11, 1380:7, 1386:18, 1389:17, 1412:3, 1419:1, 1422:4, 1422:8, 1427:12, 1435:3, 1435:6, 1436:8, 1438:1, 1438:3, 1439:22, 1443:1, 1446:13, 1464:7, 1464:14, 1467:19, 1467:22, 1472:1
**year-end** [1] - 1439:22
**years** [53] - 1259:6, 1262:10, 1263:4, 1268:7, 1277:8, 1277:9, 1278:8, 1278:10, 1281:22, 1282:11, 1288:12, 1296:19, 1297:2, 1298:23, 1299:7, 1303:19, 1318:14, 1323:25, 1324:2, 1324:6, 1324:13, 1324:15, 1337:10, 1351:15, 1351:25, 1352:9, 1352:10, 1354:12, 1354:14, 1356:22, 1363:1, 1368:1, 1396:9, 1396:11, 1396:14, 1434:8, 1436:3, 1443:18, 1446:2, 1446:17, 1446:21, 1449:9, 1457:23, 1467:8, 1469:3, 1478:17, 1486:18, 1487:7, 1489:12, 1489:13, 1490:3, 1495:1
**yes-or-no** [1] - 1437:7
**yesterday** [29] - 1253:5, 1260:6, 1261:7, 1261:17, 1265:11, 1268:25, 1269:4, 1269:21, 1275:3, 1275:10, 1287:15, 1287:23, 1295:4, 1297:22, 1299:15, 1304:18, 1306:1, 1307:14, 1313:10, 1313:12, 1313:15, 1314:12, 1319:8, 1322:2, 1325:25, 1343:4, 1352:5, 1502:10, 1502:12
**Yesterday** [1] - 1262:7
**YORK** [1] - 1250:1
**York** [17] - 1250:6, 1250:15, 1251:2, 1251:7, 1259:14, 1277:21, 1288:16, 1316:11, 1362:19, 1363:9, 1364:13, 1366:12, 1379:12, 1415:25, 1477:25
**young** [2] - 1363:12, 1461:15
**yourself** [14] - 1266:9, 1267:17, 1286:6, 1286:20, 1362:16, 1416:15, 1417:5, 1430:10, 1438:12, 1438:19, 1438:20, 1469:23, 1471:3
**youth** [6] - 1279:10, 1280:9, 1280:21, 1280:23, 1303:3, 1303:5
**yup** [1] - 1492:25

# Z

**zone** [14] - 1259:9, 1259:15, 1316:19, 1316:23, 1317:8, 1327:1, 1327:6, 1327:13, 1327:16, 1327:21, 1327:24, 1328:7, 1328:9, 1337:14
**Zone** [1] - 1306:19
**zones** [21] - 1258:25, 1259:2, 1259:5, 1259:7, 1259:11, 1259:20, 1313:25, 1316:7, 1316:10, 1316:13, 1316:16, 1317:5, 1317:6, 1327:5, 1327:10, 1328:19, 1358:17, 1358:23, 1359:8, 1392:21, 1393:7

#

**§403** [3] - 1518:9, 1518:11, 1519:8
**§702** [2] - 1512:23, 1519:11

VB          OCR          CRR