UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

NORTH AMERICAN SOCCER LEAGUE, LLC,

Plaintiff,

v.

UNITED STATES SOCCER FEDERATION, INC. and MAJOR LEAGUE SOCCER, L.L.C.,

Defendants.

: 17CV5495(HG)

: United States Courthouse
: Brooklyn, New York

: January 23,2025
: 9:30 a.m.

- - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR A JURY TRIAL
BEFORE THE HONORABLE HECTOR GONZALEZ
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Plaintiff: WINSTON & STRAWN, LLP
200 Park Avenue
New York, NY 10166
BY:JEFFREY L. KESSLER, ESQ.
DAVID G. FEHER , ESQ.
EVA W. COLE, ESQ.
JOHANNA RAE HUDGENS, ESQ.
MARK E. RIZIK JR., ESQ.

PEARSON WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
BY:CLIFFORD H. PEARSON, ESQ.

PEARSON WARSHAW, LLP
555 Montgomery Street, Suite 1205
San Francisco, California 94104
BY:ADRIAN JOHN BUONANOCE, ESQ.
MATTHEW A. PEARSON, ESQ.
NEIL J. SWARTZBERG, ESQ.

For the Defendant United States Soccer Federation, Inc.:

LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
BY: LAWRENCE E. BUTERMAN, ESQ.

LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
by: CHRISTOPHER S. YATES, ESQ.

Counsel for Defendant Counsel for Defendant Major League Soccer, L.L.C.

PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
BY: BRADLEY I. RUSKIN, ESQ.
KEVIN J. PERRA, ESQ.
SCOTT A. EGGERS, ESQ.

PROSKAUER ROSE LLP
1001 Pennsylvania Ave.NW Suite 600S
Washington, DC 20004
BY: COLIN R. KASS, ESQ.

Court Reporter: SOPHIE NOLAN
225 Cadman Plaza East/Brooklyn, NY 11201
NolanEDNY@aol.com

Proceedings recorded by mechanical stenography, transcript produced by Computer-Aided Transcription

(In open court; jury not present.)

THE COURT: Is there an issue?

MR. RUSKIN: Yes, please, Your Honor. At 8:59 a.m. this morning we were e-mailed a purported transcript of the audio that came up yesterday. There was no reach out to try to work anything out beforehand.

What we've received is a purported transcript of the audio. We have no idea what the source is, no idea if it's complete. There's been no authentication of the document. I would add it was never produced in the discovery. It wasn't on the PTO. We received the audio New Year's Eve.

But that aside, the bottom line is we don't know of any authentication with respect to the document.

THE COURT: This is supposed to be a transcript of an audio file of what?

MR. RUSKIN: Purportedly it's of a press conference.

MR. KESSLER: Your Honor, it's not purportedly. At Mr. Garber's deposition we showed him a partial transcript. We had the audio file. He testified, yes, he was at that press conference. He testified about the excerpts we showed him which were all relevant to this case. Yesterday they he objected that what he had been shown --

THE COURT: I remember. I know the history from yesterday.

MR. KESSLER: What we did last night is we gave the

audio file to a court reporter, Sandra Perkeland, a certified court reporter and she simply made a transcript of the full audio file and the audio file is an exhibit. They've had it the whole time.

THE COURT: How many sections of -- what quotes do you want to elicit from him?

MR. KESSLER: Okay. I have several. Does Your Honor have it in front of you?

THE COURT: I do not.

MR. KESSLER: Can we hand the Court one? It would be easier rather than my reading it. You can look at them.

So the first quote, Your Honor, is on page two from 6 to 16.

THE COURT: Okay.

MR. KESSLER: The next one is on page six from line 13 to 19.

THE COURT: You probably mean 12 to 17.

MR. KESSLER: Yes, 12 to 19 or maybe 12 to 17, yes. It goes through to 19. That whole next thing. I should say all the way to 23. I'm sorry.

THE COURT: Okay.

MR. KESSLER: The next is page seven from 12 to 24.

THE COURT: You mean 14?

MR. KESSLER: Yes, Your Honor. I'm sorry.

And then it's just one more, I believe. And the

final one is on page 13. And that's from line two to 13.

Mr. Ruskin, none of these quotes seem particularly --

MR. RUSKIN: None may be troubling and I hope and expect none of them are troubling at all is my expectation. On the other hand, this is coming -- I haven't been able to review any of those because I --

THE COURT: How much more time do you have with Mr. Garber?

MR. KESSLER: I would say, Your Honor, maybe an hour and a half total.

THE COURT: You're going to have someone at the firm listen to the transcript and those quotes that Mr. Kessler identified. If you have an issue with the transcription you will let me know.

I'm not going to let this whole transcript in. You can ask him foundational questions about being interviewed by whoever it is that interviewed him and then just read the quote to him and say, do you have any reason to doubt that that was your quote. Do you still believe that or whatever you want to ask him.

MR. KESSLER: That's exactly what I did at the deposition when it was not the full transcript, exactly.

MR. RUSKIN: Not exactly. But, Your Honor, if he does that, I assume that I can then read from other pieces of

this and then ask the witness questions?

THE COURT: Sure. All right.

(Pause in proceedings.)

(Jury enters.)

THE COURT: All right. You can be seated.

Good morning, ladies and gentlemen.

Mr. Kessler, you can continue.

MR. KESSLER: Thank you, Your Honor.

DONALD GARBER,

called by the Plaintiff, having been previously duly sworn, was examined and testified as follows:

CONTINUED CROSS-EXAMINATION

BY MR. KESSLER:

Q Good morning, Mr. Garber.

A Good morning.

Q Mr. Garber, I would like to now show you an exhibit that's been marked Plaintiff's Exhibit 574.

(Exhibit published to the witness, counsel and the Court.)

Q You'll see that Plaintiff's Exhibit 574 in the middle is an e-mail from you to Mr. Gulati to Mr. Flynn and Mr. Abbott; correct? Dated October 1, 2009.

A I see that, yes.

Q Okay. And on top you are responding to Mr. Gulati's e-mail to you about this subject; correct?

A That's correct.

MR. KESSLER: Your Honor, I would move into evidence Plaintiff's Exhibit 574.

MR. BUTERMAN: No objection.

THE COURT: Admitted.

(Plaintiff's Exhibit 574 received in evidence.)

MR. KESSLER: We can publish that.

(Exhibit published.)

BY MR. KESSLER:

Q And this e-mail exchange was in response -- if you go to the very first e-mail which is on page four, this was an e-mail that was sent from Selby Wellman. Do you see that?

A I do see that it was from Selby Wellman. I don't believe that it was sent to me though.

Q Yes, but you ended up getting a copy of this e-mail; correct? Let me show you on page two, you'll see.

A That will be great.

Q Okay. You'll see that in the middle of the page Mr. Robert Hoskins sends it to Dan Flynn and then Mr. Gulati just above that says since you are both being mentioned in these e-mails, thought you should see them. Please do forward to anyone else." Do you see that?

A I do see that, yes.

Q So Mr. Gulati sent you this series of e-mails; correct?

A I believe so, yes.

Q And what these series of e-mails were about was discussing how a group of USL owners were calling themselves the TOA and seeking to form a separate Division-II league; is that correct, as just a subject matter?

A That's correct.

Q Okay. And do you remember that the breakout group from the USL is what eventually became the NASL; correct?

A I'm aware of that.

Q Okay. So, with that context, let's look at the page 1. And this is what you write: First of all, you write to Mr. Gulati, "he sent us an identical note."

Do you see that?

A I do.

Q So, does that remind you that you actually got a copy of these communications on your own, you got your own version of this set of communications. That's what you're telling Mr. Gulati?

A No, I don't know that it's -- that I got all the communications. He sent us a note, I'm not quite sure which -- whether it was the first note or whether it was the other e-mails in this, but clearly he sent us a note for sure.

Q And what you wrote after that, you said: "We have been very transparent and clear with both groups."

And the two groups you're talking about is the USL group and the breakout group that became NASL, those were the two groups?

A Right.

Q And what you were clear was is that, A, "we believe it is illogical to have two second division leagues."

That was your position; correct?

A Correct.

Q And, B, "we are interested in a closer relationship with

a U.S. second division."

So you were -- your second point was, you think there should be one second division and you're interested in having a closer relationship with that one second division league; correct?

A Whether that was the NASL or the USL; correct.

Q Yes. Okay. And, Mr. Garber, it's correct that what this reflected was your general belief that the correct structure would be to have one, a Division-I league, a Division-II league, a Division-III league, a Division-IV league, and there are -- under the -- and the rights and the requirements that U.S. Soccer has established, right? That was your view?

A Are you reading that for me or --

Q Well, I'm saying: Is that your view? Is it your view at this time that you thought there should be only one division -- from your -- just from your personal standpoint of what made sense, there should be one Division-I league, one Division-II league, one in every other division, that was your view; right?

A My view was then and still is today that anybody who satisfies the standards can have that division, but in a -- a world where we have a structure similar to other countries, one Division-I, one Division-II, et cetera, et cetera. But anybody who satisfies those requirements can be in that division. I'm not making that call.

Q Okay. Try to answer the question that I'm asking.

Your view -- I'm not asking you -- we both agree that under the standards, if you qualify you can have more than one league designated Division-I and Division-II, correct? We agree on that?

A We do.

Q Let's put that aside.

Your personal view, if it were possible, if it were legally possible, would be, and you expressed at the time, was that the best structure would be just one Division-I league, just one Division-II league; correct?

A I agree with that.

Q Yes. And you conveyed that view to Mr. Gulati; correct?

A Correct.

Q Thank you.

And, by the way, Mr. Gulati conveyed that view to you?

A He might have.

Q Do you recall being at a board meeting where Mr. Gulati said having more than one Division-I league, more than one Division-II league makes him look stupid and he doesn't want to look stupid?

A I recall that.

Q Now, let me direct you next to JX-64. This is the board of directors meeting in executive session of December 6th,

2016. Do you see that?

A I do.

Q Okay. And if you take a look at page 88 of this transcript, Do you recall that at this meeting in December 6th 2016, both the USL and the NASL were applying for a Division-II sanction for the 2016 season?

A I don't recall that, no.

Q You don't recall that, okay.

Let me see if I can find something to refresh your recollection about that. Let me go back to page 44.

You'll see on page 44, Mr. Cordero says that "Don and John and others now recuse themselves from -- it's just -- I mean, it's uncomfortable enough as it is to have."

And then you say the following: "I am going to, having spoken to our counsel as it relates to us, I don't believe that we need to recuse ourselves as it relates to what discussions this group has with other leagues that are not related to Major League Soccer or our standing, I believe we should have to leave the room."

I think you meant to say "should not have to leave the room"; correct?

It says: "Unless you want to have a discussion about that and think that would create problems for the Federation, what concerns me is that these discussions are going on and I'm not, nor is Major League Soccer, aware of

them and they have affected us. So maybe there are things you can talk about that are affecting us and then we'll stay and when it doesn't we'll leave. But I don't want to have a discussion that this board makes decisions that could affect Major League Soccer without being a part of discussions. So, by the way, that is, this is new right, because I've recused myself from."

And does this remind you that what was happening was there was going to be a discussion of the two leagues, USL and NASL for D-II, and you were saying I want to stay for these discussions because I have an interest in USL and my team's in USL.

Do you recall that?

A I do recall that now.

Q Yes. Okay. You now recall it.

And you prevailed. In other words, they allowed you to stay for this part of the discussion about the two leagues at this point; correct?

A Correct.

Q Okay. So you got to stay. And now let's go back to the comments I was going to show you that you made. And this is now on page 88.

And what you say is the following on line 14: "I think another thing, too, and I think that -- I wonder -- and maybe the lawyers would have to work on this, I wonder if

there's a rule that could be passed that deals with the standard that says, if you're a new league and, you know, whatever that league is, you have X number of years to be compliant with your division. And if not, you cannot get waivers. Because I think the challenge that we have in all these waivers, because, I mean, early on in MLS's history, I'm sure you have this -- before my time -- but you had waivers."

Do you remember saying that?

A I don't remember saying that, but I do see it here.

Q And it's true, correct, your early on in MLS's history, it needed waivers; correct?

A Correct.

Q Right.

And what you're saying here is that when you have a new league applying for Division-II, we should have a system maybe where they don't have to -- they have a number of years to become complaint; correct?

A Correct.

Q And the new league at this time for D-II was USL; correct? This is their first time applying for D-II?

MR. BUTERMAN: Objection.

THE COURT: Basis.

MR. BUTERMAN: Mischaracterizes the record, Your Honor.

THE COURT: He can answer it.

BY MR. KESSLER:

Q Okay. Was this the first time USL was applying for D-II?

A I don't think so.

Q Had they been D-II before?

A No, I believe they had.

Q Oh, when they were jointly in the league by --

A Your question was what D-II they were, yes.

Q That was the league that the Federation ran in which both teams and both leagues were in, is that what you're referring to?

A Yes.

Q Okay. But as an independent league, this was the first time USL was now saying I want to be D-II; correct?

MR. RUSKIN: Objection, misstates the record.

MR. YATES: Objection misstates the record.

Q When was the USL --

THE COURT: Can I rule on the objection?

MR. KESSLER: I'm sorry.

THE COURT: If you can answer that question, you can answer it. If it's incorrect, you can correct it.

A Okay. Do you want to ask the question again?

Q When was the USL previously a D-II sanctioned league before the 2016 season?

A It was prior to that. It was when they had the joint league with the NASL, like 2011, 2010. I don't remember.

Q Okay.
A But I know they had a D-II sanction at some point.
Q It was that one year when the Federation actually ran the league and allowed teams from both conferences to be in it; is that correct?
MR. RUSKIN: Objection, Your Honor. It's an improper question when he knows that's not the fact.
THE COURT: I'll allow it.
A Ask the question again, please.
Q Okay. I'll ask it to you: Are you talking about the time when the Federation ran it jointly for both the NASL teams and the USL teams?
A I believe so.
Q And you're not thinking of any other time; right?
A Not that I can recall.
Q Okay. Now, Mr. Garber, you said here that you wondered whether there could be a time, a number of years, for a league to become compliant with the standards; correct?
A Yes, I said that.
Q Okay. And were you making that comment with respect to both the NASL and USL or just with respect to USL?
A For anything who was applying for sanctioning, I believe making this statement that they should have some time to be able to get compliant.
Q Okay. Now, did you know -- you were later recused from

the later part of the meeting when the two leagues came into talk or were you there?

A Correct, no, I was recused.

Q Okay. Did you ever learn that NASL asked at this -- never mind. Withdrawn.

Let me go on to your next comment on page 89. After you state, "because I think the challenge that we" -- this is 88 just to give context, "because I think the challenge that we have in all these waivers because I mean early on in MLS's history, I'm sure you have this before my time, but you had waivers you were required."

Mr. Flynn says, "a lot of it"; right?

A Correct.

Q So, Mr. Flynn was commenting that MLS had gotten a lot of waivers; right?

A That's what he said, yes.

Q Right.

And then you try to say and Mr. Garber to start, And then Mr. Cordero says: "This is the first year you don't have a waiver."

And what Mr. Cordero was saying this is the first year he can remember in the history of the MLS that you didn't have a waiver, correct? That's what he was saying?

A That's what he was saying.

Q Right.

And you responded, "but the waivers for things like coaching."

And he responded, "either you have waivers or you don't."

That was his response; correct?

A That's correct. That's what he said.

Q And then you said, "I think you could put it in buckets, though, Carlos."

Carlos is Mr. Cordero; correct?

And you said: "You're not being practical. There's a difference between a guy going from a license A to a license B. I mean" -- "I don't mean to be contentious with you and going from eight teams to 24 and having, you know, a 5,000 seat stadium to 25,000, I mean, it's a ridiculous statement. I'm sorry to be aggressive but it's ridiculous."

And then Mr. Cordero says: "We're interpreting what the rules are."

And Mr. Garber said: "No, you're not. You can establish that there are certain."

And then Mr. Cordero says: "This is going back to whether -- let's go back, let's go. Tell the Federation, go back and rewrite the rules. Let's start over."

"Mr. Garber: I'm saying maybe the lawyers more than coaching" -- I'm sorry. "I'm saying maybe the lawyers should look at it."

"Mr. Cordero: I don't disagree. All we're trying to do to the best of our ability is interpret what's being given to us based on the facts."

"Mr. Garber: Carlos, I actually wasn't even talking to you and your task force. I was talking to the board so take a deep breath.

And he goes: "Sorry."

Mr. Cordero was on the professional league task force at that time; correct?

A I believe so.

Q Right. And he had presented recommendations as to sanctioning for USL and for NASL at that time?

A Not that I'm aware of, no.

Q Okay. And Mr. Garber says: "What I'm if suggesting here is maybe what we need to do is look at the entire process."

Then, Mr. Nunez goes: "Hey, Don, you need some coffee today, have some coffee. You make a good point."

And then you said: "Let's take a look at the process."

And then Mr. Nunez says: "No, there is a difference. I'm sorry to interrupt, but there is a fundamental difference between someone who comes in and says, okay, we want a waiver because we only have -- we have two owners. We used to have ten. That's a difference than someone who is saying" --

Mr. Garber says: "Yeah, coaching licenses."

Mr. Nunez says: "Coach license."

And then Mr. Gulati says: "But with respect, guys, I don't disagree with the principle, but you have a lot more than coaching license waivers."

Then Mr. Garber says: "I'm talking about now, Sunil, you can argue."

Mr. Gulati goes: "I know that in the early days" -- and he goes "that's after 20 years. I know."

This is what you said now, "but in the early days you needed to do that because you were required to."

And Mr. Gulati says: "The early days ended last year when Gabriel told his team."

Do you know what that refers to?

A Gabriel Brenner who owned a portion of the Houston Dynamo.

Q Okay. Mr. Gulati is saying the early days for MLS when they needed all of those waivers, just ended the last year at that occasion, is that what he was saying?

A No, I really don't know what he was saying there.

Q Well, then he goes on to say is: "All I'm saying is this: I don't disagree with the principle that we should have fewer waivers but it wasn't just coaching licenses, we had fields that didn't meet it. We had filled only six teams and Gabriel couldn't full two teams until last year or maybe this

year. So I got it. We agree on that. We should have fewer waivers."

Do you see that?

A I do.

Q Right.

And then he goes on to say: "So, I got it. We agree on that. We should have fewer waivers. And by the way, the standards change under the current rules after you've been playing. That's in the rules now. That's in the rules now."

Then I'm going to skip now, okay, if you look at page 92, Mr. Nunez says: "We're not saying no more waivers, though, we're saying" --

And then Gulati says: "You've got to meet about half.

Then Nunez says: "Yeah, you can't come back every year like Cindy was saying with the same issue."

And Gulati goes: "Yeah."

And then Mr. Nunez goes: "And in the women's league it's a little bit different situation."

THE COURT: Slow down.

BY MR. KESSLER:

Q Now, I'm going to go to something else.

MR. YATES: Your Honor, could we have a question.

MR. KESSLER: I'm sorry.

THE COURT: Mr. Kessler, is this a cross format or

are we doing a soliloquy.

MR. KESSLER: Your Honor, let me ask a specific question.

THE COURT: That would be helpful.

BY MR. KESSLER:

Q Did you agree with the statements that USSF should stop giving waivers at time?

A No, I did not.

Q Okay. Now, was it correct that USL was in partnership with you at this time?

A What time are you talking about?

Q December of 2016.

A Partnership? I wouldn't describe it as a partnership, no.

Q Your own documents describe it was as a partnership; right?

A We had some of our lower division teams playing in the USL. I wouldn't describe it as a partnership in the way I think of a partnership.

Q Did your own MLS documents describe it as a partnership in slides?

A I mean, it might have been.

Q And it's correct, isn't it, that in November of 2014, you were considering at MLS entering into a new partnership with USL, isn't that true?

A If you want to show me that, not that I can recall.

Q Let's take a look at your deposition at page 290. And you were asked the following question:

"I'll ask you" --

MR. RUSKIN: Could we see it, Mr. Kessler. It's not on our screen?

MR. KESSLER: Could you put it up?

MR. RUSKIN: Is this to refresh recollection?

THE COURT: Why don't --

MR. KESSLER: Hold on --

THE COURT: The lawyers should talk to me and not each other.

MR. KESSLER: I'll show it to the witness and see if it refreshes your recollection first.

(Exhibit published to witness, counsel and the Court.)

BY MR. KESSLER:

Q Mr. Garber, take a look at line -- page 290, line 18 to 24?

MR. RUSKIN: Your Honor, there isn't anything on our screen.

THE COURT: I know. It's coming up.

MR. RUSKIN: Thank you.

BY MR. KESSLER:

Q At 17, I'll ask you --

A (Reviewing.)
Q Mr. Garber, you've read that?
A I do -- I did.
Q Does that refresh your recollection?
A It does, thank you.
Q Does that refresh your recollection that in November of 2014, you were considering at MLS entering into a new partnership with USL for the period after 2014?
A I appreciate that. I see that now, yes.
Q That's correct?
A Correct.
Q Okay. So you don't quibble with the word "partnership" anymore, do you?
A No.
Q Okay. Let me show you next, PX-589.

(Exhibit published.)

BY MR. KESSLER:
Q And you'll see this is an e-mail from Todd Durbin which is sent to various people at MLS; is that correct?
A That's correct.
Q And you'll see in the bottom e-mail --

THE COURT: What exhibit number is this? Is this in evidence?

MR. KESSLER: I believe it's in evidence. 589 so it can be displayed.

(Exhibit published.)

BY MR. KESSLER:

Q You'll see in the bottom e-mail on the first page, it says: "We received the attached from the USL. We are meeting with USL and Sunil on Monday to discuss."

Do you see that.

A I do.

Q And this is June 22, 2017; correct?

A That's correct.

Q Do you recall that there was a meeting with Mr. Gulati and USL on the Monday after June 22, 2017 to discuss a proposal from the USL?

A I don't recall that.

Q Okay. Let me ask you this: Do you recall there was an issue that MLS teams who were in the USL were not all compliant with the D-II standards?

A I recall that.

Q Right.

And do you recall that Mr. Gulati was meeting with MLS and USL to, among other things, discuss that issue in June of 2017?

A No, I don't recall that.

Q Do you recall it was your position at MLS that your teams should not have to comply with the D-II standards in USL?

A No, I don't recall that at all.

Q You don't recall that at all, okay.

MR. KESSLER: Let's take a look at JX-46.

(Exhibit published.)

BY MR. KESSLER:

Q JX-46 says, "As a follow-up" --

MR. KESSLER: This is in evidence, it can be displayed.

(Exhibit published.)

Q This is back on November 10, 2014, and this says: "As a follow-up to our e-mail on Friday, I have attached the presentation that sets out the MLS/USL pro partnership commercial recommendations."

Do you see that?

A I do.

Q Okay. And then if we can look at the next page, do you recall seeing this presentation?

A I don't.

Q Is it correct, Mr. Garber, that you have had a developmental relationship with USL since 2013?

A That's correct.

Q And is it correct that you entered into a relationship in which 50 percent of the expansion fees that USL received during your relationship would be provided to MLS?

A Correct.

Q And in exchange for that, MLS was helping to promote the

USL and providing other services to help USL; correct?

A I'm not sure about that. I think it was just the participation of our lower teams in their lower division league. I don't recall or remember anything else we did with them.

Q Do you recall you eliminated your reserve league and teams and had your MLS teams either join USL as separate clubs or become affiliated with USL clubs?

A Yes.

Q Okay. Now, if you look at slide seven of this, do you recall --

MR. KESSLER: No, it must be the next. Seven. This is nine.

Q Do you recall --

MR. KESSLER: I'm sorry, a little further, please.

Q Okay. Do you recall that there was a plan that USL would seek D-II status in 2017?

A Do I recall --

Q That back in 2014, there was a plan that they would seek D-II status for the 2016 or '17 season?

A No, I don't recall that.

Q You don't recall that, okay.

But eventually, you know USL did apply for D-II status; right?

A Eventually they did.

Q And there was an issue about your teams not complying with the standards?
A Our teams did not want to comply and ultimately over time left the USL.
Q Okay. And now in the 2016 season, do you recall USL had to get 31 waivers to be sanctioned as a D-II league?
A No, I don't recall that.
Q Do you recall that many of your teams were not in compliance with the standards in 2016?
A The D-II standards?
Q Yes.
A I -- I don't know what -- what teams or whether they did or didn't. In 2016, we were winding our way out of that league so I don't recall what teams or what standard you're talking about.
Q Okay. Let me show you next, PX-590.
(Exhibit published.)
BY MR. KESSLER:
Q PX-590 is an e-mail from you to Mr. Abbott and Mr. Durbin and others; correct?
A Correct.
Q And you're forwarding a message from Mr. Gulati to you and Mr. Papadakis, Mr. Flynn and Mr. L'Hote; correct?
A Correct.
(Continued on the following page.)

EXAMINATION BY
MR. KESSLER:
(Continuing.)
Q Now, this is back in that June 2017 period. Do you see that?
A I do.
Q Okay.
MR. KESSLER: Your Honor, I move into evidence PX-590 in it's not already in.
MR. RUSKIN: No objection.
THE COURT: So admitted.
(Plaintiff's Exhibit PX-590 .)
MR. KESSLER: Please display it?
Q So this is June 2017. Look at what Mr. Gulati wrote to you and Mr. Papadakis.
First of all, remind the jury who is Mr. Papadakis?
A He is one of the owners of the USL.
Q Okay. So this is being sent to one of the owners of the USL to you with a CC to Mr. Flynn and Mr. L'Hote; correct?
A Correct.
Q And it says, Pro Meeting Monday. Per my discussion with each of you, our basic agenda is as follows. The overall state of pro soccer in DI and DII with emphasis on DII.

Do you see that?

A I do.

Q And then, if you look four lines down, Specific status of USL teams Re: DII standards compliance, MLS reserve teams, non-MLS teams.

Do you see that?

A I do.

Q Does this refresh your recollection that you had a meeting in June of 2017 with Mr. Gulati, Mr. Papadakis, with Mr. Flynn and with Mr. L'Hote in which, among other things, you discuss the status of MLS reserve teams regarding DII standards compliance?

A Yes.

Q Okay. So you now remember such a meeting?

A I do.

Q Okay. And, at that meeting, you took the position that the MLS teams should not have to comply; correct?

A No.

Q You don't remember that?

A Not that I don't remember it. That's not what was said.

Q Okay.

A It doesn't say that in this e-mail here.

Q Okay. Do you recall one of the things discussed in this meeting was whether or not NASL teams could be

persuaded to merge into the USL?

A No, not that I recall.

Q You don't recall that.

Okay. What do you recall was discussed at that meeting?

A The overall state of pro soccer and discussion on our plans for expansion, what it was that the USL was going to do. And then what we were going to do with our teams which was not to apply for a Division II standard and what non-MLS teams were going to participate, I would assume, in anything related to the other leagues. That's what was discussed.

Q You said that your teams were not going to apply for a Division II standard?

A Correct.

Q But your teams were part of the USL, correct?

A Our teams were part of the USL when they were playing in Division III. When they went up to Division II, we opted to not invest in what would be required to satisfy the DII standards and then ultimately wound out of that league and then started our own Division III league.

Q Mr. Garber in 2016, you played in Division II and waivers were required for your teams.

MR. RUSKIN: Objection. Misstates. Lack of foundation.

Q In 2016 --

THE COURT: Are you rephrasing your question.

MR. KESSLER: I'm rephrasing.

THE COURT: Okay.

Q Did you play in the USL your teams in the 2016 season?

MR. RUSKIN: Same objection, your Honor.

THE COURT: I'll let him ask it.

A I believe so.

Q And they were certified as Division II that year; correct?

A I don't really recall.

Q Okay.

A I don't recall.

Q In the 2017 season, did your teams play in the USL?

A They did but I don't recall what division they were playing in.

Q You don't recall the whole subject --

A They were playing in Division II.

Q Right. And your teams required waivers that year, right?

A They did, yes.

Q And they played in Division II in the 2018 season, correct?

A They must have, yes.

Q And they required waivers in the 2018 season, correct?

A I would assume so.

Q Yes, okay.

So, at this meeting in 2017, you weren't saying that your teams were not going to be part of USL for the 2018 season; right, you weren't saying that?

A I don't know what year this was referring to, so...

Q Well, this is June 21, 2017, right? I understand, Mr. Garber in later years you left USL. I'm focused on 2017-2018, okay?

In the 2017 season, your teams were part of USL?

A They were.

Q And in 2018, your teams were part of USL?

A They were.

Q And in each of those years, they needed waivers if they didn't comply with the Division II standards; correct?

A I would assume so.

Q Okay. Now, let me show you next. Let me show you PX-612.

Mr. Garber, we can look at PX-612. This is an e-mail from you to a number of the people associated with MLS; is that correct?

A Mm-hmm.

Q Okay. And this was something in advance of tomorrow's Advisory Finance Committee call; is that correct?

A That's correct.

Q And what is the Advisory Finance Committee of MLS/SUM?

A Excuse me.
Q What was the MLS/SUM Advisory Finance Committee?
A It was an ownership committee that dealt with approvals of budgets and approval of financial matters.
Q Okay. And if we can look at the next page, please.
If you look at this memo that you wrote -- well, first, I don't know if this is in evidence.
MR. KESSLER: I move it into evidence if it's not.
THE COURT: We should keep track of what's in and not in evidence. It's not in evidence.
Any objection?
MR. RUSKIN: No objection.
THE COURT: So admitted.
(Plaintiff's Exhibit PX-612 .)
Q This is from you to the MLS/SUM Advisory Committee, correct?
A That's correct.
Q And you're writing to provide an update on the LAFC transaction.
What was LAFC?
A That was a new MLS team that was going to be launched in Los Angeles.
Q Okay. And what the subject of this memo is that the LAFC team was not going to have a 35 percent single owner, correct, you recall that?

A This was an extensive document. Some of it was related to that and some of it was related to an incredible ownership group that was coming together in Los Angeles. I have to look at the whole document but I don't know that the entire document was about that.

Q Okay. One of the issues was they did not comply with the 35-percent owner requirement, correct?

A That's correct.

Q Right. And the 35-percent owner document was both a requirement of your internal rules at MLS and the standards for being certified as a Division I League, correct?

A That's correct.

Q Right. And you decided to waive your rules to let this ownership group come in, correct?

A Yes.

Q And you never applied for a waiver for this team with USSF; correct?

A Not that I'm aware of. And to be clear, I was very rarely, if ever, involved with waivers overall. So I don't know whether we asked U.S. Soccer for that. This note was reflective of our own internal waiver process.

Q Right. To your knowledge, you never applied nor such a waiver with USSF?

A Not to my knowledge.

Q Okay. But you violated the standards for Division I;

right?
A I wouldn't describe it as violated. We had three of the wealthiest, most successful, sports team owners, Hollywood executives, Magic Johnson, Mia Hamm coming in to own a team, build a stadium in Downtown Los Angeles which they did. So I wouldn't describe it as violating the standards.
Q Mr. Garber, did Division I standards require a 35-percent owner of USSF; correct?
A Unless you ask for a waiver.
Q Right. And you didn't ask for a waiver but you did it anyway, correct?
A I don't recall whether we asked for that waiver or not.
MR. RUSKIN: Your Honor, again, counsel is asking questions that he knows are contrary to the facts. It's not a proper question when he knows that.
THE COURT: All right. Ask your question.
Q Mr. Garber, did you take another expansion team from Minnesota?
A Take? No, we never took a team.
Q Did you accept another expansion team from Minnesota?
A The Minnesota ownership group that had owned a team in the NASL left that league because of their view of their failures and then looked to invest in Major League Soccer to build a stadium to support investing in players and in staff

in a way that they thought would deliver on their investment and in their community.

Q What year did the Minnesota team move to MLS from NASL?

A They started playing, I believe, in 2017. I think we announced it a couple years earlier than that. I don't recall the exact dates.

Q Okay. This ownership group had a team in the NASL before this, correct?

A They did.

Q And you considered that to be a high-quality team; correct?

A Not when they were playing in the NASL, no.

Q So you took a low-quality team into MLS?

A Again, I object to the idea that we took anything. The ownership group that was playing in the NASL was interested in having a team that would have a league with a national television contract that would bring in new partners. The owner of the Minnesota Timberwolves, the owners of the Minnesota Twins who were not interested in being part of that ownership group while they were playing in a minor league.

They came to us, saw all the things that were going on in Major League Soccer, and wanted to be part of our league.

Q Right. They wanted to be part of a DI league; right?

A No, they wanted to be part of a league with proper

owners, that was properly governed, that had national media contracts, that had national sponsors, that had at that time 22 teams and a dozen, more than dozens of stadiums. It was not, in my understanding, at all relative to what division we were in.

Q Mr. Garber, didn't they tell you they wanted to be in the DI league?

A I don't recall what they said about division.

Q Okay. Did they also not satisfy the 35-percent owner requirements?

A They did not.

Q Okay. So this is a second team that did not satisfy the 35-percent owner requirements.

Did you seek a waiver from USSF for that team?

A I believe we did.

Q You believe you received a waiver for that?

A I do.

Q What year do you think you got that waiver?

A I believe we asked for a waiver. I believe we did not ask for the waiver in the last year. I could be wrong but I believe we asked for a waiver but that's what my recollection is.

Q Okay. Now, Mr. Garber, let me show you next.

What year did you think you asked for a waiver?

A I don't recall.

Q They started playing in what year?
A I believe it was 2017.
Q Right. And you think you asked for a waiver for '17?
A I believe so, but I don't -- I believe so. I could be wrong.
Q You, each time when you prepare your reports, your annual reports, submitted asking for waivers, you're present for that; right, at the board meetings?
A Which board meetings?
Q USSF board meetings when ask you for waivers when you go through your annual report?
A No, I have been. I could recall a meeting in 2009 when I made a presentation. I have not got a staff of people that work in our legal department; that work in our sporting department. I am not involved specifically in the waiver process of applying for waivers and currently not involved in a board meeting when they're being reviewed.
Q I'm asking a little something different.
The annual report asking for waivers is presented to the USSF board each year; correct?
A I would assume it is. I am not part of that process. We're not -- that information is not shared with me. It's not shared with the professionals, so I don't know who at the MLS board -- the U.S. Soccer board it's shared with.
Q Mr. Garber, you don't recall being at meetings in which

you even spoke about your annual reports?

A I remember that in 2009, I do.

Q Let me show you next PX-194 in evidence.

This is the board meeting on September 1, 2017, in which it was decided --

MR. KESSLER: It's not in evidence? Is a JX version of this in evidence?

THE COURT: Why don't you just move. Please move.

MR. KESSLER: I will move it in but I'm sure we've done this transcript.

THE COURT: This evidence is not in evidence. This number.

MR. KESSLER: I apologize, your Honor.

THE COURT: Any objection.

MR. RUSKIN: Your Honor, it's already in as JX-77. If he wants to use that, that's fine.

MR. KESSLER: Let's use JX-77. I'm sorry, your Honor, I knew there was a version of this. I just referenced the wrong number.

Q Do you remember attending the September 1, 2017, board meeting of the USSF in which it was decided whether or not to grant sanctions for Division II to NASL and USL?

A I remember attending this meeting. I was not for the meeting where it was decided -- participated in the meeting,

or at the meeting, where it was decided to grant sanctions it the USL or the NASL.

Q You attended the first part of the meeting for general discussion about, in the general sense, the federation and how its standards should be applied?

A I'm sorry, I remember attending the early part of the meeting.

Q And do you remember that discussion was a broad-ranging discussion as to how the federation should apply its standards in general?

A I don't remember from 2017 exactly what was discussed, but I'm sure you're going to get there.

Q Okay. Let me direct your attention to Page 60.

And this is you speaking, correct?

A You have to give me a second here. Those were comments from me.

Q Yes. And let me direct you first to Line 13.

And you say, And I think that's rational because of the evolution our league parallel to the evolution, what I will call sort of the real growth of the federation over the last 20 years.

Now, what you were stating here is that there was a connection between the success of the USSF and the success of MLS, correct?

A I don't know what I was saying there. But as I've

stated yesterday, I believe that there's a connection between our federation and MLS's success.

Q Then you say, And the fact that the foundation, everyone here who should be aware of that, the corpus left over from the U.S. Soccer Foundation, which was 60 million bucks, that now is way higher than that; 5 million of that foundation money was a grant to Alan Rothenberg and to Mark Abbott still at MLS, to be, represent the startup costs for MLS in 1994, 1995.

You spoke about that, correct?

A I did.

Q And the reason you were talking about that is because you wanted to emphasize the symbiotic relationship between the federation and the league, correct?

A I think that is a misrepresentation. I was talking broadly about the history of the relationship between our league.

Q You think I --

THE COURT: Let him finish his answer.

MR. KESSLER: Sorry.

A I'll repeat that. I was talking about the history of the relationship between our league and the federation. And even prior to that, even before our league, the U.S. Soccer Foundation.

Q You think it was a misrepresentation that you were

talking about the symbiotic relationship between the federation and the league?

A It doesn't say symbiotic there.

Q Look at Page 61, next line.

But there's been this symbiotic relationship between the federation and the league.

Do you now remember that's what you were talking about?

A Yes, I think if you -- yes, I do remember saying that after the first couple of sentences.

Q Thank you.

And then you go on to say, Part of that, and I think Dan speaks about this better than I do, is the need for a strong professional league to grow the sport at all levels. We can discuss that for days on end.

You said that, correct?

A I did.

Q And, again, what you're talking about here is what you believe to be the symbiotic relationship between the federation and MLS, correct?

A Correct.

Q And you're talking about this just before the board goes on to decide when you leave the room, whether to grant the Division II sanction to NASL, whether to grant the Division II sanction to USL in which you had a relationship; correct?

A Let me be very clear --
Q Can you say yes or no to that?
A It's not a yes-or-no answer and I think you misstated the facts.
Q Okay. Let me restate my question.
A Okay.
Q After this discussion, you knew the board, you were to leave, was going to consider whether to give a DII sanction to NASL; is that true?
A That's not true.
Q You didn't know that?
A I did not know that.
Q Why did you think you were leaving the room?
A I stated that I left the room. I didn't know that I was going to leave the room in the beginning of that meeting. We were not told that there was going to be any vote on a sanctioning for the USL or the NASL.
Q Okay. Did you know that those issues were even being presented that day?
A I don't know what was being presented. I know it was going to be discussed.
Q Okay. You then go on to say the following on Line 12.
But I think it's important, the way I look at this, I think it's important to hear the perspective that, to me, this is less about MLS and the federation, though, you can't

sort of separate the discussion around that, and it's really more about the federation's governance rights of the sport. And as I have been on this board now, 18 years, I very much I believe that you need to have, they were required to, but you need to have a governing body that has teeth or else you have chaos.

You said those words, correct?

A Yes.

Q Now, Mr. Garber, when USSF didn't require MLS to fully comply with the standards for more than 20 years by giving you waivers or by not even checking to see if you're in compliance, do you think that was the federation applying the standards with teeth?

A I think if --

MR. RUSKIN: Objection.

Q It's a yes or no?

A I don't know how I can answer that question.

Q You can't answer it yes or no?

A I would say no to that. I don't agree with that statement.

Q No is fine. Your counsel gets to ask you questions.

A Yes.

Q So you don't think that was applying the standard?

A I don't agree with your -- the way you posited it. I'm not agreeing with.

Q Mr. Garber, you have to answer my questions.
A So why don't you ask it again if you wouldn't mind.
Q Mr. Garber, if the board were to deny NASL a sanction completely for DII, that would be applying their standards with teeth; correct?
A I just think it's speculation. I don't know how to answer that question. What standards? The standards on the coaching waiver? The standards on a stadium that might have fewer seats and then build a brand-new stadium?
Q The professional league standards, okay? The professional league standards don't distinguish between different requirements, correct?

MR. YATES: Objection to the form.

THE WITNESS: That's not true.

THE COURT: I'll allow it.

Q Mr. Garber, is it correct that you told the board that, as a governing body, it has to have teeth or else you have chaos?
A I was speaking broadly about my views about governance. There is nothing in this statement related to standards. I have been the longest-standing board member. I believe in proper governance for my league. I believe in proper governance for our federation which is governing things way beyond the pro leagues.
Q So, okay, what does it mean for the standards, I'm

sorry, for the governing body to have teeth? Your words. What does it mean when you're saying the governing body has to have teeth?

A I think it was a colloquial expression that they should be thinking about governance and thinking about how they apply their governance rules.

Q With teeth. What did the teeth mean?

A I don't really know it was a colloquial statement.

Q You don't know now because, Mr. Garber, there's no other explanation for the word teeth other than to apply the standard strictly, correct?

A This statement does nothing -- there's nothing reflected in the statement that has anything to do with standards. It has to do with the federation's governance. They have international player limits. They charge membership fees for players. They have athletes that have to apply to be governed by the federation. We have leagues that have to have -- players that get called up to the national team like MLS players were last night against Costa Rica. The federation has dozens of rules that are part of the their governance and I feel strongly that governance is an important part of the proper operation of a governing body.

Q Mr. Garber, you testified a few minutes ago you didn't know that the board was going to go on to discuss the

applications that were being submitted by the NASL and USL at that meeting; is that correct?

MR. RUSKIN: Objection, your Honor.

THE COURT: Sustained. That's not what he said.

Q Okay. Mr. Garber, did you know that the board was going to go on later to discuss those applications sustained?

THE COURT: Asked and answered. Move on.

MR. KESSLER: Okay.

Q Take a look at Page 59 of the transcript.

A 59?

Q 59. You'll see, Mr. Gulati is here talking at Page 21.

He says, It's really most of the leagues, if you're doing it right, their standards, the entry-level standards to get into MLS are far harder than our standards and the problem is where they're not. So right now, going on, one of the issues that you will see in a little bit is one of the leagues has put a proposal forward that submits some teams. We don't know if they meet the standards because they've come to us in the last two days. So it's a fair point and something we should discuss that's absolutely a fair point.

Do you see that?

A I do.

Q And you heard Mr. Gulati make those comments, correct?

A I was at the meeting, yes.

Q And did you understand that the league he was talking about here was NASL?

A I didn't recall him making these points and I did not know who he was talking about in his comments here.

Q But you were there and you heard those points, that's what he said; right?

A I was at that meeting, yes.

Q I know.

And your statement about the governing body that has teeth occurs right after those comments by Mr. Gulati, right?

If you go on, your comments are on Page 61, his comments are on Page 60; right?

A I think his comments are on 59.

Q 59 to 60?

A Yes.

Q And then on 61, you make the comments about the governing body should have teeth; correct?

A Correct.

Q Right. And as you're sitting here now, your testimony to the jury is you don't know what you meant by the word teeth, is that it?

A I don't. I was stating there that the federation should assert their governance rights.

Q What does it mean to assert their governance rights?
A It means that they should be thinking about their governance when they make decisions.
Q And that would include decisions as to which leagues to sanction; right?
A It should include any decisions that they make.
Q Right.
Was there anything else you know of that was going to be on this agenda today involving the federation asserting its governance rights other than a discussion about sanctioning USL and NASL?
A Today or in January.
Q That meeting?
A Can you repeat that question?
Q Do you know of any other subject that was going to be discussed at this meeting on September 1, 2017, that would involve the federation asserting its governance rights other than its consideration of whether to sanction leagues?
A I don't know what else was on the agenda.
Q Okay.

MR. KESSLER: Your Honor, I'm at a point now where I would like to use the transcript. I don't know if it's been checked or not.

THE COURT: Why don't we take our break. We'll come back at 11:00.

MR. KESSLER: Thank you.

(Jury exits courtroom at 10:43 a.m.)

THE COURT: Figure it out.

(A recess in the proceedings was taken.)

(Witness takes the witness stand.)

THE COURT: You can be seated.

MR. RUSKIN: Your Honor, can I raise one thing before the jury comes out?

Multiple times I've been forced to object because questions have been asked based on foundations that are not true. That's an improper question when a question is asked and the supposition is false. And it's required me to have to stand up in front of jury and look like I'm trying to prevent testimony in some way. I'm not, but it is inappropriate to ask those questions and I need some way in order to prevent that.

THE COURT: I'm sure Mr. Kessler is going to say that he had a basis for his question.

MR. KESSLER: I believe I did, your Honor.

MR. RUSKIN: Each of the times that I stood up and they were sustained, they were based on foundations that were not supported by the facts.

MR. KESSLER: I made one error where I said '16 versus '17 and then I corrected it after that. But other than that, your Honor, that was unintentional. I just

misguided --

THE COURT: My assumption is that the lawyers in this case know the rules about good-faith basis. And if it appears that we are straying far from that rule, I will take appropriate action. But for now make your objections and, I mean, as you know, one of my final instructions is that the lawyers are supposed to make objections. So I don't think this jury that is very attentive is perceiving any attempt to, by you or anyone, by making objections that you're trying to conceal anything. If I feel that the Good Faith Rule is being violated, I'll take appropriate action at that time either by sustaining or worse by telling the jury why I'm sustaining an objection.

MR. RUSKIN: That's all I was asking for, your Honor. Thank you very much.

MR. KESSLER: Thank you, your Honor.

THE COURT: Okay. Have we resolved the transcript issues.

MR. RUSKIN: With respect to the particular transcript -- with respect to the particular citations that Mr. Kessler referred to, he can ask the witness questions as to whether or not that's his view.

MR. KESSLER: And, your Honor, as I understand it, you do not want us to put the transcript into evidence. I'm simply going to put it before the witness and ask questions

about it. Is that what you refer?

THE COURT: Yes, I assume you don't, you don't agree yet with the full transcript or...

MR. RUSKIN: There is no way to authenticate it, your Honor.

THE COURT: So the witness will have the document in front of him. You'll point him to the quote if you want to read the quote and say, Is that a quote that you made? Then the witness can answer yes, no, I don't remember, it sounds like something I would have said.

MR. KESSLER: Very good.

(A brief pause in the proceedings was held.)

(Jury enters courtroom at 11:01 a.m.)

THE COURT: Let's take our seats. Mr. Kessler, whenever you're ready.

MR. KESSLER: Yes.

EXAMINATION BY

MR. KESSLER:

(Continuing.)

Q Mr. Garber, I want to state for one moment before I go to the final subject.

If we could put back up the September 1, 2017, transcript which is JX-77. And if you can look at, please, at Page 40.

You'll see, Mr. Garber that Mr. Gulati says the

following on Line 24.

We can move on to the last item of the day which is professional league applications and sanctioning and licensing. So we're going to take this in three parts.

Does that refresh your recollection? I won't ask it that way?

You heard those comments from Mr. Gulati; correct?

A I was at that meeting, yes.

Q Right. And so, you knew that the last item of the day, which he was now introducing, was professional league applications and sanctioning and licensing; correct?

A That's what he stated.

Q Right. And that's prior to the remarks you made later that we reviewed earlier; correct?

A That's correct.

Q Then he goes on to the following.

If you look at Page 19, he says -- well, let me go from page -- Page 41, Number 4, Item 4.

First, Russ will give us a little bit of an overview of the last quarter century and generally. Most of you have heard this and Lisa and Val heard a lot of it from me in a meeting that we had last week.

Do you know who Lisa and Val are?

A They are independent directors of U.S. Soccer. Lisa Carnoy. Yes, I know who it is.

Q So he says, So we will do that briefly. And then Carlos will talk about the current state of play and his committee's recommendations.

Now, that was Mr. Cordeiro, correct?

A Correct.

Q And his committee was the Professional League Committee, correct?

A Correct.

Q Does that refresh your recollection that at this meeting you were told Mr. Cordeiro was going to present his committee's recommendations about the sanctions?

A Correct.

Q And then he says, He's got a committee that's comprised of Carlos as chair. Dan was Dan Flynn; is that correct?

A Yes.

Q Okay. And then also Mr. Ahrens and Lydia was the general counsel, correct?

A Correct.

Q And then he says and after that, I'm sorry, Before that, we will have discussions, general discussions first, and then your recommendations.

Do you see that?

A I do.

Q So you stayed for the general discussions and that's where you made your remarks; correct?

A I don't know whether it was during the earlier part of general discussion. I made my remarks prior to any recommendation.

Q So Mr. Gulati goes on to say right below that on Line 19, So before we get to the specific recommendations, we will talk about some general issues. Everyone is welcome to stay for that. And Carlos will make some recommendation and you guys will not be present for those.

Do you see that?

A I do.

Q Okay. So does that remind you that when you made your comments about the federation governance being applied with teeth, you had first heard that there was going to be a general discussion you would participate in and then later, after you left, the recommendations would be made on the sanctioning decisions.

You knew that; correct?

A I recall that now, yes.

Q Okay. So your memory is now refreshed from your earlier testimony; correct?

A Correct.

Q Okay. Let's go on to something else. My final subject for you right now.

If you look at PX-621. This is for identification only.

So Mr. Garber --
A This is not in the book?
Q This is not in the book. Do you have a copy?
THE COURT: There you go.
MR. KESSLER: Thank you, your Honor.
Q Do you recall you gave a press conference on October 15, 2014, about the comments that Coach Klinsmann had made that you thought were adverse to the MLS, correct?
A Correct.
Q So just to remind the jury because we covered this yesterday, Coach Klinsmann was the coach and I think you said technical director, is that the right term --
A Correct.
Q -- of the Men's National Team, correct --
A Correct.
Q -- at this time.
And he made some comments about MLS that you thought were inappropriate for him to make; correct?
A Yes. False and inappropriate.
Q False and inappropriate.
And you gave a press conference on October 15, 2014; correct.
Do you remember that?
A Mm-hmm.
Q You have to say yes or no because mm-hmm doesn't work

well in the transcript.

Is it yes?

A Yes.

Q Okay. Thank you. Now, this is a -- we had an audiotape of your press conference and we had this?

MR. RUSKIN: Your Honor.

THE COURT: Just ask the question.

MR. KESSLER: Okay.

Q I'm going to ask you to look at this and ask if you remember making the following comments, okay?

If you look at Page 2, it states as follows on Line 6:

We have enjoyed an incredibly positive and mutually beneficial relationship with the federation since the founding of the league.

Do you remember making comments like that?

A I do. This is a transcript, I'm sure I made those comments.

Q And they were true comments, correct?

A Yes.

Q And I believe that both we, the leaders of MLS, our owners, the leader of the federation believe that the league and the future of the sport is inextricably linked.

Do you remember those comments?

A Yes.

Q Okay. And then did you say, And that has been the core

of everything that this league has done and is the basis of what I think has been probably the most successful partnership between any league and any federation in the world of football.

You said that, correct?

A Yes, mm-hmm.

Q You would agree there was a partnership, a successful partnership, between MLS and the United States Soccer Federation; correct?

A I do believe that. Partnership is a broad description, but the relationship was very close and we worked hard together to grow the sport. But partnership at times has different meanings.

Q But you used the word "partnership"?

A Yes.

Q Okay. Let's look next at Page 6.

On Page 6, you say, on Line 13. Well, look at that.

It says, you know, I've been the commissioner of this league for 15 years. I've also been a member of the U.S. Soccer board for the same amount of time and I do deeply, deeply believe in the future of the sport. I believe even more in the partnership that we have with the U.S. Soccer Federation.

Did you say that?

A Yes.

Q And you believed it then and you believe to now?
A I do, mm-hmm.
Q Okay. If you look next at Page 7, you stated, I'm going to repeat the comment I made before and it really is one of our core values. We believe that the league and the future of this sport and our relationship with the federation are inextricably linked.
You stated that, correct?
A I did.
Q Right.
That is, if we are able to continue what we have had a strategy to do together, which was to have the league.
In other words, one of the strategy you had together was to have MLS, correct?
A I don't know how to answer this. You can't answer that without finishing the rest of the sentence.
Q I'll finish the rest of the sentence.
A Thank you.
Q Okay. Is to have the league invest deeply in player development, for us to work collectively on a wide variety of progress and initiatives --
THE COURT: Programs.
Q -- to grow the game overall?
THE COURT: Programs.
Q -- to become more and more of a soccer nation?

THE COURT: Mr. Kessler, please listen to me. It's programs not progress.

MR. KESSLER: I'm sorry. Thank you.

Q On a variety of progress and initiatives.

THE COURT: Why don't you read it again, please.

MR. KESSLER: I'll read it again.

Q That is, if we are able to continue what we have had had a strategy to do together, which is to have the league, is to have the league invest deeply in player development, for us to work collectively on a wide variety of programs and initiatives, to grow the game overall, then we will become more and more of a soccer nation.

You stated that, correct?

A I did.

Q Let me go to Page 13.

You and Mr. Gulati discussed this issue between you after it happened, correct?

A I'm sure I discussed it with him.

Q And you sent him a strong letter?

A Yes.

Q Did you state at the press conference, I sent a very strong letter, this is Line 3, to Sunil and a number of our MLS board members. Unsolicited yesterday, sent a note to Sunil and I spoke to him very briefly before this call.

You made those comments, correct?

A Yes, I did.

Q And then you said the following on Line 7.

As I started this, he was one of my closest friends.

Is that a reference to Mr. Gulati?

A Yes, it is.

Q So you publicly stated he was one of your closest friends, correct?

A Correct.

Q And then you went on to say, And the partnership that we have with him.

You're talking about a partnership with Mr. Gulati himself; correct?

A I was referring to him as the president of U.S. Soccer.

Q Okay. So the partnership that we have with him, you meant as the president of U.S. Soccer has led to the league we have today.

You stated that, correct?

A Yes.

Q And I'm confident that he will understand and accept the severity of what is happening here and ensure that our technical director is in line with the vision that he has publicly stated.

You made those comments, correct?

A I did.

Q Now, Mr. Garber, after you made these comments, do you

recall Mr. Gulati then also gave out comments to the press in response?

A I don't recall that.

Q Do you recall that he said publicly, We are on the same page?

A I don't recall what happened after this press conference.

(Continued on the next page.)

BY MR. KESSLER (Continuing):

Q I'm just going to show you just to see if it refreshes your recollection PX-598. And you'll see this is a news article --

THE COURT: Just take him where you're taking him and ask him whether that refreshes his recollection.

MR. KESSLER: I will do that, your Honor. Thank you.

Q Mr. Garber, take a look at this, and I'm going to will direct your attention to the second page of this document. If you look at the second full paragraph that begins with the word "given," read that, please, to yourself.

THE COURT: Have you read it.

THE WITNESS: I have.

Q Does that refresh your recollection that after you gave your press conference Mr. Gulati made public statements, we're on the same page?

A I do. It refreshes my recollection, thank you.

MR. KESSLER: Thank you. I have no further questions, your Honor.

THE COURT: Your direct.

MR. RUSKIN: Your Honor, may I proceed.

THE COURT: Yes, please.

MR. RUSKIN: Thank you.

DIRECT EXAMINATION BY MR. RUSKIN:

Q Good morning, Commissioner Garber.

A Good morning.

Q Commissioner Garber, on cross you talked a little bit about your duties and roles in Major League Soccer, but if you could just return to that and briefly describe your duties as commissioner of Major League Soccer.

A I am, in essence, the chief executive for our league with responsibility to oversee the operations of the league, the growth of the league, the building of our fan base, the generating of revenue, the management of our ownership group. And beyond that, ensuring that our teams and players are engaged in the community and operating in a major first class manner.

Q And yesterday you also mentioned the importance of integrity.

Can you touch upon that?

A Leagues in many cases are -- they're really a part of the public trust. Teams are part of the community. Players, we hope, operate as role models. Our owners and coaches and our league staff are held to very, very high standards. We have those standards actually articulated in our rules in ways that through our governance we have the right to ensure that every member of the MLS family is held to the highest standard.

Q And I think you testified yesterday that you've been

commissioner now for over 25 years.
A Yes.
Q How does that rank among major sports commissioners?
A It means I'm an old guy. There are five major leagues in the United States. The commissioner of the National Hockey League has been the commissioner for over 30 years. I'm the second longest standing commissioner. After me, is the NFL commissioner, the baseball commissioner, and the NBA commissioner, and now the new commissioner of the National Women's Soccer League.
Q On a worldwide basis compared to other major soccer leagues, how does your tenure compare?
A I don't think there's another executive that has been running a top professional league for as long as I've been running Major League Soccer.
Q I guess we've talked a lot and heard Major League Soccer mentioned a lot, but step back.
What is Major League Soccer.
A It's the top men's professional soccer league in our country. We'll add our thirtieth team in San Diego this year in just a couple of weeks. We have most -- all but one of our 30 teams have been built specifically for the support of soccer. We've got thousands and thousands and thousands of employees. We've got hundreds and hundreds of players that are organized in a players' union. This past year, we had

over eleven million fans come attend our games. We had national media contracts, national sponsorships. We have got a very, very robust community relations program. We've got merchandising and licensing relationship. We are operating no different than any other major league here in North America or any other professional football league in Europe, South America, or Asia.

Q And when you used "football" there, you were using the world term for what we call soccer?

A We call it soccer here, correct.

Q Do you believe MLS has been successful under your leadership?

A I don't necessarily view it as my leadership. I view MLS and I think the world views, our industry our views, our fans speak to that success. Our partners and the length of relationships we've had with our partners speak to that success.

It has been a long journey, but MLS is viewed as one of the top soccer leagues in the world. It is certainly viewed as one of the major leagues here in the United States. Our second year of existence, our sports industry awarded Major League Soccer with the sports league or sports industrialist of the year. Every year Major League Soccer is winning some award on the business side or on the innovation side.

Our owners have been committed for generations, so the league's success is really driven by visionary, passionate owners, fans that really believe in our league, staff that has committed most of their careers to the success of Major League Soccer.

From the very beginning, we tried to create the soccer nation. In the very beginning, America wasn't that. I think today it's fair to say with the World Cup coming here in 2026 that America is a true soccer nation.

Q By the way, could you just explain the World Cup; exactly what is it? Because you mentioned it.

What is the World Cup?

A The World Cup is the largest sporting tournament in the world. It will be here in United States 2026. Games will be in the United States, in Canada, in Mexico.

I was involved in co-chairing the bid of the World Cup to bring the World Cup here in 2022, the chairman being Bob Iger, the president of Disney; Michael Bloomberg, the mayor at that time; and President Clinton. We lost, we didn't win. The World Cup took place in Qatar in 2022.

But I was obviously involved in bringing the World Cup here in 2026. And I think it will be a spectacular event for the world and obviously for soccer fans and sports fans here in North America.

Q We'll come back to the World Cup a little later, but

drawing your attention to the key time period in this case, the period from 2015 to 2017, how would you describe where Major League Soccer was at that period of time?

A We had 20 teams. We had seven or eight million fans attend our games in 2015. We had many, many soccer stadiums. We had world class players. David Beckham had already left Major League Soccer, but we had dozens of world class players. We had young American players that competed in the World Cup.

In 2015, we were a league with enormous momentum that had already established itself as one of the top major leagues here in the United States.

Q Commissioner, are you aware that NASL has made an accusation in this case that Major League Soccer took action to prevent it from getting divisional sanctions that it sought for the 2016 and 2018 seasons?

A I'm aware of that.

Q What is your reaction to those allegations or that accusation?

A It is patently untrue, unfounded, and, frankly, I think it's absurd.

Q When you say "absurd," tell the jury, why is it absurd?

A Well, let's start with -- on two levels. We'll talk a little about the NASL, then I'll talk as quickly as I can about Major League Soccer.

The NASL never had teams that were connected in the

community with a robust fan base. They had several thousand fans attending their games, they had no soccer-specific stadiums that were built for their league, they had no national media contracts in the history of their league and you can't be a legitimate or proper league in our country without media contracts, and they had no press coverage and certainly you can't be a successful pro league without media coverage. They had a handful of owners. In 2015, they had an owner that was convicted of -- an investor that was convicted of federal crimes. So, to think in 2015 that the NASL (sic) would have anything to do with their demise or their lack of sanction is just untrue.

Then very quickly, and I think I described it, where MLS was at that time with 20 teams and lots of stadiums and with great owners and millions and millions of fans, the idea that we had anything to do with their lack of sanction, I view their failings as their own.

Q Have you ever sought to take any step to harm NASL?

A Never.

Q Commissioner, did you ever tell anyone at any point that you were opposed to NASL receiving any sanction that it sought?

A Absolutely not. Never.

Q Did you have any involvement whatsoever in NASL's sanctioning applications from U.S. Soccer for the 2016 and

2018 seasons?

A No, never.

Q Let me break that down to more specifics.

What role, if any, did you play in connection with U.S. Soccer's decision to deny NASL's D-I application?

A I played no role at all in their D-I sanction or their D-II request.

Q With respect to the D-I application, were you in the room or dialed in by phone when NASL presented its D-I application?

A No, I was not.

Q Let me show you --

MR. RUSKIN: If I can put up, please, demonstrative DD-8.

(Exhibit published to the jury.)

Q Commissioner, I'm showing you a picture of the individuals who voted on that application. The jury has seen this before. It's a demonstrative of these people.

I just want to ask you, were any of these people connected with Major League Soccer?

A No, they were not.

Q Did you participate in any deliberations with any of these people regarding NASL's application?

A No, I did not. Never.

Q And turning to the NASL's Division II application for the 2018 season, what role, if any, did you play in U.S. Soccer's

decision to deny that application?

A Switch the slide.

Q I will switch the slide, happily so. Thank you.

(Exhibit published to the jury.)

A Can you ask the question again?

Q For the record, I've just put up the demonstrative DD-9, which are the voting board members for the vote on the D-II sanction in the 2018 season.

And with respect to that vote, Commissioner Garber, what role, if any, did you play in U.S. Soccer's decision to deny that application?

A No role at all whatsoever.

Q Were you present in the room or dialed in by phone when NASL presented its application?

A No, I was not.

Q Were any or some of the same people who were there in 2016 that were still on the board in 2018, there were a couple of new people who were added, were any of these people who are shown in Demonstrative 9 connected with Major League Soccer?

A No, they were not.

Q On this particular area, let me sum up with a few questions.

Did you ever enter into any agreement with U.S. Soccer with respect to any of NASL's sanctioning applications?

A No, I did not.
Q And Commissioner, more specifically, did you ever enter into any agreement with any U.S. Soccer board member about NASL's sanctioning applications?
A No, I did not.
Q Did you ever enter into any agreement with Mr. Gulati regarding NASL's D-I and D-II sanctioning applications?
A Nope.
Q Did you ever cast a vote for or against any NASL sanctioning application ever?
A No, I did not. Never.
Q And finally in this area, Commissioner, did you ever tell anyone that you wanted any application -- any of NASL's sanctioning applications to be denied?

Is that a view that you ever expressed to someone?
A Never did. No, never.
Q Let me turn to the pro league standards for a moment.

With respect to U.S. Soccer's pro league standards, are you aware that U.S. Soccer has occasionally revised the standards over the years?
A Yes, I am.
Q What is your general understanding of the revision process?
A I have a general understanding. I think I've stated earlier I was not involved -- much involved in the standards

process internally at all.

But I am aware that there was an evolution of the process. As the soccer industry and the sports industry continued to evolve, those standards continued to increase.

Q Did U.S. Soccer have a task force that dealt with recommendations with respect to revisions?

A Yes, they did.

Q Were you or anyone at MLS ever a member of the task force?

A No.

Q Are the professional leagues given the opportunity to provide comments to the task force on any proposed revisions to the professional league standards?

A Yes, we are. All the leagues are provided with that opportunity.

Q All of the leagues are?

A Yes, they are.

Q And has MLS ever submitted comments to proposed revisions to the standards?

A I believe so.

Q Has MLS ever told the task force that revises its standards that MLS thought the standards should be made stricter or harder to comply with?

A Never.

Q Has MLS ever done anything to make the standards harder

to comply with?
A No.
Q Has MLS ever suggested that even if the rules are applied, the standards of the rules, that they ought not be applied with flexibility and taking into account all of the circumstances?
A Can you repeat that?
Q Sure. Has MLS ever taken the view standards ought not be applied taking into account and all the circumstances as the board reviews any particular application?
A Not that I'm aware of.
Q Let's turn to the mission of U.S. Soccer.
What is the mission of U.S. Soccer?
A To make soccer the preeminent sport in the United States.
Q Even outside of the world of soccer, you think a strong professional sports league plays a role in driving the popularity of the sport?
A Absolutely.
Imagine basketball without the Knicks. Imagine baseball without the Yankees. What would hockey be without the Rangers?
So, my point is you really don't have broad interest in a sport without having teams and players and the history and the legacy and the shared family experience of families going to games together. There really is very little about

sport that people care about without having strong leagues, strong teams, and popular players, whether it's here or it's abroad.

Q And what role do you believe a strong or strong professional soccer leagues play in growing the sport of soccer in the United States?

A Well, I think it's just a microcosm of the broad concept of the sports industry. Global soccer is probably the best example of that.

When people think of English football, they think the Manchester United, they think of the Premiere League. When you think of soccer or football in Spain, you think of Real Madrid, you think of FC Barcelona. You think of the league, you think of the great players that have worn those Jerseys and kept them close to their chests.

So, the entire soccer industry and its popularity, with the exception of every four years having World Cup games and national team games, people are fans of leagues and they're fans of teams and they're fans of players.

Q Mr. Kessler asked you a number of questions suggesting that there was something wrong about having a close relationship between U.S. Soccer and Major League Soccer.

Do you agree with that sentiment or conclusion that he was uttering?

A No.

I leaned into it. I have said in certain documents that were raised that the relationship Major League Soccer has with the federation is the envy of the soccer world. I launched the World League Association many years ago, brought 40 or 50 leagues around the world together and we meet several times a year. And they aspire to have a relationship, close relationship, between their leagues and their federation so you can align on vision.

How do we collectively make the sport more popular?

And our sport is younger. We don't have the hundred years baseball of history of baseball and football and basketball. We want to work together to grow the sport. You need strong leagues; not just one league, strong leagues. You need popular players and facilities to do that.

Q Commissioner, let's step back. We haven't really talked about you. I want to give the jury a little more about your background.

Can you tell us about your background growing up?

A Sure. I was born in Brooklyn, along with my brother and sister. We moved to Queens when we were early on in grade school. I lived in Flushing, Queens, throughout my youth.

My grandparents were all immigrants. One side settled in Flushing, the other side settled and lived their lives in Brooklyn.

I went to public schools throughout grade school, I

went to a public university, I'm a proud Queens guy, and lean into that heritage.

Q After graduating from --

Where did you go to college?

A I went to the State University of New York in Oneonta.

Q And after graduating from college, what did you do next?

A I came out of college and went to work in Queens at The Bulova School, a technical school that was teaching disabled war veterans post World War II, then post Vietnam War, technical skills. They were all disabled. I worked there in the marketing space. I launched their disabled wheelchair basketball program.

I went from there into the advertising and public relations business and worked in the early days of what is called sports marketing today and worked in two large agencies, met my wife at one of those, and then in the early eighties went to work for the National Football League.

Q Can you briefly describe your role at the National Football League?

A I joined in 1983, 1984. At that time, the NFL had just begun to get into the sports marketing business and they had a number of executives that came out of the ivy leagues and really were coming out of the packaged goods business, and I think they wanted somebody like me, with my background, to come in.

And I worked in the sponsorship business, eventually ran the commercial business for the NFL, their sponsorship business for a number of years. And from that, I started what was their business development group and became responsible for what we call fan development and grassroots development.

I launched all the event at the Superbowl, including the NFL Experience. I managed the talent at the halftime show, including selecting Michael Jackson to perform, for the first time a non-Disney character, have a celebrity do the halftime show. I did that from 1992 to 1996.

And then in 1996, the NFL was looking to create an international division. They didn't really have one at that time. I was tasked to start that company and hire its staff. I opened up offices all over the world for the NFL. I lived overseas for a bit. I managed a league, which was my first league experience, which was called the NFL Europe League. It was my first exposure to soccer, having teams in Spain and England and Amsterdam, et cetera, et cetera. And I did that until I came to Major League Soccer in 1999.

Q How did that come about?

A The group that I managed, NFL International, reported into two gentleman: Robert Kraft, who owns the New England Patriots; and Lamar Hunt, who is one of the founders of the NFL. And Lamar and Robert were the chair men of the NFL International committee. They were also two of the founders

of Major League Soccer.

I was at an owners meeting. I was a young guy. They had a commissioner for a few years. They asked me if I knew anything about soccer. I said, at that time, I didn't. They said: You'd make a good commissioner.

I learned very quickly about the sport and they offered me the job in the fall of 1999.

Q What made you decide to leave the NFL to take on an opportunity like that?

A Well, I was marketing and fan development person at the NFL. And certainly, I was trying to get people around the world who knew football was played with your feet as opposed to your hands and they thought if I was able to turn people into Asia and South America and Mexico and other parts of the world on to American football, I ought to be able to take soccer in this country and turn it into a vibrant business.

The World Cup had just taken place here in 1994. It was the most successful World Cup at that time. I was seeing, by living overseas, this enormous demographic shift that was going on in our country. I had experienced that in the eighties and nineties at the NFL. Kids were growing up playing soccer. They were following teams from abroad.

I thought -- at that time, I was a young person -- what a great opportunity for me and my family to come in and give it a shot.

Q When you joined MLS, had the league taken any steps to give you confidence that it was on the right path?
A I had three great founding owners. Both as very, very successful business, people but also people that have great experience in sports.

The Hunt family is the oldest -- the longest standing investor in the Chicago Bulls, even though they're known for the world champion Kansas City Chiefs.

Phil Anschutz is the owner of the LA Kings and built the Staples Center.

Obviously, Robert Kraft is an experienced, long-standing NFL team owner.

And I thought they had the vision, they had the commitment, they really believed in how could you have a league that can drive some different things in our country, give folks that didn't have an opportunity to go to a baseball game or a football game, maybe they could expand their passion as a player and now have a team in their local market, players that they could aspire to be.

And they sat me down and said: Hey, we're committed. We're going to make this happen. You're a young guy, why don't you give it a shot?
Q Had MLS in the years before you got there saw that it had a good start?

Tell us a little about the days before you arrived.

A I made a comment about the difference between us in our early years and the difference between the NASL in its early years.

When Major League Soccer was formed in 1996, right after the 1994 World Cup, they had world class players that just played for Mexico or played for Italy or played for Colombia. Some of the biggest names in the world joined Major League Soccer in its first year. We brought back American players that didn't have a league of their own and were playing overseas. We brought back those players that played in the World Cup, beat Colombia, which was this incredible accomplishment for young American players, and we brought them back to play in Major League Soccer.

The first game had 31 thousand fans in it. We had a million fans attend our games by July of that year. The league launched in the spring. We already had a million fans in the summer. So, it was just launched with lots of anticipation, lots of momentum, lots of excitement.

Q Fair to say it was launched as a major league from the get-go?

MR. KESSLER: Your Honor, I have a foundation objection.

It's prior to the time the witness was in the league.

THE COURT: Sorry, say that again.

MR. KESSLER: Foundation objection because he's testifying about a period before he joined the league.

THE COURT: I'll allow it.

Q The question was is it fair to say that Major League Soccer was a major league from the get-go?

A Yes. It was called Major League Soccer for a reason.

Q At the time you joined MLS as commissioner did, you know that MLS had been sanctioned as a Division I league?

A Not that I can recall, no.

Q Did it matter to you, did you focus on the fact of a sanction as Division I as part of the reason or what you were thinking about when you chose to join Major League Soccer?

A No, I did not.

Q Why is that?

A Because it's called Major League Soccer. It had major league owners. It had a great plan and when I joined league I saw that plan. It wasn't something, frankly, that I can remember even being aware of.

Q At any time that you have been commissioner of Major League Soccer, did you ever think that Major League Soccer was the only league that can be Division I?

A No.

Q If a group of people were prepared to invest the money to do so, could someone else become a Division I league?

A Yes, the answer to that is, yes. There have been

multiple -- you know the NFL and the AFL, the ABA and the NBA.

Anybody has the ability to satisfy the standards of any division can play at that level. Today, we have two Division I women's leagues. So, anybody who satisfies the standards. I knew that from the very beginning.

Q Commissioner, let's talk a little bit more about Major League Soccer in depth to give the jury more of a feel of the organization.

MR. RUSKIN: Can we please publish for the witness only Exhibit DX-785.

Q Are you familiar with this DX-785?

A I am.

Q Was this document prepared under your direction?

A Yes, it was.

MR. RUSKIN: Move to admit into evidence.

MR. KESSLER: No objection.

THE COURT: So admitted.

(DX-785 so marked and published to the jury.)

Q Commissioner, what is this deck?

A We generally go out and tell anyone who has some connection with Major League Soccer our 101. This is Major League Soccer, almost a primer of our league. Whether we're talking to an owner or talking to a sponsor, talking to a community that we're looking to work with to get a stadium built.

Q Do you present this document to investors?
A We do.
Q Do you see that 2017 appears under MLS 101 on the cover page?
A I do.
Q What does that mean?
A It means it was prepared in 2017.
Q I'd like to walk through this next with you and I'm going to focus on this one.
By the way, is this a document that you tend to prepare or MLS prepares from year to year?
A We prepare it every year.
Q I'm going to walk through this one to the extent it shows the state of the world in the last season of the brand NASL, made the choice to shut down.
Is that okay with you?
A Yes.
Q Let's go to 785.003. It's titled: Vision.
It states: To be one of the top leagues of the world as defined by the quality of our play, passion of our fans, relevance of our clubs, value of our enterprise.
Do you agree that this reflects MLS' vision?
A I do agree with that.
And I agree any great company, business, needs to have a vision, an outline of a future state. And this is what

our goal has always been: To be one of the top leagues in the world.

And by the way, it doesn't say top soccer leagues, it says one of the top leagues in the world. Very quickly, we need to do that by having players and competition that is of high quality, that has great, passionate fans that are screaming in the stands and it needs to have enough fans so that it has significance.

To me, relevance of our clubs is perhaps -- most importantly, people need to care about your teams and the teams need to care about the community. So, it's not just about games, it's about where we play our games, how we play our games, how we hold ourselves, and the value of our enterprise.

So, this doesn't speak about profitability but it speaks about: What is the value? What is it ultimately worth? How could we have a long-term way to ensure that we're valuable to investors and to our partners?

Q Commissioner, let's turn to Slide 785.008. This slide is titled: Our owners.

As of 2017, it's a list of the owners.

Can you walk us through this slide?

A I'm do it quickly. Again, this is not all of our owners at that time. This specifically was talking about our owners that have ownership interest and experience in other clubs,

which I think speaks to this understanding of the sports industry. It also speaks to their capacity.

Starting up at the top, Phil Anschutz, who owned at that point a share of the Lakers. He's the primary owner of the LA Kings.

These are the founders.

The Hunt family in Dallas with the Kansas City Chiefs.

Robert Kraft, owner of the Patriots.

Going down, Maple Leaf Sports and Entertainment. Up in Canada, we have three teams in Canada. The owner of the Toronto Maple Leafs and the NBA Toronto Raptors.

Going to the second one on the right, in Seattle, that's a team that came into Major League Soccer in 2011. That team is owned by -- partially owned by the Seahawks, the Portland Trailblazers, by Paul Allen, Joe Roth, who was a very well-known Hollywood executive and a local guy because I think it's important, to the extent you can, to continue to have local owners.

New York City just broke ground on their new soccer stadium. Manchester City is owned partially by the New York Yankees.

Arthur Blank is one of the most respected owners in all of sports. He owns the Falcons and Atlanta United.

Below that, last, is the LAFC team. Their owners

own a piece of the Warriors, Golden State, Bay Area, world champion LA Dodgers. At that time, they owned a share of Roma. Very importantly, Brandon Beck owns/founded, Riot Games, a video game company. Very, very successful, the League of Legends.

And the point of all this, diversity of ownership, experience, folks that really know that this is a difficult business, it's going to be hard, and have the capacity and wherewithal and I like to say the courage to be successful.

Q Is it enough for a league to have one or two successful owners or in your view is it important to have an array across the entire league of committed owners?

A Yes, I agree with that statement.

Q Why is that?

A We now have 30 teams and you need to cover the country, you need to build a fan base through concentric circles. And those circles come together and they can create a national fan base. If you have more teams, you have the opportunity to have a global fan base.

Some teams have many years where they don't win the World Series, like the Boston Red Sox. So, Major League Baseball doesn't succeed if only one team does really well.

By the way, we have a lot of parity in our league. Ten of ours teams have one championships over our 29 seasons. So, diversity of owners, diversity of teams, diversity of

markets --

Q In terms of the owners being strong across the entire league, all strong owners, do you view that as important?

A I do view that as important.

Q Why is that?

A They have to have the will, the capacity to invest not just in their clubs but to invest in new businesses, to get involved in new companies like Soccer United Marketing, to build stadiums. We've spent billions and billions of dollars on stadiums. And it speaks to that it's not just about putting on a game, it's about being part of the community, it's about building infrastructure, it's being, you know, just long, if you will, or having a long-term vision for the sport.

Q Let's turn to 009. You touched a little bit upon this in your prior answer, but what does Slide 009, titled League Footprint, show?

A This is just back in 2017. Obviously, this map is much larger today.

When MLS was launched, it launched according to ensuring that we had teams spread throughout the country. Even though we launched with fewer teams than we have now, we had them in the west coast, we had them in the midwest, we had them in the east coast, covering time zones, being able to offer that to sponsors, allowing us to have a national media contract.

I want to reiterate, year one of Major League Soccer, ABC and ESPN was our national broadcast partner, from day one. Budweiser was our first sponsor. National promotions at point of sale because they were able to have teams and do all the merchandising that they needed to do.

My view? You need to have a national footprint in order to be a successful league.

Q Does Major League have teams in all four time zones in the continental United States?

A Major League Soccer does.

Q Is there any major league in the United States, including NBA, NFL, NHL, Major League Baseball, that does not have teams in each of these four time zones?

A No league does not have team spread I like to say from sea to shining sea and throughout time zones and weather zones as we go through all the challenges that we have; it gets very hot in the summer, cold in the winter, and you need to be able to schedule your games to be able to manage that.

MR. RUSKIN: Let's go to the next slide, 785.010.

Q Commissioner, this slide is entitled: Expansion candidates.

What does this slide show?

A At that time, we were going through a period of expansion. Remember, I said in '15 we had 20 teams, we have 30 teams today.

These are the three, six, nine, twelve clubs that had expressed interest, many of them actually submitting bids to become a part of Major League Soccer back in 2017.

These slides represent the slides from their presentations, what they offered to us. When we have expansion teams, we need a great strong owner, we need a plan for soccer-specific stadium, we'd like to have a history of soccer support, we want to be sure that we have support in the community.

So, this is representative of those presentations that they made to us at that time.

Q And sitting here today in 2025, did MLS end up expanding to any of these cities?

A We did. We have teams in Cincinnati, with a brand new downtown stadium; Nashville stadium, with 30,000 seats in downtown Nashville; Charlotte launched a few years ago with a beautiful stadium in downtown Charlotte; St. Louis just opened up a couple of years ago, owned by the Enterprise family, beautiful stadium that's helping to re -- for the rebirth of the City of St. Louis; San Diego will come into Major League Soccer this year.

Q And what were the attributes of Major League Soccer that attracted these various potential candidates to want to be part of Major League Soccer?

A It depends. Every ownership group has different

objectives. Most importantly, they want to be part of the community. They want to capture all the excitement and the momentum of what's going on with Major League Soccer and soccer in America.

Some of these owners had large philanthropic objectives. The Taylor family in St. Louis, a privately held company, they've invested in restoring the Gateway Arch. It's a family that is an all-female ownership group, and I think Annie Taylor, the owner of that team, wanted to be one of the first women-led ownership groups in the major leagues.

But all of them have different objectives.

And I'm proud to say that Charlotte, 30,000 fans a game; Cincinnati, waiting list, 25,000 fans a game; Nashville sells out all their games; St. Louis, not only do they sell out all their games, their MLS Next third division has thousands of people going to those games.

So, all of them -- thankfully, they've been very successful thanks to the efforts of the owners.

MR. RUSKIN: Let's go to Slide 0011.

Q This slide is titled: Our stadiums.

What does it show?

A In 2017, we had 16 stadiums and this is a list of all those stadiums, popped out over there. And they speak for themselves, including Red Bull Arena, right here in New Jersey.

At that time, four were under construction.

Atlanta, that was a stadium that was built by Arthur Blank with MLS in mind. We were very involved with the city and with him on ensuring we had the proper environment for soccer. They'll host World Cup matches.

Los Angeles ultimately built their stadium in downtown LA.

Washington, D.C. C ultimately built their stadium in Washington, D.C., right near the baseball stadium.

Minnesota had their plan for a stadium when they came into MLS and they ultimately built their stadium, which is in St. Paul.

Q You said soccer-specific stadiums and that term has come up several times throughout trial.

Can you be clear about what soccer-specific stadiums mean?

A The league was founded -- it had in its original plan to build stadiums, but I think they realized that they need a business that ultimately would be able to support, you know, the billions and billions of investments that they were making in those stadiums.

And very quickly, when I came in, I realized we needed to have stadiums of our own. That's what we have in baseball, that's what we have here with the arena sports with hockey and basketball. I couldn't imagine having a sport

where you didn't have a cathedral where fans and players could celebrate all that they love about their team.

And we went over the last 25 years through a really difficult, expensive, complicated journey to get those stadiums built. The vast, vast majority of them just have soccer -- women's soccer, men's soccer -- but they might have other sporting events. Some of them, like Mercedes-Benz Stadium, which is having the championship American football final in college, they're built with soccer in mind. So, we like to say stadiums that are either soccer-specific or built for the sport.

Q And you talked about the fan experience.

Briefly, how does soccer-specific stadiums improve the fan experience?

A The first games that I went to when the then MetroStars were playing in the Meadowlands and they had 15,000 fans going to those games in a 70,000-seat stadium. Fans want to be in an environment that is appropriate to the size of their stadiums.

Our average attendance now is about 22,000 fans. It's among the top attended soccer leagues in the world. I wanted our owners to build stadiums where it was hard to get in, that we would have demand for tickets, where the fans could be on top of the players, where we could build supporter sections.

If you go to a game at Red Bull Arena, thousands of fans, they're waving flags, they're cheering in ways that our league allows them to. It's not a baseball game, it's a soccer game. And fans see that by watching games and by attending games and all of America will see that when they attend World Cup matches in a few years.

Q Beating drums in the supporter section?

A Drums, flags, everything.

Q Has the league always encouraged investment in these types of stadiums?

A It's very much encouraged.

And we won't take new teams in and -- when we expanded, I don't remember exactly when it became a requirement, but we realized in 2005, when Phil Anschutz built the Home Depot Center, now Dignity Health Park, in 2003 we just had our final there and it was standing room only. There were 27,000 fans there. We saw: This is it. If we could replicate this around the league, we're going to have one of the formulas that will drive our success.

Our Colorado team came in with soccer complex in Denver. The Hunts built a soccer complex in Dallas around 2005.

And we quickly started rolling out those stadiums and I spent, as did Mark Abbott, who you all met with, an enormous amount of my time working on development of our

stadiums. It's a big part of my job.

Q Let's briefly look at some of those stadiums?

MR. RUSKIN: If you could publish for the witness only Defendants' Exhibit 0889.

Do you recognize this slide deck titled: Stadiums & Training Facilities?

A It's a description of -- presentation on the stadiums and training facilities.

MR. RUSKIN: I'll move Defense 0889 into evidence, please.

MR. KESSLER: No objection.

THE COURT: So admitted.

(Defense 0889 so marked and published to the jury.)

Q We're not going to look at every stadium, but let's just look at a few.

If you look at 005, I think you mentioned Mr. Blank and the Atlanta team.

What is this page?

A That's a great photograph of an Atlanta United game.

They just came into the league. Their opening match had 70 plus thousand fans. That team is drawing 30, 40 thousand fans a game. It's in downtown Atlanta. They had built a training ground that has a small stadium where their Division III team plays. Atlanta is one of the highest attended soccer teams, top twenty in the world.

Q And this one is a little larger than your typical.

It was designed to combine soccer-specific and football?

A It was.

Arthur is a great member of the community, a great visionary. There will be matches, eight or nine World Cup matches, there, other huge tournaments that are played there. And our games are attracting a lot of fans.

Q Another sample, let's look at 006.

MR. KESSLER: Your Honor, we have an objection on scope, 2021.

THE COURT: Scope.

MR. KESSLER: Time period. Looking at 2021 dates now.

THE COURT: I'm allowing this.

Q Commissioner, briefly on this one, what does this slide show?

A It's just to show, I'm sure, a bunch of slides on new MLS stadiums. This actually is a rendition because this was prepared in 2017 and I think that's important. The completion date is 2021.

This stadium is up and operating. It's been there for several seasons now in downtown Austin in what's called the Domain. A team that's got a great local owner, Matthew McConaughey is a part owner of that team. It's a great

project and team in Texas.

MR. RUSKIN: If we could turn to Page 024.

Q Going a little more locally, what is this?

A This is Red Bull Arena, part of that 2017 presentation. This was completed in 2010. You know, the New York team was launched in '96 and it took us a long time to get the stadium built. Hundreds and hundreds of millions of dollars invested. Today, that probably would cost three times that if you were to build that stadium today. It's in Harrison, New Jersey. It's part of the Ironbound section. It's got a very diverse fan base.

MR. RUSKIN: And we could look at 016.

Q You mentioned the LAFC team.

What does Slide 016 show?

A This is the stadium in downtown LA. It's a team that I mentioned that's got a great fan following. On the left behind "350 million," that's an example of a supporter section. Our supporter sections have fans that actually can stand up. It's called 3252. There are 3,252 members of that group that very passionate. This is a terrific facility. It's one of the great soccer stadiums of its size anywhere in the world, in my opinion.

(Continued on the following page.)

BY MR. RUSKIN: (Continuing.)

Q You mentioned the difficulty of getting these stadiums built and what it takes. Tell us a little bit more about that and what is the role of the league in it.

A The best example is here in New York. We have two teams in New York. The New York City Football Club is our second team in New York and we work for -- since the early days of having teams in New York City, from 1996 to get a stadium built in New York City through three mayors and through decades we broke ground on that new stadium in Queens.

It will be next door to Citi Field. Very importantly, it's part of a project that has affordable housing. It's the first affordable housing project that's been built in New York City in many, many years. We broke ground last month. It will be a 25,000 seat, billion-dollar stadium and I worked on that for 20 years.

Q In a little more detail, what is the league --

A You know, the league is -- it really is the credibility and the long range plan of the league. You know, the clubs financially finance these teams locally, but if you're building a soccer stadium that's going to exist for generations, the community wants to know that it's going to be there.

They want to know that that team is going to continue to be there, not launch a team in 2017 and have it

win a NASL championship and then fold. So the league is standing behind. It's not financially. We're standing behind them with the credibility of our owners. The credibility of the commissioner, with all of the commercial expertise that we have.

And I spend my time in city halls across the United States and Canada and talk about the vision of soccer in America and why that community should either sell us land or partner with us on getting a stadium built.

Q In those discussions that you have working with the teams, working with cities, is the fact that you have a Division-I standing ever a part of it or is the fact that you've made all of these investments and you're a major league?

A No. I think you have to look at Division-II teams that have stadiums built so no. It's the strength of the owners, it's the number of fans, it's the sponsors, commercial partners who are going to fund by sponsorships of that club, that fans are going to come in and buy hot dogs and that stadium can be multiuse and used for other events. Giants Stadium is used almost every day. It has nothing to do with whatever division we're in.

Q Have there been Division-II teams that have wanted to make the investment and have built stadiums?

A Yes, I'm aware of that.

Q Give us an example.
A There are a number of them. Louisville is a good example of a nice stadium.
Q Let's turn to page 018?
(Exhibit published.)
Q This slide is titled Governance. Can you explain for the jury what this slide shows?
A I'll describe this slide. I mentioned earlier that I believe is that governance is one of the real driver's of MLS's success that partnership that owners have with each other and it's not just their partnership. It's how we organize our league. It's the way we break up decision making. We've got our owners broken up into three different committees; a committee that deals with our product or game on the field; the finance committee; a commercial committee and then there are subcommittees below that.
The commissioner's office is responsible for organizing these committees and creating the agenda and ensuring that we're productive.
Q Approximately how many people worked at MLS league office in 2017?
A I believe well over 200, 240, 50, 60. I'm not sure. Maybe 260. I don't remember.
Q And, again, without getting into any detail on this, what are some of the categories of areas that people were in across

the company?

A You know, we're structured like any other major league. We have a commissioner's office that works on managing our ownership and being the spokesperson for the league and dealing with governance and going out and overseeing the overall operation of the league.

We have a vibrant commercial company. We have a group that deals very much with our players and players development. We've got a large financial operation. We're operating all of our games. We have security people to ensure that our fans are safe. We have a very, very active human resources group. There are thousands and thousands of employees that we are ensuring that we're effectively communicating with, those are our employees at the clubs.

In addition the MLS staff, we've got a community group that we launch and spends its time working with our players and our teams to show that we're, you know, that we're embedded in the community and doing our part as a good sports league.

Q And do you believe having an office of this size, a league office, is important to the success of a league?

A It's critical. I mean, you can't have a successful major league and not have staff that your owners have to fund and pay for.

Q Let's turn to the next slide titled Designated Player

Rule at page 019.

Commissioner, before I get to the people on this slide, can you briefly tell us what is MLS's designated player rule.

A I'll describe that. I will speak slowly. The designated player rule is a rule that was adopted in 2007 after we had a World Cup where the U.S. team was playing in Germany and did well. And we do research regularly. One of the groups I didn't mention we've got a dozen people that are working in research and strategy and we go out and we talk to our fans.

And they were saying to us at that time right after the World Cup which was very successful why don't you go out and sign some big name players. We love the players that you have in your league, but if you want to continue to grow your fan base, why don't you get some of the biggest names in the world.

That rule has been coined the Beckham rule because the first player that we signed was David Beckham. This was a slide from 2017 because after David Beckham, so many really, really big name players came in, but at this time in 2017 on the right one of the most celebrated German players of all time, a gentleman name was Bastian Schweinsteiger.

The person on the right played on the new Orlando team. They launched their team and the next one with the purple jersey, the first year they signed Kaka', a Brazilian

player that was player of the year. He had previously played in Real Madrid. The player white in the white jersey had just played for Mexico, Giovanni Dos Santos and the L.A. Galaxy signed him because there is a growing expanding Hispanic fan base in the L.A. area.

Two over, the light blue jersey, that's the first team when NYFC came into the league. They signed from Athletico Madrid, one of the top teams in Spain, a gentleman by the name of David Villa and just how exciting it was for David to play for New York City. And then the one on the left is the one I'm probably proudest of because that national team had done very well in Germany. They lost later on in tournament to Germany --

Q The U.S. national team?

A The U.S. national team and this player Clint Dempsey was playing for Fulham in England. We had just launched our team in Seattle. We knew that team was going to be very successful in 2009 and the first thing that the owners of that team did was to bring Clint Dempsey home.

Captain America was what his name was. And we signed him from England, brought him to Seattle and I remember the fans at that time, 60,000 fans, cheering. So, these guys are paid a lot of money to play for major league soccer.

Q To be clear, the designated player rule is an internal MLS rule. Does it have to do with U.S. Soccer?

A No.

Q Does U.S. Soccer have anything to do with the day-to-day operation of MLS?

A No.

Q In terms of the player and designated players who would you say is the most celebrated recently -- most recent celebrated?

A Our team in Miami sold -- signed Lionel Messi and, you know, he is in my opinion the best player in the history of the game. Most people would agree with that. When we signed him he was playing in Paris. We were competing against FC Barcelona. We were competing against the Saudis who had launched a league and offered him reportedly a billion dollars to play.

And we went out and told him what a great opportunity it would be for him and his family. Like I told David Beckham when he signed the league, you can be a part of helping to build soccer in America. You've already played on an international team. You played for England. You played for Madrid. You won a championship. Clearly you just won the World Cup for Argentina. You played for Barcelona. You played for Paris, come to America.

And he did and the crowds have been, you know, spectacular and he and his family are very, very happy here in America. They just won in an exhibition game that they played

against a Mexican club in Las Vegas on Saturday. 50,000 fans and Leo scored a beautiful goal.

Q If we can turn to 025 titled U.S. Broadcast Partners what is the significance of this guide that you used as a matter of course with investors and others with whom you do business?

A This is a slide again from where we are in 2017. We could have showed this slide with national broadcasters in 1996, but at that time, we had a relationship with ESPN. It was renewed through 2022 with Fox, both Fox network but you all would call Channel 5 here in New York, as well as their Spanish language channel and their sports cable channel.

And then we had a Spanish language contract with Univision with their sports channel and with their cable channel through the 2022 season.

Q Do you consider these relationships important?

A They're life blood.

Q And why is that?

A You just can't have a professional top level sports league without having national media deals.

Q Let's turn to slide 028. It's titled "Global Reach." Commissioner, what is the significance of this slide?

A You know, we are in the soccer business so we're playing the global game and had global players. I mean, in 2017 just look at some of the players that we had. So we wanted our games broadcast around the world. Kaka', who had an

incredible following, we want those Orlando City games broadcast in Brazil. When we signed David Villa, we wanted those games broadcast in Europe. We wanted our games broadcast in Germany.

So we had games broadcast in 170 different countries, in 90 languages and we had to go out at that time, and sell the division that would sell every one of these contracts or have a representative that would help us do that.

Q And I'm seeing numbers in the sort of top part. For each of the various many telecasters that you have here around the world. There's a number, you know, that shows like 50 million or 450,000 or 6 million, 136 million.

Is that reflecting the number of people that each of the various telecasters with whom you contracted were able to reach in the marketplace?

A Yes.

Q Do other foreign leagues broadcast into the United States?

A Yes. They do. There's more soccer on television through various media outlets in the United States than any other sport. More than NFL, more than basketball more than baseball more than college sports. Every European league has their games broadcast here. The Mexican league has their games broadcast here. There's more than we can even count.

Q Commissioner, let's turn to slide 036. And this is the

last slide we'll do with the deck.

This one is entitled MLS Works. Can you tell the jury about this slide, please?

A Yes. When I joined the league one of the first things I did was launch a philanthropic program. It's just close to my heart and I believe it's what helps define the success of other professional sports leagues, the NBA and the NFL are really renowned for their philanthropic programs, both at the league level and the club level.

This MLS Works program has been around for 25 years. It will be around long after I'm commissioner and very, very importantly just a hometown example. Our league in New York City FC just made a commitment to build twenty-five soccer -- small youth soccer fields here in the New York metropolitan area as part of an effort to celebrate the World Cup coming here. So teams need to be embedded in the community, I believe.

Q Commissioner, to the extent that you've had and Major League Soccer has had successes over this period, what factors do you believe are the most significant that have contributed to that success?

A I think it starts with a very, very committed visionary courageous group of owners. It required a strategic plan that I wrote from the beginning with my staff and continue to evolve over time to talk about what kinds of investments our

owners need to make and how are we going to continue to grow the league.

It requires the ability to go out and convince players that this can be a league of choice. That was the pitch to American players. It was pitch our to Lionel Messi it was our pitch to David Beckham and it was the pitch to the young American players who played last night in Orlando when they beat Costa Rica.

We want everyone who is on our fields to make MLS a league of choice. Without great players, we don't really have a great league. Obviously it is a vibrant and professional staff. I believe in the staff at Major League Soccer. I put them up against the staff of the NFL or the NBA.

They're best in class. They work hard. They're committed. They understand the commercial business. They understand the media business and they understand the obligations that they have to be held to a high standard and I think it's those things together, I'm sure with others.

Q And with respect to the owners, do you feel or is it fair to say that they have not just stated they were prepared to invest but they have stepped up and, in fact, invested at every stage?

A That's correct.

Q In what magnitudes?

A Many, many, many billions of dollars.

Q Do you think it's important that every link in the chain of the ownership group is strong?

A Yes. You are only as strong as your weakest link and we have a club performance group that now works in Major League Soccer to work with our teams. Not every team in any league is going to have great attendance every year, but rather than just --

We've had teams that will come into the league when they present their annual plan and they say, my plan is to win a championship. We say that's not a plan. You need to tell us how you plan to create a fan base and a community of ticket sellers and what are you going to do to generate revenue and our club performance group is headed by somebody who has worked for all five major leagues and he goes out with a team of people and meets with our owners and meets with their staff and shares best practices and works on strategy, helps them sell tickets and help them come up with things that allow them to be better and we're very focused on that.

Q With all of that said, do you still feel like you face great challenges?

A Yeah. Soccer is still a growing sport in the United States. It's become more popular. I think thanks to the efforts of Soccer United Marketing. I think it's a very vibrant country or commercial market but we're competing against every major soccer league.

And we're competing with them for players. We're competing with them for fans. We're competing with them for owners. We're competing with them for media, media coverage and for media deals. We're also competing against the other leagues.

So, it is a challenge. It requires consistency. It requires -- it requires commitment and courage and it really, really requires a lot of hard work. Sports as a metaphor, you have to have the 10,000 reps to be Michael Jordan. You can't have success in this business without hard work. There are no shortcuts. You have to earn it. You have to earn it every single day.

THE COURT: Can I interrupt. When you said "other leagues" what did you mean by that?

Q The --

THE COURT: When you said other "leagues," you talked about compete against every major soccer league and a third category was other leagues.

What did you mean by that?

THE WITNESS: We're competing against the NFL, Major League Baseball. We're competing against the NBA, we're all looking to get stadiums built. We have a process like that going on right now in Philadelphia. We're competing with them for media coverage and that becomes more difficult now with the fragmentation of media. Very, very importantly every day

we're competing with them for sponsors.

There are times our sales guys are going into Procter & Gamble and waiting in the lobby is the head of the NBA or Major League Baseball. We're competing for fans. Fans only have so much time that they're able to devote to, you know, their interest and we're competing against both video games, but how many sports games can you watch.

And, lastly, and this is something that I think I've talked about, we're competing for owners. Owners have options. They can buy an MLS team. They can buy a football team. Josh Harris was looking to buy our Philadelphia team. He said no and ended up buying the Washington Commanders. We had a team that we were trying to get going in Las Vegas and we were speaking to Jim Foley who owns the Las Vegas Knights. He said no and ended up buying a Premiere League team.

The competitive environment in pro sports is just -- it's the DNA of sports. You have just got to work hard.

THE COURT: Okay.

BY MR. RUSKIN:

Q Commissioner, the NASL has taken the position in this case that if it just be given the Division-I designation that somehow that alone would have allowed it to become more successful; if U.S. Soccer had granted it that designation.

Do you agree with that?

A I do not.

Q Why not?
A It's everything that I've said, Mr. Ruskin. You need to have the right owners. You need to have stadiums. You need to have national media deals. You need to have national sponsors. You need to have enough teams. You need to have owners that are in it for the long haul. You need to have a plan. You need to have the right league office. You need to have the right staff. You need to have credibility in the marketplace.

You know, we -- we have relationships with banks. We have relationships with municipalities and integrity. I meet probably more with mayors and governors than I meet with sponsors and you need to operate in a way where you're respected and you're credible. So what division is irrelevant to that, in my opinion.
Q Commissioner, let me change topics right now. Thank you.

Just briefly on this, there's been some testimony regarding the fact that MLS faced challenges around 2001. You're familiar with that?
A I am.
Q And there was testimony that bankruptcy attorneys attended a meeting of the MLS board in that time period. Is that accurate?
A It is.
Q Were you ever concerned that the league might file for

bankruptcy and fold at that point in time?

A No, I was not.

Q Why not?

A Well, I had the owners who had just hired me sit me down and say, hey, we need to restructure. They said we're going to be fine. Robert Kraft and Lamar Hunt did the same thing. That was a challenging time in our league's history. I've said many times in the media and I've said it according to some of the minutes at U.S. Soccer, I'm proud of the strength and courage that our owners had and the plan that we put together when we all met in Denver and we said, hey, what we have needs to evolve; are you in? And if you're in, here is a really good plan and that plan was build stadiums, start a marketing company, which became Soccer United Marketing and let's lean in and they lent in -- they leaned in.

Q And they lent in with their time effort and money?

A Yes.

Q By the way, let's go to a different part of a document that Mr. Kessler showed you yesterday, when he was suggesting that MLS was not somehow not worthy of a D-I status.

Let's go to PX-614.005.

(Exhibit published.)

MR. RUSKIN: If you can pull up the MLS launch. Let's go to the third bullet.

Q I think you touched upon this a little bit before but

from the get-go there were reasonably large crowds for MLS games?

A Yes.

Q And in the fourth bullet, if you can pull that up. So this bullet says, "However, the novelty wore off and the league averaged a little over 14,000 fans per game for the second half of 1996 and stayed in the 14 to 15,000 range, fan range, for the next decade" -- let me reread it.

"However, the novelty wore off and the league average a little over 14,000 fans per game for the second half of 1996 and stayed in the 14 to 15,000 range for the next decade."

Commissioner, at the point even when the league was facing its greatest challenges, it's accurate that you were -- over 14 or 15,000 fans on average were attending every MLS game?

A Yes.

Q You started to talk a little bit about competition and others and the Judge asked about that.

In connection with your role as commissioner, do you spend a lot of time focusing on your league's competitive goals and concerns?

A Overall, yes.

Q And I think you identified, but if you could do it once more some of the primary other competitors that you see around

the world and in the United States?

A Well, it is starts with competing for fans and fans have a lot of choices and options; competing for media coverage and media deals, competing for commercial revenue and very, very importantly competing for owners.

Q Let's take a look at another part of PX 614 that Mr. Kessler didn't put up on the screen, in particular page 0015.

(Exhibit published.)

MR. RUSKIN: 0015, please. Thank you.

Q First, if you can look at --

MR. RUSKIN: Let's pull up the section on attendance.

Q This document is now in 2015, a period that we've talked about.

So, in 2015 what was MLS's attendance as of 2015?

A Over 21,000, 21,574.

Q And then in the third bullet point, if you can read that and tell the jury what that's reflecting.

A At that time we had the third highest attendance here in the United States behind the NFL and Major League Baseball.

Q So, who are you comparing yourself to in this internal working document of MLS?

A This is the -- we were comparing ourselves to the NFL and Major League Baseball.

Q And if you're third highest, who do you think was fourth and fifth in that ranking?
A The NHL -- the NBA and the NHL.
Q And then if you can pull up the next bullet point and the chart next to it. Who are you comparing yourself to in this document?
A All the top attendance soccer leagues in the world and we were seventh at that time in 2015.
Q And the other leagues are other major leagues around -- soccer leagues around the world?
A The top leagues in Europe, Germany, England, Spain, Mexico, and Italy, China which had just launched its league. That league has folded and then Argentina, France and Germany's second league.
Q And then finally on this document --
MR. RUSKIN: If we can just go down and look at the section on fans?
Q We can pull up a whole number of lines here but, for example, on the line "Young," again, who was MLS comparing itself to in its business documents looking at its competition?
A We were comparing ourselves against the U.S. Sports Leagues as well as the English Premiere League and age -- the age of your fan base; the lower you are, the younger you are, the more valuable you are to media partners and to sponsors.

Q Commissioner, in this business document from 2015, in any of the various metrics comparing MLS to other leagues that we've just looked at, is there any reference at all to NASL?

A No, there is not.

Q Now, turning to NASL, was it ever on your list of top 50 competitive threats or concerns?

A It was never on my list of concerns at all.

Q In your discussions at the board meetings, was NASL ever discussed as a competitive concern?

A No, it was not.

Q In your discussions with your senior management team, was NASL ever discussed as a competitive concern?

A No, it was not.

Q Was the reason that you didn't consider it a threat or concern the fact that it was only Division-II?

MR. KESSLER: Objection; leading.

THE COURT: Sustained.

BY MR. RUSKIN:

Q How, if at all, did the fact that NASL was Division-II affect whether or not it was a competitive threat or concern?

MR. KESSLER: Leading, Your Honor.

A It would not have affected it at all.

THE COURT: The objection is overruled.

MR. RUSKIN: Sorry, I didn't hear the objection, Your Honor, otherwise I would've waited.

BY MR. RUSKIN:

Q Why didn't you consider NASL a competitive threat or concern?

A As I've stated, they didn't have a strong ownership group. They didn't have enough teams to have a national geographic footprint. They didn't have a national media deal. They didn't have national sponsors and at that time in 2015 or so, their primary investor who owned a number of teams, had pled guilty to federal crimes.

Q And then just briefly on who else you're competing with?

MR. RUSKIN: Can we mark for identification Defendants' Exhibit 793 and publish it to the witness, please?

(Exhibit published to witness only.)

BY MR. RUSKIN:

Q What is this document?

A This also from 2017 looks like it is a presentation to the MLS board.

Q And if you flip, please, to page 012. Excuse me, before you do --

MR. RUSKIN: I move to admit it into evidence, please.

MR. KESSLER: No objection.

THE COURT: So admitted. What number is this.

MR. RUSKIN: This is Defendants' Exhibit 793.

(Defendants' Exhibit 793 received in evidence.)

BY MR. RUSKIN:

Q And now, if you could, please, go to page 012, Franz. Thank you.

Again, this lists a number of other soccer leagues from around the world. Why did you list these leagues here?

A Well, this was part of a presentation, I'm sure, talking about the game. And one of the ways we, in our sport, measure the competitive -- or the attractiveness of soccer, is how many goals are scored.

And this chart represents all those leagues that we view as competitive, playing high quality soccer. And our goals per game was at the highest. If you look at 2017 and then over a five-year average, which I think is important because MLS was continuing to evolve it's investment in players, We were second compared to the German league.

Make it easier it's called the Bundesliga.

MR. RUSKIN: If we can put up -- you can take down this exhibit and if you could, please, publish for the witness only Defendants' Exhibit 925.

(Exhibit published to witness only.)

Q And what is this document, Commissioner?

MR. RUSKIN: It might be easier if we go to page 925.0070, please.

Q Commissioner, do you recognize this document?

A I do.

MR. RUSKIN: Move to admit into evidence.

MR. KESSLER: No objection.

THE COURT: Okay.

(Defendants' Exhibit 925 received in evidence.)

MR. RUSKIN: If we can please publish Defendants' Exhibit 925.

(Exhibit published.)

BY MR. RUSKIN:

Q And, Commissioner, if can you tell us why this is a slide in MLS's business files?

A You know, this is a slide that we would have used when we were speaking to multiple constituents, to advertisers and sponsors, to broadcasters in trying to sell media rights, to owners to show the long-term promise and opportunity of an investment in Major League Soccer and, importantly, also to, you know, to cities when we were talking about why a soccer stadium would be an offering that would be different than perhaps a baseball stadium. And these are the competitive leagues that any of those folks that I just mentioned might be looking at as an option.

And very quickly it speaks that we have the youngest fan base. We had the highest percentage of GENZ and millennials and we have the most digitally native which speaks to the fact that the future of media was going to become digital and we had a very digitally oriented fan base.

And very importantly, to all of those constituents is we had, by far, the highest percentage of Hispanic fans of any of those competitive leagues.

MR. RUSKIN: You can take that down.

Q Commissioner, I want to turn to a new subject, please. Can you tell the jury, what is the U.S. Open Cup?

A The U.S. Open Cup is a tournament. It is a -- we call it a, you know, all hands. Anybody that is -- any team that is registered to play as a team with U.S. Soccer has an opportunity to play as an amateur all the way up and then knockout tournament, to play against the top division, which was, is, Major League Soccer.

Q Is the U.S. Open Cup a part of the regular MLS season?

A It is not.

Q Do MLS teams play their best players in the early rounds of the Open Cup?

A Sometimes. Most of the times, they do not.

Q And why not?

A Well, we have a crowded schedule. Because we're playing against -- playing in all time zones from the east to the west, multiple weather zones. We have a lot of travel for our teams, more than any other league in the world. We have a lot of teams, more than any other league in the world. And, therefore, we have the longest schedule of any league schedule of any league in the world. And, therefore, it's very

crowded.

Our players have to play a lot of games. We want to prioritize our league's games and we want to prioritize the tournaments that we believe are important to show our fans how competitive our teams are.

Q There's been some testimony that NASL Clubs won some number of matches in the Open Cup against MLS teams. Is that at all reflective of the relative quality and skill of players between the leagues?

A No. And it's not at all. And, frankly, that's good. It's fun for fans. Right. So if one of our teams is playing their young kids as we do often. Just two years ago, we beat a USL team with a group of academy kids in L.A. That's part of the story. In my opinion, it doesn't have any reflection at all unless you have some games like that, then the tournament is not going to be exciting for fans and, frankly, it's not exciting enough for fans in my opinion.

Q How has MLS done in the tournament itself over the last 20 years?

A Well, in the last 25 years we've one every single -- every single year.

Q Let me turn to another topic.

Did you ever interact with NASL's former interim commissioner, a Mr. Rishi Sehgal.

A Yes, I have.

Q In what context?

A As a mentor at times. Somebody that would try to give him advice, help him in any way that I could.

Q Would you -- how would you describe your relationship with Mr. Sehgel?

A Friendly.

Q Did he ever suggest to you at any point in time that prior to this lawsuit that he thought MLS was taking steps to harm NASL?

A No, he did not.

Q Did he ever suggest to you that he thought MLS had any role in connection with the denial of any NASL sanctioning application?

A No.

Q I'd like to take -- you to take a look at Defendants' Exhibit 711, please.

MR. RUSKIN: First publish for the witness only.

(Exhibit published to witness only.)

BY MR. RUSKIN:

Q Commissioner, do you recognize this e-mail?

A I do.

MR. RUSKIN: Move to admit.

THE COURT: Any objection?

MR. KESSLER: No objection.

THE COURT: All right. So admitted.

(Defendants' Exhibit 711 received in evidence.)

(Exhibit published.)

MR. RUSKIN: And if we can bring up the first e-mail, the bottom one, dated July 17, 2017.

BY MR. RUSKIN:

Q So this was sent to you in the summer of 2017; is that right, Commissioner?

A Yes.

Q And if you can -- well, let me read. "Commish" -- people call you Commish in a friendly way?

A Sometimes.

Q "Commish, thank you again for taking the time last week and the mentorship. Please do let me know when the time is appropriate for another conversation. Best, Rishi."

Did you receive this e-mail from Mr. Sehgal in summer of 2017.

A I did.

Q And why was he writing you at that time?

A I don't recall what the content of that meeting was but obviously he was thanking me for the time.

Q And the mentorship?

A Yes.

Q And did he, generally, from time to time, look to you for advice on the soccer industry and how to move forward?

A Yes.

Q Did you provide that advice and seek to assist him?
A I did.
Q Why did you make the time to speak and mentor Mr. Sehgal?
A Well, I was -- you know, I was in the job for a long time. He was a young guy interim commissioner. The league has had a lot of challenges and I -- again, I don't remember what exactly happened at this meeting but I'm sure he was saying, hey, I got this job. How could you help me be a good commissioner?
Q And you went -- and you were willing and did do that?
A Yes.
Q Are these e-mails generally consistent with your other interactions with Mr. Sehgal?
A Yes.
Q Slightly different topic but related to NASL. Did MLS ever loan players to NASL?
A We did.
Q Can you explain to the jury what does that mean that you loaned players or lent players?
A What it means is when we have players that are playing in our rosters, meaning all the players that are members of the team, the lower level players, primarily younger players, need game time and if you played or you're coaching kids, you know, that not everybody gets into the game. Limited number of substitutions. We want all of our young players to get

playing time.

Q Was it beneficial to NASL for you to loan players to them?

A It was.

Q How come?

A Well, we would either pay that player's salary or pay a portion of the salary. They would pay a portion of the salary or pay all the salary. We signed these players who wanted to play for MLS. They weren't getting enough game time so we looked to the minor leagues and loaned players.

Q Were you helping improve the quality of play at the NASL by loaning players to them?

MR. KESSLER: Objection, leading.

THE COURT: Sustained.

Q What effect, if any, was it having by loaning players -- by MLS taking the step to loan players to the NASL?

A They got better players that were cost efficient for them and in many ways they probably couldn't sign on their own or they would have, and they wouldn't have signed with MLS?

Q And did I understand you to say before that even while they were playing in NASL games, at times MLS would pay all or part of their salary?

A That's correct.

Q Mr. Garber, Commissioner Garber, have you ever met Rocco Commisso?

A I have.

Q When did you first meet him?

A I don't recall the date but I know we had lunch together with a banker, a sports banker. I don't remember his name but he invited me to meet Rocco for lunch.

Q Was this prior to the time when Mr. Commisso invested in the Cosmos?

A Yes.

Q Did the fact that Mr. Commisso bought a NASL team in 2000- in the 2016, early 2017, change whether you thought of NASL as a competitive concern?

A No.

Q How come?

A Because it's a league. It's never -- let me restate that.

One owner doesn't make a league. It never did and it never will. I learned that from my own experience for decades and decades of the sport. I knew Rocco Commisso. Mr. Commisso had interest in investing in soccer, but I did not in any way think that it would impact my view of the NASL.

MR. RUSKIN: Your Honor, I'm about to move into a longer period. Would this a good time to break for lunch?

THE COURT: Sure. Why don't we do that.

Ladies and gentlemen, we'll come back at 2:00. Remember, not to discuss the case. Have a good lunch and see

you then.

(Jury exits.)

THE COURT: All right. Thank you, back at 2:00.

(Luncheon recess.)

AFTERNOON SESSION

(In open court.)

(Parties present.)

MR. KESSLER: I have an issue to raise with the Court.

We just learned from counsel that the remainder of Mr. Garber's examination by MLS is going to be shorter than they originally anticipated.

What we have for the rest of the day, it's not an issue because we have Mr. L'Hote who is going to be a live witness and we have two videos to play. But everything is being accelerated, and so, tomorrow we have the remainder of Mr. L'Hote, we have Mr. Hunt, and we have two videos. But I'm now concerned that we could end up earlier than 3:30. Like, an hour or something. So I just let counsel know that if that happened, we would call --

MS. COLE: We would be ready to call.

MR. KESSLER: One of our experts Mr. Szymanski because we could have him come in tonight and be ready.

Counsel's objected that we didn't previously let him know it would be this week. In good faith, we didn't think he would be this week but we also don't want to leave the Court with open time in terms of that.

THE COURT: I spent a lot of time reviewing

deposition designations. Are there no other deposition designations that could fill that hour.

MR. KESSLER: All of yours are done?

MR. YATES: We have additional depositions that you had worked on that are not going to be played.

MS. HUDGENS: Your Honor, so under the joint stipulation, based on, I think, we've removed a few lines from some of our deposition designations. But we typically have under the joint stipulation we give them notice of whether we are cutting anything and they give us notice of what they're cutting. They've been cutting designations from their videos.

So we've been going back and removing that from the videos which also, unfortunately, shortens the time of the videos that we were planning to play.

So we have some of those videos completed and we're planning to play the completed ones between now and tomorrow and that will be all of the videos that we have in our case-in-chief. So we're not planning to play other videos next week.

THE COURT: Hold on. By my count, at least that I've been given time estimates for that haven't been played yet. You got Mr. Collins, you got Ms. Shalala, and you got Mr. Moeller. Right there is about 50 minutes. So I don't understand why those can't be played tomorrow.

MR. KESSLER: No, we are playing some of those today, your Honor. In other words, so that because we have less time than we thought with Mr. Garber, we're going to play some of those today. We also have Mr. Cordeiro we're going to play tomorrow as well.

MS. COLE: And Alec Papadakis.

MR. KESSLER: So we still have a few more to play I'm just concerned because I don't know how long it would be.

THE COURT: I want to fill the day, okay? I don't think it's fair to start an expert when they haven't gotten the notice that you agreed to under your stipulation, right? So if that means we end at 3:15, we end at 3:15. But I want a significant portion of tomorrow occupied.

MR. KESSLER: We will occupy it, the whole thing if we can. I just -- because I was concerned we'd be 3:15, consistent with the Court's desire, that's why we said Szymanski because he's the --

THE COURT: I might be capricious but I'm not arbitrary. So if you're telling me we'll end the day between 3:00 and 3:30, that's fine. If it's going to be earlier than 3:00, I want to know about it. I spent a lot of time reviewing deposition designations that we should be able to fill a half hour here and 45 minutes there relatively easy.

MR. KESSLER: Okay. And I guess you would stop normally, your Honor, 3:00 tomorrow. That's your normal time?

THE COURT: Yes.

MR. KESSLER: So I certainly believe unless they spend no time on Mr. Hunt, which I don't think it will be the case because it's their witness, we're cross-examining, we took him out of order. We certainly should be within 2:30 and 3:00. In other words, I don't think it will be less than that.

THE COURT: Okay. Mr. Kessler, if you could just for the ease of the reporter, the examiner, me, the witness. When you object, if you could stand because it gives us a visual cue to stop.

MR. KESSLER: I will do that, your Honor, thank you.

THE COURT: Are you ready, Mr. Ruskin.

MR. RUSKIN: I am. Thank you.

(A brief pause in the proceedings was held.)

(Jury enters the courtroom.)

THE COURT: If we can be seated.

Ladies and gentlemen, welcome back. Mr. Ruskin, you can continue your examination.

MR. RUSKIN: Thank you, your Honor.

EXAMINATION BY
MR. RUSKIN:
(Continuing.)
Q Mr. Garber, I would like to turn now to the subject of the USL, okay?
A Yes.
Q Mr. Kessler made certain statements about certain aspects of the relationship with USL. Let's look at what the document actually says.
If you can please pull up Joint Exhibit 32. This was already admitted.
If you can move to the next page, please, the agreement itself.
Mr. Garber, it's already been admitted in the case. It's a letter of intent between MLS and USL. If you can go to, please, well, tell us, what is the date of the document?
A January 14, 2013.
Q And if you can look under Roman numeral two that states the term.
What was the term of the letter of intent?
A It was two years from the first of January to the end of '13, to December 31, 2014.
Q The expiration date of this letter of intent was December 31, 2014; is that correct?
A Yes.

Q If we can turn to Page 005. And, in particular, Paragraph 4C.

Do you see there's a portion that states that MLS would receive, excuse me, that there is a provision that states that MLS would receive a portion of USL expansion fees?

A I do.

Q During the term of this two-year agreement, did MLS earn any portion of USL's expansion fees?

A We did.

Q Approximately how much?

A Approximately a million dollar.

Q Did MLS receive any portion of USL's expansion fees for any season after the 2014 season?

A No, we did not.

Q Mr. Kessler showed you a presentation from November of 2014 about potential longer-term agreements.

Did MLS enter into any new executed agreement with USL for any period after December 31, 2014?

A We did not.

Q For the period after 2014, what was the nature of the relationship?

A We had some of our teams playing in that league.

Q Did MLS, at any time, own any -- have any ownership interest in the USL?

A No, we did not.

Q In what division was USL sanctioned at the time MLS entered into the player development relationship with it?
A Division II.
Q Initially, when it entered into it in 2013, in what division was USL?
A I'm sorry, Division III.
Q Got it. And in what division was NASL sanctioned at that point in 2013?
A I don't remember what they were sanctioned as.
Q Did MLS's agreement with USL relate in any way to NASL?
A No, it did not.
Q Did MLS ever own or operate any Division II league?
A No, we did not.
Q Did MLS in any way ever own or control USL?
A No, we did not.
Q Does MLS still have a player relationship with USL?
A We do not.
Q Why not?
A When the USL was applying for Division II sanctioning, we made the decision that we would prefer to have our teams not invest in what would be required to satisfy Division II standards and eventually we started our own Division III league.
Q Is that what MLS does for player development now?
A We do. We have a league that is called MLS Next Pro.

Q Is MLS Next Pro the only Division III league?
A No, there are other leagues.
Q Let me turn to a different subject.
NASL suggested at various times that there was something somehow improper about Alan Rothenberg's relationship with MLS in connection with his service on the Pro League Standards Task Force.
The first question I want to ask you with respect to Mr. Rothenberg is, at the time that you joined the league in 1999, did Mr. Rothenberg have any role as a leader in MLS at that point?
A No.
Q Has he at any point, while you were commissioner?
A Been a leader, no.
Q Is he involved today in any way with MLS?
A No, he's not.
Q Has his relationship with MLS fully ended?
A It ended, I don't recall the year, early 2000s. He had a small equity piece in the league and we purchased that equity back from him at a value that he didn't appreciate.
Q Did Mr. Rothenberg sue the league?
A He did.
Q And since that lawsuit, Mr. Rothenberg, back in the early 2000s, hasn't had anything to do with MLS; is that fair?

A He does not. His name originally was on the trophy and his name is no longer on the trophy.

Q Let me turn to another topic.

At many points, Mr. Kessler has insinuated that there is something improper with SUM's agreement with U.S. Soccer. And you've testified to that to a great extent. I want to ask you a few questions.

Was the SUM contract the product of an arm's length negotiation?

A Yes, it was.

Q Did you personally negotiate the SUM contract?

A I did not.

Q Who did?

A Originally, it was a woman by the name of Kathy Carter who was the president of Soccer United Marketing at the time of the first agreement. There were others that were involved on her staff, I wasn't involved at all.

Q And was the SUM contract independently approved by the U.S. Soccer board at SUM?

A Yes, it was.

Q Did you vote or participate in the approval process at U.S. Soccer or the SUM contract?

A I did not.

Q Did the SUM contract have anything at all to do with divisional sanctioning?

A It did not.

Q Did the SUM contract have anything to do at all with NASL?

A No, it did not.

Q Let me turn to one other topic.

Mr. Kessler showed you the -- spent some time with the September 1, 2017, transcript of a U.S. Soccer board meeting.

Mr. Kessler spent some time with you on the September 1, 2017, transcript of the U.S. Soccer board meeting; do you recall that?

A I do.

Q Was anybody present for NASL the entirety of that meeting as a board representative?

A Not that I'm aware of.

Q Was Mr. Malik there?

A Yes, Mr. Malik was there.

Q Is Mr. Malik a board representative at that point in time?

A Yes, he was. He was the owner of the Carolina team.

Q And was he there when you made any of the comments that you made on an open transcript on that day?

A Yes, he was.

Q And then, before there was any presentation by NASL or any deliberations by the board, did you leave that meeting?

A I did.
Q And were you present for any future part of the meeting?
A I was not.
Q Were you there?
Did you know beforehand that a vote was going to be cast necessarily that day?
A No, I don't believe I knew there was going to be a vote.
Q Mr. Garber, thank you very much.
A Yes, sir.
THE COURT: I have a question. Mr. Malik, you said what league was Carolina.
THE WITNESS: I didn't explain that properly.
Steve Malik was the owner of the North Carolina NASL team and he was appointed to the U.S. Soccer board by the NASL and attended the September 2017 meeting.
THE COURT: Thank you.
THE WITNESS: I wasn't clear on that, I apologize.
MR. RUSKIN: I thought I heard that. Thank you Commissioner Garber.
THE COURT: All right. Any re-cross.
MR. KESSLER: Yes, Your Honor.

RECROSS-EXAMINATION

BY MR. KESSLER:

Q Good afternoon, Mr. Garber.

A Good afternoon.

Q Mr. Garber, did you just testify that Mr. Malik was appointed by the NASL to be its board representative?

A Yes, I believe so.

Q Okay. Wasn't it true that it was the Pro Council who selected Mr. Malik?

A He was put up on the NASL and then the Pro Council voted on it.

Q The Pro Council had to make the selection; correct?

A Yes.

Q And on the Pro Council, who had the majority of votes?

A Major League Soccer.

Q Would that be you?

A Yes, it would be me.

Q So you exercised your majority of votes to pick Mr. Malik to be one of the representatives that the Pro Council was suggesting; correct?

A That's not a fair representation.

Q Okay. I'll break it down.

A Okay.

Q Did the Pro Council make the selection?

A The Pro Council validated the NASL's appointed, or

selection, to represent them on the U.S. Soccer board.

Q Under the bylaws of the United States Soccer Federation, was it the Pro Council or NASL who had the ability to suggest a professional league representative on the board?

A The Pro Council voted on the candidates. Each of the various candidates would come up in front of the council. And for years and years, I would come up in front of that council. I would be nominated to represent Major League Soccer.

In years past, the USL would nominate Alec Papadakis. The NASL nominated their owner, Steve Malik. Today, the NWSL will nominate their commissioner, Jessica Berman.

So, just to be clear, we would meet, the representatives would talk about why they thought they should be representing the Pro Council. And in that particular year, Steve Malik sat on the U.S. Soccer board representing the NASL. Really representing the professionals.

Q Mr. Garber, try and answer my question, okay?

Mr. Garber, the Pro Council voted to put Mr. Malik to represent all the professional leagues; correct, that's what you just said?

A Right.

Q Not to represent just NASL, to represent the

professional leagues; correct?

A Correct.

Q And you had the majority of votes on the Pro Council. So if you didn't vote for Mr. Malik, he wouldn't be on; correct?

A I would assume so, yeah.

Q Okay. And, in fact, you have had the majority of votes on the Pro Council for how many years?

A I don't recall exactly how long but for a long time.

Q More than 20 years?

A I don't know when the Pro Council -- I don't remember when it was formed, but for a long time.

Q How long have you been on the board?

A 25 years.

Q The Pro Council selected you every year to be on the board; correct?

A That's correct.

Q Okay. When you selected Mr. Malik, when you voted for Mr. Malik on the Pro Council to be on, did you know that Mr. Malik was already having discussions about whether he would join the USL?

A I think I was aware of that.

Q Okay. Now, I want to come back to some things that you testified to with your counsel.

You spoke about the fact that a league has to earn its

way, right?

You spoke about earning it, right? Remember that?

A I do.

Q Okay. When MLS was selected as the DI league, the only DI league for USSF, it had no teams, it had no owners, it had no stadiums; correct?

A Maybe you could help me with what date that was.

Q 1993?

A Mm-hmm.

Q In 1993, it had no teams, no owners, no stadiums; correct?

A That's correct.

Q So it had done nothing yet to earn it, you would agree with me then; right?

A I would agree with that.

Q Okay. And despite the fact that it had done nothing to earn the Division I sanction, it was given the exclusive Division I sanction for two years; correct?

A That's correct.

Q Okay. And during that period of time, let's go through its first six years as a DI league to 2001-2002.

You'll agree with me you learned that MLS was having trouble in that period of time; correct?

A On the early years, MLS came out of the box very strong. It had a sophomore slump. That continued, I came

in the following year, reorganized, and we did very well.

Q The sophomore slump almost put it into bankruptcy?

A I don't agree with that, no.

Q The sophomore slump got the league to a point where they were talking to bankruptcy lawyers; correct?

A We were talking to bankruptcy lawyers about restructuring. You made the comment about bankruptcy, that's not a fair representation.

Q It's fair that you spoke to bankruptcy lawyers; correct?

A We had bankruptcy lawyers attending our meeting at that time, correct.

Q Prior to NASL losing its Division II sanction, do you know of any information to suggest that they ever came close to bankruptcy?

A I wouldn't know that.

Q Okay. Now, Mr. Garber, in this sophomore slump, you went down to a period where you had three operator/investors controlling ten teams; correct?

A That's correct. I'm not sure of the process here. You had made a statement that I don't agree with when you said we were close to bankruptcy. That's not what I said at any time, so just if you can restate that.

Q Sure, I'll restate it.

A It's not true.

Q During the troubled sophomore slump, I'll use your words, "sophomore slump."

During the sophomore slump, did you go down to three investor/operators for ten teams?

A We did.

Q Okay. In fact, those were the three owners you said were the ones who assured you that you wouldn't go into bankruptcy.

Do you recall that testimony?

A I do.

Q Okay. And that was Mr. Anchen; correct?

A Yes.

Q Mr. Kraft?

A Yes.

Q And Mr. Hunt?

A Yes.

Q And do you recall that if not for those three owners owning multiple teams, the league would have collapsed at that time?

A You're speculating as to that. So you asked me if I recalled it.

Q Do you remember that being discussed actually by my Mr. Hunt or others that they had to stand up to take over these teams because, otherwise, the league was going to collapse?

A No, it's more complicated than that. I'm happy to expand on it if you would like.
Q Let me ask you this. Several investor/operators left the league; correct?
A Correct.
Q They thought the league was not going to be successful, they didn't want to lose more money?
A No, that's not true.
Q But they left the league?
A They left the league because they did not agree with the plan that we had to go forward to invest in building new stadiums, to invest more in players, to invest in the creation of a commercial company that required us going out purchasing additional rights. They did not agree with that plan and left and that was their prerogative.
Q And you couldn't immediately find new investors, so you had to have three investor/operators run all the teams?
A The first thing we wanted to do was get our -- those existing investors to agree to our plan, then several years later we got new investors.
Q And that took several years later, correct?
A Three years, I think, correct.
Q How many years was it before you had no teams in multiple ownership?
A I don't recall the exact number. From 2002 to, like,

the last share of a sale was 2015, 2016.

Q Okay. So from 2002 to 2015, you still had multiple ownerships to some degree?

A Yes, there were way more than three investors. Over time, they divested their ownership interests from 2002 to 2016. The last investment of a share was 2016 but the teams were sold over a period of time.

Q So until 2016, that was 20 years since you got your Division I sanction, 1996 to 2016?

A Correct.

Q It took you 20 years to get to a position where you had individual owners for the each of your teams; right?

A No, that's not a fair representation. The sale in 2016 was a portion of the last team sold which was the Houston Dynamo.

Prior to that, those teams were being sold over a period of time. There was a 50 percent share of our Houston team, that last sale was in 2016.

Q So for that 20-year period, from 1996 to 2016, you never made a profit, right, on a league level?

A You mean at the league office, or do you mean as an enterprise?

Q As an enterprise?

A Some of our teams had made money and some of them lost money.

Q Not my question.

As an overall enterprise, you never made -- MLS the entity -- we'll talk about the teams in a second. You never made a profit; correct, in 20 years?

A That's correct.

Q Okay. And, in fact, near the end of that period in 2017-18, you go to there, you were losing over a hundred million dollars at that level; correct?

A That's correct.

Q And it's also correct that the money made from SUM never offset the losses at the league level, correct?

A That's correct.

Q Okay. And it's true that many of your teams never made a profit; correct?

A That's correct.

Q Okay. Now, Mr. Garber, for that whole 20-year period, you had your Division I sanction; correct?

A We did.

Q There was never any suggestion made by USSF that because you were unstable or because you were losing money or because you didn't have enough investor/operators that somehow your sanction should be put on provisional status or changed?

A I disagree wholeheartedly with what you just said.

Q Okay. When did you USSF say you should be on

provisional Division I status?

A They never said that.

Q Okay. When did they ever do anything to start a procedure to take away your Division I status?

A They never did that.

Q During that whole 20-year period, do you recall that you needed waivers?

A I do.

Q Right?

So, for 20 years, you get waivers. For 20 years, you're in terrible financial shape. For 20 years, you don't have separate owners for all your teams and USSF did nothing; right, nothing to take away your sanction?

MR. RUSKIN: Your Honor, objection.

THE COURT: Sustained.

MR. KESSLER: Okay.

Q Let me ask you this.

Do you recall testifying it takes years to build a successful league?

A I do.

Q Okay. And, in fact, you spoke about the fact that when you were talking about stadiums. I think when you were talking about the New York stadium for the Red Bulls, it took 14 years to get a stadium built; right?

A That's correct.

Q And they had a DI sanction?
A They were playing in Giants Stadium with the capacity way beyond the requirements.
Q But they had a DI sanction and it took them 14 years to get a new stadium built; correct, you can say yes or no?
A Yes, they had their DI sanction because they were playing in a stadium that passed the requirements of the DI standards. It was their option to invest $300 million in a stadium so that it could represent their club in a way that would be important for them and for Major League Soccer.
Q Mr. Garber, can you just answer my question. Your counsel can come up and ask you more questions.
My question is, if they worked for 14 years to try to get a new stadium built; correct, yes or no?
A Yes.
Q And, in fact, the other New York team you mentioned you testified worked on a stadium for 20 years; correct?
A That's correct.
Q Okay. Now, NASL has never had a DI sanction; correct?
A Correct.
Q Okay. Now, you seem to testify, I want to make sure I understood this, that you don't think being a DI sanctioned league has any value; is that your testimony?
A I don't believe it is what differentiates a major league from a minor league, no.

Q That's not any question.

Do you think it has any value at all, is it worthless?

A It has some value.

Q It has some value, right. Have you ever offered to give up your DI sanction?

A I was never asked and never offered.

Q Okay. If you give up your DI sanction, you wouldn't have to comply with the Professional League Standards, right?

A I would assume so.

Q Yes. But you've never offered to give it up, correct?

A No, I never did that, no.

Q Okay. Now, you testified that nobody from MLS, tell me if you testified to this, that no one from MLS proposed increases to the 2014 Professional League Standards.

Is that what you testified to? I want to make sure I get it right.

A That's my recollection.

Q Okay. In 2014, was Mr. Gulati still at Kraft Soccer?

A I don't think exactly when he left.

Q You would agree with me that when he was still at Kraft Soccer, he was attending MLS board meetings; correct?

A He attended some meetings, correct.

Q And he was employed by Kraft Soccer who was an investor/operator, operator/investor in MLS; correct?

A Correct.
Q And he attended some board meetings; correct?
A Correct.
Q Would you agree with me that when that when he was Kraft Soccer he was at MLS?
A I don't know what you mean by that.
Q Was he associated with MLS if he worked as a senior executive for an MLS team and went to MLS board meetings?
MR. RUSKIN: Objection.
THE COURT: Sustained.
Q You know that Mr. Gulati proposed increases in the Professional League Standards in 2014, don't you?
A I don't recall exactly when he proposed raising the standards.
Q Do you know that he proposed those standards while he was still working for Kraft Soccer, he proposed those increases?
A I don't recall when Sunil left Kraft Soccer, I'm sorry.
Q Okay. Can we look next at JX-41.
JX-41 is a board meeting of the United States Soccer Federation on December 8, 2013.
Do you remember attending this meeting?
A I don't recall.
Q Okay. Let's take a look, if we can, at Page 84.
And you'll see if we start with President Gulati on

Line 6.

PRESIDENT GULATI: Just as an update, so we've got the full reports with the exception of the financials, we'll send you out everything. The financials, the data we would get from the leagues on the P&Ls, we do not send out. They're not public. And if the board members outside of the Pro Leagues Review Group which is Mike, Edward, Carlos, and Dan wanted to see them, we would have to have a discussion about it, but we have access to that information.

Do you recall being there when Mr. Gulati spoke about this subject?

A I don't.

Q Let's go back to the next line.

And now we go to waivers, Lisa.

You can go down below that, please.

This is Lisa Levine, the general counsel. And you'll see she says, With respect to the waivers, you know, each year, each of the professional leagues has to make a request for a waiver from any of the standards which they don't meet.

MR. RUSKIN: Your Honor, objection. This is beyond the scope.

THE COURT: I'll allow this one question and then I'll consider that objection.

Q And you'll see it says, The first is from MLS regarding

the playing surface minimum requirements.

Do you see that?

A I do see that.

Q And, Mr. Garber, we can look at the next page. You were present for this presentation; correct?

A As I said, I didn't recall but if you have something to point to.

Q Right there.

A Great.

MR. RUSKIN: Your Honor, objection. Beyond the scope.

THE COURT: Sustained.

MR. KESSLER: Okay.

Q Let me ask you this, Mr. Garber.

You mentioned in your testimony with counsel that the NFL and the AFL, American Football League, and the NBA and the ABA were examples of situations where there were two top-tier professional leagues; correct?

THE COURT: I don't think he ever spoke about the AFL.

MR. KESSLER: My notes say he did, your Honor, but if you remember I'll just ask about the NBA.

Q Let me ask you, do you recall speaking about those two leagues or not?

A I remember commenting on it but I don't know what your

question is.

Q Well, I want to, I need to be within the scope.

Do you remember talking about the NBA and ABA?

A I believe so, yes.

Q And I think you used it as an example of where two leagues could compete with each other to be a top league; correct, that's what you were using them as?

A Yes.

Q Okay. When the NBA and the ABA competed against each other, did any of them need to be sanctioned to do that?

A I don't know what the NBA or USA Basketball rules were on sanctioning.

Q You were at the NFL, you worked at the NFL, you spoke about that?

A You asked me about the NBA.

Q Im now asking you about the NFL?

A Yes.

Q Did the NFL have to be sanctioned by anyone to be a top NFL league.

A There is no governing body for the NFL or American football.

Q Now, you mentioned about soccer-specific stadiums and how they were very important; correct?

A Yes.

Q Now, one of the stadiums you featured to the jury when

went through the pictures was the stadium in Atlanta; correct?
A Correct.
Q Atlanta is not a soccer-specific stadium; correct?
A It was a stadium built with soccer in mind.
Q Was it a soccer-specific stadium?
A It is not a 25,000-seat stadium. Atlanta was built with soccer in mind. I was involved in the planning and involved in their development of that stadium. We view it as a stadium built for soccer. It is a stadium built for soccer.
Q Does the National Football League team play in that stadium?
A They do.
Q They do, okay.
You mentioned, I think, the Charlotte stadium during your testimony?
A Correct.
Q Is the Charlotte stadium soccer-specific?
A It is not a soccer-specific stadium.
Q An NFL team plays in that?
A Correct.
Q And you admitted Charlotte even though you knew they didn't have a soccer-specific stadium; is that correct?
A It could have been an oversight.

Q You forgot to ask if it was a soccer-specific stadium was an oversight?

A When the presentation was made, it was showing that as an expansion team. That particular presentation did not highlight it as a soccer-specific stadium.

THE COURT: I think you're answering different questions.

He's asking when you admitted them into the league.

THE WITNESS: Oh, I see. Can you ask your question again?

Q You admitted them to the league knowing they didn't have a soccer-specific stadium; correct?

A The agreement that we have with Charlotte and with its owner, by a period of time they need to either develop a soccer-specific stadium, or they have to adjust their current stadium in a way that satisfies our standards. That's our relationship with them as part of our agreement.

Q By what year do they have to do that?

A I don't recall exactly, it's a couple of years.

Q Let me ask you this.

At the time that MLS restarted play in 1996 as a DI league, it had only one soccer-specific stadium; correct, out of ten?

A Can you repeat that question.

Q At the time MLS started playing in 1996, it had one or two soccer-specific stadiums; correct?

A It didn't have any soccer-specific stadiums in 1996.

Q Okay. Is it correct when you -- let me ask you this.

When you came into the league in 1999, how many soccer-specific stadiums was there?

A One.

Q That was the Columbus team?

A Correct.

Q How many more years did it get another soccer-specific stadium?

A Three or four years. I'm sorry, three years.

Q Three years. And that's because it takes time for a new league with a DI sanction to develop to the point where it could get soccer-specific stadiums; right?

A It takes a lot more than time.

Q But it takes time. It takes years; right?

A It does take time.

Q Now, when you admitted the team in Minnesota United, they came with the same name that they had when you admitted the owners, when Minnesota United, they brought the same name for the team they had in the NASL; correct?

MR. RUSKIN: Objection, beyond the scope.

THE COURT: Sustained.

MR. KESSLER: I'm sorry, your Honor. That was

scope?

THE COURT: Yes.

Q Mr. Garber, you testified about the designated player provisions in the MLS; correct?

A Correct.

Q And the designated player provisions are an exception to the budgets for player salaries that the league sets for each of the teams each year; correct?

A That's correct.

Q Okay. And the reason the league sets the budget for the teams is because you're a single-entity league; correct?

A No. The league, in cooperation with its Products Strategy Committee, sets the budget. The league has no authority. The owners in the Product Strategy Committee set the competitor guidelines, budgets, et cetera.

Q But the reason the owners in that committee have the power to set budgets for each individual team for player salaries is because of your single-entity structure; correct?

A No, this is no different than a salary cap in any other league. We have a wide variety of rules as it relates to what teams can spend and we have a relationship with the players' union that approves those budgets and approves those guidelines. Not the budgets, the specific roster expenditure lines. A union agreement.

Q The NASL was not a single-entity league; correct?
A I don't know what their structure was.
Q Okay. Now, you testified you met with Rocco Commisso?
A Correct.
Q You testified you met with him before he actually joined the NASL; correct?
A I believe that's true, yes.
Q And do you recall if what you were discussing with Mr. Commisso was his possible interest in owning a team in Major League Soccer?
A I believe that's why that meeting was set up.
Q Right. Mr. Commisso told you about his passion for soccer at that meeting; correct?
A Yes.
Q And he told you he really wanted to own a soccer team in the United States; correct?
A Correct.
Q And you would agree with me, Mr. Commisso wasn't, like, interested he didn't tell you he was interested in just, like, any old sports team, a baseball team, or a hockey team, he really wanted to be a soccer owner; right, that's what he told you?
A I don't know whether he mentioned any other teams.
Q He only mentioned soccer; right?
A I don't know what else. I, you know --

Q Did he tell you about his love for soccer?

THE COURT: Let him finish his answer, please.

THE WITNESS: Can you ask your question again?

Q Did he tell you about his love for soccer?

A Yes, he did.

Q Did he tell you about his history in soccer?

A The fact that he played as a kid, yes. He mentioned that, yes.

Q He got a scholarship to Columbia and all of that?

A I don't know that he said that but he did describe his passion for the game.

Q Now, your counsel put up the letter of intent between you and USL. After that letter of intent was signed, you continued to have an arrangement between USL and the MLS teams; correct?

A What do you mean by arrangement?

Q Well, you ended your reserve league; correct?

A We did.

Q And you told all the MLS teams that they either had to affiliate with a USL team or they had to start a USL team because they each needed to have a player development team; correct?

A Correct.

Q Right. And so, after 2014, until that arrangement ended, all the MLS teams were required to be involved in

USL; correct?

A There were a handful that were not, but the vast majority of them were required to have a development team and they needed a place to play and they played in the USL. There were some teams that were not if in.

Q In fact, a handful that were not had to get your permission because they were supposed to be; right, they had different reasons why they couldn't?

A They needed to field a lower-division team to develop players, that's correct.

Q And they were supposed to do it in USL either by owning a team or affiliating with USL; correct?

A Correct.

Q And that was the situation in 2017; correct, for that season?

A Correct.

Q And it was the situation for the 2018 season; correct?

A Correct.

Q Was it the situation for the 2019 season?

A We began winding our teams out of the USL. I don't recall exactly when that happened. I know we started MLS Next Pro in '22?

Q In 2022, you started MLS Pro?

A Right.

Q That was years after NASL lost its Division II

sanction; correct?

A Correct.

Q Now, you testified about the U.S. Open Cup; right?

A I did.

Q Now, under the rules of Professional League Standards, every MLS team is supposed to agree to play in the U.S. Open Cup every year; correct --

A Correct.

Q -- that was true?

And then you concluded in the last, was it the last year or two, that you concluded that was not good for MLS; do you recall that?

A What was not good for MLS?

Q Do you recall making public statements that you did not want all the MLS teams to have to play in the Open Cup?

A No, what I --

MR. RUSKIN: Objection, your Honor. Going into 2023. This is beyond the scope.

THE COURT: Sustained.

MR. KESSLER: Your Honor, they raised the Open Cup.

THE COURT: They raised the Open Cup based on your opening that was limited in time.

MR. KESSLER: Okay.

Q Now, you testified that before this lawsuit was filed,

you never heard that Mr. Sehgal had ever made any claims that there was some anticompetitive agreement between MLS and USSF.

Was that your testimony?

A I don't remember saying that.

Q Okay. So I'll ask you now.

A Okay.

Q Did you know before this lawsuit was filed that Sehgal had made to USSF claims about an anticompetitive -- what he believed to be an anticompetitive conspiracy between MLS and USSF?

A I don't remember when Sehgal might have said something like that, no, I don't know that date.

Q Do you recall learning during the DI application process that Sehgal had said anything about that at USSF board meetings?

MR. RUSKIN: Objection.

THE COURT: Sustained.

Q You spoke about the SUM agreement on your questioning.

The SUM agreement was entered into first in 2004; correct?

A SUM agreement with who?

Q The SUM agreement with United States Soccer Federation?

A Correct.

Q And it was extended two times through 2022; correct?

A Correct.

Q Now, during the time it was extended, Mr. Gulati was the president of USSF; correct?

A Correct.

Q So for both the extensions, this first extension and the second extension; correct?

A Correct.

Q And Mr. Gulati was not the president of USSF when USSF decided not to renew the SUM agreement in 2022; correct?

A That's correct.

Q Finally, Mr. Garber, you testified on direct that you never participated in any of the deliberations regarding sanctioning of leagues; correct?

A Correct.

Q It's correct that you were present at some board meetings when your own sanctioning decision was discussed; correct?

A Not that I could recall.

Q Let's start with the 2009 board meetings, do you remember that?

A I remember that meeting.

Q And you were there and your sanction was discussed there and you were present; correct?

A I don't know when our sanctioning or whether the sanctioning was discussed there. I know that I made a

presentation about Major League Soccer, an annual report, but I don't recall whether sanctioning that we were even asking for sanctioning, so I don't agree with that. I was at that meeting.

Q Okay. You don't recall making a presentation of your annual report and talking about it which had the requests for waivers in this.

You don't recall that?

A No.

MR. RUSKIN: Objection, your Honor. Beyond the scope.

THE COURT: Are you asking whether he was present during a deliberation of that or whether he presented before there were deliberations? Let's be clear.

MR. KESSLER: Yes.

Q Were you present when they voted to give you the sanction in 2009?

A Not that I'm aware of.

Q Were you present when they voted to give you the sanction in 2013 for the 2014 season?

MR. RUSKIN: Your Honor. Objection this is beyond the scope.

THE COURT: Sustained.

Q Mr. Garber, you were present on -- I'll ask it this way.

At the time you made your comments about the federation governing with teeth, you knew deliberations were about to take place on the sanctioning of NASL; correct?

MR. RUSKIN: Objection, beyond the scope.

THE COURT: Sustained.

MR. KESSLER: No further questions, your Honor.

THE COURT: Any redirect.

MR. RUSKIN: Very brief.

REDIRECT EXAMINATION

BY MR. RUSKIN:

(Continuing.)

Q Mr. Garber, was the goal of the USL relationship commercial or player development?

A Player development.

Q Was the intent commercial at any time after 2014?

A No, it was not.

Q Commissioner Garber, you mentioned, or you started to answer a question with respect to stadiums. And you said it takes a lot more than time, then I believe you were interrupted.

What else does it take in order for a league to have a stadium or soccer-specific stadium to be built?

A It starts with the faith in that city that they're going to be a host site, if you will, for a popular league. It requires having owners that have the financial capacity,

both with their own capital but also with their ability to incur debt. It requires a team in many cases that has a rabid or large fan base. It requires the reputation of the league that can stand by and stand behind a long-term commitment to a project.

(Continued on the next page.)

RECROSS-EXAMINATION

BY MR. RUSKIN (Continuing):

Q And have the Major League Soccer owners delivered on that type of commitment time and time again?

A Time and time again.

MR. RUSKIN: Thank you very much.

MR. KESSLER: Just one question, your Honor.

THE COURT: Yes.

RECROSS EXAMINATION

BY MR. KESSLER:

Q You just stated all the things that are required for a league to be able to have soccer-specific stadiums, correct?

A Correct.

Q The NASL had some soccer-specific stadiums; is that correct?

A Not that I'm aware of.

Q You didn't know the NASL had a number of soccer-specific stadiums?

A No.

MR. RUSKIN: Objection, lack of foundation.

THE COURT: Anything else.

MR. KESSLER: Nothing else.

MR. RUSKIN: Nothing else.

THE COURT: Please be seated.

Have a good day.

(Witness excused.)

THE COURT: Call your next witness.

MS. HUDGENS: Your Honor, we're going to call a video witness next.

THE COURT: Okay.

MS. HUDGENS: The NASL calls John Collins.

(Videotape deposition of John Collins played.)

THE COURT: Ladies and gentlemen, why don't we take

our afternoon break? And we'll be ready to go in about 15 minutes. Thank you.

(Jury exits.)

THE COURT: You can be seated.

Do you want to offer?

MS. HUDGENS: Your Honor, the video testimony of John Collins we'd like to move into evidence as --

You're not objecting to the video?

MR. BUTERMAN: No.

MS. HUDGENS: We move into evidence as JX-108 -- sorry, 109.

THE COURT: All right.

MS. HUDGENS: And the transcript would be 109-A.

THE COURT: Well, the transcript is the only thing in evidence.

MS. HUDGENS: I'm sorry, the chart with the corresponding exhibits -- I'm sorry.

THE COURT: Joint Exhibit 109 is the transcript/trial testimony of Mr. Collins.

I believe there were some exhibits that were shown to him, so do you have those to offer or were those already in evidence through another witness?

MS. HUDGENS: No, your Honor, there are no exhibits to enter.

THE COURT: All right. Very good.

(JX-109 so marked.)

(Recess taken; jury enters.)

THE COURT: Call your next witness.

MS. HUDGENS: NASL calls Richard Moeller, M-O-E-L-L-E-R.

(Video deposition of Richard Moeller played.)

THE COURT: Is that it for that witness.

MS. HUDGENS: That's all for that witness, your Honor.

THE COURT: We can do logistics later.

What's your next witness?

MS. HUDGENS: Also a video deposition.

NASL calls Donna Shalala.

THE COURT: Okay, you can play it.

(Video deposition of Donna Shalala played.)

(Continued on the following page.)

JEFF L'HOTE,

called by the Plaintiff, having been first duly sworn, was examined and testified as follows:

CROSS EXAMINATION

BY MR. KESSLER:

A I run a soccer focused management consultancy.

Q And what do you do with that consultancy?

A Well, we work with various stakeholders in the business of soccer around strategic projects and business planning and project management.

Q How did you first become involved in soccer consulting?

A It's a niche business. I finished a MBA program where I studied the business of global soccer in England and then started my business in 2005 -- 2005/2006.

Q Okay. And you started that business in the United States?

A Yes.

Q Okay. And did there come a time in 2010 when you were hired by Major League Soccer for a project?

A Yes.

Q And was that project to advise them on what their strategy should be for Division-II soccer?

A Yes. The project was -- yes, regarding options around lower division or Division-II soccer.

Q Okay. Let's take a look at Joint Exhibit 24.

(Exhibit published.)

Q If you look at the top of this e-mail, you'll see it's an e-mail from you to Mark Abbott. Do you see that?

A Yes.

Q And Mr. Abbott was a senior executive of MLS at this time; correct?

A Correct.

Q And if we look at the e-mail underneath it, this says, "Hi, Mark: I'm attaching a one-page letter outlining key elements of our D-II project and will coordinate a call meeting with Ashley for us to discuss along with the proposed project plan, also attached."

Did this reflect a proposal you were making to Mr. Abbott to for this project?

A I believe this was a follow-up to a proposal I had made to him.

Q And did Mr. Abbott first contact you or did you reach out to Mr. Abbott about this project?

A No. My recollection is that I pitched the project to Major League Soccer.

Q So, how did you decide to pitch this project to Major League Soccer? What motivated that?

A In 2010, our lower division soccer was incredibly unstable. The U.S. Soccer Federation had just run a

Division-II league and Major League Soccer at the time was interested in opportunities to develop players and others for potentially moving to their first team or potentially using them to sell to other leagues.

Q Okay. And did it occur to you that Major League Soccer needed to have a D-II strategy?

A I thought at the time that Major League Soccer would benefit from having a lower division strategy.

Q Okay. And if you look at page three of this document, it talks about two structural scenarios. And one structural scenario was MLS as a D-II league. Do you see that?

A Yes.

Q And that would be a scenario in which they would administer the league, invest in the league or be a partial owner of a league or owner?

A Correct.

Q And then the other strategy was MLS teams operating lower professional -- lower division professional team within, and you wrote outside their existing MLS market or an affiliation with team ownership; correct?

A Correct.

Q Okay. And the key questions you identified below, the project will address, is "what should MLS's relationship be with lower division professional soccer in the U.S. and Canada."

That's what you were saying you should study; correct?
A Correct.
Q And if you look at potential consultations on page five, you were proposing to interview a wide variety of people; correct?
A Potentially, yes.
Q Potentially MLS, some representatives, MLS team owners, USSF executives, USL and NASL teams, other leagues and sponsors; correct?
A Correct.
Q And did Mr. Abbott respond that he was interested in having MLS do this project with you?
A Ultimately, yes.
Q Okay. Was the project changed from its original scope as you recall?
A I don't recall the details of the original scope.
Q Okay. Let's look at JX-27.
(Exhibit published.)
Q This is an e-mail from you to Mr. Abbott containing an MLS 2 presentation; is that correct?
A Yes.
Q And was these slides basically the results of the project that you had conducted?
A This was a discussion document based on the work I had

done to date.

Q But you had already done your work to date and now you were presenting it to MLS?

A Yes.

Q Right. And it says in the first sentence, "Mark: Attached are draft slides to build upon for internal D-II discussions." Is that correct?

A Yes.

Q And you said in one/two. You're referring to slides one/two there?

A Yes.

Q "One/two gets us to consensus starting point that an MLS run D-II, open to both MLS and independent teams, provides the most potential MLS benefit and league flexibility referred to as MLS 2."

Do you see that?

A Yes.

Q And what did you mean by consensus starting point?

A After I had done my initial research, there were two other individuals at MLS who were involved in the project, Nelson Rodriguez and Todd Durbin, and I discussed my findings with them and it was our -- that was our consensus starting point, starting with Mark and have a further discussion.

Q So it was a consensus between you and Mr. Durbin that you were going to present for further discussion by MLS?

A Mr. Durbin and Mr. Rodriguez.
Q Who was Mr. Rodriguez?
A He was another senior executive at Major League Soccer.
Q Okay. So two major soccer executive reached this consensus with you to present further?
A Yes.
Q Okay. Now, let's take a look next at page 005 -- I'm sorry. Let's go to 006.

006, if you look at the question in the middle of the page, you wrote in the slide, "Question: What is the most beneficial D-II structural model for MLS." Correct?
A Correct.
Q And then you offered two options; correct?
A Two general pockets, yes.
Q Yes. One was to join or partner with another league and one was to create an MLS-led league; correct?
A Correct.
Q Okay. Now, with respect to partnering with another league, you said in this slide it was too risky to partner with NASL and USL Pro because they were unstable. That was one of the reasons?
A Correct.
Q And this was in 2010 before either of them had been certified in either Division III or D-II; correct?
A I don't recall the dates that they were sanctioned.

Q Do you recall that their first year they ran in one league that was operated by USSF itself?
A That was in 2010, I believe.
Q Right. And so this presentation was in 2010; correct?
A Can you remind me of the month in 2010?
Q Take a look at the first page I'll show it to you.
December 2010. Do you see that?
A Yes.
Q And that would be before either of them played the 2011 season; correct?
A Correct.
Q Okay. And then if you go back to that, another detriment you listed is that MLS would have limited control over league direction, growth and partnerships, et cetera. That's what you wrote?
A Yes.
Q And then you also mentioned that competing agendas may be inconsistent with MLS opportunities.
Do you see that?
A Yes.
Q Now, the competing agendas that you were referring to was competing agendas by NASL or USL?
A The other leagues; correct.
Q The other leagues, right. They may have a different agenda for their league than what MLS wanted; correct?

A Correct.

Q And at this time you knew that what MLS wanted was to have a D-II league that would focus on player development; correct?

A I didn't know that.

MS. RATHBUN: Objection, foundation. Leading.

THE COURT: I'll allow it.

A I'm sorry, would you repeat the question, please?

Q You had interviewed people at MLS, correct, and you worked to develop this consensus with a few of them; correct?

A With two others, right.

Q In the course of that did you learn that the MLS objective for D-II league would be to focus on player development?

A That was a key focus.

Q A key focus, yes. And did you also interview people from NASL as part of your project?

A Can we look back at the list?

Q Sure, sure. If you look back to the prior exhibit. We can go back to that. That was JX-24.

(Exhibit published.)

Q And if you go to the list of proposed people, you had a group of USA -- USL and NASL teams league five to seven, did you interview any of those people?

A My recollection is the only person I would have

potentially interviewed from that his would be Joey Saputo.
Q Was Mr. Saputo with either of the leagues?
A At the time he was with NASL heading into Major League Soccer.
Q Okay. How was he heading into Major League Soccer at that time?
A I forget the exact years, but Montreal left NASL to join Major League Soccer.
Q So he was on the Montreal NASL team?
A At the time of this project, yes.
Q Right. And subsequently the Montreal NASL team moved up to Division-I and joined MLS?
A They joined MLS sometime shortly after this.
Q And that was at the Division-I level that they joined?
A MLS has always been Division-I, yes.
Q Okay. And do you recall learning from Mr. Saputo or from your study at of NASL at that time, what agenda NASL may have as a league?
A I don't recall if I ever spoke with Mr. Saputo, but if there was anyone from NASL at the time, that would have been the only one I have spoken with, Mr. Saputo, on other projects. I don't remember if it was this one.
Q Let's go back to JX-27.
(Exhibit published.)
Q Did you convey any information to MLS about what you

thought would be the competing agendas that might be inconsistent with MLS opportunities, goals and objectives?

A It would be most anything other than player development.

Q Okay. Did you discuss the fact that NASL had aspirations to grow into a Division-I league, if you recall?

A I don't recall that NASL had any aspirations to grow into a Division-I league.

Q Do you recall conveying any information about NASL's possible competing agendas at that time?

A I don't recall saying anything specific at all about NASL.

Q Do you recall saying anything about the possible competing agendas of USL at that time?

A Nothing specific about USL, no.

Q Okay. So you just don't recall what you discussed about that subject at the time or -- I guess my question is do you recall you didn't discuss their competing agendas or you just don't remember?

A No. I think when I look at competing agendas, that the lower division leagues at that time were interested in generating franchise fees and bringing in new teams, not necessarily developing players to move on and sell as potential assets.

Q Okay. So you would have identified for MLS that USL and NASL were interested in bringing in new teams, generating

expansion teams and growing their independent businesses; correct?

A At the time my assumption was that's what they were interested in doing. I don't know if they would be able to do that and potential partnering with one of those two leagues at the time. It didn't see a viable opportunity if you wanted to focus on developing players.

Q And, so, the other option that you discussed was to create an MLS-led league; correct?

A Correct.

Q And you said that that was the so many option to ensure D-II viability.

That was your conclusion?

A That was my opinion at the time, yes.

Q Right. And you wrote that it offers the most flexible structure and the greatest growth potential; correct?

A Correct.

Q And you also noted that several MLS teams desired a D-II option.

That was what you learned by interviewing MLS teams; correct?

A Yes, because they were running a reserve league only around that time.

Q And then you said the consensus is to build an MLS 2 league open to MLS teams and independent owners.

That was the consensus you had developed in these slides; correct?

A Correct.

Q Now, after you made these recommendations, did you learn what MLS chose to do with respect to a D-II league.

A I don't think MLS did anything for quite a while after I presented this project.

Q Do you recall that in 2013 or 2012, do you recall --

Let me ask you, do you recall what year MLS started to talk to USL about having a relationship?

A I don't know when MLS began to speak with USL. I know MLS teams began to play in USL in about 2014.

Q Were you involved any more as a consultant to MLS about that situation?

A No. Shortly after these meetings, this project ended for me.

Q Okay. Did you learn at that time when the project ended, had MLS reached any conclusion?

A No. MLS was going to continue to study this and look at their options.

Q Okay. Did you subsequently learn -- did you subsequently learn that MLS decided to enter into some type of an arrangement with USL?

A Yes. Years later I learned that there was some arrangement.

Q Okay. Did you ever become familiar with the details of that arrangement?
A No.
Q Okay. Now, in 2012 do you recall sharing some of the data you had developed for MLS in studying the D-II situation with Sunil Gulati at U.S. Soccer?
A I recall sharing a table that showed the churn rate of professional teams over a period of time that I had started years ago on another project.
Q You didn't start that with your MLS project?
A No. I had worked for a project with Deloitte Sports Group several years before this who were in turn working for Traffic Sports and as part of that project for Deloitte and Traffic Sports, we created a churn rate to show the number of team failures by league.
Q Now, do you know how -- well, let me show you PX-074.

(Exhibit published to witness only.)

Q You'll see in the bottom of this is an e-mail from you dated January 6, 2012 and above it there's an e-mail from Mr. Gulati to you in response. Is that correct?
A Yes.
Q Okay.

MR. KESSLER: Your Honor, I move PX-74 into evidence.

MS. RATHBUN: No objection, Your Honor.

THE COURT: All right. So admitted.

(Exhibit PX-74 received in evidence.)

(Exhibit published.)

BY MR. KESSLER:

Q And, so, your e-mail was circulating an article that you had -- well, I guess it was a recent editorial that you were circulating to this group?

A Yes, it was an editorial that I wrote and was published.

Q All right. So you wrote this editorial and you circulated it to various people including Sunil Gulati?

A I believe so, yes.

Q And let me take a look at the article that you wrote. You wrote here at the very top of the second page, "Here is what I believe is a more realistic view" --

I can find that. It's on page 002 at the very top.

A I'm sorry, what's the document number?

Q We're blowing it up for you now. This is PX-74. It says -- you wrote: "Here is what I believe is a more realistic view highlighting how soccer's continued relevance in the U.S. must be led by MLS." Do you see that?

A Yes.

Q And that was your view, correct, at the time?

A This -- this editorial was in response to another editorial where the person wrote that soccer is not going to become the number three sport in the United States by a

certain period of time.

My response to the editorial was that you can't just bundle all of soccer into one bucket; that soccer is a complicated sport, that there's multiple teams and leagues and tournaments and that in the case of the U.S. at the time Major League Soccer had a very important role to play in the continuing development of soccer.

Q Now, what role did you advocate for MLS at this time?

A I don't believe I advocated any role for MLS. I was just providing my opinion in terms of their relevance.

Q Did you suggest in number one below, that MLS should increasingly focus their resources on player identification, player academies and investing in D-II or lower divisions?

A Can you blow it up again?

THE COURT: You can look in that book.

THE WITNESS: What number, Your Honor?

THE COURT: 74. That way you can read it if you want to. PX-74.

THE WITNESS: PX, sorry.

A (Reviewing.)

Yes, my premise in the article was similar to my advice in 2010, that MLS would have a lot to gain by continuing to develop players and one of the best ways to do that was through a meaningful competition so there was a pathway between player academies and MLS, to the first team in

MLS.

Q Right, and your view from 2010 when you did the project going forward was that MLS should find the way to develop a D-II strategy, which you thought would benefit MLS; correct?

A I thought MLS would benefit if they had a lower division strategy to help with their player development.

Q And that was your consistent view from 2010 to today; correct?

A Well, MLS ultimately started their own lower division league, I think in 2022.

Q Okay. From 2010 -- let's go from 2010 to 2017, did you believe MLS should have a lower division D-II strategy that it needed to develop its players?

A Well, between those dates, MLS opted to enter some of its teams in the USL leagues. That was the decision that they made that was initially one of the other options in the 2010 project I worked on.

Q That was the option that MLS chose to pursue; correct?

A At that period of time.

Q Yes. Now, at some point you became a consultant or you had some role working for the United States Soccer Federation regarding lower division issues; correct?

A In February 2017 U.S. Soccer hired me to help with the professional league compliance.

Q Okay. And did that professional league compliance

include compliance by all the leagues?
A No. When I was hired the focus was on USL and NASL because these two leagues had been provisionally sanctioned in 2017 and my role was to prepare a U.S. Soccer for their applications for 2018.
Q So Mr. L'Hote you weren't asked to do anything to monitor professional compliance or standards by MLS; correct?
A No, my project with MLS ended a long time ago.
Q No. I'm saying when you were hired by the United States Soccer Federation, you weren't given any role to monitor compliance with the professional league standards by MLS; correct?
A Not for 2017, but going forward from 2018. I'm still in that role with U.S. Soccer.
Q You're still in that role?
A Yes.
Q Did you come to learn that MLS was out of compliance with the standards because of the LAFC team in 2018 not satisfying the 35 percent ownership rule?
A I'm sorry would you remind me -- repeat the question?
Q In 2018 when you were working on compliance at USSF, did you come to learn that the LAFC team, MLS did not satisfy the 35 percent ownership rule?
A I believe it was 2018, yes.
Q Yes. Okay and they never sought a waiver for that year;

correct?

A I don't recall if they sought a waiver or not.

Q Okay. Do you recall taking any action as the compliance officer --

THE COURT: He wasn't the compliance officer. Come on.

MR. KESSLER: I'm sorry.

BY MR. KESSLER:

Q Explain what your role was in compliance.

A My role for U.S. Soccer was to in effect run the annual professional league sanctioning process and to provide information to the pro league task force and then U.S. Soccer's board with regard to compliance with the pro league standards.

Q Did you provide any information in that regard about MLS being out of compliance with the professional league standards because of the LAFC team in 2018?

A I recall that MLS received a waiver for LAFC, but I don't recall the year. I believe it was 2018.

Q Wasn't it in the subsequent year?

A I don't recall the exact date.

Q Do you recall becoming aware that the Minnesota team of MLS did not comply with the 35 percent owner rule?

A Yes.

Q And did you learn that they were out of compliance

without a waiver?

A They were -- they were granted a waiver. I don't recall when the waiver would have been required for --

Q They weren't granted a waiver until years after they started playing for MLS; correct?

A I'm not sure when the ownership of that team changed, in terms of the ownership.

Q You didn't know they were out of compliance the first year they joined MLS?

A I wasn't -- I don't recall what year Minnesota joined MLS. I just know that I was involved with MLS's application from 2018.

Q Let's take a look at PX-201.

(Exhibit published.)

Q It's already in evidence. You'll see this is an e-mail from Mr. Charles Altchek to you dated September 14, 2017. Do you see that?

A Yes.

Q Who is Mr. Altchek?

A He was a senior executive at Major League Soccer.

Q Okay. And he was sending you here the 2017 MLS annual report; correct?

A That's what it's entitled. I would have to see what the attachment was.

Q We'll look at that in a second, but just before we look,

the annual report was what MLS would file in which it would ask for any waivers; correct?
A For the upcoming season, correct.
Q This would be for the 2018 season?
A Correct.
Q Okay. Let's look, if we can, at that report on page six and if you look at page six under waiver procedures on the bottom not page six, item six the last page, waiver procedures on the bottom. It says, "MLS is not requesting any waivers for the 2018 season."
Do you see that?
A Yes.
Q Does that refresh your recollection that MLS did not request any waiver for either the LAFC team or for the Minnesota team for the 2018 season; correct?
A I know they requested the waiver. I just -- I don't know if it was 2018 or a following season.
Q Okay. But this is the official document sent to you; correct?
A Yes, but I don't know if there were subsequent documents sent to me or other discussions --
Q You're testifying now to this jury you don't remember any subsequent documents; correct?
A No, I recall going and looking at ownership documents of MLS to confirm what ownership percentages were. I just don't

remember the date of that.

Q It could have been years later; right?

A No. It certainly wasn't years later because I only became involved with MLS and NASL in 2018.

Q It wasn't for the 2018 season; correct?

A According to this letter, but I would have to see the sanctioning letter to confirm that.

Q Okay. Now in your role in 2017 you said you were mostly focused on the two D-II leagues; correct?

A Only focused on USL and NASL.

Q Okay. Let's take a look at PX-171?

(Exhibit published.)

Q At the top is an e-mail from you to Dan Flynn called draft position description. Do you see that?

A Yes.

Q And is it correct that you actually contacted Mr. Flynn to propose your taking this role; is that correct?

A No. My recollection is I was approached by Mr. Flynn and this was a follow-up to the discussion that I had with him.

MR. KESSLER: Okay. Your Honor, I move into evidence PX-171.

MS. RATHBUN: No objection.

THE COURT: So admitted.

(Exhibit PX-171 received in evidence.)

(Exhibit published.)

BY MR. KESSLER:

Q We can display it now. And what you wrote to Mr. Flynn is, "Hi, Dan: Here is a one page overview of my take on the new position." Correct?

A Correct.

Q "While the role is heavy on compliance, I thought that utilizing development in the title helped convey positive engagement. That was your suggestion; correct?

A Yes.

Q But you knew that the position that you were being hired for was going to heavily focus on compliance with respect to D-II in particular; correct?

A I think my interest was broader than that is why -- I don't think a decision had been made on anything. We were discussing what my role might be at that time.

Q Ultimately your role was heavily focused in 2017 on D-II compliance; correct?

A Almost solely on D-II compliance.

Q Okay. Now when you came in did you learn that for -- the 2017 season was already going on, is that correct, when you took this position, or about to start?

A My recollection is I started the project in February of 2017 and leagues would typically kick off in March or thereabouts.

Q Is it correct that USSF had already certified provisionally both NASL and USL as Division II leagues for the 2017 season before you took the position?
A Yes.
Q Okay. Did you come to learn that USL had been given 31 waivers from the standards for the 2017 season before you became involved in compliance?
A I don't recall the exact number, but there were a lot of team waivers for USL.
Q Was it the most you had ever heard of for a league?
A Before I took the role, I never even heard the term.
Q Did you come to learn that NASL for the 2017 season needed two waivers?
A Yes.
Q Okay. And by March of 2017, by March 30th, did you have an opportunity to discuss with Mr. Flynn any initial thinking about the D-II league situation?
A In March of 2017.
Q Yes.
A Mr. Flynn and I had met with both USL and NASL separately to talk about their waivers from 2016 and what the status was and what their plan was moving forward.
Q Okay. Was Mr. Gulati involved in your discussions at that time from USSF about the future status of the two D-II leagues?

A Mr. Gulati wasn't involved.
Q You primarily dealt with Mr. Flynn?
A Yes.
Q Did Mr. Flynn during his discussions with you indicate that he was also acting consistent with the views of Mr. Gulati in any way or did you not know?
A I do not know that.
Q Okay. Anyone else but Mr. Flynn who interacted with you during this time period?
A I interacted with -- from a U.S. Soccer standpoint with their general counsel at some point.
Q Was it Mr. Levine or Ms. Waukey (ph)?
A I believe Ms. Waukey. I don't remember the timing of it.
Q It was the general counsel?
A Yes.
Q Let's look at PX-180.

(Exhibit published to the witness, counsel and the Court.)

Q This is an e-mail from you to Mr. Flynn dated March 30, 2017; is that correct?
A Yes.
Q Okay. And the subject was NASL penalty compliance plan; correct?
A Yes.
Q Why did you use the word "penalty"?

MR. KESSLER: Let me move this into evidence Your Honor.

MS. RATHBUN: No objection.

THE COURT: All right. PX-180 is in.

(Exhibit PX-180 received in evidence.)

(Exhibit published.)

BY MR. KESSLER:

Q Why did you title this NASL penalty compliance plan?

A This was related to one of the requirements that NASL had as part of their 2017 provisional sanctioning that they would post bonds where U.S. Soccer was a beneficiary and if one of the teams then did not continue to participate, there would be a penalty involved that would go to U.S. Soccer.

Q So what you were discussing here -- look at the first paragraph. It says, "Here are some points for us to contemplate before deciding whether to push for a team penalty in the unlikely scenario that NASL is sanctioned as D-3 for 2018 and one or more of its teams refused to play."

That's what you wrote; correct?

A Yes. That was related to the -- the penalty clause and the wording as originally drafted was unclear.

Q Now, in March of 2017, you said you met with the NASL league?

A With Mr. Sehgal and the consultant that NASL had hired at the time, yes.

Q Who was that?

A I believe Mr. Bruce -- I can't remember his first name.

(Continued on the following page.)

EXAMINATION BY
MR. KESSLER:
(Continuing.)
Q Now, Mr. Sehgal and Mr. Bruce, they didn't tell you that NASL wanted to be sanctioned in DIII to move down a division, did they?
A I don't remember them ever saying anything about Division III.
Q In fact, every time you met with Mr. Sehgal that year, he told you NASL wanted to be Division II sanctioned; correct?
A I don't remember having any conversations about a divisional sanction, just how NASL was going to come into compliance.
Q So why would you be discussing with Mr. Abbott back in March of 2017 a scenario in which NASL would move down to DIII?
MS. RATHBUN: Object, your Honor.
THE COURT: Sustained.
Q Do you recall what, I'm sorry, why were you discussing with Mr. Flynn a scenario in which NASL would be pushed down to DIII at this time?
A My recollection is the wording of the bond, the performance bond requirement was unclear what would happen in NASL was sanctioned as DIII.

Q But why would the subject of DIII even being discussed when NASL didn't want to be DIII?

A I think it was just to determine if that was an outcome what would happen with that bond money. I recall at the time Mr. Sehgal asking us questions about the penalty clause. I recall us mutually -- NASL to Mr. Sehgal requesting language but I don't remember any discussion specifically about Division III.

Q Did Mr. Flynn tell you he thought that an outcome was possible now that NASL would be denied a DII sanction for 2018 and that would be forced to DIII?

MS. RATHBUN: Object, your Honor.

THE COURT: Sustained.

MR. KESSLER: I'm sorry, your Honor, was that sustained?

THE COURT: It was.

Q Okay. Do you recall a discussion with Mr. Flynn about the possibility at this time of NASL not being sanctioned as DII for 2018 and having to be sanctioned in DIII?

A Only in the context of what would happen with the penalty.

Q Look at the next paragraph where it says, Two general scenarios. A little bit below. One scenario is NASL has eight or more viable teams for 2018 likely gets sanctioned as DII but possibility that board instead sanctions as DIII,

whether or not NASL seeks or wants DIII.

Do you see that?

A Yes.

Q Who suggested that possibility?

A That was me asking a question if this happened.

Q Why did you raise as a possibility that the board would sanction NASL as DIII whether or not it wanted to.

Why did you raise that possibility at that time?

A My understanding, when I started the role, was that both NASL and USL were told that they needed to come into compliance fully with the Pro League Standards or come into substantial compliance for 2018. At that time, I think I was just thinking about what are the other possibilities.

Q When you came into that role, did you read the sanctioning letters that NASL and USL received when they got DII provisional sanction for 2017?

A At some point after starting I did, yes.

Q Before this memo, right?

A I don't recall when I received them.

Q Well, you started, you said, in February; this is now the end of March, that wasn't one of the first things you looked at?

A I don't recall when I looked at it. I do recall that the heavy lifting at the very beginning of the project was dealing with this NASL performance bond. That was sort of

the focus for quite a while in the beginning.
Q Do you recall at some point reading those two letters?
A Yes.
Q And you learned that NASL did not have any condition in its letter for it to come into substantial compliance by a particular date or to have even a plan for substantial compliance by a particular date; correct?
A No, that's not correct. I was told that is what was conveyed to both NASL and USL and then we met with NASL and the discussion on meeting the team requirement, or substantially meeting the team requirement, was discussed. I think it was mid-March which would be before this letter.
Q Mr. L'Hote, did you read the letters, yes or no?
THE COURT: He answered that question already. Move on.
Q You read the letters, right? Let's look at JX-78.
JX-78 is already in evidence. It's an e-mail from you in September; correct?
A This was yes, September 2017.
Q Right. And what you say in the bottom is, I already attached Pro League sanctioning communications from December 16th, January '17.
Do you see that?
A Yes.
Q Let's look at Pages 9 and 10 of this document. And I'm

looking now at the NASL letter on Page 9. And if you can below that up, please.

And you'll see here that this letter you were familiar with states that when U.S. Soccer's board of directors voted to grant NASL provisional DII status, it was conditioned on NASL's timely fulfillment of certain additional requirements. And these additional requirements as discussed with you, myself, and Sunil Gulati in Los Angeles on Friday, January 13, 2017, are as follows.

And then it lists, I believe, we could look at the whole letter, how many requirements there are.

I think there are six requirements; is that correct?

A Yes.

Q And none of those requirements include any requirement that they come into substantial compliance by a specific date or that they even present a plan for substantial compliance by a specific date; correct?

A My understanding --

Q Just read the requirements. Please answer that question.

Is it listed in these requirements?

A If you just give me a minute, please.

Q Sure. Read all six.

A Yes, the fourth point states that NASL will present a plan for the future including plans for the league office

and strategic vision of the league. And this plan shall be presented no later than March 15th.

Q Is there any reference here to compliance with the standards in those words?

A Not in those words.

Q Let's look at the letter by USL. Is that on Page 10?

Now, USL had a different letter you attach; correct?

A USL had their own letter.

Q Right. And it had, I believe, eight requirements listed instead of six; correct?

A Correct.

Q And look at Number 7. USL will provide a plan to the federation regarding those teams which do not currently meet the DII standards, detailing how such teams will come into compliance and providing milestones and completion dates.

Do you see that?

A Yes.

Q That's what you were referring to that you thought was in the NASL letter but it's not there; correct?

A I didn't think anything -- I didn't think anything was in the letter. I was just explaining what I was told when I started the project. And when we met with both leagues in mid-March, the messaging was the same: That what is the status of your waivers and how are you going to come into compliance or substantially come into compliance with those

waivers?

Q So before you met with those teams in mid-March, you never reviewed those letters?

A I don't know the date exactly that I reviewed the letters, but I would presume I saw them in the first few months of the project, yes.

Q Did someone from USSF tell you that this type of language appeared in the letter for NASL? Give you that impression?

A No one gave me an impression of what was in the letters, just what the expectations were.

Q Okay. Take a look back at PX-180. We'll come back to this document later.

In PX-180, you did two scenarios. We go back to the two general scenarios. We discussed the first one. Was that NASL has eight or more viable teams for 2018 likely gets sanctioned as DII but possibility that board instead sanctions as DIII whether or not NASL seeks or wants DIII.

That was the first scenario, right?

A That I wrote there, yes.

Q And you wrote a second scenario. The second scenario you wrote is that NASL has less than eight teams for 2018 does not meet DII or DIII Pro League Standards and difficult to see how league sanctioning is justifiable, teams must likely find another league or cease operations.

That's another scenario was sketched out for Mr. Flynn in March of 2017; correct?

A Yes, with regard to the penalty clause.

Q And with respect to this situation, if the league was not sanctioned you're saying the teams would most likely have to find another league or the NASL would cease operations; correct, it's what you wrote?

A If a league didn't get sanctioned, yeah, the question was first, what happens to that penalty, does it just go back, and then what are the other possible scenarios?

Q I'm looking at Scenario 1 and 2. Does the word penalty appear anywhere in that, am I missing a word?

A In the first paragraph of the e-mail I refer to the team penalty.

Q Is there any mention of the word "penalty" in either Scenario 1 or 2?

MS. RATHBUN: Objection, your Honor.

THE COURT: Sustained.

Q In Scenario 2, you're saying if NASL has less than 18 teams, it's not going to be sanctioned. And even either would have to find another league or cease operations?

THE COURT: Eight teams, 18 teams.

Q Eight teams must find another league or cease operations; correct?

A I didn't know what was going to happen. I was trying

to figure out how to word the penalty, the agreement, with regard to penalties and trying to flesh out how you would word it properly in different scenarios.

Q Actually, Mr. L'Hote, in the next paragraph of this e-mail, make a suggestion that is designed to lead to scenario number two; correct?

MS. RATHBUN: Objection, your Honor.

THE COURT: Sustained.

Q Let's look at what you wrote.

In the next paragraph, you write the following:

2018 league application deadlines and board sanctioning decision date becomes critical.

So first let me give some background. Normally, the time for league sanctioning each year is towards the end of the year, like, in November or December, something like that; correct?

A I wasn't familiar with the timing other than that for 2017 sanctioning. I was told that it happened all through the holidays, people trying to get this done. And it was one of the reasons that U.S. Soccer wanted somebody with some experience with pro soccer to handle the process so they weren't in that situation again.

Q What you wrote here is that 2018 league application deadlines and board sanctioning decision date becomes critical, particularly Re: Whether NASL will have enough

teams to apply for DII.

Do you see that?

A Yes.

Q And what you were stating here is if the date was accelerated sooner, it would be harder for NASL to come up with eight teams committed?

MS. RATHBUN: Objection.

THE COURT: I will allow it.

A No, Mr. Sehgal and Mr. Bruce told us in mid-March that they would have 12 teams. And what part of my role was trying to put together a compliance process that made sense and was fair to everybody and would allow for the board to make sanctioning decisions with enough time so that teams can start planning for the following season with regard to, you know, their scheduling and selling tickets.

So this -- there were two parts to this, to this e-mail, as I indicate in the subject line.

Q Mr. L'Hote, Mr. Sehgal did not ask you to accelerate the deadline by which they had to put in their sanctioning application, did he?

A No, and he never, he never had any issues once we told him what the August 15th deadline was.

Q Mr. Bruce never told you and no one else in NASL ever told you they wanted the application deadline to be accelerated; correct?

A At that time, there wasn't -- there wasn't an application deadline. We had to create one.
Q Okay. Then you say, My current thought is recommending to you a league application deadline of August 15th, all leagues.
Do you see that?
A Yes.
Q When you wrote "all leagues," would that also be for MLS?
A Potentially MLS and NWSL.
Q And was the deadline accelerated for anybody but the two DII leagues?
A My recollection is that the leagues that have full sanctioning submitted their application a month or two after August 15th.
Q MLS did not have its sanctioning decision made until January of '18; correct?
A I don't recall the date of their sanctioning decision.
Q It wasn't made -- MLS was not given an August 15th accelerated deadline for its sanctioning, was it?
A It wasn't August 15th. I don't recall what the date was.
Q NWSL wasn't given an August 15th deadline for its sanctioning; correct?
A Yes.

Q That's the National Women's Soccer League?
A Yes.
Q The only ones who were give this August 15th deadline were the two Division II leagues; correct?
A The two that were provisionally sanctioned for 2016.
Q And what you wrote above is that the sanctioning decision date becomes critical, particularly Re: Whether NASL will have enough teams to apply for DII; correct?
A Yes.
Q Okay. Now, accelerating the date, would it make it easier for NASL to get more teams, would it?
A As of the date of this e-mail, NASL was telling us they had 12 teams.
Q Then why would the date become critical?
A To make sure that happened.
Q You already knew when you met during that team by your study that there was a possibility that some NASL team might not return and they might have to find more teams; correct?
A I'm not sure I understand the question about my study.
Q When did you learn that NASL might lose any teams in the 2017 season?
A I believe when NASL submitted its application on August 15th.
Q You didn't know that beforehand?
A I'd have to look at all the teams. I don't recall the

exact teams in the league at the time.

Q Do you recall having meetings with Mr. Gulati and NASL and having separate meetings with USSF during June of that period of 2017?

MS. RATHBUN: Objection, your Honor.

THE COURT: I'll allow it.

A I recall NASL inviting Mr. Gulati to one of its board meetings. I don't remember the timing. And I joined him at that meeting and I remember there was a meeting with USL and MLS regarding the MLS B teams that I joined.

Q You attended both of those meetings in June of 2017; correct?

A I don't remember the date of the meetings.

Q At those meetings, do you remember discussing the possibility at that time in June that some NASL teams might leave NASL and join USL?

A I don't remember -- no, I don't remember anything of that coming up at the NASL meeting, no.

Q When did you learn about that?

A I don't know that I did learn about that.

Q You don't recall learning about that at any time?

A I don't recall the exact teams --

Q Okay.

A -- that were in both leagues every year.

Q Do you remember at the September 1, 2017, meeting being

in a meeting with the executive session; do you remember that, before the full board meeting?

A Yes.

Q Do you remember discussing at that meeting the possibility that NASL teams might end up having to leave NASL and join USL.

Do you remember that subject?

A No, I remember learning that there was going to be some more team failure at MLS with the San Francisco Deltas and the Edmonton team leaving. But my recollection is a lot of that was all part of the August 15th application that NASL submitted.

THE COURT: In your answer, you said failure of MLS with the San Francisco Deltas, is that MLS or NASL.

THE WITNESS: San Francisco Deltas played in NASL.

THE COURT: Okay. Thank you.

Q When you were talking about the full -- there's two scenarios above, go back to that. The two scenarios had to do with whether or not NASL would have eight teams or not; correct?

A I'm sorry, can you --

Q Go back to the scenarios.

A Can you put that up again?

Q Can we show the two scenarios? Oh, I'm sorry. Yes, there it is.

The two scenarios was that NASL has eight or more viable teams or has less; correct?

A With regard to the penalty in the performance bond, yes.

Q Right. So you already were discussing at this time that NASL might not have the full eight; correct?

A No, this wasn't as a discussion. This was just my trying to flesh out what possibilities were and how we were going to finalize this performance bond agreement.

Q In any event, Mr. L'Hote, your recommendation was accepted and the deadline was accelerated to August 15, 2017; correct?

A Yes, the deadline was August 15th.

Q Okay.

A For NASL and USL.

Q Now, let me show you next PX-190.

PX-190 is a compliance presentation that you prepared for Mr. Remedi and Mr. Flynn at U.S. Soccer; is that correct?

A Mr. Remedi and Mr. Flynn, yes.

MR. KESSLER: Your Honor, I move PX-190 into evidence.

MS. RATHBUN: No objection.

THE COURT: All right. So admitted.

(Plaintiff's Exhibit PX-190 .)

Q And you said, Here's compliance slides for tomorrow.
Do you see that?
A Yes.
Q And it says June 8, 2017, board meeting. Do you see that?
A Yes.
Q And did that mean that these slides were going to be presented at the USSF board meeting on that date?
A Yes, I was going to present these slides.
Q Okay. And if you look at Page 1, it's actually 03 on the. This was called, Professional League Compliance Licensing at the June 8, 2017, Executive Session; correct?
A Correct.
Q And you made this presentation; correct?
A Correct.
Q Okay. And I'd like to direct your attention to Slide 5. And what this shows is the following.
If you look first on the USL team waivers, it says that, no, if you can go to the right side. That's right.
It says that USL in December of 2016 needed 31 waivers; correct?
A Correct.
Q And that's what they were granted; correct?
A I don't remember in the letter that they mentioned all the waivers. I started doing that subsequently, but I think

there was 31 at the end of 2016 before I was involved.

Q Okay. And they were certified for Division II provisionally and at the time they needed 31 waivers; correct?

A Correct.

Q And they needed 12 stadium waivers; correct?

A In December 2016, correct.

Q They needed 13 field waivers; correct?

A Correct.

Q They needed four ownership waivers; correct?

A Correct.

Q And they needed two coach waivers which made a total of 31; correct?

A Correct.

Q And then you did an analysis as of June 2017 and they had reduced the 31 waivers. They would need 19 at that time; correct?

A Correct.

Q And, by the way, do you recall that when they submitted their application later in August, it went up from 19 to 21?

A I don't remember the exact number in August.

Q They were going in the wrong direction if -- well, we'll look at that.

You would agree if they needed more waivers than 19 later, that would be the wrong direction from your

standpoint?

A Or they were just waivers that I wasn't aware of yet that I wasn't able to look at all the teams and determine what the actual number was.

Q Okay. And, by the way, you then have an analysis of Independent and MLS B. This indicates that seven of the MLS teams needed these waivers; is that correct?

A Yes, one for field and six for stadium.

Q Right. So six of the MLS teams in USL needed stadium waivers; correct?

A Well, at the time in June 2017, that would have been waivers if it was at the time of the sanctioning process. It was just a status in effect.

Q It was a status.

Now, with respect to NASL, if you go to the left side. NASL needed -- had been given two waivers the prior year and needed to because it had less than 12 teams and it had no teams in the Central Time Zone; correct?

A Correct.

Q It did not need any team waivers at that time; correct?

A To my knowledge at the time, correct.

Q Okay. And, by the way, it mentioned that Jacksonville had no principal owner but they did have a principal owner by the time they submitted their application; correct?

A Correct.

Q Mr. Palmer?
A Yes.
Q Okay. And the 12-team requirement didn't apply to USL at that time; correct?
A In June?
Q The original requirement for -- I'm sorry, I should rephrase that.
Under the Professional League Standards, you were familiar with them; right?
You were in charge of compliance; right?
MS. RATHBUN: Objection.
A I'm familiar with the Pro League Standards.
Q It said that the first year of DII you could just have eight teams; correct?
A Correct.
Q And it wasn't until your sixth year as a DII league that you had to have 12 teams; correct?
A Correct.
Q So this requirement of 12 teams wasn't even applicable to USL at that time; correct?
A Correct.
Q Okay. But NASL did not have the 12 teams, so it needed that waiver; right?
A Right.
Q And when it says no teams in Central Time Zone, you

were aware that NASL had teams in the mountain west time zone at that time?

THE COURT: There is no such thing as the mountain west time zone.

MR. KESSLER: I'm sorry.

Q In the Mountain Time Zone?

A I don't recall where all the time zones were at the time.

Q Do you recall that the only three time zones that would counts for the standards would be East, Central, and Pacific?

A Under the Pro League Standards, yes.

Q Okay. Now, you write here that there's a distinction among waivers, league versus team.

Do you see that?

A Yes.

Q But, in fact, if you look at the Pro League Standards themselves, they do not make any such distinction between league and team in their language; correct?

A Correct, that was my distinction.

Q You made that distinction?

A Yes.

Q Like, if I look at the Pro League Standards, I won't even see them organized that way; right?

It doesn't say here are the league waivers and here are

the team waivers; correct?

A No, it says, here are the league requirements and here are the team requirements.

Q But there's no distinction that league or team are more important one way or the other; right?

A It just refers to waivers generic.

Q You are the one who came up with this distinction?

A I don't know if I was the one that came up with it, but it struck me as a distinction when I was doing this work.

Q Okay. Let's look at Page 6. The next page, Page 8 on the bottom.

Here it says, Notified leagues of accelerated 2018 sanctioning process.

Do you see that?

A Yes.

Q And the board decision was going to be made at the September/October meeting; correct?

A That was my understanding; correct.

Q But what actually happened was they made the decision at the very beginning of September on September 1, 2017; correct?

A I'm not sure that there was a board meeting scheduled at this time in June.

Q Okay. Take a look at Page 9, the very last page of your -- the next-to-last page of your slides.

You wrote here, Divergent business legal structure of NASL and USL. And what you wrote is the following: NASL was an owner-controlled franchise model and that was true; correct?

A Correct.

Q And USL was a privately-owned for-profit franchisor; is that correct?

A Correct.

Q And was it also correct that this time that the MLS teams were playing in USL?

A In 2017, yes, there were some MLS B teams playing in USL.

Q Then you said both leagues are incentivized by expansion fees.

Do you see that?

A Yes.

Q And by that, you meant that part of their business model was to expand and get expansion fees for that?

A Correct.

Q Now, it's true of both leagues, correct?

A Correct.

Q Okay. Now, look at the very last page of this.

Discussion and Next Steps. And the last bullet says, Discuss U.S. Soccer's objectives for lower-division pro soccer.

Do you see that?
A Yes.
Q Did you have that discussion as one of your next steps after, or did you have to at this meeting on June, June 8th of 2017, or did you have that after that meeting?
A I never had that discussion with U.S. Soccer.
Q But that was one of the next steps you listed?
A This was a summary of where I was in the new compliance process and highlighting what I thought might be next steps.
Q Okay. You did, though, in fact, have subsequent discussions involving Mr. Gulati, Mr. Papadakis, Mr. Garber, Mr. Flynn which included a discussion of the overall state of pro soccer in DI and DII with an emphasis on DII; correct?
A My recollection of that one meeting that I attended with the people you mentioned was focused on the MLS B teams playing in USL and how they were going to come into compliance with the Pro League Standards.
Q Let's look at that. PX-590, is that already in evidence? It is. PX-590 is in evidence. We can display it.
You'll see this is an e-mail. Look at the bottom e-mail from Mr. Gulati and it's to Don Garber and Alec Papadakis but you were also copied with Mr. Flynn; correct?
A Correct.

Q And this is talking about a meeting that was going to take place on the Monday after June 21st of 2017; correct?
A Yes. I don't remember the date but that's what the e-mail says.
Q And you did attend this meeting; correct?
A When it happened, I attended it, yes.
Q Yes. And it says, Per my discussion with each of you, our basic agenda is as follows: Overall state of pro soccer in DI and DII with emphasis on DII.
Do you see that?
A Yes..
Q MLS DI expansion update. USL DII expansion update. And then specific status of USL teams Re: DII standards compliance. And it talks about MLS reserve teams and non-MLS teams.
Now, all that you remember about that meeting being discussed was the MLS reserve teams' compliance with the standards.
That's your memory?
A Yes.
Q So do you know what happened to the rest of this agenda for this meeting?
A No, I don't recall any of those other topics being discussed.
Q Tell me what you recall about what was discussed at

that meeting?

A I recall that there were some MLS B teams playing in USL that didn't meet the Pro League Standards with regard to seating capacity. And the discussion was how those teams needed to come into compliance and U.S. Soccer needed to know how that was going to happen.

Q Do you recall Mr. Garber, was Mr. Garber the only one attending from MLS or did anyone else attend from MLS?

A I don't recall.

Q Do you recall Mr. Garber stating at that meeting that he thought there should be a way where the MLS teams didn't have to comply with the DII standards, it should be given some type exemption or some type of special treatment or anything else like that?

A I don't remember anything like that, no.

Q Do you remember that subject coming up subsequently?

A No.

Q Okay. Did Mr. Garber give you a plan for how the MLS teams were going to come into compliance that year?

A No, the meeting was about we needed a plan and there was a discussion around that.

Q And what did Mr. Garber say?

A I don't recall the details other than USL was going to follow up with how these teams were going to come into compliance.

Q And it says below, We will try to provide you an update on compliance issues prior to the meeting so that you could review ex ante.

Do you see that?

A Yes.

Q It says, Alec, as you have mentioned that you will have a proposal for the meeting, it would be very helpful to see that in advance of the session.

That's what Mr. Gulati wrote, not you; correct?

A Correct.

Q Do you recall Mr. Papadakis providing any type of proposal at the meeting as to how his league was going to come into compliance with the DII standards?

A I just remember a verbal discussion around the topic.

Q You don't remember -- do you remember when Mr. Papadakis said?

A I don't remember what he said. I remember leaving the meeting that the expectation was that USL was going to provide details how these teams were going to come into compliance.

Q Then there's a reference to Mr. Gulati meeting with the NASL board on Friday.

Do you see that?

A Yes.

Q Did you go to that meeting?

A I went to one meeting with Mr. Gulati, with the NASL board, I don't remember what the date was.
Q Okay. What do you recall was discussed at that meeting?
A I don't recall much that was discussed. I recall Mr. Gulati getting questions about the sanctioning process but I don't remember other details. I don't know how long we were there. I don't think it was more than 15 minutes.
Q Do you recall that the discussion was NASL at that time wanted a DII sanction for the next season; correct?
A I don't have -- no, I don't have a specific recollection of what anyone said at that point.
Q Do you recall Mr. Gulati saying anything about NASL possibly having discussions with USL about a possible merger or their teams moving to USL at that meeting?
A No, I don't recall that.
Q Do you recall any specifics about that meeting?
A The only specific I recall is being asked about the sanctioning process.
Q And what was asked?
A I don't remember the question, but it was the reason I think that I was invited to just explain that I was in this role now with U.S. Soccer.
Q Did they ask why the date had been accelerated?
A I don't remember any question directly to me on

anything.

Q Is there any other detail you could share with the jury on that meeting?

A No.

MR. KESSLER: Your Honor, this is probably a good time to stop for the day since it's almost 5:30.

THE COURT: All right.

Ladies and gentlemen, we are done for the day. I'll give you my nightly reminder of not to discuss the case or do any research or read any accounts of the case, if any accounts exist.

So, with that, I wish you a good night and we will see you tomorrow. And remember tomorrow is Friday so we will be ending early.

All right. Thank you.

(Jury exits courtroom at 5:27 p.m.)

THE COURT: Mr. L'Hote, see you tomorrow morning.

THE WITNESS: Thank you.

(Witness leaves the witness stand.)

THE COURT: I think we need to move the two depositions in.

MS. HUDGENS: That's right, your Honor. For Mr. Moeller the video transcripts we move to admit as JX-110 and there will be a chart cross referencing the deposition exhibits to the exhibits that we're moving in and that would

be JX-110A. JX-77 and JX-78 were shown but are already in evidence and we'll move to admit PX-199, JX-74, and JX-75 through the video testimony of Mr. Moeller and there is no objections to those.

THE COURT: All right. So all of that is admitted.

MS. HUDGENS: And for Ms. Shalala, her video testimony transcript is marked as JX-111. We move to admit that along with the chart to cross reference the exhibits shown between the deposition numbers and the following JX numbers or exhibit numbers. The chart is JX-111A.

And then we move to admit the follow exhibit into evidence which is PX-493. There's no objection to that. And JX-77 which is already in evidence was also part of that testimony.

THE COURT: Okay. All right. So with no objection those are admitted.

(The above-referenced exhibits were marked in evidence.)

MS. HUDGENS: Thank you.

THE COURT: Why don't we regroup at a quarter to to go through the charge.

MR. KESSLER: Very good, your Honor.

THE COURT: You can stay seated, I'm going to stay at the computer for a moment.

(A recess in the proceedings was taken.)

(Continued on the next page.)

(In open court; jury not present.)

THE COURT: So, let's go back on the record to talk about the charge. You've had a significant writing on this charge.

I think based on my last instructions and the last markup that I gave the parties, my plan was to just go through those portions in the instruction where I said "for discussion." I guess we have the new language I proposed on was it 51, whatever number in the fifties, and I guess the correspondence on Instruction 23, right?

So, let's start with instruction -- and I'm working off of ECF 508.

Is that the document that the parties have, just so that we have a record?

The relevant charge documents, not counting your correspondence, the original instruction back-and-forth from the parties was ECF 474, then I did my version, then the parties responded with their markup of my version which was ECF 507, and then I generated ECF 508 with what I had accepted or wanted to discuss.

Is that right?

MR. KESSLER: That's correct, your Honor.

THE COURT: So, looking at 508, the first instruction that I think I had anything for discussion was Instruction 19.

Did I have anything before that?

MR. CHIU: No, your Honor.

THE COURT: I think in order to discuss 19, we probably should discuss at the same time 19, 34, and 35.

I guess my first question for you --

And is it going to be you, Mr. Kessler.

MR. KESSLER: It is, your Honor, although some of my colleagues might pick up on something, but yes.

THE COURT: My first question is I'm not really sure what your intended edit of -- in the second point on Page 22 of "each other" and "with."

What is that intended -- what is that language intended to do?

MR. KESSLER: So, I think actually, your Honor, the "with" -- I know what the "each other" was. And the "with" I agree with you makes it a little bit confusing. So, let me tell you what we were trying to do.

THE COURT: Well, I haven't said anything yet so I don't know what you're agreeing with.

MR. KESSLER: What we were trying to do is that the conspiracy should be sufficient if we prove that USSF and MLS, the two Defendants, conspired with each other to benefit USL, we should be able to prevail even if we can't prove that -- we're also alleging USL was in the conspiracy, but I would analogize it to you can have a price-fixing conspiracy, you

allege three people are in the conspiracy, the jury can find that you only showed two of the three conspired but you still can win against the two of the three.

And here, we have two defendants. So, as long as I show the two defendants are in the conspiracy -- I am alleging it's with USL, but if USL was a defendant and I didn't have sufficient proof for them, that wouldn't be a requirement to prevail against the others.

THE COURT: Your language necessarily requires a trilateral conspiracy.

MR. KASS: Colin Kass, representing MLS.

Your Honor, our position is USL needs to be part of the conspiracy.

THE COURT: I know, but what was the original proposed language by...

MR. KASS: Their original position is that the Defendants conspired --

THE COURT: But wait a minute. Maybe I'm just misreading these documents. I'm looking at ECF 507.

And ECF 507, this is the -- we have to go to the primary source here, ECF 507.

MR. KASS: ECF 507, you can see the language in blue is our language. You can see it drops a footnote that says: NASL is objecting to that language in brackets.

They're not proposing that language, they're

objecting to that language.

THE COURT: Then I'm completely confused because in the instruction to 507, it says: If a party proposes new or alternative language, it is indicated in blue NASL; green, Defendants' text.

So, now you're telling me that that blue language is Defendants' language?

MR. KESSLER: Yes, your Honor. That's why I was confused also when I was looking at it because I was trying to think how does that correspond with my position, and it did not.

So, we oppose that.

THE COURT: Did I misread your instructions.

MR. KASS: I don't know, your Honor, but I think the parties' position on this is --

THE COURT: And then it says, and to add confusion, I don't understand this at all, then, because the footnote says: NASL's objection. Without this proposed addition, the instruction inaccurately describes NASL's claims.

The proposed addition is the bracketed blue language "each other" and "with."

Do the parties not remember what they submitted.

MR. CHIU: Your Honor, I think this was originally their proposal. We objected to it on the basis for what Mr. Kessler just articulated, which is that there is no such

thing as the ability to prove just a conspiracy between MLS and U.S. Soccer.

THE COURT: Let's get to first principals. First principals are -- I then have now zero understanding of who proposed what.

This footnote, at least as I read it, given that it's blue text, is NASL's objection. NASL is objecting, saying: Without this proposed addition.

The only addition I see is blue text.

So, whose language is that?

MR. KESSLER: Your Honor, I apologize for all of us. We obviously have not done this in a way that's consistent with what we said or that you instructed.

THE COURT: I've spent hours working on this, reading your legend on the first page, and reading this text. I mean...

MR. KESSLER: But what I can say, your Honor, I believe we propose that it just say: The Defendants conspired with United States Soccer and they put in this "each other" and "with" language.

MR. CHIU: That's incorrect. We did not.

THE COURT: One at a time.

I'm sorry, I don't know your name.

MR. CHIU: Mr. Chiu, Aaron Chiu.

THE COURT: Go ahead. One at a time.

MR. CHIU: Consistent with the legend, the blue text is what NASL proposed. And that is consistent with the footnotes here and the objections that we proposed.

THE COURT: Otherwise, I was going crazy; otherwise, this was Alice in Wonderland.

MR. CHIU: Looking back at this, it adds confusion to the instruction, which, as we said in the original proposal, this is the language they proposed, the Court rejected in 507, and they came back.

THE COURT: I'm prepared to give that language because I don't understand why Defendants would argue with that language because it makes your point even more clear.

MR. KASS: Your Honor, we do want NASL to prove that USL participated in the conspiracy. That is true.

THE COURT: I understand that. Let me just walk through the issues that I have.

And my concern, Mr. Kessler, is that you are shifting -- if I go through each set of proposed instructions, you shift what you're asking for even though your language consistently from the beginning of starting to talk about the charge has always included a trilateral conspiracy. Let me just walk through that.

In the original party proposal, ECF 474, Instruction 23, at Page 89, and here we're talking about the second count, which is the conspiracy to monopolize, which is the only count

that references USL, it says -- and then this is a partially joint instruction and this is literally a Frankenstein document.

It says: NASL's second count alleges that.

So, that's joint language.

And then there's some debate about whether to call it U.S. Soccer or United States Soccer Federation, but effectively it says: NASL's second count alleges that Defendants conspired with each other.

And then this is Plaintiff's language, quote: And another soccer entity, close quote.

So, clearly, the only other soccer entity in this case is USL. So, from the first instruction that the Defendants and the Plaintiff gave me, Plaintiff requested language that spoke to a trilateral conspiracy, period, full stop.

And then turning now to ECF 507, the draft jury instructions, which was the parties' markup of my first draft of the instructions, where NASL proposes the "each other" and "with" language, it specifically says, quote: Without this proposed addition, the instruction inaccurately describes NASL's claim. NASL alleges not only that Defendants conspired with USL but that the Defendants conspired with each other.

That Defendants conspired with USL, what else does that mean?

And this is what you've been telling me. And now you're telling me that that's not what you want. I don't see it any clearer than that.

MR. KESSLER: Okay, so, your Honor, I would say here it's fine. I think it's more -- and maybe this is some of it -- our real objection is to Instruction 35, which says we have to prove against -- we have to prove all three. Even if we prove that the two Defendants conspired but for some reason the jury finds our evidence is insufficient for the third one, for USL, that we lose against the Defendants, which I don't think is how the law of conspiracy works.

THE COURT: But that sentence that you are objecting to, which is, again, now let's be clear since this record is so convoluted at this point, is ECF 508, Instruction 35.

Plaintiff objects to the sentence that says: In order to find that MLS sought to achieve a Division II monopoly for USL, you must find that USL was also a member of the conspiracy.

MR. KESSLER: Right.

THE COURT: Why isn't that simply a finer point to the instruction on the previous instruction, No. 34, that says: Plaintiff's second count alleges that Defendants conspired with each other to monopolize the alleged relevant market for team membership in a Division I sanctioned league

in the United States and Canada and that Defendants conspired with each other and with United Soccer League, or USL, to monopolize the alleged relevant market for team membership in a Division II sanctioned league in the United States and Canada, in violation of Section two of the Sherman Act.

MR. KESSLER: Because we believe, your Honor, that the case law would support the view that if MLS and USSF conspired to get a monopoly for USL, even if our proof as to USL's participation was weaker, that wouldn't defeat the claim.

THE COURT: The problem with what you just said is that if the jury finds that, they would be violating the instruction on Instruction 34. Instruction 34 says: And the Defendants conspired with each other and with United Soccer League.

There is no -- and what I'm doing in Instruction 35 is just making a finer point on that.

MR. KESSLER: So I guess, your Honor, and I apologize -- I understand what you're saying about the confusion and the language.

All we're really saying is that, you know, maybe if we changed the "and" to "or." The problem I have --

THE COURT: We're not changing the "and" to "or" on January 23, after I've been working on instructions since whenever ECF 474 was filed. This is the road that you chose

to go down and this is how you describe Count Two.

MR. KESSLER: Your Honor, I understand what you said and I'll just make my case that I think we are entitled to prevail under the law even if we prove that only two of the three alleged conspirators participated.

And I think that's well established on many cases. Your Honor may have had some. There will be cases with multiple defendants in a conspiracy and the jury finds some of the defendants are guilty because they participated and they dismiss as to some. But there's no requirement for the Plaintiff to -- even if you alleged four people in a conspiracy, if the jury finds you only proved three participated you still prevail against those three.

This instruction suggests we can prove the conspiracy was agreed to but we don't have sufficient evidence for the third participant, who is a nondefendant, and we would loss against the two. I just don't think that's the law.

THE COURT: You have alleged that the conspiracy was trilateral.

MR. KESSLER: Yes, but that's no different from alleging that three companies fixed prices and we only prove it for two. It's the same thing.

You allege there are more participants and your evidence is insufficient to one of the participants. Think of it in the criminal conspiracy context. You can have four

conspiracy defendants and you say they're all in a conspiracy. But if the Government proves beyond a reasonable doubt for three, they get three convictions. They don't lose it because the fourth one was insufficient evidence.

It could be that the jury finds we didn't meet the preponderance just with respect to the third conspirator but we met it with respect to the other two.

THE COURT: Let me hear --

MR. CHIU: Two points to that, your Honor.

First, I think Mr. Kessler is conflating this idea that you can have cases where you don't identify as defendants all the members of the alleged conspiracy, right? That happens all the time in those price fixing cases, maybe only one or two defendants are named.

The other point is that the conspiracy we're talking about here is the conspiracy to monopolize under section two. And the case law makes very clear that even if you don't names a defendant, you need to have someone in the conspiracy, especially here where the market allegedly being monopolized is a D-II team membership market, neither of which MLS or U.S. Soccer actually competes in. And none of the cases that they cite in support of this view support that.

In both the NYNEX case -- there, it was the unnamed defendant who was part of the alleged conspiracy that the Court said: Look, you don't get to get out of this because

the co-conspirator is not a named defendant.

But the co-conspirator is the one who participated in the market being allegedly monopolize.

The Volvo case, the defendant there was the Association of Tennis Promotors and they were participants in the market allegedly being monopolized.

So, the case law is very clear that if you're going to allege a conspiracy to monopolize, someone in the alleged conspiracy has to be participating in the market that's being --

THE COURT: That's a big difference between your standard drug conspiracy, where four members -- I can have a case where four individuals are charged with a conspiracy and the jury decides that one wasn't a member and the other three can be guilty.

MR. KESSLER: The difference here is that we are alleging because the MLS teams were part of USL, they formed those teams and participated -- virtually all of them, not every one of them, but many of them the MLS teams, they put teams in. That made them, that made MLS, a participant in the market.

So, it's not like MLS has no relationship to the market here. I mean, that's what we're going to argue to the jury, and your Honor has heard us present a lot of that evidence about the teams participating. In fact, the ones --

not most, but many of the teams who needed those waivers were MLS teams in USL. So, it's not like USL was an independent, you know, completely separated from MLS. Our contention is that MLS was participating in the market that way.

MR. KASS: Your Honor, that's not what they pled --

THE COURT: So that the reporter -- can you please stand.

MR. KASS: Colin Kass.

That's not the claim that they pled. What they pled was a conspiracy claim. And there's no liability under section two of the Sherman Act for aiding and abetting or shared monopoly. You have to actually allege that the defendant or a co-conspirator monopolized the market.

They don't deny that MLS does not compete in the D-II market. They say that there's connections, there's an affiliation agreement. But they didn't sue the teams, they didn't sue the teams that are in USL, they didn't sue MLS teams, they didn't sue MLS owners. They sued MLS and MLS does not compete in D-II.

The only way to get to D-II, to get through the corporate form, is either alter ego liability, which they have not alleged, or conspiracy. And conspiracy is the path that they chose. And by choosing that path, they have to prove the conspiracy.

MR. KESSLER: And your Honor, I would say the case

law that they cite which requires a participant are monopolization cases, not conspiracy to monopolize. And we've limited our monopolization case for MLS to D-I for that reason. And I do believe that the MLS teams participating, because they are the investor operator owners of MLS, that gives us the ability to argue that MLS is participating.

In fact, we heard Mr. Garber testify he required all the teams to either -- some didn't, he said, but they were supposed to, but the teams were required by MLS either to affiliate with a USL team or set up their own USL team. And they did both; some did one, some did the other.

THE COURT: Let me ask Defendants, why isn't MLS' participation through teams in USL enough to make them a competitor in the Division II market.

MR. KASS: I have a few answers for that, but I'll start by pointing to the model jury instructions which say that the second element of a conspiracy to monopolize is that the defendant specifically intended that one of the parties to the agreement would obtain monopoly power in that market.

THE COURT: So, what you're saying that that means is that there's no scenario where MLS would obtain monopoly power in D-II.

MR. KASS: Correct. According to his theory, either he has to say that we are USL and have an alter ego theory, which that's not their theory, or he has to prove a

conspiracy. There's no shared monopoly under section two, there's no aiding and abetting other than through a conspiracy. That's the only way to get there.

THE COURT: Unlike a standard conspiracy in a drug case, for example, at least one of the conspirators needs to have the ability to monopolize in that market.

MR. KASS: And just to take his example, if you have a conspiracy with three different players in there and the jury finds liability as to two, what happens?

The sales by the third party that's not guilty, those go out of the case because there's no conspiracy covering that third segment, that third product, or that third segment.

So, the only way to get there is to have the conspiracy. The liability has to match the conspiracy, the scope of the conspiracy.

MR. KESSLER: Your Honor, again, I just would note that none of the cases they cite talk about that this requirement applies to a conspiracy to monopolize claim. And we do believe that the cases we cited, including Volvo, suggest the opposite.

THE COURT: Don't they cite -- maybe these are my own cites.

No, Defendants, you cite that District of Arkansas case and you cite that Eleventh Circuit case, right, about the

principal that no one can conspire to monopolize a market unless at least one of the co-conspirators competes in that market.

MR. KASS: Correct, your Honor.

THE COURT: I guess my question to you is why isn't MLS' ownership of teams in USL competition in that market.

MR. KASS: So first of all, MLS' ownership in teams would mean that the teams would have to be a defendant, first of all. But even if you get there, then all you would have is participation in a market. It's not enough to establish monopolization.

A monopolization means one party has monopoly power. That's my point about there's no shared monopoly claim under section two of the Sherman Act. So, it's not enough that there's some commercial arrangement in the monopolized market. They have to be the monopolist --

THE COURT: The monopolist or -- the cases that you cite, the Eastern District of Arkansas case and the Eleventh Circuit case, seem to only say that the alleged co-conspirator who needs to touch that market has to compete in the market. It's not that it has monopolistic powers in that market, it's just competition in that market.

MR. KASS: So, without going through what those specific cases say, the model instructions make it clear that one of the parties to the agreement has to monopolize. And

"monopolize" is a specific term. It's not just participation, it's monopolization of the market.

And there lots of case -- I don't know if we cited all of them, but there's lots of cases that say there's no shared monopoly.

THE COURT: But wouldn't that be the case just -- in a substantive count, you don't need to actually monopolize in order to have the conspiracy for a section two or --

MR. KESSLER: That was the point --

THE COURT: I'm not talking to you, Mr. Kessler, please.

MR. KESSLER: Sorry, sorry.

THE COURT: Just because I say something you might agree with, don't jump in.

MR. KESSLER: Okay. Sorry.

MR. KASS: Could you repeat the question?

THE COURT: In a conspiracy you are striving towards the goal without having to necessarily reach the goal, right.

So, why do you need for a conspiracy count to be a monopolist?

Again, I'll confess my lack of experience in this area. But just in my experience in the criminal context, you don't need to substantively complete the offense in order to conspire.

MR. KASS: The object of the conspiracy has to be at the end if, it is successful, that the conspiracy would result in their being a monopolist. The monopolist under their theory is USL. It is not MLS. So, they have to prove that the object of the conspiracy is that one of the conspirators would have achieved the monopoly, not just one of the defendants would have touched the market or even participated in the market. There has to be a monopolist at the end of that successful conspiracy.

THE COURT: So, what you're saying is that in the world where the conspiracy succeeds, one of the conspirators has to benefit from that success by virtue of being in that market.

MR. KASS: And actually being the monopolist.

THE COURT: Does it need to go that far, actually, to being the monopolist.

MR. KASS: That has to be the object of the conspiracy, the object to the agreement, yes. That's why it's a section two monopolization claim and not a section one claim that goes to other issues. Section two focuses on monopolists.

THE COURT: What's the end result in your case if they had achieved the monopoly.

MR. KESSLER: If they had achieved it, USL and all of its member teams would benefit from that monopoly. For

example, some of the MLS teams literally have teams in USL, they're not affiliated with teams. The value of those teams for resale goes up if you have a monopoly.

As a member of USL, they have whatever rights all the members of USL have to share in the economics of USL, whatever. There are full member teams of USL.

So, in the object of this conspiracy, it would be that USL and all of its teams -- because that's what it's comprised of, its teams -- and a number of those teams are MLS teams, and, in fact, were directed by MLS to go and do this. And that's why we believe this fits right into the --

And your Honor is a hundred percent right that you don't have to achieve it, it's just like you have to have the intent. We believe the intent was to have USL be the only D-II league, which would then benefit all of its participating teams including those who were MLS teams.

THE COURT: Pretty intenuated, huh.

MR. KESSLER: I don't think it's intenuated because the direct beneficiary are the teams. The league benefits too, but the teams benefit because the values of their franchises go up directly. It's not an indirect benefit, it's a direct benefit.

THE COURT: Do you want to respond.

MR. KASS: Your Honor, USL is clearly the entity in the market selling memberships, selling expansion teams. They

are the one in the market. They are not -- under his theory, they are not a wrongdoer. They are the monopolist, but they're not the wrongdoer.

There's no case, no case, that says there's section two liability where the monopolist had not engaged in any liability but some third-party is liable.

At most what he's saying is that there's some benefit, so that's motive. It may be motive for a conspiracy but it is not a monopolization by the Defendants.

THE COURT: Let me ask Defendants this question: Since Plaintiff in Instruction 19 and 34 have effectively given you what you want, what's your view -- from just preservation of your own record in this case of striking the challenged sentence in Instruction 35 --

And we would cross this bridge if the jury came out with a note that said: Does USL have to be a member?

-- as the instruction is drafted right now by Plaintiff's own hand, it requires the trilateral and the participation of USL.

MR. KASS: Your Honor, as you heard from the beginning, it's a little confusing as to what is meant by that. I think this is a very clear statement. I think we need that clear statement so that there's no confusion for the jury that USL actually has to be part of the conspiracy.

THE COURT: All right. I think we have exhausted

this point. I understand it, I'll need to think about it.

Any last thoughts on that point, on the 19, 34, 35?

MR. KESSLER: Only, your Honor, and I know you will, if you look at the Second Circuit case law we cited, I do think it supports our position. And I know you probably read it already and I'd urge you to look --

THE COURT: Do you agree with Defendants that you need a party to -- that one of the co-conspirators has to be a participant in the market.

MR. KESSLER: No.

So in other words, I believe the case law we cited doesn't require that. It says, in other words, you can actually have two conspirators conspiring for someone else to benefit even if they're not in the conspiracy. But having said that -- that's what our case law supports.

Having said that, I think what I was arguing is even if that is the requirement, MLS should be considered a participant for the reasons I stated.

But I also maintain the case law we cited in Volvo and the case law we cited in Discon indicates that there is not a requirement in the conspiracy to monopolize.

THE COURT: You're saying that -- and I'm just making this up because this could be an off-the-wall hypothetical, but if U.S. Soccer conspired with Nike, just to take a name that's come up in this case, and for some reason

they both thought that having USL have a monopoly in the Division II market, that they could just conspire completely unbeknownst to USL, USL would be the beneficiary, and that would be a section two violation.

MR. KESSLER: Let me tell you how that can happen, that very one.

Let's say Nike is the exclusive licensing company of USL and it's branding the league. And they have an agreement that --

THE COURT: No, let's say there's no relationship.

MR. KESSLER: If it's no relationship at all, I don't think you'd ever have such a case.

THE COURT: So, there does have to be some touching of the market.

MR. KESSLER: Because that would be the only logic why two people would conspire, put aside like they're altruists. I'm not saying it's an altruist.

If there's an economic motive for two companies to give a monopoly to a third because they view it benefits them the third company -- that's what I think the case law I cited stands for -- doesn't have to be a participant.

But the motivation here was MLS had its teams in this league and you know it was really double motivation --

THE COURT: All right. Let me just circle back now that we've had all this discussion.

Why is it your challenged language in Instruction 35, like I said at the beginning, just a finer point on what you've already agreed to in terms of the instruction for the element of the conspiracy?

MR. KESSLER: So, I guess it was not our intention in that other language to require them to be proven to be a member of the conspiracy. I understand your Honor saying that's the way it could be read. That is not what we intended by that language. But I understand you're saying we're stuck with that language and you view it that way, but that was not our intention.

Our intention was to try to distinguish between one or the other and maybe we did it inartfully.

THE COURT: What about the fact that you've -- you're saying that the fact that you've consistently taken the position that USL is a co-conspirator is not a necessary element that you have to prove.

MR. KESSLER: That's correct, we've always said they're a co-conspirator, and that's why I get back to the conspiracy law.

If it has to be proved, it's not because of conspiracy law, but your Honor is right on on the conspiracy law, it's because of the requirements that they're arguing for a section two claim. And what I'm saying is the case law doesn't support them on the section two.

So, they --

THE COURT: So how do you distinguish their citation to this Eleventh Circuit case that says: No authority exists holding a defendant can conspire to monopolize a market in which it does not compete.

Are you agreeing with that as a principal?

MR. KESSLER: No, I think that case law is wrong and it's not in the Second Circuit. So --

THE COURT: So, your point is regardless of whether MLS had teams in USL, that MLS and USL could conspire without having a necessary co-conspirator being USL.

MR. KESSLER: It is possible but that's not --

THE COURT: I'm just asking you.

MR. KESSLER: Such a conspiracy is possible, it's not the conspiracy we're alleging because here, the motivation is tied to the connection.

But is it possible there could be such a conspiracy?

Again, I can come up with hypotheticals where why two companies might conspire to give a third party a monopoly because they believe it helps them in some ways, indirect ways, direct ways. This person is the monopoly --

THE COURT: I want to understand your position on the law.

Is your position on the law that if the facts of this case were that MLS did not have during the relevant

period any teams in USL --

MR. KESSLER: Yes.

THE COURT: Let me finish.

And that no -- and that MLS and U.S. Soccer conspired with respect to USL and D-II, that USL would not need to be a member of that conspiracy?

MR. KESSLER: That's correct. Even though that's not what we've alleged, that would be true.

And the reason it would, your Honor, I'll give you an example.

THE COURT: I don't need an example.

That's your position?

MR. KESSLER: Yes, that's our position.

THE COURT: So, in your position, it doesn't matter whether MLS has a team in USL or not.

MR. KESSLER: Correct; but if it does matter, then we argue then we've satisfied it with USL having the teams -- with MLS having the teams.

THE COURT: And in none of the back-and-forth on the instructions you raise that point, correct.

MR. KESSLER: If we didn't raise it in a clear and cogent way, then that's our fault and I'm raising it now and I apologize if we didn't raise it clearly before.

THE COURT: I've got your positions on that, so let's go back through the rest of the instructions.

Is there anything else on that point with 19, 34, and 35? I want to move off that.

MR. KESSLER: I think that's all there was.

THE COURT: All right. Then I guess the next point where I wanted to have discussion was on Instruction 21 and it's the apparent authority.

I guess my question for Defendants is -- here, I'm actually not sure what Plaintiff's position is, but it strikes me --

Is anyone arguing that this is an apparent authority case?

I guess part of the problem is that in my initial instruction I put "apparent authority."

But Mr. Kessler, are you arguing that this is an apparent authority case?

MR. KESSLER: No.

And the reason we thought it was adding in confusion is because there are no issues about that. We thought the instruction adequate.

THE COURT: So, what if I just after the first sentence, if I just delete "or apparent authority," and then there's no need for the suggested language that Defendants ask for.

MR. CHIU: We would have no problem with that, your Honor. Our initial objection was just for completeness based

on the model.

THE COURT: I understand.

MR. KESSLER: Okay.

THE COURT: That's what I'm doing then. So, the first sentence will read: A corporate entity is legally bound by the acts and the statements of its agents or employees done or made within the scope of the agent's employment, period.

And then it will continue: The fact that.

Now let's turn to Instruction 23. And here, Plaintiff wants to remove the sentence beginning with "instead" and going through "unlawful objective," right?

MR. KESSLER: Correct, your Honor.

THE COURT: I guess my first question is based on what you initially proposed back in the olden days when the first round of instructions were, you indicated -- you proposed or your instruction was: In addition, evidence by a biased subgroup of board members exerted a disproportionate influence.

And then you continue. In that, and I was reading from ECF 474, Instruction 18, you obviously made it clear that your theory was that there was a biased subgroup of board members.

So, how is the language that I have in the instruction not consistent with what you, yourself, proposed?

MR. KESSLER: So, that instruction was based on

Supreme Court cases regarding standard setting where it actually would lead to a per se rule. And your Honor rejected that whole line. We had made that argument on summary judgment as well.

But our theory here, this is very clear --

THE COURT: Your theory is what you put in papers to me. Your theory is that there was evidence of a biased group of board members.

MR. KESSLER: But we're not...

Sunil Gulati and Garber are board members, right? So there could have been an application there. But the conspiracy we're alleging is as follows. We'll be very clear about this because there are three possible conspiracies that you could do for a board.

The instruction your Honor has, the language we objected to, would be appropriate if we were alleging an internal conspiracy between the board members with respect to how they voted here, you know, which some cases do, some cases do. We do not, right?

We're alleging here a conspiracy between MLS as an entity and USSF as an entity, primarily through Mr. Garber and Mr. Gulati but not exclusively them, there are others we have mentioned that are there, but it's between the two entities.

And our theory of the conspiracy is that Mr. Gulati in his position was able to get USSF to participate. And,

yes, it required board action, but that that's no different from cases in which a CEO or top executive expires but he still needs board approval in order to take an action.

We don't have to prove that the individual board members, just like you wouldn't in a corporate board, knew what the CEO had agreed to or done.

The point is the corporation acts and we have to show that Mr. Gulati knew what was going on. That's going to be our burden to show that.

(Continued on the following page.)

(Continuing.)

MR. KESSLER: But to require us to prove each individual board member knew that, is not I do not believe consistent and the case law they cite sort of lines us up because you look at our own case which spoke about the overarching conspiracy, it used the "agreement to vote" language to contrast with what we ended up following in this case.

It wasn't this claim. It had to -- well, if you're alleging a conspiracy in the vote then you need an agreement to vote but that's not what we're alleging in terms of this. We filed an amended complaint after that decision and if you look at the summary judgment decision of Judge Cogan, it's very clear that he treats the claim as being between the entities.

There's no discussion at all of the issue of individual board members and how they voted. They didn't even raise that issue. What he looks at is the economic motive of SUM. The history of unequal treatment.

THE COURT: But how does my instruction -- it doesn't require all board members.

MR. KESSLER: The way I interpret your instruction is that we would -- we couldn't prevail if we showed that only Mr. Gulati, and you -- it's the voting board. Mr. Gulati and Mr. Garber didn't even vote. It shouldn't be about the vote.

THE COURT: There's nothing in that instruction that speaks to a vote.

MR. KESSLER: What it says is "plaintiff must present evidence that board members in their individual capacity consciously committed themselves to a common scheme to achieve an unlawful objective."

I believe the jury will believe that they would not -- if we prove to them that Gulati and Garber conspired and caused to act, they would think we failed if we couldn't show that these individuals they emphasize so much the voting board members, that's how they're going to interpret this.

THE COURT: That is what you have argument for. I mean, the instruction doesn't require their vote. There's nothing in the instruction that requires voting.

MR. KESSLER: So could it then say, must present evidence that -- but it doesn't have to be board members, right? It could be Mr. Flynn. Mr. Flynn.

THE COURT: The problem is that we are -- we're literally. The flight is in the air right now. We're on trial. The flight is in the air.

MR. KESSLER: Right.

THE COURT: You're now trying to, like, you want to rebuild, you know, the left engine. Your instruction to me or your proposed instruction to me specifically said, and this is the language you wanted me to read to the jury: "In addition,

evidence that a biased subgroup of board members exerted a disproportionate influence to affect vote outcomes."

You're the one who wanted to insert "voting" into the instruction, right? You're the one who asked for a biased subgroup of board members and now you're asking for something else and here we are two weeks into the trial.

MR. KESSLER: So, again, Your Honor, I'm not trying to change the flight. I think the flight was clear in our complaint and what was ruled on in summary judgment.

The instruction you just said was designed to invoke this case law that if Mr. Garber and Mr. Gulati alone exercises influence, that was another path.

THE COURT: But that was -- come on, Mr. Kessler. This is what you gave me as the proposed instruction, right? And it was the proposed instruction because your belief of the theory of the case is that that was what the evidence was. That's what you presented to me.

MR. KESSLER: Okay. So then, Your Honor, could we then put in, must present evidence that a subset of board members? I'm concerned about this --

THE COURT: Here is what I'm -- I will hear from defendants, but here is what I'm thinking of doing with this instruction is to just make the following change: "Plaintiff" -- this is halfway towards the bottom, "after the 2018 season, plaintiff must present evidence that at least

some board members," delete "in their individual capacities" "consciously committed themselves to a common scheme designed to achieve an unlawful objective."

MR. KESSLER: Thank you, Your Honor. That would satisfy us.

THE COURT: Any objection to that.

MR. CHIU: I think the language -- he's reading this out of context and out of whether it's necessary built into the instruction and we have to remember in this case, both Mr. Garber and Mr. Gulati were board members. That's why this instruction is important is because it's necessary to instruct the jury that --

THE COURT: I am giving you basically the entire thing. At least some board members, right, you agree with me that you don't need all the board members, right?

MR. CHIU: But the individual --

THE COURT: How else are they acted if not -- isn't that assumed? Right? What is the added value of their individual -- "plaintiff must present evidence that at least some board members."

I mean, what else is needed there?

MR. CHIU: Yeah, I think it's important nevertheless to allow the jury to not make the error of just looking to evidence of board action, right, that there are members of the board that acted in their individual capacities, came together

and agreed to achieve an unlawful purpose.

What Mr. Kessler was doing with that on that adjustment, if you take that passage out, it's possible that they can look at two members of the board who are neither affiliated with MLS or U.S. Soccer, Mr. Gulati, for example, and assume, right, that just because they voted a certain way that that was -- there is your concerted action. The law makes very clear that normal board activity is not enough and that's why this instruction is important because it allows and ensures that the jury finds concerted action on the basis.

THE COURT: Okay, okay. I understand.

Mr. Kessler, what's your objection, if any, if I leave "at least some board members in their individual capacity" how else are they going to be acting anyway?

MR. KESSLER: Well, I guess is "individual capacities" sufficiently clear to the jury that -- like, what does that mean, "individual"? I mean, I guess, I'm trying to think myself what does "individual capacity" mean in terms of, you know, to benefit yourself personally does that mean? I mean clearly it doesn't mean that. I guess I don't think it adds anything.

I think by taking it out you give them exactly what they're entitled to which is they have to consciously commit themselves to a common scheme designed to achieve an unlawful objective. You know, that clearly can't be just voting normal

board activities, right?

They're saying they don't want confusion, that it's just voting is a conspiracy. So if they consciously committed themselves to accomplish a scheme, I think that's when they get what they need.

THE COURT: It plays into the language later in that instruction that you don't object to at the bottom, where it says, "For that reason, plaintiff must show that U.S. Soccer conspired with at least one other party acting in that other parties' individual capacity to deny plaintiff's sanction applications."

MR. KESSLER: Yeah, I don't have a problem with MLS acting in its individual capacity. It's confusing when you're talking about a person acting in their individual capacity. I have no objection to the MLS part, because it's an entity. It's an entity acting as.

THE COURT: But I think the concern the defendants have is that they don't -- there's no question that the board denied the sanction, right?

MR. KESSLER: Yes.

THE COURT: So what defendants are trying to avoid, I think, is that by taking out that language it could confuse the jury into thinking that the board action in and of itself is sufficient to establish the conspiracy, but the conscious commitment to the common scheme.

MR. KESSLER: You could say that. You could say that the mere fact of voting doesn't establish it. In other words, that would be clear.

THE COURT: Let me ask defendants. I don't like to put words in your mouth.

MR. CHIU: I think you hit the nail on the head. That is precisely the concern. It goes back to the Second Circuit decision in this case contrasting it with the relevant case saying that, look, because in this case what's being alleged here is a conspiracy to apply the standards in a certain way, you need to show more than just that the board voted a certain way.

You need to show an underlying agreement, an unlawful underlying agreement that was then effectuated by virtue of how the board voted and that's why this individual capacity language is important because it gets at that idea, right?

Otherwise the jury could be confused and we could risk error in finding, look, the board voted a certain way. People advocated and we've been hearing the story come out over the last couple of days.

That's the important dividing line that the jury needs to understand in this case because this is not a challenge to the professional league standards themselves anymore. This is a conspiracy to apply them in a certain way.

THE COURT: All right. I got it. Thank you. Let me -- I will mull that over.

The next one that I had left over for discussion is instruction 49. Is that the next point where I had --

MR. KESSLER: Yes.

THE COURT: Again, I agree with defendants that this language was jointly proposed, so, you know, I do think it seems to me that in light of Schneiderman, I don't see the place for "significant."

I know you both proposed it and now plaintiff is backing away from that, but as I read Schneiderman which is the most recent thing out of the circuit on this I think significant has to go.

Defendants, I'll hear from you.

MR. CHIU: I think our objection was based on the model that was jointly proposed.

THE COURT: Right. So I'm going to strike "significant."

I gave you my proposed new language on instruction 51. You haven't had a chance to comment on that.

Any objection?

MR. CHIU: No objection from defendants.

MR. KESSLER: No, we don't have any objection.

THE COURT: Okay. I think that was it. Was there any other open item that I had marked?

MR. KESSLER: I don't think so, Your Honor.

MR. KASS: Your Honor?

THE COURT: Yes.

MR. KASS: I believe that there were a number of instructions that we proposed that the Court did not adopt and we would like to submit a letter or something to preserve the record if that's okay.

THE COURT: You can do that, but -- it's your Appellate record. I'm not going to tell you how to preserve your Appellate record. I think the back and forth, the paper trail, we have here is an archivists nightmare, but I think it has everything in there.

But, sure, if you want to have clarity on what I did or didn't do that you agree with or don't agree with or don't agree with, feel free to put it into a letter, but I'm not going to respond to it.

MR. KESSLER: Your Honor, we weren't thinking of putting in a letter, but --

THE COURT: Now that they are.

MR. KESSLER: I just want to make sure I preserve my record, but I think we already have preserved it through the process.

THE COURT: These are sophisticated parties that know what the circuit requires. So I will certainly not give you advice on that.

So, what's the plan for tomorrow?

MR. KESSLER: We will complete Mr. L'Hote.

THE COURT: How much further do you think you have with him?

MR. KESSLER: I would say, Your Honor, forty-five minutes or something like that. And, of course, they go.

THE COURT: Let me ask defense, how long do you think.

MS. RATHBUN: Approximately half an hour.

THE COURT: That is an hour and a half.

MR. KESSLER: And perhaps there will be some redirect. I don't know.

And then they want Mr. Hunt to go.

THE COURT: How --

MR. KESSLER: We're doing that out of convenience.

THE COURT: How long do you think Mr. Hunt will go.

MR. RUSKIN: I think thirty, forty-five minutes, Your Honor.

MR. KESSLER: And then maybe an hour of cross.

THE COURT: Okay.

MR. KESSLER: And then we have an hour of video that we can play.

THE COURT: What is left on the video.

MR. KESSLER: Mr. Papadakis and Mr. Cordero.

THE COURT: I hadn't seem the timing.

MR. KESSLER: It's 52 minutes.

THE COURT: I just haven't seen it.

MR. KESSLER: So I think that should get us fairly close to the proper time to adjourn.

THE COURT: All right. Thank you, everyone.

I haven't forgotten your verdict sheet. I will say that I think we were closer last time than we are now. So, it will be my weekend reading.

(Matter adjourned until Friday, January 24, 2025.)

- ooOoo -

# I N D E X


| WITNESS | PAGE |
|---|---|
| DON GARBER | |
| CONTINUED DIRECT-EXAMINATION BY MR. KESSLER | 1542 |
| CROSS-EXAMINATION BY MR. RUSKIN | 1600 |
| RECROSS-EXAMINATION BY MR. KESSLER | 1676 |
| REDIRECT EXAMINATION BY MR. RUSKIN | 1703 |
| RECROSS-EXAMINATION BY MR. RUSKIN | 1705 |
| REDIRECT EXAMINATION BY MR. KESSLER | 1706 |
| JEFF L'HOTE | |
| DIRECT EXAMINATION BY MR. KESSLER | 1709 |


E X H I B I T S


| | |
|---|---|
| Plaintiff's Exhibit 574 | 1542 |
| Plaintiff's Exhibit PX-590 | 1564 |
| Plaintiff's Exhibit PX-612 | 1569 |
| DX-785 | 1619 |
| Defense 0889 | 1631 |
| Defendants' Exhibit 793 | 1654 |
| Defendants' Exhibit 925 | 1656 |
| Defendants' Exhibit 711 | 1660 |
| JX-109 | 1708 |
| Exhibit PX-74 | 1722 |

Exhibit PX-171 1729

Exhibit PX-180 1733

Plaintiff's Exhibit PX-190 1749

JX-110 1762

JX-110A 1763

JX-77 and JX-78 1763

PX-199, JX-74, and JX-75 1763

JX-111 1763

JX-111A 1763

PX-493 1763

JX-77 1763

## $

**$300** [1] - 1686:8

## '

**'13** [1] - 1669:22
**'15** [1] - 1625:24
**'16** [1] - 1586:23
**'17** [4] - 1562:20, 1574:3, 1586:24, 1738:22
**'18** [1] - 1745:17
**'22** [1] - 1698:22
**'96** [1] - 1633:6

## 0

**0011** [1] - 1627:19
**0015** [2] - 1651:8, 1651:10
**002** [1] - 1722:15
**005** [3] - 1631:16, 1670:1, 1714:7
**006** [3] - 1632:9, 1714:8, 1714:9
**009** [2] - 1624:14, 1624:15
**012** [2] - 1654:18, 1655:2
**016** [2] - 1633:12, 1633:14
**018** [1] - 1636:4
**019** [1] - 1638:1
**024** [1] - 1633:2
**025** [1] - 1641:3
**028** [1] - 1641:20
**03** [1] - 1750:10
**036** [1] - 1642:25
**0889** [4] - 1631:4, 1631:9, 1631:13, 1805:20

## 1

**1** [13] - 1542:15, 1544:2, 1575:4, 1575:21, 1585:16, 1588:22, 1674:7, 1674:10, 1742:11, 1742:16, 1747:25, 1750:10, 1755:20
**10** [3] - 1561:9, 1738:25, 1740:6
**10,000** [1] - 1646:9
**1001** [1] - 1537:10
**10020** [1] - 1537:2
**10036** [1] - 1537:7
**101** [2] - 1619:21, 1620:3
**10166** [1] - 1536:15
**109** [2] - 1707:11, 1707:18
**109-A** [1] - 1707:13
**10:43** [1] - 1586:2
**11201** [1] - 1537:17
**11:00** [1] - 1585:25
**11:01** [1] - 1588:13
**12** [12] - 1539:17, 1539:18, 1539:22, 1579:22, 1744:10, 1746:13, 1751:6, 1752:17, 1753:17, 1753:19, 1753:22
**12-team** [1] - 1753:3
**1205** [1] - 1536:22
**1271** [1] - 1537:2
**13** [8] - 1539:16, 1540:1, 1576:17, 1594:17, 1596:15, 1739:9, 1751:8
**136** [1] - 1642:12
**14** [10] - 1539:23, 1548:23, 1650:7, 1650:11, 1650:15, 1669:17, 1685:24, 1686:4, 1686:13, 1727:16
**14,000** [2] - 1650:6, 1650:10
**15** [6] - 1592:7, 1592:21, 1594:19, 1707:1, 1749:11, 1761:8
**15,000** [4] - 1629:16, 1650:7, 1650:11, 1650:15
**15165** [1] - 1536:19
**1542** [2] - 1805:6, 1805:16
**1564** [1] - 1805:17
**1569** [1] - 1805:18
**15th** [11] - 1740:2, 1744:22, 1745:4, 1745:15, 1745:19, 1745:21, 1745:23, 1746:3, 1746:23, 1748:11, 1749:13
**16** [2] - 1539:13, 1627:22
**1600** [1] - 1805:7
**1619** [1] - 1805:19
**1631** [1] - 1805:20
**1654** [1] - 1805:21
**1656** [1] - 1805:22
**1660** [1] - 1805:23
**1676** [1] - 1805:8
**16th** [1] - 1738:22
**17** [4] - 1539:17, 1539:18, 1558:25, 1660:4
**170** [1] - 1642:5
**1703** [1] - 1805:9
**1705** [1] - 1805:10
**1706** [1] - 1805:11
**1708** [1] - 1805:24
**1709** [1] - 1805:13
**1722** [1] - 1805:25
**1729** [1] - 1806:1
**1733** [1] - 1806:2
**1749** [1] - 1806:3
**1762** [1] - 1806:4
**1763** [7] - 1806:5, 1806:6, 1806:7, 1806:8, 1806:9, 1806:10, 1806:11
**17CV5495(HG** [1] - 1536:3
**18** [5] - 1558:18, 1580:3, 1742:19, 1742:22, 1791:20
**19** [14] - 1539:16, 1539:18, 1539:19, 1589:17, 1591:5, 1751:16, 1751:20, 1751:24, 1765:25, 1766:3, 1766:4, 1784:11, 1785:2, 1790:1
**1983** [1] - 1613:20
**1984** [1] - 1613:20
**1992** [1] - 1614:10
**1993** [2] - 1679:8, 1679:10
**1994** [3] - 1577:9, 1615:17, 1617:5
**1995** [1] - 1577:9
**1996** [12] - 1614:10, 1614:11, 1617:4, 1634:8, 1641:8, 1650:7, 1650:11, 1683:9, 1683:19, 1693:22, 1694:1, 1694:3
**1999** [4] - 1614:19, 1615:7, 1672:10, 1694:5

## 2

**2** [7] - 1593:11, 1712:21, 1713:15, 1719:24, 1742:11, 1742:16, 1742:19
**20** [16] - 1555:9, 1576:21, 1580:10, 1604:4, 1605:14, 1625:24, 1634:16, 1658:19, 1678:10, 1683:8, 1683:11, 1684:4, 1685:10, 1685:11, 1686:17
**20-year** [3] - 1683:19, 1684:16, 1685:6
**200** [2] - 1536:15, 1636:22
**2000** [2] - 1537:4, 1663:10
**20004** [1] - 1537:11
**2000s** [2] - 1672:18, 1672:24
**2001** [1] - 1648:18
**2001-2002** [1] - 1679:21
**2002** [3] - 1682:25, 1683:2, 1683:5
**2003** [1] - 1630:15
**2004** [1] - 1700:20
**2005** [3] - 1630:14, 1630:22, 1709:15
**2005/2006** [1] - 1709:15
**2007** [1] - 1638:6
**2009** [6] - 1542:15, 1574:12, 1575:2, 1639:18, 1701:19, 1702:17
**2010** [15] - 1550:25, 1633:5, 1709:19, 1710:24, 1714:23, 1715:3, 1715:4, 1715:5, 1715:7, 1723:22, 1724:2, 1724:7, 1724:11, 1724:16
**2011** [3] - 1550:25, 1622:14, 1715:9
**2012** [3] - 1720:8, 1721:4, 1721:19
**2013** [7] - 1561:19, 1669:17, 1671:4, 1671:8, 1688:21, 1702:20, 1720:8
**2014** [20] - 1557:23, 1559:7, 1559:8, 1561:9, 1562:19, 1592:7, 1592:21, 1669:22, 1669:24, 1670:13, 1670:16, 1670:18, 1670:20, 1687:15, 1687:19, 1688:12, 1697:24, 1702:20, 1703:15, 1720:12
**2015** [13] - 1604:2, 1604:5, 1604:9, 1605:8, 1605:10, 1651:14, 1651:16, 1652:8, 1653:1, 1654:7, 1683:1, 1683:2
**2016** [29] - 1547:1, 1547:5, 1547:6, 1550:23, 1557:12, 1562:20, 1563:5, 1563:9, 1563:13, 1566:21, 1566:25, 1567:4, 1604:15, 1605:25, 1607:17, 1663:10, 1683:1, 1683:6, 1683:8, 1683:9, 1683:13, 1683:18, 1683:19, 1731:21, 1746:5, 1750:20, 1751:1, 1751:7
**2017** [80] - 1560:8, 1560:11, 1560:21, 1562:17, 1564:4, 1564:14, 1565:9, 1567:13, 1568:2, 1568:6, 1568:9,

1572:4, 1574:2, 1575:4, 1575:21, 1576:11, 1585:16, 1588:22, 1604:2, 1620:3, 1620:7, 1621:21, 1624:17, 1626:3, 1627:22, 1632:20, 1633:4, 1634:25, 1636:21, 1638:19, 1638:20, 1641:6, 1641:23, 1654:16, 1655:12, 1660:4, 1660:6, 1660:16, 1663:10, 1674:7, 1674:10, 1675:17, 1698:14, 1724:11, 1724:23, 1725:4, 1725:13, 1727:16, 1727:21, 1729:8, 1730:17, 1730:21, 1730:24, 1731:3, 1731:6, 1731:12, 1731:15, 1731:18, 1732:20, 1733:10, 1733:22, 1735:16, 1737:16, 1738:19, 1739:9, 1742:2, 1743:18, 1746:21, 1747:4, 1747:11, 1747:25, 1749:12, 1750:4, 1750:12, 1751:15, 1752:11, 1755:20, 1756:11, 1757:5, 1758:2
**2017-18** [1] - 1684:7
**2017-2018** [1] - 1568:8
**2018** [35] - 1567:21, 1567:24, 1568:3, 1568:11, 1604:15, 1606:1, 1606:25, 1607:8, 1607:17, 1698:17, 1725:5, 1725:13, 1725:18, 1725:21, 1725:24, 1726:17, 1726:19, 1727:12, 1728:4, 1728:10, 1728:15, 1728:17, 1729:4, 1729:5, 1733:18, 1736:11, 1736:19, 1736:24, 1737:12, 1741:16, 1741:22, 1743:11, 1743:23, 1755:12, 1796:25
**2019** [1] - 1698:19
**2021** [3] - 1632:11, 1632:13, 1632:21
**2022** [8] - 1603:17, 1603:20, 1641:9, 1641:14, 1698:23, 1700:25, 1701:9, 1724:10
**2023** [1] - 1699:18
**2025** [2] - 1626:12, 1804:10
**2026** [3] - 1603:9, 1603:14, 1603:22
**21** [4] - 1568:6, 1583:12, 1751:20, 1790:5
**21,000** [1] - 1651:17
**21,574** [1] - 1651:17
**21st** [1] - 1758:2
**22** [4] - 1560:8, 1560:11, 1573:3, 1766:11
**22,000** [1] - 1629:20
**225** [1] - 1537:17
**23** [5] - 1539:20, 1765:10, 1770:24, 1773:24, 1791:9
**23,2025** [1] - 1536:7
**24** [6] - 1539:22, 1553:13, 1558:19, 1589:1, 1710:1, 1804:10
**240** [1] - 1636:22
**25** [5] - 1601:1, 1629:3, 1643:10, 1658:20, 1678:14
**25,000** [3] - 1553:14, 1627:13, 1634:15
**25,000-seat** [1] - 1692:7
**260** [1] - 1636:23
**27,000** [1] - 1630:17
**29** [1] - 1623:24
**290** [2] - 1558:2, 1558:18
**2:00** [2] - 1663:24, 1664:3
**2:30** [1] - 1668:9

# 3

**3** [1] - 1596:22
**3,252** [1] - 1633:19
**30** [6] - 1601:6, 1601:22, 1623:15, 1625:25, 1631:21, 1732:19
**30,000** [2] - 1626:15, 1627:12
**30th** [1] - 1731:15
**31** [11] - 1563:6, 1617:14, 1669:22, 1669:24, 1670:18, 1731:5, 1750:20, 1751:1, 1751:3, 1751:13, 1751:16
**32** [1] - 1669:10
**3252** [1] - 1633:19
**34** [7] - 1766:4, 1772:22, 1773:13, 1784:11, 1785:2, 1790:1
**35** [12] - 1569:24, 1725:19, 1725:23, 1726:23, 1766:4, 1772:6, 1772:15, 1773:16, 1784:14, 1785:2, 1787:2, 1790:2
**35-percent** [5] - 1570:7, 1570:9, 1571:9, 1573:9, 1573:13
**350** [1] - 1633:17
**3:00** [4] - 1667:21, 1667:22, 1668:2, 1668:9
**3:15** [3] - 1667:13, 1667:16
**3:30** [2] - 1665:15, 1667:21

# 4

**4** [2] - 1589:18
**40** [3] - 1588:24, 1612:5, 1631:21
**400** [1] - 1536:19
**41** [1] - 1589:18
**44** [2] - 1547:10, 1547:11
**45** [1] - 1667:24
**450,000** [1] - 1642:12
**474** [4] - 1765:17, 1770:23, 1773:25, 1791:20
**49** [1] - 1801:4
**4C** [1] - 1670:2

# 5

**5** [3] - 1577:6, 1641:10, 1750:17
**5,000** [1] - 1553:13
**50** [7] - 1561:22, 1612:5, 1636:22, 1642:11, 1653:5, 1666:24, 1683:17
**50,000** [1] - 1641:1
**505** [1] - 1537:4
**507** [8] - 1765:19, 1767:19, 1767:20, 1767:21, 1767:22, 1768:3, 1770:9, 1771:17
**508** [4] - 1765:12, 1765:19, 1765:23, 1772:14
**51** [2] - 1765:9, 1801:20
**52** [1] - 1804:1
**555** [1] - 1536:22
**574** [5] - 1542:10, 1542:13, 1542:21, 1542:24, 1805:16
**589** [1] - 1559:24
**59** [5] - 1583:10, 1583:11, 1583:12, 1584:15, 1584:16
**5:27** [1] - 1762:16
**5:30** [1] - 1762:6

# 6

**6** [8] - 1539:13, 1593:11, 1594:16, 1594:17, 1642:12, 1689:1, 1721:19, 1755:10
**60** [5] - 1576:13, 1577:5, 1584:14, 1584:16, 1636:22
**60,000** [1] - 1639:22
**600S** [1] - 1537:10
**61** [3] - 1578:4, 1584:13, 1584:18
**614** [1] - 1651:6
**6th** [2] - 1546:25, 1547:4

# 7

**7** [3] - 1595:3, 1597:2, 1740:12
**70** [1] - 1631:21
**70,000-seat** [1] - 1629:17
**711** [3] - 1659:16, 1660:1, 1805:23
**74** [1] - 1723:17
**785.003** [1] - 1620:18
**785.008** [1] - 1621:19
**785.010** [1] - 1625:19
**793** [4] - 1654:12, 1654:24, 1654:25, 1805:21

# 8

**8** [4] - 1688:21, 1750:4, 1750:12, 1755:10
**84** [1] - 1688:24
**88** [3] - 1547:3, 1548:22, 1552:8
**89** [2] - 1552:6, 1770:24
**8:59** [1] - 1538:3
**8th** [1] - 1757:4

# 9

**9** [4] - 1607:19, 1738:25, 1739:1, 1755:24
**90** [1] - 1642:6
**91403** [1] - 1536:20
**92** [1] - 1556:11
**925** [4] - 1655:19, 1656:4, 1656:6, 1805:22

**925.0070** [1] - 1655:23
**94104** [1] - 1536:22
**94111** [1] - 1537:5
**9:30** [1] - 1536:8

# A

**a.m** [4] - 1536:8, 1538:3, 1586:2, 1588:13
**Aaron** [1] - 1769:24
**ABA** [4] - 1619:1, 1690:17, 1691:3, 1691:9
**Abbott** [12] - 1542:14, 1563:19, 1577:8, 1630:24, 1710:4, 1710:6, 1710:15, 1710:18, 1710:19, 1712:12, 1712:20, 1735:15
**ABC** [1] - 1625:2
**abetting** [2] - 1777:11, 1779:2
**ability** [8] - 1554:2, 1619:2, 1644:3, 1677:4, 1704:1, 1769:1, 1778:6, 1779:6
**able** [19] - 1540:6, 1551:24, 1595:11, 1596:7, 1615:13, 1615:15, 1624:23, 1625:4, 1625:17, 1625:18, 1628:19, 1642:14, 1647:5, 1667:24, 1706:4, 1719:4, 1752:3, 1766:23, 1792:25
**above-referenced** [1] - 1763:18
**abroad** [2] - 1611:3, 1615:22
**Absolutely** [2] - 1605:23, 1610:18
**absolutely** [1] - 1583:21
**absurd** [3] - 1604:20, 1604:21
**academies** [2] - 1723:13, 1723:25
**academy** [1] - 1658:13
**accelerate** [1] - 1744:18
**accelerated** [8] - 1665:13, 1744:5, 1744:25, 1745:11, 1745:20, 1749:11, 1755:12, 1761:24
**accelerating** [1] - 1746:10
**accept** [2] - 1571:21, 1597:19
**accepted** [2] - 1749:11, 1765:19
**access** [1] - 1689:9
**accomplish** [1] - 1799:4
**accomplishment** [1] - 1617:12
**According** [1] - 1778:23
**according** [3] - 1624:19, 1649:8, 1729:6
**account** [2] - 1610:5, 1610:9
**accounts** [2] - 1762:10, 1762:11
**accurate** [2] - 1648:23, 1650:14
**accusation** [2] - 1604:13, 1604:18
**achieve** [6] - 1772:17, 1783:13, 1795:6, 1797:3, 1798:1, 1798:24
**achieved** [3] - 1782:6, 1782:23, 1782:24
**act** [1] - 1795:9
**Act** [3] - 1773:5, 1777:11, 1780:14
**acted** [2] - 1797:17, 1797:25
**acting** [6] - 1732:5, 1798:14, 1799:9, 1799:13, 1799:14, 1799:16
**action** [10] - 1587:5, 1587:11, 1604:13, 1726:3, 1793:1, 1793:3, 1797:24, 1798:7, 1798:10, 1799:23
**active** [1] - 1637:11
**activities** [1] - 1799:1
**activity** [1] - 1798:8
**acts** [2] - 1791:6, 1793:7
**actual** [1] - 1752:4
**add** [3] - 1538:10, 1601:20, 1768:16
**added** [2] - 1607:18, 1797:18
**adding** [1] - 1790:17
**addition** [8] - 1637:15, 1768:18, 1768:20, 1769:8, 1769:9, 1771:21, 1791:16, 1795:25
**additional** [4] - 1666:4, 1682:14, 1739:6, 1739:7
**address** [1] - 1711:23
**adds** [2] - 1770:6, 1798:21
**adequate** [1] - 1790:19
**adjourn** [1] - 1804:4
**adjourned** [1] - 1804:10
**adjust** [1] - 1693:16
**adjustment** [1] - 1798:3
**administer** [1] - 1711:14
**admit** [8] - 1619:15, 1654:20, 1656:1, 1659:22, 1762:23, 1763:2, 1763:8, 1763:12
**admitted** [19] - 1542:23, 1564:11, 1569:13, 1619:17, 1631:12, 1654:23, 1659:25, 1669:11, 1669:14, 1692:23, 1693:8, 1693:12, 1694:19, 1694:20, 1722:1, 1729:24, 1749:24, 1763:6, 1763:17
**adopt** [1] - 1802:5
**adopted** [1] - 1638:6
**advance** [2] - 1568:22, 1760:8
**adverse** [1] - 1592:8
**advertisers** [1] - 1656:12
**advertising** [1] - 1613:13
**advice** [5] - 1659:3, 1660:24, 1661:1, 1723:22, 1802:25
**advise** [1] - 1709:22
**Advisory** [4] - 1568:23, 1568:25, 1569:2, 1569:15
**advocate** [1] - 1723:8
**advocated** [2] - 1723:9, 1800:20
**affect** [3] - 1548:4, 1653:20, 1796:2
**affected** [2] - 1548:1, 1653:22
**affecting** [1] - 1548:2
**affiliate** [2] - 1697:20, 1778:10
**affiliated** [3] - 1562:8, 1783:2, 1798:5
**affiliating** [1] - 1698:12
**affiliation** [2] - 1711:19, 1777:16
**affordable** [2] - 1634:12, 1634:13
**AFL** [3] - 1619:1, 1690:16, 1690:20
**afternoon** [4] - 1665:1, 1676:3, 1676:4, 1707:1
**age** [2] - 1652:23, 1652:24
**agencies** [1] - 1613:16
**agenda** [8] - 1564:23, 1585:9, 1585:19, 1636:18, 1715:25, 1717:17, 1758:8, 1758:21
**agendas** [8] - 1715:17, 1715:21, 1715:22, 1718:1, 1718:9, 1718:13, 1718:17, 1718:19
**agent's** [1] - 1791:7
**agents** [1] - 1791:6
**aggressive** [1] - 1553:15
**ago** [7] - 1582:24, 1612:4, 1626:16, 1626:18, 1658:12, 1721:9, 1725:8
**agree** [39] - 1546:2, 1546:5, 1546:12, 1556:1, 1556:7, 1557:6, 1580:19, 1580:24, 1588:3, 1594:7, 1611:23, 1620:22, 1620:23, 1620:24, 1623:13, 1640:10, 1647:24, 1679:13, 1679:15, 1679:22, 1680:3, 1680:21, 1682:10, 1682:14, 1682:19, 1687:21, 1688:4, 1696:18, 1699:6, 1702:3, 1751:24, 1766:16, 1781:14, 1785:7, 1797:14, 1801:6, 1802:14, 1802:15
**agreed** [5] - 1667:12, 1774:15, 1787:3, 1793:6, 1798:1
**agreeing** [3] - 1580:25, 1766:19, 1788:6
**agreement** [29] - 1607:23, 1608:3, 1608:6, 1669:12, 1670:7, 1670:17, 1671:10, 1673:5, 1673:16, 1693:14, 1693:18, 1695:25, 1700:2, 1700:19, 1700:20, 1700:22, 1700:23, 1701:9, 1743:1, 1749:9, 1777:16, 1778:19, 1780:25, 1782:18, 1786:8, 1794:6, 1794:10, 1800:13, 1800:14
**agreements** [1] - 1670:16
**ahead** [1] - 1769:25
**Ahrens** [1] - 1590:16
**Aided** [1] - 1537:18
**aiding** [2] - 1777:11, 1779:2
**air** [2] - 1795:19, 1795:20
**Alan** [2] - 1577:7, 1672:5
**Alec** [4] - 1667:6, 1677:11, 1757:23, 1760:6
**Alice** [1] - 1770:5
**align** [1] - 1612:8
**all-female** [1] - 1627:8
**allegations** [1] - 1604:17
**allege** [4] - 1767:1, 1774:23, 1776:8, 1777:12
**alleged** [12] - 1772:24, 1773:3, 1774:5, 1774:11, 1774:18, 1775:12, 1775:24, 1776:8, 1777:22, 1780:19, 1789:8, 1800:10
**allegedly** [3] - 1775:19, 1776:3, 1776:6
**alleges** [4] - 1771:4, 1771:8, 1771:22, 1772:23
**alleging** [10] - 1766:24, 1767:5, 1774:21, 1776:17, 1788:15, 1792:12, 1792:16, 1792:20, 1794:10, 1794:11
**Allen** [1] - 1622:16
**allow** [10] - 1551:8, 1581:15, 1618:3,

1645:17, 1689:23, 1716:7, 1744:8, 1744:12, 1747:6, 1797:23
**allowed** [3] - 1548:16, 1551:4, 1647:22
**allowing** [2] - 1624:24, 1632:15
**allows** [2] - 1630:3, 1798:9
**almost** [5] - 1619:22, 1635:21, 1680:2, 1730:19, 1762:6
**alone** [2] - 1647:22, 1796:11
**Altchek** [2] - 1727:16, 1727:19
**alter** [2] - 1777:21, 1778:24
**alternative** [1] - 1768:4
**altruist** [1] - 1786:17
**altruists** [1] - 1786:17
**amateur** [1] - 1657:10
**amended** [1] - 1794:12
**America** [13] - 1602:5, 1602:7, 1603:7, 1603:9, 1603:24, 1615:14, 1627:4, 1630:5, 1635:8, 1639:20, 1640:18, 1640:22, 1640:25
**American** [9] - 1604:8, 1615:15, 1617:8, 1617:12, 1629:8, 1644:5, 1644:7, 1690:16, 1691:20
**AMERICAN** [1] - 1536:4
**Americas** [1] - 1537:2
**amount** [2] - 1594:20, 1630:25
**Amsterdam** [1] - 1614:18
**analogize** [1] - 1766:25
**analysis** [2] - 1751:15, 1752:5
**Anchen** [1] - 1681:11
**Angeles** [5] - 1569:22, 1570:3, 1571:5, 1628:6, 1739:8
**Annie** [1] - 1627:9
**announced** [1] - 1572:5
**annual** [10] - 1574:7, 1574:11, 1574:19, 1575:1, 1645:9, 1702:1, 1702:6, 1726:10, 1727:21, 1728:1
**Anschutz** [3] - 1616:9, 1622:3, 1630:14
**answer** [21] - 1546:1, 1549:25, 1550:19, 1550:20, 1577:19, 1579:3, 1580:17, 1580:18, 1581:1, 1581:7, 1588:9, 1595:15, 1618:25, 1624:15, 1677:20, 1686:11, 1697:2, 1703:18, 1739:19, 1748:13
**answered** [2] - 1583:8, 1738:14
**answering** [1] - 1693:6
**answers** [1] - 1778:15
**ante** [1] - 1760:3
**anticipated** [1] - 1665:9
**anticipation** [1] - 1617:18
**anticompetitive** [3] - 1700:2, 1700:9, 1700:10
**anyway** [2] - 1571:12, 1798:14
**apologize** [5] - 1575:14, 1675:19, 1769:11, 1773:19, 1789:23
**apparent** [5] - 1790:6, 1790:10, 1790:13, 1790:15, 1790:21
**appear** [1] - 1742:12
**appeared** [1] - 1741:8
**Appellate** [2] - 1802:9, 1802:10
**applicable** [1] - 1753:19
**application** [27] - 1606:5, 1606:8, 1606:9, 1606:16, 1606:22, 1606:24, 1607:1, 1607:11, 1607:14, 1608:10, 1608:13, 1610:10, 1659:13, 1700:14, 1727:11, 1743:11, 1743:23, 1744:20, 1744:24, 1745:2, 1745:4, 1745:14, 1746:22, 1748:11, 1751:20, 1752:24, 1792:11
**applications** [11] - 1583:1, 1583:6, 1589:3, 1589:11, 1605:25, 1607:25, 1608:4, 1608:7, 1608:14, 1725:5, 1799:11
**applied** [7] - 1570:16, 1570:22, 1576:5, 1591:12, 1610:4, 1610:5, 1610:9
**applies** [1] - 1779:19
**apply** [12] - 1562:23, 1566:9, 1566:12, 1576:9, 1582:6, 1582:10, 1582:17, 1744:1, 1746:8, 1753:3, 1800:10, 1800:25
**applying** [10] - 1547:5, 1549:15, 1549:20, 1550:2, 1551:22, 1574:16, 1580:12, 1580:23, 1581:4, 1671:19
**appointed** [3] - 1675:16, 1676:6, 1676:25
**appreciate** [2] - 1559:9, 1672:20
**approached** [1] - 1729:18
**appropriate** [5] - 1587:5, 1587:11, 1629:18, 1660:14, 1792:16
**approval** [3] - 1569:4, 1673:21, 1793:3
**approvals** [1] - 1569:3
**approved** [1] - 1673:18
**approves** [2] - 1695:23
**arbitrary** [1] - 1667:20
**Arch** [1] - 1627:7
**archivists** [1] - 1802:11
**area** [5] - 1607:21, 1608:12, 1639:5, 1643:15, 1781:23
**Area** [1] - 1623:1
**areas** [1] - 1636:25
**Arena** [3] - 1627:24, 1630:1, 1633:4
**arena** [1] - 1628:24
**Argentina** [2] - 1640:21, 1652:13
**argue** [5] - 1555:7, 1770:11, 1776:23, 1778:6, 1789:17
**arguing** [4] - 1785:16, 1787:23, 1790:10, 1790:14
**argument** [2] - 1792:3, 1795:12
**Arkansas** [2] - 1779:24, 1780:18
**arm's** [1] - 1673:8
**arrangement** [7] - 1697:14, 1697:16, 1697:24, 1720:23, 1720:25, 1721:2, 1780:15
**array** [1] - 1623:11
**arrived** [1] - 1616:25
**Arthur** [3] - 1622:23, 1628:2, 1632:5
**article** [4] - 1599:4, 1722:5, 1722:12, 1723:21
**articulated** [2] - 1600:22, 1768:25
**Ashley** [1] - 1710:12
**Asia** [2] - 1602:7, 1615:14
**aside** [3] - 1538:12, 1546:7, 1786:16
**aspects** [1] - 1669:8
**aspirations** [2] - 1718:4, 1718:6
**aspire** [2] - 1612:6, 1616:19
**assert** [2] - 1584:25, 1585:1
**asserting** [2] - 1585:9, 1585:17
**assets** [1] - 1718:23
**assist** [1] - 1661:1
**associated** [2] - 1568:19, 1688:7
**Association** [2] - 1612:4, 1776:5
**assume** [9] - 1540:25, 1566:10, 1567:25, 1568:15, 1574:21, 1588:2, 1678:6, 1687:10, 1798:6
**assumed** [1] - 1797:18
**assumption** [2] - 1587:2, 1719:3
**assured** [1] - 1681:7
**athletes** [1] - 1582:16
**Athletico** [1] - 1639:8
**Atlanta** [9] - 1622:24, 1628:2, 1631:17, 1631:19, 1631:22, 1631:24, 1692:1, 1692:4, 1692:7
**attach** [1] - 1740:7
**attached** [5] - 1560:4, 1561:10, 1710:13, 1713:6, 1738:21
**attaching** [1] - 1710:10
**attachment** [1] - 1727:24
**attempt** [1] - 1587:8
**attend** [6] - 1602:1, 1604:5, 1617:15, 1630:6, 1758:5, 1759:8
**attendance** [6] - 1629:20, 1645:6, 1651:13, 1651:16, 1651:20, 1652:7
**attended** [10] - 1576:3, 1629:21, 1631:25, 1648:22, 1675:17, 1687:23, 1688:2, 1747:11, 1757:15, 1758:6
**attending** [10] - 1575:21, 1575:24, 1576:6, 1605:2, 1630:5, 1650:15, 1680:11, 1687:22, 1688:22, 1759:8
**attention** [4] - 1576:13, 1599:10, 1604:1, 1750:16
**attentive** [1] - 1587:8
**attorneys** [1] - 1648:21
**attracted** [1] - 1626:23
**attracting** [1] - 1632:8
**attractiveness** [1] - 1655:8
**attributes** [1] - 1626:22
**audio** [8] - 1538:5, 1538:8, 1538:11, 1538:15, 1538:19, 1539:1, 1539:3
**audiotape** [1] - 1593:5
**August** [13] - 1744:22, 1745:4, 1745:15, 1745:19, 1745:21, 1745:23, 1746:3, 1746:23, 1748:11, 1749:11, 1749:13, 1751:20, 1751:21
**Austin** [1] - 1632:23
**authenticate** [1] - 1588:4
**authentication** [2] - 1538:9, 1538:13
**authority** [7] - 1695:14, 1788:4, 1790:6, 1790:10, 1790:13, 1790:15,

1790:21
**Ave.NW** [1] - 1537:10
**Avenue** [2] - 1536:15, 1537:2
**average** [4] - 1629:20, 1650:10, 1650:15, 1655:13
**averaged** [1] - 1650:6
**avoid** [1] - 1799:21
**award** [1] - 1602:24
**awarded** [1] - 1602:21
**aware** [19] - 1544:1, 1547:25, 1554:13, 1570:18, 1577:4, 1604:12, 1604:16, 1608:19, 1609:2, 1610:11, 1618:18, 1635:25, 1674:15, 1678:22, 1702:18, 1706:8, 1726:22, 1752:2, 1754:1

# B

**back-and-forth** [2] - 1765:16, 1789:19
**background** [4] - 1612:17, 1612:18, 1613:24, 1743:13
**backing** [1] - 1801:11
**banker** [2] - 1663:4
**bankruptcy** [11] - 1648:21, 1649:1, 1680:2, 1680:5, 1680:6, 1680:7, 1680:9, 1680:11, 1680:15, 1680:22, 1681:8
**banks** [1] - 1648:10
**Barcelona** [3] - 1611:13, 1640:12, 1640:21
**base** [13] - 1600:10, 1605:1, 1623:16, 1623:18, 1623:19, 1633:11, 1638:15, 1639:5, 1645:11, 1652:24, 1656:22, 1656:25, 1704:3
**Baseball** [6] - 1623:22, 1625:12, 1646:21, 1647:4, 1651:21, 1651:25
**baseball** [11] - 1601:8, 1610:20, 1612:11, 1616:16, 1628:9, 1628:24, 1630:3, 1642:21, 1656:18, 1696:20
**based** [11] - 1554:3, 1586:10, 1586:21, 1666:7, 1699:22, 1712:25, 1765:5, 1790:25, 1791:13, 1791:25, 1801:15
**basic** [2] - 1564:23, 1758:8
**basis** [7] - 1549:22, 1586:18, 1587:3, 1594:1, 1601:11, 1768:24, 1798:10
**Basketball** [1] - 1691:11
**basketball** [5] - 1610:19, 1612:12, 1613:12, 1628:25, 1642:21
**Bastian** [1] - 1638:22
**Bay** [1] - 1623:1
**beat** [3] - 1617:11, 1644:8, 1658:12
**Beating** [1] - 1630:7
**beautiful** [3] - 1626:17, 1626:19, 1641:2
**became** [8] - 1543:25, 1544:18, 1614:4, 1630:13, 1649:14, 1724:20, 1729:4, 1731:7
**Beck** [1] - 1623:3
**Beckham** [6] - 1604:6, 1638:17, 1638:18, 1638:19, 1640:17, 1644:6
**become** [14] - 1549:17, 1551:18, 1562:8, 1595:25, 1596:12, 1618:24, 1626:3, 1645:22, 1647:22, 1656:24, 1709:12, 1721:1, 1722:25, 1746:14
**becomes** [4] - 1646:24, 1743:12, 1743:24, 1746:7
**becoming** [1] - 1726:22
**BEFORE** [1] - 1536:12
**beforehand** [3] - 1538:6, 1675:6, 1746:24
**began** [3] - 1698:20, 1720:11, 1720:12
**beginning** [12] - 1579:15, 1603:6, 1603:7, 1619:5, 1643:24, 1737:24, 1738:1, 1755:20, 1770:20, 1784:21, 1787:2, 1791:10
**begins** [1] - 1599:11
**begun** [1] - 1613:21
**behind** [5] - 1633:17, 1635:2, 1651:21, 1704:4
**belief** [2] - 1545:8, 1796:15
**below** [8] - 1591:4, 1636:16, 1689:15, 1711:22, 1723:11, 1736:23, 1739:2, 1760:1
**Below** [1] - 1622:25
**beneficial** [3] - 1593:13, 1662:2, 1714:11
**beneficiary** [3] - 1733:11, 1783:19, 1786:3
**benefit** [14] - 1711:8, 1713:14, 1724:4, 1724:5, 1766:22, 1782:12, 1782:25, 1783:15, 1783:20, 1783:21, 1783:22, 1784:8, 1785:14, 1798:19
**benefits** [2] - 1783:19, 1786:19
**Benz** [1] - 1629:7
**Berman** [1] - 1677:13
**best** [10] - 1546:10, 1554:2, 1611:8, 1634:5, 1640:9, 1644:14, 1645:16, 1657:15, 1660:14, 1723:23
**better** [3] - 1578:12, 1645:18, 1662:17
**between** [38] - 1553:11, 1554:22, 1576:23, 1577:2, 1577:13, 1577:16, 1577:22, 1578:1, 1578:5, 1578:18, 1581:11, 1594:3, 1594:8, 1596:16, 1611:22, 1612:7, 1617:1, 1617:2, 1658:9, 1666:17, 1667:21, 1669:15, 1697:12, 1697:14, 1700:2, 1700:10, 1713:24, 1723:25, 1724:14, 1754:18, 1763:10, 1769:1, 1776:11, 1787:12, 1792:17, 1792:20, 1792:23, 1794:14
**beyond** [11] - 1581:24, 1600:12, 1686:3, 1689:22, 1690:10, 1694:23, 1699:18, 1702:10, 1702:21, 1703:4, 1775:2
**biased** [5] - 1791:17, 1791:21, 1792:7, 1796:1, 1796:4
**bid** [1] - 1603:16
**bids** [1] - 1626:2
**big** [4] - 1631:1, 1638:13, 1638:20, 1776:11
**biggest** [2] - 1617:7, 1638:15
**billion** [2] - 1634:15, 1640:13
**billion-dollar** [1] - 1634:15
**billions** [5] - 1624:9, 1628:20, 1644:25
**bit** [12] - 1556:19, 1583:17, 1589:19, 1600:4, 1614:15, 1619:6, 1624:14, 1634:3, 1649:25, 1650:18, 1736:23, 1766:16
**Blank** [3] - 1622:23, 1628:3, 1631:16
**blood** [1] - 1641:16
**Bloomberg** [1] - 1603:18
**blow** [1] - 1723:14
**blowing** [1] - 1722:17
**blue** [8] - 1639:6, 1767:22, 1768:4, 1768:6, 1768:20, 1769:7, 1769:9, 1770:1
**board** [103] - 1546:19, 1546:24, 1548:4, 1554:5, 1574:8, 1574:9, 1574:10, 1574:17, 1574:20, 1574:24, 1575:4, 1575:21, 1578:21, 1579:7, 1580:3, 1581:3, 1581:16, 1581:21, 1582:25, 1583:5, 1594:20, 1596:23, 1607:7, 1607:17, 1608:3, 1610:10, 1648:22, 1653:8, 1654:17, 1673:19, 1674:7, 1674:10, 1674:14, 1674:18, 1674:25, 1675:16, 1676:6, 1677:1, 1677:5, 1677:17, 1678:13, 1678:16, 1687:22, 1688:2, 1688:8, 1688:20, 1689:6, 1700:16, 1701:15, 1701:19, 1726:13, 1736:25, 1737:6, 1739:4, 1741:17, 1743:11, 1743:24, 1744:12, 1747:7, 1748:2, 1750:4, 1750:8, 1755:16, 1755:22, 1760:22, 1761:2, 1791:17, 1791:21, 1792:8, 1792:10, 1792:14, 1792:17, 1793:1, 1793:3, 1793:4, 1793:5, 1794:3, 1794:17, 1794:21, 1794:24, 1795:4, 1795:11, 1795:16, 1796:1, 1796:5, 1796:19, 1797:1, 1797:10, 1797:14, 1797:15, 1797:20, 1797:24, 1797:25, 1798:4, 1798:8, 1798:13, 1799:1, 1799:18, 1799:23, 1800:11, 1800:15, 1800:19
**Bob** [1] - 1603:18
**body** [8] - 1580:5, 1581:17, 1582:1, 1582:2, 1582:23, 1584:10, 1584:19, 1691:20
**bond** [6] - 1735:23, 1735:24, 1736:4, 1737:25, 1749:3, 1749:9
**bonds** [1] - 1733:11
**book** [3] - 1592:2, 1592:3, 1723:15
**born** [1] - 1612:19
**Boston** [1] - 1623:21
**bottom** [12] - 1538:12, 1559:21, 1560:3, 1660:4, 1721:18, 1728:8, 1728:9, 1738:20, 1755:11, 1757:22, 1796:24, 1799:7
**bought** [1] - 1663:9
**Boulevard** [1] - 1536:19
**bound** [1] - 1791:5
**box** [1] - 1679:24
**bracketed** [1] - 1768:20

**brackets** [1] - 1767:24
**brand** [3] - 1581:9, 1620:14, 1626:14
**brand-new** [1] - 1581:9
**branding** [1] - 1786:8
**Brandon** [1] - 1623:3
**Brazil** [1] - 1642:2
**Brazilian** [1] - 1638:25
**break** [6] - 1585:24, 1606:3, 1636:12, 1663:22, 1676:22, 1707:1
**breakout** [2] - 1543:24, 1544:18
**breath** [1] - 1554:6
**Brenner** [1] - 1555:15
**bridge** [1] - 1784:15
**brief** [3] - 1588:12, 1668:19, 1703:8
**Briefly** [1] - 1629:13
**briefly** [9] - 1590:1, 1596:24, 1600:6, 1613:18, 1631:2, 1632:16, 1638:3, 1648:17, 1654:10
**bring** [4] - 1572:17, 1603:17, 1639:19, 1660:3
**bringing** [3] - 1603:21, 1718:21, 1718:25
**broad** [4] - 1576:8, 1594:10, 1610:22, 1611:7
**broad-ranging** [1] - 1576:8
**Broadcast** [1] - 1641:3
**broadcast** [9] - 1625:2, 1641:25, 1642:2, 1642:3, 1642:4, 1642:5, 1642:17, 1642:23, 1642:24
**broadcasters** [2] - 1641:7, 1656:13
**broader** [1] - 1730:14
**broadly** [2] - 1577:16, 1581:19
**broke** [3] - 1622:20, 1634:10, 1634:14
**broken** [1] - 1636:13
**Brooklyn** [3] - 1536:6, 1612:19, 1612:24
**brother** [1] - 1612:19
**brought** [6] - 1612:4, 1617:8, 1617:10, 1617:12, 1639:21, 1694:21
**Bruce** [4] - 1734:2, 1735:4, 1744:9, 1744:23
**bucket** [1] - 1723:3
**buckets** [1] - 1553:7
**bucks** [1] - 1577:6
**budget** [2] - 1695:10, 1695:13
**budgets** [6] - 1569:4, 1695:7, 1695:15, 1695:17, 1695:23, 1695:24
**Budweiser** [1] - 1625:3
**build** [15] - 1571:5, 1571:25, 1581:9, 1623:16, 1624:9, 1628:18, 1629:22, 1629:24, 1633:9, 1640:18, 1643:13, 1649:13, 1685:18, 1713:6, 1719:24
**building** [4] - 1600:10, 1624:12, 1634:21, 1682:11
**built** [31] - 1601:22, 1605:3, 1616:9, 1619:25, 1628:2, 1628:6, 1628:8, 1628:11, 1629:5, 1629:9, 1629:10, 1630:14, 1630:21, 1631:23, 1633:7, 1634:3, 1634:9, 1634:14, 1635:9, 1635:16, 1635:24, 1646:22, 1685:24, 1686:5, 1686:14, 1692:5, 1692:7, 1692:10, 1703:22, 1797:8
**Bull** [3] - 1627:24, 1630:1, 1633:4
**bullet** [6] - 1649:24, 1650:4, 1650:5, 1651:18, 1652:4, 1756:23
**Bulls** [2] - 1616:7, 1685:23
**Bulova** [1] - 1613:8
**bunch** [1] - 1632:18
**Bundesliga** [1] - 1655:16
**bundle** [1] - 1723:3
**BUONANOCE** [1] - 1536:23
**burden** [1] - 1793:9
**business** [29] - 1602:24, 1613:14, 1613:21, 1613:23, 1614:1, 1614:2, 1614:3, 1614:4, 1615:16, 1616:4, 1620:24, 1623:8, 1628:19, 1641:5, 1641:22, 1644:15, 1644:16, 1646:10, 1652:20, 1653:1, 1656:10, 1709:9, 1709:10, 1709:13, 1709:14, 1709:15, 1709:16, 1756:1, 1756:17
**businesses** [2] - 1624:7, 1719:1
**BUTERMAN** [5] - 1537:3, 1542:22, 1549:21, 1549:23, 1707:9
**buy** [4] - 1635:19, 1647:10, 1647:11
**buying** [2] - 1647:12, 1647:15
**BY** [41] - 1542:6, 1543:2, 1550:1, 1556:21, 1557:5, 1558:17, 1558:24, 1559:17, 1560:2, 1561:4, 1563:18, 1564:1, 1588:17, 1599:1, 1600:1, 1634:1, 1647:19, 1653:18, 1654:1, 1654:14, 1655:1, 1659:19, 1660:5, 1669:1, 1676:2, 1703:10, 1705:2, 1706:2, 1709:6, 1722:4, 1726:8, 1730:2, 1733:7, 1735:1, 1805:6, 1805:7, 1805:8, 1805:9, 1805:10, 1805:11, 1805:13
**by..** [1] - 1767:15
**BY:ADRIAN** [1] - 1536:23
**BY:BRADLEY** [1] - 1537:8
**by:CHRISTOPHER** [1] - 1537:5
**BY:CLIFFORD** [1] - 1536:20
**BY:COLIN** [1] - 1537:11
**BY:JEFFREY** [1] - 1536:16
**BY:LAWRENCE** [1] - 1537:3
**bylaws** [1] - 1677:2



## C

**CA** [1] - 1537:5
**cable** [2] - 1641:11, 1641:13
**Cadman** [1] - 1537:17
**California** [2] - 1536:20, 1536:22
**Canada** [7] - 1603:15, 1622:11, 1635:7, 1711:25, 1773:1, 1773:5
**candidates** [4] - 1625:21, 1626:23, 1677:6, 1677:7
**cannot** [1] - 1549:4
**cap** [1] - 1695:20
**capacities** [3] - 1797:1, 1797:25, 1798:16
**capacity** [13] - 1622:2, 1623:8, 1624:6, 1686:2, 1703:25, 1759:4, 1795:5, 1798:14, 1798:18, 1799:10, 1799:13, 1799:14, 1800:16
**capital** [1] - 1704:1
**capricious** [1] - 1667:19
**captain** [1] - 1639:20
**capture** [1] - 1627:2
**care** [3] - 1611:1, 1621:10, 1621:11
**careers** [1] - 1603:4
**Carlos** [7] - 1553:8, 1553:9, 1554:4, 1590:2, 1590:14, 1591:7, 1689:7
**Carnoy** [1] - 1589:25
**Carolina** [3] - 1674:20, 1675:13, 1675:15
**Carter** [1] - 1673:14
**case** [58] - 1538:21, 1587:3, 1604:1, 1604:13, 1647:21, 1663:25, 1666:19, 1668:7, 1669:14, 1723:5, 1762:9, 1762:10, 1771:13, 1773:7, 1774:3, 1775:17, 1775:23, 1776:4, 1776:7, 1776:13, 1777:25, 1778:3, 1779:5, 1779:11, 1779:25, 1780:18, 1780:19, 1781:3, 1781:6, 1782:22, 1784:4, 1784:13, 1785:4, 1785:11, 1785:15, 1785:19, 1785:20, 1785:25, 1786:12, 1786:20, 1787:24, 1788:3, 1788:7, 1788:25, 1790:11, 1790:15, 1794:4, 1794:5, 1794:8, 1796:11, 1796:16, 1797:9, 1800:8, 1800:9, 1800:23
**case-in-chief** [1] - 1666:19
**cases** [17] - 1600:18, 1704:2, 1774:6, 1774:7, 1775:11, 1775:13, 1775:21, 1778:2, 1779:18, 1779:20, 1780:17, 1780:24, 1781:4, 1792:1, 1792:18, 1793:2
**cast** [2] - 1608:9, 1675:7
**categories** [1] - 1636:25
**category** [1] - 1646:18
**cathedral** [1] - 1629:1
**CAUSE** [1] - 1536:11
**caused** [1] - 1795:9
**CC** [1] - 1564:19
**cease** [4] - 1741:25, 1742:6, 1742:21, 1742:23
**celebrate** [2] - 1629:2, 1643:15
**celebrated** [3] - 1638:21, 1640:6, 1640:7
**celebrity** [1] - 1614:9
**Center** [2] - 1616:10, 1630:15
**Central** [3] - 1752:18, 1753:25, 1754:10
**century** [1] - 1589:20
**CEO** [2] - 1793:2, 1793:6
**certain** [11] - 1553:19, 1612:1, 1669:7, 1723:1, 1739:6, 1798:6, 1800:11, 1800:12, 1800:19, 1800:25
**certainly** [7] - 1602:19, 1605:7, 1615:11, 1668:5, 1668:8, 1729:3,

1802:24
**certified** [6] - 1539:1, 1567:8, 1570:11, 1714:24, 1731:1, 1751:2
**cetera** [6] - 1545:23, 1614:18, 1695:15, 1715:14
**chain** [1] - 1645:1
**chair** [2] - 1590:14, 1614:24
**chairing** [1] - 1603:16
**chairman** [1] - 1603:17
**challenge** [5] - 1549:5, 1552:7, 1552:8, 1646:6, 1800:24
**challenged** [2] - 1784:14, 1787:1
**challenges** [5] - 1625:16, 1645:20, 1648:18, 1650:14, 1661:6
**challenging** [1] - 1649:7
**champion** [2] - 1616:8, 1623:2
**championship** [4] - 1629:8, 1635:1, 1640:20, 1645:10
**championships** [1] - 1623:24
**chance** [1] - 1801:20
**change** [5] - 1556:8, 1648:16, 1663:10, 1796:8, 1796:23
**changed** [4] - 1684:23, 1712:15, 1727:6, 1773:22
**changing** [1] - 1773:23
**Channel** [1] - 1641:10
**channel** [4] - 1641:11, 1641:13, 1641:14
**chaos** [2] - 1580:6, 1581:18
**character** [1] - 1614:9
**charge** [7] - 1582:15, 1753:10, 1763:22, 1765:3, 1765:4, 1765:15, 1770:21
**charged** [1] - 1776:13
**Charles** [1] - 1727:16
**Charlotte** [7] - 1626:16, 1626:17, 1627:12, 1692:16, 1692:19, 1692:23, 1693:14
**chart** [6] - 1652:5, 1655:10, 1707:16, 1762:24, 1763:9, 1763:11
**checked** [1] - 1585:23
**checking** [1] - 1580:11
**cheering** [2] - 1630:2, 1639:22
**chests** [1] - 1611:15
**Chicago** [1] - 1616:7
**chief** [2] - 1600:8, 1666:19
**Chiefs** [2] - 1616:8, 1622:8
**China** [1] - 1652:12
**Chiu** [2] - 1769:24
**CHIU** [14] - 1766:2, 1768:23, 1769:21, 1769:24, 1770:1, 1770:6, 1775:9, 1790:24, 1797:7, 1797:16, 1797:22, 1800:6, 1801:15, 1801:22
**choice** [3] - 1620:15, 1644:4, 1644:10
**choices** [1] - 1651:3
**choosing** [1] - 1777:23
**chose** [5] - 1618:12, 1720:5, 1724:18, 1773:25, 1777:23
**churn** [2] - 1721:7, 1721:14
**Cincinnati** [2] - 1626:14, 1627:13
**Cindy** [1] - 1556:16
**circle** [1] - 1786:24
**circles** [2] - 1623:16, 1623:17
**Circuit** [6] - 1779:25, 1780:19, 1785:4, 1788:3, 1788:8, 1800:8
**circuit** [2] - 1801:12, 1802:24
**circulated** [1] - 1722:10
**circulating** [2] - 1722:5, 1722:7
**circumstances** [2] - 1610:6, 1610:9
**citation** [1] - 1788:3
**citations** [1] - 1587:20
**cite** [8] - 1775:22, 1778:1, 1779:18, 1779:22, 1779:24, 1779:25, 1780:18, 1794:4
**cited** [7] - 1779:20, 1781:3, 1785:4, 1785:11, 1785:19, 1785:20, 1786:20
**cites** [1] - 1779:23
**Citi** [1] - 1634:11
**cities** [3] - 1626:13, 1635:11, 1656:16
**city** [3] - 1628:3, 1635:6, 1703:23
**City** [12] - 1616:8, 1622:7, 1622:20, 1622:21, 1626:20, 1634:6, 1634:8, 1634:9, 1634:14, 1639:10, 1642:1, 1643:13
**CIVIL** [1] - 1536:11
**claim** [11] - 1771:22, 1773:10, 1777:9, 1777:10, 1779:19, 1780:13, 1782:19, 1787:24, 1794:9, 1794:14
**claims** [3] - 1700:1, 1700:9, 1768:19
**clarity** [1] - 1802:13
**class** [5] - 1600:13, 1604:6, 1604:7, 1617:5, 1644:14
**clause** [3] - 1733:20, 1736:6, 1742:3
**clear** [25] - 1544:16, 1544:21, 1570:18, 1579:1, 1628:15, 1639:24, 1675:19, 1677:14, 1702:14, 1770:12, 1772:13, 1775:17, 1776:7, 1780:24, 1784:22, 1784:23, 1789:21, 1791:20, 1792:5, 1792:12, 1794:14, 1796:8, 1798:8, 1798:16, 1800:3
**clearer** [1] - 1772:3
**clearly** [7] - 1544:14, 1640:20, 1771:12, 1783:24, 1789:23, 1798:20, 1798:25
**Clint** [2] - 1639:15, 1639:19
**Clinton** [1] - 1603:19
**close** [9] - 1594:11, 1611:15, 1611:21, 1612:6, 1643:5, 1680:14, 1680:22, 1771:11, 1804:4
**closer** [3] - 1544:25, 1545:4, 1804:7
**closest** [2] - 1597:3, 1597:6
**Club** [1] - 1634:6
**club** [6] - 1635:18, 1641:1, 1643:9, 1645:4, 1645:13, 1686:9
**Clubs** [1] - 1658:6
**clubs** [9] - 1562:7, 1562:8, 1620:21, 1621:9, 1621:25, 1624:7, 1626:1, 1634:19, 1637:14
**co** [10] - 1603:16, 1776:1, 1776:2, 1777:13, 1780:2, 1780:19, 1785:8, 1787:16, 1787:19, 1788:11
**co-chairing** [1] - 1603:16
**co-conspirator** [7] - 1776:1, 1776:2, 1777:13, 1780:19, 1787:16, 1787:19, 1788:11
**co-conspirators** [2] - 1780:2, 1785:8
**Coach** [2] - 1592:7, 1592:11
**coach** [3] - 1555:2, 1592:11, 1751:12
**coaches** [1] - 1600:20
**coaching** [7] - 1553:2, 1553:24, 1555:1, 1555:5, 1555:23, 1581:8, 1661:23
**coast** [2] - 1624:22, 1624:23
**coffee** [2] - 1554:17
**Cogan** [1] - 1794:13
**cogent** [1] - 1789:22
**coined** [1] - 1638:17
**cold** [1] - 1625:17
**COLE** [3] - 1536:17, 1665:18, 1667:6
**Colin** [2] - 1767:11, 1777:8
**collapse** [1] - 1681:25
**collapsed** [1] - 1681:18
**colleagues** [1] - 1766:8
**collectively** [3] - 1595:20, 1596:10, 1612:9
**college** [5] - 1613:4, 1613:6, 1613:7, 1629:9, 1642:22
**Collins** [5] - 1666:23, 1706:23, 1706:24, 1707:7, 1707:19
**colloquial** [2] - 1582:4, 1582:8
**Colombia** [2] - 1617:7, 1617:11
**Colorado** [1] - 1630:20
**Columbia** [1] - 1697:9
**Columbus** [1] - 1694:8
**combine** [1] - 1632:2
**coming** [9] - 1540:6, 1558:22, 1570:3, 1571:4, 1603:8, 1613:23, 1643:15, 1747:18, 1759:16
**Commanders** [1] - 1647:12
**comment** [6] - 1551:20, 1552:6, 1595:4, 1617:1, 1680:7, 1801:20
**commenting** [2] - 1552:14, 1690:25
**comments** [26] - 1548:21, 1576:15, 1583:25, 1584:5, 1584:11, 1584:13, 1584:14, 1584:15, 1584:18, 1589:7, 1591:12, 1592:7, 1592:17, 1593:10, 1593:15, 1593:17, 1593:18, 1593:23, 1596:25, 1597:23, 1597:25, 1598:1, 1609:12, 1609:18, 1674:21, 1703:1
**commercial** [13] - 1561:12, 1614:2, 1635:4, 1635:17, 1636:15, 1637:7, 1644:15, 1645:24, 1651:4, 1682:13, 1703:13, 1703:15, 1780:15
**Commish** [3] - 1660:9, 1660:10, 1660:12
**Commissioner** [21] - 1600:2, 1600:4, 1604:12, 1605:20, 1606:15, 1607:9, 1608:2, 1608:12, 1612:15, 1619:6, 1619:19, 1621:19, 1625:20, 1632:16,

1655:21, 1656:9, 1657:5, 1660:7, 1662:24, 1675:21, 1703:17
**commissioner** [32] - 1594:18, 1600:7, 1601:1, 1601:5, 1601:6, 1601:7, 1601:8, 1601:9, 1615:3, 1615:5, 1618:7, 1618:19, 1635:4, 1638:2, 1641:21, 1642:25, 1643:11, 1643:18, 1647:20, 1648:16, 1650:13, 1650:20, 1653:1, 1655:24, 1658:24, 1659:20, 1661:5, 1661:9, 1672:13, 1677:13
**commissioner's** [2] - 1636:17, 1637:3
**commissioners** [1] - 1601:3
**Commisso** [9] - 1662:25, 1663:6, 1663:9, 1663:18, 1663:19, 1696:3, 1696:9, 1696:12, 1696:18
**commit** [1] - 1798:23
**commitment** [6] - 1616:14, 1643:13, 1646:7, 1704:5, 1705:4, 1799:25
**committed** [10] - 1603:1, 1603:4, 1616:21, 1623:12, 1643:22, 1644:15, 1744:6, 1795:5, 1797:2, 1799:3
**Committee** [7] - 1568:23, 1568:25, 1569:2, 1569:15, 1590:7, 1695:13, 1695:14
**committee** [8] - 1569:3, 1590:6, 1590:13, 1614:25, 1636:14, 1636:15, 1695:16
**committee's** [2] - 1590:3, 1590:11
**committees** [2] - 1636:14, 1636:18
**common** [4] - 1795:5, 1797:2, 1798:24, 1799:25
**communicating** [1] - 1637:14
**communications** [4] - 1544:8, 1544:9, 1544:12, 1738:21
**community** [17] - 1572:2, 1600:13, 1600:19, 1602:3, 1605:1, 1619:24, 1621:11, 1624:11, 1626:9, 1627:2, 1632:5, 1634:22, 1635:8, 1637:15, 1637:18, 1643:16, 1645:11
**companies** [4] - 1624:8, 1774:21, 1786:18, 1788:19
**company** [10] - 1614:13, 1620:24, 1623:4, 1627:7, 1637:1, 1637:7, 1649:14, 1682:13, 1786:7, 1786:20
**compare** [1] - 1601:12
**compared** [2] - 1601:11, 1655:15
**comparing** [6] - 1651:22, 1651:24, 1652:5, 1652:19, 1652:22, 1653:2
**compete** [6] - 1646:17, 1691:6, 1777:14, 1777:19, 1780:20, 1788:5
**competed** [2] - 1604:8, 1691:9
**competes** [2] - 1775:21, 1780:2
**competing** [28] - 1640:11, 1640:12, 1645:24, 1646:1, 1646:2, 1646:3, 1646:4, 1646:20, 1646:21, 1646:23, 1647:1, 1647:4, 1647:6, 1647:9, 1651:2, 1651:3, 1651:4, 1651:5, 1654:10, 1715:17, 1715:21, 1715:22, 1718:1, 1718:9, 1718:13, 1718:17, 1718:19
**competition** [6] - 1621:5, 1650:18, 1652:21, 1723:24, 1780:6, 1780:22
**competitive** [13] - 1647:16, 1650:21, 1653:6, 1653:9, 1653:12, 1653:20, 1654:2, 1655:8, 1655:11, 1656:18, 1657:3, 1658:5, 1663:11
**competitor** [2] - 1695:15, 1778:14
**competitors** [1] - 1650:25
**complaint** [3] - 1549:17, 1794:12, 1796:9
**complete** [3] - 1538:9, 1781:24, 1803:2
**completed** [3] - 1633:5, 1666:16, 1666:17
**completely** [4] - 1581:4, 1768:2, 1777:3, 1786:2
**completeness** [1] - 1790:25
**completion** [2] - 1632:20, 1740:15
**complex** [2] - 1630:20, 1630:21
**Compliance** [1] - 1750:11
**compliance** [50] - 1563:9, 1565:4, 1565:12, 1580:12, 1724:24, 1724:25, 1725:1, 1725:7, 1725:11, 1725:17, 1725:21, 1726:3, 1726:5, 1726:9, 1726:13, 1726:16, 1726:25, 1727:8, 1730:7, 1730:12, 1730:18, 1730:19, 1731:7, 1732:22, 1733:8, 1735:14, 1737:11, 1737:12, 1738:5, 1738:7, 1739:15, 1739:17, 1740:3, 1740:15, 1740:25, 1744:11, 1749:17, 1750:1, 1753:10, 1757:8, 1757:18, 1758:14, 1758:17, 1759:5, 1759:19, 1759:25, 1760:2, 1760:13, 1760:20
**compliant** [4] - 1549:4, 1551:18, 1551:24, 1560:16
**complicated** [3] - 1629:4, 1682:1, 1723:4
**comply** [11] - 1560:24, 1563:3, 1565:17, 1568:14, 1570:6, 1580:10, 1609:23, 1610:1, 1687:8, 1726:23, 1759:12
**complying** [1] - 1563:1
**comprised** [2] - 1590:13, 1783:9
**computer** [1] - 1763:25
**Computer** [1] - 1537:18
**Computer-Aided** [1] - 1537:18
**conceal** [1] - 1587:10
**concentric** [1] - 1623:16
**concept** [1] - 1611:7
**concern** [9] - 1653:9, 1653:12, 1653:15, 1653:20, 1654:3, 1663:11, 1770:17, 1799:17, 1800:7
**concerned** [5] - 1648:25, 1665:15, 1667:8, 1667:16, 1796:20
**concerns** [4] - 1547:24, 1650:22, 1653:6, 1653:7
**concerted** [2] - 1798:7, 1798:10
**concluded** [2] - 1699:10, 1699:11
**conclusion** [3] - 1611:23, 1719:13, 1720:18
**condition** [1] - 1738:4
**conditioned** [1] - 1739:5
**conducted** [1] - 1712:24
**conference** [8] - 1538:16, 1538:20, 1592:6, 1592:21, 1593:5, 1596:21, 1598:7, 1599:16
**conferences** [1] - 1551:4
**confess** [1] - 1781:22
**confidence** [1] - 1616:2
**confident** [1] - 1597:19
**confirm** [2] - 1728:25, 1729:7
**conflating** [1] - 1775:10
**confuse** [1] - 1799:22
**confused** [3] - 1768:2, 1768:9, 1800:18
**confusing** [3] - 1766:16, 1784:21, 1799:13
**confusion** [6] - 1768:16, 1770:6, 1773:20, 1784:23, 1790:17, 1799:2
**connected** [3] - 1604:25, 1606:19, 1607:19
**connection** [8] - 1576:23, 1577:1, 1606:4, 1619:21, 1650:20, 1659:12, 1672:6, 1788:16
**connections** [1] - 1777:15
**conscious** [1] - 1799:24
**consciously** [4] - 1795:5, 1797:2, 1798:23, 1799:3
**consensus** [8] - 1713:12, 1713:18, 1713:22, 1713:24, 1714:5, 1716:10, 1719:24, 1720:1
**consider** [5] - 1579:8, 1641:15, 1653:14, 1654:2, 1689:24
**consideration** [1] - 1585:18
**considered** [2] - 1572:10, 1785:17
**considering** [2] - 1557:24, 1559:7
**consistency** [1] - 1646:6
**consistent** [8] - 1661:12, 1667:17, 1724:7, 1732:5, 1769:12, 1770:2, 1791:24, 1794:4
**Consistent** [1] - 1770:1
**consistently** [2] - 1770:20, 1787:15
**conspiracies** [1] - 1792:13
**conspiracy** [79] - 1700:10, 1766:21, 1766:24, 1766:25, 1767:1, 1767:5, 1767:10, 1767:13, 1769:1, 1770:14, 1770:21, 1770:25, 1771:15, 1772:11, 1772:19, 1774:8, 1774:12, 1774:15, 1774:18, 1774:25, 1775:1, 1775:12, 1775:15, 1775:16, 1775:18, 1775:24, 1776:8, 1776:9, 1776:12, 1776:13, 1777:10, 1777:22, 1777:24, 1778:2, 1778:17, 1779:1, 1779:3, 1779:4, 1779:8, 1779:11, 1779:15, 1779:16, 1779:19, 1781:8, 1781:17, 1781:20, 1782:1, 1782:2, 1782:5, 1782:9, 1782:11, 1782:18, 1783:7, 1784:8, 1784:24, 1785:14, 1785:21, 1787:4, 1787:7, 1787:20, 1787:22, 1788:14, 1788:15, 1788:17, 1789:6, 1792:12,

1792:17, 1792:20, 1792:24, 1794:6, 1794:10, 1799:3, 1799:24, 1800:10, 1800:25
**conspirator** [8] - 1775:6, 1776:1, 1776:2, 1777:13, 1780:19, 1787:16, 1787:19, 1788:11
**conspirators** [7] - 1774:5, 1779:5, 1780:2, 1782:5, 1782:11, 1785:8, 1785:13
**conspire** [7] - 1780:1, 1781:25, 1786:2, 1786:16, 1788:4, 1788:10, 1788:19
**conspired** [17] - 1766:22, 1767:2, 1767:17, 1769:18, 1771:9, 1771:22, 1771:23, 1771:24, 1772:8, 1772:24, 1773:1, 1773:8, 1773:14, 1785:24, 1789:5, 1795:8, 1799:9
**conspiring** [1] - 1785:13
**constituents** [2] - 1656:12, 1657:1
**construction** [1] - 1628:1
**consultancy** [2] - 1709:7, 1709:8
**consultant** [3] - 1720:13, 1724:20, 1733:24
**consultations** [1] - 1712:4
**consulting** [1] - 1709:12
**contact** [1] - 1710:18
**contacted** [1] - 1729:16
**containing** [1] - 1712:20
**contemplate** [1] - 1733:16
**content** [1] - 1660:19
**contention** [1] - 1777:3
**contentious** [1] - 1553:12
**context** [7] - 1544:2, 1552:8, 1659:1, 1736:20, 1774:25, 1781:23, 1797:8
**continental** [1] - 1625:9
**continue** [13] - 1541:7, 1595:11, 1596:7, 1622:18, 1634:25, 1638:14, 1643:24, 1644:1, 1668:23, 1720:19, 1733:12, 1791:8, 1791:19
**Continued** [7] - 1563:25, 1598:8, 1633:24, 1704:6, 1734:4, 1764:2, 1793:10
**CONTINUED** [2] - 1542:5, 1805:5
**continued** [6] - 1609:4, 1679:25, 1697:14, 1708:17, 1722:19
**Continuing** [8] - 1564:3, 1588:19, 1599:1, 1669:3, 1703:11, 1705:2, 1735:3, 1794:1
**continuing** [4] - 1634:1, 1655:14, 1723:7, 1723:23
**contract** [9] - 1572:17, 1624:25, 1641:12, 1673:8, 1673:11, 1673:18, 1673:22, 1673:24, 1674:2
**contracted** [1] - 1642:14
**contracts** [5] - 1573:2, 1602:2, 1605:4, 1605:6, 1642:8
**contrary** [1] - 1571:15
**contrast** [1] - 1794:7
**contrasting** [1] - 1800:8
**contributed** [1] - 1643:20
**control** [2] - 1671:14, 1715:13
**controlled** [1] - 1756:3
**controlling** [1] - 1680:19
**convenience** [1] - 1803:15
**conversation** [1] - 1660:14
**conversations** [1] - 1735:12
**convey** [2] - 1717:25, 1730:8
**conveyed** [3] - 1546:13, 1546:16, 1738:9
**conveying** [1] - 1718:8
**convicted** [2] - 1605:9
**convictions** [1] - 1775:3
**convince** [1] - 1644:3
**convoluted** [1] - 1772:14
**cooperation** [1] - 1695:12
**coordinate** [1] - 1710:11
**copied** [1] - 1757:24
**copy** [3] - 1543:8, 1544:7, 1592:3
**Cordeiro** [3] - 1590:4, 1590:10, 1667:4
**Cordero** [5] - 1547:11, 1552:19, 1552:21, 1553:9, 1803:24
**cordero** [4] - 1553:16, 1553:20, 1554:1, 1554:8
**core** [2] - 1593:25, 1595:5
**corporate** [3] - 1777:21, 1791:5, 1793:5
**corporation** [1] - 1793:7
**corpus** [1] - 1577:4
**Correct** [12] - 1699:2, 1701:4, 1701:7, 1701:14, 1706:5, 1753:18, 1754:20, 1756:19, 1778:23, 1780:4, 1789:16, 1791:12
**correct** [396] - 1542:15, 1542:18, 1542:19, 1543:9, 1543:17, 1543:22, 1543:23, 1543:25, 1544:23, 1544:24, 1545:5, 1545:6, 1545:7, 1545:8, 1546:5, 1546:11, 1546:13, 1546:14, 1547:21, 1548:18, 1548:19, 1549:10, 1549:11, 1549:12, 1549:17, 1549:18, 1549:20, 1550:13, 1550:20, 1551:5, 1551:18, 1552:3, 1552:13, 1552:23, 1553:5, 1553:6, 1553:9, 1554:9, 1557:9, 1557:23, 1559:10, 1559:11, 1559:19, 1559:20, 1560:8, 1560:9, 1561:18, 1561:20, 1561:21, 1561:24, 1562:1, 1563:20, 1563:21, 1563:23, 1563:24, 1564:20, 1564:21, 1565:17, 1566:14, 1566:15, 1567:9, 1567:22, 1567:24, 1568:14, 1568:20, 1568:23, 1568:24, 1569:16, 1569:17, 1569:25, 1570:7, 1570:8, 1570:11, 1570:12, 1570:14, 1570:17, 1571:9, 1571:12, 1572:8, 1572:11, 1574:20, 1576:14, 1576:24, 1577:10, 1577:14, 1578:15, 1578:19, 1578:20, 1578:25, 1580:7, 1581:5, 1581:12, 1581:16, 1582:11, 1583:2, 1583:25, 1584:19, 1584:20, 1589:7, 1589:11, 1589:14, 1589:15, 1590:4, 1590:5, 1590:7, 1590:8, 1590:12, 1590:14, 1590:17, 1590:18, 1590:25, 1591:17, 1591:20, 1591:21, 1592:8, 1592:9, 1592:13, 1592:14, 1592:15, 1592:18, 1592:22, 1593:18, 1594:5, 1594:9, 1595:8, 1595:14, 1596:13, 1596:17, 1596:25, 1597:7, 1597:8, 1597:12, 1597:17, 1597:23, 1602:10, 1644:23, 1662:23, 1669:24, 1676:12, 1676:20, 1677:22, 1678:1, 1678:2, 1678:5, 1678:16, 1678:17, 1679:6, 1679:11, 1679:12, 1679:18, 1679:19, 1679:23, 1680:5, 1680:10, 1680:12, 1680:19, 1680:20, 1681:11, 1682:4, 1682:5, 1682:21, 1682:22, 1683:10, 1684:4, 1684:5, 1684:8, 1684:9, 1684:10, 1684:11, 1684:12, 1684:14, 1684:15, 1684:17, 1685:25, 1686:5, 1686:14, 1686:17, 1686:18, 1686:19, 1686:20, 1687:11, 1687:22, 1687:23, 1687:25, 1688:1, 1688:2, 1688:3, 1690:5, 1690:18, 1691:7, 1691:23, 1692:2, 1692:3, 1692:4, 1692:18, 1692:22, 1692:24, 1693:13, 1693:23, 1694:2, 1694:4, 1694:9, 1694:22, 1695:4, 1695:5, 1695:8, 1695:9, 1695:11, 1695:19, 1696:1, 1696:4, 1696:6, 1696:13, 1696:16, 1696:17, 1697:15, 1697:17, 1697:22, 1697:23, 1698:1, 1698:10, 1698:12, 1698:13, 1698:14, 1698:16, 1698:17, 1698:18, 1699:1, 1699:7, 1699:8, 1700:21, 1700:24, 1700:25, 1701:1, 1701:3, 1701:6, 1701:9, 1701:10, 1701:13, 1701:15, 1701:17, 1701:23, 1703:3, 1706:4, 1706:7, 1710:7, 1710:8, 1711:16, 1711:20, 1711:21, 1712:2, 1712:3, 1712:6, 1712:10, 1712:11, 1712:21, 1713:7, 1714:11, 1714:12, 1714:13, 1714:16, 1714:17, 1714:22, 1714:24, 1715:4, 1715:10, 1715:11, 1715:23, 1715:25, 1716:1, 1716:4, 1716:9, 1716:10, 1719:2, 1719:9, 1719:10, 1719:16, 1719:17, 1719:21, 1720:2, 1720:3, 1721:20, 1722:22, 1724:4, 1724:8, 1724:18, 1724:22, 1725:7, 1725:12, 1726:1, 1727:5, 1727:22, 1728:2, 1728:3, 1728:5, 1728:15, 1728:19, 1728:23, 1729:5, 1729:9, 1729:16, 1729:17, 1730:5, 1730:6, 1730:9, 1730:13, 1730:18, 1730:21, 1731:1, 1732:20, 1732:23, 1733:19, 1735:11, 1738:7, 1738:8, 1738:18, 1739:12, 1739:17, 1740:7, 1740:10, 1740:11, 1740:19, 1742:2, 1742:7, 1742:24, 1743:6, 1743:16, 1744:25, 1745:17, 1745:24, 1746:4, 1746:8, 1746:18, 1747:12, 1748:20, 1749:2, 1749:6, 1749:12, 1749:19, 1750:12, 1750:13, 1750:14, 1750:15, 1750:21, 1750:22, 1750:23, 1751:4, 1751:5, 1751:6, 1751:7, 1751:8, 1751:9, 1751:10, 1751:11,

1751:13, 1751:14, 1751:17, 1751:18, 1752:7, 1752:10, 1752:18, 1752:19, 1752:20, 1752:21, 1752:24, 1752:25, 1753:4, 1753:14, 1753:15, 1753:17, 1753:20, 1753:21, 1754:19, 1755:1, 1755:17, 1755:18, 1755:21, 1756:4, 1756:5, 1756:7, 1756:8, 1756:9, 1756:20, 1756:21, 1757:14, 1757:24, 1757:25, 1758:2, 1758:5, 1760:9, 1760:10, 1761:10, 1765:22, 1787:18, 1789:7, 1789:20
**corrected** [1] - 1586:24
**correspond** [1] - 1768:10
**correspondence** [2] - 1765:10, 1765:16
**corresponding** [1] - 1707:17
**Cosmos** [1] - 1663:7
**cost** [2] - 1633:8, 1662:17
**Costa** [2] - 1582:20, 1644:8
**costs** [1] - 1577:8
**Council** [16] - 1676:8, 1676:10, 1676:12, 1676:14, 1676:20, 1676:24, 1676:25, 1677:3, 1677:6, 1677:16, 1677:21, 1678:3, 1678:8, 1678:11, 1678:15, 1678:19
**council** [2] - 1677:7, 1677:9
**counsel** [16] - 1542:11, 1547:15, 1558:15, 1571:14, 1580:21, 1590:17, 1665:7, 1665:16, 1678:24, 1686:12, 1689:16, 1690:15, 1697:12, 1732:11, 1732:14, 1732:17
**Counsel** [2] - 1537:7, 1537:8
**counsel's** [1] - 1665:21
**count** [9] - 1642:24, 1666:21, 1770:24, 1770:25, 1771:4, 1771:8, 1772:23, 1781:7, 1781:20
**Count** [1] - 1774:1
**counting** [1] - 1765:15
**countries** [2] - 1545:22, 1642:6
**country** [8] - 1601:20, 1605:5, 1615:16, 1615:20, 1616:15, 1623:15, 1624:20, 1645:24
**counts** [1] - 1754:10
**couple** [7] - 1572:5, 1578:9, 1601:21, 1607:17, 1626:18, 1693:20, 1800:21
**courage** [3] - 1623:9, 1646:7, 1649:10
**courageous** [1] - 1643:23
**course** [3] - 1641:5, 1716:12, 1803:6
**COURT** [244] - 1536:1, 1538:2, 1538:14, 1538:23, 1539:5, 1539:9, 1539:14, 1539:17, 1539:21, 1539:23, 1540:8, 1540:12, 1541:2, 1541:5, 1542:23, 1549:22, 1549:25, 1550:17, 1550:19, 1551:8, 1556:20, 1556:25, 1557:4, 1558:9, 1558:11, 1558:22, 1559:22, 1564:11, 1567:1, 1567:3, 1567:6, 1569:9, 1569:13, 1571:17, 1575:8, 1575:12, 1575:15, 1577:19, 1581:15, 1583:4, 1583:8, 1585:24, 1586:3, 1586:6, 1586:17, 1587:2, 1587:17, 1588:2, 1588:6, 1588:14, 1592:4, 1593:7, 1595:22, 1595:24, 1596:1, 1596:5, 1599:5, 1599:13, 1599:21, 1599:23, 1617:25, 1618:3, 1619:17, 1631:12, 1632:12, 1632:15, 1646:13, 1646:16, 1647:18, 1653:17, 1653:23, 1654:23, 1656:3, 1659:23, 1659:25, 1662:14, 1663:23, 1664:3, 1665:25, 1666:21, 1667:10, 1667:19, 1668:4, 1668:11, 1668:17, 1668:21, 1675:12, 1675:18, 1675:22, 1685:15, 1688:10, 1689:23, 1690:12, 1690:19, 1693:6, 1694:24, 1695:2, 1697:2, 1699:19, 1699:22, 1700:18, 1702:12, 1702:23, 1703:5, 1703:7, 1705:8, 1706:13, 1706:16, 1706:19, 1706:22, 1706:25, 1707:4, 1707:12, 1707:14, 1707:18, 1707:25, 1708:3, 1708:7, 1708:10, 1708:14, 1716:7, 1722:1, 1723:15, 1723:17, 1726:5, 1729:24, 1733:4, 1735:19, 1736:13, 1736:16, 1738:14, 1742:18, 1742:22, 1743:8, 1744:8, 1747:6, 1748:13, 1748:16, 1749:24, 1754:3, 1762:7, 1762:17, 1762:20, 1763:5, 1763:16, 1763:21, 1763:24, 1765:2, 1765:23, 1766:3, 1766:9, 1766:18, 1767:9, 1767:14, 1767:18, 1768:2, 1768:13, 1768:16, 1769:3, 1769:14, 1769:22, 1769:25, 1770:4, 1770:10, 1770:15, 1772:12, 1772:21, 1773:11, 1773:23, 1774:18, 1775:8, 1776:11, 1777:6, 1778:12, 1778:20, 1779:4, 1779:22, 1780:5, 1780:17, 1781:6, 1781:10, 1781:13, 1781:17, 1782:10, 1782:15, 1782:22, 1783:17, 1783:23, 1784:10, 1784:25, 1785:7, 1785:22, 1786:10, 1786:13, 1786:24, 1787:14, 1788:2, 1788:9, 1788:13, 1788:22, 1789:3, 1789:11, 1789:14, 1789:19, 1789:24, 1790:4, 1790:20, 1791:2, 1791:4, 1791:13, 1792:6, 1794:20, 1795:1, 1795:12, 1795:18, 1795:22, 1796:13, 1796:21, 1797:6, 1797:13, 1797:17, 1798:11, 1799:6, 1799:17, 1799:21, 1800:4, 1801:1, 1801:6, 1801:17, 1801:24, 1802:3, 1802:8, 1802:19, 1802:23, 1803:3, 1803:7, 1803:10, 1803:14, 1803:16, 1803:20, 1803:23, 1803:25, 1804:2, 1804:5
**Court** [11] - 1537:16, 1539:10, 1542:12, 1558:16, 1665:6, 1665:24, 1732:18, 1770:8, 1775:25, 1792:1, 1802:5
**court** [5] - 1538:1, 1539:1, 1539:2, 1665:3, 1765:1
**Court's** [1] - 1667:17
**Courthouse** [1] - 1536:5
**courtroom** [4] - 1586:2, 1588:13, 1668:20, 1762:16
**cover** [2] - 1620:3, 1623:15
**coverage** [5] - 1605:6, 1605:8, 1646:3, 1646:24, 1651:3
**covered** [1] - 1592:10
**covering** [2] - 1624:23, 1779:12
**crazy** [1] - 1770:4
**create** [8] - 1547:23, 1603:6, 1614:11, 1623:17, 1645:11, 1714:16, 1719:9, 1745:2
**created** [1] - 1721:14
**creating** [1] - 1636:18
**creation** [1] - 1682:13
**credibility** [4] - 1634:18, 1635:3, 1648:8
**credible** [1] - 1648:14
**crimes** [2] - 1605:10, 1654:9
**criminal** [2] - 1774:25, 1781:23
**critical** [5] - 1637:22, 1743:12, 1743:25, 1746:7, 1746:14
**CROSS** [3] - 1542:5, 1709:5, 1805:7
**cross** [8] - 1556:25, 1600:4, 1668:7, 1675:22, 1762:24, 1763:9, 1784:15, 1803:19
**CROSS-EXAMINATION** [2] - 1542:5, 1805:7
**cross-examining** [1] - 1668:7
**crowded** [2] - 1657:19, 1658:1
**crowds** [2] - 1640:23, 1650:1
**cue** [1] - 1668:14
**Cup** [32] - 1603:8, 1603:10, 1603:12, 1603:13, 1603:17, 1603:20, 1603:22, 1603:25, 1604:8, 1611:17, 1615:17, 1615:18, 1617:5, 1617:11, 1628:5, 1630:6, 1632:6, 1638:7, 1638:12, 1640:21, 1643:15, 1657:6, 1657:7, 1657:13, 1657:16, 1658:7, 1699:3, 1699:7, 1699:15, 1699:21, 1699:22
**current** [4] - 1556:8, 1590:2, 1693:17, 1745:3
**cutting** [3] - 1666:10, 1666:11

# D

**D-3** [1] - 1733:17
**D-II** [48] - 1548:10, 1549:19, 1549:20, 1550:2, 1550:4, 1550:7, 1550:13, 1550:22, 1551:2, 1560:16, 1560:24, 1562:17, 1562:20, 1562:23, 1563:6, 1563:10, 1606:7, 1607:7, 1608:7, 1710:11, 1711:6, 1711:11, 1713:6, 1713:13, 1714:11, 1714:24, 1716:3, 1716:13, 1719:12, 1719:18, 1720:5, 1721:5, 1723:13, 1724:4, 1724:12, 1729:9, 1730:13, 1730:17, 1730:19, 1731:17, 1731:24, 1775:20, 1777:15, 1777:19, 1777:20, 1778:22, 1783:15, 1789:5
**D.C** [2] - 1628:8, 1628:9
**Dallas** [2] - 1622:7, 1630:21

**Dan** [7] - 1543:12, 1578:12, 1590:14, 1689:8, 1729:13, 1730:4
**data** [2] - 1689:4, 1721:5
**date** [29] - 1632:21, 1663:3, 1669:16, 1669:23, 1679:7, 1700:13, 1713:1, 1713:2, 1726:21, 1729:1, 1738:6, 1738:7, 1739:16, 1739:17, 1741:4, 1743:12, 1743:24, 1744:4, 1745:18, 1745:21, 1746:7, 1746:10, 1746:12, 1746:14, 1747:13, 1750:8, 1758:3, 1761:2, 1761:24
**dated** [5] - 1542:15, 1660:4, 1721:19, 1727:16, 1732:19
**dates** [5] - 1572:6, 1632:13, 1714:25, 1724:14, 1740:15
**DAVID** [1] - 1536:16
**David** [8] - 1604:6, 1638:18, 1638:19, 1639:9, 1639:10, 1640:17, 1642:2, 1644:6
**day-to-day** [1] - 1640:2
**days** [11] - 1555:8, 1555:10, 1555:12, 1555:17, 1578:14, 1583:20, 1613:14, 1616:25, 1634:7, 1791:14, 1800:21
**DC** [1] - 1537:11
**DD-8** [1] - 1606:13
**DD-9** [1] - 1607:6
**deadline** [11] - 1744:19, 1744:22, 1744:24, 1745:2, 1745:4, 1745:11, 1745:20, 1745:23, 1746:3, 1749:11, 1749:13
**deadlines** [2] - 1743:11, 1743:24
**deal** [1] - 1654:6
**dealing** [2] - 1637:5, 1737:25
**deals** [7] - 1549:1, 1636:14, 1637:8, 1641:19, 1646:4, 1648:4, 1651:4
**dealt** [3] - 1569:3, 1609:5, 1732:2
**debate** [1] - 1771:6
**debt** [1] - 1704:2
**decade** [2] - 1650:8, 1650:12
**decades** [3] - 1634:10, 1663:18
**December** [12] - 1546:25, 1547:4, 1557:12, 1669:22, 1669:24, 1670:18, 1688:21, 1715:7, 1738:22, 1743:15, 1750:20, 1751:7
**decide** [3] - 1578:22, 1615:8, 1710:22
**decided** [7] - 1570:13, 1575:5, 1575:22, 1575:25, 1576:1, 1701:9, 1720:22
**decides** [1] - 1776:14
**deciding** [1] - 1733:16
**decision** [18] - 1606:5, 1607:1, 1607:10, 1636:12, 1671:20, 1701:16, 1724:15, 1730:15, 1743:12, 1743:24, 1745:16, 1745:18, 1746:7, 1755:16, 1755:19, 1794:12, 1794:13, 1800:8
**decisions** [6] - 1548:4, 1585:3, 1585:4, 1585:6, 1591:16, 1744:13
**deck** [3] - 1619:19, 1631:5, 1643:1
**deep** [1] - 1554:6
**deeply** [4] - 1594:21, 1595:19, 1596:9
**defeat** [1] - 1773:9
**Defendant** [3] - 1537:2, 1537:7, 1537:8
**defendant** [9] - 1767:6, 1775:18, 1775:24, 1776:1, 1776:4, 1777:13, 1778:18, 1780:8, 1788:4
**Defendants** [21] - 1766:22, 1767:17, 1769:18, 1770:11, 1771:9, 1771:14, 1771:22, 1771:23, 1771:24, 1772:8, 1772:10, 1772:23, 1773:1, 1773:14, 1778:12, 1779:24, 1784:9, 1784:10, 1785:7, 1790:7, 1790:22
**defendants** [16] - 1536:9, 1767:4, 1767:5, 1774:8, 1774:9, 1775:1, 1775:11, 1775:14, 1782:7, 1796:22, 1799:17, 1799:21, 1800:4, 1801:6, 1801:14, 1801:22
**Defendants'** [14] - 1631:4, 1654:12, 1654:24, 1654:25, 1655:19, 1656:4, 1656:5, 1659:15, 1660:1, 1768:5, 1768:7, 1805:21, 1805:22, 1805:23
**defense** [1] - 1803:7
**Defense** [3] - 1631:9, 1631:13, 1805:20
**define** [1] - 1643:6
**defined** [1] - 1620:20
**degree** [1] - 1683:3
**delete** [2] - 1790:21, 1797:1
**deliberation** [1] - 1702:13
**deliberations** [5] - 1606:21, 1674:25, 1701:12, 1702:14, 1703:2
**deliver** [1] - 1572:1
**delivered** [1] - 1705:3
**Deloitte** [2] - 1721:11, 1721:13
**Deltas** [3] - 1748:9, 1748:14, 1748:15
**demand** [1] - 1629:23
**demise** [1] - 1605:11
**demographic** [1] - 1615:19
**demonstrative** [3] - 1606:12, 1606:17, 1607:6
**Demonstrative** [1] - 1607:19
**Dempsey** [2] - 1639:15, 1639:19
**denial** [1] - 1659:12
**denied** [3] - 1608:14, 1736:10, 1799:19
**Denver** [2] - 1630:21, 1649:11
**deny** [6] - 1581:3, 1606:5, 1607:1, 1607:11, 1777:14, 1799:10
**department** [2] - 1574:14, 1574:15
**deposition** [13] - 1538:18, 1540:23, 1558:2, 1666:1, 1666:8, 1667:23, 1706:24, 1708:6, 1708:12, 1708:15, 1762:24, 1763:10
**depositions** [2] - 1666:4, 1762:21
**Depot** [1] - 1630:15
**depth** [1] - 1619:7
**describe** [14] - 1557:13, 1557:15, 1557:18, 1557:20, 1571:2, 1571:6, 1600:6, 1604:2, 1613:18, 1636:8, 1638:5, 1659:4, 1697:10, 1774:1
**described** [1] - 1605:13
**describes** [2] - 1768:19, 1771:21
**description** [3] - 1594:10, 1631:7, 1729:14
**Designated** [1] - 1637:25
**designated** [7] - 1546:4, 1638:3, 1638:5, 1639:24, 1640:5, 1695:3, 1695:6
**designation** [2] - 1647:21, 1647:23
**designations** [5] - 1666:1, 1666:2, 1666:8, 1666:11, 1667:23
**designed** [5] - 1632:2, 1743:5, 1796:10, 1797:2, 1798:24
**desire** [1] - 1667:17
**desired** [1] - 1719:18
**despite** [1] - 1679:16
**detail** [3] - 1634:17, 1636:24, 1762:2
**detailing** [1] - 1740:14
**details** [5] - 1712:17, 1721:1, 1759:23, 1760:19, 1761:7
**determine** [2] - 1736:3, 1752:3
**detriment** [1] - 1715:12
**develop** [8] - 1693:15, 1694:14, 1698:9, 1711:2, 1716:10, 1723:23, 1724:3, 1724:13
**developed** [2] - 1720:1, 1721:5
**developing** [2] - 1718:22, 1719:7
**development** [21] - 1595:20, 1596:9, 1614:4, 1614:5, 1615:10, 1630:25, 1637:9, 1671:2, 1671:24, 1692:9, 1697:21, 1698:3, 1703:13, 1703:14, 1716:3, 1716:14, 1718:3, 1723:7, 1724:6, 1730:8
**developmental** [1] - 1561:19
**devote** [1] - 1647:5
**DI** [27] - 1564:24, 1572:24, 1573:7, 1606:5, 1606:6, 1606:8, 1606:9, 1608:7, 1649:20, 1679:4, 1679:5, 1679:21, 1686:1, 1686:4, 1686:6, 1686:7, 1686:19, 1686:22, 1687:5, 1687:7, 1693:22, 1694:14, 1700:14, 1757:13, 1758:9, 1758:12, 1778:3
**dialed** [2] - 1606:9, 1607:13
**Diego** [2] - 1601:20, 1626:20
**difference** [8] - 1553:11, 1554:21, 1554:22, 1554:24, 1617:1, 1617:2, 1776:11, 1776:16
**different** [23] - 1556:19, 1574:18, 1581:12, 1594:13, 1602:5, 1616:15, 1626:25, 1627:11, 1636:13, 1642:5, 1649:18, 1656:17, 1661:15, 1672:3, 1693:6, 1695:20, 1698:8, 1715:24, 1740:7, 1743:3, 1774:20, 1779:8, 1793:1
**differentiates** [1] - 1686:24
**difficult** [4] - 1623:7, 1629:4, 1646:24, 1741:23
**difficulty** [1] - 1634:2
**digital** [1] - 1656:25
**digitally** [2] - 1656:23, 1656:25

**Dignity** [1] - 1630:15
**DII** [29] - 1564:24, 1564:25, 1565:4, 1565:11, 1566:18, 1579:8, 1581:4, 1736:10, 1736:19, 1736:25, 1737:16, 1739:5, 1740:14, 1741:17, 1741:23, 1744:1, 1745:12, 1746:8, 1753:13, 1753:16, 1757:13, 1758:9, 1758:12, 1758:13, 1759:12, 1760:13, 1761:10
**DIII** [14] - 1735:5, 1735:17, 1735:22, 1735:25, 1736:1, 1736:2, 1736:11, 1736:19, 1736:25, 1737:1, 1737:7, 1741:18, 1741:23
**direct** [10] - 1546:24, 1576:13, 1576:17, 1599:10, 1599:21, 1701:11, 1750:16, 1783:19, 1783:22, 1788:21
**DIRECT** [3] - 1600:1, 1805:5, 1805:13
**DIRECT-EXAMINATION** [1] - 1805:5
**directed** [1] - 1783:10
**direction** [4] - 1619:13, 1715:14, 1751:22, 1751:25
**directly** [2] - 1761:25, 1783:21
**director** [2] - 1592:12, 1597:21
**directors** [3] - 1546:25, 1589:24, 1739:4
**disabled** [3] - 1613:8, 1613:10, 1613:11
**disagree** [4] - 1554:1, 1555:4, 1555:22, 1684:24
**Discon** [1] - 1785:20
**discovery** [1] - 1538:10
**Discuss** [1] - 1756:24
**discuss** [17] - 1560:5, 1560:11, 1560:20, 1565:11, 1578:14, 1582:25, 1583:6, 1583:21, 1663:25, 1710:12, 1718:4, 1718:17, 1731:16, 1762:9, 1765:20, 1766:3, 1766:4
**discussed** [26] - 1565:24, 1566:4, 1566:11, 1576:11, 1579:21, 1585:16, 1596:16, 1596:18, 1653:9, 1653:12, 1681:22, 1701:16, 1701:22, 1701:25, 1713:21, 1718:15, 1719:8, 1736:1, 1738:11, 1739:8, 1741:15, 1758:17, 1758:24, 1758:25, 1761:3, 1761:5
**discussing** [9] - 1543:20, 1696:8, 1730:16, 1733:14, 1735:15, 1735:20, 1747:14, 1748:4, 1749:5
**discussion** [38] - 1547:22, 1548:4, 1548:9, 1548:17, 1564:22, 1566:6, 1576:4, 1576:8, 1576:9, 1579:7, 1580:1, 1585:10, 1591:2, 1591:14, 1689:8, 1712:25, 1713:23, 1713:25, 1729:19, 1736:7, 1736:17, 1738:10, 1749:7, 1756:23, 1757:3, 1757:6, 1757:12, 1758:7, 1759:4, 1759:21, 1760:14, 1761:9, 1765:8, 1765:24, 1786:25, 1790:5, 1794:16, 1801:3
**discussions** [17] - 1547:17, 1547:24, 1548:5, 1548:11, 1590:20, 1590:24, 1635:10, 1653:8, 1653:11, 1678:20, 1713:7, 1728:21, 1731:23, 1732:4, 1757:11, 1761:14
**dismiss** [1] - 1774:10
**Disney** [2] - 1603:18, 1614:9
**display** [3] - 1564:13, 1730:3, 1757:20
**displayed** [2] - 1559:25, 1561:7
**disproportionate** [2] - 1791:17, 1796:2
**distinction** [7] - 1754:13, 1754:18, 1754:20, 1754:21, 1755:4, 1755:7, 1755:9
**distinguish** [3] - 1581:11, 1787:12, 1788:2
**DISTRICT** [3] - 1536:1, 1536:1, 1536:12
**District** [2] - 1779:24, 1780:18
**Divergent** [1] - 1756:1
**diverse** [1] - 1633:10
**diversity** [4] - 1623:6, 1623:25
**divested** [1] - 1683:5
**dividing** [1] - 1800:22
**Division** [81] - 1543:21, 1545:9, 1545:10, 1545:17, 1545:18, 1545:23, 1546:4, 1546:10, 1546:11, 1546:20, 1546:21, 1547:6, 1549:15, 1566:9, 1566:13, 1566:17, 1566:20, 1566:21, 1567:8, 1567:17, 1567:21, 1568:14, 1570:11, 1570:25, 1571:8, 1575:23, 1578:23, 1578:24, 1606:24, 1618:8, 1618:11, 1618:21, 1618:24, 1619:4, 1631:24, 1635:12, 1635:15, 1635:23, 1647:21, 1653:15, 1653:19, 1671:3, 1671:6, 1671:12, 1671:19, 1671:21, 1671:22, 1672:1, 1679:17, 1679:18, 1680:13, 1683:9, 1684:17, 1685:1, 1685:4, 1698:25, 1709:23, 1709:25, 1711:1, 1714:24, 1717:12, 1717:14, 1717:15, 1718:5, 1718:7, 1731:2, 1735:8, 1735:10, 1736:8, 1746:4, 1751:2, 1772:17, 1772:25, 1773:4, 1778:14, 1786:2
**division** [37] - 1544:22, 1545:1, 1545:3, 1545:4, 1545:16, 1545:18, 1545:21, 1545:25, 1549:4, 1557:17, 1562:3, 1567:14, 1573:4, 1573:8, 1614:12, 1619:3, 1627:15, 1635:22, 1642:7, 1648:14, 1657:11, 1671:1, 1671:5, 1671:7, 1698:9, 1709:25, 1710:24, 1711:8, 1711:18, 1711:24, 1718:20, 1724:5, 1724:9, 1724:12, 1724:22, 1735:6, 1756:24
**Division-I** [13] - 1545:9, 1545:17, 1545:23, 1546:4, 1546:10, 1546:20, 1635:12, 1647:21, 1717:12, 1717:14, 1717:15, 1718:5, 1718:7
**Division-II** [16] - 1543:21, 1545:9, 1545:18, 1545:23, 1546:4, 1546:11, 1546:21, 1547:6, 1549:15, 1635:15, 1635:23, 1653:15, 1653:19, 1709:23, 1709:25, 1711:1
**Division-III** [1] - 1545:10
**Division-IV** [1] - 1545:10
**divisional** [3] - 1604:14, 1673:25, 1735:13
**divisions** [1] - 1723:13
**DNA** [1] - 1647:17
**document** [30] - 1538:9, 1538:13, 1570:1, 1570:4, 1570:5, 1570:9, 1588:6, 1599:10, 1619:13, 1620:1, 1620:10, 1649:18, 1651:14, 1651:23, 1652:6, 1652:15, 1653:1, 1654:15, 1655:21, 1655:24, 1669:9, 1669:16, 1711:9, 1712:25, 1722:16, 1728:18, 1738:25, 1741:13, 1765:13, 1771:3
**documents** [9] - 1557:15, 1557:20, 1612:1, 1652:20, 1728:20, 1728:23, 1728:24, 1765:15, 1767:19
**Dodgers** [1] - 1623:2
**dogs** [1] - 1635:19
**dollar** [2] - 1634:15, 1670:11
**dollars** [5] - 1624:9, 1633:7, 1640:13, 1644:25, 1684:8
**Domain** [1] - 1632:24
**Don** [3] - 1547:11, 1554:16, 1757:23
**DON** [1] - 1805:4
**DONALD** [1] - 1542:1
**done** [16] - 1575:11, 1594:1, 1609:25, 1639:12, 1658:18, 1666:3, 1679:13, 1679:16, 1713:1, 1713:2, 1713:19, 1743:19, 1762:8, 1769:12, 1791:6, 1793:6
**Donna** [2] - 1708:13, 1708:15
**door** [1] - 1634:11
**Dos** [1] - 1639:3
**double** [1] - 1786:23
**doubt** [2] - 1540:19, 1775:2
**down** [18] - 1556:20, 1565:3, 1606:3, 1616:20, 1620:15, 1622:10, 1649:4, 1652:16, 1655:17, 1657:4, 1676:22, 1680:18, 1681:3, 1689:15, 1735:5, 1735:16, 1735:21, 1774:1
**downtown** [7] - 1626:15, 1626:16, 1626:17, 1628:7, 1631:22, 1632:23, 1633:15
**Downtown** [1] - 1571:5
**dozen** [2] - 1573:3, 1638:9
**dozens** [3] - 1573:3, 1582:20, 1604:7
**draft** [4] - 1713:6, 1729:14, 1771:17, 1771:18
**drafted** [2] - 1733:21, 1784:17
**drawing** [2] - 1604:1, 1631:21
**drive** [2] - 1616:15, 1630:19
**driven** [1] - 1603:2
**driver's** [1] - 1636:9
**driving** [1] - 1610:16
**drops** [1] - 1767:23
**drug** [2] - 1776:12, 1779:4
**drums** [1] - 1630:7
**Drums** [1] - 1630:8
**duly** [2] - 1542:3, 1709:3
**Durbin** [5] - 1559:18, 1563:19,

1713:21, 1713:24, 1714:1
**during** [16] - 1561:23, 1591:1, 1670:7, 1679:20, 1681:1, 1681:3, 1685:6, 1692:16, 1700:14, 1701:2, 1702:13, 1732:4, 1732:9, 1746:16, 1747:3, 1788:25
**duties** [2] - 1600:5, 1600:6
**DX-785** [4] - 1619:10, 1619:11, 1619:18, 1805:19
**Dynamo** [2] - 1555:16, 1683:15

# E

**e-mail** [34] - 1542:14, 1542:18, 1543:3, 1543:4, 1543:5, 1543:8, 1559:18, 1559:21, 1560:3, 1561:10, 1563:19, 1565:23, 1568:18, 1659:20, 1660:4, 1660:15, 1710:3, 1710:4, 1710:9, 1712:20, 1721:18, 1721:19, 1722:5, 1727:15, 1729:13, 1732:19, 1738:17, 1742:13, 1743:5, 1744:17, 1746:12, 1757:22, 1757:23, 1758:4
**e-mailed** [1] - 1538:4
**e-mails** [5] - 1543:14, 1543:17, 1543:19, 1544:14, 1661:12
**early** [20] - 1549:6, 1549:10, 1552:9, 1555:8, 1555:10, 1555:12, 1555:17, 1576:6, 1612:20, 1613:14, 1613:16, 1617:2, 1634:7, 1657:15, 1663:10, 1672:18, 1672:24, 1679:24, 1762:14
**earn** [6] - 1646:11, 1670:8, 1678:25, 1679:13, 1679:17
**earning** [1] - 1679:2
**ease** [1] - 1668:12
**easier** [4] - 1539:11, 1655:16, 1655:22, 1746:11
**East** [1] - 1754:10
**east** [2] - 1624:23, 1657:20
**East/Brooklyn** [1] - 1537:17
**Eastern** [1] - 1780:18
**EASTERN** [1] - 1536:1
**easy** [1] - 1667:25
**ECF** [13] - 1765:12, 1765:17, 1765:19, 1767:19, 1767:20, 1767:21, 1767:22, 1770:23, 1771:17, 1772:14, 1773:25, 1791:20
**economic** [2] - 1786:18, 1794:18
**economics** [1] - 1783:5
**edit** [1] - 1766:10
**editorial** [6] - 1722:6, 1722:8, 1722:9, 1722:23, 1722:24, 1723:2
**Edmonton** [1] - 1748:10
**Edward** [1] - 1689:7
**effect** [3] - 1662:15, 1726:10, 1752:13
**effectively** [3] - 1637:13, 1771:8, 1784:11
**effectuated** [1] - 1800:14
**efficient** [1] - 1662:17
**effort** [2] - 1643:15, 1649:16
**efforts** [2] - 1627:18, 1645:23
**EGGERS** [1] - 1537:9
**ego** [2] - 1777:21, 1778:24
**eight** [14] - 1553:13, 1604:4, 1632:6, 1736:24, 1740:9, 1741:16, 1741:22, 1742:22, 1742:23, 1744:6, 1748:19, 1749:1, 1749:6, 1753:14
**eighties** [2] - 1613:17, 1615:21
**either** [20] - 1553:3, 1562:7, 1587:12, 1629:10, 1635:8, 1662:6, 1693:15, 1697:19, 1698:11, 1714:23, 1714:24, 1715:9, 1717:2, 1728:14, 1742:15, 1742:20, 1777:21, 1778:8, 1778:9, 1778:23
**element** [3] - 1778:17, 1787:4, 1787:17
**elements** [1] - 1710:11
**Eleven** [1] - 1537:7
**eleven** [1] - 1602:1
**Eleventh** [3] - 1779:25, 1780:18, 1788:3
**elicit** [1] - 1539:6
**eliminated** [1] - 1562:6
**embedded** [2] - 1637:18, 1643:16
**emphasis** [3] - 1564:24, 1757:13, 1758:9
**emphasize** [2] - 1577:13, 1795:10
**employed** [1] - 1687:24
**employees** [4] - 1601:24, 1637:13, 1637:14, 1791:6
**employment** [1] - 1791:7
**encouraged** [2] - 1630:9, 1630:11
**end** [15] - 1578:14, 1626:12, 1665:15, 1667:13, 1667:20, 1669:21, 1684:6, 1737:21, 1743:14, 1748:5, 1751:1, 1782:2, 1782:8, 1782:22
**ended** [13] - 1543:8, 1555:12, 1555:18, 1647:12, 1647:15, 1672:17, 1672:18, 1697:17, 1697:25, 1720:15, 1720:17, 1725:8, 1794:7
**ending** [1] - 1762:14
**engaged** [2] - 1600:13, 1784:5
**engagement** [1] - 1730:9
**engine** [1] - 1795:23
**England** [7] - 1614:18, 1614:22, 1639:16, 1639:21, 1640:19, 1652:11, 1709:14
**English** [2] - 1611:10, 1652:23
**enjoyed** [1] - 1593:12
**enormous** [3] - 1604:9, 1615:19, 1630:25
**ensure** [5] - 1597:20, 1600:23, 1621:17, 1637:10, 1719:11
**ensures** [1] - 1798:10
**ensuring** [5] - 1600:12, 1624:20, 1628:4, 1636:19, 1637:13
**enter** [7] - 1607:23, 1608:2, 1608:6, 1670:17, 1707:24, 1720:22, 1724:14
**entered** [4] - 1561:21, 1671:2, 1671:4, 1700:20
**entering** [2] - 1557:24, 1559:7
**Enterprise** [1] - 1626:18
**enterprise** [5] - 1620:21, 1621:14, 1683:22, 1683:23, 1684:2
**enters** [4] - 1541:4, 1588:13, 1668:20, 1708:2
**Entertainment** [1] - 1622:10
**entire** [6] - 1554:15, 1570:5, 1611:16, 1623:12, 1624:2, 1797:13
**entirety** [1] - 1674:13
**entities** [2] - 1792:23, 1794:15
**entitled** [5] - 1625:20, 1643:2, 1727:23, 1774:3, 1798:23
**entity** [12] - 1684:3, 1695:11, 1695:18, 1696:1, 1771:11, 1771:12, 1783:24, 1791:5, 1792:21, 1799:15, 1799:16
**entry** [1] - 1583:14
**entry-level** [1] - 1583:14
**environment** [3] - 1628:4, 1629:18, 1647:16
**envy** [1] - 1612:3
**equity** [2] - 1672:19, 1672:20
**error** [3] - 1586:23, 1797:23, 1800:19
**especially** [1] - 1775:19
**ESPN** [2] - 1625:2, 1641:8
**ESQ** [15] - 1536:16, 1536:16, 1536:17, 1536:17, 1536:18, 1536:20, 1536:23, 1536:23, 1536:24, 1537:3, 1537:5, 1537:8, 1537:8, 1537:9, 1537:11
**essence** [1] - 1600:8
**establish** [4] - 1553:19, 1780:10, 1799:24, 1800:2
**established** [3] - 1545:12, 1604:10, 1774:6
**estimates** [1] - 1666:22
**et** [6] - 1545:23, 1614:18, 1695:15, 1715:14
**Europe** [4] - 1602:6, 1614:16, 1642:3, 1652:11
**European** [1] - 1642:22
**EVA** [1] - 1536:17
**Eve** [1] - 1538:11
**event** [3] - 1603:22, 1614:6, 1749:10
**events** [2] - 1629:7, 1635:20
**eventually** [5] - 1543:25, 1562:23, 1562:25, 1614:1, 1671:22
**evidence** [57] - 1542:21, 1542:24, 1559:23, 1559:24, 1561:6, 1564:8, 1569:7, 1569:8, 1569:10, 1575:3, 1575:6, 1575:7, 1575:12, 1587:24, 1619:15, 1631:9, 1654:20, 1654:25, 1656:1, 1656:4, 1660:1, 1707:7, 1707:10, 1707:15, 1707:22, 1721:24, 1722:2, 1727:15, 1729:22, 1729:25, 1733:1, 1733:5, 1738:17, 1749:22, 1757:20, 1763:2, 1763:13, 1763:14, 1763:19, 1772:9, 1774:15, 1774:24, 1775:4, 1776:25, 1791:16, 1792:7, 1795:4, 1795:16, 1796:1, 1796:16, 1796:19, 1796:25, 1797:19, 1797:24

**evolution** [3] - 1576:19, 1609:2
**evolve** [4] - 1609:4, 1643:25, 1649:12, 1655:14
**ex** [1] - 1760:3
**exact** [8] - 1572:6, 1682:25, 1717:7, 1726:21, 1731:8, 1747:1, 1747:22, 1751:21
**exactly** [14] - 1540:22, 1540:23, 1540:24, 1576:11, 1603:10, 1630:13, 1661:7, 1678:9, 1687:20, 1688:13, 1693:20, 1698:21, 1741:4, 1798:22
**examination** [2] - 1665:8, 1668:23
**EXAMINATION** [18] - 1542:5, 1564:1, 1588:17, 1600:1, 1669:1, 1676:1, 1703:9, 1705:1, 1706:1, 1709:5, 1735:1, 1805:5, 1805:7, 1805:8, 1805:9, 1805:10, 1805:11, 1805:13
**examined** [2] - 1542:3, 1709:3
**examiner** [1] - 1668:12
**examining** [1] - 1668:7
**example** [14] - 1611:9, 1633:17, 1634:5, 1636:1, 1636:2, 1643:12, 1652:19, 1691:5, 1779:5, 1779:7, 1783:1, 1789:10, 1789:11, 1798:5
**examples** [1] - 1690:17
**exception** [3] - 1611:17, 1689:3, 1695:6
**excerpts** [1] - 1538:20
**exchange** [2] - 1543:3, 1561:25
**excitement** [2] - 1617:18, 1627:2
**exciting** [3] - 1639:9, 1658:16, 1658:17
**exclusive** [2] - 1679:17, 1786:7
**exclusively** [1] - 1792:22
**excuse** [3] - 1569:1, 1654:18, 1670:4
**excused** [1] - 1706:18
**executed** [1] - 1670:17
**Executive** [1] - 1750:12
**executive** [11] - 1546:25, 1600:8, 1601:13, 1622:17, 1688:8, 1710:6, 1714:3, 1714:4, 1727:20, 1748:1, 1793:2
**executives** [3] - 1571:4, 1613:22, 1712:9
**exemption** [1] - 1759:13
**exercised** [1] - 1676:18
**exercises** [1] - 1796:12
**exerted** [2] - 1791:17, 1796:1
**exhausted** [1] - 1784:25
**exhibit** [7] - 1539:3, 1542:9, 1559:22, 1655:18, 1716:19, 1763:11, 1763:12
**Exhibit** [62] - 1542:10, 1542:11, 1542:13, 1542:21, 1542:24, 1543:1, 1558:15, 1559:16, 1560:1, 1561:3, 1561:8, 1563:17, 1564:12, 1569:14, 1606:14, 1607:4, 1619:10, 1631:4, 1636:5, 1649:22, 1651:9, 1654:12, 1654:13, 1654:24, 1654:25, 1655:19, 1655:20, 1656:4, 1656:6, 1656:7, 1659:16, 1659:18, 1660:1, 1660:2, 1669:10, 1707:18, 1710:1, 1710:2, 1712:19, 1716:21, 1717:24, 1721:17, 1722:2, 1722:3, 1727:14, 1729:12, 1729:25, 1730:1, 1732:17, 1733:5, 1733:6, 1749:25, 1805:16, 1805:17, 1805:18, 1805:21, 1805:22, 1805:23, 1805:25, 1806:1, 1806:2, 1806:3
**exhibition** [1] - 1640:25
**exhibits** [7] - 1707:17, 1707:20, 1707:23, 1762:25, 1763:9, 1763:18
**exist** [2] - 1634:21, 1762:11
**existence** [1] - 1602:21
**existing** [2] - 1682:19, 1711:19
**exists** [1] - 1788:4
**exits** [4] - 1586:2, 1664:2, 1707:3, 1762:16
**expand** [3] - 1616:17, 1682:2, 1756:18
**expanded** [1] - 1630:13
**expanding** [2] - 1626:12, 1639:4
**expansion** [16] - 1561:22, 1566:7, 1571:18, 1571:21, 1625:24, 1626:6, 1670:5, 1670:8, 1670:12, 1693:4, 1719:1, 1756:14, 1756:18, 1758:12, 1783:25
**Expansion** [1] - 1625:20
**expect** [1] - 1540:5
**expectation** [2] - 1540:5, 1760:18
**expectations** [1] - 1741:11
**expenditure** [1] - 1695:25
**expensive** [1] - 1629:4
**Experience** [1] - 1614:7
**experience** [11] - 1610:24, 1614:16, 1616:5, 1621:25, 1623:7, 1629:12, 1629:14, 1663:17, 1743:21, 1781:22, 1781:23
**experienced** [2] - 1615:20, 1616:11
**expert** [1] - 1667:11
**expertise** [1] - 1635:4
**experts** [1] - 1665:19
**expiration** [1] - 1669:23
**expires** [1] - 1793:2
**explain** [6] - 1603:10, 1636:6, 1661:18, 1675:14, 1726:9, 1761:22
**explaining** [1] - 1740:21
**explanation** [1] - 1582:10
**exposure** [1] - 1614:17
**expressed** [3] - 1546:9, 1608:15, 1626:2
**expression** [1] - 1582:4
**extended** [2] - 1700:25, 1701:2
**extension** [2] - 1701:5, 1701:6
**extensions** [1] - 1701:5
**extensive** [1] - 1570:1
**extent** [4] - 1620:13, 1622:18, 1643:18, 1673:6

**F**

**face** [1] - 1645:19
**faced** [1] - 1648:18
**Facilities** [1] - 1631:6
**facilities** [2] - 1612:14, 1631:8
**facility** [1] - 1633:20
**facing** [1] - 1650:14
**fact** [32] - 1551:7, 1577:3, 1618:10, 1635:11, 1635:12, 1644:21, 1648:18, 1653:15, 1653:19, 1656:24, 1663:9, 1678:7, 1678:25, 1679:16, 1681:6, 1684:6, 1685:21, 1686:16, 1697:7, 1698:6, 1718:4, 1735:9, 1754:17, 1757:10, 1776:25, 1778:7, 1783:10, 1787:14, 1787:15, 1791:8, 1800:2
**factors** [1] - 1643:19
**facts** [5] - 1554:3, 1571:15, 1579:4, 1586:22, 1788:24
**failed** [1] - 1795:9
**failings** [1] - 1605:17
**failure** [2] - 1748:9, 1748:13
**failures** [2] - 1571:24, 1721:15
**Fair** [1] - 1617:19
**fair** [12] - 1583:20, 1583:22, 1603:8, 1618:4, 1644:19, 1667:11, 1672:25, 1676:21, 1680:8, 1680:9, 1683:13, 1744:12
**fairly** [1] - 1804:3
**faith** [3] - 1587:3, 1665:22, 1703:23
**Faith** [1] - 1587:10
**Falcons** [1] - 1622:24
**fall** [1] - 1615:7
**false** [3] - 1586:12, 1592:19, 1592:20
**familiar** [7] - 1619:11, 1648:19, 1721:1, 1739:3, 1743:17, 1753:9, 1753:12
**families** [1] - 1610:24
**family** [10] - 1600:24, 1610:24, 1615:24, 1616:6, 1622:7, 1626:18, 1627:6, 1627:8, 1640:16, 1640:24
**fan** [19] - 1600:10, 1605:1, 1614:5, 1615:10, 1623:16, 1623:17, 1623:19, 1629:12, 1629:14, 1633:11, 1633:16, 1638:15, 1639:4, 1645:11, 1650:7, 1652:24, 1656:22, 1656:25, 1704:3
**fans** [51] - 1602:1, 1602:14, 1603:3, 1603:23, 1604:4, 1605:2, 1605:15, 1611:18, 1611:19, 1617:14, 1617:15, 1617:16, 1620:21, 1621:6, 1621:7, 1627:12, 1627:13, 1629:1, 1629:16, 1629:20, 1629:23, 1630:2, 1630:4, 1630:17, 1631:21, 1631:22, 1632:8, 1633:18, 1635:17, 1635:19, 1637:11, 1638:10, 1639:22, 1641:1, 1646:2, 1647:4, 1650:6, 1650:10, 1650:15, 1651:2, 1652:17, 1657:2, 1658:4, 1658:11, 1658:16, 1658:17
**Fans** [1] - 1629:17
**far** [4] - 1583:15, 1587:4, 1657:2, 1782:15
**fault** [1] - 1789:22
**FC** [3] - 1611:13, 1640:11, 1643:13

**featured** [1] - 1691:25
**February** [3] - 1724:23, 1730:23, 1737:20
**federal** [2] - 1605:10, 1654:9
**FEDERATION** [1] - 1536:7
**Federation** [15] - 1537:3, 1547:24, 1550:8, 1551:3, 1551:11, 1553:21, 1594:9, 1594:23, 1677:3, 1688:21, 1700:23, 1710:25, 1724:21, 1725:10, 1771:7
**federation** [26] - 1576:4, 1576:9, 1576:20, 1577:2, 1577:14, 1577:22, 1578:2, 1578:6, 1578:19, 1579:25, 1580:12, 1581:23, 1582:17, 1582:20, 1584:24, 1585:9, 1585:17, 1591:12, 1593:13, 1593:21, 1594:3, 1595:7, 1612:3, 1612:7, 1703:1, 1740:13
**federation's** [2] - 1580:2, 1582:14
**fees** [8] - 1561:22, 1582:16, 1670:5, 1670:8, 1670:12, 1718:21, 1756:14, 1756:18
**feet** [1] - 1615:12
**FEHER** [1] - 1536:16
**female** [1] - 1627:8
**few** [12] - 1582:24, 1607:21, 1615:3, 1626:16, 1630:6, 1631:15, 1666:7, 1667:7, 1673:7, 1716:10, 1741:5, 1778:15
**fewer** [5] - 1555:23, 1556:1, 1556:7, 1581:9, 1624:21
**Field** [1] - 1634:11
**field** [4] - 1636:15, 1698:9, 1751:8, 1752:8
**fields** [3] - 1555:24, 1643:14, 1644:9
**fifth** [1] - 1652:2
**fifties** [1] - 1765:9
**figure** [2] - 1586:3, 1743:1
**file** [7] - 1538:15, 1538:19, 1539:1, 1539:3, 1648:25, 1728:1
**filed** [4] - 1699:25, 1700:8, 1773:25, 1794:12
**files** [1] - 1656:10
**fill** [3] - 1666:2, 1667:10, 1667:24
**filled** [1] - 1555:24
**final** [6] - 1540:1, 1587:6, 1588:21, 1591:22, 1629:9, 1630:16
**finalize** [1] - 1749:9
**finally** [3] - 1608:12, 1652:15, 1701:11
**finance** [2] - 1634:20, 1636:15
**Finance** [3] - 1568:23, 1568:25, 1569:2
**financial** [4] - 1569:4, 1637:9, 1685:11, 1703:25
**financially** [2] - 1634:20, 1635:2
**financials** [2] - 1689:3, 1689:4
**findings** [1] - 1713:21
**fine** [5] - 1575:17, 1580:21, 1649:6, 1667:21, 1772:5
**finer** [3] - 1772:21, 1773:17, 1787:2
**finish** [4] - 1577:19, 1595:17, 1697:2, 1789:3
**finished** [1] - 1709:13
**finishing** [1] - 1595:16
**firm** [1] - 1540:13
**First** [2] - 1769:3, 1775:10
**first** [79] - 1539:12, 1543:4, 1544:3, 1544:13, 1549:20, 1550:2, 1550:12, 1552:19, 1552:21, 1558:14, 1560:3, 1564:16, 1569:6, 1576:3, 1576:17, 1578:9, 1589:19, 1590:20, 1591:13, 1600:13, 1614:9, 1614:15, 1614:17, 1617:8, 1617:14, 1625:3, 1627:10, 1629:15, 1634:13, 1638:18, 1638:25, 1639:6, 1639:18, 1643:4, 1651:11, 1659:17, 1660:3, 1663:2, 1669:21, 1672:8, 1673:16, 1679:21, 1682:18, 1689:25, 1700:20, 1701:5, 1709:3, 1709:12, 1710:18, 1711:3, 1713:5, 1715:1, 1715:6, 1723:25, 1727:8, 1733:14, 1734:2, 1737:21, 1741:5, 1741:15, 1741:19, 1742:9, 1742:13, 1743:13, 1750:18, 1753:13, 1765:23, 1766:5, 1766:9, 1769:3, 1769:15, 1771:13, 1771:18, 1780:7, 1780:8, 1790:20, 1791:5, 1791:13, 1791:15
**fits** [1] - 1783:11
**five** [8] - 1601:4, 1643:13, 1645:14, 1655:13, 1712:4, 1716:23, 1803:5, 1803:17
**five-year** [1] - 1655:13
**fixed** [1] - 1774:21
**fixing** [2] - 1766:25, 1775:13
**flags** [2] - 1630:2, 1630:8
**flesh** [2] - 1743:2, 1749:8
**flexibility** [2] - 1610:5, 1713:14
**flexible** [1] - 1719:15
**flight** [4] - 1795:19, 1795:20, 1796:8
**flip** [1] - 1654:18
**Flushing** [2] - 1612:21, 1612:23
**Flynn** [28] - 1542:14, 1543:12, 1552:12, 1552:14, 1563:23, 1564:19, 1565:10, 1590:14, 1729:13, 1729:16, 1729:18, 1730:3, 1731:16, 1731:20, 1732:2, 1732:4, 1732:8, 1732:19, 1735:21, 1736:9, 1736:17, 1742:1, 1749:18, 1749:20, 1757:12, 1757:24, 1795:17
**focus** [11] - 1618:10, 1620:9, 1716:3, 1716:13, 1716:15, 1716:16, 1719:7, 1723:12, 1725:2, 1730:12, 1738:1
**focused** [7] - 1568:7, 1645:18, 1709:7, 1729:9, 1729:10, 1730:17, 1757:16
**focuses** [1] - 1782:20
**focusing** [1] - 1650:21
**fold** [2] - 1635:1, 1649:1
**folded** [1] - 1652:13
**Foley** [1] - 1647:14
**folks** [3] - 1616:16, 1623:7, 1656:19
**follow** [6] - 1561:5, 1561:10, 1710:16, 1729:19, 1759:24, 1763:12
**follow-up** [4] - 1561:5, 1561:10, 1710:16, 1729:19
**following** [25] - 1547:14, 1548:23, 1558:3, 1563:25, 1579:22, 1589:1, 1589:16, 1593:10, 1597:2, 1615:22, 1633:16, 1633:24, 1642:1, 1680:1, 1708:17, 1728:17, 1734:4, 1743:10, 1744:14, 1750:17, 1756:2, 1763:10, 1793:10, 1794:7, 1796:23
**follows** [7] - 1542:4, 1564:23, 1593:11, 1709:4, 1739:9, 1758:8, 1792:12
**football** [13] - 1594:4, 1602:6, 1602:8, 1611:10, 1611:12, 1612:11, 1615:12, 1615:15, 1616:17, 1629:8, 1632:3, 1647:10, 1691:21
**Football** [5] - 1613:17, 1613:19, 1634:6, 1690:16, 1692:12
**footnote** [3] - 1767:23, 1768:17, 1769:6
**footnotes** [1] - 1770:3
**Footprint** [1] - 1624:16
**footprint** [2] - 1625:6, 1654:6
**FOR** [1] - 1536:11
**for-profit** [1] - 1756:6
**Force** [1] - 1672:7
**force** [7] - 1554:5, 1554:9, 1609:5, 1609:9, 1609:12, 1609:21, 1726:12
**forced** [2] - 1586:9, 1736:11
**foreign** [1] - 1642:17
**forget** [1] - 1717:7
**forgot** [1] - 1693:1
**forgotten** [1] - 1804:6
**form** [3] - 1543:21, 1581:13, 1777:21
**format** [1] - 1556:25
**formed** [3] - 1617:4, 1678:12, 1776:17
**former** [1] - 1658:23
**formulas** [1] - 1630:19
**forth** [3] - 1765:16, 1789:19, 1802:10
**forty** [2] - 1803:5, 1803:17
**forty-five** [2] - 1803:5, 1803:17
**forward** [7] - 1543:14, 1583:18, 1660:24, 1682:11, 1724:3, 1725:13, 1731:22
**forwarding** [1] - 1563:22
**Foundation** [3] - 1577:5, 1577:24, 1618:1
**foundation** [6] - 1566:24, 1577:3, 1577:7, 1617:21, 1706:12, 1716:6
**foundational** [1] - 1540:17
**foundations** [2] - 1586:10, 1586:21
**founded** [1] - 1628:17
**founders** [3] - 1614:23, 1614:25, 1622:6
**founding** [2] - 1593:14, 1616:3
**four** [12] - 1543:4, 1565:3, 1611:17, 1625:8, 1625:13, 1628:1, 1694:12, 1751:10, 1774:11, 1774:25, 1776:12, 1776:13
**fourth** [4] - 1650:4, 1652:1, 1739:24, 1775:4

**Fox** [2] - 1641:9
**fragmentation** [1] - 1646:25
**France** [1] - 1652:13
**franchise** [2] - 1718:21, 1756:3
**franchises** [1] - 1783:21
**franchisor** [1] - 1756:6
**Francisco** [5] - 1536:22, 1537:5, 1748:9, 1748:14, 1748:15
**Frankenstein** [1] - 1771:2
**frankly** [4] - 1604:19, 1618:17, 1658:10, 1658:16
**Franz** [1] - 1655:2
**free** [1] - 1802:15
**Friday** [5] - 1561:10, 1739:9, 1760:22, 1762:13, 1804:10
**friendly** [2] - 1659:6, 1660:10
**friends** [2] - 1597:3, 1597:7
**front** [5] - 1539:8, 1586:13, 1588:7, 1677:7, 1677:8
**fulfillment** [1] - 1739:6
**Fulham** [1] - 1639:16
**full** [12] - 1539:2, 1540:23, 1555:25, 1588:3, 1599:11, 1689:3, 1745:13, 1748:2, 1748:17, 1749:6, 1771:15, 1783:6
**fully** [3] - 1580:9, 1672:17, 1737:11
**fun** [1] - 1658:11
**fund** [2] - 1635:18, 1637:23
**fundamental** [1] - 1554:22
**future** [8] - 1593:22, 1594:21, 1595:6, 1620:25, 1656:24, 1675:2, 1731:24, 1739:25



**G**

**Gabriel** [3] - 1555:13, 1555:15, 1555:25
**gain** [1] - 1723:22
**Galaxy** [1] - 1639:3
**Gamble** [1] - 1647:3
**game** [27] - 1595:23, 1596:11, 1616:17, 1617:14, 1623:4, 1624:11, 1627:13, 1630:1, 1630:3, 1630:4, 1631:19, 1631:22, 1636:14, 1640:10, 1640:25, 1641:23, 1650:6, 1650:10, 1650:16, 1655:7, 1655:12, 1661:23, 1661:24, 1662:9, 1697:11
**Games** [2] - 1603:14, 1623:4
**games** [34] - 1602:1, 1604:5, 1605:2, 1610:25, 1611:17, 1611:18, 1617:15, 1621:12, 1621:13, 1625:18, 1627:14, 1627:15, 1627:16, 1629:15, 1629:17, 1630:4, 1630:5, 1632:8, 1637:10, 1641:25, 1642:1, 1642:3, 1642:5, 1642:23, 1647:7, 1650:2, 1658:2, 1658:3, 1658:15, 1662:21
**Garber** [72] - 1540:9, 1542:7, 1542:9, 1545:7, 1551:16, 1552:18, 1553:18, 1553:23, 1554:4, 1554:14, 1555:1, 1555:6, 1558:18, 1559:2, 1561:18, 1566:21, 1568:7, 1568:18, 1571:8, 1571:18, 1573:6, 1573:23, 1574:25, 1580:9, 1581:1, 1581:3, 1581:16, 1582:9, 1582:24, 1583:5, 1588:20, 1588:25, 1592:1, 1597:25, 1599:9, 1600:2, 1600:4, 1607:9, 1662:24, 1667:3, 1669:4, 1669:14, 1675:10, 1675:21, 1676:3, 1676:5, 1677:20, 1677:21, 1680:17, 1684:16, 1686:11, 1690:4, 1690:14, 1695:3, 1701:11, 1702:24, 1703:12, 1703:17, 1757:11, 1757:23, 1759:7, 1759:10, 1759:18, 1759:22, 1778:7, 1792:10, 1792:21, 1795:8, 1796:11, 1797:10
**garber** [1] - 1794:25
**GARBER** [2] - 1542:1, 1805:4
**Garber's** [2] - 1538:18, 1665:8
**Gateway** [1] - 1627:7
**general** [18] - 1545:8, 1576:3, 1576:4, 1576:10, 1590:17, 1590:20, 1590:24, 1591:2, 1591:6, 1591:14, 1608:22, 1608:24, 1689:16, 1714:14, 1732:11, 1732:14, 1736:22, 1741:15
**generally** [4] - 1589:20, 1619:20, 1660:23, 1661:12
**generate** [1] - 1645:12
**generated** [1] - 1765:19
**generating** [3] - 1600:11, 1718:21, 1718:25
**generations** [2] - 1603:1, 1634:22
**generic** [1] - 1755:6
**gentleman** [3] - 1614:22, 1638:22, 1639:8
**gentlemen** [5] - 1541:6, 1663:24, 1668:22, 1706:25, 1762:8
**GENZ** [1] - 1656:22
**geographic** [1] - 1654:6
**German** [2] - 1638:21, 1655:15
**Germany** [5] - 1638:7, 1639:12, 1639:13, 1642:4, 1652:11
**Germany's** [1] - 1652:14
**get-go** [3] - 1617:20, 1618:5, 1650:1
**Giants** [1] - 1686:2
**giants** [1] - 1635:20
**Giovanni** [1] - 1639:3
**given** [14] - 1554:3, 1599:12, 1609:11, 1647:21, 1666:22, 1679:17, 1725:10, 1731:5, 1745:19, 1745:23, 1752:16, 1759:12, 1769:6, 1784:12
**global** [4] - 1623:19, 1641:23, 1709:14
**Global** [2] - 1611:8, 1641:20
**goal** [5] - 1621:1, 1641:2, 1703:12, 1781:18
**goals** [4] - 1650:22, 1655:9, 1655:12, 1718:2
**Golden** [1] - 1623:1
**GONZALEZ** [1] - 1536:12
**good-faith** [1] - 1587:3
**goods** [1] - 1613:23
**governance** [18] - 1580:2, 1581:19, 1581:22, 1581:23, 1582:5, 1582:6, 1582:14, 1582:21, 1582:22, 1584:25, 1585:1, 1585:3, 1585:10, 1585:17, 1591:12, 1600:23, 1636:9, 1637:5
**Governance** [1] - 1636:6
**governed** [2] - 1573:1, 1582:17
**governing** [10] - 1580:5, 1581:17, 1581:23, 1582:1, 1582:2, 1582:23, 1584:10, 1584:19, 1691:20, 1703:2
**Government** [1] - 1775:2
**governors** [1] - 1648:12
**grade** [2] - 1612:20, 1612:25
**graduating** [2] - 1613:3, 1613:6
**grandparents** [1] - 1612:22
**grant** [6] - 1575:23, 1576:1, 1577:7, 1578:22, 1578:23, 1739:5
**granted** [4] - 1647:23, 1727:2, 1727:4, 1750:23
**grassroots** [1] - 1614:5
**great** [24] - 1543:10, 1605:15, 1611:14, 1615:24, 1616:3, 1616:4, 1618:16, 1620:24, 1621:6, 1626:6, 1631:19, 1632:5, 1632:24, 1632:25, 1633:16, 1633:21, 1640:15, 1644:10, 1644:11, 1645:6, 1645:20, 1673:6, 1690:9
**greatest** [2] - 1650:14, 1719:16
**green** [1] - 1768:4
**ground** [4] - 1622:20, 1631:23, 1634:10, 1634:15
**group** [30] - 1543:20, 1543:24, 1544:18, 1547:17, 1570:3, 1570:14, 1571:22, 1572:7, 1572:15, 1572:20, 1600:11, 1614:4, 1614:21, 1618:23, 1626:25, 1627:8, 1633:20, 1637:8, 1637:12, 1637:16, 1643:23, 1645:2, 1645:4, 1645:13, 1654:5, 1658:13, 1716:23, 1722:7, 1792:8
**Group** [2] - 1689:7, 1721:12
**groups** [5] - 1544:16, 1544:17, 1544:19, 1627:10, 1638:8
**grow** [9] - 1578:13, 1594:12, 1595:23, 1596:11, 1612:12, 1638:14, 1644:1, 1718:5, 1718:6
**growing** [6] - 1611:5, 1612:18, 1615:21, 1639:4, 1645:21, 1719:1
**growth** [4] - 1576:20, 1600:10, 1715:14, 1719:16
**guess** [17] - 1601:16, 1668:1, 1718:16, 1722:6, 1765:8, 1765:9, 1766:5, 1773:18, 1780:5, 1787:5, 1790:4, 1790:7, 1790:12, 1791:13, 1798:15, 1798:17, 1798:20
**guide** [1] - 1641:4
**guidelines** [2] - 1695:15, 1695:24
**guilty** [4] - 1654:9, 1774:9, 1776:15, 1779:10
**Gulati** [37] - 1542:14, 1543:12, 1543:17, 1544:4, 1544:10, 1546:13, 1546:16, 1546:19, 1555:3, 1555:8,

1555:12, 1555:17, 1556:13, 1556:17, 1560:10, 1560:19, 1563:22, 1599:16, 1608:6, 1688:25, 1721:6, 1721:20, 1722:10, 1731:23, 1732:1, 1732:6, 1739:8, 1792:10, 1792:22, 1792:24, 1793:8, 1794:24, 1795:8, 1796:11, 1797:10, 1798:5
**gulati** [26] - 1564:14, 1565:9, 1583:12, 1583:25, 1584:11, 1588:25, 1589:7, 1591:4, 1596:16, 1597:4, 1597:11, 1598:1, 1687:19, 1688:11, 1689:10, 1701:2, 1701:8, 1747:2, 1747:7, 1757:11, 1757:23, 1760:9, 1760:21, 1761:1, 1761:6, 1761:13
**GULATI** [1] - 1689:2
**Gulati's** [1] - 1542:17
**guy** [7] - 1553:11, 1601:4, 1613:1, 1615:2, 1616:22, 1622:17, 1661:5
**guys** [4] - 1555:3, 1591:8, 1639:22, 1647:2

# H

**half** [7] - 1540:11, 1556:14, 1650:7, 1650:10, 1667:24, 1803:9, 1803:10
**halftime** [2] - 1614:7, 1614:10
**halfway** [1] - 1796:24
**halls** [1] - 1635:6
**Hamm** [1] - 1571:4
**hand** [3] - 1539:10, 1540:6, 1784:18
**handful** [3] - 1605:8, 1698:2, 1698:6
**handle** [1] - 1743:21
**hands** [2] - 1615:13, 1657:8
**happily** [1] - 1607:3
**happy** [2] - 1640:24, 1682:1
**hard** [7] - 1594:11, 1623:8, 1629:22, 1644:14, 1646:8, 1646:10, 1647:17
**harder** [4] - 1583:15, 1609:23, 1609:25, 1744:5
**harm** [2] - 1605:18, 1659:9
**Harris** [1] - 1647:11
**Harrison** [1] - 1633:9
**haul** [1] - 1648:6
**head** [2] - 1647:3, 1800:6
**headed** [1] - 1645:13
**heading** [2] - 1717:3, 1717:5
**Health** [1] - 1630:15
**hear** [5] - 1579:24, 1653:24, 1775:8, 1796:21, 1801:14
**heard** [14] - 1583:25, 1584:6, 1589:7, 1589:21, 1591:13, 1601:16, 1675:20, 1700:1, 1731:10, 1731:11, 1776:24, 1778:7, 1784:20
**hearing** [1] - 1800:20
**heart** [1] - 1643:6
**heavily** [2] - 1730:12, 1730:17
**heavy** [2] - 1730:7, 1737:24
**HECTOR** [1] - 1536:12
**held** [6] - 1588:12, 1600:21, 1600:24, 1627:6, 1644:17, 1668:19
**help** [8] - 1562:1, 1642:8, 1645:17, 1659:3, 1661:8, 1679:7, 1724:6, 1724:23
**helped** [1] - 1730:8
**helpful** [2] - 1557:4, 1760:7
**helping** [4] - 1561:25, 1626:19, 1640:18, 1662:11
**helps** [3] - 1643:6, 1645:16, 1788:20
**heritage** [1] - 1613:2
**Hi** [2] - 1710:10, 1730:4
**high** [5] - 1572:10, 1600:21, 1621:6, 1644:17, 1655:11
**high-quality** [1] - 1572:10
**higher** [1] - 1577:6
**highest** [7] - 1600:24, 1631:24, 1651:20, 1652:1, 1655:12, 1656:22, 1657:2
**highlight** [1] - 1693:5
**highlighting** [2] - 1722:19, 1757:9
**himself** [1] - 1597:12
**hire** [1] - 1614:13
**hired** [7] - 1649:4, 1709:20, 1724:23, 1725:2, 1725:9, 1730:11, 1733:24
**Hispanic** [2] - 1639:4, 1657:2
**history** [15] - 1538:23, 1549:6, 1549:10, 1552:10, 1552:22, 1577:16, 1577:21, 1605:4, 1610:23, 1612:11, 1626:7, 1640:9, 1649:7, 1697:6, 1794:19
**hit** [1] - 1800:6
**hmm** [6] - 1568:21, 1592:24, 1592:25, 1594:6, 1595:2, 1679:9
**Hockey** [1] - 1601:5
**hockey** [3] - 1610:20, 1628:25, 1696:20
**hold** [3] - 1558:10, 1621:13, 1666:21
**holding** [1] - 1788:4
**holidays** [1] - 1743:19
**Hollywood** [2] - 1571:4, 1622:17
**Home** [1] - 1630:15
**home** [1] - 1639:19
**hometown** [1] - 1643:12
**Honor** [116] - 1538:3, 1538:17, 1539:8, 1539:12, 1539:24, 1540:10, 1540:24, 1541:8, 1542:20, 1549:24, 1551:6, 1556:23, 1557:2, 1558:20, 1564:8, 1567:5, 1571:14, 1575:14, 1575:16, 1575:19, 1583:3, 1585:21, 1586:7, 1586:19, 1586:25, 1587:15, 1587:16, 1587:23, 1588:5, 1592:5, 1593:6, 1599:7, 1599:20, 1599:22, 1617:21, 1632:10, 1653:21, 1653:25, 1663:21, 1666:6, 1667:2, 1668:2, 1668:15, 1668:24, 1675:23, 1685:14, 1689:21, 1690:10, 1690:21, 1694:25, 1699:17, 1699:20, 1702:10, 1702:21, 1703:6, 1705:7, 1706:20, 1707:6, 1707:23, 1708:9, 1721:23, 1721:25, 1723:16, 1729:21, 1733:2, 1735:18, 1736:12, 1736:14, 1742:17, 1743:7, 1747:5, 1749:21, 1762:5, 1762:22, 1763:23, 1765:22, 1766:2, 1766:7, 1766:14, 1767:12, 1768:8, 1768:14, 1768:23, 1769:11, 1769:17, 1770:13, 1772:4, 1773:6, 1773:18, 1774:2, 1774:7, 1775:9, 1776:24, 1777:5, 1777:25, 1779:17, 1780:4, 1783:12, 1783:24, 1784:20, 1785:3, 1787:7, 1787:22, 1789:9, 1790:25, 1791:12, 1792:2, 1792:15, 1796:7, 1796:18, 1797:4, 1802:1, 1802:2, 1802:17, 1803:5, 1803:18
**HONORABLE** [1] - 1536:12
**hope** [2] - 1540:4, 1600:20
**Hoskins** [1] - 1543:12
**host** [2] - 1628:5, 1703:24
**hot** [2] - 1625:17, 1635:19
**hour** [8] - 1540:10, 1665:16, 1666:2, 1667:24, 1803:9, 1803:10, 1803:19, 1803:21
**hours** [1] - 1769:14
**housing** [2] - 1634:13
**Houston** [3] - 1555:15, 1683:15, 1683:17
**HUDGENS** [15] - 1536:17, 1666:6, 1706:20, 1706:23, 1707:6, 1707:10, 1707:13, 1707:16, 1707:23, 1708:4, 1708:8, 1708:12, 1762:22, 1763:7, 1763:20
**huge** [1] - 1632:7
**human** [1] - 1637:11
**hundred** [3] - 1612:10, 1684:7, 1783:12
**hundreds** [3] - 1601:24, 1633:7
**Hundreds** [1] - 1633:7
**Hunt** [9] - 1614:23, 1616:6, 1622:7, 1649:6, 1665:14, 1681:15, 1681:23, 1803:13, 1803:16
**hunt** [1] - 1668:6
**Hunts** [1] - 1630:21
**hypothetical** [1] - 1785:24
**hypotheticals** [1] - 1788:18

# I

**idea** [6] - 1538:8, 1572:14, 1605:15, 1775:10, 1800:16
**identical** [1] - 1544:4
**identification** [3] - 1591:24, 1654:11, 1723:12
**identified** [4] - 1540:14, 1650:24, 1711:22, 1718:24
**identify** [1] - 1775:11
**Iger** [1] - 1603:18
**II** [91] - 1543:21, 1545:9, 1545:18, 1545:23, 1546:4, 1546:11, 1546:21, 1547:6, 1548:10, 1549:15, 1549:19, 1549:20, 1550:2, 1550:4, 1550:7,

1550:13, 1550:22, 1551:2, 1560:16, 1560:24, 1562:17, 1562:20, 1562:23, 1563:6, 1563:10, 1566:9, 1566:13, 1566:17, 1566:21, 1567:8, 1567:17, 1567:21, 1568:14, 1575:23, 1578:23, 1578:24, 1606:7, 1606:24, 1607:7, 1608:7, 1613:9, 1635:15, 1635:23, 1653:15, 1653:19, 1671:3, 1671:12, 1671:19, 1671:21, 1680:13, 1698:25, 1709:23, 1709:25, 1710:11, 1711:1, 1711:6, 1711:11, 1713:6, 1713:13, 1714:11, 1714:24, 1716:3, 1716:13, 1719:12, 1719:18, 1720:5, 1721:5, 1723:13, 1724:4, 1724:12, 1729:9, 1730:13, 1730:17, 1730:19, 1731:2, 1731:17, 1731:24, 1735:10, 1746:4, 1751:2, 1772:17, 1773:4, 1775:20, 1777:15, 1777:19, 1777:20, 1778:14, 1778:22, 1783:15, 1786:2, 1789:5
**Ill** [10] - 1545:10, 1566:17, 1566:20, 1631:24, 1671:6, 1671:22, 1672:1, 1714:24, 1735:8, 1736:8
**illogical** [1] - 1544:22
**imagine** [1] - 1628:25
**Imagine** [2] - 1610:19
**immediately** [1] - 1682:16
**immigrants** [1] - 1612:22
**impact** [1] - 1663:20
**importance** [1] - 1600:15
**important** [22] - 1579:23, 1579:24, 1582:22, 1622:18, 1623:11, 1624:3, 1624:4, 1632:20, 1637:21, 1641:15, 1645:1, 1655:13, 1658:4, 1686:10, 1691:23, 1723:6, 1755:5, 1797:11, 1797:22, 1798:9, 1800:16, 1800:22
**importantly** [9] - 1621:10, 1623:3, 1627:1, 1634:12, 1643:12, 1646:25, 1651:5, 1656:15, 1657:1
**impression** [2] - 1741:9, 1741:10
**improper** [4] - 1551:7, 1586:11, 1672:5, 1673:5
**improve** [2] - 1629:13, 1662:11
**inaccurately** [2] - 1768:19, 1771:21
**inappropriate** [4] - 1586:15, 1592:18, 1592:19, 1592:20
**inartfully** [1] - 1787:13
**INC** [1] - 1536:7
**Inc** [1] - 1537:3
**incentivized** [1] - 1756:13
**include** [4] - 1585:4, 1585:6, 1725:1, 1739:14
**included** [2] - 1757:12, 1770:21
**including** [8] - 1614:6, 1614:8, 1625:11, 1627:24, 1722:10, 1739:25, 1779:20, 1783:16
**inconsistent** [2] - 1715:18, 1718:2
**incorrect** [2] - 1550:20, 1769:21
**increase** [1] - 1609:4
**increases** [3] - 1687:15, 1688:11, 1688:17
**increasingly** [1] - 1723:12
**incredible** [3] - 1570:2, 1617:11, 1642:1
**incredibly** [2] - 1593:12, 1710:24
**incur** [1] - 1704:2
**Independent** [1] - 1752:6
**independent** [6] - 1550:12, 1589:24, 1713:13, 1719:1, 1719:25, 1777:2
**independently** [1] - 1673:18
**indicate** [2] - 1732:4, 1744:17
**indicated** [2] - 1768:4, 1791:15
**indicates** [2] - 1752:6, 1785:20
**indirect** [2] - 1783:21, 1788:20
**individual** [18] - 1683:12, 1695:17, 1793:4, 1794:3, 1794:17, 1795:4, 1797:1, 1797:16, 1797:19, 1797:25, 1798:13, 1798:15, 1798:17, 1798:18, 1799:10, 1799:13, 1799:14, 1800:15
**individuals** [4] - 1606:16, 1713:20, 1776:13, 1795:10
**industrialist** [1] - 1602:23
**industry** [8] - 1602:14, 1602:21, 1609:3, 1611:8, 1611:16, 1622:2, 1660:24
**inextricably** [2] - 1593:22, 1595:7
**influence** [3] - 1791:18, 1796:2, 1796:12
**information** [7] - 1574:22, 1680:14, 1689:9, 1717:25, 1718:8, 1726:12, 1726:15
**infrastructure** [1] - 1624:12
**initial** [4] - 1713:19, 1731:16, 1790:12, 1790:25
**initiatives** [3] - 1595:21, 1596:4, 1596:11
**innovation** [1] - 1602:24
**insert** [1] - 1796:3
**insinuated** [1] - 1673:4
**instead** [4] - 1736:25, 1740:10, 1741:17, 1791:11
**instruct** [1] - 1797:11
**instructed** [1] - 1769:13
**instruction** [40] - 1765:7, 1765:11, 1765:16, 1765:24, 1768:3, 1768:19, 1770:7, 1771:2, 1771:13, 1771:21, 1772:22, 1773:13, 1774:14, 1784:17, 1787:3, 1790:13, 1790:19, 1791:16, 1791:24, 1791:25, 1792:15, 1794:20, 1794:22, 1795:1, 1795:13, 1795:14, 1795:23, 1795:24, 1796:4, 1796:10, 1796:14, 1796:15, 1796:23, 1797:9, 1797:11, 1798:9, 1799:7, 1801:4, 1801:19
**Instruction** [14] - 1765:10, 1765:25, 1770:23, 1772:6, 1772:14, 1773:13, 1773:16, 1784:11, 1784:14, 1787:1, 1790:5, 1791:9, 1791:20
**instructions** [13] - 1587:6, 1765:5, 1768:13, 1770:18, 1771:18, 1771:19, 1773:24, 1778:16, 1780:24, 1789:20, 1789:25, 1791:15, 1802:5
**insufficient** [3] - 1772:9, 1774:24, 1775:4
**integrity** [2] - 1600:16, 1648:11
**intended** [5] - 1766:10, 1766:12, 1766:13, 1778:18, 1787:8
**intent** [8] - 1669:15, 1669:20, 1669:23, 1697:12, 1697:13, 1703:15, 1783:14
**intention** [3] - 1787:5, 1787:11, 1787:12
**intenuated** [2] - 1783:17, 1783:18
**interact** [1] - 1658:23
**interacted** [2] - 1732:8, 1732:10
**interactions** [1] - 1661:13
**interest** [9] - 1548:11, 1610:22, 1621:25, 1626:2, 1647:6, 1663:19, 1670:24, 1696:9, 1730:14
**interested** [11] - 1544:25, 1545:3, 1572:15, 1572:19, 1696:19, 1711:2, 1712:12, 1718:20, 1718:25, 1719:4
**interests** [1] - 1683:5
**interim** [2] - 1658:23, 1661:5
**internal** [6] - 1570:10, 1570:21, 1639:24, 1651:22, 1713:6, 1792:17
**internally** [1] - 1609:1
**international** [3] - 1582:15, 1614:12, 1640:19
**International** [2] - 1614:21, 1614:25
**interpret** [3] - 1554:2, 1794:22, 1795:11
**interpreting** [1] - 1553:16
**interrupt** [2] - 1554:21, 1646:13
**interrupted** [1] - 1703:20
**interview** [3] - 1712:5, 1716:16, 1716:24
**interviewed** [4] - 1540:17, 1540:18, 1716:9, 1717:1
**interviewing** [1] - 1719:20
**introducing** [1] - 1589:10
**invest** [14] - 1566:18, 1571:24, 1595:19, 1596:9, 1618:23, 1624:6, 1624:7, 1644:21, 1671:21, 1682:11, 1682:12, 1686:8, 1711:14
**invested** [4] - 1627:7, 1633:7, 1644:21, 1663:6
**investing** [3] - 1571:25, 1663:19, 1723:13
**investment** [6] - 1572:1, 1630:9, 1635:24, 1655:14, 1656:15, 1683:6
**investments** [3] - 1628:20, 1635:13, 1643:25
**investor** [4] - 1605:9, 1616:7, 1654:8, 1778:5
**investor/operator** [1] - 1687:25
**investor/operators** [4] - 1681:4, 1682:3, 1682:17, 1684:21
**investors** [7] - 1620:1, 1621:18, 1641:5, 1682:16, 1682:19, 1682:20, 1683:4
**invited** [2] - 1663:5, 1761:22

**inviting** [1] - 1747:7
**invoke** [1] - 1796:10
**involve** [1] - 1585:17
**involved** [25] - 1570:19, 1574:15, 1574:16, 1603:16, 1603:21, 1608:25, 1624:8, 1628:3, 1672:15, 1673:17, 1692:8, 1692:9, 1697:25, 1709:12, 1713:20, 1720:13, 1727:11, 1729:4, 1731:7, 1731:23, 1732:1, 1733:13, 1751:1
**involvement** [1] - 1605:24
**involving** [2] - 1585:9, 1757:11
**Ironbound** [1] - 1633:10
**irrelevant** [1] - 1648:14
**issue** [11] - 1538:2, 1540:14, 1556:16, 1560:15, 1560:20, 1563:1, 1596:16, 1665:5, 1665:11, 1794:16, 1794:18
**issues** [11] - 1570:6, 1579:18, 1583:17, 1587:18, 1591:6, 1724:22, 1744:21, 1760:2, 1770:16, 1782:20, 1790:18
**Italy** [2] - 1617:6, 1652:12
**item** [4] - 1589:2, 1589:9, 1728:8, 1801:25
**Item** [1] - 1589:18
**itself** [6] - 1604:10, 1652:20, 1658:18, 1669:13, 1715:2, 1799:23
**IV** [1] - 1545:10
**ivy** [1] - 1613:22

# J

**Jackson** [1] - 1614:8
**Jacksonville** [1] - 1752:22
**January** [9] - 1585:12, 1669:17, 1669:21, 1721:19, 1738:22, 1739:9, 1745:17, 1773:24, 1804:10
**january** [1] - 1536:7
**JEFF** [2] - 1709:1, 1805:12
**jersey** [3] - 1638:25, 1639:2, 1639:6
**Jersey** [2] - 1627:25, 1633:9
**Jerseys** [1] - 1611:15
**Jessica** [1] - 1677:13
**Jim** [1] - 1647:14
**job** [4] - 1615:7, 1631:1, 1661:4, 1661:8
**Joe** [1] - 1622:16
**Joey** [1] - 1717:1
**JOHANNA** [1] - 1536:17
**John** [4] - 1547:12, 1706:23, 1706:24, 1707:7
**JOHN** [1] - 1536:23
**Johnson** [1] - 1571:4
**join** [7] - 1562:7, 1618:12, 1678:21, 1714:15, 1717:7, 1747:16, 1748:6
**joined** [16] - 1613:20, 1616:1, 1617:7, 1618:2, 1618:7, 1618:16, 1643:4, 1672:9, 1696:6, 1717:12, 1717:13, 1717:14, 1727:9, 1727:10, 1747:8, 1747:10
**joint** [5] - 1550:24, 1666:6, 1666:9, 1771:2, 1771:5
**Joint** [3] - 1669:10, 1707:18, 1710:1
**jointly** [4] - 1550:6, 1551:11, 1801:7, 1801:16
**Jordan** [1] - 1646:9
**Josh** [1] - 1647:11
**journey** [2] - 1602:18, 1629:4
**JR** [1] - 1536:18
**Judge** [2] - 1650:19, 1794:13
**JUDGE** [1] - 1536:12
**judgment** [3] - 1792:4, 1794:13, 1796:9
**July** [2] - 1617:15, 1660:4
**jump** [1] - 1781:14
**June** [19] - 1560:8, 1560:11, 1560:20, 1564:4, 1564:14, 1565:9, 1568:6, 1747:3, 1747:11, 1747:15, 1750:4, 1750:12, 1751:15, 1752:11, 1753:5, 1755:23, 1757:4, 1758:2
**jury** [48] - 1538:1, 1564:16, 1584:22, 1586:8, 1586:13, 1587:8, 1587:12, 1592:10, 1604:21, 1606:14, 1606:16, 1607:4, 1612:16, 1619:7, 1619:18, 1631:13, 1636:7, 1643:3, 1651:19, 1657:6, 1661:18, 1691:25, 1708:2, 1728:22, 1762:2, 1765:1, 1767:1, 1771:17, 1772:9, 1773:12, 1774:8, 1774:12, 1775:5, 1776:14, 1776:24, 1778:16, 1779:9, 1784:15, 1784:24, 1795:7, 1795:25, 1797:12, 1797:23, 1798:10, 1798:16, 1799:23, 1800:18, 1800:22
**Jury** [7] - 1541:4, 1586:2, 1588:13, 1664:2, 1668:20, 1707:3, 1762:16
**JURY** [1] - 1536:11
**justifiable** [1] - 1741:24
**JX** [2] - 1575:6, 1763:10
**JX-108** [1] - 1707:10
**JX-109** [2] - 1708:1, 1805:24
**JX-110** [2] - 1762:23, 1806:4
**JX-110A** [2] - 1763:1, 1806:5
**JX-111** [2] - 1763:8, 1806:8
**JX-111A** [2] - 1763:11, 1806:9
**JX-24** [1] - 1716:20
**JX-27** [2] - 1712:18, 1717:23
**JX-41** [2] - 1688:19, 1688:20
**JX-46** [2] - 1561:2, 1561:5
**JX-64** [1] - 1546:24
**JX-74** [2] - 1763:2, 1806:7
**JX-75** [2] - 1763:2, 1806:7
**JX-77** [7] - 1575:16, 1575:18, 1588:23, 1763:1, 1763:14, 1806:6, 1806:11
**JX-78** [4] - 1738:16, 1738:17, 1763:1, 1806:6

# K

**Kaka'** [2] - 1638:25, 1641:25
**Kansas** [2] - 1616:8, 1622:7
**KASS** [22] - 1537:11, 1767:11, 1767:16, 1767:22, 1768:14, 1770:13, 1777:5, 1777:8, 1778:15, 1778:23, 1779:7, 1780:4, 1780:7, 1780:23, 1781:16, 1782:1, 1782:14, 1782:17, 1783:24, 1784:20, 1802:2, 1802:4
**Kass** [2] - 1767:11, 1777:8
**Kathy** [1] - 1673:14
**keep** [1] - 1569:9
**kept** [1] - 1611:15
**KESSLER** [184] - 1536:16, 1538:17, 1538:25, 1539:7, 1539:10, 1539:15, 1539:18, 1539:22, 1539:24, 1540:10, 1540:22, 1541:8, 1542:6, 1542:20, 1542:25, 1543:2, 1550:1, 1550:18, 1556:21, 1556:24, 1557:2, 1557:5, 1558:7, 1558:10, 1558:13, 1558:17, 1558:24, 1559:17, 1559:24, 1560:2, 1561:2, 1561:4, 1561:6, 1562:12, 1562:15, 1563:18, 1564:2, 1564:8, 1564:13, 1567:2, 1569:8, 1575:6, 1575:10, 1575:14, 1575:18, 1577:20, 1583:9, 1585:21, 1586:1, 1586:19, 1586:23, 1587:16, 1587:23, 1588:11, 1588:16, 1588:18, 1592:5, 1593:8, 1596:3, 1596:6, 1599:1, 1599:7, 1599:19, 1617:21, 1618:1, 1619:16, 1631:11, 1632:10, 1632:13, 1653:16, 1653:21, 1654:22, 1656:2, 1659:24, 1662:13, 1665:5, 1665:19, 1666:3, 1667:1, 1667:7, 1667:15, 1668:1, 1668:5, 1668:15, 1675:23, 1676:2, 1685:16, 1690:13, 1690:21, 1694:25, 1699:20, 1699:24, 1702:15, 1703:6, 1705:7, 1706:2, 1706:14, 1709:6, 1721:23, 1722:4, 1726:7, 1726:8, 1729:21, 1730:2, 1733:1, 1733:7, 1735:2, 1736:14, 1749:21, 1754:5, 1762:5, 1763:23, 1765:22, 1766:7, 1766:14, 1766:20, 1768:8, 1769:11, 1769:17, 1772:4, 1772:20, 1773:6, 1773:18, 1774:2, 1774:20, 1776:16, 1777:25, 1779:17, 1781:9, 1781:12, 1781:15, 1782:24, 1783:18, 1785:3, 1785:10, 1786:5, 1786:11, 1786:15, 1787:5, 1787:18, 1788:7, 1788:12, 1788:14, 1789:2, 1789:7, 1789:13, 1789:16, 1789:21, 1790:3, 1790:16, 1791:3, 1791:12, 1791:25, 1792:9, 1794:2, 1794:22, 1795:3, 1795:15, 1795:21, 1796:7, 1796:18, 1797:4, 1798:15, 1799:12, 1799:20, 1800:1, 1801:5, 1801:23, 1802:1, 1802:17, 1802:20, 1803:2, 1803:5, 1803:11, 1803:15, 1803:19, 1803:21, 1803:24,

1804:1, 1804:3, 1805:6, 1805:8, 1805:11, 1805:13
**Kessler** [26] - 1540:14, 1541:7, 1556:25, 1558:5, 1586:17, 1587:21, 1588:14, 1596:1, 1611:20, 1649:19, 1651:7, 1668:11, 1669:7, 1670:15, 1673:4, 1674:6, 1674:9, 1766:6, 1768:25, 1770:17, 1775:10, 1781:10, 1790:14, 1796:13, 1798:2, 1798:12
**KEVIN** [1] - 1537:8
**key** [5] - 1604:1, 1710:10, 1711:22, 1716:15, 1716:16
**kick** [1] - 1730:24
**kid** [1] - 1697:7
**kids** [3] - 1658:12, 1658:13, 1661:23
**Kids** [1] - 1615:21
**kinds** [1] - 1643:25
**Kings** [2] - 1616:9, 1622:5
**Klinsmann** [2] - 1592:7, 1592:11
**Knicks** [1] - 1610:19
**Knights** [1] - 1647:14
**knockout** [1] - 1657:11
**knowing** [1] - 1693:12
**knowledge** [3] - 1570:22, 1570:24, 1752:21
**known** [2] - 1616:8, 1622:17
**knows** [3] - 1551:7, 1571:15, 1571:16
**Kraft** [11] - 1614:22, 1616:11, 1622:9, 1649:6, 1681:13, 1687:19, 1687:22, 1687:24, 1688:5, 1688:16, 1688:18

# L

**l'Hote** [1] - 1725:6
**L'HOTE** [2] - 1709:1, 1805:12
**L'Hote** [11] - 1563:23, 1564:19, 1565:10, 1665:11, 1665:14, 1738:13, 1743:4, 1744:18, 1749:10, 1762:17, 1803:2
**L.A** [3] - 1639:3, 1639:5, 1658:13
**L.L.C** [2] - 1536:8, 1537:9
**LA** [5] - 1616:9, 1622:5, 1623:2, 1628:7, 1633:15
**lack** [5] - 1566:23, 1605:11, 1605:16, 1706:12, 1781:22
**ladies** [4] - 1541:6, 1663:24, 1668:22, 1762:8
**Ladies** [1] - 1706:25
**LAFC** [10] - 1569:18, 1569:20, 1569:24, 1622:25, 1633:13, 1725:18, 1725:22, 1726:17, 1726:18, 1728:14
**Lakers** [1] - 1622:4
**Lamar** [3] - 1614:23, 1614:24, 1649:6
**land** [1] - 1635:8
**language** [44] - 1641:11, 1641:12, 1736:7, 1741:8, 1754:19, 1765:8, 1766:12, 1767:9, 1767:15, 1767:22, 1767:23, 1767:24, 1767:25, 1768:1, 1768:4, 1768:6, 1768:7, 1768:20, 1769:10, 1769:20, 1770:8, 1770:10, 1770:12, 1770:19, 1771:5, 1771:10, 1771:15, 1771:20, 1773:20, 1787:1, 1787:6, 1787:9, 1787:10, 1790:22, 1791:23, 1792:15, 1794:7, 1795:25, 1797:7, 1799:6, 1799:22, 1800:16, 1801:7, 1801:19
**languages** [1] - 1642:6
**large** [5] - 1613:15, 1627:5, 1637:9, 1650:1, 1704:3
**larger** [2] - 1624:18, 1632:1
**largest** [1] - 1603:13
**Las** [3] - 1641:1, 1647:13, 1647:14
**last** [37] - 1538:25, 1555:12, 1555:18, 1555:25, 1573:20, 1576:20, 1582:19, 1583:20, 1589:2, 1589:9, 1589:20, 1589:22, 1620:14, 1622:25, 1629:3, 1634:15, 1643:1, 1644:7, 1658:18, 1658:20, 1660:12, 1683:1, 1683:6, 1683:14, 1683:18, 1699:10, 1728:8, 1755:24, 1755:25, 1756:22, 1756:23, 1765:5, 1785:2, 1800:21, 1804:7
**lastly** [1] - 1647:8
**LATHAM** [2] - 1537:1, 1537:4
**launch** [4] - 1634:25, 1637:16, 1643:5, 1649:23
**launched** [16] - 1569:21, 1612:4, 1613:11, 1614:6, 1617:16, 1617:17, 1617:19, 1624:19, 1624:21, 1626:16, 1633:6, 1638:24, 1639:16, 1640:13, 1652:12
**law** [23] - 1772:11, 1773:7, 1774:4, 1774:17, 1775:17, 1776:7, 1778:1, 1785:4, 1785:11, 1785:15, 1785:19, 1785:20, 1786:20, 1787:20, 1787:22, 1787:23, 1787:24, 1788:7, 1788:23, 1788:24, 1794:4, 1796:11, 1798:7
**lawsuit** [4] - 1659:8, 1672:23, 1699:25, 1700:8
**lawyers** [10] - 1548:25, 1553:23, 1553:24, 1558:11, 1587:2, 1587:7, 1680:5, 1680:6, 1680:9, 1680:11
**lead** [2] - 1743:5, 1792:2
**leader** [3] - 1593:21, 1672:10, 1672:14
**leaders** [1] - 1593:20
**leadership** [2] - 1602:12, 1602:13
**leading** [4] - 1653:16, 1653:21, 1662:13, 1716:6
**Leaf** [1] - 1622:10
**Leafs** [1] - 1622:12
**league** [272] - 1543:21, 1545:5, 1545:9, 1545:10, 1545:17, 1545:18, 1546:4, 1546:10, 1546:11, 1546:20, 1546:21, 1549:2, 1549:3, 1549:15, 1549:19, 1550:6, 1550:8, 1550:12, 1550:22, 1550:25, 1551:4, 1551:17, 1554:8, 1556:18, 1562:4, 1562:6, 1563:6, 1563:14, 1566:19, 1566:20, 1571:23, 1572:16, 1572:21, 1572:23, 1572:24, 1572:25, 1573:7, 1576:19, 1577:14, 1577:17, 1577:22, 1577:23, 1578:2, 1578:6, 1578:13, 1581:10, 1581:11, 1581:22, 1584:2, 1589:3, 1589:10, 1593:14, 1593:21, 1594:1, 1594:3, 1594:19, 1595:5, 1595:12, 1595:19, 1596:8, 1596:9, 1597:15, 1600:8, 1600:9, 1600:10, 1600:21, 1601:14, 1601:19, 1602:5, 1602:6, 1602:22, 1603:3, 1604:9, 1605:3, 1605:4, 1605:5, 1605:7, 1608:17, 1608:18, 1609:13, 1610:16, 1611:14, 1612:13, 1614:15, 1614:16, 1616:1, 1616:15, 1617:9, 1617:16, 1617:19, 1617:24, 1618:2, 1618:5, 1618:8, 1618:16, 1618:21, 1618:24, 1619:22, 1623:10, 1623:12, 1623:23, 1624:3, 1625:7, 1625:11, 1625:14, 1628:17, 1630:3, 1630:9, 1630:18, 1631:20, 1634:4, 1634:17, 1634:18, 1634:19, 1635:1, 1635:14, 1636:12, 1636:20, 1637:2, 1637:4, 1637:6, 1637:19, 1637:21, 1637:23, 1638:14, 1639:7, 1639:23, 1640:13, 1640:17, 1641:19, 1642:22, 1642:23, 1643:4, 1643:9, 1643:12, 1644:2, 1644:4, 1644:10, 1644:11, 1645:5, 1645:8, 1645:25, 1646:17, 1648:7, 1648:25, 1650:6, 1650:9, 1650:13, 1652:12, 1652:13, 1652:14, 1655:15, 1657:22, 1657:23, 1657:24, 1657:25, 1661:5, 1663:14, 1663:16, 1670:22, 1671:12, 1671:23, 1671:25, 1672:1, 1672:9, 1672:19, 1672:21, 1675:13, 1677:4, 1678:25, 1679:4, 1679:5, 1679:21, 1680:4, 1681:18, 1681:24, 1682:4, 1682:6, 1682:9, 1682:10, 1683:20, 1683:21, 1684:11, 1685:19, 1686:23, 1686:25, 1691:6, 1691:19, 1693:9, 1693:12, 1693:23, 1694:5, 1694:14, 1695:7, 1695:10, 1695:11, 1695:12, 1695:13, 1695:21, 1696:1, 1697:17, 1703:21, 1703:24, 1704:4, 1706:4, 1711:1, 1711:11, 1711:14, 1711:15, 1713:14, 1714:15, 1714:16, 1714:19, 1715:2, 1715:13, 1715:25, 1716:3, 1716:13, 1716:23, 1717:18, 1718:5, 1718:7, 1719:9, 1719:22, 1719:25, 1720:5, 1721:15, 1724:10, 1724:24, 1724:25, 1725:11, 1726:11, 1726:12, 1726:13, 1726:16, 1731:10, 1731:17, 1733:23, 1739:25, 1740:1, 1741:24, 1741:25, 1742:4, 1742:6, 1742:8, 1742:21, 1742:23, 1743:11, 1743:14, 1743:23, 1745:4, 1747:1, 1753:16, 1754:14, 1754:19, 1754:25, 1755:2, 1755:4, 1760:12, 1772:25, 1773:4, 1783:15, 1783:19, 1786:8, 1786:23, 1800:24
**LEAGUE** [2] - 1536:4, 1536:8
**League** [108] - 1537:9, 1547:18, 1547:25, 1548:5, 1570:11, 1571:24, 1572:23, 1590:6, 1600:5, 1600:7,

1601:6, 1601:10, 1601:15, 1601:16, 1601:18, 1602:22, 1602:23, 1603:4, 1604:3, 1604:7, 1604:13, 1604:24, 1606:19, 1607:19, 1611:11, 1611:22, 1612:2, 1612:4, 1613:17, 1613:19, 1614:16, 1614:19, 1615:1, 1617:4, 1617:8, 1617:13, 1618:4, 1618:6, 1618:12, 1618:15, 1618:20, 1619:7, 1619:21, 1619:22, 1622:14, 1623:5, 1623:21, 1624:15, 1625:1, 1625:8, 1625:10, 1625:12, 1626:3, 1626:20, 1626:22, 1626:24, 1627:3, 1643:19, 1644:12, 1645:4, 1646:21, 1647:4, 1647:15, 1651:21, 1651:25, 1652:23, 1656:15, 1657:12, 1672:7, 1676:15, 1677:9, 1686:10, 1687:8, 1687:15, 1688:12, 1690:16, 1692:12, 1696:10, 1699:5, 1702:1, 1705:3, 1709:20, 1710:21, 1710:23, 1711:1, 1711:5, 1711:7, 1714:3, 1717:3, 1717:5, 1717:8, 1723:6, 1727:20, 1737:11, 1738:21, 1741:23, 1746:1, 1750:11, 1753:8, 1753:12, 1754:12, 1754:17, 1754:23, 1757:18, 1759:3, 1773:2, 1773:15

**league's** [4] - 1603:2, 1649:7, 1650:21, 1658:3

**leagues** [90] - 1544:22, 1547:17, 1548:9, 1548:17, 1550:9, 1552:1, 1566:11, 1581:24, 1582:17, 1583:13, 1583:18, 1585:4, 1585:18, 1601:4, 1601:12, 1602:19, 1602:20, 1604:11, 1609:11, 1609:14, 1609:16, 1611:1, 1611:5, 1611:18, 1612:5, 1612:7, 1612:13, 1613:22, 1619:4, 1620:19, 1621:1, 1621:3, 1621:4, 1627:10, 1629:21, 1642:17, 1643:7, 1645:14, 1646:5, 1646:14, 1646:16, 1646:18, 1652:7, 1652:9, 1652:10, 1652:11, 1653:2, 1655:4, 1655:5, 1655:10, 1656:19, 1657:3, 1658:9, 1662:10, 1672:2, 1677:22, 1678:1, 1689:5, 1689:18, 1690:18, 1690:24, 1691:6, 1701:13, 1711:4, 1712:9, 1715:23, 1715:24, 1717:2, 1718:20, 1719:5, 1723:4, 1724:15, 1725:1, 1725:3, 1729:9, 1730:24, 1731:2, 1731:25, 1740:22, 1745:5, 1745:8, 1745:12, 1745:13, 1746:4, 1747:24, 1755:12, 1756:13, 1756:20

**Leagues** [3] - 1600:18, 1652:23, 1689:7

**lean** [2] - 1613:1, 1649:15

**leaned** [2] - 1612:1, 1649:15

**learn** [15] - 1552:4, 1716:12, 1720:4, 1720:17, 1720:21, 1720:22, 1725:17, 1725:22, 1726:25, 1730:20, 1731:5, 1731:12, 1746:20, 1747:19, 1747:20

**learned** [7] - 1615:6, 1663:17, 1665:7, 1679:22, 1719:20, 1720:24, 1738:4

**learning** [4] - 1700:14, 1717:16, 1747:21, 1748:8

**least** [9] - 1666:21, 1769:6, 1779:5, 1780:2, 1796:25, 1797:14, 1797:19, 1798:13, 1799:9

**leave** [12] - 1547:19, 1547:20, 1548:3, 1578:22, 1579:8, 1579:15, 1615:8, 1665:23, 1674:25, 1747:16, 1748:5, 1798:13

**leaves** [1] - 1762:19

**leaving** [3] - 1579:13, 1748:10, 1760:17

**led** [5] - 1597:15, 1627:10, 1714:16, 1719:9, 1722:20

**left** [20] - 1563:4, 1568:7, 1571:23, 1577:4, 1579:14, 1591:15, 1604:6, 1633:16, 1639:10, 1682:3, 1682:9, 1682:10, 1682:15, 1687:20, 1688:18, 1717:7, 1752:15, 1795:23, 1801:3, 1803:23

**legacy** [1] - 1610:24

**legal** [2] - 1574:14, 1756:1

**legally** [2] - 1546:9, 1791:5

**legend** [2] - 1769:15, 1770:1

**Legends** [1] - 1623:5

**legitimate** [1] - 1605:5

**length** [2] - 1602:15, 1673:8

**lent** [3] - 1649:15, 1649:16, 1661:19

**Leo** [1] - 1641:2

**less** [7] - 1579:25, 1667:3, 1668:10, 1741:22, 1742:19, 1749:2, 1752:17

**letter** [25] - 1596:19, 1596:22, 1669:15, 1669:20, 1669:23, 1697:12, 1697:13, 1710:10, 1729:6, 1729:7, 1738:5, 1738:12, 1739:1, 1739:3, 1739:11, 1740:6, 1740:7, 1740:8, 1740:19, 1740:21, 1741:8, 1750:24, 1802:6, 1802:15, 1802:18

**letters** [7] - 1737:15, 1738:2, 1738:13, 1738:16, 1741:3, 1741:5, 1741:11

**level** [10] - 1583:14, 1619:3, 1641:18, 1643:9, 1661:22, 1683:20, 1684:8, 1684:11, 1717:14

**levels** [2] - 1578:13, 1604:22

**Levine** [2] - 1689:16, 1732:12

**liability** [6] - 1777:10, 1777:21, 1779:9, 1779:15, 1784:5, 1784:6

**liable** [1] - 1784:6

**license** [4] - 1553:11, 1555:2, 1555:5

**licenses** [2] - 1555:1, 1555:23

**licensing** [4] - 1589:4, 1589:11, 1602:4, 1786:7

**Licensing** [1] - 1750:12

**life** [1] - 1641:16

**lifting** [1] - 1737:24

**light** [2] - 1639:6, 1801:8

**likely** [4] - 1736:24, 1741:16, 1741:25, 1742:5

**limited** [4] - 1661:24, 1699:23, 1715:13, 1778:3

**limits** [1] - 1582:15

**line** [13] - 1538:12, 1539:15, 1540:1, 1548:23, 1558:18, 1578:4, 1597:21, 1652:19, 1689:13, 1744:17, 1792:3, 1800:22

**Line** [9] - 1576:17, 1579:22, 1589:1, 1591:5, 1593:11, 1594:17, 1596:22, 1597:2, 1689:1

**lines** [5] - 1565:3, 1652:18, 1666:7, 1695:25, 1794:4

**link** [2] - 1645:1, 1645:3

**linked** [2] - 1593:22, 1595:7

**Lionel** [2] - 1640:8, 1644:5

**Lisa** [5] - 1589:21, 1589:23, 1589:24, 1689:14, 1689:16

**list** [8] - 1621:21, 1627:13, 1627:22, 1653:5, 1653:7, 1655:5, 1716:18, 1716:22

**listed** [4] - 1715:13, 1739:21, 1740:10, 1757:7

**listen** [2] - 1540:13, 1596:1

**lists** [2] - 1655:4, 1739:10

**literally** [3] - 1771:2, 1783:1, 1795:19

**live** [1] - 1665:11

**lived** [3] - 1612:21, 1612:23, 1614:14

**lives** [1] - 1612:24

**living** [1] - 1615:19

**LLC** [1] - 1536:4

**LLP** [7] - 1536:14, 1536:19, 1536:21, 1537:1, 1537:4, 1537:6, 1537:10

**loan** [3] - 1661:16, 1662:2, 1662:16

**loaned** [2] - 1661:19, 1662:10

**loaning** [2] - 1662:12, 1662:15

**lobby** [1] - 1647:3

**local** [4] - 1616:18, 1622:17, 1622:19, 1632:24

**locally** [2] - 1633:3, 1634:20

**logic** [1] - 1786:15

**logistics** [1] - 1708:10

**long-standing** [1] - 1616:12

**long-term** [4] - 1621:17, 1624:13, 1656:14, 1704:4

**longer-term** [1] - 1670:16

**longest** [4] - 1581:21, 1601:7, 1616:6, 1657:24

**longest-standing** [1] - 1581:21

**look** [103] - 1539:11, 1544:2, 1546:21, 1546:22, 1547:3, 1553:25, 1554:15, 1554:18, 1556:10, 1558:2, 1558:18, 1561:2, 1561:15, 1562:10, 1564:14, 1565:3, 1568:18, 1569:5, 1569:6, 1570:4, 1578:4, 1579:23, 1583:10, 1586:13, 1588:23, 1589:17, 1591:24, 1593:9, 1593:11, 1594:16, 1594:17, 1595:3, 1599:9, 1599:11, 1631:2, 1631:14, 1631:15, 1631:16, 1632:9, 1633:12, 1635:15, 1641:24, 1651:6, 1651:11, 1652:16, 1655:12, 1659:15, 1660:23, 1669:8, 1669:18, 1688:19, 1688:24, 1690:4, 1710:1, 1710:3,

1710:9, 1711:9, 1712:4, 1712:18, 1714:7, 1714:9, 1715:6, 1716:18, 1716:19, 1718:19, 1720:19, 1722:12, 1723:15, 1727:13, 1727:25, 1728:6, 1728:7, 1729:11, 1732:16, 1733:14, 1736:22, 1738:16, 1738:25, 1739:10, 1740:6, 1740:12, 1741:12, 1743:9, 1746:25, 1750:10, 1750:18, 1751:23, 1752:3, 1754:17, 1754:23, 1755:10, 1755:24, 1756:22, 1757:19, 1757:22, 1785:4, 1785:6, 1794:5, 1794:13, 1798:4, 1800:9, 1800:19
**Look** [1] - 1775:25
**looked** [5] - 1571:24, 1653:3, 1662:10, 1737:22, 1737:23
**Looking** [2] - 1632:13, 1770:6
**looking** [13] - 1614:11, 1619:24, 1646:22, 1647:11, 1652:20, 1656:20, 1728:24, 1739:1, 1742:11, 1765:23, 1767:19, 1768:9, 1797:23
**looks** [2] - 1654:16, 1794:18
**Los** [5] - 1569:22, 1570:3, 1571:5, 1628:6, 1739:8
**lose** [4] - 1682:7, 1746:20, 1772:10, 1775:3
**losing** [3] - 1680:13, 1684:7, 1684:20
**loss** [1] - 1774:17
**losses** [1] - 1684:11
**lost** [4] - 1603:19, 1639:12, 1683:24, 1698:25
**Louis** [4] - 1626:17, 1626:20, 1627:6, 1627:14
**Louisville** [1] - 1636:2
**love** [4] - 1629:2, 1638:13, 1697:1, 1697:4
**low** [1] - 1572:13
**low-quality** [1] - 1572:13
**lower** [19] - 1557:17, 1562:3, 1652:24, 1661:22, 1698:9, 1709:25, 1710:24, 1711:8, 1711:17, 1711:18, 1711:24, 1718:20, 1723:13, 1724:5, 1724:9, 1724:12, 1724:22, 1756:24
**lower-division** [2] - 1698:9, 1756:24
**lunch** [4] - 1663:3, 1663:5, 1663:22, 1663:25
**Luncheon** [1] - 1664:5
**Lydia** [1] - 1590:16

## M

**M-O-E-L-L-E-R** [1] - 1708:5
**Madrid** [4] - 1611:13, 1639:2, 1639:8, 1640:20
**Magic** [1] - 1571:4
**magnitudes** [1] - 1644:24
**mail** [34] - 1542:14, 1542:18, 1543:3, 1543:4, 1543:5, 1543:8, 1559:18, 1559:21, 1560:3, 1561:10, 1563:19, 1565:23, 1568:18, 1659:20, 1660:4, 1660:15, 1710:3, 1710:4, 1710:9, 1712:20, 1721:18, 1721:19, 1722:5, 1727:15, 1729:13, 1732:19, 1738:17, 1742:13, 1743:5, 1744:17, 1746:12, 1757:22, 1757:23, 1758:4
**mailed** [1] - 1538:4
**mails** [5] - 1543:14, 1543:17, 1543:19, 1544:14, 1661:12
**maintain** [1] - 1785:19
**Major** [74] - 1537:8, 1547:18, 1547:25, 1548:5, 1571:24, 1572:23, 1600:5, 1600:7, 1601:15, 1601:16, 1601:18, 1602:22, 1602:23, 1603:4, 1604:3, 1604:7, 1604:13, 1604:24, 1606:19, 1607:19, 1611:22, 1612:2, 1614:19, 1615:1, 1617:4, 1617:7, 1617:13, 1618:4, 1618:6, 1618:12, 1618:15, 1618:19, 1618:20, 1619:6, 1619:21, 1622:14, 1623:21, 1625:1, 1625:8, 1625:10, 1625:12, 1626:3, 1626:20, 1626:22, 1626:24, 1627:3, 1643:18, 1644:12, 1645:4, 1646:20, 1647:4, 1651:21, 1651:25, 1656:15, 1657:12, 1676:15, 1677:9, 1686:10, 1696:10, 1702:1, 1705:3, 1709:20, 1710:21, 1710:22, 1711:1, 1711:5, 1711:7, 1714:3, 1717:3, 1717:5, 1717:8, 1723:5, 1727:20
**major** [22] - 1600:13, 1601:3, 1601:4, 1601:11, 1602:5, 1602:20, 1604:10, 1617:19, 1618:5, 1618:15, 1625:11, 1627:10, 1635:13, 1637:2, 1637:22, 1639:23, 1645:14, 1645:25, 1646:17, 1652:9, 1686:24, 1714:4
**MAJOR** [1] - 1536:8
**majority** [6] - 1629:5, 1676:14, 1676:18, 1678:3, 1678:7, 1698:3
**Malik** [15] - 1674:16, 1674:17, 1674:18, 1675:12, 1675:15, 1676:5, 1676:9, 1676:19, 1677:12, 1677:17, 1677:21, 1678:4, 1678:18, 1678:19, 1678:20
**manage** [1] - 1625:18
**managed** [3] - 1614:7, 1614:15, 1614:21
**management** [4] - 1600:11, 1653:11, 1709:7, 1709:11
**managing** [1] - 1637:3
**Manchester** [2] - 1611:11, 1622:21
**manner** [1] - 1600:14
**map** [1] - 1624:17
**Maple** [2] - 1622:10, 1622:12
**March** [14] - 1730:24, 1731:15, 1731:18, 1732:19, 1733:22, 1735:16, 1737:21, 1738:12, 1740:2, 1740:23, 1741:2, 1742:2, 1744:9
**Mark** [6] - 1577:7, 1630:24, 1710:4, 1710:10, 1713:5, 1713:23
**mark** [1] - 1654:11
**MARK** [1] - 1536:18
**marked** [7] - 1542:10, 1619:18, 1631:13, 1708:1, 1763:8, 1763:18, 1801:25
**market** [37] - 1616:18, 1645:24, 1711:19, 1772:25, 1773:3, 1775:19, 1775:20, 1776:3, 1776:6, 1776:9, 1776:21, 1776:23, 1777:4, 1777:13, 1777:15, 1778:14, 1778:19, 1779:6, 1780:1, 1780:3, 1780:6, 1780:10, 1780:15, 1780:20, 1780:21, 1780:22, 1781:2, 1782:7, 1782:8, 1782:13, 1783:25, 1784:1, 1785:9, 1786:2, 1786:14, 1788:5
**Marketing** [4] - 1624:8, 1645:23, 1649:14, 1673:15
**marketing** [5] - 1613:11, 1613:15, 1613:21, 1615:10, 1649:14
**marketplace** [2] - 1642:15, 1648:9
**markets** [1] - 1624:1
**markup** [3] - 1765:6, 1765:18, 1771:18
**match** [2] - 1631:20, 1779:15
**matches** [5] - 1628:5, 1630:6, 1632:6, 1632:7, 1658:7
**matter** [5] - 1543:22, 1618:10, 1641:4, 1789:14, 1789:16
**Matter** [1] - 1804:10
**matters** [1] - 1569:4
**Matthew** [1] - 1632:24
**MATTHEW** [1] - 1536:23
**mayor** [1] - 1603:19
**mayors** [2] - 1634:9, 1648:12
**MBA** [1] - 1709:13
**McConaughey** [1] - 1632:25
**Meadowlands** [1] - 1629:16
**mean** [38] - 1539:17, 1539:23, 1547:13, 1549:6, 1552:9, 1553:12, 1553:14, 1557:22, 1581:25, 1582:2, 1582:7, 1585:1, 1587:6, 1620:6, 1628:16, 1637:22, 1641:23, 1646:14, 1646:19, 1661:18, 1683:21, 1688:6, 1697:16, 1713:18, 1750:7, 1771:25, 1776:23, 1780:8, 1795:13, 1797:21, 1798:17, 1798:18, 1798:19, 1798:20
**mean..** [1] - 1769:16
**meaning** [1] - 1661:21
**meaningful** [1] - 1723:24
**meanings** [1] - 1594:13
**means** [7] - 1585:2, 1601:4, 1620:7, 1661:20, 1667:13, 1778:20, 1780:12
**meant** [5] - 1547:20, 1584:22, 1597:15, 1756:17, 1784:21
**measure** [1] - 1655:7
**mechanical** [1] - 1537:18
**media** [22] - 1573:1, 1602:2, 1605:4, 1605:6, 1605:7, 1624:24, 1641:19, 1642:20, 1644:16, 1646:3, 1646:4, 1646:24, 1646:25, 1648:4, 1649:8, 1651:3, 1651:4, 1652:25, 1654:6, 1656:13, 1656:24
**meet** [14] - 1555:24, 1556:13, 1583:19, 1612:5, 1648:12, 1663:2, 1663:5,

1677:14, 1689:20, 1740:13, 1741:23, 1759:3, 1775:5
**meeting** [84] - 1546:19, 1546:25, 1547:4, 1552:1, 1560:4, 1560:10, 1560:19, 1565:9, 1565:14, 1565:16, 1565:25, 1566:5, 1568:2, 1574:12, 1574:17, 1575:4, 1575:22, 1575:24, 1575:25, 1576:1, 1576:3, 1576:7, 1579:16, 1583:2, 1584:1, 1584:8, 1585:13, 1585:16, 1589:8, 1589:22, 1590:10, 1615:2, 1648:22, 1660:19, 1661:7, 1674:8, 1674:11, 1674:14, 1674:25, 1675:3, 1675:17, 1680:11, 1688:20, 1688:22, 1696:11, 1696:13, 1701:21, 1702:4, 1710:12, 1738:10, 1738:11, 1747:9, 1747:18, 1747:25, 1748:1, 1748:2, 1748:4, 1750:4, 1750:8, 1755:17, 1755:22, 1757:4, 1757:5, 1757:15, 1758:1, 1758:5, 1758:16, 1758:22, 1759:1, 1759:10, 1759:20, 1760:2, 1760:7, 1760:12, 1760:18, 1760:21, 1760:25, 1761:1, 1761:4, 1761:15, 1761:17, 1762:3
**Meeting** [1] - 1564:22
**meetings** [19] - 1574:8, 1574:9, 1574:10, 1574:25, 1653:8, 1687:22, 1687:23, 1688:2, 1688:8, 1700:16, 1701:16, 1701:19, 1720:15, 1747:2, 1747:3, 1747:8, 1747:11, 1747:13, 1747:14
**meets** [2] - 1645:15
**member** [15] - 1581:21, 1594:19, 1600:24, 1608:3, 1609:8, 1632:5, 1772:18, 1776:14, 1782:25, 1783:4, 1783:6, 1784:16, 1787:7, 1789:6, 1794:3
**members** [30] - 1596:23, 1607:7, 1633:19, 1661:21, 1689:6, 1775:12, 1776:12, 1783:5, 1791:17, 1791:22, 1792:8, 1792:10, 1792:17, 1793:5, 1794:17, 1794:21, 1795:4, 1795:11, 1795:16, 1796:1, 1796:5, 1796:20, 1797:1, 1797:10, 1797:14, 1797:15, 1797:20, 1797:24, 1798:4, 1798:13
**membership** [4] - 1582:16, 1772:25, 1773:3, 1775:20
**memberships** [1] - 1783:25
**memo** [3] - 1569:6, 1569:23, 1737:18
**memory** [2] - 1591:19, 1758:19
**men** [1] - 1614:24
**Men's** [1] - 1592:14
**men's** [2] - 1601:19, 1629:6
**mention** [2] - 1638:9, 1742:15
**mentioned** [24] - 1543:13, 1600:15, 1601:17, 1603:11, 1631:16, 1633:13, 1633:16, 1634:2, 1636:8, 1656:19, 1686:16, 1690:15, 1691:22, 1692:16, 1696:23, 1696:24, 1697:7, 1703:17, 1715:17, 1750:24, 1752:22, 1757:16, 1760:6, 1792:23
**mentor** [2] - 1659:2, 1661:3
**mentorship** [2] - 1660:13, 1660:21
**Mercedes** [1] - 1629:7
**Mercedes-Benz** [1] - 1629:7
**merchandising** [2] - 1602:4, 1625:5
**mere** [1] - 1800:2
**merge** [1] - 1566:1
**merger** [1] - 1761:14
**message** [1] - 1563:22
**messaging** [1] - 1740:23
**Messi** [2] - 1640:8, 1644:5
**met** [14] - 1613:16, 1630:24, 1649:11, 1662:24, 1696:3, 1696:5, 1731:20, 1733:22, 1735:9, 1738:9, 1740:22, 1741:2, 1746:16, 1775:7
**metaphor** [1] - 1646:8
**metrics** [1] - 1653:2
**metropolitan** [1] - 1643:14
**MetroStars** [1] - 1629:15
**Mexican** [2] - 1641:1, 1642:23
**Mexico** [5] - 1603:15, 1615:14, 1617:6, 1639:3, 1652:12
**Mia** [1] - 1571:4
**Miami** [1] - 1640:8
**Michael** [3] - 1603:18, 1614:8, 1646:9
**microcosm** [1] - 1611:7
**mid** [4] - 1738:12, 1740:23, 1741:2, 1744:9
**mid-March** [4] - 1738:12, 1740:23, 1741:2, 1744:9
**middle** [3] - 1542:13, 1543:11, 1714:9
**midwest** [1] - 1624:22
**might** [21] - 1546:18, 1557:22, 1581:8, 1629:6, 1648:25, 1655:22, 1656:19, 1667:19, 1700:12, 1718:1, 1730:16, 1746:17, 1746:18, 1746:20, 1747:15, 1748:5, 1749:6, 1757:9, 1766:8, 1781:13, 1788:19
**Mike** [1] - 1689:7
**milestones** [1] - 1740:15
**millennials** [1] - 1656:23
**million** [13] - 1577:5, 1577:6, 1602:1, 1604:4, 1617:15, 1617:16, 1633:17, 1642:11, 1642:12, 1670:11, 1684:8, 1686:8
**millions** [3] - 1605:15, 1633:7
**mind** [6] - 1552:5, 1581:2, 1628:3, 1629:9, 1692:5, 1692:8
**minimum** [1] - 1690:1
**Minnesota** [12] - 1571:19, 1571:21, 1571:22, 1572:3, 1572:18, 1572:19, 1628:10, 1694:19, 1694:21, 1726:22, 1727:10, 1728:15
**minor** [3] - 1572:20, 1662:10, 1686:25
**minute** [2] - 1739:22, 1767:18
**minutes** [9] - 1582:24, 1649:9, 1666:24, 1667:24, 1707:2, 1761:8, 1803:6, 1803:17, 1804:1
**mischaracterizes** [1] - 1549:23
**misguided** [1] - 1587:1
**misread** [1] - 1768:13
**misreading** [1] - 1767:19
**misrepresentation** [2] - 1577:15, 1577:25
**missing** [1] - 1742:12
**mission** [2] - 1610:12, 1610:13
**misstated** [1] - 1579:3
**misstates** [3] - 1550:14, 1550:15, 1566:23
**MLS** [280] - 1552:14, 1552:22, 1555:17, 1557:20, 1557:24, 1559:7, 1559:19, 1560:15, 1560:20, 1560:23, 1561:23, 1561:25, 1562:7, 1565:4, 1565:5, 1565:11, 1565:17, 1566:9, 1568:19, 1569:21, 1570:10, 1572:3, 1572:13, 1574:24, 1576:24, 1577:8, 1577:9, 1578:19, 1579:25, 1580:9, 1582:19, 1583:15, 1592:8, 1592:17, 1593:20, 1594:8, 1595:14, 1596:23, 1600:24, 1602:11, 1602:13, 1602:18, 1605:14, 1609:8, 1609:18, 1609:21, 1609:22, 1609:25, 1610:3, 1610:8, 1616:1, 1616:23, 1618:7, 1618:8, 1620:3, 1620:11, 1624:19, 1626:12, 1627:15, 1628:3, 1628:11, 1632:18, 1636:20, 1637:15, 1639:25, 1640:3, 1643:2, 1643:10, 1644:9, 1647:10, 1648:18, 1648:22, 1649:20, 1649:23, 1650:1, 1650:15, 1651:23, 1652:19, 1653:2, 1654:17, 1655:14, 1657:13, 1657:15, 1658:7, 1658:18, 1659:8, 1659:11, 1661:15, 1662:9, 1662:16, 1662:19, 1662:21, 1665:8, 1669:15, 1670:3, 1670:5, 1670:7, 1670:12, 1670:17, 1670:23, 1671:1, 1671:12, 1671:14, 1671:16, 1671:24, 1671:25, 1672:1, 1672:6, 1672:10, 1672:15, 1672:17, 1672:24, 1679:4, 1679:22, 1679:24, 1684:2, 1687:13, 1687:14, 1687:22, 1687:25, 1688:5, 1688:7, 1688:8, 1689:25, 1693:22, 1694:1, 1695:4, 1697:14, 1697:19, 1697:25, 1698:22, 1698:23, 1699:6, 1699:11, 1699:13, 1699:15, 1700:2, 1700:10, 1710:6, 1711:11, 1711:17, 1711:19, 1712:8, 1712:13, 1712:21, 1713:3, 1713:12, 1713:13, 1713:14, 1713:15, 1713:20, 1713:25, 1714:11, 1714:16, 1715:13, 1715:18, 1715:25, 1716:2, 1716:9, 1716:12, 1717:12, 1717:13, 1717:15, 1717:25, 1718:2, 1718:24, 1719:9, 1719:18, 1719:20, 1719:24, 1719:25, 1720:5, 1720:6, 1720:9, 1720:11, 1720:12, 1720:13, 1720:18, 1720:19, 1720:22, 1721:5, 1721:10, 1722:20, 1723:8, 1723:9, 1723:11, 1723:22, 1723:25, 1724:1, 1724:3, 1724:4, 1724:5, 1724:9, 1724:12, 1724:14, 1724:18, 1725:7, 1725:8, 1725:11, 1725:17, 1725:22, 1726:15,

1726:18, 1726:23, 1727:5, 1727:9, 1727:11, 1727:21, 1728:1, 1728:9, 1728:13, 1728:25, 1729:4, 1745:9, 1745:10, 1745:16, 1745:19, 1747:10, 1748:9, 1748:14, 1752:6, 1752:9, 1756:9, 1756:11, 1757:16, 1758:12, 1758:14, 1758:15, 1758:17, 1759:2, 1759:8, 1759:11, 1759:18, 1766:21, 1767:11, 1769:1, 1772:17, 1773:7, 1775:20, 1776:17, 1776:19, 1776:20, 1776:22, 1777:2, 1777:3, 1777:4, 1777:14, 1777:17, 1777:18, 1778:3, 1778:4, 1778:5, 1778:6, 1778:9, 1778:21, 1782:4, 1783:1, 1783:9, 1783:10, 1783:16, 1785:17, 1786:22, 1788:10, 1788:25, 1789:4, 1789:15, 1789:18, 1792:20, 1798:5, 1799:12, 1799:15
**MLS'** [4] - 1620:22, 1778:12, 1780:6, 1780:7
**MLS's** [11] - 1549:6, 1549:10, 1552:9, 1577:2, 1636:10, 1638:3, 1651:16, 1656:10, 1671:10, 1711:23, 1727:11
**MLS-led** [2] - 1714:16, 1719:9
**MLS/SUM** [3] - 1568:25, 1569:2, 1569:15
**MLS/USL** [1] - 1561:11
**model** [7] - 1714:11, 1756:3, 1756:18, 1778:16, 1780:24, 1791:1, 1801:16
**models** [1] - 1600:20
**Moeller** [5] - 1666:24, 1708:4, 1708:6, 1762:23, 1763:3
**moment** [3] - 1588:20, 1608:17, 1763:25
**momentum** [3] - 1604:9, 1617:18, 1627:3
**Monday** [4] - 1560:5, 1560:11, 1564:22, 1758:2
**money** [10] - 1577:7, 1618:23, 1639:23, 1649:16, 1682:7, 1683:24, 1683:25, 1684:10, 1684:20, 1736:4
**monitor** [2] - 1725:6, 1725:10
**monopolist** [10] - 1780:16, 1780:17, 1781:21, 1782:3, 1782:8, 1782:14, 1782:16, 1784:2, 1784:5
**monopolistic** [1] - 1780:21
**monopolists** [1] - 1782:21
**monopolization** [7] - 1778:2, 1778:3, 1780:11, 1780:12, 1781:2, 1782:19, 1784:9
**monopolize** [16] - 1770:25, 1772:24, 1773:3, 1775:16, 1776:3, 1776:8, 1778:2, 1778:17, 1779:6, 1779:19, 1780:1, 1780:25, 1781:1, 1781:7, 1785:21, 1788:5
**monopolized** [4] - 1775:19, 1776:6, 1777:13, 1780:15
**monopoly** [17] - 1772:18, 1773:8, 1777:12, 1778:19, 1778:21, 1779:1, 1780:12, 1780:13, 1781:5, 1782:6, 1782:23, 1782:25, 1783:3, 1786:1, 1786:19, 1788:19, 1788:21
**Montgomery** [2] - 1536:22, 1537:4
**month** [3] - 1634:15, 1715:5, 1745:14
**months** [1] - 1741:6
**Montreal** [3] - 1717:7, 1717:9, 1717:11
**morning** [7] - 1538:4, 1541:6, 1542:7, 1542:8, 1600:2, 1600:3, 1762:17
**Most** [1] - 1627:1
**most** [25] - 1571:3, 1583:13, 1589:20, 1594:2, 1601:21, 1603:4, 1615:18, 1621:9, 1622:23, 1638:21, 1640:6, 1640:10, 1643:20, 1656:23, 1657:17, 1713:14, 1714:10, 1718:3, 1719:15, 1731:10, 1742:5, 1777:1, 1784:7, 1801:12
**mostly** [1] - 1729:8
**motivated** [1] - 1710:23
**motivation** [3] - 1786:22, 1786:23, 1788:15
**motive** [4] - 1784:8, 1786:18, 1794:18
**mountain** [2] - 1754:1, 1754:4
**Mountain** [1] - 1754:6
**mouth** [1] - 1800:5
**move** [32] - 1542:20, 1564:8, 1569:8, 1572:3, 1575:8, 1575:9, 1575:10, 1583:8, 1589:2, 1631:9, 1654:20, 1656:1, 1659:22, 1660:24, 1663:21, 1669:12, 1707:7, 1707:10, 1718:22, 1721:23, 1729:21, 1733:1, 1735:5, 1735:16, 1738:15, 1749:21, 1762:20, 1762:23, 1763:2, 1763:8, 1763:12, 1790:2
**Move** [1] - 1619:15
**moved** [2] - 1612:20, 1717:11
**moving** [4] - 1711:3, 1731:22, 1761:15, 1762:25
**MR** [312] - 1538:3, 1538:16, 1538:17, 1538:25, 1539:7, 1539:10, 1539:15, 1539:18, 1539:22, 1539:24, 1540:4, 1540:10, 1540:22, 1540:24, 1541:8, 1542:6, 1542:20, 1542:22, 1542:25, 1543:2, 1549:21, 1549:23, 1550:1, 1550:14, 1550:15, 1550:18, 1551:6, 1556:21, 1556:23, 1556:24, 1557:2, 1557:5, 1558:5, 1558:7, 1558:8, 1558:10, 1558:13, 1558:17, 1558:20, 1558:23, 1558:24, 1559:17, 1559:24, 1560:2, 1561:2, 1561:4, 1561:6, 1562:12, 1562:15, 1563:18, 1564:2, 1564:8, 1564:10, 1564:13, 1566:23, 1567:2, 1567:5, 1569:8, 1569:12, 1571:14, 1575:6, 1575:10, 1575:14, 1575:16, 1575:18, 1577:20, 1580:15, 1581:13, 1583:3, 1583:9, 1585:21, 1586:1, 1586:7, 1586:19, 1586:20, 1586:23, 1587:14, 1587:16, 1587:19, 1587:23, 1588:4, 1588:11, 1588:16, 1588:18, 1592:5, 1593:6, 1593:8, 1596:3, 1596:6, 1599:1, 1599:7, 1599:19, 1599:22, 1599:24, 1600:1, 1606:12, 1617:21, 1618:1, 1619:9, 1619:15, 1619:16, 1625:19, 1627:19, 1631:3, 1631:9, 1631:11, 1632:10, 1632:13, 1633:2, 1633:12, 1634:1, 1647:19, 1649:23, 1651:10, 1651:12, 1652:16, 1653:16, 1653:18, 1653:21, 1653:24, 1654:1, 1654:11, 1654:14, 1654:20, 1654:22, 1654:24, 1655:1, 1655:17, 1655:22, 1656:1, 1656:2, 1656:5, 1656:8, 1657:4, 1659:17, 1659:19, 1659:22, 1659:24, 1660:3, 1660:5, 1662:13, 1663:21, 1665:5, 1665:19, 1666:3, 1666:4, 1667:1, 1667:7, 1667:15, 1668:1, 1668:5, 1668:15, 1668:18, 1668:24, 1669:2, 1675:20, 1675:23, 1676:2, 1685:14, 1685:16, 1688:9, 1689:21, 1690:10, 1690:13, 1690:21, 1694:23, 1694:25, 1699:17, 1699:20, 1699:24, 1700:17, 1702:10, 1702:15, 1702:21, 1703:4, 1703:6, 1703:8, 1703:10, 1705:2, 1705:6, 1705:7, 1706:2, 1706:12, 1706:14, 1706:15, 1707:9, 1709:6, 1721:23, 1722:4, 1726:7, 1726:8, 1729:21, 1730:2, 1733:1, 1733:7, 1735:2, 1736:14, 1749:21, 1754:5, 1762:5, 1763:23, 1765:22, 1766:2, 1766:7, 1766:14, 1766:20, 1767:11, 1767:16, 1767:22, 1768:8, 1768:14, 1768:23, 1769:11, 1769:17, 1769:21, 1769:24, 1770:1, 1770:6, 1770:13, 1772:4, 1772:20, 1773:6, 1773:18, 1774:2, 1774:20, 1775:9, 1776:16, 1777:5, 1777:8, 1777:25, 1778:15, 1778:23, 1779:7, 1779:17, 1780:4, 1780:7, 1780:23, 1781:9, 1781:12, 1781:15, 1781:16, 1782:1, 1782:14, 1782:17, 1782:24, 1783:18, 1783:24, 1784:20, 1785:3, 1785:10, 1786:5, 1786:11, 1786:15, 1787:5, 1787:18, 1788:7, 1788:12, 1788:14, 1789:2, 1789:7, 1789:13, 1789:16, 1789:21, 1790:3, 1790:16, 1790:24, 1791:3, 1791:12, 1791:25, 1792:9, 1794:2, 1794:22, 1795:3, 1795:15, 1795:21, 1796:7, 1796:18, 1797:4, 1797:7, 1797:16, 1797:22, 1798:15, 1799:12, 1799:20, 1800:1, 1800:6, 1801:5, 1801:15, 1801:22, 1801:23, 1802:1, 1802:2, 1802:4, 1802:17, 1802:20, 1803:2, 1803:5, 1803:11, 1803:15, 1803:17, 1803:19, 1803:21, 1803:24, 1804:1, 1804:3, 1805:6, 1805:7, 1805:8, 1805:9, 1805:10, 1805:11, 1805:13
**MS** [29] - 1665:18, 1666:6, 1667:6, 1706:20, 1706:23, 1707:6, 1707:10, 1707:13, 1707:16, 1707:23, 1708:4, 1708:8, 1708:12, 1716:6, 1721:25, 1729:23, 1733:3, 1735:18, 1736:12,

1742:17, 1743:7, 1744:7, 1747:5, 1749:23, 1753:11, 1762:22, 1763:7, 1763:20, 1803:9
**mull** [1] - 1801:2
**multiple** [9] - 1586:9, 1619:1, 1656:12, 1657:21, 1681:18, 1682:24, 1683:2, 1723:4, 1774:8
**multiuse** [1] - 1635:20
**municipalities** [1] - 1648:11
**must** [12] - 1562:12, 1567:23, 1722:20, 1741:24, 1742:23, 1772:18, 1795:3, 1795:15, 1796:19, 1796:25, 1797:19, 1799:8
**mutually** [2] - 1593:12, 1736:6

# N

**nail** [1] - 1800:6
**name** [14] - 1638:13, 1638:20, 1638:22, 1639:9, 1639:20, 1663:4, 1673:1, 1673:2, 1673:14, 1694:20, 1694:22, 1734:2, 1769:23, 1785:25
**named** [2] - 1775:14, 1776:1
**names** [3] - 1617:7, 1638:15, 1775:17
**Nashville** [3] - 1626:15, 1626:16, 1627:13
**NASL** [179] - 1543:25, 1544:18, 1545:6, 1547:5, 1548:10, 1550:25, 1551:11, 1551:21, 1552:4, 1554:12, 1565:25, 1571:23, 1572:3, 1572:7, 1572:12, 1572:15, 1575:23, 1576:2, 1578:23, 1579:9, 1579:17, 1581:3, 1583:1, 1584:3, 1585:11, 1604:12, 1604:23, 1604:25, 1605:10, 1605:18, 1605:21, 1606:9, 1607:14, 1608:9, 1617:2, 1620:14, 1635:1, 1647:20, 1653:3, 1653:5, 1653:8, 1653:12, 1653:19, 1654:2, 1658:6, 1659:9, 1659:12, 1661:15, 1661:16, 1662:2, 1662:11, 1662:16, 1662:21, 1663:9, 1663:11, 1663:20, 1671:7, 1671:10, 1672:4, 1674:3, 1674:13, 1674:24, 1675:16, 1675:17, 1676:6, 1676:10, 1677:3, 1677:12, 1677:18, 1677:25, 1680:13, 1686:19, 1694:22, 1696:1, 1696:6, 1698:25, 1703:3, 1706:6, 1706:9, 1706:23, 1708:4, 1708:13, 1712:9, 1714:20, 1715:22, 1716:17, 1716:23, 1717:3, 1717:7, 1717:9, 1717:11, 1717:17, 1717:20, 1718:4, 1718:6, 1718:11, 1718:25, 1725:2, 1729:4, 1729:10, 1731:2, 1731:12, 1731:20, 1732:22, 1733:8, 1733:9, 1733:17, 1733:22, 1733:24, 1735:5, 1735:10, 1735:13, 1735:16, 1735:21, 1735:25, 1736:2, 1736:6, 1736:10, 1736:18, 1736:23, 1737:1, 1737:7, 1737:10, 1737:15, 1737:25, 1738:4, 1738:9, 1739:1, 1739:5, 1739:24, 1740:19, 1741:8, 1741:16, 1741:18, 1741:22, 1742:6, 1742:19, 1743:25, 1744:5, 1744:23, 1746:8, 1746:11, 1746:12, 1746:17, 1746:20, 1746:22, 1747:2, 1747:7, 1747:15, 1747:16, 1747:18, 1748:5, 1748:6, 1748:11, 1748:14, 1748:15, 1748:19, 1749:1, 1749:6, 1749:15, 1752:15, 1752:16, 1753:22, 1754:1, 1756:2, 1760:22, 1761:1, 1761:9, 1761:13, 1767:24, 1768:4, 1769:7, 1770:2, 1770:13, 1771:19, 1771:22
**NASL's** [18] - 1605:24, 1606:5, 1606:22, 1606:24, 1607:24, 1608:4, 1608:7, 1608:13, 1658:23, 1676:25, 1718:8, 1739:6, 1768:18, 1768:19, 1769:7, 1771:4, 1771:8, 1771:22
**nation** [4] - 1595:25, 1596:12, 1603:7, 1603:9
**national** [22] - 1572:16, 1573:1, 1573:2, 1582:19, 1602:2, 1605:4, 1611:18, 1623:17, 1624:24, 1625:2, 1625:6, 1639:11, 1639:14, 1639:15, 1641:7, 1641:19, 1648:4, 1654:5, 1654:6, 1654:7
**National** [8] - 1592:14, 1601:5, 1601:9, 1613:17, 1613:18, 1625:3, 1692:12, 1746:1
**native** [1] - 1656:23
**nature** [1] - 1670:20
**NBA** [15] - 1601:8, 1619:1, 1622:12, 1625:12, 1643:7, 1644:13, 1646:21, 1647:4, 1652:3, 1690:16, 1690:22, 1691:3, 1691:9, 1691:11, 1691:15
**near** [2] - 1628:9, 1684:6
**necessarily** [5] - 1602:13, 1675:7, 1718:22, 1767:9, 1781:18
**necessary** [4] - 1787:16, 1788:11, 1797:8, 1797:11
**need** [57] - 1547:16, 1554:15, 1554:16, 1578:12, 1580:4, 1580:5, 1586:15, 1612:13, 1612:14, 1621:5, 1621:10, 1621:11, 1623:15, 1623:16, 1625:6, 1625:17, 1626:6, 1628:18, 1643:16, 1644:1, 1645:10, 1648:2, 1648:3, 1648:4, 1648:5, 1648:6, 1648:7, 1648:8, 1648:13, 1649:5, 1661:22, 1691:2, 1691:10, 1693:15, 1751:16, 1752:20, 1762:20, 1775:18, 1781:7, 1781:20, 1781:24, 1782:15, 1784:23, 1785:1, 1785:8, 1789:6, 1789:11, 1790:22, 1794:10, 1797:15, 1799:5, 1800:11, 1800:13
**needed** [31] - 1549:11, 1555:11, 1555:18, 1568:13, 1625:5, 1628:23, 1685:7, 1697:21, 1698:4, 1698:9, 1711:6, 1724:13, 1731:13, 1737:10, 1750:20, 1751:3, 1751:6, 1751:8, 1751:10, 1751:12, 1751:24, 1752:7, 1752:9, 1752:16, 1752:17, 1753:22, 1759:5, 1759:20, 1777:1, 1797:21
**needs** [8] - 1620:24, 1621:7, 1649:12, 1767:12, 1779:5, 1780:20, 1793:3, 1800:23
**negotiate** [1] - 1673:11
**negotiation** [1] - 1673:9
**NEIL** [1] - 1536:24
**Nelson** [1] - 1713:21
**network** [1] - 1641:9
**never** [34] - 1538:10, 1552:5, 1570:16, 1570:22, 1571:20, 1604:25, 1606:2, 1608:16, 1653:7, 1663:14, 1663:16, 1663:17, 1683:20, 1684:2, 1684:3, 1684:11, 1684:13, 1684:19, 1685:2, 1685:5, 1686:19, 1687:6, 1687:11, 1687:12, 1700:1, 1701:12, 1725:25, 1731:11, 1741:3, 1744:21, 1744:23, 1757:6
**Never** [6] - 1605:19, 1605:23, 1606:23, 1608:11, 1608:16, 1609:24
**nevertheless** [1] - 1797:22
**new** [34] - 1548:6, 1549:2, 1549:15, 1549:19, 1557:24, 1559:7, 1569:21, 1572:17, 1581:9, 1601:9, 1607:18, 1622:20, 1624:7, 1624:8, 1626:14, 1630:12, 1632:18, 1634:10, 1638:23, 1657:5, 1670:17, 1682:11, 1682:16, 1682:20, 1686:5, 1686:14, 1694:14, 1718:21, 1718:25, 1730:5, 1757:8, 1765:8, 1768:3, 1801:19
**NEW** [1] - 1536:1
**New** [26] - 1536:6, 1536:15, 1537:2, 1537:7, 1538:11, 1613:5, 1614:22, 1622:20, 1622:21, 1627:24, 1633:5, 1633:9, 1634:5, 1634:6, 1634:7, 1634:8, 1634:9, 1634:14, 1639:10, 1641:10, 1643:12, 1643:14, 1685:23, 1686:16
**news** [1] - 1599:3
**Next** [5] - 1627:15, 1671:25, 1672:1, 1698:22, 1756:23
**next** [52] - 1539:15, 1539:19, 1539:22, 1546:24, 1552:6, 1559:15, 1561:15, 1562:12, 1563:16, 1568:16, 1569:5, 1573:23, 1575:3, 1578:4, 1594:16, 1595:3, 1598:8, 1613:6, 1620:8, 1625:19, 1634:11, 1637:25, 1638:24, 1650:8, 1650:11, 1652:4, 1652:5, 1666:20, 1669:12, 1688:19, 1689:13, 1690:4, 1704:6, 1706:19, 1706:21, 1708:3, 1708:11, 1714:7, 1736:22, 1743:4, 1743:10, 1749:16, 1755:10, 1755:25, 1757:3, 1757:7, 1757:9, 1761:10, 1764:2, 1790:4, 1801:3, 1801:4
**next-to-last** [1] - 1755:25
**NFL** [30] - 1601:7, 1613:20, 1614:2, 1614:7, 1614:11, 1614:14, 1614:16, 1614:21, 1614:24, 1615:8, 1615:11, 1615:21, 1616:12, 1619:1, 1625:12,

1642:21, 1643:7, 1644:13, 1646:20, 1651:21, 1651:24, 1690:16, 1691:13, 1691:16, 1691:18, 1691:19, 1691:20, 1692:21
**NHL** [3] - 1625:12, 1652:3
**nice** [1] - 1636:3
**niche** [1] - 1709:13
**night** [4] - 1538:25, 1582:19, 1644:7, 1762:12
**nightly** [1] - 1762:9
**nightmare** [1] - 1802:11
**Nike** [2] - 1785:24, 1786:7
**nine** [3] - 1562:13, 1626:1, 1632:6
**nineties** [1] - 1615:21
**nobody** [1] - 1687:13
**NOLAN** [1] - 1537:16
**NolanEDNY@aol.com** [1] - 1537:17
**nominate** [2] - 1677:11, 1677:13
**nominated** [2] - 1677:9, 1677:12
**non** [4] - 1565:5, 1566:9, 1614:9, 1758:15
**non-Disney** [1] - 1614:9
**non-MLS** [3] - 1565:5, 1566:9, 1758:15
**nondefendant** [1] - 1774:16
**none** [7] - 1540:2, 1540:4, 1540:5, 1739:14, 1775:21, 1779:18, 1789:19
**normal** [3] - 1668:2, 1798:8, 1798:25
**normally** [2] - 1668:2, 1743:13
**North** [3] - 1602:5, 1603:24, 1675:15
**NORTH** [1] - 1536:4
**not..** [1] - 1792:9
**note** [8] - 1544:4, 1544:12, 1544:13, 1544:14, 1570:20, 1596:23, 1779:17, 1784:16
**noted** [1] - 1719:18
**notes** [1] - 1690:21
**Nothing** [2] - 1706:14, 1706:15
**nothing** [11] - 1581:20, 1582:12, 1635:21, 1679:13, 1679:16, 1685:13, 1718:14, 1795:1, 1795:14
**notice** [3] - 1666:9, 1666:10, 1667:12
**Notified** [1] - 1755:12
**novelty** [2] - 1650:5, 1650:9
**November** [5] - 1557:23, 1559:6, 1561:9, 1670:15, 1743:15
**Number** [2] - 1589:18, 1740:12
**number** [35] - 1549:3, 1549:16, 1551:17, 1559:22, 1568:19, 1575:13, 1575:20, 1596:22, 1611:20, 1613:22, 1614:3, 1635:17, 1636:2, 1642:11, 1642:13, 1652:18, 1654:8, 1654:23, 1655:4, 1658:7, 1661:24, 1682:25, 1706:9, 1721:14, 1722:16, 1722:25, 1723:11, 1723:16, 1731:8, 1743:6, 1751:21, 1752:4, 1765:9, 1783:9, 1802:4
**numbers** [4] - 1642:9, 1763:10, 1763:11
**numeral** [1] - 1669:18
**Nunez** [5] - 1554:16, 1554:20, 1556:11, 1556:15, 1556:18
**nunez** [1] - 1555:2
**NWSL** [3] - 1677:13, 1745:10, 1745:23
**NY** [3] - 1536:15, 1537:2, 1537:17
**NYFC** [1] - 1639:7
**NYNEX** [1] - 1775:23

# O



**Oaks** [1] - 1536:20
**object** [11] - 1572:14, 1586:9, 1668:13, 1735:18, 1736:12, 1782:1, 1782:5, 1782:17, 1782:18, 1783:7, 1799:7
**objected** [4] - 1538:22, 1665:21, 1768:24, 1792:16
**objecting** [5] - 1707:8, 1767:24, 1768:1, 1769:7, 1772:13
**objection** [61] - 1542:22, 1550:14, 1550:15, 1550:17, 1551:6, 1564:10, 1566:23, 1567:5, 1569:11, 1569:12, 1575:15, 1580:15, 1581:13, 1583:3, 1587:13, 1617:22, 1618:1, 1619:16, 1631:11, 1632:10, 1653:16, 1653:23, 1653:24, 1654:22, 1656:2, 1659:23, 1659:24, 1662:13, 1685:14, 1688:9, 1689:21, 1689:24, 1690:10, 1694:23, 1699:17, 1700:17, 1702:10, 1702:21, 1703:4, 1721:25, 1729:23, 1733:3, 1742:17, 1743:7, 1744:7, 1747:5, 1749:23, 1753:11, 1763:13, 1763:17, 1768:18, 1769:7, 1772:6, 1790:25, 1797:6, 1798:12, 1799:15, 1801:15, 1801:21, 1801:22, 1801:23
**Objection** [3] - 1549:21, 1706:12, 1716:6
**objections** [5] - 1587:5, 1587:7, 1587:9, 1763:4, 1770:3
**objective** [5] - 1716:13, 1791:11, 1795:6, 1797:3, 1798:25
**objectives** [5] - 1627:1, 1627:6, 1627:11, 1718:2, 1756:24
**objects** [1] - 1772:16
**obligations** [1] - 1644:17
**obtain** [2] - 1778:19, 1778:21
**obviously** [6] - 1603:21, 1603:23, 1644:11, 1660:20, 1769:12, 1791:20
**Obviously** [2] - 1616:11, 1624:17
**occasion** [1] - 1555:19
**occasionally** [1] - 1608:19
**occupied** [1] - 1667:14
**occupy** [1] - 1667:15
**occur** [1] - 1711:5
**occurs** [1] - 1584:11
**October** [3] - 1542:15, 1592:7, 1592:21
**OF** [2] - 1536:1, 1536:11
**off-the-wall** [1] - 1785:23
**offense** [1] - 1781:24
**offer** [3] - 1624:24, 1707:5, 1707:21
**offered** [7] - 1615:7, 1626:5, 1640:13, 1687:4, 1687:6, 1687:11, 1714:13
**offering** [1] - 1656:17
**offers** [1] - 1719:15
**office** [8] - 1636:17, 1636:20, 1637:3, 1637:20, 1637:21, 1648:7, 1683:21, 1739:25
**officer** [2] - 1726:4, 1726:5
**offices** [1] - 1614:14
**official** [1] - 1728:18
**offset** [1] - 1684:11
**often** [1] - 1658:12
**old** [2] - 1601:4, 1696:20
**olden** [1] - 1791:14
**oldest** [1] - 1616:6
**once** [2] - 1650:24, 1744:21
**one** [144] - 1539:10, 1539:15, 1539:25, 1540:1, 1545:3, 1545:4, 1545:9, 1545:15, 1545:17, 1545:18, 1545:23, 1546:4, 1546:10, 1546:11, 1546:20, 1551:3, 1564:17, 1564:18, 1565:24, 1570:6, 1583:16, 1583:17, 1586:7, 1586:23, 1587:6, 1588:20, 1595:5, 1595:13, 1597:3, 1597:6, 1601:21, 1602:18, 1602:20, 1604:10, 1612:13, 1613:16, 1614:12, 1614:23, 1620:9, 1620:13, 1620:19, 1621:1, 1621:4, 1622:13, 1622:23, 1623:10, 1623:22, 1623:24, 1625:1, 1625:3, 1627:9, 1630:18, 1631:24, 1632:1, 1632:16, 1633:21, 1636:9, 1638:8, 1638:21, 1638:24, 1639:8, 1639:10, 1639:11, 1642:7, 1643:2, 1643:4, 1655:7, 1658:11, 1658:20, 1660:4, 1663:16, 1665:19, 1674:5, 1676:19, 1687:14, 1689:23, 1691:25, 1693:23, 1694:1, 1694:7, 1705:7, 1710:10, 1711:10, 1714:15, 1714:16, 1714:21, 1715:1, 1717:21, 1717:22, 1719:5, 1723:3, 1723:11, 1723:23, 1724:16, 1730:4, 1733:9, 1733:11, 1733:18, 1736:23, 1737:21, 1741:10, 1741:15, 1743:20, 1744:23, 1745:2, 1747:7, 1752:8, 1755:5, 1755:7, 1755:8, 1757:3, 1757:7, 1757:15, 1759:7, 1761:1, 1772:9, 1774:24, 1775:4, 1775:14, 1776:2, 1776:14, 1776:19, 1778:11, 1778:18, 1779:5, 1780:1, 1780:2, 1780:12, 1780:25, 1782:5, 1782:6, 1782:11, 1782:19, 1784:1, 1785:8, 1786:6, 1787:12, 1796:3, 1796:4, 1799:9, 1801:3
**One** [3] - 1612:22, 1769:22, 1769:25
**one-page** [1] - 1710:10
**one/two** [3] - 1713:9, 1713:10, 1713:12
**Oneonta** [1] - 1613:5
**ones** [4] - 1666:17, 1681:7, 1746:3, 1776:25
**ooOoo** [1] - 1804:12

**open** [8] - 1538:1, 1665:3, 1665:24, 1674:22, 1713:13, 1719:25, 1765:1, 1801:25
**Open** [10] - 1657:6, 1657:7, 1657:13, 1657:16, 1658:7, 1699:3, 1699:7, 1699:15, 1699:21, 1699:22
**opened** [2] - 1614:14, 1626:17
**opening** [2] - 1631:20, 1699:23
**operate** [3] - 1600:20, 1648:13, 1671:12
**operated** [1] - 1715:2
**operating** [5] - 1600:13, 1602:4, 1632:22, 1637:10, 1711:17
**operation** [4] - 1582:22, 1637:6, 1637:9, 1640:3
**operations** [5] - 1600:9, 1741:25, 1742:7, 1742:21, 1742:24
**operator** [1] - 1778:5
**operator/investor** [1] - 1687:25
**operator/investors** [1] - 1680:18
**opinion** [7] - 1633:22, 1640:9, 1648:15, 1658:14, 1658:17, 1719:14, 1723:10
**opportunities** [3] - 1711:2, 1715:18, 1718:2
**opportunity** [11] - 1609:11, 1609:15, 1615:9, 1615:24, 1616:16, 1623:18, 1640:16, 1656:14, 1657:10, 1719:6, 1731:16
**oppose** [1] - 1768:12
**opposed** [2] - 1605:21, 1615:12
**opposite** [1] - 1779:21
**opted** [2] - 1566:17, 1724:14
**option** [6] - 1656:20, 1686:8, 1719:8, 1719:11, 1719:19, 1724:18
**options** [6] - 1647:10, 1651:3, 1709:24, 1714:13, 1720:20, 1724:16
**or..** [1] - 1588:3
**order** [9] - 1586:16, 1625:7, 1668:8, 1703:21, 1766:3, 1772:17, 1781:8, 1781:24, 1793:3
**organization** [1] - 1619:8
**organize** [1] - 1636:12
**organized** [2] - 1601:25, 1754:24
**organizing** [1] - 1636:18
**oriented** [1] - 1656:25
**original** [9] - 1628:17, 1712:15, 1712:17, 1753:6, 1765:16, 1767:14, 1767:16, 1770:7, 1770:23
**originally** [5] - 1665:9, 1673:1, 1673:14, 1733:21, 1768:23
**Orlando** [3] - 1638:23, 1642:1, 1644:7
**otherwise** [4] - 1653:25, 1681:24, 1770:5, 1800:18
**Otherwise** [1] - 1770:4
**ought** [3] - 1610:4, 1610:8, 1615:15
**ourselves** [4] - 1547:16, 1621:13, 1651:24, 1652:22
**outcome** [2] - 1736:3, 1736:9
**outcomes** [1] - 1796:2
**outlets** [1] - 1642:20
**outline** [1] - 1620:25
**outlining** [1] - 1710:10
**outside** [3] - 1610:15, 1689:6, 1711:19
**overall** [10] - 1564:24, 1566:6, 1570:19, 1595:23, 1596:11, 1637:6, 1650:23, 1684:2, 1757:12, 1758:8
**overarching** [1] - 1794:6
**overruled** [1] - 1653:23
**overseas** [3] - 1614:15, 1615:19, 1617:10
**oversee** [1] - 1600:9
**overseeing** [1] - 1637:5
**oversight** [2] - 1692:25, 1693:2
**overview** [2] - 1589:19, 1730:4
**own** [27] - 1544:8, 1557:15, 1557:20, 1566:20, 1570:21, 1571:5, 1605:17, 1617:9, 1623:1, 1628:23, 1662:18, 1663:17, 1670:23, 1671:12, 1671:14, 1671:22, 1696:15, 1701:16, 1704:1, 1724:9, 1740:8, 1778:10, 1779:23, 1784:13, 1784:18, 1794:5
**owned** [10] - 1555:15, 1571:22, 1622:3, 1622:15, 1622:21, 1623:2, 1626:18, 1654:8, 1756:6
**owner** [30] - 1569:24, 1570:7, 1570:9, 1571:9, 1572:18, 1573:9, 1573:13, 1605:9, 1616:9, 1616:12, 1619:23, 1622:4, 1622:9, 1622:11, 1626:6, 1627:9, 1632:24, 1632:25, 1663:16, 1674:20, 1675:15, 1677:12, 1693:15, 1696:21, 1711:15, 1726:23, 1752:23, 1756:3
**owner-controlled** [1] - 1756:3
**owners** [65] - 1543:20, 1554:24, 1564:17, 1564:18, 1571:3, 1572:18, 1573:1, 1593:21, 1600:20, 1603:1, 1603:3, 1605:8, 1605:15, 1615:2, 1616:3, 1618:16, 1621:20, 1621:21, 1621:23, 1621:24, 1622:19, 1622:23, 1622:25, 1623:11, 1623:12, 1623:25, 1624:2, 1624:3, 1627:5, 1627:18, 1629:22, 1635:3, 1635:16, 1636:10, 1636:13, 1637:23, 1639:18, 1643:23, 1644:1, 1644:19, 1645:15, 1646:3, 1647:9, 1648:3, 1648:6, 1649:4, 1649:10, 1651:5, 1656:14, 1679:5, 1679:10, 1681:6, 1681:17, 1683:12, 1685:12, 1694:21, 1695:14, 1695:16, 1703:25, 1705:3, 1712:8, 1719:25, 1777:18, 1778:5
**ownership** [29] - 1569:3, 1570:3, 1570:14, 1571:22, 1572:7, 1572:15, 1572:20, 1600:11, 1621:25, 1623:6, 1626:25, 1627:8, 1627:10, 1637:4, 1645:2, 1654:4, 1670:23, 1682:24, 1683:5, 1711:20, 1725:19, 1725:23, 1727:6, 1727:7, 1728:24, 1728:25, 1751:10, 1780:6, 1780:7
**ownerships** [1] - 1683:3
**owning** [3] - 1681:18, 1696:9, 1698:11
**owns** [3] - 1614:22, 1622:24, 1647:14
**owns/founded** [1] - 1623:3

# P

**P&Ls** [1] - 1689:5
**p.m** [1] - 1762:16
**Pacific** [1] - 1754:11
**packaged** [1] - 1613:23
**PAGE** [1] - 1805:3
**Page** [25] - 1576:13, 1578:4, 1583:10, 1583:12, 1584:13, 1584:14, 1588:24, 1589:17, 1589:18, 1593:11, 1594:16, 1594:17, 1595:3, 1596:15, 1633:2, 1670:1, 1688:24, 1739:1, 1740:6, 1750:10, 1755:10, 1755:24, 1766:10, 1770:24
**page** [59] - 1539:12, 1539:15, 1539:22, 1540:1, 1543:4, 1543:9, 1543:11, 1544:2, 1547:3, 1547:10, 1547:11, 1548:22, 1552:6, 1556:11, 1558:2, 1558:18, 1560:3, 1561:15, 1563:25, 1569:5, 1589:18, 1598:5, 1598:8, 1599:10, 1599:17, 1620:4, 1631:18, 1633:24, 1636:4, 1638:1, 1651:7, 1654:18, 1655:2, 1655:22, 1669:12, 1690:4, 1704:6, 1708:17, 1710:10, 1711:9, 1712:4, 1714:7, 1714:10, 1715:6, 1722:13, 1722:15, 1728:6, 1728:7, 1728:8, 1730:4, 1734:4, 1755:10, 1755:24, 1755:25, 1756:22, 1764:2, 1769:15, 1793:10
**Pages** [1] - 1738:25
**paid** [1] - 1639:23
**palmer** [1] - 1753:1
**Papadakis** [11] - 1563:23, 1564:15, 1564:16, 1565:9, 1667:6, 1677:11, 1757:11, 1757:24, 1760:11, 1760:16, 1803:24
**paper** [1] - 1802:10
**papers** [1] - 1792:6
**Paragraph** [1] - 1670:2
**paragraph** [6] - 1599:11, 1733:15, 1736:22, 1742:13, 1743:4, 1743:10
**parallel** [1] - 1576:19
**Paris** [2] - 1640:11, 1640:22
**parity** [1] - 1623:23
**Park** [2] - 1536:15, 1630:15
**Part** [1] - 1578:11
**part** [56] - 1548:5, 1548:17, 1552:1, 1566:15, 1566:16, 1568:3, 1568:9, 1568:11, 1572:19, 1572:23, 1572:24, 1572:25, 1574:21, 1576:3, 1576:6, 1582:21, 1582:22, 1591:1, 1600:18, 1600:19, 1618:11, 1624:11, 1626:3, 1626:24, 1627:1, 1631:1, 1632:25, 1633:4, 1633:10, 1634:12, 1635:12, 1637:18, 1640:17, 1642:9, 1643:15,

1649:18, 1651:6, 1655:6, 1657:13, 1658:13, 1662:22, 1675:2, 1693:18, 1716:17, 1721:13, 1733:10, 1744:10, 1748:11, 1756:17, 1763:14, 1767:12, 1775:24, 1776:17, 1784:24, 1790:12, 1799:15
**partial** [2] - 1538:18, 1711:14
**partially** [3] - 1622:15, 1622:21, 1771:1
**participant** [6] - 1774:16, 1776:20, 1778:1, 1785:9, 1785:18, 1786:21
**participants** [3] - 1774:23, 1774:24, 1776:5
**participate** [6] - 1566:10, 1591:14, 1606:21, 1673:21, 1733:12, 1792:25
**participated** [9] - 1575:25, 1701:12, 1770:14, 1774:5, 1774:9, 1774:13, 1776:2, 1776:18, 1782:7
**participating** [6] - 1776:9, 1776:25, 1777:4, 1778:4, 1778:6, 1783:15
**participation** [6] - 1562:3, 1773:9, 1778:13, 1780:10, 1781:1, 1784:19
**particular** [11] - 1587:19, 1587:20, 1607:21, 1610:10, 1651:7, 1670:1, 1677:17, 1693:4, 1730:13, 1738:6, 1738:7
**particularly** [3] - 1540:3, 1743:25, 1746:7
**parties** [9] - 1665:4, 1765:6, 1765:13, 1765:17, 1765:18, 1768:22, 1778:18, 1780:25, 1802:23
**parties'** [3] - 1768:15, 1771:18, 1799:10
**partner** [4] - 1625:2, 1635:9, 1714:15, 1714:19
**partnering** [2] - 1714:18, 1719:5
**Partners** [1] - 1641:3
**partners** [6] - 1572:17, 1602:15, 1602:16, 1621:18, 1635:18, 1652:25
**partnership** [23] - 1557:9, 1557:13, 1557:15, 1557:18, 1557:19, 1557:20, 1557:24, 1559:8, 1559:12, 1561:11, 1594:3, 1594:7, 1594:8, 1594:10, 1594:12, 1594:14, 1594:22, 1597:9, 1597:11, 1597:14, 1636:10, 1636:11
**partnerships** [1] - 1715:14
**parts** [3] - 1589:4, 1615:14, 1744:16
**party** [8] - 1768:3, 1770:23, 1779:10, 1780:12, 1784:6, 1785:8, 1788:19, 1799:9
**passage** [1] - 1798:3
**passed** [2] - 1549:1, 1686:7
**passion** [4] - 1616:17, 1620:20, 1696:12, 1697:11
**passionate** [3] - 1603:2, 1621:6, 1633:20
**past** [2] - 1601:25, 1677:11
**patently** [1] - 1604:19
**path** [4] - 1616:2, 1777:22, 1777:23, 1796:12
**pathway** [1] - 1723:25
**Patriots** [2] - 1614:23, 1622:9
**Paul** [2] - 1622:16, 1628:12
**pause** [2] - 1588:12, 1668:19
**Pause** [1] - 1541:3
**pay** [6] - 1637:24, 1662:6, 1662:7, 1662:8, 1662:21
**PEARSON** [4] - 1536:19, 1536:20, 1536:21, 1536:23
**penalties** [1] - 1743:2
**penalty** [15] - 1732:22, 1732:25, 1733:8, 1733:13, 1733:16, 1733:20, 1736:5, 1736:21, 1742:3, 1742:9, 1742:11, 1742:14, 1742:15, 1743:1, 1749:3
**Pennsylvania** [1] - 1537:10
**people** [40] - 1559:19, 1568:19, 1574:13, 1606:17, 1606:18, 1606:22, 1607:16, 1607:18, 1611:1, 1611:10, 1611:18, 1615:11, 1615:13, 1616:4, 1618:23, 1621:10, 1627:16, 1636:20, 1636:25, 1637:10, 1638:2, 1638:9, 1640:10, 1642:13, 1645:15, 1660:9, 1712:5, 1716:9, 1716:16, 1716:22, 1716:24, 1722:10, 1743:19, 1757:16, 1767:1, 1774:11, 1786:16, 1800:20
**Per** [1] - 1758:7
**per** [5] - 1564:22, 1650:6, 1650:10, 1655:12, 1792:2
**perceiving** [1] - 1587:8
**percent** [7] - 1561:22, 1569:24, 1683:17, 1725:19, 1725:23, 1726:23, 1783:12
**percentage** [2] - 1656:22, 1657:2
**percentages** [1] - 1728:25
**perform** [1] - 1614:8
**performance** [6] - 1645:4, 1645:13, 1735:24, 1737:25, 1749:3, 1749:9
**perhaps** [3] - 1621:9, 1656:18, 1803:11
**period** [32] - 1559:8, 1564:4, 1604:1, 1604:2, 1604:3, 1618:2, 1625:23, 1632:13, 1643:19, 1648:22, 1651:14, 1663:22, 1670:18, 1670:20, 1679:20, 1679:23, 1680:18, 1683:7, 1683:17, 1683:19, 1684:6, 1684:16, 1685:6, 1693:15, 1721:8, 1723:1, 1724:19, 1732:9, 1747:4, 1771:15, 1789:1, 1791:7
**Perkeland** [1] - 1539:1
**permission** [1] - 1698:7
**PERRA** [1] - 1537:8
**person** [7] - 1615:10, 1615:23, 1638:23, 1716:25, 1722:24, 1788:21, 1799:14
**personal** [2] - 1545:16, 1546:8
**personally** [2] - 1673:11, 1798:19
**perspective** [1] - 1579:24
**persuaded** [1] - 1566:1
**ph** [1] - 1732:12
**Phil** [3] - 1616:9, 1622:3, 1630:14
**Philadelphia** [2] - 1646:23, 1647:11
**philanthropic** [3] - 1627:5, 1643:5, 1643:8
**phone** [2] - 1606:9, 1607:13
**photograph** [1] - 1631:19
**pick** [2] - 1676:18, 1766:8
**picture** [1] - 1606:15
**pictures** [1] - 1692:1
**piece** [2] - 1623:1, 1672:19
**pieces** [1] - 1540:25
**pitch** [5] - 1644:5, 1644:6, 1710:22
**pitched** [1] - 1710:20
**place** [6] - 1603:20, 1615:17, 1698:4, 1703:3, 1758:2, 1801:9
**Plaintiff** [10] - 1536:5, 1536:14, 1542:2, 1709:2, 1771:14, 1772:16, 1774:11, 1784:11, 1791:10
**plaintiff** [6] - 1795:3, 1796:24, 1796:25, 1797:19, 1799:8, 1801:10
**Plaintiff's** [15] - 1542:10, 1542:13, 1542:21, 1542:24, 1564:12, 1569:14, 1749:25, 1771:10, 1772:23, 1784:18, 1790:8, 1805:16, 1805:17, 1805:18, 1806:3
**plaintiff's** [1] - 1799:10
**plan** [33] - 1562:16, 1562:19, 1618:16, 1618:17, 1626:6, 1628:10, 1628:17, 1634:19, 1643:23, 1645:9, 1645:10, 1645:11, 1648:7, 1649:10, 1649:13, 1682:11, 1682:15, 1682:19, 1710:13, 1731:22, 1732:22, 1733:8, 1738:6, 1739:16, 1739:25, 1740:1, 1740:12, 1759:18, 1759:20, 1765:6, 1803:1
**planning** [6] - 1666:15, 1666:17, 1666:19, 1692:8, 1709:10, 1744:14
**plans** [2] - 1566:7, 1739:25
**play** [39] - 1567:4, 1567:13, 1590:2, 1606:4, 1606:25, 1607:10, 1611:5, 1617:13, 1619:3, 1620:20, 1621:12, 1639:10, 1639:23, 1640:14, 1657:9, 1657:10, 1657:11, 1657:15, 1658:2, 1662:9, 1662:11, 1665:12, 1666:15, 1666:17, 1666:19, 1667:4, 1667:5, 1667:7, 1692:12, 1693:22, 1698:4, 1699:6, 1699:15, 1708:14, 1720:12, 1723:6, 1733:18, 1803:22
**played** [30] - 1566:21, 1567:21, 1606:6, 1615:12, 1617:6, 1617:10, 1632:7, 1638:23, 1639:1, 1639:3, 1640:18, 1640:19, 1640:21, 1640:22, 1640:25, 1644:7, 1661:23, 1666:5, 1666:22, 1666:25, 1697:7, 1698:4, 1706:24, 1708:6, 1708:15, 1715:9, 1748:15
**Player** [1] - 1637:25
**player** [31] - 1582:15, 1595:19, 1596:9, 1616:18, 1638:3, 1638:6, 1638:18, 1639:1, 1639:2, 1639:15, 1639:24, 1640:5, 1640:9, 1671:2, 1671:16,

1671:24, 1695:3, 1695:6, 1695:7, 1695:17, 1697:21, 1703:13, 1703:14, 1716:3, 1716:13, 1718:3, 1723:12, 1723:13, 1723:25, 1724:6
**player's** [1] - 1662:6
**Players** [1] - 1600:19
**players** [64] - 1571:25, 1582:16, 1582:18, 1582:19, 1600:12, 1601:24, 1604:6, 1604:7, 1604:8, 1610:23, 1611:2, 1611:14, 1611:19, 1612:14, 1616:18, 1617:5, 1617:9, 1617:10, 1617:12, 1621:5, 1629:1, 1629:24, 1637:8, 1637:17, 1638:13, 1638:20, 1638:21, 1640:5, 1641:23, 1641:24, 1644:4, 1644:5, 1644:7, 1644:10, 1646:1, 1655:15, 1657:15, 1658:2, 1658:8, 1661:16, 1661:19, 1661:20, 1661:21, 1661:22, 1661:25, 1662:2, 1662:8, 1662:10, 1662:12, 1662:15, 1662:16, 1662:17, 1682:12, 1698:10, 1711:2, 1718:22, 1719:7, 1723:23, 1724:13, 1779:8
**players'** [2] - 1601:25, 1695:23
**playing** [35] - 1556:9, 1557:17, 1566:16, 1567:15, 1567:17, 1572:4, 1572:12, 1572:15, 1572:20, 1574:1, 1615:22, 1617:10, 1629:16, 1638:7, 1639:16, 1640:11, 1641:22, 1655:11, 1657:19, 1657:20, 1658:11, 1661:20, 1662:1, 1662:21, 1667:1, 1670:22, 1686:2, 1686:7, 1690:1, 1694:1, 1727:5, 1756:10, 1756:11, 1757:17, 1759:2
**plays** [4] - 1610:16, 1631:24, 1692:21, 1799:6
**Plaza** [1] - 1537:17
**pled** [4] - 1654:9, 1777:5, 1777:9
**plus** [1] - 1631:21
**pockets** [1] - 1714:14
**point** [51] - 1545:2, 1548:18, 1551:2, 1554:17, 1583:21, 1583:22, 1585:21, 1588:7, 1605:20, 1610:22, 1622:4, 1623:6, 1625:4, 1649:1, 1650:13, 1651:18, 1652:4, 1659:7, 1671:8, 1672:11, 1672:13, 1674:18, 1680:4, 1690:7, 1694:14, 1713:12, 1713:18, 1713:23, 1724:20, 1732:11, 1737:17, 1738:2, 1739:24, 1761:12, 1766:10, 1770:12, 1772:14, 1772:21, 1773:17, 1775:15, 1780:13, 1781:9, 1785:1, 1785:2, 1787:2, 1788:9, 1789:20, 1790:1, 1790:4, 1793:7, 1801:4
**pointing** [1] - 1778:16
**points** [5] - 1584:4, 1584:6, 1673:4, 1733:15, 1775:9
**popped** [1] - 1627:23
**popular** [5] - 1611:2, 1612:9, 1612:14, 1645:22, 1703:24
**popularity** [2] - 1610:17, 1611:16
**portion** [9] - 1555:15, 1662:7, 1667:14, 1670:3, 1670:5, 1670:8, 1670:12, 1683:14
**portions** [1] - 1765:7
**Portland** [1] - 1622:16
**posited** [1] - 1580:24
**position** [23] - 1544:23, 1560:23, 1565:16, 1647:20, 1683:11, 1729:14, 1730:5, 1730:11, 1730:22, 1731:3, 1767:12, 1767:16, 1768:10, 1768:15, 1785:5, 1787:16, 1788:22, 1788:24, 1789:12, 1789:13, 1789:14, 1790:8, 1792:25
**positions** [1] - 1789:24
**positive** [2] - 1593:12, 1730:8
**possibilities** [2] - 1737:13, 1749:8
**possibility** [9] - 1736:18, 1736:25, 1737:4, 1737:6, 1737:8, 1741:17, 1746:17, 1747:15, 1748:5
**possible** [13] - 1546:8, 1546:9, 1696:9, 1718:9, 1718:12, 1736:10, 1742:10, 1761:14, 1788:12, 1788:14, 1788:17, 1792:13, 1798:3
**possibly** [1] - 1761:14
**post** [3] - 1613:9, 1733:11
**potential** [7] - 1626:23, 1670:16, 1712:4, 1713:14, 1718:23, 1719:5, 1719:16
**potentially** [6] - 1711:3, 1712:7, 1712:8, 1717:1, 1745:10
**power** [4] - 1695:17, 1778:19, 1778:22, 1780:12
**powers** [1] - 1780:21
**practical** [1] - 1553:10
**practices** [1] - 1645:16
**precisely** [1] - 1800:7
**preeminent** [1] - 1610:14
**prefer** [1] - 1671:20
**Premiere** [3] - 1611:11, 1647:15, 1652:23
**premise** [1] - 1723:21
**prepare** [4] - 1574:6, 1620:11, 1620:12, 1725:4
**prepared** [7] - 1618:23, 1619:13, 1620:7, 1632:20, 1644:20, 1749:17, 1770:10
**prepares** [1] - 1620:11
**preponderance** [1] - 1775:6
**prerogative** [1] - 1682:15
**present** [29] - 1538:1, 1574:7, 1590:10, 1591:8, 1607:13, 1620:1, 1645:9, 1665:4, 1674:13, 1675:2, 1690:5, 1701:15, 1701:23, 1702:12, 1702:16, 1702:19, 1702:24, 1713:25, 1714:5, 1739:16, 1739:24, 1750:9, 1765:1, 1776:24, 1795:4, 1795:15, 1796:19, 1796:25, 1797:19
**presentation** [18] - 1561:11, 1561:16, 1574:13, 1631:7, 1633:4, 1654:16, 1655:6, 1670:15, 1674:24, 1690:5, 1693:3, 1693:4, 1702:1, 1702:5, 1712:21, 1715:4, 1749:17, 1750:14
**presentations** [2] - 1626:5, 1626:10
**presented** [11] - 1554:11, 1574:19, 1579:19, 1579:20, 1606:9, 1607:14, 1702:13, 1720:7, 1740:2, 1750:8, 1796:17
**presenting** [1] - 1713:3
**preservation** [1] - 1784:13
**preserve** [3] - 1802:6, 1802:9, 1802:20
**preserved** [1] - 1802:21
**PRESIDENT** [1] - 1689:2
**President** [2] - 1603:19, 1688:25
**president** [6] - 1597:13, 1597:15, 1603:18, 1673:15, 1701:3, 1701:8
**press** [10] - 1538:16, 1538:20, 1592:6, 1592:21, 1593:5, 1596:21, 1598:1, 1598:6, 1599:16, 1605:6
**presume** [1] - 1741:5
**Pretty** [1] - 1783:17
**prevail** [5] - 1766:23, 1767:8, 1774:4, 1774:13, 1794:23
**prevailed** [1] - 1548:16
**prevent** [3] - 1586:14, 1586:16, 1604:14
**previous** [1] - 1772:22
**previously** [4] - 1542:3, 1550:22, 1639:1, 1665:21
**price** [2] - 1766:25, 1775:13
**price-fixing** [1] - 1766:25
**prices** [1] - 1774:21
**primarily** [3] - 1661:22, 1732:2, 1792:21
**primary** [4] - 1622:4, 1650:25, 1654:8, 1767:21
**primer** [1] - 1619:22
**principal** [4] - 1752:23, 1780:1, 1788:6
**principals** [2] - 1769:3, 1769:4
**principle** [2] - 1555:4, 1555:22
**prioritize** [2] - 1658:3
**privately** [2] - 1627:6, 1756:6
**privately-owned** [1] - 1756:6
**Pro** [33] - 1564:22, 1671:25, 1672:1, 1672:7, 1676:8, 1676:10, 1676:12, 1676:14, 1676:20, 1676:24, 1676:25, 1677:3, 1677:6, 1677:16, 1677:21, 1678:3, 1678:8, 1678:11, 1678:15, 1678:19, 1689:7, 1698:22, 1698:23, 1714:20, 1737:11, 1738:21, 1741:23, 1753:12, 1754:12, 1754:17, 1754:23, 1757:18, 1759:3
**pro** [14] - 1561:11, 1564:24, 1566:6, 1581:24, 1605:7, 1608:17, 1608:18, 1647:16, 1726:12, 1726:13, 1743:21, 1756:24, 1757:13, 1758:8
**problem** [7] - 1583:16, 1773:11, 1773:22, 1790:12, 1790:24, 1795:18, 1799:12
**problems** [1] - 1547:23
**procedure** [1] - 1685:4
**procedures** [2] - 1728:7, 1728:8

**proceed** [1] - 1599:22
**Proceedings** [1] - 1537:18
**proceedings** [5] - 1541:3, 1586:4, 1588:12, 1668:19, 1764:1
**process** [21] - 1554:15, 1554:19, 1570:21, 1574:16, 1574:21, 1608:23, 1609:1, 1609:3, 1646:22, 1673:21, 1680:20, 1700:15, 1726:11, 1743:21, 1744:11, 1752:12, 1755:13, 1757:9, 1761:6, 1761:19, 1802:22
**Procter** [1] - 1647:3
**produced** [2] - 1537:18, 1538:10
**product** [3] - 1636:14, 1673:8, 1779:12
**Product** [1] - 1695:14
**productive** [1] - 1636:19
**Products** [1] - 1695:12
**professional** [32] - 1554:8, 1578:13, 1581:10, 1581:11, 1589:3, 1589:10, 1601:14, 1601:19, 1602:6, 1609:11, 1609:13, 1610:16, 1611:5, 1641:18, 1643:7, 1644:11, 1677:4, 1677:22, 1678:1, 1689:18, 1690:18, 1711:18, 1711:24, 1721:8, 1724:24, 1724:25, 1725:7, 1725:11, 1726:11, 1726:16, 1800:24
**Professional** [7] - 1590:6, 1687:8, 1687:15, 1688:12, 1699:5, 1750:11, 1753:8
**professionals** [2] - 1574:23, 1677:19
**profit** [4] - 1683:20, 1684:4, 1684:14, 1756:6
**profitability** [1] - 1621:15
**program** [5] - 1602:3, 1613:12, 1643:5, 1643:10, 1709:13
**programs** [5] - 1595:22, 1595:24, 1596:2, 1596:10, 1643:8
**progress** [3] - 1595:21, 1596:2, 1596:4
**project** [35] - 1633:1, 1634:12, 1634:13, 1704:5, 1709:11, 1709:20, 1709:22, 1709:24, 1710:11, 1710:13, 1710:15, 1710:19, 1710:20, 1710:22, 1711:23, 1712:13, 1712:15, 1712:23, 1713:20, 1716:17, 1717:10, 1720:7, 1720:15, 1720:17, 1721:9, 1721:10, 1721:11, 1721:13, 1724:2, 1724:17, 1725:8, 1730:23, 1737:24, 1740:22, 1741:6
**projects** [2] - 1709:10, 1717:22
**promise** [1] - 1656:14
**promote** [1] - 1561:25
**promotions** [1] - 1625:4
**Promotors** [1] - 1776:5
**proof** [2] - 1767:7, 1773:8
**proper** [8] - 1571:16, 1572:25, 1581:22, 1582:22, 1605:5, 1628:4, 1804:4
**properly** [3] - 1573:1, 1675:14, 1743:3
**proposal** [9] - 1560:12, 1583:18, 1710:14, 1710:16, 1760:7, 1760:12, 1768:24, 1770:8, 1770:23
**propose** [2] - 1729:17, 1769:18
**proposed** [31] - 1609:12, 1609:18, 1687:14, 1688:11, 1688:13, 1688:15, 1688:16, 1710:12, 1716:22, 1765:8, 1767:15, 1768:18, 1768:20, 1769:5, 1769:8, 1770:2, 1770:3, 1770:8, 1770:18, 1771:21, 1791:14, 1791:16, 1791:24, 1795:24, 1796:14, 1796:15, 1801:7, 1801:10, 1801:16, 1801:19, 1802:5
**proposes** [2] - 1768:3, 1771:19
**proposing** [2] - 1712:5, 1767:25
**PROSKAUER** [2] - 1537:6, 1537:10
**proud** [3] - 1613:1, 1627:12, 1649:9
**proudest** [1] - 1639:11
**prove** [17] - 1766:21, 1766:23, 1769:1, 1770:13, 1772:7, 1772:8, 1774:4, 1774:14, 1774:21, 1777:23, 1778:25, 1782:4, 1787:17, 1793:4, 1794:2, 1795:8
**proved** [2] - 1774:12, 1787:21
**proven** [1] - 1787:6
**proves** [1] - 1775:2
**provide** [8] - 1569:18, 1609:12, 1661:1, 1726:11, 1726:15, 1740:12, 1760:1, 1760:19
**provided** [2] - 1561:23, 1609:14
**provides** [1] - 1713:13
**providing** [4] - 1562:1, 1723:10, 1740:15, 1760:11
**provision** [1] - 1670:4
**provisional** [5] - 1684:22, 1685:1, 1733:10, 1737:16, 1739:5
**provisionally** [4] - 1725:3, 1731:2, 1746:5, 1751:3
**provisions** [2] - 1695:4, 1695:6
**PTO** [1] - 1538:11
**public** [7] - 1599:16, 1600:19, 1612:25, 1613:1, 1613:13, 1689:6, 1699:14
**publicly** [3] - 1597:6, 1597:22, 1598:4
**publish** [7] - 1542:25, 1619:9, 1631:3, 1654:12, 1655:18, 1656:5, 1659:17
**published** [32] - 1542:11, 1543:1, 1558:15, 1559:16, 1560:1, 1561:3, 1561:8, 1563:17, 1606:14, 1607:4, 1619:18, 1631:13, 1636:5, 1649:22, 1651:9, 1654:13, 1655:20, 1656:7, 1659:18, 1660:2, 1710:2, 1712:19, 1716:21, 1717:24, 1721:17, 1722:3, 1722:8, 1727:14, 1729:12, 1730:1, 1732:17, 1733:6
**pull** [6] - 1649:23, 1650:4, 1651:12, 1652:4, 1652:18, 1669:10
**purchased** [1] - 1672:19
**purchasing** [1] - 1682:14
**purple** [1] - 1638:25
**purported** [2] - 1538:4, 1538:7
**purportedly** [2] - 1538:16, 1538:17
**purpose** [1] - 1798:1
**pursue** [1] - 1724:18
**push** [1] - 1733:16
**pushed** [1] - 1735:21
**put** [29] - 1546:7, 1553:7, 1558:7, 1583:18, 1587:24, 1587:25, 1588:22, 1606:12, 1607:6, 1644:12, 1649:10, 1651:7, 1655:17, 1676:10, 1677:21, 1680:2, 1684:22, 1697:12, 1744:11, 1744:19, 1748:23, 1769:19, 1776:19, 1786:16, 1790:13, 1792:6, 1796:19, 1800:5, 1802:15
**putting** [2] - 1624:11, 1802:18
**PX** [2] - 1651:6, 1723:19
**PX-074** [1] - 1721:16
**PX-171** [4] - 1729:11, 1729:22, 1729:25, 1806:1
**PX-180** [6] - 1732:16, 1733:4, 1733:5, 1741:12, 1741:14, 1806:2
**PX-190** [5] - 1749:16, 1749:17, 1749:21, 1749:25, 1806:3
**PX-194** [1] - 1575:3
**PX-199** [2] - 1763:2, 1806:7
**PX-201** [1] - 1727:13
**PX-493** [2] - 1763:13, 1806:10
**PX-589** [1] - 1559:15
**PX-590** [7] - 1563:16, 1563:19, 1564:9, 1564:12, 1757:19, 1757:20, 1805:17
**PX-598** [1] - 1599:3
**PX-612** [4] - 1568:17, 1568:18, 1569:14, 1805:18
**PX-614.005** [1] - 1649:21
**PX-621** [1] - 1591:24
**PX-74** [5] - 1721:23, 1722:2, 1722:17, 1723:18, 1805:25

## Q

**Qatar** [1] - 1603:20
**qualify** [1] - 1546:3
**quality** [7] - 1572:10, 1572:13, 1620:20, 1621:6, 1655:11, 1658:8, 1662:11
**quarter** [2] - 1589:20, 1763:21
**Queens** [5] - 1612:20, 1612:21, 1613:1, 1613:7, 1634:10
**questioning** [1] - 1700:19
**questions** [19] - 1540:17, 1541:1, 1571:15, 1580:21, 1581:1, 1586:10, 1586:15, 1587:21, 1587:25, 1599:20, 1607:22, 1611:20, 1673:7, 1686:12, 1693:7, 1703:6, 1711:22, 1736:5, 1761:6
**quibble** [1] - 1559:12
**quickly** [8] - 1604:23, 1605:13, 1615:6, 1621:4, 1621:23, 1628:22, 1630:23, 1656:21
**quite** [3] - 1544:12, 1720:6, 1738:1
**quote** [9] - 1539:12, 1540:19, 1540:20, 1588:7, 1588:8, 1771:10, 1771:11,

1771:20
**quotes** [3] - 1539:5, 1540:2, 1540:13

# R

**rabid** [1] - 1704:3
**RAE** [1] - 1536:17
**raise** [8] - 1586:7, 1665:5, 1737:6, 1737:8, 1789:20, 1789:21, 1789:23, 1794:18
**raised** [3] - 1612:2, 1699:20, 1699:22
**raising** [2] - 1688:13, 1789:22
**ran** [5] - 1550:8, 1551:3, 1551:11, 1614:2, 1715:1
**range** [4] - 1634:19, 1650:7, 1650:8, 1650:11
**Rangers** [1] - 1610:21
**ranging** [1] - 1576:8
**rank** [1] - 1601:3
**ranking** [1] - 1652:2
**Raptors** [1] - 1622:12
**rarely** [1] - 1570:19
**rate** [2] - 1721:7, 1721:14
**RATHBUN** [13] - 1716:6, 1721:25, 1729:23, 1733:3, 1735:18, 1736:12, 1742:17, 1743:7, 1744:7, 1747:5, 1749:23, 1753:11, 1803:9
**rather** [2] - 1539:11, 1645:6
**rational** [1] - 1576:18
**Re** [4] - 1565:4, 1743:25, 1746:7, 1758:13
**re** [2] - 1626:19, 1675:22
**re-cross** [1] - 1675:22
**reach** [4] - 1538:5, 1642:15, 1710:18, 1781:18
**Reach** [1] - 1641:20
**reached** [2] - 1714:4, 1720:18
**reaction** [1] - 1604:17
**read** [23] - 1540:18, 1540:25, 1559:2, 1588:8, 1596:5, 1596:6, 1599:12, 1599:13, 1651:18, 1660:9, 1723:17, 1737:14, 1738:13, 1738:16, 1739:19, 1739:23, 1762:10, 1769:6, 1785:5, 1787:8, 1791:5, 1795:25, 1801:11
**reading** [8] - 1539:11, 1545:13, 1738:2, 1769:15, 1791:19, 1797:7, 1804:8
**ready** [5] - 1588:15, 1665:18, 1665:20, 1668:17, 1707:1
**real** [3] - 1576:20, 1636:9, 1772:6
**Real** [2] - 1611:13, 1639:2
**realistic** [2] - 1722:14, 1722:19
**realized** [3] - 1628:18, 1628:22, 1630:14
**really** [32] - 1555:20, 1567:10, 1580:1, 1582:8, 1583:13, 1595:4, 1600:18, 1603:2, 1603:3, 1610:22, 1610:25, 1612:15, 1613:23, 1614:12, 1616:14, 1623:7, 1623:22, 1629:3, 1634:18, 1638:19, 1638:20, 1643:8, 1644:10, 1646:7, 1646:8, 1649:13, 1677:18, 1696:15, 1696:21, 1766:9, 1773:21, 1786:23
**reason** [14] - 1540:19, 1577:12, 1618:6, 1618:11, 1653:14, 1695:10, 1695:16, 1761:21, 1772:8, 1778:4, 1785:25, 1789:9, 1790:17, 1799:8
**reasonable** [1] - 1775:2
**reasonably** [1] - 1650:1
**reasons** [4] - 1698:8, 1714:21, 1743:20, 1785:18
**rebirth** [1] - 1626:19
**rebuild** [1] - 1795:23
**recalled** [1] - 1681:21
**receive** [4] - 1660:15, 1670:4, 1670:5, 1670:12
**received** [15] - 1538:7, 1538:11, 1542:24, 1560:4, 1561:22, 1573:16, 1654:25, 1656:4, 1660:1, 1722:2, 1726:18, 1729:25, 1733:5, 1737:15, 1737:19
**receiving** [1] - 1605:21
**recent** [3] - 1640:6, 1722:6, 1801:12
**recently** [1] - 1640:6
**recess** [3] - 1586:4, 1664:5, 1764:1
**Recess** [1] - 1708:2
**recognize** [3] - 1631:5, 1655:24, 1659:20
**recollection** [24] - 1547:10, 1558:8, 1558:14, 1559:4, 1559:6, 1565:8, 1573:22, 1589:5, 1590:9, 1599:3, 1599:6, 1599:15, 1599:18, 1687:18, 1710:20, 1716:25, 1728:13, 1729:18, 1730:23, 1735:23, 1745:13, 1748:10, 1757:15, 1761:12
**recommendation** [3] - 1591:3, 1591:7, 1749:10
**recommendations** [9] - 1554:11, 1561:12, 1590:3, 1590:11, 1590:21, 1591:5, 1591:15, 1609:6, 1720:4
**recommending** [1] - 1745:3
**record** [12] - 1549:23, 1550:14, 1550:15, 1607:6, 1765:2, 1765:14, 1772:14, 1784:13, 1802:7, 1802:9, 1802:10, 1802:21
**recorded** [1] - 1537:18
**RECROSS** [5] - 1676:1, 1705:1, 1706:1, 1805:8, 1805:10
**RECROSS-EXAMINATION** [4] - 1676:1, 1705:1, 1805:8, 1805:10
**recuse** [2] - 1547:12, 1547:16
**recused** [3] - 1548:6, 1551:25, 1552:3
**Red** [5] - 1623:21, 1627:24, 1630:1, 1633:4, 1685:23
**redirect** [2] - 1703:7, 1803:12
**REDIRECT** [3] - 1703:9, 1805:9, 1805:11
**reduced** [1] - 1751:16
**refer** [2] - 1588:1, 1742:13
**reference** [5] - 1597:4, 1653:3, 1740:3, 1760:21, 1763:9
**referenced** [2] - 1575:20, 1763:18
**references** [1] - 1771:1
**referencing** [1] - 1762:24
**referred** [2] - 1587:21, 1713:14
**referring** [6] - 1550:9, 1568:5, 1597:13, 1713:9, 1715:21, 1740:18
**refers** [2] - 1555:14, 1755:6
**reflect** [1] - 1710:14
**reflected** [2] - 1545:8, 1582:13
**reflecting** [2] - 1642:13, 1651:19
**reflection** [1] - 1658:14
**reflective** [2] - 1570:21, 1658:8
**reflects** [1] - 1620:22
**refresh** [9] - 1547:9, 1558:8, 1559:4, 1559:6, 1565:8, 1589:5, 1590:9, 1599:15, 1728:13
**refreshed** [1] - 1591:19
**refreshes** [4] - 1558:14, 1599:2, 1599:6, 1599:18
**refused** [1] - 1733:18
**regard** [7] - 1726:13, 1726:15, 1742:3, 1743:2, 1744:14, 1749:3, 1759:3
**regarding** [11] - 1565:11, 1606:22, 1608:7, 1648:18, 1689:25, 1701:12, 1709:24, 1724:22, 1740:13, 1747:10, 1792:1
**regardless** [1] - 1788:9
**registered** [1] - 1657:9
**regroup** [1] - 1763:21
**regular** [1] - 1657:13
**regularly** [1] - 1638:8
**reiterate** [1] - 1625:1
**rejected** [2] - 1770:9, 1792:2
**relate** [1] - 1671:10
**related** [8] - 1547:18, 1566:11, 1570:1, 1570:2, 1581:20, 1661:15, 1733:9, 1733:20
**relates** [3] - 1547:15, 1547:16, 1695:21
**relations** [2] - 1602:3, 1613:14
**relationship** [36] - 1544:25, 1545:4, 1561:19, 1561:21, 1561:23, 1577:13, 1577:16, 1577:22, 1578:1, 1578:5, 1578:18, 1578:24, 1593:13, 1594:11, 1595:6, 1602:4, 1611:22, 1612:2, 1612:6, 1612:7, 1641:8, 1659:4, 1669:8, 1670:21, 1671:2, 1671:16, 1672:6, 1672:17, 1693:18, 1695:22, 1703:12, 1711:23, 1720:10, 1776:22, 1786:10, 1786:11
**relationships** [4] - 1602:16, 1641:15, 1648:10, 1648:11
**relative** [2] - 1573:4, 1658:8
**relatively** [1] - 1667:25
**relevance** [4] - 1620:21, 1621:9, 1722:19, 1723:10
**relevant** [6] - 1538:21, 1765:15, 1772:24, 1773:3, 1788:25, 1800:8
**remainder** [2] - 1665:7, 1665:13

**remarks** [3] - 1589:13, 1590:25, 1591:2
**Remedi** [2] - 1749:18, 1749:20
**Remember** [1] - 1625:24
**remember** [80] - 1538:23, 1543:24, 1549:8, 1549:9, 1550:25, 1552:22, 1562:4, 1565:14, 1565:19, 1565:20, 1575:2, 1575:21, 1575:24, 1576:6, 1576:8, 1576:11, 1578:7, 1578:8, 1588:9, 1592:23, 1593:10, 1593:15, 1593:23, 1618:18, 1630:13, 1636:23, 1639:21, 1661:6, 1663:4, 1663:25, 1671:9, 1678:11, 1679:2, 1681:22, 1688:22, 1690:22, 1690:25, 1691:3, 1700:5, 1700:12, 1701:20, 1701:21, 1717:22, 1718:18, 1728:22, 1729:1, 1732:13, 1734:2, 1735:7, 1735:12, 1736:7, 1747:8, 1747:9, 1747:13, 1747:14, 1747:17, 1747:25, 1748:1, 1748:4, 1748:7, 1748:8, 1750:24, 1751:21, 1758:3, 1758:16, 1759:15, 1759:16, 1760:14, 1760:15, 1760:17, 1761:2, 1761:7, 1761:21, 1761:25, 1762:13, 1768:22, 1797:9
**remind** [7] - 1544:7, 1548:8, 1564:16, 1591:11, 1592:10, 1715:5, 1725:20
**reminder** [1] - 1762:9
**remove** [1] - 1791:10
**removed** [1] - 1666:7
**removing** [1] - 1666:13
**rendition** [1] - 1632:19
**renew** [1] - 1701:9
**renewed** [1] - 1641:9
**renowned** [1] - 1643:8
**reorganized** [1] - 1680:1
**repeat** [8] - 1577:21, 1585:14, 1595:4, 1610:7, 1693:25, 1716:8, 1725:20, 1781:16
**rephrase** [1] - 1753:7
**rephrasing** [2] - 1567:1, 1567:2
**replicate** [1] - 1630:18
**report** [7] - 1574:11, 1574:19, 1702:1, 1702:6, 1727:22, 1728:1, 1728:6
**reported** [1] - 1614:21
**reportedly** [1] - 1640:13
**Reporter** [1] - 1537:16
**reporter** [4] - 1539:1, 1539:2, 1668:12, 1777:6
**reports** [4] - 1574:6, 1574:7, 1575:1, 1689:3
**represent** [8] - 1577:8, 1626:4, 1677:1, 1677:9, 1677:22, 1677:25, 1686:9
**representation** [3] - 1676:21, 1680:8, 1683:13
**representative** [6] - 1626:10, 1642:8, 1674:14, 1674:18, 1676:6, 1677:4
**representatives** [3] - 1676:19, 1677:15, 1712:8
**representing** [4] - 1677:16, 1677:18, 1767:11
**represents** [1] - 1655:10
**reps** [1] - 1646:9
**reputation** [1] - 1704:3
**request** [3] - 1606:7, 1689:18, 1728:14
**requested** [2] - 1728:16, 1771:14
**requesting** [2] - 1728:9, 1736:7
**requests** [1] - 1702:6
**require** [7] - 1571:8, 1580:9, 1785:12, 1787:6, 1794:2, 1794:21, 1795:13
**required** [18] - 1552:11, 1555:11, 1566:18, 1566:22, 1567:18, 1567:24, 1580:4, 1586:12, 1643:23, 1671:21, 1682:13, 1697:25, 1698:3, 1706:3, 1727:3, 1778:7, 1778:9, 1793:1
**requirement** [15] - 1570:7, 1570:10, 1630:14, 1735:24, 1738:10, 1738:11, 1739:14, 1753:3, 1753:6, 1753:19, 1767:7, 1774:10, 1779:19, 1785:17, 1785:21
**requirements** [20] - 1545:11, 1545:24, 1573:10, 1573:13, 1581:12, 1686:3, 1686:7, 1690:1, 1733:9, 1739:7, 1739:11, 1739:12, 1739:14, 1739:19, 1739:21, 1740:9, 1755:2, 1755:3, 1787:23
**requires** [13] - 1644:3, 1646:6, 1646:7, 1646:8, 1703:25, 1704:2, 1704:3, 1767:9, 1778:1, 1784:18, 1795:14, 1802:24
**reread** [1] - 1650:8
**resale** [1] - 1783:3
**research** [4] - 1638:8, 1638:10, 1713:19, 1762:10
**reserve** [7] - 1562:6, 1565:4, 1565:11, 1697:17, 1719:22, 1758:14, 1758:17
**resolved** [1] - 1587:17
**resources** [2] - 1637:12, 1723:12
**respect** [24] - 1538:13, 1551:20, 1551:21, 1555:3, 1587:19, 1587:20, 1606:8, 1607:9, 1607:24, 1608:18, 1609:6, 1644:19, 1672:8, 1689:17, 1703:18, 1714:18, 1720:5, 1730:12, 1742:4, 1752:15, 1775:6, 1775:7, 1789:5, 1792:17
**respected** [2] - 1622:23, 1648:14
**respond** [3] - 1712:12, 1783:23, 1802:16
**responded** [3] - 1553:1, 1553:3, 1765:18
**responding** [1] - 1542:17
**response** [6] - 1543:3, 1553:5, 1598:2, 1721:20, 1722:23, 1723:2
**responsibility** [1] - 1600:9
**responsible** [2] - 1614:4, 1636:17
**rest** [5] - 1595:16, 1595:17, 1665:10, 1758:21, 1789:25
**restarted** [1] - 1693:22
**restate** [4] - 1579:5, 1663:14, 1680:23, 1680:24
**restoring** [1] - 1627:7
**restructure** [1] - 1649:5
**restructuring** [1] - 1680:7
**result** [2] - 1782:2, 1782:22
**results** [1] - 1712:23
**return** [2] - 1600:6, 1746:18
**revenue** [3] - 1600:11, 1645:12, 1651:4
**review** [2] - 1540:7, 1760:3
**Review** [1] - 1689:7
**reviewed** [4] - 1574:17, 1589:14, 1741:3, 1741:4
**Reviewing** [2] - 1559:1, 1723:20
**reviewing** [2] - 1665:25, 1667:23
**reviews** [1] - 1610:10
**revised** [1] - 1608:19
**revises** [1] - 1609:21
**revision** [1] - 1608:22
**revisions** [3] - 1609:6, 1609:12, 1609:18
**rewrite** [1] - 1553:22
**Rica** [2] - 1582:20, 1644:8
**Richard** [2] - 1708:4, 1708:6
**ridiculous** [2] - 1553:14, 1553:15
**rights** [9] - 1545:11, 1580:2, 1584:25, 1585:1, 1585:10, 1585:17, 1656:13, 1682:14, 1783:4
**Riot** [1] - 1623:3
**rishi** [1] - 1658:24
**Rishi** [1] - 1660:14
**risk** [1] - 1800:19
**risky** [1] - 1714:19
**RIZIK** [1] - 1536:18
**road** [1] - 1773:25
**Robert** [6] - 1543:12, 1614:22, 1614:24, 1616:11, 1622:9, 1649:6
**robust** [2] - 1602:3, 1605:1
**Rocco** [4] - 1662:24, 1663:5, 1663:18, 1696:3
**Rodriguez** [3] - 1713:21, 1714:1, 1714:2
**role** [33] - 1600:20, 1606:4, 1606:6, 1606:25, 1607:10, 1607:12, 1610:16, 1611:4, 1613:18, 1634:4, 1650:20, 1659:12, 1672:10, 1723:6, 1723:8, 1723:9, 1724:21, 1725:4, 1725:10, 1725:14, 1725:15, 1726:9, 1726:10, 1729:8, 1729:17, 1730:7, 1730:16, 1730:17, 1731:11, 1737:9, 1737:14, 1744:10, 1761:23
**roles** [1] - 1600:5
**rolling** [1] - 1630:23
**Roma** [1] - 1623:3
**Roman** [1] - 1669:18
**room** [9] - 1547:19, 1547:21, 1578:22, 1579:13, 1579:14, 1579:15, 1606:8, 1607:13, 1630:16
**ROSE** [2] - 1537:6, 1537:10
**roster** [1] - 1695:24
**rosters** [1] - 1661:21

**Roth** [1] - 1622:16
**Rothenberg** [5] - 1577:7, 1672:9, 1672:10, 1672:21, 1672:23
**Rothenberg's** [1] - 1672:5
**round** [1] - 1791:15
**rounds** [1] - 1657:15
**Rule** [2] - 1587:11, 1638:1
**rule** [14] - 1549:1, 1550:17, 1587:4, 1638:4, 1638:6, 1638:17, 1639:24, 1639:25, 1725:19, 1725:23, 1726:23, 1792:2
**ruled** [1] - 1796:9
**rules** [16] - 1553:17, 1553:22, 1556:8, 1556:9, 1570:10, 1570:13, 1582:6, 1582:20, 1587:3, 1600:22, 1610:3, 1610:4, 1691:11, 1695:21, 1699:5
**run** [5] - 1682:17, 1709:7, 1710:25, 1713:13, 1726:10
**running** [3] - 1601:14, 1601:15, 1719:22
**Ruskin** [4] - 1540:2, 1648:2, 1668:17, 1668:22
**RUSKIN** [87] - 1537:8, 1538:3, 1538:16, 1540:4, 1540:24, 1550:14, 1551:6, 1558:5, 1558:8, 1558:20, 1558:23, 1564:10, 1566:23, 1567:5, 1569:12, 1571:14, 1575:16, 1580:15, 1583:3, 1586:7, 1586:20, 1587:14, 1587:19, 1588:4, 1593:6, 1599:22, 1599:24, 1600:1, 1606:12, 1619:9, 1619:15, 1625:19, 1627:19, 1631:3, 1631:9, 1633:2, 1633:12, 1634:1, 1647:19, 1649:23, 1651:10, 1651:12, 1652:16, 1653:18, 1653:24, 1654:1, 1654:11, 1654:14, 1654:20, 1654:24, 1655:1, 1655:17, 1655:22, 1656:1, 1656:5, 1656:8, 1657:4, 1659:17, 1659:19, 1659:22, 1660:3, 1660:5, 1663:21, 1668:18, 1668:24, 1669:2, 1675:20, 1685:14, 1688:9, 1689:21, 1690:10, 1694:23, 1699:17, 1700:17, 1702:10, 1702:21, 1703:4, 1703:8, 1703:10, 1705:2, 1705:6, 1706:12, 1706:15, 1803:17, 1805:7, 1805:9, 1805:10
**Russ** [1] - 1589:19

## S

**safe** [1] - 1637:11
**salaries** [2] - 1695:7, 1695:18
**salary** [6] - 1662:6, 1662:7, 1662:8, 1662:22, 1695:20
**sale** [4] - 1625:4, 1683:1, 1683:13, 1683:18
**sales** [2] - 1647:2, 1779:10
**sample** [1] - 1632:9
**San** [7] - 1536:22, 1537:5, 1601:20, 1626:20, 1748:9, 1748:14, 1748:15
**sanction** [39] - 1547:6, 1551:2, 1578:23, 1578:24, 1579:8, 1581:3, 1585:5, 1585:18, 1605:12, 1605:16, 1605:21, 1606:6, 1607:8, 1618:11, 1679:17, 1679:18, 1680:13, 1683:9, 1684:17, 1684:22, 1685:13, 1686:1, 1686:4, 1686:6, 1686:19, 1687:5, 1687:7, 1694:14, 1699:1, 1701:22, 1702:17, 1702:20, 1735:13, 1736:10, 1737:7, 1737:16, 1761:10, 1799:11, 1799:19
**sanctioned** [25] - 1550:22, 1563:6, 1618:8, 1671:1, 1671:7, 1671:9, 1686:22, 1691:10, 1691:18, 1714:25, 1725:3, 1733:17, 1735:5, 1735:10, 1735:25, 1736:18, 1736:19, 1736:24, 1741:17, 1742:5, 1742:8, 1742:20, 1746:5, 1772:25, 1773:4
**sanctioning** [46] - 1551:22, 1554:12, 1579:17, 1585:11, 1589:3, 1589:11, 1591:16, 1605:25, 1607:24, 1608:4, 1608:7, 1608:10, 1608:14, 1659:12, 1671:19, 1673:25, 1691:12, 1701:13, 1701:16, 1701:24, 1701:25, 1702:2, 1702:3, 1703:3, 1726:11, 1729:7, 1733:10, 1737:15, 1738:21, 1741:24, 1743:11, 1743:14, 1743:18, 1743:24, 1744:13, 1744:19, 1745:14, 1745:16, 1745:18, 1745:20, 1745:24, 1746:6, 1752:12, 1755:13, 1761:6, 1761:19
**sanctions** [6] - 1575:23, 1576:1, 1590:11, 1604:14, 1736:25, 1741:18
**Sandra** [1] - 1539:1
**Santos** [1] - 1639:3
**Saputo** [5] - 1717:1, 1717:2, 1717:16, 1717:19, 1717:21
**sat** [2] - 1616:20, 1677:17
**satisfied** [1] - 1789:17
**satisfies** [4] - 1545:21, 1545:24, 1619:4, 1693:17
**satisfy** [7] - 1566:18, 1573:9, 1573:12, 1619:2, 1671:21, 1725:22, 1797:5
**satisfying** [1] - 1725:18
**Saturday** [1] - 1641:1
**Saudis** [1] - 1640:12
**saw** [5] - 1572:22, 1616:23, 1618:17, 1630:17, 1741:5
**Scenario** [3] - 1742:11, 1742:16, 1742:19
**scenario** [12] - 1711:11, 1711:13, 1733:17, 1735:16, 1735:21, 1736:23, 1741:19, 1741:21, 1742:1, 1743:6, 1778:21
**scenarios** [11] - 1711:10, 1736:23, 1741:14, 1741:15, 1742:10, 1743:3, 1748:18, 1748:22, 1748:24, 1749:1
**schedule** [4] - 1625:18, 1657:19, 1657:24
**scheduled** [1] - 1755:22
**scheduling** [1] - 1744:15
**scheme** [5] - 1795:5, 1797:2, 1798:24, 1799:4, 1799:25
**Schneiderman** [2] - 1801:8, 1801:11
**scholarship** [1] - 1697:9
**School** [1] - 1613:8
**school** [3] - 1612:21, 1612:25, 1613:8
**schools** [1] - 1612:25
**Schweinsteiger** [1] - 1638:22
**scope** [14] - 1632:11, 1689:22, 1690:11, 1691:2, 1694:23, 1695:1, 1699:18, 1702:11, 1702:22, 1703:4, 1712:15, 1712:17, 1779:16, 1791:7
**Scope** [1] - 1632:12
**scored** [2] - 1641:2, 1655:9
**SCOTT** [1] - 1537:9
**screaming** [1] - 1621:7
**screen** [3] - 1558:6, 1558:21, 1651:7
**se** [1] - 1792:2
**sea** [2] - 1625:15
**Seahawks** [1] - 1622:15
**season** [36] - 1547:6, 1550:23, 1562:20, 1563:5, 1567:4, 1567:13, 1567:21, 1567:24, 1568:4, 1568:9, 1606:25, 1607:8, 1620:14, 1641:14, 1657:13, 1670:13, 1698:15, 1698:17, 1698:19, 1702:20, 1715:10, 1728:3, 1728:4, 1728:10, 1728:15, 1728:17, 1729:5, 1730:21, 1731:3, 1731:6, 1731:12, 1744:14, 1746:21, 1761:10, 1796:25
**seasons** [4] - 1604:15, 1606:1, 1623:24, 1632:23
**seat** [2] - 1553:14, 1634:15
**seated** [6] - 1541:5, 1586:6, 1668:21, 1706:16, 1707:4, 1763:24
**seating** [1] - 1759:4
**seats** [3] - 1581:9, 1588:14, 1626:15
**Seattle** [3] - 1622:13, 1639:17, 1639:21
**Second** [3] - 1785:4, 1788:8, 1800:7
**second** [29] - 1544:22, 1545:1, 1545:2, 1545:3, 1545:4, 1573:12, 1576:15, 1599:10, 1599:11, 1601:7, 1602:21, 1622:13, 1634:6, 1650:7, 1650:10, 1652:14, 1655:15, 1684:3, 1701:6, 1722:13, 1727:25, 1741:21, 1766:10, 1770:24, 1771:4, 1771:8, 1772:23, 1778:17
**section** [16] - 1630:7, 1633:10, 1633:18, 1651:12, 1652:17, 1775:16, 1777:11, 1779:1, 1780:14, 1781:8, 1782:19, 1784:4, 1786:4, 1787:24, 1787:25
**Section** [2] - 1773:5, 1782:20
**sections** [3] - 1539:5, 1629:25, 1633:18
**security** [1] - 1637:10
**see** [89] - 1542:13, 1542:16, 1543:5, 1543:6, 1543:9, 1543:11, 1543:14, 1543:15, 1543:16, 1544:5, 1547:1,

1547:9, 1547:11, 1549:9, 1556:3, 1558:5, 1558:13, 1559:9, 1559:18, 1559:21, 1560:3, 1560:6, 1561:13, 1564:4, 1565:1, 1565:6, 1580:11, 1583:12, 1583:17, 1583:23, 1588:25, 1590:22, 1591:9, 1599:2, 1599:3, 1620:3, 1630:4, 1630:5, 1650:25, 1663:25, 1670:3, 1688:25, 1689:8, 1689:17, 1689:25, 1690:2, 1690:3, 1693:10, 1710:3, 1710:4, 1711:11, 1713:16, 1715:7, 1715:19, 1719:6, 1721:18, 1722:20, 1727:15, 1727:17, 1727:23, 1728:11, 1729:6, 1729:14, 1737:2, 1738:23, 1739:3, 1740:16, 1741:24, 1744:2, 1745:6, 1750:2, 1750:4, 1754:15, 1754:24, 1755:14, 1756:15, 1757:1, 1757:22, 1758:10, 1760:4, 1760:7, 1760:23, 1762:13, 1762:17, 1767:22, 1767:23, 1769:9, 1772:2, 1801:8
**seeing** [3] - 1561:16, 1615:18, 1642:9
**seek** [4] - 1562:17, 1562:19, 1573:14, 1661:1
**seeking** [1] - 1543:21
**seeks** [2] - 1737:1, 1741:18
**seem** [4] - 1540:2, 1686:21, 1780:19, 1803:25
**segment** [2] - 1779:12, 1779:13
**Sehgal** [15] - 1658:24, 1660:15, 1661:3, 1661:13, 1700:1, 1700:8, 1700:12, 1700:15, 1733:24, 1735:4, 1735:9, 1736:5, 1736:6, 1744:9, 1744:18
**Sehgel** [1] - 1659:5
**Selby** [2] - 1543:5, 1543:6
**selected** [4] - 1676:9, 1678:15, 1678:18, 1679:4
**selecting** [1] - 1614:8
**selection** [3] - 1676:12, 1676:24, 1677:1
**sell** [8] - 1627:14, 1635:8, 1642:7, 1645:17, 1656:13, 1711:4, 1718:22
**sellers** [1] - 1645:12
**selling** [3] - 1744:15, 1783:25
**sells** [1] - 1627:14
**send** [2] - 1689:4, 1689:5
**sending** [1] - 1727:21
**sends** [1] - 1543:12
**senior** [5] - 1653:11, 1688:7, 1710:6, 1714:3, 1727:20
**sense** [3] - 1545:17, 1576:4, 1744:11
**sent** [14] - 1543:5, 1543:7, 1543:17, 1544:4, 1544:12, 1544:14, 1559:19, 1564:18, 1596:19, 1596:21, 1596:23, 1660:6, 1728:18, 1728:21
**sentence** [9] - 1595:16, 1595:17, 1713:5, 1772:12, 1772:16, 1784:14, 1790:21, 1791:5, 1791:10
**sentences** [1] - 1578:9
**sentiment** [1] - 1611:23
**separate** [5] - 1543:21, 1562:7, 1580:1, 1685:12, 1747:3
**separated** [1] - 1777:3
**separately** [1] - 1731:20
**September** [13] - 1575:4, 1575:21, 1585:16, 1588:22, 1674:7, 1674:10, 1675:17, 1727:16, 1738:18, 1738:19, 1747:25, 1755:20
**September/October** [1] - 1755:17
**Series** [1] - 1623:21
**series** [2] - 1543:17, 1543:19
**service** [1] - 1672:6
**services** [1] - 1562:1
**Session** [1] - 1750:12
**session** [3] - 1546:25, 1748:1, 1760:8
**SESSION** [1] - 1665:1
**set** [6] - 1544:9, 1695:14, 1695:17, 1696:11, 1770:18, 1778:10
**sets** [4] - 1561:11, 1695:7, 1695:10, 1695:13
**setting** [1] - 1792:1
**settled** [2] - 1612:23
**seven** [6] - 1539:22, 1562:10, 1562:12, 1604:4, 1716:23, 1752:6
**seventh** [1] - 1652:8
**several** [10] - 1539:7, 1605:1, 1612:5, 1628:14, 1632:23, 1682:3, 1682:19, 1682:21, 1719:18, 1721:12
**severity** [1] - 1597:20
**Shalala** [4] - 1666:23, 1708:13, 1708:15, 1763:7
**shall** [1] - 1740:1
**shape** [1] - 1685:11
**share** [7] - 1622:4, 1623:2, 1683:1, 1683:6, 1683:17, 1762:2, 1783:5
**shared** [8] - 1574:22, 1574:23, 1574:24, 1610:24, 1777:12, 1779:1, 1780:13, 1781:5
**shares** [1] - 1645:16
**sharing** [2] - 1721:4, 1721:7
**sheet** [1] - 1804:6
**Sherman** [4] - 1536:20, 1773:5, 1777:11, 1780:14
**shift** [2] - 1615:19, 1770:19
**shifting** [1] - 1770:18
**shining** [1] - 1625:15
**shortcuts** [1] - 1646:11
**shortens** [1] - 1666:14
**shorter** [1] - 1665:8
**shortly** [2] - 1717:13, 1720:15
**shot** [2] - 1615:25, 1616:22
**show** [36] - 1542:9, 1543:9, 1548:21, 1558:1, 1558:13, 1559:15, 1563:16, 1568:16, 1573:23, 1575:3, 1599:2, 1606:11, 1614:8, 1614:10, 1624:16, 1625:22, 1627:21, 1632:17, 1632:18, 1633:14, 1637:17, 1656:14, 1658:4, 1715:6, 1721:14, 1721:16, 1748:24, 1749:16, 1767:5, 1793:8, 1793:9, 1795:10, 1799:8, 1800:11, 1800:13
**showed** [9] - 1538:18, 1538:20, 1641:7, 1649:19, 1670:15, 1674:6, 1721:7, 1767:2, 1794:23
**showing** [2] - 1606:15, 1693:3
**shown** [5] - 1538:22, 1607:19, 1707:20, 1763:1, 1763:10
**shows** [4] - 1620:13, 1636:7, 1642:11, 1750:17
**shut** [1] - 1620:15
**sic** [1] - 1605:10
**side** [6] - 1602:24, 1602:25, 1612:22, 1612:23, 1750:19, 1752:15
**sign** [2] - 1638:13, 1662:18
**signed** [12] - 1638:18, 1638:25, 1639:4, 1639:7, 1639:21, 1640:8, 1640:10, 1640:17, 1642:2, 1662:8, 1662:19, 1697:13
**significance** [3] - 1621:8, 1641:4, 1641:21
**significant** [6] - 1643:20, 1667:14, 1765:3, 1801:9, 1801:13, 1801:18
**similar** [2] - 1545:22, 1723:21
**simply** [3] - 1539:2, 1587:25, 1772:21
**single** [7] - 1569:24, 1646:12, 1658:20, 1658:21, 1695:11, 1695:18, 1696:1
**single-entity** [3] - 1695:11, 1695:18, 1696:1
**sister** [1] - 1612:20
**sit** [1] - 1649:4
**site** [1] - 1703:24
**sitting** [2] - 1584:21, 1626:12
**situation** [9] - 1556:19, 1698:14, 1698:17, 1698:19, 1720:14, 1721:5, 1731:17, 1742:4, 1743:22
**situations** [1] - 1690:17
**six** [13] - 1539:15, 1555:24, 1626:1, 1679:21, 1728:6, 1728:7, 1728:8, 1739:12, 1739:23, 1740:10, 1752:8, 1752:9
**sixth** [1] - 1753:16
**size** [3] - 1629:18, 1633:21, 1637:20
**sketched** [1] - 1742:1
**skill** [1] - 1658:8
**skills** [1] - 1613:10
**skip** [1] - 1556:10
**Slide** [5] - 1621:19, 1624:15, 1627:19, 1633:14, 1750:17
**slide** [28] - 1562:10, 1607:2, 1607:3, 1621:19, 1621:22, 1625:19, 1625:20, 1625:22, 1627:20, 1631:5, 1632:16, 1636:6, 1636:7, 1636:8, 1637:25, 1638:3, 1638:19, 1641:6, 1641:7, 1641:20, 1641:21, 1642:25, 1643:1, 1643:3, 1656:9, 1656:11, 1714:10, 1714:19
**slides** [12] - 1557:21, 1626:4, 1632:18, 1712:23, 1713:6, 1713:9, 1720:2, 1750:1, 1750:7, 1750:9, 1755:25
**slightly** [1] - 1661:15
**slow** [1] - 1556:20

**slowly** [1] - 1638:5
**slump** [7] - 1679:25, 1680:2, 1680:4, 1680:17, 1681:1, 1681:2, 1681:3
**small** [3] - 1631:23, 1643:14, 1672:19
**so..** [1] - 1568:5
**SOCCER** [3] - 1536:4, 1536:7, 1536:8
**soccer** [118] - 1564:24, 1566:6, 1595:25, 1596:12, 1601:11, 1601:19, 1601:23, 1602:9, 1602:10, 1602:19, 1603:7, 1603:9, 1603:23, 1604:5, 1605:2, 1609:3, 1610:14, 1610:15, 1611:5, 1611:6, 1611:8, 1611:12, 1611:16, 1612:3, 1614:17, 1615:4, 1615:16, 1615:22, 1621:3, 1622:20, 1626:7, 1626:8, 1627:4, 1628:5, 1628:13, 1628:15, 1629:6, 1629:9, 1629:10, 1629:13, 1629:21, 1630:4, 1630:20, 1630:21, 1631:25, 1632:2, 1633:21, 1634:21, 1635:7, 1639:23, 1640:18, 1641:22, 1642:19, 1643:13, 1643:14, 1645:21, 1645:25, 1646:17, 1652:7, 1652:10, 1655:4, 1655:8, 1655:11, 1656:16, 1660:24, 1663:19, 1691:22, 1692:4, 1692:5, 1692:6, 1692:8, 1692:10, 1692:11, 1692:19, 1692:20, 1692:24, 1693:1, 1693:5, 1693:13, 1693:16, 1693:23, 1694:2, 1694:3, 1694:6, 1694:10, 1694:15, 1696:13, 1696:15, 1696:21, 1696:24, 1697:1, 1697:4, 1697:6, 1703:22, 1706:4, 1706:6, 1706:9, 1709:7, 1709:10, 1709:12, 1709:14, 1709:23, 1709:25, 1710:24, 1711:24, 1714:4, 1722:24, 1723:3, 1723:7, 1743:21, 1756:25, 1757:13, 1758:8, 1771:11, 1771:12
**Soccer** [142] - 1537:3, 1537:9, 1545:12, 1547:18, 1547:25, 1548:5, 1570:20, 1571:24, 1572:23, 1574:24, 1577:5, 1577:23, 1589:24, 1594:8, 1594:20, 1594:23, 1597:13, 1597:15, 1600:5, 1600:7, 1601:10, 1601:15, 1601:16, 1601:18, 1602:22, 1602:23, 1603:5, 1604:3, 1604:7, 1604:13, 1604:24, 1605:25, 1606:19, 1607:19, 1607:24, 1608:3, 1608:19, 1609:5, 1610:12, 1610:13, 1611:22, 1612:2, 1614:19, 1615:1, 1617:4, 1617:8, 1617:13, 1618:5, 1618:6, 1618:12, 1618:15, 1618:20, 1619:7, 1619:21, 1619:22, 1622:14, 1624:8, 1625:2, 1625:10, 1626:3, 1626:21, 1626:22, 1626:24, 1627:3, 1639:25, 1640:2, 1643:19, 1644:12, 1645:5, 1645:23, 1647:23, 1649:9, 1649:14, 1656:15, 1657:9, 1657:12, 1673:5, 1673:15, 1673:19, 1673:22, 1674:7, 1674:10, 1675:16, 1676:15, 1677:1, 1677:2, 1677:10, 1677:17, 1686:10, 1687:19, 1687:22, 1687:24, 1688:5, 1688:16, 1688:18, 1688:20, 1696:10, 1700:23, 1702:1, 1705:3, 1709:20, 1710:21, 1710:23, 1710:25, 1711:1, 1711:5, 1711:7, 1714:3, 1717:4, 1717:5, 1717:8, 1721:6, 1723:6, 1724:21, 1724:23, 1725:4, 1725:10, 1725:14, 1726:10, 1727:20, 1732:10, 1733:11, 1733:13, 1743:20, 1746:1, 1749:18, 1757:6, 1759:5, 1761:23, 1769:2, 1769:19, 1771:7, 1773:2, 1773:14, 1775:21, 1785:24, 1789:4, 1798:5, 1799:9
**soccer's** [1] - 1722:19
**Soccer's** [7] - 1606:5, 1606:25, 1607:10, 1608:18, 1726:13, 1739:4, 1756:24
**soccer-specific** [27] - 1605:2, 1626:7, 1628:13, 1628:15, 1629:10, 1629:13, 1632:2, 1691:22, 1692:4, 1692:6, 1692:19, 1692:20, 1692:24, 1693:1, 1693:5, 1693:13, 1693:16, 1693:23, 1694:2, 1694:3, 1694:6, 1694:10, 1694:15, 1703:22, 1706:4, 1706:6, 1706:9
**sold** [4] - 1640:8, 1683:7, 1683:14, 1683:16
**solely** [1] - 1730:19
**soliloquy** [1] - 1557:1
**someone** [9] - 1540:12, 1554:22, 1554:25, 1608:15, 1618:24, 1741:7, 1775:18, 1776:8, 1785:13
**sometime** [1] - 1717:13
**sometimes** [2] - 1657:17, 1660:11
**sooner** [1] - 1744:5
**SOPHIE** [1] - 1537:16
**sophisticated** [1] - 1802:23
**sophomore** [7] - 1679:25, 1680:2, 1680:4, 1680:17, 1681:1, 1681:2, 1681:3
**sorry** [36] - 1539:20, 1539:24, 1550:18, 1553:15, 1553:24, 1554:7, 1554:21, 1556:24, 1562:15, 1575:18, 1576:6, 1577:20, 1582:1, 1590:19, 1596:3, 1671:6, 1688:18, 1694:12, 1694:25, 1707:11, 1707:16, 1707:17, 1714:8, 1716:8, 1722:16, 1723:19, 1725:20, 1726:7, 1735:20, 1736:14, 1748:21, 1748:24, 1753:6, 1754:5, 1769:23, 1781:12
**Sorry** [4] - 1617:25, 1653:24, 1781:12, 1781:15
**sort** [5] - 1576:20, 1580:1, 1642:9, 1737:25, 1794:4
**sought** [6] - 1604:14, 1605:18, 1605:22, 1725:25, 1726:2, 1772:17
**sounds** [1] - 1588:10
**source** [2] - 1538:8, 1767:21
**South** [2] - 1602:6, 1615:14
**Sox** [1] - 1623:21
**space** [1] - 1613:11
**Spain** [4] - 1611:12, 1614:17, 1639:8, 1652:11
**Spanish** [2] - 1641:11, 1641:12
**speaking** [5] - 1576:14, 1581:19, 1647:14, 1656:12, 1690:23
**speaks** [8] - 1578:12, 1621:16, 1622:1, 1622:2, 1624:10, 1656:21, 1656:23, 1795:2
**special** [1] - 1759:13
**specific** [39] - 1557:2, 1591:5, 1605:2, 1626:7, 1628:13, 1628:15, 1629:10, 1629:13, 1632:2, 1691:22, 1692:4, 1692:6, 1692:19, 1692:20, 1692:24, 1693:1, 1693:5, 1693:13, 1693:16, 1693:23, 1694:2, 1694:3, 1694:6, 1694:10, 1694:15, 1695:24, 1703:22, 1706:4, 1706:6, 1706:9, 1718:10, 1718:14, 1739:15, 1739:17, 1758:13, 1761:11, 1761:18, 1780:24, 1781:1
**Specific** [1] - 1565:3
**specifically** [8] - 1574:15, 1601:22, 1608:2, 1621:24, 1736:8, 1771:20, 1778:18, 1795:24
**specifics** [2] - 1606:3, 1761:17
**spectacular** [2] - 1603:22, 1640:24
**speculating** [1] - 1681:20
**speculation** [1] - 1581:6
**spend** [4] - 1635:6, 1650:21, 1668:6, 1695:22
**spends** [1] - 1637:16
**spent** [7] - 1624:9, 1630:24, 1665:25, 1667:22, 1674:6, 1674:9, 1769:14
**spoken** [2] - 1547:15, 1717:21
**spokesperson** [1] - 1637:4
**sponsor** [2] - 1619:23, 1625:3
**sponsors** [10] - 1573:2, 1624:24, 1635:17, 1647:1, 1648:5, 1648:13, 1652:25, 1654:7, 1656:13, 1712:10
**sponsorship** [2] - 1614:1, 1614:2
**sponsorships** [2] - 1602:2, 1635:18
**sport** [24] - 1578:13, 1580:2, 1593:22, 1594:12, 1594:21, 1595:6, 1610:14, 1610:17, 1610:23, 1611:1, 1611:5, 1612:9, 1612:10, 1612:12, 1615:6, 1624:13, 1628:25, 1629:11, 1642:21, 1645:21, 1655:7, 1663:18, 1722:25, 1723:4
**sporting** [3] - 1574:14, 1603:13, 1629:7
**sports** [27] - 1571:3, 1601:3, 1602:21, 1602:22, 1603:23, 1609:3, 1610:16, 1611:8, 1613:15, 1613:21, 1616:5, 1622:1, 1622:24, 1628:24, 1637:18, 1641:11, 1641:13, 1641:18, 1642:22, 1643:7, 1646:8, 1647:7, 1647:16, 1647:17, 1663:4, 1696:20
**Sports** [5] - 1622:10, 1652:22, 1721:11, 1721:13, 1721:14
**spread** [2] - 1624:20, 1625:14
**spring** [1] - 1617:16

**Square** [1] - 1537:7
**St** [5] - 1626:17, 1626:20, 1627:6, 1627:14, 1628:12
**Stadium** [3] - 1629:8, 1635:21, 1686:2
**stadium** [66] - 1553:14, 1571:5, 1571:25, 1581:8, 1581:9, 1619:24, 1622:21, 1626:7, 1626:15, 1626:17, 1626:19, 1628:2, 1628:6, 1628:8, 1628:9, 1628:10, 1628:11, 1629:17, 1631:14, 1631:23, 1632:22, 1633:6, 1633:9, 1633:15, 1634:8, 1634:10, 1634:16, 1634:21, 1635:9, 1635:20, 1636:3, 1656:17, 1656:18, 1685:23, 1685:24, 1686:5, 1686:7, 1686:9, 1686:14, 1686:17, 1692:1, 1692:4, 1692:5, 1692:6, 1692:7, 1692:9, 1692:10, 1692:13, 1692:16, 1692:19, 1692:20, 1692:24, 1693:1, 1693:5, 1693:13, 1693:16, 1693:17, 1693:23, 1694:11, 1703:22, 1751:6, 1752:8, 1752:9
**stadiums** [46] - 1573:3, 1604:5, 1605:3, 1605:14, 1624:9, 1624:10, 1627:20, 1627:22, 1627:23, 1628:13, 1628:15, 1628:18, 1628:21, 1628:23, 1629:5, 1629:10, 1629:13, 1629:19, 1629:22, 1630:10, 1630:23, 1631:1, 1631:2, 1631:7, 1632:19, 1633:21, 1634:2, 1635:16, 1635:24, 1646:22, 1648:3, 1649:13, 1679:6, 1679:10, 1682:12, 1685:22, 1691:22, 1691:25, 1694:2, 1694:3, 1694:6, 1694:15, 1703:18, 1706:4, 1706:6, 1706:10
**Stadiums** [1] - 1631:5
**staff** [14] - 1571:25, 1574:13, 1600:21, 1603:3, 1614:13, 1637:15, 1637:23, 1643:24, 1644:12, 1644:13, 1645:15, 1648:8, 1673:17
**stage** [1] - 1644:22
**stakeholders** [1] - 1709:9
**stand** [9] - 1586:5, 1586:13, 1633:19, 1668:13, 1681:23, 1704:4, 1762:19, 1777:7
**standard** [11] - 1549:2, 1563:14, 1566:9, 1566:13, 1580:23, 1582:11, 1600:24, 1644:17, 1776:12, 1779:4, 1792:1
**standards** [71] - 1545:21, 1546:3, 1551:18, 1556:8, 1560:16, 1560:24, 1563:2, 1563:9, 1563:10, 1565:4, 1565:12, 1566:19, 1568:14, 1570:10, 1570:25, 1571:7, 1571:8, 1576:5, 1576:10, 1580:10, 1580:13, 1581:4, 1581:7, 1581:8, 1581:10, 1581:11, 1581:20, 1581:25, 1582:14, 1583:14, 1583:15, 1583:19, 1600:21, 1600:22, 1608:17, 1608:18, 1608:20, 1608:25, 1609:4, 1609:13, 1609:19, 1609:22, 1609:25, 1610:4, 1610:8, 1619:2, 1619:5, 1671:22, 1686:8, 1688:14, 1688:15, 1689:19, 1693:17, 1725:7, 1725:11, 1725:18, 1726:14, 1726:16, 1731:6, 1740:4, 1740:14, 1754:10, 1758:13, 1758:18, 1759:12, 1760:13, 1800:10, 1800:24
**Standards** [14] - 1672:7, 1687:8, 1687:15, 1688:12, 1699:5, 1737:11, 1741:23, 1753:8, 1753:12, 1754:12, 1754:17, 1754:23, 1757:18, 1759:3
**standing** [9] - 1547:18, 1581:21, 1601:7, 1616:7, 1616:12, 1630:16, 1635:2, 1635:12
**standpoint** [3] - 1545:16, 1732:10, 1752:1
**stands** [2] - 1621:7, 1786:21
**Staples** [1] - 1616:10
**start** [16] - 1552:18, 1553:22, 1604:22, 1614:13, 1616:24, 1649:13, 1667:11, 1685:3, 1688:25, 1697:20, 1701:19, 1721:10, 1730:22, 1744:14, 1765:11, 1778:16
**started** [23] - 1566:20, 1572:4, 1574:1, 1597:3, 1614:3, 1630:23, 1650:18, 1671:22, 1694:1, 1698:21, 1698:23, 1703:17, 1709:15, 1709:16, 1720:9, 1721:8, 1724:9, 1727:5, 1730:23, 1737:9, 1737:20, 1740:22, 1750:25
**Starting** [1] - 1622:3
**starting** [6] - 1713:12, 1713:18, 1713:22, 1713:23, 1737:17, 1770:20
**starts** [3] - 1643:22, 1651:2, 1703:23
**startup** [1] - 1577:8
**State** [2] - 1613:5, 1623:1
**state** [10] - 1552:7, 1564:24, 1566:6, 1588:20, 1590:2, 1596:21, 1620:14, 1620:25, 1757:12, 1758:8
**statement** [12] - 1551:23, 1553:14, 1580:20, 1581:20, 1582:8, 1582:12, 1582:13, 1584:10, 1623:13, 1680:21, 1784:22, 1784:23
**statements** [5] - 1557:6, 1599:16, 1669:7, 1699:14, 1791:6
**STATES** [3] - 1536:1, 1536:7, 1536:12
**states** [7] - 1593:11, 1620:19, 1669:18, 1670:3, 1670:4, 1739:4, 1739:24
**States** [30] - 1536:5, 1537:2, 1594:8, 1601:5, 1602:20, 1603:14, 1603:15, 1604:11, 1610:14, 1611:6, 1625:9, 1625:11, 1635:7, 1642:18, 1642:20, 1645:22, 1651:1, 1651:21, 1677:2, 1688:20, 1696:16, 1700:23, 1709:17, 1722:25, 1724:21, 1725:9, 1769:19, 1771:7, 1773:1, 1773:4
**stating** [4] - 1576:22, 1584:24, 1744:4, 1759:10
**status** [16] - 1562:17, 1562:20, 1562:24, 1565:3, 1565:11, 1649:20, 1684:22, 1685:1, 1685:4, 1731:21, 1731:24, 1739:5, 1740:24, 1752:13, 1752:14, 1758:13
**stay** [7] - 1548:2, 1548:10, 1548:17, 1548:20, 1591:7, 1763:24, 1763:25
**stayed** [3] - 1590:24, 1650:7, 1650:11
**stenography** [1] - 1537:18
**step** [4] - 1601:17, 1605:18, 1612:15, 1662:16
**stepped** [1] - 1644:21
**Steps** [1] - 1756:23
**steps** [5] - 1616:1, 1659:8, 1757:3, 1757:7, 1757:9
**Steve** [3] - 1675:15, 1677:12, 1677:17
**still** [17] - 1540:20, 1545:20, 1577:8, 1607:17, 1645:19, 1645:21, 1667:7, 1671:16, 1683:2, 1687:19, 1687:21, 1688:16, 1725:13, 1725:15, 1767:2, 1774:13, 1793:3
**stipulation** [3] - 1666:7, 1666:9, 1667:12
**stood** [1] - 1586:20
**stop** [5] - 1557:6, 1668:1, 1668:14, 1762:6, 1771:16
**story** [2] - 1658:14, 1800:20
**strategic** [3] - 1643:23, 1709:10, 1740:1
**strategy** [12] - 1595:12, 1595:13, 1596:8, 1638:10, 1645:16, 1709:23, 1711:6, 1711:8, 1711:17, 1724:4, 1724:6, 1724:12
**Strategy** [2] - 1695:13, 1695:14
**STRAWN** [1] - 1536:14
**straying** [1] - 1587:4
**Street** [2] - 1536:22, 1537:4
**strength** [2] - 1635:16, 1649:9
**stricter** [1] - 1609:23
**strictly** [1] - 1582:11
**strike** [1] - 1801:17
**strikes** [1] - 1790:8
**striking** [1] - 1784:13
**striving** [1] - 1781:17
**strong** [17] - 1578:13, 1596:19, 1596:22, 1610:15, 1611:1, 1611:2, 1611:4, 1612:13, 1624:2, 1624:3, 1626:6, 1645:2, 1645:3, 1654:4, 1679:25
**strongly** [1] - 1582:21
**struck** [1] - 1755:9
**structural** [3] - 1711:10, 1714:11
**structure** [7] - 1545:8, 1545:22, 1546:10, 1695:18, 1696:2, 1719:16, 1756:1
**structured** [1] - 1637:2
**stuck** [1] - 1787:9
**studied** [1] - 1709:14
**study** [5] - 1712:1, 1717:17, 1720:19, 1746:17, 1746:19
**studying** [1] - 1721:5
**stupid** [2] - 1546:21, 1546:22
**subcommittees** [1] - 1636:16
**subgroup** [4] - 1791:17, 1791:21, 1796:1, 1796:5

**subject** [17] - 1542:18, 1543:22, 1567:16, 1569:23, 1585:15, 1588:21, 1591:22, 1657:5, 1669:4, 1672:3, 1689:11, 1718:16, 1732:22, 1736:1, 1744:17, 1748:7, 1759:16
**submit** [1] - 1802:6
**submits** [1] - 1583:18
**submitted** [9] - 1574:7, 1583:1, 1609:18, 1745:14, 1746:22, 1748:12, 1751:19, 1752:24, 1768:22
**submitting** [1] - 1626:2
**subsequent** [4] - 1726:20, 1728:20, 1728:23, 1757:10
**subsequently** [5] - 1717:11, 1720:21, 1750:25, 1759:16
**subset** [1] - 1796:19
**substantial** [5] - 1737:12, 1738:5, 1738:6, 1739:15, 1739:16
**substantially** [2] - 1738:11, 1740:25
**substantive** [1] - 1781:7
**substantively** [1] - 1781:24
**substitutions** [1] - 1661:25
**succeed** [1] - 1623:22
**succeeds** [1] - 1782:11
**success** [14] - 1576:23, 1577:2, 1602:15, 1602:17, 1603:2, 1603:4, 1630:19, 1636:10, 1637:21, 1643:6, 1643:21, 1646:10, 1782:12
**successes** [1] - 1643:19
**successful** [20] - 1571:3, 1594:2, 1594:7, 1602:11, 1605:7, 1615:18, 1616:4, 1623:4, 1623:9, 1623:10, 1625:7, 1627:18, 1637:22, 1638:12, 1639:17, 1647:23, 1682:6, 1685:19, 1782:2, 1782:9
**sue** [5] - 1672:21, 1777:16, 1777:17, 1777:18
**sued** [1] - 1777:18
**sufficient** [4] - 1766:21, 1767:7, 1774:15, 1799:24
**sufficiently** [1] - 1798:16
**suggest** [6] - 1659:7, 1659:11, 1677:4, 1680:14, 1723:11, 1779:21
**suggested** [4] - 1610:3, 1672:4, 1737:4, 1790:22
**suggesting** [4] - 1554:14, 1611:20, 1649:19, 1676:20
**suggestion** [3] - 1684:19, 1730:9, 1743:5
**suggests** [1] - 1774:14
**Suite** [4] - 1536:19, 1536:22, 1537:4, 1537:10
**SUM** [14] - 1673:8, 1673:11, 1673:18, 1673:19, 1673:22, 1673:24, 1674:2, 1684:10, 1700:19, 1700:20, 1700:22, 1700:23, 1701:9, 1794:19
**sum** [1] - 1607:21
**SUM's** [1] - 1673:5
**summary** [4] - 1757:8, 1792:3, 1794:13, 1796:9
**summer** [4] - 1617:17, 1625:17, 1660:6, 1660:16
**Sunil** [9] - 1555:7, 1560:5, 1596:22, 1596:24, 1688:18, 1721:6, 1722:10, 1739:8, 1792:10
**Superbowl** [1] - 1614:6
**support** [9] - 1571:25, 1601:22, 1626:8, 1628:19, 1773:7, 1775:22, 1787:25
**supported** [1] - 1586:22
**supporter** [4] - 1629:24, 1630:7, 1633:17, 1633:18
**supports** [2] - 1785:5, 1785:15
**supposed** [6] - 1538:14, 1587:7, 1698:7, 1698:11, 1699:6, 1778:9
**supposition** [1] - 1586:12
**Supreme** [1] - 1792:1
**surface** [1] - 1690:1
**Sustained** [13] - 1583:4, 1685:15, 1688:10, 1690:12, 1694:24, 1699:19, 1700:18, 1702:23, 1703:5, 1735:19, 1736:13, 1742:18, 1743:8
**sustained** [5] - 1583:7, 1586:21, 1653:17, 1662:14, 1736:15
**sustaining** [2] - 1587:12, 1587:13
**SWARTZBERG** [1] - 1536:24
**Switch** [1] - 1607:2
**switch** [1] - 1607:3
**sworn** [2] - 1542:3, 1709:3
**symbiotic** [5] - 1577:13, 1578:1, 1578:3, 1578:5, 1578:18
**system** [1] - 1549:15
**Szymanski** [2] - 1665:19, 1667:18

# T

**table** [1] - 1721:7
**talent** [1] - 1614:7
**talks** [2] - 1711:10, 1758:14
**task** [7] - 1554:5, 1554:8, 1609:5, 1609:8, 1609:12, 1609:21, 1726:12
**Task** [1] - 1672:7
**tasked** [1] - 1614:13
**Taylor** [2] - 1627:6, 1627:9
**teaching** [1] - 1613:8
**team** [130] - 1555:13, 1569:21, 1569:24, 1570:16, 1571:3, 1571:5, 1571:18, 1571:20, 1571:21, 1571:22, 1572:3, 1572:7, 1572:10, 1572:13, 1572:16, 1573:12, 1573:14, 1582:19, 1601:20, 1611:18, 1616:12, 1616:18, 1622:14, 1622:15, 1622:25, 1623:22, 1625:14, 1627:9, 1629:2, 1630:20, 1631:17, 1631:21, 1631:24, 1632:24, 1632:25, 1633:1, 1633:5, 1633:13, 1633:15, 1634:7, 1634:24, 1634:25, 1638:7, 1638:24, 1639:7, 1639:11, 1639:14, 1639:15, 1639:16, 1639:17, 1639:18, 1640:8, 1640:19, 1645:5, 1645:14, 1647:10, 1647:11, 1647:13, 1647:15, 1653:11, 1657:8, 1657:9, 1658:13, 1661:22, 1663:9, 1674:20, 1675:16, 1683:14, 1683:18, 1686:16, 1688:8, 1692:12, 1692:21, 1693:4, 1694:8, 1694:19, 1694:22, 1695:17, 1696:9, 1696:15, 1696:20, 1696:21, 1697:20, 1697:21, 1698:3, 1698:9, 1698:12, 1699:6, 1704:2, 1711:3, 1711:18, 1711:20, 1712:8, 1717:9, 1717:11, 1721:15, 1723:25, 1725:18, 1725:22, 1726:17, 1726:22, 1727:6, 1728:14, 1728:15, 1731:9, 1733:16, 1738:10, 1738:11, 1742:14, 1746:16, 1746:17, 1748:9, 1748:10, 1750:18, 1752:20, 1754:14, 1754:19, 1755:1, 1755:3, 1755:4, 1772:25, 1773:3, 1775:20, 1778:10, 1789:15
**Team** [1] - 1592:14
**team's** [1] - 1548:11
**Teams** [1] - 1600:19
**teams** [220] - 1550:9, 1551:4, 1551:12, 1553:13, 1555:24, 1555:25, 1557:17, 1560:15, 1560:23, 1562:3, 1562:7, 1563:1, 1563:3, 1563:8, 1563:12, 1563:14, 1565:4, 1565:5, 1565:11, 1565:17, 1565:25, 1566:8, 1566:10, 1566:12, 1566:15, 1566:16, 1566:22, 1567:4, 1567:13, 1567:18, 1568:3, 1568:9, 1568:11, 1573:3, 1583:19, 1600:12, 1601:22, 1604:4, 1604:25, 1605:14, 1610:23, 1611:2, 1611:19, 1614:17, 1615:22, 1621:10, 1621:11, 1622:11, 1623:15, 1623:18, 1623:20, 1623:24, 1623:25, 1624:20, 1624:21, 1625:5, 1625:8, 1625:12, 1625:24, 1625:25, 1626:6, 1626:14, 1630:12, 1631:25, 1634:5, 1634:8, 1634:20, 1635:11, 1635:15, 1635:23, 1637:17, 1639:8, 1643:16, 1645:5, 1645:8, 1648:5, 1654:5, 1654:8, 1657:15, 1657:22, 1657:23, 1658:5, 1658:7, 1658:11, 1670:22, 1671:20, 1679:5, 1679:10, 1680:19, 1681:4, 1681:18, 1681:24, 1682:17, 1682:23, 1683:6, 1683:12, 1683:16, 1683:24, 1684:3, 1684:13, 1685:12, 1695:8, 1695:11, 1695:22, 1696:23, 1697:15, 1697:19, 1697:25, 1698:5, 1698:20, 1699:15, 1711:17, 1712:9, 1713:13, 1716:23, 1718:21, 1718:25, 1719:1, 1719:18, 1719:20, 1719:25, 1720:12, 1721:8, 1723:4, 1724:15, 1733:12, 1733:18, 1736:24, 1740:13, 1740:14, 1741:2, 1741:16, 1741:22, 1741:24, 1742:5, 1742:20, 1742:22, 1742:23, 1744:1, 1744:6, 1744:10, 1744:13, 1746:8, 1746:11, 1746:13, 1746:18, 1746:20, 1746:25, 1747:1, 1747:10, 1747:15, 1747:22, 1748:5, 1748:19, 1749:2, 1752:3, 1752:7, 1752:9, 1752:17,

1752:18, 1753:14, 1753:17, 1753:19, 1753:22, 1753:25, 1754:1, 1756:10, 1756:11, 1757:16, 1758:13, 1758:14, 1758:15, 1759:2, 1759:4, 1759:11, 1759:19, 1759:24, 1760:19, 1761:15, 1776:17, 1776:18, 1776:19, 1776:20, 1776:25, 1777:1, 1777:2, 1777:16, 1777:17, 1777:18, 1778:4, 1778:8, 1778:9, 1778:13, 1780:6, 1780:7, 1780:8, 1782:25, 1783:1, 1783:2, 1783:6, 1783:8, 1783:9, 1783:10, 1783:16, 1783:19, 1783:20, 1783:25, 1786:22, 1788:10, 1789:1, 1789:17, 1789:18
**teams'** [1] - 1758:17
**technical** [4] - 1592:12, 1597:21, 1613:8, 1613:10
**teeth** [14] - 1580:5, 1580:13, 1581:5, 1581:17, 1582:1, 1582:3, 1582:7, 1582:10, 1584:11, 1584:19, 1584:23, 1591:13, 1703:2
**telecasters** [2] - 1642:10, 1642:14
**television** [2] - 1572:17, 1642:19
**Ten** [1] - 1623:24
**ten** [4] - 1554:24, 1680:19, 1681:4, 1693:24
**tend** [1] - 1620:10
**Tennis** [1] - 1776:5
**tenure** [1] - 1601:12
**term** [13] - 1592:12, 1602:9, 1621:17, 1624:13, 1628:13, 1656:14, 1669:19, 1669:20, 1670:7, 1670:16, 1704:4, 1731:11, 1781:1
**terms** [8] - 1624:2, 1640:5, 1665:24, 1723:10, 1727:7, 1787:3, 1794:11, 1798:18
**terrible** [1] - 1685:11
**terrific** [1] - 1633:20
**testified** [18] - 1538:19, 1538:20, 1542:3, 1582:24, 1600:25, 1673:6, 1678:24, 1686:17, 1687:13, 1687:14, 1687:16, 1695:3, 1696:3, 1696:5, 1699:3, 1699:25, 1701:11, 1709:3
**testify** [3] - 1676:5, 1686:21, 1778:7
**testifying** [3] - 1618:2, 1685:18, 1728:22
**testimony** [16] - 1584:21, 1586:14, 1591:20, 1648:17, 1648:21, 1658:6, 1681:9, 1686:23, 1690:15, 1692:17, 1700:4, 1707:6, 1707:19, 1763:3, 1763:8, 1763:15
**Texas** [1] - 1633:1
**text** [5] - 1768:5, 1769:7, 1769:9, 1769:15, 1770:1
**thankfully** [1] - 1627:17
**thanking** [1] - 1660:20
**THE** [255] - 1536:12, 1538:2, 1538:14, 1538:23, 1539:5, 1539:9, 1539:14, 1539:17, 1539:21, 1539:23, 1540:8, 1540:12, 1541:2, 1541:5, 1542:23, 1549:22, 1549:25, 1550:17, 1550:19, 1551:8, 1556:20, 1556:25, 1557:4, 1558:9, 1558:11, 1558:22, 1559:22, 1564:11, 1567:1, 1567:3, 1567:6, 1569:9, 1569:13, 1571:17, 1575:8, 1575:12, 1575:15, 1577:19, 1581:14, 1581:15, 1583:4, 1583:8, 1585:24, 1586:3, 1586:6, 1586:17, 1587:2, 1587:17, 1588:2, 1588:6, 1588:14, 1592:4, 1593:7, 1595:22, 1595:24, 1596:1, 1596:5, 1599:5, 1599:13, 1599:14, 1599:21, 1599:23, 1617:25, 1618:3, 1619:17, 1631:12, 1632:12, 1632:15, 1646:13, 1646:16, 1646:20, 1647:18, 1653:17, 1653:23, 1654:23, 1656:3, 1659:23, 1659:25, 1662:14, 1663:23, 1664:3, 1665:25, 1666:21, 1667:10, 1667:19, 1668:4, 1668:11, 1668:17, 1668:21, 1675:12, 1675:14, 1675:18, 1675:19, 1675:22, 1685:15, 1688:10, 1689:23, 1690:12, 1690:19, 1693:6, 1693:10, 1694:24, 1695:2, 1697:2, 1697:3, 1699:19, 1699:22, 1700:18, 1702:12, 1702:23, 1703:5, 1703:7, 1705:8, 1706:13, 1706:16, 1706:19, 1706:22, 1706:25, 1707:4, 1707:12, 1707:14, 1707:18, 1707:25, 1708:3, 1708:7, 1708:10, 1708:14, 1716:7, 1722:1, 1723:15, 1723:16, 1723:17, 1723:19, 1726:5, 1729:24, 1733:4, 1735:19, 1736:13, 1736:16, 1738:14, 1742:18, 1742:22, 1743:8, 1744:8, 1747:6, 1748:13, 1748:15, 1748:16, 1749:24, 1754:3, 1762:7, 1762:17, 1762:18, 1762:20, 1763:5, 1763:16, 1763:21, 1763:24, 1765:2, 1765:23, 1766:3, 1766:9, 1766:18, 1767:9, 1767:14, 1767:18, 1768:2, 1768:13, 1768:16, 1769:3, 1769:14, 1769:22, 1769:25, 1770:4, 1770:10, 1770:15, 1772:12, 1772:21, 1773:11, 1773:23, 1774:18, 1775:8, 1776:11, 1777:6, 1778:12, 1778:20, 1779:4, 1779:22, 1780:5, 1780:17, 1781:6, 1781:10, 1781:13, 1781:17, 1782:10, 1782:15, 1782:22, 1783:17, 1783:23, 1784:10, 1784:25, 1785:7, 1785:22, 1786:10, 1786:13, 1786:24, 1787:14, 1788:2, 1788:9, 1788:13, 1788:22, 1789:3, 1789:11, 1789:14, 1789:19, 1789:24, 1790:4, 1790:20, 1791:2, 1791:4, 1791:13, 1792:6, 1794:20, 1795:1, 1795:12, 1795:18, 1795:22, 1796:13, 1796:21, 1797:6, 1797:13, 1797:17, 1798:11, 1799:6, 1799:17, 1799:21, 1800:4, 1801:1, 1801:6, 1801:17, 1801:24, 1802:3, 1802:8, 1802:19, 1802:23, 1803:3, 1803:7, 1803:10, 1803:14, 1803:16, 1803:20, 1803:23, 1803:25, 1804:2, 1804:5
**themselves** [9] - 1543:20, 1547:12, 1627:24, 1754:18, 1795:5, 1797:2, 1798:24, 1799:4, 1800:24
**theory** [11] - 1778:23, 1778:24, 1778:25, 1782:4, 1784:1, 1791:21, 1792:5, 1792:6, 1792:7, 1792:24, 1796:16
**thereabouts** [1] - 1730:25
**therefore** [2] - 1657:24, 1657:25
**they've** [5] - 1539:3, 1583:20, 1627:7, 1627:17, 1666:11
**thinking** [10] - 1551:14, 1582:5, 1585:2, 1618:12, 1731:16, 1737:13, 1796:22, 1799:23, 1802:17
**third** [17] - 1627:15, 1646:18, 1649:24, 1651:18, 1651:20, 1652:1, 1772:9, 1774:16, 1775:6, 1779:10, 1779:12, 1784:6, 1786:19, 1786:20, 1788:19
**third-party** [1] - 1784:6
**thirtieth** [1] - 1601:20
**thirty** [1] - 1803:17
**thoughts** [1] - 1785:2
**thousand** [4] - 1605:1, 1617:14, 1631:21, 1631:22
**thousands** [7] - 1601:23, 1627:16, 1630:1, 1637:12
**threat** [3] - 1653:14, 1653:20, 1654:2
**threats** [1] - 1653:6
**three** [34] - 1571:2, 1589:4, 1616:3, 1622:11, 1626:1, 1633:8, 1634:9, 1636:13, 1680:18, 1681:3, 1681:6, 1681:17, 1682:17, 1682:22, 1683:4, 1694:12, 1694:13, 1711:9, 1722:25, 1754:9, 1767:1, 1767:2, 1767:3, 1772:7, 1774:5, 1774:12, 1774:13, 1774:21, 1775:3, 1776:14, 1779:8, 1792:13
**throughout** [5] - 1612:21, 1612:25, 1624:20, 1625:15, 1628:14
**ticket** [1] - 1645:11
**tickets** [3] - 1629:23, 1645:17, 1744:15
**tied** [1] - 1788:16
**tier** [1] - 1690:18
**Timberwolves** [1] - 1572:18
**timely** [1] - 1739:6
**timing** [4] - 1732:13, 1743:17, 1747:8, 1803:25
**title** [2] - 1730:8, 1733:8
**titled** [9] - 1620:18, 1621:20, 1624:15, 1627:20, 1631:5, 1636:6, 1637:25, 1641:3, 1641:20
**TOA** [1] - 1543:21
**today** [15] - 1545:20, 1554:17, 1585:9, 1585:12, 1597:16, 1603:8, 1613:15, 1624:18, 1625:25, 1626:12, 1633:9, 1667:2, 1667:4, 1672:15, 1724:7
**Today** [3] - 1619:3, 1633:8, 1677:12
**Todd** [2] - 1559:18, 1713:21
**together** [14] - 1570:3, 1594:12, 1595:12, 1595:13, 1596:8, 1610:25, 1612:5, 1612:12, 1623:17, 1644:18,

1649:11, 1663:3, 1744:11, 1797:25
**tomorrow** [11] - 1665:13, 1666:18, 1666:25, 1667:5, 1667:14, 1668:2, 1750:1, 1762:13, 1762:17, 1803:1
**tomorrow's** [1] - 1568:22
**tonight** [1] - 1665:20
**took** [15] - 1565:16, 1571:20, 1572:13, 1572:14, 1603:20, 1604:13, 1633:6, 1668:8, 1682:21, 1683:11, 1685:24, 1686:4, 1730:22, 1731:3, 1731:11
**top** [28] - 1542:17, 1601:14, 1601:19, 1602:19, 1604:10, 1620:19, 1621:1, 1621:3, 1621:4, 1622:3, 1629:21, 1629:24, 1631:25, 1639:8, 1641:18, 1642:9, 1652:7, 1652:11, 1653:5, 1657:11, 1690:18, 1691:6, 1691:18, 1710:3, 1722:13, 1722:15, 1729:13, 1793:2
**top-tier** [1] - 1690:18
**topic** [5] - 1658:22, 1661:15, 1673:3, 1674:5, 1760:14
**topics** [2] - 1648:16, 1758:23
**Toronto** [2] - 1622:12
**total** [2] - 1540:11, 1751:12
**touch** [2] - 1600:17, 1780:20
**touched** [3] - 1624:14, 1649:25, 1782:7
**touching** [1] - 1786:13
**tournament** [6] - 1603:13, 1639:13, 1657:7, 1657:11, 1658:16, 1658:18
**tournaments** [3] - 1632:7, 1658:4, 1723:5
**towards** [3] - 1743:14, 1781:18, 1796:24
**track** [1] - 1569:9
**Traffic** [2] - 1721:13, 1721:14
**trail** [1] - 1802:11
**Trailblazers** [1] - 1622:16
**Training** [1] - 1631:6
**training** [2] - 1631:8, 1631:23
**transaction** [1] - 1569:19
**TRANSCRIPT** [1] - 1536:11
**transcript** [26] - 1537:18, 1538:4, 1538:7, 1538:14, 1538:18, 1539:2, 1540:13, 1540:16, 1540:23, 1547:4, 1575:11, 1583:10, 1585:22, 1587:18, 1587:20, 1587:24, 1588:3, 1588:23, 1593:1, 1593:16, 1674:7, 1674:10, 1674:22, 1707:13, 1707:14, 1763:8
**transcript/trial** [1] - 1707:19
**Transcription** [1] - 1537:18
**transcription** [1] - 1540:15
**transcripts** [1] - 1762:23
**transparent** [1] - 1544:16
**travel** [1] - 1657:21
**treatment** [2] - 1759:13, 1794:19
**treats** [1] - 1794:14
**trial** [3] - 1628:14, 1795:20, 1796:6
**TRIAL** [1] - 1536:11
**tried** [1] - 1603:6
**trilateral** [5] - 1767:10, 1770:21, 1771:15, 1774:19, 1784:18
**trophy** [2] - 1673:1, 1673:2
**trouble** [1] - 1679:23
**troubled** [1] - 1681:1
**troubling** [2] - 1540:4, 1540:5
**true** [18] - 1549:10, 1557:25, 1579:9, 1579:10, 1581:14, 1586:11, 1593:18, 1603:9, 1676:8, 1680:25, 1682:8, 1684:13, 1696:7, 1699:9, 1756:3, 1756:20, 1770:14, 1789:8
**trust** [1] - 1600:19
**try** [8] - 1538:5, 1546:1, 1552:18, 1659:2, 1677:20, 1686:13, 1760:1, 1787:12
**trying** [18] - 1554:1, 1586:13, 1587:10, 1615:11, 1647:13, 1656:13, 1742:25, 1743:2, 1743:19, 1744:11, 1749:8, 1766:17, 1766:20, 1768:9, 1795:22, 1796:7, 1798:17, 1799:21
**turn** [21] - 1608:17, 1610:12, 1615:13, 1615:16, 1621:19, 1624:14, 1633:2, 1636:4, 1637:25, 1641:3, 1641:20, 1642:25, 1657:5, 1658:22, 1669:4, 1670:1, 1672:3, 1673:3, 1674:5, 1721:12, 1791:9
**turning** [3] - 1606:24, 1653:5, 1771:17
**twelve** [1] - 1626:1
**twenty** [2] - 1631:25, 1643:13
**twenty-five** [1] - 1643:13
**Twins** [1] - 1572:19
**Two** [3] - 1736:22, 1774:1, 1775:9
**two** [91] - 1539:12, 1540:1, 1543:9, 1544:17, 1544:19, 1544:22, 1548:9, 1548:17, 1552:1, 1554:23, 1555:25, 1583:20, 1604:22, 1613:15, 1614:22, 1614:25, 1619:3, 1623:10, 1634:5, 1639:6, 1658:12, 1665:12, 1665:14, 1669:18, 1669:21, 1670:7, 1679:18, 1690:17, 1690:23, 1691:5, 1694:2, 1699:11, 1700:25, 1711:10, 1713:19, 1714:4, 1714:13, 1714:14, 1716:11, 1719:5, 1725:3, 1729:9, 1731:13, 1731:24, 1738:2, 1741:14, 1741:15, 1743:6, 1744:16, 1745:12, 1745:14, 1746:4, 1746:5, 1748:17, 1748:18, 1748:24, 1749:1, 1751:12, 1752:16, 1762:20, 1766:22, 1767:2, 1767:3, 1767:4, 1767:5, 1772:8, 1773:5, 1774:4, 1774:17, 1774:22, 1775:7, 1775:14, 1775:16, 1777:11, 1779:1, 1779:9, 1780:14, 1781:8, 1782:19, 1782:20, 1784:5, 1785:13, 1786:4, 1786:16, 1786:18, 1787:24, 1787:25, 1788:19, 1792:23, 1796:6, 1798:4
**two-year** [1] - 1670:7
**type** [6] - 1705:4, 1720:22, 1741:7, 1759:13, 1760:11
**types** [1] - 1630:10
**typical** [1] - 1632:1
**typically** [2] - 1666:8, 1730:24



**U**

**U.S** [73] - 1545:1, 1545:12, 1570:20, 1574:24, 1577:5, 1577:23, 1589:24, 1594:20, 1594:23, 1597:13, 1597:15, 1605:25, 1606:5, 1606:25, 1607:10, 1607:24, 1608:3, 1608:18, 1608:19, 1609:5, 1610:12, 1610:13, 1611:22, 1638:7, 1639:14, 1639:15, 1639:25, 1640:2, 1641:3, 1647:23, 1649:9, 1652:22, 1657:6, 1657:7, 1657:9, 1657:13, 1673:5, 1673:19, 1673:22, 1674:7, 1674:10, 1675:16, 1677:1, 1677:17, 1699:3, 1699:7, 1710:25, 1711:24, 1721:6, 1722:20, 1723:5, 1724:23, 1725:4, 1725:14, 1726:10, 1726:12, 1732:10, 1733:11, 1733:13, 1739:4, 1743:20, 1749:18, 1756:24, 1757:6, 1759:5, 1761:23, 1769:2, 1771:7, 1775:21, 1785:24, 1789:4, 1798:5, 1799:8
**ultimately** [10] - 1563:3, 1566:19, 1621:16, 1628:6, 1628:8, 1628:11, 1628:19, 1712:14, 1724:9, 1730:17
**unbeknownst** [1] - 1786:3
**unclear** [2] - 1733:21, 1735:24
**uncomfortable** [1] - 1547:13
**under** [23] - 1545:11, 1546:3, 1556:8, 1602:11, 1619:13, 1620:3, 1628:1, 1666:6, 1666:9, 1667:12, 1669:18, 1677:2, 1699:5, 1728:7, 1753:8, 1754:12, 1774:4, 1775:16, 1777:10, 1779:1, 1780:13, 1782:3, 1784:1
**underlying** [2] - 1800:13, 1800:14
**underneath** [1] - 1710:9
**understood** [1] - 1686:22
**unequal** [1] - 1794:19
**unfortunately** [1] - 1666:14
**unfounded** [1] - 1604:19
**unintentional** [1] - 1586:25
**union** [3] - 1601:25, 1695:23, 1695:25
**UNITED** [3] - 1536:1, 1536:7, 1536:12
**United** [41] - 1536:5, 1537:2, 1594:8, 1601:5, 1602:20, 1603:14, 1603:15, 1604:11, 1610:14, 1611:6, 1611:11, 1622:24, 1624:8, 1625:9, 1625:11, 1631:19, 1635:6, 1642:17, 1642:20, 1645:21, 1645:23, 1649:14, 1651:1, 1651:21, 1673:15, 1677:2, 1688:20, 1694:19, 1694:21, 1696:16, 1700:23, 1709:16, 1722:25, 1724:21, 1725:9, 1769:19, 1771:7, 1773:1, 1773:2, 1773:4, 1773:14
**University** [1] - 1613:5
**university** [1] - 1613:1
**Univision** [1] - 1641:13
**unlawful** [6] - 1791:11, 1795:6,

1797:3, 1798:1, 1798:24, 1800:14
**unless** [5] - 1547:22, 1571:10, 1658:15, 1668:5, 1780:2
**Unlike** [1] - 1779:4
**unlikely** [1] - 1733:17
**unnamed** [1] - 1775:23
**unsolicited** [1] - 1596:23
**unstable** [3] - 1684:20, 1710:25, 1714:20
**untrue** [2] - 1604:19, 1605:12
**Up** [1] - 1622:10
**up** [75] - 1538:5, 1543:8, 1558:7, 1558:22, 1561:5, 1561:10, 1566:17, 1582:18, 1586:13, 1586:20, 1588:22, 1606:12, 1607:6, 1607:21, 1612:18, 1614:14, 1615:21, 1622:3, 1626:12, 1626:18, 1628:14, 1632:22, 1633:19, 1636:12, 1636:13, 1644:13, 1644:21, 1645:17, 1647:12, 1647:15, 1649:23, 1650:4, 1651:7, 1651:12, 1652:4, 1652:18, 1655:17, 1657:10, 1660:3, 1665:15, 1669:10, 1676:10, 1677:7, 1677:8, 1681:23, 1686:12, 1687:5, 1687:7, 1687:11, 1696:11, 1697:12, 1710:16, 1717:11, 1722:17, 1723:14, 1729:19, 1739:2, 1744:5, 1747:18, 1748:5, 1748:23, 1751:20, 1755:7, 1755:8, 1759:16, 1759:24, 1766:8, 1778:10, 1783:3, 1783:21, 1785:23, 1785:25, 1788:18, 1794:4, 1794:7
**upcoming** [1] - 1728:3
**update** [5] - 1569:18, 1689:2, 1758:12, 1760:1
**urge** [1] - 1785:6
**USA** [2] - 1691:11, 1716:23
**USL** [178] - 1543:20, 1543:25, 1544:17, 1545:6, 1547:5, 1548:9, 1548:11, 1548:12, 1549:19, 1550:2, 1550:13, 1550:16, 1550:22, 1551:12, 1551:21, 1554:12, 1557:9, 1557:18, 1557:25, 1559:8, 1560:4, 1560:5, 1560:11, 1560:12, 1560:15, 1560:20, 1560:24, 1561:19, 1561:22, 1562:1, 1562:7, 1562:8, 1562:16, 1562:23, 1563:4, 1563:5, 1564:17, 1564:19, 1565:4, 1566:1, 1566:7, 1566:15, 1566:16, 1567:4, 1567:13, 1568:3, 1568:7, 1568:9, 1568:11, 1575:23, 1576:2, 1578:24, 1579:17, 1583:1, 1585:11, 1658:13, 1669:5, 1669:8, 1669:15, 1670:5, 1670:17, 1670:24, 1671:1, 1671:5, 1671:10, 1671:14, 1671:16, 1671:19, 1677:11, 1678:21, 1697:13, 1697:14, 1697:20, 1698:1, 1698:4, 1698:11, 1698:12, 1698:20, 1703:12, 1712:9, 1714:20, 1715:22, 1716:23, 1718:13, 1718:14, 1718:24, 1720:10, 1720:11, 1720:12, 1720:23, 1724:15, 1725:2, 1729:10, 1731:2, 1731:5, 1731:9, 1731:20, 1737:10, 1737:15, 1738:9, 1740:6, 1740:7, 1740:8, 1740:12, 1747:9, 1747:16, 1748:6, 1749:15, 1750:18, 1750:20, 1752:9, 1753:3, 1753:20, 1756:2, 1756:6, 1756:10, 1756:12, 1757:17, 1758:12, 1758:13, 1759:3, 1759:23, 1760:18, 1761:14, 1761:15, 1766:22, 1766:24, 1767:6, 1767:12, 1770:14, 1771:1, 1771:13, 1771:23, 1771:24, 1772:10, 1772:18, 1773:2, 1773:8, 1776:17, 1777:2, 1777:17, 1778:10, 1778:13, 1778:24, 1780:6, 1782:4, 1782:24, 1783:1, 1783:4, 1783:5, 1783:6, 1783:8, 1783:14, 1783:24, 1784:16, 1784:19, 1784:24, 1786:1, 1786:3, 1786:8, 1787:16, 1788:10, 1788:11, 1789:1, 1789:5, 1789:15, 1789:17
**USL's** [3] - 1670:8, 1670:12, 1773:9
**USSF** [33] - 1557:6, 1570:17, 1570:23, 1571:9, 1573:14, 1574:10, 1574:20, 1575:22, 1576:23, 1580:9, 1679:5, 1684:19, 1684:25, 1685:12, 1700:3, 1700:9, 1700:11, 1700:15, 1701:3, 1701:8, 1712:9, 1715:2, 1725:21, 1731:1, 1731:24, 1741:7, 1747:3, 1750:8, 1766:21, 1773:7, 1792:21, 1792:25
**utilizing** [1] - 1730:8
**uttering** [1] - 1611:24

# V

**Val** [2] - 1589:21, 1589:23
**validated** [1] - 1676:25
**valuable** [2] - 1621:18, 1652:25
**value** [10] - 1620:21, 1621:13, 1621:16, 1672:20, 1686:23, 1687:2, 1687:3, 1687:4, 1783:2, 1797:18
**values** [2] - 1595:5, 1783:20
**variety** [5] - 1595:20, 1596:4, 1596:10, 1695:21, 1712:5
**various** [10] - 1559:19, 1626:23, 1642:10, 1642:14, 1642:20, 1653:2, 1672:4, 1677:7, 1709:9, 1722:10
**vast** [3] - 1629:5, 1698:2
**Vegas** [3] - 1641:1, 1647:13, 1647:14
**Ventura** [1] - 1536:19
**verbal** [1] - 1760:14
**verdict** [1] - 1804:6
**version** [5] - 1544:8, 1575:7, 1575:19, 1765:17, 1765:18
**versus** [2] - 1586:24, 1754:14
**veterans** [1] - 1613:9
**viability** [1] - 1719:12
**viable** [4] - 1719:6, 1736:24, 1741:16, 1749:2
**vibrant** [4] - 1615:16, 1637:7, 1644:11, 1645:24
**video** [11] - 1623:4, 1647:6, 1706:21, 1707:6, 1707:8, 1708:12, 1762:23, 1763:3, 1763:7, 1803:21, 1803:23
**Video** [2] - 1708:6, 1708:15
**videos** [8] - 1665:12, 1665:14, 1666:12, 1666:14, 1666:15, 1666:16, 1666:18, 1666:20
**Videotape** [1] - 1706:24
**Vietnam** [1] - 1613:9
**view** [33] - 1545:12, 1545:14, 1545:19, 1545:20, 1546:2, 1546:8, 1546:13, 1546:16, 1571:23, 1587:22, 1602:13, 1605:16, 1608:15, 1610:8, 1623:11, 1624:3, 1624:4, 1625:6, 1655:11, 1663:20, 1692:9, 1722:14, 1722:19, 1722:22, 1724:2, 1724:7, 1773:7, 1775:22, 1784:12, 1786:19, 1787:10
**viewed** [2] - 1602:18, 1602:20
**views** [4] - 1581:19, 1602:14, 1732:5
**Villa** [2] - 1639:9, 1642:2
**violated** [3] - 1570:25, 1571:2, 1587:11
**violating** [2] - 1571:6, 1773:12
**violation** [2] - 1773:5, 1786:4
**virtually** [1] - 1776:18
**virtue** [2] - 1782:12, 1800:15
**Vision** [1] - 1620:18
**vision** [8] - 1597:21, 1612:8, 1616:13, 1620:22, 1620:25, 1624:13, 1635:7, 1740:1
**visionary** [3] - 1603:2, 1632:6, 1643:22
**visual** [1] - 1668:14
**Volvo** [3] - 1776:4, 1779:20, 1785:19
**vote** [16] - 1579:17, 1607:7, 1607:9, 1608:9, 1673:21, 1675:6, 1675:9, 1678:4, 1794:6, 1794:10, 1794:11, 1794:25, 1795:2, 1795:13, 1796:2
**voted** [14] - 1606:16, 1676:11, 1677:6, 1677:21, 1678:18, 1702:16, 1702:19, 1739:4, 1792:18, 1794:17, 1798:6, 1800:12, 1800:15, 1800:19
**votes** [4] - 1676:14, 1676:18, 1678:3, 1678:7
**voting** [8] - 1607:7, 1794:24, 1795:10, 1795:14, 1796:3, 1798:25, 1799:3, 1800:2

# W

**wait** [1] - 1767:18
**waited** [1] - 1653:25
**waiting** [2] - 1627:13, 1647:3
**waive** [1] - 1570:13
**waiver** [32] - 1552:20, 1552:23, 1554:23, 1570:16, 1570:21, 1570:23, 1571:10, 1571:11, 1571:13, 1573:14, 1573:16, 1573:18, 1573:19, 1573:20, 1573:21, 1573:24, 1574:3, 1574:15, 1581:8, 1689:19, 1725:25, 1726:2,

1726:18, 1727:1, 1727:2, 1727:3, 1727:4, 1728:7, 1728:8, 1728:14, 1728:16, 1753:23
**waivers** [61] - 1549:5, 1549:6, 1549:7, 1549:11, 1552:9, 1552:11, 1552:15, 1553:1, 1553:3, 1555:5, 1555:18, 1555:23, 1556:2, 1556:7, 1556:11, 1557:7, 1563:6, 1566:22, 1567:18, 1567:24, 1568:13, 1570:19, 1574:7, 1574:10, 1574:16, 1574:19, 1580:11, 1685:7, 1685:10, 1689:14, 1689:17, 1702:7, 1728:2, 1728:9, 1731:6, 1731:9, 1731:13, 1731:21, 1740:24, 1741:1, 1750:18, 1750:20, 1750:25, 1751:3, 1751:6, 1751:8, 1751:10, 1751:12, 1751:16, 1751:24, 1752:2, 1752:7, 1752:10, 1752:12, 1752:16, 1752:20, 1754:14, 1754:25, 1755:1, 1755:6, 1777:1
**walk** [5] - 1620:8, 1620:13, 1621:22, 1770:15, 1770:22
**wall** [1] - 1785:23
**wants** [5] - 1575:17, 1634:22, 1737:1, 1741:18, 1791:10
**war** [1] - 1613:9
**War** [2] - 1613:9
**Warriors** [1] - 1623:1
**WARSHAW** [2] - 1536:19, 1536:21
**Washington** [4] - 1537:11, 1628:8, 1628:9, 1647:12
**watch** [1] - 1647:7
**watching** [1] - 1630:4
**WATKINS** [2] - 1537:1, 1537:4
**Waukey** [1] - 1732:12
**waukey** [1] - 1732:13
**waving** [1] - 1630:2
**ways** [8] - 1600:22, 1630:2, 1655:7, 1662:18, 1723:23, 1788:20, 1788:21
**weaker** [1] - 1773:9
**weakest** [1] - 1645:3
**wealthiest** [1] - 1571:3
**weather** [2] - 1625:15, 1657:21
**week** [5] - 1589:22, 1660:12, 1665:22, 1665:23, 1666:20
**weekend** [1] - 1804:8
**weeks** [2] - 1601:21, 1796:6
**welcome** [2] - 1591:6, 1668:22
**well-known** [1] - 1622:17
**Wellman** [2] - 1543:5, 1543:6
**west** [4] - 1624:22, 1657:21, 1754:1, 1754:4
**whatsoever** [2] - 1605:24, 1607:12
**wheelchair** [1] - 1613:11
**wherewithal** [1] - 1623:9
**white** [2] - 1639:2
**whole** [11] - 1539:4, 1539:19, 1540:16, 1567:16, 1570:4, 1652:18, 1667:15, 1684:16, 1685:6, 1739:11, 1792:3
**wholeheartedly** [1] - 1684:24
**wide** [4] - 1595:20, 1596:10, 1695:21, 1712:5
**wife** [1] - 1613:16
**willing** [1] - 1661:10
**win** [5] - 1603:20, 1623:20, 1635:1, 1645:9, 1767:3
**winding** [2] - 1563:13, 1698:20
**winning** [1] - 1602:24
**WINSTON** [1] - 1536:14
**winter** [1] - 1625:17
**wish** [1] - 1762:12
**withdrawn** [1] - 1552:5
**witness** [31] - 1541:1, 1542:11, 1558:13, 1558:15, 1586:5, 1587:21, 1587:25, 1588:6, 1588:9, 1617:23, 1619:9, 1631:3, 1654:12, 1654:13, 1655:18, 1655:20, 1659:17, 1659:18, 1665:12, 1668:7, 1668:12, 1706:19, 1706:21, 1707:22, 1708:3, 1708:7, 1708:8, 1708:11, 1721:17, 1732:17, 1762:19
**Witness** [3] - 1586:5, 1706:18, 1762:19
**WITNESS** [12] - 1581:14, 1599:14, 1646:20, 1675:14, 1675:19, 1693:10, 1697:3, 1723:16, 1723:19, 1748:15, 1762:18, 1805:3
**woman** [1] - 1673:14
**women** [1] - 1627:10
**Women's** [2] - 1601:10, 1746:1
**women's** [3] - 1556:18, 1619:4, 1629:6
**women-led** [1] - 1627:10
**won** [4] - 1640:20, 1640:25, 1658:6
**wonder** [2] - 1548:24, 1548:25
**wondered** [1] - 1551:16
**Wonderland** [1] - 1770:5
**word** [11] - 1559:12, 1582:10, 1584:22, 1594:14, 1599:12, 1732:25, 1742:11, 1742:12, 1742:15, 1743:1, 1743:3
**wording** [2] - 1733:21, 1735:23
**words** [13] - 1548:16, 1580:7, 1582:1, 1595:13, 1667:2, 1668:9, 1681:2, 1740:4, 1740:5, 1785:11, 1785:12, 1800:3, 1800:5
**wore** [2] - 1650:5, 1650:9
**works** [4] - 1637:3, 1645:4, 1645:16, 1772:11
**Works** [2] - 1643:2, 1643:10
**world** [37] - 1545:22, 1594:4, 1602:9, 1602:14, 1602:19, 1603:14, 1603:23, 1604:6, 1604:7, 1610:15, 1612:3, 1612:5, 1614:14, 1615:12, 1615:15, 1616:8, 1617:5, 1617:7, 1620:14, 1620:20, 1621:2, 1621:4, 1623:1, 1629:21, 1631:25, 1633:22, 1638:16, 1641:25, 1642:11, 1651:1, 1652:7, 1652:10, 1655:5, 1657:22, 1657:23, 1657:25, 1782:11
**World** [25] - 1603:8, 1603:10, 1603:12, 1603:13, 1603:16, 1603:17, 1603:20, 1603:21, 1603:25, 1604:8, 1611:17, 1612:4, 1613:9, 1615:17, 1615:18, 1617:5, 1617:11, 1623:21, 1628:5, 1630:6, 1632:6, 1638:7, 1638:12, 1640:21, 1643:15
**worldwide** [1] - 1601:11
**worn** [1] - 1611:14
**worse** [1] - 1587:12
**worth** [1] - 1621:17
**worthless** [1] - 1687:2
**worthy** [1] - 1649:20
**would've** [1] - 1653:25
**wound** [1] - 1566:19
**write** [4] - 1544:3, 1743:10, 1754:13
**writing** [3] - 1569:18, 1660:18, 1765:3
**wrongdoer** [2] - 1784:2, 1784:3
**wrote** [27] - 1544:15, 1564:14, 1569:6, 1643:24, 1711:19, 1714:10, 1715:15, 1719:15, 1722:8, 1722:9, 1722:12, 1722:13, 1722:18, 1722:24, 1730:3, 1733:19, 1741:20, 1741:21, 1741:22, 1742:7, 1743:9, 1743:23, 1745:8, 1746:6, 1756:1, 1756:2, 1760:9



# Y

**Yankees** [2] - 1610:20, 1622:22
**YATES** [5] - 1537:5, 1550:15, 1556:23, 1581:13, 1666:4
**year** [60] - 1551:3, 1552:19, 1552:22, 1555:13, 1555:18, 1555:25, 1556:1, 1556:16, 1567:8, 1567:18, 1568:5, 1572:3, 1573:18, 1573:20, 1573:24, 1574:1, 1574:20, 1601:20, 1601:25, 1602:21, 1602:23, 1612:6, 1617:8, 1617:15, 1620:11, 1620:12, 1625:1, 1626:21, 1638:25, 1639:1, 1645:6, 1655:13, 1658:21, 1670:7, 1672:18, 1677:17, 1678:15, 1680:1, 1689:18, 1693:19, 1695:8, 1699:7, 1699:11, 1715:1, 1720:9, 1725:25, 1726:19, 1726:20, 1727:9, 1727:10, 1735:9, 1743:14, 1743:15, 1747:24, 1752:16, 1753:13, 1753:16, 1759:19
**Year's** [1] - 1538:11
**years** [72] - 1549:3, 1549:16, 1551:17, 1555:9, 1568:7, 1568:13, 1572:5, 1576:21, 1580:3, 1580:10, 1594:19, 1601:1, 1601:6, 1608:20, 1611:17, 1612:4, 1612:11, 1614:3, 1615:3, 1616:23, 1617:2, 1617:3, 1623:20, 1626:16, 1626:18, 1629:3, 1630:6, 1634:14, 1634:16, 1643:10, 1658:12, 1658:19, 1658:20, 1669:21, 1677:8, 1677:11, 1678:8, 1678:10, 1678:14, 1679:18, 1679:21, 1679:24, 1682:19, 1682:21, 1682:22, 1682:23, 1683:8, 1683:11, 1684:4, 1685:10, 1685:11, 1685:18, 1685:24, 1686:4, 1686:13, 1686:17, 1693:20, 1694:10, 1694:12,

1694:13, 1694:17, 1698:25, 1717:7, 1720:24, 1721:9, 1721:12, 1727:4, 1729:2, 1729:3
**yes-or-no** [1] - 1579:3
**yes.** [1] - 1758:11
**yesterday** [9] - 1538:5, 1538:21, 1538:24, 1577:1, 1592:11, 1596:23, 1600:15, 1600:25, 1649:19
**YORK** [1] - 1536:1
**York** [22] - 1536:6, 1536:15, 1537:2, 1537:7, 1613:5, 1622:20, 1622:21, 1633:5, 1634:5, 1634:6, 1634:7, 1634:8, 1634:9, 1634:14, 1639:10, 1641:10, 1643:12, 1643:14, 1685:23, 1686:16
**Young** [1] - 1652:19
**young** [9] - 1604:8, 1615:2, 1615:23, 1616:21, 1617:12, 1644:7, 1658:12, 1661:5, 1661:25
**younger** [3] - 1612:10, 1652:24, 1661:22
**youngest** [1] - 1656:21
**yourself** [5] - 1599:12, 1651:22, 1652:5, 1791:24, 1798:19
**youth** [2] - 1612:21, 1643:14

## Z

**zero** [1] - 1769:4
**Zone** [3] - 1752:18, 1753:25, 1754:6
**zone** [2] - 1754:2, 1754:4
**zones** [9] - 1624:23, 1625:8, 1625:13, 1625:15, 1657:20, 1657:21, 1754:7, 1754:9